WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
J. Christopher Shore (JS-6031)



Attorneys for Plaintiff OLD LADDER
LITIGATION CO., LLC

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| OLD LADDER LITIGATION CO., LLC, as Litigation Designee on behalf of the Liquidation Trust, <br><br> Plaintiff, <br><br> v. <br><br> INVESTCORP BANK B.S.C.; INVESTCORP S.A.; INVESTCORP INTERNATIONAL, INC.; INVIFIN, S.A.; INVESTCORP INVESTMENT EQUITY LIMITED; INVESTCORP HOLDINGS LIMITED; INVESTCORP WERNER HOLDINGS L.P.; STEPUP LIMITED (GENERAL PARTNER OF INVESTCORP WERNER HOLDINGS L.P.); OWNERSHIP HOLDINGS LIMITED; C.P. HOLDINGS LIMITED; SIPCO LIMITED; BALLET LIMITED; DENARY LIMITED; GLEAM LIMITED; HIGHLANDS LIMITED; NOBLE LIMITED; OUTRIGGER LIMITED; QUILL LIMITED; RADIAL LIMITED; SHORELINE LIMITED; ZINNIA LIMITED; CIP LIMITED; STEP INVESTMENTS LIMITED; WL HOLDINGS LIMITED; EQUITY WERA LIMITED; CLIMBING PRODUCTS LIMITED; LADDER EQUITY LIMITED; WERNER EQUITY LIMITED; WERNER INVESTMENTS LIMITED; WERNER IIP LIMITED; ANNISVILLE LIMITED; | Case No. 08 CV 0876 <br><br> COMPLAINT; DEMAND FOR JURY TRIAL |

COOPERSTOWN LIMITED; FRISCO
LIMITED; PLATEA LIMITED;

CRAIG R. WERNER FAMILY LIMITED
PARTNERSHIP (CRAIG WERNER –
GENERAL PARTNER); ROBERT I.
WERNER - IRREV. TRUST DATED
8/30/94 (RONALD WERNER –
ADMINISTRATIVE TRUSTEE);
RICHMOND DRIVE ENTERPRISES,
L.P. (RICHARD WERNER AND LOIS
WERNER – GENERAL PARTNERS);
MICHAEL E. WERNER REVOCABLE
TRUST, U/A/D 1/2/96 (MICHAEL
WERNER – TRUSTEE); BRUCE D.
WERNER – TRUST (BRUCE WERNER –
TRUSTEE); ELIZABETH W.
ACKERMAN TRUST DTD 12/18/67
(JEFFREY R. ACKERMAN,
SUCCESSOR TRUSTEE); ERIC J.
WERNER; ALLIGATOR PARTNERS,
L.P. (HOWARD SOLOT AND JANET
SOLOT – GENERAL PARTNERS);
MICHAEL J. SOLOT; DONALD M.
WERNER; RONALD E. WERNER;
DENNIS G. HEINER; THE HEINER
FAMILY TRUST (DENNIS HEINER
AND MARGO HEINER – TRUSTEES);
MINDY WERNER ALTER; ELISE W.
FROST; FLORENCE J. WERNER -
IRREV. TRUST DATED 10/7/94
(RONALD WERNER, MARC WERNER
AND MICHAEL WERNER –
TRUSTEES); GAIL RAUCH
BLACKMAN; BRUCE D. WERNER
FAMILY LIMITED PARTNERSHIP
(BRUCE WERNER – MANAGING
GENERAL PARTNER); IRA AND ELISE
FROST FAMILY LIMITED
PARTNERSHIP (ELISE FROST –
GENERAL MANAGING PARTNER);
RONI S. ROSATI; NOEL BERK-
RAUCH; GERALD R. WHIPMAN;
HOWARD L. SOLOT; ISABELLE N.
WERNER; SOPHIA K. WERNER;
AGNES BONTE FRANCOIS; WERNER-
ALTER, LLC (MINDY WERNER ALTER
– MANAGER); JANET F. SOLOT;
BEVERLY WERNER NEEDHAM;
MARSHA BETH KARP; EDWARD A.
POLLACK; EDWARD POLLACK, POA
MLW; ROBERT I. WERNER; LAURA
WERNER; LAURA W. WERNER

REVOCABLE TRUST, U/A/D 1/2/96
(LAURA WERNER – TRUSTEE);
RANKELL FAMILY TRUST (STEVEN
RANKELL – TRUSTEE); STEVEN
RANKELL; MARC L. WERNER;
RICHMOND J. ROSATI; RYAN
GREGORY ROSATI; ROSS DANIEL
ROSATI; RAUCH TRUST (ALEENA
SHAPIRO – TRUSTEE); PETER R.
O'COIN; ELISSA SCHWARTZ;
SUZANNE SCHWARTZ; JONATHAN C.
WERNER GIFT TRUST U/A/D/ 11/1/96
(JEFFREY WEISMAN – TRUSTEE);
STEPHANIE N. WERNER GIFT TRUST
U/A/D 11/1/96 (JEFFREY WEISMAN –
TRUSTEE); VINCENT J. GARCELL
LIVING TRUST (VINCENT J.
GARCELL & KAREN R. GARCELL,
TRUSTEES); BARBARA L. WERNER;
ASHLEY ELIZABETH WERNER;
JEFFREY ADDISON WERNER;
WERNER GC TRUST FOR ERIN
(BEVERLY WERNER NEEDHAM-
TRUSTEE); ERIN JOY RYAN; WERNER
GC TRUST FOR SHANNON (BEVERLY
WERNER NEEDHAM – TRUSTEE);
SHANNON ROSE RYAN; MICHAEL E.
WERNER; ALLISON TYLER KARP;
FLORENCE J. WERNER; MARGOT A.
WERNER GIFT TRUST U/A/D 11/1/96
(LAURA WERNER – TRUSTEE);
STEWART CHARITABLE REMAINDER
UNITRUST (GARY STEWART -
TRUSTEE); STEWART CHARITABLE
REMAINDER UNITRUST (ILENE
STEWART – TRUSTEE); ROBERT A.
ROSATI; JEFFREY R. ACKERMAN;
LEE L. BASILOTTA; MICHEL
FRANCOIS; ELLEN BERK-RAUCH;
MELANIE R. WERNER; HEATHER
BLACKMAN; KAREN LYNN
MOSESKA; BARBARA L. WERNER;
ELI BERK-RAUCH; HANNA BERK-
RAUCH; CLAIRE FRANCOIS; JAMES
ANDRE FRANCOIS; TAMMY H.
WERNER; DONALD E. ACHENBACH;
DAVID A. CARDILLO; MELISSA S.
KARP; J. DAVID GOLDBLATT; JUNE
GOLDBLATT; CLAUDE J. FRANCOIS;
PHILLIP F. TIDY; GARY L. STEWART;
RICHARD D. BONTE; VERA BONTE;
MARLANE T. KRANE; DEBRA A.
ROTHMAN; MARGARET E. BONTE;

ANNE L. WERNER RESIDUARY
TRUST (TIMOTHY F. BURKE –
TRUSTEE); GARCELL 1997 UNITRUST
DTD 12/19/1997; MAURICE WEINER;
ANNE L. WERNER RESIDUARY
TRUST – EX (TIMOTHY F. BURKE –
TRUSTEE); NOVAK PARTNERSHIP,
AKA A CALIFORNIA LIMITED
PARTNERSHIP (ALYCE NOVAK –
TRUSTEE); ALYCE NOVAK; JOSHUA
J. ROTHMAN; KEVIN MATTHEW
ROTHMAN; PAULA J. GRIFFITH;
HENRY W. DOWLER; VINCENT A.
GENIS; MATTHEW W. WEISS;
STEVEN R. BENTSON; WILLIAM J.
RIPPIN; DAVID C. MCGOWAN; BRAD
J. GELLIS; MICHAEL E. TRZYNKA;
LARRY V. FRIEND; EDWARD W.
GERICKE; JOHN J. FIUMEFREDDO;
MICHAEL D. BROOKS; JORDANA
ROTHMAN; LINDA C. JOUBERT; ERIC
A. MASON;  JASON S. KRANE; BRUCE
B. FISHER; WILLIAM C. HAZLETT;
NEAL R. MARTIN; DENNIS J.
JOHNSON; JEREMY M. KAPLAN;
RACHAEL A. KAPLAN; BETH KATZ;
SUSAN MORROW; DAVID M. CONN;
MARC L. WERNER - IRREVOCABLE
TRUST 1 (RICHARD WERNER AND
DONNA S. WERNER – TRUSTEES);
THE ESTATE OF MAX HANFLING
(EDWARD A. POLLACK –
EXECUTOR); HERMAN H. LISS;
KARRAH KAPLAN; DEBORAH ANN
KAPLAN TRUST U/D 14 JANUARY
1998 (JEREMY M. KAPLAN –
TRUSTEE); JUDITH LILY KAPLAN
TRUST U/D 14 JANUARY 1998
(JEREMY M. KAPLAN – TRUSTEE);
JULIA E. KAPLAN; NEIL D. KAPLAN;
ROBERT H. PINNEY; JESSICA Z.
JOUBERT; MICHAEL D. WISE; SARA
P. GRAHAM; CARLY KRANE;
RICHARD M. KELLY; SHIRLEY W.
RAUCH TRUST (SHIRLEY RAUCH,
STANLEY RAUCH, AND MARLANE
KRONE – TRUSTEES); FRANCESCA
GIANOGLIO BONTE; ALESSANDRA
BONTE; KELLY SINON; SUZANNE
ROSEN; DEBORAH KAPLAN; JUDITH
KAPLAN;

VINCENT J. GARCELL; SYLVIA S.

KAPLAN; BETH MORROW; ILENE
STEWART; STANLEY S. RAUCH
TRUST; BRUCE D. WERNER; CRAIG R.
WERNER TRUST; ELIZABETH
WERNER TRUST, N.C.B.; LOIS S.
WERNER REVOCABLE TRUST;
RICHARD L. WERNER REVOCABLE
TRUST; DOROTHY M. WHIPMAN;
CRAIG WERNER;

DANA SNYDER; JAMES BAKER;
PETER NOLAN; CHRISTOPHER
STADLER; THOMAS SULLIVAN;
MICHAEL WONG; JAMES
HARDYMON; JAMES EGAN;
CHARLES MARQUIS; MAMOUN
ASKARI; STEPHEN TEMPINI;

STEVEN RICHMAN; DONALD
RESNICK; TIMOTHY LEWIS;
CHRISTOPHER FILARDI; JOHN
REMMERS; KEVIN WALZ; JOHN J.
DYLIK; WENDY A. MEIKLE; LISA A.
PRESSLER; DOUGLAS BATES;
GEORGE KOERNER; JOHN THIGPEN

LEONARD GREEN & PARTNERS, L.P.;
LGP MANAGEMENT INC.; GREEN
EQUITY INVESTORS III, L.P.;
WERNER CO–INVESTMENT LLC;

MURRAY DEVINE & CO., INC.;
LOUGHLIN MEGHJI & CO., INC.; AND
DOES 1 THROUGH 300, INCLUSIVE,

Defendants.

Table of Contents

Page

I.   Nature of the Case ...............................................................................................1

II.  Parties ....................................................................................................................3

     A.   Plaintiff ........................................................................................................3

     B.   Werner Entities ...........................................................................................4

     C.   1997 Cashout Shareholder Defendants ..............................................5

     D.   2003 Cashout Shareholder Defendants ..............................................5

     E.   Investcorp and Related Entity Defendants .......................................5

     F.   Company Director Defendants................................................................7

     G.   Defendants Who Were Both Directors and Officers of the Company ...........................8

     H.   Company Officer Defendants...................................................................9

     I.   Leonard Green & Co. and related entities..........................................10

     J.   Murray Devine & Co., Inc. ......................................................................10

     K.   Loughlin Meghji & Co., Inc. ...................................................................11

III. Jurisdiction and Venue .....................................................................................11

IV.  Factual Background............................................................................................11

     A.   The Werner Company History ...............................................................11

     B.   In 1997, The Werner and Solot Families Cash Out and Burdens the Company
          with Massive Debt.....................................................................................12

     C.   The Company, Saddled with Debt from the 1997 Shareholder Cashout,
          Performs Poorly, and Investcorp Accelerates its Exit Strategy .....................22

          1.   The Company's Financial Struggles Causes it to Cut its Workforce and
               Cause Investcorp to Seek an Early Exit..................................................23

          2.   Investcorp and the Company's Directors and Officers Continue to Prepare
               and Distribute Knowingly False, Unrealistic and Unachievable Projections
               to Market the Company for Sale..............................................................27

          3.   Failing to Find a Buyer, Investcorp and the Company's Directors,
               Officers, and Shareholders Turn Their Focus to Another Shareholder
               Cashout ........................................................................................29

     D.   The Self-Interested Insiders Conceal Material Facts about Future Sales to Home
          Depot and Extract $150 Million from the Company to Distribute to Themselves
          and Other Shareholders ...........................................................................29

          1.   From 2000 to 2002, the Company Learns that It Faces Serious Problems
               with Home Depot...................................................................................30

Table of Contents
(continued)

Page

2. In January 2003, the Company Loses its Aluminum Stepladder Business at Home Depot ...................................................................................................................31

3. In March 2003, the Company Learns That Its Fiberglass Stepladder Sales to Home Depot Are At Risk..........................................................................................32

4. Managements' Internal Analysis in Early 2003 Confirms that the Company's Performance Is Significantly Deteriorating........................................33

5. In May 2003, the Company Learns that Home Depot's Import Program Will Further Endanger the Company's Ability to Function as a Going Concern .................................................................................................................34

E. The Self-Interested Insiders Conceal the Company's Serious Problems and Take Even More Money Out of the Company While Saddling it with More Debt ........................................................................................................................35

1. The Self-Interested Insiders Knowingly Provide Incomplete, False and Misleading Information to Ratings Agencies ..........................................36

2. The Self-Interested Insiders Knowingly Provide Incomplete, False and Misleading Information to Senior Lenders to Secure Loan Approval..................37

3. The Self-Interested Insiders Provide Incomplete, False and Misleading Information to the 1997 Bondholders to Secure Consent for the 2003 Shareholder Cashout ......................................................................................39

F. In June 2003 the Self-Interested Insiders and the Company's other Shareholders Extract $150 Million More from the Company in Illegal Dividends and $21.5 million of fees............................................................................................................40

G. The So-Called "Solvency" Opinion of Murray Devine ..................................51

H. The 2003 Shareholder Cashout Deepened the Company's Insolvency .........................52

I. Investcorp and Leonard Green Are Controlling Shareholders......................................53

J. Investcorp and Leonard Green Are Parties to Management Agreements.....................53

K. Within Months of the June Closing of the 2003 Shareholder Cashout, the Undisclosed Risks Facing the Company Become Reality ................................................54

L. The Self-Interested Insiders Continue to Fail to Disclose Additional Lost Business...................................................................................................................55

M. The Company's Massive Debt Load Prevents it from Offering Competitive Pricing .....................................................................................................................56

N. The Self-Interested Insiders Continue to Breach their Fiduciary Duties by Acting in their Own Interests to the Detriment of Creditors.........................................57

1. The Company Drops Industry Giant Home Depot ..............................................57

2. Lenders and the 1997 Bondholders Interrogate Management While the Company's Debt Ratings Continued to Fall ......................................................58

Table of Contents
(continued)

Page

O.  From 2004 to 2006, the Self-Interested Insiders Further Destroy the Company's Value by Focusing on their Out-Of-The-Money Equity Interests and Management Fees ...........................................................................................60

　　1.  In 2004, the Self-Interested Insiders Seek Loan Amendments and Debt Covenant Waivers Which Provide No Value to the Company ............................60

　　2.  In 2005, the Self-Interested Insiders Cause the Company to Waste Millions of Dollars in Fees for a Second Lien Refinancing that Provides No Benefit to the Company and Serves Only to Prolong the Inevitable Bankruptcy Filing ..............................................................................................62

　　3.  In February 2005 the Company Retains Loughlin Meghji ....................................64

　　4.  In March 2005, the Company Retains Insolvency Counsel....................................64

　　5.  The Self-Interested Insiders Liquidate the Company's Extruded Products Division Which Further Diminishes the Value of the Company ..........................69

　　6.  The Company's Debt Burden Cripples Ongoing Business Operations .................70

　　7.  In 2006, the Self-Interested Insiders Take Further Actions Against the Company's Interests, But Finally File for Bankruptcy Protection .......................71

P.  Throughout the Long Financial Descent from 1997 to 2006, the Company Paid Millions of Dollars in Fees to Advisors and Others That Provided No Value to the Company ....................................................................................................72

Q.  Final Tally .....................................................................................................................79

V.  Detailed Information Regarding the Company's Directors and Officers..............................81

　A.  Directorship of Holding (PA)........................................................................................81

　B.  Directorship of Holding (DE) .......................................................................................83

　C.  Directorship of Werner Co............................................................................................84

　D.  Director Defendants ......................................................................................................84

　E.  Defendants Who Were both Officers and Directors .....................................................86

　F.  Officer Defendants ........................................................................................................88

VI.  Claims for Relief ...............................................................................................................89

# I.

## Nature of the Case

1.      This action concerns a pattern of concerted greed and avarice that caused the financial destruction of an iconic American ladder manufacturer, Werner Co. (collectively, with its affiliates the "Company").  As set forth herein, the Company's shareholders and management who are defendants herein engaged in a wide ranging and destructive course of self-dealing and mismanagement so damaging to the Company that, when the Company was liquidated in bankruptcy proceedings in 2007, it was unable to distribute a single dollar to any of its general unsecured creditors with more than $1 billion in filed claims.  These as-yet-unpaid unsecured creditors included voluntary creditors such as bondholders and trade vendors and involuntary creditors such as personal injury victims, rank and file employees, and the federal government.  In fact, the Company's debts so greatly exceeded its assets that it could not satisfy its secured creditors' claims, leaving in excess of $100 million unpaid.  During the same ten-year period that the Company was amassing these debts, however, the shareholders withdrew nearly half a billion dollars in "equity distributions," while the Company's purported fiduciary management (and their advisors) accepted tens of millions of dollars in fees and other payments intended to facilitate their acquiescence and participation in these cashout schemes.  By this action, the trustee charged with bringing Company claims seeks to reestablish normal priorities of distribution, reallocate the risk of loss back to the Company's shareholders and other fiduciaries where it belongs, and provide meaningful redress to the Company and its thousands of unpaid creditors.

2.      The defendants' raiding of the Company began in 1997, when the Company's then-shareholders and insiders transformed the otherwise successful Company into their own mint, causing it to incur hundreds of millions of dollars in unnecessary bond and bank debt.  This debt, which was far beyond what the Company had ever incurred in its entire 75-year history,

1

was not used to buy new equipment, advertise the Company's products, explore new markets, or advance the Company's interests in any way. Instead, the defendant insiders used the proceeds to enrich themselves. All told, over $330 million was distributed directly to shareholders in the 1997 cashout. In addition, the Company paid nearly $50 million in unnecessary and wasteful transaction fees and management bonuses to effect what was, in essence, a radical decapitalization of the Company.

3.      As set forth herein, the 1997 cashout rendered the Company insolvent. Indeed, immediately following the 1997 cashout, the Company's audited, publicly-filed financial statements reflect a negative net worth of $153.7 million. The cashout leveraged the Company beyond all prudent levels of debt capacity, leaving it with unreasonably small capital and no flexibility to evolve and adapt to a changing marketplace or to withstand any significant downturn in business or fluctuation of commodity costs which the Company had experienced in the past and knew it would experience. The Company encountered exactly such a downturn several years later when it was faced with increased competition, increased commodity prices, and most acutely, significant problems with its most important customer, Home Depot.

4.      In 2003, rather than solve the Company's deepening crises, the defendants proceeded to burden the Company with even more debt despite the known crumbling relationship with Home Depot, the Company's largest (more than 30% of sales) and most important customer. In that 2003 transaction, the defendants irresponsibly paid themselves another $150 million (and paid more than $20 million in transaction fees and management bonuses) through the incurrence of debt. To accomplish this, certain defendants knowingly made materially false representations to the Company's lenders and bondholders regarding the Company's financial prospects, and intentionally concealed material adverse information

regarding the Company's critical customer relationships. Again, the increased debt did not serve the Company or its interests – it only lined the pockets of the shareholders and insiders and left the Company, at that time, with a publicly-reported negative net worth of over $230 million.

5.       This second decapitalization of the Company, coupled with the problems with Home Depot that certain defendants intentionally concealed from lenders and bondholders, sent the Company into its death spiral. Rather than act responsibly, over the next two years, the defendants took multiple desperate actions to cover their tracks and improperly prolong the Company's life when it was insolvent and clearly should have reorganized its financial affairs in Chapter 11 proceedings. Defendants' actions were designed not to protect creditors when they most needed it, but to create value for insiders and out-of-the money shareholder equity positions directly at the creditors' expense. Such actions only further devalued the Company, and eventually, a longstanding American institution that had thrived for over 80 years was liquidated in bankruptcy.

6.       This action is brought by Old Ladder Litigation Co., LLC, as Litigation Designee ("Litigation Designee") on behalf of the Old Ladder Liquidation Trust (the "Liquidation Trust"). By this action, the Litigation Designee seeks, on behalf of the Liquidation Trust and all unsecured creditors who are beneficiaries of the Liquidation Trust, to recover in excess of $1 billion in damages caused by these insider and shareholder defendants.

## II.

## Parties

**A.       Plaintiff**

7.       Plaintiff Old Ladder Litigation Co., LLC is the court-approved and court-authorized Litigation Designee of the Old Ladder Liquidation Trust, which was established in connection with the Revised Second Amended Liquidating Plan dated September 14, 2007 (the "Plan") confirmed on October 25, 2007, by the United States Bankruptcy Court for the District

of Delaware (the "Bankruptcy Court") in the Chapter 11 cases and proceedings (the "Bankruptcy Proceedings") of the Debtors.  Plaintiff is organized under the laws of the state of Delaware.

8.    The effective Date of the Plan occurred on October 31, 2007.  On that date the Debtors transferred all of their right, title, and interest in all of the claims and causes of action asserted herein to the Liquidation Trust.  The agreement establishing the Liquidation Trust provides: "[e]xcept as otherwise provided in the Plan, all Causes of Action that the respective Debtors and their Estates may hold against any Person or Entity shall automatically vest in the Liquidation Trust.  The Liquidation Trust shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Causes of Action without the consent or approval of any third party and without any further order of the Bankruptcy Court, except as otherwise provided herein or in the Liquidation Trust Agreement….  The Litigation Designee, on behalf of the Liquidation Trust, shall pursue such Causes of Action…."

9.    The Litigation Designee has sole authority and discretion to act on behalf of the Liquidation Trust with respect to the claims asserted herein.[1]

**B.    Werner Entities**

10.    The claims asserted herein are based upon damages for the following companies: Werner Holding Co. (PA), Inc. ("Holding (PA)"), is a corporation organized in 1945 under the laws of the state of Pennsylvania.  Holding (PA) and its affiliates filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on June 12, 2006 ("Petition Date").

11.    Werner Holding Co. (DE), Inc. ("Holding (DE)"), is a corporation organized in 1988 under the laws of the state of Delaware.  Holding (DE) is a wholly owned subsidiary of Holding (PA).

---

[1] As the party responsible for bringing claims on behalf of the Liquidation Trust, the Litigation Designee has been provided with certain of the books and records of the Company.  Many of the allegations herein are based upon such books and records.

12.    Werner Co. is a Pennsylvania corporation and is a wholly owned subsidiary of Holding (DE).  It was the principle operating company.

13.    WIP Technologies, Inc., a wholly owned subsidiary of Werner Co., held the intellectual property for the Company.

14.    Holding (PA) had no substantial operations or assets other than its investment in Holding (DE), and Holding (DE) had no substantial operations or assets other than its investment in Werner Co.  Holding (PA), Holding (DE), Werner Co. and WIP Technologies, Inc. are collectively referred to as "Werner" or the "Company" herein.

**C.    1997 Cashout Shareholder Defendants**

15.    Numerous Werner and Solot family shareholders and Company management received over $330 million as shareholders in the "1997 Shareholder Cashout."  Every company, partnership, and individual or entity of any kind that received an illegal dividend or distribution of cash or property as a shareholder during the 1997 Shareholder Cashout is a defendant herein.

**D.    2003 Cashout Shareholder Defendants**

16.    Investcorp (as defined in paragraph 27 below) and numerous Werner and Solot family shareholders and Company management received more than $150 million as shareholders in the "2003 Shareholder Cashout."  Each of the companies, partnerships, and individuals or entities that received an illegal dividend or distribution of cash or property as shareholders during the 2003 Shareholder Cashout are defendants herein.

**E.    Investcorp and Related Entity Defendants**

17.    Defendant SIPCO Limited is a Cayman Islands corporation that owns and controls a majority of the shares of defendant Ownership Holdings Limited, a Cayman Islands corporation.  Ownership Holdings Limited, directly and through defendant C.P. Holdings

Limited, a Cayman Islands corporation, controls a majority of the shares of defendant Investcorp Bank B.S.C.

18.     Investcorp Bank B.S.C. is a corporation organized under the laws of Bahrain as a Bahraini Shareholding Company.

19.     Investcorp Bank B.S.C. is a 100% owner of defendant Investcorp Holdings Limited, a Cayman Islands corporation, which is a 100% owner of defendant Investcorp S.A., a Luxembourg corporation.

20.     Investcorp S.A. is the 100% owner of defendant Investcorp International, Inc., a New York corporation.  SIPCO Limited controls Investcorp S.A. through its ownership (both direct and indirect) and control of Ownership Holdings Limited, C.P. Holdings Limited, Investcorp Bank B.S.C. and Investcorp Holdings Limited.

21.     Investcorp S.A. owned and controlled the Company through its ownership and control of defendant Investcorp Investment Equity Limited, which is a Cayman Islands corporation and a wholly owned subsidiary of Investcorp S.A.; and its beneficial ownership of the shares of voting stock of Holding (PA) held by defendants: Ballet Limited, Denary Limited, Gleam Limited, Highlands Limited, Noble Limited, Outrigger Limited, Quill Limited, Radial Limited, Shoreline Limited, and Zinnia Limited (all Cayman Islands corporations), with whom Investcorp S.A. or an affiliate has management services or similar agreements pursuant to which those entities have granted Investcorp S.A. or the affiliate the authority to direct the voting and disposition of the voting stock in Holding (PA) owned by such entities.

22.     Defendant CIP Limited indirectly owned a small amount of the stock in each of defendants Ballet Limited, Denary Limited, Gleam Limited, Highlands Limited, Noble Limited, Outrigger Limited, Quill Limited, Radial Limited, Shoreline Limited, and Zinnia Limited.  CIP

Limited shared beneficial ownership of the shares of voting stock of Holding (PA) held by these entities because it acted as a director of such entities and the ultimate beneficial shareholders of each such entity had granted to CIP Limited revocable proxies in companies that owned those entities' stock.

23.     Defendant Invifin, S.A. is a Luxembourg corporation.

24.     Defendants Annisville Limited, Cooperstown Limited, Frisco Limited, Platea Limited, Stepup Limited, Step Investments Limited, Equity WERA Limited, Werner Equity Limited, Climbing Products Limited, Ladder Equity Limited, Werner Investments Limited, Werner IIP Limited, and WL Holdings Limited are all Cayman Islands corporations.

25.     Defendant Investcorp Werner Holdings L.P. is a Cayman Islands corporation. Upon information and belief, Defendant Stepup Limited is a general partner of Defendant Investcorp Werner Holdings L.P.

26.     Defendants Ownership Holdings Limited and C.P. Holdings Limited are Cayman Islands corporations.

27.     Collectively, the entities and their subsidiaries and affiliates identified in this Part E (other than Werner and Holding (PA)) are referred to as "Investcorp."

28.     The Does include partners and/or shareholders of named defendant entities that held stock in the Company and received avoidable transfers as set forth herein, but that cannot be currently ascertained.

**F.     Company Director Defendants**

29.     As detailed throughout this Complaint, at various times referenced herein, Investcorp or Leonard Green (as defined in paragraph 34) appointed Dana Snyder, James Baker, Peter Nolan, Christopher Stadler, Thomas Sullivan, Michael Wong, Savio Tung, Charles

Philippin, James Hardymon, James Egan, Charles Marquis, Mamoun Askari, and Stephen Tempini as Company directors.  These Company directors (along with directors of the Company who were also officers, as described below) are hereinafter collectively referred to as the "Director Defendants."  Factual allegations further describing the Director Defendants are provided below in Section V.

## G.    Defendants Who Were Both Directors and Officers of the Company

30.    As detailed throughout this Complaint, at various times referenced herein, Investcorp, Leonard Green, and/or designated members of the Werner/Solot families (the "Werner Family Controlling Shareholders") including Donald Werner, Howard Solot, Michael Werner, Eric Werner, Michael Solot, Craig Werner, Bruce Werner and possibly others not known at this time, and/or their designated Company directors appointed the following individuals to serve as both directors and officers of the Company:

- Defendant Donald Werner served as Chairman of the Board of Directors and President and Chief Executive Officer ("CEO");

- Defendant Howard Solot served as a director and Executive Vice President and Chief Operating Officer ("COO");

- Defendant Dennis Heiner served as a director and President and CEO;

- Defendant Eric J. Werner served as a director and at various times Secretary, Corporate Counsel, General Counsel, Chief Administrative Officer, and Corporate Ethics Officer;

- Defendant Michael Werner served as Vice Chairman of the board of directors and several positions at the Vice President level as well as President of the Company's Werner Ladder Co. business unit;

- Defendant Steven Richman served as a director, President, and CEO.

Detailed factual allegations further describing these defendants are provided below in Section V below.

**H.    Company Officer Defendants**

31.    As detailed throughout this Complaint, at various times referenced herein, Investcorp, Leonard Green, and/or the Werner/Solot families by and through their designated Company directors appointed the following individuals to serve as officers of the Company:

- Defendant Steven Bentson as Vice President, Manufacturing and as a member of the Company's Executive Leadership Team (who report directly to the CEO) and Management Leadership Team;

- Defendant Larry Friend as Vice President and Controller, Vice President-Finance, Chief Financial Officer ("CFO"), and Treasurer, and as a member of the Company's Executive and Management Leadership Teams;

- Defendant Edward Gericke first as Vice President-Sales and later as Senior Vice President, Sales and as a member of the Company's Executive and Management Leadership Teams;

- Defendant Peter O'Coin as Senior Vice President, Operations and as a member of the Company's Executive and Management Leadership Teams;

- Defendant Craig Werner as Director of Manufacturing – Western Region and General Manager – Chicago Division and as a member of the Company's Management Leadership Team;

- Defendant John Fiumefreddo as Vice President, Engineering and New Product Development, as Senior Vice President, Product Development and as a member of the Company's Executive and Management Leadership Teams;

- Defendant Robert Rosati as Vice President and Chief Information Officer and as a member of the Company's Management Leadership Team;

- Defendant William Rippin as Vice President-Supply Chain Management and as a member of the Company's Executive and Management Leadership Teams;

- Defendant John Remmers as Senior Vice President – Operations.

Factual allegations further describing these defendants are provided in Section V below.

**I.    Leonard Green & Co. and related entities**

32.    Defendant Leonard Green & Partners, L.P. is a limited partnership organized under the laws of the state of Delaware.  The general partner of Leonard Green & Partners, L.P. is, and at all relevant times was, LGP Management, Inc., a Delaware corporation.

33.    Defendant Green Equity Investors III, L.P. is a limited partnership organized under the laws of the state of Delaware.

34.    Defendant Werner Co–Investment LLC is a limited liability corporation organized under the laws of the state of Delaware.  Leonard Green & Partners, L.P., LGP Management, Inc., Green Equity Investors III, L.P., and Werner Co–Investment LLC are collectively referred to as "Leonard Green."

**J.    Murray Devine & Co., Inc.**

35.    Defendant Murray Devine & Co., Inc. ("Murray Devine") is a corporation organized under the laws of the state of Pennsylvania, with offices in Philadelphia, Pennsylvania and New York, New York.

**K.      Loughlin Meghji & Co., Inc.**

36.     Defendant Loughlin Meghji & Co., Inc. ("Loughlin Meghji" or "LM") is a corporation organized under the laws of the state of New York, with its principal place of business in New York, New York.

## III.

### Jurisdiction and Venue

37.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 157 and 1334.

38.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409(c).

## IV.

### Factual Background

**A.      The Werner Company History**

39.     Before its financial collapse at the hands of the defendants, the Company had a long and respected history as a durable family business and a staple of United States manufacturing.  Until Investcorp's highly-leveraged takeover in 1997, the Company always had been owned and run by the Werner and Solot families.  R. D. Werner founded the Company in 1922 as a distributor of flooring tools and materials.  During World War II the Company began manufacturing extruded plastic products for the U.S. Navy and subsequently expanded its business to include aluminum products during the post-war boom.

40.     In or about 1950, the Company seized an opportunity to fulfill unmet market needs and began manufacturing climbing products, including aluminum, fiberglass, and wood ladders, scaffolding, stages and planks.  Over the next 50 years, the Company grew to become the nation's largest manufacturer of fiberglass, aluminum and wood ladders, and an innovator in

the climbing products industry.  Under the Werner/Solot families' leadership, the Company grew its manufacturing capabilities and reputation, pioneering various processes and technologies to improve the durability, safety, and versatility of climbing products.  By 1997, the Company's climbing products business constituted approximately 76% of the Company's total sales.

41.     The Company also expanded manufacturing of aluminum extruded products and sales to the automotive, electronics, architectural and construction industries.  Such products included garage door openers, bicycle frames, pneumatic cylinders, material handling systems, electrical connectors, curtain walls, and office partitions.  By 1997, the Company's aluminum extrusion business generated approximately 24% of its total sales.

42.     As of May 31, 1997, the Company was 100% owned and operated by three generations of the Werner and Solot families, and employed over 2,700 people across the United States, including approximately 1,400 union employees.  The Company also had maintained steady growth, culminating with a five-year compound annual net sales growth rate of 11.9% between 1993 and 1997.  The Company was a top participant in every market it served and 1997 yielded the highest net sales in the Company's history, $416.3 million.

**B.     In 1997, The Werner and Solot Families Cash Out and Burdens the Company with Massive Debt**

43.     By 1997, the Company's shareholders had accumulated approximately $75 million in shareholders' equity on the Company's books.  As the second generation of the Werner and Solot families approached retirement age, they sought to liquidate the majority of their ownership and relinquish control of the Company to a third party.  Investcorp was identified as a potential buyer.

44.     Although the Company's financial statements showed only $75 million in equity, upon information and belief, the Company's directors and officers, Investcorp, and the Werner Family Controlling Shareholders (collectively, and including Leonard Green after the 2003 Shareholder Cashout, the "Self-Interested Insiders") and the Werner/Solot families developed a scheme to distribute more than $330 million to pay to the Werner and Solot family shareholders. This massive cashout amounted to over 52 times the Company's net income for 1995 and over 17 times the Company's net income for 1996.

45.     In the 1997 Shareholder Cashout, Investcorp invested $122 million (though Investcorp was immediately refunded $17 million as various "fees") and purchased newly issued stock representing 67% of the Company's stock which gave them control of the Company through board positions and as majority shareholders.  To fund the balance of the $330 million payout to the Werner/Solot family shareholders, the Werner Family Controlling Shareholders and the Company's directors and officers caused the Company to borrow approximately $300 million in bond and bank debt.

