LEVI LUBARSKY & FEIGENBAUM LLP
Howard B. Levi
1185 Avenue of the Americas, 17th Floor
New York, New York  10036
(212) 308-6100
Attorneys for Defendant Murray
    Devine & Co., Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x

OLD LADDER LITIGATION CO., LLC,            :       Case No. 08 CV 0876 (RMB) (THK)

                              Plaintiff,          :

            -against-                             :       <u>DECLARATION</u>

INVESTCORP BANK B.S.C., <u>et al.</u>,            :

                              Defendants.         :

------------------------------------------------------------ x

            I, Daniel M. DiDomenico, declare under the penalty of perjury, pursuant to 28

U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information

and belief:

            1.      I am Senior Vice President of defendant Murray Devine & Co., Inc.

("Murray Devine").  I submit this declaration in support of that part of defendants' joint motion

that seeks dismissal of Plaintiff's Twenty-Ninth and Thirtieth Claims for Relief against Murray

Devine.  The facts set forth in this affidavit are based upon my personal knowledge and a review

of the books and records of Murray Devine.

            2.      Annexed hereto as Exhibit A is a copy of the Murray Devine Engagement

Letter between Holding(DE)[1] and Murray Devine.

---

[1] Unless otherwise indicated, capitalized terms used in this affidavit have the same meaning as that in Plaintiff's
Complaint in this action.

3.     Annexed hereto as Exhibit B is a copy of a letter dated June 10, 2003 from Holding(PA) and Holding(DE) to Murray Devine.

4.     Annexed hereto as Exhibit C is a copy of a solvency opinion dated June 11, 2003 by Murray Devine addressed to, among others, the Boards of Directors of Holding(DE) and Holding(PA).

Executed at Philadelphia, Pennsylvania on May 30, 2008

_____
DANIEL M. DiDOMENICO

2

Exhibit A

May 16, 2003

Board of Directors
WERNER HOLDING CO. (DE), INC.
WERNER HOLDING CO. (PA), INC.

JP Morgan Securities Inc.,
Citigroup Global Markets Inc.,
 as Joint Lead Arrangers, and

the several Lenders that are parties to the Credit Agreement.
Referred to below

Gentlemen:

Murray, Devine & Co., Inc. ("MD&Co.") is pleased to submit our engagement letter to provide valuation services to Werner Holding Co. (DE), Inc. (the "Company"), a wholly owned subsidiary of Werner Holding Co. (PA), Inc. ("Holdings") in connection with the Recapitalization and Stock Purchase Agreement in which Holdings sell capital stock to Green Equity Investors III, L.P. ("GEI") and will redeem $150.0 million of common stock from existing shareholders (the "Recapitalization").

In connection with the Recapitalization, the financing will consist of: (i) a $230.0 million Senior Secured Credit Facility (a five year $60.0 million Revolving Credit Facility and a $170.0 million Term Loan) provided to the Company by JP Morgan Securities Inc and Citigroup Global Markets Inc., as Joint Lead Arrangers and other lenders under the credit facility (collectively, the "Lenders"); (ii) a $65.0 million purchase of Holdings' Convertible Pay-in-Kind Preferred Stock by GEI; (iii) approximately $23.9 million of available cash of the Company; and (iv) $20.0 million of incremental proceeds provided by the Company's $50.0 million accounts receivable securitization facility.

Based on the above financing, the Company will (a) effect the Recapitalization, (b) refinance approximately $115.4 million of existing indebtedness, (c) provide a dividend to Holdings of $85.0 million (the "Dividend") to fund a portion of the $150.0 million common stock redemption

**Board of Directors**
**WERNER HOLDING CO. (DE), INC.**
**May 16, 2003**
**Page 2**

at Holdings (the "Redemption") and (d) pay fees and expenses related to the Recapitalization and its financing (collectively, the "Transaction").

## SCOPE OF ENGAGEMENT

Murray, Devine & Co., Inc. has been requested to provide an opinion that, on the Closing Date, as contemplated herein, and immediately before and/or immediately after giving effect to the Transaction, the Redemption or the Dividend (as indicated below) and all related indebtedness to be incurred in connection therewith, with respect to Holdings and the Company, each on a consolidated basis, and with respect to the Company on a stand-alone basis, that:

1)   immediately before and after giving effect to the Transaction, the aggregate value of the assets of Holdings at fair value and present fair saleable value, exceeds: (a) its total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities); and (b) the amount required to pay such liabilities as they become absolute and matured or due in the normal or usual course of business;

2)   immediately before and after giving effect to the Transaction, the aggregate value of the assets of the Company at fair value and present fair saleable value, exceeds: (a) its total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities); and (b) the amount required to pay such liabilities as they become absolute and matured or due in the normal or usual course of business;

3)   after giving effect to the Transaction, Holdings has the ability to pay its debts and liabilities (including contingent, subordinated, unmatured and unliquidated liabilities) as they become absolute and matured or due in the normal or usual course of business;

4)   after giving effect to the Transaction, the Company has the ability to pay its debts and liabilities (including contingent, subordinated, unmatured and unliquidated liabilities) as they become absolute and matured or due in the normal or usual course of business;

5)   after giving effect to the Transaction, Holdings does not have an unreasonably small amount of capital with which to conduct its business;

6)   after giving effect to the Transaction, the Company does not have an unreasonably small amount of capital with which to conduct its business;

7)   immediately before the Dividend, the aggregate value of the assets of the Company, at fair value and present fair saleable value, exceed: (a) its total

Board of Directors
WERNER HOLDING CO. (DE), INC.
May 16, 2003
Page 3

liabilities (including contingent, subordinated, unmatured and unliquidated liabilities); and (b) the amount required to pay such liabilities as they become absolute and matured or due in the normal or usual course of business, by an amount at least equal to the Dividend plus the Stated Capital of the Company;

8)      immediately after giving effect to the Dividend, the excess of the aggregate value of the Company's assets at fair value and present fair saleable value over the Company's liabilities (including contingent, subordinated, unmatured and unliquidated liabilities), is equal to or exceeds the amount of the Stated Capital of the Company; and

9)      immediately after the Redemption, the aggregate value of the assets of Holdings, at fair value and present fair saleable value, exceeds the sum of the total liabilities of Holdings required to be reflected on a balance sheet prepared in accordance with GAAP by an amount that would be needed if Holdings were to be dissolved at the time of the Redemption, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those shareholders receiving payment in the Redemption.

