WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
J. Christopher Shore (JS-6031)

633 West Fifth Street, Suite 1900
Los Angeles, California 90071
(213) 620-7700
Craig Averch (Admitted Pro Hac Vice)

*Attorneys for Plaintiff OLD LADDER LITIGATION CO., LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OLD LADDER LITIGATION CO., LLC, as Litigation Designee on behalf of the Liquidation Trust,<br><br>        Plaintiff,<br><br>  v.<br><br>INVESTCORP BANK B.S.C., *et al.*,<br><br>        Defendants. | Case No.  08 CIV 0876 (RMB)(THK)<br><br>**DECLARATION OF CRAIG AVERCH IN SUPPORT OF OPPOSITION TO DEFENDANTS' CONSOLIDATED MOTIONS FOR TRANSFER OF VENUE, AND DISMISSAL** |

I, **Craig Averch,** hereby declare, pursuant to Article 28 U.S.C. § 1746:

      1.      I am a partner in the law firm White & Case LLP, attorneys for plaintiff Old Ladder Litigation Co. LLC ("Old Ladder") in this matter.  I have personal knowledge of the matters discussed herein.  I submit this declaration in support of the opposition filed by Old Ladder to the Defendants' Consolidated Motion to Transfer Venue and Dismiss the Complaint in the above captioned action.

      2.      I personally supervised the preparation of Attachment A hereto ("Attachment A") and the preparation and compilation of documents and excerpts of documents included as Exhibits 1-73 to Attachment A.

      3.      The descriptions provided in Attachment A are true and accurate descriptions of information contained in Exhibits 1-73.  To the best of my knowledge, Exhibits 1-73 are true and correct copies of documents or excerpts of documents identified and described in Attachment A, all of which were produced by Old Werner, Investcorp Defendants, and Leonard Green.

      4.      Attachment B is a summary of complaints filed by Old Ladder in states other than Delaware.

      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Los Angeles, California
On this 8th day of July, 2008.

/s/ Craig Averch
**Craig Averch**

**ATTACHMENT A – A Listing of Documents and Summary of Contents Relating to Venue and Jurisdiction**

**New York Professionals Hired to Execute the 1997 Shareholder Cashout**

| Ex. | Document Description | Summary of Contents Pertaining to New York and Jurisdiction |
|---|---|---|
| 1[1] | Working Group List – Project Step-Up (Sale of Old Werner) | • Gibson, Dunn & Crutcher LLP ("Gibson"), located in New York, New York, was retained. Eleven of fourteen professionals reside in New York. Two professionals reside in Connecticut or New Jersey. (p. 15-16)<br><br>• Merrill Lynch & Co., located in New York, New York, was retained. Five of six professionals reside in New York, New York. The remaining professional resides in New Jersey. (p. 19)<br><br>• Cravath, Swaine & Moore LLP, located in New York, New York, was retained. All four professionals reside in New York. (p. 22)<br><br>• Chase Securities Inc., located in New York, New York, was retained. Five of the seven professionals reside in New York, New York. One professional resides in Connecticut. (p. 18)<br><br>• Goldman, Sachs & Co. ("Goldman"), located in New York, New York, was retained. Seven of twelve professionals reside in New York, New York. Four professionals reside in Connecticut or New Jersey. (pp. 3-4)<br><br>• BT Alex, Brown, Inc., located in New York, New York, was retained. All six professionals reside in New York. (p.23)<br><br>• Investcorp International Inc., located in New York, New York, was retained. Five of eight professionals reside in New York. Three professionals reside in Connecticut or New Jersey. (p.13)<br><br>• Coopers & Lybrand, located in New York, New York, was retained. Six of ten professionals reside in New York. Four professionals reside in Connecticut or New Jersey. (p. 14)<br><br>• Marsh & McLennan, Inc., located in New York, New York, was retained. One of two professional resides in New York, New York. (p. 17)<br><br>• Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), located in New York, New York, |

---

[1] Unless otherwise specified, all exhibits referenced herein are attached hereto, as referenced in the Declaration of Craig Averch.

**ATTACHMENT A – A Listing of Documents and Summary of Contents Relating to Venue and Jurisdiction**

| Ex. | Document Description | Summary of Contents Pertaining to New York and Jurisdiction |
|---|---|---|
| | | was retained. Nine of ten professionals reside in New York. (p. 6-7) <br><br> • Baker & McKenzie, located in New York, New York, was retained. The one professional listed resides in New York. (p. 12) |
| See Ex. 11 | Credit Agreement dated November 24, 1997 | • Bankers Trust Co., located in New York, New York, was retained as the Administrative Agent and Co-Arranger for the 1997 Credit Facility. (see cover page) |
| See Ex. 16 | Letter of Representations re 10% Senior Subordinated Notes due 2007 dated 11/21/1997 | • IBJ Schroder Bank and Trust Co., located in New York, New York, was retained to act as the Trustee, Paying Agent, Fiscal Agent, or other agent of Old Werner with respect to the 10% Senior Subordinated Notes Securities. (p. 1) |

**Negotiations Leading to the 1997 Shareholder Cashout**

| Ex. | Document Description | Summary of Contents Pertaining to New York and Jurisdiction |
|---|---|---|
| 2 | Old Werner corporate records documenting solicitation of offers to purchase Old Werner in New York [excerpts only] | • New York trip on July 28, 1997 to solicit offers to purchase Old Werner. <br><br> • Meeting with Investcorp in New York on August 29, 1997. <br><br> • Meeting scheduled in New York on September 8, 1997. <br><br> • Meeting regarding the Old Werner and Solot Families in New York on October 5, 1997. <br><br> • Meeting regarding financing in New York on October 17, 1997. <br><br> • Meeting to redraft the Road Show documents in New York on October 22, 1997. <br><br> • Road Show scheduled in New York. |
| 3 | Proposal Letter to purchase Old Werner | • Investcorp's proposal letter to purchase Old Werner sent to Goldman in New York, New York. |
| 4 | Old Werner Proxy Statement for Special Meeting of Shareholders | • From September 28, 1997 to October 7, 1997, Old Werner's management and financial and legal advisors met and negotiated with representatives of Investcorp and its legal advisors in person at Skadden's office in New York, New York and by telephone regarding the terms of the |

**ATTACHMENT A – A Listing of Documents and Summary of Contents Relating to Venue and Jurisdiction**

| Ex. | Document Description | Summary of Contents Pertaining to New York and Jurisdiction |
|---|---|---|
| | to be Held on November 21, 1997 [excerpts only] | 2003 Shareholder Cashout.  (p. 23) |
| 5 | Old Werner Minutes of the Special Meeting of the Board of Directors on October 6, 1997 | • On October 6, 1997, Old Werner's board of directors held a special meeting at Skadden's office in New York, New York to review and approve the proposed recapitalization agreement. |

**1997 Shareholder Cashout Funds Flow**

| Ex. | Document Name | Summary of Contents Pertaining to New York and Jurisdiction |
|---|---|---|
| 6 | Investcorp Memorandum dated November 21, 1997 re Funds Flow | • Investcorp purchased Old Werner stock with funds from its New York bank account.  The funds were deposited into Old Werner's New York bank account.<br>• Loan proceeds flowed from New York bank accounts to Old Werner's New York bank account.<br>• Payments at the closing of the 2003 Shareholder Cashout were from Old Werner's New York bank accounts.  Many of these payments were wired to bank accounts in New York. |

**1997 Shareholder Cashout Documents**

| Ex. | Document Name | Parties | Summary of Contents Pertaining New York and Jurisdiction |
|---|---|---|---|
| 7 | Amended and Restated Recapitalization Agreement dated October 27, 1997 [excerpts only] | Old Werner and its Investors [Investcorp Investment Equity Ltd.; Ballet Ltd.; Denary Ltd.; Gleam Ltd.; Highlands Ltd.; Noble Ltd.; Outrigger Ltd.; Quill Ltd.; Radial Ltd.; Shoreline Ltd.; Zinnia Ltd.; Annisville Ltd.; Cooperstown Ltd.; Frisco Ltd.; Platea Ltd.; and Stepup Ltd.] | • The closing of the 1997 Shareholder Cashout took place at Gibson's office in New York, New York. (section 1.6)<br>• All copies of notices to the Investors to be sent to Investcorp International Inc. in New York, New York and Gibson in New York, New York.  All copies of notices to Old Werner to be sent to Skadden in New York, New York. (section 8.3) |

**ATTACHMENT A – A Listing of Documents and Summary of Contents Relating to Venue and Jurisdiction**

| Ex. | Document Name | Parties | Summary of Contents Pertaining New York and Jurisdiction |
|---|---|---|---|
| | | | • Each of the parties to the agreement expressly and irrevocably submits to non-exclusive personal jurisdiction. (section 8.9)<br><br>• Investcorp Investment Equity Limited was appointed as the Investor Representative – agent, attorney-in-fact and representative authorized and directed to take all actions and exercise all rights on behalf of the Investcorp Investors under the Agreement. (section 8.17) |
| 8 | Shareholder Voting Agreement dated October 8, 1997 | Investors [Investcorp Investment Equity Ltd.; Ballet Ltd.; Denary Ltd.; Gleam Ltd.; Highlands Ltd.; Noble Ltd.; Outrigger Ltd.; Quill Ltd.; Radial Ltd.; Shoreline Ltd.; Zinnia Ltd.; Annisville Ltd.; Cooperstown Ltd.; Frisco Ltd.; Platea Ltd.; Stepup Ltd.], Old Werner and Howard L. Solot | • All notices to the Investors to be sent to Investcorp International Inc. in New York, New York, with copies to Gibson in New York, New York. Copies of notices to Old Werner to be sent to Skadden in New York, New York. (section 8(e)) |
| 9 | Letter Agreement re Stand-By Commitment to Loan up to $320 Million of Senior Debt dated November 20, 1997 | Old Werner and Invifin S.A. | • Invifin S.A. to provide up to $320 million of senior debt for use in effecting the 1997 Shareholder Cashout for six million dollar fee. |
| 10 | Shareholder Agreement dated November 24, 1997 [excerpts only] | Old Werner; Investcorp Investment Equity Limited; Ballet Ltd.; Denary Ltd.; Gleam Ltd.; Highlands Ltd.; Noble Ltd.; Outrigger Ltd.; Quill Ltd.; Radial Ltd.; | • Each of the parties irrevocably consents to the jurisdiction. (section 8(e)) |

**ATTACHMENT A – A Listing of Documents and Summary of Contents Relating to Venue and Jurisdiction**

| Ex. | Document Name | Parties | Summary of Contents Pertaining New York and Jurisdiction |
|---|---|---|---|
| | | Shoreline Ltd.; Zinnia Ltd.; Stepup Ltd. (accepted and agreed to for the purposes of Section 5 only); Donald M. Werner; Howard L. Solot; Bruce D. Werner; Michael E. Werner; Craig R. Werner; Eric J. Werner; and Michael J. Solot | |
| 11 | Credit Agreement dated November 24, 1997 [excerpts only] | Old Werner; Bankers Trust Co. (Administrative Agent and Co-Arranger); Merrill Lynch Capital Corp. (Syndication Agent and Co-Arranger); The Chase Manhattan Bank (Documentation Agent); Goldman Sachs Credit Partners, L.P. (Co-Agent); and several lenders (see signature pages). | • All payments are made to Bankers Trust Co., at its office in New York, New York. (section 5.9(d))<br><br>• Copies of all notices to the Old Werner to be sent to Gibson located in New York, New York.  All notices to the Administrative Agent and Swing Line Lender to be sent to Bankers Trust Co. in New York, New York. (section 12.2)<br><br>• The credit agreement is governed by New York law. (section 12.10)<br><br>• Each party to the credit agreement submits itself to the jurisdiction of New York state courts, the federal courts in the Southern District of New York, and the appellate courts thereof. (section 12.11)<br><br>• The agreement was executed and delivered in New York, New York.  (see signature block)<br><br>• 15 of the 21 lenders party to the agreement are located in New York. (Schedule I) |
| 12 | Gibson Opinion Letter re Credit | | The opinion assumes the following: |

**ATTACHMENT A – A Listing of Documents and Summary of Contents Relating to Venue and Jurisdiction**

| Ex. | Document Name | Parties | Summary of Contents Pertaining New York and Jurisdiction |
|---|---|---|---|
| | Agreement dated as of November 24, 1997 | | • Stock certificates are delivered to the Administrative Agent in New York, New York, as described in the Pledge Agreements. The Pledged Shares are valid and perfected security interests under New York law. (section 8)<br><br>• The Lenders gave value to Old Werner in New York. (section 8(e))<br><br>• The Administrative Agent obtained possession of all the Pledged Shares in New York. (section 8(p))<br><br>• The opinion was issued by Gibson's New York office. |
| 13 | Notice of Borrowing | Bankers Trust Co. and Old Werner | • Old Werner hereby notifies Bankers Trust Co., located in New York, New York, that it will borrow $55,000,000 and $90,000,000 on November 24, 1997. The proceeds of these loans were deposited in Old Werner's New York bank account. |
| 14 | $135,000,000,000 10% Senior Subordinated Notes due 2007 Purchase Agreement [excerpts only] | Old Werner and the Initial Purchasers [Chase Securities Inc.; Donaldson, Lufkin & Jenrette Securities Corp.; Goldman] | • Chase Securities Inc. and Goldman are located in New York, New York. (see signature pages)<br><br>• Delivery of and payments for the securities are made at Gibson's office in New York, New York. (section 3)<br><br>• Notices to the Initial Purchasers to be sent to Chase Securities in New York, New York. Copies of notices to Old Werner to be sent to Gibson and Investcorp International Inc., both located in New York, New York. (section 14(b))<br><br>• The agreement is governed by New York law. (section 17) |
| 15 | 10% Senior Subordinated Notes due 2007 Indenture | Old Werner and IBJ Schroder Bank & Trust Co. | • IBJ Schroder Bank & Trust Co., the Trustee, is a New York banking corporation located in New York. (preamble)<br><br>• All deadlines in the Indenture are governed by New York time. |

**ATTACHMENT A – A Listing of Documents and Summary of Contents Relating to Venue and Jurisdiction**

| Ex. | Document Name | Parties | Summary of Contents Pertaining New York and Jurisdiction |
|---|---|---|---|
| | dated as of November 24, 1997 [excerpts only] | | (section 4.01)<br><br>• Copies of notices to Old Werner to be sent to Gibson and Investcorp International Inc., both located in New York, New York. Notices to the Trustee to be sent to IBJ Schroder Bank & Trust Co. in New York, New York. (section 13.02)<br><br>• The Indenture and the Securities (10% Senior Subordinated Notes) are governed by New York law. (section 13.09) |
| 16 | Letter of Representations re 10% Senior Subordinated Notes due 2007 dated November 21, 1997 [excerpts only] | Old Werner and IBJ Schroder Bank & Trust Co. | • Letter to The Depository Trust Co. in New York, New York. (p.1)<br><br>• The 10% Senior Subordinated Notes were initially deposited with and distributed through The Depository Trust Co. ("DTC"), a New York corporation located in New York, prior to closing. (p.1)<br><br>• All notices to DTC to be sent to its address in New York, New York. (p. 2)<br><br>• All payments (interest, maturity and redemption, principal) to be sent to DTC's New York bank account absent any other arrangement (pp. 3-4)<br><br>• Governed by New York law. (p.5) |
| 17 | Gibson opinion letter dated November 24, 1997 to Chase Securities Inc., Donaldson, Lufkin & Jenrette Securities Corp. and Goldman re 10% Senior | | • The opinion letter is issued by Gibson's New York office.<br><br>• The opinion letter is addressed to Chase Securities Inc. located in New York, New York. |

**ATTACHMENT A – A Listing of Documents and Summary of Contents Relating to Venue and Jurisdiction**

| Ex. | Document Name | Parties | Summary of Contents Pertaining New York and Jurisdiction |
|---|---|---|---|
| | Subordinated Notes | | |
| 18 | Cross Receipt dated November 24, 1997 to Chase Securities Inc., Donaldson, Lufkin & Jenrette Securities Corp. and Goldman | | • Addressed to Chase Securities Inc. in New York, New York.<br><br>• The 10% Senior Subordinated Notes delivered to Chase Securities Inc., Donaldson, Lufkin & Jenrette Securities Corp. and Goldman pursuant to the Purchase Agreement dated November 14, 1997.<br><br>• Chase Securities Inc., on behalf of Initial Purchasers, acknowledges receipt. |
| 19 | Senior Subordinated Notes Commitment Letter Agreement dated November 14, 1997 [excerpts only] | Investcorp Investment Equity Limited [on behalf of itself and Ballet Ltd., Denary Ltd., Gleam Ltd., Highlands Ltd., Noble Ltd., Outrigger Ltd., Quill Ltd., Radial Ltd., Shoreline Ltd., Zinnia Ltd., Annisville Ltd., Cooperstown Ltd., Frisco Ltd., Platea Ltd., Stepup Ltd.]; Chase Securities Inc.; The Chase Manhattan Bank; DLJ Bridge Finance, Inc.; and Goldman Sachs Credit Partners L.P. | • All deadlines in the Commitment Letter and Fee Letter are governed by New York time.  (p.10)<br><br>• New York is selected as the governing law and forum for the Senior Subordinated Credit Facility. (Exhibit A:  Summary of Principal Terms and Conditions, p.15)<br><br>• New York is selected as the governing law and forum for the Exchange Notes. (Annex I to Exhibit A:  Summary of Principal Terms and Conditions of Exchange Notes, p.5) |
| 20 | Senior Subordinated Notes Engagement Letter dated November 14, 1997 [excerpts only] | Investcorp Investment Equity Limited [on behalf of itself and Ballet Ltd., Denary Ltd., Gleam Ltd., Highlands Ltd., Noble Ltd., Outrigger Ltd., | • Investcorp Investment Equity Limited (on behalf of itself and the Investors) engages Chase Securities Inc., The Chase Manhattan Bank, DLJ Bridge Finance, Inc. and Goldman Sachs Credit Partners L.P. in connection to the Senior Subordinated Credit Facility. |

**ATTACHMENT A – A Listing of Documents and Summary of Contents Relating to Venue and Jurisdiction**

| Ex. | Document Name | Parties | Summary of Contents Pertaining New York and Jurisdiction |
|---|---|---|---|
| | | Quill Ltd., Radial Ltd., Shoreline Ltd., Zinnia Ltd., Annisville Ltd., Cooperstown Ltd., Frisco Ltd., Platea Ltd., Stepup Ltd.]; Chase Securities Inc.; The Chase Manhattan Bank; DLJ Bridge Finance, Inc.; and Goldman Sachs Credit Partners L.P. | • The Engagement Letter is governed by New York law. (section 8)<br><br>• All parties to the engagement irrevocably and unconditionally submit to the exclusive jurisdiction of any state or federal court sitting in New York, New York and irrevocably and unconditionally waive any objection to venue of any suit, action or proceeding brought in any such court. (section 8) |

**New York Professionals Hired to Execute the 2003 Shareholder Cashout**

| Ex. | Document Name | Summary of Contents Pertaining to New York and Jurisdiction |
|---|---|---|
| 21 | April 10, 2003 Investcorp Organizational Meeting [excerpts only] | • Investcorp International Inc. is located in New York, New York. Two of three professionals reside in New York. One professional resides in New Jersey. (p. 14)<br><br>• J. P. Morgan Securities Inc., located in New York, New York, was retained. Nine of eighteen professionals reside in New York. Eight professionals reside in Connecticut or New Jersey. (pp. 16-19)<br><br>• Citigroup, located in New York, New York, was retained. Seven of ten professionals reside in New York. The remaining three professionals reside in Connecticut or New Jersey. (pp. 20-21)<br><br>• Gibson, located in New York, New York, was retained. Two professionals reside in Connecticut or New Jersey. (p. 22)<br><br>• Simpson Thatcher & Bartlett LLP, located in New York, New York, was retained. All professionals reside in Connecticut. (p. 23) |
| See Ex. | Consent to Amendment to Indenture with | • MacKenzie Partners, Inc., located in New York, New York, was retained as the Information Agent. (p. 2) |

**ATTACHMENT A – A Listing of Documents and Summary of Contents Relating to Venue and Jurisdiction**

| Ex. | Document Name | Summary of Contents Pertaining to New York and Jurisdiction |
|---|---|---|
| 33 | respect to the 10% Senior Subordinated Notes Due 2007 dated May 16, 2003 | |
| See Ex. 24 | Tabulation Agent Agreement | • Bank of New York, located in New York, was retained as Tabulation Agent to solicit bondholders' consents. |

**Negotiations and Closing of the 2003 Shareholder Cashout**

| Ex. | Document Name | Summary of Contents Pertaining to New York and Jurisdiction |
|---|---|---|
| 22 | Rating Agency Contact Information | • Standard & Poor's and Moody's Investors Service are both located in New York, New York. |
| 23 | May 2003 Confidential Information Memorandum re $230,000 Senior Secured Credit Facilities [excerpts only] | • May 9, 2003, lenders meeting held in New York, New York. (p.6) |
| 24 | Tabulation Agent Agreement | • The Agreement and the Bank of New York's appointment as the Tabulation Agent are governed by New York law. (¶ 17)<br><br>• All notices to the Bank of New York to be sent to its New York address, while copies of all notices to Old Werner to be sent to Gibson in New York, New York. (¶ 21) |
| 25 | May 16, 2003 letter to holders of the 10% Senior Subordinated Notes due 2007 re solicitation of consent | • Bondholders instructed to return their consent forms to the Bank of New York located in New York, New York. |

**ATTACHMENT A – A Listing of Documents and Summary of Contents Relating to Venue and Jurisdiction**

| Ex. | Document Name | Summary of Contents Pertaining to New York and Jurisdiction |
|-----|---------------|-------------------------------------------------------------|
| 26 | Old Werner Minutes of the Special Meeting of Shareholders on May 30, 2003 | • The special meeting on May 30, 2003, at which the shareholders approved the 2003 Shareholder Cashout, was held in New York, New York. |

**2003 Shareholder Cashout Funds Flow**

| Ex. | Document Name | Summary of Contents Pertaining to New York and Jurisdiction |
|-----|---------------|-------------------------------------------------------------|
| 27 | Emails dated June 6, 2003 regarding the opening of an Old Werner New York bank account and documents confirming the same | • Two business accounts were opened with JPMorgan Chase Bank ("JPMCB") in New York for the purpose of consummating the 2003 Shareholder Cashout. |
| 28 | Letter dated June 11, 2003 to Joseph Brusco at JPMCB in New York, New York | • Old Werner, instructs JPMCB to distribute $180,000,000 from its New York account no. 304154938 according to wire instructions. |
| 29 | Distribution checks sent to shareholders | • Shareholder distributions are made by checks from Old Werner's Chase Manhattan Bank account in New York, New York. |
| 30 | Old Werner Shareholder Closing Instructions dated June 11, 2003 | • All payments relating to the 2003 Shareholder Cashout were paid from Old Werner's New York bank accounts.<br><br>• All Investcorp entities received distributions in their New York bank accounts.<br><br>• Many additional transfers were wired to New York bank accounts. |

**ATTACHMENT A – A Listing of Documents and Summary of Contents Relating to Venue and Jurisdiction**

**2003 Shareholder Cashout Documents**

| Ex. | Document Name | Parties | Summary of Contents Pertaining to New York and Jurisdiction |
|---|---|---|---|
| 31 | Recapitalization and Stock Purchase Agreement dated May 7, 2003 [excerpts only] | Old Werner; Green Equity Investors III, L. P.; and most of Old Werner's shareholders, including Investcorp Werner Holdings L.P. by Stepup Ltd., its general partner; Investcorp Investment Equity Ltd; Ballet Ltd.; Denary Ltd.; Gleam Ltd.; Highlands Ltd.; Noble Ltd.; Outrigger Ltd.; Quill Ltd.; Radial Ltd.; Shoreline Ltd.; Zinnia Ltd.; Annisville Ltd.; Frisco Ltd.; Step Investment Ltd.; Equity Wera Ltd.; Werner Equity Ltd.; Cooperstown Ltd.; Platea Ltd.; Climbing Products Ltd.; Ladder Equity Ltd.; Werner IIP Ltd.; Werner Investments ltd.; and WL Holding Ltd. | • The closing of the 2003 Shareholder Cashout took place at Gibson's office in New York, New York. (section 2.6)<br><br>• Copies of all notices to Old Werner and its shareholders to be sent to Gibson's office in New York, New York. (section 10.2)<br><br>• The agreement is governed by New York law. (section 10.5)<br><br>• The parties irrevocably submit to the jurisdiction of New York state courts and the federal courts of the United States located in the Borough of Manhattan, New York City. (section 10.5) |
| 32 | May 16, 2003 Letter to Old Werner's Shareholders [excerpts only] | | • Special meeting of Old Werner's shareholders scheduled for May 30, 2003 in New York, New York to approve the amendment to Old Werner's Articles of Incorporation and the Recapitalization and Stock Purchase Agreement. |
| 33 | Consent to Amendment to Indenture with respect to the 10% Senior Subordinated | | • Executed consent forms to be sent to The Bank of New York (the Tabulation Agent) located in New York, New York. (p.1)<br><br>• Copies of the Consent Solicitation Statement can be requested from MacKenzie Partners, Inc, (the Information Agent) located in New York, |

**ATTACHMENT A – A Listing of Documents and Summary of Contents Relating to Venue and Jurisdiction**

| Ex. | Document Name | Parties | Summary of Contents Pertaining to New York and Jurisdiction |
|---|---|---|---|
| | Notes Due 2007 dated May 16, 2003 [excerpts only] | | New York. (p.2)<br><br>• J. P. Morgan Securities, Inc. and Citigroup, both located in New York, New York, are the Solicitation Agents.  (p.2)<br><br>• All deadlines in the consent solicitation are governed by New York time.  (p.4) |
| 34 | Gibson Opinion Letters dated June 11, 2003 | | • The opinion letters were issued by Gibson's New York office.<br><br>• The opinion letters relating to the 2003 Shareholder Cashout are limited to the effect of New York law. |
| 35 | Amended and Restated Shareholder Agreement dated June 11, 2003 [excerpts only] | Old Werner, Green Equity Investors III, L.P., Werner Co.-Investment LLC, Investcorp Investment Equity Limited, all Class D Shareholders (Ballet Ltd., Denary Ltd., Gleam Ltd., Highlands Ltd., Noble Ltd., Outrigger Ltd., Quill Ltd., Radial Ltd., Shoreline Ltd., Zinnia Ltd.), and the Werner Family Designated Shareholders (Donald Werner, Howard Solot, Bruce Werner, Michael Werner, Craig Werner, Eric Werner, Michael Solot) | • Copies of notices to Old Werner and Old Werner's shareholders (excluding Green Equity Investors III, L.P.) to be sent to Gibson in New York, New York. (section 11(f))<br><br>• The agreement is governed by New York law. (section 11(g)) |
| 36 | Credit Agreement dated June 11, 2003 (only Schedule I is included) | Old Werner.; Citigroup Global Markets Inc. (Syndication Agent, Joint Lead Arranger, Joint Bookrunner); JPMCB (Administrative Agent); J. P. Morgan Securities, Inc. (Joint Lead Arranger, Joint Bookrunner); Citigroup North America, Inc.; | • Copies of notices to Old Werner to be sent to Gibson in New York, New York.  Copies of notices to the Administrative Agent, Issuing Lender and the Swing Lender to be sent to JPMCB in New York, New York. (section 12.2) |

**ATTACHMENT A – A Listing of Documents and Summary of Contents Relating to Venue and Jurisdiction**

| Ex. | Document Name | Parties | Summary of Contents Pertaining to New York and Jurisdiction |
|---|---|---|---|
| | [excerpts only] | General Electric Capital Corp.; Natexis Banque Populaires; Allied Irish Bank PLC; First SunAmerica Life Insurance Co.; KZH CypressTree-1 LLC; KZH ING-2 LLC; KZH Sterling LLC; KZH Waterside LLC; Stanwich Loan Funding LLC; Galaxy CLO 1999-1, Ltd.; KZH Soleil-2 LLC; Jupiter Loan Funding LLC; Winged Foot Funding Trust; KZH Riverside LLC; KZH Soleil LLC; | • The Credit Agreement is governed by New York law (section 12.10)<br><br>• Each party to the Credit Agreement submits to the non-exclusive jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof and waives any objection to the venue of any action or proceeding in any such court. (section 12.11(i) & (ii))<br><br>• 11 of the 17 lenders are located in New York. These 11 New York lenders provided $45 million of the $50 million Revolving Facility and $164,850,000 of the $180 million Term Loan. (Schedule I) |
| 37 | Gibson Opinion Letter dated June 11, 2003 to JPMCB and the Lenders re Credit Agreement dated as of June 11, 2003 to JPMCB [excerpts only] | | • The opinion letter is issued by Gibson's New York office. |
| 38 | Simpson Thatcher Opinion Letter dated June 11, 2003 to JPMCB | | • Attorneys from Simpson Thatcher rendering the opinion are members of the New York Bar (p.4)<br><br>• The opinion is limited to New York law and |

**ATTACHMENT A – A Listing of Documents and Summary of Contents Relating to Venue and Jurisdiction**

| Ex. | Document Name | Parties | Summary of Contents Pertaining to New York and Jurisdiction |
|---|---|---|---|
| | and the Lenders re Credit Agreement dated as of June 11, 2003 | | federal law. (p.4) |
| 39 | First Amendment dated May 6, 2004 to the Credit Agreement dated June 11, 2003 | Old Werner; several lenders from time to time parties to the Credit Agreement; Citigroup Global Markets Inc. (Syndication Agent); Citigroup Global Markets Inc. (Joint Lead Arranger and Joint Bookrunner); J. P. Morgan Securities, Inc. (Joint Lead Arrangers and Joint Bookrunners); and JPMCB (Administrative Agent) | • Calls for delivery of executed signature pages to Simpson Thatcher & Bartlett LLP in New York, New York. (section 2.1(b))<br><br>• The First Amendment was executed and delivered in New York, New York. (section 3.3)<br><br>• The First Amendment is governed by New York law (section 3.3) |
| 40 | Waiver and Agreement dated March 31, 2005 to the Credit Agreement dated as of June 11, 2003 (unsigned execution copy) | Old Werner; several lenders from time to time parties to the Credit Agreement; Citigroup Global Markets Inc. (Syndication Agent); Citigroup Global Markets Inc. (Joint Lead Arranger and Joint Bookrunner); J. P. Morgan Securities, Inc. (Joint Lead Arrangers and Joint Bookrunners); and JP Morgan Chase Bank N.A. (formerly known as JPMCB) (Administrative Agent) | • The waiver was executed and delivered in New York, New York (section 6.3)<br><br>• The waiver is governed by New York law (section 6.3) |
| 41 | Second Amendment and Second Waiver dated May 10, 2005 to and under | Old Werner; several lenders from time to time parties to the Credit Agreement; Citigroup Global Markets Inc. (Syndication Agent); Citigroup Global Markets Inc. (Joint Lead Arranger and Joint Bookrunner); JP Morgan Securities, Inc. (Joint | • Calls for delivery of executed signature pages to Simpson Thatcher & Bartlett LLP in New York, New York. (section 4.1(b))<br><br>• The amendment was executed and delivered in |

**ATTACHMENT A – A Listing of Documents and Summary of Contents Relating to Venue and Jurisdiction**

| Ex. | Document Name | Parties | Summary of Contents Pertaining to New York and Jurisdiction |
|---|---|---|---|
| | the Credit Agreement dated June 11, 2003 [excerpts only] | Lead Arrangers and Joint Bookrunners); and JP Morgan Chase Bank N.A. (formerly known as JPMCB) (Administrative Agent) | New York, New York. (section 6.3)<br><br>• The amendment is governed by New York law. (section 6.3) |
| 42 | Third Waiver and Agreement dated March 30, 2006 to and under the Credit Agreement dated June 11, 2003 (unsigned execution copy) | Old Werner and several lenders from time to time parties to the Credit Agreement, Citigroup Global Markets Inc. (Syndication Agent); Citigroup Global Markets Inc. (Joint Lead Arranger and Joint Bookrunner); JP Morgan Securities, Inc. (Joint Lead Arrangers and Joint Bookrunners); and JP Morgan Chase Bank, N.A. (formerly known as JPMCB) (Administrative Agent) | • Calls for delivery of executed signature pages to Simpson Thatcher & Bartlett LLP in New York, New York. (section 4(b))<br><br>• The waiver was executed and delivered in New York, New York. (section 6.3)<br><br>• The waiver is governed by New York law (section 6.3) |
| | Amended and Restated Agreement for Management Advisory, Strategic Planning and Consulting Services dated June 11, 2003 (See Exhibit A of the Declaration of Anthony W. Clark) | Investcorp International Inc. and Old Werner | • Notices to Investcorp International Inc. to be sent to its office in New York, New York, with a copy to Gibson in New York, New York. (¶ 10)<br><br>• New York law applies and governs the agreement. (¶¶ 13 & 16) |

**New York Professionals Hired to Execute the 2005 Refinancing**

| Ex. | Document Name | Summary of Contents Pertaining to New York and Jurisdiction |
|---|---|---|
| 43 | Credit Suisse First | • Credit Suisse First Boston, located in New York, New York, was retained. (pp. 4-5) |

**ATTACHMENT A – A Listing of Documents and Summary of Contents Relating to Venue and Jurisdiction**

| | Boston Working Group List | • Morgan Stanley, located in New York, New York, was retained. (p. 6) |
| | | • Gibson, located in New York, New York, was retained as counsel to Old Werner. (p. 8) |
| | | • Willkie Farr & Gallagher LLP is located in New York, New York, was retained. (p. 9) |
| | | • Loughlin Meghji is located in New York, New York. (p. 7) |
| 44 | March 2005 Working Group List | • JPMCB, located in New York, New York, was retained as Administrative Agent for the First Lien Facility. |
| | | • Simpson Thatcher & Bartlett LLP, located in New York, New York, was retained as counsel to JPMCB (the Administrative Agent). |
| | | • Alavarez & Marsal, located in New York, New York, was retained as financial advisors to JPMCB (the Administrative Agent). |

**2005 Refinancing Documents**

| Ex. | Document Name | Parties | Summary of Contents Pertaining to New York and Jurisdiction |
|---|---|---|---|
| 45 | Draft Confidential Information Memorandum dated April 21, 2005 re $100,000,000 Second Lien Term Loan [excerpts only] | | • Governed by New York law. (p. 3)<br>• Interested lenders are instructed to direct their communication to Credit Suisse First Boston in New York, New York. (pp. 6-8)<br>• A bank meeting is scheduled for April 21, 2005 at the offices of Credit Suisse First Boston in New York, New York. (p.11) |
| 46 | $100,000,000 Senior Secured Credit Facility dated May 10, 2005 | Old Werner, Credit Suisse First Boston, and Morgan Stanley Senior Funding Inc. | • All copies of notices to Old Werner to be sent to Gibson in New York. All notices to the Administrative Agent to be sent to Credit Suisse First Boston in New York. (section 12.2) |

**ATTACHMENT A – A Listing of Documents and Summary of Contents Relating to Venue and Jurisdiction**

| Ex. | Document Name | Parties | Summary of Contents Pertaining to New York and Jurisdiction |
|---|---|---|---|
| | [excerpts only] | | • The agreement is governed by New York law. (section 12.10)<br><br>• Each party submits to the non-exclusive general jurisdiction of the courts of New York, the United States courts for the Southern District of New York, and the appellate courts thereof. (section 12.11)<br><br>• The agreement was executed and delivered in New York, New York.  (see signature block)<br><br>• Schedule I indicates that the lending offices of both Credit Suisse First Boston and Morgan Stanley Senior Funding, Inc. are located in New York, New York. |
| 47 | Intercreditor Agreement dated May 10, 2005 [excerpts only] | Old Werner, JP Morgan Chase Bank, N.A. (First Lien Administrative Agent), and Credit Suisse First Boston (Second Lien Administrative Agent) | • Copies of notices to Old Werner to be sent to Gibson in New York, New York and all copies of notices to the First Lien Administrative Agent to be sent to JP Morgan Chase Bank N.A. in New York, New York.  Notices to the Second Lien Administrative Agent to be sent to an address in New York, New York. (section 10.01)<br><br>• The agreement is construed in accordance with and governed by New York law. (section 10.07(a))<br><br>• Each party irrevocably and unconditionally submits to the nonexclusive jurisdiction of any New York state court or federal court of the United States sitting in New York, New York and any appellate court from any thereof. (section 10.07(b))<br><br>• Each party irrevocably and unconditionally waives any objection to the laying of venue of any suit, action or proceeding in any New York state or federal court. (section 10.07(c)) |

**ATTACHMENT A – A Listing of Documents and Summary of Contents Relating to Venue and Jurisdiction**

| Ex. | Document Name | Parties | Summary of Contents Pertaining to New York and Jurisdiction |
|---|---|---|---|
| 48 | Waiver and Amendment No. 1 dated March 31, 2006 to the Credit Agreement dated May 10, 2005 | Old Werner; several lenders from time to time parties to the Credit Agreement and Credit Suisse, Cayman Islands Branch (Administrative Agent) | • All deadlines in the waiver are governed by New York time. (section 4)<br><br>• Calls for delivery of executed signature pages to Weil, Gotshal & Manges LLP in New York, New York. (section 5(c))<br><br>• The waiver is governed by New York law. (section 12) |
| 49 | Waiver and Amendment No. 2 dated May 10, 2006 to the Credit Agreement dated May 10, 2005 (unsigned execution copy) | Old Werner; several lenders from time to time parties to the Credit Agreement and Credit Suisse, Cayman Islands Branch (Administrative Agent) | • All deadlines in the waiver are governed by New York time. (section 2)<br><br>• The waiver is governed by New York law.  (section 12) |

**Old Werner Meetings Held in New York**

| Ex. | Document Name | Summary of Contents Pertaining to New York and Jurisdiction |
|---|---|---|
| 50 | June 16, 1998 – Old Werner Minutes of the Regular Quarterly Meeting of the Board of Directors | • The quarterly meeting was held in New York, New York. |
| 51 | December 14, 1998 – Old Werner Minutes of the Regular Quarterly Meeting of the Board of Directors | • The quarterly meeting was held in New York, New York. |
| 52 | February 25, 1999 – Old Werner Minutes of the Regular Quarterly Meeting of the Board of Directors | • The quarterly meeting was held in New York, New York. |
| 53 | March 23, 1999 – Old Werner Minutes of the Meeting of the Audit Committee | • The audit committee meeting was held in New York, New York. |
| 54 | September 29, 1999 – Old Werner Minutes of the Special Meeting of the Board of Directors | • The special meeting was held via teleconference at Gibson's office in |

**ATTACHMENT A – A Listing of Documents and Summary of Contents Relating to Venue and Jurisdiction**

| Ex. | Document Name | Summary of Contents Pertaining to New York and Jurisdiction |
|---|---|---|
| | | New York, New York. |
| 55 | December 8, 1999 – Old Werner Minutes of the Regular Quarterly Meeting of the Board of Directors | • The quarterly meeting was held at Gibson's office in New York, New York. |
| 56 | May 10, 2000 – Old Werner Minutes of the Annual Meeting of Shareholders | • The annual shareholders' meeting was held in New York, New York. |
| 57 | May 10, 2000 – Old Werner Minutes of the Annual Meeting of the Board of Directors | • The annual meeting was held in New York, New York. |
| 58 | November 30, 2000 – Old Werner Minutes of the Regular Quarterly Meeting of the Board of Directors | • The quarterly meeting was held in New York, New York. |
| 59 | March 9, 2001 – Old Werner Minutes of the Regular Quarterly Meeting of the Board of Directors | • The quarterly meeting was held in New York, New York. |
| 60 | May 15, 2001 – Old Werner Minutes of the Annual Meeting of Shareholders | • The annual shareholders' meeting was held in New York, New York. |
| 61 | May 15, 2001 – Old Werner Minutes of the Annual Meeting of the Board of Directors | • The annual meeting was held in New York, New York. |
| 62 | March 27, 2002 – Old Werner Notice of Special Meeting of the Board of Directors | • Special meeting scheduled for April 3, 2002 in New York, New York. |
| 63 | April 3, 2002 – Old Werner Minutes of the Annual Meeting of Shareholders | • The annual shareholders' meeting was held in New York, New York. |
| 64 | April 3, 2002 – Old Werner Minutes of the Annual Meeting of the Board of Directors | • The annual meeting was held in New York, New York. |
| 65 | April 9, 2003 – Old Werner Minutes of the Annual Meeting of Shareholders | • The annual shareholders' meeting was held in New York, New York. |
| 66 | April 9, 2003 – Old Werner Minutes of the Annual Meeting of the Board of Directors | • The annual meeting was held in New York, New York. |

**ATTACHMENT A – A Listing of Documents and Summary of Contents Relating to Venue and Jurisdiction**

| Ex. | Document Name | Summary of Contents Pertaining to New York and Jurisdiction |
|---|---|---|
| 67 | May 14, 2004 – Old Werner Minutes of the Annual Meeting of the Board of Directors | • The annual meeting was held in New York, New York. |
| 68 | May 5, 2005 – Old Werner Minutes of the Annual Meeting of Shareholders | • The annual shareholders' meeting was held in New York, New York. |
| 69 | May 5, 2005 – Old Werner Minutes of the Annual Meeting of the Board of Directors | • The annual meeting was held in New York, New York.  The board of directors discussed and considered the 2005 Refinancing. |
| 70 | April 24, 2006 – Old Werner Special Meeting of the Board of Directors | • The special meeting was held at Rothschild, Inc.'s office in New York, New York. |
| 71 | May 11, 2006 – Old Werner Notice of Annual Meeting of the Board of Directors | • Annual meeting scheduled for May 16, 2006 in New York, New York. |

**Other Sample Contacts**

| Ex. | Document Name | Summary of Contents Pertaining to New York and Jurisdiction |
|---|---|---|
| 72 | Communication with lenders after the 2003 Shareholder Cashout | • Letter sent to Neil R. Boylan of JPMCB in New York, New York as agent for the senior secured lenders pursuant to section 8.2(d) of the Credit Agreement. |
| 73 | Willkie Farr & Gallagher LLP retention agreement dated March 22, 2005 | • Willkie Farr & Gallagher, located in New York, New York, is retained as Old Werner's restructuring counsel. |

EXHIBIT 1

WORKING GROUP LIST
PROJECT STEP-UP
INDEX

| Company | Page |
|---|---|
| Werner Holding Co. (PA), Inc. | 1 |
| Werner Co. - Chicago | 2 |
| Goldman, Sachs & Co. | 3-4 |
| Cohen & Grigsby, P.C. | 5 |
| Skadden, Arps, Slate, Meagher & Flom | 6-7 |
| Ernst & Young LLP | 8 |
| Ansel M. Schwartz, Attorney at Law | 9 |
| McDermott, Will & Emery | 10 |
| The Benefits Department | 11 |
| Baker & McKenzie | 12 |
| Investcorp International Inc. | 13 |
| Coopers & Lybrand | 14 |
| Gibson, Dunn & Crutcher | 15-16 |
| Marsh & McLennan, Inc. | 17 |
| Chase Securities Inc. | 18 |
| Merrill Lynch & Co. | 19 |
| Donaldson, Lufkin & Jenrette | 20 |
| White & Case | 21 |
| Cravath, Swaine & Moore | 22 |
| BT Alex, Brown, Incorporated | 23 |

*[Handwritten notes:]*

5/15/96

NCB  Mike McCuen
(216) 576-9401
Kevin Kinska - Pru
(201) 802-4519
David Quababush
(201) 802-6541

## WORKING GROUP LIST
## PROJECT STEP-UP

Werner Holding Co. (PA), Inc.
93 Werner Road
Greenville, PA 16125-9499
Tel: (412) 588-8600

| Contact Name & Title | Business Phone/Fax | Home Phone/Fax | Home Address | E-Mail | Cellular/Portable Phones/Pagers |
|---|---|---|---|---|---|
| Richard L. Werner<br>Chairman of the Board<br>Asst: Darlene M. Green | Tel: (412) 588-2000 ext. 2245<br>Fax: (412) 588-5157<br>Tel: (412) 588-2000 ext. 2379 | Tel: (412) 981-1251<br>Fax: (412) 981-0625<br>Tel: (561) 994-8890<br>Fax: (561) 994-1925 | 561 Richmond Drive<br>Sharon, PA 16146<br>3405 NW 51st Place<br>Boca Raton, FL 33496 | rlwerner@wernerco.com | car: (412) 866-7652<br>car: (561) 271-5670 |
| Donald M. Werner<br>President & CEO<br>Asst: Chris Bebech | Tel: (412) 588-2000 ext. 2312<br>Fax: (412) 588-6550<br>Tel: 588-2000 ext. 2212 | Tel: (412) 981-1250<br>Fax: (412) 346-2665<br>Tel: (561) 997-2535<br>Fax: (561) 997-2534 | 770 Woodlawn Drive<br>Hermitage, PA 16148<br>2512 Coco Plum Blvd, #1302<br>Bridgepointe, Broken Sound<br>Boca Raton, FL 33496 | dmwerner@wernerco.com | car: (412) 866-6750<br>portable: (412) 866-6733<br>car: (561) 289-0483<br>car: (561) 289-8555 |
| Howard L. Sloat<br>Exec. VP & COO<br>Asst: Darlene M. Green | Tel: (412) 588-2000 ext. 2415<br>Fax: (412) 588-5157<br>Tel: (412) 588-2000 ext. 2379 | Tel: (412) 983-0947 | 3305 McConnell Road<br>Hermitage, PA 16148 | solothl@wernerco.com | car: (412) 866-7067 |
| Donald W. Resnick<br>CFO<br>Asst: Lisa A. Rhoades | Tel: (412) 588-2000 ext. 2732<br>Fax: (412) 588-0718<br>Tel: (412) 588-2000 ext. 2744 | Tel: (561) 998-8186<br>Fax: (561) 998-8186<br>Tel: (941) 352-6751<br>Fax: (941) 352-2837 | 1449 Winterberry Court<br>Hermitage, PA 16148<br>5852 Jameson Drive<br>Naples, FL 34119<br>3422 NW 51st Place<br>Boca Raton, FL 33496 | rasnidw@wernerco.com | car: (412) 866-1638<br>portable: (412) 866-1637 |
| Eric J. Werner<br>General Counsel<br>Asst: Paula A. Larsen | Tel: (412) 588-2000 ext. 2205/2489<br>Fax: (412) 588-0619<br>Tel: (412) 588-2000 ext. 2283/2738 | Tel: (412) 342-2222<br>Fax: (412) 342-0399 | 705 Westminster Road<br>Hermitage, PA 16148 | ejwerner@wernerco.com | car: (412) 866-5280<br>portable: (412) 866-5180<br>pager: (888) 843-2814 |
| Geoffrey R. Hartenstein<br>Senior Counsel<br>Asst: Lisa L. Pitner | Tel: (412) 588-2000 ext. 2639/2660<br>Fax: (412) 589-5899<br>Tel: (412) 588-2000 ext. 2637/2658 | Tel: (412) 962-8113 | 1271 Foxwood Drive<br>Hermitage, PA 16148 | grhartenstein@wernerco.com | car: (412) 866-6273 |
| Wendy A. Meikle<br>Legal Administration Supervisor<br>Asst: Lisa L. Pitner | Tel: (412) 588-2000 ext. 2641/2661<br>Fax: (412) 589-5898<br>Tel: (412) 588-2000 ext. 2637/2658 | Tel: (330) 876-5301 | 5075 Gardner Barclay Road<br>Fairindale, OH 44417 | wameikle@wernerco.com | car: (330) 502-3346 |

Draft: October 22, 1997

WORKING GROUP LIST
PROJECT STEP-UP

Werner Co.
10800 West Belmont Avenue
P. O. Box 446
Franklin Park, IL 60131
Tel: (847) 455-9450

| Contact Name & Title | Business Phone/Fax | Home Phone/Fax | Home Address | E-Mail | Cellular/Portable Phones/Pagers |
|---|---|---|---|---|---|
| Robert I. Werner Vice-Chairman | | Tel: (847) 272-6814 Fax: (847) 272-5823 | 305 Buckthorn Circle Northbrook, IL 60062 | riwerner@wernerco.com | car: (847) 917-5660 |
| Michael E. Werner President (Werner Ladder Co.) Asst: Linda Kandra | Tel: (412) 588-2000 ext. 2459 | Tel: (305) 935-1697 Fax: (305)-931-8075 | 3000 Island Blvd, #3001 Williams Island, FL 33160 | | car: (305) 282-1697 |
| Craig R. Werner General Manager (Werner Co. Chicago Div.) Asst: Diane Toysar | Tel: (847) 455-8001 ext. 421 | Tel: (312) 944-7990 Fax: (312) 944-8131 | 33 E. Bellevue Place, #2W Chicago, IL 60611 | mewerner@wernerco.com | car: (312) 343-9450 portable: (412) 698-1626 pager: (800) 393-1592 |
| | Tel: (847) 455-8001 ext. 250 | Tel: (847) 615-0174 | 1055 Old Barn Lane Lake Forest, IL 60045 | crwerner@wernerco.com | car: (847) 404-0017 |
| Bruce D. Werner General Manager (Werner Extruded) | Tel: (847) 455-8001 ext. 211 | | | | |
| Michael J. Solot National Manager (Werner Ladder Co.) | Tel: (847) 455-8001 ext. 370 | Tel: (847) 317-0423 Fax: (847) 840-8933 | 90 Oakwood Lane Lincolnshire, IL 60069 | bdwerner@wernerco.com | car: (847) 651-9246 |
| | Tel: (847) 455-8001 ext. 213 | Tel: (773) 325-2239 Fax: (773) 325-2232 | 2855 North Mildred, Apt. 2N Chicago, IL 60657 | solotmj@wernerco.com | car: (312) 972-6439 pager: (800) 313-5603 |

Draft: October 22, 1997

**WORKING GROUP LIST**
**PROJECT STEP-UP**

Goldman, Sachs & Co.
4900 Sears Tower
Chicago, IL 60605
Tel: (312) 902-1000

Goldman, Sachs & Co.
85 Broad Street
New York, NY 10004
Tel: (212) 902-1000

| Contact Name & Title | Business Phone/Fax | Home Phone/Fax | Home Address | E-Mail | Cellular/Portable Phones/Pagers |
|---|---|---|---|---|---|
| **Investment Banking Services - Chicago** | | | | | |
| Fred P. Wich<br>Vice President<br>Asst: Karen Glasgow | Tel: (312) 655-6043<br>Fax: (312) 655-5521<br>Tel: (312) 655-4894 | Tel: (847) 328-4481<br>Fax: (847) 328-5039 | 2848 Sheridan Place<br>Evanston, IL 60201 | fpwich@gs.com | |
| **Mergers & Acquisitions - New York** | | | | | |
| Mac Heller<br>Managing Director<br>Asst: Margaret Langan | Tel: (212) 902-5556<br>Fax: (212) 357-4449<br>Tel: (212) 902-5509 | Tel: (203) 869-6796<br>Fax: (203)-869-1449 | 21 Brynwood Lane<br>Greenwich, CT 06831 | smheller@gs.com | |
| Kevin A. Quinn<br>Vice President<br>Asst: Arlene Rivera | Tel: (212) 902-6868<br>Fax: (212) 357-4449<br>Tel: (212) 902-2715 | Tel: (908) 789-2385 | 618 Highland Avenue<br>Westfield, NJ 07090 | kaquin@gs.com | |
| Michael Z. Rabin<br>Vice President<br>Asst: Phyllis Junick | Tel: (212) 902-4267<br>Fax: (212) 357-4449<br>Tel: (212) 902-2095 | Tel: (203) 656-0272<br>Fax: (203) 655-1755 | 8 Nickerson Lane<br>Darien, CT 06820 | michael.rabin@gs.com | |
| Lisa M. Price<br>Associate<br>Asst: Lisa Manfredi | Tel: (212) 902-6744<br>Fax: (212) 357-4449<br>Tel: (212) 902-5515 | Tel: (201) 459-9162<br>Fax: (201) 459-9162 | 1008 Garden Street #4<br>Hoboken, NJ 07030 | lmprice@gs.com | |
| Michael N. Flanagan<br>Associate<br>Asst: Michelle McGuire | Tel: (212) 902-2422<br>Fax: (212) 357-4449<br>Tel: (212) 902-5527 | | 235 2nd Avenue<br>Apt. 5A<br>New York, NY 10003 | michael.flanagan@gs.com | |
| **Corporate Finance - New York** | | | | | |
| Mike R. Lynch<br>Managing Director<br>Asst: Theresa Foley | Tel: (212) 902-8116<br>Fax: (212) 357-1500<br>Tel: (212) 902-0425 | Tel: (212) 593-2965 | 435 E. 52nd Street<br>Apt. 8A<br>New York, NY 10022 | mrlynch@gs.com | |
| **Investment Banking Services** | | | | | |
| Ardi Perponis<br>Vice President | Tel: (212) 902-3122<br>Fax: (212) 357-1500 | Tel: (212) 535-3922 | 360 East 65th Street<br>Apt. 11B<br>New York, NY 10021 | | |
| **Leveraged Finance** | | | | | |
| Christopher H. Turner<br>Vice President | Tel: (212) 902-0256<br>Fax: (212) 357-1500 | Tel: (212) 486-0952 | 116 East 83rd Street<br>Apt. 8B<br>New York, NY 10021 | | |
| Chris Kojima<br>Vice President | Tel: (212) 902-0910<br>Fax: (212) 357-1500 | Tel: (212) 861-7949 | 201 East 69th Street<br>Apt. 11G<br>New York, NY 10021 | | |

Draft: October 22, 1997

WORKING GROUP LIST
PROJECT STEP-UP

| Contact Name & Title | Business Phone/Fax | Home Phone/Fax | Home Address | E-Mail | Cellular/Portable Phones/Pagers |
|---|---|---|---|---|---|
| Jennifer Tye<br>Analyst | Tel: (212) 902-3124<br>Fax: (212) 357-1500 | Tel: (212) 586-9748 | 211 West 56th Street<br>Apt. 6F<br>New York, NY 10019 | | |
| High Yield Capital Markets<br>Tom Connolly<br>Vice President | Tel: (212) 902-2576<br>Fax: (212) 902-3000 | Tel: (212) 724-9185 | 145 West 67th Street<br>Apt. 38D<br>New York, NY 10023 | | |

Draft: October 22, 1997

WORKING GROUP LIST
PROJECT STEP-UP

| Contact Name & Title | Business Phone/Fax | Home Phone/Fax | Home Address | E-Mail | Cellular/Portable Phones/Pagers |
|---|---|---|---|---|---|
| Cohen & Grigsby, P.C.<br>2900 CNG Tower<br>625 Liberty Avenue<br>Pittsburgh, PA 15222 | | | | | |
| Charles C. Cohen<br>Esquire | Tel: (412) 394-4800<br>Fax: (412) 391-3382 | Tel: (412) 441-0879 | 3 Shady Court<br>Pittsburgh, PA 15232 | ccohen@cohenlaw.com | car: (412) 298-4646 |
| Daniel L. Wessels<br>Esquire | Tel: (412) 394-4985<br>Fax: (412) 391-3382 | Tel: (412) 741-7155 | Newbury Lane<br>Sewickley, PA 15143 | dwessels@cohenlaw.com | car: (412) 427-2658 |
| Data Room | Tel: (412) 394-0652 | | | | |

Draft: October 22, 1997

# WORKING GROUP LIST
## PROJECT STEP-UP

Skadden, Arps, Slate, Meagher & Flom
LLP
919 Third Avenue
New York, NY 10022

Skadden, Arps, Slate, Meagher
& Flom LLP
333 West Wacker Drive
Chicago, IL 60606-1285

| Contact Name & Title | Business Phone/Fax | Home Phone/Fax | Home Address | E-Mail | Cellular/Portable Phones/Pagers |
|---|---|---|---|---|---|
| **Corporate - New York** | | | | | |
| Roger S. Aaron Esquire | Tel: (212) 735-3300 Fax: (212) 735-2247 | Tel: (212) 717-1539 Fax: (212) 288-3662 | 785 Park Avenue New York, NY 10021 | raaron@skadden.com | |
| David J. Friedman Esquire | Tel: (212) 735-2218 Fax: (212) 735-2000 Fax: (212) 735-3625 (<20 pages) | Tel: (212) 595-6897 | 201 West 70th Street Apt. 20E New York, NY 10023 | dfriedma@skadden.com | |
| Keith E. Gottfried Esquire | Tel: (212) 735-3717 Fax: (212) 735-2394 | Tel: (212) 427-0945 | 175 East 96th Street Apt. 22G New York, NY 10128 | kgottfri@skadden.com | |
| **Antitrust - New York** | | | | | |
| Neal R. Stoll Esquire | Tel: (212) 735-3660 Fax: (212) 735-2000 | Tel: (914) 238-8095 Fax: (914) 238-1346 | 49 Valley View Chappaqua, NY 10514 | nstoll@skadden.com | |
| **Employee Benefits - New York** | | | | | |
| Neil M. Leff Esquire | Tel: (212) 735-3269 Fax: (212) 735-3628 | Tel: (914) 723-8977 Fax: (914) 723-4251 | 29 Haverford Avenue Scarsdale, NY 10583 | | |
| Anne Beckman Esquire | Tel: (212) 735-2155 Fax: (212) 735-2000 Fax: (212) 735-3593 (<15 pages) | Tel: (212) 362-3462 | 211 Central Park West Apt. 5J New York, NY 10024 | abeckman@skadden.com | |
| **Tax - New York** | | | | | |
| Diana Lopo Esquire | Tel: (212) 735-3475 Fax: (212) 735-2000 Fax: (212) 735-3608 (<10 pages) | Tel: (212) 260-8198 Fax: (212) 260-9812 | 112 East 19th Street Apt. 9R New York, NY 10003 | dlopo@skadden.com | |
| Dean S. Shulman Esquire | Tel: (212) 735-2008 Fax: (212) 735-2000 Fax: (212) 735-3873 (<10 pages) | Tel: (212) 327-0014 | 401 East 74th Street Apt. 10D New York, NY 10021 | dshulman@skadden.com | |
| Jonathan L. Koslow Esquire | Tel: (212) 735-2810 Fax: (212) 735-2000 Fax: (212) 735-2778 (<10 pages) | Tel: (212)876-6865 | 40 East 88th Street New York, NY 10128 | jkoslow@skadden.com | |
| **Chicago** | | | | | |
| Gordon Wright Esquire | Tel: (312) 407-0969 Fax: (312) 407-0411 | Tel: (312) 902-3639 | 555 West Madison Tower III Chicago, IL 60611 | gowright@skadden.com | |

WORKING GROUP LIST
PROJECT STEP-UP

| Contact Name & Title | Business Phone/Fax | Home Phone/Fax | Home Address | E-Mail | Cellular/Portable Phones/Pagers |
|---|---|---|---|---|---|
| Marsha Sherry Paralegal | Tel: (312) 407-0700 Fax: (312) 407-0411 | | | | |
| Data Room | Tel: (312) 407-0541 | | | | |

Draft: October 22, 1997

WORKING GROUP LIST
PROJECT STEP-UP

| Contact Name & Title | Business Phone/Fax | Home Phone/Fax | Home Address | E-Mail | Cellular/Portable Phones/Pagers |
|---|---|---|---|---|---|
| **Ernst & Young LLP**<br>1300 Huntington Building<br>925 Euclid Avenue<br>Cleveland, OH 44115-1405 | | | | | |
| <u>Audi</u><br>C. Lee Thomas<br>Partner | Tel: (216) 861-8846<br>Fax: (216) 861-2595 | Tel: (440) 449-4232 | 5319 Sebastian Court<br>Highland Heights, OH 44143 | | |
| Todd A. Trehan<br>Senior Manager | Tel: (216) 737-1540<br>Fax: (216) 861-2013 | Tel: (330) 637-8509 | P.O. Box 485<br>241 Fox Run Drive<br>Cortland, OH 44410 | | |
| William M. Ganger, Jr.<br>Senior Manager | Tel: (216) 737-1535<br>Fax: (216) 861-2013 | Tel: (440) 247-0457 | 194 Low Street<br>Cleveland, OH 44022 | | |

Draft: October 22, 1997

WORKING GROUP LIST
PROJECT STEP-UP

| Contact Name & Title | Business Phone/Fax | Home Phone/Fax | Home Address | E-Mail | Cellular/Portable Phones/Pagers |
|---|---|---|---|---|---|
| Ansel M. Schwartz Attorney at Law<br>425 North Craig Street<br>Suite 301<br>Pittsburgh, PA 15213<br><br>Ansel M. Schwartz (Intellectual Property)<br>Esquire | Tel: (412) 621-9222<br>Fax: (412) 621-8640 | Tel: (412) 363-6633<br>Fax: (412) 441-7787 | 1321 Beechwood Blvd.<br>Pittsburgh, PA 15217 | ams2100@aol.com | car: (412) 848-5212 |

Draft: October 22, 1997

## WORKING GROUP LIST
### PROJECT STEP-UP

*old address* (handwritten)

| Contact Name & Title | Business Phone/Fax | Home Phone/Fax | Home Address | E-Mail | Cellular/Portable Phones/Pagers |
|---|---|---|---|---|---|
| McDermott, Will & Emery<br>1850 K Street N.W.<br>Washington, D.C. 20006<br>Raymond A. Jacobsen (Antitrust)<br>Esquire | Tel: (202) 778-8028<br>Fax: (202) 778-3735 | Tel: (703) 823-3259 | 4205 Maple Tree Court<br>Alexandria, VA 22304 | rajacobsen@mwe.com | |

Draft: October 22, 1997

**WORKING GROUP LIST**
**PROJECT STEP-UP**

| Contact Name & Title | Business Phone/Fax | Home Phone/Fax | Home Address | E-Mail | Cellular/Portable Phones/Pagers |
|---|---|---|---|---|---|
| The Benefits Department<br>900 Fifth Avenue<br>Pittsburgh, PA 15219<br><br>Hollis T. Hurd (ERISA/Employee Benefits)<br>Esquire | Tel: (412) 471-9924<br>Fax: (412) 471-9925 | Tel: (412) 681-6085 | 406 Schenley Road<br>Pittsburgh, PA 15217 | hhurd@bendept.com | pager: (800) 759-7243<br>ph 8555464 |

(412) 401 - 3332

Draft: October 22, 1997

WORKING GROUP LIST
PROJECT STEP-UP

| Contact Name & Title | Business Phone/Fax | Home Phone/Fax | Home Address | E-Mail | Cellular/Portable Phones/Pagers |
|---|---|---|---|---|---|
| Baker & McKenzie<br>805 Third Avenue<br>New York, NY 10022<br><br>Brett L. Gold<br>Esquire | Tel: (212) 751-5700<br>Fax: (212) 759-9133 | Tel: (718) 855-7517 | 75 Livingston Street, 11E<br>Brooklyn, NY 11201 | brett.l.gold@bakernet.com | |

Draft: October 22, 1997

WORKING GROUP LIST
PROJECT STEP-UP

| | | | Coopers & Lybrand | Coopers & Lybrand | Coopers & Lybrand | Coopers & Lybrand | Coopers & Lybrand |
|---|---|---|---|---|---|---|---|
| | | | 1301 Avenue of the Americas | One Canterbury Green | 203 North LaSalle Street | 1 Sylvan Way | 2400 Eleven Penn Center |
| | | | New York, NY 10019 | P.O. Box 10108 | Chicago, IL 60601 | Parsippany, NJ 07054 | Philadelphia, PA 19103-2952 |
| | | | Tel: (212) 259-1000 | Stamford, CT 06904-2108 | Tel: (312) 701-5500 | Tel: (201) 829-9000 | Tel: (215) 963-8000 |
| | | | Fax: (212) 259-1325 | Tel: (203) 326-8400 | Fax: (312) 701-6533 | Fax: (201) 829-9313 | Fax: (215) 963-8700 |
| **Contact Name & Title** | **Business Phone/Fax** | **Home Phone/Fax** | **Home Address** | **E-Mail** | **Cellular/Portable Phones/Pagers** | | |
| _Financial Advisory_ | | | | | | | |
| Franklin J. Rudd, Partner, New York, Room 7-108 | Tel: (203) 326-8467, Fax: (203) 977-3148, Tel: (212) 259-3448, Fax: (212) 259-4999 | Tel: (203) 967-9080 | 2700 Bedford St., Unit Q, Stamford, CT 06905 | | | | |
| Nick Peros, Manager | Tel: (212) 259-2390, Fax: (212) 259-5417 | | 158-16 Sanford Avenue, Apt. 4A, Flushing, NY 11358 | | | | |
| Rob Ernst, Manager | Tel: (212) 259-3237, Fax: (212) 259-5417 | Tel: (201) 612-1335 | 481 Lafayette Avenue, Wyckoff, NJ 07481 | | | | |
| Dave Indelicato, Senior Associate | Tel: (212) 259-4747, Fax: (212) 259-5417 | Tel: (914) 833-9012 | 1815 Palmer Avenue, Apt. #3V, Larchmont, NY 10538 | | | | |
| _Human Resources_ | | | | | | | |
| Peter W. Gehrich | Tel: (212) 259-1656, Fax: (212) 259-4048 | Tel: (516) 742-7520 | 33 Easton Road, Garden City, NY 11530 | | | | |
| _Acquisition Finance_ | | | | | | | |
| Avery Tuchman, Senior Associate | Tel: (212) 259-4230, Fax: (212) 259-5417 | | 3 Franklin Court, East Brunswick, NJ 08816 | | | | |
| _Tax_ | | | | | | | |
| Ian Schachter, Partner | Tel: (212) 259-1370, Tel: (212) 259-4731 | Tel: (914) 834-3045 | 17 Stuyvesant Avenue, Larchmont, NY 10538 | | | | |
| William Gentilesco, Manager | Tel: (973) 829-9229, Fax: (973) 829-9315 | Tel: (973) 292-0495 | 30 Elm Street, Morristown, NJ 07960 | | | | |
| Janet Schabhut, Sr. Associate | Tel: (212) 259-3679, Fax: (212) 259-5251 | Tel: (212) 582-3880 | 75 West End Avenue #R3F, New York, NY 10023 | | | | |
| _Insurance/Risk Management_ | | | | | | | |
| Cathy McKeon, Partner | Tel: (212) 259-1844, Fax: (212) 259-4057 | Tel: (212) 832-8919, Tel: (732) 613-6095 | 430 East 56th Street, #5B, New York, NY 10022 | | | | |

Draft: October 22, 1997

**WORKING GROUP LIST**
**PROJECT STEP-UP**

| Contact Name & Title | Business Phone/Fax | Home Phone/Fax | Home Address | E-Mail | Cellular/Portable Phones/Pagers |
|---|---|---|---|---|---|
| Gibson, Dunn & Crutcher 200 Park Avenue New York, NY 10166-0193 Tel: (212) 351-4000 Fax: (212) 351-4035 | Gibson, Dunn & Crutcher 1050 Connecticut Avenue NW Washington, DC 20036 Tel: (202) 955-8500 Fax: (202) 467-0539 | Gibson, Dunn & Crutcher 1801 California Street Suite 4100 Denver, CO 80202 Tel: (303) 298-5700 Fax: (303) 296-5310 | Gibson, Dunn & Crutcher 1717 Main Street Suite 5400 Dallas, TX 75201-7390 Tel: (214) 698-3100 Fax: (214) 698-3400 | | |
| **Corporate** E. Michael Greaney - New York Partner | Tel: (212) 351-4065 Fax: (212) 351-4035 | Tel: (203) 966-0023 | 93 Adams Lane New Canaan, CT 06840 | | portable: (917) 226-2852 |
| Richard M. Russo - Denver | Tel: (303) 298-5715 Fax: (303) 220-7599 | Tel: (303) 220-7553 | 5555 South Steele Street Greenwood Village, CO 80121 | | |
| Lawson M. Vicario - New York | Tel: (212) 351-3814 Fax: (212) 351-4035 | Tel: (914) 395-1439 | 392 Third Avenue Apt. #2 Brooklyn, NY 11215 | | |
| Dylan K. Remley - New York Associate | Tel: (212) 351-3855 Fax: (212) 351-4035 | Tel: (914) 395-1439 | 294 Bronxville Road Apt. #6F Bronxville, NY 10708 | | |
| **Management Agreements** David B. Rosenauer - New York Partner | Tel: (212) 351-3853 Fax: (212) 351-4035 | Tel: (212) 353-9309 Fax: (212) 353-9513 | 115 4th Avenue, #8F New York, NY 10003 | | portable: (917) 855-5442 |
| Michelle Herschkowitz - New York Associate | Tel: (212) 351-4040 Fax: (212) 351-5245 | Tel: (212) 410-6732 | 1160 3rd Avenue, #5J New York, NY 10028 | | |
| **Real Estate** Kimmarie Sinatra - New York Partner | Tel: (212) 351-3865 Fax: (212) 351-4035 | Tel: (201) 443-0497 Fax: (201) 443-0498 | Blue Mill Road Morristown, NJ 07960 | | |
| **Bank Agreements/Finance** Janet L. Vance - New York Partner | Tel: (212) 351-3854 Fax: (212) 351-4035 | Tel: (212) 627-2888 | 247 West 12th Street, #1B New York, NY 10014 | | |
| Annabel S-Y Fan - New York Associate | Tel: (212) 351-4045 Fax: (212) 351-4035 | Tel: (212) 750-2373 | 200 East 58 Street, #16B New York, NY 10022 | | |
| Duncan O'Brien - New York | Tel: (212) 351-3951 Fax: (212) 351-4035 | Tel: (212) 831-1319 | 1080 Fifth Avenue, #5A New York, NY 10128 | | |
| Susan K. Zamzow - New York | Tel: (212) 351-3881 Fax: (212) 351-4035 | Tel: (212) 779-1358 | 445 Fifth Avenue, #21B New York, NY 10016 | | |

Draft: October 22, 1997

WORKING GROUP LIST
PROJECT STEP-UP

| Contact Name & Title | Business Phone/Fax | Home Phone/Fax | Home Address | E-Mail | Cellular/Portable Phones/Pagers |
|---|---|---|---|---|---|
| 144A Offering<br>Joerg H. Esdorn - New York | Tel: (212) 351-3851<br>Fax: (212) 351-4035 | Tel: (914) 921-3595<br>Fax: (914) 921-0199 | 16 Maple Drive<br>Rye, NY 10580 | | |
| Anthony L. Wolk - New York<br>Associate | Tel: (212) 351-4098<br>Fax: (212) 351-4035 - general<br>Fax: (212) 351-5301 - direct | Tel: (212) 697-8962 | 80 Park Avenue, #8E<br>New York, NY 10016 | awolk@gdclaw.com | |
| Todd S. Cohen - New York | Tel: (212) 351-3874<br>Fax: (212)351-4035 | Tel: (212) 545-0164 | 105 Lexington Avenue, #4E<br>New York, NY 10016 | | |

Draft: October 22, 1997

WORKING GROUP LIST
PROJECT STEP-UP

Marsh & McLennan, Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Tel: (212) 345-5000
Fax: (212) 345-4808

J&H Marsh & McLennan, Inc.
One Financial Center
Boston, MA 02111-2651
Tel: (617) 960-5700
Fax: (617) 960-8852

| Contact Name & Title | Business Phone/Fax | Home Phone/Fax | Home Address | E-Mail | Cellular/Portable Phones/Pagers |
|---|---|---|---|---|---|
| Phillip V. Moyles<br>Managing Director | Tel:(212) 345-3896<br>Fax:(212) 345-4618 | Tel:(212) 679-1121 | 7 Park Avenue, Apt. 7D<br>New York, NY 10016 | | |
| Joel B. Brandt<br>Vice President | Tel: (617) 960-5759<br>Tel: (888) 960-5709 ext. 5759<br>Fax: (617) 960-5852 | Tel: (617) 784-0121 | 80 Hampton Road<br>Sharon, MA 02067 | | |

Draft: October 22, 1997

WORKING GROUP LIST
PROJECT STEP-UP

| Contact Name & Title | Business Phone/Fax | Home Phone/Fax | Home Address | E-Mail | Cellular/Portable Phones/Pagers |
|---|---|---|---|---|---|
| Chase Securities Inc.<br>270 Park Avenue<br>New York, NY 10017<br>Tel: (212) 270-4300 | | | | | |
| Acquisition Finance - 4th Fl. | | | | | |
| Douglas V. Traver<br>Managing Director | Tel: (212) 270-1915<br>Fax: (212) 270-1848 | Tel: (203) 655-0245 | 18 Nolen Lane<br>Darien, CT 06820 | | |
| David M. Mallet<br>Vice President | Tel: (212) 270-0335<br>Fax: (212) 270-1848 | Tel: (212) 877-5604 | 525 West End Avenue<br>Apt. 14D<br>New York, NY 10024 | | |
| High Yield - 4th Fl. | | | | | |
| Thomas Walker<br>Managing Director | Tel: (212) 270-0606<br>Fax: (212) 270-0994 | Tel: (212) 260-5337 | 46 West 11th Street<br>New York, NY 10011 | | |
| Lauren L. Camp<br>Vice President | Tel: (212) 270-4980<br>Fax: (212) 270-0994 | Tel: (212) 582-7890 | 124 West 60th Street<br>New York, NY 10023 | | |
| Ellen Mitchell<br>Associate | Tel: (212) 270-3332<br>Fax: (212) 270-0994 | | 555 East 78th Street, #5A<br>New York, NY 10021 | | |
| Kincaid B. Coburn<br>Analyst | Tel: (212) 270-5055<br>Fax: (212) 270-0994 | Tel: (212) 570-4733 | | | |
| Global Syndicated Finance - 5th Fl. | | | | | |
| Ruth Shirlehoff<br>Managing Director | Tel: (212) 270-4334<br>Fax: (212) 270-1063 | Tel: (212) 580-1819 | 545 West End Avenue<br>Apt. 6E<br>New York, NY 10024 | | |

Draft: October 22, 1997

**WORKING GROUP LIST**
**PROJECT STEP-UP**

| Contact Name & Title | Business Phone/Fax | Home Phone/Fax | Home Address | E-Mail | Cellular/Portable Phones/Pagers |
|---|---|---|---|---|---|
| Donaldson Lufkin & Jenrette<br>2121 Avenue of the Stars<br>Suite 3000<br>Los Angeles, CA 90067<br>Tel: (310) 282-6100<br>Fax: (310) 282-6178 | | | | | |
| LBO Coverage<br>Michael K Hooks<br>Managing Director | Tel: (310) 282-6177 | Tel: (310) 286-3110 | 241 S. Linden Drive<br>Beverly Hills, CA 90067 | | |
| David Posnick<br>Vice President | Tel: (310) 282-5031 | Tel: (310) 478-9709 | 1441 Butler Avenue, #10<br>Los Angeles, CA 90025 | | |
| Michael Connolly<br>Vice President | Tel: (310) 282-6189 | Tel: (310) 858-0522 | 128 S. Camden Drive, #207<br>Beverly Hills, CA 90212 | | |
| Edwin Shen<br>Vice President | Tel: (310) 282-6117 | Tel: (310) 478-3847 | 1421 Midvale Avenue, #101<br>Los Angeles, CA 90024 | | |
| Craig Wadler<br>Associate | Tel: (310) 282-5582 | Tel: (310) 553-0607<br>Fax: (310) 553-9729 | 1400 Ambassador Street, #212<br>Los Angeles, CA 90035 | | |

Draft: October 22, 1997

WORKING GROUP LIST
PROJECT STEP-UP

| Contact Name & Title | Business Phone/Fax | Home Phone/Fax | Home Address | E-Mail | Cellular/Portable Phones/Pagers |
|---|---|---|---|---|---|
| White & Case<br>1155 Avenue of the Americas<br>New York, NY 10036<br>Tel: (212) 819-8200<br>Fax: (212) 354-8113<br>Eric L. Berg | (212) 819-8253 | | | | |

Draft: October 22, 1997

## WORKING GROUP LIST
### PROJECT STEP-UP

BT Alex. Brown, Incorporated
One Bankers Trust Plaza - 30th Floor
New York, NY 10006
Tel: (212) 250-2500

| Contact Name & Title | Business Phone/Fax | Home Phone/Fax | Home Address | E-Mail | Cellular/Portable Phones/Pagers |
|---|---|---|---|---|---|
| **Global Finance - 30th Fl.** | | | | | |
| Bruce Tully Managing Director | Tel: (212) 250-3233 Fax: (212) 250-7200 | Tel: (212) 362-2763 | 170 West End Avenue Apt. 28N New York, NY 10023 | | |
| Mitch Goldstein Vice President | Tel: (212) 250-8869 Fax: (212) 250-7200 | Tel: (914) 238-6640 Fax: (914) 234-8721 | 10 Quaker Lane Chappaqua, NY 10514 | | |
| Sean Murphy Associate | Tel: (212) 250-4814 Fax: (212) 250-7200 | . | 200 West 60th Street Apt. 28F New York, NY 10023 | | |
| Mariah Buchweitz Analyst | Tel: (212) 775-8734 Fax: (212) 250-7200 | Tel: (212) 496-7153 | 101 W. 90th Street Apt. 21K New York, NY 10024 | | |
| Adam Duarte Analyst | Tel: (212) 775-9518 Fax: (212) 250-7200 | Tel: (212) 260-4315 Fax: (212) 254-8469 | 301 East 22nd Street Apt. 10E New York, NY 10010 | | |
| **Loan Syndication - 37th Fl.** | | | | | |
| Peter Nolan Vice President | Tel: (212) 775-2603 Fax: (212) 250-1343 | Tel: (914) 921-3871 | 10 Eldridge Place Rye, NY 10580 | | |

Draft: October 22, 1997

# EXHIBIT 2

(Excerpts Only)

# NY Trip

☐ **NY Trip**
1. ○ 7/28/97 11:56p NY trip
2. ○ Key questions to ask
   a. ○ What attracted you to Werner
   b. ○ What expectations do you have of the family and management
   c. ○ How did you think about the capital structure, how would you capitalize the business
      1. ○ How do you evaluate future investment for growth opportunities
   d. ○ What other issues would you need to address later in the process
3. ○ Template
   a. ○ Team
   b. ○ Ownership/Investors
   c. ○ What attracted them to Werner?
   d. ○ Firm Background
   e. ○ Involvement with Company & Managemetn
   f. ○ Capital structure
   g. ○ Potential issues
   h. ○ Returns
   i. ○ Character
   j. ○ Comments
      1. ○ HLS -
      2. ○ DWR
      3. ○ DMW
      4. ○ Kevin
      5. ○ MEW
   k. ○ Invite into second round: initial impressions
      1. ○ DWR -
      2. ○ HLS -
      3. ○ MEW -
      4. ○ DMW-
      5. ○ Kevin -
4. ○ Strategic Guys
5. ○ Exor
   a. ○ Team
      1. ○ Andrea Botta, President
      2. ○ Joe Parzick
      3. ○ Raja Benchekroun
   b. ○ Ownership - Agnelli family
      1. ○ $2 billion in capital
      2. ○ Institionalized - 4th generation
      3. ○ Expect to have the same Corp. structure in 10 years
      4. ○ Stable business
   c. ○ What attracted them to Werner?
      1. ○ Stabale earnings
      2. ○ Built a great company, with a fine brand
      3. ○ Platform opportunity
   d. ○ See their annual report for investments
      1. ○ Riverwood Intl packaging
      2. ○ Lear Corp.
      3. ○ Western Industries - automotive
      4. ○ Reinsurance - several

      *"looking for "Baby Elephant" in Consumer business"*

   e. ○ Involvement
      1. ○ Capital budgeting process
      2. ○ Long-term philosophy
         a. ○ Rather stay private than public
         b. ○ Additional capital as warrented
         c. ○ Don't have same pressures as LBO funds

**Buyer Notes**

1. **Investcor**

   1. **Phone numbers**

      1. Chris Stadler
         1. Home 201-847-8968
         2. office  212-599-4700

   2. **Fri-8/29/97 - 280 Park Ave, 37th Floor,New York , NY**

      1. 212-599-4700 Fax 212-983-7073

      2. Investcor has a CEO & Management Comm made up of 20 people from all over the world

      3. Investcor attendees
         1. Chris Stadler - focus new investments (201-847-8968)
         2. Chris O'Brien - focus new investments
         3. Mamoun Askari - principal
         4. Savio W. ZTung - NY office coordinator and original investor in 1982 - on mgmt comm
         5. Charles J. Philippin - responsible for post-transition transactions - experienced management consultant from Coopers & Lybant

      4. RLW-HLS-DMW

      5. Agenda Items

         1. Werner's view of management structure post-acquistion
            1. time frame for key executives i.e. how long do they want to keep working full time?
            2. co-investment desires for key executives
            3. transition to next generation

         2. Investcorp equity plan
            1. relationship to "private company expense reduction"

         3. Discussion of opportunities beyond the projections
            1. Investcorp's preliminary understanding of cost savings and related capital expenditures.

      6. Review of Family Mgmt
         1. Background of each
         2. Future interest in continuing

# Buyer Notes

1. **AEA**

   1. **Meeting schedules for Mon 9/8 @ 10:30am in NY offices**

      1. DMW spoke to Kevin, then RLW - told Dick to invite HLS

      2. Agenda like Exor, AIP & Investcor
         1. talk about business, people etc
         2. meet all members of AEA group
         3. meet President & Chairman of group Vincent Mai

      3. John Whitehead per Michael Rabin 9/5
         1. Former vice-chairman Goldman Sachs & former Asst Sectry of State (Reagan-Bush admin)
         2. polished guy, wrote book on client server, GS image
      4. Vincient Mai -Chief Exec AEA
         1. 55 yrs old - So African or English
         2. Urban guy -polished -well spoken
         3. will selll us on AEA as an institution
         4. all investors former AEA exec's-from large company corp exec ranks
         5. group of partners less impressive than top 2 guys
         6. will have 2 partners on our board & will not be as smart
         7. will sell us on benefits on being part of AEA portfolio
         8. will ask for recap accounting

2. **Fri -9/5/97 Tel John Goldsmith-Kevin Quinn**

   1. John called Kevin - 1 Hr conversation
   2. Don't have same level of enthusiam that once had

   3. Like the Business & people but hard to see how they can go forward
      1. don't feel good about numbers
         1. appropiateness of adjustments
         2. feel 97 is not sustainable
         3. feel revised EBIDA will be down $9-12 million
         4. feel earnings will be $54 to $57 million
         5. reduced their multiple willing to pay to 7.9
         6. think probable value 7.9 x $55 mil = $435 & could go down to $400
         7. this was from orig bid of $500-540
         8. concern about cost reduction results from capital expenditures if had downturn as we would not have the volume to support investment
         9. accountants studied work papers and are not comfortable with the add-backs
         10. they felt that either Resnick was not telling it right or they are not hearing it right

**Buyer Notes**

1. ° **Questions for Family discussion Sunday 10/5/97 - NY**

   1. ° Should we set salaries at real market or should family members get paid over market?

   2. ° MEW's comment
      1. ° question of quality (paid same as family) vs. equity (paid for position & performance)

   3. ° DMW
      1. ° reviewed Carlo's study using old Cooper & Lybrand study of 92 & ECS Top Management Report 1997/1998 (Discussed with Carlos Sat 10/3)

         1. ° based on durable goods only

         2. ° did not adjust for any other factors

         3. ° did not adjust for Pres of CBU not having full responsibility for all functions such as Mfg, Engr, HR, IS, Financial &Acctg etc - he used one position down like Exec VP

         4. ° did not reflect 25th Percentile or median,only 75th Percentile

            1. ° for people in new positions like a new Pres, should use either 25th

            2. ° median per Carlos

               1. ° fully experienced with full operational responsibilities incl mfg, HR,Engr etc
               2. ° fully satisfactory previous experience in that job on outside or within current company

      2. ° used RLW's study of Watson Wyatt

         1. ° Dick used category of All Organizations excluding Non Profit Organizations
            1. ° vs Carlos which used narrow band in durable goods only
            2. ° use 1996 base and upgraded 4% per year to get 1998 basis

         2. ° Dick used basis for last 3 years

         3. ° Dick used exact sales numbers for each postion

         4. ° adjusted CBU Pres to Exec VP as major focus is on sales, distribution, marketing working with other functional areas of business

      3. ° need a balance to keep family members at fair salary considering

## Buyer Notes

1. ▫ **DMW Comments @ NY Mtg -Financing 10/17**

    1. ▫ Top line current position
        1. ▫ CBU

        | | Sept | | YTD | | For 4th Qtr |
        |---|---|---|---|---|---|
        | | plan | actual | plan | actual | |
        | WLC | $27.5 | $28.9 | $260.7 | $261.1 | will be on plan |
        | WXP | 9.4 | 9.1 | 79.9 | 76.3 | willl be on plan |
        | | $36.9 | $38.0 | $340.6 | $337.4 | |

    2. ▫ Werner Ladder Co

        1. ▫ ladder business ahead of plan

        2. ▫ Focus on delighting customers
            1. ▫ fill rate improvements working
            2. ▫ now 98.4%

        3. ▫ Home Depot
            1. ▫ named Supplier of Year
            2. ▫ run rate over plan - now running over $90 mil
            3. ▫ 98 anticipate $120 mil from mtg with Depot
            4. ▫ planning to double stores by 2001

        4. ▫ Lowes
            1. ▫ Advised of visit to Green & Chi - 3 top exec's

            2. ▫ Greg Wessling presentation review
                1. ▫ reaffirmed relationship with Werner
                2. ▫ focus on sm & med in past - converted stores since 89 to big box
                3. ▫ new forcus on 25 top markets only have 4 stores now - double market potential
                4. ▫ open store every 5 days - 80 yr
                5. ▫ will double stores in 4 or 5 yrs

            3. ▫ Werner presentation
                1. ▫ stimulated new marketing, merch & distribution concepts
                2. ▫ great new sales & mktg team - did great job - new female mktg mgr

                3. ▫ new programs Lowes interested in with Werner
                    1. ▫ VMI for D.C.'s
                    2. ▫ Bar Coded shipment receipts in 6 months
                    3. ▫ Focus on driving Werner Brand
                    4. ▫ Incr adv & point of sale

**Buyer Notes**

*For Eser*

1. **10/20/97 Follow Up Points**

   1. Customer Discussion with Investcorp

      1. DMW to review with MEW
      2. Two customers
         1. Home Depot
         2. Lowes
         3. 
      3. Agreement with Investcorp Chris Stadler 10/17
         1. We can pick the person we want them to speak with
         2. Identify the customer contact and set up the time
         3. Investcorp will submitt the questions
         4. Limit the call to 1/2 hour
         5. We will participate in the call
         6. We should frame the set up for the call "Our new investors want to speak to them"
         7. Schedule the calls for the week of 10/27

   2. DMW to finish on weekend - review with Chris on Tues 10/21
      1. make flight arrangements to Denver on later Continental flight
      2. Arrange Marriott Hotel at Crocker center, Boca - asked Don R to do sat 10/18-he will bring in brochures - made tentitive arrangement for 2 rooms - meeting at 10 am & lunch
      3. Performance targets
      4. options for individuals
      5. bought stock program for non-family mgmt
      6. salary & bonus program for family

   3. Should get 1st draft of Road SHow on Sun 10/19
      1. e-mail to Eric on Sun
      2. review with Chris on Tues
      3. Redraft session in NY Weds
      4. make sure marketing story is correct for road show
      5. make sure it flows and gets the salient info across
      6. we must identify "How we like to talk about areas & what area's

   4. Offering Memorandom -per Fri 10/17 mtg

      1. they will rewrite
         1. hit it with strong marketing-Ladders up front then Extr
         2. reduce amount of copy
         3. downplay WFI (as internal)
         4. summary section - make more focused

**Buyer Notes**

1. **2 Week Nov. 3-14, 1997- Road Show  (DMW)**
   1. Werner Team - DWR,HLS,MEW,DMW - all mtgs & presentations
   2. Investcorp Team -Chris Stadler, Mamoun Askari, Tom Sullivan - varied
   3. Chase - Tom Walker , Ellen Mitchell, Lauren Camp
   4. DLJ - Michael Hooks, Steve Ratner

   5. Events
      1. Presentations to Chase & DLJ sales forces to educate them in selling bonds to investors
      2. Presentation to two Rating agencies - Moody's  (rated us B2 B-)& Standard and Poors (rated us B3 B-)
      3. Large meeting in NY for Banks - about 60 people
      4. Presentations to groups of investors at Breakfast, Lunch and just non food meetings
      5. Presentations to individual investors - one on one type meetings
      6. rough estimates
         1. 32 or 33 meetings
         2. addressed about 160 to 165 people all inclusive

   6. Cities
      1. New York - 3 days
      2. Chicago
      3. Milwaukee
      4. Houston
      5. Minneapolis
      6. Los Angeles
      7. San Mateo
      8. Hartford
      9. Boston
      10. Baltimore
      11. Philadelphia
      12. Denver
      13. Werner Co business w/ inventor in Salt Lake City

   7. Purpose to help Chase & DLJ place $135 million Sr Subordinated Debt in Bonds with key investment firms
      1. final pricing established at 10% coupon interest
      2. Bond due 2007
      3. advised that Road show performance of mgmt team excellent which helped keep interest down to 10% - claimed could have been priced 1/2% higher if not for teams performance which built trust in investors

   4. Met with many large funds such as
      1. Prudential - Neward
      2. Cigna,Phoenix, Aeltus & Mass Mutual -Hartford
      3. Franklin Funds - San Mateo

EXHIBIT 3

| FACSIMILE TRANSMISSION | INVESTCORP |
|---|---|

280 Park Avenue
New York, NY 10017
Telephone: (212) 599-4700
Fax: (212) 983-7073

**TO** : Kevin A. Quinn

COMPANY : Goldman, Sachs & Co.

FAX NO. : (212) 357-4449

FROM : Chris Stadler and Ahmed Fattouh

DATE : July 24, 1997

PRIORITY : Normal

TIME : 6:55 PM

MESSAGE

Attached please find our indication of interest.

We will provide you with our preferred dates for management presentations and data room visits as soon as possible.

*[Handwritten notes:]*

Bharain
— family business (60%)
— streamlined approach
— blue chip companies
   Carnello
   Gucci
   own Falcon

① Middle Eastern
② Longterm view
③ seem to have a good character
④ public market exit

Total number of pages including cover page: 5

To verify receipt or to report any problems, please contact (212) 599-4700 on ext 230.

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via the post. Thank you.

London: INVESTCORP INTERNATIONAL LIMITED, Invescorp House, 48 Grosvenor Street, London W1Y 6DH. Tel: 0171-629-6600 Fax: 0171-499-0371
Bahrain: INVESTCORP BANK E.C., Invescorp House, P.O. Box 5340, Manama, Bahrain. Tel: 532000 Fax: 530816

7/24/97 7:07p

INVESTCORP INTERNATIONAL INC.

# INVESTCORP

280 Park Avenue, 37th Floor
New York, New York 10017
Telephone: (212) 599-4700
Telex: 4976329 INCORP
Fax: (212) 983-7073

Christopher J. Stadler

July 24, 1997

Kevin A. Quinn
Vice President
Goldman, Sachs & Co.
85 Broad Street
New York, New York   10004

Dear Mr. Quinn:

Pursuant to our recent discussions, Investcorp International, Inc., on behalf of Investcorp S.A. ("Investcorp"), is pleased to submit our expression of interest concerning the potential acquisition of Werner Holding Co. (PA), Inc. ("Werner" or the "Company").

We understand that Goldman, Sachs & Co. has been retained to assist in the sale of the Company. In that capacity, you have provided, and we have reviewed, a Confidential Memorandum.

We understand that your transaction procedures require a prospective purchaser to provide an indication of interest in acquiring the Company and that more than one prospective purchaser may be given an opportunity to conduct an in-depth review of the Company. We understand that this expression of interest will be kept confidential by you and the Company.

Subject to the several considerations outlined below and our need to perform a detailed review of the Company, please consider this letter as our expression of interest to acquire all of the outstanding fully-diluted shares of the Company for an aggregate consideration ranging between $475 million and $550 million. Please note that this bid range represents an enterprise valuation for 100% of the Company; however, in the event that a recapitalization is determined to be the optimal transaction structure, we have assumed that sufficient continuing equity ownership may be maintained by the current owners for the transaction to qualify for recapitalization accounting treatment (approximately 10% to 15% of the pro forma equity).

As you would expect, the aggregate consideration paid may be adjusted based on changes in the Company's balance sheet and EBITDA from the levels provided us in the Company's estimates. In addition, our final valuation can only be made after we have the opportunity to meet with the Company's management and review additional information.

London: INVESTCORP INTERNATIONAL LTD, INVESTCORP HOUSE, 65 Brook Street, London W1Y 1YE.   Tel: 071-629 6600   Fax: 071-499-0571
Bahrain: INVESTCORP BANK E.C.. INVESTCORP HOUSE, P.O. Box 5340, Manama, Bahrain.   Tel: 532000   Fax: 530816

7/24/97  7:07p

**INVESTCORP**

You have asked that we provide a description of the contemplated capital structure. Although Investcorp intends to raise a portion of the funding for the transaction through conventional lenders and/or the capital markets at or just prior to closing, due to our substantial resources and capital flexibility, Investcorp has the resources to deliver the entire purchase price at closing. As is typical of Investcorp's transactions, we would expect a conservatively leveraged capital structure including an equity component of over 25%.

We understand that as a result of the indication of interest, we may be given the opportunity to meet the Company's management, tour its facilities and review additional information. Following these visits, we understand that formal acquisition proposals would be made and the acquiring party would be selected.

As you may know, Investcorp and its affiliates are the controlling shareholder of Falcon Building Products Inc. ("Falcon"). We believe that it may be advantageous to pursue a transaction which would involve the combination of Falcon and Werner. We have not yet determined whether or not this would be optimal, and we intend to assess the merits of such a transaction after further due diligence and in conjunction with Werner's management. However, in the event that such a combination is note deemed to be optimal, you should understand that Investcorp is interested in pursuing a potential transaction involving Werner on a stand-alone basis, including a potential recapitalization of Werner.

Our due diligence team is likely to consist of advisors from Coopers & Lybrand and Gibson, Dunn & Crutcher and may include other industry consultants in order to better evaluate the Company's business plan and the industry in which it competes. It is anticipated that we will retain an investment bank to assist us in our due diligence process. We anticipate that the pre-acquisition due diligence process would include (but not be limited to) the following matters:

(1)    Analysis of the Company's audited financial statements.

(2)    An in-depth review of the basis and assumptions used in developing the Company's financial projections.

(3)    Analysis of the Company's historical financial statements by segment

(4)    Evaluation of management.

(5)    Review of the Company's inventory, net fixed assets and other tangible and intangible assets.

(6)    Evaluation of the competitive factors affecting the Company.

(7)    Review of the Company's product development and capital expenditure commitments and projections.

7/24/97  7:07p

INVESTCORP

(8)    Review of relations and arrangements with sources of supply and customers.

(9)    Evaluation of legal affairs, pension liabilities, and any contingent liabilities of the Company including compliance with environmental regulations, if any.

(10)    Satisfaction that there has not occurred any material adverse change in the financial condition or prospects of the Company from the descriptions thereof set forth in the Confidential Memorandum.

(11)    Customary legal review of the Company's corporate records, leases, permits, material agreements, litigation, employee benefits plans and other similar matters.

(12)    Review of the Company's books and records including access to the Company's outside auditors and their work papers.

(13)    Review of the Company's financial performance for the financial year in progress, by segment.

(14)    Review of the relevant tax matters affecting the Company.

(15)    Analysis of and satisfaction with the EBITDA adjustments discussed in the Confidential Memorandum.

Because we are a financial investor and would not wish to be involved in the day-to-day management of the Company, it will be important in our decision to proceed with the transaction to confirm that the key members of operating management are competent and willing to continue generally in their current positions and to manage the Company under its new ownership and enter into employment agreements satisfactory to us. In addition, it would be our intention to invite the senior management of the Company and certain employees to join us as owners of the Company.

Naturally, completion of the transaction will be subject to the negotiation and execution of a definitive agreement containing conventional warranties, covenants and conditions, the completion of due diligence with results satisfactory to us and to obtaining all necessary governmental and third party consents and approvals. It is understood that none of Investcorp or its affiliates or the Company shall have any obligation with respect to the purchase or sale of the stock or assets of the Company except as may be provided in a definitive acquisition agreement.

If all agree to proceed, we would expect that in view of the substantial resources we are prepared to devote to the transaction and the associated costs we will incur, you, the Company, and any other representative of the Company, will not solicit or engage in discussions with other potential acquisition parties after the selection of the winning bidder and during the period commencing with the negotiation of the definitive agreement and thereafter, through the closing.

**INVESTCORP**

Investcorp has a history of investing in companies with a strong market position resulting from a dominant brand name and/or significant market share. We believe that we add value to the companies in which we invest through our philosophy of aggressively providing equity support in order to grow the value of the company. Werner possesses many attractive attributes and as such, we are keenly interested in moving forward as quickly as practicable with a hope of completing an acquisition. If we are invited to undertake a more in-depth review of the Company, we can quickly make arrangements concerning a meeting with the Company's management.

We hope the foregoing represents a satisfactory basis on which to begin work in the near future. We look forward to your response. Should you have any questions regarding this indication of interest, please do not hesitate to contact Mamoun Askari or myself at (212) 599-4700.

Sincerely,

# EXHIBIT 4

(Excerpts Only)

# Werner Holding Co. (PA), Inc.

---

### PROXY STATEMENT
### FOR SPECIAL MEETING OF SHAREHOLDERS
### TO BE HELD ON NOVEMBER 21, 1997

---

This Proxy Statement ("Proxy Statement") is being furnished to the shareholders of Werner Holding Co. (PA), Inc., a Pennsylvania corporation (the "Company" or "Werner"), in connection with the solicitation of proxies by the Board of Directors of the Company (the "Company Board") for use at the Special Meeting of Shareholders to be held on Friday, November 21, 1997, at 10:00 a.m., local time, at the Marriott Hotel, 5150 Town Center Circle, Boca Raton, Florida 33486, and any adjournment or postponement thereof (the "Special Meeting").

At the Special Meeting, shareholders of the Company will be asked to consider and vote upon a proposal to amend and restate the Articles of Incorporation of the Company (as amended and restated, the "Amended Articles") to completely reclassify the Company's capital stock and thereby facilitate the recapitalization transactions (collectively, the "Recapitalization") contemplated by the Recapitalization Agreement, dated as of October 8, 1997 (the "Recapitalization Agreement"), and as amended and restated as of October 27, 1997 (the "Amended Recapitalization Agreement"), by and among the Company and sixteen investors (the "Investors") organized by INVESTCORP S.A., a leading international investment firm ("Investcorp"). As part of the Recapitalization, the Investors will invest approximately $123 million in the Company and the Company will completely reclassify its capital stock, including all of the outstanding shares of its Class A Common Stock, par value $1.00 per share ("Pre-Recapitalization Class A Common Stock"), and its Class B Common Stock, par value $1.00 per share ("Pre-Recapitalization Class B Common Stock") (shares of Pre-Recapitalization Class A Common Stock and Pre-Recapitalization Class B Common Stock are collectively referred to as "Pre-Recapitalization Common Stock"), held by each shareholder. Each share of Pre-Recapitalization Class A Common Stock will be reclassified into a fraction of a retained share of Class A Common Stock, par value $.01 per share ("Post-Recapitalization Class A Common Stock"), and a fraction of a share of newly-authorized Class A-I Common Stock, par value $.01 per share ("Class A-I Common Stock"). Each share of Pre-Recapitalization Class B Common Stock will be reclassified into a fraction of a retained share of Class B Common Stock, par value $.01 per share ("Post-Recapitalization Class B Common Stock"), and a fraction of a share of newly-authorized Class B-I Common Stock, par value $.01 per share ("Class B-I Common Stock"). Class A-I Common Stock and Class B-I Common Stock are collectively referred to as the "Redeemable Shares." Post-Recapitalization Class A Common Stock and Post-Recapitalization Class B Common Stock are collectively referred to as the "Retained Shares." As part of the Recapitalization, each Redeemable Share will be redeemed (the "Redemption") by the Company at a redemption price of $2,421.29 per share (the "Cash Redemption Price"), plus the right to potentially receive additional consideration depending on certain future events, including the future growth in the value of the equity of the Company (the "Market Participation Right"). Copies of the Recapitalization Agreement, as amended and restated as of October 27, 1997, and the form of the Amended Articles are included as Annexes A and D, respectively, to this Proxy Statement. The Recapitalization and related matters are more fully described in this Proxy Statement and the Annexes hereto.

The Recapitalization is expected to be completed on or about November 24, 1997 and, on such date or such other date on which the Recapitalization is consummated (the "Closing Date"), the redemption proceeds will be disbursed to shareholders who have surrendered their share certificates to the Company for cancellation.

A blue Letter of Transmittal with which shareholders of the Company can surrender their certificates representing shares of Pre-Recapitalization Class A Common Stock and Pre-Recapitalization Class B Common Stock and instruct the Company how to pay the cash redemption proceeds shareholders are entitled to pursuant to the Recapitalization is also enclosed with this Proxy Statement. **You are urged to complete such Letter of Transmittal in accordance with the instructions contained therein and return it promptly, along with your**

share certificates and duly executed proxy card, in the enclosed pre-paid return envelope, via Federal Express, to Werner Holding Co. (PA), Inc., 93 Werner Road, Greenville, Pennsylvania 16125-9499, Attention: Eric J. Werner, General Counsel and Corporate Secretary. In the event that the Recapitalization is not consummated, the Company will return as soon as practicable any surrendered certificates. The Company will not pay any redemption proceeds to a shareholder until such shareholder has delivered his Letter of Transmittal and share certificates to the Company. Since the Company will not be paying any interest with respect to the redemption proceeds, shareholders are urged to return their Letter of Transmittal, along with their share certificates, as soon as possible. If you have any questions, please call the Company's General Counsel and Corporate Secretary, Eric J. Werner, at (412) 588-2550.

The Company has made arrangements for Goldman, Sachs & Co. ("Goldman Sachs") to serve as the paying agent with respect to the Redemption. Accordingly, promptly following the Closing, Goldman Sachs, as the Company's agent, will be disbursing to each shareholder who has surrendered their Certificates to the Company for cancellation, together with a duly executed Letter of Transmittal, and such other documents as may be required pursuant to the instructions contained therein, the redemption proceeds such shareholder is entitled to receive pursuant to the Recapitalization Agreement in accordance with the instructions set forth in the Letter of Transmittal. To ensure that you receive the redemption proceeds payable to you promptly following the disbursement thereof, you may open a money market account at Goldman Sachs and, promptly following the Closing, Goldman Sachs will credit the redemption proceeds payable to you to your money market account. You can then direct Goldman Sachs to invest or transfer such proceeds to any other account(s) that you desire. For your convenience, a prospectus relating to such money market account and an account application are enclosed, along with a return envelope addressed to Goldman Sachs. To ensure that your money market account at Goldman Sachs is opened prior to the Closing, your account application must be received by Goldman Sachs no later than November 19, 1997. Please note that you are under no obligation to open any such account, and the failure to open any such account shall not affect your rights to the redemption proceeds. Please note on the Letter of Transmittal whether you will be opening such an account at Goldman Sachs. THE ACCOUNT APPLICATION SHOULD BE RETURNED TO GOLDMAN SACHS USING THE PRE-ADDRESSED RETURN ENVELOPE AND SHOULD NOT BE RETURNED WITH THE LETTER OF TRANSMITTAL AND SHARE CERTIFICATES.

This Proxy Statement and the accompanying form of proxy are first being sent to shareholders of the Company on or about October 29, 1997.

In reviewing this Proxy Statement, shareholders of the Company should carefully consider the matters described under the heading "RISK FACTORS."

No person is authorized to give any information or to make any representations other than those contained or incorporated by reference in this Proxy Statement, and if given or made, such information or representations should not be relied upon as having been authorized by the Company or any of the Investors. This Proxy Statement does not constitute the solicitation of a proxy in any jurisdiction to or from any person to whom or from whom it is unlawful to make such proxy solicitation in such jurisdiction. The delivery of this Proxy Statement shall not, under any circumstances, create any implication that there has been no change in the information set forth herein or in the affairs of the Company or any of the Investors since the date of this Proxy Statement. All information regarding the Investors in this Proxy Statement has been supplied by Investcorp, and all information regarding the Company and its subsidiaries in this Proxy Statement has been supplied by the Company.

THE RECAPITALIZATION IS A COMPLEX TRANSACTION. SHAREHOLDERS OF THE COMPANY ARE STRONGLY URGED TO READ AND CONSIDER CAREFULLY THIS PROXY STATEMENT IN ITS ENTIRETY.

THE SECURITIES WHICH MAY BE DEEMED TO BE ISSUED PURSUANT TO THE RECAPITALIZATION HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROXY STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

The date of this Proxy Statement is October 29, 1997.

# TABLE OF CONTENTS

| | Page |
|---|---|
| FORWARD-LOOKING STATEMENTS | 6 |
| SUMMARY | 7 |
| RISK FACTORS | 13 |
|     Substantial Leverage; Debt Service Obligations; Liquidity | 13 |
|     Restrictive Covenants | 14 |
|     Control of the Company | 14 |
|     Discontinuation of Dividends | 15 |
|     Competition | 15 |
|     Sensitivity to Economic Cycles and Weather Conditions | 15 |
|     Availability and Pricing of Raw Materials | 15 |
|     Dependence on Key Customers | 15 |
|     Environmental Regulation and Proceedings | 16 |
|     Legal Proceedings | 16 |
|     MIICA Investment Portfolio | 16 |
|     Dependence on Key Personnel | 16 |
|     Limitations of Distributions to Shareholders; Creditors' Rights | 17 |
|     Lack of Public Market | 17 |
|     Restrictions on Transferability | 17 |
|     Uncertainties Relating to the Market Participation Right | 17 |
| THE SPECIAL MEETING | 18 |
|     Date, Time and Place | 18 |
|     Purpose of Special Meeting | 18 |
|     Record Date | 18 |
|     Required Votes | 18 |
|     Voting Rights | 18 |
|     Quorum | 19 |
|     Proxies | 19 |
|     Revocation of Proxy | 19 |
|     Voting Agreements | 19 |
|     Solicitation of Proxies | 19 |
|     Other Matters | 19 |
| THE RECAPITALIZATION | 21 |
|     Background of the Recapitalization | 21 |
|     Recommendation of the Company Board and the Company's Reasons for the Recapitalization | 25 |
|     Opinion of the Company's Financial Advisor | 27 |
|     Forward-Looking Financial Information | 31 |
|     Reclassification of Shares; Redemption of Shares | 32 |
|     The Reclassification Ratios | 32 |
|     Purchase and Sale of the Investor Shares | 34 |
|     Procedures for Exchange of Certificates and Receipt of Cash Redemption Price | 34 |
|     Financing of the Recapitalization | 35 |
|     Plans for the Company | 35 |
|     Accounting Treatment | 36 |
|     Appraisal and Dissenters' Rights | 36 |
|     Regulatory Reviews and Approvals | 36 |
| CERTAIN FEDERAL INCOME TAX CONSEQUENCES | 37 |
|     Shareholders' Treatment of Redemption Proceeds | 37 |
|     Market Participation Right | 39 |

| | Page |
|---|---|
| THE RECAPITALIZATION AGREEMENT | 42 |
| General | 42 |
| Closing; Timing of the Recapitalization Transactions | 42 |
| Representations and Warranties | 42 |
| Interim Operations of the Company | 42 |
| No Solicitation | 43 |
| Principal Corporate Offices | 44 |
| Domestic International Sales Corporation | 44 |
| Conditions | 44 |
| Termination | 46 |
| Termination Fee | 46 |
| Guarantee | 47 |
| CERTAIN RELATED AGREEMENTS | 47 |
| Voting Agreements | 47 |
| Shareholder Rights Agreement | 48 |
| CERTAIN ARRANGEMENTS WITH MANAGEMENT | 48 |
| General Benefit Levels | 48 |
| Employment Agreements | 49 |
| Employee Protection Agreements | 49 |
| Restricted Stock | 49 |
| Consulting Agreements | 50 |
| Management Stock Incentive Plan | 50 |
| Management Stock Purchase Agreements and Stock Loan Plan | 50 |
| Directors' and Officers' Indemnification | 50 |
| DESCRIPTION OF COMPANY CAPITAL STOCK | 51 |
| Existing Company Capital Stock | 51 |
| Company Capital Stock Following the Recapitalization | 52 |
| DESCRIPTION OF THE MARKET PARTICIPATION RIGHT | 57 |
| General | 57 |
| Payment | 59 |
| Transferability | 59 |
| Modification of Rights | 59 |
| THE BUSINESS OF THE COMPANY | 60 |
| Overview | 60 |
| Competitive Strengths | 60 |
| Business Strategy | 61 |
| Company History | 62 |
| Industry | 62 |
| Products | 63 |
| Marketing and Distribution | 65 |
| Manufacturing | 65 |
| Competition | 66 |
| Patents, Trademarks and Licenses | 66 |
| Raw Materials and Suppliers | 66 |
| Backlog | 67 |
| Employees | 67 |
| Environmental Matters | 67 |
| Properties | 68 |
| Legal Proceedings | 68 |

4

|                                                                                                           | Page |
|-----------------------------------------------------------------------------------------------------------|------|
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS                      | 69   |
| General                                                                                                   | 69   |
| Results of Operations                                                                                     | 70   |
| Nine Months Ended September 30, 1997 as Compared to Nine Months Ended September 30, 1996                   | 70   |
| Year Ended December 31, 1996 as Compared to Year Ended December 31, 1995                                   | 71   |
| Year Ended December 31, 1995 as Compared to Year Ended December 31, 1994                                   | 72   |
| Liquidity and Capital Resources                                                                           | 73   |
| Capital Expenditures                                                                                      | 74   |
| Seasonality, Working Capital and Cyclicality                                                              | 74   |
| Raw Material Costs and Inflation                                                                          | 74   |
| SUMMARY HISTORICAL AND PRO FORMA FINANCIAL DATA OF WERNER HOLDING CO. (PA), INC.                           | 75   |
| UNAUDITED PRO FORMA CONSOLIDATED CONDENSED FINANCIAL STATEMENTS                                            | 78   |
| MANAGEMENT                                                                                                 | 88   |
| Directors and Executive Officers                                                                          | 88   |
| SECURITY OWNERSHIP FOLLOWING THE RECAPITALIZATION                                                          | 90   |
| THE INVESTORS AND INVESTCORP                                                                               | 91   |
| INDEPENDENT AUDITORS                                                                                       | 91   |
| INDEX TO FINANCIAL STATEMENTS                                                                              | F-1  |

ANNEX A:    AMENDED AND RESTATED RECAPITALIZATION AGREEMENT, DATED AS OF OCTOBER 27, 1997, AMONG WERNER HOLDING CO. (PA), INC. AND THE INVESTORS LISTED THEREIN

ANNEX B:    FORM OF SHAREHOLDER VOTING AGREEMENT, DATED AS OF OCTOBER 8, 1997, AMONG WERNER HOLDING CO. (PA), INC., THE INVESTORS LISTED THEREIN AND CERTAIN OTHER SHAREHOLDERS

ANNEX C:    OPINION OF GOLDMAN, SACHS & CO., DATED AS OF OCTOBER 27, 1997

ANNEX D:    FORM OF AMENDED AND RESTATED ARTICLES OF INCORPORATION OF WERNER HOLDING CO. (PA), INC.

## THE RECAPITALIZATION

**Background of the Recapitalization**

Beginning in early 1996, the Company's management, at the direction of and in frequent consultation with the Company's directors, began to explore various possible strategic alternatives to (i) improve long-term shareholder value, (ii) ensure that the Company had adequate access to capital to fund its growth strategy, including acquisitions and international expansion and (iii) increase the liquidity of the Company's capital stock. These strategic alternatives generally included, among others, an initial public offering or a private placement of shares of the Company's capital stock, the incurrence of additional debt, the establishment of an employee stock ownership plan, a leveraged recapitalization or share repurchase, joint ventures with strategic or financial partners to partially divest various operations and the sale of the Company or parts thereof.

In early 1997, the Company retained Goldman Sachs to serve as its financial advisor and to assist the Company in exploring and assessing various strategic alternatives.

After numerous meetings during which Goldman Sachs reviewed with the Company's management and the Company Board various strategic alternatives available to the Company, the Company Board determined that an initial public offering and certain other strategic alternatives were not likely to provide maximum value for the Company's capital stock, and, in the middle of June 1997, authorized Goldman Sachs to contact various third parties to assess their potential interest in pursuing a transaction with the Company.

In light of the foregoing, on July 3, 1997, the Company sent the following letter to its shareholders:

*Dear Shareholders:*

*The Company has entered its seventy-fifth (75th) year as a family-owned business which is now into the third generation of family leadership. It has established an outstanding market presence and enjoys a prominent position as the world's leading climbing products manufacturer and one of the pre-eminent aluminum extruders. The Company's annual sales and earnings are quite substantial and provide good access to traditional bank debt financing.*

*The Company must continually address its financial needs to support the expansion of sales and operational requirements, to take advantage of business opportunities as well as to try to accommodate shareholder liquidity and estate issues. The continual growth and financial success of the Company magnifies these needs. The more successful the Company becomes, the more valuable is its stock so long as the availability of capital is maintained to sustain such growth. We are no longer certain that we can continue to be assured of appropriate capital availability within the confines of our present structure.*

*The availability of adequate capital to properly finance a dynamically growing business is more restricted for privately-held firms based on prudent debt-to-equity ratios, since the equity portion is funded through retained earnings. In contrast, publicly-owned firms can access the stock markets for additional equity, a route not available to privately-owned firms. Hence, during periods of rapid growth, the privately-owned company is limited in its ability to finance its businesses and in some cases opportunities may have to be foregone. This situation becomes further complicated when shareholder needs are combined with the needs of a dynamically growing company, such as Werner.*

*The Company's senior management and the Board of Directors have continually evaluated the aforesaid concerns for more than a decade. The shareholder aspects have been further intensified in recent years with the death of two major shareholders and the growing number of older shareholders. Several outside experts have and are assisting in the analyses, considerations and deliberations.*

*Recently we have once again examined the capital requirements needed to fund Werner's future growth and maintain its prominent market position and also meet the liquidity and estate considerations of the Company's shareholders. As a result of our strategic review, we have determined the need to explore a strategic*

21

combination with other entities or a possible sale of the Company. There can be no assurance that a specific transaction will result from the initiative we currently have underway. Any significant developments related to this undertaking will be appropriately communicated to you.

In keeping with our past practice we do not intend to make any type of public announcement regarding this matter. This subject should not be discussed outside of the Board, Senior Executives and its shareholders. To do so could impair the value of your shares and possibly injure the Company. Any formal inquiries or questions should be directed to either Donald or Richard Werner.

Any and all actions which may be taken will be with the advice and counsel of various outside advisors including legal counsel. Please be assured that we intend to follow all appropriate legal and fairness requirements in any potential transactions.

We are optimistic about the Company's future and firmly believe that any steps taken will allow the Company to fully capitalize on its attractive growth opportunities. At the time, any undertaking will be designed to enable the shareholders to develop their desired liquidity, estate needs, and maximize share value.

Sincerely,

/s/ Richard L. Werner                          /s/ Donald M. Werner
Richard L. Werner                              Donald M. Werner
Chairman of the Board of Directors             President & CEO

From June 16, 1997 to July 24, 1997, Goldman Sachs was in contact with over 80 United States and foreign companies or groups (including Investcorp) regarding their potential interest in pursuing a transaction with the Company. At the request of the Company, Goldman Sachs did not contact certain direct competitors of the Company. During that same time period, approximately 50 such companies or groups, including Investcorp (the "Preliminary Companies"), signed confidentiality agreements with the Company and were provided with a confidential offering memorandum describing the Company and a letter which described the process the Company intended to conduct. On June 16, 1997, the Company and one of the Investors, on behalf of Investcorp, entered into a confidentiality agreement (the "Confidentiality Agreement") whereby Investcorp agreed, among other things, to keep confidential certain non-public, confidential or proprietary information of the Company furnished to Investcorp by or on behalf of the Company, and to use such information only, for purposes of evaluating a proposed transaction with the Company. The other Preliminary Companies also signed confidentiality agreements with the Company substantially similar to the Confidentiality Agreement.

Each of the Preliminary Companies was requested to submit a letter setting forth its indication of interest to Goldman Sachs by July 24, 1997, specifying, among other things, the price at which it might pursue a transaction, the form of payment, any key issues or assumptions on which its proposal might be based (including any relevant tax or accounting considerations), a description of any required due diligence, a list of any required approvals, a description of the financing required to complete the transaction, whether or not such indication of interest would be subject to financing and the likely timing of the transaction. Over 25 of the Preliminary Companies, including Investcorp, submitted written indications of interest.

Copies of each of the indications of interest that were received were distributed to the Company Board and, at its meeting held on July 25, 1997, the Company Board analyzed and reviewed, with the advice and assistance of the Company's management, Goldman Sachs and the Company's legal advisors, Skadden Arps, Slate, Meagher & Flom LLP ("Skadden Arps") and Cohen & Grigsby, P.C., such indications of interest and various strategic, financial and legal considerations concerning a possible transaction with any of the Preliminary Companies who had submitted indications of interest. At such meeting, the Company Board reviewed and discussed in detail, among other things, the terms of such indications of interest, including the price, form of consideration, structure of proposed transaction and other factors. Goldman Sachs also discussed the status of

22

discussions with other companies or groups who had not yet submitted indications of interest. Based upon, among other things, the terms of each of the Preliminary Company's indication of interest, including the proposed value to be received by the Company's shareholders, the Company Board instructed Goldman Sachs to communicate with more than a dozen of the Preliminary Companies (the "Selected Preliminary Companies") to clarify certain aspects of their indications of interest and, in certain cases, to arrange meetings with certain Company executives and representatives of the Company Board. Shortly thereafter, Goldman Sachs communicated with certain Selected Preliminary Companies to clarify certain aspects of their indications of interest. Goldman Sachs subsequently informed the Selected Preliminary Companies of the Company Board's decision to invite them to participate in the next phase of the process.

Beginning at the end of July 1997, each of the Selected Preliminary Companies that continued to be interested in pursuing a transaction with the Company (the "Final Round Participants") conducted due diligence with respect to the Company. The Final Round Participants were provided with additional access to confidential information, management presentations and tours of the Company's facilities. During this same period, at numerous meetings, in person and by telephone, the Company Board was provided with updates with respect to this process.

On August 20, 1997, Skadden Arps distributed to the Final Round Participants a draft transaction agreement which was soon followed by a letter from Goldman Sachs setting forth the guidelines for submission of formal and definitive proposals and requesting that formal and definitive proposals be submitted to Goldman Sachs no later than September 18, 1997, specifying, among other things, the total amount that would be paid for the Company's outstanding shares, the manner in which such price was determined, anticipated financing plans, any conditions to the proposal and the likely timing of the transaction. The guidelines also requested that proposals be accompanied by a mark-up of the draft transaction agreement that Skadden Arps had previously distributed.

On September 18, 1997, the Company received proposals from several of the remaining Final Round Participants, including Investcorp. Each of the parties submitting proposals requested that the Company negotiate exclusively with it. Copies of such proposals were distributed to each member of the Company Board and, on or about September 19, 1997, the Company Board met to analyze and review, with the advice and assistance of the Company's management and its financial and legal advisors, the terms of the proposals. After full discussion and analysis, it was the determination of the Company Board that the proposal submitted by Investcorp was the proposal most likely to result in a transaction which was in the best interests of the Company, its shareholders and other relevant constituencies. Accordingly, the Company Board requested that Goldman Sachs seek clarification from Investcorp with respect to certain financial aspects of its proposal and, assuming such clarification was satisfactory, the Company Board authorized the Company's management, along with the Company's financial and legal advisors, to commence negotiations with respect to the proposal submitted by Investcorp. Such clarification was obtained on September 26, 1997.

Beginning on September 28, 1997, representatives of the Company's management and its financial and legal advisors met with representatives of Investcorp and its legal advisors at Skadden Arps' offices in New York City to commence negotiations of a definitive transaction agreement. Such negotiations continued in person and by telephone on a continuing basis through October 7, 1997.

On October 6, 1997, the Company Board held a special meeting at the offices of Skadden Arps to analyze and review, with the advice and assistance of its financial and legal advisors, among other things, the terms of a possible transaction with Investcorp as well as the terms of the most recent draft of the Recapitalization Agreement. At such meeting, the Company Board also received presentations from Goldman Sachs as to the final terms of the proposed transaction and its view, expressed orally at such meeting, that, subject to their review of final documentation consistent with their understanding of the proposed Recapitalization, Goldman Sachs believed it would be able to deliver an opinion that the $2,411.98, plus the nontransferable right to receive an additional contingent amount as set forth in Schedule 2 to the Recapitalization Agreement, to be received per Redeemable Share by the holders of Pre-Recapitalization Common Stock pursuant to the Redemption is fair from a financial point of view to the holders of Pre-Recapitalization Common Stock. Following the Company Board's review and discussion of the terms of the transaction, the recommendation of the Company's management that

23

the Company Board approve the transaction, Goldman Sachs' view with respect to its ability to deliver the opinion referred to above (subject to its review of the definitive Recapitalization Agreement) and other relevant factors (see ''THE RECAPITALIZATION—Recommendation of the Company Board and the Company's Reasons for the Recapitalization''), the Company Board, by unanimous vote of all directors, determined that the terms of the Recapitalization Agreement, as described at the meeting, are fair to and in the best interests of the Company and all of its constituencies, including the Company's shareholders, authorized and approved the execution and delivery of the Recapitalization Agreement in substantially the form presented to them, authorized and approved the Amended Articles, determined that the Amended Articles be submitted to a vote of the Company's shareholders, directed that the Amended Articles be submitted to the Company's shareholders for their approval and recommended that such shareholders approve and adopt the Amended Articles.

Through the evening of October 7, 1997, the Company's management, along with the Company's financial and legal advisors, continued negotiations with representatives of Investcorp and its legal advisors to finalize the Recapitalization Agreement.

On October 8, 1997, following the completion of the negotiations, the Company Board held a special telephonic meeting during which time the Company's management, along with the Company's financial and legal advisors, updated the Company Board on the final negotiations. Goldman Sachs also confirmed its view given at the October 6, 1997 meeting of the Company Board with respect to its ability to deliver the opinion referred to above (subject to its review of the definitive Recapitalization Agreement). Following such discussion, the Company Board ratified the terms of the definitive Recapitalization Agreement and the final Amended Articles. Immediately following the conclusion of the meeting of the Company Board, the Company and the Investors executed and delivered the Recapitalization Agreement. The Company and the Investors also executed and delivered a Memorandum of Understanding, dated as of October 8, 1997 (the ''Memorandum of Understanding''), to acknowledge (i) the parties' understanding that the aggregate purchase price to be paid by the Investors for the Investor Shares had been derived from an agreed equity value (the ''Agreed Equity Value'') for the Company of $388.5 million, (ii) that the Agreed Equity Value is subject to a potential upward adjustment pending resolution of certain specific due diligence items and (iii) that the final Agreed Equity Value will be resolved by mutual agreement of the parties no later than the date on which this Proxy Statement is mailed.

On October 8, 1997, the Company mailed a letter to its shareholders describing the basic terms of the transaction.

On the afternoon of October 9, 1997, the Company and Investcorp issued the following joint press release announcing the execution of the Recapitalization Agreement:

*FOR RELEASE at 1:00 PM EST Thursday October 9, 1997*

*WERNER HOLDING CO. (PA), INC. TO RECAPITALIZE; INVESTCORP TO MAKE MAJORITY EQUITY INVESTMENT.*

*Transaction To Give Werner Resources To Support Continued Growth.*

*Werner Family To Continue In Their Current Management Roles And As Major Shareholders Going Forward.*

*GREENVILLE, PA, OCTOBER 9, 1997—Werner Holding Co. (PA), Inc., today announced that they have entered into a definitive agreement regarding a recapitalization of Werner, including a majority equity investment by Investcorp, an international investment firm, and certain of its investor clients. Terms of the transaction were not disclosed.*

*Werner Holding Co. (PA), Inc., through its Werner Co. subsidiary is the premier manufacturer and marketer of ladders and other climbing equipment in the United States, and a leading producer of aluminum extrusions and fabricated components for the auto parts industry. Werner's 1997 revenues are projected to exceed $400 million.*

24

*The transaction will meet certain shareholder needs while giving Werner Co. resources to support its continued growth, capital investment program, new product development, domestic and international market expansion, and enhancements in information technology and other business systems.*

*Founded in 1922, the Company is owned by members of the Werner family. Under the terms of the agreement, Werner management will remain in their positions after the completion of the transaction. In addition, the Company will retain its present operating structure and corporate and brand names.*

*"This transaction will enable our 75 year old business to continue on its growth path and to pursue new, exciting opportunities," said Donald M. Werner, President and CEO of Werner Holding Co. (PA), Inc. "We are delighted to have Investcorp as a partner in the Company, and look forward to benefitting from the firm's experience with a wide range of outstanding companies, from Saks Fifth Avenue and Gucci to Falcon Building Products and Prime Equipment.*

*"As always, our principal goal will be to continue to seek new ways to delight our customers with new products and services offerings," concluded Mr. Werner.*

*"Werner is a company with an excellent, dedicated management team which has achieved a superb growth record," said Christopher J. Stadler, a member of Investcorp's Management Committee. "This transaction is consistent with our strategy to invest in companies that are leaders in their markets, and possess highly recognized brand names and world-class design, engineering and manufacturing capabilities. As is our practice, we will work in partnership with management to continue Werner's strategic growth program and to provide additional resources to enable the Company to achieve its potential."*

*Investcorp was established in 1982. It acts as a principal and an intermediary in international investment transactions. To date, it has completed over 60 transactions with an acquisition value of approximately $9 billion. Investcorp and its clients currently own 14 corporate investments in North America and Europe, including Saks Fifth Avenue, Star Markets, Simmons Company, The William Carter Company, Falcon Building Products, Ebel, Welcome Break and Helley Hansen. Previous investments include Tiffany, Gucci, Circle K, Thorn Lighting and Prime Equipment.*

*Werner Co., headquartered in Greenville, Pennsylvania, is the premier U.S. manufacturer and marketer of climbing equipment. The Company's products include aluminum, fiberglass and wood ladders; scaffolding, stages and planks. In addition, Werner is a leading independent producer of aluminum extrusions and fabricated components for the automotive parts industry and others. It is a pioneer in both aluminum extrusion and fiberglass pultrusion technologies. Werner employs approximately 2,700 people at manufacturing facilities it operates in Greenville, Pennsylvania; Franklin Park, Illinois; Anniston, Alabama and Carrollton, Kentucky.*

As contemplated by the Memorandum of Understanding, the parties agreed on October 27, 1997 to adjust the Agreed Equity Value of the Company from $388.5 million to $390 million, that the Investors should increase their investment in the Company's equity from $114.5 million to $122.5 million, and to reflect such changes, to amend and restate the Recapitalization Agreement as of such date.

## Recommendation of the Company Board and the Company's Reasons for the Recapitalization

At a meeting held on October 6, 1997, the Company Board unanimously approved the Amended Articles, the Recapitalization Agreement and the transactions contemplated thereby, determined that such transactions are in the best interests of the Company and the Company's shareholders and resolved to recommend that the Company's shareholders vote for the approval and adoption of the Amended Articles. Accordingly, the Company Board recommends that the Company's shareholders vote FOR the approval and adoption of the Amended Articles to facilitate the Recapitalization. In approving the Amended Articles, the Recapitalization Agreement and the transactions contemplated thereby, and in reaching its recommendation, the Company Board consulted with, and relied upon information and reports prepared or presented by, the Company's management, as well as the Company's legal counsel and financial advisor, and considered the following factors:

25

EXHIBIT 5

**WERNER HOLDING CO. (PA), INC.**

---o0o---

MINUTES OF THE

SPECIAL MEETING OF THE BOARD OF DIRECTORS

---o0o---

October 6, 1997

Pursuant to notice duly given, a copy of which has been filed with these minutes, a Special Meeting of the Board of Directors of Werner Holding Co. (PA), Inc., a Pennsylvania corporation (hereafter called the "Corporation"), was held on the 6th day of October, 1997, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 919 Third Avenue, New York, New York.

The meeting was called to order at 2:00 p.m. by Richard L. Werner, Chairman of the Board of Directors. All five (5) of the Directors of the Corporation were present: namely, Howard L. Solot, Craig R. Werner, Donald M. Werner, Richard L. Werner, and Robert I. Werner, constituting a quorum for the proper conduct of business. Also present at the meeting as invited guests were Kevin Quinn, Lisa Price and Michael Flanagan of Goldman, Sachs & Co. (Goldman Sachs), Roger S. Aaron, Esquire, David Friedman, Esquire and Keith Gottfried, Esquire, of Skadden, Arps, Slate, Meagher & Flom LLP (Skadden, Arps), Daniel L. Wessels, Esquire of Cohen & Grigsby, P.C., Geoffrey R. Hartenstein, Senior Counsel at Werner Co., Bruce D. Werner and Michael E. Werner. Eric J. Werner, Secretary of the Corporation, recorded these minutes.

Richard Werner opened the meeting by identifying the invited guests and reminding everyone that the purpose of the meeting was to consider the proposed Recapitalization Agreement among the Corporation and certain investors organized by Investcorp S.A. (the "Recapitalization Agreement"), the proposed Amended and Restated Articles of Incorporation of the Corporation (the "Amended Articles") and the transactions contemplated thereby. Prior to the meeting, each director had been provided with a copy of the latest draft of the Recapitalization Agreement, the Amended Articles, and a summary thereof prepared by Skadden, Arps.

Richard Werner then turned the meeting over to David Friedman for the purpose of addressing certain legal matters relating to the recapitalization and related transactions contemplated by the Recapitalization Agreement (the "Recapitalization") and describing the principal terms and conditions of the Recapitalization.

Mr. Friedman first reviewed the fiduciary duties of directors, both as a general matter and as provided under Sections 1712 and 1715 of the Pennsylvania Business Corporation Law (the "PBCL"), in considering transactions of this type. Mr. Friedman indicated that while he was not admitted to practice under Pennsylvania law, he was familiar with general principles and that Dan Wessels of Cohen & Grigsby, P.C. was present. Eric Werner reminded the Board that these issues were thoroughly reviewed and discussed at two prior Board meetings, one in June 1997 in Chicago, Illinois and the other in Pittsburgh in July 1997.

Mr. Friedman advised that the directors, in making a decision, should consider all factors which they deem to be relevant. Mr. Friedman observed that factors which directors of other companies in similar situations have considered have included the following: (i) their knowledge of the company and its businesses; (ii) the process followed by the company which led to a particular proposal and the likelihood that this proposal represents the best proposal reasonably available; (iii) the opinion of the company's financial advisor; (iv) the expected tax and accounting treatment of the transaction; (v) any benefit that the transaction would offer to shareholders and other relevant constituencies; (vi) the terms of the transaction, including any conditions (legal or otherwise) which will need to be satisfied; and (vii) the reputation of the investor group, both as partners in the business and their ability to obtain financing and consummate transaction.

Mr. Friedman then indicated that he would review the applicability of certain laws to the proposed transactions.

Mr. Friedman discussed Section 1906 of the PBCL and its applicability to the proposed Recapitalization. He advised the Board of the basic structure of the Recapitalization and the manner in which, in order to accommodate financial, accounting and other requirements of Investcorp, various groups of the Corporation's shareholders will be treated differently in the Amended Articles in terms of the percentage of their shares that will be reclassified into shares that will and shares that will not be redeemed. He informed the Board that under Section 1906 of the PBCL this type of disparate treatment is permissible if the purpose of the disparity is "not manifestly unreasonable" and if certain other requirements with respect to shareholder voting are observed. He indicated that while there is very limited case law interpreting Section 1906, the need to accommodate the requirements of Investcorp to realize a transaction beneficial to all shareholders would appear to satisfy the requirement of Section 1906.

Mr. Friedman then stated that the transaction contemplates a redemption of shares, which requires under Pennsylvania law and general bankruptcy laws that the Corporation remain solvent following payment of the redemption proceeds. In this regard, Mr. Friedman stated that there will be a condition set forth in the definitive agreement that the Corporation receive a satisfactory opinion as to the solvency of the Corporation following completion of the transaction.

Mr. Friedman then described the applicability of federal and state securities laws to the proposed transaction. He described the potential registration requirements of the federal securities laws as applied to a reclassification and the exemption therefrom provided by Section 3(a)(9) of the Securities Act of 1933. Mr. Friedman indicated that the Corporation's legal advisors believe that while the terms of the proposed transaction are somewhat unique, the principles underlying existing SEC no-action letters would appear to provide a basis for relying on Section 3(a)(9) for an exemption from registration in connection with the Recapitalization. In accordance with existing SEC no-action letters, Mr. Friedman stated that neither Goldman Sachs nor Donald Resnick, who will each receive special compensation in connection with the transaction, should be involved in the solicitation of proxies.

Mr. Friedman then directed the Board's attention to the outline prepared by Skadden, Arps describing the material features of the Recapitalization Agreement, the Amended Articles and various other documents and instruments to be executed and delivered in connection with the Recapitalization. He then described each item in detail and certain tax, accounting and other legal implications thereof.

In conclusion, Mr. Friedman stated that the role of the advisors and management is to assist the Board in its efforts to act on an informed basis. Accordingly, Mr. Friedman encouraged the directors to ask questions as the need arises.

Werner Holding Co. (PA), Inc.
Minutes of the Annual Meeting of the Board of Directors

October 6, 1997
Page 3 of 5

     Following the conclusion of Mr. Friedman's presentation, Richard Werner turned the meeting over to Kevin Quinn and Lisa Price of Goldman Sachs, who proceeded to explain to the Board in detail their financial analysis of the transaction, the proposed financing for the transaction, a comparison of the Investcorp transaction with the other proposals and other related financial and other information which would support the opinion of Goldman Sachs that the price to be paid by the Corporation to redeem shares of the Corporation's capital stock as set forth in the Recapitalization Agreement is fair to the shareholders of the Corporation from a financial point of view. At the conclusion of their presentation, the representatives of Goldman Sachs stated that, subject to a review of the definitive Recapitalization Agreement, Goldman Sachs was prepared to deliver an opinion that, as of the date of the Recapitalization Agreement, the proceeds to be received by the holders of the Corporation's capital stock pursuant to the redemption contemplated by the Recapitalization Agreement is fair from a financial point of view to the holders of such capital stock.

     Goldman Sachs also reviewed with the Board the proposed financing structure and the Corporation's ability to service such debt based on the projections prepared by management.

     An extensive and thorough discussion then ensued, and many questions were asked concerning the structure and details of the Recapitalization and various tax, accounting, financial and other implications thereof. As part of the discussion, consideration was also given to the reputation of Investcorp as an investor in the business. While the Board acknowledged Investcorp's excellent reputation, it was agreed that, as a matter of procedure, additional inquiries would be made of persons with firsthand knowledge.

     It was noted that the Recapitalization Agreement was in draft form and that certain additional terms and provisions would be finalized and submitted to the Board for approval or ratification promptly.

     The Board then discussed the Corporation's Restricted Stock Plan and whether the right of first refusal in favor of the Corporation set forth in Section 6(b) of the Restricted Stock Plan applies to the Recapitalization and, if so, whether it would or would not be appropriate for the Corporation to exercise such right.

     Counsel present at the meeting advised the Board that it would be reasonable for the Board to conclude that the right of first refusal contemplated by Section 6(b) of the Restricted Stock Plan does not apply to the transactions contemplated by the Recapitalization Agreement since the language of Section 6(b) applies to situations in which a holder of restricted stock proposes to sell or exchange his shares to one or more third parties, not to a situation in which the Corporation proposes to redeem shares of restricted stock. The Board was also reminded of prior advice, both written and oral, that it had received from counsel that, even if the right of first refusal set forth in Section 6(b) of the Restricted Stock Plan had applied to the Recapitalization, the Board could in the exercise of its fiduciary duties to the Corporation determine not to exercise any first refusal rights.

     The Board then discussed the proposed merger of Werner (DE) International, Inc. into the Corporation and the necessity of effectuating that merger in connection with the Recapitalization.

     After further discussion, it was the consensus of the Board that the Recapitalization Agreement with the transactions contemplated thereby represented the best alternative and was in the best interest of the Corporation, its shareholders and other relevant constituencies. Accordingly, it was determined to present the Recapitalization Agreement with the transactions contemplated to a formal vote, recognizing that the Board would be called upon to vote once again when negotiations are completed. Upon motion duly made and seconded, the Board thereupon adopted unanimously the following resolutions:

**RESOLVED:** That the Board hereby determines that the terms and provisions of the Recapitalization Agreement are fair to and in the best interests of the Corporation and all of its constituents, including the shareholders of the Corporation, and the Board does hereby recommend that shareholders at the special meeting to be called by the Board vote in favor of the adoption of the Amended Articles;

**RESOLVED:** That the Recapitalization Agreement, including the Amended Articles, and all other documents, agreements and instruments contemplated thereby, be, and they hereby are, approved and the proper officers of the Corporation be, and they hereby are, authorized and directed to execute and deliver the Recapitalization Agreement and such other agreements and instruments on behalf of the Corporation with such changes therein as such officers may approve, their approval to be conclusively evidenced by their execution and delivery thereof;

**RESOLVED:** That the Board of Directors has determined that the manner in which various groups of shareholders are treated in the Recapitalization is reasonable and has a valid business purpose by, among other things, enabling the Investors to obtain certain desired accounting treatment and fulfill its desire that certain members of the Corporation's management maintain a significant equity ownership in the Corporation following the Recapitalization;

**RESOLVED:** That a Special Meeting of Shareholders of the Corporation shall be held on Friday, November 21, 1997, at 10:00 a.m., local time, at the Marriott Hotel, 5150 Towne Centre Circle, Boca Raton, Florida for the purpose of approving the Amended Articles, that the record date for determining the shareholders eligible to vote at such meeting shall be the close of business on October 24, 1997 and that the proper officers of the Corporation be, and they hereby are, authorized and directed to cause to be prepared a proxy statement and related letter of transmittal describing the Recapitalization and otherwise containing all pertinent information necessary to enable the shareholders of the Corporation to make an informed decision concerning approval of the Amended Articles;

**RESOLVED:** That the form, terms and provisions of the Agreement and Plan of Merger (the "International Merger Agreement") providing for the merger of Werner (DE) International, Inc. with and into the Corporation, substantially in the form presented at this meeting, and the transactions contemplated thereby, be and they hereby are, authorized, approved and adopted in all respects, and that the officers of the Corporation be, and they hereby are, authorized and directed, in the name and on behalf of the Corporation, to (a) execute and deliver the International Merger Agreement and any other agreements, certificates, instruments and documents as may be required in connection therewith, in substantially the form hereby approved with such changes or additions thereto as the officer or officers executing the same shall, by execution thereof, approve, (b) perform the obligations and carry out the duties of the Corporation under the International Merger Agreement and under such other agreements, certificates, instruments and documents required in connection therewith and (c) take such other action as may be contemplated by the International Merger Agreement or as such officer or officers deem convenient, necessary or appropriate to carry out the intent of this resolution;

Werner Holding Co. (PA), Inc.
Minutes of the Annual Meeting of the Board of Directors

October 6, 1997
Page 5 of 5

**RESOLVED**: That the officers of the Corporation be, and they hereby are, authorized and directed, in the name and on behalf of the Corporation, to make any and all filings with regulatory authorities required to be made by the Corporation in connection with the Recapitalization Agreement, the International Merger Agreement and the transactions contemplated thereunder, including, without limitation, any such filings required pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations thereunder (the "HSR Act"), and to make all such other filings as they, or any of them, shall determine to be necessary, appropriate or advisable, any such filing to be conclusive evidence of their determination; and further

**RESOLVED**: That the proper officers of the Corporation be, and they hereby are, authorized and directed to take such actions as may be necessary or desirable to enter into negotiations and prepare such documents as may be necessary or advisable to consummate the debt financings contemplated by the Recapitalization;

**RESOLVED**: That the Board of Directors hereby determines that Section 6(b) of the Corporation's Restricted Stock Plan does not apply to any of the transactions contemplated by the Recapitalization Agreement and, as such, holders of restricted stock are entitled to all proceeds payable upon redemption in connection with the Recapitalization; and

**RESOLVED**: That the proper officers of the Corporation be, and they hereby are, authorized and directed to execute, in the name and on behalf of the Corporation and under its corporate seal as necessary or desirable, and to deliver any and all agreements, certificates, applications, checks or other instruments and to take from time to time any and all such action as may be necessary or desirable to implement the foregoing resolutions as such officers deem appropriate and in the best interests of the Corporation.

There being no further business to come before the meeting, the Chairman adjourned the meeting at 6:15 p.m.

A true record.

ATTEST:

Eric J. Werner, Secretary

[Corporate Seal]

EXHIBIT 6

MEMORANDUM                                     **INVESTCORP**
                                                    NEW YORK

TO       :   Mitch Goldstein

FROM     :   Ahmed Fattouh

DATE     :   November 21, 1997

RE       :   Funds Flow

---

Attached please find:

(1) **Condensed Fund Flow Summary -** generated by Investcorp - this is a somewhat simplified format which was used to generate the actual Funds Flow Memo, and this is what we refer to check invoices, etc.

(2) **Funds Flow Memo** - generated by GDC - this is the actual document to be used. It foots to the Condensed Fund Flow Summary (off balance by approximately $10, due to rounding). This includes wire transfer instructions, etc.


Several items for you to be aware of:

(1) **Werner (DE) vs. Werner (PA)** In addition to the redemption of Werner equity, several of the fees and expenses (specifically the Goldman fee, the acceleration of the four senior managers' consulting payments, and Don Resnick's transaction bonus) are obligations of Werner (PA). The dividend from Werner (DE), funded with a portion of the debt proceeds, represents the excess of these obligations over the Investcorp equity investment of $122.7 million. All other fees & expenses are obligations of Werner (DE).

(2) **Chase Fees & Expenses -** No wire instructions since they will do book to book transfers out of the Werner (DE) account.

(3) **Receivables Draw Down -** We will need to draw down $41.5 million on the Receivables Facility at close. The Borrowing Base Certificate has been completed and allows for over $43 million.

(4) **Cash Sweep -** The transactions generate approximately $86,000 in excess cash which we anticipate will be forwarded to a Company cash management account at Nat.City Bank. The instructions for this final transfer will not be ready until Monday.

(5) **Post Closing Items -** You will notice that several items on the Condensed Funds Flow Summary, and even some on the actual Funds Flow Memo are marked as post closing payments which will be processed (probably by check) after closing. There are other items which would

continued

III 041526

Page 2

fall into this category which are not included on either document, either because no invoice has been submitted or because it was always understood that the payment would be post closing. An important cash-*positive* post closing item which is *not* indicated is the proceeds from the sale of the officers' insurance policies which is expected to generate $2 million in the next several weeks (we had built in some leniency for the Werners to be able to pay for them with the net cash proceeds from the transaction).

(6) **BT Out of Pocket Expenses** - You have submitted an estimate of $50,000 for out of pocket expenses. Our accountants feel strongly that we should have some back-up on this item, especially since they are never comfortable with round numbers for out of pocket expenses. Could you please have someone provide us with a breakdown?

(7) **Missing Pages of Funds Flow** -   You may notice that the Funds Flow Memo I am sending begins with "page 3". The prior pages have to do with off-shore transactions which are not pertinent to Monday's events from your perspective. The relevant starting point for you is the series of payments by Investcorp Bank on behalf of the equity investor entities.

Separately, we still owe you the revised preferred debtors list, which we expect from Don Resnick tomorrow, and we hope to clean up any other outstanding items over the weekend.

I will try to reach you tomorrow (Saturday). If you need to reach me earlier, I can be reached as follows:

Office (212) 599-4700 or (800) 599-4701; x244

Home (212) 317-8688

Pager (800) 759-8888, pin# 1366240

Document32

**III 041527**

# WERNER HOLDING CO.
## Condensed Fund Flow Summary

| Transaction Financing | | Aggregate Werner Accounts @ Chase | | Outstanding After Close |
|---|---|---|---|---|
| | | Inflows | Outflows | |
| FROM: | Investors | | | |
| TO: | Werner Holding Co. (PA) | | | |
| RE: | Investcorp Equity Investment | $ 122,715,398.20 | | |
| FROM: | Chase Securities | | | |
| TO: | Werner Holding Co. (DE) | | | |
| RE: | Sr. Sub. Notes Net Proceeds After 3% Underwriting Fee | $ 130,950,000.00 | | |
| FROM: | Bankers Trust | | | |
| TO: | Werner Holding Co. (DE) | | | |
| RE: | Credit Facility - Term Loan B | $ 90,000,000.00 | | |
| FROM: | Bankers Trust | | | |
| TO: | Werner Holding Co. (DE) | | | |
| RE: | Credit Facility - Term Loan C | $ 55,000,000.00 | | |
| FROM: | Bankers Trust | | | |
| TO: | Werner Holding Co. (DE) | | | |
| RE: | Receivables Revolver Drawdown | $ 41,500,000.00 | | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Werner Holding Co. (PA) | | | |
| RE: | Dividend Payment | $ - | $ - | |
| | $ 217,563,284.80 | No effect on aggregate Werner Accounts at Chase | | |

III 041528

| Share Redemption & Debt Repayment | Aggregate Werner Accounts @ Chase | | Outstanding After Close |
| --- | --- | --- | --- |
| | Inflows | Outflows | |
| FROM: Werner Holding Co. (PA) | | | |
| TO: Goldman Sachs | | | |
| RE: Redemption of shares | | $ 330,685,804.00 | - |
| _136,574.2244 shares_ | | | |
| | | | |
| FROM: Werner Holding Co. (DE) | | | |
| TO: National City Bank | | | |
| RE: Repayment of Existing Senior Debt | | $ 62,361,058.51 | - |
| | | | |
| FROM: Werner Holding Co. (DE) - for Olympus Properties | | | |
| TO: National City Bank | | | |
| RE: Repayment of Existing Senior Debt | | $ - | - |
| | | | |
| FROM: Werner Holding Co. (DE) | | | |
| TO: Prudential | | | |
| RE: Total Redemptions of Senior Notes | | $ 3,679,139.71 | - |

III 041529

| Investcorp Fees & Expenses | | Aggregate Werner Accounts @ Chase | | Outstanding After Close |
|---|---|---|---|---|
| | | Inflows | Outflows | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Investcorp International Inc. | | | |
| RE: | Management Fees | | $ 5,000,000.00 | - |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Investcorp International Inc. | | | |
| RE: | Loan Financing Advisory | | $ 6,000,000.00 | - |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Invifin SA | | | |
| RE: | Standby Commitment Fee | | $ 6,000,000.00 | - |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Investcorp International Inc. | | | |
| RE: | Reimbursement of Expenses | | $ 60,340.52 | - |

III 041530

| | | Aggregate Werner Accounts @ Chase | | Outstanding |
| | | Inflows | Outflows | After Close |
|---|---|---|---|---|
| **Financing Fees** | | | | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Bankers Trust | | | |
| RE: | Credit Agreement Underwriting Fee | | $ 7,200,000.00 | - |
| | | | | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Bankers Trust | | | |
| RE: | Commitment Ticking Fee ( 24 days) | | $ 106,666.67 | - |
| | | | | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Bankers Trust | | | |
| RE: | Administrative Agent's Fee | | $ 100,000.00 | - |
| | | | | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | White & Case | | | |
| RE: | Legal Fees (BT & Sr. Lenders) | | $ 325,000.00 | - |
| | | | | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Merrill Lynch | | | |
| RE: | BT Out of Pocket | | $ 50,000.00 | - |
| | | | | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Drinker Biddle & Reath | | | |
| RE: | GDC Local Counsel | | $ 14,336.17 | |
| | | | | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Merrill Lynch | | | |
| RE: | Out of Pocket | | | |
| | | PAYMENT AFTER CLOSE | $ 9,927.85 | |
| | | | | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Chase | | | |
| RE: | Bridge Fees | | $ 1,350,000.00 | - |
| | | | | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Chase | | | |
| RE: | Reimbursement for 50% of Road Show Plane | | $ 92,946.92 | $ - |
| | | | | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Cravath Swain & Moore | | | |
| RE: | Legal Fees (High Yield Bridge) | | $ 22,141.87 | $ - |

III 041531

| | | Aggregate Werner Accounts @ Chase | | Outstanding |
| | | Inflows | Outflows | After Close |
|---|---|---|---|---|
| **Werner Advisors Fees** | | | | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Goldman Sachs | | | |
| RE: | M&A Sale Advisory Fees & Expenses | | $ 5,027,045.00 | $ - |
| | | | | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Cohen & Grigsby | | | |
| RE: | Legal Fees (Werner) | | $ 265,000.00 | $ - |
| | | | | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Skadden Arps | | | |
| RE: | Legal Fees (Werner) | | $ 1,500,000.00 | $ - |

| | Aggregate Werner Accounts @ Chase | | Outstanding |
| | Inflows | Outflows | After Close |
|---|---|---|---|
| **Investcorp Advisors Fees** | | | |
| FROM:    Werner Holding Co. (DE) | | | |
| TO:      Coopers & Lybrand | | | |
| RE:      Accounting (Investcorp & Werner) | | $  1,645,000.00 | |
| | | | |
| FROM:    Werner Holding Co. (DE) | | | |
| TO:      Gibson Dunn & Crutcher | | | |
| RE:      Legal Fees (Investcorp & Werner) | | $  1,825,000.00 | |
| | | | |
| FROM:    Werner Holding Co. (DE) | | | |
| TO:      Environmental Consultants | | | |
| RE:      Environmental Due Diligence (Investcorp) | | PAYMENT AFTER CLOSE | 10,000.00  e |

III 041533

| Other | | Aggregate Werner Accounts @ Chase | | Outstanding |
| | | Inflows | Outflows | At Close |
|---|---|---|---|---|
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Werner Co. | | | |
| RE: | Cash for Operations and Outstanding Payments | $          - | | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Murray Devine | | | |
| RE: | Solvency Opinion Fees & Expenses | $     59,200.00 | $          - | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Marsh & McLennan | | | |
| RE: | D&O Insurance | PAYMENT AFTER CLOSE | $   150,000.00  e | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | First American | | | |
| RE: | Title Insurance | $    144,798.44 | | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | R.R. Donnelly | | | |
| RE: | Proxy Printing | PAYMENT AFTER CLOSE | $   600,000.00  e | |
| FROM: | Werner Holding Co. (PA) | | | |
| TO: | Robert Werner | | | |
| RE: | Consulting Acceleration | $    854,167.00 | $          - | |
| FROM: | Werner Holding Co. (PA) | | | |
| TO: | Richard Werner | | | |
| RE: | Consulting Acceleration | $    854,167.00 | $          - | |
| FROM: | Werner Holding Co. (PA) | | | |
| TO: | Donald Werner | | | |
| RE: | Consulting Acceleration | $  1,000,000.00 | $          - | |
| FROM: | Werner Holding Co. (PA) | | | |
| TO: | Howard Solot | | | |
| RE: | Consulting Acceleration | $  1,000,000.00 | $          - | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Donald Werner | | | |
| RE: | SERP Acceleration | $  1,000,000.00 | $          - | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Howard Solot | | | |
| RE: | SERP Acceleration | $  1,000,000.00 | $          - | |
| FROM: | Werner Holding Co. (PA) | | | |
| TO: | Donald Resnick | | | |
| RE: | Transaction Bonus | $    857,500.00 | $          - | |

III 041534

| Other (cont.) | | Aggregate Werner Accounts @ Chase | | Outstanding At Close |
|---|---|---|---|---|
| | | Inflows | Outflows | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Trustee | | | |
| RE: | Trustee Fees | - | PAYMENT AFTER CLOSE | $      10,000.00  e |
| | | | | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Proskauer | | | |
| RE: | Trustee Attorney Fees | | PAYMENT AFTER CLOSE | $        3,000.00  e |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Management Payroll | | | |
| RE: | Other Transaction Bonuses | | PAYMENT AFTER CLOSE | $    190,000.00 |
| | | | | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Arthur Andersen | | | |
| RE: | BT Collateral Review Expenses | | PAYMENT AFTER CLOSE | $      12,000.00  e |
| | *Subtotals:* | $  440,165,398.20 | $  440,079,311.81 | $    984,927.85 |
| | *Net Surplus (Shortfall) At Close:* | | $        86,086.39 | |
| | | | | |
| FROM: | Werner Holding Co. (DE) | | | |
| TO: | Investment Account | | | |
| RE: | Transfer Of Excess to Werner Sweep Account at Nat. City | $        86,086.39 | | |

III 041535

*Draft 11/21/97 7:09 PM*                                                      *Draft 11/21/97 7:09 PM*

### WERNER ACQUISITION FUNDS FLOW

Responsibility

**D.   PURCHASE OF STOCK OF WERNER HOLDING CO. (PA), INC.**

| | | | | | |
|---|---|---|---|---|---|
| (D.1) | From | : Investcorp Bank E.C. | | Value Date = 24 Nov 97 | *Operations* |
| | Paid on behalf of | : Ballet Limited | | | |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 544-7-07207   (ABA# 021-000-021) | | | |
| | Amount | :          222,758.87 | | | |
| | Represents | : Purchase of | 92.0000 | Class D Shares at $2,421.29 per share | |
| | | | | | |
| | To | : Werner Holding Co. (PA), Inc. | | | |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 400-702-282   (ABA# 021-000-021) | | | |
| | Contact | :                   0.00 | | | |

| | | | | | |
|---|---|---|---|---|---|
| (D.2) | From | : Investcorp Bank E.C. | | Value Date = 24 Nov 97 | *Operations* |
| | Paid on behalf of | : Denary Limited | | | |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 544-7-07207   (ABA# 021-000-021) | | | |
| | Amount | :          222,758.87 | | | |
| | Represents | : Purchase of | 92.0000 | Class D Shares at $2,421.29 per share | |
| | | | | | |
| | To | : Werner Holding Co. (PA), Inc. | | | |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 400-702-282   (ABA# 021-000-021) | | | |
| | Contact | :                   0.00 | | | |

| | | | | | |
|---|---|---|---|---|---|
| (D.3) | From | : Investcorp Bank E.C. | | Value Date = 24 Nov 97 | *Operations* |
| | Paid on behalf of | : Gleam Limited | | | |
| | Bank | : Chase Bank of New York | | | |
| | Account | : 544-7-07207   (ABA# 021-000-021) | | | |
| | Amount | :          222,758.87 | | | |
| | Represents | : Capitalization of Werner Holding Co. (PA), Inc. | | | |
| | | Purchase of | 92.0000 | Class D Shares at $2,421.29 per share | |
| | To | : Werner Holding Co. (PA), Inc. | | | |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 400-702-282   (ABA# 021-000-021) | | | |
| | Contact | :                   0.00 | | | |

| | | | | | |
|---|---|---|---|---|---|
| (D.4) | From | : Investcorp Bank E.C. | | Value Date = 24 Nov 97 | *Operations* |
| | Paid on behalf of | : Highlands Limited | | | |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 544-7-07207   (ABA# 021-000-021) | | | |
| | Amount | :          222,758.87 | | | |
| | Represents | : Purchase of | 92.0000 | Class D Shares at $2,421.29 per share | |
| | | | | | |
| | To | : Werner Holding Co. (PA), Inc. | | | |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 400-702-282   (ABA# 021-000-021) | | | |
| | Contact | :                   0.00 | | | |

**III 041536**

*Draft 11/21/97 7:09 PM*                                                    *Draft 11/21/97 7:09 PM*

## WERNER ACQUISITION FUNDS FLOW

|  |  |  |  |  | Responsibility |
|---|---|---|---|---|---|
| (D.5) | From | : Investcorp Bank E.C. | Value Date = | 24 Nov 97 | *Operations* |
|  | Paid on behalf of | : Noble Limited |  |  |  |
|  | Bank | : Chase Bank, New York |  |  |  |
|  | Account | : 544-7-07207  (ABA# 021-000-021) |  |  |  |
|  | Amount | :            222,758.87 |  |  |  |
|  | Represents | : Purchase of | 92.0000 | Class D Shares at $2,421.29 per share |  |
|  | To | : Werner Holding Co. (PA), Inc. |  |  |  |
|  | Bank | : Chase Bank, New York |  |  |  |
|  | Account | : 400-702-282  (ABA# 021-000-021) |  |  |  |
|  | Contact | :                         0.00 |  |  |  |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| (D.6) | From | : Investcorp Bank E.C. | Value Date = | 24 Nov 97 | *Operations* |
|  | Paid on behalf of | : Outrigger Limited |  |  |  |
|  | Bank | : Chase Bank, New York |  |  |  |
|  | Account | : 544-7-07207 . (ABA# 021-000-021) |  |  |  |
|  | Amount | :            222,758.87 |  |  |  |
|  | Represents | : Purchase of | 92.0000 | Class D Shares at $2,421.29 per share |  |
|  | To | : Werner Holding Co. (PA), Inc. |  |  |  |
|  | Bank | : Chase Bank, New York |  |  |  |
|  | Account | : 400-702-282  (ABA# 021-000-021) |  |  |  |
|  | Contact | :                         0.00 |  |  |  |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| (D.7) | From | : Investcorp Bank E.C. | Value Date = | 24 Nov 97 | *Operations* |
|  | Paid on behalf of | : Quill Limited |  |  |  |
|  | Bank | : Chase Bank, New York |  |  |  |
|  | Account | : 544-7-07207  (ABA# 021-000-021) |  |  |  |
|  | Amount | :            222,758.87 |  |  |  |
|  | Represents | : Purchase of | 92.0000 | Class D Shares at $2,421.29 per share |  |
|  | To | : Werner Holding Co. (PA), Inc. |  |  |  |
|  | Bank | : Chase Bank, New York |  |  |  |
|  | Account | : 400-702-282  (ABA# 021-000-021) |  |  |  |
|  | Contact | :                         0.00 |  |  |  |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| (D.8) | From | : Investcorp Bank E.C. | Value Date = | 24 Nov 97 | *Operations* |
|  | Paid on behalf of | : Radial Limited |  |  |  |
|  | Bank | : Chase Bank, New York |  |  |  |
|  | Account | : 544-7-07207  (ABA# 021-000-021) |  |  |  |
|  | Amount | :            222,758.87 |  |  |  |
|  | Represents | : |  |  |  |
|  |  | Purchase of | 92.0000 | Class D Shares at $2,421.29 per share |  |
|  | To | : Werner Holding Co. (PA), Inc. |  |  |  |
|  | Bank | : Chase Bank, New York |  |  |  |
|  | Account | : 400-702-282  (ABA# 021-000-021) |  |  |  |
|  | Contact | :                         0.00 |  |  |  |

**III 041537**

*Draft 11/21/97 7:09 PM*                                                                 *Draft 11/21/97 7:09 PM*

## WERNER ACQUISITION FUNDS FLOW

|  |  |  | Responsibility |
|---|---|---|---|
| (D.9) | From | : Investcorp Bank E.C. | Value Date =  24 Nov 97 | Operations |

(D.9)  From            : Investcorp Bank E.C.                          Value Date =   24 Nov 97          *Operations*
       Paid on behalf of : Shoreline Limited
       Bank            : Chase Bank, New York
       Account         : 544-7-07207   (ABA# 021-000-021)
       Amount          :         222,758.87
       Represents      : Purchase of                    92.0000     Class D Shares at $2,421.29 per share

       To              : Werner Holding Co. (PA), Inc.
       Bank            : Chase Bank, New York
       Account         : 400-702-282   (ABA# 021-000-021)
       Contact         :                    0.00

(D.10) From            : Investcorp Bank E.C.                          Value Date =   24 Nov 97          *Operations*
       Paid on behalf of : Zinnia Limited
       Bank            : Chase Bank, New York
       Account         : 544-7-07207   (ABA# 021-000-021)
       Amount          :         222,758.87
       Represents      : Purchase of                    92.0000     Class D Shares at $2,421.29 per share

       To              : Werner Holding Co. (PA), Inc.
       Bank            : Chase Bank, New York
       Account         : 400-702-282   (ABA# 021-000-021)
       Contact         :                    0.00

(D.11) From            : Investcorp Bank E.C.                          Value Date =   24 Nov 97          *Operations*
       Paid on behalf of : Investcorp Investment Equity Limited
       Bank            : Chase Bank, New York
       Account         : 544-7-07207   (ABA# 021-000-021)
       Amount          :         193,703.36
       Represents      : Purchase of                    80.0000     Class D Shares at $2,421.29 per share

       To              : Werner Holding Co. (PA), Inc.
       Bank            : Chase Bank, New York
       Account         : 400-702-282   (ABA# 021-000-021)
       Contact         :                    0.00

(D.12) From            : Investcorp Bank E.C.                          Value Date =   24 Nov 97          *Operations*
       Paid on behalf of : Annisville Limited
       Bank            : Chase Bank, New York
       Account         : 544-7-07207   (ABA# 021-000-021)
       Amount          :       27,239,535.00
       Represents      : Purchase of              11,250.0000    Shares at $2,421.29 per share representing:
                                                 11,250.0000    Class E shares

       To              : Werner Holding Co. (PA), Inc.
       Bank            : Chase Bank, New York
       Account         : 400-702-282   (ABA# 021-000-021)
       Contact         :                    0.00

**III 041538**

*Draft 11/21/97 7:09 PM*                                                    *Draft 11/21/97 7:09 PM*

### *WERNER ACQUISITION FUNDS FLOW*

| | | | | | Responsibility |
|---|---|---|---|---|---|
| (D.13) | From | : Investcorp Bank E.C. | | Value Date = 24 Nov 97 | *Operations* |
| | Paid on behalf of | : Cooperstown Limited | | | |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 544-7-07207  (ABA# 021-000-021) | | | |
| | Amount | : 27,239,535.00 | | | |
| | Represents | : Purchase of | 11,250.0000 | Shares at $2,421.29 per share representing: | |
| | | | 11,250.0000 | Class E shares | |

| | | |
|---|---|---|
| To | : Werner Holding Co. (PA), Inc. | |
| Bank | : Chase Bank, New York | |
| Account | : 400-702-282  (ABA# 021-000-021) | |
| Contact | : | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| (D.14) | From | : Investcorp Bank E.C. | | Value Date = 24 Nov 97 | *Operations* |
| | Paid on behalf of | : Frisco Limited | | | |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 544-7-07207  (ABA# 021-000-021) | | | |
| | Amount | : 27,239,535.00 | | | |
| | Represents | : Purchase of | 11,250.0000 | Shares at $2,421.29 per share representing: | |
| | | | 11,250.0000 | Class E shares | |

| | | |
|---|---|---|
| To | : Werner Holding Co. (PA), Inc. | |
| Bank | : Chase Bank, New York | |
| Account | : 400-702-282  (ABA# 021-000-021) | |
| Contact | : | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| (D.15) | From | : Investcorp Bank E.C. | | Value Date = 24 Nov 97 | *Operations* |
| | Paid on behalf of | : Platea Limited | | | |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 544-7-07207  (ABA# 021-000-021) | | | |
| | Amount | : 27,239,535.00 | | | |
| | Represents | : Purchase of | 11,250.0000 | Shares at $2,421.29 per share representing: | |
| | | | 11,250.0000 | Class E shares | |

| | | |
|---|---|---|
| To | : Werner Holding Co. (PA), Inc. | |
| Bank | : Chase Bank, New York | |
| Account | : 400-702-282  (ABA# 021-000-021) | |
| Contact | : | 0.00 |

**III 041539**

## *WERNER ACQUISITION FUNDS FLOW*

|  |  |  |  | Responsibility |
|---|---|---|---|---|
| (D.16) | From | : Investcorp Bank E.C. | Value Date = 24 Nov 97 | *Operations* |
|  | Paid on behalf of | : Stepup Limited |  |  |
|  | Bank | : Chase Bank, New York |  |  |
|  | Account | : 544-7-07207  (ABA# 021-000-021) |  |  |
|  | Amount | : 11,335,966.14 |  |  |
|  | Represents | : Purchase of |  |  |

|  |  |
|---|---|
| 4,681.7840 | Shares at $2,421.29 per share representing: |
| 4,681.7840 | Class C Shares |

|  |  |
|---|---|
| To | : Werner Holding Co. (PA), Inc. |
| Bank | : Chase Bank, New York |
| Account | : 400-702-282  (ABA# 021-000-021) |
| Contact | : 0.00 |

## E.  BANKERS TRUST AND OTHER FINANCING

| (E.1) | From | : 0.00 | Value Date = 24 Nov 97 | *CI-NA* |
|---|---|---|---|---|
|  | Bank | : Bankers Trust, New York |  |  |
|  | Account | : 99401268 (ABA#021-001-033) |  |  |
|  | Amount | : 0.00  *Subject to Adjustment at Closing* |  |  |
|  | Represents | : |  |  |

| To | : Werner Holding Co. (DE), Inc. |
|---|---|
| Bank | : Chase Bank, New York |
| Account | : 400-702-274  (ABA# 021-000-021) |
| Contact | : [ Need Contact Information ] |

| (E.2) | From | : BTCo | Value Date = 24 Nov 97 | *CI-NA* |
|---|---|---|---|---|
|  | Bank | : Bankers Trust, New York |  |  |
|  | Account | : 99401268  (ABA#021-001-033) |  |  |
|  | Amount | : 90,000,000.00 |  |  |
|  | Represents | : Term Loan B |  |  |

| To | : Werner Holding Co. (DE), Inc. |
|---|---|
| Bank | : Chase Bank, New York |
| Account | : 400-702-274  (ABA# 021-000-021) |
| Contact | : [ Need Contact Information ] |

| (E.3) | From | : BTCo | Value Date = 24 Nov 97 | *CI-NA* |
|---|---|---|---|---|
|  | Bank | : Bankers Trust, New York |  |  |
|  | Account | : 99401268  (ABA#021-001-033) |  |  |
|  | Amount | : 55,000,000.0000 |  |  |
|  | Represents | : Term Loan C |  |  |

| To | : Werner Holding Co. (DE), Inc. |
|---|---|
| Bank | : Chase Bank, New York |
| Account | : 400-702-274  (ABA# 021-000-021) |
| Contact | : [ Need Contact Information ] |

III 041540

*Draft 11/21/97 7:16 PM*                                                              *Draft 11/21/97 7:16 PM*

### WERNER ACQUISITION FUNDS FLOW

|  |  |  |  | Responsibility |
|---|---|---|---|---|
| (E.4) | From | : BTCo | Value Date = 24 Nov 97 | *Operations* |
|  | Bank | : Bankers Trust, New York |  |  |
|  | Account | : 99401268  (ABA#021-001-033) |  |  |
|  | Amount | :          41,500,000.00 |  |  |
|  | Represents | : Receivables |  |  |
|  |  |  |  |  |
|  | To | : Werner Holding Co. (DE), Inc. |  |  |
|  | Bank | : Chase Bank, New York |  |  |
|  | Account | : 400-702-274   (ABA# 021-000-021) |  |  |
|  | Contact | : [ Need Contact Information ] |  |  |

| (E.5) | From | : Chase | Value Date = 24 Nov 97 | *CI-NA* |
|---|---|---|---|---|
|  | Bank | : Chase Securities |  |  |
|  | Account | : ABA#021-000-021 |  |  |
|  | Amount | :          130,950,000.00 |  |  |
|  | Represents | : High Yield |  |  |
|  |  |  |  |  |
|  | To | : Werner Holdings, Inc. |  |  |
|  | Bank | : Chase Bank, New York |  |  |
|  | Account | : 400-702-274   (ABA# 021-000-021) |  |  |
|  | Contact | : [ Need Contact Information ] |  |  |

**F    REDEMPTION OF CLASS A1 and Class B1 SHARES**

| (F.1) | From | : Werner Holding Co. (DE), Inc. | Value Date= 24 Nov 97 | *CI-NA* |
|---|---|---|---|---|
|  | Bank | : Chase Bank, New York |  |  |
|  | Account | : 400-702-274   (ABA# 021-000-021) |  |  |
|  | Amount | :          217,563,284.58 |  |  |
|  | Represents | : Dividend |  |  |
|  |  |  |  |  |
|  | To | : Werner Holding Co. (PA), Inc. |  |  |
|  | Bank | : Chase Bank, New York |  |  |
|  | Account | : 400-702-282   (ABA# 021-000-021) |  |  |
|  | Contact |  |  |  |

| (F.2) | From | : Werner Holding Co. (PA), Inc. | Value Date= 24 Nov 97 | *CI-NA* |
|---|---|---|---|---|
|  | Bank | : Chase Bank, New York |  |  |
|  | Account | : 400-702-282   (ABA# 021-000-021) |  |  |
|  | Amount | :          294,166,664.53 |  |  |
|  | Represents | : Redemption Proceeds for Class A-1 and Class B-1 Stock |  | *CI-NA* |
|  |  |  |  |  |
|  | To | : Goldman, Sachs & Co. |  |  |
|  | Bank | : Chase Bank (New York) |  |  |
|  | Account | : 930-1-011483 (ABA#021-000-021) FFC: Werner Holding Co. (PA), Inc. #030-10802-1 |  |  |
|  | Contact | :          0.00 |  |  |

| (F.3) | From | : Werner Holding Co. (PA), Inc. | Value Date= 0 Jan 00 | *CI-NA* |
|---|---|---|---|---|
|  | Bank | : Chase Bank, New York |  |  |
|  | Account | : 400-702-282   (ABA# 021-000-021) |  |  |
|  | Amount | :          21,626,663.98 |  |  |
|  | Represents | : Vera Bonte et. al. |  | *CI-NA* |
|  |  |  |  |  |
|  | To | : Vera Bonte |  |  |
|  | Bank | : Wells Fargo Bank |  |  |
|  | Account | : 6688-059617  (ABA#121-000-248 |  |  |
|  | Contact | :          0.00 |  |  |

III 041541

Draft 11/21/97 7:09 PM                                          Draft 11/21/97 7:09 PM

## WERNER ACQUISITION FUNDS FLOW

|  |  |  |  | Responsibility |
|--|--|--|--|--|
| (F.4) | From | : Werner Holding Co. (PA), Inc. | Value Date = 0 Jan 00 | CI-NA |
| | Bank | : Chase Bank, New York | | |
| | Account | : 400-702-282  (ABA# 021-000-021) | | |
| | Amount | :          14,892,475.38 | | |
| | Represents | : Richard Bonte et.al. | | CI-NA |
| | | | | |
| | To | : Richard Bonte | | |
| | Bank | : First Federal Bank (Palisades) | | |
| | Account | : 6028-0345216 (ABA#322-271-106) | | |
| | Contact | : Andrew Spencer (310-459-2786) | | |

## G   BANK DEBT PAYMENTS

| (G.1) | From | : Werner Holding Co. (DE), Inc. | Value Date = 24 Nov 97 | CI-NA |
|--|--|--|--|--|
| | Bank | : Chase Bank, New York | | |
| | Account | : 400-702-274  (ABA# 021-000-021) | | |
| | Amount | :          62,361,058.51 | | |
| | Represents | : Payment of Outstanding Bank Debt | | |
| | | | | |
| | To | : National City Bank | | |
| | Bank | : National City Bank | | |
| | Account | : 151804 (ABA#041-000-124) | | |
| | Contact | : Commercial Loans     Werner Co./Olympus Properties | | |

| (G.2) | From | : Werner Holding Co. (DE), Inc. | Value Date = 24 Nov 97 | CI-NA |
|--|--|--|--|--|
| | Bank | : Chase Bank, New York | | |
| | Account | : 400-702-274  (ABA# 021-000-021) | | |
| | Amount | :               0.00 | | |
| | Represents | : | | |
| | | | | |
| | To | : National City Bank | | |
| | Bank | : National City Bank | | |
| | Account | : 151804 (ABA#041-000-124) | | |
| | Contact | : Commercial Loans     Werner Co./Olympus Properties | | |

| (G.3) | From | : Werner Holding Co. (DE), Inc. | Value Date = 24 Nov 97 | CI-NA |
|--|--|--|--|--|
| | Bank | : Chase Bank, New York | | |
| | Account | : 400-702-274  (ABA# 021-000-021) | | |
| | Amount | :           322,641.51 | | |
| | Represents | : Olympus Properties Debt | | |
| | | | | |
| | To | : Prudential Management | | |
| | Bank | : Bank of New York | | |
| | Account | : 8900304391  (ABA#021-000-018) | | |
| | Contact | : need contact | | |

| (G.4) | From | : Werner Holding Co. (DE), Inc. | Value Date = 24 Nov 97 | CI-NA |
|--|--|--|--|--|
| | Bank | : Chase Bank, New York | | |
| | Account | : 400-702-274  (ABA# 021-000-021) | | |
| | Amount | :          2,017,374.18 | | |
| | Represents | : Existing Debt | | |
| | | | | |
| | To | : Prudential Management | | |
| | Bank | : Bank of New York | | |
| | Account | : 8900304391  (ABA#021-000-018) | | |
| | Contact | : need contact | | |

III 041542

*Draft 11/21/97  7:09 PM*                                                      *Draft 11/21/97  7:09 PM*

## WERNER ACQUISITION FUNDS FLOW

Responsibility

| (G.5) | From | : Werner Holding Co. (DE), Inc. | Value Date = | 24 Nov 97 | *CI-NA* |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 400-702-274  (ABA# 021-000-021) | | | |
| | Amount | :              297,506.09 | | | |
| | Represents | : Existing Debt | | | |
| | | | | | |
| | To | : Pruco | | | |
| | Bank | : Bank of New York | | | |
| | Account | : 8900304421 (ABA#021-000-018) | | | |
| | Contact | :              0.00 | | | |

| (G.6) | From | : Werner Holding Co. (DE), Inc. | Value Date = | 24 Nov 97 | *CI-NA* |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 400-702-274  (ABA# 021-000-021) | | | |
| | Amount | :              47,628.96 | | | |
| | Represents | : Olympus Properties Debt | | | |
| | | | | | |
| | To | : Pruco | | | |
| | Bank | : Bank of New York | | | |
| | Account | : 8900304421 (ABA#021-000-018) | | | |
| | Contact | : need contact | | | |

| (G.7) | From | : Werner Holding Co. (DE), Inc. | Value Date = | 24 Nov 97 | *CI-NA* |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 400-702-274  (ABA# 021-000-021) | | | |
| | Amount | :              137,171.42 | | | |
| | Represents | : Olympus Properties Debt | | | |
| | | | | | |
| | To | : Privest | | | |
| | Bank | : Bank of New York | | | |
| | Account | : 89000304944  (ABA#021-000-018) | | | |
| | Contact | :              0.00 | | | |

| (G.8) | From | : Werner Holding Co. (DE), Inc. | Value Date = | 24 Nov 97 | *CI-NA* |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 400-702-274  (ABA# 021-000-021) | | | |
| | Amount | :              856,817.55 | | | |
| | Represents | : Existing Debt | | | |
| | | | | | |
| | To | : Privest | | | |
| | Bank | : Bank of New York . | | | |
| | Account | : 89000304944  (ABA#021-000-018) | | | |
| | Contact | :              0.00 | | | |

**H.    PAYMENTS TO INVESTCORP AND OTHER INTERNATIONAL PARTICIPANTS**

| (H.1) | From | : Werner Holding Co. (DE), Inc. | Value Date = | 24 Nov 97 | *CI-NA* |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 400-702-274  (ABA# 021-000-021) | | | |
| | Amount | :              5,000,000.00 | | | |
| | Represents | : Management Services Advisory Agreement | | | |
| | | | | | |
| | To | : Investcorp International Inc. | | | |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 544-7-76480   (ABA# 021-000-021) | | | |
| | Contact | : [ Need Contact Information ] | | | |

| (H.2) | From | : Werner Holding Co. (DE), Inc. | Value Date = | 24 Nov 97 | *CI-NA* |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 400-702-274  (ABA# 021-000-021) | | | |

**III 041543**

*Draft 11/21/97 7:09 PM*                                                    *Draft 11/21/97 7:09 PM*

## WERNER ACQUISITION FUNDS FLOW

Responsibility

| | | | |
|---|---|---|---|
| Amount | : | 6,000,000.00 | |
| Represents | : Loan Financing Advisory Agreement | | |
| | | | |
| To | : Investcorp International Inc. | | |
| Bank | : Chase Bank, New York | | |
| Account | : 544-7-76480   (ABA# 021-000-021) | | |
| Contact | : [ Need Contact Information ] | | |

(H.3)
| | | | |
|---|---|---|---|
| From | : Werner Holding Co. (DE), Inc. | Value Date = 24 Nov 97 | CI-NA |
| Bank | : Chase Bank, New York | | |
| Account | : 400-702-274   (ABA# 021-000-021) | | |
| Amount | : 6,000,000.00 | | |
| Represents | : Invifin Commitment Fees | | |
| | | | |
| To | : Invifin SA | | |
| Bank | : Chase Bank, New York | | |
| Account | : 400-475855   (ABA# 021-000-021) | | |
| Contact | : [ Need Contact Information ] | | |

(H.4)
| | | | |
|---|---|---|---|
| From | : Werner Holding Co. (DE), Inc. | Value Date = 24 Nov 97 | CI-NA |
| Bank | : Chase Bank, New York | | |
| Account | : 400-702-274   (ABA# 021-000-021) | | |
| Amount | : 60,340.52 | | |
| Represents | : Reimbursement of expenses | | |
| | | | |
| To | : Investcorp International Inc. | | |
| Bank | : Chase Bank, New York | | |
| Account | : 544-7-76480   (ABA# 021-000-021) | | |
| Contact | : [ Need Contact Information ] | | |

## I.   OTHER PAYMENTS AT CLOSING

(I.1)
| | | | |
|---|---|---|---|
| From | : Werner Holding Co. (DE), Inc. | Value Date = 24 Nov 97 | CI-NA |
| Bank | : Chase Bank, New York | | |
| Account: | : 400-702-274   (ABA# 021-000-021) | | |
| Amount | : 1,825,000.00 | | |
| Represents | : Advance to GD&C | | |
| | | | |
| To | : Gibson, Dunn & Crutcher LLP | | |
| Bank | : Wells Fargo Bank ABA # 121000248 | | |
| Account | : 4600 146039 References: 03263-00908 | | |
| Contact | : Joan Ulyatt | | |

(I.2)
| | | | |
|---|---|---|---|
| From | : Werner Holding Co. (DE), Inc. | Value Date = 24 Nov 97 | CI-NA |
| Bank | : Chase Bank, New York | | |
| Account | : 400-702-274   (ABA# 021-000-021) | | |
| Amount | : 106,666.67 | | |
| Represents | : BT Commitment Commission | | |
| | | | |
| To | : Bankers Trust | | |
| Bank | : Bankers Trust, New York | | |
| Account | : 99401268 (ABA#021-001-033) | | |
| Contact | : Attn: Commercial Loan Division, Ref: Werner Holdings | | |

III 041544

## *WERNER ACQUISITION FUNDS FLOW*

| | | | | Responsibility |
|---|---|---|---|---|

**(13)**
| | | | Value Date = | 24 Nov 97 | *CI-NA* |
|---|---|---|---|---|---|
| From | : Werner Holding Co. (DE), Inc. | | | | |
| Bank | : Chase Bank, New York | | | | |
| Account | : 400-702-274  (ABA# 021-000-021) | | | | |
| Amount | :           7,200,000.00 | | | | |
| Represents | : Bank Financing Fee | | | | |
| | | | | | |
| To | : Bankers Trust | | | | |
| Bank | : Bankers Trust, New York | | | | |
| Account | : 99401268  (ABA#021-001-033) | | | | |
| Contact | : Attn: Commercial Loan Division, Ref: Werner Holdings | | | | |

**(14)**
| | | | Value Date = | 24 Nov 97 | *CI-NA* |
|---|---|---|---|---|---|
| From | : Werner Holding Co. (DE), Inc. | | | | |
| Bank | : Chase Bank, New York | | | | |
| Account | : 400-702-274  (ABA# 021-000-021) | | | | |
| Amount | :           100,000.00 | | | | |
| Represents | :     BT Admin. Agent Fee | | | | |
| | | | | | |
| To | : Bankers Trust | | | | |
| Bank | : Bankers Trust, New York | | | | |
| Account | : 99401268  (ABA#021-001-033) | | | | |
| Contact | : Attn: Commercial Loan Division, Ref: Werner Holdings | | | | |

**(15)**
| | | | Value Date = | 24 Nov 97 | *CI-NA* |
|---|---|---|---|---|---|
| From | : Werner Holding Co. (DE), Inc. | | | | |
| Bank | : Chase Bank, New York | | | | |
| Account | : 400-702-274  (ABA# 021-000-021) | | | | |
| Amount | :           50,000.00 | | | | |
| Represents | : Out of Pocket Expense Reimbursement | | | | |
| | | | | | |
| To | : Bankers Trust | | | | |
| Bank | : Bankers Trust, New York | | | | |
| Account | : 99401049  (ABA#021-001-033) | | | | |
| Contact | : Attn: David Zucker  ref: Werner Holding | | | | |

**(16)**
| | | | Value Date = | 24 Nov 97 | *CI-NA* |
|---|---|---|---|---|---|
| From | : Werner Holding Co. (DE), Inc. | | | | |
| Bank | : Chase Bank, New York | | | | |
| Account | : 400-702-274  (ABA# 021-000-021) | | | | |
| Amount | :           14,346.17 | | | | |
| Represents | : Drinker Biddle & Reath Legal Fees | | | | |
| | | | | | |
| To | : Brown Brothers Harriman & Co. | | | | |
| Bank | : Citibank N.A. | | | | |
| Account | : 09250276  (ABA#021-000-089)      FFC: Drinker Biddle & Reath, Acct.#3485588 | | | | |
| Contact | : | | | | |

**(17)**
| | | | Value Date = | 24 Nov 97 | *CI-NA* |
|---|---|---|---|---|---|
| From | : Werner Holding Co. (DE), Inc. | | | | |
| Bank | : Chase Bank, New York | | | | |
| Account | : 400-702-274  (ABA# 021-000-021) | | | | |
| Amount | :           1,350,000.00 | | | | |
| Represents | : Bridge Commitment Fee | | | | |
| | | | | | |
| To | : Chase Bank | | | | |
| Bank | : Chase Bank, New York | | | | |
| Account | : ABA#021-000-021 (Commercial Loans Dept.#9420) | | | | |
| Contact | : Attn: John Knapp ref: Werner Holding | | | | |

III 041545

*Draft 11/21/97  7:09 PM*                                                                *Draft 11/21/97  7:09 PM*

## *WERNER ACQUISITION FUNDS FLOW*

|  |  |  |  |  | Responsibility |
|--|--|--|--|--|--|
| (I.8) | From | : Werner Holding Co. (DE), Inc. | Value Date = | 24 Nov 97 | *CI-NA* |
|  | Bank | : Chase Bank, New York |  |  |  |
|  | Account | : 400-702-274  (ABA# 021-000-021) |  |  |  |
|  | Amount | :          92,946.92 |  |  |  |
|  | Represents | : Road Show Plane Expense |  |  |  |
|  |  |  |  |  |  |
|  | To | : Chase Bank |  |  |  |
|  | Bank | : Chase Bank, New York |  |  |  |
|  | Account | : ABA#021-000-021 (Commercial Loans Dept.#9420) | Attn: John Knapp ref. Werner Holding |  |  |

|  |  |  |  |  |  |
|--|--|--|--|--|--|
| (I.9) | From | : Werner Holding Co. (DE), Inc. | Value Date = | 24 Nov 97 | *CI-NA* |
|  | Bank | : Chase Bank, New York |  |  |  |
|  | Account | : 400-702-274  (ABA# 021-000-021) |  |  |  |
|  | Amount | :          1,645,000.00 |  |  |  |
|  | Represents | : Advance to C&L |  |  |  |
|  |  |  |  |  |  |
|  | To | : Coopers & Lybrand LLP |  |  |  |
|  | Bank | : First National Bank of Chicago |  |  |  |
|  | Account | 55-47792 (ABA#071-000-013)(NY Lockbox) |  |  |  |

|  |  |  |  |  |  |
|--|--|--|--|--|--|
| (I.10) | From | : Werner Holding Co. (DE), Inc. | Value Date = | Post Closing | *CI-NA* |
|  | Bank | : Chase Bank, New York |  |  |  |
|  | Account | : 400-702-274  (ABA# 021-000-021) |  |  |  |
|  | Amount | :          0.00 |  |  |  |
|  | Represents | : Transaction Expense |  |  |  |
|  |  |  |  |  |  |
|  | To | : RR Donnelley |  |  |  |
|  | Bank | : Bank of America |  |  |  |
|  | Account | : 1233552859 (ABA#121-000-358) |  |  |  |
|  | Contact | : [ Need Contact Information ] |  |  |  |

|  |  |  |  |  |  |
|--|--|--|--|--|--|
| (I.11) | From | : Werner Holding Co. (PA), Inc. | Value Date = | 24 Nov 97 | *CI-NA* |
|  | Bank | : Chase Bank, New York |  |  |  |
|  | Account | : 400-702-282  (ABA# 021-000-021) |  |  |  |
|  | Amount | :          5,027,045.53 |  |  |  |
|  | Represents | :          Payment at close of:          M&A Fee |  |  |  |
|  |  |  |  |  |  |
|  | To | : Goldman, Sachs & Co. |  |  |  |
|  | Bank | : Chase Bank, New York |  |  |  |
|  | Account | : 930-1-011483  (ABA#021-000-021) |  |  |  |
|  | Contact | :          0.00 |  |  |  |

|  |  |  |  |  |  |
|--|--|--|--|--|--|
| (I.12) | From | : Werner Holding Co. (DE), Inc. | Value Date = | 24 Nov 97 | *CI-NA* |
|  | Bank | : Chase Bank, New York |  |  |  |
|  | Account | : 400-702-274  (ABA# 021-000-021) |  |  |  |
|  | Amount | :          1,500,000.00 |  |  |  |
|  | Represents | :          Payment at close of:          Skadden Arps |  |  |  |
|  |  |  |  |  |  |
|  | To | : Skadden Arps |  |  |  |
|  | Bank | : Citibank N.A. |  |  |  |
|  | Account | : 3006 0143 (ABA#021-000-089) |  |  |  |
|  | Contact | :          0.00 |  |  |  |

**III 041546**

## *WERNER ACQUISITION FUNDS FLOW*

|  |  |  |  | Responsibility |
|---|---|---|---|---|
| **(1.13)** | From<br>Bank<br>Account<br>Amount<br>Represents | : Werner Holding Co. (DE), Inc.<br>: Chase Bank, New York<br>: 400-702-274 (ABA# 021-000-021)<br>:        144,798.44<br>:        Title Insurance | Value Date = 24 Nov 97 | *CI-NA* |
|  | To<br>Bank<br>Account<br>Contact | : First American Title Insurance Company<br>: Chase Bank, New York<br>: 050-021931 (ABA#021-000-021)<br>: In re: Werner Deal |  |  |
| **(1.14)** | From<br>Bank<br>Account<br>Amount<br>Represents | : Werner Holding Co. (DE), Inc.<br>: Chase Bank, New York<br>: 400-702-274 (ABA# 021-000-021)<br>:        22,141.87<br>:        Payment at close of:        Cravath Legal Fees | Value Date = 24 Nov 97 | *CI-NA* |
|  | To<br>Bank<br>Account<br>Contact | : Cravath Swaine & Moore<br>: Chase Bank, New York<br>: 001-020056 (021-000-021)<br>:        0.00 |  |  |
| **(1.15)** | From<br>Bank<br>Account<br>Amount<br>Represents | : Werner Holding Co. (DE), Inc.<br>: Chase Bank, New York<br>: 400-702-274 (ABA# 021-000-021)<br>:        59,200.00<br>: Solvency Opinion plus expenses | Value Date = 24 Nov 97 | *CI-NA* |
|  | To<br>Bank<br>Account<br>Contact | : Murray Devine & Co.<br>: First Union Bank<br>: 20000333 357 24 (ABA#031-201-467)<br>: [ Need Contact Information ] |  |  |
| **(1.16)** | From<br>Bank<br>Account<br>Amount<br>Represents | : Werner Holding Co. (DE), Inc.<br>: Chase Bank, New York<br>: 400-702-274 (ABA# 021-000-021)<br>:        0.00<br>: | Value Date = 24 Nov 97 | *CI-NA* |
|  | To<br>Bank<br>Account<br>Contact | :<br>:<br>:<br>: |  |  |
| **(1.17)** | From<br>Bank<br>Account<br>Amount<br>Represents | : Werner Holding Co. (DE), Inc.<br>: Chase Bank, New York<br>: 400-702-274 (ABA# 021-000-021)<br>:<br>: IBJ Schroeder Fees | Value Date = Post-Closing | *CI-NA* |
|  | To<br>Bank<br>Account<br>Contact | : IBJ Schroeder<br>:        0.00<br>:        0.00<br>:        0.00 |  |  |

**III 041547**

*Draft 11/21/97 7:09 PM*                                                                  *Draft 11/21/97 7:09 PM*

## WERNER ACQUISITION FUNDS FLOW

|  |  |  | | Responsibility |
|---|---|---|---|---|

| (I.18) | From | : Werner Holding Co. (DE), Inc. | Value Date = Post-Closing | CI-NA |
|---|---|---|---|---|
|  | Bank | : Chase Bank, New York |  |  |
|  | Account | : 400-702-274  (ABA# 021-000-021) |  |  |
|  | Amount | :            0.00 |  |  |
|  | Represents | : D&O Insurance |  |  |
|  |  |  |  |  |
|  | To | : Marsh & McLennan |  |  |
|  | Bank | : Bank of New York |  |  |
|  | Account | : 8900091908 (ABA#021-000-018) |  |  |
|  | Contact | : [ Need Contact Information ] |  |  |

| (I.19) | From | : Werner Holding Co. (DE), Inc. | Value Date = 24 Nov 97 | CI-NA |
|---|---|---|---|---|
|  | Bank | : Chase Bank, New York |  |  |
|  | Account | : 400-702-274  (ABA# 021-000-021) |  |  |
|  | Amount | :       325,000.00 |  |  |
|  | Represents | :     White and Case Legal Fees |  |  |
|  |  |  |  |  |
|  | To | : White and Case |  |  |
|  | Bank | : Chase Bank, New York |  |  |
|  | Account | : 110-035-909 (ABA#021-000-021) |  |  |
|  | Contact | : [need contact] |  |  |

| (I.20) | From | : Werner Holding Co. (DE), Inc. | Value Date = 24 Nov 97 | CI-NA |
|---|---|---|---|---|
|  | Bank | : Chase Bank, New York |  |  |
|  | Account | :            0.00 |  |  |
|  | Amount | :       265,000.00 |  |  |
|  | Represents | : Cohen & Grigsby Fees |  |  |
|  |  |  |  |  |
|  | To | : Cohen & Grigsby |  |  |
|  | Bank | : PNC Bank |  |  |
|  | Account | : 0002790755 (ABA#043-000-096) |  |  |
|  | Contact | :            0.00 |  |  |

### J     OTHER PAYMENTS

| (J.1) | From | : Werner Holding Co. (PA), Inc. | Value Date = 24 Nov 97 | CI-NA |
|---|---|---|---|---|
|  | Bank | : Chase Bank, New York |  |  |
|  | Account | : 400-702-282  (ABA# 021-000-021) |  |  |
|  | Amount | :       854,166.65 |  |  |
|  | Represents | : Consulting Acceleration Payment |  |  |
|  |  |  |  |  |
|  | To | : Richard L. Werner |  |  |
|  | Bank | : National City Bank (Cleveland) |  |  |
|  | Account | : 394524404 (ABA#041-000-124) |  |  |
|  | Contact | : Joan Caldwell (216-575-3491) |  |  |

| (J.2) | From | : Werner Holding Co. (PA), Inc. | Value Date = 24 Nov 97 | CI-NA |
|---|---|---|---|---|
|  | Bank | : Chase Bank, New York |  |  |
|  | Account | : 400-702-282  (ABA# 021-000-021) |  |  |
|  | Amount | :       854,166.65 |  |  |
|  | Represents | : Consulting Acceleration Payment |  |  |
|  |  |  |  |  |
|  | To | : Robert L. Werner |  |  |
|  | Bank | : Northern Trust Bank of Florida |  |  |
|  | Account | : 1740002242 (ABA#066-009-650) |  |  |
|  | Contact | : Shirley Flagler (305.931.2230) |  |  |

III 041548

*WERNER ACQUISITION FUNDS FLOW*

Responsibility

| | | | | | |
|---|---|---|---|---|---|
| (13) | From | : Werner Holding Co. (PA), Inc. | Value Date = | 24 Nov 97 | CI-NA |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 400-702-282   (ABA# 021-000-021) | | | |
| | Amount | :          1,000,000.00 | | | |
| | Represents | : Consulting Acceleration Payment | | | |
| | | | | | |
| | To | : Donald M. Werner | | | |
| | Bank | : National City Bank (Cleveland) | | | |
| | Account | : 394532754  (ABA#041-000-124) | | | |
| | Contact | : Joan Caldwell (216-575-3491) | | | |
| (14) | From | : Werner Holding Co. (PA), Inc. | Value Date = | 24 Nov 97 | CI-NA |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 400-702-282   (ABA# 021-000-021) | | | |
| | Amount | :          1,000,000.00 | | | |
| | Represents | : Consulting Acceleration Payment | | | |
| | | | | | |
| | To | : Howard L. Solot | | | |
| | Bank | : National City Bank (Cleveland) | | | |
| | Account | : 394532770  (ABA#041-000-124) | | | |
| | Contact | :          0.00 | | | |
| (15) | From | : Werner Holding Co. (DE), Inc. | Value Date = | 24 Nov 97 | CI-NA |
| | Bank | : Chase Bank, New York | | | |
| | Account | :.400-702-274   (ABA# 021-000-021) | | | |
| | Amount | :          1,000,000.00 | | | |
| | Represents | : SERP Payment | | | |
| | | | | | |
| | To | : Donald M. Werner | | | |
| | Bank | : National City Bank (Cleveland) | | | |
| | Account | : 394532754  (ABA#041-000-124) | | | |
| | Contact | : Joan Caldwell (216-575-3491) | | | |
| (16) | From | : Werner Holding Co. (DE), Inc. | Value Date = | 24 Nov 97 | CI-NA |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 400-702-274   (ABA# 021-000-021) | | | |
| | Amount | :          1,000,000.00 | | | |
| | Represents | : SERP Payment | | | |
| | | | | | |
| | To | : Howard L. Solot | | | |
| | Bank | : National City Bank (Cleveland) | | | |
| | Account | : 394532770  (ABA#041-000-124) | | | |
| | Contact | :          0.00 | | | |
| (17) | From | : Werner Holding Co. (PA), Inc. | Value Date = | 24 Nov 97 | CI-NA |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 400-702-282   (ABA# 021-000-021) | | | |
| | Amount | :           857,500.00 | | | |
| | Represents | : Transaction Bonus | | | |
| | | | | | |
| | To | : Smith Barney | | | |
| | Bank | : Chase Bank, New York | | | |
| | Account | : 066-198038 (ABA#021-000-021)    FFC to: Donald Resnick, #576-53220-10-033 | | | |
| | Contact | : | | | |

**III 041549**

# EXHIBIT 7

(Excerpts Only)

AMENDED AND RESTATED

RECAPITALIZATION AGREEMENT

by and among

WERNER HOLDING CO. (PA), INC.

and

THE INVESTORS LISTED ON SCHEDULE 1

Dated as of October 27, 1997

## TABLE OF CONTENTS
(not part of Agreement)

### ARTICLE I

### THE RECAPITALIZATION

Section 1.1    Amendment and Restatement of the
               Company's Articles of Incorporation . . 2
Section 1.2    Reclassification of Shares . . . . . . . 3
Section 1.3    Purchase and Sale of the
               Investor Shares . . . . . . . . . . . 4
Section 1.4    Redemption of Shares . . . . . . . . . 5
Section 1.5    Compliance with Section 1906 of the PBCL 5
Section 1.6    The Closing . . . . . . . . . . . . 5

### ARTICLE II

### EXCHANGE OF CERTIFICATES

Section 2.1    Exchange Procedures . . . . . . . . . 5
Section 2.2    Collection of Certificates . . . . . . . 7

### ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Section 3.1    Organization . . . . . . . . . . . . . . 8
Section 3.2    Capitalization . . . . . . . . . . . . . 9
Section 3.3    Authorization; Validity of
               Agreement; Company Action . . . . . . 10
Section 3.4    Consents and Approvals; No Violations 11
Section 3.5    Financial Statements . . . . . . . . . 12
Section 3.6    No Undisclosed Liabilities . . . . . . 13
Section 3.7    Absence of Certain Changes . . . . . . 14
Section 3.8    Employee Benefit Plans; ERISA . . . . 14
Section 3.9    Litigation . . . . . . . . . . . . . . 17
Section 3.10   No Default; Compliance with
               Applicable Laws . . . . . . . . . . . 18
Section 3.11   Taxes . . . . . . . . . . . . . . . . 18
Section 3.12   Property . . . . . . . . . . . . . . . 21
Section 3.13   Intellectual Property . . . . . . . . 22
Section 3.14   Computer Software . . . . . . . . . . 23
Section 3.15   Contracts . . . . . . . . . . . . . . 23
Section 3.16   Environmental Laws and Regulations . . 24
Section 3.17   Labor Matters . . . . . . . . . . . . 25

Section 3.18    Applicability of Pennsylvania
                Takeover Statutes . . . . . . . . . .  25
Section 3.19    Brokers or Finders . . . . . . . . .  25
Section 3.20    Opinion of Financial Advisor . . . .  26
Section 3.21    Transactions with Affiliates . . . .  26
Section 3.22    Dissenters' Rights . . . . . . . . .  26
Section 3.23    Payments . . . . . . . . . . . . . .  26
Section 3.24    Share Ownership . . . . . . . . . .  26

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF THE INVESTORS

Section 4.1     Organization . . . . . . . . . . . .  27
Section 4.2     Authorization; Validity of
                Agreement; Necessary Action . . . . .  27
Section 4.3     Consents and Approvals; No Violations  28
Section 4.4     Brokers or Finders . . . . . . . . .  29
Section 4.5     Sufficient Funds . . . . . . . . . .  29
Section 4.6     Investcorp and Investor Agreements . .  29
Section 4.7     HSR . . . . . . . . . . . . . . . .  29
Section 4.8     Investment Intent of Investors . . . .  29

ARTICLE V

COVENANTS

Section 5.1     Interim Operations of the Company . .  30
Section 5.2     Access to Information . . . . . . . .  33
Section 5.3     No Solicitation . . . . . . . . . . .  34
Section 5.4     Employee Benefits . . . . . . . . . .  36
Section 5.5     Publicity . . . . . . . . . . . . . .  38
Section 5.6     Directors' and Officers'
                Indemnification . . . . . . . . . . .  38
Section 5.7     Proxy Statement . . . . . . . . . . .  40
Section 5.8     Shareholders' Meeting . . . . . . . .  41
Section 5.9     Approvals and Consents;
                Cooperation; Notification . . . . . .  42
Section 5.10    Principal Corporate Offices . . . . .  42
Section 5.11    Takeover Statutes . . . . . . . . . .  42
Section 5.12    Domestic International Sales
                Corporation . . . . . . . . . . . . .  43
Section 5.13    Further Assurances . . . . . . . . .  43
Section 5.14    Notification of Colorado
                Insurance Department . . . . . . . . .  43
Section 5.15    New Financing . . . . . . . . . . . .  43
Section 5.16    Landlord Consents . . . . . . . . . .  43

Section 5.17    Bought Share Program . . . . . . . .    44
Section 5.18    Capital Adequacy of the
                Surviving Corporation . . . . . . .    44
Section 5.19    Reconstitution of Company Board  . . .    44
Section 5.20    Shareholder Agreements . . . . . . .    45

                ARTICLE VI

                CONDITIONS

Section 6.1     Conditions to Each Party's
                Obligations  . . . . . . . . . . . .    45
Section 6.2     Conditions to the Obligations of
                the Investors  . . . . . . . . . .    45
Section 6.3     Conditions to the Obligations of
                the Company  . . . . . . . . . . .    46

                ARTICLE VII

                TERMINATION

Section 7.1     Termination  . . . . . . . . . . .    48
Section 7.2     Effect of Termination  . . . . . . .    50

                ARTICLE VIII

                MISCELLANEOUS

Section 8.1     Amendment and Modification . . . . . .    52
Section 8.2     Nonsurvival of Representations and
                Warranties . . . . . . . . . . . .    52
Section 8.3     Notices . . . . . . . . . . . . .    52
Section 8.4     Interpretation . . . . . . . . . .    54
Section 8.5     Counterparts . . . . . . . . . . .    55
Section 8.6     Entire Agreement; Third Party
                Beneficiaries  . . . . . . . . . .    55
Section 8.7     Severability . . . . . . . . . . .    55
Section 8.8     Governing Law  . . . . . . . . . .    55
Section 8.9     Jurisdiction . . . . . . . . . . .    55
Section 8.10    Specific Performance . . . . . . .    56
Section 8.11    Joint and Several Liability  . . . .    56
Section 8.12    Assignment . . . . . . . . . . . .    57
Section 8.13    Expenses . . . . . . . . . . . . .    57
Section 8.14    Headings . . . . . . . . . . . . .    57
Section 8.15    Waivers  . . . . . . . . . . . . .    57
Section 8.16    Company Disclosure Letter  . . . . .    57
Section 8.17    Investor Representative  . . . . . .    58

| Schedule 1 | The Investors |
| Schedule 2 | Shares to be rolled-over by shareholders active in the management of the Company |
| Schedule 3 | Allocations of Investor Shares among the Investors and amounts to be paid for such shares by each of the Investors |
| Schedule 4 | Persons to be made parties to employment agreements |
| Schedule 5 | Persons to be made parties to shareholder agreements |
| | |
| Exhibit A | Form of Amended and Restated Articles of Incorporation |
| Exhibit B | Management Arrangements |
| Exhibit C | Terms of Shareholder Agreements |

AMENDED AND RESTATED RECAPITALIZATION AGREEMENT

AMENDED AND RESTATED RECAPITALIZATION AGREEMENT (this "Agreement"), dated as of October 27, 1997 (the "Agreement"), by and among Werner Holding Co. (PA), Inc., a Pennsylvania corporation (the "Company"), and the Cayman Islands corporations listed on Schedule 1 (each, an "Investor" and, collectively, the "Investors").

WHEREAS, the Board of Directors of the Company (the "Company Board") has decided to effect a comprehensive recapitalization of the Company as described herein which includes certain transactions between the Company and the Investors (the "Recapitalization");

WHEREAS, the Company Board has (i) determined that the Recapitalization is fair to, and in the best interests of, the Company and its shareholders, and (ii) resolved to approve and adopt this Agreement and the transactions contemplated hereby upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, as a condition to the Investors' willingness to enter into this Agreement and consummate the transactions contemplated hereby, the Investors have required that certain shareholders agree, among other things, to vote shares of the Company's Class A Common Stock, par value $1 per share (the "Pre-Recapitalization Company Class A Common Stock"), and the Company's Class B Common Stock, par value $1 per share (the "Pre-Recapitalization Company Class B Common Stock"), beneficially owned by them in accordance with the terms of a Shareholder Voting Agreement, dated as of October 8, 1997 (the "Voting Agreement"), by and among the Investors and the shareholders parties thereto (the "Shareholders") and comply with the other provisions of such Voting Agreement; and in order to induce the Investors to enter into this Agreement, the Shareholders have executed and delivered the Voting Agreement;

WHEREAS, the amendment and restatement of the Company's articles of incorporation contemplated by the Recapitalization require for approval (i) the vote of a majority of the issued and outstanding shares of each of (a) the Pre-Recapitalization Company Class A Common Stock, and (b) the Pre-Recapitalization Company Class B

Common Stock, and (ii) all other votes required by Section 1906 of the Pennsylvania Business Corporation Law (the "PBCL");

WHEREAS, the Company Board has determined that there is a reasonable basis for the reclassification of the Company Class A Common Stock and the Company Class B Common Stock provided for hereunder;

WHEREAS, the Company and the Investors desire to make certain representations, warranties, covenants and agreements in connection with the Recapitalization and also to prescribe various conditions to the Recapitalization; and

WHEREAS, it is intended that the transactions contemplated hereby be accounted for as a recapitalization for financial reporting purposes.

NOW, THEREFORE, in consideration of the representations, warranties, covenants and agreements contained in this Agreement, the parties hereto, intending to be legally bound hereby, agree as follows:

ARTICLE I

THE RECAPITALIZATION

Section 1.1  Amendment and Restatement of the Company's Articles of Incorporation.  In accordance with the PBCL, and upon the terms and subject to the satisfaction or waiver of conditions contained in this Agreement, at or prior to the Closing, the Company shall file with the Secretary of State of the Commonwealth of Pennsylvania Articles of Amendment to amend and restate the Company's Articles of Incorporation to read in their entirety substantially in the form attached as Exhibit A (the "Amended Articles").  The Amended Articles shall, among other things, provide as follows:

(a) The Company shall have eight classes of common stock, par value $.01 per share (collectively, the "Post-Recapitalization Company Common Stock"), and, (i) the first class of common stock shall be designated as "Class A Common Stock", (ii) the second class of common stock shall be designated as "Class A-1 Common Stock",

(iii) the third class of common stock shall be designated as "Class B Common Stock", (iv) the fourth class of common stock shall be designated as "Class B-1 Common Stock", (v) the fifth class of common stock shall be designated as "Class C Common Stock", (vi) the sixth class of common stock shall be designated as "Class D Common Stock", (vii) the seventh class of common stock shall be designated as "Class E Common Stock", and (viii) the eighth class of common stock shall be designated as "Common Stock".

(b)    Each share of Class A-1 Common Stock and each share of Class B-1 Common Stock shall be subject to mandatory redemption by the Company at any time prior to March 31, 1998 at a redemption price of $2,421.29 per share (the "Initial Cash Redemption Price") plus the right to potentially receive additional consideration depending on certain future events, including the future growth in the value of the equity of the Company, as set forth in the Amended Articles.

Section 1.2    Reclassification of Shares.

(a) Upon the effectiveness of the Amended Articles, each issued and outstanding share (other than any shares to be cancelled pursuant to Section 1.2(b)) of Pre-Recapitalization Company Class A Common Stock and Pre-Recapitalization Company Class B Common Stock (collectively, the "Pre-Recapitalization Company Common Stock") shall be reclassified and converted as follows:

(i) for each share of Pre-Recapitalization Company Class A Common Stock held by the shareholders of the Company listed on Schedule 2 and noted thereon as being affiliated shareholders (the "Listed Shareholders"): (A) the right to receive a fraction of a fully paid and nonassessable share of Class A Common Stock, and (B) the right to receive a fraction of a fully paid and nonassessable share of Class A-1 Common Stock, as provided on Schedule 2;

(ii) for each share of Pre-Recapitalization Company Class A Common Stock held by shareholders of the Company other than the Listed Shareholders (the "Other Sharehold-

ers"): (A) the right to receive .1376 of a
fully paid and nonassessable share of Class A
Common Stock, and (B) the right to receive
.8624 of a fully paid and nonassessable share
of Class A-1 Common Stock;

(iii) for each share of Pre-Recapitaliza-
tion Company Class B Common Stock held by the
Listed Shareholders: (A) the right to receive
a fraction of a share of a fully paid and
nonassessable share of Class B Common Stock,
and (B) the right to receive a fraction of a
share of a fully paid and nonassessable share
of Class B-1 Common Stock, as provided on
Schedule 2; and

(iv) for each share of Pre-Recapitaliza-
tion Company Class B Common Stock held by the
Other Shareholders: (A) the right to receive
.1376 of a fully paid and nonassessable share
of Class B Common Stock, and (B) the right to
receive .8624 of a fully paid and
nonassessable share of Class B-1 Common Stock.

(b)   Each share of Pre-Recapitalization Com-
pany Common Stock held in the treasury of the Company or
by any Subsidiary of the Company immediately prior to
the Closing Date shall, at the Closing, by virtue of the
Recapitalization and without any action on the part of
the holder thereof, be cancelled and retired and cease
to exist and no payment shall be made with respect
thereto.

Section 1.3   Purchase and Sale of the Investor
Shares.   Pursuant to the terms and subject to the condi-
tions of this Agreement, at the Closing, (a) the Company
shall sell to each of the Investors the number of shares
of Post-Recapitalization Company Common Stock, and from
such classes of Class C Common Stock, Class D Common
Stock or Class E Common Stock, to be set forth next to
the name of such Investor on Schedule 3 (the "Investor
Shares") for an aggregate purchase price for all Inves-
tor Shares of $122,715,000 (the "Purchase Price") and
for a per share purchase price of $2,421.29, (b) the
Investors shall pay the Purchase Price (allocated among
the Investors in accordance with Schedule 3), by wire
transfer of immediately available funds, to such account

or accounts designated by the Company not less than two business days prior to the Closing Date, and (c) the Company shall issue to each of the Investors certificates representing the Investor Shares purchased by such Investor pursuant to this Section 1.3.

Section 1.4   Redemption of Shares. At the Closing, following the effectiveness of the Amended Articles and the receipt of the Purchase Price, and after giving effect to the transactions contemplated by Section 1.2, the Company shall redeem (the "Redemption") all of the issued and outstanding shares of Class A-1 Common Stock and Class B-1 Common Stock.

Section 1.5   Compliance with Section 1906 of the PBCL.  The treatment of shares of Pre-Recapitalization Company Common Stock hereunder is intended to comply with the provisions of Section 1906 of the PBCL applicable to the transactions contemplated hereby.

Section 1.6   The Closing.  The closing of the Recapitalization (the "Closing") shall take place at 10:00 a.m., E.S.T., at the offices of Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York  10166 (or such other place as the parties may agree) as soon as practicable following the satisfaction or waiver of the conditions set forth in Article VI.  The date on which the Closing occurs is referred to herein as the "Closing Date."  The effectiveness of the Amended Articles, the purchase and sale of the Investor Shares and the Redemption shall be deemed to occur sequentially in that order but the Closing will be conducted in such a manner that none of such events will occur unless all three of such events occur at the Closing.

ARTICLE II

EXCHANGE OF CERTIFICATES

Section 2.1   Exchange Procedures.

(a) Contemporaneously with the mailing of the Proxy Statement (as hereinafter defined), the Closing Date, the Company will mail to each holder of record of a certificate or certificates which immediately prior to

ARTICLE VIII

MISCELLANEOUS

Section 8.1  Amendment and Modification.  Subject to applicable law, this Agreement may be amended, modified and supplemented in any and all respects, whether before or after any vote of the shareholders of the Company contemplated hereby, by written agreement of the parties hereto at any time prior to the Closing Date with respect to any of the terms contained herein.

Section 8.2  Nonsurvival of Representations and Warranties.  None of the representations and warranties in this Agreement or in any schedule, instrument or other document delivered pursuant to this Agreement shall survive the Closing Date or the termination of this Agreement.  This Section 8.2 shall not limit any covenant or agreement contained in this Agreement which by its terms contemplates performance after the Closing Date.

Section 8.3  Notices.  Subject to Section 8.9, all notices, consents and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) when delivered by hand or by Federal Express or a similar overnight courier to, (b) five days after being deposited in any United States Post Office enclosed in a postage prepaid, registered or certified envelope addressed to, or (c) when successfully transmitted by telecopier (with a confirming copy of such communication to be sent as provided in clauses (a) or (b) above) to, the party for whom intended, at the address or telecopier number for such party set forth below (or at such other address or telecopier number for a party as shall be specified by like notice, provided, however, that any notice of change of address or telecopier number shall be effective only upon receipt):

(a)  if to the Investors, to:

      Investcorp Investment Equity Limited
      P.O. Box 1111
      West Wind Building
      George Town, Grand Cayman
      British West Indies
      Telecopy No.:   (345) 949-7920

      with copies to:

      Investcorp International, Inc.
      280 Park Avenue, 37th Floor West
      New York, New York  10017
      Telecopy No.:   (212) 599-4700
      Attention: Christopher J. Stadler

      and

      Gibson, Dunn & Crutcher LLP
      200 Park Avenue
      New York, New York  10166-0193
      Telecopy No.:    (212) 351-4035
      Attention:  E. Michael Greaney, Esq.

(b)  if to the Company, to:

      Werner Holding Co. (PA), Inc.
      93 Werner Road
      Greenville, Pennsylvania  16125-9499
      Telecopy No.: (412) 588-0618
      Attention: Eric J. Werner, General
                     Counsel

      with copies to:

      Skadden, Arps, Slate, Meagher &
      Flom LLP
      919 Third Avenue
      New York, New York 10022
      Telecopy No.: (212) 735-2000
      Attention:  Roger S. Aaron, Esq.

and

Cohen & Grisby, P.C.
2900 CNG Tower
625 Liberty Avenue
Pittsburgh, Pennsylvania  15222
Telecopy No.: (412) 391-3382
Attention:  Charles C. Cohen, Esq.

Section 8.4  Interpretation.  The words "here-
of," "herein" and "herewith" and words of similar import
shall, unless otherwise stated, be construed to refer to
this Agreement as a whole and not to any particular
provision of this Agreement, and article, section, para-
graph, exhibit and schedule references are to the arti-
cles, sections, paragraphs, exhibits and schedules of
this Agreement unless otherwise specified.  Whenever the
words "include," "includes" or "including" are used in
this Agreement they shall be deemed to be followed by the
words "without limitation."  The words describing the
singular number shall include the plural and vice versa,
words denoting any gender shall include all genders.  The
phrase "to the knowledge of" or any similar phrase shall
mean such facts and other information which as of the
date of determination are actually known to any vice
president, chief financial officer, general counsel,
chief compliance officer, controller, and any officer
superior to any of the foregoing, of the referenced party
after the conduct of a reasonable investigation under the
circumstances by such officer.  The phrases "the date of
this Agreement," "the date hereof" and terms of similar
import, unless the context otherwise requires, shall be
deemed to refer to October 27, 1997.  As used in this
Agreement, the term "affiliate(s)" shall have the meaning
set forth in Rule 12b-2 of the Exchange Act.  As used in
this Agreement, "Person" means an individual, corpora-
tion, partnership, joint venture, association, trust,
estate or other entity or organization, including a
Governmental Entity.  As used in this Agreement, the term
"business day" means a day, other than a Saturday or a
Sunday, on which banking institutions in New York are re-
quired to be open. The parties have participated jointly
in the negotiation and drafting of this Agreement.  In
the event an ambiguity or question of intent or interpre-
tation arises, this Agreement shall be construed as if
drafted jointly by the parties and no presumption or
burden of proof shall arise favoring or disfavoring any

party by virtue of the authorship of any provisions of
this Agreement.

Section 8.5  <u>Counterparts</u>.  This Agreement may
be executed in multiple counterparts, all of which shall
together be considered one and the same agreement.

Section 8.6  <u>Entire Agreement; Third Party
Beneficiaries</u>.  This Agreement, the Confidentiality
Agreement and the Company Disclosure Letter (a) consti-
tute the entire agreement and supersede all prior agree-
ments and understandings, both written and oral, among
the parties with respect to the subject matter hereof,
and (b) except as provided in Section 5.6, are not in-
tended to confer upon any person, other than the parties
hereto and the Investor Representative (as defined below)
(with respect to Section 8,17) and their respective
successors and permitted assigns, any rights or remedies
hereunder.

Section 8.7  <u>Severability</u>.  If any term, provi-
sion, covenant or restriction of this Agreement is held
by a court of competent jurisdiction or other authority
to be invalid, void, unenforceable or against its regula-
tory policy, the remainder of the terms, provisions,
covenants and restrictions of this Agreement shall remain
in full force and effect and shall in no way be affected,
impaired or invalidated.

Section 8.8  <u>Governing Law</u>.  This Agreement
shall be governed and construed in accordance with the
laws of the Commonwealth of Pennsylvania applicable to
contracts to be made and performed entirely therein with-
out giving effect to the principles of conflicts of law
thereof or of any other jurisdiction.

Section 8.9  <u>Jurisdiction</u>.  Each of the parties
hereto hereby expressly and irrevocably submits to the
non-exclusive personal jurisdiction of the United States
District Court for the Western District of Pennsylvania
and to the jurisdiction of any other competent courts of
the Commonwealth of Pennsylvania located in the County of
Allegheny (collectively, the "Pennsylvania Courts"), pre-
serving, however, all rights of removal to such federal
courts under 28 U.S.C. Section 1441, in connection with
all disputes arising out of or in connection with this
Agreement or the transactions contemplated hereby and

agrees not to commence any litigation relating thereto
except in such courts.  If the aforementioned courts do
not have subject matter jurisdiction, then the proceeding
shall be brought in any other state or federal courts
located in the Commonwealth of Pennsylvania, preserving,
however, all rights of removal to such federal courts
under 28 U.S.C. Section 1441.  Each of the parties hereby
irrevocably and unconditionally (i) waives any objection
to the laying of venue of any litigation arising out of
this Agreement or the transactions contemplated hereby in
the Pennsylvania Courts, (ii) waives and agrees not to
plead or claim in any such courts that any such litiga-
tion brought in any such courts has been brought in an
inconvenient forum, (iii) waives the right to any other
jurisdiction or venue for any litigation arising out of
or in connection with this Agreement or the transactions
contemplated hereby to which any of them may be entitled
by reason of its present or future domicile, and (iv)
consents to service of any and all process in any action
or proceeding arising out of or relating to this Agree-
ment or the transactions contemplated hereby by the
mailing or telecopying such process to the Investor
Representative at the address or telecopy number, as the
case may be, specified in Section 8.3 hereof.  Notwith-
standing the foregoing, each of the parties hereto agrees
that each of the other parties shall have the right to
bring any action or proceeding for enforcement of a
judgment entered by the Pennsylvania Courts in any other
court or jurisdiction.  Nothing herein shall limit the
right of a party to effect service of process on the
other party by any legally available method.

        Section 8.10  _Specific Performance_.  Each of
the parties hereto acknowledges and agrees that in the
event of any breach of this Agreement, each non-breaching
party would be irreparably and immediately harmed and
could not be made whole by monetary damages.  It is
accordingly agreed that the parties hereto (a) will
waive, in any action for specific performance, the de-
fense of adequacy of a remedy at law and (b) shall be
entitled, in addition to any other remedy to which they
may be entitled at law or in equity, to compel specific
performance of this Agreement in any action instituted in
accordance with Section 8.9.

        Section 8.11   _Joint and Several Liability_.
Each of the Investors hereby agrees that they will be

jointly and severally liable for all covenants, agreements, obligations and representations and warranties made by any of them in this Agreement.

Section 8.12  <u>Assignment</u>.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of the other parties.  Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns.

Section 8.13  <u>Expenses</u>.  Except as otherwise provided herein, all costs and expenses incurred in connection with this Agreement and the consummation of the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not any of the transactions contemplated hereby is consummated.

Section 8.14  <u>Headings</u>.  Headings of the Articles and Sections of this Agreement and the Table of Contents are for convenience of the parties only, and shall be given no substantive or interpretative effect whatsoever.

Section 8.15  <u>Waivers</u>.  Except as otherwise provided in this Agreement, any failure of any of the parties to comply with any obligation, covenant, agreement or condition herein may be waived by the party or parties entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

Section 8.16  <u>Company Disclosure Letter</u>.  The Company Disclosure Letter shall be construed with and as an integral part of this Agreement to the same extent as if the same had been set forth verbatim herein.  The disclosure of any matter in the Company Disclosure Letter shall not be deemed to be an admission or representation as to the materiality of the item so disclosed.

Section 8.17 <u>Investor Representative</u>. Each of the Investors hereby designates and appoints Investcorp Investment Equity Limited, a Cayman Islands corporation, as such Investor's agent, attorney-in-fact and representative (in such capacity, the "Investor Representative"), and as such is hereby authorized and directed to take all such actions and exercise all such rights, power or authority, and make any decision or determination as are required, authorized or permitted by this Agreement to be performed, exercised or made by such Investor. Any such actions taken, exercises of rights, power or authority, and any decision or determination made by the Investor Representative consistent therewith, shall be absolutely and irrevocably binding on each Investor as if such Investor personally had taken such action, exercised such rights, power or authority or made such decision or determination in such Investor's individual capacity. The Investor Representative hereby acknowledges that it has full power and authority to act in the premises (including, without limitation, the power and authority, on behalf of the Investors, to execute and deliver any certificate, notice, consent or instructions hereunder) and to designate and appoint a substitute or substitutes to act hereunder with the same power and authority as the Investor Representative would have if personally acting. Each of the Investors agrees that each party hereto may conclusively rely without further investigation on the instructions and decisions of the Investor Representative acting in such capacity on behalf of any Investor, and that, as between each Investor and each other party hereto, all actions of any Investor Representative acting in such capacity shall be conclusively binding on each Investor. Each Investor acknowledges that the foregoing appointment and designation shall be deemed to be coupled with an interest, shall be irrevocable and shall survive the death or incapacity of such Investor. The Investor Representative shall not be liable to the Investors for the performance of any act or the failure to act under or in connection with this Agreement, and the Investors shall indemnify and hold harmless the Investor Representative from any liability in connection with acting as such, so long as he acted or failed to act in good faith in what it reasonably believed to be the scope of his authority for a purpose which he reasonably believed to be in the best interests of the Investors. A successor to the Investor Representative may be chosen by a major-

ity of the Investors provided that notice thereof is given by the new Investor Representative to the Company.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Company and the Investors have caused this Agreement to be signed by their respective officers thereunto duly authorized as of the date first written above.

WERNER HOLDING CO. (PA),, INC.

By: _Donald M. Werner_____
    Name: Donald M. Werner
    Title: President and CEO


INVESTCORP INVESTMENT EQUITY LIMITED


By: _____
    Name:
    Title:


BALLET LIMITED


By: _____
    Name:
    Title:


DENARY LIMITED


By: _____
    Name:
    Title:


GLEAM LIMITED


By: _____
    Name:
    Title:


60

IN WITNESS WHEREOF, the Company and the Investors, have caused this Agreement to be signed by their respective officers thereunto duly authorized as of the date first written above.

WERNER HOLDING CO. (PA), INC.

By: _____
    Name:
    Title:

INVESTCORP INVESTMENT EQUITY
    LIMITED

By: _____
    Name:    The Director Ltd.
    Title:   Director

BALLET LIMITED

By: _____
    Name:
    Title:

DENARY LIMITED

By: _____
    Name:
    Title:

GLEAM LIMITED

By: _____
    Name:
    Title:

HIGHLANDS LIMITED

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the Company and the Investors, have caused this Agreement to be signed by their respective officers thereunto duly authorized as of the date first written above.

WERNER HOLDING CO. (PA), INC.

By: _____
    Name:
    Title:


INVESTCORP INVESTMENT EQUITY
    LIMITED

By: _____
    Name:
    Title:


BALLET LIMITED

By: _____
    Name:
    Title:


DENARY LIMITED

By: _____
    Name:
    Title:


GLEAM LIMITED

By: _____
    Name:
    Title:


HIGHLANDS LIMITED

By: _____
    Name:
    Title:

NOBLE LIMITED

By: _____

    Name:
    Title:

OUTRIGGER LIMITED

By: _____

    Name:
    Title:

QUILL LIMITED

By: _____

    Name:
    Title:

RADIAL LIMITED

By: _____

    Name:
    Title:

SHORELINE LIMITED

By: _____

    Name:
    Title:

ZINNIA LIMITED

By: _____

    Name:
    Title:

ANNISVILLE LIMITED

By: _____

    Name:
    Title:

NOBLE LIMITED

By:_____
   Name:
   Title:

OUTRIGGER LIMITED

By:_____
   Name:
   Title:

QUILL LIMITED

By:_____
   Name:
   Title:

RADIAL LIMITED

By:_____
   Name:
   Title:

SHORELINE LIMITED

By:_____
   Name:
   Title:

ZINNIA LIMITED

By:_____
   Name:
   Title:

ANNISVILLE LIMITED

By:_____
   Name:  Martonmere Services Ltd.
   Title: Director

COOPERSTOWN LIMITED

By: _____
    Name:  Martonmere Services Ltd.
    Title: Director


FRISCO LIMITED

By: _____
    Name:  Martonmere Services Ltd.
    Title: Director


PLATEA LIMITED

By: _____
    Name:  Martonmere Services Ltd.
    Title: Director


STEPUP LIMITED

By: _____
    Name:    The Director Ltd.
    Title: Director


NA972740.131/7+

<u>Schedule 1</u>

<u>The Investors</u>

Investcorp Investment Equity Limited
Ballet Limited
Denary Limited
Gleam Limited
Highlands Limited
Noble Limited
Outrigger Limited
Quill Limited
Radial Limited
Shoreline Limited
Zinnia Limited
Annisville Limited
Cooperstown Limited
Frisco Limited
Platea Limited
Stepup Limited

schedule 2

| Affiliated Shareholder | Number of Shares of Class A Common Stock | Number of Shares of Class A-1 Common Stock | Number of Shares of Class B Common Stock | Number of Shares of Class B-1 Common Stock |
|---|---|---|---|---|
| Donald M. Werner | 387.7394 | 1815.1806 | 659.0138 | 3085.1362 |
| Donald M. Werner and Barbara L. Werner, Jt. Tenants | 0 | 0 | 21.6494 | 101.3506 |
| Barbara L. Werner | 0 | 0 | 88.0058 | 411.9942 |
| Howard L. Solot | 324.8570 | 1483.3630 | 1202.4123 | 5490.4577 |
| Janet F. Solot | 36.4701 | 166.5299 | 212.1734 | 968.8266 |
| Bruce D. Werner-Trust | 46.7269 | 0 | 990.4766 | 4734.4434 |
| Bruce D. Werner | 0 | 223.3531 | 0 | 0 |
| Bruce D. Werner Family Limited Partnership | 0 | 0 | 0 | 0 |
| Bruce D. Werner and Tammy H. Werner, Jt. Tenants | 0 | 0 | 391.0058 | 1868.9942 |
| Michael E. Werner, Trustee of Michael E. Werner Rev. Trust U/A/D 1/2/96 | | | 17.3011 | 82.6989 |
| Michael E. Werner | 0 | 0 | 0 | 0 |
| Laura W. Werner, Trustee of the Laura W. Werner Rev. Trust U/A/D 1/2/96 | 73.8427 | 196.2373 | 1052.0838 | 2795.9162 |
| Jonathan C. Werner Gift Trust U/A/D 11/1/96 | 0 | 0 | 179.9808 | 1128.0192 |
| Margot A. Werner Gift Trust U/A/D 11/1/96 | 0 | 0 | 102.9248 | 645.0752 |
| Stephanie N. Werner Gift Trust U/A/D 11/1/96 | 0 | 0 | 57.6544 | 361.3456 |
| Craig R. Werner-Trust | 16.8952 | 84.6048 | 102.9248 | 645.0752 |
| Craig R. Werner | 44.9561 | 225.1239 | 996.7100 | 4991.1600 |
| Craig R. Werner, Custodian for Kurt J. Werner | 0 | 0 | 0 | 0 |
| Craig R. Werner, Custodian for Kyle G. Werner | 0 | 0 | 170.2833 | 852.7167 |
| Craig R. Werner, Custodian for Erica Renee Werner | 0 | 0 | 170.2833 | 852.7167 |
| Eric J. Werner | 61.2008 | 310.3792 | 805.7122 | 4086.1578 |
| Eric J. Werner and Melanie R. Werner, Jt. Tenants | 0 | 0 | 29.4821 | 149.5179 |
| Melanie R. Werner, Custodian for Isabelle N. Werner | 0 | 0 | 274.5577 | 1218.4423 |
| Melanie R. Werner, Custodian for Sophia K. Werner | 0 | 0 | 274.5577 | 650.4423 |
| Michael J. Solot | 47.0954 | 222.9846 | 778.9106 | 3687.9394 |

182658.03-New York3S5A

SCHEDULE 3

| | |
|---|---|
| Investcorp Investment Equity Limited | 80 Shares of Class D Common Stock |
| Ballet Limited | 92 Shares of Class D Common Stock |
| Denary Limited | 92 Shares of Class D Common Stock |
| Gleam Limited | 92 Shares of Class D Common Stock |
| Highlands Limited | 92 Shares of Class D Common Stock |
| Noble Limited | 92 Shares of Class D Common Stock |
| Outrigger Limited | 92 Shares of Class D Common Stock |
| Quill Limited | 92 Shares of Class D Common Stock |
| Radial Limited | 92 Shares of Class D Common Stock |
| Shoreline Limited | 92 Shares of Class D Common Stock |
| Zinnia Limited | 92 Shares of Class D Common Stock |
| Annisville Limited | 11,250 Shares of Class E Common Stock |
| Cooperstown Limited | 11,250 Shares of Class E Common Stock |
| Frisco Limited | 11,250 Shares of Class E Common Stock |
| Platea Limited | 11,250 Shares of Class E Common Stock |
| Stepup Limited | 4,681.785 Shares of Class C Common Stock |

NA972880.187/2+

Schedule 4

Donald M. Werner
Howard L. Solot
Bruce D. Werner
Michael E. Werner
Craig R. Werner
Eric J. Werner
Michael J. Solot

Schedule 5

Donald M. Werner
Howard L. Solot
Bruce D. Werner
Michael E. Werner
Craig R. Werner
Eric J. Werner
Michael J. Solot

EXHIBIT 8

EXECUTION COPY

# SHAREHOLDER VOTING AGREEMENT

SHAREHOLDER VOTING AGREEMENT, dated as of October 8, 1997 (this "Agreement"), by and among the sixteen entities listed on the signature pages hereto (the "Investors"), Werner Holding Co. (PA), Inc., a Pennsylvania corporation (the "Company"), and the other party signatory hereto ("Shareholder").

## W I T N E S S E T H:

WHEREAS, concurrently herewith, the Investors and the Company are entering into a Recapitalization Agreement (as such agreement may hereafter be amended from time to time, the "Recapitalization Agreement") pursuant to which the Investors will invest in the Company (the "Recapitalization");

WHEREAS, pursuant to the terms of the Recapitalization Agreement, the Company shall amend and restate its Articles of Incorporation in their entirety substantially in the form attached thereto as Exhibit A (the "Amended Articles");

WHEREAS, Shareholder (collectively with (i) such Shareholder's Family Members (as defined below) and (ii) all trusts and partnerships that the Shareholder or a Family Member is deemed to control) owns or has executory, administrative or custodial control over the number of shares, par value $1.00 per share, of Class A Common Stock of the Company and the number of shares, par value $1.00 per share, of Class B Common Stock of the Company set forth opposite Shareholder's name on Schedule I hereto (all such shares are collectively referred to herein as the "Shares" or "Company Common Stock");

WHEREAS, as an inducement and a condition to entering into the Recapitalization Agreement, the Investors have required that Shareholder agree, and the Shareholder has agreed, to enter into this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual premises, representations, warranties, covenants and agreements contained herein, the parties hereto hereby agree as follows:

1.  <u>Voting</u>. Shareholder hereby agrees with the Investors that, during the period commencing on the date hereof and continuing until the first to occur of the Closing Date (as defined in the Recapitalization Agreement) or termination of Recapitalization Agreement in accordance with its terms, at any meeting of the Company's shareholders, however called, or in connection with any written consent of the Company's shareholders, Shareholder shall vote all shares of capital stock of the Company owned or controlled by Shareholder, whether now owned or controlled or hereafter acquired or controlled, (i) in favor of approval of the Amended Articles and any actions required in furtherance thereof and hereof as and to the extent required;

(ii) against any action or agreement that would result in a material breach of the Recapitalization Agreement by the Company; and (iii) except as otherwise agreed to in writing in advance by the Investors, against any proposal which would result in a change of control or recapitalization of the Company (other than the Recapitalization and the transactions contemplated by the Recapitalization Agreement). Shareholder shall not enter into any agreement or understanding with any person or entity the effect of which would be inconsistent or violative of the provisions and agreements contained in this Agreement. The obligations of Shareholder under this Section 1 shall be inoperative during any period of time that the Board of Directors of the Company (the "Board") has properly exercised its right to refrain from recommending approval of the Recapitalization or has properly exercised its right to withdraw its recommendation that the Recapitalization be approved by shareholders of the Company, in either case in accordance with the provisions of Section 5.3 of the Recapitalization Agreement.

2.    <u>Representations</u> and <u>Warranties</u>. Shareholder hereby represents and warrants to the Investors as follows:

(a)    <u>Ownership of Shares</u>. Shareholder is the record owner of or has executory, administrative or custodial control over the Shares. On the date hereof, the Shares constitute all of the shares of capital stock of the Company owned or controlled by Shareholder. Except for matters that would not impair the ability of Shareholder to fulfill Shareholder's obligations under this Agreement, Shareholder has sole and unqualified voting power with respect to the Shares and there are no existing options, warrants, calls subscriptions or other rights exercisable by a third party with respect to the Shares.

(b)    <u>Power; Binding Agreement</u>. Shareholder has the legal capacity, power and authority to enter into and perform all of Shareholder's obligations under this Agreement. The execution, delivery and performance of this Agreement by Shareholder do not and will not violate any law, regulation or court order or any other agreement to which Shareholder is a party including, without limitation, any voting agreement, shareholder agreement or voting trust. This Agreement has been duly and validly executed and delivered by Shareholder and constitutes a valid and binding agreement of Shareholder, enforceable against Shareholder in accordance with its terms.

(c)    <u>Reliance by Investors</u>. Shareholder understands and acknowledges that the Investors are entering into the Recapitalization Agreement in reliance upon Shareholder's execution, delivery and performance of this Agreement.

3.    <u>Restriction on Transfer, Proxies and Non-Interference</u>. Shareholder shall not, directly or indirectly: (i) except as contemplated by the Recapitalization Agreement, offer for sale, sell, transfer, tender, pledge, encumber, assign or otherwise dispose of, or enter into any contract, option or other arrangement or understanding with respect to or consent to the offer for sale, sale, transfer, tender, pledge, encumbrance, assignment or other disposition of, any of the Shares or any interest therein; (ii) grant any proxies or powers of attorney, or enter into a voting agreement or voting trust with respect to any of the foregoing that would be inconsistent herewith; or (iii) take any action that would make any representation or warranty of Shareholder contained

herein untrue or incorrect or have the effect of preventing or disabling Shareholder from performing Shareholder's obligations under this Agreement. To the extent that Company stock records are maintained by an independent transfer agent, the Company will direct the Company's transfer agent to place stop transfer order instructions with respect to the Shares and will notify such transfer agent that this Agreement places restrictions on the Shares. Notwithstanding anything to the contrary provided in this Agreement, the Shareholder shall have the right to transfer Shares to (i) any Family Member (as defined below), (ii) the trustee or trustees of a trust solely (except for remote contingent interests) for the benefit of Shareholder and/or one or more Family Members, (iii) a foundation created or established by Shareholder, (iv) a charitable remainder trust for the benefit of Shareholder and/or one or more Family Members and/or designated charities, (v) a partnership of which Shareholder or a Family Member owns all of the partnership interests, (vi) the executor, administrator personal representative of the estate of Shareholder, or (vii) any guardian, trustee or conservator appointed with respect to the assets of Shareholder; provided, that in the case of any such transfer, the transferee shall execute an agreement to be bound by the terms of this Agreement (so that the total number of Shares shall remain unchanged). "Family Member" shall mean the Shareholder's spouse if living with the Shareholder or the Shareholder's issue.

4.    Acquisition Proposals. Shareholder (i) shall immediately cease any existing discussions or negotiations, if any, with any parties conducted heretofore with respect to recapitalization of the Company or any acquisition of all or any material portion of the assets of, or any equity interest in, the Company or its subsidiaries, and (ii) shall not, directly or indirectly, initiate, solicit or knowingly encourage (including, without limitation, by way of furnishing non-public information or assistance), or take any other action to facilitate knowingly, any inquiries or the making of any proposal which would result in a change of control or recapitalization of the Company or any acquisition of the types referred to in clause (i) above. During any period of time that, based upon a proper determination by the Board under the 2nd sentence of Section 5.3 of the Recapitalization Agreement that the Company may take the actions permitted thereby, the Company is pursuing any of the activities permitted by such 2nd sentence of such Section 5.3, Shareholder's obligations under this Section 4 shall be deemed inoperative such that Shareholder may also pursue the activities which the Company is permitted to pursue.

5.    Stop Transfer. Shareholder shall not request that the Company register the transfer of any interest representing any of the Shares, unless such transfer is made in compliance with this Agreement. In the event of a stock dividend or distribution, or any change in the Company Common Stock by reason of any stock dividend, split-up, recapitalization, combination, exchange of shares or the like, the term "Shares" shall be deemed for purposes of this Agreement to include all such stock dividends and distributions and any shares into which or for which any or all of the Shares may be changed or exchanged.

6.    Termination. This Agreement shall terminate upon the earlier of (a) termination of the Recapitalization Agreement in accordance with its terms or (b) the Effective Time (as defined in the Recapitalization Agreement).

7.    Shareholder Capacity. It is understood and agreed that Shareholder's commitments

in this Agreement are made solely in Shareholder's capacity as a shareholder of the Company.

8.     Miscellaneous.

(a)     Entire Agreement.  This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

(b)     Certain Events.  Shareholder agrees that this Agreement and the obligations hereunder shall attach to Shareholder's Shares and shall be binding upon any person to which legal or beneficial ownership of such Shares shall pass, whether by operation of law or otherwise. Notwithstanding any transfer of Shares, the transferor shall remain liable for the performance of all obligations under this Agreement of the transferor.

(c)     Assignment.  This Agreement may not be assigned by any party, by operation of law or otherwise, without the prior written consent of the other party.

(d)     Amendments.  This Agreement may not be amended except by written agreement executed by the Investors and Shareholder.

(e)     Notices.  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly received if so given) by hand delivery, telegram, telex or telecopy, or by mail (registered or certified mail, postage prepaid, return receipt requested) or by any courier service, such as Federal Express, providing proof of delivery.  All communications hereunder shall be delivered to the respective parties at the following addresses:

If to Shareholder:          At the address set forth on Schedule I hereto

If to the Investors:        Investcorp International Inc.
                            280 Park Avenue, 37th Floor West
                            New York, New York 10017
                            Facsimile:     212.599.4700
                            Attention:     Christopher Stadler

with a copy to:             Gibson, Dunn & Crutcher LLP
                            200 Park Avenue, 48th Floor
                            New York, New York  10166
                            Facsimile:     212.351.4035
                            Attention:     E. Michael Greaney, Esq.

If to Company:

Werner Holding Co. (PA), Inc.
93 Werner Road
Greenville, Pennsylvania 16125-9499
Telephone:      412.588.2000 ext. 2205
Facsimile:      412.588.0618
Attention:      Eric J. Werner, Esq., General
Counsel

with copies to:

Skadden, Arps, Slate, Meagher & Flom LLP
919 Third Avenue
New York, New York 10022
Telephone:      212.735.3000
Facsimile:      212.735.2000
Attention:      Roger S. Aaron, Esq.

and

Cohen & Grisby, P.C.
2900 CNG Tower
625 Liberty Avenue
Pittsburgh, Pennsylvania 15222
Telephone:      412.394.4900
Facsimile:      412.391.3382
Attention:      Charles C. Cohen, Esq.

or to such other address as the person to whom notice is given may have previously furnished to the others in writing in the matter set forth above.

(f)    Severability.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or portion of any provision in such jurisdiction, and this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein.

(g)    Specific Performance.  Each of the parties hereto recognizes and acknowledges that a breach by it of any covenants or agreements contained in this Agreement will cause the other party to sustain damage for which it would not have an adequate remedy at law for money damages, and therefore each of the parties hereto agrees that in the event of any such breach the aggrieved party shall be entitled to the remedy of specific performance of such covenants and agreements and injunctive and other equitable relief in addition to any other remedy to which it

may be entitled, at law or in equity.

(h)    <u>No Waiver</u>. The failure of any party hereto to exercise any right, power or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other party hereto with its obligations hereunder, and any custom or practice of the parties at variance with the terms hereof, shall not constitute a waiver by such party of its right to exercise any such or other right, power or remedy or to demand such compliance. Any waiver of any provision hereof must be in writing and duly executed by the waiving party.

(i)    <u>Governing Law</u>. This Agreement shall be governed and construed in accordance with the laws of the Commonwealth of Pennsylvania, without giving effect to the principles of conflicts of law thereof.

(j)    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same Agreement.

(k)    <u>Parties in Interest</u>. This Agreement shall be binding upon and inure solely to the benefit of each party hereto, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

IN WITNESS WHEREOF, the Investors, the Company and Shareholder have caused this Agreement to be duly executed as of the day and year first above written.

INVESTCORP INVESTMENT EQUITY
LIMITED

By: *Sydney J. Colman*
    Name:   The Director Ltd.
    Title:    Director

BALLET LIMITED

By:_____
    Name:
    Title:

DENARY LIMITED

By:_____
    Name:
    Title:

GLEAM LIMITED

By:_____
    Name:
    Title:

HIGHLANDS LIMITED

By:_____
    Name:
    Title:

7

IN WITNESS WHEREOF, The Investors, the Company and Shareholder have caused this Agreement to be duly executed as of the day and year first above written.

INVESTCORP INVESTMENT EQUITY
LIMITED

By:_____
    Name:
    Title:

BALLET LIMITED

By:_____
    Name: H. Richard Lukers III
    Title: Authorized Representative

DENARY LIMITED

By:_____
    Name: H. Richard Lukers III
    Title: Authorized Representative

GLEAM LIMITED

By:_____
    Name: H. Richard Lukers III
    Title: Authorized Representative

HIGHLANDS LIMITED

By:_____
    Name: H. Richard Lukers III
    Title: Authorized Representative

7                                        Ea971041.doc/4+

**NOBLE LIMITED**

By: _____

Name: H. Richard Lukes III

Title: Authorized Representative

**OUTRIGGER LIMITED**

By: _____

Name: H. Richard Lukes III

Title: Authorized Representative

**QUILL LIMITED**

By: _____

Name: H. Richard Lukes III

Title: Authorized Representative

**RADIAL LIMITED**

By: _____

Name: H. Richard Lukes III

Title: Authorized Representative

**SHORELINE LIMITED**

By: _____

Name: H. Richard Lukes III

Title: Authorized Representative

**ZINNIA LIMITED**

By: _____

Name: H. Richard Lukes III

Title: Authorized Representative

8

Ea971041.doc/4+

ANNISVILLE LIMITED

By: _____
    Name:   Martonmere Services Ltd.
    Title:    Director

COOPERSTOWN LIMITED

By: _____
    Name:   Martonmere Services Ltd.
    Title:    Director

FRISCO LIMITED

By: _____
    Name:   Martonmere Services Ltd.
    Title:    Director

PLATEA LIMITED

By: _____
    Name:   Martonmere Services Ltd.
    Title:    Director

STEPUP LIMITED

By: _____
    Name:   The Director Ltd.
    Title:    Director

WERNER HOLDING CO. (PA), INC.

By: _____
    Name:
    Title:

9

SHAREHOLDER, individually or as trustee,
executor, administrator or custodian

Name:  Howard L. Solot

Consented and Agreed to as of
October _15_, 1997, in such capacity
as spouse to the Shareholder

By: 
Name:  Janet F. Solot

Schedule I to
Shareholder Voting Agreement

Name and Address of Shareholder                Number of Shares

Howard L. Solot                                Class A Common:  1,808.22
3305 McConnell Road
Hermitage, PA  16148                           Class B Common:  6,692.87

\* \* \* \* \*

EXHIBIT 9

21 NOV '97  16:39                                                                    P.2/5

**INVIFIN S.A.**
**Société Anonyme**
**11, rue Aldringen**
**L.- 2960 LUXEMBOURG**

November 20, 1997

Werner Holding Co. (DE), Inc.
93 Werner Road
Greenville, PA 16125
Attn. : Eric J. Werner

**Re : Stand-By Commitment to Loan up to $ 320 Million of Senior Debt**

Gentlemen :

The following outlines our mutual understanding and agreement in connection with the above referenced commitment.

1.    Stand-By Commitment. Invifin S.A. ("Invifin") understands that, pursuant to an Amended and Restated Recapitalization Agreement (the "Agreement"), certain investors will purchase approximately 67 % of the voting stock of Werner Holding Co. (PA), Inc., a Pennsylvania corporation ("Werner"). Invifin hereby commits to provide up to $ 320 million principal amount of senior debt (the "Senior Debt") for use in effecting the recapitalization of Werner (the "Recapitalization") in the event that Werner Holding Co. (DE), Inc. (the "Company") is unable to arrange such financing from other sources. Invifin's obligations hereunder are subject to the terms and conditions set forth in the Agreement, with such changes as to which Invifin shall consent, which consent shall not be unreasonably withheld, and the failure of the Company to arrange alternative sources for the Senior Debt.

2.    Terms of Senior Debt. The Senior Debt will (i) be provided on the closing date of the Recapitalization (the "Closing Date"), (ii) be evidenced by one or more notes which will be purchased pursuant to the terms of a Note Purchase Agreement, (iii) bear interest and have a final maturity on terms to be negotiated. The terms of the Senior Debt will be set forth in a loan agreement, a promissory note and related documents, which shall contain such other terms and conditions as are reasonably satisfactory to Invifin after consultation with you.

3.    Commissions and Expenses. The Company shall pay a fee of $ 6 million in consideration of Invifin's standby commitment to provide the Senior Debt. Such fee is payable on the Closing Date. The Company shall or shall cause its successor to reimburse Invifin for its out-of-pocket expenses, including counsel fees, incurred in connection with the making of this commitment and, if funded, its funding of the Senior Debt.

4.    Due Authorization. The Company represents that it is authorized to execute this letter agreement.

21 NOV '97  16:40                                                                P.3/5

5.  Termination. The obligations of Invifin under this letter shall terminate on the earlier to occur of the termination of the Agreement on February 8, 1998, provided that Invifin may earlier terminate its obligations hereunder by notice to the Company (a) if any condition to the closing of, or any provision in, the Agreement has been waived or the Agreement has been amended in any case without Invifin's consent, which consent shall not be unreasonably withheld; or (b) if trading in securities generally on the New York Stock Exchange or the American Stock Exchange or the over-the-counter market shall have been suspended or minimum prices shall have been established on either of such exchanges or such market by the Securities and Exchange Commission or by such exchange or a general banking moratorium shall have been declared by federal or state authorities. Upon termination of this letter agreement pursuant to this paragraph or upon any termination by the Company, the Company will remain obligated under paragraph 4 hereof with respect to the payment of Invifin's expenses.

6.  Effective Date. This letter agreement, and the commitment hereunder, shall be effective as of October 8, 1997.

7.  Counterparts. This letter agreement may be signed in counterparts, each of which shall constitute an original and which together shall constitute one and the same agreement.

Please indicate your acceptance of the foregoing by signing and returning the enclosed copy of this letter agreement. We look forward to working with you on this matter.

Very truly yours,

INVIFIN S.A.

J.R. BARTOLINI                          J.P. REILAND
Director                                Director


Accepted and Agreed :
Werner Holding Co. (DE), Inc.

By : _____
Title : _____

**Invifin S.A.**
**11, rue Aldringen**
**Luxembourg**

As of November 19, 1997

Werner Holding Co. (DE), Inc.
93 Werner Road
Greenville, PA 16125
Attn:  Eric J. Werner

Re:    Stand-By Commitment to Loan up to $320 Million
of Senior Debt

Gentlemen:

The following outlines our mutual understanding and agreement in connection with the above referenced commitment.

1.    <u>Stand-By Commitment.</u>  Invifin S.A. ("Invifin") understands that, pursuant to an Amended and Restated Recapitalization Agreement (the "Agreement"), certain investors will purchase approximately 67% of the voting stock of Werner Holding Co. (PA), Inc., a Pennsylvania corporation ("Werner").  Invifin hereby commits to provide up to $320 million principal amount of senior debt (the "Senior Debt") for use in effecting the recapitalization of Werner (the "Recapitalization") in the event that Werner Holding Co. (DE), Inc. (the "Company") is unable to arrange such financing from other sources.  Invifin's obligations hereunder are subject to the terms and conditions set forth in this letter, including the consummation of the Recapitalization substantially on the terms set forth in the Agreement, with such changes as to which Invifin shall consent, which consent shall not be unreasonably withheld, and the failure of the Company to arrange alternative sources for the Senior Debt.

2.    <u>Terms of Senior Debt.</u>  The Senior Debt will (i) be provided on the closing date of the Recapitalization (the "Closing Date"), (ii) be evidenced by one or more notes which will be purchased pursuant to the terms of a Note Purchase Agreement, (iii) bear interest and have a final maturity on terms to be negotiated.  The terms of the Senior Debt will be set forth in a loan agreement, a promissory note and related documents, which shall contain such other terms and conditions as are reasonably satisfactory to Invifin after consultation with you.

3.    <u>Commissions and Expenses.</u>  The Company shall pay a fee of $6 million in consideration of Invifin's standby commitment to provide the Senior Debt.  Such fee is payable on the Closing Date.  The Company shall or shall cause its successor to reimburse Invifin for its out-of-pocket expenses, including counsel fees, incurred in connection with the making of this commitment and, if funded, its funding of the Senior Debt.

4.   Due Authorization.  The Company represents that it is authorized to execute this letter agreement.

5.   Termination.  The obligations of Invifin under this letter shall terminate on the earlier to occur of the termination of the Agreement or February 8, 1998, provided that Invifin may earlier terminate its obligations hereunder by notice to the Company (a) if any condition to the closing of, or any provision in, the Agreement has been waived or the Agreement has been amended in any case without Invifin's consent, which consent shall not be unreasonably withheld; or (b) if trading in securities generally on the New York Stock Exchange or the American Stock Exchange or the over-the-counter market shall have been suspended or minimum prices shall have been established on either of such exchanges or such market by the Securities and Exchange Commission or by such exchange or a general banking moratorium shall have been declared by federal or state authorities.  Upon termination of this letter agreement pursuant to this paragraph or upon any termination by the Company, the Company will remain obligated under paragraph 4 hereof with respect to the payment of Invifin's expenses.

6.   Effective Date:  This letter agreement, and the commitment hereunder, shall be effective as of October 8, 1997.

7.   Counterparts.  This letter agreement may be signed in counterparts, each of which shall constitute an original and which together shall constitute one and the same agreement.

Please indicate your acceptance of the foregoing by signing and returning the enclosed copy of this letter agreement.  We look forward to working with you on this matter.

Very truly yours,

Invifin S.A.

By:_____

Title:_____

Accepted and Agreed:
Werner Holding Co. (DE), Inc.

By:_____
Title:_____

NA973210.161/3+

2

# EXHIBIT 10

(Excerpts Only)

## SHAREHOLDER AGREEMENT

**THIS SHAREHOLDER AGREEMENT** (this "Agreement") is entered into as of November 24, 1997, by and among WERNER HOLDING CO. (PA), INC., a Pennsylvania corporation (the "Company"), INVESTCORP INVESTMENT EQUITY LIMITED, a Cayman Islands corporation ("IIEL"), the other holders of shares of Class D Common Stock of the Company (IIEL and each such other holder individually a "Class D Shareholder" and collectively the "Class D Shareholders") and the individuals listed on the signature pages hereto (individually a "Designated Shareholder" and collectively the "Designated Shareholders").

### R E C I T A L S

A.     The Company, the Class D Shareholders and certain other international investors have entered into a Recapitalization Agreement (the "Recapitalization Agreement"), dated as of October 8, 1997 and amended and restated as of October 27, 1997, pursuant to which the Company will effect a comprehensive recapitalization of the Company upon the terms and conditions set forth therein (the "Recapitalization") and, among other things, amend and restate the Articles of Incorporation of the Company to authorize 1,000 shares of Class D Common Stock.

B.     Pursuant to the Recapitalization Agreement, the Designated Shareholders shall collectively, as of immediately after the closing of the Recapitalization, retain ownership of approximately 1,042 shares of Class A Common Stock and 8,746 shares of Class B Common Stock (the "Designated Shareholders' Shares") and the Class D Shareholders shall collectively own 1,000 shares of Class D Common Stock.

C.     This Agreement is being entered into pursuant to the terms and conditions of the Recapitalization Agreement.

### A G R E E M E N T

**NOW THEREFORE**, in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration and intending to be legally bound, the parties hereto agree as follows:

**SECTION 1. Definitions.** As used in this Agreement, the following terms shall have the following meanings:

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person. A Person will be deemed to control a corporation if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such corporation, whether through the ownership of voting securities, by contract or otherwise.

1

amount of $20,000.00). If the Designated Shareholder and the Company cannot agree upon an investment banker or appraiser, they shall each choose an investment banker or appraiser and the two shall choose a third investment banker or appraiser who shall establish the Fair Market Value. Notwithstanding the foregoing, the Company shall obtain valuation of all of its common stock at least once annually for purposes of the Designated Shareholder's estate and gift planning; provided, however, that such valuation is not binding on the Board of Directors for purposes of determining Fair Market Value.

(d)    The Designated Shareholder shall not be considered to have ceased to be employed by the Company for purposes of this Agreement if he or she continues to be employed by the Company or a Subsidiary, or by a company of which the Company is a Subsidiary.

(e)    This Section shall be binding on and enforceable against any Person who is a Permitted Transferee of any Designated Shareholder, and for purposes of this Section, the rights and obligations relating to the Designated Shareholders' Shares shall extend as well to shares of capital stock of the Company owned by Permitted Transferees of a Designated Shareholder and, unless the context otherwise requires, each reference to Designated Shareholder in this Section shall also encompass Permitted Transferees of any Designated Shareholder. Any stock certificates issued to evidence shares of Class A Common Stock or Class B Common Stock owned by the Designated Shareholders shall bear a legend referring to this Agreement and the restrictions contained herein.

## SECTION 6. <u>Form S-8 Registration Statement</u>

The Company will as expeditiously as practicable in connection with the effectiveness of the registration statement implementing the Initial Public Offering file with the United States Securities and Exchange Commission a registration statement on Form S-8 registering shares of the Company's capital stock subject to options held under the Company's then existing employee stock option plan or plans.

## SECTION 7. <u>Control over Shares</u>

Each Designated Shareholder represents and agrees that they are the record owner of or have executory, administrative or custodial control over the number of shares of the Company's Class A and Class B Common Stock set opposite such Shareholder's name on Exhibit A hereto. Except for matters that would not impair the ability of the Designated Shareholder to fulfill the Shareholder's obligations under this Agreement, the Designated Shareholder has sole and unqualified voting power with respect to such shares and agrees to take any necessary steps to obtain the instruments and/or documentation to implement the executory, administrative or custodial control required to fulfill such Designated Shareholder's obligations under this Agreement.

## SECTION 8. <u>Miscellaneous.</u>

(a)    <u>Notices</u>. All notices, instructions and other communications in connection with this Agreement shall be in writing and may be given by (i) personal delivery, (ii) sent by certified

8

mail, return receipt requested, postage prepaid, or (iii) delivery by a nationally recognized overnight courier, to the parties at the addresses of each as set forth on the signature pages to this Agreement (or at such other address as the Company may specify in a notice to the other parties or as any other party may specify in a notice to the Company and the other parties). Notices shall be deemed to have been given (A) when actually delivered personally, (B) the next business day if sent by overnight courier (with proof of delivery), and (C) on the fifth day after mailing by certified mail.

(b)    No Waiver.  No course of dealing and no delay on the part of any party hereto in exercising any right, power or remedy conferred by this Agreement shall operate as a waiver thereof or otherwise prejudice such party's rights, powers and remedies conferred by this Agreement or shall preclude any other or further exercise thereof or the exercise of any other right, power and remedy.

(c)    Binding Effect; Assignability.  This Agreement shall be binding upon and, except as otherwise provided herein, shall inure to the benefit of the respective parties and their permitted successors and assigns, including, without limitation, Permitted Transferees to the extent specifically provided for herein.  This Agreement shall not be assignable except as otherwise specifically provided herein; provided that IIEL's rights under Section 2 and Section 3 hereof may be exercised by IIEL or any Affiliate of IIEL.

(d)    Amendment and Waiver.  This Agreement may not be amended, modified or supplemented, and no waiver or consent to departures from the provisions hereof shall bind any party who has not given such waiver or consent, unless any such amendment, modification, supplement , waiver or consent is consented to in writing by at least a majority in interest of the Designated Shareholder's and the Company.

(e)    Governing Law; Service of Process.  This Agreement shall be construed both as to validity and performance in accordance with, and governed by, the laws of the Commonwealth of Pennsylvania applicable to agreements to be performed in Pennsylvania, without regard to principles of conflict of laws of such jurisdiction or any other jurisdiction.  Each of the parties hereto irrevocably consents to the jurisdiction and venue of any state or federal court situated in the Commonwealth of Pennsylvania, and further consents to the service of any and all process in any action or proceeding arising out of or relating to this Agreement by the mailing of copies of such process to such party at its address pursuant to Section 8(a) hereof.

(f)    Counterparts.  This Agreement may be executed in two or more counterparts each of which shall be deemed an original but all of which together shall constitute one and the same instrument, and all signatures need not appear on any one counterpart.

(g)    Headings; Sections.  All headings and captions in this Agreement are for purposes of reference only and shall not be construed to limit or affect the substance of this Agreement.  All references to Section in this Agreement refer to Sections of this Agreement, unless the context otherwise expressly provides.

9

(h)    <u>Entire Agreement</u>.  This Agreement contains, and is intended as, a complete statement of all the terms of the arrangements between the parties with respect to the matters provided for, supersedes any previous agreements and understandings between the parties with respect to those matters.

(i)    <u>Severability</u>.  In the event that any one or more of the provisions contained herein, or the application thereof in any circumstance, is held invalid, illegal or unenforceable, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained herein shall not be affected or impaired in any way thereby.

**IN WITNESS WHEREOF,** the parties hereto have executed this Shareholder Agreement as of the date first above written.

WERNER HOLDING CO. (PA), INC., a
Pennsylvania corporation

By: _____
Name:
Title:
Address: _____
_____
_____

INVESTCORP INVESTMENT EQUITY
LIMITED, a Cayman Islands corporation

By: _____
Name:
Title:
Address: _____
_____
_____

OTHER CLASS D SHAREHOLDERS

BALLET LIMITED, a Cayman Islands corporation

By: _____
Name:
Address: _____
_____
_____

DENARY LIMITED, a Cayman Islands corporation

By: _____
Name:
Address: _____
_____
_____

11

**IN WITNESS WHEREOF,** the parties hereto have executed this Shareholder Agreement as of the date first above written.

WERNER HOLDING CO. (PA), INC., a
Pennsylvania corporation

By: _____
   Name:
   Title:
   Address: _____
             _____
             _____

INVESTCORP INVESTMENT EQUITY
LIMITED, a Cayman Islands corporation

By: _____
   Name: The Director Ltd.
   Title:  Director
   Address: P.O. Box 1111
         George Town, Grand Cayman
         Cayman Islands, B.W.I.

<u>OTHER CLASS D SHAREHOLDERS</u>

BALLET LIMITED, a Cayman Islands corporation

By: _____
   Name:
   Address: _____
             _____
             _____

DENARY LIMITED, a Cayman Islands corporation

By: _____
   Name:
   Address: _____
             _____
             _____

11

IN WITNESS WHEREOF, the parties hereto have executed this Shareholder Agreement as of the date first above written.

WERNER HOLDING CO. (PA), INC., a
Pennsylvania corporation

By: _____
    Name:
    Title:
    Address: _____
           _____
           _____

INVESTCORP INVESTMENT EQUITY
LIMITED, a Cayman Islands corporation

By: _____
    Name:
    Title:
    Address: _____
           _____
           _____

OTHER CLASS D SHAREHOLDERS

BALLET LIMITED, a Cayman Islands corporation

By: _____
    Name:    Tawfeek Mohammed
    Address:  PO Box 5340
           Manama
           Bahrain

DENARY LIMITED, a Cayman Islands corporation

By: _____
    Name:    Nabeel Al Sahaf
    Address:  PO Box 5340
           Manama
           Bahrain

11

GLEAM LIMITED, a Cayman Islands corporation

By: _____
Name:   **Zahid Zakiuddin**
Address: **PO Box 5340**
         **Manama**
         **Bahrain**

HIGHLANDS LIMITED, a Cayman Islands
corporation

By: _____
Name:   **Mahmood Alaradi**
Address: **PO BOX 5340**
         **Manama**
         **Bahrain**

NOBLE LIMITED, a Cayman Islands corporation

By: _____
Name:   **Thomas Kennedy**
Address: **Box 5340**
         **Manama**
         **Bahrain**

OUTRIGGER LIMITED, a Cayman Islands
corporation

By: _____
Name:   **James Abernathy**
Address: **PO Box 5340**
         **Manama**
         **Bahrain**

QUILL LIMITED, a Cayman Islands corporation

By: _____
Name:   **Craig S. Swartz**
Address: **PO Box 5340**
         **Manama**
         **Bahrain**

12

RADIAL LIMITED, a Cayman Islands corporation

By: _____

Name: Ansel Mullins
Address: PO Box 5340
         Manama
         Bahrain


SHORELINE LIMITED, a Cayman Islands
   corporation

By: _____

Name: H. Richard Lukens III
Address: PO Box 5340
         Manama
         Bahrain


ZINNIA LIMITED, a Cayman Islands corporation

By: _____

Name: Ibrahim Gharghour
Address: PO Box 5340
         Manama
         Bahrain


Accepted and agreed to for purposes
of Section 5 only:

STEPUP LIMITED, a Cayman Islands corporation


By: _____

Name: _____
Address: _____
         _____
         _____

13

RADIAL LIMITED, a Cayman Islands corporation

By: _____
    Name:
    Address: _____
            _____
            _____

SHORELINE LIMITED, a Cayman Islands
corporation

By: _____
    Name:
    Address: _____
            _____
            _____

ZINNIA LIMITED, a Cayman Islands corporation

By: _____
    Name:
    Address: _____
            _____
            _____

Accepted and agreed to for purposes
of Section 5 only:

STEPUP LIMITED, a Cayman Islands corporation

By: _____
Name:   The Director Ltd.
Title:    Director
Address: P.O. Box 1111
         George Town, Grand Cayman
         Cayman Islands, B.W.I.

13

## DESIGNATED SHAREHOLDERS

Donald M. Werner

Howard L. Solot

Bruce D. Werner

Michael E. Werner

Craig R. Werner

Eric J. Werner

Michael J. Solot

14

## SCHEDULE A

| SHAREHOLDER | NUMBER OF CLASS A SHARES | NUMBER OF CLASS B SHARES |
|---|---|---|
| Donald M. Werner | 84.6176 | 167.7492 |
| Howard L. Solot | 84.5832 | 331.1411 |
| Bruce D. Werner | 9.5639 | 286.2985 |
| Michael E. Werner | 36.6797 | 522.5990 |
| Craig R. Werner | 10.7219 | 261.3347 |
| Eric J. Werner | 10.0714 | 353.8212 |
| Michael J. Solot | 9.9324 | 164.2720 |

NA972880.004/26

15

EXHIBIT A
TO SHAREHOLDER AGREEMENT

| NAME | POST RECAP A SHARES | POST RECAP B SHARES |
|---|---|---|
| Howard L. Solot | 361.3271 | 1,414.5856 |
| Michael J. Solot | 47.0954 | 778.9106 |
| Bruce D. Werner | 46.7269 | 1,398.7836 |
| Craig R. Werner | 61.8513 | 1,507.5600 |
| Donald M. Werner | 387.7394 | 768.6690 |
| Eric J. Werner | 61.2008 | 1,384.3097 |
| Michael E. Werner | 73.8427 | 1,495.5686 |
| TOTAL | 1,039.7837 | 8,748.3871 |

WERNER HOLDING CO. (PA), INC. SHAREHOLDER AGREEMENT

SIGNATURE PAGE FOR PERMITTED TRANSFEREE

In accordance with the Shareholder Agreement entered into as of November 24, 1997 (the "Shareholder Agreement") by and among WERNER HOLDING CO. (PA), INC. (the "Company"), INVESTCORP INVESTMENT EQUITY LIMITED, the other holders of shares of Class D Common Stock of the Company and the individuals listed on the signature pages thereto (individually a "Designated Shareholder" and collectively, the "Designated Shareholders"), with regard to the transfer of 826 shares Werner Holding Co. (PA), Inc. Class B Common Stock from Howard L. Solot to Alligator Partners, L.P. on August 24, 1999, the undersigned hereby acknowledges and agrees to be bound by the terms of the Shareholder Agreement as a Designated Shareholder.

ALLIGATOR PARTNERS, L.P.

By: _____
Howard L. Solot, General Partner

By: _____
Janet F. Solot, General Partner

# EXHIBIT 11

## (Excerpts Only)

WERNER HOLDING CO. (DE), INC.

CREDIT AGREEMENT

dated as of November 24, 1997

$320,000,000
Credit Facility

BANKERS TRUST COMPANY,
as Administrative Agent and as Co-Arranger,

MERRILL LYNCH CAPITAL CORPORATION,
as Syndication Agent and as Co-Arranger,

THE CHASE MANHATTAN BANK,
as Documentation Agent,

and

GOLDMAN SACHS CREDIT PARTNERS L.P.,
as Co-Agent

0000H4F3.W51

# TABLE OF CONTENTS

Page

SECTION 1
### DEFINITIONS . . . . . . . . . . . . . . . . . .  2
1.1  Defined Terms . . . . . . . . . . . . . . . . . . . . . . . . .  2
1.2  Other Definitional Provisions . . . . . . . . . . . . . . . . . . 37

SECTION 2
### TERM LOANS . . . . . . . . . . . . . . . . 38
2.1  Term Loans . . . . . . . . . . . . . . . . . . . . . . . . . 38
2.2  Repayment of Term Loans . . . . . . . . . . . . . . . . . . 38
2.3  Use of Proceeds . . . . . . . . . . . . . . . . . . . . . . . 39

SECTION 3
### AMOUNT AND TERMS OF
### REVOLVING CREDIT COMMITMENTS . . . . . . . . . 39
3.1  Revolving Credit Commitments  . . . . . . . . . . . . . . . 39
3.2  Commitment Fee  . . . . . . . . . . . . . . . . . . . . . . . 40
3.3  Proceeds of Revolving Credit Loans . . . . . . . . . . . . . 40
3.4  Swing Line Commitment  . . . . . . . . . . . . . . . . . . 40
3.5  Issuance of Letters of Credit . . . . . . . . . . . . . . . . . 42
3.6  Participating Interests . . . . . . . . . . . . . . . . . . . . 43
3.7  Procedure for Opening Letters of Credit  . . . . . . . . . . 43
3.8  Payments in Respect of Letters of Credit . . . . . . . . . . . 43
3.9  Letter of Credit Fees . . . . . . . . . . . . . . . . . . . . . 44
3.10 Letter of Credit Reserves . . . . . . . . . . . . . . . . . . . 45
3.11 Further Assurances . . . . . . . . . . . . . . . . . . . . . . 47
3.12 Obligations Absolute  . . . . . . . . . . . . . . . . . . . . . 47
3.13 Assignments . . . . . . . . . . . . . . . . . . . . . . . . . 47
3.14 Participations . . . . . . . . . . . . . . . . . . . . . . . . . 48

SECTION 4
### AMOUNT AND TERMS OF
### RECEIVABLES FINANCING COMMITMENTS . . . . . . . . 48
4.1  Receivables Financing Commitments  . . . . . . . . . . . . . . 48

                                                                          Page

    4.2   Commitment Fee  . . . . . . . . . . . . . . . . . . . . . . . .  49
    4.3   Proceeds of Receivables Financing Loans  . . . . . . . . . . . .  49

SECTION 5
          GENERAL PROVISIONS APPLICABLE TO LOANS . . . . . . .  49
    5.1   Procedure for Borrowing  . . . . . . . . . . . . . . . . . . . .  49
    5.2   Conversion and Continuation Options  . . . . . . . . . . . . . .  50
    5.3   Changes of Commitment Amounts  . . . . . . . . . . . . . . . . .  51
    5.4   Optional and Mandatory Prepayments; Repayments of Term
          Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52
    5.5   Interest Rates and Payment Dates  . . . . . . . . . . . . . . . .  61
    5.6   Computation of Interest and Fees  . . . . . . . . . . . . . . . .  62
    5.7   Certain Fees  . . . . . . . . . . . . . . . . . . . . . . . . . .  62
    5.8   Inability to Determine Interest Rate  . . . . . . . . . . . . . .  62
    5.9   Pro Rata Treatment and Payments  . . . . . . . . . . . . . . . .  63
    5.10  Illegality . . . . . . . . . . . . . . . . . . . . . . . . . . .  66
    5.11  Requirements of Law  . . . . . . . . . . . . . . . . . . . . . .  67
    5.12  Indemnity . . . . . . . . . . . . . . . . . . . . . . . . . . .  70
    5.13  Repayment of Loans; Evidence of Debt . . . . . . . . . . . . . .  71
    5.14  Replacement of Lenders  . . . . . . . . . . . . . . . . . . . . .  72

SECTION 6
          REPRESENTATIONS AND WARRANTIES . . . . . . . . .  73
    6.1   Financial Condition . . . . . . . . . . . . . . . . . . . . . . .  73
    6.2   No Change . . . . . . . . . . . . . . . . . . . . . . . . . . .  75
    6.3   Corporate Existence; Compliance with Law . . . . . . . . . . . .  75
    6.4   Corporate Power; Authorization . . . . . . . . . . . . . . . . .  76
    6.5   Enforceable Obligations . . . . . . . . . . . . . . . . . . . . .  76
    6.6   No Legal Bar . . . . . . . . . . . . . . . . . . . . . . . . . .  77
    6.7   No Material Litigation . . . . . . . . . . . . . . . . . . . . .  77
    6.8   Investment Company Act . . . . . . . . . . . . . . . . . . . . .  78
    6.9   Federal Regulation . . . . . . . . . . . . . . . . . . . . . . .  78
    6.10  No Default . . . . . . . . . . . . . . . . . . . . . . . . . . .  78
    6.11  Taxes  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  78
    6.12  Subsidiaries; Immaterial Subsidiaries  . . . . . . . . . . . . .  79
    6.13  Ownership of Property; Liens . . . . . . . . . . . . . . . . . .  79
    6.14  ERISA . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  79
    6.15  Collateral Documents . . . . . . . . . . . . . . . . . . . . . .  80
    6.16  Copyrights, Patents, Permits, Trademarks and Licenses . . . . . .  81

                                                                        Page

      6.17  Environmental Matters  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  82
      6.18  Accuracy and Completeness of Information  . . . . . . . . . . . . . . . .  83


SECTION 7

                          CONDITIONS PRECEDENT  . . . . . . . . . . . . . . .  83
      7.1  Conditions to Initial Loans and Letters of Credit  . . . . . . . . . . . .  83
      7.2  Conditions to All Loans and Letters of Credit  . . . . . . . . . . . . . .  90


SECTION 8

                          AFFIRMATIVE COVENANTS  . . . . . . . . . . . .  91
      8.1  Financial Statements  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  91
      8.2  Certificates; Other Information  . . . . . . . . . . . . . . . . . . . . . . .  93
      8.3  Payment of Obligations  . . . . . . . . . . . . . . . . . . . . . . . . . . .  95
      8.4  Conduct of Business and Maintenance of Existence  . . . . . . . . . . .  95
      8.5  Maintenance of Property; Insurance  . . . . . . . . . . . . . . . . . . . .  96
      8.6  Inspection of Property; Books and Records; Discussions  . . . . . . .  96
      8.7  Notices  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  96
      8.8  Environmental Laws  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  98
      8.9  Additional Collateral  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  99


SECTION 9

                          NEGATIVE COVENANTS  . . . . . . . . . . . . .  103
      9.1  Indebtedness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  103
      9.2  Limitation on Liens  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  106
      9.3  Limitation on Contingent Obligations  . . . . . . . . . . . . . . . . . .  108
      9.4  Prohibition of Fundamental Changes  . . . . . . . . . . . . . . . . . .  110
      9.5  Prohibition on Sale of Assets  . . . . . . . . . . . . . . . . . . . . . . .  110
      9.6  Limitation on Investments, Acquisitions, Loans and Advances  . . .  113
      9.7  Capital Expenditures  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  116
      9.8  Interest Rate Agreements  . . . . . . . . . . . . . . . . . . . . . . . . .  117
      9.9  Debt to EBITDA  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  117
      9.10  Interest Coverage  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  119
      9.11  Minimum Consolidated EBITDA  . . . . . . . . . . . . . . . . . . . .  120
      9.12  Limitation on Dividends  . . . . . . . . . . . . . . . . . . . . . . . . .  121
      9.13  Transactions with Affiliates  . . . . . . . . . . . . . . . . . . . . . . .  122
      9.14  Prepayments and Amendments of Subordinated Debt  . . . . . . . .  123
      9.15  Limitation on Changes in Fiscal Year  . . . . . . . . . . . . . . . . .  123
      9.16  Limitation on Business  . . . . . . . . . . . . . . . . . . . . . . . . . .  123
      9.17  Designated Senior Indebtedness  . . . . . . . . . . . . . . . . . . . .  124

|  |  | Page |
|---|---|---|
| 9.18 | Limitation on Issuance of Capital Stock | 124 |

SECTION 10

EVENTS OF DEFAULT ... 125

SECTION 11

THE AGENTS; THE ISSUING LENDER ... 129

| 11.1 | Appointment | 129 |
|---|---|---|
| 11.2 | Delegation of Duties | 129 |
| 11.3 | Exculpatory Provisions | 130 |
| 11.4 | Reliance by Co-Arrangers | 130 |
| 11.5 | Notice of Default | 131 |
| 11.6 | Non-Reliance on Agents and Other Lenders | 131 |
| 11.7 | Indemnification | 132 |
| 11.8 | Each Agent in its Individual Capacity | 132 |
| 11.9 | Successor Administrative Agent | 132 |
| 11.10 | Issuing Lender as Issuer of Letters of Credit | 133 |

SECTION 12

MISCELLANEOUS ... 133

| 12.1 | Amendments and Waivers | 133 |
|---|---|---|
| 12.2 | Notices | 135 |
| 12.3 | No Waiver; Cumulative Remedies | 136 |
| 12.4 | Survival of Representations and Warranties | 136 |
| 12.5 | Payment of Expenses and Taxes | 137 |
| 12.6 | Successors and Assigns; Participations and Assignments | 139 |
| 12.7 | Set-off | 144 |
| 12.8 | Payments Pro Rata | 144 |
| 12.9 | Counterparts | 145 |
| 12.10 | Governing Law; No Third Party Rights | 145 |
| 12.11 | Submission to Jurisdiction; Waivers | 146 |
| 12.12 | Releases | 146 |
| 12.13 | Interest | 147 |
| 12.14 | Special Indemnification | 147 |
| 12.15 | Permitted Payments and Transactions | 148 |
| 12.16 | Co-Arrangers; Administrative Agent | 149 |
| 12.17 | Certain Provisions Regarding Alabama Mortgaged Property | 149 |

0000H4F3.W51                    (iv)

SCHEDULES

Schedule I            List of Addresses for Notices; Lending Offices;
                      Commitment Amounts
Schedule II           Pricing and Commitment Fee Grid
Schedule III          Qualified Account Debtors
Schedule 6.11         Taxes
Schedule 6.12         Subsidiaries
Schedule 6.13         Fee and Leased Properties
Schedule 6.15(b)      UCC Filing Offices
Schedule 6.16         Patents, Trademarks and Copyrights
Schedule 9.1(a)       Existing Indebtedness
Schedule 9.2(h)       Existing Liens
Schedule 9.3(d)       Existing Contingent Obligations

EXHIBITS

EXHIBIT A-1           Form of B Term Loan Note
EXHIBIT A-2           Form of C Term Loan Note
EXHIBIT B             Form of Revolving Credit Note
EXHIBIT C             Form of Receivables Financing Note
EXHIBIT D             Form of Swing Line Note
EXHIBIT E             Form of Assignment and Acceptance
EXHIBIT F-1           Form of Company Security Agreement
EXHIBIT F-2           Form of Subsidiary Security Agreement
EXHIBIT G-1           Form of Holdings Guarantee
EXHIBIT G-2           Form of Subsidiary Guarantee
EXHIBIT H-1           Form of Company Pledge Agreement
EXHIBIT H-2           Form of Holdings/Subsidiary Pledge Agreement
EXHIBIT I             Form of Subsection 5.11(d)(2) Certificate
EXHIBIT J-1           Form of Opinion of Gibson, Dunn & Crutcher LLP
EXHIBIT J-2           Form of Opinion of General Counsel to the Company
EXHIBIT K-1           Form of Holdings Closing Certificate
EXHIBIT K-2           Form of Company Closing Certificate
EXHIBIT K-3           Form of Subsidiaries Closing Certificate
EXHIBIT L             Form of Mortgage
EXHIBIT M             Form of Borrowing Base Certificate
EXHIBIT N             Form of Letter of Credit Request

CREDIT AGREEMENT, dated as of November 24, 1997, among WERNER HOLDING CO. (DE), INC., a Delaware corporation (the "Company"), the several lenders from time to time parties hereto (the "Lenders"), BANKERS TRUST COMPANY, as administrative agent for the Lenders and as co-arranger (in such capacity, the "Administrative Agent"), MERRILL LYNCH CAPITAL CORPORATION, as syndication agent and as co-arranger (in such capacity, the "Syndication Agent" and, together with the Administrative Agent, the "Co-Arrangers"), THE CHASE MANHATTAN BANK, as documentation agent (in such capacity, the "Documentation Agent") and GOLDMAN SACHS CREDIT PARTNERS, L.P., as co-agent (the "Co-Agent", and together with the Administrative Agent, the Syndication Agent and the Documentation Agent, the "Agents").

## W I T N E S S E T H :

WHEREAS, Investcorp Investment Equity Limited ("IIEL"), an affiliate of Investcorp, S.A., certain of its affiliated entities and other initial investors (collectively, the "Investors") and Werner Holding Co. (PA), Inc., a Pennsylvania corporation ("Holdings") have entered into an Amended and Restated Recapitalization Agreement, dated as of October 27, 1997, as amended (together with any schedule (including those contained in the Company Disclosure Letter thereto) attached thereto, as amended, supplemented or otherwise modified from time to time, the "Recapitalization Agreement"), which will effect a recapitalization (the "Recapitalization") of Holdings;

WHEREAS, upon the consummation of the Recapitalization, the Investors will own at least 66.7% of the common stock of Holdings and certain existing shareholders and management (the "Existing Shareholders") will own the remaining portion of such common stock;

WHEREAS, Holdings and the Company intend to finance the Recapitalization (including the refinancing of certain existing indebtedness) and related premiums, fees and expenses from the following sources: (a) $182,000,000 in common equity (consisting of a cash investment of at least $122,700,000 from the Investors, with the balance consisting of retained common equity equal to (x) in the case of existing management shareholders, approximately $23,700,000 and (y) in the case of other existing shareholders, approximately $35,600,000 (with the transactions described in this clause (a) being hereinafter referred to as the "Equity

Contribution"); (b) $320,000,000 from the senior secured credit facilities provided for herein comprised of a $90,000,000 B term loan facility, a $55,000,000 C term loan facility, a $100,000,000 revolving credit facility and a $75,000,000 receivables financing credit facility; and (c) $135,000,000 in gross cash proceeds from an issuance by the Company of either (i) subordinated unsecured loans or (ii) senior subordinated notes; and

WHEREAS, the Company has requested the Lenders to make loans and other extensions of credit available to the Company to enable the Company to finance a portion of the Recapitalization and for the other purposes set forth herein;

NOW, THEREFORE, the Company, the Administrative Agent, the Syndication Agent, the Documentation Agent, the Co-Agent, the Issuing Lender and the Lenders agree as follows:

## SECTION 1
## DEFINITIONS

1.1 Defined Terms. As used in this Agreement, the terms defined in the caption hereto shall have the meanings set forth therein, and the following terms have the following meanings:

"Acquired Capital Expenditures": as defined in subsection 9.7.

"Acquired Person": as defined in subsection 9.7.

"Additional Mortgage": as defined in subsection 8.9(f).

"Adjusted Working Capital": at any time shall mean an amount equal to the Consolidated Current Assets at such time minus Consolidated Current Liabilities at such time.

"Adjustment Date": as defined in the definition of Applicable Margin.

"Administrative Agent": as defined in the preamble hereto.

"Affected Eurodollar Loans": as defined in subsection 5.4(b).

ing, prepaying the Receivables Financing Loans in whole or in part, and reborrow-
ing, all in accordance with the terms and conditions hereof.

(b) Each borrowing of Receivables Financing Loans pursuant to the
Receivables Financing Commitments shall be in an aggregate principal amount of
the lesser of (i) $1,000,000 or a whole multiple of $100,000 in excess thereof in the
case of Alternate Base Rate Loans, and $1,000,000 or a whole multiple of $100,000
in excess thereof, in the case of Eurodollar Loans and (ii) the Available Receivables
Financing Commitments.

4.2  Commitment Fee.  The Company agrees to pay to the
Administrative Agent, without duplication, the commitment fee in respect of the
Available Receivables Financing Commitment as set forth in subsection 3.2.

4.3  Proceeds of Receivables Financing Loans.  The Company shall
use the proceeds of Receivables Financing Loans (a) as set forth in subsection 2.3,
(b) for general corporate and working capital purposes of the Company and its
Subsidiaries and (c) to finance acquisitions permitted by subsection 9.6(g).


SECTION 5
GENERAL PROVISIONS APPLICABLE TO LOANS

5.1  Procedure for Borrowing.  (a)  The Company may borrow under
the Commitments on any Business Day, provided that, with respect to any borrow-
ing, the Company shall give the Administrative Agent irrevocable notice (which
notice must be received by the Administrative Agent prior to 12:00 noon (or, with
respect to Swing Line Loans, 1:00 p.m.), New York City time, (i) three Business
Days prior to the requested Borrowing Date if all or any part of the Loans are to be
Eurodollar Loans and (ii) one Business Day prior to the requested Borrowing Date
(or, in the case of Swing Line Loans and, if the Closing Date occurs on the date this
Agreement is executed and delivered, Loans made on the Closing Date, on the re-
quested Borrowing Date) if the borrowing is to be solely of Alternate Base Rate
Loans) and specifying (A) the amount of the borrowing, (B) whether such Loans are
initially to be Eurodollar Loans or Alternate Base Rate Loans or a combination
thereof, (C) if the borrowing is to be entirely or partly Eurodollar Loans, the length
of the Interest Period for such Eurodollar Loans and (D) whether the Loan is a B
Term Loan, C Term Loan, Revolving Credit Loan, Receivables Financing Loan or a
Swing Line Loan.  Upon receipt of such notice the Administrative Agent shall
promptly notify each Lender.  Not later than 12:00 noon, New York City time, on
the Borrowing Date specified in such notice, each Lender with a Commitment of the

the relevant amount and for the relevant period with respect to any such Eurodollar Loan are not generally available to the Lenders in their respective Eurodollar Lending Offices' interbank eurodollar markets, the Administrative Agent shall forthwith give telecopy notice of such determination, confirmed in writing, to the Company and the Lenders at least one day prior to, as the case may be, the requested Borrowing Date, the conversion date or the last day of such Interest Period. If such notice is given (i) any requested Eurodollar Loans shall be made as Alternate Base Rate Loans, (ii) any Alternate Base Rate Loans that were to have been converted to Eurodollar Loans shall be continued as Alternate Base Rate Loans, and (iii) any outstanding Eurodollar Loans shall be converted on the last day of the then current Interest Period applicable thereto into Alternate Base Rate Loans. Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar Loans shall be made and no Alternate Base Rate Loans shall be converted to Eurodollar Loans.

5.9  Pro Rata Treatment and Payments.  (a) Except to the extent otherwise provided herein, each borrowing of Loans by the Company from the Lenders and any reduction of the Commitments of the Lenders hereunder shall be made pro rata according to the relevant Commitment Percentages of the Lenders with respect to the Loans borrowed or the Commitments to be reduced.

(b) Whenever any payment received by the Administrative Agent under this Agreement or any Note or any other Credit Document is insufficient to pay in full all amounts then due and payable to the Administrative Agent and the Lenders under this Agreement:

(i)  If the Administrative Agent has not received a Payment Sharing Notice (or, if the Administrative Agent has received a Payment Sharing Notice but the Event of Default specified in such Payment Sharing Notice has been cured or waived in accordance with the provisions of this Agreement), such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the following order: first, to the payment of fees and expenses due and payable to the Administrative Agent under and in connection with this Agreement and the other Credit Documents; second, to the payment of all expenses due and payable under subsection 12.5, ratably among the Lenders in accordance with the aggregate amount of such payments owed to each such Lender; third, to the payment of fees due and payable under subsections 3.2 and 3.9, ratably among the Lenders in accordance with the Commitment Percentage of each Lender of the Commitment for which such payment is owed and, in the case of the Issuing Lender, the amount retained by the Issuing Lender for its own account pursuant to subsection 3.9; fourth, to the payment of interest then

due and payable on the Loans and the L/C Obligations ratably in accordance with the aggregate amount of interest owed to each such Lender; and fifth, to the payment of the principal amount of the Loans and the L/C Obligations which is then due and payable ratably (subject to the provisions of following clause (c), to the extent applicable) among the Lenders in accordance with the aggregate principal amount owed to each such Lender; or

    (ii)  If the Administrative Agent has received a Payment Sharing Notice which remains in effect, all payments received by the Administrative Agent under this Agreement or any Note shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the following order:  first, to the payment of all amounts described in clauses "first" through "third" of the foregoing clause (i) in the order set forth therein; second, to the payment of the interest accrued on all Loans and L/C Obligations, regardless of whether any such amount is then due and payable, ratably among the Lenders in accordance with the aggregate accrued interest plus the aggregate principal amount of all Loans and L/C Obligations then due and payable and owed to such Lender; and third, to the payment of the principal amount of all Loans and L/C Obligations, regardless of whether any such amount is then due and payable, ratably among the Lenders in accordance with the aggregate principal amount owed to such Lender.

    (c)  If any Lender (a "Non-Funding Lender") has (x) failed to make a Revolving Credit Loan or Receivables Financing Loan required to be made by it hereunder, and the Administrative Agent has determined that such Lender is not likely to make such Revolving Credit Loan or Receivables Financing Loan or (y) given notice to the Company or the Administrative Agent that it will not make, or that it has disaffirmed or repudiated any obligation to make, any Revolving Credit Loan or Receivables Financing Loan, in each case by reason of the provisions of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended, or otherwise, (i) any payment made on account of the principal of the Revolving Credit Loans or Receivables Financing Loans, as the case may be, outstanding shall be made as follows:

    (A)  in the case of any such payment made on any date when and to the extent that in the determination of the Administrative Agent the Company would be able under the terms and conditions hereof to reborrow the amount of such payment under the Commitments and to satisfy any applicable conditions precedent set forth in Section 7 to such reborrowing, such payment shall be made on account of the outstanding Revolving Credit Loans or

Receivables Financing Loans, as the case may be, held by the Lenders other than the Non-Funding Lender pro rata according to the respective outstanding principal amounts of the Revolving Credit Loans or Receivables Financing Loans, as the case may be, of such Lenders; and

(B)   otherwise, such payment shall be made on account of the outstanding Revolving Credit Loans or Receivables Financing Loans, as the case may be, held by the Lenders pro rata according to the respective outstanding principal amounts of such Revolving Credit Loans or Receivables Financing Loans, as the case may be; and

(C)   any payment made on account of interest on the Revolving Credit Loans or Receivables Financing Loans, as the case may be, shall be made pro rata according to the respective amounts of accrued and unpaid interest due and payable on the Revolving Credit Loans or Receivables Financing Loans, as the case may be, with respect to which such payment is being made.  The Company agrees to give the Administrative Agent such assistance in making any determination pursuant to this subsection 5.9(c) as the Administrative Agent may reasonably request.  Any such determination by the Administrative Agent shall be conclusive and binding on the Lenders.

(d)   All payments (including prepayments) to be made by the Company on account of principal, interest and fees shall be made without set-off or counterclaim and shall be made to the Administrative Agent, for the account of the Lenders at the Administrative Agent's office located at 130 Liberty Street, New York, New York 10006 (or at such other office of the Administrative Agent located in New York City as may be directed from time to time by the Administrative Agent in writing to the Company), in lawful money of the United States and in immediately available funds.  The Administrative Agent shall promptly distribute such payments in accordance with the provisions of this subsection 5.9 upon receipt in like funds as received.  If any payment hereunder (other than payments on Eurodollar Loans) would become due and payable on a day other than a Business Day, such payment shall become due and payable on the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.  If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day (and with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension) unless the result of such extension would be to extend such payment into another calendar month in which event such payment shall be made on the immediately preceding Business Day.

(e)  Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount which would constitute its Commitment Percentage of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent in accordance with subsection 5.1 and the Administrative Agent may, in reliance upon such assumption, make available to the Company a corresponding amount.  If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon at a rate equal to the daily average Federal Funds Effective Rate for the period until such Lender makes such amount immediately available to the Administrative Agent.  A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this subsection 5.9(e) shall be conclusive absent manifest error.  If such Lender's Commitment Percentage of such borrowing is not in fact made available to the Administrative Agent by such Lender within three Business Days of such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to Alternate Base Rate Loans hereunder (in lieu of any otherwise applicable interest), on demand, from the Company, without prejudice to any rights which the Company or the Administrative Agent may have against such Lender hereunder.  Nothing contained in this subsection 5.9 shall relieve any Lender which has failed to make available its ratable portion of any borrowing hereunder from its obligation to do so in accordance with the terms hereof.

(f)  The failure of any Lender to make the Loan to be made by it on any Borrowing Date shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on such Borrowing Date, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on such Borrowing Date.

(g)  All payments and optional prepayments (other than prepayments as set forth in subsection 5.11 with respect to increased costs) of Eurodollar Loans hereunder shall be in such amounts and be made pursuant to such elections so that, after giving effect thereto, the aggregate principal amount of all Eurodollar Loans with the same Interest Period shall not be less than $2,000,000 or a whole multiple of $1,000,000 (or, solely in the case of Receivables Financing Loans, $1,000,000 or a whole multiple of $100,000) in excess thereof.

5.10  Illegality.  Notwithstanding any other provision herein, if any Change in Law occurring after the date hereof shall make it unlawful for any Lender

0000H4F3.W51                                   -66-

Agreement or any holders of the Notes. After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this Section 11 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under the Credit Documents.

11.10 <u>Issuing Lender as Issuer of Letters of Credit</u>. Each Lender which is a holder of a Revolving Credit Commitment (collectively "<u>Revolving Credit Lenders</u>") hereby acknowledges that the provisions of this Section 11 shall apply to the Issuing Lender, in its capacity as issuer of the Letters of Credit, in the same manner as such provisions are expressly stated to apply to the Administrative Agent, except that obligations to indemnify the Issuing Lender shall be ratable among the Revolving Credit Lenders in accordance with their respective Revolving Credit Commitments (or, if the Revolving Credit Commitments have been terminated, the outstanding principal amount of their respective Revolving Credit Loans and L/C Obligations and their respective participating interests in the outstanding Letters of Credit).

SECTION 12
MISCELLANEOUS

12.1 <u>Amendments and Waivers</u>. Except as otherwise expressly set forth in this Agreement, no Credit Document nor any terms thereof may be amended, supplemented, waived or modified except in accordance with the provisions of this subsection 12.1. With the written consent of the Required Lenders, the Administrative Agent and the respective Credit Parties or their Subsidiaries may, from time to time, enter into written amendments, supplements or modifications hereto for the purpose of adding any provisions to any Credit Document to which they are parties or changing in any manner the rights of the Lenders or of any such Credit Party or its Subsidiaries thereunder or waiving, on such terms and conditions as the Administrative Agent may specify in such instrument, any of the requirements of any such Credit Document or any Default or Event of Default and its consequences; <u>provided</u> that:

(a) no such waiver and no such amendment, supplement or modification shall release collateral not required or permitted by any Credit Document to be released and which, in the aggregate with all other collateral released pursuant to this clause (a) (other than collateral released pursuant to the proviso to this clause (a)) during the calendar year in which such proposed release would be effected and the immediately preceding calendar year, has fair market value on the

proposed date of release in excess of 20% of the fair market value of all collateral (including any Guarantee) on such date without the written consent of the Supermajority Lenders; <u>provided</u> that, notwithstanding the foregoing, this clause (a) shall not be applicable to and no consent shall be required for (i) releases of collateral in connection with any Asset Sales permitted by subsection 9.5, (ii) releases of collateral in accordance with subsection 12.12 or (iii) upon the reincorporation of the Company or any Subsidiary in a new jurisdiction or the creation of a new Subsidiary of the Company, any release of collateral in connection with the transfer of such released collateral to such reincorporated entity or new Subsidiary in compliance with subsection 9.4, <u>provided</u> that the Administrative Agent, in its sole discretion, determines that such release and transfer, together with any grant and perfection of a new Lien therein in favor of the Administrative Agent, will cause no material impairment of the value of the collateral taken as a whole, after giving effect to such release and transfer;

(b)  no such waiver and no such amendment, supplement or modification shall (x) without the prior written consent of each Lender whose obligations hereunder are being directly modified, extend the final maturity date of any Note or the scheduled payment date of any installment of any Loan, or reduce the rate or extend the time of payment of interest thereon, or change the method of calculating interest thereon, or reduce or extend the time of payment of any fee payable to such Lender hereunder, or reduce the principal amount thereof, or change the amount of any Lender's Commitment or Commitment Percentage, or (y) without the prior written consent of each Lender, amend, modify or waive any provision of subsection 5.9(b) or this subsection 12.1 or reduce the percentage specified in the definition of Required Lenders or reduce the percentage specified in the definition of Supermajority Lenders or consent to the assignment or transfer by the Company of any of its rights and obligations under any Credit Document;

(c)  no such waiver and no such amendment, supplement or modification affecting any Agent or Issuing Lender shall amend, modify or waive any provision of Section 11 without the written consent of such Agent and Issuing Lender; and

(d)  no such waiver, and no such amendment, supplement or modification shall amend, modify or waive (x) the prepayment

requirements specified in subsection 5.4(c)(i), (ii), (iii) and (v) without the written consent of the holders of at least 51% of each of (i) the aggregate unpaid principal amount of the aggregate of the Tranches of Term Loans adversely affected thereby, if any, (ii) the Revolving Credit Commitments or, if the Revolving Credit Commitments are terminated, the aggregate unpaid principal amount of the Revolving Credit Loans and (iii) the Receivables Financing Commitments or, if the Receivables Financing Commitments are terminated, the aggregate unpaid principal amount of the Receivables Financing Loans (the Term Loans, the Revolving Credit Commitments and the Receivables Financing Commitments of any Non-Funding Lender to be disregarded in determining such percentage at any time) and (y) the order of application of prepayments specified in subsection 5.4(a) or 5.4(c)(vi) without the written consent of the holders of at least 51% of each of (i) the aggregate unpaid principal amount of each Tranche of Term Loans adversely affected thereby and (ii) as set forth in clauses (x)(ii) and (iii) of this subsection 12.1(d); provided that the foregoing provisions of this paragraph (d) shall not be applicable to any modifications to subsection 5.4(a) or 5.4(c)(vi) in order to provide for pro rata payments to any additional Tranche of Term Loans on substantially the same basis as payments to the Tranches of Term Loans existing on the Closing Date are made;

any such waiver and any such amendment, supplement or modification described in this subsection 12.1 shall apply equally to each of the Lenders and shall be binding upon each Credit Party and its Subsidiaries, the Lenders, the Administrative Agent and the Issuing Lender and all future holders of the Notes and the Loans. Any extension of a Letter of Credit by the Issuing Lender shall be treated hereunder as a new Letter of Credit. In the case of any waiver, the Credit Parties, the Lenders, the Administrative Agent and Issuing Lender shall be restored to their former position and rights hereunder and under the outstanding Notes, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

12.2  Notices.  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy or telex, if one is listed) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when sent, confirmation of receipt received, or, in the case of telex notice,

when sent, answerback received, addressed as follows in the case of the Company, the Administrative Agent, and as set forth in Schedule I in the case of any Lender, or to such other address as may be hereafter notified by the respective parties hereto and any future holders of the Notes:

<table>
<tr><td>The Company:</td><td>Werner Holding Co. (DE), Inc.<br>c/o Werner Holding Co. (PA), Inc.<br>93 Werner Road<br>Greenville, Pennsylvania 16125<br>Attention:  Eric J. Werner, Esq.<br>Telecopy: (412) 588-0618</td></tr>
<tr><td>With a copy to:</td><td>Gibson, Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, New York 10166<br>Attention:  Janet Vance, Esq.<br>Telecopy:  (212) 351-4035</td></tr>
<tr><td>The Administrative Agent<br>and Swing Line Lender:</td><td>Bankers Trust Company<br>130 Liberty Street<br>New York, NY 10006<br>Attention: Mary Kay Coyle<br>Telecopy: (212) 250-7218</td></tr>
</table>

provided that any notice, request or demand to or upon the Administrative Agent or the Issuing Lender shall not be effective until received and, provided further, that the failure to provide the copies of notices to the Company provided for in this subsection 12.2 shall not result in any liability to the Administrative Agent.

12.3  No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of any Agent or any Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

12.4  Survival of Representations and Warranties.  All representations and warranties made hereunder and in any document, certificate or statement deliv-

ered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement, the Letters of Credit and the Notes.

12.5 <u>Payment of Expenses and Taxes</u>. The Company agrees (a) to pay or reimburse the Administrative Agent, the Syndication Agent, the Documentation Agent and the Co-Agent for all their reasonable out-of-pocket costs and expenses incurred in connection with the development, negotiation, preparation and execution of the Credit Documents and any other documents prepared in connection herewith, and the consummation of the transactions contemplated hereby and thereby, including, without limitation, the reasonable fees and disbursements of one counsel to the Administrative Agent, the Syndication Agent, the Documentation Agent and the Co-Agent, (b) to pay or reimburse all of the reasonable expenses, including, without limitation, reasonable fees and expenses of counsel, incurred by the Administrative Agent in connection with the administration of the facilities provided for herein or in connection with any amendments, waivers, work-outs or restructurings in respect thereof, (c) to pay or reimburse the Administrative Agent, the Syndication Agent, the Documentation Agent, the Co-Agent, the Issuing Lender and each Lender for all their costs and expenses incurred in connection with, and to pay, indemnify, and hold the Administrative Agent, the Syndication Agent, the Documentation Agent, the Co-Agent, the Issuing Lender and each Lender harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever arising out of or in connection with, the enforcement or preservation of any rights under any Credit Document and any such other documents, including, without limitation, reasonable fees and disbursements of counsel to the Administrative Agent, the Co-Agent and each Lender incurred in connection with the foregoing and in connection with advising the Administrative Agent with respect to its rights and responsibilities under this Agreement and the documentation relating thereto, (d) to pay, indemnify, and to hold the Administrative Agent, the Syndication Agent, the Documentation Agent, the Co-Agent and each Lender harmless from any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other similar taxes (other than withholding taxes), if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, any Credit Document and any such other documents, and (e) to pay, indemnify, and hold the Administrative Agent, the Syndication Agent, the Documentation Agent, the Co-Agent, the Issuing Lender and each Lender and their respective Affiliates, officers, directors and trustees harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever

(including, without limitation, reasonable fees and disbursements of counsel) which may be incurred by or asserted against the Administrative Agent, the Syndication Agent, the Documentation Agent, the Co-Agent, the Issuing Lender or the Lenders or such Affiliates, officers, directors or trustees (x) arising out of or in connection with any investigation, litigation or proceeding related to this Agreement, the other Credit Documents, the proceeds of the Loans or the Subordinated Debt and the transactions contemplated by or in respect of such use of proceeds, or any of the other transactions contemplated hereby, whether or not the Administrative Agent, the Syndication Agent, the Documentation Agent, the Co-Agent, the Issuing Lender or any of the Lenders or such Affiliates, officers, directors or trustees is a party thereto, including, without limitation, any of the foregoing relating to the violation of, noncompliance with or liability under, any Environmental Law applicable to the Company, any of its Subsidiaries or any of the facilities and properties owned, leased or operated by the Company or any of its Subsidiaries, or (y) without limiting the generality of the foregoing, by reason of or in connection with the execution and delivery or transfer of, or payment or failure to make payments under, Letters of Credit (it being agreed that nothing in this subsection 12.5(d)(y) is intended to limit the Company's obligations pursuant to subsection 3.8) (all the foregoing, collectively, the "indemnified liabilities"), provided that the Company shall have no obligation hereunder with respect to indemnified liabilities of the Administrative Agent, the Syndication Agent, the Documentation Agent, the Co-Agent, the Issuing Lender or any Lender or any of their respective Affiliates, officers, directors and trustees arising from (i) the gross negligence or willful misconduct of the person seeking indemnification or (ii) legal proceedings commenced against the Administrative Agent, the Syndication Agent, the Documentation Agent, the Co-Agent, the Issuing Lender or Lender by any security holder or creditor thereof arising out of and based upon rights afforded any such security holder or creditor solely in its capacity as such or (iii) legal proceedings commenced against any Lender by any Transferee (as defined in subsection 12.6(f)) thereof. Without limiting the foregoing, and to the extent permitted by applicable law, Holdings and the Company agree not to assert, and hereby waive (and the Company shall cause the Subsidiaries not to assert and to waive) all rights for contribution or any other rights of recovery with respect to all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, under or related to Environmental Laws, that any of them might have by statute or otherwise against the Administrative Agent, the Syndication Agent, the Documentation Agent, the Co-Agent, the Issuing Lender or any Lender. The agreements in this subsection 12.5 shall survive repayment of the Loans and all other amounts payable hereunder.

**12.6  Successors and Assigns; Participations and Assignments.**  (a) This Agreement shall be binding upon and inure to the benefit of the Company, the Lenders, the Administrative Agent, the Syndication Agent, the Documentation Agent, the Co-Agent, all future holders of the Notes and the Loans, and their respective successors and assigns, except that the Company may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of each Lender.

(b)  Any Lender may, in the ordinary course of its commercial banking, investment or lending business and in accordance with applicable law, at any time sell to one or more banks or other entities ("Participants") participating interests in any Loan owing to such Lender, any Note held by such Lender, any Commitment of such Lender or any other interest of such Lender hereunder.  In the event of any such sale by a Lender of participating interests to a Participant, such Lender's obligations under this Agreement to the other parties to this Agreement shall remain unchanged, such Lender shall remain solely responsible for the performance thereof, such Lender shall remain the holder of any such Note for all purposes under this Agreement and the Company and the Administrative Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Credit Documents.  The Company agrees that if amounts outstanding under this Agreement and the Notes are due and unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement and any Note to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement or any Note; provided that such right of setoff shall be subject to the obligation of such Participant to share with the Lenders, and the Lenders agree to share with such Participant, as provided in subsection 12.7.  The Company also agrees that each Participant shall be entitled to the benefits of subsections 3.10, 5.11 and 5.12 with respect to its participation in the Letters of Credit and in the Commitments and the Loans outstanding from time to time as if it were a Lender; provided that no Participant shall be entitled to receive any greater amount pursuant to any such subsection than the transferor Lender would have been entitled to receive in respect of the amount of the participation transferred by such transferor Lender to such Participant had no such transfer occurred.  Notwithstanding the foregoing, no Lender shall transfer or grant any Participation under which the participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (i) extend the final maturity of any Loan, Note or Letter of Credit (unless such Letter of Credit is not extended beyond the Revolving Credit

Termination Date) in which such Participant is participating, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the Participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitments shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the Participant's participation is not increased as a result thereof) or (ii) consent to the assignment or transfer by the Company of any of its rights and obligations under this Agreement.

(c)  Subject to paragraph (g) of this subsection 12.6, any Lender may, in the ordinary course of its commercial banking, lending or investment business and in accordance with applicable law, (i) at any time and from time to time assign all or any part of its rights and obligations under this Agreement and the Notes to any Lender or any Affiliate thereof, provided that, in the event of a sale of less than all of such rights and obligations, such assigning Lender after any such sale to any other Lender or any Affiliate of such Lender shall retain Commitments and/or Loans aggregating at least $5,000,000 (or such lesser amount as the Administrative Agent may determine) and (ii) with the consent of the Company and the Administrative Agent (which in each case shall not be unreasonably withheld or delayed) at any time and from time to time assign to one or more additional banks, mutual funds or financial institutions or entities (each, an "Assignee"), all or any part of its rights and obligations under this Agreement and the Notes, pursuant to an Assignment and Acceptance, executed by such Assignee, such transferor Lender (and, in the case of an Assignee that is not then a Lender or an Affiliate thereof, by the Company and the Administrative Agent), and delivered to the Administrative Agent for its acceptance and recording in the Register (as defined below); provided that (A) each such sale pursuant to clause (ii) of this subsection 12.6(c) shall be in a principal amount of $5,000,000 or more unless the Assigning Lender is transferring all of its rights and obligations and (B) in the event of a sale of less than all of such rights and obligations, such Lender after any such sale shall retain Commitments and/or Loans aggregating at least $5,000,000 (or such lesser amount as the Administrative Agent and the Company may determine).  Upon such execution, delivery, acceptance and recording, from and after the effective date determined pursuant to such Assignment and Acceptance, (x) the Assignee thereunder shall be a party hereto and, to the extent provided in such Assignment and Acceptance, have the rights and obligations of a Lender hereunder with a Commitment as set forth therein, and (y) the assigning Lender thereunder shall, to the extent of the interest transferred, as reflected in such Assignment and Acceptance, be released from its

obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of a transferor Lender's rights and obligations under this Agreement, such transferor Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of the indemnification provisions set forth in subsection 12.5). To the extent that an assignment of all or a portion of a Lender's Commitments and/or outstanding obligations pursuant to this subsection 12.6(c) would, at the time of such assignment, result in increased cost under subsections 3.10 or 5.11 from those being charged by the respective assigning Lender prior to such assignment, then the Company shall not be obligated to pay such increased costs (although the Company shall be obligated to pay any other increased costs of the type described above resulting from changes after the date of the respective assignment if same would otherwise be required by this Agreement). Furthermore, each Lender which is permitted to make Eurodollar Loans at the time of an assignment pursuant to this subsection 12.6(c) shall not be permitted to make an assignment to any Assignee which, at the time of the respective assignment, would not be able to make Eurodollar Loans for the reasons contemplated pursuant to subsection 5.10.

(d)  The Administrative Agent, which for purposes of this subsection 12.6(d) only shall be deemed to be the agent of the Company, shall maintain at the address of the Administrative Agent referred to in subsection 12.2 a copy of each Assignment and Acceptance delivered to it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the Commitments of, and principal amounts of the Loans owing to, each Lender from time to time. The entries in the Register shall be conclusive, in the absence of manifest error, and the Person whose name is recorded in the Register as the owner of a Loan or other obligation hereunder shall be the owner thereof for all purposes of this Agreement and the other Credit Documents, notwithstanding any notice to the contrary. Any assignment of any Loan or other obligation hereunder shall be effective only upon appropriate entries with respect thereto being made in the Register. The Register shall be available for inspection by the Company or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(e)  Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an Assignee (and, in the case of an Assignee that is not then a Lender or an Affiliate thereof, by the Company and the Administrative Agent), together with payment to the Administrative Agent of a registration and processing fee of $3,500 (or $0, in the case of an assignment to an Affiliate of such assigning Lender), the Administrative Agent shall (i) promptly accept such Assignment and Acceptance and (ii) on the effective date determined pursuant thereto record the information contained therein in the Register and give notice of such acceptance and

recordation to the Lenders and the Company. On or prior to such effective date, the Company at its own expense, shall execute and deliver to the Administrative Agent (in exchange for any or all of the B Term Loan Notes, C Term Loan Notes, Revolving Credit Notes or Receivables Financing Notes of the assigning Lender, if any) new B Term Loan Notes, C Term Loan Notes, Revolving Credit Notes or Receivables Financing Notes, as the case may be, to the order of such Assignee (if requested) in an amount equal to the B Term Loans, C Term Loans, Revolving Credit Commitment or Receivables Financing Commitments, as the case may be, assumed by it pursuant to such Assignment and Acceptance and, if the assigning Lender has retained a Commitment or any Term Loans hereunder, new B Term Loan Notes, C Term Loan Notes, Revolving Credit Notes or Receivables Financing Notes, as the case may be, to the order of the assigning Lender in an amount equal to the Commitment or such Term Loans, as the case may be, retained by it hereunder (if requested). Such new Notes shall be dated the Closing Date and shall otherwise be in the form of the Notes replaced thereby.

(f)  The Administrative Agent, the Syndication Agent, the Documentation Agent, the Co-Agent and the Lenders agree that they will use reasonable efforts to protect the confidentiality of any confidential information concerning the Company and its Subsidiaries and Affiliates. Notwithstanding the foregoing, the Company authorizes each Lender to disclose to any Participant or Assignee (each, a "Transferee") and any prospective Transferee or to any Person who evaluates, approves, structures or administers the Loans on behalf of a Lender and who is subject to this confidentiality provision any and all information in such Lender's possession concerning Holdings, the Company and its Subsidiaries which has been delivered to such Lender by or on behalf of the Company pursuant to this Agreement or which has been delivered to such Lender by or on behalf of the Company in connection with such Lender's credit evaluation of Holdings, the Company and its Subsidiaries prior to becoming a party to this Agreement; provided that each Lender shall cause its respective prospective Transferees and any Person who evaluates, approves, structures or administers the Loans on such Lender's behalf to agree to protect the confidentiality of any confidential information concerning Holdings, the Company and its Subsidiaries and Affiliates.

(g)  If, pursuant to this subsection 12.6, any interest in this Agreement or any Note is transferred to any Transferee which is organized under the laws of any jurisdiction other than the United States or any State thereof, the transferor Lender shall cause such Transferee, concurrently with the effectiveness of such transfer either (1) in the case of a Transferee that is a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (i) to represent to the transferor Lender (for the benefit of the transferor Lender, the Administrative Agent and the

Company) that under applicable law and treaties no taxes will be required to be withheld by the Administrative Agent, the Company or the transferor Lender with respect to any payments to be made to such Transferee in respect of the Loans or L/C Participating Interests, (ii) to furnish to the transferor Lender (and, in the case of any Transferee registered in the Register, the Administrative Agent and the Company) either U.S. Internal Revenue Service Form 4224 or U.S. Internal Revenue Service Form 1001 (wherein such Transferee claims entitlement to complete exemption from U.S. federal withholding tax on all interest payments hereunder) and (iii) to agree (for the benefit of the transferor Lender, the Administrative Agent and the Company) to the extent permitted by then-current law to provide the transferor Lender (and, in the case of any Transferee registered in the Register, the Administrative Agent and the Company) a new Form 4224 or Form 1001 upon the expiration or obsolescence of any previously delivered form and comparable statements in accordance with applicable U.S. laws and regulations and amendments duly executed and completed by such Transferee, and to comply from time to time with all applicable U.S. laws and regulations with regard to such withholding tax exemption or (2) in the case of any Transferee that is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (i) to represent to the transferor Lender (for the benefit of the transferor Lender, the Administrative Agent and the Company) that it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (ii) to furnish to the transferor Lender (and, in the case of any Transferee registered in the Register, to the Company), with a copy to the Administrative Agent, (A) a subsection 5.11(d)(2) Certificate and (B) two (2) accurate and complete original signed copies of Internal Revenue Service Form.W-8, certifying to such Transferee's legal entitlement on the date of the effectiveness of such transfer to an exemption from U.S. withholding tax under the provisions of Section 881(c) of the Code with respect to all payments to be made under this Agreement, and (iii) to agree (for the benefit of the transferor Lender, the Administrative Agent and the Company), to the extent legally entitled to do so, upon reasonable request by the transferor Lender (or, in the case of any Transferee registered in the Register, the Administrative Agent or the Company), to provide to the transferor Lender, the Administrative Agent and the Company such other forms as may be required to establish the legal entitlement of such Transferee to an exemption from withholding tax with respect to payments under this Agreement.

　　　　(h)  For avoidance of doubt, the parties to this Agreement acknowl-edge that the provisions of this subsection concerning assignments of Loans and Notes relate only to absolute assignments and that such provisions do not prohibit assignments creating security interests, including, without limitation, (x) any pledge or assignment by a Lender of any Loan or Note to any Federal Reserve Bank in accordance with applicable law and (y) in the case of a Lender that is a fund, with

the consent of the Administrative Agent, any pledge or assignment by such Lender of all or any portion of its Loans and Notes to its trustee in support of its obligations to its trustee.

12.7  <u>Set-off</u>.  In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Company, any such notice being expressly waived by the Company to the extent permitted by applicable law, upon (or concurrently with) the taking of any action pursuant to the last paragraph of Section 10 or upon the filing of a petition under any of the provisions of the federal bankruptcy code or amendments thereto, by or against; the making of an assignment for the benefit of creditors by; the application for the appointment, or the appointment, of any receiver of, or of any substantial portion of the property of; the issuance of any execution against any substantial portion of the property of; the issuance of a subpoena or order, in supplementary proceedings, against or with respect to any substantial portion of the property of; or the issuance of a warrant of attachment against any substantial portion of the property of; the Company to set off and apply against any indebtedness, whether matured or unmatured, of the Company to such Lender, any amount owing from such Lender to the Company, at or at any time after, the happening of any of the above mentioned events, and as security for such indebtedness, the Company hereby grants to each Lender a continuing security interest in any and all deposits, accounts or moneys of the Company, then or thereafter maintained with such Lender, subject in each case to subsection 12.8 of this Agreement.  The aforesaid right of set-off may be exercised by such Lender against the Company or against any trustee in bankruptcy, debtor in possession, assignee for the benefit of creditors, receiver or execution, judgment or attachment creditor of the Company, or against anyone else claiming through or against the Company or such trustee in bankruptcy, debtor in possession, assignee for the benefit of creditors, receiver, or execution, judgment or attachment creditor, notwithstanding the fact that such right of set-off shall not have been exercised by such Lender prior to the making, filing or issuance, or service upon such Lender of, or of notice of, any such petition; assignment for the benefit of creditors; appointment or application for the appointment of a receiver; or issu- ance of execution, subpoena, order or warrant.  Each Lender agrees promptly to notify the Company, and the Administrative Agent after any such set-off and appli- cation made by such Lender, <u>provided</u> that the failure to give such notice shall not affect the validity of such set-off and application.

12.8  <u>Payments Pro Rata</u>.  (a)  Except as otherwise provided in this Agreement, the Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of the Company in respect of any obligations hereunder,

it shall distribute such payment to the Lenders pro rata based upon their respective shares, if any, of the obligations with respect to which such payment was received.

(b) Each of the Lenders agrees that, if it should receive any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Credit Documents, or otherwise), which is applicable to the payment of the principal of, or interest on, the Loans, unpaid drawings with respect to Letters of Credit, commitment fees or Letter of Credit fees, of a sum which with respect to the related sum or sums received by other Lenders is in a greater proportion than the total of such obligation then owed and due to such Lender bears to the total of such obligation then owed and due to all of the Lenders immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other Lenders an interest in the respective obligations of the respective Credit Party to such Lenders in such amount as shall result in a proportional participation by all the Lenders in such amount; provided that if all or any portion of such excess amount is thereafter recovered from such Lender, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

(c) Notwithstanding anything to the contrary contained herein, the provisions of the preceding subsections 12.8(a) and (b) shall be subject to the express provisions of this Agreement which require, or permit, differing payments to be made to Lenders which are not Non-Funding Lenders as opposed to Non-Funding Lenders.

12.9  Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Company and the Administrative Agent.  This Agreement shall become effective with respect to the Company, the Administrative Agent, the Syndication Agent, the Documentation Agent, the Co-Agent and the Lenders when the Administrative Agent shall have received copies of this Agreement executed by the Company, the Administrative Agent, the Documentation Agent and the Lenders, or, in the case of any Lender, shall have received telephonic confirmation from such Lender stating that such Lender has executed counterparts of this Agreement or the signature pages hereto and sent the same to the Administrative Agent.

12.10  Governing Law; No Third Party Rights.  This Agreement and the Notes and the rights and obligations of the parties under this Agreement and the

Notes shall be governed by, and construed and interpreted in accordance with, the law of the State of New York. This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and, except as set forth in subsection 12.6, no other Persons shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.

12.11 <u>Submission to Jurisdiction; Waivers</u>.  (a)  Each party to this Agreement hereby irrevocably and unconditionally:

(i)    submits for itself and its property in any legal action or proceeding relating to this Agreement or any of the other Credit Documents, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof;

(ii)    consents that any such action or proceeding may be brought in such courts, and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(iii)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address set forth in subsection 12.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto; and

(iv)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction.

(b)  Each party hereto unconditionally waives trial by jury in any legal action or proceeding referred to in paragraph (a) above and any counterclaim therein.

12.12 <u>Releases</u>.  The Administrative Agent and Lenders agree to cooperate with the Company and its Subsidiaries with respect to any sale or other disposition permitted by subsection 9.5 and promptly take such action and execute and deliver such instruments and documents necessary to release the liens and

0000H4F3.W51                          -146-

security interests created by the Security Documents relating to any of the assets or property affected by any such sale permitted by subsection 9.5. including, without limitation, any Uniform Commercial Code amendment, release or termination or partial release or termination statements, provided that such liens and security interests in Receivables Facility Assets shall only be required to be released to the extent required by the relevant Receivables Facility.

12.13 Interest.  Each provision in this Agreement and each other Credit Document is expressly limited so that in no event whatsoever shall the amount paid, or otherwise agreed to be paid, by the Company for the use, forbearance or detention of the money to be loaned under this Agreement or any other Credit Document or otherwise (including any sums paid as required by any covenant or obligation contained herein or in any other Credit Document which is for the use, forbearance or detention of such money), exceed that amount of money which would cause the effective rate of interest to exceed the highest lawful rate permitted by applicable law (the "Highest Lawful Rate"), and all amounts owed under this Agreement and each other Credit Document shall be held to be subject to reduction to the effect that such amounts so paid or agreed to be paid which are for the use, forbearance or detention of money under this Agreement or such other Credit Document shall in no event exceed that amount of money which would cause the effective rate of interest to exceed the Highest Lawful Rate.  Notwithstanding any provision in this Agreement or any other Credit Document to the contrary, if the maturity of the Loans or the obligations in respect of the other Credit Documents are accelerated for any reason, or in the event of any prepayment of all or any portion of the Loans or the obligations in respect of the other Credit Documents by the Company or in any other event, earned interest on the Loans and such other obligations of the Company may never exceed the Highest Lawful Rate, and any unearned interest otherwise payable on the Loans or the obligations in respect of the other Credit Documents that is in excess of the Highest Lawful Rate shall be cancelled automatically as of the date of such acceleration or prepayment or other such event and (if theretofore paid) shall, at the option of the holder of the Loans or such other obligations, be either refunded to the Company or credited on the principal of the Loans.  In determining whether or not the interest paid or payable, under any specific contingency, exceeds the Highest Lawful Rate, the Company and the Lenders shall, to the maximum extent permitted by applicable law, amortize, prorate, allocate and spread, in equal parts during the period of the actual term of this Agreement, all interest at any time contracted for, charged, received or reserved in connection with this Agreement.

12.14 Special Indemnification.  Notwithstanding any provision in this Agreement to the contrary, (A) each Lender, or Transferee of any Lender pursuant

to subsection 12.6(g) of this Agreement, shall indemnify the Company and the Administrative Agent, and hold each of them harmless against any and all payments, expenses or taxes which the Company or the Administrative Agent may become subject to or obligated to pay if and to the extent that, (i) on the Closing Date or the effective date of transfer, as the case may be, such Lender, or such Transferee of a Lender pursuant to subsection 12.6(g) of this Agreement, (a) makes the representation and covenants set forth in subsection 5.11(d)(2) of this Agreement or, in the case of a Transferee, pursuant to subsection 12.6(g)(2) of this Agreement and the Assignment and Acceptance, and (b) is not in fact also qualified to make the representation and covenants set forth in subsection 5.11(d)(1) of this Agreement or, in the case of a Transferee, pursuant to subsection 12.6(g)(2) of this Agreement and the Assignment and Acceptance, and (ii) as a result of any Change in Law or compliance by such Lender, or Transferee, with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority the Company or the Administrative Agent is required to make any additional payments on account of U.S. withholding taxes and amounts related thereto with respect to any payments under this Agreement, any Note, or a Eurodollar Loan, made prior to such Change in Law or request or directive, none of which payments would have been required if such Lender, or Transferee, was qualified on the Closing Date or the date of the transfer, as the case may be, to make the representation and covenants set forth in subsection 5.11(d)(1) of this Agreement or pursuant to subsection 12.6(g)(1) of this Agreement and the Assignment and Acceptance, as the case may be, and (B) each Lender, or Transferee, agrees that to the extent any amount payable by such Lender or Transferee pursuant to this subsection 12.14 remains unpaid on any Interest Payment Date or the date on which any prepayment is made, the Company shall have the right to set-off against any payment due to such Lender or Transferee on such date any amounts owing to the Company pursuant to this subsection 12.14.

      12.15  <u>Permitted Payments and Transactions</u>.  Notwithstanding any provision to the contrary contained in this Agreement, the Company and its Subsidiaries shall be permitted to pay fees and expenses pursuant to or in respect of, the following agreements, and, in the case of clauses (a) and (d) below, to engage in the following transactions: (a) (i) the Financing Advisory Agreement, dated as of October 8, 1997 between Investcorp International Inc. and the Company, (ii) the Agreement For Management Advisory, Strategic Planning and Consulting Services, dated as of November 24, 1997 among Investcorp International Inc. and the Company; (iii) the Stand-By Commitment Letter, dated as of November 19, 1997, between Invifin, S.A. and the Company and (iv) the Recapitalization Agreement; (b) agreements with any Person or Persons providing for the payment of customary fees in connection with serving as a director of the Company or any Subsidiary of the

Company; (c) agreements providing for the payment of commercially reasonable fees in connection with any permitted financing, refinancing, sale, transfer, sale and leaseback or other permitted disposition of any assets of the Company or its Subsidiaries; (d) the borrowing of any Indebtedness to the extent, and upon the terms and conditions, the same is expressly permitted under subsection 9.1; and (e) agreements providing for commercially reasonable fees in connection with any permitted purchase or acquisition of stock or assets by the Company or any of its Subsidiaries.

        12.16  <u>Co-Arrangers; Administrative Agent</u>.  Notwithstanding any provisions to the contrary contained in any Credit Document, if any Co-Arranger ceases to be a Lender, any item set forth any Credit Document that is required to be satisfactory to such Co-Arranger shall instead be required to be satisfactory to the Administrative Agent, and any rights powers or duties of the Co-Arranger shall be rights, powers or duties of the Administrative Agent.

        12.17  <u>Certain Provisions Regarding Alabama Mortgaged Property</u>. Notwithstanding anything to the contrary contained elsewhere in this Agreement or any of the other Credit Documents, it is hereby acknowledged and agreed that the Mortgage executed and delivered on the Closing Date with respect to the Mortgaged Property of the Company located in Alabama (the "Alabama Mortgaged Property") shall secure only the C Term Loans and obligations directly relating thereto. Furthermore, and notwithstanding anything to the contrary contained in this Agreement or any other Credit Document, if and to the extent that proceeds received from any exercise of remedies with respect to the Alabama Mortgaged Property are applied to the repayment of outstanding C Term Loans and related interest or other obligations, then on a prospective basis any distributions to be made to the Lenders (other than with respect to any Interest Rate Agreements secured pursuant to the various Security Documents) pursuant to the provisions of any other Security Document shall be adjusted with the intent that the Lenders other than the holders of C Term Loans receive incremental distributions at such times, and in such amounts, as the Administrative Agent reasonably determines shall cause the Lenders to share equally and ratably in the aggregate distributions made to the Lenders (other than with respect to any Interest Rate Agreements secured pursuant to the respective Security Documents) pursuant to the various Security Documents on the same basis as such distributions would have been made if all of the Security Documents (including the Mortgage with respect to the Alabama Mortgage Property) had at all times equally and ratably secured all obligations hereunder.

WERNER HOLDING CO (DE), INC.

IN WITNESS WHEREOF, the parties hereto have caused this
Agreement to be duly executed and delivered in New York, New York by their
proper and duly authorized officers as of the day and year first above written.

WERNER HOLDINGS CO. (DE), INC.

By: _____

Title _____

0000H4F3.W51

[Remaining Signature Pages Omitted]

Schedule I to the
Credit Agreement

## Lenders, Addresses and Commitments

| | B Term Loan Commitment | C Term Loan Commitment | Revolving Credit Commitment | Receivables Financing Commitment | Total |
|---|---|---|---|---|---|
| BANKERS TRUST COMPANY<br>130 Liberty Street, 30th Floor<br>New York, NY 10016<br>Attn: Mary Kay Coyle<br>Telecopy: 212-250-7218 | 28,475,000.00 | 29,425,000.00 | 7,850,000.00 | 5,750,000.00 | 71,500,000.00 |
| MERRILL LYNCH CAPITAL<br>CORPORATION<br>World Financial Center<br>North Tower<br>New York, NY 10281-1307<br>Attn: Michael Zupon<br>Telecopy: (212) 449-8320 | 4,400,000.00 | -- | 7,850,000.00 | 5,750,000.00 | 18,000,000.00 |
| THE CHASE MANHATTAN<br>BANK<br>270 Park Avenue<br>New York, New York 10017<br>Attn: Neil Boylan<br>Telecopy: (212) 270-1129 | 3,300,000.00 | -- | 7,300,000.00 | 5,400,000.00 | 16,000,000.00 |
| GOLDMAN SACHS CREDIT<br>PARTNERS L.P.<br>85 Broad Street<br>New York, New York 10004<br>Attn: Jennifer Tye<br>Telecopy: (212) 357-1500 | 3,300,000.00 | -- | 7,300,000.00 | 5,400,000.00 | 16,000,000.00 |
| ARAB BANKING CORPORATION<br>(B.S.C.)<br>277 Park Avenue<br>32nd Floor<br>New York, New York 10172<br>Attn: Louise Bilbro<br>Telecopy: (212) 583-0935 | -- | -- | 5,100,000.00 | 3,900,000.00 | 9,000,000.00 |
| BANK OF TOKYO-MITSUBISHI TRUST<br>COMPANY<br>1251 Avenue of the Americas<br>12th Floor<br>New York, New York 10020<br>Attn: David McLaughlin<br>Telecopy: (212) 782-4981 | 3,200,000.00 | -- | 7,000,000.00 | 5,300,000.00 | 15,500,000.00 |

| | B Term Loan Commitment | C Term Loan Commitment | Revolving Credit Commitment | Receivables Financing Commitment | Total |
|---|---|---|---|---|---|
| BANKBOSTON N.A.<br>100 Federal Street<br>Boston, MA 02109<br>Attn: Tim Barns<br>Telecopy: (617) 434-4829 | 2,800,000.00 | — | 6,100,000.00 | 4,600,000.00 | 13,500,000.00 |
| CREDIT AGRICOLE INDOSUEZ<br>55 East Monroe Street<br>47th Floor<br>Chicago, Illinois 60603<br>Attn: Paul Dytrych<br>Telecopy: (313) 372-3724 | 2,800,000.00 | — | 6,100,000.00 | 4,600,000.00 | 13,500,000.00 |
| CITIBANK, N.A.<br>399 Park Avenue<br>6th Floor, Zone 7<br>New York, New York 10043<br>Attn: Bruce Hall<br>Telecopy: (212) 559-0292 | 3,200,000.00 | — | 7,000,000.00 | 5,300,000.00 | 15,500,000.00 |
| PRIME INCOME TRUST<br>Two World Trade Center<br>72nd Floor<br>New York, New York 10048<br>Attn: Rafael Scolari<br>Telecopy: (212) 392-5345 | 4,050,000.00 | 4,950,000.00 | — | — | 9,000,000.00 |
| FIRST CHICAGO NBD BANK<br>One First National Plaza<br>Suite 0324<br>Chicago, Illinois 60670<br>Attn: Ken Krammer<br>Telecopy: (32) 732-7655 | 3,200,000.00 | — | 7,000,000.00 | 5,300,000.00 | 15,500,000.00 |
| FIRST UNION NATIONAL BANK<br>301 South College Street<br>19th Floor<br>Charlotte, North Carolina 28288<br>Attn: David Sharp<br>Telecopy: (704) 374-3300 | 3,200,000.00 | — | 7,000,000.00 | 5,300,000.00 | 15,500,000.00 |
| FLEET BANK, N.A.<br>1185 Avenue of the Americas<br>16th Floor<br>New York, New York 10036<br>Attn: Ty Anderson<br>Telecopy: (212) 819-6201 | 2,800,000.00 | — | 6,100,000.00 | 4,600,000.00 | 13,500,000.00 |
| KZH Holding Corporation III<br>c/o The Chase Manhattan Bank<br>450 West 33rd Street<br>15th Floor<br>New York, New York 10001<br>Attn: Virginia Conway<br>Telecopy: (212) 946-7776 | 2,025,000.00 | 2,475,000.00 | | | 4,500,000.00 |

0000H4F3.W51

| | B Term Loan Commitment | C Term Loan Commitment | Revolving Credit Commitment | Receivables Financing Commitment | Total |
|---|---|---|---|---|---|
| KZH Crescent Corp.<br>c/o The Chase Manhattan Bank<br>450 West 33rd Street<br>15th Floor<br>New York, New York 10001<br>Attn: Virginia Conway<br>Telecopy: (212) 946-7776 | 2,025,000.00 | 2,475,000.00 | | | 4,500,000.00 |
| NATIONAL WESTMINISTER BANK PLC<br>660 Madison Avenue<br>17th Floor<br>New York, New York 10021<br>Attn: Field Smith<br>Telecopy: (212) 418-4598 | 2,800,000.00 | -- | 6,100,000.00 | 4,600,000.00 | 13,500,000.00 |
| PILGRIM AMERICA PRIME RATE TRUST<br>Two Renaissance Square<br>40 North Central Avenue<br>Suite 1200<br>Phoenix, Arizona 85004<br>Attn: Michael Bacevich<br>Telecopy: (602) 417-8327 | 4,050,000.00 | 4,950,000.00 | -- | -- | 9,000,000.00 |
| PNC BANK, NATIONAL ASSOCIATION<br>345 Park Avenue<br>29th Floor<br>New York, New York 10154<br>Attn: Mark Williams<br>Telecopy: (212) 409-3737 | 2,800,000.00 | -- | 6,100,000.00 | 4,600,000.00 | 13,500,000.00 |
| TRUST COMPANY OF THE WEST<br>(TCW CRESCENT/MACH I PARTNERS)<br>200 Park Avenue<br>Suite 2200<br>New York, New York 10166<br>Attn: Justin Driscoll/Jonathan Insull<br>Telecopy: (212) 297-4159 | 2,025,000.00 | 2,475,000.00 | -- | -- | 4,500,000.00 |
| VAN KAMPEN MERRIT COMPANIES, INC.<br>One Parkview Plaza<br>Oakbrook Terrace, Illinois 60181<br>Attn: Jeffrey Maillet<br>Telecopy: (630) 684-6740 | 6,750,000.00 | 8,250,000.00 | -- | -- | 15,000,000.00 |
| THE MITSUBISHI TRUST AND BANKING CORPORATION<br>Attn: Paul Arzourian<br>Telecopy: (212) 644-6825 | 2,800,000.00 | -- | 6,100,000.00 | 4,600,000.00 | 13,500,000.00 |
| Total Allocation | $90,000,000 | $55,000,000 | $100,000,000 | $75,000,000 | $320,000,000 |

0000H4F3.W51

EXHIBIT 12

GIBSON, DUNN & CRUTCHER LLP

LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

200 PARK AVENUE

NEW YORK, NEW YORK 10166-0193

———

(212) 351-4000

FACSIMILE: (212) 351-4035

November 24, 1997

LOS ANGELES
333 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3197

CENTURY CITY
2029 CENTURY PARK EAST
LOS ANGELES, CALIFORNIA 90067-3026

ORANGE COUNTY
4 PARK PLAZA
IRVINE, CALIFORNIA 92614-8557

SAN DIEGO
750 B STREET
SAN DIEGO, CALIFORNIA 92101-4605

SAN FRANCISCO
ONE MONTGOMERY STREET, TELESIS TOWER
SAN FRANCISCO, CALIFORNIA 94104-4505

DALLAS
1717 MAIN STREET
DALLAS, TEXAS 75201-7390

DENVER
1801 CALIFORNIA STREET
DENVER, COLORADO 80202-2641

JAS. A. GIBSON, 1852-1922
W. E. DUNN, 1861-1925
ALBERT CRUTCHER, 1860-1931

———

WASHINGTON
1050 CONNECTICUT AVENUE, N.W.
WASHINGTON, D.C. 20036-5306

PARIS
104 AVENUE RAYMOND POINCARÉ
75116 PARIS, FRANCE

LONDON
30/35 PALL MALL
LONDON SW1Y 5LP

HONG KONG
10TH FLOOR, TWO PACIFIC PLACE
88 QUEENSWAY
HONG KONG

AFFILIATED SAUDI ARABIA OFFICE
JARIR PLAZA, OLAYA STREET
P.O. BOX 15870
RIYADH 11454, SAUDI ARABIA

WRITER'S DIRECT DIAL NUMBER

(212) 351-4000

OUR FILE NUMBER

C 03263-00908

Bankers Trust Company
as Administrative Agent
and Co-Arranger,
Merrill Lynch Capital Corporation
as Syndication Agent
and Co-Arranger,
The Chase Manhattan Bank
as Documentation Agent,
Goldman Sachs Credit Partners L.P.
as Co-Agent,
and the Lenders listed in
Schedule I hereto

Re:     *Credit Agreement dated as of November 24, 1997 among Werner Holding Co. (DE), Inc., Bankers Trust Company, as Administrative Agent and Co-Arranger, Merrill Lynch Capital Corporation, as Syndication Agent and Co-Arranger, The Chase Manhattan Bank, as Documentation Agent, Goldman Sachs Credit Partners L.P., as Co-Agent and the Lenders listed on Schedule I hereto (the "Credit Agreement")*

Ladies and Gentlemen:

        We have acted as special counsel to Werner Holding Co. (DE), Inc., a Delaware corporation (the "Company"), Ardee Investment Co., Inc., a Delaware corporation ("Ardee"), Kentucky Ladder Company, a Pennsylvania corporation ("KLC"), Olympus Properties, Inc., an Illinois corporation ("Olympus"), Phoenix Management Services, Inc., a Pennsylvania corporation ("Phoenix"), R.D. Arizona Ladder Corp. d/b/a R.D. Werner Co., Inc. - Arizona, an Arizona corporation ("R.D. Werner"), Werner Co., a Pennsylvania corporation ("Werner Co."), Werner Financial Inc., a Delaware corporation ("Werner Financial"), Werner Holding Co. (PA), Inc., a Pennsylvania corporation ("Werner PA"), Werner Management Co., a Pennsylvania corporation ("Werner Management") and WIP Technologies, Inc., a Delaware corporation ("WIP") in connection with the Credit Agreement.  Terms defined in the Credit Agreement or the

GIBSON, DUNN & CRUTCHER LLP

November 24, 1997
Page 2

applicable Financing Document (as defined below) and not otherwise defined herein are used herein as therein defined. Collectively, (i) the Company, Ardee, Werner Financial and WIP are sometimes referred to herein as "Group I Corporations", and (ii) KLC, Olympus, Phoenix, R.D. Werner, Werner Co., Werner PA and Werner Management are sometimes referred to herein as "Group II Corporations." Group I Corporations and Group II Corporations are sometimes referred to herein as the "Corporations".

In rendering this opinion, we have examined originals or copies certified or otherwise identified to our satisfaction as being true copies of the following documents and instruments:

(a)     the Credit Agreement, including the Exhibits and Schedules thereto;

(b)     the Notes executed and delivered on the date hereof;

(c)     the Company Security Agreement;

(d)     the Company Pledge Agreement;

(e)     the Holdings Guarantee;

(f)     the Holdings/Subsidiary Pledge Agreement;

(g)     the Subsidiary Guarantee;

(h)     the Subsidiary Security Agreement;

(i)     financing statements on Form UCC-1, each naming a Corporation as debtor (the "Financing Statements"), to be filed as to such Corporation in the jurisdictions listed in Annex A hereto with respect to such Corporation (each, a "Relevant Jurisdiction");

(j)     a certificate of even date herewith of the corporate secretary of each Group I Corporation as to resolutions, incumbencies of certain officers of such Group I Corporation and the form of certificate of incorporation and by-laws of such Group I Corporation in effect on the date hereof;

(k)     certificates of even date herewith executed by officers of each of the Corporations setting forth or certifying certain factual matters; and

(l)     certificates of recent date of the Secretary of State of the state of incorporation of each Group I Corporation as to the legal existence of such Group I Corporation in good standing under the laws of such state.

The documents referred to in Items (a) through (h) above are sometimes referred to herein collectively as the "Financing Documents".

GIBSON, DUNN & CRUTCHER LLP

November 24, 1997
Page 3

      We have, with your permission, assumed, without independent investigation or inquiry with respect to any such matter, that:

      (a)    Each of the Lenders and the Agents has all requisite power and authority to execute, deliver and perform its obligations under each of the Financing Documents to which it is a party; the execution and delivery of such Financing Documents and performance of such obligations have been duly authorized by all necessary action on the part of such Lender and such Agent; each of such Financing Documents has been duly executed and delivered by such Lender and such Agent; and each of such Financing Documents is the legal, valid and binding obligation of such Lender and such Agent, enforceable against it in accordance with its terms.

      (b)    The execution and delivery of the Financing Documents by each of the Lenders and the Agents party thereto and performance by each such Lender and Agent of its obligations thereunder comply with all laws and regulations that are applicable to such Lender or such Agent or the transactions contemplated by such Financing Documents because of the nature of such Lender's or such Agent's business.

      (c)    The signatures on all documents examined by us are genuine, and, except as to the Group I Corporations (with respect to which the following assumption in this paragraph (c) does not apply), all individuals executing such documents were thereunto duly authorized.

      (d)    The documents submitted to us as originals are authentic and the documents submitted to us as certified or reproduction copies conform to the originals.

      With respect to questions of fact material to the opinions expressed below, we have, with your consent, relied upon certificates of public officials and officers of each of the Corporations, in each case without having independently verified the accuracy or completeness thereof.  In addition, in rendering our opinions we have assumed the due organization, valid existence and corporate good standing of the Group II Corporations, the power and authority of each of the Group II Corporations to enter into the Financing Documents to which each is party and to consummate the transactions contemplated thereby, and the due and valid authorization, execution and delivery of such Financing Documents by each of the Group II Corporations.

      With respect to any opinion herein in regard to the existence or absence of facts that is stated to be to our actual knowledge, such statement means that, during the course of our representation of the Corporations, no information has come to the attention of the lawyers presently in our firm participating in such representation that has given them actual knowledge of facts contrary to the existence or absence of the facts indicated.  No inference as to our knowledge of the existence or absence of such facts should be drawn from our representation of the Corporations.

      Based upon the foregoing, and subject to the qualifications, exceptions, limitations and assumptions hereinafter set forth, we are of the opinion that:

      1.    Each of the Group I Corporations is a validly existing corporation in good standing under the laws of Delaware and has all requisite corporate power and authority to own and operate its properties, to conduct its business in the manner in which

GIBSON, DUNN & CRUTCHER LLP

November 24, 1997
Page 4

it presently is conducted, and to execute, deliver and perform its obligations under each of the Financing Documents to which it is party.

2.    Each of the Financing Documents to which any Group I Corporation is party has been duly authorized by all necessary corporate action on the part of such Group I Corporation and has been duly executed and delivered on behalf of such Group I Corporation.  Each of the Financing Documents to which any Corporation is party constitutes the legal, valid and binding obligation of such Corporation, enforceable against such Corporation in accordance with its terms.

3.    Neither the execution and delivery by any Group I Corporation of the Financing Documents to which it is party, the performance by such Group I Corporation of its obligations thereunder nor the consummation of the transactions contemplated thereby constitutes (or will constitute, as the case may be) or will result in a breach of such Group I Corporation's certificate of incorporation or by-laws.  Neither the execution and delivery by any Corporation of the Financing Documents to which it is party, the performance by such Corporation of its obligations thereunder nor the consummation of the transactions contemplated thereby constitutes a violation of any applicable federal or New York state law, governmental rule or regulation or of the General Corporation Law of the State of Delaware or to our actual knowledge, any order of any court or governmental authority that is applicable to such Corporation.

4.    No consent, approval or authorization of, and no registration, declaration or filing with any administrative, governmental or other public authority of the United States of America or the State of New York or under the General Corporation Law of the State of Delaware is required by law to be obtained or made in connection with the execution, delivery and performance by any Corporation, or for the validity or enforceability against such Corporation, of any of the Financing Documents to which it is party (except with respect to perfection of the Security Interests (as hereinafter defined)), other than (i) such consents, approvals, authorizations, registrations, declarations and filings that have been made or obtained on or prior to the date hereof and remain in full force and effect, and (ii) such consents, approvals, authorizations, registrations, declarations and filings, the failure to make or obtain (a) which would not have a material adverse effect on the business, condition or results of operation of the Company and its Subsidiaries taken as a whole, and (b) which would not adversely affect the validity or enforceability of any of the Financing Documents or the rights or remedies of the Agents or the Lenders thereunder, or the ability of any of them to perform its obligations under the Financing Documents to which it is party, or would not give rise to liability on the part of the Agents or the Lenders.

5.    None of the Corporations is an "investment company" or a Person directly or indirectly "controlled" by or "acting on behalf of" an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

6.    Neither the making of the Loans on the Closing Date pursuant to, nor application of the proceeds thereof in accordance with, the Credit Agreement will violate Regulation G, T, U or X promulgated by the Board of Governors of the Federal Reserve System.

GIBSON, DUNN & CRUTCHER LLP

November 24, 1997
Page 5

       7.      The provisions of the Company Security Agreement and the Subsidiary Security Agreement (collectively, the "Security Agreements") are effective to create, in favor of the Administrative Agent, on behalf of the Secured Creditors, valid and enforceable security interests (together with the security interests of the Administrative Agent described in Paragraph 8, the "Security Interests") in the interest of each Corporation party thereto, as grantor, in the Collateral (as defined in such Security Agreement) covered thereby, to the extent that a security interest can be created therein under Article 9 of the Uniform Commercial Code as in effect in the State of New York (the "New York UCC"). With respect to such Collateral as to which a security interest can be created under Article 9 of the New York UCC and perfected by the filing in any of the Relevant Jurisdictions of a financing statement under the Uniform Commercial Code as in effect in such Relevant Jurisdiction (the "Applicable UCC" in respect of such Relevant Jurisdiction), upon proper filing of the Financing Statements in the Relevant Jurisdictions, the Obligations (as defined in the respective Security Agreement) will be secured by perfected Security Interests in favor of the Administrative Agent, on behalf of the Secured Creditors, in and upon the interest of each Corporation party thereto, as grantor, in that Collateral.

       8.      Assuming delivery to the Administrative Agent of stock certificates representing shares (collectively, the "Pledged Shares") of Capital Stock described in Schedule I to each of the Company Pledge Agreement and the Holdings/Subsidiary Pledge Agreement (collectively, the "Pledge Agreements"), the security interests in the Pledged Shares granted by the Corporations party thereto, respectively, to the Administrative Agent, for the benefit of the Secured Creditors, in the Pledge Agreements will constitute valid and perfected security interests therein under New York law, prior in right to all other security interests therein (other than any such other security interest that is perfected by "control" (as defined in Section 8-106 of the New York UCC)) created under, and the priority of which is governed by, Section 9-115(5) of the New York UCC.

       Each of the opinions set forth above is subject to the following exceptions, qualifications, limitations and assumptions:

       (a)      Our opinions are subject to the effect of bankruptcy, insolvency, reorganization, moratorium, arrangement or other similar laws affecting enforcement of creditors' rights generally, including, without limitation, the effect of statutory or other laws regarding fraudulent conveyances or transfers, preferential transfers, and of laws affecting distributions by corporations to stockholders.

       (b)      Our opinions are subject to the application of general principles of equity, whether considered in a case or proceeding at law or in equity, including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing. Without limitation, we express no opinion as to the availability of specific performance, injunctive relief or other equitable relief as a remedy for noncompliance with any of the terms of the Financing Documents.

       (c)      We call to your attention that Article 9 of the Uniform Commercial Code generally requires the filing of continuation statements within the period of six (6) months prior to the expiration of five (5) years from the date of the original filing of a financing statement, and each five-year anniversary thereof, in order to maintain the effectiveness of such financing statement.

GIBSON, DUNN & CRUTCHER LLP

November 24, 1997
Page 6

      (d)    We call to your attention that perfection of security interests generally will be terminated under the Uniform Commercial Code (i) as to any collateral acquired by a debtor more than four (4) months after the debtor changes its name, identity, or corporate structure so as to make the filed financing statements seriously misleading, unless financing statements indicating the new name, identity, or corporate structure of the debtor are properly filed before the expiration of such four (4) month period, and (ii) as to any collateral consisting of "accounts", "general intangibles", mobile goods of the type and nature contemplated in Section 9-103(3)(a) of the Uniform Commercial Code, or "chattel paper" as to which perfection is achieved and/or maintained by filing, each as defined in the Uniform Commercial Code, four (4) months after a debtor changes the jurisdiction of its chief executive office (or, if earlier, when perfection would have ceased as set forth in paragraph (c) above) unless such security interests are perfected in such new jurisdiction before that termination or, under certain circumstances, after the debtor changes the place where its records are maintained to a different jurisdiction. In addition, perfection of the Security Interests may terminate if Collateral is moved to a new jurisdiction, unless financing statements are properly filed before the expiration of a statutorily specified period, which under the Uniform Commercial Code (without giving effect to non-uniform provisions thereof, as it may be in effect in any such new jurisdiction) is generally four (4) months after such change in location.

      (e)    We have assumed that value has been given by the Lenders to the Corporations in the State of New York, that each Corporation has rights in the Collateral covered by the Security Agreement or Pledge Agreement to which it is party, and that no agreement exists that postpones attachment of, or modifies, releases or terminates, the Administrative Agent's security interests therein or that would expand, modify or otherwise affect the respective rights and obligations of the parties to the Financing Documents.

      (f)    We have assumed that none of the accounts included in the Collateral is or will be due from the federal government, any agency or department thereof or any state or local government or any agency or political subdivision thereof, to the extent that any applicable law requires any action with respect to such Collateral in addition to the filing of a financing statement under any Applicable UCC.

      (g)    We have assumed that the Financing Statements have been or will be properly filed and indexed in the offices in the Relevant Jurisdictions, and that no release or termination or similar statement or filing with respect to the Security Interests has been made or filed.

      (h)    We have assumed that each of the Corporations is in compliance with the Fair Labor Standards Act (see Citicorp Industrial Credit, Inc. v. Brock, 483 U.S. 27 (1987)).

      (i)    We call to your attention that certain third parties, such as buyers in the ordinary course of business or holders in due course of negotiable instruments, could acquire an interest in such Collateral free of the Security Interests, even if the Security Interests are perfected.

      (j)    Our opinions are subject to the qualification that indemnification provisions in any of the Financing Documents may be unenforceable to the extent that such

GIBSON, DUNN & CRUTCHER LLP

November 24, 1997
Page 7

indemnification may be held to be in violation of or against public policy, including, without limitation, limitations under certain circumstances on enforceability of provisions indemnifying a party against loss attributable to or liability for its own negligent acts.

(k)     Our opinions are subject to the effect of Section 9-311 of the New York UCC and the corresponding provision of each Applicable UCC, which provide that a pledgor's rights in collateral may be voluntarily or involuntarily transferred notwithstanding a provision in a security agreement prohibiting any transfer or making the transfer constitute a default.

(l)     Our opinions set forth in Paragraphs 2 and 8 hereof are subject to the following qualifications: (A) the Administrative Agent may not be entitled to vote the Pledged Shares or to receive dividends or other distributions directly from the issuer thereof prior to becoming the record holder of the Pledged Shares; (B) none of the Pledged Shares may be sold or further transferred by the Administrative Agent or the Secured Creditors without registration under the Securities Act of 1933, except pursuant to an exemption from registration contained in such Act, and qualification or exemption from qualification under any applicable state securities or Blue Sky laws; and (C) we express no opinion on any provision relating to indemnification or contribution relating to any claims made under the federal securities laws or state securities or Blue Sky laws.

(m)     We call to your attention that, in the case of Collateral consisting of money, instruments (except instruments constituting part of chattel paper) or certificated securities, the Security Interest therein will only be enforceable and perfected if, when and to the extent that the Administrative Agent, on behalf of the Secured Creditors, obtains and maintains possession of such money, instruments or certificated securities in accordance with the Applicable UCC. Without limitation, in the case of the issuance of additional shares in respect of the Pledged Shares or payments or other distributions in respect to pledged Collateral which may only be perfected by possession, under the New York UCC the Security Interest of the Administrative Agent therein will be perfected only upon delivery thereof to the Administrative Agent.

(n)     We have assumed, with respect to the Pledged Shares, that the Administrative Agent, on behalf of the Secured Creditors, has taken its Security Interest in the Pledged Shares for value and in good faith, without the Administrative Agent or any Secured Creditor having, at the time of delivery thereof to the Administrative Agent, notice or actual knowledge of any adverse claim thereto by, or any interest therein of, any Person other than the pledgor.

(o)     We have assumed that there are no perfected security interests in the Pledged Shares or other pledged Collateral which, without possession of the Pledged Shares or other pledged Collateral by the secured party, could have become or remain perfected during the 21 day period after (i) the attachment of such security interests, or (ii) redelivery of the Pledged Shares or other pledged Collateral by the secured party to the pledgors thereof, pursuant to Sections 9-304(4), 9-304(5), 9-115 or 9-116 of the New York UCC.

(p)     We have assumed that the Administrative Agent obtained possession of all of the Pledged Shares in the State of New York.

GIBSON, DUNN & CRUTCHER LLP

November 24, 1997
Page 8

(q)     We have assumed that the chief executive office and principal place of business for each of the Company, Ardee, Werner Financial and WIP is located in New Castle County in the State of Delaware, that the chief executive office and principal place of business for each of Phoenix, Werner Co., Werner PA and Werner Management is located in Mercer County in the Commonwealth of Pennsylvania, that the chief executive office and principal place of business for KLC is located in Carrollton County in the State of Kentucky, that the chief executive office and principal place of business of Olympus is located in Cook County in the State of Illinois and that the chief executive office and principal place of business for R.D. Werner is Maricopa County in the State of Arizona.

(r)     We express no opinion with respect to the adequacy or accuracy of the descriptions of the Collateral contained in any Security Agreements or any Financing Statements.

Furthermore, the opinions herein expressed are subject to the qualification that we express no opinion as to:

(a)     The legality, validity, binding effect or enforceability (whether according to its terms or otherwise) of any provision of any Financing Document to the effect that rights or remedies are not exclusive, that every right or remedy is cumulative and may be exercised in addition to any other right or remedy, that the election of some particular remedy does not preclude recourse to one or more other remedies or that failure to exercise or delay in exercising rights or remedies will not operate as a waiver of any such right or remedy.

(b)     The legality, validity, binding effect or enforceability of any waiver under any Financing Document or any consent thereunder relating to the rights of any Corporation party thereto existing, or duties owing to it, as a matter of law, except to the extent that such Corporation can waive such rights or duties or give such consent under applicable law and has effectively made such waiver or given such consent. We express no opinion as to the effectiveness of any waiver or consent contained in any Financing Document relating to such rights or duties that is broadly or vaguely stated or does not describe the right or duty purportedly waived or to which such consent relates with reasonable specificity. Without limitation, we also express no opinion as to any provision of any Financing Document waiving the right to object to venue or with respect to the jurisdiction of the United States District Court for the Southern District of New York.

(c)     The legality, validity, binding effect or enforceability of any provision of any Financing Document that purports (i) to permit the Administrative Agent or any of the Secured Creditors or any other Person to sell or otherwise dispose of any Collateral subject thereto, except in compliance with applicable law, or (ii) to impose on the Administrative Agent or any Secured Creditor standards for the care of Collateral in the Administrative Agent's or the Secured Creditor's possession other than as provided in Section 9-207 of the New York UCC. Without limitation, we express no opinion with respect to any provision to the extent that it authorizes the Administrative Agent or a Lender to purchase Collateral at a private sale, if such Collateral is neither customarily sold in a recognized market nor the subject of widely or regularly distributed standard price quotations. We call to your attention that Section 9-504(3) of the New York UCC includes requirements for notice in connection with a private sale or other disposition of

GIBSON, DUNN & CRUTCHER LLP

November 24, 1997
Page 9

Collateral as well as a public sale, unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold in a recognized market.

(d)    The legality, validity, binding effect or enforceability of any provision of any Financing Document to the extent that it provides for a rate of interest after failure to pay principal when due or other occurrence of a default that is in excess of the rate of interest otherwise payable, to the extent such rate is found to constitute a penalty.

(e)    Any provision of any Financing Document requiring written amendments or waivers of such document insofar as it suggests that oral or other modifications, amendments or waivers could not effectively be agreed upon by the parties or that the doctrine of promissory estoppel might not apply.

(f)    The legality, validity, binding effect or enforceability of any rights of setoff, other than as provided by Section 151 of the Debtor and Creditor Law of the State of New York, as interpreted by applicable judicial decisions.

(g)    The effect on the enforceability of any of the Financing Documents against any Corporation party thereto of any facts or circumstances that would constitute a defense to the obligation of a surety, unless such defense has been waived effectively by such Corporation, to the extent that (i) any of such Corporation's obligations under such Financing Document (A) constitute obligations to answer for the debt of another Person or (B) result from subordination to any of the obligations to the Secured Creditors under the Financing Documents of any of its rights as against any other Person, or (ii) the Security Interests in such Corporation's right, title and interest in or to any of the Collateral secure Loans to, or other of the obligations of, any Person other than such Corporation, including without limitation, the Security Interests in the interests of each Corporation other than the Company.

(h)    Any Corporation's rights in or title to any of the Collateral or the location, existence or non-existence of any of the Collateral.

(i)    The priority (and therefore no opinion as to the respective rights of any creditor or other third party as against the rights of the Administrative Agent or the Secured Creditors) of any security interest in any Collateral (other than the Pledged Shares, to the extent set forth in Paragraph 8), including the Security Interests.

(j)    The creation, validity, enforceability or perfection of the Security Interests in any item of Collateral consisting of proceeds of Collateral, or proceeds acquired with cash proceeds, except to the extent set forth in Section 9-306 of the New York UCC and the corresponding provision of each Applicable UCC.

(k)    The creation, validity, enforceability or perfection of the Security Interests in any interest in or claim in or under any policy of insurance (other than a claim to proceeds of an insurance policy, to the extent provided by Section 9-306 of the New York UCC and the corresponding provision of any Applicable UCC) or contract for an annuity.

GIBSON, DUNN & CRUTCHER LLP

November 24, 1997
Page 10

(l)     The creation, validity or the enforceability of the Security Interests
(i) in any part of the Collateral in which a security interest would not be covered by the
New York UCC by virtue of Section 9-102 or 9-104 thereof, and (ii) to the extent that
attachment or creation and perfection of a security interest therein is not governed by the
New York UCC, in patents, copyrights, trademarks, trade secrets or other intellectual
property (or any opinion as to transfers of interests or rights therein in connection with
exercise of remedies against Collateral under the Security Agreements).

(m)     The creation, validity, enforceability or perfection of the Security
Interests to the extent that the Collateral consists or will consist of deposit accounts,
fixtures, consumer goods, farm products, equipment used in farming operations, crops,
timber, minerals and the like (including oil and gas) or accounts or general intangibles
resulting from the sale of any of the foregoing, or any right represented by a judgment or
any claim arising out of tort, or to the extent that attachment and perfection of a security
interest therein is not governed by the New York UCC.

(n)     The creation, validity, enforceability or perfection of the Security
Interests in any item of Collateral consisting of any license or permit issued by any
governmental authority.

(o)     The perfection of the Security Interests in the Collateral that is
subject to a statute or treaty of the United States of America that provides for a national or
international registration or for a national or international certificate of title or which
specifies a place of filing other than as provided in the Applicable UCCs.

(p)     The perfection of the Security Interests to the extent the Collateral
consists or will consist of instruments (other than the Pledged Shares) not constituting part
of chattel paper, motor vehicles and other goods covered by a certificate of title or
ownership, mobile homes, commercial coaches, trailers or other rolling stock, shipping
containers, boats or aircraft.

This opinion is limited to the effect of the present state of the laws of the
United States of America and the State of New York and, to the limited extent set forth
below, the General Corporation Law of the State of Delaware, and the Applicable UCC in
each Relevant Jurisdiction. Although we are not admitted to practice in the State of
Delaware, we are generally familiar with the General Corporation Law of the State of
Delaware and have made such inquiries as we consider necessary to render our opinions
expressed in Paragraphs 1, 2, 3 and 4 hereof. We are not admitted to practice in any
Relevant Jurisdiction other than California, Colorado, New York and Texas (each Relevant
Jurisdiction other than California, Colorado, New York and Texas, an "Excluded
Jurisdiction") and have not obtained opinions of counsel admitted in any Excluded
Jurisdiction with respect to the perfection or continued perfection of the Security Interests
created by the Security Agreements in the Collateral located in such Excluded
Jurisdictions. We have, however, examined the applicable provisions of the Applicable
UCCs as presently in effect in such Excluded Jurisdictions, as such provisions are currently
published by Mead Data Central, Inc. in the Lexis database, and our opinions in Paragraph
7, to the extent such opinions involve conclusions as to perfection of the Security Interests
under the laws of such Excluded Jurisdictions are based solely upon such review. With
respect to Paragraph 7 hereof, we express no opinion with respect to Collateral located
outside of the Relevant Jurisdictions or as to which the Applicable UCCs do not govern the

GIBSON, DUNN & CRUTCHER LLP

November 24, 1997
Page 11

perfection and the effect of perfection or nonperfection of security interests therein.  In rendering this opinion, we assume no obligation to revise or supplement this opinion should the present laws, or the interpretation thereof, be changed.

This opinion is rendered to the Agents and the Lenders as of the date hereof in connection with the Credit Agreement, and may not be relied upon by any person other than the Agents and the Lenders (and their permitted successors and assigns in accordance with the Credit Agreement), or by them in any other context, and may not be furnished to any other person or entity without our prior written consent, provided that each Lender may provide this opinion (i) to Lender examiners and other regulatory authorities should they so request or in connection with their normal examination, (ii) to the independent auditors and attorneys of such Lender, (iii) pursuant to order or legal process of any court or governmental agency, (iv) in connection with any legal action to which the Lender is a party arising out of the transactions contemplated by the Credit Agreement, or (v) in connection with the assignment of or sale of participations in the Loans in accordance with the terms of the Credit Agreement.

Very truly yours,

*Gibson, Dunn & Crutcher LLP*

GIBSON, DUNN & CRUTCHER LLP

HRD/BDK/JV/LV/SKZ

NA972890.042/24+

GIBSON, DUNN & CRUTCHER LLP

**Schedule I**

**The Lenders**

BANKERS TRUST COMPANY
130 Liberty Street, 30th floor
New York, NY 10016

MERRILL LYNCH CAPITAL
CORPORATION
World Financial Center
North Tower
New York, NY 10281-1307

THE CHASE MANHATTAN BANK
270 Park Avenue
New York, NY 10017

GOLDMAN SACHS CREDIT
PARTNERS L.P.
85 Broad Street
New York, NY 10004

ARAB BANKING CORPORATION
(B.S.C.)
277 Park Avenue, 32nd floor
New York, NY 10172

BANK OF TOKYO-MITSUBISHI
TRUST COMPANY
1251 Avenue of the Americas
12th floor
New York, NY 10172

BANKBOSTON N.A.
100 Federal Street
Boston, MA 02109

KZH HOLDING CORPORATION III
c/o The Chase Manhattan Bank
450 West 33rd Street
15th floor
New York, NY 10001

CREDIT AGRICOLE INDOSUEZ
55 East Monroe Street
47th floor
Chicago, IL 60603

CITIBANK, N.A.
399 Park Avenue
6th floor, Zone 7
New York, NY 10043

PRIME INCOME TRUST
Two World Trade Center
72nd floor
New York, NY 10048

FIRST CHICAGO NBD BANK
One First National Plaza
Suite 0324
Chicago, IL 60670

FIRST UNION NATIONAL BANK
301 South College Street
19th floor
Charlotte, NC 28288

FLEET BANK, N.A.
1185 Avenue of the Americas
16th floor
New York, NY 10036

KZH CRESCENT CORP.
c/o The Chase Manhattan Bank
450 West 33rd Street
15th floor
New York, NY 10001

NATIONAL WESTMINSTER BANK
PLC
660 Madison Avenue
17th floor
New York, NY 10021

PILGRIM AMERICA PRIME RATE
TRUST
Two Renaissance Square
40 North Central Avenue
Suite 1200
Phoenix, AZ 85004

GIBSON, DUNN & CRUTCHER LLP

**Schedule I** (cont'd)

PNC BANK, NATIONAL
ASSOCIATION
345 Park Avenue, 29th floor
New York, NY 10154

TRUST COMPANY OF THE WEST
(TCW CRESCENT/MACH I
PARTNERS)
200 Park Avenue
Suite 2200
New York, NY 10166

VAN KAMPEN MERRIT
COMPANIES, INC.
One Parkview Plaza
Oakbrook Terrace, IL 60181

THE MITSUBISHI TRUST AND
BANKING CORPORATION

GIBSON, DUNN & CRUTCHER LLP

## Annex A

## UCC Filing Offices

Secured Party Name:          Bankers Trust Company, as Administrative Agent
                             Attention: Mary Kay Coyle

Debtor Name: **Kentucky Ladder Company (Pennsylvania corp.)**
Kentucky (S/S)
Carrollton County, KY

Debtor Name: **Olympus Properties, Inc.**
Alabama (S/S)
Illinois (S/S)
Kentucky (S/S)
Carrollton County, KY
Pennsylvania (S/S)
Mercer County, PA - Recorder of Deeds

Debtor Name: **Phoenix Management Services, Inc. (Pennsylvania corp.)**
Pennsylvania (S/S)
Mercer County, PA - Recorder of Deeds

Debtor Name: **R.D. Arizona Ladder Corp. d/b/a R.D. Werner Co., Inc. - Arizona
                (Arizona corp.)**
Arizona (S/S)
Maricopa County, AZ

Debtor Name: **Werner Co. (Pennsylvania corp.)**
Alabama (S/S)
Arizona (S/S)
Maricopa County, AZ
Pima County, AZ
California (S/S)
Connecticut (S/S)
Colorado (S/S)
Florida (S/S)
Broward County, FL
Hillisborough County, FL
Orange County, FL
Georgia
DeKalb County, GA
Cobb County, GA
Gwinnett County, GA
Illinois (S/S)
Cook County, IL
DuPage County, IL
Indiana (S/S)
Kentucky (S/S)
Carrollton County, KY

GIBSON, DUNN & CRUTCHER LLP

**Annex A** (continued)

**UCC Filing Offices**

Debtor Name: **Werner Co. (Pennsylvania corp.)** (cont'd)
Louisiana
Jefferson Parish, LA
Orleans Parish, LA
Maine (S/S)
Massachusetts (S/S)
City of Cambridge, MA
Michigan (S/S)
Minnesota (S/S)
Missouri (S/S)
St. Louis County, MO
Jackson County, MO
North Carolina (S/S)
Guilford County, NC
New York (S/S)
Chautauqua County, NY
Ohio (S/S)
Auglaize County, OH
Belmont County, OH
Butler County, OH
Cuyahoga County, OH
Erie County, OH
Montgomery County, OH
Portage County, OH
Shelby County, OH
Trumbul County, OH
Oregon (S/S)
Pennsylvania (S/S)
Allegheny County, PA - Recorder of Deeds
Crawford County, PA - Recorder of Deeds
Lawrence County, PA - Recorder of Deeds
Mercer County, PA - Recorder of Deeds
York County, PA - Recorder of Deeds
Texas (S/S)
Utah (S/S)
Virginia (S/S)
City of Bristol, VA
Washington (S/S)

EXHIBIT 13

**Notice of Borrowing**

Bankers Trust Company
130 Liberty Street
New York, New York 10006-1105

Ladies and Gentlemen:

Pursuant to Section 5.1 of the Credit Agreement (capitalized terms used herein but not defined herein shall have the respective meanings specified in the Credit Agreement) dated as of November 24, 1997, among Werner Holding Co. (DE), Inc. (the "Company"), as borrower, the lenders parties thereto (the "Lenders"), Bankers Trust Company, as administrative agent for the Lenders and as co-arranger, Merrill Lynch Capital Corporation, as syndication agent and as co-arranger, The Chase Manhattan Bank, as documentation agent and Goldman Sachs Credit Partners L.P., as co-agent, we hereby notify you that the Company will borrow $55,000,000 of the C Term Loan as an Alternate Base Rate Loan. The date of borrowing such Loans will be November 24, 1997. The proceeds of such borrowings should promptly be made available at the account of the Company at Chase Bank, New York, ABA number 021-000-021, account number 400-702-274.

Please notify us immediately if you have any questions.

WERNER HOLDINGS CO. (DE), INC

Name   Eric J. Werner
Title   Vice President

2

**Notice of Borrowing**

Bankers Trust Company
130 Liberty Street
New York, New York 10006-1105

Ladies and Gentlemen:

Pursuant to Section 5.1 of the Credit Agreement (capitalized terms used herein but not defined herein shall have the respective meanings specified in the Credit Agreement) dated as of November 24, 1997, among Werner Holding Co. (DE), Inc. (the "Company"), as borrower, the lenders parties thereto (the "Lenders"), Bankers Trust Company, as administrative agent for the Lenders and as co-arranger, Merrill Lynch Capital Corporation, as syndication agent and as co-arranger, The Chase Manhattan Bank, as documentation agent and Goldman Sachs Credit Partners L.P., as co-agent, we hereby notify you that the Company will borrow $90,000,000 of the B Term Loan as an Alternate Base Rate Loan.  The date of borrowing such Loans will be November 24, 1997.  The proceeds of such borrowings should promptly be made available at the account of the Company at Chase Bank, New York, ABA number 021-000-021, account number 400-702-274.

Please notify us immediately if you have any questions.

WERNER HOLDINGS CO. (DE), INC.


Name:   Eric J. Werner
Title:   Vice President

# EXHIBIT 14

(Excerpts Only)

WERNER HOLDING CO. (DE), INC.

$135,000,000

10% Senior Subordinated Notes due 2007

PURCHASE AGREEMENT

November 14, 1997

CHASE SECURITIES INC.
DONALDSON, LUFKIN & JENRETTE
    SECURITIES CORPORATION
GOLDMAN, SACHS & CO.
c/o Chase Securities Inc.
270 Park Avenue, 4th floor
New York, New York  10017

Ladies and Gentlemen:

      Werner Holding Co. (DE), Inc., a Delaware corporation (the "Company"), proposes to issue and sell $135,000,000 aggregate principal amount of its 10% Senior Subordinated Notes due 2007 (the "Securities"). The Securities will be issued pursuant to an Indenture which is anticipated to be dated as of November 24, 1997 (the "Indenture") among the Company, Werner Holding Co. (PA), Inc., the parent company of the Company ("Holding"), as a guarantor, the subsidiaries of the Company listed on the signature pages hereto (the "Subsidiary Guarantors", and, together with Holding, the "Guarantors"), as guarantors, and IBJ Schroder Bank and Trust Company, as trustee (the "Trustee"). The Securities will be guaranteed on a senior subordinated unsecured basis (the "Note Guarantees") by each of the Guarantors. The Company hereby confirms its agreement with Chase Securities Inc. ("CSI"), Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ") and Goldman, Sachs & Co. (together with CSI and DLJ, the "Initial Purchasers") concerning the purchase of the Securities from the Company by the several Initial Purchasers.

      The Securities will be offered and sold to the Initial Purchasers without being registered under the Securities Act of 1933, as amended (the "Securities Act"), in reliance upon an exemption therefrom. The Company has prepared a preliminary offering memorandum dated October 31, 1997 (the "Preliminary Offering Memorandum") and will prepare an offering memorandum dated the date hereof (the "Offering Memorandum") setting forth information concerning the Company and the Securities. Copies of the Preliminary Offering Memorandum have been, and copies of the Offering Memorandum will be, delivered by the Company to the Initial Purchasers pursuant to the terms of this Agreement. Any references herein to the Preliminary Offering Memorandum and the Offering Memorandum shall be deemed to include all amendments and supplements thereto, unless otherwise noted. The Company hereby confirms that it has authorized the use of the Preliminary Offering Memorandum and the Offering Memorandum in connection with the offering and resale of the Securities by the Initial Purchasers in accordance with Section 2.

      Holders of the Securities (including the Initial Purchasers and their direct and indirect transferees) will be entitled to the benefits of a Registration Rights Agreement, substantially in the form attached hereto as Annex A (the "Registration Rights Agreement"), pursuant to which the Company will agree to file with the Securities and Exchange Commission (the "Commission") (i) a registration statement under the Securities Act (the "Exchange Offer

Registration Statement") registering an issue of senior subordinated notes of the Company (the "Exchange Securities") which are identical in all material respects to the Securities (except that the Exchange Securities will not contain terms with respect to transfer restrictions or registration rights) and (ii) under certain circumstances, a shelf registration statement pursuant to Rule 415 under the Securities Act (the "Shelf Registration Statement").

The Securities are being issued in connection with the recapitalization ("Recapitalization") of Holding.  Pursuant to the Recapitalization Agreement dated October 8, 1997, as amended and restated on October 27, 1997 (the "Recapitalization Agreement"), by and among Holding and certain affiliates of Investcorp S.A. ("Investcorp") and certain other international investors organized by Investcorp (collectively, the "Investors"), Holding will, subject to the approval of Holding's shareholders, among other things, redeem approximately 85% of its outstanding capital stock for approximately $330.7 million and receipt of the Market Participation Right and the Investors will purchase from Holding, for approximately $122.7 million, shares of Holding capital stock representing approximately 67% of the outstanding equity of Holding following Recapitalization.  The transactions contemplated by the Recapitalization Agreement, together with the repayment of certain indebtedness of the Company and the payment of certain fees and expenses, will be financed by (i) the $122.7 million equity investment by the Investors, (ii) the offering of the Securities, and (iii) approximately $185.7 million of borrowings under a new senior credit facility.

Capitalized terms used but not defined herein shall have the meanings given to such terms in the Offering Memorandum.

1.  *Representations, Warranties and Agreements of the Company and the Guarantors*.  The Company and the Guarantors jointly and severally represent and warrant to, and agree with, the several Initial Purchasers on and as of the date hereof and the Closing Date (as defined in Section 3) that:

(a)  Each of the Preliminary Offering Memorandum and the Offering Memorandum, as of its respective date, did not, and on the Closing Date the Offering Memorandum will not, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided* that the Company and the Guarantors make no representation or warranty as to information contained in or omitted from the Preliminary Offering Memorandum or the Offering Memorandum in reliance upon and in conformity with written information relating to the Initial Purchasers furnished to the Company by or on behalf of any Initial Purchaser specifically for use therein (the "Initial Purchasers' Information").

(b)  Each of the Preliminary Offering Memorandum and the Offering Memorandum, as of its respective date, contains all of the information that, if requested by a prospective purchaser of the Securities, would be required to be provided to such prospective purchaser pursuant to Rule 144A(d)(4) under the Securities Act.

(c)  Assuming the accuracy of the representations and warranties of the Initial Purchasers contained in Section 2 and their compliance with the agreements set forth therein, it is not necessary, in connection with the issuance and sale of the Securities to the Initial Purchasers and the offer, resale and delivery of the Securities by the Initial Purchasers in the manner contemplated by this Agreement and the Offering Memorandum, to register the Securities under the Securities Act or to qualify the Indenture under the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act").

(d)  Holding has no direct subsidiaries other than the Company.  The Company has no direct and/or indirect subsidiaries other than (i) the Subsidiary Guarantors, Manufacturers Indemnity and Insurance Company of America, Wentworth Institutional Realty Inc., and Ad Valorem Properties, Inc. and (ii) Werner Distribution, Inc., Werner

"The Securities covered hereby have not been registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), and may not be offered or sold within the United States to, or for the account or benefit of, U.S. persons (i) as part of their distribution at any time or (ii) otherwise until 40 days after the later of the commencement of the offering of the Securities and the date of original issuance of the Securities, except in accordance with Regulation S or Rule 144A or any other available exemption from registration under the Securities Act. Terms used above have the meanings given to them by Regulation S."

(v)  it has not and will not enter into any contractual arrangement with any distributor with respect to the distribution of the Securities, except with its affiliates or with the prior written consent of the Company.

Terms used in this Section 2(c) have the meanings given to them by Regulation S.

(d)  Each Initial Purchaser, severally and not jointly, represents and warrants to and agrees with the Company and the Guarantors that (i) it has not offered or sold prior to the date six months after the Closing Date will not offer or sell any Securities to persons in the United Kingdom except to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses or otherwise in circumstances which have not resulted and will not result in an offer to the public in the United Kingdom within the meaning of the Public Offers of Securities Regulations 1995; (ii) it has complied and will comply with all applicable provisions of the Financial Services Act 1986 and the Public Offers of Securities Regulations 1995 with respect to anything done by it in relation to the Securities in, from or otherwise involving the United Kingdom; and (iii) it has only issued or passed on and will only issue or pass on in the United Kingdom any document received by it in connection with the issue of the Securities to a person who is of a kind described in Article 11(3) of the Financial Services Act 1986 (Investment Advertisement) (Exemptions), Order 1996 or is a person to whom such document may otherwise lawfully be issued or passed on.

(e)  Each Initial Purchaser, severally and not jointly, agrees that, prior to or simultaneously with the confirmation of sale by such Initial Purchaser to any purchaser of any of the Securities purchased by such Initial Purchaser from the Company pursuant hereto, such Initial Purchaser shall furnish to that purchaser a copy of the Offering Memorandum (and any amendment or supplement thereto that the Company shall have furnished to such Initial Purchaser prior to the date of such confirmation of sale). In addition to the foregoing, each Initial Purchaser acknowledges and agrees that the Company and, for purposes of the opinions to be delivered to the Initial Purchasers pursuant to Sections 5(c) and (d) counsel for the Company and for the Initial Purchasers and the Company's general counsel, respectively, may rely upon the accuracy and truth of the representations and warranties of the Initial Purchasers and their compliance with their agreements contained in this Section 2, and each Initial Purchaser hereby consents to such reliance.

(f)  The Company acknowledges and agrees that the Initial Purchasers may sell Securities to any affiliate of an Initial Purchaser and that any such affiliate may sell Securities purchased by it to an Initial Purchaser, subject to the terms, conditions, representations and warranties set forth herein.

3.  *Delivery of and Payment for the Securities.*  (a) Delivery of and payment for the Securities shall be made at the offices of Gibson, Dunn & Crutcher LLP, New York, New York, or at such other place as shall be agreed upon by the Initial Purchasers and the Company, at 10:00 A.M., New York City time, on November 24, 1997, or at such other time or date, not later than seven full business days thereafter, as shall be agreed upon by

12

the Initial Purchasers and the Company (such date and time of payment and delivery being referred to herein as the "Closing Date").

(b) On the Closing Date, payment of the purchase price for the Securities shall be made to the Company by wire or book-entry transfer of same-day funds to such account or accounts as the Company shall specify prior to the Closing Date or by such other means as the parties hereto shall agree prior to the Closing Date against delivery to the Initial Purchasers of the certificates evidencing the Securities. Time shall be of the essence, and delivery at the time and place specified pursuant to this Agreement is a further condition of the obligations of the parties hereunder. Upon delivery, the Securities shall be in global form, registered in such names and in such denominations as CSI on behalf of the Initial Purchasers shall have requested in writing not less than two full business days prior to the Closing Date. The Company agrees to make one or more global certificates evidencing the Securities available for inspection by CSI on behalf of the Initial Purchasers in New York, New York at least 24 hours prior to the Closing Date.

4. *Further Agreements of the Company and Holding.* Holding and the Company agree with each of the several Initial Purchasers:

(a) at any time prior to completion of the resale of the Securities by the Initial Purchasers, to advise the Initial Purchasers promptly and, if requested, confirm such advice in writing, of the happening of any event which makes any statement of a material fact made in the Offering Memorandum untrue or which requires the making of any additions to or changes in the Offering Memorandum (as amended or supplemented from time to time) in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; to advise the Initial Purchasers promptly of any order preventing or suspending the use of the Preliminary Offering Memorandum or the Offering Memorandum, of any suspension of the qualification of the Securities for offering or sale in any jurisdiction and of the initiation or threatening of any proceeding for any such purpose; and to use its reasonable best efforts to prevent the issuance of any such order preventing or suspending the use of the Preliminary Offering Memorandum or the Offering Memorandum or suspending any such qualification and, if any such suspension is issued, to use its reasonable best efforts to obtain the lifting thereof at the earliest possible time;

(b) to furnish promptly to each of the Initial Purchasers and counsel for the Initial Purchasers, without charge, as many copies of the Preliminary Offering Memorandum and the Offering Memorandum (and any amendments or supplements thereto) as may be reasonably requested;

(c) prior to making any amendment or supplement to the Offering Memorandum, to furnish a copy thereof to each of the Initial Purchasers and counsel for the Initial Purchasers and not to effect any such amendment or supplement to which the Initial Purchasers shall reasonably object by notice to the Company after a reasonable period to review;

(d) if, at any time prior to completion of the resale of the Securities by the Initial Purchasers, (i) any event shall occur or condition exist as a result of which it is necessary, in the reasonable opinion of counsel for the Initial Purchasers or counsel for the Company to amend or supplement the Offering Memorandum so that the Offering Memorandum will not include an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances existing at the time it is delivered to a purchaser, not misleading, or (ii) if it is necessary to amend or supplement the Offering Memorandum to comply with applicable law, to promptly prepare such amendment or supplement as may be necessary to correct such untrue statement or omission or so that the Offering Memorandum, as so amended or supplemented, will comply with applicable law;

provided for in this Section 12; *provided, however*, that except as provided in this Section 12 and Section 8, the Initial Purchasers shall pay their own costs and expenses including the costs and expenses of their counsel, any transfer taxes on the Securities that they may sell and the expenses of advertising any offering of the Securities made by the Initial Purchasers.

13.  *Survival.*  The respective indemnities, rights of contribution, representations, warranties and agreements of the Company, the Guarantors and the Initial Purchasers contained in this Agreement or made by or on behalf of the Company or the Initial Purchasers pursuant to this Agreement or any certificate delivered pursuant hereto shall survive the delivery of and payment for the Securities and shall remain in full force and effect, regardless of any termination or cancelation of this Agreement or any investigation made by or on behalf of any of them or any of their respective affiliates, officers, directors, employees, representatives, agents or controlling persons

14.  *Notices, etc.*  All statements, requests, notices and agreements hereunder shall be in writing, and:

(a)  if to the Initial Purchasers, shall be delivered or sent by mail or telecopy transmission to Chase Securities Inc., 270 Park Avenue, New York, New York 10017, Attention: Mr. Thomas Walker (telecopier no.: (212) 270-0994); or

(b)  if to the Company, shall be delivered or sent by mail or telecopy transmission to Werner Holding Co., 93 Werner Road, Greenville, PA 16125-9499, Attention: Eric Werner (telecopier no.: (412) 588-0618), with a copy to: Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York 10166, Attention: E. Michael Greaney, Esq. (telecopier no. (212) 351-4035) and to: Investcorp International, Inc., 280 Park Avenue, New York, New York 10017, Attention: Christopher J. Stadler (telecopier no. (212) 983-7073);

*provided* that any notice to an Initial Purchaser pursuant to Section 9(c) shall also be delivered or sent by mail to such Initial Purchaser at its address set forth on the signature page hereof. Any such statements, requests, notices or agreements shall take effect at the time of receipt thereof. The Company shall be entitled to act and rely upon any request, consent, notice or agreement given or made on behalf of the Initial Purchasers by CSI.

15.  *Definition of Terms.*  For purposes of this Agreement, (a) the term "business day" means any day on which the New York Stock Exchange, Inc. is open for trading, (b) the term "subsidiary" has the meaning set forth in Rule 405 under the Securities Act and (c) except where otherwise expressly provided, the term "affiliate" has the meaning set forth in Rule 405 under the Securities Act.

16.  *Initial Purchasers' Information.*  The parties hereto acknowledge and agree that, for all purposes of this Agreement, the Initial Purchasers' Information consists solely of the following information in the Preliminary Offering Memorandum and the Offering Memorandum: (i) the last paragraph on the front cover page concerning the terms of the offering by the Initial Purchasers; (ii) the legend on the inside front cover page concerning over-allotment and trading activities by the Initial Purchasers; and (iii) the statements concerning the Initial Purchasers contained in the third, fourth, fifth, seventh , ninth, twelfth and thirteenth paragraphs under the heading "Plan of Distribution".

17.  *Governing Law.*  This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

18.  *Counterparts.*  This Agreement may be executed in one or more counterparts (which may include counterparts delivered by telecopier) and, if executed in more than

one counterpart, the executed counterparts shall each be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

19. *Amendments*.  No amendment or waiver of any provision of this Agreement, nor any consent or approval to any departure therefrom, shall in any event be effective unless the same shall be in writing and signed by the parties hereto.

20. *Headings*.  The headings herein are inserted for convenience of reference only and are not intended to be part of, or to affect the meaning or interpretation of, this Agreement.

FROM CRAVATH, SWAINE & MOORE (212)474-3700        (THU)11.13'97 21:29/ST. 21:20/NO. 3561350124 P  6/8

24

If the foregoing is in accordance with your understanding of our agreement, kindly sign and return to us a counterpart hereof, whereupon this instrument will become a binding agreement between the Company, the Guarantors and the several Initial Purchasers in accordance with its terms.

Very truly yours,

WERNER HOLDING CO. (DE), INC.,

by _____
    Name: Eric J. Werner
    Title: Vice President

WERNER HOLDING CO. (PA), INC.,

by _____
    Name: Eric J. Werner
    Title: Secretary / General Counsel

WERNER CO.,

by _____
    Name: Eric J. Werner
    Title: Secretary / General Counsel

GOLD MEDAL LADDER COMPANY,

by _____
    Name: Eric S. Werner
    Title: Vice President

KENTUCKY LADDER COMPANY,

by _____
    Name: Eric J. Werner
    Title: Secretary / General Counsel

FLORIDA LADDER COMPANY,

by _____
    Name: Eric S. Werner
    Title: Vice President

25

WERNER MANAGEMENT CO.,

by _____
Name: Eric S. Werner
Title: Vice President

WERNER FINANCIAL INC.,

by _____
Name: Eric S. Werner
Title: Vice President

R. D. ARIZONA LADDER CORP.,

by _____
Name: Eric S. Werner
Title: Vice President

WIP TECHNOLOGIES, INC.,

by _____
Name: Eric S. Werner
Title: Vice President

ARDEE INVESTMENT CO., INC.,

by _____
Name: Eric S. Werner
Title: Vice President

OLYMPUS PROPERTIES, INC.,

by _____
Name: Eric S. Werner
Title: Vice President

PHOENIX MANAGEMENT SERVICES, INC.,

by _____
Name: Eric S. Werner
Title: Secretary /General Counsel

Accepted:

CHASE SECURITIES INC.,

by  _~~Tom Wolf~~_____
              Authorized Signatory

Address for notices pursuant to Section 9(c):

Chase Plaza, 25th floor
New York, New York 10081
Attention:  Legal Department


DONALDSON, LUFKIN & JENRETTE
       SECURITIES CORPORATION,

       by  _____
                    Authorized Signatory

Address for notices pursuant to Section 9(c):

2121 Avenue of the Stars
Suite 3000
Los Angeles, CA 90067
Attention: Legal Department


GOLDMAN, SACHS & CO.,

       by  _____
                    Authorized Signatory

Address for notices pursuant to Section 9(c):

85 Broad Street
New York, NY 10004
Attention: Legal Department

26

Accepted:

CHASE SECURITIES INC.,

    by

              _____
                    Authorized Signatory

Address for notices pursuant to Section 9(c):

Chase Plaza, 25th floor
New York, New York 10081
Attention:  Legal Department


DONALDSON, LUFKIN & JENRETTE
    SECURITIES CORPORATION,

    by
                    Authorized Signatory

Address for notices pursuant to Section 9(c):

2121 Avenue of the Stars
Suite 3000
Los Angeles, CA 90067
Attention: Legal Department


GOLDMAN, SACHS & CO.,

    by

              _____
                    Authorized Signatory

Address for notices pursuant to Section 9(c):

85 Broad Street
New York, NY 10004
Attention: Legal Department

26

Accepted:

CHASE SECURITIES INC.,

    by     _____
                   Authorized Signatory

Address for notices pursuant to Section 9(c):

Chase Plaza, 25th floor
New York, New York 10081
Attention:  Legal Department


DONALDSON, LUFKIN & JENRETTE
        SECURITIES CORPORATION,

    by     _____
                   Authorized Signatory

Address for notices pursuant to Section 9(c):

2121 Avenue of the Stars
Suite 3000
Los Angeles, CA 90067
Attention: Legal Department


GOLDMAN, SACHS & CO.,

    by     *Goldman, Sachs & Co.*
                   Authorized Signatory

Address for notices pursuant to Section 9(c):

85 Broad Street
New York, NY 10004
Attention: Legal Department

Schedule I

| Initial Purchasers | | Principal Amount of Securities |
|---|---|---|
| Chase Securities Inc. | $ | 54,000,000 |
| Donaldson, Lufkin & Jenrette Securities Corporation | | 54,000,000 |
| Goldman, Sachs & Co. | | 27,000,000 |
| Total | $ | 135,000,000 |

# EXHIBIT 15

(Excerpts Only)

WERNER HOLDING CO. (DE), INC.

10% Senior Subordinated Notes due 2007

INDENTURE

Dated as of November 24, 1997

IBJ SCHRODER BANK & TRUST COMPANY,

Trustee

TABLE OF CONTENTS

Page

ARTICLE I

Definitions and Incorporation by Reference

SECTION 1.01.      Definitions . . . . . . . . . . . . .      2
SECTION 1.02.      Other Definitions . . . . . . . . .      33
SECTION 1.03.      Incorporation by Reference
                   of Trust Indenture Act  . . . . .      34
SECTION 1.04.      Rules of Construction . . . . . . .      35

ARTICLE II

The Securities

SECTION 2.01.      Form and Dating . . . . . . . . . .      36
SECTION 2.02.      Execution and Authentication . . .      37
SECTION 2.03.      Registrar and Paying Agent  . . . .      38
SECTION 2.04.      Paying Agent To Hold Money
                   in Trust . . . . . . . . . . .      39
SECTION 2.05.      Securityholder Lists  . . . . . . .      40
SECTION 2.06.      Transfer and Exchange . . . . . . .      40
SECTION 2.07.      Replacement Securities  . . . . . .      41
SECTION 2.08.      Outstanding Securities  . . . . . .      42
SECTION 2.09.      Temporary Securities  . . . . . . .      43
SECTION 2.10.      Cancelation . . . . . . . . . . . .      43
SECTION 2.11.      Defaulted Interest  . . . . . . . .      43
SECTION 2.12.      CUSIP Numbers . . . . . . . . . . .      44
SECTION 2.13.      Book-Entry Provisions for
                   U.S. Global Securities  . . . . .      44
SECTION 2.14.      Special Transfer Provisions . . . . .      45

ARTICLE III

Redemption

SECTION 3.01.      Notices to Trustee  . . . . . . . .      48
SECTION 3.02.      Selection . . . . . . . . . . . . .      48
SECTION 3.03.      Notice  . . . . . . . . . . . . . .      49
SECTION 3.04.      Effect of Notice of Redemption  . . .      50
SECTION 3.05.      Deposit of Redemption Price . . . . .      50
SECTION 3.06.      Securities Redeemed in Part . . . .      50
SECTION 3.07.      Optional Redemption . . . . . . . .      50
SECTION 3.08.      No Sinking Fund . . . . . . . . . .      52
SECTION 3.09.      Repurchase Offers . . . . . . . . .      52

Page

ARTICLE IV

Covenants

SECTION 4.01.    Payment of Securities . . . . . . . .    56
SECTION 4.02.    Reports . . . . . . . . . . . .    56
SECTION 4.03.    Incurrence of Indebtedness and
                 Issuance of Preferred Stock . . .    56
SECTION 4.04.    Restricted Payments . . . . . . . .    60
SECTION 4.05.    Dividend and Other Payment
                 Restrictions Affecting
                 Restricted Subsidiaries . . . . .    63
SECTION 4.06.    Asset Sales . . . . . . . . . .    65
SECTION 4.07.    Transactions with Affiliates . . . .    67
SECTION 4.08.    Change of Control . . . . . . . .    69
SECTION 4.09.    Compliance Certificate . . . . . .    69
SECTION 4.10.    [INTENTIONALLY OMITTED] . . . . . .    69
SECTION 4.11.    Liens . . . . . . . . . . . .    69
SECTION 4.12.    Additional Security Guarantees . . .    69
SECTION 4.13.    Business Activities . . . . . . .    70
SECTION 4.14.    No Senior Subordinated Debt . . . . .    71

ARTICLE V

Successor Company

SECTION 5.01.    Merger, Consolidation or Sale of All
                 or Substantially All Assets of the
                 Company . . . . . . . . . . . . .    71
SECTION 5.02.    Merger, Consolidation or Sale of All
                 or Substantially All Assets of a
                 Guarantor . . . . . . . . . . .    72

ARTICLE VI

Defaults and Remedies

SECTION 6.01.    Events of Default and Remedies . . .    73
SECTION 6.02.    Acceleration . . . . . . . . . .    75
SECTION 6.03.    Other Remedies . . . . . . . . .    76
SECTION 6.04.    Waiver of Past Defaults . . . . . .    76
SECTION 6.05.    Control by Majority . . . . . . .    76
SECTION 6.06.    Limitation on Suits . . . . . . .    77
SECTION 6.07.    Rights of Holders to
                 Receive Payment . . . . . . . .    77
SECTION 6.08.    Collection Suit by Trustee . . . . .    78
SECTION 6.09.    Trustee May File Proofs
                 of Claim . . . . . . . . . . .    78

SECTION 6.10.    Priorities . . . . . . . . . . .    78
SECTION 6.11.    Undertaking for Costs . . . . . . .    79
SECTION 6.12.    Waiver of Stay or Extension
                 Laws . . . . . . . . . . . . .    79

## ARTICLE VII

### Trustee

SECTION 7.01.    Duties of Trustee . . . . . . . . .    79
SECTION 7.02.    Rights of Trustee . . . . . . . . .    81
SECTION 7.03.    Individual Rights of Trustee . . . .    82
SECTION 7.04.    Trustee's Disclaimer . . . . . . .    82
SECTION 7.05.    Notice of Defaults . . . . . . . .    82
SECTION 7.06.    Reports by Trustee to Holders . . . .    83
SECTION 7.07.    Compensation and Indemnity . . . . .    83
SECTION 7.08.    Replacement of Trustee . . . . . .    84
SECTION 7.09.    Successor Trustee by Merger . . . . .    86
SECTION 7.10.    Eligibility; Disqualification . . . .    86
SECTION 7.11.    Preferential Collection of Claims
                 Against Company . . . . . . . . .    86

## ARTICLE VIII

### Discharge of Indenture; Defeasance

SECTION 8.01.    Legal Defeasance and Covenant
                 Defeasance . . . . . . . . . . .    87
SECTION 8.02.    Conditions to Legal or Covenant
                 Defeasance . . . . . . . . . . .    88
SECTION 8.03.    Deposited Money and Government
                 Securities to be Held in Trust;
                 Other Miscellaneous Provisions . . .    90
SECTION 8.04.    Repayment to Company . . . . . . . .    91
SECTION 8.05.    Reinstatement . . . . . . . . . . .    91
SECTION 8.06.    Satisfaction and Discharge of
                 Indenture . . . . . . . . . . . .    92

## ARTICLE IX

### Amendments

SECTION 9.01.    Without Consent of Holders . . . . . .    93
SECTION 9.02.    With Consent of Holders . . . . . . .    94
SECTION 9.03.    Compliance with Trust
                 Indenture Act . . . . . . . . . .    95

Page

SECTION 9.04.    Revocation and Effect of Consents and
                 Waivers . . . . . . . . . . . . . .    95
SECTION 9.05.    Notation on or Exchange
                 of Securities . . . . . . . . . . .    96
SECTION 9.06.    Trustee To Sign Amendments . . . . .    96
SECTION 9.07.    Payment for Consent . . . . . . . . .    96


ARTICLE X

Subordination

SECTION 10.01.    Agreement To Subordinate . . . . . .    97
SECTION 10.02.    Liquidation, Dissolution,
                  Bankruptcy . . . . . . . . . . .    97
SECTION 10.03.    Default on Senior Indebtedness . . .    98
SECTION 10.04.    Acceleration of Payment
                  of Securities . . . . . . . . .    99
SECTION 10.05.    When Distribution Must
                  Be Paid Over . . . . . . . . .    99
SECTION 10.06.    Subrogation . . . . . . . . . . . .    99
SECTION 10.07.    Relative Rights . . . . . . . . . .    99
SECTION 10.08.    Subordination May Not Be
                  Impaired by Company . . . . . . .    100
SECTION 10.09.    Rights of Trustee and
                  Paying Agent . . . . . . . . . .    100
SECTION 10.10.    Distribution or Notice to
                  Representative . . . . . . . . .    100
SECTION 10.11.    Article X Not To Prevent
                  Events of Default or Limit
                  Right To Accelerate . . . . . . .    101
SECTION 10.12.    Trust Moneys Not Subordinated . . . .    101
SECTION 10.13.    Trustee Entitled To Rely . . . . . .    101
SECTION 10.14.    Trustee to Effectuate
                  Subordination . . . . . . . . . .    102
SECTION 10.15.    Trustee Not Fiduciary for Holders
                  of Senior Indebtedness . . . . .    102
SECTION 10.16.    Reliance by Holders of Senior
                  Indebtedness on Subordination
                  Provisions . . . . . . . . . . .    102
SECTION 10.17.    Trustee's Compensation
                  Not Prejudiced . . . . . . . . .    102


ARTICLE XI

Security Guarantees

SECTION 11.01.    Security Guarantees . . . . . . . . .    103

[NYCORP3:504798.9:4636W:11/24/97--12:36p]

iv

SECTION 11.02.    Limitation on Liability . . . . . . .    105
SECTION 11.03.    Successors and Assigns  . . . . . . .    106
SECTION 11.04.    No Waiver . . . . . . . . . . . . .    106
SECTION 11.05.    Modification  . . . . . . . . . . . .    106

ARTICLE XII

Subordination of the Security Guarantees

SECTION 12.01.    Agreement To Subordinate  . . . . .    107
SECTION 12.02.    Liquidation, Dissolution,
                  Bankruptcy  . . . . . . . . . .    107
SECTION 12.03.    Default on Senior Indebtedness
                  of a Guarantor  . . . . . . . . . .    107
SECTION 12.04.    Demand for Payment  . . . . . . . .    109
SECTION 12.05.    When Distribution Must Be
                  Paid Over . . . . . . . . . . . .    109
SECTION 12.06.    Subrogation . . . . . . . . . . . .    109
SECTION 12.07.    Relative Rights . . . . . . . . . . .    109
SECTION 12.08.    Subordination May Not Be
                  Impaired by a Guarantor . . . . .    110
SECTION 12.09.    Rights of Trustee and
                  Paying Agent  . . . . . . . . . .    110
SECTION 12.10.    Distribution or Notice to
                  Representative  . . . . . . . . .    110
SECTION 12.11.    Article XII Not To Prevent
                  Events of Default or Limit
                  Right To Accelerate . . . . . . .    111
SECTION 12.12.    Trustee Entitled To Rely  . . . . . .    111
SECTION 12.13.    Trustee to Effectuate
                  Subordination . . . . . . . . . .    111
SECTION 12.14.    Trustee Not Fiduciary for Holders
                  of Senior Indebtedness of a
                  Guarantor . . . . . . . . . . . .    112
SECTION 12.15.    Reliance by Holders of Senior
                  Indebtedness of a Guarantor on
                  Subordination Provisions  . . . .    112

ARTICLE XIII

Miscellaneous

SECTION 13.01.    Trust Indenture Act Controls  . . . .    112
SECTION 13.02.    Notices . . . . . . . . . . . . . .    112
SECTION 13.03.    Communication by Holders with Other
                  Holders . . . . . . . . . . . . .    113
SECTION 13.04.    Certificate and Opinion as to
                  Conditions Precedent  . . . . . .    114

Page

SECTION 13.05.    Statements Required in Certificate
                  or Opinion . . . . . . . . . . .    114
SECTION 13.06.    When Securities Disregarded . . . . .    114
SECTION 13.07.    Rules by Trustee, Paying Agent and
                  Registrar . . . . . . . . . . . .    115
SECTION 13.08.    Legal Holidays . . . . . . . . . .    115
SECTION 13.09.    Governing Law . . . . . . . . . .    115
SECTION 13.10.    No Recourse Against Others . . . . .    115
SECTION 13.11.    Successors . . . . . . . . . . . .    115
SECTION 13.12.    Multiple Originals . . . . . . . .    115
SECTION 13.13.    Table of Contents; Headings . . . . .    116


Exhibit A -    Form of Initial Security
Exhibit B -    Form of Exchange Security
Exhibit C -    Form of Private Exchange Security
Exhibit D -    Form of Transferee Letter of Representation
Exhibit E -    Form of Supplemental Indenture
Exhibit F -    Form of Certificate to be Delivered in
               Connection with Transfers Pursuant to
               Rule 144A
Exhibit G -    Form of Certificate to be Delivered in
               Connection with Transfers pursuant to
               Regulation S

CROSS-REFERENCE TABLE

| TIA Section | | Indenture Section |
|---|---|---|
| 310(a)(1) | . . . . . . . . . . . . . . | 7.10 |
| (a)(2) | . . . . . . . . . . . . . . | 7.10 |
| (a)(3) | . . . . . . . . . . . . . . | N.A. |
| (a)(4) | . . . . . . . . . . . . . . | N.A. |
| (b) | . . . . . . . . . . . . . . | 7.08; 7.10 |
| (c) | . . . . . . . . . . . . . . | N.A. |
| 311(a) | . . . . . . . . . . . . . . | 7.11 |
| (b) | . . . . . . . . . . . . . . | 7.11 |
| (c) | . . . . . . . . . . . . . . | N.A. |
| 312(a) | . . . . . . . . . . . . . . | 2.05 |
| (b) | . . . . . . . . . . . . . . | 13.03 |
| (c) | . . . . . . . . . . . . . . | 13.03 |
| 313(a) | . . . . . . . . . . . . . . | 7.06 |
| (b)(1) | . . . . . . . . . . . . . . | N.A. |
| (b)(2) | . . . . . . . . . . . . . . | 7.06 |
| (c) | . . . . . . . . . . . . . . | 13.02 |
| (d) | . . . . . . . . . . . . . . | 7.06 |
| 314(a) | . . . . . . . . . . . . . . | 4.02; 4.09 |
| (b) | . . . . . . . . . . . . . . | N.A. |
| (c)(1) | . . . . . . . . . . . . . . | 13.04 |
| (c)(2) | . . . . . . . . . . . . . . | 13.04 |
| (c)(3) | . . . . . . . . . . . . . . | 13.04 |
| (d) | . . . . . . . . . . . . . . | N.A. |
| (e) | . . . . . . . . . . . . . . | 13.05 |
| (f) | . . . . . . . . . . . . . . | N.A. |
| 315(a) | . . . . . . . . . . . . . . | 7.01 |
| (b) | . . . . . . . . . . . . . . | 7.05; 13.02 |
| (c) | . . . . . . . . . . . . . . | 7.01 |
| (d) | . . . . . . . . . . . . . . | 7.01 |
| (e) | . . . . . . . . . . . . . . | 6.11 |
| 316(a)(last sentence) | . . . . . . . . . . . . . . | 13.06 |
| (a)(1)(A) | . . . . . . . . . . . . . . | 6.05 |
| (a)(1)(B) | . . . . . . . . . . . . . . | 6.04 |
| (a)(2) | . . . . . . . . . . . . . . | N.A. |
| (b) | . . . . . . . . . . . . . . | 6.07 |
| 317(a)(1) | . . . . . . . . . . . . . . | 6.08 |
| (a)(2) | . . . . . . . . . . . . . . | 6.09 |
| (b) | . . . . . . . . . . . . . . | 2.04 |
| 318(a) | . . . . . . . . . . . . . . | 13.01 |

N.A. means Not Applicable.

---

Note:  This Cross-Reference Table shall not, for any purpose, be deemed to be part of this Indenture.

[NYCORP3:504798.9:4636W:11/24/97--12:36p]

INDENTURE dated as of November 24, 1997, among WERNER HOLDING CO. (DE), INC., a Delaware corporation (the "Company"), WERNER HOLDING CO. (PA), INC., a Pennsylvania corporation, WERNER CO., a Pennsylvania corporation, GOLD MEDAL LADDER COMPANY, a Pennsylvania corporation, KENTUCKY LADDER COMPANY, a Pennsylvania corporation, FLORIDA LADDER COMPANY, a Florida corporation, WERNER MANAGEMENT CO., a Pennsylvania corporation, WERNER FINANCIAL INC., a Delaware corporation, R.D. ARIZONA LADDER CORP., an Arizona corporation, WIP TECHNOLOGIES, INC., a Delaware corporation, ARDEE INVESTMENT CO., INC., a Delaware corporation, OLYMPUS PROPERTIES, INC., an Illinois corporation, PHOENIX MANAGEMENT SERVICES, INC., a Pennsylvania corporation, as guarantors (collectively, the "Initial Guarantors"), and IBJ SCHRODER BANK & TRUST COMPANY, a New York banking corporation (the "Trustee").

Each party agrees as follows for the benefit of the other parties and for the equal and ratable benefit of the Holders of (i) the Company's 10% Senior Subordinated Notes due 2007 issued on the date hereof, (ii) any Additional Securities (as defined herein) that may be issued on any other Issue Date (all such Securities in clauses (i) and (ii) being referred to collectively as the "Initial Securities"), (iii) if and when issued as provided in a Registration Rights Agreement of the Company's 10% Senior Subordinated Notes due 2007 issued in a Registered Exchange Offer (as defined below) in exchange for any Initial Securities (the "Exchange Securities") and (iv), if and when issued as provided in a Registration Rights Agreement, the Private Exchange Securities (as defined) issued in a Private Exchange Offer (as defined) (the "Private Exchange Securities", and together with the Initial Securities and any Exchange Securities issued hereunder, the "Securities"). Except as otherwise provided herein, the Securities will be limited to $270,000,000 in aggregate principal amount outstanding, of which $135,000,000 in aggregate principal amount will be initially issued on the date hereof. Subject to the conditions set forth herein, the Company may issue up to an additional $135,000,000 aggregate principal amount of Securities.

ARTICLE IV

Covenants

SECTION 4.01.  Payment of Securities.  The Company
shall promptly pay the principal of and interest on the
Securities on the dates and in the manner provided in the
Securities and in this Indenture.  Unless otherwise
specified in the relevant Purchase Agreement, principal and
interest shall be considered paid on the date due if on such
date the Trustee or the Paying Agent (but only if other than
the Company or a Wholly Owned Restricted Subsidiary) holds
by 11:00 a.m., New York City time, in accordance with this
Indenture available funds sufficient to pay all principal
and interest then due and the Trustee or the Paying Agent,
as the case may be, is not prohibited from paying such money
to the Securityholders on that date pursuant to the terms of
this Indenture.

The Company shall pay interest on overdue princi-
pal at the rate specified therefor in the Securities, and it
shall pay interest on overdue installments of interest at
the same rate to the extent lawful.

SECTION 4.02.  Reports.  Notwithstanding that the
Company may not be required to remain subject to the
reporting requirements of Section 13 or 15(d) of the
Exchange Act, to the extent permitted by the Exchange Act,
the Company shall file with the SEC, and provide, within
15 days after the Company is required to file the same with
the SEC, the Trustee and the Holders with the annual reports
and the information, documents and other reports that are
specified in Sections 13 and 15(d) of the Exchange Act.  In
the event the Company is not permitted to file such reports,
documents and information with the SEC, the Company will
provide substantially similar information to the Trustee and
the Holders, as if the Company were subject to the reporting
requirements of Section 13 or 15(d) of the Exchange Act.
The Company also shall comply with the other provisions of
TIA § 314(a).

SECTION 4.03.  Incurrence of Indebtedness and
Issuance of Preferred Stock.  (a)  The Company shall not,
and shall not permit any of its Restricted Subsidiaries to,
directly or indirectly, Incur any Indebtedness (including
Acquired Debt) and the Company will not issue any
Disqualified Stock and shall not permit any of its
Restricted Subsidiaries to issue any shares of Preferred
Stock; provided, however, that the Company and its
Restricted Subsidiaries may Incur Indebtedness (including

Acquired Debt) or issue shares of Disqualified Stock and the Company's Restricted Subsidiaries may issue Preferred Stock, if the Fixed Charge Coverage Ratio for the Company's most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is Incurred or such Disqualified Stock or Preferred Stock is issued would have been at least 1.75 to 1, if such Indebtedness is Incurred or such Disqualified Stock or Preferred Stock is issued on or prior to November 30, 1999, and 2.00 to 1, if such Indebtedness is Incurred or such Disqualified Stock or Preferred Stock is issued thereafter, in each case, determined on a pro forma basis (including a pro forma application of the net proceeds therefrom), as if the additional Indebtedness had been Incurred, or the Disqualified Stock or Preferred Stock had been issued, as the case may be, at the beginning of such four-quarter period.

(b)   Notwithstanding Section 4.03(a), the following Incurrences of Indebtedness are permitted (collectively, "Permitted Indebtedness"):

(i) the Incurrence by the Company or any of its Restricted Subsidiaries of term and revolving Indebtedness and letters of credit (with letters of credit being deemed to have a principal amount equal to the undrawn face amount thereof) under Credit Facilities; _provided_ that the aggregate principal amount of all Indebtedness outstanding pursuant to this Section 4.03(b)(i) after giving effect to such Incurrence does not exceed an amount equal to $250.0 million;

(ii) the Incurrence by the Company and its Restricted Subsidiaries of Existing Indebtedness;

(iii) the Incurrence by the Company of Indebtedness represented by the Securities (other than any Additional Securities) and by the Subsidiary Guarantors of Indebtedness represented by the Security Guarantees;

(iv) the Incurrence by the Company or any of its Restricted Subsidiaries of (A) Acquired Debt or (B) Indebtedness (including Capital Lease Obligations) for the purpose of financing or refinancing all or any part of the lease, purchase price or cost of construction or improvement of any property (real or personal) or other assets that are used or useful in the business of the Company or such Restricted

Subsidiary (whether through the direct purchase of assets or the Capital Stock of any Person owning such assets and whether such Indebtedness is owed to the seller or Person carrying out such construction or improvement or to any third party), in an aggregate principal amount for all Indebtedness Incurred pursuant to this Section 4.03(b)(iv), at the date of such Incurrence (including all Permitted Refinancing Indebtedness Incurred to refund, refinance or replace any other Indebtedness Incurred pursuant to this Section 4.03(b)(iv)) not to exceed an amount equal to 10.0% of Total Assets; provided that, in the case of Indebtedness exceeding $2.0 million Incurred pursuant to this Section 4.03(b)(iv), such Indebtedness exists at the date of such purchase or transaction or is created within 180 days thereafter;

(v) the Incurrence by the Company or any of its Restricted Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to refund, refinance or replace Indebtedness (other than intercompany Indebtedness) permitted to be Incurred by this Section 4.03(b);

(vi) the Incurrence by the Company or any of its Restricted Subsidiaries of intercompany Indebtedness between or among the Company and any of its Restricted Subsidiaries, including any Indebtedness arising in connection with a Receivables Facility; provided, however, that (A) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than the Company or a Restricted Subsidiary and (B) any sale or other transfer of any such Indebtedness to a Person that is not either the Company or a Restricted Subsidiary shall be deemed, in each case, to constitute an Incurrence of such Indebtedness by the Company or such Restricted Subsidiary, as the case may be, that was not permitted by this Section 4.03(b)(vi);

(vii) the Incurrence by the Company or any of its Restricted Subsidiaries of Hedging Obligations that are Incurred (A) for the purpose of fixing or hedging interest rate risk with respect to any floating rate Indebtedness that is permitted by this Section 4.03 to be outstanding or (B) for the purpose of fixing or hedging currency exchange rate risk or commodity price risk Incurred in the ordinary course of business;

(viii) the Guarantee by the Company or any of the Subsidiary Guarantors of Indebtedness of the Company or a Restricted Subsidiary of the Company that was permitted to be Incurred by another provision of this Section 4.03;

(ix) the Incurrence of Indebtedness secured by or financing Receivables (including any such Indebtedness under the Credit Facilities), provided that the aggregate principal amount of such Indebtedness Incurred pursuant to this Section 4.03(b)(ix) does not, at any time, exceed an amount equal to $75.0 million less the aggregate Receivable Financing Amount of all Receivables Facilities of the Company and its Restricted Subsidiaries;

(x) the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness under (or constituting reimbursement obligations with respect to) letters of credit, surety bonds or similar instruments issued in connection with the ordinary course of a Permitted Business, including letters of credit in respect of workers' compensation claims, self-insurance, and insurance written by MIICA in connection with a Permitted Business; provided, however, that upon the drawing of such letters of credit or other instrument, such obligations are reimbursed within 30 days following such drawing;

(xi) the Incurrence by Foreign Subsidiaries of Indebtedness for working capital purposes, and by the Company or any of its Restricted Subsidiaries of Guarantees of Indebtedness of Foreign Subsidiaries or foreign joint ventures, provided that the aggregate principal amount of such Indebtedness and of the Indebtedness so Guaranteed at any time outstanding does not exceed 5% of Total Assets; and

(xii) the Incurrence by the Company or any of its Restricted Subsidiaries of additional Indebtedness (which may comprise Indebtedness under the New Credit Facility) in an aggregate principal amount (or accreted value, as applicable) at any time outstanding pursuant to this Section 4.03(b)(xii) not to exceed an amount equal to $35.0 million.

For purposes of determining compliance with this Section 4.03, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Permitted Indebtedness described in clauses (i) through

(xii) above or is entitled to be Incurred pursuant to
Section 4.03(a), the Company shall, in its sole discretion,
classify such item of Indebtedness in any manner that
complies with this Section 4.03 and such item of
Indebtedness will be treated as having been Incurred
pursuant to only one of such clauses or pursuant to
Section 4.03(a); provided that all outstanding Indebtedness
under the New Credit Facility immediately following the
Recapitalization shall be deemed to have been Incurred
pursuant to Sections 4.03(b)(i) and/or 4.03(b)(ix).  Accrual
of interest and the accretion of accreted value will not be
deemed to be an Incurrence of Indebtedness for purposes of
this Section 4.03.

        SECTION 4.04.  Restricted Payments.  (a)  The
Company shall not, and shall not permit any of its
Restricted Subsidiaries to, directly or indirectly: (i)
declare or pay any dividend or make any other payment or
distribution (including any payment in connection with any
merger or consolidation) on account of the Company's or any
of its Restricted Subsidiaries' Equity Interests (other than
dividends or distributions payable in Equity Interests
(other than Disqualified Stock)); (ii) purchase, redeem or
otherwise acquire or retire for value (including in
connection with any merger or consolidation) any Equity
Interests of the Company or Holding (or any Restricted
Subsidiary held by Persons other than the Company or another
Restricted Subsidiary); (iii) make any payment on or with
respect to, or purchase, redeem, defease or otherwise
acquire or retire for value any Subordinated Indebtedness,
except (A) a payment of interest or principal at Stated
Maturity and (B) the purchase, repurchase or other
acquisition or retirement of Indebtedness in anticipation of
satisfying a sinking fund obligation, principal installment
or final maturity, in each case due within one year of the
date of purchase, repurchase or other acquisition or
retirement; or (iv) make any Restricted Investment (all such
payments and other actions set forth in Sections 4.04(a)(i)
through 4.04(a)(iv) above being collectively referred to as
"Restricted Payments"), unless, at the time of and after
giving effect to such Restricted Payment:

        (1) no Default or Event of Default shall have
    occurred and be continuing or would occur as a
    consequence thereof;

        (2) the Company would, at the time of such
    Restricted Payment and after giving pro forma effect
    thereto as if such Restricted Payment had been made at
    the beginning of the applicable four-quarter period,

have been permitted to Incur at least $1.00 of additional Indebtedness pursuant to Section 4.03(a);

(3) such Restricted Payment, together with (without duplication) the aggregate amount of all other Restricted Payments made by the Company and its Restricted Subsidiaries after the Closing Date (excluding Restricted Payments permitted by Sections 4.04(b)(ii), 4.04(b)(iii), 4.04(b)(iv), 4.04(b)(v) (other than clauses (i) and (v)(A) of the definition of "Specified Affiliate Payments") and 4.04(b)(vi) but including all other Restricted Payments permitted by Section 4.04(b)), is less than the sum (without duplication) of:

(i) 50% of the Consolidated Net Income of the Company for the period (taken as one accounting period) from the beginning of the fiscal quarter during which the Closing Date occurs to the end of the Company's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment (or, if such Consolidated Net Income for such period is a deficit, less 100% of such deficit); plus

(ii) 100% of the aggregate net cash proceeds received by the Company from the issue or sale (other than to a Subsidiary) of, or from capital contributions with respect to, Equity Interests of the Company (other than Disqualified Stock), in either case after the Closing Date; plus

(iii) the aggregate principal amount (or accreted value, if less) of Indebtedness of the Company or any Restricted Subsidiary issued since the Closing Date (other than to a Restricted Subsidiary) that has been converted into Equity Interests (other than Disqualified Stock) of the Company; plus

(iv) 100% of the aggregate net cash received by the Company or a Restricted Subsidiary of the Company since the Closing Date from (A) Restricted Investments, whether through interest payments, principal payments, dividends or other distributions and payments, or the sale or other disposition (other than to the Company or a Restricted Subsidiary) thereof made by the Company and its Restricted Subsidiaries or (B) a cash

dividend from, or the sale (other than to the Company or a Restricted Subsidiary) of the stock of, an Unrestricted Subsidiary; and plus

(v) upon the redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary, the fair market value of the Investments of the Company and its Restricted Subsidiaries (other than such Subsidiary) in such Subsidiary.

(b) The provisions of Section 4.04(a) shall not prohibit:

(i) the payment of any dividend within 60 days after the date of declaration thereof, if at said date of declaration such payment would have complied with the provisions of this Section 4.04;

(ii) the redemption, repurchase, retirement, defeasance or other acquisition of Equity Interests or Subordinated Indebtedness of the Company, in exchange for, or out of the net cash proceeds of the substantially concurrent sale (other than to a Restricted Subsidiary of the Company) of, Equity Interests of, or a capital contribution to, the Company (other than any Disqualified Stock); provided, that the amount of any such net cash proceeds that are utilized for any such redemption, repurchase, retirement, defeasance or other acquisition shall be excluded from Section 4.04(a)(3)(ii);

(iii) the defeasance, redemption, repurchase, retirement or other acquisition of Subordinated Indebtedness made by an exchange for, or with the net cash proceeds from, an Incurrence of Permitted Refinancing Indebtedness;

(iv) the payment of any dividend by a Restricted Subsidiary of the Company to the holders of its common Equity Interests on a pro rata basis;

(v) to the extent constituting Restricted Payments, the Specified Affiliate Payments;

(vi) the payment of dividends, other distributions or other amounts by the Company to Holding in amounts equal to amounts required for Holding to pay Federal, state and local income taxes to the extent such income taxes are attributable to the income of the Company and its Subsidiaries; and

(vii) Restricted Payments in an aggregate amount not to exceed $10.0 million.

The Board of Directors may designate any Restricted Subsidiary to be an Unrestricted Subsidiary if such designation would not cause a Default. For purposes of making such determination, all outstanding Investments by the Company and its Restricted Subsidiaries (except to the extent repaid in cash) in the Subsidiary so designated, to the extent they do not constitute Permitted Investments at the time such Subsidiary became an Unrestricted Subsidiary, will be deemed to be Restricted Payments made at the time of such designation and will reduce the amount available for Restricted Payments under Section 4.04(a). The amount of such outstanding Investments will be equal to the portion of the fair market value of the net assets of any Subsidiary of the Company at the time that such Subsidiary is designated an Unrestricted Subsidiary that is represented by the interest of the Company and its Restricted Subsidiaries in such Subsidiary, in each case as determined in good faith by the Board of Directors of the Company. Such designation will only be permitted if such Restricted Payment would be permitted at such time and if such Restricted Subsidiary otherwise meets the definition of an Unrestricted Subsidiary.

The amount of all Restricted Payments (other than cash) shall be the fair market value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued by the Company or such Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment. The fair market value of any non-cash Restricted Payment shall be determined in good faith by the Board of Directors of the Company.  For the avoidance of doubt, it is expressly agreed that no payment or other transaction permitted by Section 4.07(b)(5), (6), (9) or (10) shall be considered a Restricted Payment for purposes of, or otherwise restricted by, this Indenture.

SECTION 4.05.  <u>Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries.</u>  The Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to (i)(a) pay dividends or make any other distributions to the Company or any of its Restricted Subsidiaries (1) on its Capital Stock or (2) with respect to any other interest or participation in, or measured by, its profits, or (b) pay any Indebtedness owed to the Company or

64

any of its Restricted Subsidiaries, (ii) make loans or advances to the Company or any of its Restricted Subsidiaries or (iii) transfer any of its properties or assets to the Company or any of its Restricted Subsidiaries, except for such encumbrances or restrictions existing under or by reason of:

(1) Existing Indebtedness;

(2) this Indenture, the Securities and the Security Guarantees;

(3) any agreement or other instrument of a Person acquired by the Company or any of its Restricted Subsidiaries as in effect at the time of such acquisition (but not created in connection with or in contemplation of such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person, or the property or assets of the Person, so acquired;

(4) purchase money obligations (including Capital Lease Obligations) for property acquired in the ordinary course of business that impose restrictions of the nature described in clause (iii) above on the property so acquired;

(5) restrictions created in connection with any Receivables Facility that, in the good faith determination of the Board of Directors or senior management of the Company, are necessary or advisable to effect such Receivables Facility;

(6) in the case of clause (iii) above, any encumbrance or restriction (1) that restricts in a customary manner the subletting, assignment, or transfer of any property or asset that is subject to a lease, license or similar contract, (2) by virtue of any transfer of, agreement to transfer, option or right with respect to, or Lien on, any property or assets of the Company or any Restricted Subsidiary not otherwise prohibited by this Indenture or (3) contained in security agreements or mortgages securing Indebtedness to the extent such encumbrance or restrictions restrict the transfer of the property subject to such security agreements or mortgages;

(7) contracts for the sale of assets, including any restriction with respect to a Restricted Subsidiary

imposed pursuant to an agreement entered into for the sale or disposition of all or substantially all of the Capital Stock or assets of such Restricted Subsidiary pending the closing of such sale or disposition;

(8) contractual encumbrances or restrictions in effect on the Closing Date, including pursuant to the New Credit Facility and its related documentation;

(9) restrictions on cash or other deposits or net worth imposed by leases, credit agreements or other agreements entered into in the ordinary course of business;

(10) customary provisions in joint venture agreements and other similar agreements;

(11) any encumbrances or restrictions created with respect to Senior Indebtedness of the Company or its Restricted Subsidiaries or Indebtedness of Foreign Subsidiaries or Insurance Subsidiaries permitted to be Incurred subsequent to the Closing Date pursuant to Section 4.03; and

(12) any encumbrances or restrictions of the type referred to in clauses (i), (ii) and (iii) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (1) through (12) above, provided that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Company, no more restrictive with respect to such dividend and other payment restrictions than those contained in the dividend or other payment restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

SECTION 4.06. Asset Sales. The Company shall not, and shall not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless (i) the Company (or the Restricted Subsidiary, as the case may be) receives consideration at the time of such Asset Sale at least equal to the fair market value of the assets or Equity Interests issued or sold or otherwise disposed of and (ii) at least 75% of the consideration therefor received by the Company or such Restricted Subsidiary is in the form of cash or Cash

Equivalents; provided that the amount of (x) any liabilities
(as shown on the Company's or such Restricted Subsidiary's
most recent balance sheet), of the Company or any Restricted
Subsidiary (other than liabilities that are by their terms
subordinated to the Securities or, in the case of
liabilities of a Restricted Subsidiary, the Security
Guarantee of such Subsidiary) that are assumed by the
transferee of any such assets and (y) any securities, notes
or other obligations received by the Company or any such
Restricted Subsidiary from such transferee that are
converted by the Company or such Restricted Subsidiary into
cash (to the extent of the cash received) within 180 days
after receipt, shall be deemed to be cash for purposes of
this provision; provided further, however, that
clause (ii) above shall not apply to any sale of Equity
Interests of or other Investments in Unrestricted
Subsidiaries.

          Within 360 days after the receipt of any Net
Proceeds from an Asset Sale, the Company may apply such Net
Proceeds, at its option, (a) to repay Senior Indebtedness or
Pari Passu Indebtedness (other than Indebtedness owed to
Holding, the Company or a Subsidiary of the Company, and
provided that if the Company shall so reduce Pari Passu
Indebtedness, it will equally and ratably make an Asset Sale
Offer (in accordance with the procedures set forth in
Section 3.09 for an Asset Sale Offer) to all Holders),
(b) to invest in properties and assets that will be used or
useful in the business of the Company or any of its
Subsidiaries or (c) to the acquisition of a controlling
interest in another business, the making of a capital
expenditure or the acquisition of other assets, in each
case, in the same or a similar line of business as the
Company was engaged in on the Closing Date. Pending the
final application of any such Net Proceeds, the Company may
temporarily reduce borrowings under a Credit Facility or
otherwise invest such Net Proceeds in any manner that is not
prohibited by this Indenture. Any Net Proceeds from Asset
Sales that are not applied or invested as provided in the
first sentence of this paragraph will be deemed to
constitute "Excess Proceeds." When the aggregate amount of
Excess Proceeds exceeds $5.0 million, the Company shall
(i) make an offer to all Holders of Securities, and
(ii) prepay, purchase or redeem (or make an offer to do so)
any other Pari Passu Indebtedness of the Company in
accordance with provisions requiring the Company to prepay,
purchase or redeem such Indebtedness with the proceeds from
any Asset Sales (or offer to do so), pro rata in proportion
to the respective principal amounts of the Securities and
such other Indebtedness required to be prepaid, purchased or

redeemed or tendered for, in the case of the Securities
pursuant to such offer (an "Asset Sale Offer") to purchase
the maximum principal amount of Securities that may be
purchased out of such pro rata portion of the Excess
Proceeds, at an offer price in cash in an amount equal to
100% of the principal amount thereof plus accrued and unpaid
interest and Liquidated Damages thereon, if any, to the date
of purchase, in accordance with the procedures set forth in
Section 3.09.  To the extent that the aggregate principal
amount of Securities tendered pursuant to an Asset Sale
Offer is less than the Excess Proceeds, the Company may use
any remaining Excess Proceeds for general corporate
purposes.  Upon completion of such offer to purchase, the
amount of Excess Proceeds shall be reset at zero.

SECTION 4.07.  <u>Transactions with Affiliates.</u>
(a)  The Company shall not, and shall not permit any of its
Restricted Subsidiaries to, make any payment to, or sell,
lease, transfer or otherwise dispose of any of its
properties or assets to, or purchase any property or assets
from, or enter into or make or amend any transaction,
contract, agreement, understanding, loan, advance or
guarantee with, or for the benefit of, any Affiliate (each
of the foregoing, an "Affiliate Transaction"), unless
(i) such Affiliate Transaction is on terms that are no less
favorable to the Company or the relevant Restricted
Subsidiary than those that would have been obtained in a
comparable transaction by the Company or such Restricted
Subsidiary with an unrelated Person and (ii) the Company
delivers to the Trustee (a) with respect to any Affiliate
Transaction entered into after the Closing Date involving
aggregate consideration in excess of $3.0 million, a
resolution of the Board of Directors set forth in an
Officers' Certificate certifying that such Affiliate
Transaction complies with clause (i) above and that such
Affiliate Transaction has been approved by a majority of the
members of the Board of Directors and (b) with respect to
any Affiliate Transaction involving aggregate consideration
in excess of $10.0 million, an opinion as to the fairness to
the Holders of such Affiliate Transaction from a financial
point of view issued by an investment banking, appraisal or
accounting firm of national standing.

(b)  The provisions of Section 4.07(a) shall not
prohibit (and the following shall not be deemed to be
Affiliate Transactions): (1) the provision of administrative
or management services by the Company or any of its officers
to any of its Restricted Subsidiaries in the ordinary course
of business, (2) any employment agreement, collective
bargaining agreement, employee benefit plan, related trust

agreement or any similar arrangement heretofore or hereafter entered into in the ordinary course of business, (3) transactions between or among the Company and/or its Restricted Subsidiaries, (4) Restricted Payments that are permitted by Section 4.04, (5) payment of compensation to employees, officers, directors or consultants in the ordinary course of business, (6) maintenance in the ordinary course of business (and payments required thereby) of benefit programs, or arrangements for employees, officers or directors, including vacation plans, health and life insurance plans, deferred compensation plans, directors' and officers' indemnification agreements and retirement or savings plans and similar plans, (7) loans or advances to employees (or guarantees of third party loans to employees) in the ordinary course of business, (8) sales of Receivables to a Receivables Subsidiary, (9) the payment of annual management, consulting and advisory fees and related expenses to Investcorp and its Affiliates (whether or not such Persons are Affiliates of the Company), (10) payments by the Company or any of its Restricted Subsidiaries to Investcorp and its Affiliates (whether or not such Persons are Affiliates of the Company) made for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including in connection with acquisitions or divestitures, which payments are approved by the Board of Directors of the Company in good faith, (11) any tax sharing agreement as in effect on the Closing Date and any other agreement as in effect on the Closing Date (including the Recapitalization Agreement) or any amendment thereto (so long as any such amendment is not disadvantageous to the Holders in any material respect) or any transaction contemplated thereby (including distributions by the Company to Holding to effect the Recapitalization), (12) the payment of all fees and expenses related to the Recapitalization, (13) transactions with customers, clients, suppliers, or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Indenture which are fair to the Company or its Restricted Subsidiaries, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party, in each case in the reasonable determination of the Board of Directors of the Company or the senior management thereof, and (14) Indebtedness permitted by Section 4.03(b)(vi) or to the extent such Indebtedness is on terms that are no less favorable to the Company or the relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction with an unrelated Person, Section 4.03(b)(xii).

SECTION 4.08.  Change of Control.  (a)  Upon the occurrence of a Change of Control, unless all Securities have been called for redemption pursuant to Section 3.07, each Holder of Securities shall have the right to require the Company to repurchase all or any part (equal to $1,000 or an integral multiple thereof) of such Holder's Securities pursuant to a Change of Control Offer made pursuant to Section 3.09 at an offer price in cash (the "Change of Control Payment") equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest and Liquidated Damages thereon, if any, to the date of purchase.

(b)  The Company shall not be required to make a Change of Control Offer upon a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in Section 3.09 applicable to a Change of Control Offer made by the Company and purchases all Securities validly tendered and not withdrawn under such Change of Control Offer.

SECTION 4.09.  Compliance Certificate.  The Company shall deliver to the Trustee within 120 days after the end of each fiscal year of the Company an Officers' Certificate stating that in the course of the performance by the signers of their duties as Officers of the Company they would normally have knowledge of any Default and whether or not the signers know of any Default that occurred during such period.  If they do have such knowledge, the certificate shall describe the Default, its status and what action the Company is taking or proposes to take with respect thereto.  The Company also shall comply with Section 314(a)(4) of the TIA.

SECTION 4.10.  [INTENTIONALLY OMITTED]

SECTION 4.11.  Liens.  The Company shall not, and shall not permit any of its Restricted Subsidiaries to, create, Incur, assume or otherwise cause or suffer to exist or become effective any Lien of any kind securing Indebtedness or trade payables (other than Permitted Liens) upon any of their property or assets, now owned or hereafter acquired, unless all payments due under this Indenture and the Securities are secured on an equal and ratable basis with the obligations so secured until such time as such obligations are no longer secured by a Lien.

SECTION 4.12.  Additional Security Guarantees.  All current and future Subsidiaries of the Company other than Foreign Subsidiaries, Insurance Subsidiaries and

Subsidiaries that have been properly designated as Unrestricted Subsidiaries in accordance with this Indenture for so long as they continue to constitute Unrestricted Subsidiaries, will be Guarantors in accordance with the terms of this Indenture.  Notwithstanding the foregoing, if any Foreign Subsidiary or Insurance Subsidiary that is a Restricted Subsidiary shall Guarantee any Indebtedness of the Company, Holding or any Domestic Subsidiary while the Securities are outstanding, then such Foreign Subsidiary or Insurance Subsidiary, as the case may be, shall become a Guarantor and shall execute and deliver to the Trustee a supplemental indenture substantially in the form of Exhibit E pursuant to which such Subsidiary shall Guarantee payment of the Securities pursuant to Article XI.  If the Company or any of its Restricted Subsidiaries shall acquire or create another Subsidiary, other than an Insurance Subsidiary or a Foreign Subsidiary or entity that is designated an Unrestricted Subsidiary, after the date hereof or designate an Unrestricted Subsidiary to be a Restricted Subsidiary, then such newly acquired, created or designated Subsidiary, shall execute and deliver to the Trustee a supplemental indenture substantially in the form of Exhibit E pursuant to which such Subsidiary shall Guarantee payment of the Securities pursuant to Article XI.

SECTION 4.13.  <u>Business Activities.</u>  The Company shall not, and shall not permit any of its Restricted Subsidiaries to, engage in any business other than Permitted Businesses, except to such extent as is not material to the Company and its Restricted Subsidiaries taken as a whole.  Holding will not engage in any business other than managing its investment in the Company and any business incidental or reasonably related thereto.  For the avoidance of doubt, and without limitation, it is expressly agreed that (i) except for the immediately preceding sentence, none of the provisions of this Article IV shall apply to Holding and (ii) none of (a) the Incurrence of Indebtedness or the issuance of Capital Stock by Holding, entering into agreements incidental or related thereto, the application of the proceeds of any such Incurrence or issuance consistent with the first preceding sentence, and compliance by Holding with the terms of any such agreements, (b) the making of Restricted Payments by Holding, (c) the payment by Holding of taxes, wages and other liabilities, (d) the preparation by Holding of financial statements and other reports, or (e) compliance by Holding with the terms of the Recapitalization Agreement or the stockholders agreement referred to in the Offering Memorandum shall be considered a violation of this Section 4.13.

SECTION 4.14.  <u>No Senior Subordinated Debt.</u>  The Company shall not Incur any Indebtedness that is expressly subordinate in right of payment to any Senior Indebtedness and senior in any respect in right of payment to the Securities and no Guarantor shall Incur any Indebtedness that is expressly subordinate in right of payment to any Senior Indebtedness and senior in any respect in right of payment to the Security Guarantees.

ARTICLE V

<u>Successor Company</u>

SECTION 5.01.  <u>Merger, Consolidation or Sale of All or Substantially All Assets of the Company.</u>  The Company shall not consolidate or merge with or into (whether or not the Company is the surviving corporation), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions, to another Person unless:

(i) the Company is the surviving corporation or the Person formed by or surviving any such consolidation or merger (if other than the Company) or to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made is a corporation organized or existing under the laws of the United States, any state thereof or the District of Columbia;

(ii) the Person formed by or surviving any such consolidation or merger (if other than the Company) or the Person to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made assumes all the obligations of the Company under the Securities and this Indenture pursuant to a supplemental indenture in a form reasonably satisfactory to the Trustee;

(iii) immediately after such transaction no Default or Event of Default exists; and

(iv) except in the case of a merger of the Company with or into a Wholly Owned Restricted Subsidiary of the Company, the Company or the Person formed by or surviving any such consolidation or merger (if other than the Company), or to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made will, at the time of such transaction and after giving pro forma effect thereto as if such transaction had occurred at the beginning of the applicable four-quarter period, either

112

such action as may be necessary or appropriate to acknowledge or effectuate the subordination between the Securityholders and the holders of Senior Indebtedness of each of the Guarantors as provided in this Article XII and appoints the Trustee as attorney-in-fact for any and all such purposes.

SECTION 12.14.  <u>Trustee Not Fiduciary for Holders of Senior Indebtedness of a Guarantor.</u>  The Trustee shall not be deemed to owe any fiduciary or other duty to the holders of Senior Indebtedness of a Guarantor and shall not be liable to any such holders if it shall mistakenly pay over or distribute to Securityholders or the relevant Guarantor or any other Person, money or assets to which any holders of Senior Indebtedness of such Guarantor shall be entitled by virtue of this Article XII or otherwise.

SECTION 12.15.  <u>Reliance by Holders of Senior Indebtedness of a Guarantor on Subordination Provisions.</u>  Each Securityholder by accepting a Security acknowledges and agrees that the foregoing subordination provisions are, and are intended to be, an inducement and a consideration to each holder of any Senior Indebtedness of a Guarantor, whether such Senior Indebtedness was created or acquired before or after the issuance of the Securities, to acquire and continue to hold, or to continue to hold, such Senior Indebtedness and such holder of Senior Indebtedness shall be deemed conclusively to have relied on such subordination provisions in acquiring and continuing to hold, or in continuing to hold, such Senior Indebtedness.

ARTICLE XIII

<u>Miscellaneous</u>

SECTION 13.01.  <u>Trust Indenture Act Controls.</u>  If any provision of this Indenture limits, qualifies or conflicts with another provision which is required to be included in this Indenture by the TIA, the required provision shall control.

SECTION 13.02.  <u>Notices.</u>  Any notice or communication shall be in writing and delivered in person or mailed by first-class mail addressed as follows:

if to the Company:

Werner Holding Co. (DE), Inc.
1105 North Market Street, Suite 1300

Wilmington, Delaware 19899

Attention of:  Eric J. Werner, with copies to:

Christopher J. Stadler
Investcorp International Inc.
280 Park Avenue, 37 West
New York, NY 10017

Gibson, Dunn & Crutcher, LLP
200 Park Avenue
New York, NY 10166
Attn: Joerg H. Esdorn, Esq.


if to the Trustee:

IBJ Schroder Bank & Trust Company
One State Street
New York, NY 10004
telecopier no.: (212) 858-2952

Attention of:  Corporate Trust Administration

        The Company or the Trustee by notice to the other
may designate additional or different addresses for
subsequent notices or communications.

        Any notice or communication mailed to a Security-
holder shall be made in compliance with Section 313(c) of
the TIA and mailed to the Securityholder at the
Securityholder's address as it appears on the registration
books of the Registrar and shall be sufficiently given if so
mailed within the time prescribed.

        Failure to mail a notice or communication to a
Securityholder or any defect in it shall not affect its
sufficiency with respect to other Securityholders.  If a
notice or communication is mailed in the manner provided
above, it is duly given, whether or not the addressee
receives it.

        SECTION 13.03.  <u>Communication by Holders with
Other Holders.</u>  Securityholders may communicate pursuant to
TIA § 312(b) with other Securityholders with respect to
their rights under this Indenture or the Securities.  The
Company, the Guarantors, the Trustee, the Registrar and
anyone else shall have the protection of TIA § 312(c).

SECTION 13.04.  <u>Certificate and Opinion as to Conditions Precedent.</u>  Upon any request or application by the Company to the Trustee to take or refrain from taking any action under this Indenture, at the request of the Trustee the Company shall furnish to the Trustee:

(1) an Officers' Certificate in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.05 hereof) stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(2) an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.05 hereof) stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

To the extent applicable, the Company shall comply with the provisions of Section 314(c)(3) of the TIA.

SECTION 13.05.  <u>Statements Required in Certificate or Opinion.</u>  Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Indenture shall include:

(1) a statement that the individual making such certificate or opinion has read such covenant or condition;

(2) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3) a statement that, in the opinion of such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4) a statement as to whether or not, in the opinion of such individual, such covenant or condition has been complied with.

SECTION 13.06.  <u>When Securities Disregarded.</u>  In determining whether the Holders of the required principal amount of Securities have concurred in any direction, waiver

or consent, Securities owned by the Company or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company shall be disregarded and deemed not to be outstanding, except that, for the purpose of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Securities which the Trustee actually knows are so owned shall be so disregarded. Also, subject to the foregoing, only Securities outstanding at the time shall be considered in any such determination.

SECTION 13.07. <u>Rules by Trustee, Paying Agent and Registrar.</u> The Trustee may make reasonable rules for action by or a meeting of Securityholders. The Registrar and the Paying Agent may make reasonable rules for their functions.

SECTION 13.08. <u>Legal Holidays.</u> A "Legal Holiday" is a Saturday, a Sunday or a day on which banking institutions are not required to be open in the State of New York. If a payment date is a Legal Holiday, payment shall be made on the next succeeding day that is not a Legal Holiday, and no interest shall accrue for the intervening period. If a regular record date is a Legal Holiday, the record date shall not be affected.

SECTION 13.09. <u>**GOVERNING LAW.**</u> **THIS INDENTURE AND THE SECURITIES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK BUT WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.**

SECTION 13.10. <u>No Recourse Against Others.</u> A director, officer, incorporator, employee, stockholder or Affiliate as such, of the Company or any Guarantor shall not have any liability for any obligations of the Company or any Guarantor under the Securities or this Indenture or for any claim based on, in respect of or by reason of such obligations or their creation. By accepting a Security, each Securityholder waives and releases all such liability. The waiver and release shall be part of the consideration for the issue of the Securities.

SECTION 13.11. <u>Successors.</u> All agreements of the Company and each Guarantor in this Indenture and the Securities shall bind their successors. All agreements of the Trustee in this Indenture shall bind its successors.

SECTION 13.12. <u>**Multiple Originals.**</u> The parties may sign any number of copies of this Indenture. Each

signed copy shall be an original, but all of them together
represent the same agreement.  One signed copy is enough to
prove this Indenture.

SECTION 13.13.  <u>Table of Contents; Headings.</u>  The
table of contents, cross-reference sheet and headings of the
Articles and Sections of this Indenture have been inserted
for convenience of reference only, are not intended to be
considered a part hereof and shall not modify or restrict
any of the terms or provisions hereof.

IN WITNESS WHEREOF, the parties have caused this
Indenture to be duly executed as of the date first written
above.

WERNER HOLDING CO. (DE), INC.,

by

Name: _____
Title:

WERNER HOLDING CO. (PA), INC.,

by

Name: _____
Title:

WERNER CO.,

by

Name: _____
Title:

GOLD MEDAL LADDER COMPANY,

by

Name: _____
Title:

represent the same agreement.  One signed copy is enough to prove this Indenture.

SECTION 13.13.  <u>Table of Contents; Headings.</u>  The table of contents, cross-reference sheet and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

WERNER HOLDING CO. (DE), INC.,

by _____
Name:
Title:

WERNER HOLDING CO. (PA), INC.,

by _____
Name:
Title:

WERNER CO.,

by _____
Name:
Title:

GOLD MEDAL LADDER COMPANY,

by _____
Name:
Title:

KENTUCKY LADDER COMPANY,

by _[signature]_ _____
Name:
Title:


FLORIDA LADDER COMPANY,

by _[signature]_ _____
Name:
Title:


WERNER MANAGEMENT CO.,

by _[signature]_ _____
Name:
Title:


WERNER FINANCIAL INC.,

by _[signature]_ _____
Name:
Title:


R.D. ARIZONA LADDER CORP.,

by _[signature]_ _____
Name:
Title:


WIP TECHNOLOGIES, INC.,

by _[signature]_ _____
Name:
Title:

116

ARDEE INVESTMENT CO., INC.,

by _____
Name:
Title:


OLYMPUS PROPERTIES, INC.,

by _____
Name:
Title:


PHOENIX MANAGEMENT SERVICES,
INC.,

by _____
Name:
Title:


IBJ SCHRODER BANK & TRUST
COMPANY, as Trustee,

by _____
Name:
Title:     STEPHEN J. GIURLANDO
           ASSISTANT VICE PRESIDENT


[NYCORP3:504798.8:WPC17:11/24/97--7:40a]

# EXHIBIT 16

(Excerpts Only)



**BOOK-ENTRY-ONLY CORPORATE DEBT ISSUES**

## Letter of Representations
[To be Completed by Issuer and Agent]

Werner Holding Co. (DE), Inc.
[Name of Issuer]

IBJ Schroder Bank & Trust Company
[Name of Agent]

11/21/97
[Date]

Attention: General Counsel's Office
**The Depository Trust Company**
55 Water Street; 49th Floor
New York, NY 10041-0099

Re:    10% Senior Subordinated Notes due 2007

[Issue Description]

Ladies and Gentlemen:

This letter sets forth our understanding with respect to certain matters relating to the above-referenced issue (the "Securities"). Agent will act as trustee, paying agent, fiscal agent, or other agent of Issuer with respect to the Securities. The Securities will be issued pursuant to a trust indenture, resolution, or other such document authorizing the issuance of the Securities dated ___November 24___, 1997 (the "Document"). ___Chase Securities Inc.___ is distributing the ["Underwriter"] Securities through The Depository Trust Company ("DTC").

To induce DTC to accept the Securities as eligible for deposit at DTC, and to act in accordance with its Rules with respect to the Securities, Issuer and Agent make the following representations to DTC:

1. Prior to closing on the Securities on ___November 24___, 199_7_, there shall be deposited with DTC one Security certificate registered in the name of DTC's nominee, Cede & Co., for each stated maturity of the Securities in the face amounts set forth on Schedule A hereto, the total of



which represents 100% of the principal amount of such Securities. If, however, the aggregate principal amount of any maturity exceeds $200 million, one certificate will be issued with respect to each $200 million of principal amount and an additional certificate will be issued with respect to any remaining principal amount. Each Security certificate shall bear the following legend:

Unless this certificate is presented by an authorized representative of The Depository Trust Company, a New York corporation ("DTC"), to Issuer or its agent for registration of transfer, exchange, or payment, and any certificate issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the registered owner hereof, Cede & Co., has an interest herein.

2. Issuer: (a) understands that DTC has no obligation to, and will not, communicate to its Participants or to any person having an interest in the Securities any information contained in the Security certificate(s); and (b) acknowledges that neither DTC's Participants nor any person having an interest in the Securities shall be deemed to have notice of the provisions of the Security certificate(s) by virtue of submission of such certificate(s) to DTC.

3. In the event of any solicitation of consents from or voting by holders of the Securities, Issuer or Agent shall establish a record date for such purposes (with no provision for revocation of consents or votes by subsequent holders) and shall send notice of such record date to DTC not less than 15 calendar days in advance of such record date. Notices to DTC pursuant to this Paragraph by telecopy shall be sent to DTC's Reorganization Department at (212) 709-6896 or (212) 709-6897, and receipt of such notices shall be confirmed by telephoning (212) 709-6870. Notices to DTC pursuant to this Paragraph by mail or by any other means shall be sent to DTC's Reorganization Department as indicated in Paragraph 5.

4. In the event of a full or partial redemption, Issuer or Agent shall send a notice to DTC specifying: (a) the amount of the redemption or refunding; (b) in the case of a refunding, the maturity date(s) established under the refunding; and (c) the date such notice is to be mailed to Security holders or published (the "Publication Date"). Such notice shall be sent to DTC by a secure means (e.g., legible telecopy, registered or certified mail, overnight delivery) in a timely manner designed to assure that such notice is in DTC's possession no later than the close of business on the business day before or, if possible, two business days before the Publication Date. Issuer or Agent shall forward such notice either in a separate secure transmission for each CUSIP number or in a secure transmission for multiple CUSIP numbers (if applicable) which includes a manifest or list of each CUSIP number submitted in that transmission. (The party sending such notice shall have a method to verify subsequently the use of such means and the timeliness of such notice.) The Publication Date shall be not less than 30 days nor more than 60 days prior to the redemption date or, in the case of an advance refunding, the date that the proceeds are deposited in escrow. Notices to DTC pursuant to this Paragraph by telecopy shall be sent to DTC's Call Notification Department at (516) 227-4039 or (516) 227-4190. If the party sending the notice does not receive a telecopy receipt from DTC confirming that the notice has been received, such party shall telephone (516) 227-4070. Notices to DTC pursuant to this Paragraph by mail or by any other means shall be sent to:

Manager; Call Notification Department
The Depository Trust Company
711 Stewart Avenue
Garden City, NY 11530-4719

5. In the event of an invitation to tender the Securities (including mandatory tenders, exchanges, and capital changes), notice by Issuer or Agent to Security holders specifying the terms of the tender and the Publication Date of such notice shall be sent to DTC by a secure means in the manner set forth in the preceding Paragraph. Notices to DTC pursuant to this Paragraph and notices of other corporate actions by telecopy shall be sent to DTC's Reorganization Department at (212) 709-1093 or (212) 709-1094, and receipt of such notices shall be confirmed by telephoning (212) 709-6884. Notices to DTC pursuant to the above by mail or by any other means shall be sent to:

> Manager; Reorganization Department
> Reorganization Window
> The Depository Trust Company
> 7 Hanover Square; 23rd Floor
> New York, NY 10004-2695

6. All notices and payment advices sent to DTC shall contain the CUSIP number of the Securities.

7. In the event of a change in the interest rate, Agent shall send notice of such change to Standard & Poor's Corporation. Such notice, which shall also include Agent contact's name and telephone number, shall also be sent to DTC's Dividend Department either by telecopy to (212) 709-1723, or if by mail or by any other means to:

> Manager; Announcements
> Dividend Department
> The Depository Trust Company
> 7 Hanover Square; 22nd Floor
> New York, NY 10004-2695

8. Issuer or Agent shall provide a written notice of interest payment information to a standard interest announcement service subscribed to by DTC as soon as the information is available. In the unlikely event that no such service exists, Issuer or Agent shall provide such notice directly to DTC electronically, as previously arranged by Issuer or Agent and DTC, as soon as the information is available. If electronic transmission has not been arranged, absent any other arrangements between Issuer or Agent and DTC, such information should be sent by telecopy to DTC's Dividend Department at (212) 709-1723 or (212) 709-1686, and receipt of such notices shall be confirmed by telephoning (212) 709-1270. Notices to DTC pursuant to the above by mail or by any other means shall be sent to:

> Manager; Announcements
> Dividend Department
> The Depository Trust Company
> 7 Hanover Square; 22nd Floor
> New York, NY 10004-2695

9. Issuer or Agent shall provide CUSIP numbers for each issue for which payment is being sent, as well as the dollar and cent amount of the payment for each issue to DTC, no later than noon (Eastern Time) on the payment date.

10. Interest payments and principal payments that are part of periodic principal-and-interest payments shall be received by Cede & Co., as nominee of DTC, or its registered assigns, in same-day funds no later than 2:30 p.m. (Eastern Time) on each payment date. Absent any other arrangements between Issuer or Agent and DTC, such funds shall be wired as follows:

The Chase Manhattan Bank
ABA # 021 000 021
For credit to a/c Cede & Co.
c/o The Depository Trust Company
Dividend Deposit Account # 066-026776

11. Maturity and redemption payments allocated with respect to each CUSIP number shall be received by Cede & Co., as nominee of DTC, or its registered assigns, in same-day funds no later than 2:30 p.m. (Eastern Time) on the payment date. Absent any other arrangements between Issuer or Agent and DTC, such funds shall be wired as follows:

The Chase Manhattan Bank
ABA # 021 000 021
For credit to a/c Cede & Co.
c/o The Depository Trust Company
Redemption Deposit Account # 066-027306

12. Principal payments (plus accrued interest, if any) as a result of optional tenders for purchase effected by means of DTC's Repayment Option Procedures shall be received by Cede & Co., as nominee of DTC, or its registered assigns, in same-day funds no later than 2:30 p.m. (Eastern Time) on the first payment date. Absent any other arrangements between Issuer or Agent and DTC, such funds shall be wired as follows:

The Chase Manhattan Bank
ABA # 021 000 021
For credit to a/c Cede & Co.
c/o The Depository Trust Company
Reorganization Deposit Account # 066-027608

13. DTC may direct Issuer or Agent to use any other number or address as the number or address to which notices or payments of interest or principal may be sent.

14. In the event of a redemption, acceleration, or any other similar transaction (e.g., tender made and accepted in response to Issuer's or Agent's invitation) necessitating a reduction in the aggregate principal amount of Securities outstanding or an advance refunding of part of the Securities outstanding, DTC, in its discretion: (a) may request Issuer or Agent to issue and authenticate a new Security certificate; or (b) may make an appropriate notation on the Security certificate indicating the date and amount of such reduction in principal except in the case of final maturity, in which case the certificate will be presented to Issuer or Agent prior to payment, if required.

15. In the event that Issuer determines that beneficial owners of Securities shall be able to obtain certificated Securities, Issuer or Agent shall notify DTC of the availability of certificates. In such event, Issuer or Agent shall issue, transfer, and exchange certificates in appropriate amounts, as required by DTC and others.

16. DTC may discontinue providing its services as securities depository with respect to the Securities at any time by giving reasonable notice to Issuer or Agent (at which time DTC will confirm with Issuer or Agent the aggregate principal amount of Securities outstanding). Under such circumstances, at DTC's request Issuer and Agent shall cooperate fully with DTC by taking appropriate action to make available one or more separate certificates evidencing Securities to any DTC Participant having Securities credited to its DTC accounts.

17. Nothing herein shall be deemed to require Agent to advance funds on behalf of Issuer.

-4-

18. This Letter of Representations may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original, but all such counterparts together shall constitute but one and the same instrument.

19. This Letter of Representations is governed by, and shall be construed in accordance with, the laws of the State of New York without giving effect to principles of conflicts of law.

20. The following riders, attached hereto, are hereby incorporated into this Letter of Representations:

_____ Riders 1, 2, 3, 4 and 5 _____

_____

_____

**Notes:**

A. If there is an Agent (as defined in this Letter of Representations), Agent, as well as Issuer, must sign this Letter. If there is no Agent, in signing this Letter Issuer itself undertakes to perform all of the obligations set forth herein.

B. Schedule B contains statements that DTC believes accurately describe DTC, the method of effecting book-entry transfers of securities distributed through DTC, and certain related matters.

Very truly yours,

Werner Holding Co. (DE), Inc.
                    (Issuer)

By: _____
        (Authorized Officer's Signature)

IBJ Schroder Bank & Trust Company
                    (Agent)

By: _____
        (Authorized Officer's Signature)

Received and Accepted:
THE DEPOSITORY TRUST COMPANY

By: _____

CC: Underwriter
    Underwriter's Counsel

EXHIBIT 17

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

### 200 PARK AVENUE

NEW YORK, NEW YORK 10166-0193

(212) 351-4000

FACSIMILE: (212) 351-4035

November 24, 1997

#### LOS ANGELES
333 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3197

#### CENTURY CITY
2029 CENTURY PARK EAST
LOS ANGELES, CALIFORNIA 90067-3026

#### ORANGE COUNTY
4 PARK PLAZA
IRVINE, CALIFORNIA 92614-8557

#### SAN DIEGO
750 B STREET
SAN DIEGO, CALIFORNIA 92101-4605

#### SAN FRANCISCO
ONE MONTGOMERY STREET, TELESIS TOWER
SAN FRANCISCO, CALIFORNIA 94104-4505

#### DALLAS
1717 MAIN STREET
DALLAS, TEXAS 75201-7390

#### DENVER
1801 CALIFORNIA STREET
DENVER, COLORADO 80202-2641

JAS. A. GIBSON, 1852-1922
W. E. DUNN, 1861-1925
ALBERT CRUTCHER, 1860-1931

#### WASHINGTON
1050 CONNECTICUT AVENUE, N.W.
WASHINGTON, D.C. 20036-5306

#### PARIS
104 AVENUE RAYMOND POINCARÉ
75116 PARIS, FRANCE

#### LONDON
30/35 PALL MALL
LONDON SW1Y 5LP

#### HONG KONG
10TH FLOOR, TWO PACIFIC PLACE
88 QUEENSWAY
HONG KONG

#### AFFILIATED SAUDI ARABIA OFFICE
JARIR PLAZA, OLAYA STREET
P.O. BOX 15870
RIYADH 11454, SAUDI ARABIA

WRITER'S DIRECT DIAL NUMBER

OUR FILE NUMBER

(212) 351-4000

C 03263-00908

CHASE SECURITIES INC.
DONALDSON, LUFKIN & JENRETTE
    SECURITIES CORPORATION
GOLDMAN, SACHS & CO.

c/o    Chase Securities Inc.
       270 Park Avenue, 4th Floor
       New York, New York 10017

Re:    Werner Holding Co. (DE), Inc.

Ladies and Gentlemen:

    We have acted as special counsel for Werner Holding Co. (DE), Inc. a Delaware corporation (the "Company"), Werner Holding Co. (PA), Inc. ("Holding") and the subsidiaries of the Company listed on the signature pages to the Purchase Agreement referred to below (the "Subsidiary Guarantors", and, together with Holding, the "Guarantors"), in connection with the offering and sale by the Company of $135,000,000 aggregate principal amount of its 10% Senior Subordinated Notes due 2007 (the "Securities") to you, as initial purchasers (the "Initial Purchasers") thereof, pursuant to the purchase agreement dated November 14, 1997 (the "Purchase Agreement") among the Company, the Guarantors, and the Initial Purchasers. This opinion letter is delivered to you at the request of the Company pursuant to Section 5(c) of the Purchase Agreement. Capitalized terms used herein that are not defined herein shall have the same meanings given them in the Purchase Agreement. Werner Financial Inc., WIP Technologies, Inc. and ARDEE Investment Co., Inc., the Guarantors that are incorporated under the Delaware General Corporation Law (the "DGCL"), are referred to herein as the "Delaware Guarantors." The Delaware Guarantors and the Company are referred to herein as the Delaware Corporations. The Company and each of the Guarantors are referred to herein as the Corporations.

I.

    In our capacity as special counsel for the Corporations, we have examined, in connection with the opinions set forth herein, among other things, originals, certified copies or copies otherwise identified to our satisfaction as being true copies of the originals of the Purchase Agreement, the

GIBSON, DUNN & CRUTCHER LLP

CHASE SECURITIES INC.
DONALDSON, LUFKIN & JENRETTE
   SECURITIES CORPORATION
GOLDMAN, SACHS & CO.
November 24, 1997
Page 2

Indenture, the Registration Rights Agreement, the Securities issued on the date hereof, the Offering Memorandum, the Recapitalization Agreement and such other documents, corporate records, certificates of public officials and other instruments as we have deemed necessary or advisable to enable us to render the opinions set forth herein.

In our examination, we have assumed the genuineness of all signatures, the legal capacity of natural persons, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as certified or photostatic copies, and the authenticity of the originals of such copies. As to any facts material to these opinions, we have relied upon certificates of officers of Holding and its subsidiaries, and upon certificates of public officials.

Further, in rendering our opinion, we have assumed that:

(a)     Each party to the Purchase Agreement, the Registration Rights Agreement, the Indenture and the Recapitalization Agreement (collectively, the "Documents") and the Securities (other than the Delaware Corporations, as to which the assumptions in this clause (a) do not apply) (i) has all requisite power and authority to execute, deliver and perform its obligations thereunder, (ii) has duly authorized, by all necessary action on such party's part, the execution and delivery of each such Document and the Securities and the performance of such obligations and (iii) has duly executed and delivered each such Document and the Securities; and

(b)     Each of the Documents is the legal, valid and binding obligation of, and is enforceable against, each party thereto (other than the Delaware Corporations, as to which the assumptions in this clause (b) do not apply) in accordance with its terms.

(c)     The proceeds from the sale of the Securities will be applied as set forth in the Offering Memorandum.

Upon the basis of the foregoing, and subject to the qualifications, exceptions, limitations and assumptions set forth herein, we are of the opinion that:

1.     Each of the Company and the Delaware Guarantors has been duly incorporated and is validly existing as a corporation in good standing under the laws of Delaware, and has all power and authority necessary to own or hold its properties and to conduct the businesses in which it is engaged (except where the failure to be in good standing or have such power or authority would not, singularly or in the aggregate, have a Material Adverse Effect).

2.     The descriptions in the Offering Memorandum of statutes and contracts and other documents set forth under the headings "Summary-The Transactions," "Summary-The Offering," "Risk Factors-Restrictive Loan Covenants," "The Transactions," "Principal Shareholders-Right of First Offer; Tag-Along Rights," "Certain Transactions - Agreements with Certain Shareholders" and "The New Credit Facility" are accurate in all material respects; the statements in the Offering

GIBSON, DUNN & CRUTCHER LLP

CHASE SECURITIES INC.
DONALDSON, LUFKIN & JENRETTE
    SECURITIES CORPORATION
GOLDMAN, SACHS & CO.
November 24, 1997
Page 3

Memorandum under the heading "Certain Federal Income Tax Consequences," to the extent that they constitute summaries of matters of law or regulation or legal conclusions, have been reviewed by us and fairly summarize the matters described therein in all material respects; and we have no actual knowledge of any current or pending legal or governmental actions, suits or proceedings which would be required to be described in the Offering Memorandum if the Offering Memorandum were a prospectus included in a registration statement on Form S-1 which are not described as so required.

3.    The Indenture conforms in all material respects with the requirements of the Trust Indenture Act and the rules and regulations of the Commission applicable to an indenture which is qualified thereunder.

4.    Each of the Delaware Corporations has full right, power and authority to execute and deliver each of the Documents and the Securities to which it is a party and to perform its obligations thereunder; and all corporate action required to be taken by each of the Delaware Corporations for the due and proper authorization, execution and delivery of each of such Documents and Securities and the consummation of the transactions contemplated thereby have been duly and validly taken.

5.    Each of the Purchase Agreement and the Registration Rights Agreement has been duly authorized, executed and delivered by each of the Delaware Corporations and the Registration Rights Agreement constitutes a valid and legally binding agreement of each of the Delaware Corporations enforceable against each of the Delaware Corporations in accordance with its terms.

6.    The Indenture has been duly authorized, executed and delivered by each of the Delaware Corporations, and the Indenture constitutes a valid and legally binding agreement of each of the Delaware Corporations enforceable against each of the Delaware Corporations in accordance with its terms.

7.    The Securities have been duly authorized and issued by the Company and, upon due authentication thereof by the Trustee and payment and delivery in accordance with the Purchase Agreement, will constitute valid and legally binding obligations of the Company entitled to the benefits of the Indenture and enforceable against the Company in accordance with their terms.

8.    Each Document and the Securities conform in all material respects to the description thereof contained in the Offering Memorandum.

9.    Neither Holding nor any of its subsidiaries is an "investment company" or, to our knowledge, a company "controlled by" an investment company within the meaning

GIBSON, DUNN & CRUTCHER LLP

CHASE SECURITIES INC.
DONALDSON, LUFKIN & JENRETTE
    SECURITIES CORPORATION
GOLDMAN, SACHS & CO.
November 24, 1997
Page 4

of the Investment Company Act and the rules and regulations of the Commission thereunder.

10.    Neither the consummation of the transactions contemplated by the Purchase Agreement nor the sale, issuance, execution or delivery of the Securities will violate Regulation G, T, U or X of the Federal Reserve Board.

11.    Assuming the accuracy of the representations and warranties and compliance with the agreements of the Company, the Guarantors and the Initial Purchasers contained in the Purchase Agreement, no registration of the Securities under the Securities Act -or qualification of the Indenture under the Trust Indenture Act is required in connection with the issuance and sale of the Securities by the Company to the Initial Purchasers and the offer, resale and delivery of the Securities by the Initial Purchasers in the manner contemplated by the Purchase Agreement.

12.    Except as contemplated by or relating to the New Credit Facility (as defined in the Offering Memorandum), and assuming the accuracy of the representations and warranties and compliance with the agreements of the Company, the Guarantors and the Initial Purchasers contained in the Purchase Agreement, the execution and delivery by the Company and each of the Guarantors of each of the Documents, the performance of the payment obligations thereunder and the issuance, authentication, sale and delivery of the Securities will not conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance upon any property or assets of Holding or any of its subsidiaries pursuant to, any United States federal law or any New York statute, rule or regulation that in our experience is generally applicable to the transactions of the type contemplated hereby except for such violations that are not reasonably likely to have a Material Adverse Effect; and no consent, approval, authorization or order of, or filing or registration with, any court or arbitrator or governmental agency or body under any such statute, rule or regulation is required for the execution, or delivery by the Company and each of the Guarantors of each of the Documents, the performance of the payment obligations thereunder and the issuance, authentication, sale and delivery of the Securities, except for such consents, approvals, authorizations, filings, registrations or qualifications (i) which have been obtained or made prior to the Closing Date, or (ii) which if not obtained are not reasonably likely to have a Material Adverse Effect.

The foregoing opinions are subject to the following assumptions, qualifications, limitations and exceptions:

A.    With respect to the opinions stated in paragraph 12, we express no opinion as to violations of state securities or blue sky laws, or consents, approvals, authorizations or orders of, or

GIBSON, DUNN & CRUTCHER LLP

CHASE SECURITIES INC.
DONALDSON, LUFKIN & JENRETTE
    SECURITIES CORPORATION
GOLDMAN, SACHS & CO.
November 24, 1997
Page 5

filings or registrations with, state securities regulatory authorities and any such consents, approvals, authorizations, or orders of, or filings or registrations with, the Commission and any state securities regulatory authorities as may be required in the future to be obtained or made pursuant to the Registration Rights Agreement.

      B.     With respect to the opinions stated in paragraphs 5 through 7, our opinions as to enforceability, validity and legally binding nature are subject to (i) the effect of any applicable bankruptcy, insolvency, reorganization, moratorium, arrangement or other similar laws affecting enforcement of creditors' rights generally, including, without limitation, the effect of statutory or other laws regarding fraudulent conveyances or transfers, preferential transfers, and of laws affecting distributions by corporations to stockholders, and (ii) general principles of equity, regardless of whether a matter is considered in a proceeding in equity, at law or in an arbitration, including, without limitation, concepts of materiality, reasonableness, good faith and fair dealing. Further, we express no opinion as to the validity, legally binding nature or enforceability of any provision in the Documents or the Securities relating to indemnification, exculpation contribution or the ability to obtain specific performance, injunctive relief or other equitable relief as a remedy for noncompliance with any of the Documents.

      C.     We express no opinion regarding (i) the effectiveness of any waiver (whether or not stated as such) under the Documents of, or any consent thereunder relating to, any unknown future rights or the rights of any party thereto existing, or duties owing to it, as a matter of law, (ii) the effectiveness of any waiver (whether or not stated as such) contained in the Documents of rights of any party, or duties owing to it, that is broadly or vaguely stated or does not describe the right or duty purportedly waived with reasonable specificity, and (iii) any provision of the Documents requiring written amendments or waivers of such documents insofar as it suggests that oral or other modifications, amendments or waivers could not be effectively agreed upon by the parties or that the doctrine of promissory estoppel might not apply.

      D.     We express no opinion regarding (i) the effect on the enforceability of any guaranty against the guarantor of any facts or circumstances occurring after the date hereof that would constitute a defense to the obligation of a surety or (ii) the effectiveness of any waiver of any such defense by the Guarantor under the Documents.

## II.

We have participated in conferences with representatives of the Company and the Guarantors, representatives of Holding's independent accountants and counsel, and representatives of the Initial Purchasers and their counsel at which conferences the contents of the Preliminary Offering Memorandum and the Offering Memorandum and related matters were discussed and, although we assume no responsibility for the accuracy, completeness or fairness of the Offering Memorandum (except as expressly provided above), nothing has come to our attention to cause us to believe that the Offering Memorandum (other than the financial statements (including the schedules and notes thereto)

GIBSON, DUNN & CRUTCHER LLP

CHASE SECURITIES INC.
DONALDSON, LUFKIN & JENRETTE
   SECURITIES CORPORATION
GOLDMAN, SACHS & CO.
November 24, 1997
Page 6

and other financial, accounting and statistical information contained therein, as to which we express no belief), as of the date thereof and as of the date hereof, contained or contains any untrue statement of a material fact or omitted or omits to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

***

Whenever an opinion herein with respect to the existence or absence of facts is stated to be "to our knowledge," or "to our actual knowledge," such statement is intended to signify that, during the course of our representation of Holding and its subsidiaries, as herein described, no information has come to the attention of the lawyers working on the transactions contemplated by the Documents that would give us actual knowledge of facts contrary to the existence or absence of the facts indicated. However, we have not undertaken any independent investigation to determine the existence or absence of such facts, and no inference as to our knowledge of the existence or absence of such facts should be drawn from our representation of the Company or any affiliate thereof.

We are admitted to practice in the State of New York. In addition, we are generally familiar with the Delaware General Corporation Law and have made such investigation thereof as we deem necessary for the limited purpose of rendering the opinions contained in paragraphs 1, 4, 5, 6, 7, and 12. This opinion is limited to the present laws of the United States of America, the State of New York and, to the limited extent set forth above, the Delaware General Corporation Law. The opinions expressed herein are based upon the law and circumstances as they are in effect or exist on the date hereof, and we assume no obligation to revise or supplement this letter in the event of future changes in the law or interpretation thereof with respect to circumstances or events that may occur subsequent to the date hereof.

This opinion is rendered solely for your benefit and is not to be used, circulated, quoted or otherwise referred to for any purpose without our written permission, except that IBJ Schroder Bank & Trust Company, in its capacity as Trustee under the Indenture may rely on this opinion as if it were addressed to it.

Very truly yours,

*Gibson, Dunn & Crutcher LLP*

GIBSON, DUNN & CRUTCHER LLP

MEG/JHE/ALW

NA373200.025

EXHIBIT 18

# WERNER HOLDING CO. (DE), INC.

## CROSS-RECEIPT

November 24, 1997

CHASE SECURITIES INC.
DONALDSON, LUFKIN & JENRETTE
   SECURITIES CORPORATION
GOLDMAN, SACHS & CO.

c/o    Chase Securities Inc.
      270 Park Avenue, 4th Floor
      New York, New York 10017

Ladies and Gentlemen:

      Pursuant to the Purchase Agreement dated November 14, 1997 (the "Purchase Agreement") among Werner Holding Co. (DE), Inc. (the "Issuer"), the Guarantors (as defined in the Purchase Agreement), and you, as Initial Purchasers (the "Initial Purchasers"), the Issuer is herewith delivering to you $135,000,000 aggregate principal amount of its 10% Senior Subordinated Notes due 2007 (the "Notes").

      The Issuer hereby acknowledges receipt from you of immediately available funds of $130,950,000, constituting payment in full for $135,000,000 aggregate principal amount of the Notes, less the $4,050,000 Initial Purchaser's discounts and commissions.

Please acknowledge receipt of $135,000,000 aggregate principal amount of the

Notes by signing a copy of this letter in the space provided below.

Very truly yours,

WERNER HOLDING CO. (DE), INC.

By: _____
Name:  Eric J. Werner
Title:   General Counsel

Receipt of $135,000,000
aggregate principal amount
of the Notes is hereby acknowledged
this 24th day of November, 1997

CHASE SECURITIES INC.
(On behalf of the Initial Purchasers)

By: _____
Name: Lauren Camp
Title: Vice President

N:\973210.190\3

EXHIBIT 19

(Excerpts Only)

November 14, 1997

Investcorp Investment Equity Limited,
on its own behalf and on behalf of
certain of its affiliates and other
international investors
  c/o Investcorp Bank E.C.
  P.O. Box 5460
  Bahrain

<u>Werner Holding Co. (DE), Inc.</u>
<u>Senior Subordinated Credit Facility</u>
<u>Commitment Letter</u>

Ladies and Gentlemen:

        You have advised Chase Securities Inc. ("CSI"),
The Chase Manhattan Bank ("Chase"), DLJ Bridge Finance, Inc.
("DLJ") and Goldman Sachs Credit Partners L.P. ("GS") that
Werner Holding Co. (PA), Inc. (the "Company") intends to
effect a recapitalization (the "Recapitalization") in
connection with which Investcorp Investment Equity Limited
and certain affiliated entities and other international
investors (collectively, the "Investor") would acquire
approximately 66% of the equity interests in the Company.
You have further advised CSI, Chase, DLJ and GS that the
aggregate amount needed to effect the Recapitalization and
the Transactions (as defined below) and to pay fees and
expenses in connection therewith will not exceed
approximately $502,700,000.

        In connection with the Recapitalization,
(a) Werner Holding Co. (DE), Inc., a wholly owned subsidiary
of the Company (the "Borrower"), will obtain senior secured
credit facilities in an aggregate principal amount of up to
$320,000,000 (the "Senior Facilities"), consisting of a
receivables bridge loan facility in an aggregate principal
amount of up to $75,000,000, a tranche B term loan facility
in an aggregate principal amount of $90,000,000, a tranche C
term loan facility in an aggregate principal amount of
$55,000,000 and a revolving credit facility in an aggregate
principal amount of $100,000,000, (b) the Borrower will
either (i) issue not less than $135,000,000 in aggregate
principal amount of its senior subordinated notes (the

[NYCORP2:447202.7:4674D:11/10/97--11:18a]

"Notes") in a public offering or private placement or
(ii) if it is not possible to issue the Notes on or prior to
the closing date of the Recapitalization (the
"Recapitalization Closing Date"), borrow not less than
$135,000,000 under a senior subordinated unsecured credit
facility (the "Facility"), (c) the Investor and certain
existing shareholders and members of existing management of
the Company (collectively, "Existing Shareholders") will
make a common equity contribution (the "Equity
Contribution") to the Company in an amount not less than
$182,000,000 (consisting of a cash investment of at least
$122,700,000 from an entity controlled by the Investor, with
the balance to be represented by retained common stock held
by Existing Shareholders), (d) existing indebtedness of the
Company and its subsidiaries in an approximate principal
amount of $74,100,000 will be repaid and (e) the Company
will pay fees and expenses in connection with the foregoing
transactions, which transactions are collectively referred
to herein as the "Transactions".

        CSI is pleased to advise you that it is willing to
act as advisor and arranger and manager for the Facility,
and each of Chase, DLJ and GS (collectively, the "Initial
Lenders"), severally and not jointly, is pleased to advise
you of its commitment to provide the principal amount of the
Facility set forth opposite its name on Schedule I attached
hereto, in each case upon the terms and subject to the
conditions set forth or referred to in this commitment
letter (the "Commitment Letter") and in the Summary of
Principal Terms and Conditions attached hereto as Exhibit A
(the "Term Sheet").  You agree that no other agents, co-
agents or arrangers will be appointed, no other titles will
be awarded and no compensation (other than that expressly
contemplated by the Term Sheet and the Fee Letter dated the
date hereof and delivered herewith (the "Fee Letter")) will
be paid in connection with the Facility unless you and we
shall so agree.

        Each Initial Lender reserves the right, prior to
or after execution of definitive documentation for the
Facility, to syndicate through CSI, all or a portion of its
commitment to one or more financial institutions that will
become parties to the definitive documentation (each Initial
Lender and the other financial institutions, if any,
becoming parties to such documentation, the "Lenders");
provided, however, that each Initial Lender agrees to
maintain at least 51% of its initial Commitment under the
Facility as set forth on Schedule I; provided further,
however, that the Investor shall have the right to consent
(which consent shall not be unreasonably withheld) to any

[NYCORP2:447202.7:4674D:11/10/97--11:18a]

financial institution to which any Initial Lender proposes
to assign a portion of its commitment.  Upon any such Lender
issuing its commitment to provide a portion of the Facility,
the relevant Initial Lender shall be released from a portion
of its commitment in an amount equal to the commitment of
such Lender.  You understand that CSI may commence
syndication efforts promptly following execution of this
Commitment Letter and the Fee Letter, and you agree actively
to assist CSI in achieving a timely syndication that is
satisfactory to CSI.  This may be accomplished by a variety
of means, including direct contact during the syndication
among the senior officers, representatives and advisors of
the Investor and the Company, on the one hand, and the
proposed Lenders, on the other hand.  Such assistance shall
also include using your commercially reasonable efforts to
ensure that CSI's syndication efforts benefit materially
from your lending relationships and the lending
relationships of the Company.  To the extent that the
syndication of a credit facility in connection with any
other investment by you could disrupt or otherwise interfere
with the orderly syndication of the Facility, it is
understood and agreed that you will provide CSI with
reasonable prior notice of the syndication of such other
credit facility and, upon the Initial Lenders' request,
endeavor in good faith to coordinate the syndication of such
credit facility with the syndication of the Facility.

        You agree to assist CSI in forming any such
syndicate and to provide, and to use reasonable efforts to
cause the Company and your and its affiliates and advisors,
to provide, CSI, promptly upon request, with all information
reasonably deemed necessary by CSI to complete the
syndication successfully, including, but not limited to,
(a) assisting CSI in the preparation of a confidential
information package for delivery to potential syndicate
members and participants and (b) providing information and
projections prepared by you or your advisers relating to the
transactions described herein.  You agree to coordinate any
other financings relating to the Transactions with CSI's
syndication effort and to refrain from any such financings
(other than the Senior Facilities and the Notes) during such
syndication process until the execution and delivery of
definitive documentation relating to the Facility unless
otherwise agreed to by CSI.  You further agree to make your
appropriate officers, representatives and advisors, and to
use reasonable efforts to cause the Company to make its
appropriate officers, representatives and advisors,
available to participate in information meetings for
potential syndicate members and participants at such times
and places as CSI may reasonably request.

[NYCORP2:447202.7:4674D:11/10/97--11:18a]

As consideration for the commitments hereunder and each Initial Lender's agreement contained herein as to, and CSI's efforts in connection with, the structuring and syndication of the Facility, you agree to pay to the Initial Lenders the fees set forth in the Fee Letter.

You hereby represent and covenant that (a) to the best of your knowledge, all information (excluding information of a general economic nature and financial projections) concerning the Company, the Borrower, the Recapitalization, the Transactions and other transactions contemplated hereby (the "Information") that has been or will be prepared by or on behalf of you, the Company, the Borrower or any of your or their authorized representatives, and that has been made or will be made available to CSI or any Initial Lender by you, the Company, the Borrower or any of your or their authorized representatives, in connection with the Recapitalization, the Transactions or the other transactions contemplated hereby, when taken as a whole, will be complete and correct in all material respects (after giving effect to all written updates thereto delivered to CSI and the Initial Lenders prior to the Bridge Loan Closing Date (as defined in the Term Sheet)) and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (b) to the best of your knowledge, all financial projections concerning the Company, the Borrower, the Recapitalization, the Transactions and the other transactions contemplated hereby (the "Projections") that have been or will be prepared by or on behalf of you, the Company, the Borrower or any of your or their authorized representatives, and that have been or will be made available to CSI or any Initial Lender by you, the Company, the Borrower or any of your or their authorized representatives, in connection with the Recapitalization, the Transactions or the other transactions contemplated hereby, have been and will be prepared in good faith based upon assumptions that are reasonable at the time made and at the time the related Projections are made available to CSI or any Initial Lender.  You agree that if, at any time from and including the date hereof until the Bridge Loan Closing Date, any of the representations in the preceding sentence would be incorrect if the Information and Projections were being furnished, and such representations were being made, at such time, then you will promptly supplement the Information and the Projections so that such representations will be correct under those circumstances. In arranging the Facility, including the syndication of the Facility, CSI and the Initial Lenders will be using, and

relying primarily on, the Information and the Projections
without independent verification thereof.

      The commitments hereunder are subject to (a) each
Lender's reasonable satisfaction that the Company, the
Borrower and their subsidiaries are not subject to material
contractual or other restrictions that would be violated by
the contemplated transactions, (b) each Lender's reasonable
satisfaction with the terms of the Recapitalization, the
Transactions and all agreements and arrangements relating
thereto (including, without limitation, all ancillary and
transitional agreements) (it being understood that the terms
of the Recapitalization and the Transactions set forth in
the Preliminary Offering Memorandum dated October 31, 1997
received prior to the date hereof (the "Preliminary Offering
Memorandum") are reasonably satisfactory in all respects,
(c) each Lender's reasonable satisfaction with the corporate
and capital structure of the Company and its subsidiaries
after the consummation of the Recapitalization, the
Transactions and the other Transactions contemplated hereby,
including, without limitation, each Lender's satisfaction
with the level of economic and voting interest of the
Investor in the Company (it being understood (i) that the
corporate and capital structure of the Company and its
subsidiaries after the consummation of the Recapitalization,
the Transactions and the other transactions contemplated
hereby set forth in the Preliminary Offering Memorandum is
satisfactory in all respects and (ii) that the level of
economic and voting interests of the Investor in the Company
of approximately 66% is satisfactory in all respects),
(d) each Initial Lender's not becoming aware (whether as a
result of its due diligence analyses and reviews or
otherwise) after the date hereof of any information which is
inconsistent in a material and adverse manner with any such
information or other matter disclosed to such Lender prior
to the date hereof or which is reasonably likely to result
in a Material Adverse Effect (as defined below), (e) there
not having occurred or becoming known to any Lender any
material adverse condition or material adverse change in or
affecting the business, properties, assets, liabilities
(including contingent liabilities), operations, condition
(financial or otherwise) or material agreements of or
applicable to the Borrower or the Company and its
subsidiaries, taken as a whole, since December 31, 1996 (a
"Material Adverse Effect"), (f) there not having occurred
and being continuing any material disruption of, or material
adverse change in, the financial, banking or capital market
conditions that, in the Lenders' reasonable judgment, could
materially impair the satisfactory syndication of the
Facility, (g) each Lender's satisfaction that there shall be

no competing offering, placement or arrangement of any debt securities or bank financing by or on behalf of the Company or any subsidiary thereof (other than the Senior Facilities and the Notes), prior to or during the syndication of the Facility and until the date of execution of definitive documentation relating to the Facility, (h) the Investor, the Company and the Borrower shall have cooperated fully in the syndication efforts relating to the Facility and (i) the other conditions set forth herein and in the Term Sheet.

The commitments hereunder are further subject to the negotiation, execution and delivery of definitive documentation with respect to the Facility reasonably satisfactory to all the Lenders. Notwithstanding anything contained in this Commitment Letter to the contrary, if any Lender so requests, the definitive documentation with respect to the Facility will provide that such Lender may, in lieu of making its portion of the Initial Loans, purchase notes or other debt securities of the Borrower containing terms which are substantially identical to (and are the economic equivalent of) the terms of the Initial Loans (and the Exchange Notes, if issued). The terms and conditions of the commitments hereunder and the Facility are not limited to the terms and conditions set forth herein or in the Term Sheet. Those matters that are not covered by or made clear under the provisions hereof or of the Term Sheet are subject to the approval and agreement of all the Lenders and you.

Each of the Lenders appoints CSI to act as its agent in connection with advising the Borrower as to the satisfaction or failure of satisfaction of any of the conditions to its commitment. In connection with the foregoing, each Lender will promptly notify CSI, as agent, of any event or occurrence that represents a failure of a condition to such Lender's commitment and of such Lender's determination not to provide its commitment as a result thereof. If CSI is so notified, CSI, on behalf of such Lender, will promptly notify the Borrower and the Investor that the conditions to such Lenders' commitment have not been satisfied and that such Lender will, as a result thereof, not provide its portion of the Facility.

By executing this Commitment Letter, you agree to (a) provide CSI, DLJ and GS, as soon as practicable and in no event later than 30 days prior to the Bridge Loan Closing Date, with a complete initial draft of a registration statement or a Rule 144A confidential offering memorandum relating to the Notes (including audited consolidated financial statements of the Company and its subsidiaries for the fiscal years 1994, 1995, and 1996, unaudited

consolidated financial statements of the Company and its
subsidiaries for the fiscal quarter ended September 30,
1997, and appropriate pro forma financial statements
prepared in accordance with generally accepted accounting
principles in the United States and Regulation S-X under the
Securities Act of 1933, as amended), and timely receipt of
such complete initial draft is hereby acknowledged, and (b)
provide CSI, DLJ and GS, as soon as practicable and in no
event later than 15 days prior to the Bridge Loan Closing
Date, with a complete preliminary offering memorandum or
prospectus usable in a customary high-yield road show,
including audited consolidated financial statements of the
Company and its subsidiaries for the fiscal years 1994, 1995
and 1996 and unaudited consolidated financial statements of
the Company and its subsidiaries for the fiscal quarter
ended September 30, 1997, and each subsequent fiscal quarter
ended 30 days or more before the later of the date the
Initial Loans are made or the Notes are issued.

By executing this Commitment Letter, you also
agree (a) to reimburse the Lenders and CSI from time to time
for all reasonable out-of-pocket expenses (including, but
not limited to, syndication expenses, expenses incurred in
connection with due diligence and reasonable fees and
expenses of counsel) of the Lenders and CSI associated with
the Facility and the preparation, execution and delivery of
this Commitment Letter, the Term Sheet, the Fee Letter and
the definitive documentation for the Facility contemplated
hereby and (b) to indemnify and hold harmless the Lenders
and CSI and their respective officers, directors, employees,
affiliates, agents and controlling persons (each an
"indemnified party") from and against any and all losses,
claims, damages, liabilities and expenses to which any such
person may become subject arising out of or relating to this
Commitment Letter, the Term Sheet, the Fee Letter, the
Recapitalization, the Transactions or any related
transaction or any claim, litigation, investigation or
proceeding relating to any of the foregoing, regardless of
whether any such indemnified party is a party thereto, and
to reimburse each of such indemnified parties upon demand
for any reasonable legal or other expenses reasonably
incurred in connection with investigating or defending any
of the foregoing (it being agreed that any settlement of
claims for monetary damages involving the Lenders or CSI
shall be by mutual agreement between the Lenders or CSI, as
the case may be, and you); provided that the foregoing
indemnity will not, as to any indemnified party, apply to
losses, claims, damages, liabilities or expenses (i) to the
extent they are found by a final decision of a court of
competent jurisdiction to have resulted from the wilful

misconduct or gross negligence of such indemnified party or its agents or representatives or (ii) to the extent they arise out of any legal proceedings commenced against any Lender by any transferee thereof.  The provisions contained in this paragraph shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the commitment hereunder; provided that, effective upon the borrowing under the Facility, the provisions contained in this paragraph shall be superseded in all respects by the terms of the definitive documentation for the Facility.  Notwithstanding any other provision of this Commitment Letter, neither you nor any indemnified party shall be liable for any indirect or consequential damages in connection with its activities related hereto or the transactions contemplated hereby.

We agree to keep confidential the information referred to in clauses (a) and (b) of the seventh paragraph of this letter and not to disclose any such information to any other person (other than to officers, employees, agents, advisors or representatives of the Initial Lenders or CSI or potential or actual syndicate members, each of which shall have agreed to be bound by the provisions of this paragraph) except such information that (a) is otherwise required by law to be disclosed (in which case we agree to inform you promptly thereof), (b) has been publicly disclosed other than in breach of this letter, (c) is available to us on a nonconfidential basis from a source other than you or (d) was available to us on a nonconfidential basis prior to its disclosure by you.  You agree that this Commitment Letter is for your confidential use only, and you will not, without the prior agreement of the Lenders, disclose this Commitment Letter, the contents hereof or any commitments of any Lender to any person other than (a) your directors, shareholders, officers, employees, agents and advisors who are directly involved in the consideration of the matters referred to herein and (b) as required by law or compulsory legal process; provided that you may disclose this Commitment Letter and the contents hereof to the Company and the Existing Shareholders and their respective directors, shareholders, officers, employees, agents and advisors, in each case on a confidential basis.  The provisions contained in this paragraph shall remain in full force and effect notwithstanding the termination of this Commitment Letter or the commitments of the Lenders.

Except as expressly provided herein, this Commitment Letter and the commitment of the Lenders shall not be assignable by you without the prior written consent

[NYCORP2:447202.7:4674D:11/10/97--11:18a]

of each of the Lenders, and any attempted assignment shall be void. This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each Initial Lender, CSI and you. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission shall be effective as delivery of a manually executed counterpart of this Commitment Letter. This Commitment Letter is intended to be solely for the benefit of, and is not intended to confer any benefits upon or create any rights in favor of any person other than, the parties hereto, the Lenders and, with respect to the indemnification provided in the second preceding paragraph, each indemnified party. This Commitment Letter shall be governed by, and construed in accordance with, the laws of the State of New York.

Your obligations under this Commitment Letter, other than those arising under the sixth, twelfth and thirteenth paragraphs of this Commitment Letter, shall automatically terminate and be superseded by the provisions of the definitive documentation for the Facility upon the execution of such documentation and the consummation of the Transactions.

This Commitment Letter and the commitment hereunder shall terminate at the earlier of (a) the consummation of the Transactions without any borrowing under the Facility and (b) 5:00 p.m., New York time, on January 31, 1998, unless the Bridge Loan Closing Date shall previously have occurred. Notwithstanding the foregoing, the compensation, reimbursement and indemnification provisions hereof and of the Term Sheet and the Fee Letter shall survive any termination of this Commitment Letter or the commitment hereunder.

Notwithstanding any provision herein to the contrary, from and after the Recapitalization Closing Date, the Investor shall be automatically released from each and all of its obligations under this Commitment Letter (without any further action on the part of any person or entity) and all references herein to the term "the Investor" or "you" shall be deemed to be a reference to the Borrower exclusively; provided that the Investor shall have delivered to the Initial Lenders documents reasonably satisfactory in all material respects to the Initial Lenders which provide for the assumption by the Borrower of each and all of the Investor's obligations under this Commitment Letter.

[NYCORP2:447202.7:4674D:11/10/97--11:18a]

       Please indicate your acceptance of the terms hereof and of the Fee Letter by signing in the appropriate space below and in the Fee Letter and returning the enclosed duplicate original of each of this Commitment Letter and the Fee Letter not later than 5:00 p.m., New York City time, on November 14, 1997, at which time the commitment hereunder

will expire unless you have signed and returned such
duplicate originals in accordance with this sentence.

     We look forward to working with you on this
financing.

                                Very truly yours,

                                THE CHASE MANHATTAN BANK,

                            by _____
                                Name:
                                Title:  WILLIAM J. CAGGIANO
                                        MANAGING DIRECTOR

                        CHASE SECURITIES INC.,

                            by _____
                                Name: ELIZABETH G. HOBBS
                                Title: MANAGING DIRECTOR

                        DLJ BRIDGE FINANCE, INC.,

                            by _____
                                Name:
                                Title:

                      GOLDMAN SACHS CREDIT PARTNERS
                      L.P.,

                            by _____
                                Name:
                                Title:

Accepted and agreed to as of
the date first written above:

INVESTCORP INVESTMENT EQUITY
LIMITED, on its own behalf
and on behalf of certain of
its affiliates and other
international investors.

    by _____
       Name:
       Title:

   [NYCORP2:447202.7:4674D:11/10/97--11:18a]

NOV.11.1997H,12:45PM MOORE TO 212 892 7539                          NO.239   P.2/3

11.11.1997  11:47                          P.03

11

will expire unless you have signed and returned such
duplicate originals in accordance with this sentence.
We look forward to working with you on this
financing.

                              Very truly yours,

                              THE CHASE MANHATTAN BANK,

                              by _____
                                 Name:
                                 Title:


                              CHASE SECURITIES INC.,

                              by _____
                                 Name:
                                 Title:


                              DLJ BRIDGE FINANCE, INC.,

                              by _Paul Thompson___
                                 Name:
                                 Title:


                              GOLDMAN SACHS CREDIT PARTNERS
                              L.P.,

                              by _____
                                 Name:
                                 Title:


Accepted and agreed to as of
the date first written above:

INVESTCORP INVESTMENT EQUITY
LIMITED, on its own behalf
and on behalf of certain of
its affiliates and other
international investors.

     by _____
        Name:
        Title:


[NYCORP2:447302.7:4674D:11/10/97--11:28a]

NOV 05 '97 09:24PM GOLDMAN, SACHS & CO.                                    P.2
FROM CRAVATH, SWAINE & MOORE               (MON)11. 9'97 20:51/ST. 19:55/NO. 3700000434 P 12

10

will expire unless you have signed and returned such
duplicate originals in accordance with this sentence.

    We look forward to working with you on this
financing.

                              Very truly yours,

                              THE CHASE MANHATTAN BANK,

                              by _____
                                 Name:
                                 Title:


                              CHASE SECURITIES INC.,

                              by _____
                                 Name:
                                 Title:


                              DLJ BRIDGE FINANCE, INC.,

                              by _____
                                 Name:
                                 Title:


                              GOLDMAN SACHS CREDIT PARTNERS
                              L.P.,

                              by _____
                                 Name:
                                 Title:


Accepted and agreed to as of
the date first written above:

INVESTCORP INVESTMENT EQUITY
LIMITED, on its own behalf
and on behalf of certain of
its affiliates and other
international investors.


    by _____
       Name:


[NYCORP2:447262.6:4645A:11/03/97--7:20p]

19

will expire unless you have signed and returned such
duplicate originals in accordance with this sentence.

       We look forward to working with you on this
financing.

                           Very truly yours,

                           THE CHASE MANHATTAN BANK,

                           by _____ _____
                              Name:
                              Title:

                           CHASE SECURITIES INC.,

                           by _____ _____
                              Name:
                              Title:

                           DLJ BRIDGE FINANCE, INC.,

                           by _____ __
                              Name:
                              Title:

                           GOLDMAN SACHS CREDIT PARTNERS
                           L.P.,

                           by _____ _____
                              Name:
                              Title:

Accepted and agreed to as of
the date first written above:

INVESTCORP INVESTMENT EQUITY
LIMITED, on its own behalf
and on behalf of certain of
its affiliates and other
international investors.

by _signature_
  Name:  The Director Ltd.
  Title:  Director

DOCDIR2:1643697.5:4416RB:10/30/97--4:18PM

SCHEDULE I

| Initial Lender | Commitment |
| --- | --- |
| Chase | $54,000,000 |
| DLJ | $54,000,000 |
| GS | $27,000,000 |

CONFIDENTIAL                                            EXHIBIT A
November 14, 1997


<u>Werner Holding Co. (DE), Inc.</u>
<u>Senior Subordinated Credit Facility</u>
<u>Summary of Principal Terms and Conditions</u>

All capitalized terms used herein but not defined
herein shall have the meanings provided in the Commitment
Letter to which this Exhibit A is attached.

| | |
|---|---|
| <u>Initial Loans:</u> | The Lenders (as defined below) will severally make loans (the "Initial Loans") to the Borrower (as defined below) on the Bridge Loan Closing Date (as defined below) in an aggregate principal amount of $135,000,000 or such lesser amount as may be requested by the Investor. The initial commitments of each of The Chase Manhattan Bank ("Chase"), DLJ Bridge Finance, Inc. ("DLJ") and Goldman Sachs Credit Partners L.P. ("GS", and together with Chase and DLJ, the "Initial Lenders") are set forth in Schedule I to the Commitment Letter. The Initial Lenders and each assignee of any portion of the Initial Loans or of an Initial Lender's commitment to make the Initial Loans are collectively referred to as the "Lenders". |
| | Notwithstanding anything contained in the Commitment Letter or this Exhibit A to the contrary, if any Lender so requests, the definitive documentation with respect to the Facility will provide that such Lender may, in lieu of making its portion of the Initial Loans, purchase notes or other debt securities of the Borrower containing terms which are substantially identical to (and are the economic equivalent of) the terms of the Initial Loans (and the Exchange Notes if issued). |
| <u>Borrower:</u> | Werner Holding Co. (DE), Inc. (the "Borrower"). |
| <u>Guarantors:</u> | The obligations of the Borrower in respect of the Initial Loans and the Exchange Notes (as defined below) will be unconditionally and irrevocably guaranteed on a senior subordinated basis by each guarantor, if any, of the Senior |

15

| Governing Law and Forum: | New York. |
| Counsel for CSI and the Lenders: | Cravath, Swaine & Moore. |

<u>Summary of Principal Terms and Conditions
of Exchange Notes</u>

All capitalized terms used herein but not defined herein shall have the meanings provided in the Commitment Letter to which this Annex I is attached.

<u>Issuer:</u>    The Borrower will issue Exchange Notes under an indenture which complies with the Trust Indenture Act (the "Indenture"). The Borrower in its capacity as issuer of the Exchange Notes is referred to as the "Issuer".

<u>Guarantors:</u>    Same as for the Initial Loans.

<u>Principal Amount:</u>    The Exchange Notes will be available only in exchange for the Initial Loans. The principal amount of any Exchange Note will equal 100% of the aggregate principal amount (including any accrued interest not required to be paid in cash) of the Initial Loan for which it is exchanged.

<u>Maturity:</u>    The Exchange Notes will mature on the tenth anniversary of the Bridge Loan Closing Date.

<u>Interest Rate:</u>    The Exchange Notes will bear interest at a rate equal to the Initial Rate (as defined below) plus the Exchange Spread (as defined below). Notwithstanding the foregoing, the interest rate in effect at any time shall not exceed 16.0% per annum nor be less than 10.0% per annum, and to the extent the interest payable on any Exchange Note exceeds a rate of 15.0% per annum, the Issuer may, at its option, cause such excess interest to be paid by issuing additional Exchange Notes in a principal amount equal to such excess portion of interest. In no event shall the interest rate on the Exchange Notes exceed the highest lawful rate permitted under applicable law.

"Exchange Spread" shall mean 0 basis points during the three-month period commencing on the Initial Maturity Date and shall increase by 50 basis points at the beginning of each subsequent three-month period.

|  | escrow by a mutually agreeable fiduciary. |
|---|---|
| <u>Right to Transfer Exchange Notes:</u> | The holders of the Exchange Notes shall have the absolute and unconditional right to transfer such Exchange Notes in compliance with applicable law to any third parties. |
| <u>Covenants:</u> | Those typical for an indenture governing a high-yield senior subordinated note issue and others to be reasonably agreed upon by the Investor and the Lenders. |
| <u>Events of Default:</u> | Those typical for an indenture governing a high-yield senior subordinated note issue and others to be reasonably agreed upon by the Investor and the Lenders. |
| <u>Governing Law and Forum:</u> | New York. |

# EXHIBIT 20

(Excerpts Only)

November 14, 1997

Investcorp Investment Equity Limited,
on its own behalf and on behalf of
certain of its affiliates and other
international investors
  c/o Investcorp Bank E.C.
  P.O. Box 5460
  Bahrain

<u>Werner Holding Co. (DE), Inc.</u>
<u>Senior Subordinated Notes</u>
<u>Engagement Letter</u>

Ladies and Gentlemen:

        You have advised Chase Securities Inc. ("CSI"),
The Chase Manhattan Bank ("Chase"), Donaldson, Lufkin &
Jenrette Securities Corporation ("DLJ") and Goldman, Sachs &
Co. ("GS") that Werner Holding Co. (PA), Inc. (the
"Company") intends to effect a recapitalization (the
"Recapitalization") in connection with which Investcorp
Investment Equity Limited and certain affiliated entities
and other international investors (collectively, the
"Investor") would acquire approximately 66% of the equity
interests in the Company.  You have further advised CSI,
Chase, DLJ and GS that the aggregate amount needed to effect
the Recapitalization and the Transactions (as defined below)
and to pay fees and expenses in connection therewith will
not exceed approximately $502,700,000.

        In connection with the Recapitalization,
(a) Werner Holding Co. (DE), Inc., a wholly owned subsidiary
of the Company (the "Borrower"), will obtain senior secured
credit facilities in an aggregate principal amount of up to

[NYCORP2:447186.8:4674D:11/04/97--9:43p]

$320,000,000, consisting of a receivables bridge loan facility in an aggregate principal amount of up to $75,000,000, a tranche B term loan facility in an aggregate principal amount of $90,000,000 a tranche C term loan facility in an aggregate principal amount of $55,000,000 and a revolving credit facility in an aggregate principal amount of $100,000,000, (b) the Borrower will either (i) issue not less than $135,000,000 in aggregate principal amount of its senior subordinated notes (the "Notes") in a public offering or private placement or (ii) if it is not possible to issue the Notes on or prior to the Transaction Closing Date (as defined below), borrow not less than $135,000,000 under a senior subordinated unsecured credit facility provided by the Advisors or affiliates of the Advisors (the "Bridge Loan"), (c) the Investor and certain existing shareholders and members of existing management of the Company (collectively, "Existing Shareholders") will make a common equity contribution to the Company in an amount not less than $182,000,000 (consisting of a cash investment of at least $122,700,000 from an entity controlled by the Investor, with the balance to be represented by retained common stock held by Existing Shareholders), (d) existing indebtedness of the Company and its subsidiaries in an approximate principal amount of $74,100,000 will be repaid and (e) the Company will pay fees and expenses in connection with the foregoing transactions, which transactions are collectively referred to herein as the "Transactions". In the event the Transactions do not occur, but the Investor or an affiliate of the Investor acquires a controlling interest in the Company or a majority of the assets of the Company, within 12 months of the date hereof, such other acquisition shall be deemed to be the Transactions.

Accordingly, the parties hereto agree as follows:

1. <u>Engagement of CSI, DLJ and GS</u>. The Investor hereby engages CSI, DLJ and GS (collectively, the "Advisors") to provide to the Investor, the Company and the Borrower such capital markets and other financial advisory services in connection with the Transactions, including the financing and refinancing thereof, as the Investor, the Company and the Borrower may reasonably request, and the Investor shall use reasonable efforts to cause the Company and the Borrower to engage the Advisors as the exclusive underwriters of, or exclusive placement agents for, or exclusive initial purchasers of, any public or private offering of debt securities ("Securities") by the Company or the Borrower in connection with financing the Transactions, or refinancing the Bridge Loan (other than any refinancing of the Bridge Loan (in whole but not in part) with equity or

debt provided by the Investor or its affiliates) (any such offering being an "Offering"), whether completed prior to, on or after the closing date of the Transactions (the "Transaction Closing Date"), including, but not limited to, the contemplated issuance by the Borrower of approximately $135,000,000 aggregate principal amount of senior subordinated notes having standard market terms comparable to similar offerings being made at the time, as shall be agreed between the Borrower and the Advisors (the "Proposed Financing").  Each Advisor reserves the right not to participate in any Offering, and the foregoing is not an agreement by any Advisor to underwrite, place or purchase any Securities or otherwise provide any financing.  In connection with any Offering in which the Advisors elect to participate, CSI shall act as lead manager, and the Investor shall use reasonable efforts to cause the Company to enter into an underwriting agreement, placement agency agreement or purchase agreement, as applicable, with the Advisors, which agreement shall be in CSI's standard form, consistent with this letter agreement and otherwise mutually acceptable.

It is currently expected that the Proposed Financing will be consummated on or prior to the Transaction Closing Date.  You agree that you will, and you will cause the Company and the Borrower to, promptly commence the preparation of a registration statement or a private placement memorandum relating to the Proposed Financing and that you will, and you will cause the Company and the Borrower to, use reasonable efforts to prepare, with the assistance of the Advisors, a complete final draft of such document (including the audited and pro forma financial statements to be included therein) as soon as practicable, and, in any event, on or prior to the Transaction Closing Date.

2.  <u>Matters Relating to Engagement.</u>  The Investor acknowledges that the Advisors have been retained solely to provide the services set forth in this letter agreement.  In rendering such services, the Advisors shall act as independent contractors, and any duties of any Advisor arising out of its engagement hereunder shall be owed solely to the Investor, the Company and the Borrower.

The Investor acknowledges that each Advisor is a securities firm that is engaged in securities trading and brokerage activities, as well as providing investment banking and financial advisory services.  In the ordinary course of trading and brokerage activities, each Advisor and its affiliates may at any time hold long or short positions,

[NYCORP2:447186.8:4674D:11/04/97--9:43p]

and may trade or otherwise effect transactions, for their own account or the accounts of customers, in debt or equity securities of entities that may be involved in the transactions contemplated hereby.  Each Advisor recognizes its responsibility for compliance with federal securities laws in connection with such activities.

3.  <u>Termination.</u>  This letter agreement may be terminated by any Advisor with respect to itself (but not the other Advisors) at any time upon ten days' prior written notice to the Investor.  This letter agreement may be terminated by the Investor upon ten days' prior written notice to the Advisors after the earliest of (i) the day that is 12 months after the Transaction Closing Date (the "Payment Date"), (ii) receipt by the Borrower of aggregate gross proceeds of approximately $135,000,000 from the sale of Securities consummated after the Transaction Closing Date (in which case no such notice need be given to the Advisors), (iii) the Transaction Closing Date if the Proposed Financing is consummated on or prior to the Transaction Closing Date (in which case no such notice need be given to the Advisors) and (iv) January 31, 1998, if the Bridge Loan shall not have been funded prior to such date.  Upon any termination of this letter agreement, the obligations of the parties hereunder shall terminate, except for their obligations under paragraphs 4, 5(b), 5(c), 5(d) and 7 below.

4.  <u>Indemnification.</u>  In consideration of the engagement hereunder, the Investor and the Company (each, an "Indemnifying Party") shall indemnify and hold harmless each Advisor to the extent set forth in Annex A hereto, the provisions of which are incorporated by reference herein and constitute a part hereof.

5.  <u>Fees and Expenses.</u>  (a)  In any Offering that is consummated prior to termination of this letter agreement and in which the Advisors act as exclusive underwriters, exclusive placement agents or exclusive initial purchasers, the Investor agrees that it will cause the applicable issuer to pay aggregate underwriters' or initial purchasers' discounts, or placement agency fees, as applicable, equal to 3.0% of the gross proceeds of such Offering, payable at the closing of such Offering out of the proceeds thereof.

(b)  If the Proposed Financing shall not have been consummated prior to the Payment Date, the Investor agrees to pay to the Advisors on the Payment Date for its services hereunder a cash fee equal to 3.0% of the aggregate principal amount outstanding on the Payment Date of the

Bridge Loan. The Investor's obligation to pay such fees shall be absolute and unconditional and shall not be subject to reduction by way of set-off or counterclaim.

(c) The Investor shall be entitled to a partial refund of, and each Advisor shall refund to the Investor, any fee actually paid pursuant to paragraph 5(b) above in an amount equal to the product of (i) the gross spread (i.e. underwriter's or initial purchaser's discount) or placement agency fees received by such Advisor after the Payment Date in connection with each Offering in which the Advisors act as exclusive underwriters, exclusive placement agents or exclusive initial purchasers, as applicable, and that is consummated during the period specified in Column A below following the Payment Date times (ii) the percentage set forth opposite such period in Column B below.

| Column A | Column B |
|---|---|
| 0-90 days | 100.0% |
| 91-180 days | 75.0% |
| 181-270 days | 50.0% |
| 271 days and thereafter | 25.0% |

In no event shall any Advisor be required to refund to the Investor pursuant to this paragraph 5(c) more than the amount of the fee actually paid to such Advisor pursuant to paragraph 5(b) above.

(d) In addition, whether or not the Transactions are consummated, the Investor shall reimburse each Advisor promptly upon request for all its reasonable out-of-pocket costs and expenses (including, without limitation, reasonable fees and expenses of counsel) incurred in connection with the preparation of this letter agreement or any of the transactions contemplated hereby, whether or not any Securities are issued, offered or sold; provided that, to the extent provided in CSI's standard underwriting agreement, placement agency agreement or purchase agreement, as applicable, there shall be no obligation to reimburse any such costs and expenses (including any Advisor's road-show costs and reasonable fees and expenses of counsel) incurred in connection with any Offering in which the Advisors participate. The Investor shall be responsible for all printing costs, filing fees and "blue-sky" fees and expenses.

[NYCORP2:447186.8:4674D:11/04/97--9:43p]

6. <u>Disclosure.</u>  In connection with its engagement hereunder, each Advisor shall assist the Investor, the Company and the Borrower in preparing a prospectus, private placement memorandum, confidential offering memorandum or other document to be used in connection with each Offering in which such Advisor participates (each an "Offering Document").  The Investor shall, and shall cause its affiliates and advisors and the Company and its affiliates and advisors, to, furnish each Advisor with all financial and other information concerning the Company, the Borrower, the Recapitalization, the Transactions and the other transactions contemplated hereby (the "Information") which such Advisor may reasonably request for inclusion in any Offering Document or otherwise.  Each Advisor may rely, without independent verification, upon the accuracy and completeness of the Information and any Offering Document, and the Advisors do not assume any responsibility therefor.

Each Advisor may share any Offering Document, the Information and any other information or matters relating to the Company, the Borrower, the Recapitalization, the Transactions and the other transactions contemplated hereby with affiliates of such Advisor, and any such affiliate may likewise share information relating to the Company, the Recapitalization, the Transactions and the other trans- actions contemplated hereby with such Advisor.  Each Advisor shall be responsible for any such affiliate's compliance with paragraph 7(a) below.

7. <u>Confidentiality.</u>  You agree that this letter agreement is for your confidential use only, and you will not, without the prior agreement of the Advisors, disclose this letter agreement, the contents hereof or the activities of any Advisors pursuant hereto to any person other than (a) your directors, shareholders, officers, employees, agents and advisors who are directly involved in the consideration of the matters referred to herein and (b) as required by law or compulsory legal process; <u>provided</u> that you may disclose this letter agreement and the contents hereof to the Company and the Existing Shareholders and their respective directors, shareholders, officers, employees, agents and advisors, in each case on a confidential basis.  The provisions contained in this paragraph shall remain in full force and effect notwithstanding the termination of this letter agreement.

8. <u>Governing Law and Submission to Jurisdiction.</u> This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to the conflicts of laws principles thereof.

[NYCORP2:447186.8:4674D:11/04/97--9:43p]

THE INVESTOR AND EACH ADVISOR IRREVOCABLY AGREES TO WAIVE TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS LETTER AGREEMENT OR THE PERFORMANCE OF SERVICES HEREUNDER.

The Investor and the Advisors irrevocably and unconditionally submit to the exclusive jurisdiction of any state or federal court sitting in the City of New York over any suit, action or proceeding arising out of or relating to this letter agreement. Service of any process, summons, notice or document by registered mail addressed to the Investor or the Advisors, as the case may be, shall be effective service of process against the Investor or the Advisors, as the case may be, for any suit, action or proceeding brought in any such court. The Investor and the Advisors irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court, and any objection that any such suit, action or proceeding has been brought in any such court, and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. A final judgment in any such suit, action or proceeding brought in any such court may be enforced in any other court to whose jurisdiction the Investor or the Advisors, as the case may be, may be subject by suit upon judgment.

9.  <u>Miscellaneous.</u>  This letter agreement contains the entire agreement between the parties relating to the subject matter hereof and supersedes all oral statements and prior writings with respect thereto. This letter agreement may not be amended or modified except by a writing executed by each of the parties hereto. Paragraph headings herein are for convenience only and are not a part of this letter agreement. This letter agreement is solely for the benefit of the Investor, the Company and the Advisors, and no other person (except for the Indemnified Persons, to the extent set forth in Annex A hereto) shall acquire or have any rights under or by virtue of this letter agreement. This letter agreement may not be assigned by the Investor without the Advisors' prior written consent.

If any term, provision, covenant or restriction contained in this letter agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable or against public policy, the remainder of the terms, provisions, covenants and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated. The Investor and the Advisors shall endeavor in good faith negotiations to

replace the invalid, void or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, void or unenforceable provisions.

This letter agreement may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement.  Delivery of an executed counterpart of a signature page of this letter agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart of this letter agreement.

Notwithstanding any provision herein to the contrary, from and after the Transaction Closing Date, the Investor shall be automatically released from each and all of its obligations under this letter agreement (without any further action on the part of any person or entity) and all references herein to the term "the Investor" or "you" shall be deemed to be a reference to the Borrower exclusively; <u>provided</u> that the Investor shall have delivered to the Advisors documents reasonably satisfactory in all material respects to the Advisors which provide for the assumption by the Borrower of each and all of the Investor's obligations under this letter agreement.

If the foregoing correctly sets forth our understanding, please indicate your acceptance of the terms hereof by signing in the appropriate space below and returning to CSI the enclosed duplicate original hereof, whereupon this letter agreement shall become a binding agreement between us.

Very truly yours,

CHASE SECURITIES INC.,

by _Elizabeth G Hobbs_
Name: ELIZABETH G. HOBBS
Title: MANAGING DIRECTOR


DONALDSON, LUFKIN & JENRETTE SECURITIES CORPORATION,

by _____
Name:
Title:


GOLDMAN, SACHS & CO.,

by _____
Name:
Title:


Accepted and agreed to as of the date first written above:

INVESTCORP INVESTMENT EQUITY LIMITED, on its own behalf and on behalf of certain of its affiliates and other international investors.

by _____
Name:
Title:

9

   If the foregoing correctly sets forth our
understanding, please indicate your acceptance of the terms
hereof by signing in the appropriate space below and
returning to CSI the enclosed duplicate original hereof,
whereupon this letter agreement shall become a binding
agreement between us.

                              Very truly yours,

                              CHASE SECURITIES INC.,

                              by _____
                                 Name:
                                 Title:


                              DONALDSON, LUFKIN & JENRETTE
                              SECURITIES CORPORATION,

                              by _Michael K Hooks_
                                 Name: _Michael K Hooks_
                                 Title: _Managing Director_


                              GOLDMAN, SACHS & CO.,

                              by _____
                                 Name:
                                 Title:



Accepted and agreed to as of
the date first written above:

INVESTCORP INVESTMENT EQUITY
LIMITED, on its own behalf
and on behalf of certain
of its affiliates and other
international investors.


   by _____
      Name:
      Title:



[NYCORP2:4471.4:4674D:11/04/97--9:43p]

If the foregoing correctly sets forth our understanding, please indicate your acceptance of the terms hereof by signing in the appropriate space below and returning to CSI the enclosed duplicate original hereof, whereupon this letter agreement shall become a binding agreement between us.

Very truly yours,

CHASE SECURITIES INC.,

by _____
   Name:
   Title:

DONALDSON, LUFKIN & JENRETTE SECURITIES CORPORATION,

by _____
   Name:
   Title:

GOLDMAN, SACHS & CO.,

by *Goldman, Sachs & Co.*
   Name:
   Title:

Accepted and agreed to as of the date first written above:

INVESTCORP INVESTMENT EQUITY LIMITED, on its own behalf and on behalf of certain of its affiliates and other international investors.

by _____
   Name:
   Title:

[NYCORP2:447106.7:4615a:11/03/97--7:04p]

If the foregoing correctly sets forth our
understanding, please indicate your acceptance of the terms
hereof by signing in the appropriate space below and
returning to CSI the enclosed duplicate original hereof,
whereupon this letter agreement shall become a binding
agreement between us.

Very truly yours,

CHASE SECURITIES INC.,

by _____ _____
   Name:
   Title:


DONALDSON, LUFKIN & JENRETTE
SECURITIES CORPORATION,

by _____ __
   Name:
   Title:


GOLDMAN, SACHS & CO.,

by __ _____
   Name:
   Title:


Accepted and agreed to as of
the date first written above:

INVESTCORP INVESTMENT EQUITY
LIMITED, on its own behalf
and on behalf of certain
of its affiliates and other
international investors,

by _Cax Pinicanico_
   Name:  The Director Ltd.
   Title: Director

EXHIBIT 21

APRIL 10, 2003



# INVESTCORP

## ORGANIZATIONAL MEETING

STRICTLY PRIVATE AND CONFIDENTIAL

**JPMorgan**

**citigroup**

III077756

C O N F I D E N T I A L

## 8. Working group list

### Werner Holding Co. (PA), Inc.

93 Werner Road
Greenville, PA 16125
(724) 588-8600

10800 West Belmont Avenue
Franklin Park, IL 60131

| Name | Business Information | | Home Information |
|------|------|------|------|
| Eric J. Werner<br>Vice President, Secretary and<br>General Counsel<br>ejwerner@wernerco.com<br><br>Asst: Paula Larsen<br>(724) 588-2000 x2283 | Tel:<br><br>Fax: | (724) 588-2000<br>x2205/2489<br><br>(724) 588-0618 | 705 Westminster Road<br>Hermitage, PA 16148<br>Tel:    (724) 342-2222<br>Fax:    (724) 342-0399<br>Cell:    (724) 866-5280<br>Pager:  (888) 933-2814 |
| Dennis G. Heiner<br>Chief Executive Officer<br>dgheiner@wernerco.com<br><br>Asst: Darlene Artman<br>(724) 588-2000 x2212 | PA:<br>Tel:<br>Fax:<br><br>IL:<br>Tel:<br>Fax: | (724) 588-2000 x2245<br>(724) 588-5157<br><br><br>(847) 455-8001 x4470<br>(847) 455-5972 | 130 Thorntree Lane<br>Winnetka, IL 60093<br>Tel:    (847) 784-0565<br>Car:    (847) 452-5381<br>Cell:    (847) 477-3595 |
| Larry V. Friend<br>Chief Financial Officer<br>frienlv@wernerco.com<br><br>Asst: Lisa Rhoades<br>(724) 588-2000 x2744 | Tel:<br>Fax: | (724) 588-2000 x2732<br>(724) 588-0718 | 1350 Meadowood Circle<br>Poland, OH 44514<br>Tel:    (330) 757-1608<br>Fax:    (330) 757-1808<br>Cell:    (724) 988-9112 |
| Peter R. O'Coin<br>Senior Vice President, Operations<br>ocoinpr@wernerco.com<br><br>Asst: Paula Larsen<br>(724) 588-2000 x2283 | Tel:<br>Fax: | (724) 588-2000 x2776<br>(724) 588-0611 | 131 Preserve Valley Drive<br>Cranberry Township, PA 16006<br>Tel:    (724) 742-0035<br>Cell:    (724) 988-9509 |
| Steven R. Bentson<br>Vice President, Manufacturing<br>bentssr@wernerco.com<br><br>Asst: Paula Larsen<br>(724) 588-2000 x2283 | Tel:<br>Fax: | (724) 588-2000 x2974<br>(724) 588-0611 | 1235 Foxwood Drive<br>Hermitage, PA 16148<br>Tel:    (724) 962-2368<br>Fax:    (724) 622-4423<br>Cell:    (724) 866-3525 |
| John J. Fiumefreddo<br>Vice President, Engineering and New<br>Product Development<br>fiumejj@wernerco.com<br><br>Asst: Darlene Artman<br>(724) 588-2000 x2212 | Tel:<br>Fax: | (724) 588-2000 x2385<br>(724) 588-2448 | 112 Destinaire Drive<br>New Wilmington, PA 16142<br>Tel:    (724) 946-3848<br>Cell:    (724) 988-9097 |

ORGANIZATIONAL MEETING

III077768

CONFIDENTIAL

## Werner Holding Co. (PA), Inc.

93 Werner Road      10800 West Belmont Avenue
Greenville, PA 16125   Franklin Park, IL 60131
(724) 588-8600

| Name | Business Information | | Home Information |
|------|------|------|------|
| **Ed W. Gericke**<br>Senior Vice President, Sales & Mktg.<br>gericew@wernerco.com<br><br>Asst: Darlene Artman<br>(724) 588-2000 x2212 | Tel:<br>Fax: | (847) 455-8001 x4232<br>(847) 455-5972 | 320 S. 7th St.<br>Geneva, IL 60134<br>Tel:  (630) 232-6044<br>Cell: (630) 235-3916 |
| **Geoffrey R. Hartenstein**<br>Senior Counsel<br>grhartenstein@wernerco.com<br><br>Asst: Lisa Pittner<br>(724) 588-2000 x2637 | Tel:<br>Fax: | (724) 588-2000 x2639<br>(724) 588-0618 | 1271 Foxwood Drive<br>Hermitage, PA 16148<br>Tel:  (724) 962-8113<br>Car: (724) 866-8273 |
| **Gary G. Kimmel**<br>Manager Finance<br>kimmegg@wernerco.com<br><br>Asst: Lisa Rhoades<br>(724) 588-2000 x2744 | Tel:<br>Fax: | (724) 588-2000 x2858<br>(724) 588-0718 | 4891 Northwoods Drive<br>Hermitage, PA 16148<br>Tel:  (724) 347-3475<br>Cell: (724) 699-8475 |
| **Tim K. Lewis**<br>Assistant Corporate Controller<br>lewistk@wernerco.com<br><br>Asst: Lisa Rhoades<br>(724) 588-2000 x2744 | Tel:<br>Fax: | (724) 588-2000 x2807<br>(724) 588-0718 | 200 Frazier Drive<br>New Castle, PA 16105<br>Tel:  (724) 654-5042<br>Cell: (724) 866-5301 |
| **Wendy A. Meikle**<br>Legal Administration Supervisor<br>wameilke@wernerco.com<br><br>Asst: Lisa Pittner<br>(724) 588-2000 x2637 | Tel:<br>Fax: | (724) 588-2000 x2641<br>(724) 588-0618 | 5075 Gardner Barclay Road<br>Farmdale, OH 44417<br>Tel:  (330) 876-5301<br>Cell: (330) 502-3346 |

ORGANIZATIONAL MEETING

JPMorgan       13      citigroup

III077769

C O N F I D E N T I A L

# Investcorp
280 Park Avenue
New York, NY 10017
(212) 599-4700

| Name | Business Information | | Home Information |
|---|---|---|---|
| **Christopher J. Stadler**<br>*cstadler@investcorp.com*<br><br>Asst: Stephanie Ronay<br>(212) 703-1268 | Tel:<br>Fax: | (212) 703-1230<br>(212) 983-7073 | 307 Freeman's Lane<br>Franklin Lakes, NJ 07417<br>Tel:    (201) 847-8968<br>Fax:    (201) 847-8972<br>Cell:    (646) 373-8028 |
| **Thomas J. Sullivan**<br>*tsullivan@investcorp.com*<br><br>Asst: Christine Duss<br>(212) 703-1165 | Tel:<br>Fax: | (212) 703-1152<br>(212) 983-7073 | 141 Overhill Road<br>Bronxville, NY 10708<br>Tel:    (914) 961-6210<br>Cell:    (518) 229-3858 |
| **Tarek Ajouz**<br>*tajouz@investcorp.com*<br><br>Asst: Sandra Zagula<br>(212) 703-1138 | Tel:<br>Fax: | (212) 703-1107<br>(212) 329-6848 | 301 Elizabeth Street<br>Apt. 6M<br>New York, NY 10012<br>Cell:    (917) 593-8017 |

ORGANIZATIONAL MEETING

JPMorgan    14    citigroup

III077770

CONFIDENTIAL

**Leonard Green & Partners, L.P.**
11111 Santa Monica Boulevard, Suite 2000
Los Angeles, CA 90025
(310) 954-0444

| Name | Business Information | | Home Information |
|------|---------------------|---|------------------|
| Peter J. Nolan<br>Managing Partner<br>nolan@leonardgreen.com | Tel:<br>Fax: | (310) 954-0450<br>(310) 954-0404 | 814 Pacific Ave<br>Manhattan Beach, CA 90266<br>Tel:    (310) 372-0484<br>Fax:    (310) 372-5750<br>Cell:   (310) 650-0600 |
| James D. Halper<br>Partner<br>halper@leonardgreen.com | Tel:<br>Fax: | (310) 954-0430<br>(310) 954-0404 | 17243 Avenida de la Herradura<br>Pacific Palisades, CA 90272<br>Tel:    (310) 454-7487<br>Cell:   (203) 561-7347 |
| Michael S. Wong<br>Vice President<br>mwong@leonardgreen.com | Tel:<br>Fax:<br>Cell: | (310) 954-0415<br>(310) 954-0404<br>(310) 710-9100 | 10449 Holman Ave.<br>Los Angeles, CA 90024<br>Tel:    (310) 470-8880<br>Fax:    (310) 470-8881<br>Cell:   (310) 710-9100 |
| J. Kristofer Galashan<br>Associate<br>galashan@leonardgreen.com | Tel:<br>Fax: | (310) 954-0425<br>(310) 954-0404 (fax) | 11611 Chenault St., Apt. 310<br>Los Angeles, CA 90049<br>Tel:    (310) 889-7698<br>Cell:   (310) 702-7082 |

ORGANIZATIONAL MEETING

JPMorgan

citigroup

III077771

C O N F I D E N T I A L

# J.P. Morgan Securities Inc.

## JPMorgan – Financial Sponsors Group
277 Park Avenue, 22nd Floor
New York, NY 10172
(212) 270-6000

| Name | Business Information | | Home Information | |
|------|------|------|------|------|
| **Thomas Cassidy**<br>Managing Director<br>tom.cassidy@jpmorgan.com | Tel:<br>Fax: | (212) 622-8668<br>(646) 534-0339 | 83 Bittersweet Lane<br>New Canaan, CT 06840<br>Tel:<br>Cell: | <br><br>(203) 966-2890<br>(917) 327-8282 |
| **John Gammage**<br>Managing Director<br>johnc.gammage@jpmorgan.com | Tel:<br>Fax: | (212) 622-7050<br>(646) 534-0344 | 16 Delwood Avenue<br>Greenwich, CT 06830<br>Tel:<br>Fax:<br>Cell: | <br><br>(203) 629-4501<br>(203) 629-0004<br>(917) 703-7050 |
| **Joe Purcell**<br>Vice President<br>joe.purcell@jpmorgan.com | Tel:<br>Fax: | (212) 622-8444<br>(646) 534-0348 | 91 Long Lots<br>Westport, CT 06880<br>Tel:<br>Fax:<br>Cell: | <br><br>(203) 226-9552<br>(203) 221-7651<br>(917) 886-3191 |
| **John LaVoie**<br>Vice President<br>john.lavoie@jpmorgan.com | Tel:<br>Fax: | (212) 622-8550<br>(646) 534-0345 | 8 Holly Lane<br>Darien, CT 06820<br>Tel:<br>Fax:<br>Cell: | <br><br>(203) 655-4816<br>(203) 655-4814<br>(203) 500-3524 |

ORGANIZATIONAL MEETING

**JPMorgan**

citigroup

III077772

CONFIDENTIAL

## JPMorgan – Syndicated & Leveraged Finance Group
270 Park Avenue, 5th Floor
New York, NY 10017

| Name | Business Information | | Home Information |
|------|------|------|------|
| **Douglas Traver**<br>Managing Director and Group Co-Head<br>*douglas.traver@jpmorgan.com* | Tel:<br>Fax: | (212) 270-1915<br>(212) 270-1063 | 18 Nolen Lane<br>Darien, CT 06820<br>Tel:    (203) 656-0245<br>Fax:   (203) 656-7273<br>Cell:   (917) 445-0782 |
| **Gerry Murray**<br>Managing Director<br>*gerry.murray@jpmorgan.com* | Tel:<br>Fax: | (212) 270-2735<br>(212) 270-1063 | 5 Sherman Avenue<br>Bronxville, NY 10708<br>Tel:    (914) 961-9072<br>Cell:   (646) 265-7405 |
| **Adam Sell**<br>Vice President<br>*adam.sell@jpmorgan.com* | Tel:<br>Fax: | (212) 270-3497<br>(212) 270-1063 | 808 Bloomfield Street, Apt. B<br>Hoboken, NJ 07030<br>Tel:    (201) 217-6681<br>Cell:   (201) 401-3826 |
| **Adam Reinmann**<br>Associate<br>*adam.reinmann@jpmorgan.com* | Tel:<br>Fax: | (212) 270-2238<br>(212) 270-1063 | 249 East 48th Street, Apt. 10J<br>New York, NY 10017<br>Tel:    (212) 593-9901<br>Cell:   (917) 439-4255 |
| **Karen de Castro**<br>Analyst<br>*karen.decastro@jpmorgan.com* | Tel:<br>Fax: | (212) 270-4591<br>(212) 270-1063 | 777 Sixth Avenue, Apt. 15J<br>New York, NY 10001<br>Tel:    (212) 924-4447<br>Cell:   (917) 214-7391 |
| **Liana Blat**<br>Analyst<br>*liana.blat@jpmorgan.com* | Tel:<br>Fax: | (212)-270-5704<br>(212)-270-1063 | 1096 East 73rd Street<br>Brooklyn, NY 11234<br>Tel:    (718) 968-7159<br>Cell:   (347) 743-6666 |

## JPMorgan – Loan Capital Markets
270 Park Avenue, 5th Floor
New York, NY 10017

| Name | Business Information | | Home Information |
|------|------|------|------|
| **Peter Nolan**<br>Managing Director<br>*peter.nolan@jpmorgan.com* | Tel:<br>Fax: | (212) 270-0443<br>(212) 270-1063 | 10 Eldredge Place<br>Rye, NY 10580<br>Tel:    (914) 921-3871<br>Fax:   (914) 921-1446 |

ORGANIZATIONAL MEETING

**JPMorgan**

citigroup

III077773

CONFIDENTIAL

## JPMorgan – High Yield Capital Markets
270 Park Avenue, 4th Floor
New York, NY 10017

| Name | Business Information | | Home Information |
|------|------|------|------|
| Brian Tramontozzi<br>Vice President<br>brian.tramontozzi@jpmorgan.com | Tel:<br>Fax: | (212) 270-9153<br>(212) 270-1329 | 109 Cliffield Road<br>Bedford, NY 10506<br>Tel:    (914) 234-4273<br>Fax:    (914) 234-7839<br>Cell:   (917) 868-3099 |

## JPMorgan – Corporate Banking
270 Park Avenue, 4th Floor
New York, NY 10017

| Name | Business Information | | Home Information |
|------|------|------|------|
| Neil Boylan<br>Managing Director<br>neil.boylan@jpmorgan.com | Tel:<br>Fax: | (212) 270-1410<br>(212) 270-0009 | 332 Lakeview Drive<br>Wykoff, NJ 07481<br>Tel:    (201) 847-8158<br>Cell:   (917) 374-6748 |

## JPMorgan – Documentation
270 Park Avenue, 5th Floor
New York, NY 10017

| Name | Business Information | | Home Information |
|------|------|------|------|
| Gary Spevack<br>Vice President<br>gary.l.spevack@jpmorgan.com | Tel:<br>Fax: | (212) 270-5964<br>(212) 270-1063 | 26 Louis Drive<br>Melville, NY 11747<br>Tel:    (631) 692-5560<br>Cell:   (631) 875-2876 |

## JPMorgan – Credit
270 Park Avenue, 4th Floor
New York, NY 10017

| Name | Business Information | | Home Information |
|------|------|------|------|
| Mary Gherty<br>Managing Director<br>mary.gherty@jpmorgan.com | Tel:<br>Fax: | (212) 270-2057<br>(212) 270-6017 | |

ORGANIZATIONAL MEETING

JPMorgan

citigroup

III077774

CONFIDENTIAL

## JPMorgan – Global Mergers & Acquisitions
277 Park Avenue, 3rd Floor
New York, NY 10172
(212) 270-6000

| Name | Business Information | | Home Information |
|------|---------------------|---|------------------|
| **Alex Lynch**<br>Managing Director<br>*alex.lynch@jpmorgan.com* | Tel:<br>Fax: | (212) 622-1156<br>(646) 534-0134 | 5 Woodside Road - Deer<br>ParkGreenwich, CT 06830<br>Tel:    (203) 869-9859<br>Fax:    (203) 869-0257 |
| **Henry Gosebruch**<br>Vice President<br>*henry.gosebruch@jpmorgan.com* | Tel:<br>Fax: | (212) 622-2299<br>(646) 534-1120 | 300 East 40th Street, Apt. 23W<br>New York, NY 10016<br>Tel:    (212) 697-7162<br>Cell:   (917) 208-7203 |
| **J.D. Moore**<br>Associate<br>*jd.moore@jpmorgan.com* | Tel:<br>Fax: | (212) 622-2364<br>(646) 735-3538 | 178 Clinton Street, Apt. 2R<br>Brooklyn, NY 11201<br>Tel:    (718) 522-5353<br>Fax:    (718) 522-5353<br>Cell:   (917) 324-1716<br>Pager: (888) 943-5295 |

ORGANIZATIONAL MEETING

JPMorgan

citigroup

III077775

C O N F I D E N T I A L

# Citigroup

## Citigroup – Financial Entrepreneurs Group
388 Greenwich Street, 33rd Floor
New York, NY 10013
(212) 816-6000

| Name | Business Information | | Home Information | |
|---|---|---|---|---|
| **Michael Zimmerman**<br>Managing Director<br>michael.r.zimmerman@citigroup.com<br><br>Asst: Renee Steinberg<br>(212) 816-2430 | Tel:<br>Fax: | (212) 816-9235<br>(212) 816-4741 | 67 Glenville Road<br>Greenwich, CT 06831<br>Tel:<br>Fax:<br>Cell: | <br><br>(203) 629-1986<br>(203) 629-8796<br>(917) 921-8623 |
| **John Katzenberg**<br>Managing Director<br>john.katzenberg@citigroup.com<br><br>Asst: Jennifer Defazio<br>(212) 816-9175 | Tel:<br>Fax: | (212) 816-7671<br>(212) 816-4422 | 27 North Moore Street<br>Apartment 10-B<br>New York, NY 10013<br>Tel:<br>Fax:<br>Cell: | <br><br><br>(917) 431-3147<br>(917) 431-9224<br>(917) 359-4104 |

## Citigroup – U.S. Building Products Investment Banking
388 Greenwich Street, 32nd Floor
New York, NY 10013
Tel: (212) 816-6000

| Name | Business Information | | Home Information | |
|---|---|---|---|---|
| **Richard Moriarty**<br>Managing Director<br>richard.moriarty@citigroup.com<br><br>Asst: Debbie Morris<br>(212) 816-7208 | Tel:<br>Fax: | (212) 816-7545<br>(212) 816-7917 | 412 Ridgewood Avenue<br>Glen Ridge, NJ 07028<br>Tel:<br>Fax:<br>Cell: | <br><br>(973) 509-7218<br>(973) 509-2051<br>(973) 204-1678 |
| **Awais Kharal**<br>Associate<br>awais.kharal@citigroup.com<br><br>Asst: Marisa Pirozzi<br>(212) 816-7208 | Tel:<br>Fax: | (212) 816-3399<br>(212) 816-7917 | 225 West 83rd Street, Apt. 15H<br>New York, NY 10024<br>Tel: | <br><br>(917) 441-0353 |
| **Saleh Shaya**<br>Analyst<br>saleh.shaya@citigroup.com | Tel:<br>Fax: | (212) 816-9255<br>(212) 816-7917 | 99 John Street, Apt. 1221<br>New York, NY 10038<br>Cell: | <br><br>(917) 769-6875 |

ORGANIZATIONAL MEETING

JPMorgan

20

 citigroup

III077776

CONFIDENTIAL

## Citigroup – Leveraged Finance
390 Greenwich Street, 1st Floor
New York, NY 10013

| Name | Business Information | | Home Information |
|------|------|------|------|
| **Stephen R. Sellhausen**<br>Managing Director<br>*stephen.sellhausen@citigroup.com* | Tel:<br>Fax: | (212) 723-6588<br>(212) 723-8691 | 10 Hillsley Road<br>Darien, CT 06820<br>Tel:    (203) 656-3938<br>Cell:    (917) 834-1318 |
| **Jason Marks**<br>Analyst<br>*jason.s.marks@citigroup.com* | Tel:<br>Fax: | (212) 723-6946<br>(212) 723-8590 | 330 East 39th Street, Apt. 23N<br>New York, NY 10016<br>Tel:    (212) 972-2377<br>Cell:    (917) 992-3645 |

## Citigroup – Mergers & Acquisitions
390 Greenwich Street, 25th Floor
New York, NY 10013

| Name | Business Information | | Home Information |
|------|------|------|------|
| **Nicholas Sakellariadis**<br>Managing Director<br>*nicholas.sakellariadis@citigroup.com* | Tel:<br>Fax: | (212) 816-8252<br>(212) 816-6108 | 639 West End Avenue, Apt. 14A<br>New York, NY 10025<br>Tel:    (212) 580-7201<br>Fax:    (212) 580-7305<br>Cell:    (917) 842-4273 |
| **Stavros Tsibiridis**<br>Director<br>*stavros.tsibiridis@citigroup.com* | Tel:<br>Fax: | (212) 816-4833<br>(212) 816-7076 | 300 Mercer Street, Apt. 27M<br>New York, NY 10025<br>Tel:    (212) 598-9369<br>Fax:    (646) 215-4389<br>Cell:    (917) 306-9369 |
| **Jason Badesha**<br>Analyst<br>*jason.badesha@citigroup.com* | Tel:<br>Fax: | (212) 723-0151<br>(212) 723-5997 | 75 West Street, Apt. 4-O<br>New York, NY 10006<br>Tel:    (646) 246-9865 |

ORGANIZATIONAL MEETING

JPMorgan

citigroup

III077777

C O N F I D E N T I A L

**Gibson, Dunn & Crutcher LLP**
200 Park Avenue
New York, NY 10166
Tel: (212) 351-4000

| Name | Business Information | | Home Information |
|------|------|------|------|
| **E. Michael Greaney** <br> Partner <br> *mgreaney@gibsondunn.com* <br><br> Asst: Mona Elba <br> (212) 351-3801 | Tel: <br> Fax: | (212) 351-4065 <br> (212) 351-5260 | 93 Adams Lane <br> New Canaan, CT  06840 <br> Tel:   (203) 966-0023 <br> Fax:   (203) 966-7295 <br> Cell:  (917) 226-2852 |
| **Janet Vance** <br> Partner <br> *jvance@gibsondunn.com* <br><br> Asst: Elaina Burton <br> (212) 351- 2485 | Tel: <br> Fax: | (212) 351-3854 <br> (212) 351-5288 | |
| **William M. Rustum** <br> Associate <br> *wrustum@gibsondunn.com* | Tel: <br> Fax: | (212) 351-4082 <br> (212) 351-5346 | 41 Knob Hill Drive <br> Summit, NJ 07901 <br> Tel:   (908) 918-1399 |
| **Ashley Gregory** <br><br> *agregory@gibsondunn.com* | Tel: <br> Fax: | (212) 351-3819 <br> (212) 351- | |
| **Joerg Esdorn** <br><br> *jesdorn@gibsondunn.com* | Tel: <br> Fax: | (212) 351- <br> (212) 351- | |
| **Glenn Schoenfeld** <br><br> *gschoenfeld@gibsondunn.com* | Tel: <br> Fax: | (212) 351- <br> (212) 351- | |
| **Ben Burkhart** <br><br> *bburkhart@gibondunn.com* | Tel: <br> Fax: | (212) 351- <br> (212) 351- | |

ORGANIZATIONAL MEETING

III077778

C O N F I D E N T I A L

## Skadden, Arps, Slate, Meagher and Flom LLP
300 South Grand Avenue
Los Angeles, CA 90071
Tel: (212) 687-5000

| Name | Business Information | | Home Information |
|------|---------------------|---|-----------------|
| Nicholas P. Saggese<br>Partner<br>nsaggese@skadden.com | Tel:<br>Fax: | (213) 687-5550<br>(213) 621-5550 | |
| Casey T. Fleck<br>Associate<br>cfleck@skadden.com | | | |

## Simpson, Thatcher & Bartlett
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-2000

| Name | Business Information | | Home Information |
|------|---------------------|---|-----------------|
| Frank Huck<br>Partner<br>fhuck@stblaw.com | Tel:<br>Fax: | (212) 455-7025<br>(212) 455-2502 | 90 Inwood Road<br>Darien, CT 06820<br>Tel:     (203) 655-6382<br>Fax:     (203) 655-3631<br>Cell:    (203) 952-9610 |
| Arthur Robinson<br>Partner<br>arobinson@stblaw.com | Tel:<br>Fax: | (212) 455-7086<br>(212) 455-2502 | 43 Meadow Road<br>Riverside, CT 06878<br>Tel:     (203) 637-3552<br>Fax:     (203) 637-3023<br>Cell:    (917) 841-7759 |

ORGANIZATIONAL MEETING

JPMorgan

citigroup

III077779

EXHIBIT 22

Normal
Anthony    Antonelli    Standard & Poor's    "Rating Analyst, Ratings Services"    "55 Water Street
39th Floor"    New York    NY    10041-0003    United States of America
(212) 438-7820 (212) 438-5019
0/0/00    0/0/00
anthony_antonelli@standardandpoors.com    SMTP    Anthony Antonelli (anthony_antonelli@standardandpoors.com)
Unspecified    A.A.
Normal False    Normal    http://www.standardandpoors.com
Cynthia    Werneth    Standard & Poor's    "Director, Ratings Services"    "55 Water Street, 39th Floor"
New York    NY    10041-0003    United States of America
(212) 438-7873 or 7820 (212) 438-7819
0/0/00    0/0/00    cindy_werneth@sandp.com
SMTP    Cynthia Werneth (cindy_werneth@sandp.com)    Unspecified
C.W.    "A Division of The McGraw-Hill Companies
"    Normal False    Normal
Xavier    Buffon    Standard & Poor's    "Associate Director, Corporate Group"    "21-25, rue Balzac"
75406 Paris Cedex 08 - France    United States of America
(33) 1 44 20 66 51    (33) 1 44 20 66 75
0/0/00    0/0/00
xavier_buffon@standardandpoors.com    SMTP    Xavier Buffon (xavier_buffon@standardandpoors.com)    Normal
False    Normal    X.B.
Jason    Colodne    Morgan Stanley    Executive Director    1585 Broadway    New York
NY    10036    United States of America
(212) 507-3444 (212) 761-2903
0/0/00    0/0/00    jason.colodne@moganstanley.com    SMTP    Jason Colodne
(jason.colodne@moganstanley.com)    Unspecified    J.C.
Normal False    Normal
Paul    Aran    Moody's Investors Service    "Vice President / Senior Analyst, Corporate Finance
Group"    99 Church Street    New York    NY    10007    United States of America
(212) 553-3855 (212) 553-7849
0/0/00    0/0/00
paul.aran@moody's.com    SMTP    Paul Aran (paul.aran@moody's.com)    Unspecified
P.A.    Normal False    Normal
Susan    Lai    Moody's Investors Service    "Senior Associate, Corporate Finance Group"    99
Church Street    New York    NY    10007    United States of America
(212) 553-3855 (212) 553-7265
0/0/00    0/0/00    Susan.Lai@moodys.com
SMTP    Susan Lai (Susan.Lai@moodys.com)    Unspecified    S.L.
Normal False    Normal
CFA    Steven P. Oman    Moody's Investors Service    "Senior Vice President, Corporate Group"
"Harborside Financial Center Plaza Five
Suite 2400"    Jersey City    New    Jersey 07311-3988    United States of America
(201) 915-8349 (201) 915-8750
0/0/00    0/0/00
steve.oman@moodys.com    SMTP    Steven P. Oman (steve.oman@moodys.com)
Unspecified    C.S.P.O.    Normal False
Normal
Y.    Benjamin    Shum    Werner Co    General Manager China    "(new office as if 8/05):
Unit 25N, Cross Region Plaza 899 LingLing Road"    Shanghai    China 200030    United States of
America    "Rm 1802, Building 68, Di Jing Yuan
999 Nong, Zhaojiabang Road"    Shanghai    2000030    China
86 21 6487 6531 x 608    6901 (speed dial)    011 86 159 2100 6321    011 86 159
2100 6321    0/0/00 "Laura Powers, Ext. 2770"    0/0/00
/O=Werner Co/OU=US/cn=Recipients/cn=CN-BenShum EX    Y. Benjamin Shum (benshum@wernerco.com.cn)
ybshum@163.com SMTP    Y. Benjamin Shum (ybshum@163.com)    ybshum@yahoo.com    SMTP    Y.
Benjamin Shum (ybshum@yahoo.com)    Unspecified    Y.B.S.    "Phone
number for Fed-Ex shipments to Ben in China:  021-64876531 (per his return address label on one of his shipments to
us)
"    Normal False    Normal
John    Dylik    Werner Co    "Sr Marketing Mgr, Market Planning & Business Development"
10800 West Belmont Avenue    Franklin Park    IL    60131    United States of America
"(847) 455-8001 , Ext.4315"

WER 027614

EXHIBIT 23

(Excerpts Only)

MAY 2003



STRICTLY PRIVATE AND CONFIDENTIAL

**WERNER HOLDING CO. (DE), INC.**

$230,000,000 Senior Secured Credit Facilities
Consisting of up to:

$60,000,000 Revolving Credit Facility
$170,000,000 Term Loan Facility

Confidential Information Memorandum (for Private-side Investors)

JPMorgan                                 citigroup

GRN 002020

CONFIDENTIAL

## Notice to recipients

This Confidential Information Memorandum (the "Confidential Memorandum") has been prepared solely for informational purposes from information supplied by Werner Holding Co. (DE), Inc. ("Werner" or the "Company", and is being furnished by J.P. Morgan Securities Inc., ("JPMorgan") and Citigroup Global Markets Inc. ("Citigroup Global Markets", and together with JPMorgan, the "Agents") as Joint Bookrunners. The Agents, JPMorgan and Citigroup, however, have not independently verified any of the information and data contained herein and make no representation or warranty as to the accuracy or completeness of such information. By accepting this Confidential Memorandum, each recipient agrees that the Agents, JPMorgan and Citigroup shall not have any liability for any representations (express or implied) contained in, or for any omissions from, this Confidential Memorandum or any other written or oral communications transmitted to the recipient by or on behalf of the Agents, JPMorgan, Citigroup or Werner in the course of the recipient's evaluation of the proposed financing.

The information contained herein has been prepared to assist interested parties in making their own evaluation of Werner and does not purport to be all-inclusive or to contain all of the information that may be material to a prospective participant's decision to participate in the financing. Each recipient of the information and data contained herein should perform its own independent investigation and analysis of the transaction and the creditworthiness of Werner. The information and data contained herein are not a substitute for the recipient's independent evaluation and analysis.

This Confidential Memorandum includes certain statements, estimates and projections prepared and provided by Werner's management with respect to the anticipated future performance of Werner. Such statements, estimates and projections reflect various assumptions by the Company's management concerning anticipated results and have been included solely for illustrative purposes. No representations are made as to the accuracy of such statements, estimates or projections or with respect to any other materials herein. Actual results may vary materially from the projected results contained herein.

Statements contained in this Confidential Memorandum describing documents and agreements are provided in summary form only and such summaries are qualified in their entirety by reference to such documents and agreements.

The information and data contained herein are confidential and may not be divulged to any person or entity or reproduced, disseminated or disclosed, in whole or in part, except as set forth in the Confidentiality Agreement under which the information contained in this Confidential Memorandum is provided.

WERNER HOLDING CO. (DE), INC.

JPMorgan                                    1                                    citigroup

GRN 002021

CONFIDENTIAL

## Authorization letter

**WERNER HOLDING CO. (DE), INC.**

P.O. Box 8985
1105 North Market Street, Suite 1300
Wilmington, Delaware 19899

Telephone 302/478-5723 • Telecopier 302/427-7683

JP Morgan Securities Inc.
270 Park Avenue, 5th Floor
New York, NY 10017

Citigroup Global Capital Markets Inc.
390 Greenwich Street, 1st Floor
New York, NY 10013

May 7, 2003

Ladies and Gentlemen:

Werner Holding Co. (DE), Inc. ("Werner" or the "Company") hereby authorizes you and your affiliates to distribute the Confidential Information Memorandum (the "Confidential Memorandum") dated May 2003 to potential lenders in connection with the proposed Senior Secured Credit Facilities (the "Facilities") for Werner described in the Confidential Memorandum.

We have reviewed such Confidential Memorandum and its attachments and hereby confirm to you and your affiliates that, to the best of our knowledge, the information contained in the Confidential Memorandum is correct in all material respects and does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in the light of the circumstances under which such statements were made. It is understood that Werner makes no representation or warranty concerning the estimates and projections contained in the Confidential Memorandum except that such estimates and projections were made in good faith by the management of Werner, on the basis of assumptions believed by such management to be reasonable. Such estimates and projections and the assumptions on which they are based may or may not prove to be correct. Statements as to the terms and conditions of the Facility described in the Confidential Information Memorandum are qualified in their entirety by reference to the definitive documentation, to which reference should be made for the full terms and conditions.

Very truly yours,

Larry V. Friend
Chief Financial Officer

WERNER HOLDING CO. (DE), INC.

JPMorgan

2

citigroup

GRN 002022

C O N F I D E N T I A L

# Contact list

## Werner Holding Co. (PA), Inc.

93 Werner Road                    10800 West Belmont Avenue
Greenville, PA 16125          Franklin Park, IL 60131
Fax: (724) 588-0315

| Name | Title | Email | Telephone |
|------|-------|-------|-----------|
| Dennis G. Heiner | Chief Executive Officer | dgheiner@wernerco.com | (724) 588-2000 x2245 |
| Steven R. Bentson | VP, Manufacturing | bentssr@wernerco.com | (724) 588-2000 x2974 |
| John J. Fiumefreddo | VP, Engineering and New Product Development | fiumejj@wernerco.com | (724) 588-2000 x2385 |
| Larry V. Friend | VP, Chief Financial Officer and Treasurer | frienlv@wernerco.com | (724) 588-2000 x2732 |
| Ed W. Gericke | Senior VP, Sales & Mktg. | gericew@wernerco.com | (847) 455-8001 x4232 |
| Peter R. O'Coin | Senior VP, Operations | ocoinpr@wernerco.com | (724) 588-2000 x2776 |
| Eric J. Werner | Vice President, Secretary and General Counsel | ejwerner@wernerco.com | (724) 588-2000 x2205 x2489 |
| Geoffrey Hartenstein | Senior Counsel | grhartenstein@wernerco.com | (724) 588-2000 x2639 |
| Gary G. Kimmel | Manager Finance | kimmegg@wernerco.com | (724) 588-2000 x2858 |
| Tim K. Lewis | Asst. Corporate Controller | lewistk@wernerco.com | (724) 588-2000 x2807 |
| Wendy A. Meikle | Legal Admin. Supervisor | wameikle@wernerco.com | (724) 588-2000 x2641 |

## Investcorp

280 Park Avenue
New York, NY 10017
Fax: (212) 983-7073

| Name | Title | Email | Telephone |
|------|-------|-------|-----------|
| Christopher J. Stadler | Partner | cstadler@investcorp.com | (212) 703-1230 |
| Thomas J. Sullivan | Principal | tsullivan@investcorp.com | (212) 703-1152 |
| Tarek Ajouz | Associate | tajouz@investcorp.com | (212) 703-1107 |

## Leonard Green & Partners, L.P.

11111 Santa Monica Boulevard, Suite 2000
Los Angeles, CA 90025
Fax: (310) 954-0404

| Name | Title | Email | Telephone |
|------|-------|-------|-----------|
| Peter J. Nolan | Managing Partner | nolan@leonardgreen.com | (310) 954-0450 |
| James D. Halper | Partner | halper@leonardgreen.com | (310) 954-0430 |
| Michael S. Wong | Vice President | mwong@leonardgreen.com | (310) 954-0415 |
| J. Kristofer Galashan | Associate | galashan@leonardgreen.com | (310) 954-0425 |

WERNER HOLDING CO. (DE), INC.

GRN 002023

CONFIDENTIAL

**J.P. Morgan Securities Inc.**
270 Park Avenue, 5th Floor
New York, NY 10017
Fax: (212) 270-1063

### Leveraged Finance - Structuring

| Name | Title | Email | Telephone |
|---|---|---|---|
| Douglas Traver | Managing Director and Group Co-Head | douglas.traver@jpmorgan.com | (212) 270-1915 |
| Gerry Murray | Managing Director | gerry.murray@jpmorgan.com | (212) 270-2735 |
| Adam Sell | Vice President | adam.sell@jpmorgan.com | (212) 270-3497 |
| Adam Reinmann | Associate | adam.reinmann@jpmorgan.com | (212) 270-2238 |
| Karen de Castro | Analyst | karen.decastro@jpmorgan.com | (212) 270-4591 |
| Liana Blat | Analyst | liana.blat@jpmorgan.com | (212) 270-5704 |

### Leveraged Finance - Distribution

| Name | Title | Email | Telephone |
|---|---|---|---|
| Andrew O'Brien | Managing Director | andrew.j.obrien@jpmorgan.com | (212) 270-4345 |
| Douglas Antonacci | Managing Director | douglas.antonacci@jpmorgan.com | (212) 270-4345 |
| Mary Ann Riley | Managing Director | mary.ann.riley@jpmorgan.com | (212) 270-4345 |
| Nels Kauppila | Managing Director | nels.kauppila@jpmorgan.com | (212) 270-4345 |
| Claire O'Connor | Managing Director | claire.oconnor@jpmorgan.com | (212) 270-4345 |
| Cynthia Ogden | Managing Director | cynthia.ogden@jpmorgan.com | (212) 270-4345 |
| Benjamin Thompson | Managing Director | benjamin.gsf.thompson@jpmorgan.com | (212) 270-4345 |
| Charles Caccavo | Vice President | charles.caccavo@jpmorgan.com | (212) 270-4345 |

### Leveraged Finance - Documentation

| Name | Title | Email | Telephone |
|---|---|---|---|
| Gary Spevack | Vice President | gary.l.spevack@jpmorgan.com | (212) 270-5964 |

### Corporate Banking - Financial Sponsors Group

| Name | Title | Email | Telephone |
|---|---|---|---|
| Neil Boylan | Managing Director | neil.boylan@jpmorgan.com | (212) 270-1410 |

**J.P. Morgan Securities Inc.**
277 Park Avenue, 22nd Floor
New York, NY 10172
Tel: (646) 434-0345

### Investment Banking - Financial Sponsors Group

| Name | Title | Email | Telephone |
|---|---|---|---|
| Thomas Cassidy | Managing Director | tom.cassidy@jpmorgan.com | (212) 622-8668 |
| John Gammage | Managing Director | johnc.gammage@jpmorgan.com | (212) 622-7050 |
| Joe Purcell | Vice President | joe.purcell@jpmorgan.com | (212) 622-8444 |
| John LaVoie | Vice President | john.lavoie@jpmorgan.com | (212) 622-8550 |

WERNER HOLDING CO. (DE), INC.

GRN 002024

CONFIDENTIAL

**Citigroup Global Markets Inc.**
390 Greenwich Street, 1st Floor
New York, NY 10013
Fax: (212) 723-8541

### Leveraged Finance

| Name | Title | Email | Telephone |
|------|-------|-------|-----------|
| Stephen R. Sellhausen | Managing Director | stephen.sellhausen@citigroup.com | (212) 723-6588 |
| Jason Marks | Analyst | jason.s.marks@citigroup.com | (212) 723-6946 |

### Loan Syndications

| Name | Title | Email | Telephone |
|------|-------|-------|-----------|
| Judith Fishlow-Minter | Managing Director | judith.fishlowminter@citigroup.com | (212) 723-6935 |
| Emily Bogdanoff | Associate | emily.m.bogdanoff@citigroup.com | (212) 723-6506 |
| Christopher Wood | Analyst | christopher.wood@citigroup.com | (212) 723-6585 |

### Global Loan Sales

| Name | Title | Email | Telephone |
|------|-------|-------|-----------|
| Jonathan Calder | Managing Director | jonathan.d.calder@citigroup.com | (212) 723-6681 |
| Richard Rothschild | Managing Director | richard.rothschild@citigroup.com | (212) 723-6720 |
| Brett Applebaum | Director | brett.h.applebaum@citigroup.com | (212) 723-6744 |
| Jeffrey Ferrell | Director | jeffrey.ferrell@citigroup.com | (212) 723-6609 |
| Martin Pryor | Director | martin.r.pryor@citigroup.com | (212) 723-6934 |
| Melinda Weir | Director | melinda.g.weir@citigroup.com | (212) 723-1407 |
| Joseph Wilson | Director | joseph.t.wilson@citigroup.com | (212) 723-6970 |
| Charles Ferrando | Vice President | charles.ferrando@citigroup.com | (212) 723-6624 |
| Sean Peters | Asst. Vice President | sean.peters@citigroup.com | (212) 723-1406 |
| Peter Benoist | Associate | peter.f.benoist@citigroup.com | (212) 723-6659 |
| Lisa Schneider | Associate | lisa.schneider@citigroup.com | (212) 723-1001 |

**Citigroup Global Markets Inc.**
388 Greenwich Street, 33rd Floor
New York, NY 10013

### Financial Entrepreneurs Group

| Name | Title | Email | Telephone |
|------|-------|-------|-----------|
| Michael Zimmerman | Managing Director | michael.r.zimmerman@citigroup.com | (212) 816-9235 |
| John Katzenberg | Managing Director | john.katzenberg@citigroup.com | (212) 816-7671 |

**Simpson Thacher & Bartlett**
425 Lexington Avenue
New York, NY 10017
Fax: (212) 455-2502

| Name | Title | Email | Telephone |
|------|-------|-------|-----------|
| Frank Huck | Partner | fhuck@stblaw.com | (212) 455-7025 |
| Matthew O'Shea | Associate | moshea@stblaw.com | (212) 455-2304 |

WERNER HOLDING CO. (DE), INC.

**JPMorgan**                    5                    citigroup

GRN 002025

CONFIDENTIAL

## Transaction timetable

| May 2003 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
|  |  |  |  | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

| June 2003 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 |  |  |  |  |  |

| Transaction timetable | |
|---|---|
| **Date** | **Details** |
| Wednesday, May 7 | Transaction launched via Intralinks |
| Friday, May 9 | Lenders Meeting |
|  | Date:    Friday, May 9, 2003 |
|  | Location:  270 Park Avenue (between 47th and 48th Streets) |
|  | 11th Floor, Conference Room F |
|  | New York, NY 10017 |
|  | Time:    9:30 AM Registration |
|  | 10:00 AM Meeting |
|  | Dial-in:  888-394-8091 (Domestic) |
|  | 973-935-2101 (International) |
|  | Passcode: WERNER HOLDING CO. |
|  | Playback:  877-519-4471 (Domestic) |
|  | 973-341-3080 (International) |
|  | Pincode: 3918194 |
| Thursday, May 22 | Final deadline for Lenders to respond to syndicate invitation (by 12:00pm Eastern Standard Time) |
| Monday, June 2 | Final Comments on Documentation due (by 12:00pm Eastern Standard Time) |
| Wednesday, June 4 | Closing |

WERNER HOLDING CO. (DE), INC.

JPMorgan

6

citigroup

GRN 002026

EXHIBIT 24

EXECUTION COPY

May 12, 2003

## TABULATION AGENT AGREEMENT

The Bank of New York
101 Barclay Street, Floor 8 West
New York, New York  10286
Attention:  Corporate Trust Administration

Ladies and Gentlemen:

This letter agreement (the "Agreement") confirms our agreement that, effective the date hereof, The Bank of New York (referred to hereinafter as "you") has been engaged by Werner Holding Co. (DE), Inc. (the "Company") to act as Tabulation Agent in connection with the Company's proposed solicitation (the "Solicitation") of consents (the "Consents") from the holders of its 10% Senior Subordinated Notes due 2007 (the "Notes").  The Solicitation will be made upon the terms and subject to the conditions set forth in the Consent Solicitation Statement, Consent Form and a cover letter to bondholder, which together, as they may be supplemented or amended from time to time, constitute the "Solicitation Materials".  All terms used but not defined herein shall have the meaning ascribed to them in the Solicitation Materials.

The Solicitation will be commenced by the Company on May 12, 2003.  The Solicitation shall expire at 5:00 p.m., New York City time, on May 27, 2003 (the "Initial Expiration Date"), or on such subsequent date or time to which the Company may extend the Solicitation.  Subject to the terms of the Solicitation Materials, the Company expressly reserves the right to extend the Solicitation from time to time and may extend the Solicitation by giving oral (promptly confirmed in writing) or written notice to you before 9:00 a.m., New York City time, on the business day following the scheduled Expiration Date.  The later of the Initial Expiration Date and the latest time and date to which the Solicitation may be so extended is hereinafter referred to as the "Expiration Date".

As Tabulation Agent, you will receive and verify Consents submitted by the Record Holders and maintain a tabulation report and payment schedule in spreadsheet form.  You will provide to the Company and to MacKenzie Partners, Inc., as information agent for the Solicitation (the "Information Agent"), the tabulation report and payment schedule, copies of the Consents received by you and an Affidavit of Tabulation

III 008551

verifying the tabulation report and payment schedule. As Tabulation Agent, you will be subject to the following terms and conditions.

1.     You are to examine each of the Consent Forms and any other documents delivered, mailed or otherwise sent to you by or for Record Holders to ascertain whether (i) the Consent Forms and any such other documents are duly executed and properly completed in accordance with instructions set forth therein, and (ii) the Consent Forms have otherwise been properly executed and delivered. In each case where the Consent Forms or any other documents have been improperly completed or executed or any of the Consent Forms are not in proper form for transfer or where some other irregularity in connection with the acceptance of the Solicitation exists, you will endeavor to inform the affected Record Holder of the need for fulfillment of all requirements and to take any other action as may be reasonably necessary or advisable to cause such irregularity to be corrected.

2.     With the approval of a designated authorized officer of the Company, or of Gibson, Dunn & Crutcher LLP, counsel to the Company ("GD&C") (such approval, if given orally, to be promptly confirmed in writing), or any other party designated in writing by an officer of the Company, you are authorized to waive any irregularities in connection with any Consents given pursuant to the Solicitation.

3.     Consents may be made only as set forth in Solicitation Materials, and Consent Forms shall be considered properly executed and delivered only when executed and delivered as specified in the Solicitation Materials. Notwithstanding the provisions of this Section 3, only Consent Forms that the Company or GD&C shall approve as having been properly executed and delivered shall be considered to be properly executed and delivered (such approval, if given orally, shall be promptly confirmed in writing).

4.     You shall advise the Company with respect to any Consents received subsequent to the Expiration Date and accept its instructions with respect to disposition of such Consents.

5.     Payment to Record Holders in consideration for giving Consents pursuant to the terms and conditions of the Solicitation (the "Consent Payments") will be made by wire transfer to The Depositary Trust Company ("DTC") on behalf of the Company by you at the rate of $15.00 per $1,000.00 of principal amount of the Notes as soon as practicable after the funds referred to below are received by you from the Company.

Immediately available funds will be deposited with you on the day you are to wire funds in respect of the Consent Payments to DTC. After such payment, you shall promptly present the Consent Forms to the Company, together with any other documents reasonably requested by the Company, including a certificate by you indicating the number of Consent Forms validly executed and delivered.

2

III  008552

6.      You are not authorized to pay or offer to pay any concessions, commissions or solicitation fees to any broker, dealer, bank or other persons or to engage or utilize any person to solicit Consents. Except as provided in Section 1 of this Agreement, you are not authorized to give any information or to make any representations in connection with the Solicitation, or to pay or offer to pay anyone else to do so, other than as set forth in the Solicitation Materials.

7.      As Tabulation Agent hereunder you:

(a)      shall not be liable for any action or omission to act unless the same constitutes your own gross negligence, willful misconduct or bad faith, and in no event shall you be liable to a Record Holder, the Company or any third party for special, indirect or consequential damages, or lost profits, arising in connection with this Agreement;

(b)      shall have no duties or obligations other than those specifically set forth herein or as may be subsequently agreed to in writing between you and the Company;

(c)      will be regarded as making no representations and having no responsibilities as to the validity, sufficiency, value or genuineness of any of the Solicitation Materials, and will not be required to make any representation as to the validity, value or genuineness of the Solicitation;

(d)      shall not be obligated to take any legal action hereunder which might in your judgment involve any expense or liability, unless you shall have been furnished with indemnity satisfactory to you;

(e)      may conclusively rely on and shall be protected in acting in reliance upon any certificate, instrument, opinion, notice, letter, telegram or other document or security delivered to you and believed by you to be genuine and to have been signed or presented by any authorized officer of the Company;

(f)      may act upon any statement, request, document, certificate, agreement or other instrument whatsoever, not only as to its due execution and validity and effectiveness of its provisions, but also as to the truth and accuracy of any information contained therein, which you shall in good faith believe to be genuine or to have been signed or presented by any authorized officer of the Company;

(g)      may conclusively rely on and shall be protected in acting upon written or oral instructions from any authorized officer of the Company;

(h)      may consult with counsel of your selection with respect to any questions relating to your duties and responsibilities and the advice or opinion of such counsel shall be full and complete authorization and protection in respect of any action

3

III 008553

taken, suffered or omitted to be taken by you hereunder in good faith and in accordance with the advice or opinion of such counsel; and

(i)    shall not advise any person as to the wisdom of giving their Consent pursuant to the Solicitation or as to the market value or decline or appreciation in market value of the Notes.

8.    All requests for information relating to the Solicitation shall be directed to the Information Agent.

9.    You are authorized to cooperate with and to furnish information to any organization (and its representatives) designated from time to time by the Company or GD&C in any manner reasonably requested by it in connection with the Solicitation.

10.    You shall advise the Company, GD&C, the Solicitation Agents, the Information Agent and such other person or persons as Company may request, daily up to and including the Expiration Date, as to the number of Consents which have been executed and delivered pursuant to the Solicitation and the items received by you pursuant to this Agreement. In addition, you will also inform, and cooperate in making available to, the aforementioned persons upon oral request made from time to time prior to the Expiration Date of such other information as they may reasonably request. Such cooperation shall include, without limitation, the granting by you to the Company and such person as the Company may request, of access to those persons on your staff who are responsible for receiving Consents, in order to ensure that immediately prior to the Initial Expiration Date and each other Expiration Date, if any, the Company shall have received information in sufficient detail to enable it to decide whether to extend the Solicitation. You shall prepare a final list of all Record Holders whose Consents were executed and delivered, the principal amount of Notes consenting and deliver such list to the Company.

11.    Consents delivered to you pursuant to the Solicitation shall be preserved by you for a period of time at least equal to the period of time you preserve other records pertaining to consent solicitations.

12.    For services rendered as Tabulation Agent hereunder, you shall be entitled to such compensation as shall be agreed in writing between the company and you. The provisions of this section shall survive the termination of this Agreement.

13.    You hereby acknowledge receipt of the Solicitation Materials. Any inconsistency between this Agreement, on the one hand, and the Solicitation Materials (as they may be amended from time to time), on the other hand, shall be resolved in favor of the latter documents, except with respect to your duties, liabilities and indemnification as Tabulation Agent.

4

**III 008554**

14.    The Company covenants and agrees to fully indemnify and hold you harmless against any and all loss, liability, cost or expense, including reasonable attorneys' fees and expenses, incurred without gross negligence, willful misconduct or bad faith on your part, arising out of or in connection with any act, omission, delay or refusal made by you in reliance upon any signature, endorsement, assignment, certificate, order, request, notice, instruction or other instrument or document believed by you in good faith to be valid, genuine and sufficient and in accepting any Consent believed by you in good faith to be authorized, and in delaying or refusing in good faith to accept any Consent believed by you in good faith to not be valid, genuine, sufficient or authorized. In each case the Company shall be notified by you, by letter or facsimile transmission, of the written assertion of a claim against you or of any other action commenced against you, promptly after you shall have received any such written assertion or shall have been served with a summons in connection therewith. The Company shall be entitled to participate at its own expense in the defense of any such claim or other action and, if the Company so elects, the Company shall assume the defense of any suit brought to enforce any such claim. In the event that the Company shall assume the defense of any such suit, the Company shall not be liable for the fees and expenses of any additional counsel thereafter retained by you, so long as the Company shall retain counsel satisfactory to you to defend such suit, and so long as there is not, in the reasonable judgment of such counsel, a conflict of interest between you and the Company. The provisions of this section shall survive the termination of this Agreement.

15.    You shall arrange to comply with all requirements under the tax laws of the United States, including those relating to missing Tax Identification Numbers, and shall file any appropriate reports with the Internal Revenue Service (e.g., 1099, 1099B, etc.). The Company understands that you are required to deduct 30% on payments to Record Holders who have not supplied their correct Taxpayer Identification Number or required certification. Such funds will be turned over to the Internal Revenue Service.

16.    You shall deliver or cause to be delivered in a timely manner to each governmental authority to which any taxes are payable in respect of the Consent and the payments made to consenting Record Holders, the Company's check in the amount of all transfer taxes so payable; provided, however, that you shall reimburse the Company for amounts refunded to you in respect of your payment of any such transfer taxes, at such time as such refund is received by you.

17.    This Agreement and your appointment as Tabulation Agent hereunder shall be construed and enforced in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within such state, and without regard to conflicts of laws principles, and shall inure to the benefit of, and the obligations created hereby shall be binding upon, the successors and assigns of each of the parties hereto.

III 008555

18.     This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same agreement.

19.     In case any provision of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

20.     This Agreement shall not be deemed or construed to be modified, amended, rescinded, cancelled or waived, in whole or in part, except by a written instrument signed by a duly authorized representative of the party to be charged. This Agreement may not be modified orally.

21.     Unless otherwise provided herein, all notices, requests and other communications to any party hereunder shall be in writing (including facsimile or similar writing) and shall be given to such party, addressed to it, at its address or telecopy number set forth below:

If to the Company:

Werner Holding Co. (DE), Inc.
93 Werner Road
Greenville, Pennsylvania 16125
Attention: Eric J. Werner, Esq.
Facsimile: (724) 589-5898

with a copy to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
Attention: E. Michael Greaney, Esq.
Facsimile: (212) 351-4035

If to the Tabulation Agent:

The Bank of New York
101 Barclay Street
Floor 8 West
New York, New York 10286
Attention: Corporate Trust Administration
Facsimile: (212) 815-5707

22.     Unless terminated earlier by the parties hereto, this Agreement shall terminate 90 days following the Expiration Date.  Notwithstanding the foregoing,

6

III 008556

Sections 13 and 15 shall survive the termination of this Agreement. Upon any termination of this Agreement, you shall promptly deliver to the Company any funds or property then held by you as Tabulation Agent under this Agreement.

23.    This Agreement shall be binding and effective as of the date hereof.


[Remainder of this page intentionally left blank.]

7

III 008557

Please acknowledge receipt of this Agreement and confirm the arrangements herein provided by signing and returning the enclosed copy.

WERNER HOLDING CO. (DE), INC.

By: _____

Name:  Eric J. Werner
Title:  Vice President, Secretary &
General Counsel

Accepted as of the date first
above written:

THE BANK OF NEW YORK, as Tabulation Agent

By: _____
Name:
Title:

III 008558

Please acknowledge receipt of this Agreement and confirm the arrangements herein provided by signing and returning the enclosed copy.

WERNER HOLDING CO. (DE), INC.

By: _____
Name:
Title:

Accepted as of the date first
above written:

THE BANK OF NEW YORK, as Tabulation Agent

By: *Cynthia Chaney*
Name:    CYNTHIA J CHANEY
Title:    VICE PRESIDENT

III  008559

EXHIBIT 25

**WERNER HOLDING CO. (DE), INC.**
93 Werner Road
Greenville, Pennsylvania 16125

**May 16, 2003**

**To the Holders of our 10% Senior Subordinated Notes due 2007:**

Werner Holding Co. (DE), Inc. (the "**Company**") is writing to recommend, and to solicit your consent to, certain amendments (the "**Proposed Amendments**") to the Indenture, dated as of November 24, 1997, among the Company, the guarantors named therein and The Bank of New York (as successor to IBJ Schroder Bank and Trust Company) (the "**Indenture**"), governing the Company's outstanding $135.0 million aggregate principal amount 10% Senior Subordinated Notes due 2007 (the "**Notes**"). The Proposed Amendments are necessary to allow the Company and its parent (Werner Holding Co. (PA), Inc. ("**Holding (PA)**")) to complete a recapitalization transaction (the "**Recapitalization Transaction**"), as described in the enclosed Consent Solicitation Statement (the "**Consent Solicitation Statement**"). The Board of Directors of Holding (PA) has approved the Recapitalization Transaction, and accordingly, we advise you to vote "for" the Proposed Amendments by completing the enclosed consent form (the "**Consent Form**").

The Proposed Amendments modify certain restrictive covenants contained in the Indenture in order to permit (i) the payment of a dividend necessary to fund, among other things, a repurchase of Holding (PA)'s capital stock pursuant to the Recapitalization Transaction and (ii) the payment of fees to certain affiliates of the Company and a "transaction bonus" in respect of the Recapitalization Transaction to certain officers and employees.

This solicitation is being made subject to the terms and conditions set forth in the Consent Solicitation Statement and in the accompanying Consent Form. Adoption of the Proposed Amendments requires the affirmative consent of the holders of a majority in principal amount of the outstanding Notes. The Company will make payments of $15.00 cash per each $1,000.00 principal amount of Notes to each holder who consents to the Proposed Amendments, subject to the restrictions and upon the conditions discussed in the Consent Solicitation Statement.

We urge you to carefully read the Consent Solicitation Statement in order to vote your interests. **Your consent is important because approval of the Proposed Amendments requires the affirmative vote of a majority in principal amount of the outstanding Notes, and failure to consent will have the same effect as a vote against the Proposed Amendments.** To be sure your consent is represented, please sign, date and return the enclosed Consent Form on or before May 28, 2003 to:

### THE BANK OF NEW YORK

| *By Overnight Courier:* | *By Hand:* | *By Registered or Certified Mail:* |
|---|---|---|
| The Bank of New York | The Bank of New York | The Bank of New York |
| Corporate Trust Operations | Corporate Trust Operations | Corporate Trust Operations |
| Reorganization Unit | Reorganization Unit | Reorganization Unit |
| 101 Barclay Street – 7E | 101 Barclay Street – Lobby Window | 101 Barclay Street – 7E |
| New York, NY 10286 | New York, NY 10286 | New York, NY 10286 |
| Attn:  Mr. Bernard Arsenec | Attn:  Mr. Bernard Arsenec | Attn:  Mr. Bernard Arsenec |

By Facsimile Transmission (for eligible institutions only):
(212) 298-1915
Confirm by Telephone
(212) 815-5098

**If you have any questions, please do not hesitate to contact the Company's information agent, MacKenzie Partners, Inc., toll free at (800) 322-2885.**

Very truly yours,

Werner Holding Co. (DE), Inc.

EXHIBIT 26

## WERNER HOLDING CO. (PA), INC.

---oOo---

MINUTES OF THE SPECIAL MEETING OF SHAREHOLDERS

---oOo---

May 30, 2003

In accordance with due and sufficient notice properly given by the Secretary of Werner Holding Co. (PA), Inc., (the "Corporation"), a Pennsylvania corporation, on May 16, 2003, to each holder of Class A, B, C, D and E Stock of the Corporation, a Special Meeting of Shareholders was held at Investcorp International Inc., 280 Park Avenue, 36th Floor, West Tower, New York, New York, on Friday, May 30, 2003.

The meeting was called to order at 9:00 a.m. by Donald M. Werner, the Chairman of the meeting. The Shareholders entitled to vote that were present at the meeting included: Karen Lynn Moseska, Donald M. Werner, and Eric J. Werner. Also present at the meeting by invitation were E. Michael Greaney, Esquire, of Gibson, Dunn & Crutcher LLP and Wendy A. Meikle, Legal Administration Supervisor at Werner Co. Eric J. Werner, Secretary of the Corporation, recorded these minutes.

The Chairman welcomed those in attendance and made some preliminary comments regarding the conduct and agenda of the meeting. The Chairman then explained the procedure for the appointment of the Inspector of Elections. The record date for the determination of shareholders entitled to notice of and to vote at the meeting was fixed as the close of business on May 7, 2003. At this time the Chairman requested that the Secretary be sworn in by executing the Oath of Inspector of Elections. Following his appointment as the Inspector of Elections, the Secretary was requested to determine the presence of a quorum and to serve as judge of voting on all matters requiring a shareholder vote at the meeting. The Secretary reported that 1,596.6508 shares of the 1,879.5454 total shares, representing 84.95%, of the Corporation's Class A Stock issued and outstanding and entitled to vote at the meeting, 16,768.7113 shares of the 21,774.9346 shares, representing 77.01%, of the Corporation's Class B Stock issued and outstanding and entitled to vote at the meeting, 5,015.7790 shares of the 5,515.7790 shares, representing 90.94%, of the Corporation's Class C Stock issued and outstanding and entitled to vote at the meeting, all 1,000 shares, representing 100%, of the Corporation's Class D Stock issued and outstanding and entitled to vote at the meeting, and all 45,000 shares, representing 100%, of the Corporation's Class E Stock issued and outstanding and entitled to vote at the meeting, were represented at the meeting either in person or by proxy. The Secretary announced that a quorum was present for all purposes and that the meeting was lawfully and properly convened and competent to proceed with the transaction of business for which it had been called.

Following a review of the Proposal, as described in detail in the proxy materials, the Chairman noted that there were no material changes, but expected there would be an increase in the fees paid to the bondholders. After a brief discussion, the Chairman asked if there were any questions or comments. Karen Lynn Moseska did not have any questions, but wanted to thank everyone for their hard work.

Werner Holding Co. (PA), Inc.                                        May 30, 2003
Minutes of the Special Meeting of Shareholders                      Page 2 of 2

The Chairman declared the polls for the proposal to be open and requested that any shareholder that had not already voted by proxy or any shareholder wishing to change a previous vote submit their ballot. After the polls were closed the Inspector of Elections tabulated the votes and announced the results of the vote as follows:

With respect to the Class A Common Stock, 1,596.6508 shares, representing 100%, have been cast in favor of the Proposal to approve the amendment to the Corporation's Articles of Incorporation and the Recapitalization and Stock Purchase Agreement.

With respect to the Class B Common Stock, 16,768.7113 shares, representing 100%, have been cast in favor of the Proposal to approve the amendment to the Corporation's Articles of Incorporation and the Recapitalization and Stock Purchase Agreement.

With respect to the Class C Common Stock, 5,015.7790 shares, representing 100%, have been cast in favor of the Proposal to approve the amendment to the Corporation's Articles of Incorporation and the Recapitalization and Stock Purchase Agreement.

With respect to the Class D Common Stock, 1,000 shares, representing 100%, have been cast in favor of the Proposal to approve the amendment to the Corporation's Articles of Incorporation and the Recapitalization and Stock Purchase Agreement.

With respect to the Class E Common Stock, 45,000 shares, representing 100%, have been cast in favor of the Proposal to approve the amendment to the Corporation's Articles of Incorporation and the Recapitalization and Stock Purchase Agreement.

The Chairman announced that the Proposal received a unanimous vote of the holders of the outstanding shares of each of the classes casting votes on the amendment to the Corporation's Articles of Incorporation and the Recapitalization and Stock Purchase Agreement, and is duly adopted. He further directed that the Certificate of the Inspector of Elections be filed with the minutes of the meeting.

The Chairman asked if there were any other matters which should properly come before the meeting. There being no further business to come before the meeting, after motion duly made and seconded, it was unanimously resolved to adjourn at 9:25 a.m.

A true record.

Attest:

Eric J. Werner, Secretary
[Corporate Seal]

## OATH OF INSPECTOR OF ELECTION

I, the undersigned, duly appointed Inspector of Election, being duly sworn, do solemnly swear that I will fairly and impartially perform my duties as Inspector of Election at the special meeting of shareholders of Werner Holding Co. (PA), Inc. to be held on May 30, 2003 and will faithfully and diligently canvass the votes cast at such meeting and honestly and truthfully report the results of the voting at said meeting.

INSPECTOR OF ELECTION:

By: _____

Eric J. Werner

**Werner Holding Co. (PA), Inc.**

**Special Meeting of Shareholders**
**May 30, 2003**

**Certificate and Report of Inspector of Election**

I, the undersigned, having been duly qualified, do hereby certify the following:

That at the special meeting of shareholders of Werner Holding Co. (PA), Inc. (the "Company"), held on May 30, 2003, at 9:00 a.m., local time, at the offices of Investcorp International Inc., 280 Park Avenue, 36th Floor, West Tower, New York, New York, 10017, 1,596.6508 f the 1,879.5454 shares, representing 84.95% of the Company's Class A common stock outstanding as of May 7, 2003 and entitled to vote at the meeting, 16,768.7113 of the 21,774.9346 shares, representing 77.01% of the Company's Class B common stock outstanding as of May 7, 2003 and entitled to vote at the meeting, 5,015.7790 of the 5,515.7790 shares, representing 90.94% of the Company's Class C common stock outstanding as of May 7, 2003 and entitled to vote at the meeting, 1,000.0000 of the 1,000.0000 shares, representing 100% of the Company's Class D common stock outstanding as of May 7, 2003 and entitled to vote at the meeting and 45,000.0000 of the 45,000.0000 shares, representing 100% of the Company's Class E common stock outstanding as of May 7, 2003 and entitled to vote at the meeting were reported in person or by proxy.

That I inspected the signed proxies submitted at or prior to the meeting and the ballots properly voted at the meeting and found the same to be in proper form.

That I did receive the votes of the shareholders by ballot or proxy for the approval and adoption of the amendment to the Company's Articles of Incorporation (the "Amended Articles") and the Recapitalization and Stock Purchase Agreement (the "Recapitalization Agreement"), in the form described in the Company's Proxy Statement dated May 16, 2003 and did canvass the votes cast.

That the results of the vote taken at such meeting were as follows:

| Class A Common Stock | Votes |
|---|---|
| FOR | 1,596.6508 |
| AGAINST | 0 |
| Class B Common Stock | Votes |
| FOR | 16,768.7113 |
| AGAINST | 0 |

| Class C Common Stock | Votes |
|---|---|
| FOR | 5,015.7790 |
| AGAINST | 0 |

| Class D Common Stock | Votes |
|---|---|
| FOR | 50,681.8000 |
| AGAINST | 0 |

| Class E Common Stock | Votes |
|---|---|
| FOR | 45,000.0000 |
| AGAINST | 0 |

That a majority of the shares of the Company's Class A common stock entitled to vote, a majority of the shares of the Company's Class B common stock entitled to vote, a majority of the shares of the Company's Class C common stock entitled to vote, a majority of the shares of the Company's Class D common stock entitled to vote and a majority of the shares of the Company's Class E common stock entitled to vote, have been voted to approve and adopt the Amended Articles and the Recapitalization Agreement.

IN WITNESS WHEREOF, I have made this certificate and have hereunder set my hand, this 30th day of May 2003.

Eric J. Werner
Corporate Secretary

2

EXHIBIT 27

## Meikle, Wendy A.

---

**From:**     Meikle, Wendy A.

**Sent:**      Friday, June 06, 2003 2:13 PM

**To:**        'Mary.C.Barrezueta@chase.com'

**Subject:** WHDE Account

---

Pursuant to the executed account documents provided to you, please proceed with the opening of a business account (acct. no. 304154938) in the name of Werner Holding Co. (DE), Inc., (tax ID 25-1581345).

Werner Holding Co. (DE), Inc., is a Delaware corporation, and it's business address is 1105 North Market Street, Suite 1300, P.O. Box 8985, Wilmington, DE 19899-8985. Werner Holding Co. (DE), Inc. is a wholly owned subsidiary of Werner Holding Co. (PA), Inc., a Pennsylvania corporation, which stock is held by 160+ individual, institutional and corporate shareholders.

The purpose of the account is for the consummation of transactions in connection with a Recapitalization and Stock Purchase Agreement, by and among Werner Holding Co. (PA), Inc., certain of it's shareholders, and Green Equity Investors III, L.P.

Please send the account statement and account analysis to the attention of Larry V. Friend, Vice President, Treasurer and Chief Financial Officer, 93 Werner Road, Greenville, PA, 16125.

The company contact for this account is Eric J. Werner, Vice President, Secretary and General Counsel, 93 Werner Road, Greenville, PA 16125, telephone 724-588-2000 ext. 2641, facsimile 724-588-0618, e-mail ejwerner@wernerco.com.

It is not anticipated that checks will be drawn on this account. If you have any questions, or require additional information, please contact me.

## Meikle, Wendy A.

**From:**   Meikle, Wendy A.
**Sent:**    Friday, June 06, 2003 2:13 PM
**To:**      'Mary.C.Barrezueta@chase.com'
**Subject:** WHPA Account

---

Pursuant to the executed account documents provided to you, please proceed with the opening of a business account (acct. no. 304154946) in the name of Werner Holding Co. (PA), Inc., (tax ID 25-0906895).

Werner Holding Co. (PA), Inc., is a Pennsylvania corporation, and it's business address is 93 Werner Road, Greenville, PA 16125. The stock of Werner Holding Co. (PA), Inc., is held by 160+ individual, institutional and corporate shareholders.

The purpose of the account is for the consummation of transactions in connection with a Recapitalization and Stock Purchase Agreement, by and among Werner Holding Co. (PA), Inc., certain of it's shareholders, and Green Equity Investors III, L.P.

Please send the account statement and account analysis to the attention of Larry V. Friend, Vice President, Treasurer and Chief Financial Officer, 93 Werner Road, Greenville, PA, 16125.

The company contact for this account is Eric J. Werner, Vice President, Secretary and General Counsel, 93 Werner Road, Greenville, PA 16125, telephone 724-588-2000 ext. 2641, facsimile 724-588-0618, e-mail ejwerner@wernerco.com.

It is anticipated that checks will be drawn on this account. If you have any questions, or require additional information, please contact me.

EXHIBIT 28

# WERNER HOLDING CO. (DE), INC.

P.O. Box 8985
1105 North Market Street, Suite 1300
Wilmington, Delaware  19899

Telephone 302/478-5723  •  Telecopier 302/427-7663

June 11, 2003

Joseph Brusco
JPMorgan Chase Bank
270 Park Avenue, 15th Floor
New York, NY 10017

Re:    Werner Holding Co. (DE), Inc. Account No. 304154938

Dear Joe:

Upon receipt of the incoming wires of $180,000,000 into this account, please proceed with the wire instructions as outlined on the attached spreadsheet.  Should you have any questions or issues with any of the wires, please contact Wendy A. Meikle at 330-883-9356 for further instruction.   In addition please provide Wendy with all funds confirmations by e-mail at wameikle@wernerco.com.  Thank you.

Sincerely,

Eric J. Werner
Vice President, Secretary
and General Counsel

## WERNER HOLDINGS FUNDS FLOW JUNE 11, 2000

| DEBIT ACCOUNT | Name | Proceeds Amount | Financial Institution | ABA Number | For Credit To: Account Name | For Credit To: Account Number | For Further Credit: Acct. Name and Number | Account Rep Name & Number |
|---|---|---|---|---|---|---|---|---|
| Werner Holding Co. (DE), Inc. | Deutsche Bank Existing Term Loans & Accrued Int. & Fees | $116,145,447.90 | Deutsche Bank Trust Company Americas | 021-001-033 | Commercial Loan Department | 99-40-12-68 | Ref: Werner Co | Stephanie Felin 847-615-4194 |
| Werner Holding Co. (DE), Inc. | 304154938 JP Morgan Bridge Loan | $85,485,000.00 | JPMorgan Chase | 021-000-021 | Werner Holding Co. (DE), Inc. | 304154646 | Ref.: Recap Distribution Dividend | |
| Werner Holding Co. (DE), Inc. | 304154938 Content Solicitation Expense | $4,050,000.00 | Bank of New York | 021-000-018 | Corporate Trust Agency | 111-565 | Account #07263A: Ref.: Consent Payment | |
| Werner Holding Co. (DE), Inc. | 304154938 JP Morgan / Citi - Underwriting Fees & Expenses | $5,857,508.05 | JPMorgan Chase | 021-000-021 | Attn: Loan and Agency Services | 323225872 | Re: Werner Holding Closing Fees | |
| Werner Holding Co. (DE), Inc. | 304154938 Citigroup Advisory Fees & Expenses | $1,904,506.48 | Chase Bank | 021-000-021 | | 098199036 | Inv # C8B3446A8Y31157(FINAL) | Attn: Vincent Petignano |
| Werner Holding Co. (DE), Inc. | 304154938 GDC | $1,650,000.00 | Wells Fargo Bank | 121-000-248 | Gibson, Dunn & Crutcher LLP | 4660-146039 | Ref.: 03263-01119 | Attn: Julie Saavedra (212)-253-6146 |
| Werner Holding Co. (DE), Inc. | 304154938 JP Morgan M&A Fees and Expenses | $1,044,525.01 | JPMorgan Chase Bank | 021-000-021 | JP Morgan Securities Inc. | 066914523 JPMSI-IB BEST | Re: Invoice M032767CAG | |
| Werner Holding Co. (DE), Inc. | 304154938 Deloitte & Touche LLP | $517,393.00 | JPMorgan Chase | 021-000-021 | | 9101-044392 | Reference Invoice number 07342711 | |
| Werner Holding Co. (DE), Inc. | 304154938 Skadden - LGP Legal | $465,000.00 | Citibank, N.A. | 021-000-089 | | 3006071AN | Invoice # 995840 | |
| Werner Holding Co. (DE), Inc. | 304154938 Cohen & Grigsby | $150,000.00 | PNC Bank, N.A. | 043-000-096 | | 000790755 | Ref: Werner | |
| Werner Holding Co. (DE), Inc. | 304154938 PricewaterhouseCoopers | $113,000.00 | Citibank NA | 021-000-089 | PricewaterhouseCoopers LLP | 30406437 | Ref: 376554-1222-00; Invoice Number 2274-000000-06 | |
| Werner Holding Co. (DE), Inc. | 304154938 LGP Out of Pocket | $109,245.92 | Wells Fargo Bank | 121 000 248 | | 0266-116369 | Ref: Werner Out-of-Pocket | |
| Werner Holding Co. (DE), Inc. | 304154938 III Out of Pocket | $105,000.00 | Chase, New York | 021-000-021 | Investoro International Inc. | 5441-734640 | Ref: III Werner Expenses | |
| Werner Holding Co. (DE), Inc. | 304154938 S&P | $57,500.00 | Bank of America | 071-000-039 | Standard & Poor's | 81684-10104 | Invoice # 10000725 | |
| Werner Holding Co. (DE), Inc. | 304154938 Murray Devine - Solvency Opinion & Expenses | $48,050.00 | FIRST REPUBLIC BANK | 321-081-669 | | 1110799-1 | Invoice # 03-0509 | |
| Werner Holding Co. (DE), Inc. | 304154938 Moody's | $48,000.00 | SUNTRUST BANK | 061-000-104 | | 88010582847 | Invoice # 01-049275-008 | |
| Werner Holding Co. (DE), Inc. | 304154938 IRR Donnelly | $32,000.00 | Bank of America | 026-009-593 | | 1233552859 | Invoice # 1200046108 | |
| Werner Holding Co. (DE), Inc. | 304154938 Bank Penta LLP (LGP PA counsel) | $21,344.33 | PNC Bank, N.A. | 043-000-122 | | 1005119350 | Invoice # 1200046109 100 | |
| Werner Holding Co. (DE), Inc. | 304154938 Marketing Edge Consulting LLC (LGP Mkt Research) | $20,000.00 | Fleet Bank | 011-500-010 | | 9414-077271 | Ref # 115536-001101829682Fisher | |
| Werner Holding Co. (DE), Inc. | 304154938 Assn Risk Services Companies, Inc. | $20,000.00 | Bank One | 071000013 | | 5305653 | Invoice number 001662-MON07 | |
| Werner Holding Co. (DE), Inc. | 304154938 White & Case (DB Counsel) | $19,250.00 | Bank of New York | 021-000-018 | White & Case LLP | 3751058396 | Invoice number 8700000100721 | |
| Werner Holding Co. (DE), Inc. | 304154938 Cuddy & Feder LLP (LGP HSR) | $13,571.47 | Citibank, F.S.B. | 321-171-184 | | 620141059 | 6301-04004538 BFCO - BT ALEX BROWN | |
| Werner Holding Co. (DE), Inc. | 304154938 Tabulation Agent Fee: BNY | $10,000.00 | Bank of New York | 021-000-018 | Corporate Trust Agency | 0012865511 | Client # 139304 | |
| Werner Holding Co. (DE), Inc. | 304154938 Merrill Electronic Data Room | $7,695.28 | Bank of New York | 021-000-018 | | 111-565 | Account #07263A: Ref.: Consent Fees | |
| Werner Holding Co. (DE), Inc. | 304154938 Reed Smith | $5,711.65 | Mellon Bank N.A. | 043-000-261 | | 1702-2568 4510 | Invoice Number: 10400041 | |
| Werner Holding Co. (PA), Inc. | **Addition to Werner Holding Co. (PA) Wires** | | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 Step Investments Limited | $12,237,502.85 | Chase Bank, New York | 021-000-021 | Investoro Bank BSC | 5447-07207 | Step Investments Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 WL Holdings Limited | $11,119,358.84 | Chase Bank, New York | 021-000-021 | Investoro Bank BSC | 5447-07207 | WL Holdings Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 Equity WEFA Limited | $10,392,910.84 | Chase Bank, New York | 021-000-021 | Investoro Bank BSC | 5447-07207 | Equity WEFA Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 Climbing Products Limited | $9,883,063.94 | Chase Bank, New York | 021-000-021 | Investoro Bank BSC | 5447-07207 | Climbing Products Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 Ladder Equity Limited | $8,883,063.94 | Chase Bank, New York | 021-000-021 | Investoro Bank BSC | 5447-07207 | Ladder Equity Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 Werner Equity Limited | $8,883,063.94 | Chase Bank, New York | 021-000-021 | Investoro Bank BSC | 5447-07207 | Werner Equity Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 Investoro Investments Limited | $8,883,063.94 | Chase Bank, New York | 021-000-021 | Investoro Bank BSC | 5447-07207 | Investoro Investments Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 Werner IP Limited | $5,529,611.74 | Chase Bank, New York | 021-000-021 | Investoro Bank BSC | 5447-07207 | Werner Investments Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 Investoro Werner Holdings L.P. | $5,137,510.24 | Chase Bank, New York | 021-000-021 | Investoro Bank BSC | 5447-07207 | Investoro Werner Holdings L.P. | |
| Werner Holding Co. (PA), Inc. | 304154646 Ambielle Limited | $3,224,800.37 | Chase Bank, New York | 021-000-021 | Investoro Bank BSC | 5447-07207 | Ambielle Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 Cooperstown Limited | $3,224,800.37 | Chase Bank, New York | 021-000-021 | Investoro Bank BSC | 5447-07207 | Cooperstown Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 Finico Limited | $3,224,800.37 | Chase Bank, New York | 021-000-021 | Investoro Bank BSC | 5447-07207 | Finico Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 Pilates Limited | $3,224,116.80 | Chase Bank, New York | 021-000-021 | Investoro Bank BSC | 5447-07207 | Pilates Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 Craig W. Werner Family Limited Partnership | | Northern Trust Chicago | 071000152 | General Ledger Account | 5186001000 | Craig Werner Family Limited Partnership | |
| Werner Holding Co. (PA), Inc. | 304154646 LGP Deal Fee | $2,500,000.00 | Chase, New York | 021000021 | | 096/5163093 | Ref: Werner Deal Fee | Craig Werner Deal Fee |
| Werner Holding Co. (PA), Inc. | 304154646 JP Morgan (Suisse) SA | $2,401,000.00 | Chase Bank, New York | 021-000-021 | JP Morgan (Suisse) SA | 544 | Ref: JP Morgan (Suisse) SA | |
| Werner Holding Co. (PA), Inc. | 304154646 Robert I. Werner - Irrev. Trust dated 8/30/94 | $2,240,291.38 | JP Morgan Chase, NYC | 021000021 | Goldman Sachs & Co. | 9300011483 | Robert I Werner Irrev Trust Acct. No. 020475989 | Tricia Stringer 312-655-4600 |
| Werner Holding Co. (PA), Inc. | 304154646 Richmond Drive Enterprises, L.P. | $2,059,296.17 | CITIBANK, NY, NY | 021000089 | Charles Schwab & Co. Inc | 40553953 | Richmond Drive Enterprises LP Acct. No. 2258-2957 | Alyson or Lynn 888-231-2955 ext. 4 |
| Werner Holding Co. (PA), Inc. | 304154646 Michael Werner, Trustee of Michael E. Werner Rev. Trust UAD 1/2/96 | $2,057,170.76 | Mellon Bank, Pittsburgh, PA | 043000261 | Merrill Lynch | 1011730 | Michael Werner Revocable Trust UAD 1/2/96 Acct. No. 02K-22987 | Al Shiksa 312-496-6220 |
| Werner Holding Co. (PA), Inc. | 304154646 Bruce D. Werner - Trust | $2,028,074 | Mellon Bank Chicago | 071000152 | General Ledger Account | 5186001000 | Bruce D Werner Trust Acct. No. 23-21161 | Stephanie Felin 847-615-3088 |
| Werner Holding Co. (PA), Inc. | 304154646 Jeffrey R. Ackerman, Successor Trustee of Elizabeth W. Ackerman | $2,019,514.50 | Fiduciary Trust International, NY | 026007922 | The Ackerman Trust, Cananda | 420470718 | | George Castrudeda 212-632-3046 |
| Werner Holding Co. (PA), Inc. | 304154646 Eric J. Werner | $1,695,101.05 | Mellon Bank, Pittsburgh, PA | 043000261 | Merrill Lynch Denver Service Center | 1011730212 | Eric J. and Melanie R. Werner Acct. No. 08G-10787 | Nick Palomiki 724-742-7383 |
| Werner Holding Co. (PA), Inc. | 304154646 Alligator Partners, L.P. | $1,615,102.53 | National City Bank | 041000124 | Alligator Partners, LP | 432042000 BNF # 271155 | | David J. McGuire 216-222-3726 |
| Werner Holding Co. (PA), Inc. | 304154646 Michael J. Solot | $1,274,467.19 | Mellon Bank, Pittsburgh, PA | 043000261 | Merrill Lynch | 1011730 | Michael J. Solot Acct. No. 020108042 | Janice Cope 312-496-6220 |
| Werner Holding Co. (PA), Inc. | 304154646 Donald M. Werner | $1,095,618.54 | JP Morgan Chase, NYC | 021000021 | Goldman Sachs | 06198038 | Donald M Werner Acct No. 020108542 | Angela Montalbo 215-656-7802 |
| Werner Holding Co. (PA), Inc. | 304154646 Robert I. Werner | $1,000,809.57 | JP Morgan Chase, NYC | 021000021 | Smith Barney | | Robert I Werner Acct. No. 576-50661-19-467 | Julie Grant 312-648-4506 |
| Werner Holding Co. (PA), Inc. | 304154646 Del Fee | $1,000,000.00 | Chase, New York | 021000021 | Investoro International | 5447734640 | Ref: III Werner | |

Revised: 6/10/2003
Printed: 6/11/2003

WERNER HOLDINGS FUNDS FLOW
JUNE 11, 2003

| DEBIT ACCOUNT | Name | Financial Institution | ABA Number | Proceeds Amount | For Credit To: Account | For Credit To: Account Number | For Further Credit: Acct. Name and Number | Account Rep Name & |
|---|---|---|---|---|---|---|---|---|
| Werner Holding Co. (PA), Inc. 304154846 | Dennis G. Heiner | Union National Bank, 10 Franklin Road S.E., Roanoke, VA 24012 | 051405549 | $964,341.09 | First Clearing Corporation | 5050-000-000-631 | Heiner Acct. No. 3662-4281 | Kathy Jimeno 800-826-6323 |
| Werner Holding Co. (PA), Inc. 304154846 | Mindy Werner Alter | Northern Trust Chicago | 071000152 | $912,942.74 | General Ledger Acct. | 5186011000 | Mindy Werner and Daniel Alter Tenants in Common Acct. No. 23-08041 | Stephanie Felin 847-615-3088 |
| Werner Holding Co. (PA), Inc. 304154846 | Elise W. Frost | Northern Trust Chicago | 071000152 | $891,474.78 | General Ledger Acct. | 5186011000 | Elise Werner Frost Trust Acct. No. 23-08041 | Olga Stokes 847-266-4210 |
| Werner Holding Co. (PA), Inc. 304154846 | Repayment to WHPA re Stock Loan Program | PNC Bank | 043000096 | $387,470.41 | General Ledger Acct. | 1006799118 | | |
| Werner Holding Co. (PA), Inc. 304154846 | Florence J. Werner - Irrev. Trust Dated 10/7/94 | JP Morgan Chase, NYC | 021000021 | $856,439.16 | Werner Co. | 9301011483 | Florence J. Werner Irrev. Trust Acct. No. 000593863 | |
| Werner Holding Co. (PA), Inc. 304154846 | Gail Rauch Blackman | JP Morgan Chase, NYC | 021000021 | $852,791.74 | Goldman Sachs & Co. | 930101483 | Gail Blackman, General Partner Blackman Family Limited Partnership Acct. No. 424-34234-12-334 | Tricia Stringer 312-655-4600 |
| Werner Holding Co. (PA), Inc. 304154846 | Bruce D. Werner Family Limited Partnership | Northern Trust Chicago | 071000152 | $784,545.41 | Smith Barney Inc. | 000593863 | Bruce D. Werner Family Limited Partnership Acct. No. 424-34234-12-334 | Jack Zaffos 305-536-2732 |
| Werner Holding Co. (PA), Inc. 304154846 | Ira and Elise Frost Family Limited Partnership | Northern Trust Chicago | 071000152 | $784,023.85 | General Ledger Account | 5186011000 | Ira and Elise Frost Family Limited Partnership Acct. No. 23-08042 | Stephanie Felin 847-615-3088 |
| Werner Holding Co. (PA), Inc. 304154846 | Ron S. Rosati | Mellon Bank, Pittsburgh, PA | 043318092 | $723,148.09 | General Ledger Acct. | 5186011000 | | Olga Stokes 847-266-4210 |
| Werner Holding Co. (PA), Inc. 304154846 | Noel Bark Rauch | Northern Trust Chicago | 071000152 | $640,863.65 | Robert A. Rosati and Ron Sue Rosati | 4582540 | Noel Bark Rauch Acct. No. 23-21008 | Amy Ferroli 724-589-6740 |
| Werner Holding Co. (PA), Inc. 304154846 | Gerald R. Whipman | Northern Trust Chicago | 071000152 | $597,288.31 | General Ledger Acct. | 5186011000 | Mr. GR and Mrs. KM Whipman Acct. No. 23-21008 | Michele Pearson 847-615-4193 |
| Werner Holding Co. (PA), Inc. 304154846 | Howard L. Solot | Nat West Bank $4-20-03 | Swift Code NWBKGB2L | $658,334.27 | Mr. GR and Mrs. KM Whipman | 76751586 | | |
| Werner Holding Co. (PA), Inc. 304154846 | Melanie R. Werner, Custodian for Isabelle N. Werner | National City Bank | 041000124 | $538,950.82 | Howard L. Solot Rev. Trust UAD 6-20-99 | 655225788 | Daniel J. McGuire 011-4-#-496-01-1-133 | Daniel J. McGuire 011.4.#.496.01.1.133 |
| Werner Holding Co. (PA), Inc. 304154846 | Melanie R. Werner, Custodian for Sophia K. Werner | Mellon Bank, Pittsburgh, PA | 043000261 | $536,950.82 | Merrill Lynch Denver Service Center | 101172012 | Melanie R. Werner C/F Isabelle N. Werner Acct. No. 6960-10728 | Daniel J. McGuire 724-255-2708 |
| Werner Holding Co. (PA), Inc. 304154846 | Agnes Bonte Francois | Societe Generale, Paris France | 30053-03831 | $515,541.89 | Merrill Lynch Denver Service Center | 101172012 | Melanie R. Werner C/F Sophia K. Werner Acct. No. 6960-10799 | Nick Polonski 724-342-7383 |
| Werner Holding Co. (PA), Inc. 304154846 | Werner Pollack, LLC | Northern Trust Chicago | 071000152 | $504,206.12 | Agnes Bonte Francois | 00036722102 | | Suzanne Trella 011.3.11.41.02.01.00 / 011.3.11.41.02.01.52 |
| Werner Holding Co. (PA), Inc. 304154846 | Janet F. Solot | National City Bank | 041000124 | $486,179.83 | General Ledger Acct. | 5186011000 | | |
| Werner Holding Co. (PA), Inc. 304154846 | Beverly Werner Needham | JP Morgan Chase, NYC | 021000021 | $459,812.06 | Janet F. Solot Revocable Trust | 101172012 | Janet F. Solot Rev. Trust UAD 8-20-99 011.3.11.41.02.01.00 / 011.3.11.41.02.01.52 | Stephanie Felin 847-615-3088 |
| Werner Holding Co. (PA), Inc. 304154846 | Donald M. Werner | Mellon Bank, Pittsburgh, PA | 043000261 | $457,568.52 | Merrill Lynch Denver Service Center | 069198036 | Beverly Werner Needham Fixed Income Acct. No. 6960-10736 / Donald and Barbara Werner Acct. No. 6960-10785 | Daniel J. McGuire 724-255-2708 |
| Werner Holding Co. (PA), Inc. 304154846 | Marsha Beth Karp | Northern Trust Chicago | 071000152 | $453,623.86 | General Ledger Acct. | 5186011000 | Marsha Beth Karp Acct. No. 23-22392 | Jim Cook 312-648-4506 |
| Werner Holding Co. (PA), Inc. 304154846 | Edward A. Pollack | Wachovia Bank 190 River Road Summit, NJ 07901 | 031201467 | $446,780.96 | Edward Pollack | 101005791020 | | Nick Polonski 724-342-7383 |
| Werner Holding Co. (PA), Inc. 304154846 | Edward Pollack, POA MLW | Wachovia Bank | 031201467 | $390,000.00 | Edward Pollack | t01005791-0200 | | Leah Horwitz 847-266-4200 |
| Werner Holding Co. (PA), Inc. 304154846 | Robert I. Werner | Northern Trust Bank of Florida NA | 066009650 | $369,970.00 | Smith Barney Inc. | 069198036 | Robert I. Werner Acct. No. 1740002242 | Don Lewis 908-589-3705 |
| Werner Holding Co. (PA), Inc. 304154846 | Laura Werner, Trustee of the Laura W. Werner Rev. Trust | JP Morgan Chase, NYC | 021000021 | $351,922.02 | Merrill Lynch | 1011730 | Laura Werner Revocable Trust UAD 1-2-96 Acct. No. 62K-22986 | Marcie Muela 305-931-2230 |
| Werner Holding Co. (PA), Inc. 304154846 | Repayment to Werner Co. by Marc L. Werner for Outstanding Loan/Stock Pledge | Mellon Bank, Pittsburgh, PA | 043318092 | $269,053.37 | Robert A. Rosati and Ron Sue Rosati | 4582540 | | Al Shikas 312-496-8220 |
| Werner Holding Co. (PA), Inc. 304154846 | Rankell Family Trust | Mellon Bank, Pittsburgh, PA | 043318092 | $314,684.93 | Werner Co. | | | |
| Werner Holding Co. (PA), Inc. 304154846 | Marc L. Werner | LaSalle Bank NA | 071005505 | $276,648.64 | Smith Barney Inc. | 069198036 | Steven & Hope Rankell, Trustees of the Rankell Family Trust Acct. No. 204-20721-1-A-554 | Mike Snowden 800-454-9805 |
| Werner Holding Co. (PA), Inc. 304154846 | Ron S. Rosati, Custodian for Richmond J. Rosati | Mellon Bank, Pittsburgh, PA | 043318092 | $274,352.87 | Marc L. Werner/ Donna B. Werner | 5304885089 | Marc L. Werner Acct. No. 23-19797 | Ms. Paula Stein 847-913-3300 |
| Werner Holding Co. (PA), Inc. 304154846 | Ron S. Rosati, Custodian for Ryan Gregory Rosati | Mellon Bank, Pittsburgh, PA | 043318092 | $269,053.37 | Robert A. Rosati and Ron Sue Rosati | 4582540 | | Amy Ferroli 724-589-6740 |
| Werner Holding Co. (PA), Inc. 304154846 | Rauch Trust | JP Morgan Chase, NYC | 043000096 | $254,192.49 | Robert A. Rosati and Ron Sue Rosati | 4582540 | Rauch Trust UAD 6/15/98 Acct. No. 23-21087 | Amy Ferroli 724-589-6740 |
| Werner Holding Co. (PA), Inc. 304154846 | Peter R. O'Coin | Northern Trust Chicago | 071000152 | $228,486.04 | Peter R. O'Coin & Peggy A. O'Coin | 1019520331 | Peter R. O'Coin & Peggy A. O'Coin Acct. No. 23-19797 | Michele M. Pearson 847-615-4193 |
| Werner Holding Co. (PA), Inc. 304154846 | Eileen Schwartz | Mellon Bank, Pittsburgh, PA | 043318092 | $216,471.19 | General Ledger Account | 5186011000 | Eileen H. Schwartz Acct. No. 23-00867 | Patrick Kennedy 724-776-5077 |
| Werner Holding Co. (PA), Inc. 304154846 | Suzanne Schwartz | Chase Bank, New York | 021-000-021 | $218,202.53 | General Ledger Account | 5186011000 | Suzanne Schwartz Trust Acct. No. 23-00001 | Melanie Napolitan 800-621-1811 ext 12246 |
| Werner Holding Co. (PA), Inc. 304154846 | Ron S. Rosati, Custodian for Ross Daniel Rosati | Mellon Bank, Pittsburgh, PA | 043318092 | $215,242.76 | Robert A. Rosati and Ron Sue Rosati | 4582540 | | Melanie Napolitan 800-621-1811 ext 12248 |
| Werner Holding Co. (PA), Inc. 304154846 | Jonathan C. Werner Gift Trust UAD 11/1/96 | First National Bank of Pennsylvania | 043000261 | $201,251.89 | Merrill Lynch | 1011730 | Jonathan Charles Werner Gift Trust UAD 11/1/96 Acct. No. 62K-22983 | Amy Ferroli 724-589-6740 |
| Werner Holding Co. (PA), Inc. 304154846 | Stephanie N. Werner Gift Trust UAD 11/1/96 | Chase Bank, New York | 021-000-021 | $201,251.89 | Merrill Lynch | 1011730 | Stephanie Noelle Werner Gift Trust UAD 11/1/96 Acct. No. 62K-22983 | Al Shikas 312-496-8220 |
| Werner Holding Co. (PA), Inc. 304154846 | Ballet Limited | Chase Bank, New York | 021-000-021 | $179,899.10 | Investcorp Bank BSC | 5447-07207 | Ballet Limited | |
| Werner Holding Co. (PA), Inc. 304154846 | Donary Limited | Chase Bank, New York | 021-000-021 | $179,899.10 | Investcorp Bank BSC | 5447-07207 | Donary Limited | |

Revised: 6/10/2003
Printed: 6/11/2003

**WERNER HOLDINGS FUNDS FLOW**
**JUNE 11, 2003**

| DEBIT ACCOUNT | Name | Financial Institution | ABA Number | Proceeds Amount | For Credit To: Account Name | For Credit To: Account Number | For Further Credit: Acct. Name and Number | Account Rep Name & Number |
|---|---|---|---|---|---|---|---|---|
| Werner Holding Co. (PA), Inc. | Gleam Limited | Chase Bank, New York | 021-000-021 | $179,850.19 | Investoro Bank BSC | 544-7-07207 | Gleam Limited | Nick Palombi 724-342-7383 |
| Werner Holding Co. (PA), Inc. | Highmass Limited | Chase Bank, New York | 021-000-021 | $179,850.19 | Investoro Bank BSC | 544-7-07207 | Highmass Limited | |
| Werner Holding Co. (PA), Inc. | Noble Limited | Chase Bank, New York | 021-000-021 | $179,850.19 | Investoro Bank BSC | 544-7-07207 | Noble Limited | |
| Werner Holding Co. (PA), Inc. | Outfogar Limited | Chase Bank, New York | 021-000-021 | $179,850.19 | Investoro Bank BSC | 544-7-07207 | Outfogar Limited | |
| Werner Holding Co. (PA), Inc. | Gall Limited | Chase Bank, New York | 021-000-021 | $179,850.19 | Investoro Bank BSC | 544-7-07207 | Gall Limited | |
| Werner Holding Co. (PA), Inc. | Radial Limited | Chase Bank, New York | 021-000-021 | $179,850.19 | Investoro Bank BSC | 544-7-07207 | Radial Limited | |
| Werner Holding Co. (PA), Inc. | Shorelline Limited | Chase Bank, New York | 021-000-021 | $179,850.19 | Investoro Bank BSC | 544-7-07207 | Shorelline Limited | |
| Werner Holding Co. (PA), Inc. | Zimza Limited | Chase Bank, New York | 021-000-021 | $179,850.19 | Investoro Bank BSC | 544-7-07207 | Zimza Limited | |
| Werner Holding Co. (PA), Inc. | Barbara L. Werner | Mellon Bank, Pittsburgh, PA | 043000261 | $172,080.19 | Merrill Lynch Service Center | 101172012 | Barbara Werner Acct. No. 68G-11081 | Marc Memmon 847-934-8426 |
| Werner Holding Co. (PA), Inc. | Investory Investment Equity Limited | Chase Bank, New York | 021-000-021 | $156,426.49 | Pershing LLC | 930-1-032992 | Investory Investment Equity Limited | |
| Werner Holding Co. (PA), Inc. | Marc L. Werner, Custodian for Ashley Elizabeth Werner | Chase Manhattan Bank, Metro Tech Center, Brooklyn, NY | 021000021 | $148,786.51 | Pershing LLC | 930-1-032992 | M.L. Werner Partners, LLC Acct. No. 684009589 | Marc Memmon 847-934-8426 |
| Werner Holding Co. (PA), Inc. | Marc L. Werner, Custodian for Jeffrey Addison Werner | Chase Manhattan Bank, Metro Tech Center, Brooklyn, NY | 021000021 | $148,786.51 | Pershing LLC | 930-1-032992 | M.L. Werner Partners, LLC Acct. No. 684009589 | Marc Memmon 847-934-8426 |
| Werner Holding Co. (PA), Inc. | Werner GC Trust for Erin (Erin Joy Ryan) | JP Morgan Chase, NYC | 021000021 | $148,786.51 | Smith Barney Inc. | 066198038 | Fixed Income - Beverly W. and James S. Needham Trustees Werner GC Trust for Erin 576-56202-16 | Jan Cook 312-648-4506 |
| Werner Holding Co. (PA), Inc. | Werner GC Trust for Shannon (Shannon Rose Ryan) | JP Morgan Chase, NYC | 021000021 | $148,786.51 | Smith Barney Inc. | 066198038 | Fixed Income - Beverly W. and James S. Needham Trustees for Shannon 576-56203-15 | Jan Cook 312-648-4506 |
| Werner Holding Co. (PA), Inc. | Michael E. Werner | Mellon Bank, Pittsburgh, PA | 043000261 | $144,366.78 | Merrill Lynch | 1011730 | Michael Werner Revocable Trust UAD 1-2-96 Acct. No. 62K-22987 | Al Strelsa 312-496-8520 |
| Werner Holding Co. (PA), Inc. | Marsha Beth Karp, Custodian for Allison Tyler Karp | Northern Trust Bank of Florida | 071000152 | $138,678.26 | General Ledger Acct. | 5186011000 | Marsha B. Karp, Custodian UTMA FBO Allison T. Karp Acct. No. 22-22384 | Leah Horwitz 847-266-4200 |
| Werner Holding Co. (PA), Inc. | Florence J. Werner | Mellon Bank, Pittsburgh, PA | 043000261 | $126,188.99 | Merrill Lynch | 1011730 | Florence J. Werner Acct. No. 62K-22987 | Al Strelsa 312-496-8520 |
| Werner Holding Co. (PA), Inc. | Werner Gift Trust UAD 11/1/96 | First Union National Bank/Philadelphia, PA | 031201467 | $112,733.44 | c/o SEI Private Trust Co. | 2100011327896 | Margot Alexa Werner Gift Trust UAD 11/1/96 Acct. No. 62C-22985 | Marcos Muela 305-530-7228 |
| Werner Holding Co. (PA), Inc. | Stewart Charitable Remainder Unitrust | First Union National Bank/Philadelphia, PA | 031201467 | $110,311.99 | c/o SEI Private Trust Co. | 2100011327896 | The Stewart Charitable Remainder Unitrust Acct. No. 62061 | Harold Thomas (Founders Financial Network) 1-858-405-3868 |
| Werner Holding Co. (PA), Inc. | Robert A. Rossi | First National Bank of Pennsylvania | 043319092 | $104,039.45 | Robert A. Rossi and Florence Sue Rossi | 4582540 | | Amy Perell 724-589-6742 |
| Werner Holding Co. (PA), Inc. | Jeffrey R. Ackerman | Fleet Bank | 011000138 | $86,903.59 | Jeffrey R. Ackerman | 00315-61967 | | Jane Delaney 781-235-1800 |
| Werner Holding Co. (PA), Inc. | Marc L. Werner | Chase Bank, New York | 021-000-021 | $72,666.15 | Pershing LLC | 930-1-32-992 | Marc L. Werner Account No. 014-842-769 | Marc Demmon 847-615-5088 |
| Werner Holding Co. (PA), Inc. | Lee L. Bastalla | National City Bank | 014042759 | $65,808.50 | Lee L. and Diane D. Bastalla | 266223347 | | Jean Ambrosty 724-981-3816 |
| Werner Holding Co. (PA), Inc. | Agnes Francois, Custodian for Michel Francois | BNP PARIBAS | 043000122 | $57,647.44 | Michel Francois | 00007505866 | | Mme Quenot 011 331 30 99 22 52 / 011 33 330 15 53 52 |
| Werner Holding Co. (PA), Inc. | Ellen Berk-Rauch | Northern Trust Chicago | 071000152 | $57,263.24 | General Ledger Acct. | 5186011000 | Ellen Berk-Rauch Acct. No. 23-21009 | Nick Palombi |
| Werner Holding Co. (PA), Inc. | Eric J. Werner and Melanie R. Werner, Jt. Tenants | Mellon Bank, Pittsburgh, PA | 043000261 | $57,647.44 | Merrill Lynch Denver Service Center | 101172012 | Eric J. and Melanie R. Werner Acct. No. 23-21003 | Michele Pearson 847-615-4193 |
| Werner Holding Co. (PA), Inc. | Noel Berk-Rauch, Custodian for Heather Blackman | JP Morgan Chase, NYC | 021000021 | $49,327.16 | Smith Barney Inc. | 066198038 | Gail Blackman, General Partner Blackman Family Limited Partnership Acct. No. 42K-32034 | Nick Palombi 724-342-7383 |
| Werner Holding Co. (PA), Inc. | Agnes Francois, Custodian for Claire Francois | JP Morgan Chase, NYC | 021000021 | $46,006.02 | Karen Lynn Mosestta | 058467066 | | Jack Zaffos 305-936-2732 |
| Werner Holding Co. (PA), Inc. | Karen Lynn Mosestta | Northern Trust Chicago | 071000152 | $42,331.48 | Merrill Lynn Mosestta | 058467066 | | Mme Quenot 011 331 30 99 22 52 / 011 331 30 15 53 52 |
| Werner Holding Co. (PA), Inc. | Donald M. Werner and Barbara L. Werner, Jt. Tenants | Northern Trust Chicago | 071000152 | $39,550.69 | Merrill Lynch Denver Service Center | 101172012 | Donald and Barbara Werner Acct. No. 23-21198 | Mme Quenot 011 331 30 99 22 52 / 011 331 30 15 53 52 |
| Werner Holding Co. (PA), Inc. | Noel Berk-Rauch, Custodian for Eli Berk-Rauch | BNP PARIBAS | 300041613 | $36,053.07 | General Ledger Acct. | 5186011000 | Eli Berk-Rauch Acct. No. 23-21033 | Michele Pearson 847-615-4193 |
| Werner Holding Co. (PA), Inc. | Bruce D. Werner and Tammy H. Werner, Jt. Tenants | First National Bank of Pennsylvania | 043319092 | $33,629.30 | General Ledger Account | 5186011000 | Bruce D. Werner Trust Acct. No. 23-21181 | Stephanie Felin 847-615-5088 |
| Werner Holding Co. (PA), Inc. | Donald E. Achenbach | National City Bank | 043000122 | $28,672.55 | Donald E. and Stasen M. Achenbach | 317-1085-5 | | Amy Perell 724-589-6742 |
| Werner Holding Co. (PA), Inc. | David A. Cardillo | BNP PARIBAS | 300041613 | $26,102.69 | David A. & Maryann Cardillo | 06584/24624 | | Chris H. 724-588-2413 |
| Werner Holding Co. (PA), Inc. | Agnes Francois, Custodian for Melissa S. Karp | Northern Trust Chicago | 071000152 | $23,676.66 | Claire Francois | 5186011000 | Marsha B. Karp, Custodian UTMA FBO Melissa S. Karp Acct. No. 22-22363 | Leah Horwitz 847-266-4200 |
| Werner Holding Co. (PA), Inc. | J. David Goldblatt | HSBC Bank, USA | 021001088 | $22,650.52 | Vingard | 001112046 | David Goldblatt Acct. No. 099066 05981 in favor of fund: 36-GNMA | Vingard Group Voyager Service 800-284-7245 |

Revised: 6/10/2003
Printed: 6/11/2003

WERNER HOLDINGS FUNDS FLOW
JUNE 11, 2003

| DEBIT ACCOUNT | | Name | Proceeds Amount | Financial Institution | ABA Number | For Credit To: Account Name | For Credit To: Account Number | For Further Credit: Acct. Name and Number | Account Rcy Name & Number |
|---|---|---|---|---|---|---|---|---|---|
| Werner Holding Co. (PA), Inc. | 304154946 | Jane Goldblatt and J. David Goldblatt, Jt. Tenants | $22,600.52 | Bank of America 5201 Laurel Canyon Blvd. Valley Village, CA 91607 | 122000661 | Jane Goldblatt, David Goldblatt | 23619 | | Flaugina G. 818-506-2951 |
| Werner Holding Co. (PA), Inc. | 304154946 | Claude J. Francois | $18,833.77 | Societe Generale, Paris France | 30003-03831 | Claude Francois | 00050293407 | | Suzanne Trelie 011 331 41 02 03 60 011 331 41 02 03 62 |
| Werner Holdg Co. (PA), Inc. | 304154946 | Philip F. Tidy | $10,761.94 | Lloyds TSB | 77-25-03 | Mrs. S.N. Tidy | 10734868 | | |
| Werner Holdg Co. (PA), Inc. | 304154946 | Gary L. Stewart | $8,699.37 | Washington Mutual Bank FA | 322271627 | Gary Stewart | 4404119760 | | Gail Johnson 760-743-8334 |

Page 4 of 4

Revised: 6/10/2003
Printed: 6/11/2003

EXHIBIT 29







UFB LA, CA 06192003
TR#1079   PKT #016
>1221-0527-8<
6922499860

0057583140  06/23/2003  4235 3 128
JPMORGANCHASE METROTECH

6600052267



ACCOUNT NUMBER

ACCOUNT NAME  WERNER HOLDING CO (PA) INC.

DATE June 11, 2003                1-2
                                   210

PAY TO THE
ORDER OF   Debra A. Rothman                    75          $ 791,447.55

Seven hundred ninety one thousand four hundred forty seven and 55/100        DOLLARS

CHASE   The Chase Manhattan Bank
        55 Water Street
        New York, NY 10041        668

"006413"  :021000021:                                    89  "007914755"

"006413"  :021000021:              304154946"89 "007914755"



6415

ACCOUNT NUMBER ___3 0 4 1 5 4 9 4 *6*___

ACCOUNT NAME ___WERNER HOLDING CO (PA) INC.___

DATE ___June 11, 2003___     1-2 / 210

PAY TO THE ORDER OF ___Joshua J. Rothman___     $ 70,223.01

Seventy thousand two hundred twenty three and 01/100 ——————— DOLLARS

CHASE  The Chase Manhattan Bank
55 Water Street
New York, NY 10041

668

89

⑈006415⑈ ⑆0210000 21⑈     ⑈0007022301⑈

⑈006415⑈ ⑆0210000 21⑈          304154946⑈89 ⑈0007022301⑈

0016720145 06/16/2003 9201 138 3
JPMORGANCHASE METROTECH
0016720876 06/16/2003 9201 138 3
JPMORGANCHASE METROTECH
PAID 9    0016720876 06/16/2003 9201 138 3
06/13/03  007  JPMORGANCHASE METROTECH DEPOSITION

6600109374

ACCOUNT NUMBER    304154946                                                         6416

ACCOUNT NAME    WERNER HOLDING CO (PA) INC.

                                                              DATE June 11, 2003              1-2
                                                      7-5                                     210

PAY TO THE
ORDER OF    Kevin Matthew Rothman                                              $ 70,223.01

Seventy thousand two hundred twenty three and 01/100 _____ DOLLARS

◼ CHASE    The Chase Manhattan Bank          668
           55 Water Street
           New York, NY 10041                              Eric J Werner
                                                                                         MP

⑈006416⑈ ⑉021000021⑉                                    89 ⑈0007022301⑈

⑈006416⑈ ⑉021000021⑉              304154946⑈89 ⑈0007022301⑈

6600109373



ACCOUNT NUMBER

ACCOUNT NAME    WERNER HOLDING CO (PA) INC.

DATE    June 11, 2003    1-2 / 210

PAY TO THE
ORDER OF    Paula J. Griffith    $ 68,608.54

Sixty eight thousand six hundred eight and 54/100    DOLLARS

CHASE    The Chase Manhattan Bank
55 Water Street
New York, NY 10041

6417

⑈"006417"⑈ ⑈:021000021⑈:    89    ⑈"00068608 54"⑈

⑈"006400"⑈ ⑈:021000021⑈:    304154946"89    ⑈"00068608 54"⑈



6418

ACCOUNT NUMBER _304154946_____

ACCOUNT NAME _WERNER HOLDING CO (PA) INC._

DATE _____ June 11, 2003 ___  1-2/210

PAY TO THE
ORDER OF _Henry W. Dowler_____ | $68,436.50

_Sixty eight thousand four hundred thirty six and 50/100_____ DOLLARS

CHASE **The Chase Manhattan Bank**
55 Water Street
New York, NY 10041

668

⑆006418⑈ ⑆021000021⑉

⑆006418⑈ ⑆021000021⑉        304154946⑈89 ⑆000684365O⑈

6700594671

For Deposit Only To Named Account

6419

ACCOUNT NUMBER    304154946

ACCOUNT NAME    WERNER HOLDING CO (PA) INC
                540018146 14 062503

DATE  June 11, 2003                    1-2
                                       210

PAY TO THE
ORDER OF    Vincent A. Genis                    $68,436.50

Sixty eight thousand four hundred thirty six and 50/100

DOLLARS

◼ CHASE    The Chase Manhattan Bank
           55 Water Street        668
           New York, NY 10041

                                       3-1
                                                    MP

⑈"006419"⑈ ⑉021000021⑉:                    89 ⑈"0006843650"

⑈"006419"⑈ ⑉021000021⑉:        304154946"89 ⑈"0006843650"

CREDIT TO THE ACCOUNT OF
THE WITHIN NAMED PAYEE
Absence Of Endorsement Guaranteed
NATIONAL CITY BANK OF PA
PERCENTAGE

021000089        8612
B00000 NCHA
1664 540018146 062503

0017767148 06/25/2003 00014 138
JPMORGANCHASE METROTECH
0017767148 06/25/2003 2869 135 4
JPMORGANCHASE METROTECH POSITION
0300454232

PAID RJ
06/25/03 070

6700722722

6420

ACCOUNT NUMBER 304154946

A-4

ACCOUNT NAME  WERNER HOLDING CO ( PA) INC.

DATE June 11, 2003

1-2
210

PAY TO THE
ORDER OF  Matthew W. Weiss

$68,339.38

Sixty eight thousand three hundred thirty nine and 38/100

DOLLARS

CHASE  The Chase Manhattan Bank
55 Water Street
New York, NY 10041

668

89

⑆006420⑆ ⑈021000021⑈ ⑆0006833938⑆

⑆006420⑆ ⑈021000021⑈   304154946⑈89 ⑆0006833938⑆

1020-0019-9     3   06/18/03   -5   3
06/17/03     3  0212-0400-5     3
                 3  002           3
0528656924   0306376149   0426762865

020-011-1940 2P07 6/16/2003
1688927

021000021
PAID  RJ
06/18/03  076
06005195

0014745762 96/1
JPMORGANCHASE METR
0014745762 06/18/2003 2192 133 4
JPMORGANCHASE METROTECH POSITION

6700594670

Credit to the Account of the
Within Named Payee in Accordance
With Payee's Instructions
Absence of Endorsement Guaranteed by
The Bank of Cherry Creek, N.A.
Denver, Colo.
Trust Dept.

6421

ACCOUNT NUMBER ___304154946___

ACCOUNT NAME ___WERNER HOLDING CO (PA) INC.___

DATE June 11, 2003    1-2/210

PAY TO THE
ORDER OF   Steven R. Bentson                                    $ 67,930.89

Sixty seven thousand nine hundred thirty and 89/100                              DOLLARS

**CHASE**   The Chase Manhattan Bank
55 Water Street
New York, NY 10041          668

*signature*    MP

⑈006421⑈ ⑆021000021⑆                                      89  ⑈0006793089⑈

⑈006421⑈ ⑆021000021⑆                    304154946⑈89 ⑈0006793089⑈



0519064704 12 01 95001258 061303
FIRST NATIONAL BANK OF PA
HERMITAGE PA        >043318092<

043000261
                    021000021    06/16/03
6354-008      06132003    60730    RJ
                          006    9999
07008491B5    29000490670
            004114216B 06/16/2003  7412 4 122

6600109375

CREDIT TO THE ACCOUNT OF
THE WITHIN NAMED PAYEE
In accordance with payees instructions
Absence of endorsement Guaranteed
First National Bank of Pennsylvania
HERMITAGE OFFICE
HERMITAGE, PA.

ACCOUNT NUMBER _____ 6423

ACCOUNT NAME    WERNER HOLDING CO ( PA) INC.    DATE June 11, 2003    1-2/210

PAY TO THE
ORDER OF    William J. Rippin _____ | $ 61,742.31

Sixty one thousand seven hundred forty two and 31/100 _____ DOLLARS

CHASE  The Chase Manhattan Bank
55 Water Street
New York, NY 10041

668

⑈006423⑈ ⑆021000021⑈    89 ⑈0006174231⑈

⑈006423⑈ ⑆021000021⑈    304154946⑈89 ⑈0006174231⑈

For Deposit Only

021000021    06/30/03    ▶043000096◀
65219    RJ    06272003  PK:07  E:5356
666    9999
210055565 0500355256
005661332? 06/30/2003 0571 3 114

6700781643

304154946

6424

ACCOUNT NUMBER _____

ACCOUNT NAME ___ WERNER HOLDING CO (PA) INC ___

DATE ___ June 11, 2003 ___    1-2 / 210

PAY TO THE
ORDER OF ___ David A. McGowan ___    $58,898.15

Fifty eight thousand eight hundred ninety eight and 15/100 ___ DOLLARS

**CHASE**
1-4

The Chase Manhattan Bank
55 Water Street
New York, NY 10041

668

Eric J. Werner    MP

89

⑈006424⑈ ⑆021000021⑉

⑈006424⑈ ⑆021000021⑉    304154946⑈89 ⑈000588915⑉

004356288⑈ 06/17/2003 7816 4 116
JPMORGANCHASE METROTECH

6700627888



ACCOUNT NUMBER __304154946__                                              6425

ACCOUNT NAME __WERNER HOLDING CO ( PA) INC.__
__450065571 06 061503  002063634__

DATE June 11, 2003                                                        1-2
                                                                          ───
                                                                          210

PAY TO THE
ORDER OF __Brad J. Gellis__                                      $58,660.00

__Fifty eight thousand six hundred sixty and 00/100__                DOLLARS

CHASE  The Chase Manhattan Bank
       55 Water Street
       New York, NY 10041          668

⑈006425⑈ ⑆021000021⑆                    89  ⑈0005866000⑈

⑈006425⑈ ⑆021000021⑆          304154946⑈89 ⑈0005866000⑈



021000089        8216
B00000        002063634
3545  450065571 061503

0016729588 06/16/2003 2238 1 138
JPMORGANCHASE METROTECH
PAID N
JPMORGANCHASE METROTECH POSITION

6600109372

6426

ACCOUNT NUMBER   304154946

ACCOUNT NAME   WERNER HOLDING CO (PA) INC
150118754 14 061603

DATE June 11, 2003

1-2
210

PAY TO THE
ORDER OF   Michael E. Trzynka                    $ 58,660.00

Fifty eight thousand six hundred sixty and 00/100                    DOLLARS

CHASE   The Chase Manhattan Bank
55 Water Street
New York, NY 10041

668

MP

⑈006426⑈ ⑆021000021⑆ 0304154946⑈      89 ⑈000586000⑈

---

021000089    8612
BOOOOO NCHA.
1664 150118754 061603

021000021        9999
PAID    4    04559
06/16/03    076    92 51
0700204967

⑈0410001244
NATL CITY BK095 06/13/03
4100 W.150 CLEV OH 44135

52050104
680010927?

For Deposit Only.
Michael E. Trzynka
029402 3 573

6427

ACCOUNT NUMBER ___304154946___

ACCOUNT NAME ___WERNER HOLDING CO (PA) INC.___

DATE June 11, 2003

$\frac{1-2}{210}$

PAY TO THE ORDER OF ___Larry V. Friend___ $ 58,362.23

Fifty eight thousand three hundred sixty two and 23/100 ──────── DOLLARS

CHASE    The Chase Manhattan Bank
55 Water Street
New York, NY 10041

668

"006427"  ":021000021:"  89  "000583623"

"006427"  ":021000021:"  304154946"89  "000583623"





6428

ACCOUNT NUMBER —— 304154946

ACCOUNT NAME   WERNER HOLDINGCO (PA) INC.

DATE June 11, 2003

PAY TO THE
ORDER OF   Edward W. Gericke                                   $ 57,151.59

Fifty seven thousand one hundred fifty one and 59/100 ———— DOLLARS

CHASE   The Chase Manhattan Bank
55 Water Street
New York, NY 10041

668

⑈006428⑈ ⑈021000021⑈                          89  ⑈0005715159⑈

⑈006428⑈ ⑈021000021⑈                     304154946⑈89 ⑈0005715159⑈

6600059141

304154946

| | | | 6429 |
|---|---|---|---|
| ACCOUNT NUMBER | _____ | | |
| ACCOUNT NAME | WERNER HOLDING CO (PA) INC. | DATE June 11, 2003 | 1-2 / 210 |

PAY TO THE
ORDER OF   John J. Fiumefreddo                                    $ 56,849.10

Fifty six thousand eight hundred forty nine and 10/100                    DOLLARS

**CHASE**  The Chase Manhattan Bank
55 Water Street
New York, NY 10041

668

89

⑈006429⑈ ⑆021000021⑆                                    ⑈0005684910⑈

⑈006429⑈ ⑆021000021⑆          304154946⑈89 ⑈0005684910⑈

0020510003420   06-16-03
XX33924028MK  Q0001765224
FNB SLIPPERMROCK
070009041
889154788 062173003 7353 4 114
JPMORGANCHASE METROTECH

6700627887

CREDITED TO THE ACCOUNT OF
THE WITHIN NAMED PAYEE
In Accordance With Payee's Instructions
Absence of Endorsement Guaranteed
FIRST NATIONAL BANK
OF SLIPPERY ROCK

6430

ACCOUNT NUMBER

ACCOUNT NAME        W E R N E R   H O L D I N G   C O  ( P A )  I N C .

DATE  June 11, 2003                1-2
                                   210

PAY TO THE
ORDER OF        John M. Guyton                              $ 54,616.62

Fifty four thousand six hundred sixteen and 62/100                        DOLLARS

CHASE   The Chase Manhattan Bank
        55 Water Street
        New York, NY 10041

668

MP

⑆006430⑆ ⑈021000021⑈                        89 ⑉000546162⑉

⑆006430⑆ ⑈021000021⑈        304154946⑈89 ⑉000546162⑉

MERCER CO. BK SANDY LAKE, PA

6700627006

ACCOUNT NUMBER    304154946

6431

ACCOUNT NAME    WERNER HOLDING CO (PA) INC.

DATE    June 11, 2003

1-2
210

PAY TO THE
ORDER OF    Michael D. Brooks

$ 51,070.51

Fifty one thousand seventy and 51/100

DOLLARS

CHASE    The Chase Manhattan Bank
55 Water Street
New York, NY 10041

668

MP

⑆006431⑆ ⑈021000021⑉

89 ⑇000510705⑊

⑆006431⑆ ⑈021000021⑉    304154946⑆89 ⑇000510705⑊

6432

ACCOUNT NUMBER    304154946

ACCOUNT NAME    WERNER HOLDING CO (PA) INC.

DATE June 11, 2003

1-2
210

PAY TO THE
ORDER OF    Debra A. Rothman, Custodian for Jordana Rothman    $ 49,327.16

Forty nine thousand three hundred twenty seven and 16/100 _____ DOLLARS

CHASE    The Chase Manhattan Bank
55 Water Street
New York, NY 10041

668

⑈"006432"⑈ ⑈:021000021⑈:

304154946"89 ⑈"000049327⑈16⑈"

⑈"006432"⑈ ⑈:021000021⑈:    304154946"89 ⑈"000049327⑈16⑈"

6600109371



6433

ACCOUNT NUMBER _____ 304154946

ACCOUNT NAME _____ WERNER HOLDING CO (PA) INC.

DATE __ June 11, 2003

1-2
210

420106102 06 061603 075484927

PAY TO THE
ORDER OF _____ Linda C. Joubert                                    $ 42,241.27

Forty two Thousand two hundred forty one and 27/100                    DOLLARS

CHASE   The Chase Manhattan Bank
        55 Water Street
        New York, NY 10041              668

⑈006433⑈ ⑆021000021⑈                                        89 ⑈0004224127⑈

⑈006433⑈ ⑆021000021⑈              304154946⑈89 ⑈0004224127⑈

021000089        8216      >0210-0008<
B00983           075484927CITIBANK,NY
1341 420106102  061603 20%2422627

0016745923 06/17/2003 9217 158 6
JPMORGANCHASE METROTECH
0016747154 06/17/2003 9217 1 158
JPMORGANCHASE METROTECH
0016747154 06/17/2003 9217 158 3
JPMORGANCHASE METROTECH POSITION

PAID
06/16/03

6700627004



6434

ACCOUNT NUMBER  304154946

ACCOUNT NAME  WERNER HOLDING CO (PA) INC

DATE  June 11, 2003

1-2
210

PAY TO THE
ORDER OF  Eric A. Mason                                                      $ 41,006.11

Forty one thousand six and 11/100 ———————————————————— DOLLARS

CHASE  The Chase Manhattan Bank
55 Water Street
New York, NY 10041

668

⑈"006434"⑈ ⑊021000021⑊ 89 ⑈"0004100611"⑈

⑈"006434"⑈ ⑊021000021⑊   304154946"89 ⑈"0004100611"⑈



ACCOUNT NUMBER _____

6435

ACCOUNT NAME    WERNER HOLDING CO (PA) INC.

DATE  June 11, 2003

1-2
210

PAY TO THE
ORDER OF    Geoffrey R. Hartenstein

$ 39,827.21

Thirty nine thousand eight hundred twenty seven and 21/100 ——————————— DOLLARS

**CHASE**  The Chase Manhattan Bank
55 Water Street
New York, NY 10041

MP

⑈006435⑈ ⑆021000021⑆ 89 ⑈000398 27 21⑈

⑈006435⑈ ⑆021000021⑆          304154946⑈89 ⑈000398 27 21⑈



6437

ACCOUNT NUMBER    304154946

ACCOUNT NAME    WERNER HOLDING CO (PA) INC.

DATE    June 11, 2003

PAY TO THE
ORDER OF    Bruce B. Fischer    $ 35,720.11

Thirty five thousand seven hundred twenty and 11/100    DOLLARS

CHASE    The Chase Manhattan Bank
55 Water Street
New York, NY 10041    668

⑆006437⑆ ⑈021000021⑈    89 ⑆000357201 1⑈

⑆006437⑆ ⑈021000021⑈    304154946⑈89 ⑆000357201 1⑈



ACCOUNT NUMBER    304154946                                                          6438

ACCOUNT NAME    WERNER HOLDING CO (PA) INC.
                                150118492  14  061603
                                         DATE  June 11, 2003          1-2
                                                                     ———
                                                                      210

PAY TO THE
ORDER OF    William C. Hazlett                                    $ 34,285.04

Thirty four thousand two hundred eighty five and 04/100 _____ DOLLARS

CHASE    The Chase Manhattan Bank
         55 Water Street            668
         New York, NY 10041

⑈006438⑈ ⑆021000021⑆

⑈006438⑈ ⑆021000021⑆        304154946⑈89 ⑆0003428504⑈

6440

ACCOUNT NUMBER ___304154946___

ACCOUNT NAME _____WERNER HOLDING CO (PA) INC._____

DATE __June 11, 2003__          1-2
                                 ———
                                 210

PAY TO THE
ORDER OF ___Dennis J. Johnson_____ $ 29,758.76

Twenty nine thousand seven hundred fifty eight and 76/100 _____ DOLLARS

CHASE   The Chase Manhattan Bank
        55 Water Street          668
        New York, NY 10041

⑆006440⑆ ⑈021000021⑇        89  ⑈00029758 76⑈

⑆006440⑆ ⑈021000021⑇        304154946⑈89 ⑈00029758 76⑈

304154946                                                                      6441

ACCOUNT NUMBER

WERNER HOLDING CO (PA) INC.

ACCOUNT NAME

DATE  June 11, 2003                    1-2
                                        210

PAY TO THE
ORDER OF    Jeremy M. Kaplan                              $  28,250.40

Twenty eight thousand two hundred fifty and 40/100 _____ DOLLARS

CHASE  The Chase Manhattan Bank        668
       55 Water Street
       New York, NY 10041

⑈"006441"⑈  ⑈:021000021⑈                            89 ⑈"00028 25040⑈   MP

⑈"006441"⑈  ⑈:021000021⑈          304154946"89 ⑈"00028 25040⑈

67006627883



ACCOUNT NUMBER  304154946                                                                  6442

ACCOUNT NAME  WERNER HOLDING CO (PA) INC.

DATE  June 11, 2003                1-2
                                   210

PAY TO THE
ORDER OF  Neil D. Kaplan, Custodian for Rachael A. Kaplan          $ 28,250.40

Twenty eight thousand two hundred fifty and 40/100                    DOLLARS

CHASE  The Chase Manhattan Bank
       55 Water Street              668
       New York, NY 10041

⑆006442⑆ ⑈021000021⑈                                    89  ⑈000 28 25040⑈

⑆006442⑆ ⑈021000021⑈                    304154946⑆89 ⑈000 28 25040⑈

6443

ACCOUNT NUMBER ___304-154946___

ACCOUNT NAME  WERNER HOLDING CO (PA) INC.

DATE  June 11, 2003        1-2
                           ———
                           210

PAY TO THE
ORDER OF ___Beth Katz_____  $26,905.10

Twenty six thousand nine hundred five and 10/100 _____ DOLLARS

**CHASE**  The Chase Manhattan Bank          668
           55 Water Street
           New York, NY 10041

                                              89

⑈006443⑈ ⑆021000021⑆

⑈006443⑈ ⑆021000021⑆          304154946⑈89 ⑈00026905 10⑈

For deposit only –
acct 3343 5865
Beth M. Katz

6700787169

ACCOUNT NUMBER

ACCOUNT NAME WERNER HOLDING CO (PA) INC.

DATE June 11, 2003

1-2
210

PAY TO THE
ORDER OF Susan Morrow                                         $26,905.10

Twenty six thousand nine hundred five and 10/100 _____ DOLLARS

CHASE  The Chase Manhattan Bank
55 Water Street
New York, NY 10041                    668

⑈006444⑈ ⑈021000021⑈                              89 ⑈0002690510⑈

⑈006444⑈ ⑈021000021⑈              304154946⑈89 ⑈0002690510⑈

021000021    06/17/03    BANK ONE, NA
65134        RJ         ⊙740⊙⊙⊙10
986          9999       06162003

0043563937 06/17/2003 7354 4 116
JPMORGANCHASE METROTECH

6700627882

ACCOUNT NUMBER 304-154946

ACCOUNT NAME WERNER HOLDING CO (PA)INC.

DATE June 11, 2003

1-2
210

PAY TO THE ORDER OF Susan Morrow                          $26,905.10

Twenty six thousand nine hundred five and 10/100                          DOLLARS

CHASE

The Chase Manhattan Bank
55 Water Street
New York, NY 10041

668

89

"006444"  ":0210000 21:"  304154946"89 "000 2690510"

BANK ONE, NA
074000010
06162003

00495639937 06/17/2003 7354 4 116
JPMORGANCHASE METROTECH

6700627002

6445

ACCOUNT NUMBER 304-154946

ACCOUNT NAME  WERNER HOLDING CO(PA)INC

DATE _____ June 11, 2003

$\frac{1-2}{210}$

PAY TO THE
ORDER OF  David M. Conn                                              $ 26,836.82

Twenty six thousand eight hundred thirty six and 82/100 _____ DOLLARS

CHASE  The Chase Manhattan Bank
55 Water Street
New York, NY 10041                    668

                                                          MP

⑆006445⑆ ⑉021000021⑉                     ⑈304154946⑈89 ⑉000268368 2⑉

⑆006445⑆ ⑉021000021⑉          304154946⑈89 ⑉000268368 2⑉

NORTHFORK VIA ACS LEVERBANK :021414064

621000021
PAID  RJ
06/17/03  070          JPMORGANCHASE METROTECH
080005530          JPMORGANCHASE METROTECH POSITION

00014717944 06/17/2003 2594 1 136
00014717944 06/17/2003 2594 109 4

6700627881



ACCOUNT NUMBER 304-154946

ACCOUNT NAME  WERNER HOLDING CO (PA)INC

DATE  June 11, 2003                    1-2
                                        210

PAY TO THE
ORDER OF  Karrah Kaplan                              $ 21,524.37

Twenty-one thousand five hundred twenty four and 37/100                    DOLLARS

CHASE   The Chase Manhattan Bank
        55 Water Street
        New York, NY 10041          668

�串006446⑮ ⑦021000021⑧

⑮006446⑮ ⑦021000021⑧          304154946⑮89 ⑦0002152437⑧





ACCOUNT NUMBER  304-154946

ACCOUNT NAME  WERNER HOLDING CO (PA) Inc

6447

DATE  June 11, 2003        1-2 / 210

PAY TO THE ORDER OF  Jeremy M. Kaplan, Trustee of the Deborah Ann Kaplan
Trust U/D 14 January 1998                              $ 21,255.22

Twenty-one thousand two hundred fifty five and 22/100                    DOLLARS

CHASE  The Chase Manhattan Bank
55 Water Street
New York, NY 10041                    668

⑈"006447"⑈ ⑆:021000021⑆:

⑈"006447"⑈ ⑆:021000021⑆:        304154946"89 ,"000212552 2,"





6448

ACCOUNT NUMBER ___006448___

ACCOUNT NAME  WERNER HOLDING CO (PA) inc

DATE  June 11, 2003                1-2
                                    210

PAY TO THE
ORDER OF  Jeremy M. Kaplan, Trustee of the Judith Lily Kaplan
          Trust U/D 14 January 1998                        $21,255.22

Twenty-one thousand two hundred fifty five and 22/100 _____ DOLLARS

CHASE
The Chase Manhattan Bank
55 Water Street
New York, NY 10041

668

⑆006448⑆  ⑉021000021⑉            89  ⑉0002125522⑉

⑆006448⑆  ⑉021000021⑉     304154946⑆89  ⑉0002125522⑉

06/17/03
0212-0400-5
002
06009280

0125127426
06172003
0520-0027-8  FRB BALTIMO
ENT=3713 TRC=3750 PK=20

0014722660 06/17/03
JPMORGANCHASE METROTECH
021000021
PAID N
06/17/03  970
0500479200  010 0006 06/16/03  09:51  90152980 TRANCU  $21,255.22%

6700627880



ACCOUNT NUMBER    304-154946                                          6449

ACCOUNT NAME    WERNER HOLDING CO (PA) INC

DATE    June 11, 2003    1-2/210

PAY TO THE ORDER OF    Neil D. Kaplan, Custodian for Julia E. Kaplan    $ 21,255.22

Twenty one thousand two hundred fifty five and 22/100    DOLLARS

CHASE
The Chase Manhattan Bank
55 Water Street
New York, NY 10041    668

⑈006449⑈ ⑆021000021⑈                304154946⑈89 ⑆0002125522⑆

6450

ACCOUNT NUMBER  304-154946

ACCOUNT NAME  WERNER HOLDING CO (PA)INC

DATE  June 11, 2003

1-2
210

PAY TO THE
ORDER OF  Neil D. Kaplan

$ 19,102.93

Nineteen thousand one hundred two and 93/100 _____ DOLLARS

CHASE  The Chase Manhattan Bank
55 Water Street
New York, NY 10041

668

MP

⑈"006450"⑈ ⑊021000021⑊

⑈"006450"⑈ ⑊021000021⑊     304154946"89 ⑈"0001910293⑈

6451

ACCOUNT NUMBER 304-154946

ACCOUNT NAME WERNER HOLDING CO (PA) INC

DATE June 11, 2003

1-2
210

PAY TO THE
ORDER OF Robert H. Pinney                                    $ 13,586.38

Thirteen thousand five hundred eighty six and 38/100 ——————— DOLLARS

**CHASE** The Chase Manhattan Bank
55 Water Street
New York, NY 10041

668

89

⑈006451⑈ ⑈021000021⑈

⑈006451⑈ ⑈021000021⑈    304154946⑈89 ⑈0001358638⑈

6452

ACCOUNT NUMBER     304-154946

ACCOUNT NAME      WERNER HOLDING CO (PA) INC

DATE _____ June 11, 2003                    1-2
                                                210

PAY TO THE
ORDER OF      Jessica Z. Joubert                        $ 13,452.55

Thirteen thousand four hundred fifty two and 55/100 _____ DOLLARS

CHASE    The Chase Manhattan Bank
         55 Water Street
         New York, NY 10041              668

                                         89

⑈006452⑈ ⑆021000021⑆

⑈006452⑈ ⑆021000021⑆          304154946⑈89 ⑆0001345255⑈

021000089        8216      >0210-0008<
B00215        075497103CITIBANK,NY
1350 440095269 061703 2012422627

021000021    90014732349 06/18/2003 2466 1 121
PAID  RJ       JPMORGANCHASE METROTECH
06/18/03 070
080078 JPMORGANCHASE METROTECH POSITION

6700788062

ACCOUNT NUMBER  304-154946

**4-4**

6453

ACCOUNT NAME  WERNER HOLDING CO (PA) INC

DATE  June 11, 2003

1-2
210

PAY TO THE
ORDER OF  Michael D. Wise

$ 11,370.02

Eleven thousand three hundred seventy and 02/100 _____ DOLLARS

**CHASE**  The Chase Manhattan Bank
55 Water Street
New York, NY 10041

668

MP

⑈006453⑈ ⑈021000021⑈                                    89 ⑈000113700 2⑈

⑈006453⑈ ⑈021000021⑈          304154946⑈89 ⑈000113700 2⑈

6700594668



6600109280

6456

ACCOUNT NUMBER  304-154946

ACCOUNT NAME  WERNER HOLDING CO (PA) INC

DATE  June 11, 2003

1-2
210

PAY TO THE
ORDER OF  Shirley W. Rauch Trust #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    $9,723.75

Nine thousand seven hundred twenty three and 75/100 _____ DOLLARS

CHASE  The Chase Manhattan Bank
55 Water Street
New York, NY 10041

668

⑈006456⑈ ⑆021000021⑆ 304154946⑈ 89 ⑈0000972375⑈



ACCOUNT NUMBER  304-154946                                                        6457

ACCOUNT NAME  WERNER HOLDING CO (PA) INC

DATE  June 11, 2003                          1-2
                                             210

PAY TO THE
ORDER OF  Francesca Gianoglio Bonte                              $ 9,416.64

Nine thousand four hundred sixteen and 64/100 ———————————————— DOLLARS

CHASE  The Chase Manhattan Bank
       55 Water Street
       New York, NY 10041

668

⑈"006457⑈ ⑆021000021⑆                          89 ⑈"0000941664⑈"

⑈"006457⑈ ⑆021000021⑆        304154946"89 ⑈"0000941664⑈"

FOR DEPOSIT ONLY
6028-0345216

6457

ACCOUNT NUMBER  304-154946

ACCOUNT NAME  WERNER HOLDING CO (PA) INC

DATE  June 11, 2003   1-2
                        210

PAY TO THE
ORDER OF  Francesca Gianoglio Bonte                    $ 9,416.64

Nine thousand four hundred sixteen and 64/100 —————— DOLLARS

CHASE  The Chase Manhattan Bank
       55 Water Street          668
       New York, NY 10041

3-1

"006457"  ":0210000 21:"                          89  "000094166 4"

"006457"  ":0210000 21:"          304154946"89  "000094166 4"





ACCOUNT NUMBER   304-154946                                      6458

ACCOUNT NAME   WERNER HOLDING CO (PA) INC

DATE   June 11, 2003      1-2/210

PAY TO THE ORDER OF   Richard D. Bonte, Custodian for Alessandra Bonte    $ 9,416.64

Nine thousand four hundred sixteen and 64/100                    DOLLARS

CHASE
The Chase Manhattan Bank
55 Water Street
New York, NY 10041                668

"006458"  ":021000021:"        89  "0000941664"



6700722720



⑊"006459"⑊ ⑊⑉021000021⑊⑉      304154946"89 ⑊"0000869937⑊"



Judith Kaplan
for deposit only
0910147 07065



6700602135



ACCOUNT
NUMBER 304154946                                                    4411

ACCOUNT
NAME  Werner Holding Co (PA) Inc                    DATE  June 13, 2003        1-2
                                                                              210

PAY TO THE
ORDER OF   Marc L. Werner - Irrevocable Trust 1 c/o Richard L. Werner, Trustee  $ 24,214.98

Twenty-four thousand two hundred fourteen and 98/100 ─────────────  DOLLARS

CHASE   JPMorgan Chase Bank
        401 Madison Avenue          134
        New York, NY 10017                                          3-1

⑈004411⑈ ⑈021000021⑈                        89  ⑈000 2421498⑈

⑈004411⑈ ⑈021000021⑈        304154946⑈89  ⑈000 2421498⑈

3   06/25/03    3
0212-0400-5
3      002       3
0710-0030-00
740038615  0710-0030-1
740038615  06-25-03
740038615  4890 4895  01 74 144

>271972899< 08 020 011027475 20030624
BANKFINANCIAL 017768432 06/25/2003 2557 1 138
021000021
PAID  RJ 00177680432 06/25/2003 2557 125 4
06/25/03  070   JPMORGANCHASE METROTECH
0400178962      JPMORGANCHASE METROTECH POSITION

6700722721

PAY TO THE ORDER OF
MARC L. WERNER IRREVOCABLE
TRUST #1
Richard L Werner
Donna Werner Trustee
a/c 0007-140476



ACCOUNT NUMBER 304154946                                4412

ACCOUNT NAME Werner Holding Co (PA) Inc.    DATE June 16, 2003    1-2 210

PAY TO THE ORDER OF ___Suzanne Rosen_____ $ 8,699.37

Eight thousand six hundred ninety nine and 37/100 _____ DOLLARS

CHASE  JPMorgan Chase Bank
401 Madison Avenue
New York, NY 10017        134

⑆004412⑆ ⑆021000021⑆        89  ⑈0000869937⑈