46.     Substantially all of the proceeds of that debt were paid to the families via a $330.7 million share redemption and/or dividend, and to pay fees in the transaction.  The 1997 shareholder defendants, who received funds from the $330.7 million cash payout (the "1997 Shareholder Defendants"), and the amounts they received as shareholders, are identified below:

| Name | Amount Received from 1997 Shareholder Cashout |
|------|-----------------------------------------------|
| Jeffrey R. Ackerman | $674,462.92 |
| Werner-Alter, LLC and Mindy Werner-Alter (as manager) | $3,913,137.81 |
| Mindy Werner Alter | $7,083,009.13 |
| Ellen Berk-Rauch | $522,030.12 |
| Noel Berk-Rauch | $4,973,735.97 |
| Eli Berk-Rauch and Noel Berk-Rauch (as custodian for Eli Berk-Rauch) | $306,953.71 |
| Hanna Berk-Rauch and Noel Berk-Rauch (as custodian for Hanna Berk-Rauch) | $306,953.71 |
| Gail Rauch Blackman | $6,618,506.72 |
| Heather Blackman and Gail Rauch Blackman (as custodian for Heather Blackman) | $306,953.71 |
| Francesca Gianoglio Bonte | $73,084.22 |
| Margaret E. Bonte | $4,032,160.68 |
| Richard D. Bonte | $14,746,306.94 |
| Alessandra Bonte and Richard D. Bonte (as custodian for Alessandra Bonte) | $73,084.22 |
| Vera Bonte | $12,480,696.20 |

| Name | Amount Received from 1997 Shareholder Cashout |
|------|-----------------------------------------------|
| Agnes Bonte Francois | $4,032,160.68 |
| Claire Francois and Agnes Francois (as custodian for Claire Francois) | $279,808.15 |
| James Andre Francois and Agnes Francois (as custodian for James Andre Francois) | $279,808.15 |
| Michel Francois and Agnes Francois (as custodian for Michel Francois) | $522,030.12 |
| Claude J. Francois | $146,168.43 |
| Ira and Elise Frost Family Limited Partnership and Elise Frost (as managing general partner) | $5,777,829.41 |
| Elise W. Frost | $7,070,480.41 |
| Vincent J. Garcell | $3,796,203.06 |
| J. David Goldblatt | $175,402.12 |
| June Goldblatt and J. David Goldblatt | $175,402.12 |
| Sara P. Graham | $83,524.82 |
| Paula J. Griffith | $532,470.73 |
| Max Hanfling | $175,402.12 |
| Jessica Z. Joubert | $104,406.02 |

| Name | Amount Received from 1997 Shareholder Cashout |
|---|---|
| Linda C. Joubert | $219,252.65 |
| Jeremy M. Kaplan | $219,252.65 |
| Deborah A. Kaplan and Jeremy M. Kaplan (as custodian for Deborah A. Kaplan) | $164,961.52 |
| Judith L. Kaplan and Jeremy J. Kaplan (as custodian for Judith L. Kaplan) | $164,961.52 |
| Neil D. Kaplan | $93,965.42 |
| Julia E. Kaplan and Neil D. Kaplan (as custodian for Julia E. Kaplan) | $164,961.52 |
| Kerrah Kaplan and Neil D. Kaplan (as custodian for Kerrah Kaplan) | $167,049.64 |
| Rachael A. Kaplan and Neil D. Kaplan (as custodian for Rachael A. Kaplan) | $219,252.65 |
| Sylvia S. Kaplan | $271,455.66 |
| Marsha Beth Karp | $3,520,571.16 |
| Allison Tyler Karp and Marsha Beth Karp (as custodian for Allison Tyler Karp) | $1,060,765.21 |
| Melissa S. Karp and Marsha Beth Karp (as custodian for Melissa | $183,754.60 |

| Name | Amount Received from 1997 Shareholder Cashout |
|---|---|
| S. Karp) | |
| Marlane T. Krane | $6,618,506.72 |
| Jason S. Krane and Marlane T. Krane (as custodian for Jason S. Krane) | $306,953.71 |
| Herman H. Liss | $175,402.12 |
| Beth Morrow | $208,812.05 |
| Susan Morrow | $208,812.05 |
| Karen Lynn Moseska | $357,068.60 |
| Beverly Werner Needham | $3,568,597.93 |
| Werner GC Trust for Erin; Erin Joy Ryan; and Beverly W. Needham (as trustee) | $1,154,730.63 |
| Werner GC Trust for Shannon; Shannon Rose Ryan; and Beverly W. Needham (as trustee) | $1,154,730.63 |
| Stewart Charitable Remainder Unitrust and Ilene Stewart (as trustee) | $856,129.40 |
| Ilene Stewart | $202,547.69 |
| Novak Partnership, AKA a California Limited Partnership and Alyce Novak (as | $1,083,734.54 |

| Name | Amount Received from 1997 Shareholder Cashout |
|---|---|
| general partner) | |
| Edward A. Pollack | $3,482,984.99 |
| Rankell Family Trust and Steven J. Rankell (as trustee) | $2,142,411.63 |
| Shirley W. Rauch Trust | $1,291,419.00 |
| Stanley S. Rauch Trust | $984,465.29 |
| Robert A. Rosati | $428,064.70 |
| Roni S. Rosati | $5,612,345.86 |
| Richmond J. Rosati and Roni S. Rosati (as custodian for Richmond J. Rosati) | $2,088,120.50 |
| Ross Daniel Rosati and Roni S. Rosati (as custodian for Ross Daniel Rosati) | $1,670,496.40 |
| Ryan Gregory Rosati and Roni S. Rosati (as custodian for Ryan Gregory Rosati) | $2,088,120.50 |
| Debra A. Rothman | $6,142,415.25 |
| Jordana Rothman and Debra A. Rothman (as custodian for Jordana Rothman) | $306,953.71 |
| Joshua J. Rothman and Debra A. Rothman (as custodian for Joshua J. | $544,999.45 |

| Name | Amount Received from 1997 Shareholder Cashout |
|---|---|
| Rothman) | |
| Kevin M. Rothman and Debra A. Rothman (as custodian for Kevin M. Rothman) | $544,999.45 |
| Elissa Schwartz | $1,695,553.84 |
| Suzanne Schwartz | $1,693,465.72 |
| Howard L. Solot | $16,885,642.38 |
| Janet F. Solot | $2,749,027.37 |
| Michael J. Solot | $9,469,481.16 |
| Philip F. Tidy | $83,524.82 |
| Maurice Weiner | $1,967,009.51 |
| Matthew W. Weiss and Elizabeth Werner (as custodian for Matthew W. Weiss) | $321,570.56 |
| Matthew W. Weiss | $208,812.05 |
| Anne L. Werner Residuary Trust - EX and Timothy F. Burke (as trustee) | $1,900,189.65 |
| Anne L. Werner Residuary Trust and Timothy F. Burke (as trustee) | $3,785,762.46 |
| Barbara L. Werner | $997,557.46 |
| Bruce D. Werner | $540,802.56 |

| Name | Amount Received from 1997 Shareholder Cashout |
|---|---|
| Bruce D. Werner Trust and Bruce D. Werner (as trustee) | $11,463,460.47 |
| Bruce D. Werner and Tammy H. Werner | $200,237.92 |
| Bruce D. Werner Family Limited Partnership and Bruce D. Werner (as managing general partner) | $4,525,376.89 |
| Craig R. Werner Trust and Craig R. Werner (as trustee) | $12,576,652.08 |
| Craig R. Werner Family Limited Partnership and Craig Werner (as general partner) | $6,452,359.67 |
| Donald M. Werner | $11,865,088.10 |
| Donald M. Werner and Barbara L. Werner | $245,399.14 |
| Elizabeth Werner Trust, N.C.B. | $15,673,432.44 |
| Eric J. Werner | $10,645,291.06 |
| Eric J. Werner and Melanie R. Werner | $362,026.26 |
| Florence J. Werner | $979,328.51 |
| Florence J. Werner Irrevocable Trust dated 10/7/94 and Ronald Werner, Marc | $6,662,336.37 |

| Name | Amount Received from 1997 Shareholder Cashout |
|---|---|
| Werner, and Michael Werner (as trustees) | |
| Laura W. Werner Revocable Trust U/A/D 1/2/96 and Laura W. Werner (as trustee) | $2,731,261.61 |
| Jonathan C. Werner Gift Trust U/A/D 11/1/96 and Jeffrey Weisman (as trustee) | $1,561,914.13 |
| Margot A. Werner Gift Trust U/A/D 11/1/96 and Laura Werner (as trustee) | $874,922.49 |
| Stephanie N. Werner Gift Trust U/A/D 11/1/96 and Jeffrey Weisman (as trustee) | $1,561,914.13 |
| Lois S. Werner Revocable Trust | $3,135,834.95 |
| Marc L. Werner | $9,830,766.89 |
| Marc L. Werner Irrevocable Trust 1 and Richard Werner and Donna Werner (as trustees) | $187,930.84 |
| Ashley Elizabeth Werner and Marc L. Werner (as custodian for Ashley Elizabeth Werner) | $1,154,730.63 |

| Name | Amount Received from 1997 Shareholder Cashout |
|---|---|
| Jeffrey Addison Werner and Marc L. Werner (as custodian for Jeffrey Addison Werner) | $1,154,730.63 |
| Isabelle N. Werner and Melanie R. Werner (as custodian for Isabelle N. Werner) | $2,950,202.16 |
| Sophia K. Werner and Melanie R. Werner (as custodian for Sophia K. Werner) | $1,574,909.43 |
| Michael E. Werner | $475,147.36 |
| Michael E. Werner Revocable Trust U/A/D 1/2/96 | $6,769,723.94 |

| Name | Amount Received from 1997 Shareholder Cashout |
|---|---|
| Richard L. Werner Revocable Trust | $12,845,950.24 |
| Robert I. Werner | $2,871,332.73 |
| Robert I. Werner Irrevocable Trust dated 8/30/94 and Ronald Werner (as administrative trustee) | $15,717,596.19 |
| Ronald E. Werner | $7,765,720.12 |
| Dorothy M. Whipman | $2,631,031.82 |
| Gerald R. Whipman | $2,004,595.68 |
| Total Shareholder Cashout | $330,685,803.82 |

47.     Following the 1997 Shareholder Cashout, the Company's new debt load consisted of: (1) $186.5 million of borrowings under a $320 million secured senior credit facility that comprising two term loans, a revolving credit loan and a receivables line of credit (collectively, "1997 Senior Credit Facility"); and (2) indebtedness of $135 million outstanding under Holding (DE)'s 10% Senior Subordinated Notes due in 2007 ("1997 Bonds," the holders of which are referred to as "1997 Bondholders").

48.     The Company also paid fees and bonuses of almost $50 million in connection with the 1997 Shareholder Cashout, for which the Company received no value, including (without limitation):

- $17 million immediately refunded to Investcorp comprised of $6 million to Investcorp International, Inc. as a "loan financing advisory" fee, $6 million to Invifin S.A. as a "stand-by commitment" fee, $5 million to Investcorp International, Inc. as an advance for five years of "management fees," and over $60,000 to Investcorp International, Inc. for "expenses."

- transaction bonuses amounting to over $1 million, including $857,500 paid to the Company's CFO, Donald Resnick.

- "Consulting Acceleration" fees of $854,167, $854,167, $1,000,000, and $1,000,000 paid to Robert Werner, Richard Werner, Donald Werner, and Howard Solot, respectively.

- Senior Executive Retirement Plan (SERP) Acceleration fees of $1,000,000 each paid to Donald Werner and Howard Solot.

49.     As reported by its 1997 10-K, the Company's 1997 net earnings were "significantly impacted" by expenses, which were largely paid to insiders.  These expenses alone

amounted to almost twice as much as the Company's combined net income for the two previous years.

50.     Although falsely justified in the Company's 1997 Annual Report as a transaction that would provide the Company with the capital it needed to move forward, none of the supposed cash infusion from the 1997 Shareholders Cashout went back into the Company. Instead, the cash passed through the Company and was immediately paid out to the shareholders and advisors that participated in the scheme.

51.     Plainly, the Werner/Solot families and Investcorp used the 1997 Shareholder Cashout as a vehicle to pay out hundreds of millions of dollars of creditors' advances to themselves and other shareholders, saddling the Company with unnecessary and debilitating debt, and leaving the Company with unreasonably small capital with which to conduct business.  This transaction effected a fundamental shift in the risk/reward relationship that is the basic foundation of American corporate structure: by causing the Company to incur massive debt and siphoning out the residual cash held by the Company, Investcorp and the Company's shareholders, directors (who were also shareholders) and officers sought to shift all of the corporate risk to the Company's creditors while keeping the potential rewards in their own pockets.

52.     Upon information and belief, to accomplish the 1997 Shareholder Cashout, the Company's directors and officers presented lenders and bondholders with financial projections they knew or should have known the Company had little likelihood of achieving.  In fact, the Company never achieved the sales and EBITDA numbers it "projected" it would achieve from 1998 to 2002.

53.     Upon information and belief, in connection with the 1997 Shareholder Cashout, the Werner/Solot families and Investcorp attempted to justify their questionable transaction and

shield themselves from possible repercussions by purchasing a sham "solvency opinion" from Murray Devine. After performing virtually no analysis, Murray Devine delivered an "opinion letter" riddled with disclaimers that declared the Company solvent notwithstanding the 1997 Shareholder Cashout. In so doing, Murray Devine intentionally or recklessly ignored facts and information that directly contradicted its opinion.

54.    The Company paid Murray Devine $59,200 for the solvency opinion. Upon information and belief, Murray Devine did not complete the necessary due diligence and analysis required to prepare a genuine solvency opinion regarding a complex transaction by a market leading company with numerous subsidiaries and $367 million in revenues.

55.    Rather, Murray Devine's solvency opinion appears to have been purchased solely to create a veil of legitimacy, and was bought and paid for by the Company at the direction of the Werner Family Controlling Shareholders, the Company's officers and directors and Investcorp. Murray Devine's work fell far below the professional standard of care governing the issuance of solvency opinions, and failed to comply with generally accepted professional standards.

56.    Contrary to the solvency opinion, the 1997 Shareholder Cashout transaction rendered the Company insolvent. It left the Company with unreasonably small capital to proceed with its business, and with debts beyond its ability to pay as they came due. Most pointedly, the enormous debt load generated by the transaction left the Company highly vulnerable to fluctuations in the economy and market conditions (such as commodity prices), and prevented the Company from being able to respond to such conditions effectively.

57.    On December 31, 1997, immediately after the 1997 Shareholder Cashout, the audited balance sheet of the Company reflected negative shareholders' equity of $153.7 million, roughly a $229 million reversal from the prior year. The Company's 1997 10-K acknowledged

that the newly created shareholders' deficit "was the result of the Recapitalization and the recording of related expenses, net of income tax benefits."

58.    Indeed, in the prospectus for the 1997 Bonds issued by the Company in the 1997 Shareholder Cashout, the Company acknowledged that a court could find that the transaction may have (a) rendered the Company insolvent; (b) left the Company with unreasonably small capital; or (c) caused the Company to incur debts beyond its ability to pay such debts as they matured.  The proxy statement sent to shareholders at the time further warned that distributions could be voided and shareholders could be required to return them.  The same documents informed Investcorp, the Company, and its directors, officers, and shareholders that their huge equity payout could be challenged as a fraudulent transfer.  This action makes exactly that claim.

59.    Following the 1997 Shareholder Cashout, the Company would never again report positive shareholders' equity.

**C.    The Company, Saddled with Debt from the 1997 Shareholder Cashout, Performs Poorly, and Investcorp Accelerates its Exit Strategy**

60.    The Shareholder Rights Agreement entered into in connection with the 1997 Shareholder Cashout granted Investcorp the right to appoint at least a majority of the Company's board of directors.  Investcorp appointed Savio Tung, Christopher Stadler, and Charles Philippin to the Company's board of directors and thus took control of the Company.  Family shareholders Donald Werner, Howard Solot, Michael Werner, Eric Werner, Michael Solot, Craig Werner, and Bruce Werner retained the right to designate at least one director and up to the number of directors equal to one third of the authorized directors minus one.

61.     According to documents contemporaneous to the 1997 Shareholder Cashout, Investcorp hoped to achieve returns of 24-27% on its investment in the Company, gambling that the Company would be extremely successful over the next five years.  Upon information and belief, Investcorp never intended to maintain a long-term interest in the Company, but rather planned to accept $17 million in transaction fees, limit its holding period to five or fewer years, and attempt to sell its interest at a profit.  Because of the Company's high debt burden from the 1997 Shareholder Cashout and resulting disappointing financial performance, Investcorp's plan failed and it began searching for an escape route much earlier.  Over the course of several years, it explored a myriad of cash-out exit strategies.

**1.       The Company's Financial Struggles Causes it to Cut its Workforce and Cause Investcorp to Seek an Early Exit**

62.     Immediately after the 1997 Shareholder Cashout, the Company began to suffer the constraining and debilitating effects of having to service its staggering new debt.  The Company's interest expense exploded from $7.5 million in 1996, the year before the 1997 Shareholder Cashout, to $30.6 million in 1998.  As early as April 1998, the Company was unable to lower prices to compete with its competitors, and its sales professionals feared that the Company's sales would suffer as a result.  In a 1998 first quarter sales review, Ed Gericke, the Company's Vice President of Sales, worried that the "hot and hostile" competitive environment continued to drive ladder prices down in all sales channels.

63.     The Company's heavy debt burden also tightened cash flow and prevented the Company from properly implementing operational improvements – creating new product lines and efficiency mechanisms – to meet market demands.  The Company's unmanageable debt led to sharply decreasing performance.

64.     By November 2000, Investcorp internally expressed concern about the Company's poor projected operating results.  The Company's overall performance continued to worsen and it struggled to meet its financial covenants in bank loan documents that were executed in connection with the 1997 Shareholder Cashout.

65.     By February 2001, it became clear to the Self-Interested Insiders that the Company soon would violate its loan covenants.   The Company management's 2001 EBITDA forecast showed that in the fourth quarter of 2001, the Company would barely meet the EBITDA required by the loan covenants.  Indeed, in July 2001, the Company was forced to seek amendments to the financial covenants in the 1997 Senior Credit Facility because it could not comply with its minimum EBITDA covenant.

66.     According to contemporaneous documents, by August 2001, Investcorp considered the Company's performance and sales to be disappointing.   Reversing the prior trend of at least 15 years of growth, the Company's net sales decreased from 2000 to 2001.  Indeed, from 1998 to 2002, the Company never once met the sales projections used to promote the 1997 Bonds and secure loans for the 1997 Shareholder Cashout.

67.     The differences between management's rationalizations and reality became particularly acute by the end of 2002, as the projections forecasted continuous growth each year while sales actually declined in 2001 and 2002.  By that time, the projected sales and EBITDA levels of $663 million and $114 million, respectively, bore no resemblance to the actual achieved sales of $520 million and EBITDA of $83 million, a material divergence of roughly 22% and 27% respectively.

68.     Upon information and belief, as of late 2001, Investcorp knew that the Company had limited upside potential and accelerated its exit strategy.

69.    Investcorp described its attempts to sell the Company in a November 2001 internal memorandum from Investcorp's Werner team (including directors Christopher Stadler and Thomas Sullivan) to Investcorp's Investment Committee and others.  The memorandum explained that Investcorp began to contact strategic buyers and caused the Company to retain Salomon Smith Barney and J.P. Morgan to provide advice regarding a possible sale.  The memorandum also evidenced Investcorp's continuous pattern of self-dealing, revealing that Investcorp insisted on JP Morgan as the co-lead as opposed to other candidates because it "felt that this appointment would be important to [Investcorp's] relationship with JP Morgan Chase given events taking place with SI Corporation and other portfolio companies which they have supported."  Investcorp's decision to use the Company's already limited cash resources to pay JP Morgan Chase apparently had little  to do with what was best for the Company, its other shareholders or creditors, and more to do with what was best for Investcorp's other investments and financial dealings.

70.    A few months later, in January 2002, Investcorp's Werner team, Chris Stadler, Thomas Sullivan, and Tarek Ajouz, sent another internal Investcorp memorandum providing an update on the Company's sales process to Investcorp's CEO Office and Investment Committee. In this memorandum, Investcorp reported internally that, despite its contacting approximately twenty of the most logical strategic buyers through the advisors, there was little interest.

71.    Investcorp considered a deal with Masco Corporation that contained conditional incentives based on the Company's achievement of EBITDA targets over a two-year period. Although Investcorp presented internal projections prepared by the Company's management to prospective buyers, it acknowledged internally that the "targets would have to be set at a significant discount to the current Management plan and at a level that we believe presents very

little risk of non-achievement." Even at that level, Investcorp expected that, given the Company's disappointing financial performance prospects, it "might hedge the position to protect against the possibility that Werner's earnings do not meet the established thresholds…." Investcorp later abandoned the potential deal in favor of an auction process because it was concerned about the contingency of "Werner maintaining a flat EBITDA performance over the two-year period."

72.    The Company's poor sales performance and need to meet its loan covenants and service its debt by any means available forced it to begin terminating employees. In the second quarter of 2001, the Company fired approximately 80 salaried employees, representing 10% of its salaried personnel. Approximately one year later, the Company terminated an additional 5% of the Company's salaried employees across most functional areas.

73.    The workforce cuts alone could not salvage the Company's poor performance. In September 2002, Investcorp again concluded that the Company's performance remained "below original expectations," and was "significantly behind [Investcorp's] original investment thesis."

74.    In the midst of the Company's cutbacks and declining performance, Investcorp continued to extract significant cash "management fees" from the Company when the Company could least afford it. In November 2002, the Company pre-paid $1.5 million to Investcorp International, Inc. for the following year's "management fees." None of these fees paid for services that provided any economic benefit to the Company.

2. **Investcorp and the Company's Directors and Officers Continue to Prepare and Distribute Knowingly False, Unrealistic and Unachievable Projections to Market the Company for Sale**

75.    As reflected in Company board level presentations, in 2002, Investcorp and the Company's directors and officers knew that the climbing equipment market was growing at a slowing rate, that the Company's core business faced slower growth ahead, and that its market share was approaching saturation.  Nevertheless, Investcorp and the Company's management prepared knowingly false or reckless, and unrealistic, projections that were based on unreasonable assumptions showing the Company achieving impossibly high sales growth while simultaneously reducing costs by up to $15 million annually.  Investcorp and the Company's directors and officers described these projections as a "significant stretch."  Nonetheless, the Company marketed itself for sale using management's inflated figures.  The Company's directors also knew that "major restructuring" would be needed to reach EBITDA objectives. Demonstrating their misguided loyalty to Investcorp instead of the Company, the directors expressed concern that restructuring may not be "a risk that Investcorp wants to take at a time when their interest is to sell."

76.    Upon information and belief, Investcorp continued to believe that the Company was underperforming and its growth potential was minimal.  In October 2002, Investcorp and the Company's directors and officers caused the Company once again to engage Salomon Smith Barney and JP Morgan in a renewed effort to sell the Company through a formal auction. Investcorp's goal was to sell the Company by the end of the year "in order to allow Investcorp to book any income associated with the sale in fiscal year 2002."  The memorandum distributed by

Salomon Smith Barney in connection with the attempted sale used management's knowingly false or reckless, unrealistic, and inflated projected annual growth rate of 8.5%, even though actual growth rate from 1998 to 2002 was less than 4%.

77.     In early 2003, Investcorp continued to express concern internally (in a memorandum from Christopher Stadler, Thomas Sullivan, and Tarek Ajouz to Investcorp's Investment Committee) about the Company's performance.  The memorandum detailed the Company's sluggish sales performance over the past two years, operating risks associated with unsteady performance of Home Depot (the Company's largest customer) and the Company's reliance on the Power Retail Channel (two customers - Home Depot and Lowes).

78.     Investcorp analyzed management's five-year business plan calling for "aggressive growth" of 9% and "significant operating improvements" amounting to $20 million per year for each of the first three years.  Like the false financial projections used in connection with the 1997 Shareholder Cashout, management's projections in early 2003 were knowingly false or reckless, inflated and unrealistic, and based on contemporaneous documents.

79.     Most importantly, Investcorp knew of the significant flaws in the projections and nonetheless proceeded with the marketing process.

80.     Investcorp generated its own internal scenarios for sales growth, indicating an "Aggressive Base Case" of 5%, a "Conservative Base Case" of 3% and a "Low Base Case" of 0%.  Investcorp assigned a probability of 25% to the Aggressive Base Case, 50% to the "Conservative Base Case" and 15% to the "Low Base Case."  Investcorp did not assign any probability to management's unrealistic 9% projection.  Thus, Investcorp's own analysis concluded that even 5% growth was unlikely, that 3% was more likely, and that 0% was a significant possibility.

81.     Investcorp also did not assign a percentage to the possibility that the Company might achieve $20 million per year in cost savings as projected by management, considering it far too unrealistic.  Instead, Investcorp estimated a 15% probability that the Company might achieve 25% of those savings, a 50% probability that the Company might achieve 75% of those savings, and a 25% probability that the Company might achieve 90% of those savings.

3.     **Failing to Find a Buyer, Investcorp and the Company's Directors, Officers, and Shareholders Turn Their Focus to Another Shareholder Cashout**

82.     Even using false, misleading, and inflated projections, Investcorp failed to find a willing buyer for the Company that would provide Investcorp with its desired rate of return. Investcorp again began to focus on "recapitalization" options.  It ultimately selected Leonard Green as a recapitalization partner, as set forth below.

D.     **The Self-Interested Insiders Conceal Material Facts about Future Sales to Home Depot and Extract $150 Million from the Company to Distribute to Themselves and Other Shareholders**

83.     As of January 2003, the Company had 75% of Home Depot's climbing products business and 100% of Lowe's business.  Home Depot and Lowe's accounted for 40% of the entire climbing products market.  Home Depot alone held a roughly 32% share of the ladder market.  Potential for any growth in that market was limited.

84.     Upon information and belief, the Self-Interested Insiders knew that the Company's business depended in large part on these two customers.  Home Depot was, by far, the Company's most important customer.  In 2002, the Company's sales to Home Depot accounted for at least 31% of the Company's net sales ($161 million), almost twice as much as

the Company's next largest customer, Lowe's, and almost eight times as much as the third largest customer.

1.     **From 2000 to 2002, the Company Learns that It Faces Serious Problems with Home Depot**

85.     In late 2000, coinciding with Investcorp's efforts to cash out of the Company earlier than planned, the Company's management learned of what would become a disastrous reversal in its Home Depot business.  A management change at Home Depot commenced a shift in its product sourcing strategy, and Home Depot began to seek out less expensive, overseas sources of supply.  In particular, Home Depot began to pursue offshore sourcing of a wide range of products, with an established goal of having 12% of Home Depot's product offerings coming from overseas.

86.     As part of its new sourcing strategy, in the summer of 2001, Home Depot began selling household stepstools manufactured in China by Tricam Industries ("Tricam") in its stores nationwide.  It also began to stock Tricam's twenty-one foot telescoping articulating ladder, branded "Gorilla," in March 2002.

87.     By November 2002, Home Depot began selling a thirteen-foot Gorilla ladder in its stores, as well as additional imported Tricam ladder accessories.

88.     In 2002, Home Depot reduced its inventory of the Company's products by $18 million and cut its promotional activity by $14 million.  The Self-Interested Insiders were informed that such actions were the result of Home Depot's shift of focus from the top line to the bottom line but the Self-Interested Insiders could not respond by cutting prices as that would reduce cash flow and prevent the Company from servicing debt.  The Company's inability to

adapt to the changing market was due to its debt load from the 1997 Shareholder Cashout and the restrictions and covenants made to lenders, which the Company could not satisfy.

89.    Because the Company was vastly overleveraged and had significant interest and other debt service costs, it was forced to charge more for its ladders to cover the normal costs of production plus a significant premium to pay the Company's enormous interest charges and other debt service costs.  The per-unit debt premium significantly reduced the Company's ability to compete with lower prices offered by its competitors.

2.    **In January 2003, the Company Loses its Aluminum Stepladder Business at Home Depot**

90.    In January 2003, Home Depot reported lower than anticipated results.  Company management, as well as industry analysts, understood that a Home Depot slowdown meant a slowdown for the Company.  It also necessitated that suppliers increase their working capital requirements while Home Depot attempted to manage its supply chain more closely.

91.    On or about January 2, 2003, Home Depot notified the Company that, as of March 2003, Home Depot would no longer buy four models of aluminum step ladders from the Company: a type I two foot aluminum ladder, a type II six foot aluminum ladder, a type III four foot aluminum ladder, and a type III six foot aluminum ladder.  Home Depot replaced these ladders with imports manufactured in China by Tricam.  Unlike in the past, Home Depot did not give the Company the opportunity to compete for the business.  As reflected in contemporaneous documents, the losses of these ladders were later characterized as "a significant portion of [the Company's] volume in aluminum step ladders" which "effectively eliminated Werner's aluminum step ladder presence in Home Depot."  Senior management later acknowledged that the losses "create[d] a significant threat to [the Company's] business."

31

92.     By this time, the Company's management was informed that Home Depot wanted lower cost producers and intended to source much of its ladder business off shore and wanted a lower cost producer.  Home Depot already had begun purchasing 25% of its ladders from Louisville Ladder sourced in Mexico, in addition to buying ladders from Tricam sourced in China.

93.     By February 17, 2003, the Company's management was informed that in May 2003, Home Depot would be replacing a fifth Werner ladder – a type II eight foot aluminum ladder.  The Company's management estimated that it would lose sales of 144,555 units.  The Company's management considered Home Depot's import program to be an "invasion," but could do nothing about it while maintaining its suffocating debt load.

94.     Around this time, the Company's management projected that the lost aluminum stepladder business would result in annual lost sales of 600,000 to 800,000 ladders, roughly 25% of the Company's total unit sales to Home Depot.  The projected lost sales to Home Depot totaled over $20 million of revenue per year, roughly 15% of the Company's total sales to Home Depot.

95.     The Self-Interested Insiders failed to report these significant losses publicly to the SEC in a Form 8-K at the time they occurred.  Rather, Investcorp and the directors and officers deliberately concealed and delayed disclosing the Company's losses for nine months to enable the shareholders to siphon yet more cash out of the Company.

3.     **In March 2003, the Company Learns That Its Fiberglass Stepladder Sales to Home Depot Are At Risk**

96.     Already suffering the devastating loss of its aluminum stepladder business, the Company soon learned in March 2003, that Home Depot also was working with Midland/Tricam to develop fiberglass ladders to be produced abroad.  The Company's fiberglass ladder lines accounted for approximately $90 million in gross sales to Home Depot in 2002.

97.     In April 2003, the Company's management desperately tried to convince Home Depot to remain with the Company. Specifically, the Company's CEO, Dennis Heiner, and the Senior Vice President of Sales met with Home Depot to try to convince Home Depot to remain with the Company, to no avail.

98.     At this point in time, two months prior to the 2003 Shareholder Cashout, the Self-Interested Insiders were on notice of the warning signs that the Company would lose further significant business from Home Depot. As discussed in Paragraph 144 below, these warnings materialized when Home Depot ceased purchasing fiberglass stepladders from the Company in August 2003.

**4.     Managements' Internal Analysis in Early 2003 Confirms that the Company's Performance Is Significantly Deteriorating**

99.     At its February 2003 board meeting, the Company internally reported "Softness across all channels." For the first few months of the year (before Home Depot stopped purchasing the Company's aluminum stepladders), same period sales to the Company's most important channel, Power Retail, were down almost 12% to $33 million, including a 16.5% decline at Home Depot ($18.4 million, down $3.6 million) and a 5.3% decline at Lowe's ($14.6 million, down $820,000). Sales to the professional channel were down 11%, sales to the hardware channel were down 16% ($1.5 million), and sales to the retail channel were down almost 16% ($587,000).

100.     These deflated sales numbers did not yet reflect the impact of the loss of Home Depot's aluminum stepladder business, as Home Depot's sales of the Company's aluminum stepladders did not end until March 2003.

101.   A comparison of first quarter of 2003 with the first quarter of 2002 revealed $4.4 million in decreased sales, including decreases of $2.2 million attributable to Home Depot, $0.9 million attributable to Lowe's, $0.3 million attributable TruServ, and $0.2 million attributable to Sears.  The numbers still largely failed to reflect the Company's loss of its aluminum stepladder business at Home Depot, which did not begin until March 2003.

**5.    In May 2003, the Company Learns that Home Depot's Import Program Will Further Endanger the Company's Ability to Function as a Going Concern**

102.   In May 2003, Home Depot requested a proposal from the Company to be Home Depot's exclusive supplier of ladders.  Investcorp and senior management at the Company were informed of the importance of such an opportunity and conducted several management and board consultations to finalize the Company's proposal.  Although they were on notice that it would jeopardize the Company's relationship with Home Depot if they did not show sufficient interest in the bidding opportunity, these insiders knew the Company could not effectively compete on price because the Company's prices were already 10-15% higher than its competitors' prices, due in large part to the debt incurred in the 1997 Shareholder Cashout.

103.   Specifically, as reflected in Company documents, on May 14, 2003, while in the process of determining how the Company should deal with Home Depot's "all the business" proposal, the Company learned that Home Depot was concerned about the Company's ability to deliver products at a competitive price, and that as a result the Company's future business at Home Depot was in jeopardy.  The Company's senior management recognized that the Company's future as a going concern was at risk because of the likely loss of substantially all Home Depot business.

104.   The next day, on May 15, 2003, Home Depot met with the Company's senior management to discuss the Company's response to the "all the business" request.  Because the Company was forced to price its ladders at high margins to service the debt incurred in the 1997 Shareholder Cashout (and the soon to be completed 2003 Shareholder Cashout (described below)), the Company could offer only a small price reduction in exchange for increased volume.  Home Depot informed the Company that its proposed price quotes were too high by a "gargantuan percentage."  Home Depot also informed the Company that its business was "tabled and on-hold" and that it could lose additional Home Depot business once Home Depot evaluated its import program.  Upon information and belief, the Self-Interested Insiders knew or recklessly disregarded that Home Depot would never accept the Company's uncompetitive pricing, and thus, that the Company would lose more, if not all, of Home Depot's business to less expensive competitors.

**E.     The Self-Interested Insiders Conceal the Company's Serious**

**Problems and Take Even More Money Out of the Company While**

**Saddling it with More Debt**

105.   Despite its lost sales to Home Depot and the known risk of devastating future losses (which occurred just a few months later), Investcorp and the Company's directors and officers made no effort to re-position the Company's capital structure to remain competitive, which would have required equity participation and a longer-term business plan that was incompatible with Investcorp's exit strategies.  Home Depot's strategic moves towards importing cheaper ladders and aggressively cutting back its business with the Company were catastrophic blows to the ongoing viability of the Company – events requiring immediate management attention (as well as action) and public disclosure pursuant to SEC regulations.  Instead,

Investcorp and management proceeded with their schemes to extract all available cash from the Company without regard to its future financial viability. Driven by the self-interest of Investcorp and the interested directors and officers, the Self-Interested Insiders single-mindedly pursued another cashout that would saddle the Company with even more debt while allowing its equity holders and insiders to reap millions of dollars.

106.    Upon information and belief, the Self-Interested Insiders intentionally concealed the true extent of the Company's serious problems with Home Depot from the 1997 Bondholders and lenders solely because they needed bondholder consent and lender approval to proceed with the new shareholder payout.

1.      **The Self-Interested Insiders Knowingly Provide Incomplete, False and Misleading Information to Ratings Agencies**

107.    Specifically, in connection with the 2003 Shareholder Cashout, the Self-Interested Insiders provided financial information to ratings agencies, Moody's and S&P's. The Self-Interested Insiders reported projected compound annual revenue growth of 4.3%. Upon information and belief, the Self-Interested Insiders knew that such "projected" growth was false, and not what they believed regarding the Company's true growth prospects. In fact, they knew that the most likely outcome of the Company's operations would result in far lower revenue. Nevertheless, they did not disclose the truth to the ratings agencies.

108.    In addition, to disguise the Company's true financial picture, the Self-Interested Insiders also presented "projections" of $20.0 million in estimated annual savings in operational costs based on the Company's aluminum extrusion business being used to satisfy the Company's manufacturing needs. Again, upon information and belief, the Self-Interested Insiders knew that the projected "estimated" cost savings were false.

109.    Further, the Self-Interested Insiders did not disclose to the ratings agencies the loss of the Company's aluminum ladder business at Home Depot business or the significant likelihood of additional future further losses.

2.    **The Self-Interested Insiders Knowingly Provide Incomplete, False and Misleading Information to Senior Lenders to Secure Loan Approval**

110.    Before lending more than $200 million to the Company, the new bank group lenders required detailed financial disclosures from the Company as part of their due diligence process.

111.    In the JPMorgan Chase Bank Revised Syndicated Loans Approval Sheet and attached memorandum dated April 9, 2003, Investcorp and the Company's directors and officers painted rosy, but false, financial projections, omitting the Company's serious problems with Home Depot.  Investcorp and the Company's directors and officers unrealistically forecasted 4-5% same store sales growth at Home Depot despite knowing that the Company already had lost its aluminum stepladder business to foreign competition and would likely lose further Home Depot business in the very near term.  Indeed, the threat of imports was not mentioned once in the loan approval memorandum.

112.    In a later memorandum presented to lenders in New York on or about May 9, 2003, the Self-Interested Insiders presented the same knowingly false "projections" that it had previously presented to the ratings agencies.  Though styled as "projections," upon information and belief, the information the Self-Interested Insiders provided to lenders were not actual projections prepared in good faith, nor were they what the Self-Interested Insiders reasonably expected nor were they based on reasonable assumptions.  Instead, the projections were

knowingly false, misleading, and based on stale and inaccurate information.  Indeed, upon information and belief, Investcorp and the Self-Interested Insider directors and officers, provided "projections" that they knew to be false even before taking into account the loss of Home Depot.

113.    The Self-Interested Insiders also concealed critical information that would have exposed the false numbers and revealed the true precarious state of the Company.  Specifically, they did not report to lenders the Company's loss of its aluminum stepladder business at Home Depot.  They did not report the Self-Interested Insiders' knowledge that Home Depot also was developing offshore sourcing of fiberglass stepladders.  They did not report their knowledge that Home Depot had placed its business with the Company "on hold" because of Home Depot's import program or that, they knew the Company would likely lose future business with Home Depot because of the Company's uncompetitive pricing.  Indeed, to the contrary, they affirmatively misrepresented to lenders that the risk of Home Depot's sourcing ladders from overseas was minimal because it would be difficult for Home Depot to manage, even though they knew that Home Depot already was sourcing ladders from overseas and had plans to expand its purchases of imported ladders.

114.    Indeed, in stark contrast to knowingly false "projections" of sales growth prepared almost half way through the fiscal year, by the end of 2003, the Company's sales actually had declined $17.3 million in large part due to "lower unit sales volumes of aluminum stepladders." Investcorp and the Company's directors and officers already knew about those lost sales when they made the "projections."  Upon information and belief, the Self-Interested Insiders fabricated the "projections" to obtain the approvals necessary to secure the financing and pay themselves $150 million in connection with the 2003 Shareholder Cashout.

3.      **The Self-Interested Insiders Provide Incomplete, False and**

        **Misleading Information to the 1997 Bondholders to Secure Consent**

        **for the 2003 Shareholder Cashout**

115.    The Indenture Agreement for the 1997 Bonds issued in connection with the 1997

Shareholder Cashout required that Holding (DE) solicit consent from the 1997 Bondholders to

allow the Company to (1) transfer to Holding (PA) $85 million to fund, in part, a redemption by

Holding (PA) of its outstanding common stock and payments to Holding (PA)'s management in

connection with option cancellations, in an aggregate amount of $150,000,000; (2) pay

transaction fees to Investcorp (or its affiliates) of $1 million, to Leonard Green of $2.5 million,

and to and certain officers and employees of $1.725 million; and (3) pay an annual fee of $1

million for and enter into a management agreement with, Leonard Green upon consummation of

the 2003 Shareholder Cashout.  The initial consent solicitation offered to pay the 1997

Bondholders 1.5% (approximately $2 million) in exchange for their consent to the transaction.

116.    The Consent Solicitation Statement sent to the 1997 Bondholders was

intentionally, knowingly, or recklessly, materially misleading, in that it omitted material

information necessary to make a prudent investment decision.  For example, it concealed and

omitted that a significant downturn in the Company's business already was well underway.  It

concealed and omitted the actions taken by Home Depot and the degradation of the Company's

business relationship with Home Depot.  It concealed and omitted the extent of the lost business

at Home Depot (over $20 million) and that further Home Depot business was likely to be lost.  In

fact, the document does not mention Home Depot at all.