Our report will be solely for the use of the Boards of Directors of Holdings and the Company and the Lenders, as additional third-party support for their own due diligence procedures performed in connection with the Recapitalization and should not be referred to in any other debt placement, offering, etc., or distributed to any other party. In addition, we assume no responsibility for updating the report for events or developments following its issuance.

PROCEDURES

Below are the typical procedures and analyses we perform as part of our due diligence process:

1)      Review of the Confidential Information Memorandum and Recapitalization Agreement, Indentures and credit agreements related to the Credit Facility and related exhibits and schedules to such documents thereto.

2)      Review of recent audited and unaudited financial statements of the Company.

3)      Review the Company's prospective financial statements for seven years subsequent to the closing date. Inquire of the Company's management as to key assumptions underlying the prospective financial information.

**Board of Directors**
**WERNER HOLDING CO. (DE), INC.**
May 16, 2003
Page 4

> Corroborate the key assumptions with outside studies on the Company's particular industry, if appropriate.

4)  Physically inspect certain Company operations to obtain an understanding of their products and operations. Interview management about their historical and projected operating and financial results.

5)  Interview the Company's corporate management to discuss their written assertions concerning contingent liabilities that are not recorded in the Company's historical or the Company's projected financial statements. Corroborate such assertions through discussions with the Company's actuaries, environmental specialists, outside legal counsel, etc.

6)  Prepare a business enterprise valuation of the Company. The analyses will utilize current standards of valuation including Discounted Free Cash Flow and Comparable Market Multiples approaches as going concerns after giving effect to the transaction and will utilize industry data related to the Company, to the extent available, and its competitors and ascertain a value of the Company considering its competitive strengths and weaknesses in the marketplace.

7)  Isolate and analyze all contingent liabilities of the Company not recorded under GAAP.

8)  Prepare a sensitivity analysis of the Company's prospective financial information assuming various changes in the key assumptions (e.g., interest rates, sales volume, sale prices, costs, etc.). Analyze the results of such changes on the Company's financial and operating ratios and compliance with the Company's debt covenants with respect to all debt that will be outstanding subsequent to the closing of the Recapitalization.

9)  Conduct an industry review and discuss with industry experts, if needed, current and future trends impacting the Company's industries.

Based on the foregoing, we will render an opinion to the Boards of Directors of Holdings and the Company and the Lenders as to whether or not the Company or Holdings, as the case may be, each on a consolidated basis have met the criteria set forth in sections (1) through (9) on pages 2 and 3.


INDEMNIFICATION

The Company agrees to indemnify and hold harmless MD&Co., its shareholders, agents and employees to the full extent lawful, from and against any losses, claims, damages, or liabilities

Board of Directors
WERNER HOLDING CO. (DE), INC.
May 16, 2003
Page 5

(or actions, including shareholder and unsecured creditor actions, in respect thereof) related to or arising out of our involvement in this engagement or our role in connection therewith, and will reimburse MD&Co., its agents, shareholders, and employees for any amounts such indemnified parties shall have paid in respect of such losses, claims, damages or liabilities, and will reimburse us and any other party entitled to be indemnified hereunder for all reasonable expenses (including reasonable legal fees) as they are incurred by us or any other such indemnified party in connection with investigating, preparing, or defending any such action or claim in which we are a party, except that the Company will not, however, be responsible for any claims, liabilities, losses, damages, or expenses which have resulted from the recklessness, gross negligence or willful misconduct of such indemnified party.   Such obligations to indemnification by way of reimbursements shall be subject to the Company's control of any resulting litigation and the Company's' approval of any settlement.   If any action, suit, proceeding or investigation is commenced as to which any indemnified party hereunder proposes to demand indemnification, it shall notify the Company with reasonable promptness. The Company will assume the defense of any claim subject to this agreement, including the employment of counsel and payment of such counsel's fees and disbursements.   Should MD&Co. determine that separate counsel is necessary because there is an actual conflict between the parties then MD&Co. may employ one firm of separate counsel and the Company shall pay such counsel's reasonable fees and disbursements.  The foregoing agreement shall be in addition to any rights that we or any indemnified party may have at common law or otherwise, including, but not limited to, any right to contribution.  The provisions of this paragraph shall survive the termination of this agreement.

The Company recognizes and confirms that in rendering our opinions we will be using and relying on data, material, and other information furnished to us orally or in writing by others, as well as upon information contained in publicly available reports and statements; and the Company recognizes and confirms that we do not assume responsibility for the accuracy of such data, material and information, and that we may rely upon it without independent verification to the extent such reliance is reasonable under the circumstances.


DELIVERY

We have built our reputation on providing a high quality product in a very timely fashion.  In compliance with the timing requirements stipulated in the financing commitment, we will issue our opinion prior to the closing of the Recapitalization.  It has been our practice to issue a draft of our letter to the Lender's counsel one week prior to the completion of a transaction.  We understand the anticipated closing date will be on or around June 4, 2003.


FEES AND CHARGES

Based upon our discussions, our fee will be $45,000 plus reasonable out-of-pocket expenses incurred for travel, lodging and miscellaneous items necessary to complete the engagement.

Board of Directors
WERNER HOLDING CO. (DE), INC.
May 16, 2003
Page 6

Payment of our fee, in full, is due upon the closing of the Recapitalization.  If our engagement is terminated prior to the issuance of our opinion, we will be reimbursed for our time and realizable expenses incurred up to notification of termination.

If you are in agreement with the terms and conditions of this letter, please sign in the space provided and return one copy of this agreement to the signatory at the letterhead address.

We appreciate your confidence in selecting us for this important matter and assure you that this engagement will receive our careful and continued attention.