117.    Nonetheless, the initial offer was not enough to secure bondholder consent to

proceed with the 2003 Shareholder Cashout.  Thus, on or about May 28, 2003, the Company

increased its offer to more than $4 million to obtain the 1997 Bondholders' consent. The revised

solicitation also failed to mention Home Depot. In its revised solicitation, the Self-Interested

Insiders continued to conceal all of the information regarding its lost aluminum stepladder

business and omitted its knowledge that it could not compete with lower cost competitors and

would likely lose its Home Depot business.

118.    Based on the knowingly false, misleading, and deceptive misinformation provided

by the Self-Interested Insiders and the $4 million consent fee, in early June 2003 the Company

finally was able to obtain the 1997 Bondholders' consent to proceed with the 2003 Shareholder

Cashout.

**F.      In June 2003 the Self-Interested Insiders and the Company's other**

**Shareholders Extract $150 Million More from the Company in Illegal**

**Dividends and $21.5 million of fees**

119.    In spite of the known risks facing the Company of losing its largest and most

important customer, Home Depot, Investcorp, the Werner Family Controlling Shareholders, and

the Company's directors and officers continued to push for the new shareholder cashout.

120.    The Company, Investcorp, its other shareholders, and Leonard Green entered into

a Recapitalization and Stock Purchase Agreement, under which Leonard Green would invest $65

million in the Company in exchange for newly issued preferred stock that would be convertible

into approximately 22.2% of the common equity of the Company. Leonard Green's ownership

percentage potentially would increase to approximately 30% over time. Leonard Green &

Partners, L.P. controlled 100% of the Series A Preferred Stock through two affiliated entities.

Green Equity Investors III, L.P. (Leonard Green & Partners, L.P.'s investors) owned 98.6% and

Werner Co. – Investment LLC (Leonard Green & Partners, L.P.'s investment vehicle) owned

1.4%.  Upon information and belief, only the 1.4% represented capital investment on behalf of

Leonard Green & Partners, L.P.  Upon information and belief, Leonard Green & Partners, L.P.

collected at least 5 times as much in fees from the Company that it ever had invested in the

Company as equity.

121.    On June 11, 2003, the 2003 Shareholder Cashout closed.  At a time when the

Company's audited financial statements reflected a shareholders' deficit of approximately $100

million, the Company paid out approximately $150 million in illegal dividends to its

shareholders.

122.    The Company did not have $150 million in surplus cash to use for the payout.

Instead, the Company borrowed more money to fund the distribution.  Holding (DE) signed up

for a new senior secured credit facility with aggregate commitments of $230.0 million comprised

of (1) a $180.0 million term loan (the "2003 Term Loan") and (2) a $50.0 million revolving

credit facility, undrawn at closing (the "2003 Revolving Credit Facility") (collectively, the "2003

Credit Facilities").  In addition, the Company obtained a new secured $50 million Accounts

Receivable Securitization Facility ($40 million drawn at closing).

123.    Mechanically, to fund the payout, Holding (DE) received approximately $200

million in funds from the borrowings.  Holding (DE) used those funds and the majority of the

Company's remaining cash to pay off the approximately $116 million existing senior credit

facility, repay the Company's existing $20 million Accounts Receivable facility, pay an $85

million dividend to Holding (PA), and to pay the significant fees and costs incurred in the

transaction (over $20 million).

124.    Holding (PA) used the dividend paid by Holding (DE) and the $65 million

provided by Leonard Green to distribute approximately $150 million to existing shareholders,

including $97 million to Investcorp and its investors and $50 million to the Werner/Solot family

and management shareholders.  The shareholders who are defendants and who received the

payouts (the "2003 Shareholder Defendants") and the amounts received are detailed below:

| Name | Amount Received from 2003 Shareholder Cashout |
|---|---|
| Step Investments Limited | $12,237,502.85 |
| WL Holdings Limited | $11,119,358.84 |
| Equity WERA Limited | $10,392,910.84 |
| Climbing Products Limited | $8,883,063.94 |
| Ladder Equity Limited | $8,883,063.94 |
| Werner Equity Limited | $8,883,063.94 |
| Werner Investments Limited | $8,883,063.94 |
| Werner IIP Limited | $5,528,617.14 |
| Investcorp Werner Holdings L.P. and Stepup Limited (as general partner) | $5,137,510.24 |
| Annisville Limited | $3,294,800.37 |
| Cooperstown Limited | $3,294,800.37 |
| Frisco Limited | $3,294,800.37 |
| Platea Limited | $3,294,800.37 |
| Craig R. Werner Family Limited Partnership and Craig Werner (as general partner) | $3,068,716.80 |
| Investcorp Bank B.S.C. | $2,401,809.72 |
| Robert I. Werner - Irrev. Trust dated 8/30/94 and Ronald | $2,240,291.38 |

| Name | Amount Received from 2003 Shareholder Cashout |
|---|---|
| Werner (as administrative trustee) | |
| Richmond Drive Enterprises, L.P. and Richard Werner and Lois Werner (as general partners) | $2,059,246.17 |
| Michael E. Werner Revocable Trust, U/A/D 1/2/96 and Michael Werner (as trustee) | $2,057,170.78 |
| Bruce D. Werner – Trust and Bruce Werner (as trustee) | $2,028,074.94 |
| Elizabeth W. Ackerman Trust DTD 12/18/67 and Jeffrey R. Ackerman (as successor trustee) | $2,019,514.59 |
| Eric J. Werner | $1,695,101.06 |
| Alligator Partners, L.P. and Howard Solot and Janet Solot (as general partners) | $1,615,102.58 |
| Michael J. Solot | $1,274,487.19 |
| Donald M. Werner | $1,095,618.54 |
| Ronald E. Werner | $1,000,609.57 |
| The Heiner Family Trust and Dennis G. Heiner and Margo Heiner (as trustees) | $964,941.09 |
| Mindy Werner Alter | $912,642.74 |

| Name | Amount Received from 2003 Shareholder Cashout |
|---|---|
| Elise W. Frost | $891,474.78 |
| Unknown beneficiaries of WHPA Stock Loan Program | $887,470.41 |
| Florence J. Werner - Irrev. Trust Dated 10/7/94 and Ronald Werner (as trustee) | $858,439.16 |
| Gail Rauch Blackman | $852,791.74 |
| Bruce D. Werner Family Limited Partnership and Bruce D. Werner (as managing general partner) | $764,545.41 |
| Ira and Elise Frost Family Limited Partnership and Elise Frost (as general managing partner) | $764,023.85 |
| Roni S. Rosati | $723,148.09 |
| Noel Berk-Rauch | $640,863.66 |
| Gerald R. Whipman | $597,298.31 |
| Howard L. Solot | $558,334.27 |
| Isabelle N. Werner and Melanie R. Werner (as custodian for Isabelle N. Werner) | $536,850.82 |
| Sophia K. Werner and Melanie R. Werner (as custodian for Sophia K. Werner) | $536,850.82 |

| Name | Amount Received from 2003 Shareholder Cashout |
|---|---|
| Agnes Bonte Francois | $519,541.80 |
| Werner-Alter, LLC and Mindy Werner-Alter (as manager) | $504,206.12 |
| Janet F. Solot | $486,179.83 |
| Beverly Werner Needham | $459,812.06 |
| Donald M. Werner | $457,668.52 |
| Marsha Beth Karp | $453,623.86 |
| Edward A. Pollack | $448,780.96 |
| Edward Pollack, POA MLW | $390,000.00 |
| Robert I. Werner | $369,970.00 |
| Laura W. Werner Revocable Trust, U/A/D 1/2/96 and Laura Werner (as trustee) | $351,922.02 |
| Marc L. Werner (as part of repayment for outstanding loan/stock pledge) | $314,684.93 |
| Rankell Family Trust (Steven Rankell – Trustee) | $276,048.64 |
| Marc L. Werner | $274,252.87 |
| Richmond J. Rosati and Roni S. Rosati (as custodian for Richmond J. Rosati) | $269,053.45 |
| Ryan Gregory Rosati and Roni S. Rosati (as custodian for | $269,053.45 |

| Name | Amount Received from 2003 Shareholder Cashout |
|---|---|
| Ryan Gregory Rosati) | |
| Rauch Trust and Aleena Shapiro (as trustee) | $254,192.49 |
| Peter R. O'Coin | $226,486.04 |
| Elissa Schwartz | $218,471.19 |
| Suzanne Schwartz | $218,202.53 |
| Ross Daniel Rosati and Roni S. Rosati (as custodian for Ross Daniel Rosati) | $215,242.76 |
| Jonathan C. Werner Gift Trust U/A/D/ 11/1/96 and Jeffery Weisman (as trustee) | $201,251.89 |
| Stephanie N. Werner Gift Trust U/A/D 11/1/96 and Jeffery Weisman (as trustee) | $201,251.89 |
| Vincent J. Garcell Living Trust and Vincent J. Garcell and Karen R. Garcell (as trustees) | $184,107.52 |
| Ballet Limited | $179,890.19 |
| Denary Limited | $179,890.19 |
| Gleam Limited | $179,890.19 |
| Highlands Limited | $179,890.19 |
| Noble Limited | $179,890.19 |
| Outrigger Limited | $179,890.19 |
| Quill Limited | $179,890.19 |

| Name | Amount Received from 2003 Shareholder Cashout |
|---|---|
| Radial Limited | $179,890.19 |
| Shoreline Limited | $179,890.19 |
| Zinnia Limited | $179,890.19 |
| Barbara L. Werner | $172,080.13 |
| Investcorp Investment Equity Limited | $156,426.49 |
| Ashley Elizabeth Werner and Marc L. Werner (as custodian for Ashley Elizabeth Werner) | $148,786.51 |
| Jeffrey Addison Werner and Marc L. Werner (as custodian for Jeffrey Addison Werner) | $148,786.51 |
| Werner GC Trust for Erin; Erin Joy Ryan; and Beverly Werner Needham (as trustee) | $148,786.51 |
| Werner GC Trust for Shannon; Shannon Rose Ryan; and Beverly Werner Needham (as trustee) | $148,786.51 |
| Michael E. Werner | $144,386.78 |
| Allison Tyler Karp and Marsha Beth Karp (as custodian for Allison Tyler Karp) | $136,679.26 |
| Florence J. Werner | $126,185.99 |
| Margot A. Werner Gift Trust U/A/D | $112,733.44 |

| Name | Amount Received from 2003 Shareholder Cashout |
|---|---|
| 11/1/96 and Laura Werner (as trustee) | |
| Stewart Charitable Remainder Unitrust and Gary Stewart (as trustee) | $110,311.99 |
| Robert A. Rosati | $104,039.48 |
| Jeffrey R. Ackerman | $86,903.99 |
| Marc L. Werner | $72,666.15 |
| Lee L. Basilotta | $68,436.50 |
| Michel Francois and Agnes Francois (as custodian for Michel Francois) | $67,263.24 |
| Ellen Berk-Rauch | $67,263.24 |
| Eric J. Werner and Melanie R. Werner | $57,647.44 |
| Heather Blackman and Gail Rauch Blackman (as custodian for Heather Blackman) | $49,327.16 |
| Karen Lynn Moseska | $46,008.02 |
| Donald M. Werner and Barbara L. Werner | $42,331.48 |
| Eli Berk-Rauch and Noel Berk-Rauch (as custodian for Eli Berk-Rauch) | $39,550.66 |
| Hanna Berk-Rauch and Noel Berk-Rauch (as custodian for | $39,550.66 |

| Name | Amount Received from 2003 Shareholder Cashout |
|---|---|
| Hanna Berk-Rauch) | |
| Claire Francois and Agnes Francois (as custodian for Claire Francois) | $36,053.07 |
| James Andre Francois and Agnes Francois (as custodian for James Andre Francois) | $36,053.07 |
| Bruce D. Werner and Tammy H. Werner | $33,829.30 |
| Donald E. Achenbach | $28,672.58 |
| David A. Cardillo | $26,102.60 |
| Melissa S. Karp and Marsha Beth Karp (as custodian for Melissa S. Karp) | $23,676.66 |
| J. David Goldblatt | $22,600.52 |
| June Goldblatt and J. David Goldblatt | $22,600.52 |
| Claude J. Francois | $18,833.77 |
| Phillip F. Tidy | $10,761.94 |
| Gary L. Stewart | $8,699.37 |
| Richard D. Bonte | $1,900,055.12 |
| Vera Bonte | $1,608,132.00 |
| Marlane T. Krane | $852,791.74 |
| Debra A. Rothman | $791,447.55 |
| Margaret E. Bonte | $519,541.80 |
| Anne L. Werner | $487,793.80 |

| Name | Amount Received from 2003 Shareholder Cashout |
|---|---|
| Residuary Trust and Timothy F. Burke (as trustee) | |
| Garcell 1997 Unitrust DTD 12/19/1997 | $305,031.59 |
| Maurice Weiner | $253,448.12 |
| Anne L. Werner Residuary Trust – EX and Timothy F. Burke (as trustee) | $244,838.47 |
| Novak Partnership, AKA a California Limited Partnership and Alyce Novak (as general partner) | $139,638.54 |
| Joshua J. Rothman | $70,223.01 |
| Kevin Matthew Rothman | $70,223.01 |
| Paula J. Griffith | $68,608.54 |
| Henry W. Dowler | $68,436.50 |
| Vincent A. Genis | $68,436.50 |
| Matthew W. Weiss | $68,339.38 |
| Steven R. Bentson | $67,930.89 |
| William J. Rippin | $61,742.31 |
| David C. McGowan | $58,898.15 |
| Brad J. Gellis | $58,660.00 |
| Michael E. Trzynka | $58,660.00 |
| Larry V. Friend | $58,362.23 |
| Edward W. Gericke | $57,151.59 |

| Name | Amount Received from 2003 Shareholder Cashout |
|---|---|
| John J. Fiumefreddo | $56,849.10 |
| Michael D. Brooks | $51,070.51 |
| Jordana Rothman and Debra A. Rothman (as custodian for Jordana Rothman) | $49,327.16 |
| Linda C. Joubert | $42,241.27 |
| Eric A. Mason | $41,006.11 |
| Jason S. Krane and Marlane T. Krane (as custodian for Jason S. Krane) | $39,550.66 |
| Bruce B. Fisher | $35,720.11 |
| William C. Hazlett | $34,285.04 |
| Neal R. Martin | $31,873.83 |
| Dennis J. Johnson | $29,758.76 |
| Jeremy M. Kaplan | $28,250.40 |
| Rachael A. Kaplan and Neil D. Kaplan (as custodian for Rachael A. Kaplan) | $28,250.40 |
| Beth Katz | $26,905.10 |
| Susan Morrow | $26,905.10 |
| David M. Conn | $26,836.82 |
| Marc L. Werner - Irrevocable Trust 1 and Richard Werner (as trustee) | $24,214.98 |
| The Estate of Max Hanfling and Edward A. Pollack (as | $22,600.52 |

| Name | Amount Received from 2003 Shareholder Cashout |
|---|---|
| executor) | |
| Herman H. Liss | $22,600.52 |
| Karrah Kaplan | $21,524.37 |
| Deborah Ann Kaplan Trust U/D 14 January 1998 and Jeremy M. Kaplan (as trustee) | $21,255.22 |
| Judith Lily Kaplan Trust U/D 14 January 1998 and Jeremy M. Kaplan (as trustee) | $21,255.22 |
| Julia E. Kaplan and Neil D. Kaplan (as custodian for Julia E. Kaplan) | $21,255.22 |
| Neil D. Kaplan | $19,102.93 |
| Robert H. Pinney | $13,586.38 |
| Jessica Z. Joubert | $13,452.55 |
| Michael D. Wise | $11,370.02 |
| Sara P. Graham | $10,761.94 |
| Carly Krane and | $9,776.50 |

| Name | Amount Received from 2003 Shareholder Cashout |
|---|---|
| Marlane T. Krane (as custodian for Carly Krane) | |
| Richard M. Kelly | $9,776.50 |
| Shirley W. Rauch Trust and Shirley Rauch, Stanley Rauch, and Marlane Krone (as trustees) | $9,723.75 |
| Francesca Gianoglio Bonte | $9,416.89 |
| Alessandra Bonte and Richard D. Bonte (as custodian for Alessandra Bonte) | $9,416.64 |
| Kelly Sinon | $8,699.37 |
| Suzanne Rosen | $8,699.37 |
| Deborah Kaplan | $6,995.19 |
| Judith Kaplan | $6,995.19 |
| | |
| TOTAL | $146,888,204.36 |

125.    The Company also paid $3,017,599.01 to management shareholders for option cashouts.  The shareholders who are defendants and who received the option cashouts (the "2003 Option Defendants") and the amounts received are detailed below:

| Options | Amount |
|---|---|
| Robert Rosati | $37,807.41 |
| Craig Werner | $59,696.20 |
| Donald Werner | $49,746.75 |
| Eric Werner | $56,696.20 |
| Michael Werner | $149,240.24 |
| Dennis Heiner | $870,568.19 |
| Peter O'Coin | $137,770.58 |
| David Conn | $24,873.50 |
| David Cardillo | $24,873.50 |
| Dennis Johnson | $24,873.50 |
| Donald Achenbach | $24,873.50 |
| William Hazlett | $24,873.50 |
| Vincent Genis | $36,286.37 |
| Eric Mason | $49,746.75 |
| David McGowan | $59,696.20 |
| Henry Dowler | $87,554.15 |
| Bruce Fisher | $69,645.39 |
| John Fiumefreddo | $61,231.39 |

| Options | Amount |
|---|---|
| Steven Bentson | $78,683.83 |
| William Rippin | $87,554.15 |
| Lee Basilotta | $87,554.15 |
| Michael Wise | $15,307.80 |
| Robert Pinney | $19,670.89 |
| Neal Martin | $49,746.75 |
| Brad Gellis | $76,609.88 |
| Michael Brooks | $128,346.52 |
| Larry Friend | $127,317.54 |
| Michael Trzynka | $94,518.89 |
| Richard Kelly | $17,908.76 |
| Edward Gericke | $167,058.15 |
| John Thigpen | $7,868.46 |
| Christopher Filardi | $19,670.89 |
| Douglas Bates | $7,868.46 |
| George Koerner | $12,934.16 |
| Kevin Walz | $19,670.89 |

126.    Holding (DE) was the borrower under the 2003 Credit Facilities, and Holding

(PA), Werner, and certain of Holding (DE)'s other subsidiaries guaranteed the obligations.  The

2003 Credit Facilities were secured by (i) substantially all assets of Holding (PA) and certain of

its subsidiaries and (ii) 100% of the capital stock of those subsidiaries.

127.    The Company also paid approximately $21.5 million in transaction fees, including

approximately $4 million to secure the 1997 Bondholders' consent, "transaction bonuses" to

management amounting to $1.725 million, a "deal fee" and related expenses to Investcorp of over $1.1 million, and a "deal fee" and related expenses to Leonard Green of over $2.6 million. None of these fees paid for services that benefited the Company's business in any way.

128.    Management was persuaded to go through with the 2003 Shareholder Cashout and thereby breach their fiduciary duties because they were improperly influenced by the promise of large bonuses. The "transaction bonuses" granted by the Company to the people who actively participated in preparing false information included:

- $250,000 to Steven Bentson;

- $250,000 to Larry Friend;

- $250,000 to Edward Gericke;

- $250,000 to Dennis Heiner;

- $250,000 to Peter Coin;

- $250,000 to Eric Werner;

- $50,000 to John Fiumefreddo;

- $50,000 to Timothy Lewis;

- $15,000 to John J. Dylik;

- $10,000 to Wendy A. Meikle;

- $10,000 to Lisa A. Pressler; and

- smaller bonuses to other employees.

129.    None of the proceeds of the 2003 Credit Facilities and the $65 million investment by Leonard Green benefited the Company. Instead, after paying off the prior existing debt with the new debt proceeds, substantially all of the remaining money went into the bank accounts of the 2003 Shareholder Defendants. Further, the transaction increased secured debts of the

Company and thereby further diminished the prospect that any of the Company's general unsecured creditors would be paid their valid debts.

130.    Just as the 2003 Shareholder Cashout closed, the Company's senior management internally reported that sales to Home Depot had declined $11.6 million (14.6%) year-to-date versus the prior year.  Senior management also acknowledged that sales to the professional channel also had declined 8.8%, and sales to the Hardware channel were down 9%.  In addition, senior management already knew of "another potential merchant change at Home Depot."  As discussed above, the Self-Interested Insiders knew or recklessly disregarded that the Company had no realistic chance of retaining Home Depot's business in the face of Home Depot's import program.

### G.    The So-Called "Solvency" Opinion of Murray Devine

131.    In connection with the 2003 Shareholder Cashout, the Self-Interested Insiders once again attempted to facilitate their scheme by purchasing a "solvency" opinion from Murray Devine & Co for $45,000.  Murray Devine issued its opinion on June 11, 2003, which falsely concluded, once again, that the Company was solvent.

132.    Despite its conclusion, the Murray Devine opinion itself showed that the Company was, in fact, insolvent.  For example, the opinion noted that management's own projections "indicate insufficient liquidity to redeem the [1997 Bonds] at maturity and assume a refinancing…upon their maturity on November 15, 2007."  The opinion also noted that management "has prepared Projections that show [Holding (DE)] with outstanding loans under the A/R Facility after its maturity date."

133.    Murray Devine chose to ignore these and other facts that directly contradicted their conclusion of solvency by "assuming them away" based on implausible and unrealistic

management explanations.  Investcorp and the Company's directors and officers knew or should have known that the opinion was a sham and could not be relied upon to justify their actions.

**H.    The 2003 Shareholder Cashout Deepened the Company's Insolvency**

134.    The 2003 Shareholder Cashout furthered the Company's insolvency by decreasing the Company's already unreasonably small capital and further impairing the Company's ability to pay its debts as they matured or came due.

135.    The Company's audited financial statements for the year ending December 31, 2003 reflected a $231.9 million shareholders' deficit, roughly a $130 million decline from the prior year.  The Company's 2003 10-K admitted that the "shareholders' deficit occurred as a result of a redemption of common stock of $332.9 [million] in connection with a recapitalization that occurred in 1997….  The shareholders' deficit increased in 2003 by $147.0 [million] as a result of redemption of common stock that occurred in connection with the recapitalization that occurred in 2003."  The Company also admitted in its 2003 10-K that its "liquidity and capital resources were significantly impacted as a result of the Recapitalization that occurred on June 11, 2003."  The Company further admitted at the time that it might not be able to comply with its debt covenants for the second half of 2004.  All of these facts show that the solvency opinion was baseless and could not have been based on a thorough review or analysis of the Company's financials as required by minimum professional standards.  Investcorp and the Company's directors and officers knew or should have known the worthless nature of the opinion and that it could not be relied upon.

**I.      Investcorp and Leonard Green Are Controlling Shareholders**

136.    After the 2003 Shareholder Cashout, Investcorp and its affiliates owned approximately 51% of Werner's outstanding stock, Leonard Green and its affiliates owned approximately 22%, and the Werner/Solot families and management owned approximately 26%.

137.    Following the 2003 Shareholder Cashout, Holding (PA) reconstituted its Board of Directors to have nine members.  Investcorp and its affiliates had the right to designate no fewer than four directors.  Leonard Green and its affiliates had the right to designate two directors. The Werner Family Controlling Shareholders had the right to designate two directors, with Holding (PA)'s CEO acting as the ninth director.

138.    Investcorp and Leonard Green also had special rights to control the Company.  For most transactions outside the day-to-day manufacturing operations of the business, the Company had to secure the approval of a majority of directors, including at least one director designated by Investcorp and its affiliates and one director designated by Leonard Green and its affiliates.

139.    The Investcorp designated board members exercised day-to-day decision-making control over the Company.

140.    Both Investcorp and Leonard Green were controlling shareholders of the Company.

**J.      Investcorp and Leonard Green Are Parties to Management**

        **Agreements**

141.    In June 2003, the Company entered into a so-called "Management Services Agreement" with Leonard Green, by which the Company agreed to pay Leonard Green a non-refundable annual fee of $1 million.   Under the agreement, Leonard Green was required to provide management, consulting and financial planning services to the Company on an ongoing

basis.  In addition, the existing management agreement with Investcorp was amended to provide for an annual management fee of $1.0 million.

142.    In or about late November 2003, the Company paid $1 million to Investcorp International, Inc. and $1 million to Leonard Green & Partners, L.P. as "management fees" for the twelve months ending November 25, 2004.

**K.    Within Months of the June Closing of the 2003 Shareholder Cashout, the Undisclosed Risks Facing the Company Become Reality**

143.    At least as early as August 2003 (and, upon information and belief, earlier), the Company learned from industry contacts that there were "new Chinese import SKUs in production" for Home Depot.  On August 25, 2003, CEO Dennis Heiner internally reported, "recent intelligence was confirmed that Home Depot is importing some fiberglass steps, sooner not later.  We hear a type 2 promo to 10 SKU's totaling 100,000 units."

144.    Confirming the Company's known but undisclosed fears and warnings it received from March 2003 to May 2003, discussed in paragraphs 96 through 104 above, in August 2003, Home Depot met with the Company and confirmed that it had decided to replace all fiberglass stepladders previously purchased from the Company with Tricam imports.  Home Depot reported that it was pleased with the performance of the import program, and that the Company had been given the opportunity to compete for the business in May 2003 with the "all the business proposal" (see paragraph 104 above), but the Company had failed to offer any competitive proposals.

145.    Home Depot also disclosed that it would conduct a "line review" at the end of October 2003 for "all of the business or none of the business" for extension ladders.  In short, Home Depot sought the Company's best bid for Home Depot's extension ladder business.

146.   Shortly after this meeting, the Company's management estimated, based on 2002 data, that "losing the Home Depot step ladder business" would decrease sales by $60 million and EBITDA by $13 to $19 million annually.

147.   The Company's management estimated that if the Company also lost the Home Depot extension ladder business, it would result in an additional $67 million in lost sales and $13 to $18 million in lost EBITDA.  All told, the Company's management internally acknowledged that Home Depot's import program had reduced the Company's sales by at least $100 million and EBITDA by at least $20 million.

## L.    The Self-Interested Insiders Continue to Fail to Disclose Additional Lost Business

148.   The Self-Interested Insiders knew that the loss of Home Depot's stepladder business alone would result in the Company breaching covenants in the 2003 Credit Facilities beginning in the third quarter of 2004.  Yet, the Self-Interested Insiders significantly delayed reporting Home Depot's decision to lenders, the 1997 Bondholders and the public.  Indeed, throughout September 2003 and much of October, Investcorp and the Company's directors and officers continued to conceal from lenders, the 1997 Bondholders, and the public that the Company would not be able to comply with required covenants which had been agreed to just a few months before.

149.   At least as early as September 2003, consistent with the knowledge learned by the Self-Interested Insiders from January to May 2003 as set forth in paragraphs 90 to 104 above, Home Depot explicitly confirmed that it was under "a lot of pressure from above to convert the whole business (steps and extensions) to import."  Investcorp internally recognized the possibility that at the line review, the Company would lose the extension ladder business at

Home Depot to imports.  Investcorp also knew or recklessly disregarded that the problem would likely get worse given Home Depot's initiative to source 10-15% of its $50 billion business from the Far East and the Company's inability to lower prices to competitive levels due to its crushing cash interest burden incurred in the 1997 and 2003 Shareholder Cashouts.

150.    In the middle of October 2003, Investcorp and senior management at the Company finally provided limited information to the 1997 Bondholders by filing an 8-K, although it did not conduct conference calls or meetings with the lending group to avoid "undue alarm in the near term."  The Company's 8-K, filed October 17, 2003, finally disclosed the previously known but concealed information that Home Depot had decided that it would "no longer purchase aluminum and fiberglass stepladders from Werner" and that Home Depot would "purchase these products directly from China."  Of course, Home Depot had informed the Company of its decision regarding fiberglass stepladders more than two months earlier, and had informed the Company of its decision regarding aluminum stepladders at the beginning of 2003. Once this information was revealed to the public, the trading price of the 1997 Bonds immediately fell over 30%.

**M.    The Company's Massive Debt Load Prevents it from Offering Competitive Pricing**

151.    The Self-Interested Insiders knew well before the 2003 Shareholder Cashout that the Company could not lower its prices enough to satisfy Home Depot and still pay the massive cash interest on its debt.  Despite the warnings from Home Depot that the Company needed to lower its prices by a "gargantuan percentage" discussed above in paragraph 104, therefore, the Company went into the Home Depot line review on October 21, 2003 with the "strategy" of gaining the entire extension ladder business by submitting initial bid pricing at only a 4 ½ %

56

discount.  At the meeting, Home Depot warned the Company that there was a "significant bid difference" between prices charged by the Company and its competitors.

152.    At a follow-up meeting on October 22, 2003, Home Depot informed the Company that its 4 ½% discount proposal had no chance of success and that the pricing gap between the Company and its competitors was in the "high double digits."  The Company responded by increasing its proposed discount to 7%, although internally it had projected that Home Depot would require at least a 9-10% discount to gain the extension ladder business.

153.    A month later, the Company and Home Depot met again.  Home Depot reported that the Company's higher pricing placed it at a significant disadvantage, but Home Depot offered the Company 60% of the extension ladder business, estimated at $45-$50 million, if the Company would provide a 12% price reduction.  Under this proposal, the Company would lose an estimated $13-$15 million in extension ladder sales to Louisville Ladder Company, who would have the remaining 40% share of Home Depot's business.

N.    **The Self-Interested Insiders Continue to Breach their Fiduciary Duties by Acting in their Own Interests to the Detriment of Creditors**

1.    **The Company Drops Industry Giant Home Depot**

154.    Around this time, Lowe's offered the Company a five-year exclusive contract in exchange for the Company dropping Home Depot.  The Company's management understood that accepting the Lowe's offer meant losing access to Home Depot's 40% share of the market and that the Company would have to recapitalize or refinance its existing debt.  Despite these significant adverse consequences, management decided to pursue the exclusive contract with Lowe's.

155.    On December 3, 2003, Company senior management met with the CEO of Lowe's.  The parties agreed in principle to a two- or three-year exclusive contract, targeting 30-40% annual

growth.  On December 11, 2003, the Company and Lowe's entered into a Letter of Understanding setting forth the terms of a three-year exclusive deal between the parties.  The Self-Interested Insiders knew that the Lowes contract was no substitute for the lost Home Depot business.

156.    A few days later, the Company notified Home Depot of its decision to drop Home Depot as a customer, (although Home Depot was in the process of heavily reducing business with the Company) citing to Home Depot's import program as one of the driving forces that caused the Company to reach an exclusive deal with Lowe's.

2.    **Lenders and the 1997 Bondholders Interrogate Management While the Company's Debt Ratings Continued to Fall**

157.    Throughout December 2003, as information leaked out about Louisville Ladder's gaining market share in Home Depot's extension ladder business, the Self-Interested Insiders dodged inquiries from dozens of 1997 Bondholders and ratings agencies.

158.    On December 19, 2003, the Company filed an 8-K with the SEC, publicly revealing for the first time that it had agreed to sell Werner branded climbing equipment exclusively to Lowe's and to discontinue supplying Home Depot.  The Company reported that sales to Home Depot in 2002 amounted to over $160 million.

159.    On a December 31, 2003 conference call with lenders, the Self-Interested Insiders represented that the Company would be able to service its debt going forward, but that it would be asking for a long-term modification of covenants, and, possibly, a modified principal amortization schedule.  The lenders complained that they had not been told about the $20 million of lost sales in the first quarter of 2003, and that the first time that they heard of the Company losing Home Depot business to Chinese imports was in October 2003, after the Company had distributed a sizable dividend to shareholders just a few months earlier.  The lenders also

complained that the Company had not disclosed the substantial risk that Home Depot would take a significant amount of business away from the Company. The lenders further asserted that the Company's knowledge that Home Depot had taken steps to source ladders from China before the 2003 Shareholder Cashout should have been disclosed.

160.    The Company did not conduct a conference call with the 1997 Bondholders until the beginning of 2004. On that call, the Company refused to answer any questions.

161.    Both Moody's and Standard and Poor's lowered the Company's corporate debt ratings and reported a negative outlook.

162.    By January 2004, Investcorp internally reported that the credit markets believed that the Company's equity was "fully impaired." Upon information and belief, Investcorp had known this since the 1997 Shareholder Cashout.

163.    By May 2004, each of the Self-Interested Insiders knew or should have known that the Company was insolvent. Instead of seeking protection for the creditors by pursuing a financial restructuring to delever the Company they proceeded to prolong the life of the Company to extract more cash and benefits for themselves.

164.    On December 3, 2004, Standard & Poor's Ratings Services further lowered its corporate credit rating of the Company to CCC+ from B. The rating agency concluded that the Company's outlook was "negative" due to the Company's poor operating performance, very aggressive debt burden, and pressures on earnings and liquidity, which could lead to near term covenant compliance issues. It also concluded that if liquidity did not improve over the next year the Company's cash flow could be insufficient to restructure its operations and meet debt service requirements. Standard & Poor's determined that the Company could violate material covenants as early as December 31, 2004, and warned that, even if the Company obtained

another covenant waiver from its lenders, the increased fees and expenses would likely lead to more liquidity erosion.

**O.    From 2004 to 2006, the Self-Interested Insiders Further Destroy the Company's Value by Focusing on their Out-Of-The-Money Equity Interests and Management Fees**

  **1.    In 2004, the Self-Interested Insiders Seek Loan Amendments and Debt Covenant Waivers Which Provide No Value to the Company**

  165.    Despite public reports of the Company's increased financial struggles, the Company's directors, officers, and controlling shareholders continued to expend precious working capital on futile attempts to prolong the Company's existence, to preserve their equity option, and to delay reckoning in connection with the 1997 and 2003 Shareholder Cashouts.

  166.    Early in 2004, the Self-Interested Insiders were informed that "far-east sourced products" represented significant competition to the Company and that the Company could not compete without an aggressive restructuring.  For example, in April 2004, CFO Larry Friend's own calculations showed that the Company's stock was worthless only months after the 2003 Shareholder Cashout and by no later than the end of 2003.  He also projected that the Company's stock would remain worthless throughout 2004.

  167.    Management's efforts focused on developing detailed plans to reduce manufacturing and distribution capacity and to downsize the Company's overhead expense structure.  To compete with ladders sourced from China, the Company planned to phase out production at high-cost U.S. facilities and replace it with capacity in Mexico and sourcing from Asia.  These plans required substantial cash outlays, which the Company did not have the

capacity to use because of its highly leveraged condition as a result of the 1997 and 2003 Shareholder Cashouts.

168.    Therefore, the Company spent more money to achieve modifications to its debt obligations and to pursue long shot efforts to create value for insiders and shareholders' out-of-the money shareholder equity positions, while creditors shouldered all of the risk.  In April 2004, Management sought to amend the senior debt covenants to allow for a higher debt-to-EBITDA ratio.  In May 2004, the Company's senior secured lenders approved the loan amendment proposed by management.  The amendment, among other things, increased the Company's maximum debt-to-bank EBITDA ratio, allowing the Company to avoid defaulting on its prior debt covenants.  The Company spent $1 million in fees to effect the loan amendments.

169.    In a June 2004 conference call with senior lenders, management noted that the cost to complete restructuring and downsizing initiatives the Company wanted to implement would be in the range of $20 to $25 million, mostly to be incurred in 2004.

170.    Given the high cash needs of the Company, the debt covenant amendments would not be enough.

171.    In November 2004, Investcorp knew that a year-end covenant default was likely, even if the Company took potentially harmful action to achieve short-term covenant compliance. Operating performance further deteriorated due to manufacturing inefficiencies, poor inventory forecasting, and a shift towards a lower margin product mix.  Indeed, Investcorp estimated that free cash flow had sharply decreased from $17.3 million to negative $10.6 million.  Investcorp further acknowledged that any action taken to achieve short-term covenant compliance could still result in a covenant default in the fourth quarter and potentially harm the Company's performance.

172.    Around this time, the Self-Interested Insiders, including specifically Larry Friend, developed, and implemented, a fraudulent plan to manipulate the Company's financial numbers to satisfy loan covenants and so that the Company could refinance its debt obligations and stave off bankruptcy.  The scheme included intentionally stretching payables, taking receivables at a discount to generate cash and selling assets, all while searching for loopholes to extend existence of the Company.  These actions were undertaken despite the Self-Interested Insiders' knowledge that they were materially detrimental to the Company.

173.    In its 2004 financial statements, the Company reported a decrease in net sales of approximately $55 million, and a net loss of approximately $12 million.  This expanded shareholders' deficit by $26 million, increasing from $231,862,000 in 2003 to $257,912,000 in 2004.

**2.    In 2005, the Self-Interested Insiders Cause the Company to**
      **Waste Millions of Dollars in Fees for a Second Lien**
      **Refinancing that Provides No Benefit to the Company and**
      **Serves Only to Prolong the Inevitable Bankruptcy Filing**

174.    By early 2005, within a year of the Company's last restructuring of its debt, the Self-Interested Insiders were informed that the Company would need to obtain another waiver of the covenants in the 2003 Credit Facility, amend the covenants, or obtain refinancing.

175.    On or about February 3, 2005, the Company and JPMorgan Chase Bank met to discuss the Company's Preliminary 2005 Business Plan Financial Overview.  The financial overview incorporated all of the assumptions management made about the Company's performance in 2005.  These assumptions included a 12.2% increase in gross sales of Ladder Products of 12.2% and a 9.1% increase in sales of Extruded Products, despite decreases in sales of these products in each of the last three years.  The plan also unrealistically projected

aluminum costs at the December 2004 market price of 88 cents per pound despite the fact that the current market price already was higher.  Aluminum was the largest element in the Company's production costs, and an increase of $0.01 per pound would negatively affect annual EBITDA by $800,000.  The Company's alteration, therefore, resulted in an increase in the "projected" EBITDA of several million dollars.