Very truly yours,

Dennis J. Murray
President

DJM/klk

**SIGNED AND AGREED TO:**

**FOR: WERNER HOLDING CO. (DE), INC.**

**BY:**_____          _____
                                                                                   DATE

**ITS:**_____

Exhibit B

*Werner Holding Co. (PA), Inc.*
*93 Werner Road*
*Greenville, PA 16125*
*Telephone: (412) 588-2550    Telecopier: (412) 588-1223*

**WERNER HOLDING CO. (DE), INC.**

P.O. Box 8985
1105 North Market Street, Suite 1300
Wilmington, Delaware 19899

June 10, 2003

MURRAY, DEVINE & CO., INC.
1650 Arch Street, Suite 2700
Philadelphia, PA 19103

Dear Sirs:

We confirm, to our knowledge and belief, that the following representations made to you during your review of the Recapitalization, Dividend and Redemption (except as otherwise defined herein, all defined terms are as defined in your solvency opinion dated the date hereof) (collectively referred to as the "Transactions") for the purpose of determining the solvency of the Company and Holdings, as the case may be, after giving effect to the Transactions, are true and correct in all material respects:

1.    We acknowledge management's responsibility for the fair presentation of the financial position, results of operations and cash flows of Holdings and the Company as reported in the audited consolidated balance sheets of Holdings and the Company as of December 31, 2002 and December 31, 2001 and the related statements of operations, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2002 (collectively, the "Financial Statements"). The Financial Statements have been prepared in conformity with generally accepted accounting principles ("GAAP") as in effect as of the date of such Financial Statements applied on a consistent basis with previous periods. The balance sheets included in the Financial Statements present fairly in all material respects the consolidated financial position of Holdings and the Company on the respective dates indicated, and the statements of operations, stockholders' equity and cash flows included in such Financial Statements present fairly in all material respects the consolidated results of operations and cash flows of Holdings and the Company for the respective periods indicated.

2.    We are not aware of (a) any irregularities involving management or employees of Holdings, the Company or their subsidiaries who have significant roles in the system of internal accounting control, or any irregularities involving other employees that could reasonably be

MURRAY, DEVINE & CO., INC.
June 10, 2003
Page 2

expected to have a material adverse effect on the Projections or the
Financial Statements, or (b) any violations or alleged violations of
laws or regulations which would or could result in a material loss to
Holdings or the Company, such that it should be recorded as a loss
contingency in the Financial Statements. There have been no
communications from regulatory agencies concerning non-
compliance with or deficiencies in financial reporting practices that
could reasonably be expected to have a material adverse effect on the
Financial Statements. To our knowledge, Holdings, the Company
and their subsidiaries have complied with all material contractual
agreements that would reasonably be expected to have a material
adverse effect on the Projections or the Financial Statements in the
event of non-compliance.

3.      All material liabilities (other than contingent liabilities) on
December 31, 2002, of which we are aware, are included or reflected
in the Financial Statements, to the extent required under GAAP.
There are no other material liabilities or material gain or loss
contingencies that have come to our attention since such Financial
Statements were issued that would reasonably be expected to have a
material adverse effect on the financial condition of Holdings or the
Company that have not been disclosed in interim financial
statements made available to you or otherwise disclosed to you or
reflected in such Financial Statements. There are no other audited
financial statements for Holdings or the Company for any period
subsequent to December 31, 2002.

4.      The assumptions upon which the Projections are based are, in our
opinion, reasonable in all material respects. The Projections are
consistent in all material respects with the accounting principles
expected to be used by Holdings and the Company during the
forecast period. The Projections reflect the expected financial
performance of both Holdings and the Company, with no material
differences between the two.

5.      The Projections are consistent with expected operations of Holdings
and the Company during the forecast period.

MURRAY, DEVINE & CO., INC.
June 10, 2003
Page 3

6. The Holdings Pro Forma Balance Sheet reflects all material assumptions and material information necessary to reflect the Transactions and related financing thereof on a pro forma basis as of March 31, 2003. The Holdings Pro Forma Balance Sheet includes all material assets and liabilities, in accordance with GAAP, which it is anticipated that Holdings will have immediately after the Transactions.

7. We have not prepared a Company Pro Forma Balance Sheet. However, if such Company Pro Forma Balance Sheet had been prepared it would not be materially different than the Holdings Pro Forma Balance Sheet.

8. We are not aware of any material adverse change in Holdings' or the Company's net assets as of the date hereof when compared to the Holdings Pro Forma Balance Sheet or Company Pro Forma Balance Sheet if it had been prepared.

9. We have no knowledge of any contingent liabilities of Holdings or the Company which would reasonably be expected to result in a material adverse effect on the business, condition (financial or otherwise), operations, performance, properties or prospects of Holdings or the Company.

10. Holdings' and the Company's commitments for future inventory purchases are for quantities not in excess of anticipated requirements and at prices which are not expected to result in material loss.

11. We are not aware of any material adverse change in Holdings or the Company's net working capital or stockholders' equity as of the date hereof as compared to those items on the Financial Statements dated December 31, 2002.

12. We have read your opinion, and nothing has come to our attention that would lead us to believe that the facts contained in the opinion are inaccurate, misleading or erroneous in any material respect.

MURRAY, DEVINE & CO., INC.
June 10, 2003
Page 4

13.    Based upon our review of the Transactions, the projected operating results and related debt of Holdings and the Company, no matters or occurrences have come to our attention up to the date of this letter which would cause us to believe that Holdings or the Company, as the case may be, would not be solvent.

14.    No matters or occurrences have come to our attention up to the date of this letter which would materially adversely affect the Financial Statements and related disclosures or have caused or would reasonably be expected to cause any material adverse change in the financial position or results of operations of Holdings or the Company.

15.    No matters or occurrences have come to our attention up to the date of this letter which would materially adversely affect the Projections, the Holdings Pro Forma Balance Sheet or the Company Pro Forma Balance Sheet, if it had been prepared, or have caused or would reasonably be expected to cause any material adverse change in the financial position of Holdings or the Company.

16.    There are no interim financial statements for Holdings or the Company for any period subsequent to April 30, 2003.

17.    The stated capital of the Company, for the purpose of determining the Company's capital adequacy in numbers 7 and 8 of your opinion, is $2,650,000.

18.    We have prepared Projections that indicate insufficient liquidity to redeem the Senior Subordinated Notes at maturity and assume a refinancing of the Senior Subordinated Notes upon their maturity on November 15, 2007. We believe that the amounts due at the time the Senior Subordinated Notes mature will be repaid through a new financing. You have assumed, with our consent, that the Company will be able refinance the Senior Subordinated Notes when they mature.

MURRAY, DEVINE & CO., INC.
June 10, 2003
Page 5

19.  We have prepared Projections that show the Company with outstanding borrowings under the A/R Facility after its maturity date.  We believe that the Company will be able to renew the A/R Facility when such commitment expires.  You have assumed, with our consent, that the Company will be able to renew the A/R Facility when such commitment expires.