176.    No reasonable basis existed for the assumptions underlying the projections.  The projections regarding aluminum were particularly unfounded in that they were formed without regard to the fact that the Company was unable to afford proper hedging against increases in aluminum prices due to its highly leveraged state and payment of millions in fees each year to Investcorp and Leonard Green.  Historic increases in the price of aluminum contradicted the Company's unrealistic projection that prices would remain steady or decrease.

177.    Even incorporating all of management's false assumptions, made with knowledge of their falsity or reckless disregard for whether they were true or false, JPMorgan still concluded that, based on the preliminary business plan, the Company would "not comply with debt covenants effective as of the end of the first quarter of 2005."

178.    The projected balance sheet in the 2005 business plan demonstrated that there was no value for equity shareholders in the Company and that Investcorp, Leonard Green and the directors and officers were in breach of their fiduciary duties to creditors by failing to seek bankruptcy protection or a financial restructuring immediately.  The balance sheet showed that even under the best-case scenario, the Company would suffer drastic losses and further expand negative net worth.

179.    Upon information and belief, the Self-Interested Insiders knew that the Company would soon violate lender covenants and that breached covenants would prevent the Company's auditors from issuing opinions necessary to comply with SEC filing requirements.

180.    Eventually, Investcorp, Leonard Green, and the Company's directors and officers concluded that the only way to try to protect their interests (i.e., fees, excessive salaries and phantom residual equity stake) and to create as much distance as possible between the 2003 Shareholder Cashout and the inevitable bankruptcy filing was to waste more of the Company's dwindling assets by refinancing the 2003 Credit Facilities.

### 3.    In February 2005 the Company Retains Loughlin Meghji

181.    In February 2005, the Company hired Loughlin Meghji for the supposed purpose of assisting management in presenting its business plan and forecasts to its lenders and developing a new business model, operational improvements, and project management.

### 4.    In March 2005, the Company Retains Insolvency Counsel

182.    On March 8, 2005, the Company's own analysis showed that it was in breach of at least one of the financial covenants resulting from the 2003 Shareholder Cashout loans. Though the Self-Interested Insiders would cause the Company to delay filing for over a year, in or about this time, the Company hired Willkie Farr & Gallagher LLP ("Willkie Farr") as bankruptcy counsel and began preparing for a bankruptcy filing. The Company paid Willkie Farr approximately $70,000 for Willkie Farr's work in March and April 2005.

183.    In the face of the Company's inability to comply with its loan covenants, the Company's auditors, PriceWaterhouseCoopers ("PWC"), refused to provide a clean audit opinion and the Company was unable to file necessary SEC documents. The Company sought twelve months of covenant relief from its lenders, but the senior lenders refused. Upon

information and belief, to convince the First Lien Holder Banks to provide a 40-day waiver for covenants, senior management prepared fraudulent and unsupportable projections showing increased sales and profits. Their scheme worked.

184.    On or about March 30, 2005, the Company's Board approved an agreement waiving the bank covenants until May 10, 2005. To obtain the banks' consent, the Company paid hundreds of thousands of dollars to the banks in fees.

185.    Although the Self-Interested Insiders also engaged in contingency planning for both in court and out of court restructuring opportunities, the 40-day waiver provided Investcorp and the Company's directors and officers a brief amount of time to arrange for financing that would delay the Company's bankruptcy filing another year. Among other reasons, given the Company's insolvency, Investcorp, Leonard Green, and the Company's officers and directors were motivated to try to outlive applicable statutes of limitation relating to their misconduct regarding the 2003 Shareholder Cashout.

186.    On or about March 31, 2005 the Self-Interested Insiders decided that the Company would no longer file reporting documents with the Securities Exchange Commission.

187.    On or about April 25, 2005, the Company finally was able to obtain a commitment for a $100 million Senior Secured Second Lien Facility and a new $50 million accounts receivable financing facility. To secure this commitment, the Company's directors, officers, and newly hired advisor Loughlin Meghji presented to lenders fraudulent financial projections, prepared by, among others, Loughlin Meghji and Larry Friend. As Mr. Friend admitted in a meeting a few months later, the Company's officers and directors, and Loughlin Meghji knew that the figures were false and had been fabricated, but presented them to lenders simply to secure a refinancing and avoid bankruptcy.

188.    The projections provided to lenders were intentionally and materially false and misleading.  While the projections, prepared in March 2005, estimated achieving $16.75 million in EBITDA for 2005, the Company's EBITDA for 2005 actually was negative $1.526 million.

189.    Investcorp understood that the Company needed to finalize its refinancing so that it could get the needed amendment from the existing bank group.  Without the amendment from the senior lenders, PWC would not issue an unqualified 2004 audit opinion.  In fact, PWC only issued its unqualified 2004 audit opinion after the effective closing of the refinancing.

190.    Having secured the commitment for the $100 million refinancing, the Self-Interested Insiders abruptly directed the Company and its insolvency counsel to cease preparations for filing bankruptcy.  On May 5, 2005, the directors obtained approval for the amendment to the existing first lien credit agreement, which paid 97% of the new loan proceeds to the senior lenders and fees.  The amendment gave the Company potential covenant relief for two years and provided that the proceeds from the $100 million in new loans were to be applied to the loans under the first lien credit agreement in direct order of maturity, satisfying the next 2 ½ years of amortization requirements.

191.    On May 5, 2005, the directors met to review and approve the proposed 2005 Senior Secured Debt Refinancing (the "2005 Refinancing").

192.    On May 10, 2005, the Company entered into a Credit Agreement for an aggregate Senior Secured Second Lien Credit Facility of $100 million (the "2005 Credit Facility").  Approximately $91.7 million of the facility's proceeds went directly to the senior lenders to repay amounts outstanding under the 2003 Credit Facility, approximately $5.5 million went directly to pay fees and expenses associated with the loan, and the remaining $2.8 million was

retained to assist in servicing the Company's ever-growing debt.  Virtually all of the secured debt issued in connection with the 2005 Credit Facility would go unpaid in the bankruptcy.

193.    The 2005 Credit Facility matured on December 11, 2009 or May 15, 2007, if the 1997 Bonds were not refinanced prior to May 15, 2007.  As discussed below, the 1997 Bonds were never refinanced and remain unpaid.

194.    Interest under the 2005 Credit Facility was extraordinarily high, defined as the higher of the prime rate, or the Federal Funds Rate plus 0.50%, plus an interest margin of 9.00% or LIBOR plus an interest margin of 10%.  In either case, 1.5% of the interest payable was capitalized rather than paid in cash because the Company didn't have the money to pay current cash interest on its secured debt.

195.    On May 10, 2005, in connection with the 2005 Credit Facility, Larry Friend knowingly signed a solvency certificate stating falsely that the Company was solvent and asserting that the Company's projections were reasonable and attainable.  Like the prior solvency opinions obtained from Murray Devine, this solvency certificate had no backup analysis and was not based in fact or prepared in good faith.

196.    Upon information and belief, the 2005 Credit Facility never was intended to provide a long-term solution to the Company's increasing financial woes.  It was instead a short-term fix for the Company's hemorrhaging finances.  Even after the refinancing, the Company remained dangerously close to defaulting on its financial commitments and loan covenants.  As early as May 12, 2005, two days after the 2005 Credit Facility closed, Investcorp knew that the Company would "need to explore a full refinancing in late 2006 or early 2007."   In a June 15, 2005 presentation, LM stated that one of its next objectives was to "Position Werner to be

tracking EBITDA run-rates which allow the Company to launch a refinancing plan by the end of the 2nd Quarter of 2006."

197.    The Company was insolvent well before and after the 2005 Refinancing.  As such, the directors and officers had an undeniable fiduciary duty to care for the interests of the Company's creditors.  Had they fulfilled this duty and caused the Company to declare bankruptcy prior to the 2005 Refinancing, the Company could have saved millions of dollars for its creditors.

198.    In a June 9, 2005 conference call, the Company's CEO, Steve Richman, explained to the 1997 Bondholders that the Company was progressing as planned with its restructuring and optimization program, which it expected to cost between $55 and $60 million (more than double what had been "projected" in 2004) and yield annual benefits of approximately $40 million when complete in 2008.  At this time, the Self-Interested Insiders knew or should have known that the Company would not survive until 2008 or be able to finance $55 to $60 million dollars to complete the restructuring.

199.    Larry Friend also addressed creditors during the call and explained that general and administrative expenses were more than $1 million higher than in the same quarter in 2004 because of the higher professional fees incurred, mostly in connection with the refinancing.  He also disclosed that EBITDA for the current quarter was negative $1.1 million.

200.    At this point, Investcorp, Leonard Green, and the Company's directors and officers were simply playing a financial shell game, moving money around to buy time, with the help of their advisors.  The Company's Condensed Consolidated Statements of Income for the second quarter reflect a net loss of $5,378,000 and a year-to-date net income loss of $14,673,000.

201.   Later in 2005, the Self-Interested Insiders, including Larry Friend, again manipulated the Company's financials in an attempt to "comply" with debt covenants.

202.   In November 2005, Miller Buckfire & Co., LLC ("Miller Buckfire") proposed that the Company evaluate whether it should seek a "band aid" covenant amendment or a more comprehensive deleveraging transaction to address its dire financial condition.  Miller Buckfire noted that the Company's "substantial fixed charges," largely consisting of the interest expense on the Company's debt incurred in 1997, 2003 and 2005, constituted a significant impediment to any future restructuring.

203.   At that time, the Self-Interested Insiders expected the Company to breach financial covenants in the first quarter of 2006 or earlier.  They also expected that the Company's liquidity would worsen by an additional $18 million or more in 2006, due to the impending covenant violations and "going concern-qualified" audit opinion that the Company expected was forthcoming from their auditors.

**5.      The Self-Interested Insiders Liquidate the Company's**

       **Extruded Products Division Which Further Diminishes the**

       **Value of the Company**

204.   On or about January 27, 2005, the Company retained Tri-Artisan Partners LLC to provide investment-banking services "in connection with the possible sale, merger, consolidation, reorganization, or other business combination, tender offer or similar transaction involving all or a substantial portion of the business, assets, or stock of the Company's Extruded Products division."

205.   By the end of 2005, the Company liquidated its Extruded Products division, selling it to WXP, Inc., an affiliate of H.I.G. Capital, LLC, for approximately $18 million.  The

Company also sold its Anniston, Alabama manufacturing and distribution facility to B.R. Williams Trucking Company for approximately $5 million, even though it apparently incurred approximately $7.6 million in expenses through the sale because of employee severance and equipment relocation costs. From the short-term perspective of the Self-Interested Insiders in control of the Company, though, these actions were a "critical part" of the Company's ability to comply with debt covenants and stay afloat. In fact, the extruded products business generated $2-3 million per year in EBITDA; and its liquidation only further devalued the Company's assets. The Company took a loss of almost $19 million on the sale.

### 6.    The Company's Debt Burden Cripples Ongoing Business Operations

206.    Aluminum was the largest element in the Company's production costs, and an increase of $0.01 per pound would negatively affect annual EBITDA by $800,000. Historically, the Company engaged in strategic hedging to guard against fluctuations in the market. In 2005, however, the Company's debilitating debt load and payments to Investcorp and Leonard Green prevented its ability to continue to take this precaution.

207.    In a March 10, 2005 meeting, the Company highlighted rapidly increasing aluminum prices and reported that "continued hedging is cost prohibitive at current prices" and that it had "limited availability to pass on cost increases to Climbing Products customers." In short, the Company's highly leveraged condition left it financially constrained and it could not afford to hedge aluminum, as it otherwise would have.

208.    The Company's inability to hedge aluminum prices (as upon information and belief the Company's major competitors had done) due to its extreme debt load and payments to all of its advisors and insiders, including Leonard Green and Investcorp, resulted in the Company

ultimately paying far more for aluminum than it could afford, further debilitating the Company's operations, and adding to its deepening insolvency.

> **7.      In 2006, the Self-Interested Insiders Take Further Actions Against the Company's Interests, But Finally File for Bankruptcy Protection**

209.    Investcorp recognized early in 2006 that bankruptcy was a virtual certainty.  One memorandum remarked, "[w]e are completing the 2006 budget and the outcome is not pretty . . . continued record high prices for aluminum with little abatement forecasted.  As such this will be a VERY difficult restructuring to accomplish outside of court." The Company's management projected debt ratio forecasts vastly exceeding covenants by about 30% beginning the first quarter of 2006 and rising to a projected six times allowed ratios by the end of the year.

210.    In the spring of 2006, the Company secured waivers from its first and second lien lenders waiving potential 2005 year-end and 2006 first quarter covenant defaults until May 10, 2006, and then to June 14, 2006.  The lenders also waived the requirement of a clean audit opinion on the Company's 2005 year-end financial statements.  The Company paid $160,349.84 (0.125%) for the waiver from its first lien lenders, not including tens of thousands of dollars of additional fees incurred by the Company in related legal fees.  The Company also paid $125,000 (0.125%) to the second lien lenders.

211.    By this time, Investcorp knew that the Company would file for bankruptcy protection "in May or June – possibly as early as May 10th, but no later than June 10th."

212.    The Company failed to make its required bond interest payment on May 15, 2006, and planned to file for Chapter 11 bankruptcy protection on June 2, 2006.

213.    Having wasted millions of dollars avoiding its imminent bankruptcy filing, the Self-Interested Insiders further breached their fiduciary duties by prolonging the filing from June 2, 2006 to June 12, 2006, three years and one day after Investcorp and the directors and officers of the Company closed the 2003 Shareholder Cashout that saddled the Company with more debt and led to its ultimate downfall.  The Company should have been prepared to file, and should have filed for bankruptcy protection long before June 12, 2006.  It had retained its bankruptcy counsel more than a year earlier, in March 2005.

**P.    Throughout the Long Financial Descent from 1997 to 2006, the Company Paid Millions of Dollars in Fees to Advisors and Others That Provided No Value to the Company**

214.    The Company incurred charges of $101.2 million relating to the 1997 Shareholder Cashout and over $20 million in fees alone in the 2003 Shareholder Cashout.

215.    Recognizing that their equity was clearly out of the money, upon information and belief, defendants' motivation was to keep the Company alive and put as much distance as possible in between the Shareholder Cashouts and the Company's inevitable bankruptcy filing, thus leaving the Company to pay advisory fees and excessive salaries while also maneuvering to delay any third-party review of the misconduct of the Self-Interested Insiders.

216.    To those ends, throughout the long financial descent from 1997 to 2006, Investcorp, Leonard Green, and interested directors and officers caused the Company to pay millions of dollars more in fees that damaged the Company and its creditors.  These significant expenditures served only the shareholders' interests in stretching out the Company's life at all costs in speculative attempts to revive shareholders' negative residual stake in the Company and to protect from disgorgement of their illegally obtained Company distributions.

217. The Company paid millions of dollars in fees for all of the covenant waivers, amendments, and refinancing efforts described above. For example, and without limitation:

- The Company paid approximately $500,000 for the March 2005 waiver of covenants for the senior secured debt from the 2003 Shareholder Cashout; and

- The Company paid approximately $5.5 million in fees and expenses for the 2005 Credit Facility.

218. The Company also paid millions of dollars to restructuring and financial advisors. For example, and without limitation:

- In February 2005, the Company retained LM for the supposed purpose of assisting management in presenting its business plan and forecasts to its lenders and developing a new business model, operational improvements, and project management. In fact, LM was retained to help Investcorp and the directors and officers carry out their self-interested schemes at the expense of the Company's creditors. Indeed, LM provided substantial assistance to the Company in presenting fraudulent financial projections to lenders to secure the refinancing in May 2005. LM was directed to report to Investcorp as well as to the Company's CEO Steven Richman. The Company paid LM a retainer of $150,000 plus $150,000 per month, and also agreed to pay a "value added adjustment" subject to negotiation. Between February 2005 and April 2006, the Company paid LM over $2 million.

- At about the same time, the Company's board of directors unanimously approved retention of Willkie Farr. Although Investcorp, Leonard Green, and their interested directors would continue wasting millions of dollars trying to secure value for themselves (at least in the form of fees and salaries) and avoid fraudulent transfer litigation for

another 15 months, Willkie Farr eventually would represent the Company in its
bankruptcy filing on June 12, 2006.

- Early in January 2006, the Self-Interested Insiders knew bankruptcy was imminent, but,
  instead of filing for bankruptcy protection, the Company actively began shopping for
  restructuring firms, and hired yet another advisor, Rothschild, Inc., to explore further
  financing alternatives.  The Self-Interested Insiders knew that no chance of successfully
  re-financing the Company existed at this time, they had simply waited much too long.
  The Company's 2006 business plan revealed payment of $9.8 million in fees for
  restructuring advisors through July.

219.   Throughout the long descent described above, the Self-Interested Insiders looked
out for their own interests, at the expense of the interests of the Company and its creditors.  Their
self-interest is apparent from numerous other actions they took.

220.   First, they continued to take millions of dollars from the Company in the form of
"management fees," even while the Company spiraled into bankruptcy.  For example, and
without limitation:

- Certain management of the Company proposed in April 2004 that it suspend management
  fee payments until EBITDA levels increased, but Leonard Green rejected the proposal.

- Despite pending disaster, in or about late November 2004, the Self-Interested Insiders
  caused the Company to pay $1 million to Investcorp International, Inc. and $1 million to
  Leonard Green & Partners, L.P. as "management fees" for the twelve months ending
  November 25, 2005.

- In or about January 2006, the Company paid $1 million to Investcorp International, Inc. and $1 million to Leonard Green & Partners, L.P. as "management fees" for the twelve months ending November 25, 2006.

- Even the Company's 2006 business plan called for payment of these fees to Investcorp and Leonard Green.  The management fees Investcorp and Leonard Green received from 1997 to 2006 were entirely undeserved, as Investcorp and Leonard Green acted in their own self-interest, to protect themselves from liability at the expense of the Company and its creditors.  Investcorp and Leonard Green provided no beneficial services to the Company, all of their actions focused on attempting to protect their equity investment to the detriment of creditors.

221.    Second, the Self-Interested Insiders continually put their self-interest as residual shareholders before the Company's interests by taking actions to delay the inevitable bankruptcy filing.  For example, and without limitation:

- Acknowledging that they were exposing themselves to significant liability in continuing to pursue their own profits to the detriment of the Company, and anticipating future litigation, the Self-Interested Insiders caused the Company to change its insurance to include a particularly telling coverage expansion.  On or about June 30, 2005, in connection with renewing its insurance policy, the Company added Endorsement #23. Endorsement #23(a) the so-called "Bankruptcy Trustee Carve back," states that in consideration of the premium charged, the insured versus insured exclusion shall not apply in any bankruptcy proceeding by or against the Company, any Claim brought by the examiner, trustee, receiver, liquidator or rehabilitator (or any assignee thereof) of such Company, if any.  In other words, the Company paid for additional insurance

coverage for lawsuits such as this one, brought in a bankruptcy context by insureds against each other.

- Once again utilizing the Company's funds for their own gain, on or about January 3, 2006, Investcorp and the self-interested directors and officers caused the revision of Endorsement # 4 to the Company's insurance policy to delete the specific exclusion of claims made against Investcorp. Such a change would have no benefit for the Company or even its directors and officers. Indeed, to the extent Investcorp could be deemed covered by the policy, the change would in effect lessen coverage for the Company and its directors and officers because the policy is a burning limits policy. Any coverage provided to Investcorp would reduce coverage available for the Company and its directors and officers.

- By the end of October 2005, the Company's senior management expected "significant shortfalls" throughout 2005 and proposed taking a "shorter-term, less strategic view" simply to maintain compliance with debt covenants in 2006.

- Consistent with the Self-Interested Insiders' motive to seek any potential avenue for recovery for out-of-the-money-equity, no matter how detrimental to the Company and its creditors, the Company hired Rothschild in January 2006 to focus on the Company's interested board of directors' mandate to "extend the runway." The Self-Interested Insiders sought to give themselves as much time as possible to gamble on a significant decline in high aluminum prices, although those prices showed no sign of abatement.

222.    Third, the Self-Interested Insiders refused to shoulder responsibility for the risks they caused the Company to undertake, instead improperly attempting to shift those risks to creditors. For example, and without limitation:

- Although they understood that no money would be available to it or other equity holders in a bankruptcy proceeding, Investcorp and its affiliates refused to return any of the more than $100 million in dividends, share repurchase proceeds, management fees, and other payments it had received from the Company at the expense of its creditors.  Investcorp concluded that there was "no economic case for re-investment in the business," and refused to provide the funds that would have been required for the Company to survive.  Leonard Green also refused to return its management and "deal" fees or other payments.

- Although creditors proposed recapitalization plans to the Company in March and April 2006, the Self-Interested Insiders refused to proceed or even negotiate with respect to such proposals because the proposals did not offer equity holders any recovery, absent equity holders' providing some contribution up front.

223.    The Self-Interested Insiders also caused the Company to continue to provide significant compensation to officers and directors from 2004 to 2006.  Notable examples from 2004 include total compensation packages of $6,687,022 to CEO Dennis G. Heiner, $397,455 to Director Donald M. Werner, $351,015 to Director Howard L. Solot (who resigned in the first quarter), and $201,752 to Dana R. Snyder of Investcorp (including directors fees and a separate "consulting fee" of $119,643).

224.    Investcorp also continued to exercise its control over the Company and its directors and officers in an inappropriate fashion.  For example, on or about March 1, 2005, Tarek Ajouz of Investcorp International, emailed Thomas J. Sullivan, an Investcorp appointed Director, regarding edits to the proposed LM engagement letter.  Specifically, Ajouz edited the engagement letter to remove a provision by which the Company promised to provide "current, complete, and accurate" information to LM and not to omit material facts.

225.    The Self-Interested Insiders clearly were trying to cover their tracks, but fully knew their actions were improper.  For example, and without limitation:

- In connection with its initial bankruptcy preparations in 2005, Willkie Farr provided Eric Werner with a memorandum detailing the expanding duties of directors and officers once a company is in the "Zone of Insolvency."  The memorandum specifically warned the Self-Interested Insiders that directors and officers may be subject to liability for deepening insolvency claims of creditors.

- In connection with the 2005 Refinancing, the directors called in the Company's outside counsel, Gibson Dunn & Crutcher, to provide a detailed presentation regarding directors' fiduciary duties.  Both law firms instructed that directors must be strictly loyal and act in the best interests of the corporation, and that abstention from board issues should be considered where there may be a question regarding disinterestedness.  Counsel further instructed that if the Company were in the "zone of insolvency," their directors' fiduciary obligations required that they act in the best interests of both creditors and shareholders, and that once the Company was insolvent, directors owed fiduciary duties solely to creditors.

- Upon information and belief, at the direction of Self-Interested Insiders, Larry Friend (the CFO) manipulated the financial statements of the Company to "comply" with debt covenants, and Larry Friend and LM presented false projections to lenders to restructure the Company's debt in 2005.

- The Self-Interested Insiders consulted bankruptcy counsel Willkie Farr in March 2005, but delayed filing for over a year – indeed, until one day after the three-year anniversary of the 2003 Shareholder Cashout.  Throughout this time period, they should have been

preserving claims for the benefit of the Company and its creditors. Instead, the delay was an attempt to avoid their own personal liability.

**Q.    Final Tally**

226.    All told, from 1997 to 2006, the Company dramatically deteriorated from a thriving, family-owned business that was a staple of United States manufacturing to a shell of its former self. It fired more than half of its workforce, reducing its employees from more than 2,700 to fewer than 1,200.

227.    The meteoric drop in its shareholders' equity from both the 1997 and 2003 Shareholder Cashouts is astonishing. The Company had positive shareholders' equity of $75 million before the 1997 Shareholder Cashout. The Company's balance sheets would never show positive net worth again. That equity was extinguished (many times over) through the payment of over $330 million to shareholders in the 1997 Shareholder Cashout and over $150 million to shareholders in the 2003 Shareholder Cashout. By the time shareholders were finished, the Company's books showed a negative $231 million net worth.

228.    No third party buyers were interested in purchasing the Company at an amount that would cover the Company's senior debt.

229.    The Self-Interested Insiders' actions from 2004 to 2006 only made things worse for the Company and its creditors. In 2004, the Company lost at least $30 million in book value, leaving it with a negative $260 million net worth. In 2005, the Company lost at least another $52 million, leaving it with a negative $312 million net worth. Moreover, the fees and costs paid out by the Company between 1997 and 2006 associated with the Shareholder Cashouts and 2005 Refinance and various professionals hired to assist with or prepare for these events other

attempted strategies to benefit Investcorp, Leonard Green, the Werner family shareholders, and the interested directors and officers total approximately $100 million.

230.    None of the approximately $100 million in fees paid in connection with these events ever benefited the Company in any regard, nor were they ever intended to do so.  These fees were paid solely to assist Investcorp, the Werner family shareholders, Leonard Green, and the interested directors and officers extract approximately $500 million from the Company and improperly delay its bankruptcy filing.

231.    As the Company admitted in its own bankruptcy filing, it was grossly upside down when it filed.  According to the Declaration of Larry Friend filed on that day, as of March 31, 2006, the Company's unaudited balance sheet reflected total assets, on a consolidated basis, of $201,042,000 versus total liabilities of $473,447,000.

232.    In the Company's own words, on the day it finally filed for bankruptcy in June 2006, the Company failed because it was "constrained by its highly leveraged capital structure .... Quite simply, we [had] too much debt."

233.    The Company was not able to reorganize and emerge from bankruptcy and the approved Plan was a plan of liquidation that contemplated the liquidation of all of the assets of the Company and distribution of all proceeds.

234.    Substantially all of the Company's assets were purchased for what was essentially a credit bid comprised of an amount approximately equal to or less than what was owed to the First Lien Holders, to the DIP financing lenders and to cover insignificant administrative expenses.  There were no third party non-creditor bids for the Company.

235.    All equity interests were extinguished in their entirety.

236.    The allowed Second Lien Claim and the General Unsecured Claims were transferred to and treated under the Liquidation Trust and received no repayment from the Company.  Over $1.8 billion still is owed to creditors, including secured creditors claims and general unsecured claims, including all amounts owed to the 1997 Bondholders and all claims held by product liability victims, trade creditors, and unpaid employee life insurance and retiree benefit claims.

237.    Investcorp, Leonard Green, Company shareholders, and the Company's directors and officers pocketed half a billion dollars of the Company's assets through a series of Shareholder Cashouts, bonuses, and so called "fees" while simultaneously destroying an iconic American manufacturing company to the detriment of the majority of the Company's hardworking blue collar employees and all of its general unsecured creditors.  The vast majority of the Company's creditors stand to receive only what the Litigation Designee can collect and distribute through the Liquidation Trust.

## V.

## Detailed Information Regarding the Company's Directors and Officers

## A.    Directorship of Holding (PA)

238.    As of December 1997, the directors of Holding (PA) were Donald Werner, Howard Solot, Savio Tung (Investcorp),[2] Charles Philippin (Investcorp), and Christopher Stadler (Investcorp).  Donald Werner was the Chairman and Howard Solot was the Vice Chairman.

239.    In 1999, James Egan (Investcorp), Charles Marquis (Investcorp), and Thomas Sullivan (Investcorp) joined the board, and Savio Tung (Investcorp) resigned from the board.  As of January 1, 2000, Dennis Heiner joined the board as he took over Donald Werner's previous

---

[2] In this section, the parentheticals identify the entity who appointed the director.

titles of President and Chief Executive Officer; however, Donald Werner remained on as Chairman.

240.    In November 2000, Mamoun Askari (Investcorp) became a director, replacing Charles Philippin (Investcorp).  In January 2001, Michael Werner was appointed to the board as Vice Chairman.  In 2001, Charles Griffith (Investcorp) and James Hardymon (Investcorp) became directors.  Mr. Griffith (Investcorp) resigned in January 2002 and was replaced by Stephen Tempini (Investcorp).  In 2002, Dana Snyder (Investcorp) joined the board.

241.    Just prior to the 2003 Shareholder Cashout, the directors of Holding (PA) were Mamoun Askari (Investcorp), James Egan (Investcorp), James Hardymon (Investcorp), Dennis Heiner, Charles Marquis (Investcorp), Howard Solot, Dana Snyder (Investcorp), Christopher Stadler (Investcorp), Thomas Sullivan (Investcorp), Steven Tempini (Investcorp), Donald Werner, and Michael Werner (the "2003 Shareholder Cashout Directors").

242.    As part of the 2003 Shareholder Cashout, Mamoun Askari (Investcorp), James Egan (Investcorp), Charles Marquis (Investcorp), Steven Tempini (Investcorp) and Michael Werner resigned as directors and were replaced by Peter Nolan (Leonard Green) and Michael Wong (Leonard Green), leaving a board of  James Hardymon (Investcorp), Dennis Heiner, Peter Nolan (Leonard Green), Howard Solot, Dana Snyder (Investcorp), Christopher Stadler (Investcorp), Thomas Sullivan (Investcorp), Donald Werner, and Michael Wong (Leonard Green).

243.    By April 2004, Eric Werner had replaced Howard Solot.  By January 2005, Steven Richman had replaced Dennis Heiner.  The board then retained the same directors until the Company declared bankruptcy in June 2006, except that in or about 2006, James Baker

(Investcorp) and James Egan (Investcorp) replaced James Hardymon (Investcorp) and Christopher Stadler (Investcorp).

**B.        Directorship of Holding (DE)**

244.    As of December 1997, the directors of Holding (DE) were Donald Werner, Howard Solot, Savio Tung (Investcorp), Charles Philippin (Investcorp), and Christopher Stadler (Investcorp). Donald Werner was the Chairman and Howard Solot was the Vice Chairman.

245.    In 1999, James Egan (Investcorp), Charles Marquis (Investcorp), and Thomas Sullivan (Investcorp) joined the board, and Savio Tung (Investcorp) resigned from the board. As of January 1, 2000, Dennis Heiner joined the board as he took over Donald Werner's previous titles of President and Chief Executive Officer; however, Donald Werner remained on as Chairman.

246.    In November 2000, Mamoun Askari (Investcorp) became a director, replacing Charles Philippin (Investcorp).

247.    In January 2001, Michael Werner was appointed to the board as Vice Chairman, but he later resigned that position. In 2001, Charles Griffith (Investcorp) became a director. Mr. Griffith (Investcorp) resigned in January 2002 and was replaced by Stephen Tempini (Investcorp).

248.    Just prior to the 2003 Shareholder Cashout, the directors of Holding (DE) were Mamoun Askari (Investcorp), James Egan (Investcorp), Dennis Heiner, Charles Marquis (Investcorp), Howard Solot, Christopher Stadler (Investcorp), Thomas Sullivan (Investcorp), Stephen Tempini (Investcorp), and Donald Werner.

249.    As part of the 2003 Shareholder Cashout, Mamoun Askari (Investcorp), James Egan (Investcorp), Charles Marquis (Investcorp) and Stephen Tempini (Investcorp) resigned as

directors and were replaced by James Hardymon (Investcorp), Dana Snyder (Investcorp), Peter

Nolan (Leonard Green) and Michael Wong (Leonard Green), leaving a board of James

Hardymon (Investcorp), Dennis Heiner, Peter Nolan (Leonard Green), Howard Solot, Dana

Snyder (Investcorp), Christopher Stadler (Investcorp), Thomas Sullivan (Investcorp), Donald

Werner, and Michael Wong (Leonard Green).

250.    By April 2004, Eric Werner had replaced Howard Solot.  By January 2005,

Steven Richman had replaced Dennis Heiner.  The board then retained the same directors until

the Company declared bankruptcy in June 2006, except that in 2006, James Baker (Investcorp)

and James Egan (Investcorp) replaced James Hardymon (Investcorp) and Christopher Stadler

(Investcorp).

### C.    Directorship of Werner Co.

251.    Just prior to the 2003 Recapitalization, the directors of Werner Co. were James

Hardymon (Investcorp), Dennis Heiner, Charles Marquis (Investcorp), Dana Snyder

(Investcorp), Howard Solot, Christopher Stadler (Investcorp), Thomas Sullivan (Investcorp),

Stephen Tempini (Investcorp) and Donald Werner.  As part of the 2003 Recapitalization, Charles

Marquis (Investcorp) and Stephen Tempini (Investcorp) resigned as directors and were replaced

by Peter Nolan (Leonard Green) and Michael Wong (Leonard Green).  In or about June of 2004,

Eric Werner replaced Howard Solot.  Effective January 2005, Steven Richman replaced Dennis

Heiner as a director.  In 2006, James Baker (Investcorp) and James Egan (Investcorp) replaced

James Hardymon (Investcorp) and Christopher Stadler (Investcorp).

### D.    Director Defendants

252.    Defendant Dana Snyder was a director of the Company beginning May 2002 until

after the Company declared bankruptcy in June 2006.  He was designated by Investcorp.  He was

the Company's Interim President and CEO from September 21, 2004 through January 4, 2005, when Mr. Heiner resigned and before Mr. Richman replaced him.  Mr. Snyder has been an advisory director to Investcorp's private equity group since 2002.

253.    Defendant James Baker was a director of the Company from early 2006 until after the Company declared bankruptcy in June 2006.  He was designated by Investcorp.  He has been a principal of Investcorp since 2000.

254.    Defendant Peter Nolan was a director of the Company from June 2003 until after the Company declared bankruptcy in June 2006.  He was designated by Leonard Green.  He has been a managing partner of Leonard Green & Partners, L.P. since 1997.

255.    Defendant Christopher Stadler was a director of the Company from November 1997 to March 31, 2006.  He was designated by Investcorp.  Mr. Stadler has been an executive of Investcorp or one of more of its wholly owned subsidiaries since April 1996.  He has been a member of Investcorp's steering committee.

256.    Defendant Thomas Sullivan was a director of the Company from July 1999 until after the Company declared bankruptcy in June 2006.  He was designated by Investcorp.  He has been an executive of Investcorp or one or more of its wholly owned subsidiaries since April 1996.

257.    Defendant Michael Wong was a director of the Company from June 2003 until after the Company declared bankruptcy in June 2006.  He was designated by Investcorp.  He has been an executive of Leonard Green & Partners L.P. since 1998.

258.    Defendant James Hardymon was a director of the Company from May 2001 to late 2006.  He was designated by Investcorp.  He has been a member of the advisory board of Investcorp since 2002.

259.    Defendant James Egan was a director of the Company from May 1999 until 2003. He resigned in connection with the 2003 Shareholder Cashout.  He became a director again in March 2006, which position he held until after the Company declared bankruptcy in June 2006. He has been an executive officer of Investcorp or one of its wholly owned subsidiaries since January 1999.

260.    Defendant Charles Marquis was a director of the Company from May 1999 until 2003.  He was designated by Investcorp.  He resigned in connection with the 2003 Shareholder Cashout.  He was a senior advisor to Investcorp or one or more of its wholly owned subsidiaries beginning January 1999.

261.    Defendant Mamoun Askari was a director of the Company from November 2000 to 2003.  He was designated by Investcorp.  He resigned in connection with the 2003 Shareholder Cashout.  He was an executive of Investcorp or one or more of its wholly owned subsidiaries beginning September 1990.

262.    Defendant Stephen Tempini was a director of the Company from January 2002 to 2003.  He was designated by Investcorp.  He resigned in connection with the 2003 Shareholder Cashout.  He was an executive of Investcorp or one or more of its wholly owned subsidiaries since April 2001.

**E.    Defendants Who Were both Officers and Directors**

263.    From May 1997 until after the Company declared bankruptcy in 2006, Defendant Donald Werner was the Company's Chairman of the board of directors.  In addition to his duties on the Company's board of directors, Donald Werner served as President and CEO of Holding (PA) from May 1997 until his retirement in January 2000.  He was a member of the Company's Executive and Management Leadership Teams.

264.    Defendant Howard Solot was a director of the Company from 1974 to 2004, and held the positions of Executive Vice President and Chief Operating Officer of Holding (PA) from 1995 to March of 1999.  He was a member of the Company's Executive and Management Leadership Teams.

265.    Defendant Dennis Heiner was President and Chief Executive Officer of Holding (PA) beginning January 1, 2000 and Holding (DE) and Werner beginning June 1999.  He was also a director during that time period.  He was a member of the Company's Executive and Management Leadership Teams.  He left the Company effective October 29, 2004 but served as a director of the Company until December 31, 2004.

266.    Defendant Eric J. Werner joined the Company in 1988 as Secretary and Corporate Counsel.  By the end of 1997, he held the offices of Secretary, General Counsel, Chief Administrative Officer, and Corporate Ethics Officer.  He became a director in April 2004, which position he held until after the Company declared bankruptcy in June 2006.  He was a member of the Company's Executive and Management Leadership Teams.

267.    Defendant Michael Werner joined the Company in 1988 and held several positions at the Vice President level.  He held the office of President of the Company's Werner Ladder Co. business unit from 1997 to until he resigned as an officer of the Company in January 2001.  He was Vice Chairman of the board of directors from January 2001 until he resigned as part of the 2003 Shareholder Cashout in June 2003.

268.    Defendant Steven Richman became President and CEO of the Company effective January 4, 2005.  He held those offices until after the Company declared bankruptcy in June 2006.  He was also a director for that time period.  He was a member of the Company's Executive and Management Leadership Teams.

## F.    Officer Defendants

269.    Defendant Steven Bentson was the Vice President, Manufacturing of the Company beginning in July 2001, and held that office until at least May 2005. He was a member of the Company's Executive and Management Leadership Teams.

270.    Defendant Larry Friend joined the Company in April 1999 as Vice President and Controller; he became Vice President-Finance in June 2000, and then Vice President, Chief Financial Officer, and Treasurer in January 2001. He remained an officer until after the Company's bankruptcy filing. He was a member of the Company's Executive and Management Leadership Teams.

271.    Defendant Edward Gericke joined the Company as Vice President-Sales in January 2001, and was appointed Senior Vice President, Sales in January 2001. He was a member of the Company's Executive and Management Leadership Teams.

272.    Defendant Peter O'Coin was appointed Senior Vice President, Operations in March 2002 and resigned from the Company effective March 31, 2005. He was a member of the Company's Executive and Management Leadership Teams.

273.    Defendant Craig Werner was an officer of the Company throughout the relevant time period. At or around the time of the 2003 Shareholder Cashout, he was Director of Manufacturing – Western Region and General Manager – Chicago Division. He was a member of the Company's Management Leadership Team.