FOR:  **WERNER HOLDINGS CO. (PA), INC. and
WERNER HOLDINGS CO. (DE), INC.**

BY:  _____    6/9/03
Dennis G. Heiner                         Date
President and Chief Executive Officer

_____    6/9/D3
Larry V. Friend                         Date
Vice President, Chief Financial Officer and Treasurer

Exhibit C



**MURRAY DEVINE**

c o m p a n y

*Valuation and Financial Advisors*

June 11, 2003

Boards of Directors
  WERNER HOLDING CO. (DE), INC.,
  WERNER HOLDING CO. (PA), INC.,

JPMORGAN CHASE BANK,
as Administrative Agent,

CITIGROUP GLOBAL MARKETS INC.,
as Syndication Agent,

J.P. MORGAN SECURITIES, INC. and
CITIGROUP GLOBAL MARKETS INC.,
as Joint Lead Arrangers and Joint Bookrunners, and

the Lenders party to the Credit Agreement referred to below

Ladies and Gentlemen:

This letter is furnished at the request of Werner Holding Co. (DE), Inc. (the "Company") and
Werner Holding Co. (PA), Inc. ("Holdings") pursuant to: (i) Section 7.11 of the Recapitalization
and Stock Purchase Agreement dated May 7, 2003 (the "Recapitalization Agreement") by and
among those persons listed on Exhibit A of the Recapitalization Agreement, Holdings, and
Green Equity Investors III, L.P. ("Investor"); and (ii) Section 7.1(n) of the senior secured credit
agreement dated June 11, 2003 (the "Credit Agreement") by and among the Company, the
several lenders from time to time be party thereto (the "Lenders"), Citigroup Global Markets
Inc., as syndication agent (the "Syndication Agent"), JPMorgan Chase Bank, as the
administrative agent (the "Administrative Agent" and together with the Syndication Agent, the
"Agents") and J.P. Morgan Securities, Inc. and Citigroup Global Markets Inc., as Joint Lead
Arrangers and Joint Bookrunners (in such capacity, the "Arrangers"). Unless otherwise defined
herein, all capitalized terms have the meanings ascribed to them in the Credit Agreement.

Boards of Directors
WERNER HOLDING CO. (DE), INC.
WERNER HOLDING CO. (PA), INC.
June 11, 2003
Page 2

Transaction Assumptions

Pursuant to the Recapitalization Agreement (i) Holdings will sell to Investor 65,000 shares of Series A Participating Convertible Preferred Stock (the "Preferred") for aggregate consideration of $65.0 million; (ii) each outstanding share of Holdings' common stock will be reclassified into (x) 0.396646 shares of a new class of redeemable common stock (the "Class R Common Stock") and (y) 0.603354 shares of a retained share of the applicable class of common stock, (iii) Holdings will redeem all of the issued and outstanding shares of Class R Stock and make certain payments to management in connection with option cancellations for aggregate consideration of approximately $150.0 million (the "Redemption"), and (iv) Holdings will take certain other actions as specified in the Recapitalization Agreement. The preceding is collectively referred to as the "Recapitalization." Upon consummation of the Recapitalization, Investor will own approximately a 22% interest in Holdings and the existing shareholders will own approximately a 78% interest in Holdings.

The Recapitalization will be financed through a combination of: (a) cash in the approximate amount of $23.9 million from the Company's balance sheet; (b) $65.0 million from the purchase of the Preferred by the Investors; (c) $174.0 million of borrowings by the Company under the Credit Agreement; and (d) $20.0 million of incremental fundings under the Company's A/R Facility.

The proceeds from the above will be used to: (a) effect the Redemption in the aggregate amount of approximately $150.0 million; (b) refinance the Company's Existing Credit Agreement in the amount of approximately $115.4 million; and (c) pay transaction fees and expenses of approximately $20.0 million.

The Credit Agreement consists of: (a) $180.0 million of Term Loans; and (b) a $50.0 million Revolving Credit Commitment which includes subfacilities for: (i) the issuance of Letters of Credit in an aggregate undrawn face amount at any one time outstanding not to exceed $35.0 million; and (ii) Swing Line Loans in an aggregate principal amount at any on time outstanding not to exceed $10.0 million. The proceeds under the Credit Agreement, together with the $23.9 million of cash from the Company's balance sheet and $20.0 million of incremental fundings under the Company's A/R Facility, will be used to (i) refinance the Company's Existing Credit Agreement in the amount of approximately $115.4 million; (ii) fund the $85.0 million distribution (the "Dividend") to Holdings to finance in part the Redemption; and (iii) pay fees and expenses related to the Recapitalization. Loans shall be made as either Eurodollar Loans or Alternate Base Rate Loan, except for Swing Line Loans which will only be made as Alternate Base Rate Loans.

The Term Loans shall be repaid in 12 installments on the dates and in the amounts set forth in Section 5.4(e) of the Credit Agreement. The Revolving Credit Loans shall be repaid on the Revolving Credit Maturity Date.

Eurodollar Loans shall bear interest for each day during each Interest Period applicable thereto,

**Boards of Directors**
  WERNER HOLDING CO. (DE), INC.
  WERNER HOLDING CO. (PA), INC.
June 11, 2003
Page 3

commencing on (and including) the first day of such Interest Period to, but excluding, the last day of such Interest Period, on the unpaid principal amount thereof at a rate per annum equal to the Eurodollar Rate determined for such Interest Period plus the Applicable Margin. Alternate Base Rate Loans shall bear interest for the period from and including the date such Loans are made to, but excluding, the maturity date thereof, or to but excluding, the conversion date if such Loans are earlier converted into Eurodollar Loans on the unpaid principal amount thereof at a rate per annum equal to the Alternative Base Rate plus the Applicable Margin. Interest on all Loans shall be payable in arrears on each Interest Payment Date.

All obligations of the Company under the Credit Agreement will be secured by a perfected first priority security interest in (a) all of the capital stock of the Company and each of the direct and indirect subsidiaries (whether now owned or subsequently formed or acquired) (other than immaterial subsidiaries) of the Company (but limited to 65% in the case of foreign subsidiaries), (b) all of the inventory, equipment and certain real property (with any exceptions to be agreed upon by the Company and the Agents) of the Company and each of its direct and indirect domestic subsidiaries (whether now owned or subsequently formed or acquired) and (c) substantially all other tangible and intangible assets (including, without limitation, patents, trademarks, tradenames and general intangibles and to the extent permitted by the A/R Facility, any accounts receivable not subject thereto) of the Company and such subsidiaries. All obligations of the Company under the Credit Agreement will also be unconditionally guaranteed by Holdings and each of the direct and indirect domestic subsidiaries of the Company, whether now owned or subsequently formed or acquired (other than Werner Funding Corporation or any other special purpose vehicle in connection with the A/R Facility and other than subsidiaries deemed immaterial by the Agents).