274.    Defendant John Fiumefreddo joined the Company in July 2002 as Vice President, Engineering and New Product Development, was appointed Senior Vice President, Product Development in May 2003, and resigned in January 2005. He was a member of the Company's Executive and Management Leadership Teams.

275.    Defendant Robert Rosati was an officer of the Company.  At or around the time of the 2003 Shareholder Cashout, he was Vice President and Chief Information Officer.  He was a member of the Company's Management Leadership Team.

276.    Defendant John Remmers was appointed Senior Vice President – Operations on March 14, 2005.

## VI.

## Claims for Relief

### FIRST CLAIM FOR RELIEF
**Recovery of Fraudulent Transfers (Constructive)**
**Against the 1997 Shareholder Defendants, Investcorp International Inc., Invifin S.A.,**
**SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C.,**
**Investcorp Holdings Limited, Investcorp S.A., Donald Resnick, and DOES 1-100**
**[11 U.S.C. §§ 544, and 550, 26 U.S.C. § 6502, and applicable state law including N.Y. DEBT.**
**& CRED. LAW §§ 270 *et seq.*]**

277.    Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

278.    Under 11 U.S.C. § 544(b), a debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor  holding an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e).  The Internal Revenue Service had an allowable unsecured claim against the Company that was unpaid on the Petition Date.  Specifically, the Internal Revenue Service held an allowable unsecured claim in the amount of $212,726 that remained unpaid on the Petition Date relating to federal withholding taxes owed pursuant to section 3111 of the Internal Revenue Code (the "Employment Tax Claim").  The Employment Tax Claim was an unpaid, undisputed, unsecured claim (in existence before the Petition Date) specifically allowed by the Bankruptcy Court after the Petition Date.  In addition, the Internal

Revenue Service asserts an unsecured claim as evidenced by claim no. 1040 for penalties accruing on the Employment Tax Claim.  The existence of these two claims allows the Plaintiff to utilize the ten-year statute of limitation provided by 26 U.S.C. § 6502 and stand in the shoes of the Internal Revenue Service under Section 544(b) to commence a fraudulent transfer action.

279.    In connection with the 1997 Shareholder Cashout, the Company made the following illegal transfers (the "1997 Shareholder Cashout Fraudulent Transfers") to or for the benefit of the following defendants:

| Name | Amount Received from 1997 Shareholder Cashout |
|---|---|
| Jeffrey R. Ackerman | $674,462.92 |
| Werner-Alter, LLC and Mindy Werner-Alter (as manager) | $3,913,137.81 |
| Mindy Werner Alter | $7,083,009.13 |
| Ellen Berk-Rauch | $522,030.12 |
| Noel Berk-Rauch | $4,973,735.97 |
| Eli Berk-Rauch and Noel Berk-Rauch (as custodian for Eli Berk-Rauch) | $306,953.71 |
| Hanna Berk-Rauch and Noel Berk-Rauch (as custodian for Hanna Berk-Rauch) | $306,953.71 |
| Gail Rauch Blackman | $6,618,506.72 |
| Heather Blackman and Gail Rauch Blackman (as custodian for Heather Blackman) | $306,953.71 |
| Francesca Gianoglio Bonte | $73,084.22 |
| Margaret E. Bonte | $4,032,160.68 |
| Richard D. Bonte | $14,746,306.94 |
| Alessandra Bonte and Richard D. Bonte (as custodian for Alessandra Bonte) | $73,084.22 |
| Vera Bonte | $12,480,696.20 |

| Name | Amount Received from 1997 Shareholder Cashout |
|---|---|
| Agnes Bonte Francois | $4,032,160.68 |
| Claire Francois and Agnes Francois (as custodian for Claire Francois) | $279,808.15 |
| James Andre Francois and Agnes Francois (as custodian for James Andre Francois) | $279,808.15 |
| Michel Francois and Agnes Francois (as custodian for Michel Francois) | $522,030.12 |
| Claude J. Francois | $146,168.43 |
| Ira and Elise Frost Family Limited Partnership and Elise Frost (as managing general partner) | $5,777,829.41 |
| Elise W. Frost | $7,070,480.41 |
| Vincent J. Garcell | $3,796,203.06 |
| J. David Goldblatt | $175,402.12 |
| June Goldblatt and J. David Goldblatt | $175,402.12 |
| Sara P. Graham | $83,524.82 |
| Paula J. Griffith | $532,470.73 |
| Max Hanfling | $175,402.12 |
| Jessica Z. Joubert | $104,406.02 |

| Name | Amount Received from 1997 Shareholder Cashout |
|---|---|
| Linda C. Joubert | $219,252.65 |
| Jeremy M. Kaplan | $219,252.65 |
| Deborah A. Kaplan and Jeremy M. Kaplan (as custodian for Deborah A. Kaplan) | $164,961.52 |
| Judith L. Kaplan and Jeremy J. Kaplan (as custodian for Judith L. Kaplan) | $164,961.52 |
| Neil D. Kaplan | $93,965.42 |
| Julia E. Kaplan and Neil D. Kaplan (as custodian for Julia E. Kaplan) | $164,961.52 |
| Kerrah Kaplan and Neil D. Kaplan (as custodian for Kerrah Kaplan) | $167,049.64 |
| Rachael A. Kaplan and Neil D. Kaplan (as custodian for Rachael A. Kaplan) | $219,252.65 |
| Sylvia S. Kaplan | $271,455.66 |
| Marsha Beth Karp | $3,520,571.16 |
| Allison Tyler Karp and Marsha Beth Karp (as custodian for Allison Tyler Karp) | $1,060,765.21 |
| Melissa S. Karp and Marsha Beth Karp (as custodian for Melissa | $183,754.60 |

| Name | Amount Received from 1997 Shareholder Cashout |
|---|---|
| S. Karp) | |
| Marlane T. Krane | $6,618,506.72 |
| Jason S. Krane and Marlane T. Krane (as custodian for Jason S. Krane) | $306,953.71 |
| Herman H. Liss | $175,402.12 |
| Beth Morrow | $208,812.05 |
| Susan Morrow | $208,812.05 |
| Karen Lynn Moseska | $357,068.60 |
| Beverly Werner Needham | $3,568,597.93 |
| Werner GC Trust for Erin; Erin Joy Ryan; and Beverly W. Needham (as trustee) | $1,154,730.63 |
| Werner GC Trust for Shannon; Shannon Rose Ryan; and Beverly W. Needham (as trustee) | $1,154,730.63 |
| Stewart Charitable Remainder Unitrust and Ilene Stewart (as trustee) | $856,129.40 |
| Ilene Stewart | $202,547.69 |
| Novak Partnership, AKA a California Limited Partnership and Alyce Novak (as | $1,083,734.54 |

| Name | Amount Received from 1997 Shareholder Cashout |
|---|---|
| general partner) | |
| Edward A. Pollack | $3,482,984.99 |
| Rankell Family Trust and Steven J. Rankell (as trustee) | $2,142,411.63 |
| Shirley W. Rauch Trust | $1,291,419.00 |
| Stanley S. Rauch Trust | $984,465.29 |
| Robert A. Rosati | $428,064.70 |
| Roni S. Rosati | $5,612,345.86 |
| Richmond J. Rosati and Roni S. Rosati (as custodian for Richmond J. Rosati) | $2,088,120.50 |
| Ross Daniel Rosati and Roni S. Rosati (as custodian for Ross Daniel Rosati) | $1,670,496.40 |
| Ryan Gregory Rosati and Roni S. Rosati (as custodian for Ryan Gregory Rosati) | $2,088,120.50 |
| Debra A. Rothman | $6,142,415.25 |
| Jordana Rothman and Debra A. Rothman (as custodian for Jordana Rothman) | $306,953.71 |
| Joshua J. Rothman and Debra A. Rothman (as custodian for Joshua J. | $544,999.45 |

| Name | Amount Received from 1997 Shareholder Cashout |
|---|---|
| Rothman) | |
| Kevin M. Rothman and Debra A. Rothman (as custodian for Kevin M. Rothman) | $544,999.45 |
| Elissa Schwartz | $1,695,553.84 |
| Suzanne Schwartz | $1,693,465.72 |
| Howard L. Solot | $16,885,642.38 |
| Janet F. Solot | $2,749,027.37 |
| Michael J. Solot | $9,469,481.16 |
| Philip F. Tidy | $83,524.82 |
| Maurice Weiner | $1,967,009.51 |
| Matthew W. Weiss and Elizabeth Werner (as custodian for Matthew W. Weiss) | $321,570.56 |
| Matthew W. Weiss | $208,812.05 |
| Anne L. Werner Residuary Trust - EX and Timothy F. Burke (as trustee) | $1,900,189.65 |
| Anne L. Werner Residuary Trust and Timothy F. Burke (as trustee) | $3,785,762.46 |
| Barbara L. Werner | $997,557.46 |
| Bruce D. Werner | $540,802.56 |

| Name | Amount Received from 1997 Shareholder Cashout |
| --- | --- |
| Bruce D. Werner Trust and Bruce D. Werner (as trustee) | $11,463,460.47 |
| Bruce D. Werner and Tammy H. Werner | $200,237.92 |
| Bruce D. Werner Family Limited Partnership and Bruce D. Werner (as managing general partner) | $4,525,376.89 |
| Craig R. Werner Trust and Craig R. Werner (as trustee) | $12,576,652.08 |
| Craig R. Werner Family Limited Partnership and Craig Werner (as general partner) | $6,452,359.67 |
| Donald M. Werner | $11,865,088.10 |
| Donald M. Werner and Barbara L. Werner | $245,399.14 |
| Elizabeth Werner Trust, N.C.B. | $15,673,432.44 |
| Eric J. Werner | $10,645,291.06 |
| Eric J. Werner and Melanie R. Werner | $362,026.26 |
| Florence J. Werner | $979,328.51 |
| Florence J. Werner Irrevocable Trust dated 10/7/94 and Ronald Werner, Marc | $6,662,336.37 |

| Name | Amount Received from 1997 Shareholder Cashout |
| --- | --- |
| Werner, and Michael Werner (as trustees) | |
| Laura W. Werner Revocable Trust U/A/D 1/2/96 and Laura W. Werner (as trustee) | $2,731,261.61 |
| Jonathan C. Werner Gift Trust U/A/D 11/1/96 and Jeffrey Weisman (as trustee) | $1,561,914.13 |
| Margot A. Werner Gift Trust U/A/D 11/1/96 and Laura Werner (as trustee) | $874,922.49 |
| Stephanie N. Werner Gift Trust U/A/D 11/1/96 and Jeffrey Weisman (as trustee) | $1,561,914.13 |
| Lois S. Werner Revocable Trust | $3,135,834.95 |
| Marc L. Werner | $9,830,766.89 |
| Marc L. Werner Irrevocable Trust 1 and Richard Werner and Donna Werner (as trustees) | $187,930.84 |
| Ashley Elizabeth Werner and Marc L. Werner (as custodian for Ashley Elizabeth Werner) | $1,154,730.63 |

| Name | Amount Received from 1997 Shareholder Cashout |
|---|---|
| Jeffrey Addison Werner and Marc L. Werner (as custodian for Jeffrey Addison Werner) | $1,154,730.63 |
| Isabelle N. Werner and Melanie R. Werner (as custodian for Isabelle N. Werner) | $2,950,202.16 |
| Sophia K. Werner and Melanie R. Werner (as custodian for Sophia K. Werner) | $1,574,909.43 |
| Michael E. Werner | $475,147.36 |
| Michael E. Werner Revocable Trust | $6,769,723.94 |

| Name | Amount Received from 1997 Shareholder Cashout |
|---|---|
| U/A/D 1/2/96 | |
| Richard L. Werner Revocable Trust | $12,845,950.24 |
| Robert I. Werner | $2,871,332.73 |
| Robert I. Werner Irrevocable Trust dated 8/30/94 and Ronald Werner (as administrative trustee) | $15,717,596.19 |
| Ronald E. Werner | $7,765,720.12 |
| Dorothy M. Whipman | $2,631,031.82 |
| Gerald R. Whipman | $2,004,595.68 |

95

| Name | Fees/Bonuses Received in November 1997 in Connection with 1997 Shareholder Cashout |
|---|---|
| Investcorp International, Inc. (portions of which, upon information and belief, were transferred to SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited and Investcorp S.A.) | $11,060,340.52 |
| Invifin, S.A. (portions of which, upon information and belief, were transferred to SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited, Investcorp S.A., and Investcorp International, Inc.) | $6,000,000 |
| Donald Werner | $2,000,000 |
| Howard Solot | $2,000,000 |
| Robert Werner | $854,167 |
| Donald Resnick | $857,500 |

280.    Each of the 1997 Shareholder Cashout Fraudulent Transfers constituted a transfer of an interest in the property of the Company.

281.    Each of the 1997 Shareholder Cashout Fraudulent Transfers was made for less than fair consideration and less than reasonably equivalent value.  Indeed, each of the 1997 Shareholder Cashout Fraudulent Transfers was made for no consideration.

282.    At the times of, and subsequent to, each of the 1997 Shareholder Cashout Fraudulent Transfers, the Company had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

283.    Each of the 1997 Shareholder Cashout Fraudulent Transfers (a) was made when the Company was insolvent; (b) rendered the Company insolvent; and/or (c) left the Company with unreasonably small capital in relation to the Company's business at the time.

284.    At the time of each of the 1997 Shareholder Cashout Fraudulent Transfers, the Company intended or believed that it would incur debts beyond its ability to pay as such debts matured.

285.    By virtue of the foregoing, each of the 1997 Shareholder Cashout Fraudulent Transfers was a fraudulent transfer avoidable under 26 U.S.C. § 6502 and applicable state law including N.Y. DEBT. & CRED. LAW §§ 270 *et seq.* by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502, and Plaintiff is entitled to avoid and recover each of the 1997 Shareholder Cashout Fraudulent Transfers under 11 U.S.C. §§ 544 and 550.

286.    Under 11 U.S.C. § 550(a), "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--

> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee."

287.    Each defendant to this claim is the initial transferee of one or more of the 1997 Shareholder Cashout Fraudulent Transfers, the entity for whose benefit one or more of the 1997 Shareholder Cashout Fraudulent Transfers was made, or an immediate or mediate transferee of the initial transferee.

288.    The real names of Does 1-100 are not known or ascertainable by Plaintiff at this time because Plaintiff has no way of knowing what the named defendants did with the funds they received from the 1997 Shareholder Cashout Fraudulent Transfers, which could include transferring them to DOE defendants.  Does 1-100 are the immediate or mediate transferees of the initial transferee named defendants and are subject to liability pursuant to 11 U.S.C. § 550.

289.    To the extent that one or more of the 1997 Shareholder Cashout Fraudulent Transfers is avoided, Plaintiff may recover the property transferred, or the value of the transferred property, from each defendant to this claim pursuant to section 550(a) of the Bankruptcy Code.

290.    Plaintiff seeks to recover damages from each defendant to this claim in an amount equal to the dollar value of the property transferred pursuant to each of the 1997 Shareholder Cashout Fraudulent Transfers as of the date of the transfer, together with interest on that amount from the date of the transfer, attorneys' fees, and costs of suit and collection allowable by law.

### SECOND CLAIM FOR RELIEF
**Recovery of Fraudulent Transfers (Intentional)**
**Against the 1997 Shareholder Defendants, Investcorp International Inc., Invifin S.A., SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited, Investcorp S.A., Donald Resnick, and DOES 1-100**
**[11 U.S.C. §§ 544, and 550, 26 U.S.C. § 6502, and applicable state law including N.Y. DEBT. & CRED. LAW §§ 270 *et seq.*]**

291.    Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

292.    Under 11 U.S.C. § 544(b), a debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor  holding an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e).  The phrase "under applicable law" has been

interpreted to include any applicable fraudulent transfer laws that would govern potentially fraudulent transactions.

293.    In connection with the 1997 Shareholder Cashout, the Company made the 1997 Shareholder Cashout Fraudulent Transfers of funds to or for the benefit of the defendants to this claim.

294.    Each of the 1997 Shareholder Cashout Fraudulent Transfers constituted a transfer of an interest in the property of the Company.

295.    Each of the 1997 Shareholder Cashout Fraudulent Transfers was made for less than fair consideration and less than reasonably equivalent value.  Indeed, each of the 1997 Shareholder Cashout Fraudulent Transfers was made for no consideration.

296.    At the times of, and subsequent to, each of the 1997 Shareholder Cashout Fraudulent Transfers, the Company had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

297.    Each of the 1997 Shareholder Cashout Fraudulent Transfers (a) was made when the Company was insolvent; (b) rendered the Company insolvent; and/or (c) left the Company with unreasonably small capital in relation to the Company's business at the time.

298.    At the time of each of the 1997 Shareholder Cashout Fraudulent Transfers, the Company intended or believed that the Company would incur debts beyond its ability to pay as such debts matured.

299.    Each of the 1997 Shareholder Cashout Fraudulent Transfers was made with the actual intent to hinder, delay, or defraud present or future creditors.

300.    By virtue of the foregoing, each of the 1997 Shareholder Cashout Fraudulent Transfers was a fraudulent transfer avoidable under 26 U.S.C. § 6502 and applicable state law

including N.Y. DEBT. & CRED. LAW §§ 270 *et seq.* by a creditor holding an unsecured claim that

is allowable under 11 U.S.C. § 502, and Plaintiff is entitled to avoid and recover each of the 1997

Shareholder Cashout Fraudulent Transfers under 11 U.S.C. §§ 544 and 550.

301.    Under 11 U.S.C. § 550(a), "[e]xcept as otherwise provided in this section, to the

extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this

title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court

so orders, the value of such property, from--

> (1) the initial transferee of such transfer or the entity for whose benefit such
>
> transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee."

302.    Each defendant to this claim is the initial transferee of one or more of the 1997

Shareholder Cashout Fraudulent Transfers, the entity for whose benefit one or more of the 1997

Shareholder Cashout Fraudulent Transfers was made, or an immediate or mediate transferee of

the initial transferee.

303.    The real names of Does 1-100 are not known or ascertainable by Plaintiff at this

time because Plaintiff has no way of knowing what the named defendants did with the funds they

received from the 1997 Shareholder Cashout Fraudulent Transfers, which could include

transferring them to DOE defendants.  Does 1-100 are the immediate or mediate transferees of

the initial transferee named defendants and are subject to liability pursuant to 11 U.S.C. § 550.

304.    To the extent that one or more of the 1997 Shareholder Cashout Fraudulent

Transfers is avoided, Plaintiff may recover the property transferred, or the value of the

transferred property, from each defendant to this claim pursuant to section 550(a) of the

Bankruptcy Code.

305.    Plaintiff seeks to recover damages from each defendant to this claim in an amount equal to the dollar value of the property transferred pursuant to each of the 1997 Shareholder Cashout Fraudulent Transfers as of the date of the transfer, together with interest on that amount from the date of the transfer, attorneys' fees, and costs of suit and collection allowable by law.

### THIRD CLAIM FOR RELIEF
**Recovery of Fraudulent Transfers (Constructive)**
**Against Investcorp International Inc., SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited and Investcorp S.A.**
**[11 U.S.C. §§ 544, and 550, 26 U.S.C. § 6502, and applicable state law including N.Y. DEBT. & CRED. LAW §§ 270 *et seq.*]**

306.    Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

307.    Under 11 U.S.C. § 544(b), any debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor  holding an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e).  The phrase "under applicable law" has been interpreted to include any applicable fraudulent transfer laws that would govern potentially fraudulent transactions.

308.    After the 1997 Shareholder Cashout and before the 2003 Shareholder Cashout, the Company transferred at least $1,500,000 to Investcorp International, Inc. (portions of which, upon information and belief, were transferred to SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited, and Investcorp S.A.) (the "1997-2003 Fraudulent Transfers").

309.    Each of the 1997-2003 Fraudulent Transfers constituted a transfer of an interest in the property of the Company.

310.    Each of the 1997-2003 Fraudulent Transfers was made for less than fair consideration and less than reasonably equivalent value.

311.    At the times of, and subsequent to, each of the 1997-2003 Fraudulent Transfers, the Company had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

312.    Each of the 1997-2003 Fraudulent Transfers (a) was made when the Company was insolvent; (b) rendered the Company insolvent; and/or (c) left the Company with unreasonably small capital in relation to the Company's business at the time.

313.    At the time of each of the 1997-2003 Fraudulent Transfers, the Company intended or believed that the Company would incur debts beyond its ability to pay as such debts matured.

314.    By virtue of the foregoing, each of the 1997-2003 Fraudulent Transfers was a fraudulent transfer avoidable under 26 U.S.C. § 6502 and applicable state law including N.Y. DEBT. & CRED. LAW §§ 270 *et seq.* by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502, and Plaintiff is entitled to avoid and recover each of the 1997-2003 Fraudulent Transfers under 11 U.S.C. §§ 544 and 550.

315.    Under 11 U.S.C. § 550(a), "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee."

316.    Each defendant to this claim is the initial transferee of one or more of the 1997-2003 Fraudulent Transfers, the entity for whose benefit one or more of the 1997-2003 Fraudulent Transfers was made, or an immediate or mediate transferee of the initial transferee.

317.    To the extent that one or more of the 1997-2003 Fraudulent Transfers is avoided, Plaintiff may recover the property transferred, or the value of the transferred property, from each defendant to this claim pursuant to section 550(a) of the Bankruptcy Code.

318.    Plaintiff seeks to recover damages from each defendant to this claim in an amount equal to the dollar value of the property transferred pursuant to each of the 1997-2003 Fraudulent Transfers as of the date of the transfer, together with interest on that amount from the date of the transfer, attorneys' fees, and costs of suit and collection allowable by law.

## FOURTH CLAIM FOR RELIEF
### Recovery of Fraudulent Transfers (Intentional)
**Against Investcorp International Inc., SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited and Investcorp S.A. [11 U.S.C. §§ 544, and 550, 26 U.S.C. § 6502, and applicable state law including N.Y. DEBT. & CRED. LAW §§ 270 *et seq.*]**

319.    Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

320.    Under 11 U.S.C. § 544(b), any debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor  holding an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e).  The phrase "under applicable law" has been interpreted to include the states' fraudulent transfer laws that would govern potentially fraudulent transactions.

321.    Each of the 1997-2003 Fraudulent Transfers constituted a transfer of an interest in the property of the Company.

322.    Each of the 1997-2003 Fraudulent Transfers was made for less than fair consideration and less than reasonably equivalent value.

323.    At the times of, and subsequent to, each of the 1997-2003 Fraudulent Transfers, the Company had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

324.    Each of the 1997-2003 Fraudulent Transfers (a) was made when the Company was insolvent; (b) rendered the Company insolvent; and/or (c) left the Company with unreasonably small capital in relation to the Company's business at the time.

325.    At the time of each of the 1997-2003 Fraudulent Transfers, the Company intended or believed that the Company would incur debts beyond its ability to pay as such debts matured.

326.    Each of the 1997-2003 Fraudulent Transfers was made with the actual intent to hinder, delay, or defraud present or future creditors.

327.    By virtue of the foregoing, each of the 1997-2003 Fraudulent Transfers was a fraudulent transfer avoidable under 26 U.S.C. § 6502 and applicable state law including N.Y. DEBT. & CRED. LAW §§ 270 *et seq.* by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502, and Plaintiff is entitled to avoid each of the 1997-2003 Fraudulent Transfers under 11 U.S.C. §§ 544 and 550.

328.    Under 11 U.S.C. § 550(a), "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee."

329.    Each defendant to this claim is the initial transferee of one or more of the 1997-2003 Fraudulent Transfers, the entity for whose benefit one or more of the 1997-2003 Fraudulent Transfers was made, or an immediate or mediate transferee of the initial transferee.

330.    To the extent that one or more of the 1997-2003 Fraudulent Transfers is avoided, Plaintiff may recover the property transferred, or the value of the transferred property, from each defendant to this claim pursuant to section 550(a) of the Bankruptcy Code.

331.    Plaintiff seeks to recover damages from each defendant to this claim in an amount equal to the dollar value of the property transferred pursuant to each of the 1997-2003 Fraudulent Transfers as of the date of the transfer, together with interest on that amount from the date of the transfer, attorneys' fees, and costs of suit and collection allowable by law.

## FIFTH CLAIM FOR RELIEF
**Recovery of Fraudulent Transfers (Constructive)**
**Against the 2003 Shareholder Defendants, 2003 Option Defendants, Steven Bentson, Larry Friend, Edward Gericke, Dennis Heiner, Peter O'Coin, Eric Werner, John Fiumefreddo, Timothy Lewis, John J. Dylik, Wendy A. Meikle, Lisa A. Pressler, Investcorp (Other than Invifin S.A.), Leonard Green & Partners, L.P., LGP Management, Inc., Murray Devine, and Does 101-300**
**[11 U.S.C. §§ 544 and 550, and applicable state law including N.Y. DEBT. & CRED. LAW §§ 270 *et seq.*]**

332.    Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

333.    Under 11 U.S.C. § 544(b), any debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor  holding an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e).  The phrase "under applicable law" has been

interpreted to include the states' fraudulent transfer laws that would govern potentially fraudulent transactions.

334.    In connection with the 2003 Shareholder Cashout, the Company made the following transfers (the "2003 Shareholder Cashout Fraudulent Transfers") of funds to or for the benefit of the defendants to this claim:

| Name | Amount Received from 2003 Shareholder Cashout |
|---|---|
| Step Investments Limited | $12,237,502.85 |
| WL Holdings Limited | $11,119,358.84 |
| Equity WERA Limited | $10,392,910.84 |
| Climbing Products Limited | $8,883,063.94 |
| Ladder Equity Limited | $8,883,063.94 |
| Werner Equity Limited | $8,883,063.94 |
| Werner Investments Limited | $8,883,063.94 |
| Werner IIP Limited | $5,528,617.14 |
| Investcorp Werner Holdings L.P. and Stepup Limited (as general partner) | $5,137,510.24 |
| Annisville Limited | $3,294,800.37 |
| Cooperstown Limited | $3,294,800.37 |
| Frisco Limited | $3,294,800.37 |
| Platea Limited | $3,294,800.37 |
| Craig R. Werner Family Limited Partnership and Craig Werner (as general partner) | $3,068,716.80 |
| Investcorp Bank B.S.C. | $2,401,809.72 |
| Robert I. Werner - Irrev. Trust dated 8/30/94 and Ronald | $2,240,291.38 |

| Name | Amount Received from 2003 Shareholder Cashout |
|---|---|
| Werner (as administrative trustee) | |
| Richmond Drive Enterprises, L.P. and Richard Werner and Lois Werner (as general partners) | $2,059,246.17 |
| Michael E. Werner Revocable Trust, U/A/D 1/2/96 and Michael Werner (as trustee) | $2,057,170.78 |
| Bruce D. Werner – Trust and Bruce Werner (as trustee) | $2,028,074.94 |
| Elizabeth W. Ackerman Trust DTD 12/18/67 and Jeffrey R. Ackerman (as successor trustee) | $2,019,514.59 |
| Eric J. Werner | $1,695,101.06 |
| Alligator Partners, L.P. and Howard Solot and Janet Solot (as general partners) | $1,615,102.58 |
| Michael J. Solot | $1,274,487.19 |
| Donald M. Werner | $1,095,618.54 |
| Ronald E. Werner | $1,000,609.57 |
| The Heiner Family Trust and Dennis G. Heiner and Margo Heiner (as trustees) | $964,941.09 |
| Mindy Werner Alter | $912,642.74 |

| Name | Amount Received from 2003 Shareholder Cashout |
|---|---|
| Elise W. Frost | $891,474.78 |
| Unknown beneficiaries of WHPA Stock Loan Program | $887,470.41 |
| Florence J. Werner - Irrev. Trust Dated 10/7/94 and Ronald Werner (as trustee) | $858,439.16 |
| Gail Rauch Blackman | $852,791.74 |
| Bruce D. Werner Family Limited Partnership and Bruce D. Werner (as managing general partner) | $764,545.41 |
| Ira and Elise Frost Family Limited Partnership and Elise Frost (as general managing partner) | $764,023.85 |
| Roni S. Rosati | $723,148.09 |
| Noel Berk-Rauch | $640,863.66 |
| Gerald R. Whipman | $597,298.31 |
| Howard L. Solot | $558,334.27 |
| Isabelle N. Werner and Melanie R. Werner (as custodian for Isabelle N. Werner) | $536,850.82 |
| Sophia K. Werner and Melanie R. Werner (as custodian for Sophia K. Werner) | $536,850.82 |

| Name | Amount Received from 2003 Shareholder Cashout |
|---|---|
| Agnes Bonte Francois | $519,541.80 |
| Werner-Alter, LLC and Mindy Werner-Alter (as manager) | $504,206.12 |
| Janet F. Solot | $486,179.83 |
| Beverly Werner Needham | $459,812.06 |
| Donald M. Werner | $457,668.52 |
| Marsha Beth Karp | $453,623.86 |
| Edward A. Pollack | $448,780.96 |
| Edward Pollack, POA MLW | $390,000.00 |
| Robert I. Werner | $369,970.00 |
| Laura W. Werner Revocable Trust, U/A/D 1/2/96 and Laura Werner (as trustee) | $351,922.02 |
| Marc L. Werner (as part of repayment for outstanding loan/stock pledge) | $314,684.93 |
| Rankell Family Trust (Steven Rankell – Trustee) | $276,048.64 |
| Marc L. Werner | $274,252.87 |
| Richmond J. Rosati and Roni S. Rosati (as custodian for Richmond J. Rosati) | $269,053.45 |
| Ryan Gregory Rosati and Roni S. Rosati (as custodian for | $269,053.45 |

| Name | Amount Received from 2003 Shareholder Cashout |
| --- | --- |
| Ryan Gregory Rosati) | |
| Rauch Trust and Aleena Shapiro (as trustee) | $254,192.49 |
| Peter R. O'Coin | $226,486.04 |
| Elissa Schwartz | $218,471.19 |
| Suzanne Schwartz | $218,202.53 |
| Ross Daniel Rosati and Roni S. Rosati (as custodian for Ross Daniel Rosati) | $215,242.76 |
| Jonathan C. Werner Gift Trust U/A/D/ 11/1/96 and Jeffery Weisman (as trustee) | $201,251.89 |
| Stephanie N. Werner Gift Trust U/A/D 11/1/96 and Jeffery Weisman (as trustee) | $201,251.89 |
| Vincent J. Garcell Living Trust and Vincent J. Garcell and Karen R. Garcell (as trustees) | $184,107.52 |
| Ballet Limited | $179,890.19 |
| Denary Limited | $179,890.19 |
| Gleam Limited | $179,890.19 |
| Highlands Limited | $179,890.19 |
| Noble Limited | $179,890.19 |
| Outrigger Limited | $179,890.19 |
| Quill Limited | $179,890.19 |

| Name | Amount Received from 2003 Shareholder Cashout |
| --- | --- |
| Radial Limited | $179,890.19 |
| Shoreline Limited | $179,890.19 |
| Zinnia Limited | $179,890.19 |
| Barbara L. Werner | $172,080.13 |
| Investcorp Investment Equity Limited | $156,426.49 |
| Ashley Elizabeth Werner and Marc L. Werner (as custodian for Ashley Elizabeth Werner) | $148,786.51 |
| Jeffrey Addison Werner and Marc L. Werner (as custodian for Jeffrey Addison Werner) | $148,786.51 |
| Werner GC Trust for Erin; Erin Joy Ryan; and Beverly Werner Needham (as trustee) | $148,786.51 |
| Werner GC Trust for Shannon; Shannon Rose Ryan; and Beverly Werner Needham (as trustee) | $148,786.51 |
| Michael E. Werner | $144,386.78 |
| Allison Tyler Karp and Marsha Beth Karp (as custodian for Allison Tyler Karp) | $136,679.26 |
| Florence J. Werner | $126,185.99 |
| Margot A. Werner Gift Trust U/A/D | $112,733.44 |

| Name | Amount Received from 2003 Shareholder Cashout |
|---|---|
| 11/1/96 and Laura Werner (as trustee) | |
| Stewart Charitable Remainder Unitrust and Gary Stewart (as trustee) | $110,311.99 |
| Robert A. Rosati | $104,039.48 |
| Jeffrey R. Ackerman | $86,903.99 |
| Marc L. Werner | $72,666.15 |
| Lee L. Basilotta | $68,436.50 |
| Michel Francois and Agnes Francois (as custodian for Michel Francois) | $67,263.24 |
| Ellen Berk-Rauch | $67,263.24 |
| Eric J. Werner and Melanie R. Werner | $57,647.44 |
| Heather Blackman and Gail Rauch Blackman (as custodian for Heather Blackman) | $49,327.16 |
| Karen Lynn Moseska | $46,008.02 |
| Donald M. Werner and Barbara L. Werner | $42,331.48 |
| Eli Berk-Rauch and Noel Berk-Rauch (as custodian for Eli Berk-Rauch) | $39,550.66 |
| Hanna Berk-Rauch and Noel Berk-Rauch (as custodian for | $39,550.66 |

| Name | Amount Received from 2003 Shareholder Cashout |
|---|---|
| Hanna Berk-Rauch) | |
| Claire Francois and Agnes Francois (as custodian for Claire Francois) | $36,053.07 |
| James Andre Francois and Agnes Francois (as custodian for James Andre Francois) | $36,053.07 |
| Bruce D. Werner and Tammy H. Werner | $33,829.30 |
| Donald E. Achenbach | $28,672.58 |
| David A. Cardillo | $26,102.60 |
| Melissa S. Karp and Marsha Beth Karp (as custodian for Melissa S. Karp) | $23,676.66 |
| J. David Goldblatt | $22,600.52 |
| June Goldblatt and J. David Goldblatt | $22,600.52 |
| Claude J. Francois | $18,833.77 |
| Phillip F. Tidy | $10,761.94 |
| Gary L. Stewart | $8,699.37 |
| Richard D. Bonte | $1,900,055.12 |
| Vera Bonte | $1,608,132.00 |
| Marlane T. Krane | $852,791.74 |
| Debra A. Rothman | $791,447.55 |
| Margaret E. Bonte | $519,541.80 |
| Anne L. Werner | $487,793.80 |

| Name | Amount Received from 2003 Shareholder Cashout |
|---|---|
| Residuary Trust and Timothy F. Burke (as trustee) | |
| Garcell 1997 Unitrust DTD 12/19/1997 | $305,031.59 |
| Maurice Weiner | $253,448.12 |
| Anne L. Werner Residuary Trust – EX and Timothy F. Burke (as trustee) | $244,838.47 |
| Novak Partnership, AKA a California Limited Partnership and Alyce Novak (as general partner) | $139,638.54 |
| Joshua J. Rothman | $70,223.01 |
| Kevin Matthew Rothman | $70,223.01 |
| Paula J. Griffith | $68,608.54 |
| Henry W. Dowler | $68,436.50 |
| Vincent A. Genis | $68,436.50 |
| Matthew W. Weiss | $68,339.38 |
| Steven R. Bentson | $67,930.89 |
| William J. Rippin | $61,742.31 |
| David C. McGowan | $58,898.15 |
| Brad J. Gellis | $58,660.00 |
| Michael E. Trzynka | $58,660.00 |
| Larry V. Friend | $58,362.23 |
| Edward W. Gericke | $57,151.59 |

| Name | Amount Received from 2003 Shareholder Cashout |
|---|---|
| John J. Fiumefreddo | $56,849.10 |
| Michael D. Brooks | $51,070.51 |
| Jordana Rothman and Debra A. Rothman (as custodian for Jordana Rothman) | $49,327.16 |
| Linda C. Joubert | $42,241.27 |
| Eric A. Mason | $41,006.11 |
| Jason S. Krane and Marlane T. Krane (as custodian for Jason S. Krane) | $39,550.66 |
| Bruce B. Fisher | $35,720.11 |
| William C. Hazlett | $34,285.04 |
| Neal R. Martin | $31,873.83 |
| Dennis J. Johnson | $29,758.76 |
| Jeremy M. Kaplan | $28,250.40 |
| Rachael A. Kaplan and Neil D. Kaplan (as custodian for Rachael A. Kaplan) | $28,250.40 |
| Beth Katz | $26,905.10 |
| Susan Morrow | $26,905.10 |
| David M. Conn | $26,836.82 |
| Marc L. Werner - Irrevocable Trust 1 and Richard Werner (as trustee) | $24,214.98 |
| The Estate of Max Hanfling and Edward A. Pollack (as | $22,600.52 |

| Name | Amount Received from 2003 Shareholder Cashout |
|------|------|
| executor) | |
| Herman H. Liss | $22,600.52 |
| Karrah Kaplan | $21,524.37 |
| Deborah Ann Kaplan Trust U/D 14 January 1998 and Jeremy M. Kaplan (as trustee) | $21,255.22 |
| Judith Lily Kaplan Trust U/D 14 January 1998 and Jeremy M. Kaplan (as trustee) | $21,255.22 |
| Julia E. Kaplan and Neil D. Kaplan (as custodian for Julia E. Kaplan) | $21,255.22 |
| Neil D. Kaplan | $19,102.93 |
| Robert H. Pinney | $13,586.38 |
| Jessica Z. Joubert | $13,452.55 |
| Michael D. Wise | $11,370.02 |
| Sara P. Graham | $10,761.94 |

| Name | Amount Received from 2003 Shareholder Cashout |
|------|------|
| Carly Krane and Marlane T. Krane (as custodian for Carly Krane) | $9,776.50 |
| Richard M. Kelly | $9,776.50 |
| Shirley W. Rauch Trust and Shirley Rauch, Stanley Rauch, and Marlane Krone (as trustees) | $9,723.75 |
| Francesca Gianoglio Bonte | $9,416.89 |
| Alessandra Bonte and Richard D. Bonte (as custodian for Alessandra Bonte) | $9,416.64 |
| Kelly Sinon | $8,699.37 |
| Suzanne Rosen | $8,699.37 |
| Deborah Kaplan | $6,995.19 |
| Judith Kaplan | $6,995.19 |
| | |

| Options | Amount |
|---|---|
| Robert Rosati | $37,807.41 |
| Craig Werner | $59,696.20 |
| Donald Werner | $49,746.75 |
| Eric Werner | $56,696.20 |
| Michael Werner | $149,240.24 |
| Dennis Heiner | $870,568.19 |
| Peter O'Coin | $137,770.58 |
| David Conn | $24,873.50 |
| David Cardillo | $24,873.50 |
| Dennis Johnson | $24,873.50 |
| Donald Achenbach | $24,873.50 |
| William Hazlett | $24,873.50 |
| Vincent Genis | $36,286.37 |
| Eric Mason | $49,746.75 |
| David McGowan | $59,696.20 |
| Henry Dowler | $87,554.15 |
| Bruce Fisher | $69,645.39 |
| John Fiumefreddo | $61,231.39 |
| Steven Bentson | $78,683.83 |

| Options | Amount |
|---|---|
| William Rippin | $87,554.15 |
| Lee Basilotta | $87,554.15 |
| Michael Wise | $15,307.80 |
| Robert Pinney | $19,670.89 |
| Neal Martin | $49,746.75 |
| Brad Gellis | $76,609.88 |
| Michael Brooks | $128,346.52 |
| Larry Friend | $127,317.54 |
| Michael Trzynka | $94,518.89 |
| Richard Kelly | $17,908.76 |
| Edward Gericke | $167,058.15 |
| John Thigpen | $7,868.46 |
| Christopher Filardi | $19,670.89 |
| Douglas Bates | $7,868.46 |
| George Koerner | $12,934.16 |
| Kevin Walz | $19,670.89 |
| | |

| Name | Fees/Bonuses Received in Connection with 2003 Shareholder Cashout |
|---|---|
| Leonard Green & Partners, L.P., and upon information and belief, LGP Management, Inc. | $2,609,245.92 |
| Investcorp International, Inc. (portions of which, upon information and belief, were transferred to SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited and Investcorp S.A.) | $1,105,000 |
| Steven Bentson | $250,000 |
| Larry Friend | $250,000 |
| Edward Gericke | $250,000 |
| Dennis Heiner | $250,000 |
| Peter O'Coin | $250,000 |
| Eric Werner | $250,000 |
| John Fiumefreddo | $50,000 |
| Timothy Lewis | $50,000 |
| Murray Devine & Co. | $48,050 |
| John J. Dylik | $15,000 |
| Wendy A. Meikle | $10,000 |
| Lisa A. Pressler | $10,000 |

335.   Each of the 2003 Shareholder Cashout Fraudulent Transfers constituted a transfer of an interest in the property of the Company.