The Preferred is convertible at the option of the holder at any time into fully paid and non-assessable shares of Class F Common Stock of Holdings at a conversion rate equal to $1,000 divided by $4,929.66 (such multiple, the "Conversion Rate"). The Conversion Rate will increase by 14% per year, compounded quarterly from the date of issuance (the "Issue Date") to the third anniversary of the Issue Date. Dividends on the Preferred shall be cumulative and accrue from the Issue Date and will be payable quarterly on each March 31, June 30, September 30 and December 31, commencing on June 30, 2003, at a rate per annum of 14.0% of the liquidation preference per share. Any dividends not declared and paid in full in cash shall be added to the liquidation preference of the Preferred. The liquidation preference of the Preferred shall initially be $1,000 per share. The holders of the Preferred will also be entitled to receive dividends on the Preferred in an amount equal to the amount by which the aggregate amount of dividends paid and payable on outstanding common stock from the Issue Date through the date such dividends are declared on the outstanding shares of common stock exceeds the sum of all preferred dividends (whether or not declared or paid) since the Issue Date. Upon (A) the occurrence of a Change of Control (as defined in the Restated Articles of Incorporation), (B) the occurrence of a Qualified IPO (as defined in the Restated Articles of Incorporation), or (C) the receipt of the written request of any or all of the holder of the Preferred at any time on or after January 1, 2007 and on or prior to December 31, 2008 (the "Put Notice") (any of

Boards of Directors
  WERNER HOLDING CO. (DE), INC.
  WERNER HOLDING CO. (PA), INC.
June 11, 2003
Page 4

the foregoing transactions referred to as a "Put Event"), each of the holders of Preferred will have the right, but not the obligation, to require Holdings to redeem in whole or in part such holder's shares of Preferred at the prices set forth in the Restated Articles of Incorporation.

The A/R Facility, as amended, was originally entered into on May 29, 1998 by and among Werner Funding Corporation ("Seller"), Werner Co., Market Street Funding Corporation (the "Issuer") and PNC Bank, National Association. Under the A/R Facility, the Issuer agrees to purchase, and make reinvestments of, undivided percentage ownership interests with regard to the Purchased Interests (as defined in the A/R Facility) from the Seller in an aggregate amount not to exceed $50.0 million. The A/R Facility shall terminate on May 26, 2006 or such earlier date as specified in the A/R Facility as amended.

The Senior Subordinated Notes were issued on November 24, 1997 and will mature on November 15, 2007. Interest on the Senior Subordinated Notes is payable, in cash, semi-annually on May 15 and November 15 of each year. The Senior Subordinated Notes are redeemable, at the Company's option, on one or more occasions, at any time, in whole or in part, on or after November 15, 2002, at the redemption prices set forth in the Indenture governing the Senior Subordinated Notes. The Senior Subordinated Notes are general unsecured obligations of the Company and are subordinated in right of payment to all existing and future senior debt of the Company.

We have been provided with an estimated Pro Forma Balance Sheet of Holdings prepared by management of Holdings, dated as of May 13, 2003 (the "Holdings Pro Forma Balance Sheet"). The Holdings Pro Forma Balance Sheet assumes that closing of the Recapitalization occurred on March 31, 2003, and indicates that Holdings' capitalization on such date, after giving effect to the Recapitalization and related financings, would comprise $43.8 million of current liabilities, $355.3 million of long-term debt, other long-term liabilities of $91.1 million and stockholders' equity of negative $200.2 million. Management of Holdings has informed us that the foregoing amounts were determined in accordance with generally accepted accounting principles ("GAAP") and do not necessarily reflect fair market value. Management of Holdings has represented that the capitalization indicated in the Holdings Pro Forma Balance Sheet will not be materially different than its capitalization on the Closing Date (as hereinafter defined).

Management has not prepared a Pro Forma Balance Sheet for the Company (the "Company Pro Forma Balance Sheet"). However, management of Holdings has informed us that if such Company Pro Forma Balance Sheet had been prepared it would not be materially different than the Holdings Pro Forma Balance Sheet.

<u>Definitions, Analyses, Procedures and Opinions</u>

Murray, Devine & Co., Inc. has been requested to provide its opinions as to whether, on the Closing Date, as contemplated herein, and immediately before and/or immediately after giving

Boards of Directors
  WERNER HOLDING CO. (DE), INC.
  WERNER HOLDING CO. (PA), INC.
June 11, 2003
Page 5

effect to the Recapitalization and the Dividend (as indicated below) and all related indebtedness to be incurred in connection therewith, with respect to Holdings and the Company, as the case my be, each on a consolidated basis, and with respect to the Company on a stand-alone basis, that:

1)  immediately before and after giving effect to the Recapitalization, the aggregate value of the assets of Holdings, at fair value and present fair saleable value, exceeds: (a) its total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities); and (b) the amount required to pay such liabilities as they become absolute and matured or due in the normal or usual course of business;

2)  immediately before and after giving effect to the Recapitalization, the aggregate value of the assets of the Company, at fair value and present fair saleable value, exceeds: (a) its total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities); and (b) the amount required to pay such liabilities as they become absolute and matured or due in the normal or usual course of business;

3)  after giving effect to the Recapitalization, Holdings has the ability to pay its debts and liabilities (including contingent, subordinated, unmatured and unliquidated liabilities) as they become absolute and matured or due in the normal or usual course of business;

4)  after giving effect to the Recapitalization, the Company has the ability to pay its debts and liabilities (including contingent, subordinated, unmatured and unliquidated liabilities) as they become absolute and matured or due in the normal or usual course of business;

5)  after giving effect to the Recapitalization, Holdings does not have an unreasonably small amount of capital with which to conduct its business;

6)  after giving effect to the Recapitalization, the Company does not have an unreasonably small amount of capital with which to conduct its business;

7)  immediately before the Dividend, the aggregate value of the assets of the Company, at fair value and present fair saleable value, exceeds: (a) its total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities); and (b) the amount required to pay such liabilities as they become absolute and matured or due in the normal or usual course of business, by an amount at least equal to the Dividend plus the Stated Capital of the Company;

MURRAY, DEVINE & CO.