336.    Each of the 2003 Shareholder Cashout Fraudulent Transfers was made for less than fair consideration and less than reasonably equivalent value.  In fact, each of the 2003 Shareholder Cashout Fraudulent Transfers was made for no consideration.

337.    At the times of, and subsequent to, each of the 2003 Shareholder Cashout Fraudulent Transfers, the Company had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

338.    Each of the 2003 Shareholder Cashout Fraudulent Transfers (a) was made when the Company was insolvent; (b) rendered the Company insolvent; and/or (c) left the Company with unreasonably small capital in relation to the Company's business at the time.

339.    At the time of each of the 2003 Shareholder Cashout Fraudulent Transfers, the Company intended or believed that the Company would incur debts beyond its ability to pay as such debts matured.

340.    By virtue of the foregoing, each of the 2003 Shareholder Cashout Fraudulent Transfers was a fraudulent transfer avoidable under applicable state law including N.Y. DEBT. & CRED. LAW §§ 270 *et seq.* by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502, and Plaintiff is entitled to avoid and recover each of the 2003 Shareholder Cashout Fraudulent Transfers under 11 U.S.C. §§ 544 and 550.

341.    Under 11 U.S.C. § 550(a), "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee."

342.  Each defendant to this claim is the initial transferee of one or more of the 2003 Shareholder Cashout Fraudulent Transfers, the entity for whose benefit one or more of the 2003 Shareholder Cashout Fraudulent Transfers was made, or an immediate or mediate transferee of the initial transferee.

343.  The real names of Does 101-300 are not known or ascertainable by Plaintiff at this time because Plaintiff has no way of knowing what the named defendants did with the funds they received from the 2003 Shareholder Cashout Fraudulent Transfers, which could include transferring them to DOE defendants.  Does 101-300 are the immediate or mediate transferees of the initial transferee named defendants and are subject to liability pursuant to 11 U.S.C. § 550.

344.  To the extent that one or more of the 2003 Shareholder Cashout Fraudulent Transfers is avoided, Plaintiff may recover the property transferred, or the value of the transferred property, from each defendant to this claim pursuant to section 550(a) of the Bankruptcy Code.

345.  Plaintiff seeks to recover damages from each defendant to this claim in an amount equal to the dollar value of the property transferred pursuant to each of the 2003 Shareholder Cashout Fraudulent Transfers as of the date of the transfer, together with interest on that amount from the date of the transfer, attorneys' fees, and costs of suit and collection allowable by law.

## SIXTH CLAIM FOR RELIEF
### Recovery of Fraudulent Transfers (Intentional)
**Against the 2003 Shareholder Defendants, 2003 Option Defendants, Steven Bentson, Larry Friend, Edward Gericke, Dennis Heiner, Peter O'Coin, Eric Werner, John Fiumefreddo, Timothy Lewis, John J. Dylik, Wendy A. Meikle, Lisa A. Pressler, Investcorp (other than Invifin S.A.), Leonard Green & Partners, L.P., LGP Management, Inc., Murray Devine, and Does 101-300**
**[11 U.S.C. §§ 544 and 550, and applicable state law including N.Y. DEBT. & CRED. LAW §§ 270 *et seq.*]**

346. Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

347. Under 11 U.S.C. § 544(b), a debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e). The phrase "under applicable law" has been interpreted to include the states' fraudulent transfer laws that would govern potentially fraudulent transactions.

348. In connection with the 2003 Shareholder Cashout, the Company made the 2003 Shareholder Cashout Fraudulent Transfers of funds to or for the benefit of the defendants to this claim.

349. Each of the 2003 Shareholder Cashout Fraudulent Transfers constituted a transfer of an interest in the property of the Company.

350. Each of the 2003 Shareholder Cashout Fraudulent Transfers was made for less than fair consideration and less than reasonably equivalent value. Each of the 1997 Shareholder Cashout Fraudulent Transfers was made for no consideration.

351.    At the times of, and subsequent to, each of the 2003 Shareholder Cashout Fraudulent Transfers, the Company had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

352.    Each of the 2003 Shareholder Cashout Fraudulent Transfers (a) was made when the Company was insolvent; (b) rendered the Company insolvent; and/or (c) left the Company with unreasonably small capital in relation to the Company's business at the time.

353.    At the time of each of the 2003 Shareholder Cashout Fraudulent Transfers, the Company intended or believed that the Company would incur debts beyond its ability to pay as such debts matured.

354.    Each of the 2003 Ilegal Shareholder Cashout Fraudulent Transfers was made with the actual intent to hinder, delay, or defraud present or future creditors.

355.    By virtue of the foregoing, each of the 2003 Shareholder Cashout Fraudulent Transfers was a fraudulent transfer avoidable under applicable state law including N.Y. DEBT. & CRED. LAW §§ 270 *et seq.* by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502, and Plaintiff is entitled to avoid and recover each of the 2003 Shareholder Cashout Fraudulent Transfers under 11 U.S.C. §§ 544 and 550.

356.    Under 11 U.S.C. § 550(a), "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee."

357.    Each defendant to this claim is the initial transferee of one or more of the 2003 Shareholder Cashout Fraudulent Transfers, the entity for whose benefit one or more of the 2003 Shareholder Cashout Fraudulent Transfers was made, or an immediate or mediate transferee of the initial transferee.

358.    The real names of Does 101-300 are not known or ascertainable by Plaintiff at this time because Plaintiff has no way of knowing what the named defendants did with the funds they received from the 1997 Shareholder Cashout Fraudulent Transfers, which could include transferring them to DOE defendants.  Does 101-300 are the immediate or mediate transferees of the initial transferee named defendants and are subject to liability pursuant to 11 U.S.C. § 550.

359.    To the extent that one or more of the 2003 Shareholder Cashout Fraudulent Transfers is avoided, Plaintiff may recover the property transferred, or the value of the transferred property, from each defendant to this claim pursuant to section 550(a) of the Bankruptcy Code.

360.    Plaintiff seeks to recover damages from each defendant to this claim in an amount equal to the dollar value of the property transferred pursuant to each of the 2003 Shareholder Cashout Fraudulent Transfers as of the date of the transfer, together with interest on that amount from the date of the transfer, attorneys' fees, and costs of suit and collection allowable by law.

**SEVENTH CLAIM FOR RELIEF**
**Recovery of Fraudulent Transfers (Constructive)**
**Against Leonard Green & Partners, L.P., LGP Management, Inc., Investcorp International, Inc., SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited, Investcorp S.A., Donald Werner, Howard Solot**
**[11 U.S.C. §§ 544 and 550, and applicable state law including N.Y. DEBT. & CRED. LAW §§ 270 *et seq.*]**

361.    Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

362.    Under 11 U.S.C. § 544(b), a debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e).  The phrase "under applicable law" has been interpreted to include the states' fraudulent transfer laws that would govern potentially fraudulent transactions.

363.    After the 2003 Shareholder Cashout but more than two years before the Petition Date, the Company made transfers (the "2003-2004 Fraudulent Transfers") of funds to or for the benefit of the following defendants including, but not limited to, the following:

| Name | Amounts Received |
|---|---|
| Leonard Green & Partners, L.P., (portions of which, upon information and belief, were transferred to LGP Management, Inc.) | $1,000,000 |
| Investcorp International, Inc. (portions of which, upon information and belief, were transferred to SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited and Investcorp S.A.) | $1,000,000 |
| Donald Werner | $391,714 |
| Howard Solot | $344,409 |

364.    Each of the 2003-2004 Fraudulent Transfers constituted a transfer of an interest in the property of the Company.

365.    Each of the 2003-2004 Fraudulent Transfers was made for less than fair consideration and less than reasonably equivalent value.  Each of the 2003-2004 Fraudulent Transfers was made for no consideration.

366.    At the times of, and subsequent to, each of the 2003-2004 Fraudulent Transfers, the Company had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

367.    Each of the 2003-2004 Fraudulent Transfers (a) was made when the Company was insolvent; (b) rendered the Company insolvent; and/or (c) left the Company with unreasonably small capital in relation to the Company's business at the time.

368.    At the time of each of the 2003-2004 Fraudulent Transfers, the Company intended or believed that the Company would incur debts beyond its ability to pay as such debts matured.

369.    By virtue of the foregoing, each of the 2003-2004 Fraudulent Transfers was a fraudulent transfer avoidable under applicable state law including N.Y. DEBT. & CRED. LAW §§

270 *et seq.* by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502, and Plaintiff is entitled to avoid and recover each of the 2003-2004 Fraudulent Transfers under 11 U.S.C. §§ 544 and 550.

370.    Under 11 U.S.C. § 550(a), "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--

> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee."

371.    Each defendant to this claim is the initial transferee of one or more of the 2003-2004 Fraudulent Transfers, the entity for whose benefit one or more of the 2003-2004 Fraudulent Transfers was made, or an immediate or mediate transferee of the initial transferee.

372.    To the extent that one or more of the 2003-2004 Fraudulent Transfers is avoided, Plaintiff may recover the property transferred, or the value of the transferred property, from each defendant to this claim pursuant to section 550(a) of the Bankruptcy Code.

373.    Plaintiff seeks to recover damages from each defendant to this claim in an amount equal to the dollar value of the property transferred pursuant to each of the 2003-2004 Fraudulent Transfers as of the date of the transfer, together with interest on that amount from the date of the transfer, attorneys' fees, and costs of suit and collection allowable by law.

## EIGHTH CLAIM FOR RELIEF
### Recovery of Fraudulent Transfers (Intentional)
### Against Leonard Green & Partners, L.P., LGP Management, Inc., Investcorp International, Inc., SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited, Investcorp S.A., Donald Werner, Howard Solot
### [11 U.S.C. §§ 544 and 550, and applicable state law including N.Y. DEBT. & CRED. LAW §§ 270 *et seq.*]

374.    Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

375.    Under 11 U.S.C. § 544(b), any debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor  holding an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e).  The phrase "under applicable law" has been interpreted to include the states' fraudulent transfer laws that would govern potentially fraudulent transactions.

376.    After the 2003 Shareholder Cashout but more than two years before the Petition Date, the Company made the 2003-2004 Fraudulent Transfers of funds to or for the benefit of the defendants to this claim.

377.    Each of the 2003-2004 Fraudulent Transfers constituted a transfer of an interest in the property of the Company.

378.    Each of the 2003-2004 Fraudulent Transfers was made for less than fair consideration and less than reasonably equivalent value.  Each of the 2003-2004 Fraudulent Transfers was made for no consideration.

379.    At the times of, and subsequent to, each of the 2003-2004 Fraudulent Transfers, the Company had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

380.   Each of the 2003-2004 Fraudulent Transfers (a) was made when the Company was insolvent; (b) rendered the Company insolvent; and/or (c) left the Company with unreasonably small capital in relation to the Company's business at the time.

381.   At the time of each of the 2003-2004 Fraudulent Transfers, the Company intended or believed that the Company would incur debts beyond its ability to pay as such debts matured.

382.   Each of the 2003-2004 Fraudulent Transfers was made with the actual intent to hinder, delay, or defraud present or future creditors.

383.   By virtue of the foregoing, each of the 2003-2004 Fraudulent Transfers was a fraudulent transfer avoidable under applicable state law including N.Y. DEBT. & CRED. LAW §§ 270 *et seq.* by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502, and Plaintiff is entitled to avoid and recover each of the 2003-2004 Fraudulent Transfers under 11 U.S.C. §§ 544 and 550.

384.   Under 11 U.S.C. § 550(a), "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--

      (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

      (2) any immediate or mediate transferee of such initial transferee."

385.   Each defendant to this claim is the initial transferee of one or more of the 2003-2004 Fraudulent Transfers, the entity for whose benefit one or more of the 2003-2004 Fraudulent Transfers was made, or an immediate or mediate transferee of the initial transferee.

386.   To the extent that one or more of the 2003-2004 Fraudulent Transfers is avoided, Plaintiff may recover the property transferred, or the value of the transferred property, from each defendant to this claim pursuant to section 550(a) of the Bankruptcy Code.

387.   Plaintiff seeks to recover damages from each defendant to this claim in an amount equal to the dollar value of the property transferred pursuant to each of the 2003-2004 Fraudulent Transfers as of the date of the transfer, together with interest on that amount from the date of the transfer, attorneys' fees, and costs of suit and collection allowable by law.

**NINTH CLAIM FOR RELIEF**
**Recovery of Fraudulent Transfers (Constructive)**
**Against Leonard Green & Partners, L.P., LGP Management, Inc., Investcorp International, Inc., SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited, Investcorp S.A., Dennis Heiner, Donald Werner, Howard Solot, Steven Richman, and John Remmers**
**[11 U.S.C. §§ 544 and 550, and applicable state law including N.Y. DEBT. & CRED. LAW §§ 270 *et seq.*]**

388.   Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

389.   Under 11 U.S.C. § 544(b), any debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor  holding an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e).  The phrase "under applicable law" has been interpreted to include the states' fraudulent transfer laws that would govern potentially fraudulent transactions.

390.   Within two years of the Petition Date, the Company made the following transfers (the "Two Year Fraudulent Transfers") of funds to or for the benefit of the following defendants:

| Name | Amounts Received |
|---|---|
| Leonard Green & Partners, L.P., (portions of which, upon information | $2,000,000 |

| | |
|---|---|
| and belief, were transferred to LGP Management, Inc.) | |
| Investcorp International, Inc., (portions of which, upon information and belief, were transferred to SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited and Investcorp S.A.) | $2,000,000 |
| Loughlin Meghji & Co. | Over $2,700,000 |
| Dennis Heiner | $6,114,117 |
| Donald Werner | $931,638 |
| Howard Solot | $350,642 |
| Steven Richman | $600,000 |
| John Remmers | $180,000 |

391.    Each of the Two Year Fraudulent Transfers constituted a transfer of an interest in the property of the Company.

392.    Each of the Two Year Fraudulent Transfers was made for less than fair consideration and less than a reasonably equivalent value.  Each of the Two Year Fraudulent Transfers was made for no consideration.

393.    At the times of, and subsequent to, each of the Two Year Fraudulent Transfers, the Company had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

394.    Each of the Two Year Fraudulent Transfers (a) was made when the Company was insolvent; (b) rendered the Company insolvent; or (c) left the Company with unreasonably small capital in relation to the Company's business at the time.

395.    At the time of each of the Two Year Fraudulent Transfers, the Company incurred and intended, or believed that the Company would incur, debts that would be beyond its ability to pay as such debts matured.

396.    By virtue of the foregoing, each of the Two Year Fraudulent Transfers was a fraudulent transfer avoidable under applicable state law including N.Y. DEBT. & CRED. LAW §§ 270 *et seq.* by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502 and the applicable state's fraudulent transfer statutes, and Plaintiff is entitled to avoid and recover each of the Two Year Fraudulent Transfers under 11 U.S.C. §§ 544 and 550.

397.    Under 11 U.S.C. § 550(a), "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--

> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee."

398.    Each defendant to this claim is the initial transferee of one or more of the Two Year Fraudulent Transfers, the entity for whose benefit one or more of the Two Year Fraudulent Transfers was made, or an immediate or mediate transferee of the initial transferee.

399.    To the extent that one or more of the Two Year Fraudulent Transfers is avoided, Plaintiff may recover the property transferred, or the value of the transferred property, from each defendant to this claim pursuant to section 550(a) of the Bankruptcy Code.

400.    Plaintiff seeks to recover damages from each defendant to this claim in an amount equal to the dollar value of the property transferred pursuant to each of the Two Year Fraudulent

Transfers as of the date of the transfer, together with interest on that amount from the date of the transfer, attorneys' fees, and costs of suit and collection allowable by law.

### TENTH CLAIM FOR RELIEF
**Recovery of Fraudulent Transfers (Intentional)**
**Against Leonard Green & Partners, L.P., LGP Management, Inc., Investcorp International, Inc., SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited, Investcorp S.A., Dennis Heiner, Donald Werner, Howard Solot, Steven Richman, and John Remmers**
**[11 U.S.C. §§ 544 and 550, and applicable state law including N.Y. DEBT. & CRED. LAW §§ 270 *et seq.*]**

401.    Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

402.    Under 11 U.S.C. § 544(b), any debtor may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor  holding an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e).  The phrase "under applicable law" has been interpreted to include the states' fraudulent transfer laws that would govern potentially fraudulent transactions.

403.    Within two years of the Petition Date, the Company made the Two Year Fraudulent Transfers of funds to or for the benefit of the defendants to this claim.

404.    Each of the Two Year Fraudulent Transfers constituted a transfer of an interest in the property of the Company.

405.    Each of the Two Year Fraudulent Transfers was made for less than fair consideration and less than a reasonably equivalent value.  Each of the Two Year Fraudulent Transfers was made for no consideration.

406. At the times of, and subsequent to, each of the Two Year Fraudulent Transfers, the Company had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

407. Each of the Two Year Fraudulent Transfers (a) was made when the Company was insolvent; (b) rendered the Company insolvent; or (c) left the Company with unreasonably small capital in relation to the Company's business at the time.

408. At the time of each of the Two Year Fraudulent Transfers, the Company incurred and intended, or believed that the Company would incur, debts that would be beyond its ability to pay as such debts matured.

409. Each of the Two Year Fraudulent Transfers was made with the actual intent to hinder, delay, or defraud present or future creditors.

410. By virtue of the foregoing, each of the Two Year Fraudulent Transfers was a fraudulent transfer avoidable under applicable state law including N.Y. DEBT. & CRED. LAW §§ 270 *et seq.* by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502 and the applicable state's fraudulent transfer statutes, and Plaintiff is entitled to avoid and recover each of the Two Year Fraudulent Transfers under 11 U.S.C. §§ 544 and 550.

411. Under 11 U.S.C. § 550(a), "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee."

412.    Each defendant to this claim is the initial transferee of one or more of the Two Year Fraudulent Transfers, the entity for whose benefit one or more of the Two Year Fraudulent Transfers was made, or an immediate or mediate transferee of the initial transferee.

413.    To the extent that one or more of the Two Year Fraudulent Transfers is avoided, Plaintiff may recover the property transferred, or the value of the transferred property, from each defendant to this claim pursuant to section 550(a) of the Bankruptcy Code.

414.    Plaintiff seeks to recover damages from each defendant to this claim in an amount equal to the dollar value of the property transferred pursuant to each of the Two Year Fraudulent Transfers as of the date of the transfer, together with interest on that amount from the date of the transfer, attorneys' fees, and costs of suit and collection allowable by law.

**ELEVENTH CLAIM FOR RELIEF**
**Recovery of Fraudulent Transfers (Constructive)**
**Against Leonard Green & Partners, L.P., LGP Management, Inc., Investcorp International, Inc., SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited, Investcorp S.A., Dennis Heiner, Donald Werner, Howard Solot, Steven Richman, and John Remmers**
**[11 U.S.C. §§ 548(a)(1)(B) and 550]**

415.    Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

416.    Within two years of the Petition Date, the Company made the Two Year Fraudulent Transfers of funds to or for the benefit of the defendants to this claim.

417.    Each of the Two Year Fraudulent Transfers constituted a transfer of an interest in the property of the Company.

418.    Each of the Two Year Fraudulent Transfers was made for less than fair consideration and less than a reasonably equivalent value. Each of the Two Year Fraudulent Transfers was made for no consideration.

419.    At the times of, and subsequent to, each of the Two Year Fraudulent Transfers, the Company had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

420.    Each of the Two Year Fraudulent Transfers (a) was made when the Company was insolvent; (b) rendered the Company insolvent; (c) left the Company with unreasonably small capital in relation to the Company's business at the time; or (d) was made to or for the benefit of an insider or was an obligation to or incurred for the benefit of an insider under an employment contract and not in the ordinary course of business.

421.    At the time of each of the Two Year Fraudulent Transfers, the Company incurred and intended, or believed that the Company would incur, debts that would be beyond its ability to pay as such debts matured.

422.    By virtue of the foregoing, each of the Two Year Fraudulent Transfers was a fraudulent transfer avoidable under 11 U.S.C. §§ 548(a)(1)(B), and Plaintiff is entitled to recover each of the Two Year Fraudulent Transfers under 11 U.S.C. § 550.

423.    Under 11 U.S.C. § 550(a), "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--

> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee."

424.   Each defendant to this claim is the initial transferee of one or more of the Two Year Fraudulent Transfers, the entity for whose benefit one or more of the Two Year Fraudulent Transfers was made, or an immediate or mediate transferee of the initial transferee.

425.   To the extent that one or more of the Two Year Fraudulent Transfers is avoided, Plaintiff may recover the property transferred, or the value of the transferred property, from each defendant to this claim pursuant to section 550(a) of the Bankruptcy Code.

426.   Plaintiff seeks to recover damages from each defendant to this claim in an amount equal to the dollar value of the property transferred pursuant to each of the Two Year Fraudulent Transfers as of the date of the transfer, together with interest on that amount from the date of the transfer, attorneys' fees, and costs of suit and collection allowable by law.

**TWELFTH CLAIM FOR RELIEF**
**Recovery of Fraudulent Transfers (Intentional)**
**Against Leonard Green & Partners, L.P., LGP Management, Inc., Investcorp International, Inc., SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited, Investcorp S.A., Dennis Heiner, Donald Werner, Howard Solot, Steven Richman, and John Remmers**
**[11 U.S.C. §§ 548(a)(1)(A) and 550]**

427.   Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

428.   Within two years of the Petition Date, the Company made the Two Year Fraudulent Transfers of funds to or for the benefit of the defendants to this claim.

429.   Each of the Two Year Fraudulent Transfers constituted a transfer of an interest in the property of the Company.

430.   Each of the Two Year Fraudulent Transfers was made for less than fair consideration and less than a reasonably equivalent value.  Each of the Two Year Fraudulent Transfers was made for no consideration.

431.    At the times of, and subsequent to, each of the Two Year Fraudulent Transfers, the Company had at least one creditor with an allowable unsecured claim for liabilities, which remained unsatisfied as of the Petition Date.

432.    Each of the Two Year Fraudulent Transfers (a) was made when the Company was insolvent; (b) rendered the Company insolvent; (c) left the Company with unreasonably small capital in relation to the Company's business at the time; or (d) was made to or for the benefit of an insider or was an obligation to or incurred for the benefit of an insider under an employment contract and not in the ordinary course of business.

433.    At the time of each of the Two Year Fraudulent Transfers, the Company incurred and intended, or believed that the Company would incur, debts that would be beyond its ability to pay as such debts matured.

434.    Each of the Two Year Fraudulent Transfers was made with the actual intent to hinder, delay, or defraud an entity to which the Company was or became indebted, on or after the date of the transfer.

435.    By virtue of the foregoing, each of the Two Year Fraudulent Transfers was a fraudulent transfer avoidable under 11 U.S.C. §§ 548(a)(1)(B), and Plaintiff is entitled to recover each of the Two Year Fraudulent Transfers under 11 U.S.C. § 550.

436.    Under 11 U.S.C. § 550(a), "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--

> (1)    the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee."

437.    Each defendant to this claim is the initial transferee of one or more of the Two

Year Fraudulent Transfers, the entity for whose benefit one or more of the Two Year Fraudulent

Transfers was made, or an immediate or mediate transferee of the initial transferee.

438.    To the extent that one or more of the Two Year Fraudulent Transfers is avoided,

Plaintiff may recover the property transferred, or the value of the transferred property, from each

defendant to this claim pursuant to section 550(a) of the Bankruptcy Code.

439.    Plaintiff seeks to recover damages from each defendant to this claim in an amount

equal to the dollar value of the property transferred pursuant to each of the Two Year Fraudulent

Transfers as of the date of the transfer, together with interest on that amount from the date of the

transfer, attorneys' fees, and costs of suit and collection allowable by law.

### THIRTEENTH CLAIM FOR RELIEF
**Recovery of Preferential Transfers**
**Against Leonard Green & Partners, L.P., LGP Management, Inc., Investcorp International, Inc., SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited, Investcorp S.A., Donald Werner, Steven Richman, and John Remmers**
**[11 U.S.C. §§ 547, 550]**

440.    Plaintiff repeats and realleges each of the allegations set forth above and below as

if fully set forth herein.

441.    Under 11 U.S.C. § 547, any Debtor may avoid any transfer of an interest of the

Debtor in property, (1) to or for the benefit of a creditor, (2) for or on account of an antecedent

debt owed by the Debtor before such transfer was made, (3) made while the Debtor was insolvent,

(4) made (A) on or within 90 days before the date of the filing of the petition, or (B) between

ninety days and one year before the date of the filing of the petition, if such creditor at the time of

such transfer was an insider, and (5) that enables such creditor to receive more than such creditor

would receive if (A) the Debtor's case were a case under chapter 7 of the Bankruptcy Code, (B) the transfer had not been made, and (C) such creditor received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

442.    Within one year of the Petition Date, the Company made transfers ("Preferential Transfers") of funds to the defendants to this claim, including but not limited to, the following:

| Name | Amounts Received |
|------|------------------|
| Leonard Green & Partners, L.P., and LGP Management, Inc. | $1,000,000 |
| Investcorp International, Inc., (portions of which, upon information and belief, were transferred to SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited and Investcorp S.A.) | $1,194,027 |
| Loughlin Meghji & Co. | $612,244 |
| Donald Werner | $537,333 |
| Steven Richman | $600,000 |
| John Remmers | $180,000 |

443.    Each of the Preferential Transfers constituted a transfer of an interest in the Company's property.

444.    Each of the Preferential Transfers was to or for the benefit of a creditor.

445.    Each of the Preferential Transfers was for or on account of an antecedent debt owed by the Company before it was made.

446.    Each of the Preferential Transfers was made while the Company was insolvent.

447.    Each of the Preferential Transfers was made on or within 90 days before the Petition Date, or was to an insider within the meaning of section 101(31) of the Bankruptcy Code and was made between ninety days and one year before the Petition Date.

448.    Each of the Preferential Transfers enabled such creditor to receive more than the creditor would receive if (A) the Company's cases were cases under chapter 7 of the Bankruptcy Code, (B) the transfer had not been made, and (C) such creditor received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

449.    Each of the Preferential Transfers constitutes an avoidable preferential transfer, within the meaning of section 547 of the Bankruptcy Code.

450.    By virtue of the foregoing, Plaintiff is entitled to avoid and recover each of the Preferential Transfers under 11 U.S.C. §§ 547(b) and 550.

451.    Under 11 U.S.C. § 550(a), "[e]xcept as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--

> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee."

452.    Each defendant to this claim is the initial transferee of one or more of the Preferential Transfers, the entity for whose benefit one or more of the Preferential Transfers was made, or an immediate or mediate transferee of the initial transferee.

453.    To the extent that one or more of the Preferential Transfers is avoided, Plaintiff may recover the property transferred, or the value of the transferred property, from each defendant to this claim pursuant to section 550(a) of the Bankruptcy Code.

454.    Plaintiff seeks to recover damages from each defendant to this claim in an amount equal to the dollar value of the property transferred pursuant to each of the Preferential Transfers

as of the date of the transfer, together with interest on that amount from the date of the transfer,

attorneys' fees, and costs of suit and collection allowable by law.

### FOURTEENTH CLAIM FOR RELIEF
**Aiding and Abetting Fraudulent Transfer**
**Against Murray Devine, Investcorp International, Inc., SIPCO Limited, Ownership
Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited,
Investcorp S.A., Mamoun Askari, James Egan, James Hardymon, Dennis Heiner, Charles
Marquis, Howard Solot, Dana Snyder, Christopher Stadler, Thomas Sullivan, Steven
Tempini, Donald Werner, Michael Werner, Eric Werner, Steven Bentson, Larry Friend,
Edward Gericke, Peter O'Coin, Craig Werner, John Fiumefreddo, Robert Rosati, and the
Werner Family Controlling Shareholders (Donald Werner, Howard Solot, Michael Werner,
Eric Werner, Michael Solot, Craig Werner, Bruce Werner)**

455.    Plaintiff repeats and realleges each of the allegations set forth above and below as

if fully set forth herein.

456.    Murray Devine aided and abetted the 2003 Shareholder Cashout Fraudulent

Transfers.  Murray Devine knowingly participated in and substantially assisted the payout of the

2003 Shareholder Cashout Fraudulent Transfers through the issuance of its solvency opinion.

457.    Murray Devine's engagement letter provided that Murray Devine's opinion was to

be used by the Company and its lenders in connection to the 2003 Shareholder Cashout.

Accordingly, Murray Devine knew that the intended beneficiaries of the solvency opinion were

the Company and its lenders, and that they would rely upon its findings in the execution of the

2003 Shareholder Cashout Fraudulent Transfers.  Murray Devine had a duty to meet the minimum

standards of professionals in its industry and owed the Company and its creditors a duty to not

make intentional or negligent misrepresentations in the solvency opinion and not materially

misstate the condition of the Company therein.

458.    Murray Devine breached this duty by issuing an opinion concluding that the

Company was solvent and that, among other things:  (1) the Company's assets at fair value

immediately before and after the 2003 Shareholder Cashout exceeded its total liabilities, and the

amount required to pay such liabilities when matured; (2) after the 2003 Shareholder Cashout, the Company had the ability to pay its debts and liabilities as they matured; and (3) after the 2003 Shareholder Cashout, the Company did not have an unreasonably small amount of capital. Murray Devine's conclusions were material and false. Murray Devine knew, or recklessly or negligently ignored and thereby remained willfully blind to the fact, that the 2003 Shareholder Cashout rendered the Company insolvent, with an unreasonably small amount of capital to conduct its business, and with insufficient liquidity to meet its debt obligations when they matured.

459. In issuing the opinion, Murray Devine knew or recklessly and negligently ignored facts that directly contradicted its conclusion of solvency and did not comply with basic minimum industry standards for issuing solvency opinions. At a minimum, in issuing its solvency opinion, Murray Devine was willfully blind to the Company's true financial condition. By issuing this opinion, Murray Devine knowingly participated in the 2003 Shareholder Cashout Fraudulent Transfers.

460. By aiding and abetting the 2003 Shareholder Cashout Fraudulent Transfers, Murray Devine proximately caused the Company to pay over $150 million to its shareholders and option holders, in addition to millions of dollars in fees and expenses, which deepened the Company's insolvency. Murray Devine is liable to the Company and its creditors for damages resulting from the 2003 Shareholder Cashout Fraudulent Transfers.

461. 2003 Shareholder Cashout Directors, Dennis Heiner, Eric Werner, Steve Bentson, Larry Friend, Edward Gericke, Peter O'Coin, Craig Werner, John Fiumefreddo, and Robert Rosati (the "2003 Shareholder Cashout Officers"), Investcorp and the Werner Family Controlling Shareholders (collectively, the "2003 Shareholder Cashout Fiduciaries") aided and abetted the

2003 Shareholder Cashout Fraudulent Transfers.  They aided and abetted the 2003 Shareholder Cashout Fraudulent Transfers by, among other things, substantially assisting and encouraging each other to proceed with the 2003 Shareholder Cashout Fraudulent Transfers despite their knowledge of, reckless disregard for, or willful blindness to the fact, that the Company was insolvent and that such transfers would deepen the Company's insolvency.

462.    By virtue of their fiduciary relationship with the Company, the 2003 Shareholder Cashout Fiduciaries knew, or recklessly or negligently ignored, that the 2003 Shareholder Cashout Fraudulent Transfers rendered the Company insolvent, with an unreasonably small amount of capital to conduct its business, and with insufficient liquidity to meet its debt obligations when they matured.

463.    By designing, approving, and implementing the 2003 Shareholder Cashout Fraudulent Transfers, the 2003 Shareholder Cashout Fiduciaries knowingly gave substantial assistance to the Company and each other in accomplishing the 2003 Shareholder Cashout.

464.    By aiding and abetting the 2003 Shareholder Cashout Fraudulent Transfers, the 2003 Shareholder Cashout Fiduciaries proximately caused the Company to pay $150 million to its shareholders and option holders, in addition to millions of dollars in fees and expenses, which deepened the Company's insolvency.  The 2003 Shareholder Cashout Fiduciaries are liable to the Company and its creditors for damages resulting from the 2003 Shareholder Cashout.

### FIFTEENTH CLAIM FOR RELIEF
**Breach of Fiduciary Duty**
**Against Mamoun Askari, James Egan, Charles Marquis, Christopher Stadler, Thomas Sullivan, Steven Tempini, Donald Werner, Howard Solot, Dennis Heiner, Eric Werner, Steve Bentson, Larry Friend, Edward Gericke, Peter O'Coin, Craig Werner, John Fiumefreddo, Robert Rosati, Investcorp International, Inc., SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited, Investcorp S.A., and the Werner Family Controlling Shareholders (Donald Werner, Howard Solot, Michael Werner, Eric Werner, Michael Solot, Craig Werner, Bruce Werner)**

465.    Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

466.    As directors of Holding (DE), Mamoun Askari, James Egan, Charles Marquis, Christopher Stadler, Thomas Sullivan, Steven Tempini, Donald Werner, Howard Solot, and Dennis Heiner (the "2003 Intermediate Dividend Directors") had fiduciary duties to Holding (DE) to act with the utmost good faith, loyalty, fair dealing, and due care toward Holding (DE) and in furtherance of the best interests of Holding (DE).

467.    As officers of Holding (DE), Dennis Heiner, Eric Werner, Steve Bentson, Larry Friend, Edward Gericke, Peter O'Coin, Craig Werner, John Fiumefreddo, and Robert Rosati (the "2003 Intermediate Dividend Officers") had fiduciary duties to Holding (DE) to act with the utmost good faith, loyalty, fair dealing, and due care toward Holding (DE) and in furtherance of the best interests of Holding (DE).

468.    In connection with the 2003 Shareholder Cashout, upon the approval and direction of the 2003 Intermediate Dividend Directors, Holding (DE) paid Holding (PA) a dividend in the amount of $85 million ("2003 Intermediate Dividend").

469.    Investcorp owned 67% of the shares of Holding (PA) at the time of the 2003 Intermediate Dividend. Investcorp appointed eight of the twelve seats on Holding (PA)'s board of directors. Investcorp exercised control over the board and the business affairs of Holding (PA). By virtue of Investcorp's domination and control over Holding (PA), Investcorp also dominated and controlled Holding (DE), a wholly owned subsidiary of Holding (PA). Indeed, Investcorp appointed and controlled five of the nine seats on Holding (DE)'s board of directors. As a controlling shareholder of Holding (DE), Investcorp had fiduciary duties to Holding (DE) to act

with the utmost good faith, loyalty, fair dealing, and due care toward Holding (DE) and in furtherance of the best interests of Holding (DE).

470.    The Werner Family Controlling Shareholders exercised control over the board and the business affairs of Holding (PA) at the time of the 2003 Intermediate Dividend because the Werner Family Controlling Shareholders appointed three seats on Holding (PA)'s board of directors.  By virtue of the Werner Family Controlling Shareholders' domination and control over Holding (PA), the Werner Family Controlling Shareholders also dominated and controlled Holding (DE), a wholly owned subsidiary of Holding (PA).  Indeed, the Werner Family Controlling Shareholders appointed and controlled two of the nine seats on Holding (DE)'s board of directors.  As a controlling shareholder of Holding (DE), the Werner Family Controlling Shareholders had fiduciary duties to Holding (DE) to act with the utmost good faith, loyalty, fair dealing, and due care toward Holding (DE) and in furtherance of the best interests of Holding (DE).