**Boards of Directors**
**WERNER HOLDING CO. (DE), INC.**
**WERNER HOLDING CO. (PA), INC.**
June 11, 2003
Page 6

8)    immediately after giving effect to the Dividend, the excess of the aggregate value of the Company's assets at fair value and present fair saleable value over the Company's liabilities (including contingent, subordinated, unmatured and unliquidated liabilities), is equal to or exceeds the amount of the Stated Capital of the Company; and

9)    immediately after the Redemption, the aggregate value of the assets of Holdings, at fair value and present fair saleable value, exceeds the sum of the total liabilities of Holdings required to be reflected on a balance sheet prepared in accordance with GAAP by an amount that would be needed, if Holdings were to be dissolved at the time of the Redemption, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those shareholders receiving payment in the Redemption.

In evaluating the foregoing, the subject phrases and the definitions ascribed thereto are as follows:

"aggregate value of the assets" - The value of all assets of Holdings or the Company, as the case may be, each on a consolidated basis. Such assets shall include all current assets, all fixed assets such as property, plant and equipment and all intangible assets including contracts, tradenames, trademarks, databases, mailing lists, backlog, licenses, patents and other intangible assets including those in the nature of goodwill and going concern value.

"fair value" - The total amount at which the assets of Holdings or the Company, as the case may be, each on a consolidated basis, would likely sell as part of a going concern and for continued use as part of a going concern, within a commercially reasonable period of time, between one or more willing buyers and a willing seller with neither party being under any compulsion to buy or sell and with all parties having reasonable knowledge of all facts.

"present fair saleable value" - The price that could be obtained by an independent willing seller from an independent willing buyer with reasonable promptness in an arms-length transaction under present conditions for the sale of comparable business enterprises.

"liabilities (including contingent, subordinated, unmatured and unliquidated liabilities)" - The debts and liabilities of Holdings or the Company, as the case may be, each on a consolidated basis, as of the Closing Date, including fees and expenses of Holdings and the Company incurred in connection with the Recapitalization, the amount of indebtedness of Holdings and the Company

Boards of Directors
 WERNER HOLDING CO. (DE), INC.
 WERNER HOLDING CO. (PA), INC.
June 11, 2003
Page 7

outstanding immediately thereafter (including, without limitation, the Credit
Agreement, the A/R Facility and the Senior Subordinated Notes), and Holdings'
and the Company's estimated amount of reasonably anticipated liabilities that
may result from contingencies, which liabilities may or may not meet the criteria
for accrual under *Statement of Financial Accounting Standards ("FAS") No. 5 of
the Financial Accounting Standards Board (Accounting for Contingencies)* and,
therefore, may not be included in liabilities under GAAP, including:  a) pending
litigation, asserted claims and assessments, guarantees, and other contingent
liabilities including, without limitation, employee benefit plan liabilities relating
to retiree benefits identified to us by responsible officers of Holdings and the
Company; as well as b) contingent liabilities relating to environmental matters
identified to us by responsible officers of Holdings and the Company.

We have undertaken certain analyses and procedures relating to the preparation of the requested
opinion.   The procedures undertaken, none of which extended past the date of this letter,
consisted solely of the following:

1.   Read the Recapitalization Agreement and available exhibits and schedules
     thereto.

2.   Read the Credit Agreement and available exhibits and schedules thereto.

3.   Read the A/R Facility.

4.   Read the Indenture dated November 24, 1997 related to the issuance of the
     Senior Subordinated Notes.

5.   Read the offering memorandum for the Senior Subordinated Notes dated
     November 14, 1997 and the consent solicitation statement dated May 16, 2003.

6.   Read the multi-year financial forecast for the fiscal years 2003 through 2009,
     which included income statements, balance sheets and statements of cash flows,
     prepared by management of Holdings on a quarterly basis for fiscal years 2003
     through 2004 and on an annual basis for fiscal years 2005 through 2009, received
     via e-mail May 16, 2003 (the "Projections").  In this regard, made inquiries of
     certain officials of Holdings who have responsibility for financial and accounting
     matters with respect to those assumptions that have been made in formulating the
     Projections.

7.   Performed valuations of Holdings and the Company, using current standards of
     valuation including the comparable market multiple, comparable market sales
     and discounted free cash flow approaches as going concerns after giving effect to

MURRAY, DEVINE & CO.

**Boards of Directors**
  WERNER HOLDING CO. (DE), INC.
  WERNER HOLDING CO. (PA), INC.
June 11, 2003
Page 8

the Recapitalization and related financings.

8.     Read the Form 10K of Holdings and the Company, filed as co-registrants, for the fiscal year ended December 31, 2002, including the audited financial statements of Holdings as of and for the years ended December 31, 2002 and 2001 audited by PricewaterhouseCoopers LLP. In this regard, officials of Holdings have informed us that no other audited financial statements for any date or period subsequent to December 31, 2002 exist.

9.     Read the Form 10Q of Holdings and the Company, filed as co-registrants, for the quarterly period ended March 31, 2003, including the unaudited financial statements of Holdings as of and for the three month periods ended March 31, 2003 and 2002.

10.     Read the interim financial statements of Holdings for the period ended April 30, 2003 as included in Holdings April 2003 Financial Package. In this regard, officials of Holdings have informed us that no other unaudited financial statements for any date or period subsequent to April 30, 2003 exist.

11.     Read the Holdings Pro Forma Balance Sheet prepared by management of Holdings. With respect to the amounts shown in the Holdings Pro Forma Balance Sheet and accompanying notes and schedules thereto, we have made inquiries of certain officers of Holdings who have responsibility for financial and accounting matters regarding:

       a)     The basis for the assumptions and the information presented in the Holdings Pro Forma Balance Sheet and the consistency of such assumptions and information with the Recapitalization and related financings; and

       b)     Whether the Holdings Pro Forma Balance Sheet includes all material assets and liabilities which it is anticipated will have to be recorded under GAAP after giving effect to the Recapitalization and related financings.

12.     Inquired of certain officers of Holdings and the Company, as appropriate, who have responsibility for financial and accounting matters regarding:

       a)   Whether they were aware of any material

MURRAY, DEVINE & CO.