471.    Investcorp, the Werner Family Controlling Shareholders, and the 2003 Intermediate Dividend Directors and 2003 Intermediate Dividend Officers (collectively, "2003 Intermediate Dividend Fiduciaries") also owed fiduciary duties to Holding (DE)'s creditors because Holding (DE) was insolvent or operating in the zone of insolvency at the time of the 2003 Intermediate Dividend.  The 2003 Intermediate Dividend Fiduciaries had fiduciary duties to act with the utmost good faith, loyalty, fair dealing, and due care toward Holding (DE)'s creditors and in furtherance of the best interests of Holding (DE)'s creditors.

472.    The 2003 Intermediate Dividend Fiduciaries had a duty of care to inform themselves of Holding (DE)'s true financial state before making a business decision regarding the 2003 Illegal Intermediate Dividend.  The 2003 Intermediate Dividend Fiduciaries breached their

duty of care because based on readily available financial information, they knew, should have known, recklessly disregarded, and/or should have informed themselves of Holding (DE)'s precarious financial condition and inability to survive an $85 million cashout. Their breaches constituted, at a minimum, gross negligence.

473. Prior to the 2003 Intermediate Dividend, the 2003 Intermediate Dividend Fiduciaries had access to material information including, but not limited to: (1) the Company's internal financial reports and statements showing the existence of an exorbitant shareholder's deficit since 1997; (2) that the Company lost Home Depot's aluminum stepladder business and would likely lose further Home Depot business; and (3) that Home Depot's strategic plan was to move to bottom-line products and would likely replace the Company's ladders with cheaper import ladders. The 2003 Intermediate Dividend Fiduciaries were grossly negligent and/or reckless in fulfilling their duty of care because they blatantly ignored material information regarding Holding (DE)'s deteriorating financials caused Holding (DE) to implement the 2003 Intermediate Dividend to the detriment of Holding (DE).

474. The 2003 Intermediate Dividend Fiduciaries had a duty of loyalty to act in the best interest of Holding (DE), and to abstain from self-dealing and pursuing personal interests not shared by Holding (DE) and its creditors. The 2003 Intermediate Dividend Fiduciaries breached their fiduciary duties when they engaged in acts of self-dealing; the 2003 Intermediate Dividend Fiduciaries approved the 2003 Intermediate Dividend, a transaction that would harm, not benefit Holding (DE) and its creditors, in order to enrich themselves.

475. The 2003 Intermediate Dividend Fiduciaries were interested in the 2003 Intermediate Dividend transaction. They lacked the independence to determine objectively whether the transaction was in the best interest of Holding (DE) and its creditors because the 2003

Intermediate Dividend Fiduciaries knew they would reap substantial personal financial benefit if the transaction was approved and implemented.  The 2003 Intermediate Dividend was part of an overall scheme to extract $150 million from the Company for the benefit of the 2003 Intermediate Dividend Fiduciaries, including close to $100 million to Investcorp, tens of millions of dollars to family shareholders, and millions of dollars in Option Cashouts and "transaction bonuses" to the 2003 Intermediate Directors and Officers.

476.   The 2003 Intermediate Dividend Fiduciaries individually and collectively knew, recklessly disregarded, or should have known that the 2003 Intermediate Dividend was not in Holding (DE)'s best interests.  At the time of the transaction, the Company's audited financial statements reflected a negative net worth of approximately $100 million.  Sales to Home Depot were down from the previous year, and were expected to drop further with Home Depot's continuing shift towards import ladders.  The Company had already lost a significant portion of their aluminum stepladder business earlier in the year, and in March 2003, the 2003 Intermediate Dividend Fiduciaries learned that the Company's fiberglass ladder business was also at high risk.  Also, the 2003 Intermediate Dividend Fiduciaries knew the Company was uncompetitive in its pricing for Home Depot by a large margin.  They knew or recklessly disregarded that the Company had no realistic chance of retaining the Home Depot business at the margins it needed to service the Company's substantial debt load, much less the additional debt load contemplated in the 2003 Shareholder Cashout.

477.   Given the Company's unstable and pessimistic outlook, the 2003 Intermediate Dividend Fiduciaries knew or recklessly disregarded that implementing the 2003 Shareholder Cashout transaction was not in the Holding (DE)'s best interest; they knew or recklessly disregarded that Holding (DE) could not afford an $85 million dividend in its highly leveraged

state.  Nonetheless, the 2003 Intermediate Dividend Fiduciaries proceeded to conceal Holding

(DE)'s true financial condition from Holding (DE)'s creditors and caused the Company to pay the

2003 Intermediate Dividend.

478.    The 2003 Intermediate Dividend Fiduciaries wasted Holding (DE)'s assets.

479.    The 2003 Intermediate Dividend Fiduciaries had a duty to disclose all material

facts regarding the 2003 Intermediate Dividend to Holding (DE)'s creditors.  The 2003

Intermediate Dividend Fiduciaries breached this duty by concealing from the creditors the true

state of the Company's business relationship with Home Depot and their true projections as to the

Company's financial future.

480.    The 2003 Intermediate Dividend Fiduciaries concealed Holding (DE)'s loss of

Home Depot aluminum ladder business and the probable loss of additional Home Depot business

while garnering creditors', including the 1997 Bondholders', approval of the 2003 Intermediate

Dividend.  Indeed, 2003 Intermediate Dividend Fiduciaries actively concealed the true extent of

the Company's financial and business risks by using materially false, misleading, and inflated

projections that they knew the Company was unlikely to achieve.  Relying on these false

projections and other misleading information provided to them at the direction of the 2003

Intermediate Dividend Fiduciaries, the Company's creditors had no reason to suspect that the

2003 Intermediate Dividend Fiduciaries were concealing the truth and engaging in self-dealing.

481.    Furthermore, at the time of the 2003 Intermediate Dividend, Holding (DE) was

dominated and controlled fully, completely, and exclusively by Investcorp, the Werner Family

Controlling Shareholders and the 2003 Intermediate Dividend Directors and 2003 Intermediate

Dividend Officers appointed by them, such that Holding (DE) could not be expected to pursue any

claims against them. All informed persons that could have induced a lawsuit were actively

participating in the breaches of fiduciary duties, and therefore, no informed but not culpable person was in a position to induce Holding (DE) to initiate suit against the defendants to this claim.

482.    As a direct and proximate result of the 2003 Intermediate Dividend Fiduciaries' breaches of their fiduciary duties, Holding (DE) was damaged in an amount of at least $85 million.  The 2003 Intermediate Dividend Fiduciaries are liable to the Company and its creditors for damages and equitable remedies resulting from their flagrant breaches of fiduciary duties.

### SIXTEENTH CLAIM FOR RELIEF
**Breach of Fiduciary Duty**
**Against Mamoun Askari, James Egan, James Hardymon, Charles Marquis, Dana Snyder, Christopher Stadler, Thomas Sullivan, Steven Tempini, Donald Werner, Michael Werner, Howard Solot, Dennis Heiner, Eric Werner, Steve Bentson, Larry Friend, Edward Gericke, Peter O'Coin, Craig Werner, John Fiumefreddo, Robert Rosati, Investcorp International, Inc., SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited, Investcorp S.A., and the Werner Family Controlling Shareholders (Donald Werner, Howard Solot, Michael Werner, Eric Werner, Michael Solot, Craig Werner, Bruce Werner)**

483.    Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

484.    As directors of Holding (PA), the 2003 Shareholder Cashout Directors, Mamoun Askari, James Egan, James Hardymon, Charles Marquis, Dana Snyder, Christopher Stadler, Thomas Sullivan, Steven Tempini, Donald Werner, Michael Werner, Howard Solot, and Dennis Heiner, had fiduciary duties to Holding (PA) to act with the utmost good faith, loyalty, fair dealing and due care toward Holding (PA) and in furtherance of the best interests of Holding (PA).  The 2003 Shareholder Cashout Directors minus James Hardymon, Dana Snyder and Michael Werner also acted as directors of Holding (DE), and thus had direct fiduciary duties to Holding (DE).  The 2003 Shareholder Cashout Directors minus Mamoun Askari, James Egan, and Michael Werner also acted as directors of Werner Co., and thus had direct fiduciary duties to

Werner Co. By virtue of Holding (PA)'s 100% ownership of Holding (DE) and Holding (DE)'s 100% ownership of Werner Co., the 2003 Shareholder Cashout Directors owed the above described fiduciary duties to the entire Company.

485.    As officers of Holding (PA), Holding (DE) and Werner Co., the 2003 Shareholder Cashout Officers, Dennis Heiner, Eric Werner, Steve Bentson, Larry Friend, Edward Gericke, Peter O'Coin, Craig Werner, John Fiumefreddo, and Robert Rosati, had fiduciary duties to the Company to act with the utmost good faith, loyalty, fair dealing and due care toward the Company and in furtherance of the best interests of the Company.

486.    Investcorp owned approximately 67% of the shares of Holding (PA) at the time of the 2003 Shareholder Cashout. Investcorp appointed eight of the twelve seats on Holding (PA)'s board of directors. Investcorp exercised control over the board and the business affairs of Holding (PA). By virtue of Investcorp's domination and control over Holding (PA), and its appointment of six of nine directors on the board of Holding (DE), Investcorp also dominated and controlled Holding (DE), a wholly owned subsidiary of Holding (PA). By virtue of Investcorp's domination and control over Holding (PA) and Holding (DE), and its appointment of six of nine directors on the board of Werner Co., Investcorp also dominated and controlled Werner Co., a wholly owned subsidiary of Holding (DE). Thus, Investcorp exercised control over the board and the business affairs of the Company. By virtue of Investcorp's domination and control over the Company, Investcorp had fiduciary duties to the Company to act with the utmost good faith, loyalty, fair dealing, and due care toward the Company and in furtherance of the best interests of the Company.

487.    The Werner Family Controlling Shareholders exercised control over the board and the business affairs of Holding (PA) at the time of the 2003 Shareholder Cashout because the

Werner Family Controlling Shareholders appointed and controlled three seats on Holding (PA)'s board of directors.  By virtue of the Werner Family Controlling Shareholders' domination and control over Holding (PA) and its appointment of two of nine directors to the board of directors of Holding (DE), the Werner Family Controlling Shareholders also dominated and controlled Holding (DE), a wholly owned subsidiary of Holding (PA).  By virtue of the Werner Family Controlling Shareholders' domination and control over Holding (PA) and Holding (DE) and its appointment of two of nine directors to the board of directors of Werner Co., the Werner Family Controlling Shareholders also dominated and controlled Werner Co., a wholly owned subsidiary of Holding (DE).   Thus, the Werner Family Controlling Shareholders exercised control over the board and the business affairs of the Company.  By virtue of the Werner Family Controlling Shareholders' domination and control over the Company, the Werner Family Controlling Shareholders had fiduciary duties to the Company to act with the utmost good faith, loyalty, fair dealing, and due care toward the Company and in furtherance of the best interests of the Company.

488.    Investcorp, the Werner Family Controlling Shareholders, the 2003 Shareholder Cashout Directors and the 2003 Shareholder Cashout Officers (collectively, "2003 Shareholder Cashout Fiduciaries") also owed fiduciary duties to the Company's creditors because the Company was insolvent or operating in the zone of insolvency at the time of the 2003 Shareholder Cashout.  The 2003 Shareholder Cashout Fiduciaries had fiduciary duties to act with the utmost good faith, loyalty, fair dealing, and due care toward the Company's creditors and in furtherance of the best interests of the Company's creditors.

489.    The 2003 Shareholder Cashout Fiduciaries had a duty to inform themselves of the Company's true financial state before making a decision to extract $150 million from the

Company.  The 2003 Shareholder Cashout Fiduciaries breached their duty of care because based on readily available financial information, they knew, recklessly disregarded, or should have known and/or should have informed themselves of the Company's precarious financial condition and inability to survive the loss of $150 million in capital.

490.   Prior to the 2003 Shareholder Cashout, the 2003 Shareholder Cashout Fiduciaries had access to material information including, but not limited to:  (1) the Company's internal financial reports and statements showing the existence of an exorbitant shareholder's deficit since 1997; (2) that the Company lost Home Depot's aluminum stepladder business and would likely lose further Home Depot business; and (3) that Home Depot planned to move to lower cost bottom-line products and would likely replace the Company's ladders with lower cost import ladders.  The 2003 Shareholder Cashout Fiduciaries acted in bad faith, and grossly abused their discretion when they ignored evidence of the Company's deteriorating financial state and caused the Company to execute the 2003 Shareholder Cashout to the detriment of the Company and its creditors.

491.   The 2003 Shareholder Cashout Fiduciaries had a duty of loyalty to act in the best interest of the Company, and to abstain from self-dealing and pursuing personal interests not shared by the Company and its creditors.  The 2003 Shareholder Cashout Fiduciaries breached their fiduciary duties when they engaged in acts of self-dealing; the 2003 Shareholder Cashout Fiduciaries approved and executed the 2003 Shareholder Cashout to the detriment of the Company in order to enrich themselves.

492.   The 2003 Shareholder Cashout Fiduciaries had an interest in the 2003 Shareholder Cashout.   Because the 2003 Shareholder Cashout Fiduciaries stood to gain substantial personal financial benefit from the 2003 Shareholder Cashout, they lacked the independence necessary to determine objectively whether the transaction was in the best interest of the Company and its

creditors.  Investcorp used the 2003 Shareholder Cashout to extract nearly $100 million in

distributions and deal fees.  Likewise, the 2003 Shareholder Cashout Directors and 2003

Shareholder Cashout Officers received substantial "transaction bonuses" and over $3 million in

option cash outs.

493.    The 2003 Shareholder Cashout Fiduciaries individually and collectively knew or

recklessly disregarded that the 2003 Shareholder Cashout was not in the Company's best interests.

At the time of the transaction, the Company's audited financial statements reflected a negative net

worth of approximately $100 million.  Sales to Home Depot were down from the previous year,

and were expected to drop further with Home Depot's continuing shift towards import ladders.

The Company had already lost a significant portion of its aluminum stepladder business with

Home Depot earlier in the year, and in March 2003, the 2003 Shareholder Cashout Fiduciaries

learned that the Company would likely lose further Home Depot business.

494.    The 2003 Shareholder Cashout Fiduciaries also knew the Company could not

compete with the prices its competitors were offering Home Depot by a large margin.  They knew

or recklessly disregarded that the Company had no realistic chance of retaining the Home Depot

business at margins needed to services the Company's existing debt load, much less the vastly

increased debt load contemplated in the 2003 Shareholder Cashout.

495.    Given the Company's unstable and pessimistic financial outlook, the 2003

Shareholder Cashout Fiduciaries knew, or recklessly disregarded, that implementing the 2003

Shareholder Cashout was not in the Company's best interest; they knew or recklessly disregarded

that the Company could not afford a $150 million cash out in its highly leveraged state.

Nonetheless, the 2003 Shareholder Cashout Fiduciaries proceeded to conceal the Company's true

financial condition from the Company's creditors and caused the Company to execute the 2003 Shareholder Cashout.

496.    The 2003 Shareholder Cashout Fiduciaries' self-dealing wasted the Company's assets.

497.    The 2003 Shareholder Cashout Fiduciaries had a duty to disclose all material facts regarding the 2003 Shareholder Cashout to the Company's creditors.  The 2003 Shareholder Cashout Fiduciaries breached this duty by fraudulently concealing the true state of the Company's business relationship with Home Depot and disseminating unrealistic financial projections.

498.    The 2003 Shareholder Cashout Fiduciaries concealed the Company's loss of Home Depot aluminum stepladder business and the probable loss of additional Home Depot business while garnering creditors' approval of the 2003 Shareholder Cashout.  Indeed, the 2003 Shareholder Cashout Fiduciaries concealed the true extent of the Company's financial and business risks by actively misleading the creditors with materially inflated projections that the 2003 Shareholder Cashout Fiduciaries knew or recklessly disregarded that the Company was unlikely to achieve.  Relying on these false projections and other misleading information provided to them at the direction of the 2003 Shareholder Cashout Fiduciaries, the Company's creditors had no reason to suspect that the 2003 Shareholder Cashout Fiduciaries were concealing the truth and engaging in self-dealing.

499.    At the time of the 2003 Shareholder Cashout, the Company was dominated and controlled fully, completely, and exclusively by Investcorp, the Werner Family Controlling Shareholders, and the 2003 Shareholder Cashout Directors and 2003 Shareholder Cashout Officers appointed by them, such that the Company could not be expected to pursue any claims against them.  All informed persons that could have induced a lawsuit were actively participating

in the breaches of fiduciary duties, and therefore, no informed but not culpable person was in a position to induce the Company to initiate suit against the 2003 Shareholder Cashout Fiduciaries.

500.   The 2003 Shareholder Cashout Fiduciaries served their own and their constituencies' interests (not the Company's) through the 2003 Shareholder Cashout.  Investcorp cashed out approximately $97 million in distributions and $1.1 million in fees.  The 2003 Shareholder Cashout Directors and the 2003 Shareholder Cashout Officers caused the Company to pay $1.725 million in transaction bonuses and over $3 million in option cash outs, much of which went directly to these very same self-interested parties.  As expected, the 2003 Shareholder Cashout was financially devastating for the Company.  By the end of 2003, the Company had a $231.9 million negative net worth and significantly reduced liquidity and capital resources.  The Company's insolvency was deepened, further damaging the Company and its creditors.

501.   As a direct and proximate result of the 2003 Shareholder Cashout Fiduciaries' breach of their fiduciary duties, the Company and its creditors were damaged in an amount exceeding $170 million.  The 2003 Shareholder Cashout Fiduciaries are liable for any and all loss the Company and its creditors suffered as a result of their flagrant breaches of fiduciary duties self-dealing.  The 2003 Shareholder Cashout Fiduciaries are also liable for punitive damages because their breaches constitute willful, reckless, and oppressive conduct.

## SEVENTEENTH CLAIM FOR RELIEF
### Illegal Dividend / Unlawful Distribution
### Against Mamoun Askari, James Egan, Dennis Heiner, Charles Marquis, Howard Solot, Christopher Stadler, Thomas Sullivan, Stephen Tempini, and Donald Werner
### [Del. Code Ann. Title 8 § 170 *et seq.*]

502.    Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

503.    The 2003 Intermediate Dividend was illegal.  Under Delaware law, a dividend is only legally declared and paid if it is paid out of a corporation's "surplus" or, if there is no surplus, out of net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year.  Delaware law defines surplus as the amount by which the total assets of the corporation exceed the sum of the total liabilities, plus the par value of outstanding capital stock, and any amount the corporation added to stated capital (or, if the capital stock does not have par value, the corporation's stated capital).  At the time of the 2003 Intermediate Dividend, the Company had no surplus and its net profits were insufficient to justify the payment of the 2003 Intermediate Dividend.

504.    In authorizing and implementing the 2003 Intermediate Dividend, the 2003 Intermediate Dividend Directors breached their duties of due care, good faith, and loyalty, and such breaches constitute self-dealing, willful misconduct, recklessness, and/or gross negligence.

## EIGHTEENTH CLAIM FOR RELIEF
### Unlawful Dividend / Unlawful Distribution
**Against Mamoun Askari, James Egan, James Hardymon, Charles Marquis, Dana Snyder, Christopher Stadler, Thomas Sullivan, Steven Tempini, Donald Werner, Michael Werner, Howard Solot, and Dennis Heiner**
**[15 Pa. C.S. §§ 1551, 1553]**

505.    Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

506.    In connection with the 2003 Shareholder Cashout, upon the approval and direction of the 2003 Shareholder Cashout Directors, Holding (PA) made a distribution to shareholders in the amount of approximately $150 million.

507.    The 2003 Shareholder Cashout was unlawful because, after giving effect to it, (1) the Company was unable to pay its debts as they became due in the usual course of its business; and (2) the total assets of the Company were less than the sum of its total liabilities plus the amount that would be needed, if the Company were to be dissolved at the time as of which the distribution is measured, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the 2003 Shareholder Cashout.

508.    The 2003 Shareholder Cashout was also a violation of Holding (PA)'s Bylaws Article V, Section 1, which mandates that the board of directors declare and pay dividends only out of unreserved and unrestricted earned surplus of the Company. At the time of the 2003 Shareholder Cashout, the Company had no surplus and its net profits were insufficient to justify the payment of the 2003 Shareholder Cashout.

509.    In authorizing and implementing the 2003 Shareholder Cashout, the 2003 Shareholder Cashout Directors breached their duties of due care, good faith, and loyalty, and such breaches constitute self-dealing, willful misconduct and/or recklessness.

510.    From the 2003 Shareholder Cashout through June 2006, when the Company declared bankruptcy, it was dominated and controlled fully, completely, and exclusively by Investcorp, Leonard Green and the Werner Family Controlling Shareholders and the directors and officers of the Company appointed by them, such that the Company did not and could not be expected to pursue any claims against them.  No informed but not culpable person was in a position to induce the Company to initiate suit against the 2003 Shareholder Cashout Fiduciaries.

**NINETEENTH CLAIM FOR RELIEF**
**Breach of Fiduciary Duty**
**Against James Hardymon, Dana Snyder, Christopher Stadler, Thomas Sullivan, Donald Werner, Howard Solot, Dennis Heiner, Peter Nolan, Michael Wong, Eric Werner, Steven Richman, James Baker, and James Egan, Steve Bentson, Larry Friend, Edward Gericke, Peter O'Coin, Craig Werner, John Fiumefreddo, Robert Rosati, William Rippin, John Remmers, the Werner Family Controlling Shareholders (Donald Werner, Howard Solot, Michael Werner, Eric Werner, Michael Solot, Craig Werner, Bruce Werner), Leonard Green, Investcorp International, Inc., SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited, Investcorp S.A.**

511.    Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

512.    At relevant times, James Hardymon, Dana Snyder, Christopher Stadler, Thomas Sullivan, Donald Werner, Howard Solot, Dennis Heiner, Peter Nolan, Michael Wong, Eric Werner, Steven Richman, James Baker, and James Egan (collectively, the "Post 2003 Shareholder Cashout Directors") were directors of the Company.

513.    As directors of the Company, the Post 2003 Shareholder Cashout Directors had fiduciary duties to the Company to act with the utmost good faith, loyalty, fair dealing and due care toward the Company and in furtherance of the best interests of the Company.

514.    At relevant times, Dennis Heiner, Steven Richman, Eric Werner, Steve Bentson, Larry Friend, Edward Gericke, Peter O'Coin, Craig Werner, John Fiumefreddo, Robert Rosati,

Michael Trzynka, William Rippin, and John Remmers (collectively, the "Post 2003 Shareholder Cashout Officers") were officers of the Company.

515.   As officers of the Company, the Post 2003 Shareholder Cashout Officers had fiduciary duties to the Company to act with the utmost good faith, loyalty, fair dealing, and due care toward the Company and in furtherance of the best interests of the Company.

516.   After the 2003 Shareholder Cashout, Investcorp owned over 50% of the shares of Holding (PA).  Investcorp appointed four of the nine seats on Holding (PA)'s board of directors. Investcorp exercised control over the board and the business affairs of Holding (PA).  By virtue of Investcorp's domination and control over Holding (PA), Investcorp also dominated and controlled Holding (DE), a wholly owned subsidiary of Holding (PA), and Werner Co. a wholly owned subsidiary of Holding (DE).  Indeed, Investcorp appointed and controlled four of the nine seats on Holding (DE)'s board of directors.  As a controlling shareholder of the Company, Investcorp had fiduciary duties to the Company to act with the utmost good faith, loyalty, fair dealing, and due care toward the Company and in furtherance of the best interests of the Company.

517.   After the 2003 Shareholder Cashout, the Werner Family Controlling Shareholders exercised control over the board and the business affairs of Holding (PA) because the Werner Family Controlling Shareholders appointed two seats on Holding (PA)'s board of directors.  By virtue of the Werner Family Controlling Shareholders' domination and control over Holding (PA), the Werner Family Controlling Shareholders also dominated and controlled Holding (DE), a wholly owned subsidiary of Holding (PA), and Werner Co. a wholly owned subsidiary of Holding (DE).  Indeed, the Werner Family Controlling Shareholders appointed and controlled two of the nine seats on Holding (DE)'s board of directors.  As a controlling shareholder of the Company, the Werner Family Controlling Shareholders had fiduciary duties to the Company to act with the

utmost good faith, loyalty, fair dealing, and due care toward the Company and in furtherance of the best interests of the Company.

518.    After the 2003 Shareholder Cashout, Leonard Green, and its affiliates owned approximately 22% of the shares of Holding (PA).  Leonard Green appointed two of the nine seats on the board and had the power to veto important business decisions.  Leonard Green exercised control over the board and the business affairs of Holding (PA).  By virtue of Leonard Green's domination and control over Holding (PA), Leonard Green also dominated and controlled Holding (DE), a wholly owned subsidiary of Holding (PA), and Werner Co. a wholly owned subsidiary of Holding (DE).  Indeed, Leonard Green appointed and controlled two of the nine seats on Holding (DE)'s board of directors.  As a controlling shareholder of the Company, Leonard Green had fiduciary duties to the Company to act with the utmost good faith, loyalty, fair dealing, and due care toward the Company and in furtherance of the best interests of the Company.

519.    The Post 2003 Shareholder Cashout Directors and the Post 2003 Shareholder Cashout Officers were wholly designated and controlled by Investcorp, Leonard Green, and the Werner Family Controlling Shareholder (collectively, the "Post 2003 Shareholder Cashout Controlling Shareholders").

520.    The Post 2003 Shareholder Cashout Controlling Shareholders, the Post 2003 Shareholder Cashout Directors and the Post 2003 Shareholder Cashout Officers (collectively, the "Post 2003 Shareholder Cashout Fiduciaries") also owed fiduciary duties to the Company's creditors because the Company was insolvent or operating in the zone of insolvency at all relevant times.  The Post 2003 Shareholder Cashout Fiduciaries had fiduciary duties to act with the utmost good faith, loyalty, fair dealing, and due care toward the Company's creditors and in furtherance of the best interests of the Company's creditors.

521.    The Post 2003 Shareholder Cashout Fiduciaries breached these duties from 2003 to 2006 by failing to cause the Company to undergo a restructuring resulting in the de-leveraging of the Company (when they knew or recklessly disregarded that such a transaction was in the best interest of the Company), and instead working only on behalf of shareholders' out-of-the-money equity stakes at the expense of corporate value and the Company's creditors.  The Post 2003 Shareholder Cashout Fiduciaries were self-interested because they and their constituencies were motivated by substantial financial benefits in the form of fees and compensation.  Because of the Post 2003 Shareholder Cashout Fiduciaries' self-interest, they lacked the independence to act in the best interests of the Company and its creditors.

522.    Each of the Post 2003 Shareholder Cashout Fiduciaries also breached their duties by their participation in, and acquiescence in, the following acts, each of which constituted a separate and distinct breach of the Post 2003 Shareholder Cashout Fiduciaries' fiduciary duties:

(a) Unable to alleviate pressures on liquidity after the 2003 Shareholder Cashout, the Post 2003 Shareholder Cashout Fiduciaries caused the Company to spend $1 million in fees to effect amendments to the Company's loan agreements in May 2004.  At this time, the Post 2003 Shareholder Cashout Fiduciaries knew or recklessly disregarded that the Company's financial state would further deteriorate and that compliance with the amended covenants would almost assuredly be short-lived.  Nonetheless, the Post 2003 Shareholder Cashout Fiduciaries gambled with the creditors' money and elected to buy a temporary fix to avoid the necessary de-leveraging that was in the Company's best interests.

(b)  In 2004 and 2005 the Post 2003 Shareholder Cashout Fiduciaries, including specifically Larry Friend, developed, and implemented, a fraudulent plan to manipulate the Company's financial reports to satisfy loan covenants and so that the Company could

refinance its debt obligations.  The scheme included intentionally stretching payables and taking receivables at a discount to generate cash.

(c)  In March 2005, the Post 2003 Shareholder Cashout Fiduciaries wasted approximately half a million dollars for a 40-day waiver of covenants, which bought time to arrange for financing that would further delay the inevitable de-leveraging that was needed.  The Post 2003 Shareholder Cashout Fiduciaries knew or recklessly disregarded that neither this covenant waiver nor the subsequent refinancing would solve the Company's financial problems or benefit the Company.  They internally projected that the Company would fall deeper into insolvency in 2005.  However, driven by self-interest, the Post 2003 Shareholder Cashout Fiduciaries failed to seek a de-leveraging of the Company.

(d)  On May 10, 2005, the Post 2003 Shareholder Cashout Fiduciaries caused Holding (DE) to enter into the 2005 Credit Facility in connection with the 2005 Senior Secured Debt Refinancing.  This debt charged an extraordinarily high interest rate and would only damage the Company further.  Given that the Company was insolvent prior to the refinancing and was expected to fall deeper into insolvency, the Post 2003 Shareholder Cashout Fiduciaries knew or recklessly disregarded that it was impossible for the Company to service the 2005 Credit Facility, along with its other financial commitments. The Post 2003 Shareholder Cashout Fiduciaries caused the Company to dissipate another $5.5 million of the Company's (and creditors') assets to pay fees for the financing that was only a damaging short-term fix.

(e)  The Post 2003 Shareholder Cashout Fiduciaries breached their fiduciary duties by causing the Company to liquidate its Extruded Products division and Anniston facility, which damaged the Company's business and deepened its insolvency.

158

(f)  The Post 2003 Shareholder Cashout Fiduciaries breached their fiduciary duties by causing the Company to pay out millions in management fees to Investcorp and Leonard Green from 2003 to 2006 despite the Company's deepening insolvency.

(g)  The Post 2003 Shareholder Cashout Fiduciaries breached their fiduciary duties by causing Holding (DE) to provide significant compensation packages out of the ordinary course of business to its senior management from 2003 to 2006 despite the Company's deepening insolvency.

(h)  From 2005 until the Company finally succumbed to bankruptcy in June 2006, the Post 2003 Shareholder Cashout Fiduciaries breached their fiduciary duties by causing Holding (DE) to pay millions of dollars from 2005 to 2006 to restructuring and financial advisors retained to serve their personal interests and not the Company's interests.  LM and Rothschild were retained to assist the Post 2003 Shareholder Cashout Fiduciaries carry out schemes to delay the Company's filing of bankruptcy so that the Cashout Fiduciaries could continue to engage in speculative (and damaging) attempts, among other things, to recoup their negative equity value.  The Post 2003 Shareholder Cashout Fiduciaries caused the Company to retain Willkie Farr in March 2005 but delayed filing for bankruptcy protection for fifteen months in an attempt to avoid liability for their breaches of fiduciary duties.

(i)  The Post 2003 Shareholder Cashout Fiduciaries breached their fiduciary duties by concealing the true extent of the Company's terrible financial condition from the Company's creditors.  From 2003 on, the Post 2003 Shareholder Cashout Fiduciaries continued to use materially misleading and inflated projections that they knew or recklessly disregarded that the Company likely would not achieve.  In connection to the

2005 Senior Secured Debt Refinancing, Larry Friend signed a solvency certificate stating

that the Company was solvent and confirming that the Company's projections were

reasonable and attainable.  Given the Post 2003 Shareholder Cashout Fiduciaries'

assurances, the Company's creditors had no reason to suspect that the Post 2003

Shareholder Cashout Fiduciaries were concealing the truth and engaging in self-dealing.

(j)  The Post 2003 Shareholder Cashout Fiduciaries breached their fiduciary duties by

delaying the Company's bankruptcy filing in an improper attempt to use the statute of

limitations as a defense against liability arising from their blatant breaches of fiduciary

duty and unlawful distribution in 2003.

523.    Each of the Post 2003 Shareholder Cashout Fiduciaries' breaches was committed

with knowledge that it would damage the Company or in reckless disregard for the likely damage

it would cause (and did cause) to the Company.

524.    Furthermore, at all relevant times, the Company was dominated and controlled

fully, completely, and exclusively by Investcorp, Leonard Green and the Werner Family

Controlling Shareholders and the directors/officers of the Company appointed by them, such that

the Company could not be expected to pursue any claims against them.

525.    As a direct and proximate result of the Post 2003 Shareholder Cashout Fiduciaries'

breaches of their fiduciary duties, the Company was damaged in an amount to be determined but

in at least the tens of millions of dollars.  The Post 2003 Shareholder Cashout Fiduciaries are

liable to the Company and its creditors for damages (and equitable remedies) resulting from their

flagrant breaches of fiduciary duties.

526.    From the completion of the 2003 Shareholder Cashout until the Company filed for

bankruptcy protection, the Company was dominated and controlled fully, completely, and

exclusively by Investcorp, Leonard Green, the Werner Family Controlling Shareholders, and the

directors and officers appointed by them, such that the Company could not be expected to pursue

any claims against them.  All informed persons that could have induced a lawsuit were actively

participating in the breaches of fiduciary duties, and therefore, no informed but not culpable person

was in a position to induce the Company to initiate suit against the defendants to this claim.

## TWENTIETH CLAIM FOR RELIEF
**Aiding and Abetting Breach of Fiduciary Duty**
**Against Mamoun Askari, James Egan, Charles Marquis, Christopher Stadler, Thomas
Sullivan, Steven Tempini, Donald Werner, Howard Solot, Dennis Heiner, Eric Werner,
Steve Bentson, Larry Friend, Edward Gericke, Peter O'Coin, Craig Werner, John
Fiumefreddo, Robert Rosati, Investcorp International, Inc., SIPCO Limited, Ownership
Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited,
Investcorp S.A., the Werner Family Controlling Shareholders (Donald Werner, Howard
Solot, Michael Werner, Eric Werner, Michael Solot, Craig Werner, Bruce Werner), and
Murray Devine**

527.    Plaintiff repeats and realleges each of the allegations set forth above and below as

if fully set forth herein.

528.    As set forth in the Fifteenth Claim for Relief, the 2003 Intermediate Dividend

Fiduciaries owed fiduciary duties to Holding (DE) and its creditors to act with the utmost good

faith, loyalty, fair dealing and due care toward Holding (DE) and its creditors and in furtherance

of the best interests of Holding (DE) and its creditors.

529.    As described in the Fifteenth Claim for Relief, the 2003 Intermediate Dividend

Fiduciaries breached their fiduciary duties by causing the Company to implement the 2003

Intermediate Dividend.  The 2003 Intermediate Dividend Fiduciaries breached their fiduciary

duties when they engaged in acts of self-dealing and deceit regarding the Company's financial

condition, despite knowing or recklessly disregarding that the 2003 Intermediate Dividend would

harm the Company and its creditors.

530.    The 2003 Intermediate Dividend Fiduciaries aided and abetted each other's breaches of fiduciary duties to Holding (DE) and Holding (DE)'s creditors because, among other things, they knew of each other's fiduciary duties to Holding (DE) and its creditors, yet knowingly participated in and substantially assisted the other's breaches of those duties, as further alleged herein.

531.    The 2003 Shareholder Cashout Directors and the 2003 Shareholder Cashout Officers aided and abetted the 2003 Intermediate Dividend Fiduciaries' breaches of fiduciary duties because among other things, the 2003 Shareholder Cashout Directors and the 2003 Shareholder Cashout Officers knew that a fiduciary relationship existed between the 2003 Intermediate Dividend Fiduciaries and Holding (DE) and Holding (DE)'s creditors, yet knowingly participated in and substantially assisted the 2003 Intermediate Dividend Fiduciaries' breaches of their fiduciary duties.

532.    By virtue of being the directors and officers of Holding (DE)'s parent company, Holding (PA), the 2003 Shareholder Cashout Directors and the 2003 Shareholder Cashout Officers knew that Holding (DE) was insolvent or operating in the zone of insolvency.  The 2003 Shareholder Cashout Directors and the 2003 Shareholder Cashout Officers had access to material financial information indicating Holding (DE)'s precarious financial state, including, among others:  (1) financial statements showing the existence of an exorbitant shareholder's deficit since 1997; (2) the loss of Home Depot aluminum step ladder business and likely loss of Home Depot fiberglass ladder business in the near future; and (3) Home Depot's strategic decision to incrementally replace the Company's ladders with cheaper import ladders.

533.    The 2003 Shareholder Cashout Directors and the 2003 Shareholder Cashout Officers knew or recklessly disregarded that a $85 million cash out would deepen Holding (DE)'s insolvency and harm the Company.

534.    Notwithstanding this knowledge, the 2003 Shareholder Cashout Directors and the 2003 Shareholder Cashout Officers knowingly participated in the 2003 Intermediate Dividend Fiduciaries' breach of fiduciary duties by encouraging and scheming with the 2003 Intermediate Dividend Fiduciaries to implement the 2003 Intermediate Dividend.

535.    Murray Devine aided and abetted the 2003 Intermediate Dividend Fiduciaries' breaches of fiduciary duties because among other things, Murray Devine knew that a fiduciary relationship existed between the 2003 Intermediate Dividend Fiduciaries and Holding (DE) and Holding (DE)'s creditors, yet knowingly participated in and substantially assisted the 2003 Intermediate Dividend Fiduciaries' breaches of their fiduciary duties.

536.    By virtue of being hired by the Company to provide a solvency opinion in connection to the 2003 Shareholder Cashout, Murray Devine knew or recklessly disregarded that the Company had insufficient liquidity and would not be able to meet its loan obligations when they matured.  Murray Devine also knew that its solvency opinion was necessary in order for the 2003 Intermediate Dividend Fiduciaries to implement the 2003 Intermediate Dividend and would be used for such purpose.

537.    Murray Devine issued an opinion concluding that the Company was solvent without regard to red flags that directly contradicted its conclusion of solvency and without complying with professional standards for issuing solvency opinions.  Upon information and belief, by issuing this opinion, Murray Devine knowingly participated in the 2003 Intermediate Dividend Fiduciaries' breaches of fiduciary duty; with Murray Devine's solvency opinion in hand,

the 2003 Intermediate Dividend Fiduciaries were able to consummate the 2003 Intermediate Dividend.

538.    By aiding and abetting each other's breaches of fiduciary duties, the 2003 Intermediate Dividend Fiduciaries proximately caused Holding (DE) to dividend up $85 million and pay millions of dollars in fees and expenses, which deepened the Company's insolvency and left creditors without financial recourse.  The 2003 Intermediate Dividend Fiduciaries are liable to Holding (DE) and its creditors for damages (and equitable remedies) resulting from their breaches of fiduciary duties.