**Boards of Directors**
 WERNER HOLDING CO. (DE), INC.
 WERNER HOLDING CO. (PA), INC.
June 11, 2003
Page 9

liabilities or loss contingencies that are required to be accrued or disclosed by FAS No. 5 or that would be material to Holdings or the Company, whether or not required to be disclosed under FAS No. 5, or any unasserted claims or assessments that their legal counsel has advised them are probable of assertion and must be disclosed in accordance with FAS No. 5; and

b) Whether they were aware of any events or conditions that, as of the date thereof, would cause Holdings or the Company, as the case may be, each on a consolidated basis, after giving effect to the consummation of the Recapitalization and related financings, not to be solvent.

13. Read copies of the Minutes of meetings and/or Unanimous Written Consents in lieu of meetings of the Board of Directors of Holdings for the period January 24, 2001 through June 11, 2003 and officials of Holdings have informed us that no subsequent meetings have occurred or written consents obtained.

14. Read copies of the Minutes of meetings and/or Unanimous Written Consents in lieu of meetings of the Board of Directors of the Company for the period January 24, 2001 through June 11, 2003 and officials of the Company have informed us that no subsequent meetings have occurred or written consents obtained.

15. Read copies of the Minutes of meetings and/or Unanimous Written Consents in lieu of meetings of the Board of Directors of Werner Co. for the period March 31, 2001 through June 11, 2003 and officials of the Company have informed us that no subsequent meetings have occurred or written consents obtained.

16. Read the Phase I Environmental Site Assessment reports prepared by Environmental Resources Management for the following sites:

- 1800, 1810, and 1820 Grogan Avenue, Merced, CA, dated June 14, 2003.
- 93 Werner Road, Greenville, PA, dated February 2002.
- 10800 West Belmont Avenue, Franklin Park, IL, dated February 2002.

MURRAY, DEVINE & CO.

Boards of Directors
  WERNER HOLDING CO. (DE), INC.
  WERNER HOLDING CO. (PA), INC.
June 11, 2003
Page 10

- 100 National Drive, Anniston, AL, dated March 11, 2002.
- 252 Ladder Lane, Carrolton, KY, dated March 2002.

17.    Conducted interviews with individuals responsible for the management of Holdings and the Company for the purpose of reviewing their operations and reviewing such operations in terms of their past operating results, markets served and ability to attain operating results consistent with the Projections.

18.    Conducted interviews with those individuals responsible for the legal affairs of Holdings and the Company regarding any litigation to which Holdings or the Company are currently a party and any claims or causes of action which may be probable of legal assertion against them which would be reasonably likely to have a material adverse effect on the business, condition (financial or otherwise), operations, performance, properties or prospects of Holdings or the Company.  We further discussed whether Holdings or the Company are currently involved in, or are expected to be involved in, any investigation or enforcement action by any governmental body which may result in the imposition of any sanctions, fines, or penalties, the effect of which could have a material adverse effect on the business, condition (financial or otherwise), operations, performance, properties or prospects of Holdings or the Company, each on a consolidated basis.

19.    Conducted interviews with the management of Holdings and the Company to discuss assertions concerning contingent liabilities that are not recorded in Holdings' or the Company's historical financial statements or the Holdings Pro Forma Balance Sheet or reflected in the Projections.

We have not made any independent investigation in rendering this opinion other than the examination described above.  Our opinions are, therefore, qualified by the scope of that examination.

Based solely upon the foregoing, and subject to the other qualifications set forth in this letter, on the Closing Date and immediately before and/or immediately after giving effect to the Recapitalization and the Dividend (as indicated below) and all related indebtedness to be incurred in connection therewith, with respect to Holdings and the Company, as the case may be, each on a consolidated basis, and with respect to the Company on a stand-alone basis, we are of the opinion that:

Boards of Directors
  WERNER HOLDING CO. (DE), INC.
  WERNER HOLDING CO. (PA), INC.
June 11, 2003
Page 11

1)    immediately before and after giving effect to the Recapitalization, the aggregate value of the assets of Holdings, at fair value and present fair saleable value, exceeds: (a) its total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities); and (b) the amount required to pay such liabilities as they become absolute and matured or due in the normal or usual course of business;

2)    immediately before and after giving effect to the Recapitalization, the aggregate value of the assets of the Company, at fair value and present fair saleable value, exceeds: (a) its total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities); and (b) the amount required to pay such liabilities as they become absolute and matured or due in the normal or usual course of business;

3)    after giving effect to the Recapitalization, Holdings has the ability to pay its debts and liabilities (including contingent, subordinated, unmatured and unliquidated liabilities) as they become absolute and matured or due in the normal or usual course of business;

4)    after giving effect to the Recapitalization, the Company has the ability to pay its debts and liabilities (including contingent, subordinated, unmatured and unliquidated liabilities) as they become absolute and matured or due in the normal or usual course of business;

5)    after giving effect to the Recapitalization, Holdings does not have an unreasonably small amount of capital with which to conduct its business;

6)    after giving effect to the Recapitalization, the Company does not have an unreasonably small amount of capital with which to conduct its business;

7)    immediately before the Dividend, the aggregate value of the assets of the Company, at fair value and present fair saleable value, exceeds: (a) its total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities); and (b) the amount required to pay such liabilities as they become absolute and matured or due in the normal or usual course of business, by an amount at least equal to the Dividend plus the Stated Capital of the Company;

8)    immediately after giving effect to the Dividend, the excess of the aggregate value of the Company's assets at fair value and present fair saleable value over the Company's liabilities (including contingent, subordinated, unmatured and unliquidated liabilities), is equal to or exceeds the amount of

Boards of Directors
WERNER HOLDING CO. (DE), INC.
WERNER HOLDING CO. (PA), INC.
June 11, 2003
Page 12

the Stated Capital of the Company; and

9)    immediately after the Redemption, the aggregate value of the assets of Holdings, at fair value and present fair saleable value, exceeds the sum of the total liabilities of Holdings required to be reflected on a balance sheet prepared in accordance with GAAP by an amount that would be needed if Holdings were to be dissolved at the time of the Redemption, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those shareholders receiving payment in the Redemption.

In rendering the opinions set forth above, we call to your attention that management of Holdings has prepared Projections that indicate insufficient liquidity to redeem the Senior Subordinated Notes at maturity and assume a refinancing of the Senior Subordinated Notes upon their maturity on November 15, 2007. Management believes that the amounts due at the time the Senior Subordinated Notes mature will be repaid through a new financing. We have assumed, with your consent, that the Company will be able refinance the Senior Subordinated Notes when they mature. We offer no opinion on the ability of Holdings or the Company to effect a new financing at that point in time.