539.    By aiding and abetting the 2003 Intermediate Dividend Fiduciaries breaches of fiduciary duties, the 2003 Shareholder Cashout Directors, the 2003 Shareholder Cashout Officers, and Murray Devine proximately caused the Company to dividend up $85 million and pay millions of dollars in fees and expenses, which deepened the Company's insolvency.  The 2003 Shareholder Cashout Directors, the 2003 Shareholder Cashout Officers, and Murray Devine are liable to the Company and its creditors for damages (and equitable remedies) resulting from the 2003 Intermediate Dividend Fiduciaries' breaches of fiduciary duties.

**TWENTY-FIRST CLAIM FOR RELIEF**
**Aiding and Abetting Breach of Fiduciary Duty**
**Against Mamoun Askari, James Egan, James Hardymon, Charles Marquis, Dana Snyder,**
**Christopher Stadler, Thomas Sullivan, Steven Tempini, Donald Werner, Michael Werner,**
**Howard Solot, and Dennis Heiner, Dennis Heiner, Eric Werner, Steve Bentson, Larry**
**Friend, Edward Gericke, Peter O'Coin, Craig Werner, John Fiumefreddo, Robert Rosati,**
**Investcorp International, Inc., SIPCO Limited, Ownership Holdings Limited, C.P. Holdings**
**Limited, Investcorp B.S.C., Investcorp Holdings Limited, Investcorp S.A., the Werner**
**Family Controlling Shareholders (Donald Werner, Howard Solot, Michael Werner, Eric**
**Werner, Michael Solot, Craig Werner, Bruce Werner), Murray Devine**

540.    Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

541.    As set forth in the Sixteenth Claim for Relief, the 2003 Shareholder Cashout Fiduciaries owed fiduciary duties to the Company and its creditors to act with the utmost good faith, loyalty, fair dealing and due care toward the Company and its creditors and in furtherance of the best interests of the Company and its creditors.

542.    As described in the Sixteenth Claim for Relief, the 2003 Shareholder Cashout Fiduciaries breached their fiduciary duties by causing the Company to implement the 2003 Shareholder Cashout. The 2003 Shareholder Cashout Fiduciaries breached their fiduciary duties when they engaged in acts of self-dealing and deceit regarding the Company's financial condition, despite knowing or recklessly disregarding that the 2003 Shareholder Cashout would harm the Company and its creditors.

543.    The 2003 Shareholder Cashout Fiduciaries aided and abetted each other's breaches of fiduciary duties to the Company and its creditors because, among other things, they knew of each other's fiduciary duties to the Company and its creditors, yet knowingly participated in and substantially assisted the other's breaches of those duties, as further alleged herein.

544.    The 2003 Intermediate Dividend Directors and the 2003 Intermediate Dividend Officers aided and abetted the 2003 Shareholder Cashout Fiduciaries' breaches of fiduciary duties

because among other things, the 2003 Intermediate Dividend Directors and the 2003 Intermediate Dividend Officers knew that a fiduciary relationship existed between the 2003 Shareholder Cashout Fiduciaries and the Company and its creditors, yet knowingly participated and substantially assisted in the 2003 Shareholder Cashout Fiduciaries' breaches of their fiduciary duties.

545.   By virtue of being the directors and officers of Holding (PA)'s wholly owned subsidiary, Holding (DE), the 2003 Intermediate Dividend Directors and the 2003 Intermediate Dividend Officers knew that Holding (PA) was insolvent or operating in the zone of insolvency. The 2003 Intermediate Dividend Directors and the 2003 Intermediate Dividend Officers had access to material financial information indicating Holding (PA)'s precarious financial state, including, among others:  (1) financial statements showing the existence of an exorbitant shareholder's deficit since 1997; (2) the loss of Home Depot aluminum step ladder business and likely loss of further Home Depot business in the near future; and (3) Home Depot's strategic decision to incrementally replace the Company's ladders with cheaper import ladders.  The 2003 Shareholder Cashout Fiduciaries had access to the same information.

546.   The 2003 Intermediate Dividend Directors, the 2003 Intermediate Dividend Officers, and the 2003 Shareholder Cashout Fiduciaries knew or recklessly disregarded that a $150 million shareholder distribution and a $3 million option cashout would deepen the Company's insolvency and harm the Company.

547.   Notwithstanding this knowledge, the 2003 Intermediate Dividend Directors and 2003 Intermediate Dividend Officers knowingly participated in the 2003 Shareholder Cashout Fiduciaries' breaches of fiduciary duties by carrying out an essential component of the 2003 Shareholder Cashout – the 2003 Intermediate Dividend.  The 2003 Intermediate Dividend

Directors and 2003 Intermediate Dividend Officers knew that the 2003 Shareholder Cashout depended on Holding (DE)'s $85 million dividend up to Holding (PA). Accordingly, the 2003 Intermediate Dividend Directors and the 2003 Intermediate Dividend Officers effected the 2003 Intermediate Dividend, making the 2003 Shareholder Cashout possible. The 2003 Intermediate Dividend Directors and the 2003 Intermediate Dividend Officers actively worked hand-in-hand with the 2003 Shareholder Cashout Fiduciaries to consummate the 2003 Shareholder Cashout.

548.    Murray Devine aided and abetted the 2003 Shareholder Cashout Fiduciaries' breaches of fiduciary duties because among other things, Murray Devine knew that a fiduciary relationship existed between the 2003 Shareholder Cashout Fiduciaries and the Company and its creditors, yet knowingly participated in and substantially assisted the 2003 Shareholder Cashout Fiduciaries' breaches of their fiduciary duties.

549.    By virtue of being hired by the Company to provide a solvency opinion in connection with the 2003 Shareholder Cashout, Murray Devine knew that the Company had insufficient liquidity and would not be able to meet its loan obligations when they matured. Murray Devine also knew that its solvency opinion was necessary in order for the 2003 Shareholder Cashout Fiduciaries to implement the 2003 Shareholder Cashout and would be used for such purpose.

550.    Murray Devine issued an opinion concluding that the Company was solvent without regard to red flags that directly contradicted its conclusion of solvency and without complying with professional standards for issuing solvency opinions. By issuing this opinion, Murray Devine knowingly participated in the 2003 Shareholder Cashout Fiduciaries' breaches of fiduciary duty; with Murray Devine's solvency opinion in hand, the 2003 Shareholder Cashout Fiduciaries were able to consummate the 2003 Shareholder Cashout.

551.   By aiding and abetting each other's breaches of fiduciary duties, the 2003 Shareholder Cashout Fiduciaries proximately caused the Company to pay out $150 million in shareholder distribution, $3 million in option distribution, and millions of dollars in fees and expenses, all of which deepened the Company's insolvency.   The 2003  Shareholder Cashout Fiduciaries are liable to the Company and its creditors for damages (and equitable remedies) resulting from their breaches of fiduciary duties.

552.   By aiding and abetting the 2003 Shareholder Cashout Fiduciaries breaches of fiduciary duties, the 2003 Intermediate Dividend Directors, the 2003 Intermediate Dividend Officers, and Murray Devine proximately caused Holding (PA) to pay out $150 million in shareholder distribution, $3 million in option distribution, and millions of dollars in fees and expenses, all of which deepened the Company's insolvency.   The 2003 Intermediate Dividend Directors, the 2003 Intermediate Dividend Officers, and Murray Devine are liable to the Company and its creditors for damages (and equitable remedies) resulting from the 2003 Shareholder Cashout Fiduciaries' breaches of fiduciary duties.

**TWENTY-SECOND CLAIM FOR RELIEF**
**Aiding and Abetting Breach of Fiduciary Duty**
**Against James Hardymon, Dana Snyder, Christopher Stadler, Thomas Sullivan, Donald Werner, Howard Solot, Dennis Heiner, Peter Nolan, Michael Wong, Eric Werner, Steven Richman, James Baker, and James Egan, Dennis Heiner, Steven Richman, Eric Werner, Steve Bentson, Larry Friend, Edward Gericke, Peter O'Coin, Craig Werner, John Fiumefreddo, Robert Rosati, William Rippin, John Remmers, the Werner Family Controlling Shareholders (Donald Werner, Howard Solot, Michael Werner, Eric Werner, Michael Solot, Craig Werner, Bruce Werner), Leonard Green, Investcorp International, Inc., SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited, Investcorp S.A., and Loughlin Meghji**

553.    Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

554.    As set forth in the Nineteenth Claim for Relief, the Post 2003 Shareholder Cashout Fiduciaries had fiduciary duties to the Company and the Company's creditors to act with the utmost good faith, loyalty, fair dealing and due care toward the Company and its creditors and in furtherance of the best interests of the Company and its creditors.

555.    As set forth in the Nineteenth Claim for Relief, the Post 2003 Shareholder Cashout Fiduciaries breached their fiduciary duties by fraudulently prolonging the Company's life in attempts to resurrect value for out-of-the-money equity at the expense of corporate value and the Company's creditors.

556.    As a direct and proximate result of the Post 2003 Shareholder Cashout Fiduciaries' breaches of their fiduciary duties, the Company's value plummeted.  The Post 2003 Shareholder Cashout Fiduciaries are liable to the Company and its creditors for damages (and equitable remedies) resulting from their breaches of fiduciary duties.

557.    The Post 2003 Shareholder Cashout Fiduciaries aided and abetted each other's breaches of fiduciary duties to the Company and the Company's creditors because, among other

169

things, they knew of each other's fiduciary duties to the Company and its creditors, yet knowingly participated in and substantially assisted each other's breaches of those duties.

558.    By aiding and abetting each other's breaches of fiduciary duties, the Post 2003 Shareholder Cashout Fiduciaries wasted the Company's assets, unnecessarily delayed the Company from filing bankruptcy (or otherwise de-leveraging the Company), and caused the Company's value to plummet to the detriment of the Company and its creditors.  The Post 2003 Shareholder Cashout Fiduciaries are liable to the Company and its creditors for damages (and equitable remedies) resulting from their aiding and abetting the other's breaches of fiduciary duties.

559.    Loughlin Meghji aided and abetted the Post 2003 Shareholder Cashout Fiduciaries' breaches of their fiduciary duties because, among other things, Loughlin Meghji knew that a fiduciary relationship existed between the Post 2003 Shareholder Cashout Fiduciaries and the Company and its creditors, yet knowingly participated in and substantially assisted the Post 2003 Shareholder Cashout Fiduciaries' breaches of their fiduciary duties.

560.    By virtue of being retained by the Company to assist the Post 2003 Shareholder Cashout Fiduciaries develop and present business plans and forecasts to lenders, Loughlin Meghji had access to material financial information which showed that the Company was insolvent.  At least as of March 2005, Loughlin Meghji knew that the Company had insufficient liquidity and would not be able to meet its loan obligations when they matured.

561.    Notwithstanding this knowledge, Loughlin Meghji knowingly participated and substantially assisted the Post 2003 Shareholder Cashout Fiduciaries' breach their fiduciary duties; Loughlin Meghji substantially assisted the Post 2003 Shareholder Cashout Fiduciaries create and distribute materially inflated projections and business plans to conceal the true extent of the Company's terrible financial condition from the Company's creditors.  With Loughlin

Meghji's knowing participation, the Post 2003 Shareholder Cashout Fiduciaries were able to

conceal the Company's rapidly unraveling finances and delay the Company from filing for

bankruptcy until June 2006.

562.    By aiding and abetting the Post 2003 Shareholder Cashout Fiduciaries breaches of

fiduciary duties, Loughlin Meghji wasted the Company's assets, unnecessarily delayed the

Company from filing bankruptcy (or otherwise de-leveraging the Company), and caused the

Company's value to plummet to the detriment of the Company's creditors. Loughlin Meghji is

liable to the Company and the Company's creditors for damages resulting from its aiding and

abetting the Post 2003 Shareholder Cashout Fiduciaries' breaches of fiduciary duties.

### TWENTY-THIRD CLAIM FOR RELIEF
**Deepening Insolvency**
**Against Mamoun Askari, James Egan, James Hardymon, Charles Marquis, Dana Snyder,
Christopher Stadler, Thomas Sullivan, Steven Tempini, Donald Werner, Michael Werner,
Howard Solot, Dennis Heiner, Eric Werner, Steve Bentson, Larry Friend, Edward Gericke,
Peter O'Coin, Craig Werner, John Fiumefreddo, Robert Rosati, Investcorp International,
Inc., SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp
B.S.C., Investcorp Holdings Limited, Investcorp S.A., and Werner Family Controlling
Shareholders (Donald Werner, Howard Solot, Michael Werner, Eric Werner, Michael Solot,
Craig Werner, Bruce Werner)**

563.    Plaintiff repeats and realleges each of the allegations set forth above and below as

if fully set forth herein.

564.    At the time of the 2003 Shareholder Cashout, the 2003 Shareholder Cashout

Fiduciaries knew that the Company was insolvent or operating in the zone of insolvency. The

Company's audited financial statements reflected a highly leveraged company with a

stockholders' deficit of approximately $100 million. At this time, the Company had lost business

from and was also anticipating potential further lost business from its biggest customer, Home

Depot. The Company was insolvent or operating in the zone of insolvency at the time of the 2003

Shareholder Cashout, and the 2003 Shareholder Cashout Fiduciaries had knowledge revealing that

the Company's future business would be under increasing pressure and at significantly lower margins, and that the Company would likely lose significant business as a result.

565.    Notwithstanding this knowledge, the 2003 Shareholder Cashout Fiduciaries, with the help of Murray Devine, falsely represented to lenders that the Company was solvent and caused the Company to implement the 2003 Shareholder Cashout.

566.    As part of the 2003 Shareholder Cashout, the 2003 Shareholder Cashout Fiduciaries caused the Company to enter into the 2003 Credit Facilities, totaling $230 million, and to incur $21.5 million in transaction fees.  Given the Company's precarious financial condition, taking on additional debt was a move the 2003 Shareholder Cashout Fiduciaries knew or recklessly disregarded was directly contrary to the Company's best interests, and it pushed the Company deeper into insolvency.

567.    As part of the 2003 Shareholder Cashout, the 2003 Shareholder Cashout Fiduciaries caused the Company to distribute $150 million to shareholders and $3 million in option cash outs.  The $153 million cash out eradicated any of the Company's liquidity and exacerbated the Company's insolvency.

568.    For example, inevitably and just months after the 2003 Shareholder Cashout, the Company's massive debt load prevented the Company from offering competitive pricing to Home Depot and ultimately led to the Company losing Home Depot's business.  With Home Depot no longer a customer, the Company's profitability suffered drastically.  The Company never recovered.

569.    By facilitating the 2003 Shareholder Cashout, the 2003 Shareholder Cashout Fiduciaries fraudulently extended the Company's life beyond insolvency, which damaged the Company by increasing its negative net worth.  The 2003 Shareholder Cashout Fiduciaries are liable for all damages (and equitable remedies) resulting from the 2003 Shareholder Cashout.

## TWENTY-FOURTH CLAIM FOR RELIEF
**Deepening Insolvency**
**Against James Hardymon, Dana Snyder, Christopher Stadler, Thomas Sullivan, Donald Werner, Howard Solot, Dennis Heiner, Peter Nolan, Michael Wong, Eric Werner, Steven Richman, James Baker, and James Egan, Steve Bentson, Larry Friend, Edward Gericke, Peter O'Coin, Craig Werner, John Fiumefreddo, Robert Rosati, William Rippin, John Remmers, Leonard Green, Investcorp International, Inc., SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited, Investcorp S.A., and Werner Family Controlling Shareholder (Donald Werner, Howard Solot, Michael Werner, Eric Werner, Michael Solot, Craig Werner, Bruce Werner)**

570.   Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

571.   The Post 2003 Shareholder Cashout Fiduciaries fraudulently prolonged the Company's life beyond insolvency, resulting in damage to the corporation caused by increased debt.

572.   After the 2003 Shareholder Cashout, the Company was insolvent.  The Company's audited financial statements at the end of 2003 reflected a stockholders' deficit of approximately $231.9 million.  The Company was highly leveraged, which significantly impacted its liquidity and capital resources.  After losing all of its Home Depot business in 2003, the Company had no hope for financial improvement in the immediate future.

573.   Notwithstanding the Company's insolvency, the Post 2003 Shareholder Cashout Fiduciaries engaged in costly attempts to extend the life of the Company and delay the deleveraging of the Company (such as through bankruptcy), which include, among other things, spending $ 1 million in fees to effect amendments to the Company's loan agreements in May 2004 to provide temporary compliance with financial covenants, and spending approximately half a million dollars for a 40-day waiver of the Company's financial covenants in March 2005.

574.   In May 2005, the Post 2003 Shareholder Cashout Fiduciaries pushed the Company deeper into insolvency by causing the Company to enter into the 2005 Credit Facility in connection with the 2005 Refinancing.  Under the 2005 Credit Facility, the Company borrowed

another $100 million at an extraordinarily high interest rate. The Company paid out

approximately $5.5 million in fees and expenses associated with the loan. To legitimize the 2005

Refinancing to creditors, Larry Friend signed a certificate that falsely represented that the

Company was solvent. The Post 2003 Shareholder Cashout Fiduciaries knew that the 2005

Refinancing would not alleviate the Company's financial woes, but only serve to temporarily

extend the Company's life and disguise its insolvency from creditors.

575.    Shortly after the 2005 Refinancing, the Post 2003 Shareholder Cashout Fiduciaries

internally recognized that bankruptcy was inevitable. At this time, the Company was reporting a

negative EBITDA, a net loss, and negative cash flow. Nonetheless, in the spring of 2006, the Post

2003 Shareholder Cashout Fiduciaries caused the Company to dissipate additional assets in fees

and expenses to obtain covenant waivers from its first and second lien holders. The Post 2003

Shareholder Cashout Fiduciaries again fraudulently prolonged the Company's life to the detriment

of the Company and its creditors.

576.    The Post 2003 Shareholder Cashout Fiduciaries, including specifically Larry

Friend, also manipulated the Company's financial numbers to disguise the Company's insolvent

state from lenders and creditors.

577.    During this time, the Post 2003 Shareholder Cashout Fiduciaries also deepened the

Company's insolvency by causing the Company to pay millions of dollars to restructuring and

financial advisors retained to assist the Post 2003 Shareholder Cashout Fiduciaries fraudulently

prolong the life of the Company.

578.    The Post 2003 Shareholder Cashout Fiduciaries deepened the Company's

insolvency when they caused the Company to further dissipate assets by liquidating its Extruded

Products division and Anniston facility to generate cash needed to temporarily comply with debt covenants. These actions damaged the Company's business, deepening its insolvency further.

579.    The Post 2003 Shareholder Cashout Fiduciaries continued the Company in business despite its insolvency, thus exacerbating its deteriorating financial condition and injuring the Company and creditors. The Post 2003 Shareholder Cashout Fiduciaries are liable for all damages (and equitable remedies) resulting from their fraudulent, intentional and/or negligent expansion of the Company's debt and prolonging of the Company's life to the detriment of Company and creditors.

## TWENTY-FIFTH CLAIM FOR RELIEF
### Breach of Contract
### Against Investcorp International Inc.

580.    Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

581.    On November 27, 1997, Investcorp International Inc. and Holding (DE) entered into an Agreement for Management, Advisory, Strategic Planning and Consulting Services (the "1997 Investcorp Management Services Agreement"), under which Investcorp International Inc. promised to provide, inter alia, advice concerning management, finance, marketing, and strategic planning for a period of five years. In consideration for Investcorp International Inc.'s advisory services, Holding (DE) promised to pay to Investcorp International Inc. consulting services fees at the rate of $1 million per year.

582.    On November 25, 2002, Investcorp International Inc. and Holding (DE) entered into another Agreement for Management Advisory, Strategic, Planning and Consulting Services (the "2002 Investcorp Management Services Agreement"), under which Investcorp International Inc. promised to provide, inter alia, advice concerning management, finance, marketing, and

strategic planning for a period of one year. In consideration for Investcorp International Inc.'s advisory services, Holding (DE) promised to pay to Investcorp International Inc. consulting services fees at the rate of $1.5 million per year. The 2002 Investcorp Management Services Agreement automatically renewed for successive one-year periods on the 25th day of November.

583. On June 11, 2003, Investcorp International Inc. and Holding (DE) entered into an Amended and Restated Agreement for Management Advisory, Strategic Planning and Consulting Services (the "Investcorp Management Services Amendment"), under which Investcorp International Inc. promised to provide, among other things, advice concerning management, finance, marketing, and strategic planning from November 25, 2002 to November 24, 2007. In consideration of Investcorp International Inc.'s advisory services, the Holding (DE) promised to pay Investcorp International Inc. a pre-paid annual fee of $1 million.

584. At the closing of the 1997 Shareholder Cashout the Company paid Investcorp International Inc. $5 million as advance payment of fees promised by Holding (DE) under the 1997 Investcorp Management Services Agreement. In or about November 2002, the Company pre-paid Investcorp International Inc. a consulting service fee of $1.5 million for the period from November 25, 2002 to November 24, 2003. Each year from November 25, 2003 until the Company's bankruptcy, the Company paid Investcorp International Inc. a pre-paid annual fee of $1 million as provided by the Investcorp Management Services Amendment. Holding (DE) fully performed on the 1997 Investcorp Management Services Agreement, and the 2002 Investcorp Management Services Agreement., and Investcorp Management Services Amendment (collectively, "Investcorp Management Agreements").

585. Investcorp International Inc. breached the Investcorp Management Agreements because it was grossly negligent and acted in bad faith in providing management, finance,

marketing, and strategic planning advice to the Company.  Investcorp International, Inc. acted in

its own interests and not in the interests of the Company.  Investcorp International, Inc.'s "advice"

was contrary to the best interests of the Company.

586.    Investcorp International Inc.'s breaches of the Investcorp Management Agreements

proximately caused damages to the Company amounting to hundreds of millions of dollars.

**TWENTY-SIXTH CLAIM FOR RELIEF**
**Breach of Contract**
**Against Leonard Green & Partners, L.P.**

587.    Plaintiff repeats and realleges each of the allegations set forth above and below as

if fully set forth herein.

588.    On June 11, 2003, Leonard Green & Partners, L.P. and Holding (DE) entered into a

Management Services Agreement (the "2003 LG Management Services Agreement), under which

Leonard Green & Partner, L.P. promised to provide management, consulting, and financial

planning services to Holding (DE) on an ongoing basis in connection with the operation and

growth of Holding (DE) in the ordinary course of business for a period of five years.  In

consideration for Leonard Green & Partners, L.P.'s advisory services, Holding (DE) promised to

pay to Leonard Green & Partners, L.P. consulting services fees at the rate of $1 million per year in

advance.

589.    On November 25, 2003, Leonard Green & Partners, L.P. and Holding (DE) entered

into an Amendment to Management Services Agreement (the "LG Management Amendment").

The LG Management Amendment lowered Leonard Green & Partners, L.P.'s annual fee to

$900,000 but added an annual expense payment of $100,000 to Leonard Green & Partners, L.P.

590.    The Holding (DE) paid to Leonard Green & Partners, L.P. a prorated amount of the

$1 million advisory fee for the period from June 11, 2003 to November 25, 2003.  From

November 25, 2003 until the Company's bankruptcy, Holding (DE) paid Leonard Green &

Partners, L.P. a pre-paid annual fee of $1,000,000 as provided in the LG Management

Amendment. Holding (DE) fully performed on the 2003 LG Management Services Agreement

and LG Management Amendment (collectively, "LG Management Services Agreements").

591.    Leonard Green & Partners, L.P. breached the LG Management Services

Agreements because it was grossly negligent and acted in bad faith in providing management,

consulting, and financial planning services to Holding (DE). Leonard Green & Partners, L.P.

acted in its own interests and not in the interests of Holding (DE). Leonard Green & Partners,

L.P.'s "advice" was contrary to the best interests of Holding (DE).

592.    Leonard Green & Partners, L.P.'s breach of the LG Management Services

Agreement and LG Management Amendment proximately caused damages to the Company

amounting to hundreds of millions of dollars.

### TWENTY-SEVENTH CLAIM FOR RELIEF
**Unjust Enrichment**
**Against the 2003 Shareholder Defendants, the 2003 Option Defendants, Leonard Green & partners, L.P., Investcorp International, Inc., Steven Bentson, Larry Friend, Edward Gericke, Dennis Heiner, Peter O'Coin, Eric Werner, John Fiumefreddo, Timothy Lewis, and Murray Devine**

593.    Plaintiff repeats and realleges each of the allegations set forth above and below as

if fully set forth herein.

594.    The defendants to this claim received the 2003 Shareholder Cashout Fraudulent

Transfers.

595.    The defendants to this claim were substantially enriched by their receipt of the

monies described herein, the Company suffered substantial harm as a result of the 2003

Shareholder Cashout Fraudulent Transfers. In order to fund the $153 million distribution and

option cashout and $21.5 million in transaction fees the Company took on an unmanageable amount of debt, strained its liquidity, and exacerbated its insolvency.

596.    The 2003 Shareholder Cashout Fraudulent Transfers were unjustified because the defendants did not compensate or confer any benefit to the Company in return for these transfers. In the alternative, to the extent the defendants provided services to the Company, the 2003 Shareholder Cashout Fraudulent Transfers exceeded the reasonable value of such services.

597.    Equity demands disgorgement of these monies from the defendants.  The defendants should not be rewarded for using the 2003 Shareholder Cashout Fraudulent Transfers to extract unearned cash and drive the Company into financial distress.

## TWENTY-EIGHTH CLAIM FOR RELIEF
### Unjust Enrichment
**Against Leonard Green & Partners, L.P., LGP Management, Inc., Investcorp International, Inc., SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited and Investcorp S.A., Loughlin Meghji, Dennis Heiner, Peter O'Coin, Donald Werner, Howard Solot, Steven Richman, and John Remmers**

598.    Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

599.    After the 2003 Shareholder Cashout and until the Petition Date, the Company paid the following amounts as compensation and management fees (the "2003-2006 Unjust Payments") to the following defendants:

| Name | Amounts Received |
|---|---|
| Leonard Green & Partners, L.P., (portions of which, upon information and belief, were transferred to LGP Management, Inc.) | At least $3,000,000 |
| Investcorp International, Inc., (portions of which, upon information and belief, were transferred to SIPCO Limited, Ownership Holdings Limited, C.P. Holdings Limited, Investcorp B.S.C., Investcorp Holdings Limited and Investcorp S.A.) | At least $3,000,000 |

| Loughlin Meghji & Co. | At least $2,700,000 |
| Dennis Heiner | At least $6,114,117 |
| Donald Werner | At least $1,323,352 |
| Howard Solot | At least $695,051 |
| Steven Richman | At least $600,000 |
| John Remmers | At least $180,000 |

600.    When the defendants to this claim received the monies described herein, they were enriched at the expense of the Company.  While the Company spent millions of dollars retaining the defendants to this claim to serve its best interests, the defendants to this claim, among other things, dissipated Company's remaining assets and caused the Company to delay de-leveraging the Company or seek bankruptcy protections, to the Company's detriment.

601.    The 2003-2006 Unjust Payments were unjustified because the defendants to this claim did not compensate or confer any benefit to the Company in return for these payments.  In the alternative, to the extent the defendants to this claim provided services to the Company, the 2003-2006 Unjust Payments exceeded the reasonable value of such services.

602.    Equity demands disgorgement of these monies from the 2003-2006 Unjustly Enriched Defendants.  2003-2006 Unjustly Enriched Defendants should not be rewarded for their failure to act appropriately and in the best interest of the Company.

### TWENTY-NINTH CLAIM FOR RELIEF
**Breach of Contract**
**Against Murray Devine**

603.    Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

180

604.    On May 16, 2003, Murray Devine and Holding (DE) entered into an agreement evidenced by the "MD Engagement Letter" under which Murray Devine was retained by Holding (DE) to provide valuation services culminating in an opinion that immediately before and/or immediately after the 2003 Shareholder Cashout, Holding (DE) and Holding (PA), each on a consolidated basis and stand-alone basis, that:

1.  immediately before and after giving effect to the Transaction, the aggregate value of the assets of Holdings, at fair value and present fair saleable value, exceeds: (a) its total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities); and (b) the amount required to pay such liabilities as they become absolute and matured or due in the normal or usual course of business;

2.  immediately before and after giving effect to the Transaction, the aggregate value of the assets of the Company, at fair value and present fair saleable value, exceeds: (a) its total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities); and (b) the amount required to pay such liabilities as they become absolute and matured or due in the normal or usual course of business;

3.  after giving effect to the Transaction, Holdings has the ability to pay its debts and liabilities (including contingent, subordinated, unmatured and unliquidated liabilities) as they become absolute and matured or due in the normal course of business;

4.  after giving effect to the Transaction, the Company has the ability to pay its debts and liabilities (including contingent, subordinated, unmatured and unliquidated liabilities) as they become absolute and matured or due in the normal course of business;

5.  after giving effect to the Transaction, Holdings does not have an unreasonably small amount of capital with which to conduct its business;

6.  after giving effect to the Transaction, the Company does not have an unreasonably small amount of capital with which to conduct its business;

7.  immediately before the Dividend, the aggregate value of the assets of the Company, at fair value and present fair saleable value, exceeds:  (a) its total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities); and (b) the amount required to pay such liabilities as they become absolute and matured or due in the normal or usual course of business; by an amount at least equal to the Dividend plus the Stated Capital of the Company;

8.  immediately after giving effect to the Dividend, the excess of the aggregate value of the Company's assets at fair value and present fair saleable value

over the Company's liabilities (including contingent, subordinated, unmatured and unliquidated liabilities), is equal to or exceeds the amount of the Stated Capital of the Company; and

9.  immediately after the Redemption, the aggregate value of the assets of Holdings, at fair value and present fair saleable value, exceeds the sum of the total liabilities of Holdings required to be reflected on a balance sheet prepared in accordance with GAAP by an amount that would be needed, if Holdings were to be dissolved at the time of the Redemption, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those shareholders receiving payment in the Redemption.

605.    The MD Engagement Letter listed procedures and analyses typically part of Murray Devine's due diligence, including, but not limited to:  (1) review prospective financial information and inquire and corroborate management assumptions underlying those prospective financial statements; (2) conduct a sensitivity analysis of the Company's prospective financial information; (3) review of the Company's audited and unaudited financial statements; and (4) interview the Company's management concerning their historical and projected operating and financial results.  In consideration for Murray Devine's solvency opinion, Holding (DE) promised to pay to Murray Devine a fee of $45,000 plus reasonable out-of-pocket expenses.

606.    The MD Engagement Letter provided that Murray Devine's opinion would be used by the Company and JP Morgan Securities Inc. and Citigroup Global Markets Inc., and other lenders under the 2003 Credit Facilities (collectively, the "Lenders") in connection to the 2003 Shareholder Cashout.  Murray Devine knew that the Company's directors, officers, and controlling shareholders would use the opinion to proceed with the 2003 Shareholder Cashout and that Lenders would rely on the solvency opinion their decision to approve the 2003 Credit Facilities necessary to complete the 2003 Shareholder Cashout.

607.    In its solvency opinion, Murray Devine falsely concluded exactly what it was asked to conclude in the MD Engagement Letter.

608.    At the closing of the 2003 Shareholder Cashout, Holding (DE) paid Murray Devine $48,050 pursuant to the MD Engagement Letter.  Holding (DE) fully performed on its promise under the MD Engagement Letter.

609.    Murray Devine breached the MD Engagement Letter because it did not satisfactorily perform the basic procedures and analyses it identified in the MD Engagement Letter, and failed to comply with professional standards for issuing solvency opinions.  Murray Devine's work fell below the professional standard governing the issuance of solvency opinions, and failed to comply with generally accepted professional standards.   Because the procedures performed by Murray Devine were so deficient, Murray Devine's solvency opinion amounted to no opinion at all and its conclusions were false.

610.    Murray Devine also breached the MD Engagement Letter by issuing an opinion it knew or should have known was false.  Murray Devine's cursory review uncovered red flags that should have put Murray Devine on notice of the Company's insolvency, including, among others: (1) Pro Forma Balance Sheet of Holding (PA) reflecting an exorbitant amount of liabilities and shareholders' deficit after the closing of the 2003 Shareholder Cashout, e.g., $43.8 million of current liabilities, $355.3 million of long-term debt, other long-term liabilities of $91.1 million, and stockholders' equity of negative $200.2 million; (2) management projections indicating that the Holding (PA) would have insufficient liquidity to redeem the Senior Subordinated Notes at maturity; and (3) management projections showing that Holding (DE) would have outstanding loans under the A/R Facility after its maturity.  Murray Devine ignored these and other red flags indicating the Company's insolvency and issued an opinion contradictory to the true financial state of the Company.

611.    As a proximate result of Murray Devine's breaches of the MD Engagement Letter and contractual duties created and implied therein, the Company secured lender's approval for loans necessary to implement the 2003 Shareholder Cashout, and executed that transaction, which damaged the Company and its creditors in the amount of hundreds of millions of dollars.

**THIRTIETH CLAIM FOR RELIEF**
**Professional Negligence**
**Against Murray Devine**

612.    Plaintiff repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

613.    Pursuant to the MD Engagement Letter, Murray Devine was retained by Holding (DE) to provide valuation services culminating in an opinion that immediately before and/or immediately after the 2003 Shareholder Cashout, the Company had the ability to pay its debts and liabilities as they came due and did not have an unreasonably small amount of capital with which to conduct business, as set forth in more detail in the MD Engagement Letter.

614.    The MD Engagement Letter listed procedures and analyses typically part of Murray Devine's due diligence, including, but not limited to:  (1) review prospective financial information and inquire and corroborate management assumptions underlying those prospective financial statements; (2) conduct a sensitivity analysis of the Company's prospective financial information; (3) review of the Company's audited and unaudited financial statements; and (4) interview the Company's management concerning their historical and projected operating and financial results.

615.    The MD Engagement Letter expressly provided that Murray Devine's opinion would be used by the Company and JP Morgan Securities Inc., Citigroup Global Markets Inc., and other lenders under the 2003 Credit Facilities (collectively, the "Lenders") in connection to the

184

2003 Shareholder Cashout.  Murray Devine knew that the Company's directors, officers, and controlling shareholders would use the solvency opinion to proceed with the 2003 Shareholder Cashout and that the Lenders would rely on the solvency opinion in their decision to approve the 2003 Credit Facilities necessary to complete the 2003 Shareholder Cashout.

616.    In its solvency opinion, Murray Devine falsely concluded exactly what it was asked to conclude in the Engagement Letter.

617.    Murray Devine owed a duty of care to the Company on account of its professional relationship with the Company.  Murray Devine had a duty, among others, to: (1) comply with all professional standards for issuing solvency opinions, which included performing procedures identified in the MD Engagement Letter; and (2) issue an opinion accurately reflecting the true financial condition of the Company.

618.    Murray Devine breached its duty of care by performing procedures and analyses in preparation of its opinion in a negligent, grossly negligent or reckless manner.  Murray Devine failed to satisfactorily perform many of the procedures it identified as necessary in the MD Engagement Letter, and grossly failed to comply with professional standards for issuing solvency opinions.  Murray Devine's work fell far below the professional standard of care governing the issuance of solvency opinions, and failed to comply with generally accepted professional standards. Because the procedures performed by Murray Devine were so deficient, Murray Devine's conclusions regarding the Company's solvency were false, and were made with reckless disregard.

619.    Murray Devine's reckless review, nonetheless, uncovered red flags that should have put Murray Devine on notice of the Company's insolvency, including, among others:  (1) a Pro Forma Balance Sheet of Holding (PA) reflecting an exorbitant amount of liabilities and shareholders' deficit after the closing of the 2003 Shareholder Cashout, e.g., $43.8 million of

current liabilities, $355.3 million of long-term debt, other long-term liabilities of $91.1 million, and stockholders' equity of negative $200.2 million; (2) management projections indicating that the Holding (PA) would have insufficient liquidity to redeem the Senior Subordinated Notes at maturity; and (3) management projections showing that Holding (DE) would have outstanding loans under the A/R Facility after its maturity. Murray Devine did not sufficiently investigate these and other red flags obviously signaling the Company's insolvency and negligently, grossly negligently or recklessly issued an opinion that disguised the true financial state of the Company.

620.    As a proximate result of Murray Devine's negligence, the Company used the solvency opinion to secure Lenders' approval for loans necessary to implement the 2003 Shareholder Cashout and executed that transaction, which damaged the Company and its creditors in the amount of hundreds of millions of dollars.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment and grant the following relief:

(a) Enter judgment in favor of the Plaintiff on behalf of the Liquidation Trust and against the Defendants in this action;

(b) Avoid and set aside the fraudulent transfers identified in Claims One through Thirteen;

(c) Direct each respective transferee of the fraudulent transfers identified in Claims One through Thirteen to deliver to the Plaintiff for the benefit of the Liquidation Trust the property transferred or pay the value of such property, plus prejudgment interest;

(d) Award general and compensatory damages in favor of the Plaintiff for the benefit of the Liquidation Trust on all claims against the defendants to those claims, jointly and severally, for all damages sustained by the Company, in an amount to be proven at trial, plus prejudgment interest;

(e) Award forfeiture of compensation in favor of Plaintiff for the benefit of the Liquidation Trust on Claims Fifteen, Sixteen and Nineteen against the defendants to those claims, from the first date of their breaches of fiduciary duties;

(f) Direct disgorgement, and award all appropriate equitable remedies, including restitution, in favor of the Plaintiff for the benefit of the Liquidation Trust on all claims against the defendants to those claims, jointly and severally, in an amount to be determined at trial, plus prejudgment interest;

(g) Award punitive damages and prejudgment interest in favor of the Plaintiff for the benefit of the Liquidation Trust as allowed by law;

(g) Award Plaintiff its attorneys' fees, costs, and other expenses incurred in this action; and

(h) Grant Plaintiff such other and further relief as the Court considers appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims and issues triable by a jury.

Dated: January 24, 2008

WHITE & CASE LLP

By: _____

J. Christopher Shore (JS-6031)
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8200

Attorneys for Plaintiff