In rendering the opinions set forth above, we call to your attention that management of Holdings has prepared Projections that show the Company with outstanding loans under the A/R Facility after its maturity date. Management believes that the Company will be able to renew the A/R Facility when such commitment expires. We have assumed, with your consent, that the Company will be able to renew the A/R Facility when such commitment expires. We offer no opinion as to the ability of the Company to renew such commitment.

In rendering the above opinions, we have assumed and relied upon certain past, current and projected audited and unaudited financial information, including without limitation the Projections, specified herein, which has not been independently verified and for which we assume no responsibility as to its accuracy and completeness. With respect to the Projections, we have assumed that they have been reasonably prepared on bases reflecting the best currently available estimates and judgments of management of Holdings of the future financial performance of Holdings. Our opinion is based on financial, economic, market and other conditions as in effect on, and the information made available to us as of, the date hereof. In addition, we have assumed that the Recapitalization will be consummated in accordance with the terms of the Recapitalization Agreement, without any waiver of any material terms or conditions contained therein. Further, we have assumed good title to the assets of Holdings and the Company, and have made no inspection of those assets for the purpose of determining the value of such assets, both of which we expressly disclaim responsibility for in connection with the rendering of this opinion.

MURRAY, DEVINE & CO.

Boards of Directors
WERNER HOLDING CO. (DE), INC.
WERNER HOLDING CO. (PA), INC.
June 11, 2003
Page 13

This letter is intended solely for use of the addressees in connection with the Recapitalization and related financings and is not to be relied upon by any other person or entity or for any other purpose without our prior written consent. This letter is not to be disclosed or otherwise circulated, quoted or referred to any persons or entities other than the addressees without our written consent (which will not be unreasonably withheld). Notwithstanding anything to the contrary in the immediately preceding sentence, our consent shall not be required for any of the following: (a) submitting information copies of this opinion to counsel or advisors to the Agents, the Investor, the Arrangers, the Lenders, Holdings or the Company; (b) furnishing this opinion upon the demand or order of any court, administrative agency or regulatory body or as may be required in response to any summons or subpoena; (c) attaching this opinion as an exhibit to the Credit Agreement; (d) furnishing this opinion as may be required or ordered in, or as may be necessary, to protect the Agents', the Arrangers, the Lenders', Holdings' or the Company's interest in, any litigation, governmental proceeding or investigation pertaining to the Credit Agreement, or related transactions to which the Agents, the Arrangers, the Lenders, Holdings or the Company are or may be subject (whether or not named as a party in such proceeding); or (e) furnishing this opinion to a governmental agency as otherwise required by any law, order, regulation or ruling applicable to the Agents, the Arrangers, the Lenders, Holdings or the Company.

This letter is also delivered with the explicit understanding that it is based on current standards of valuation and assessment and that standards of valuation and assessment may change in the future. We disclaim any responsibility for any impact any such changes may have on the valuation or assessment of Holdings and the Company described in this letter. Except as contemplated by the Projections, unforeseen future events which may change the current or projected value of Holdings and the Company do not apply and have not been factored into the opinion expressed in this letter.

This letter is a financial opinion only. We make no representations regarding questions of legal interpretation and expressly disclaim that it be construed in any way as a legal opinion. This opinion is delivered to each recipient subject to the conditions, scope of the engagement, limitations and understandings set forth in this opinion and subject to the understanding that the obligations of Murray, Devine & Co., Inc. in connection with this letter are solely corporate obligations, and no officer, director, employee, agent, shareholder or controlling person of Murray, Devine & Co., Inc. shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of Holdings, the Company or any of their subsidiaries or affiliates. Further, it is understood that in no event, regardless of the legal theory advanced, shall Murray, Devine & Co., Inc. be responsible to Holdings, the Company or any of their subsidiaries or affiliates other than for its gross negligence, bad faith, willful misconduct or reckless disregard of its obligations.

MURRAY, DEVINE & CO.

Boards of Directors
  WERNER HOLDING CO. (DE), INC.
  WERNER HOLDING CO. (PA), INC.
June 11, 2003
Page 14

We have no obligation to update or revise this letter for any events occurring subsequent to the date of this letter.

Very truly yours,

MURRAY, DEVINE & CO., INC.

*Murray, Devine & Co., Inc.*

<u>AFFIDAVIT OF SERVICE</u>

STATE OF NEW YORK          )
                                              : ss.:
COUNTY OF NEW YORK    )

Kenneth J. Horrmann, being duly sworn, deposes and says:

1. I am not a party to the action, am over 18 years of age and am employed by

Skadden, Arps, Slate, Meagher &  Flom LLP, Four Times Square, New York, NY 10036.

2. On June 2, 2008, I served the following:

- *Notice of Motion,*
- *Opening  Memorandum of Law in Support of Defendants' Joint Motions to Transfer Venue and to Dismiss the Complaint,*
- *Declaration of Michael D. Brooks,*
- *Declaration of Anthony W. Clark,*
- *Declaration of David M. Conn,*
- *Declaration of Daniel M. DiDomenico,*
- *Declaration of John J. Dylik,*
- *Declaration of Christopher G. Filardi,*
- *Declaration of Bruce B. Fischer,*
- *Declaration of Karen R. Garcell,*
- *Declaration of Vincent J. Garcell,*
- *Declaration of Edward W. Gericke,*
- *Declaration of Timothy K. Lewis,*
- *Declaration of Neal R. Martin,*
- *Declaration of Lisa A. Pressler,*
- *Declaration of John M. Remmers,*
- *Affidavit of Steven P. Richman,*
- *Declaration of Christopher J. Stadler,*
- *Declaration of Gary Stewart,*
- *Declaration of Thomas J. Sullivan,*
- *Declaration of Gregory W. Werkheiser,*
- *Declaration of Eric J. Werner; and*
- *Declaration of Michael S. Wong*

 by first-class mail by depositing same in a post-paid properly addressed envelope, in an official

depository under the exclusive care and custody of the U.S. Postal Service within the State of

New York upon:

Kevin C. Walz
8045 Bainbrook Drive
Chagrin Falls, OG 44023

David A. Cardillo
23 St. Glory Road
Greenville, PA 16125

_____
Kenneth J. Horrmann

Sworn to before me this
2nd day of June 2008.

Brian E. Keating
Notary Public, State of New York
No. 01KE5009535
Qualified in Westchester County
Certificate Filed in New York County
Commission Expires March 15, 2011

2