Part 2 of Exhibits to Declaration of Craig Averch
(Docket No. 121)

EXHIBIT 30

Shareholder Closing Instructions

| DEBIT ACCOUNT | | Tracking No. | Name | Proceeds Amount | Financial Institution | ABA Number | For Credit To: Account Name | For Credit To: Account Number | For Further Credit: Acct. Name and Number | Account Rep Name & Number |
|---|---|---|---|---|---|---|---|---|---|---|
| **SOURCES** | | | | | | | | | | |
| **WERNERCO** | | | | | | | | | | |
| **WERNERCO** | | | | | | | | | | |
| Werner Holding Co. (PA), Inc. | 3041540(40) | | JPN and Citi Term Loan | $180,000,000.00 | | | | | | |
| Werner Holding Co. (PA), Inc. | 3041540(40) | | Additional A/R Facility Draw down | $20,000,000.00 | | | | | | |
| Werner Holding Co. (PA), Inc. | 3041540(40) | | LPG Convertible Part. | $55,000,000.00 | | | | | | |
| Werner Holding Co. (PA), Inc. | 3041540(40) | | Balance Sheet Cash | $22,685,172.98 | | | | | | |
| Werner Holding Co. (DE), Inc. | 3041540(38) | | Deutsche Banc Existing Term Loans & Account Int. & Fees | $116,143,447.90 | Deutsche Bank Trust Company, Americas | 021-001-033 | Commercial Loan Department | 98-40-12-68 | Ref. Werner Co. | |
| Werner Holding Co. (DE), Inc. | 3041540(38) | | Werner Holding Co. (PA), Inc. | $65,401,647.17 | JPMorgan Chase NY | 021-000-021 | | | | |
| Werner Holding Co. (DE), Inc. | 3041540(38) | | JP Morgan / Citi - Underwriting Fees & Expenses | $5,807,928.05 | JPMorgan Chase | 021-000-021 | | | Ref. Recap Underwriting Fees | |
| Werner Holding Co. (DE), Inc. | 3041540(38) | | JP Morgan M&A Fees and Expenses | $1,044,526.01 | JPMorgan Chase Bank | 021-000-021 | JP Morgan Securities Inc. | 066914623 JPASH IB BEST | Ref. Invoice #003276703 | |
| Werner Holding Co. (DE), Inc. | 3041540(38) | | Citigroup Advisory Fees & Expenses | $1,904,535.09 | JPMorgan Chase | 021-000-021 | | 0691 08008 | Inv # 068335464915-FINAL ATTN. Vincent Paragano | |
| Werner Holding Co. (DE), Inc. | 3041540(38) | | Consent Solicitation - Expenses | $11,000,000.00 | Chase, New York | 021-000-021 | Corporate Trust Agency | 111-0/65 | | |
| Werner Holding Co. (DE), Inc. | 3041540(38) | | Tabulation Agent Fee - BNY | $37,805.28 | Chase, New York | 021-000-018 | Corporate Trust Agency | 111-0/65 | Account 80725/34. Ref. Consent Payment | |
| Werner Holding Co. (DE), Inc. | 3041540(38) | | Merrill Receiving Data Room | $11,000.00 | US BANK | 091-000-022 | Merrill | 1702-06022-5310 | Ref. Werner Data Room Fees | |
| Werner Holding Co. (DE), Inc. | 3041540(38) | | Marketing Edge Consulting, LLC (LGP Mkt. Research) | $45,000.00 | Chase, New York | 021-000-021 | | 106-0700 | | |
| Werner Holding Co. (DE), Inc. | 3041540(38) | | Aon Consulting Inc. (Employee Benefits Consulting) | $20,000.00 | Chase, New York | 021-000-021 | | 710-060609 | Invoice # 03-0659 | |
| Werner Holding Co. (DE), Inc. | 3041540(38) | | Aon Risk Services Companies, Inc. | $20,000.00 | Chase, New York | 021-000-021 | | 710-060242 | Ref. Werner | |
| Werner Holding Co. (DE), Inc. | 3041540(38) | | GDC | $20,000.00 | Bank of America | 071000012 | | 5626653 | Invoice number 87000001/07321 | |
| Werner Holding Co. (DE), Inc. | 3041540(38) | | Cohen & Grigsby | $150,000.00 | PNC Bank, N.A. | 043-000-096 | Cohen & Grigsby, P.C. General Account | 0002780765 | | |
| Werner Holding Co. (DE), Inc. | 3041540(40) | | PricewaterhouseCoopers | $113,000.00 | Citibank NA | 021-000-089 | PricewaterhouseCoopers LLP | 3040643/ | Ref. 378554-12222-00, Invoice Reference 2274-000000- | |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 119 | Skadden, LGP Legal | $17,893.00 | Citibank, F.S.B | 321-171-184 | | 910-1-046362 | Reference invoice number 075427111 | |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 160 | Heil & Mauella LLP (LGP HSR) | $44,000.00 | Chase, New York | 021-000-021 | Standard & Poor's | 910-2-709785 | Ref. # 910304/010062606 Other | |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 118 | Moody's | $57,500.00 | SUNTRUST BANK | 061-000-104 | | 818964-10124 | Invoice # 066427 | |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 22 | S&P | $87,500.00 | Chase, New York | 021-000-021 | Standard & Poor's | 818964-10124 | Ref # 1110338-20016 | |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 27 | Blank Rome LLP (LGP PA counsel) | $152,500.00 | Commerce Bank, N.A. | 031-000-011 | | 0366-193959 | Ref # 1103545-00033 BT CO - BY ALEX BROWN | |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 74 | White & Case (LGP DE Counsel) | $105,000.00 | Bank of New York | 021-000-018 | White & Case LLP | 630-1-046934 | | |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 75 | RealSmith | $8,714.40 | PNC Bank, N.A. | 043-000-261 | | 0002780765 | Ref. III Out of Pocket Expenses | |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 128 | Ladner Equity Limited | $38,863.063.94 | Investco Bank BSC | 0366-193959 | Investco Bank BSC | 944-7-07207 | Ref. Ladner Equity Limited | |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 128 | Werner Equity Limited | $38,863.063.94 | Investco Bank BSC | | Investco Bank BSC | 944-7-07207 | Ref. Werner Equity Limited | |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 127 | Werner III Limited | $55,526,517.14 | Investco Bank BSC | | Investco Bank BSC | 944-7-07207 | Ref. Werner III Limited | |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 5 | Werner Investments Limited | $55,137,510.24 | Investco Bank BSC | | Investco Bank BSC | 944-7-07207 | Ref. Werner Investments Limited | |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 135 | Amroxilla Limited | $53,294,800.37 | Investco Bank BSC | | Investco Bank BSC | 944-7-07207 | Ref. Amroxilla Limited | |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 24 | Cooperstown Limited | $53,294,800.37 | Investco Bank BSC | | Investco Bank BSC | 944-7-07207 | Ref. Cooperstown Limited | |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 54 | Climbing Products Limited | $53,294,800.37 | Investco Bank BSC | | Investco Bank BSC | 944-7-07207 | Ref. Climbing Products Limited | |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 128 | Platea Limited | $53,068,716.80 | Investco Bank BSC | | Investco Bank BSC | 944-7-07207 | Ref. Platea Limited | |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 55 | Craig B. Werner Family Limited Partnership | $2,401,869.72 | Northern Trust Chicago | 071000152 | Craig Werner Family Limited Partnership | 5441-70707 | Craig Werner Family Limited Partnership | Stephanie Fain 847-615-4194 |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 66 | Robert I. Werner - Irrev. Trust dated 8/30/94 | $2,028,074.94 | Northern Trust Chicago | 071000152 | Robert I. Werner Irrev. Trust | 5186071000 | Robert I. Werner Irrev. Trust | Stephanie Fain 847-615-4194 |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 99 | Richmond Drive Enterprises, L.P. | $32,069,246.17 | CITIBANK NY, NY | 021000089 | Richmond Drive Enterprises LP | 29017893 | Richmond Drive Enterprises LP | Tricia Stanger 312-855-4600 |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 154 | Michael W. Werner - Trust | | Charles Schwab & Co. Inc. | 021000089 | Charles Schwab & Co. Inc. | 40045689833 | Michael Werner Revocable Trust UAD 1-2-96 Acct. No. 0040-2507 | Alyson or Lynn 800-221-0860 ext. 4 |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 132 | Michael W. Werner Revocable Trust UAD 12-051,778.78 | | Melon Bank, New York | 021000089 | | 01011720 | Michael Werner Revocable Trust UAD 1-2-96 Acct. No. 004-2297 | Al Griffiths 312-456-4520 |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 154 | Bruce D. Werner - Trust | | Melon Bank, New York | 070000152 | General Ledger Account | 15860110000 | Bruce Werner Family Trust Acct. No. 23-211981 | Stephanie Fain 847-615-4600 |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 69 | Jeffrey R. Ackerman, Successor Trustee of Elizabeth W. Ackerman | $2,019,814.69 | Northern Trust, Pittsburgh, PA | 071000152 | Goldman Sachs & Co. | 93010114483 | Alyson or Lynn | Tricia Stanger 312-855-4600 |
| Werner Holding Co. (DE), Inc. | 3041540(40) | 128 | Michael W. Werner Revocable Trust UAD 1/2/96 | $2,019,814.69 | Fiduciary Trust International, NY | 026007022 | The Ackerman Trust, Capt. | 42047071718 | Eric J. and Melanie R. Werner Acct. No. 6805-107967 | George Caladella 212-420-2604 |
| Werner Holding Co. (DE), Inc. | 3041540(38) | 138 | Eric J. Werner | $1,896,101.06 | Melon Bank, Pittsburgh, PA | 042000681 | | 19117-0012 | Eric J. and Melanie R. Werner Acct. No. 6805-107967 | Nick Fazzolari 724-342-7363 |

Revised: 6/10/2003
Printed: 6/10/2003

Shareholder Closing Instructions

| DEBIT ACCOUNT | Tracking No. | Name | Proceeds Amount | Financial Institution | ABA Number | For Credit To: Account Name | For Credit To: Account Number | For Further Credit: Acct. Name and Number | Account Rep Name & Number |
|---|---|---|---|---|---|---|---|---|---|
| Werner Holding Co. (PA), Inc. | 115 | Alligator Partners, L.P. | $1,615,102.53 | National City Bank | 041000124 | Alligator Partners, L.P. | 1017230 | | Daniel J. McGuire 216-222-2708 |
| Werner Holding Co. (PA), Inc. | 118 | Michael J. Sobti | $1,274,867.19 | Mellon Bank, Pittsburgh, PA | 043000261 | Michael J. Sobti | 9207011483 | Michael J. Sobti Acct. No. 862K-23508 | Janaro's Cove 312-496-8022 |
| Werner Holding Co. (PA), Inc. | 138 | Donald M. Werner | $1,005,618.54 | JP Morgan Chase, NYC | 021000021 | Donald M. Werner | 9301011483 | Donald M. Werner Acct. No. 0301058542 | Angela Marcarino 215-496-0506 |
| Werner Holding Co. (PA), Inc. | 157 | Ronald E. Werner | $1,000,006.87 | JP Morgan Chase, NYC | 021000021 | Smith Barney | 06919B008 | Ronald E. Werner Acct. No. 7CW-018467 | Thoa Shaper 312-666-0506 |
| Werner Holding Co. (PA), Inc. | 51 | Dennis G. Werner | $964,041.09 | Union National Bank, 34NE Orange Ave, Roanoke, VA 24012 | 054405549 | Smith Barney | | Dennis G. Werner Acct. No. 178-019547 | Don Cook 312-666-0506 |
| Werner Holding Co. (PA), Inc. | 9 | Mindy Werner Alter | $912,842.74 | Northern Trust Chicago | 071000152 | First Clearing Corporation | 5000-000-0004-31 | Mindy Werner and Daniel Alter Tenants in Common Acct. No. 3662-4261 | Angela Marcarino 608-626-6523 |
| Werner Holding Co. (PA), Inc. | 4 | Elise W. Frost | $891,474.76 | Northern Trust Chicago | 071000152 | General Ledger Acct. | 5186011000 | Elise Werner Frost Trust Acct. No. 23-00045 | Stephanie Felin 847-615-3088 |
| Werner Holding Co. (PA), Inc. | 38 | Repayment to WWFA for Stock Loan Program | $887,470.41 | PNC Bank | 043018092 | Werner Co. | 1026709188 | | Olga Stokes 847-266-4210 |
| Werner Holding Co. (PA), Inc. | 102 | Florence J. Werner - Irrev. Trust Dated 10/7/94 | $889,439.16 | Mellon Bank, Pittsburgh, PA | 043000261 | Goldman Sachs & Co. | 9201011483 | Florence J. Werner Irrev. Trust Acct. No. 02089 | Amy Pernel 724-589-6740 |
| Werner Holding Co. (PA), Inc. | 142 | Gail Rauch Blackman | $852,781.74 | JP Morgan Chase, NYC | 021000021 | General Ledger Acct. | 0619B008 | | Angela Marcarino 312-496-8022 |
| Werner Holding Co. (PA), Inc. | 13 | Gerald R. Whipman | $840,963.68 | Northern Trust Chicago | 071000152 | General Ledger Acct. | 5186011000 | Noel Ben-Rauch Acct. No. 23-01008 | Michele Pearson 847-266-4250 |
| Werner Holding Co. (PA), Inc. | 156 | Agnes Boivie Francois | $797,298.31 | Nat West Bank 54-30-03 | 30020-03831 | Agnes Boivie Francois | 00030722102 | | Thoa Shaper 312-496-8022 |
| Werner Holding Co. (PA), Inc. | 116 | Noel Ben-Rauch | $592,206.31 | Northern Trust Chicago | 071000152 | Mr. GR and Mrs. KM Trust LLAD 8-30-69 | 76761589 | Mr. GR and Mrs. KM Trust, LLAD 8-30-69 Acct. No. 424-30634-12,334 | Don Cook 312-496-6623 |
| Werner Holding Co. (PA), Inc. | 10 | Bruce D. Werner Family Limited Partnership | $540,893.68 | First National Bank of Pennsylvania | 043018092 | Howell L. Sobti Rev. Trust LLAD 8-30-69 | 665222788 | Bruce D. Werner Family Limited Partnership Acct. No. 23-13167 | Daniel J. McGuire 216-222-2708 |
| Werner Holding Co. (PA), Inc. | 68 | Ira and Elise Frost Family Limited Partnership | $588,534.27 | Northern Trust Chicago | 071000152 | General Ledger Acct. | 5186011000 | Ira and Elise Frost Family Limited Partnership Acct. No. 23-00042 | Stephanie Felin 847-615-3088 |
| Werner Holding Co. (PA), Inc. | 152 | Ronit S. Rosati | $506,650.62 | Mellon Bank, Pittsburgh PA | 043000261 | Robert A. Rosati and Ronit | 40626540 | | Amy Pernel 724-589-6740 |
| Werner Holding Co. (PA), Inc. | 151 | Melanie N. Werner, Custodian for Isabelle A. Werner | $506,850.62 | Mellon Bank, Pittsburgh, PA | 043000261 | Merrill Lynch Private Service Center | 10117302 | Melanie N. Werner C/F Isabelle N. Werner Acct. No. 6BD-10788 | Nick Palombi 724-362-7383 |
| Werner Holding Co. (PA), Inc. | 117 | Janet F. Sobti | $486,178.83 | First National Bank of Pennsylvania | 043000261 | Merrill Lynch Private Service Center | 10117302 | Melanie N. Werner C/F Sophia K. Werner Acct. No. 6BD-10789 | Nick Palombi 724-362-7383 |
| Werner Holding Co. (PA), Inc. | 3 | Beverly Werner Needham | $504,206.12 | Northern Trust Chicago | 071000152 | General Ledger Acct. | 5186011000 | Janet F. Sobti Revocable Trust Acct. No. 101-605-791-0200 | Don Lewis 908-688-3705 |
| Werner Holding Co. (PA), Inc. | 148 | Edward Pollack, P.OA RLIW | $504,036.42 | Wachovia Bank 190 River Road, Summit, NJ 07901 | 011201467 | Edward Pollack | 101005797.0200 | Werner-Alter, LLC Acct. No. 23-21057 | Stephanie Trujillo 908-608-3705 |
| Werner Holding Co. (PA), Inc. | 148 | Edward Pollack | $443,760.96 | Wachovia Bank 190 River Road, Summit, NJ 07901 | 011201467 | Edward Pollack | | Beverly Werner Needham Fixed Income Acct. No. 6BD-10766 | Jan Cook 312-666-4250 |
| Werner Holding Co. (PA), Inc. | 96 | Randall Family Trust | $276,048.64 | JP Morgan Chase, NYC | 021000021 | Smith Barney Inc. | 06919B008 | Laura W. Werner Revocable Trust LLAD 1-2-96 Acct. No. 6BD-22066 | Don Lewis 908-688-3705 |
| Werner Holding Co. (PA), Inc. | 155 | Marc L. Werner | $274,202.67 | LaSalle Bank N.A. | 071000508 | Marc L. Werner/ Donna S. Werner | 5304850069 | Steven S. Hope Randall, Trustee of the Randall Family Trust Acct. No. 204-20721-1-0-564 | Mike Snowden 800-454-6605 |
| Werner Holding Co. (PA), Inc. | 143 | Laura Werner, Trustee of the Laura W. Werner Rev. Trust / Repayment to Werner Co. by Marc L. Werner for Outstanding | $390,970.00 | Northern Trust Bank of N.A. | 071000508 | General Ledger Account | 1015535311 | Robert I. Werner Acct. No. 23-00242 | Marcos Matta 305-671-3365 |
| Werner Holding Co. (PA), Inc. | 148 | Ronit S. Rosati, Custodian for Richmond J. Rosati | $351,922.02 | Mellon Bank, Pittsburgh PA | 043000261 | Robert A. Rosati and Ronit Rosati | 40626540 | Laura W. Werner Revocable Trust LLAD 1-2-96 Acct. No. 6BD-22066 | Amy Pernel 724-589-6740 |
| Werner Holding Co. (PA), Inc. | 138 | Ronit S. Rosati, Custodian for Ryan Gregory Rosati | $314,694.93 | PNC Bank | 043018092 | Werner Co. | 1026709188 | | Amy Pernel 724-589-6740 |
| Werner Holding Co. (PA), Inc. | 97 | Rauch Trust | $254,162.69 | Northern Trust Chicago | 071000152 | General Ledger Account | 5186011000 | Rauch Trust LLAD 6/10/98 Acct. No. 9116-68519 | Michele Pearson 847-266-4250 |
| Werner Holding Co. (PA), Inc. | 86 | Peter R. O'Con | $228,484.04 | PNC Bank | 043000090 | Peter R. O'Con & Peggy A. O'Con | 1015635331 | Patrick Kennedy 847-615-4519 | Patrick Kennedy 847-615-4519 |
| Werner Holding Co. (PA), Inc. | 111 | Elissa Schwartz | $214,471.19 | Northern Trust Chicago | 071000152 | General Ledger Account | 5186011000 | Elissa H. Schwartz Acct. No. 23-00987 | Melanie Napoleon 800-621-1611 |
| Werner Holding Co. (PA), Inc. | 112 | Suzanne Schwartz | $218,202.53 | Northern Trust Chicago | 071000152 | General Ledger Account | 5186011000 | Suzanne Schwartz Trust Acct. No. 23-00001 | Melanie Napoleon 800-621-1611 |
| Werner Holding Co. (PA), Inc. | 104 | Ronit S. Rosati, Custodian for Ross Daniel Rosati | $216,242.76 | First National Bank of Pennsylvania | 043018092 | Robert A. Rosati and Ronit Sue Rosati | | | Amy Pernel 724-589-6740 |

Revised 6/10/2003
Printed 6/10/2003

Shareholder Closing Instructions

| DEBT ACCOUNT | | Tracking No. | Name | Proceeds Amount | Financial Institution | ABA Number | For Credit To Account Name | For Credit To Account Number | For Further Credit, Acct. Name and Number | Account Rep Name & Number |
|---|---|---|---|---|---|---|---|---|---|---|
| Werner Holding Co. (PA), Inc. | 304154646 | 144 | Jonathan C. Werner Gift Trust UAD 11/1/96 | $201,251.89 | Mellon Bank, Pittsburgh, PA | 043000261 | Pershing LLC | 1011730 | Jonathan Charles Werner Gift Trust UAD 11/1/96 Acct. No. 636-028583 | Al Shikas 312-466-8220 |
| Werner Holding Co. (PA), Inc. | 304154646 | 146 | Stephanie N. Werner Gift Trust UAD 11/1/96 | $201,251.89 | Mellon Bank, Pittsburgh, PA | 043000261 | Pershing LLC | 1011730 | Stephanie Noelle Werner Gift Trust UAD 11/1/96 Acct. No. 636-028583 | Al Shikas 312-466-8220 |
| Werner Holding Co. (PA), Inc. | 304154646 | 39 | Vincent J. Garzell & Karen R. Garzell, Trustees of the Vincent J. | $184,107.02 | JP Morgan Chase, NYC | 021000021 | Pershing LLC | 1011730 | Vincent J. Garzell Acct. No. 094-028500 | Al Shikas 312-466-8220 |
| Werner Holding Co. (PA), Inc. | 304154646 | 6 | Bahnt Limited | $178,890.10 | Chase Bank, New York | 021-000-021 | Investcorp Bank BSC | 544-7-07207 | Bahnt Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 | 25 | Denarii Limited | $178,890.10 | Chase Bank, New York | 021-000-021 | Investcorp Bank BSC | 544-7-07207 | Denarii Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 | 43 | Gleann Limited | $178,890.10 | Chase Bank, New York | 021-000-021 | Investcorp Bank BSC | 544-7-07207 | Gleann Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 | 52 | Highlands Limited | $178,890.10 | Chase Bank, New York | 021-000-021 | Investcorp Bank BSC | 544-7-07207 | Highlands Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 | 60 | Balef Limited | $178,890.10 | Chase Bank, New York | 021-000-021 | Investcorp Bank BSC | 544-7-07207 | Balef Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 | 86 | Noble Limited | $178,890.10 | Chase Bank, New York | 021-000-021 | Investcorp Bank BSC | 544-7-07207 | Noble Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 | 89 | Outragel Limited | $178,890.10 | Chase Bank, New York | 021-000-021 | Investcorp Bank BSC | 544-7-07207 | Outragel Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 | 90 | Quill Limited | $178,890.10 | Chase Bank, New York | 021-000-021 | Investcorp Bank BSC | 544-7-07207 | Quill Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 | 84 | Radlul Limited | $178,890.10 | Chase Bank, New York | 021-000-021 | Investcorp Bank BSC | 544-7-07207 | Radlul Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 | 113 | Shoreline Limited | $178,890.10 | Chase Bank, New York | 021-000-021 | Investcorp Bank BSC | 544-7-07207 | Shoreline Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 | 1311 | Zinnia Limited | $178,890.10 | Chase Bank, New York | 021-000-021 | Investcorp Bank BSC | 544-7-07207 | Zinnia Limited | |
| Werner Holding Co. (PA), Inc. | 304154646 | 150 | Barbara L. Werner | $172,640.13 | Chase Manhattan Bank, N.A. Metro Tech Center, Brooklyn, NY | 021-000-021 | Service Center | 930-1-032562 | M.L. Werner Partners, LLC Acct. No. 694000856 | Marc Memmon 847-934-9426 |
| Werner Holding Co. (PA), Inc. | 304154646 | 149 | Marc L. Werner, Custodian for Jeffrey Addison Werner | $148,788.51 | Chase Bank, New York Metro Tech Center, Brooklyn, NY | 021-000-021 | Service Center | 930-1-032562 | Marc L. Werner, LLC Acct. No. 690-11083 | Marc Memmon 847-934-9426 |
| Werner Holding Co. (PA), Inc. | 304154646 | 53 | Marc L. Werner, Custodian for Ashley Elizabeth Werner | $148,788.51 | Chase Bank, New York Metro Tech Center, Brooklyn, NY | 021-000-021 | Service Center | 930-1-032562 | Marc L. Werner, LLC Acct. No. 690-11083 | Marc Memmon 847-934-9426 |
| Werner Holding Co. (PA), Inc. | 304154646 | 85 | Investcorp Investment Equity Limited | $148,788.51 | JP Morgan Chase, NYC | 021000021 | Smith Barney Inc. | 066168008 | Fixed Income - Beverly W. and James S. Needham Trustees for Shannon Acct. No. 696-25671 | Jane Delaney 781-235-8000 |
| Werner Holding Co. (PA), Inc. | 304154646 | 94 | Werner GC Trust for Erin (Erin Joy Ryan) | $148,788.51 | JP Morgan Chase, NYC | 021000021 | Smith Barney Inc. | 066168008 | Fixed Income - Beverly W. and James S. Needham Trustees for Erin Acct. No. 696-11083 | Jane Delaney 781-235-8000 |
| Werner Holding Co. (PA), Inc. | 304154646 | 148 | Werner GC Trust for Shannon (Shannon Rose Ryan) | $148,788.51 | JP Morgan Chase, NYC | 021000021 | Smith Barney Inc. | 066168008 | Fixed Income - Beverly W. and James S. Needham Trustees for Shannon Acct. No. 696-25671 | Jane Delaney 781-235-8000 |
| Werner Holding Co. (PA), Inc. | 304154646 | 153 | Michael E. Werner | $144,366.78 | Merrill Lynch | 021000021 | Merrill Lynch | 1011730 | Michael Werner Revocable Trust UAD 1-2-96 Acct. No. 690-02001 | Marc Memmon 847-934-9426 |
| Werner Holding Co. (PA), Inc. | 304154646 | 69 | Martha Beth Karp, Custodian for Allison Tyler Karp | $735,679.26 | Northern Trust Chicago | 071000152 | Merrill Lynch | 5166011000 | Martin Karp UTMA FBO Allison T. Karp Acct. No. 23-23054 | Marc Memmon 847-934-9426 |
| Werner Holding Co. (PA), Inc. | 304154646 | 141 | Florence J. Werner | $735,155.69 | Northern Trust Bank of Florida | 066009650 | General Ledger Acct. | 5166011000 | Florence J. Werner Acct. No. 1740000231 | Marcos Muslik 305-591-2230 |
| Werner Holding Co. (PA), Inc. | 304154646 | 145 | Margot A. Werner Gift Trust UAD 11/1/96 | $112,793.44 | Mellon Bank, Pittsburgh, PA | 043000261 | Merrill Lynch | 1011730 | Margot A. Werner Gift Trust UAD 11/1/96 Acct. No. 636-025885 | Al Shikas 312-466-8220 |
| Werner Holding Co. (PA), Inc. | 304154646 | 120 | Stewart Charitable Remainder Unitrust | $110,311.90 | First Union National Bank/Philadelphia, PA | 031201467 | c/o SEI Private Trust Co. | 2100011327696 | The Stewart Charitable Remainder Unitrust Acct. No. 02061 | Harold Thomas (Founders Financial Network) 1-888-408-3688 |
| Werner Holding Co. (PA), Inc. | 304154646 | 150 | Marc L. Werner, Custodian for Jeffrey Addison Werner | $148,788.51 | Chase Bank, New York | 021-000-021 | Service Center | 930-1-032562 | Marc L. Werner, LLC Acct. No. 690-11083 | Marc Memmon 847-934-9426 |
| Werner Holding Co. (PA), Inc. | 304154646 | 101 | Robert A. Rosali | $104,030.48 | First National Bank of Pennsylvania | 043100262 | General Ledger Acct. | 516601 | Robert A. Rosali and Sue Rosali | Amy Peret 724-589-8740 |
| Werner Holding Co. (PA), Inc. | 304154646 | 9 | Jeffrey R. Ackerman | $86,900.99 | First National Bank/Fleet Bank | 011501967 | General Ledger Acct. | 516601967 | Jeffrey R. Ackerman | Amy Peret 724-589-8740 |
| Werner Holding Co. (PA), Inc. | 304154646 | 2 | Marc L. Werner | $86,900.99 | Chase Bank, New York | 021-000-021 | Service Center | 930-1-032562 | Marc L. Werner Acct. No. 690-02001 | Marc Memmon 847-934-9426 |
| Werner Holding Co. (PA), Inc. | 304154646 | 140 | Lee L. Bastista | $64,436.50 | Chase Bank, New York | 021000021 | Perhing LLC | 1011730 | Lee L. and Elaine D. Bastista | Marc Memmon 847-934-9426 |
| Werner Holding Co. (PA), Inc. | 304154646 | 14 | Agnes Francois, Custodian for Michel Francois | $57,947.44 | JP Morgan Chase, NYC | 021000021 | Perhing LLC | 0000792665666 | | Joan Anthony 724-981-3815 |
| Werner Holding Co. (PA), Inc. | 304154646 | 33 | Agnes Francois, Custodian for Claire Francois | $87,285.24 | BNP PARIBAS | 30004-01613 | Claire Francois | 00000008494 | | Nick Patenski 724-589-4193 |
| Werner Holding Co. (PA), Inc. | 304154646 | 31 | Agnes Francois, Custodian for James Andre Francois | $87,285.24 | BNP PARIBAS | 30004-01613 | James Francois | 00000008494 | | Nick Patenski 724-589-4193 |
| Werner Holding Co. (PA), Inc. | 304154646 | 137 | Bruce D. Werner and Tammy H. Werner, Jt. Tenants | $49,327.16 | Northern Trust Chicago | 071000152 | Merrill Lynch | 1011730012 | Bruce D. Werner Trust Acct. No. 23-21005 | Nick Patenski 724-589-4193 |
| Werner Holding Co. (PA), Inc. | 304154646 | 882 | Donald A. Werner and Barbara L. Werner, Jr., Tenants | $46,006.02 | JP Morgan Chase, Pittsburgh, PA | 043000261 | Karen Lynn Mosesko | 1011730012 | Donald and Barbara Werner Acct. No. 424-26234-10-204 | Nick Patenski 724-589-4193 |
| Werner Holding Co. (PA), Inc. | 304154646 | 12 | Noel Berk-Rauch, Custodian for Eli Berk-Rauch | $35,550.66 | Northern Trust Chicago | 071000152 | Merrill Lynch | 5166011000 | Eli Berk-Rauch Acct. No. 23-21033 | McKinley Pearson 724-589-4193 |
| Werner Holding Co. (PA), Inc. | 304154646 | 31 | Noel Berk-Rauch, Custodian for Hanna Berk-Rauch | $35,550.66 | Northern Trust Chicago | 071000152 | Merrill Lynch | 5166011000 | Hanna Berk-Rauch Acct. No. 23-21034 | McKinley Pearson 724-589-4193 |
| Werner Holding Co. (PA), Inc. | 304154646 | 137 | Gail Rauch Blackman, Custodian for Heather Blackman | $87,285.24 | JP Morgan Chase, NYC | 021000021 | General Ledger Acct. | 280225547 | Gail Blackman - General Partner Blackman Family Limited Partnership Acct. No. | Marcos Muslik 305-591-2230 |
| Werner Holding Co. (PA), Inc. | 304154646 | 9 | Eric J. Werner and Melanie R. Werner, Jt. Tenants | $87,285.24 | Mellon Bank, Pittsburgh, PA | 043000261 | Merrill Lynch | 1011730 | Eric J. and Melanie R. Werner Acct. No. 424-26234-10-204 | Marcos Muslik 305-591-2230 |
| Werner Holding Co. (PA), Inc. | 304154646 | 32 | Ellen Berk-Rauch | $30,651.07 | BNP PARIBAS | 30004-01613 | | 00000000613 | Ellen Berk-Rauch Acct. No. 23-21009 | Mike Clairold 011 331 30 15 52 52 |
| Werner Holding Co. (PA), Inc. | 304154646 | 21 | David A. Carollo | $26,102.60 | National City Bank | 042000122 | David A. & Maryann Carollo | 065967462824 | | Ray Perell 724-588-9740 |

Revised: 6/10/2003
Printed: 6/10/2003

Shareholder Closing Instructions

| DEBIT ACCOUNT | | Tracking No. | Name | Proceeds Amount | Financial Institution | ABA Number | For Credit To: Account Name | For Credit To: Account Number | For Further Credit: Acct. Name and Number | Account Reg Name & Number |
|---|---|---|---|---|---|---|---|---|---|---|
| Werner Holding Co. (PA), Inc. | 304154946 | 70 | Marsha Beth Karp, Custodian for Melissa S. Karp | $23,976.68 | Northern Trust Chicago | (071000152) | General Ledger Acct. | (5186011000) | Marsha B Karp, Custodian UTMA FBO Melissa S. Karp Acct. No. 23-22363 | Leah Horwitz 847-266-4200 |
| Werner Holding Co. (PA), Inc. | 304154946 | 44 | J. David Goldsall | $22,600.52 | HSBC Bank, USA | 021001088 | Vanguard | 00011-2045 | David Goldsall Acct. No. 99921266581 In favor of fund 36-SRMIA | Vanguard Group Voyager Service 800-284-7245 818-506-2661 |
| Werner Holding Co. (PA), Inc. | 304154946 | 46 | June Goldsall and J. David Goldsall, Jr. Tenants | $22,050.52 | Bank of America 3301 Laurel Canyon Blvd Valley Village, CA. 91607 | 122000661 | June Goldsall, David Goldsall | 00000283407 | | Suzanne Treille 011 331 41 02 03 60 011 331 41 02 03 62 |
| Werner Holding Co. (PA), Inc. | 304154946 | 34 | Claude J. Francois | $18,833.77 | Societe Generale, Paris France | 30003-03831 | Claude Francois | 000002834 | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 122 | Philip T. Tay | $10,761.94 | Lloyds TSB | 77-25-03 | Min. S.A. Tay | 10754868 | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 121 | Gary L. Stewart | $9,699.37 | Washington Mutual Bank FA | 322271627 | Gary Stewart | 4404119760 | | Gail Johnson 760-742-8334 |
| Werner Holding Co. (PA), Inc. | 304154946 | 17 | Richard D. Bonie | $1,000,066.12 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 19 | Vera Bonie | $1,606,132.00 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 74 | Marlene T. Krane | $862,781.74 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 107 | Debra A. Rothman | $791,447.95 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 16 | Margaret E. Bonie | $518,541.80 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 26 | Henry W. Dowler | $464,436.50 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 41 | Vincent A. Genis | $464,435.50 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 40 | Brad J. Genis | $58,850.00 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 123 | Michael E. Trzynka | $58,860.00 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 124 | Maurice Weiner | $253,448.12 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 39 | Garver 1987 Valued GTD 12/19/1987 | $467,782.50 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 109 | Timothy J. Banks, Trustee of Arnold J. Werner Revocable Living Trust | $244,838.47 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 110 | Kevin Matthew Rothman | $70,223.01 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 8 | Steven R. Benson | $67,930.89 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 47 | Paula J. Griffith | $58,608.54 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 100 | William J. Rippin | $51,742.31 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 29 | David A. McGowan | $58,848.10 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 80 | John J. Fumetheobb | $57,151.99 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 48 | John M. Guyton | $54,616.62 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 20 | Michael D. Brooks | $51,070.51 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 108 | Debra A. Rothman, Custodian for Jordana Rothman | $46,327.16 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 58 | Linda C. Jockert | $42,241.27 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 79 | Erik A. Mason | $41,006.11 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 49 | Geoffrey R. Hichenstein | $39,607.21 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 75 | Marlene T. Krane, Custodian for Jason S. Krane | $38,550.68 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 28 | Bruce B. Racher | $35,720.11 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 50 | William C. Hazell | $34,266.04 | | | | | | |
| Werner Holding Co. (PA), Inc. | 304154946 | 78 | Neal R. Martin | $31,873.83 | | | | | | |

Revised  6/10/2003
Printed  6/10/2003

Shareholder Closing Instructions

| DEBIT ACCOUNT | Tracking No. | Name | Proceeds Amount | Financial Institution | ABA Number | For Credit To: Account Name | For Credit To: Account Number | For Further Credit: Acct. Name and Number | Account Rep Name & Number |
|---|---|---|---|---|---|---|---|---|---|
| Werner Holding Co. (PA), Inc. | 304154646 | 59 | Dennis J. Johnson | $24,768.76 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 60 | Jeremy M. Kaplan | $25,292.40 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 67 | Neil D. Kaplan, Custodian for Rachael A. Kaplan | $25,392.40 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 71 | Beth Katz | $26,905.10 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 81 | Susan Morrow | $26,905.10 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 61 | David M. Conn | $26,808.82 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 23 | | $26,808.82 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 147 | Neil D. Werner, Irrevocable Trust u/t/a Richard D. Werner | $28,214.66 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 83 | Edward A. Pollack, Executor of the Estate of Max Harting | $22,600.82 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 84 | Karrish Kaplan | $21,524.37 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 64 | Karrish Kaplan | $21,524.37 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 61 | Jeremy M. Kaplan, Trustee of the Deborah Ann Kaplan Trust U/D 14 January 1998 | $21,266.22 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 62 | Jeremy M. Kaplan, Trustee of the Judith Lily Kaplan Trust U/D 14 January 1998 | $21,266.22 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 66 | Neil D. Kaplan, Custodian for Julia E. Kaplan | $21,266.22 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 65 | Neil D. Kaplan | $18,102.93 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 90 | Robert H. Finney | $15,696.38 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 87 | Jessica Z. Jockett | $13,462.55 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 159 | Michael D. Wise | $11,370.02 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | | Sara Eli Krank | $10,785.04 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 73 | Matthew T. Krank, Custodian for Carly Krane | $9,769.52 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 72 | Richard M. Kelly | $8,778.60 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 98 | Shirley W. Rauch Trust #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 | $9,723.76 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 15 | Francesca Giansiglio Bonte | $9,416.64 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 16 | Richard D. Bonte, Custodian for Alessandra Bonte | $9,416.64 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 114 | Kelly Strom | $8,699.37 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 100 | Suzanne Kaplan | $8,099.37 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 50 | Deborah Kaplan | $6,095.19 | | | | | |
| Werner Holding Co. (PA), Inc. | 304154646 | 63 | Judith Kaplan | $6,095.19 | | | | | |

Revised: 6/10/2003
Printed: 6/10/2003

# EXHIBIT 31

(Excerpts Only)

EXECUTION COPY

# RECAPITALIZATION AND STOCK PURCHASE AGREEMENT

by and among

## WERNER HOLDING CO. (PA), INC.,

The Shareholders of Werner Holding Co. (PA), Inc.
Listed on the Signature Pages Hereto

and

Green Equity Investors III, L.P.

May 7, 2003

TABLE OF CONTENTS

Page

ARTICLE I   DEFINITIONS ................................................................................1

ARTICLE II   RECAPITALIZATION, PURCHASE AND REDEMPTION OF SHARES ..........7

|  |  |  |
|---|---|---|
| 2.1 | Amendment and Restatement of the Company's Articles of Incorporation. | 7 |
| 2.2 | Reclassification of Shares | 8 |
| 2.3 | Purchase and Sale of the Investor Shares | 8 |
| 2.4 | Redemption of Shares | 8 |
| 2.5 | Exchange of Certificates | 8 |
| 2.6 | Closing | 9 |

ARTICLE III   REPRESENTATIONS AND WARRANTIES OF THE COMPANY .................9

|  |  |  |
|---|---|---|
| 3.1 | Corporate Organization | 10 |
| 3.2 | Capital Stock | 10 |
| 3.3 | Subsidiaries | 11 |
| 3.4 | Investments | 11 |
| 3.5 | Corporate Authority; Noncontravention | 11 |
| 3.6 | SEC Reports and Financial Statements | 12 |
| 3.7 | No Undisclosed Material Liabilities | 13 |
| 3.8 | Absence of Certain Changes | 13 |
| 3.9 | Insurance | 14 |
| 3.10 | Customers | 14 |
| 3.11 | Taxes | 15 |
| 3.12 | Governmental Permits | 16 |
| 3.13 | Real Property | 16 |
| 3.15 | Leases | 17 |
| 3.15 | Plant and Equipment | 17 |
| 3.16 | Intellectual Property | 17 |
| 3.17 | Labor Relations | 17 |
| 3.18 | Employee Benefit Plans | 18 |
| 3.19 | Certain Contracts | 21 |
| 3.20 | Compliance with Law | 22 |
| 3.21 | Environmental Matters | 22 |
| 3.22 | Litigation | 22 |
| 3.23 | International Trade Laws and Regulations | 22 |
| 3.24 | Transaction with Affiliates | 23 |
| 3.26 | Finders | 23 |

ARTICLE IV   REPRESENTATIONS AND WARRANTIES OF THE
             SHAREHOLDERS ..................................................................23

|  |  |  |
|---|---|---|
| 4.1 | Authority and Related Matters | 23 |

i

4.2    No Finder ....................................................................................................24

ARTICLE V    REPRESENTATIONS AND WARRANTIES OF INVESTOR............................24

5.1    Organization of Investor ........................................................................24
5.2    Authority and Related Matters................................................................25
5.3    No Finder ...............................................................................................25
5.4    Absence of Proceedings.........................................................................25
5.5    Investment Intent ..................................................................................25
5.6    Status as Accredited Investor................................................................25
5.7    Financial Capability ...............................................................................26
5.8    No Outside Reliance ..............................................................................26
5.9    Governmental Consents .........................................................................26

ARTICLE VI    ADDITIONAL COVENANTS .....................................................................26

6.1    Operations Prior to the Closing Date......................................................26
6.2    Access by Investor .................................................................................28
6.3    Confidentiality .......................................................................................28
6.4    Certain Agreements ...............................................................................29
6.5    No Public Announcement .......................................................................29
6.6    Governmental Filings; Consents.............................................................29
6.7    Non-Solicitation of Employees................................................................30
6.8    Shareholders' Meeting...........................................................................30
6.9    Bondholders' Consent ............................................................................30
6.12   Shareholders' Agreement; Registration Rights Agreement .....................30
6.11   Approval of Transactions........................................................................31

ARTICLE VII    CONDITIONS PRECEDENT TO OBLIGATION OF INVESTOR..................31

7.1    No Misrepresentation or Breach .............................................................31
7.2    Litigation................................................................................................31
7.3    HSR Act .................................................................................................31
7.4    Governmental Approvals........................................................................31
7.5    Financing................................................................................................31
7.6    Bondholders' Consent ............................................................................32
7.7    Shareholder Approval .............................................................................32
7.8    Management Services Agreement ...........................................................32
7.9    Amended and Restated Shareholders' Agreement ..................................32
7.10   Amended and Restated Registration Rights Agreement...........................32
7.11   Solvency Opinion....................................................................................32
7.12   Opinion of Counsel .................................................................................32
7.13   Organizational Documents......................................................................32
7.14   Minimum EBITDA....................................................................................32

ARTICLE VIII    CONDITIONS PRECEDENT TO OBLIGATIONS OF THE
COMPANY AND THE SHAREHOLDERS...................................................33

    8.1    No Misrepresentation or Breach ...........................................................33
    8.2    Litigation................................................................................................33
    8.3    HSR Act..................................................................................................33
    8.4    Financing................................................................................................33
    8.5    Bondholders' Consent ...........................................................................33
    8.6    Solvency Opinion...................................................................................33
    8.7    Shareholder Approval ............................................................................33

ARTICLE IX    TERMINATION..................................................................................34

    9.1    Termination.............................................................................................34
    9.2    Effect of Termination.............................................................................34

ARTICLE X    GENERAL PROVISIONS......................................................................34

    10.1    Survival of Representations and Warranties ..........................................34
    10.2    Notices ...................................................................................................35
    10.3    Partial Invalidity....................................................................................36
    10.4    Execution in Counterparts; Facsimile Signatures .................................36
    10.5    Governing Law .......................................................................................36
    10.6    Expenses.................................................................................................36
    10.7    Assignment; Successors and Assigns; No Third Party Beneficiaries....36
    10.8    No Implied Representation .....................................................................36
    10.9    Titles and Headings................................................................................37
    10.10    Schedules and Exhibits ..........................................................................37
    10.11    Knowledge .............................................................................................37
    10.12    Entire Agreement; Amendments.............................................................37
    10.13    Waivers ..................................................................................................37

## Exhibits and Schedules

Exhibit A          Shareholders and their Shareholdings
Exhibit B          Form of Amended Charter
Exhibit C          Form of Statement with Respect to Shares
Exhibit D          Form of Amended and Restated Shareholders' Agreement
Exhibit E          Form of Amended and Restated Registration Rights Agreement
Exhibit F          Form of Management Services Agreement
Exhibit G          Form of Opinion of Company Counsel


Schedule 3.2(b)    Company Options
Schedule 3.2(c)    Agreements with Respect to Capital Stock
Schedule 3.2(e)    Post-Recapitalization Equity Capitalization
Schedule 3.3       Subsidiaries
Schedule 3.4       Investments
Schedule 3.5       Corporate Authority; Noncontravention
Schedule 3.8       Absence of Certain Changes
Schedule 3.9       Insurance
Schedule 3.10      Customers
Schedule 3.11      Tax Matters
Schedule 3.13      Real Property
Schedule 3.14      Leases
Schedule 3.16      Intellectual Property
Schedule 3.17      Labor Relations
Schedule 3.18      Employee Benefit Plans
Schedule 3.19      Certain Contracts
Schedule 3.20      Compliance with Law
Schedule 3.21      Environmental Matters
Schedule 3.22      Litigation
Schedule 3.24      Transactions with Affiliates
Schedule 3.25      Finders
Schedule 4.1       Shareholder Authority and Related Matters
Schedule 6.1       Operations Prior to the Closing Date
Schedule 7.14      EBITDA Adjustments
Schedule 10.11     Persons Having Knowledge

# RECAPITALIZATION AND STOCK PURCHASE AGREEMENT

This RECAPITALIZATION AND STOCK PURCHASE AGREEMENT is dated as of May 7, 2003, by and among those Persons listed on <u>Exhibit A</u> hereto, Werner Holding Co. (PA), Inc., a Pennsylvania corporation (the "<u>Company</u>"), and Green Equity Investors III, L.P., a Delaware limited partnership ("<u>Investor</u>").

## BACKGROUND

A.    The outstanding equity securities of the Company consist of shares of Class A Common Stock, Class B Common Stock, Class C Common Stock, Class D Common Stock and Class E Common Stock, each having a par value of $0.01 per share.

B.    The Shareholders are, in the aggregate, the owners of 100% of the outstanding shares of Class D and Class E Common Stock of the Company, as well as a majority of the outstanding shares of Class A, Class B and Class C Common Stock of the Company.

C.    The board of directors of the Company (the "<u>Board</u>") has decided to effect a recapitalization of the Company as described herein, which includes the reclassification and redemption of certain shares of capital stock and certain transactions between the Company and Investor.

D.    The Board has determined that the transactions contemplated by this Agreement are fair to, and in the best interests of, the Company and its shareholders.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties and agreements set forth herein, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

In addition to the other words and terms defined elsewhere in this Agreement, as used in this Agreement, the following words and terms have the meanings specified or referred to below:

"<u>Affiliate</u>" means, with respect to any Person that is not an individual, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person. A Person will be deemed to control a corporation if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such corporation, whether through the ownership of voting securities, by contract or otherwise. A Person will be deemed to control a partnership if (a) such Person or a subsidiary of such Person, directly or indirectly, is the sole general partner or sole managing general partner of such partnership or (b) the only general partners of such partnership are such Person and/or subsidiaries of such Person. A Person will be deemed to control a limited liability company if

"Transaction Expenses" means the legal, accounting, financial advisory and consulting expenses incurred in connection with the transactions contemplated hereby by any of the Company, the Subsidiaries, the Shareholders and, in the event and only in the event of Closing upon the terms and subject to the satisfaction or waiver of the conditions contained in this Agreement, Investor.

"Werner Delaware" means Werner Holding Co. (DE), Inc., a Delaware corporation.

# ARTICLE II
# RECAPITALIZATION, PURCHASE AND REDEMPTION OF SHARES

2.1     Amendment and Restatement of the Company's Articles of Incorporation; Statement with Respect to Shares.  In accordance with the PBCL, and upon the terms and subject to the satisfaction or waiver of the conditions contained in this Agreement, at or prior to the Closing, the Company shall file with the Secretary of State of the Commonwealth of Pennsylvania Articles of Amendment to amend and restate the Company's Articles of Incorporation substantially in the form attached hereto as Exhibit B (the "Amended Articles"), which shall include a Statement with Respect to Shares substantially in the form attached hereto as Exhibit C (the "Preferred Statement" and together with the Amended Articles, the "Amended Charter"). The Amended Charter shall, among other things, provide as follows:

(a)     The Company shall have eight classes of common stock, par value $0.01 per share, (i) the first class of common stock shall be designated as Class A Common Stock (the "Post-Recapitalization Class A Stock,") (ii) the second class of common stock shall be designated as Class B Common Stock (the "Post-Recapitalization Class B Stock"), (iii) the third class of common stock shall be designated as Class C Common Stock (the "Post-Recapitalization Class C Stock"), (iv) the fourth class of common stock shall be designated as Class D Common Stock (the "Post-Recapitalization Class D Stock"), (v) the fifth class of common stock shall be designated as Class E Common Stock (the "Post-Recapitalization Class E Stock"), (vi) the sixth class of common stock shall be designated as Class R Common Stock (the "Class R Stock"), (vii) the seventh class of common stock shall be designated as Class F Common Stock (the "Class F Stock") and (viii) the eighth class of common stock shall be designated as Common Stock (the "Post Recapitalization Common Stock");

(b)     Each share of Class R Stock shall be subject to redemption by the Company at the Series R Redemption Amount (as defined below); and

(c)     The Company will have a class of preferred stock having the powers, preferences and relative, participating, optional and other special rights of convertible pay-in-kind preferred stock, as set forth in the Preferred Statement (the "Series A Preferred Stock.")

2.2    Reclassification of Shares. Upon the effectiveness of the Amended Charter (the "Effectiveness Time"), each issued and outstanding Pre-Recapitalization Share shall be reclassified and converted into the right to receive 0.396646 shares of fully paid and nonassessable Class R Stock and:

(a) for each share of Class A Stock, the right to retain 0.603354 shares of Post-Recapitalization Class A Stock;

(b) for each share of Class B Stock, the right to retain 0.603354 shares of Post-Recapitalization Class B Stock;

(c) for each share of Class C Stock, the right to retain 0.603354 shares of Post-Recapitalization Class C Stock;

(d) for each share of Class D Stock, the right to retain 0.603354 shares of Post-Recapitalization Class D Stock; and

(e) for each share of Class E Stock, the right to retain 0.603354 shares of Post-Recapitalization Class E Stock.

2.3    Purchase and Sale of the Series A Preferred Stock. Upon the terms and subject to the satisfaction or waiver of the conditions contained in this Agreement, at the Closing and following the Effectiveness Time, Investor agrees to purchase and the Company agrees to issue and sell to Investor 65,000 shares of Series A Preferred Stock (the "Preferred Shares") for an aggregate consideration of $65,000,000 (the "Purchase Price"). At the Closing, Investor shall deliver the Purchase Price to the Company by wire transfer of immediately available funds.

2.4    Redemption of Shares. Upon the terms and subject to the satisfaction or waiver of the conditions contained in this Agreement and the Amended Charter, at the Closing and following the Effectiveness Time, upon receipt by the Company of the Purchase Price and the proceeds of the New Bank Facility, the Company shall redeem (the "Redemption") all of the issued and outstanding shares of Class R Stock. The redemption price to be paid for each share of Class R Stock shall be $4,929.66 (the "Series R Redemption Amount.")

2.5    Exchange of Certificates.

(a)    As soon as practicable following the Closing and upon surrender to the Paying Agent for cancellation of certificates which immediately prior to the Closing Date represent issued and outstanding Pre-Recapitalization Shares (the "Certificates") and proper delivery of a duly executed letter of transmittal and such other customary documents as may be required pursuant to the letter of transmittal, the holder of such Certificate shall receive in exchange therefor: (i) certificates evidencing that number of Post-Recapitalization Shares which such holder is entitled to receive pursuant to Section 2.2, and (ii) the Series R Redemption Amount such holder is entitled to receive pursuant to Section 2.4. The Series R Redemption Amount will be paid, in the case of holders of Class D and E Stock, and holders of more than 1,000 shares of Class C Stock immediately prior to the recapitalization, via wire transfer of immediately available funds. No interest will be paid or accrued with respect to any Series R Redemption Amount payable upon the surrender of the Certificates. Following the effectiveness

of the Amended Charter and until surrendered in accordance with the provisions of this Section 2.5, each Certificate shall represent for all purposes only the right to receive, upon such surrender, Post-Recapitalization Shares in accordance with Section 2.2 and the Series R Redemption Amount in accordance with Section 2.4, without any interest thereon, subject to any required withholding taxes.

(b)     Beginning at 5:00 p.m., Eastern Daylight Time, on the last business day before the Closing Date, there shall be no transfers of Pre-Recapitalization Shares on the stock transfer books of the Company which were outstanding immediately prior to the Closing. If, after the Closing Date, Certificates are presented to the Company, they shall be cancelled and exchanged for Post-Recapitalization Shares in accordance with Section 2.2, the Series R Redemption Amount in accordance with Section 2.4, without any interest thereon, subject to any required withholding taxes, in accordance with the procedures set forth in this Section 2.5.

(c)     No dividends or other distributions with respect to Post-Recapitalization Shares with a record date after the Closing Date shall be paid to the holder of any unsurrendered Certificate with respect to Post-Recapitalization Shares represented thereby until the surrender of such Certificate in accordance with this Section 2.5.

(d)     The Company shall not be liable to any Person in respect of any Post-Recapitalization Shares (or dividends or distributions with respect thereto) or Series R Redemption Amount delivered to a public official pursuant to any applicable abandoned property, escheat or similar law.

2.6     <u>Closing</u>.  Upon the terms and subject to the satisfaction or waiver of the conditions contained in this Agreement, the consummation of the transactions provided for in this Article II (the "<u>Closing</u>") shall take place on the second business day after the date on which each of the conditions set forth in Articles VII and VIII have been satisfied or waived by the party or parties entitled to the benefit of such conditions (it being understood that, in the case of waiver of any conditions for the benefit of the Company and the Shareholders, such waiver may be made by the Company on behalf of itself and each of the Shareholders), or on such other date as Investor and the Company (on behalf of itself and the Shareholders) mutually agree.  The date on which the Closing actually occurs is hereinafter referred to as the "<u>Closing Date</u>."  The Closing shall take place at the offices of Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York 10166 or at such other place as Investor and the Company (on behalf of itself and the Shareholders) mutually agree.  For purposes of this Section 2.6 and Section 9.1 hereof, any determination made or action taken by the Company on behalf of itself and the Shareholders shall be deemed to be the determination or act of each Shareholder. The effectiveness of the Amended Charter, the sale of the Preferred Shares and the Redemption shall be deemed to occur sequentially in that order but the Closing will be conducted in such a manner that none of such events will occur unless all three of such events occur at the Closing.

ARTICLE III
<u>REPRESENTATIONS AND WARRANTIES OF THE COMPANY</u>

The Company represents and warrants to Investor as follows:

ARTICLE IX
TERMINATION

9.1    Termination. Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated at any time prior to the Closing Date: (a) by the mutual consent of Investor and the Company (on behalf of itself and the Shareholders); (b) by Investor in the event that any condition set forth in Article VII shall not be satisfied and shall not be reasonably capable of being satisfied within 30 days following Investor's written notice to the Company of such breach; (c) by the Company (on behalf of itself and the Shareholders) in the event that any condition set forth in Article VIII shall not be satisfied and shall not be reasonably capable of being satisfied within 30 days following the Company's written notice to the Investor of such breach; and (d) by the Company (on behalf of itself and the Shareholders) or by Investor if the Closing shall not have occurred on or before July 15, 2003; provided, however, that no party may terminate this Agreement pursuant to clause (b), (c) or (d) if the failure of any condition in Article VII or Article VIII to be satisfied or the failure of the Closing to occur on or before July 15, 2003 results from the breach by such party of this Agreement.

9.2    Effect of Termination. If this Agreement is terminated pursuant to this Article IX, all obligations of the parties under this Agreement (other than under this Section 9.2, or under Section 6.3, Section 6.5, Section 10.5 and Section 10.6) shall be terminated without liability or penalty on the part of any party or its officers, directors or shareholders to any other party; provided, however that no such termination shall relieve any party from liability for damages resulting from any breach by such party of this Agreement or otherwise limit any remedy available to a party or parties on account of any such breach.

ARTICLE X
GENERAL PROVISIONS

10.1    Survival of Representations and Warranties. Other than as set forth in the following sentence, the representations and warranties set forth in Article III, IV and V of this Agreement shall survive the Closing for a period of six months from the Closing Date. The representations and warranties set forth in Sections 3.21 of Article III shall survive the Closing until the later of (a) the first anniversary of the Closing Date and (b) the date on which the Company's Annual Report on Form 10-K for the fiscal year ending December 31, 2003 is filed with the United States Securities and Exchange Commission, or if not obligated, contractually or otherwise, to file a Form 10-K for the year then ending, such date as the Company shall have delivered audited financial statements for the year then ending to Investor, and the representations and warranties set forth in Sections 3.1, 3.2, 3.5(a) and 3.5(b)(i) of Article III shall survive the Closing until the later of (i) the second anniversary of the Closing Date and (ii) the date on which the Company's Annual Report on Form 10-K for the fiscal year ending December 31, 2004 is filed with the United States Securities and Exchange Commission, or if not obligated, contractually or otherwise, to file a Form 10-K for the year then ending, such date as the Company shall have delivered audited financial statements for the year then ending to Investor.

10.2 <u>Notices</u>. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed to have been duly given or made (a) three business days after being sent by registered or certified mail, return receipt requested, (b) upon delivery, if hand delivered, (c) one business day after being sent by prepaid overnight carrier with guaranteed delivery, with a record of receipt, or (d) upon transmission with confirmed delivery if sent by facsimile or telecopy, to the parties at the following addresses (or at such other addresses as shall be specified by the parties by like notice):

　　　(a)　　if to Investor:

　　　　　　Green Equity Investors III, L.P.
　　　　　　11111 Santa Monica Blvd., Suite 2000
　　　　　　Los Angeles, CA 90025
　　　　　　Attention: Michael S. Wong
　　　　　　Fax: (310) 954-0404

　　　with a copy (which shall not constitute notice) to:

　　　　　　Skadden, Arps, Slate, Meagher & Flom LLP
　　　　　　300 South Grand Avenue, 34th Floor
　　　　　　Los Angeles, CA 91104
　　　　　　Attention: Nick P. Saggese, Esq.
　　　　　　Fax: 213-687-5600

　　　(b)　　if to the Company:

　　　　　　Werner Holding Co. (PA), Inc.
　　　　　　93 Werner Road
　　　　　　Greenville, Pennsylvania 16125
　　　　　　Attention: Eric J. Werner, Esq.
　　　　　　Fax: (724) 589-5898

　　　with a copy (which shall not constitute notice) to:

　　　　　　Gibson, Dunn & Crutcher LLP
　　　　　　200 Park Avenue
　　　　　　New York, New York 10166
　　　　　　Attention: E. Michael Greaney, Esq.
　　　　　　Fax: (212) 351-4035

　　　(c)　　if to Shareholders:

　　　　　　c/o Werner Holding Co. (PA), Inc.
　　　　　　93 Werner Road
　　　　　　Greenville, Pennsylvania 16125
　　　　　　Attention: Eric J. Werner, Esq.
　　　　　　Fax: (724) 589-5898

with a copy (which shall not constitute notice) to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
Attention: E. Michael Greaney, Esq.
Fax: (212) 351-4035

10.3    Partial Invalidity.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the maximum extent possible.

10.4    Execution in Counterparts; Facsimile Signatures.  This Agreement may be executed in two or more counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement.  Facsimile signatures shall be treated as originals to the extent the sender can show that such facsimile was actually transmitted.

10.5    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of laws.  The parties hereby irrevocably submit to the jurisdiction of the courts of the State of New York and the Federal courts of the United States of America located in the Borough of Manhattan, the City of New York solely in respect of the interpretation and enforcement of the provisions of this Agreement and the transactions contemplated hereby and hereby waive, and agree not to assert, as a defense in any action, suit or proceeding for the interpretation or enforcement hereof, that it is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable in said courts or that the venue thereof may not be appropriate or that this Agreement may not be enforced in or by such courts, and the parties hereto irrevocably agree that all claims with respect to such action or proceeding shall be heard and determined in such courts.  The parties consent to and grant any such court jurisdiction over the person of such parties and over the subject matter of such dispute and agree that mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 10.2 or in such other manner as may be permitted by law shall be valid and sufficient service thereof.

10.6    Expenses.  Except as otherwise provided herein, each party hereto will bear all expenses incurred by it in connection with this Agreement and the transactions contemplated hereby; provided, however, that the Company shall pay the Transaction Expenses.

10.7    Assignment; Successors and Assigns; No Third Party Beneficiaries. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned

by any of the parties hereto without the prior written consent of the other parties; provided, however, that Investor shall be permitted to assign any of its rights and interests hereunder to any Affiliate of Investor controlled by LGP without the consent of any other parties hereto, but such assignment shall not release Investor of its obligations hereunder. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors or assigns, heirs, legatees, distributees, executors, administrators and guardians. Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer a benefit upon any Person other than the parties hereto (and their successors and assigns, heirs, legatees, distributees, executors, administrators and guardians permitted by this Section 10.7.)

10.8    No Implied Representation. Notwithstanding anything contained in this Agreement to the contrary, it is the explicit intent of each party hereto that the Company, the Subsidiaries and the Shareholders are making no representation or warranty whatsoever, express or implied, beyond those expressly given in this Agreement.

10.9    Titles and Headings. Titles and headings to sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

10.10    Schedules and Exhibits. The schedules and exhibits referred to in this Agreement shall be construed as an integral part of this Agreement to the same extent as if the same had been set forth verbatim herein.

10.11    Knowledge. In each provision of this Agreement in which a representation or warranty is qualified to the "knowledge" of a Person or to the "best of the knowledge" of a person, unless otherwise stated in such provision, each such phrase means that the Person does not have knowledge of any state of facts which is different from the facts described in the warranty or representation after due inquiry with respect to the facts described in the warranty or representation. With respect to the Company, such knowledge shall refer solely to the "knowledge" of one or more of those individuals identified in Schedule 10.11.

10.12    Entire Agreement; Amendments. This Agreement, including the schedules and exhibits, contains the entire understanding of the parties hereto with regard to the subject matter contained herein. The parties hereto, by mutual agreement in writing, may amend, modify and supplement this Agreement. Any purported amendment that does not comply with the foregoing shall be null and void.

10.13    Waivers. Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the party or parties entitled to the benefit thereof. The failure of any party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

[the remainder of this page is intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

GREEN EQUITY INVESTORS III, L.P.

By: GEI Capital III, LLC, its General Partner

By: _____
Name: Peter Nolan
Title: Manager

WERNER HOLDING CO. (PA), INC.,
a Pennsylvania corporation

By: _____
Name:
Title:

*Recap Agmt 5/5/0?*

## CERTAIN CLASS A AND CLASS B <u>SHAREHOLDERS</u>

Alligator Partners, L.P.

By: _____

Name: Howard L. Solot & Janet F. Solot
Title: General Partners


_____
Howard L. Solot


_____
Janet F. Solot

Bruce D. Werner and Tammy H. Werner,
    Joint Tenants

By: _____
    Name:  Bruce D. Werner and Tammy H. Werner
    Title:  Joint Tenants


Bruce D. Werner Family Limited Partnership

By: _____
    Name:  Bruce D. Werner
    Title:  Managing General Partner


Bruce D. Werner — Trust

By: _____
    Name:  Bruce D. Werner
    Title:  Trustee

Elise W. Frost

Ira and Elise Frost Family Limited Partnership

By:

    Name: Elise W. Frost

    Title: General Managing Partner

_(signature)_

Marsha Beth Karp


**Marsha Beth Karp, Custodian for Allison Tyler Karp**

By: _(signature: Custodian for Allison Tyler Karp)_

    Name:  Marsha Beth Karp

    Title:  Custodian for Allison Tyler Karp


**Marsha Beth Karp, Custodian for Melissa S. Karp**

By: _(signature: Custodian for Melissa S. Karp)_

    Name:  Marsha Beth Karp

    Title:  Custodian for Melissa S. Karp

CERTAIN CLASS A AND CLASS B SHAREHOLDERS

Michael J. Solot

## CERTAIN CLASS A AND CLASS B SHAREHOLDERS

*Mindy Werner Alter*

Mindy Werner Alter

Werner-Alter, LLC

*Mindy Werner Alter*

By:
Name:  Mindy Werner Alter
Title:  Manager Werner-Alter, LLC

Ellen Berk-Rauch

Noel Berk-Rauch

Noel Berk-Rauch, Custodian for
Eli Berk-Rauch

By: _____
Name: Noel Berk-Rauch
Title: Custodian for Eli Berk-Rauch

Noel Berk-Rauch, Custodian for
Hanna Berk-Rauch

By: _____
Name: Noel Berk-Rauch
Title: Custodian for Hanna Berk-Rauch

**Rauch Trust**

By: _Aleena A Shapiro_

    Name:  Aleena R. Shapiro

    Title:  Trustee Rauch Trust

May 6, 2003

_____
Richard D. Bonte

Richard D. Bonte, Custodian for
   Alessandra Bonte

By: _____
   Name: Richard D. Bonte
   Title: Custodian for Alessandra Bonte

_____
Francesca Gianoglio Bonte

X   _____
   Margaret E. Bonte

_____
Vera Bonte

**Richmond Drive Enterprises, L.P.**

By: _____

    Name:  Richard L. Werner & Lois S. Werner
    Title:  General Partners


**Marc L. Werner – Irrevocable Trust 1**

By: _____

    Name:  Richard L. Werner
    Title:  Trustee

Shirley W. Rauch Trust

By: _Shirley W. Rauch_  _Stanley S. Rauch_
   Name: Shirley W. Rauch & Stanley S. Rauch
   Title: Trustees

_Roni S. Rosati_
Roni S. Rosati

Roni S. Rosati, Custodian for
 Richmond J. Rosati

_Roni S. Rosati, custodian_
By: _for Richmond J. Rosati_
 Name: Roni S. Rosati
 Title: Custodian for Richmond J. Rosati

Roni S. Rosati, Custodian for
 Ross Daniel Rosati

_Roni S Rosati, custodian_
By: _for Ross Daniel Rosati_
 Name: Roni S, Rosati
 Title: Custodian for Ross Daniel Rosati

Roni S. Rosati, Custodian for
 Ryan Gregory Rosati

_Roni S. Rosati, custodian_
By: _for Ryan Gregory Rosati_
 Name: Roni S. Rosati
 Title: Custodian for Ryan Gregory Rosati

_Robert A. Rosati_
Robert A. Rosati

Craig R. Werner Family Limited Partnership

By: _____
    Name: Craig R. Werner
    Title: General Partner

_____

Donald M. Werner

Donald M. Werner and Barbara L. Werner,
   Joint Tenants

By: _____

   Name:  Donald M. Werner & Barbara L. Werner
   Title:  Joint Tenants

_____

Barbara L. Werner

**Melanie R. Werner, Custodian for**
**Isabelle N. Werner**

By: _____

Name:  Melanie R. Werner

Title:  Custodian for Isabelle N. Werner


**Melanie R. Werner, Custodian for**
**Sophia K. Werner**

By: _____

Name:  Melanie R. Werner

Title:  Custodian for Sophia K. Werner

_____
**Eric J. Werner**


**Eric J. Werner and Melanie R. Werner,**
**Joint Tenants**

By: _____

Name:  Eric J. Werner & Melanie R. Werner

Title:  Joint Tenants

Michael Werner, Trustee of the Michael E. Werner
   Revocable Trust, U/A/D 1/2/96

By: _____
   Name: Michael E. Werner
   Title: Trustee

_____
Michael E. Werner


Laura Werner, Trustee of the Laura W. Werner
   Revocable Trust, U/A/D 1/2/96

By: _____
   Name: Laura W. Werner
   Title: Trustee


Laura Werner, Trustee of the Margot A. Werner
   Gift Trust, U/A/D 11/1/96

By: _____
   Name: Laura W. Werner
   Title: Trustee

_Debra A. Rothman_

**Debra A. Rothman, Custodian for Jordana Rothman**

By: _____

  Name:  Debra A. Rothman

  Title:  Custodian for Jordan Rothman

_Gail Rauch Blackman_

**Gail Rauch Blackman**

**Gail Rauch Blackman, Custodian for**
**Heather Blackman**

By: _Gail Rauch Blackman_

    Name:  Gail Rauch Blackman
    Title:  Custodian for Heather Blackman

_Custodian for Heather_

_[signature]_

Marlane T. Krane

Marlane T. Krane, Custodian for
Carly Krane

By: _[signature]_
Name: Marlane T. Krane
Title: Custodian for Carly Krane

Marlane T. Krane, Custodian for
Jason S. Krane

By: _[signature]_
Name: Marlane T. Krane
Title: Custodian for Jason S. Krane

_Florence J. Werner_

Florence J. Werner

_Robert I. Werner_

Robert I. Werner

**Beth Katz**

Karen Lynn Moseska

Susan Morrow

**A CERTAIN CLASS C <u>SHAREHOLDER</u>**

**INVESTCORP WERNER HOLDINGS L.P.**

By: STEPUP LIMITED, *its general partner*

By: _____

    Name:    Mahmood Al Aradi
    Title:    Authorized Representative

CERTAIN CLASS C <u>SHAREHOLDERS</u>

Dennis G. Heiner

## CLASS D <u>SHAREHOLDERS</u>

**INVESTCORP INVESTMENT EQUITY**
    **LIMITED**

By:_____
    Name:
    Title:

**BALLET LIMITED**

By:_____
    Gary S. Long
    Authorized Representative

**DENARY LIMITED**

By:_____
    Craig Bottger
    Authorized Representative

**GLEAM LIMITED**

By:_____
    Anthony Palys
    Authorized Representative

**HIGHLANDS LIMITED**

By:_____
    Fahad Murad
    Authorized Representative

**NOBLE LIMITED**

By:_____
    Abeer Al Shehabi
    Authorized Representative

**OUTRIGGER LIMITED**

By: _____
Salman A. Abbasi
Authorized Representative

**QUILL LIMITED**

By: _____
Mahmood Al Aradi
Authorized Representative

**RADIAL LIMITED**

By: _____
Stephen J. Atkinson
Authorized Representative

**SHORELINE LIMITED**

By: _____
Kevin O'Shea
Authorized Representative

**ZINNIA LIMITED**

By: _____
Karen Stone
Authorized Representative

**SHORELINE LIMITED**

By:_____ _____
    Name:
    Title:

By:_____
    Name:
    Title:

**ZINNIA LIMITED**

By:_____ _____
    Name:
    Title:

By:_____ _____
    Name:
    Title:

**INVESTCORP INVESTMENT EQUITY
LIMITED**

By: _Sydney J. Coleman_____
    Name:  The Director Ltd.
    Title:  Director

CLASS E SHAREHOLDERS

**ANNISVILLE LIMITED**

By:_____
    Name: Martonmere Services Ltd.
    Title: Director

**FRISCO LIMITED**

By:_____
    Name: Martonmere Services Ltd.
    Title: Director

**STEP INVESTMENTS LIMITED**

By: _W. wen_____
    Name: Cardinal Investments Limited
    Title: Director

**EQUITY WERA LIMITED**

By:_____
    Name: The Director Ltd.
    Title: Director

**WERNER EQUITY LIMITED**

By:_____avuatte_____
    Name: Bluejay Investments Ltd.
    Title: Director

**COOPERSTOWN LIMITED**

By:_____
    Name: Martonmere Services Ltd.
    Title: Director

CLASS E <u>SHAREHOLDERS</u>

**ANNISVILLE LIMITED**

By:_____
    Name:  Marionmere Services Ltd.
    Title:  Director

**FRISCO LIMITED**

By:_____
    Name:  Marionmere Services Ltd.
    Title:  Director

**STEP INVESTMENTS LIMITED**

By:_____
    Name:  Cardinal Investments Limited
    Title:  Director

**EQUITY WERA LIMITED**

By:_____
    Name:  The Director Ltd.
    Title:  Director

**WERNER EQUITY LIMITED**

By:_____
    Name:  Bluejay Investments Ltd.
    Title:  Director

**COOPERSTOWN LIMITED**

By:_____
    Name:  Marionmere Services Ltd.
    Title:  Director

**PLATEA LIMITED**

By:_____
    Name: Martonmere Services Ltd.
    Title: Director

**CLIMBING PRODUCTS LIMITED**

By:_____
    Name: Cardinal Investments Limited
    Title: Director

**LADDER EQUITY LIMITED**

By:_____
    Name: Cardinal Investments Limited
    Title: Director

**WERNER IIP LIMITED**

By:_____
    Name: Bluejay Investments Ltd.
    Title: Director

**WERNER INVESTMENTS LIMITED**

By:_____
    Name: Cardinal Investments Limited
    Title: Director

**WL HOLDINGS LIMITED**

By:_____
    Name: Bluejay Investments Ltd.
    Title: Director

**PLATEA LIMITED**

By: _____

    Name: Martonmere Services Ltd.
    Title: Director

**CLIMBING PRODUCTS LIMITED**

By: _____

    Name: Cardinal Investments Limited
    Title: Director

**LADDER EQUITY LIMITED**

By: _____

    Name: Cardinal Investments Limited
    Title: Director

**WERNER IIP LIMITED**

By: _____

    Name: Bluejay Investments Ltd.
    Title: Director

**WERNER INVESTMENTS LIMITED**

By: _____

    Name: Cardinal Investments Limited
    Title: Director

**WL HOLDINGS LIMITED**

By: _____

    Name: Bluejay Investments Ltd.
    Title: Director

**SCHEDULE 3.2(b)**
**Company Options**

| Name | Exercise Price | Number of Shares |
| --- | --- | --- |
| Achenbach, Donald | $2,421.29 | 50 |
| Basilotta, Lee L. | $2,421.29 | 175 |
| Bates, Doug | $2,450.00 | 20 |
| Bentson, Steven R. | $2,450.00 | 200 |
| Brooks, Mike D. | $2,421.29 | 150 |
| Brooks, Mike D. | $2,450.00 | 60 |
| Cardillo, David A. | $2,421.29 | 50 |
| Conn, Dave | $2,421.29 | 50 |
| Dowler, Hank W. | $2,421.29 | 125 |
| Filardi, Chris | $2,450.00 | 50 |
| Fischer, Bruce | $2,421.29 | 100 |
| Fiumefreddo, John J. | $3,000.00 | 200 |
| Friend, Larry V. | $2,421.29 | 125 |
| Friend, Larry V. | $2,450.00 | 100 |
| Gellis, Brad | $2,421.29 | 125 |
| Gellis, Brad | $2,450.00 | 35 |
| Genis, Vincent A. | $3,100.00 | 100 |
| Gericke, Ed W. | $2,421.29 | 160 |
| Gericke, Ed W. | $2,450.00 | 140 |
| Guyton, John M. | $2,421.29 | 150 |
| Hartenstein, Geoff | $2,421.29 | 120 |
| Hartenstein, Geoff | $2,450.00 | 30 |
| Hazlett, Bill | $2,421.29 | 50 |
| Heiner, Dennis G. | $2,421.29 | 1,250 |
| Johnson, Dennis J. | $2,421.29 | 50 |
| Kelly, Richard | $2,421.29 | 35 |
| Koerner, George | $2,421.29 | 25 |
| Martin, Neal | $2,421.29 | 75 |
| Martin, Neal | $2,450.00 | 30 |
| Mason, Eric | $2,421.29 | 100 |
| McGowan, Dave A. | $2,421.29 | 120 |
| O'Coin, Peter R. | $3,000.00 | 450 |
| Pinney, Robert H. | $2,450.00 | 50 |
| Rippin, Bill J. | $2,421.29 | 175 |
| Rosati, Rob | $2,421.29 | 75 |
| Thigpen, John | $2,450.00 | 20 |
| Trzynka, Mike E. | $2,421.29 | 150 |
| Trzynka, Mike E. | $2,450.00 | 50 |
| Walz, Kevin | $2,450.00 | 50 |
| Werner, Craig R. | $2,421.29 | 300 |
| Werner, Don | $2,421.29 | 100 |
| Werner, Eric J. | $2,421.29 | 300 |
| Werner, Michael E. | $2,421.29 | 300 |
| Wise, Michael D. | $3,000.00 | 50 |

# EXHIBIT 32

(Excerpts Only)

# Werner Holding Co. (PA), Inc.

93 Werner Road
Greenville, PA 16125

Telephone: (724) 588-2550          Telecopier: (724) 588-0618

May 16, 2003

Dear Shareholder,

You are cordially invited to attend a Special Meeting of Shareholders of Werner Holding Co. (PA), Inc., to be held on Friday, May 30, 2003, at 9:00 a.m., at the offices of Investcorp International Inc., 280 Park Avenue, 36th Floor, West Tower, New York, New York.

At the Special Meeting, the Company's shareholders will be asked to consider and vote on a proposal to approve an amendment to the Company's Articles of Incorporation (the "Amended Articles") and a Recapitalization and Stock Purchase Agreement (the "Recapitalization Agreement"). Pursuant to the Amended Articles and the Recapitalization Agreement each shareholder will effectively have 39.6646% of their outstanding shares redeemed by the Company at a redemption price of $4,929.66 per share in cash, while retaining the other 60.3354% of their outstanding shares.

As part of the recapitalization, Green Equity Investors III, L.P., a Delaware limited partnership and an affiliate of Leonard Green & Partners, L.P. ("GEI"), one of the nation's preeminent private equity firms, will invest $65,000,000 in the Company in exchange for the purchase of 65,000 shares of a new class of preferred stock of the Company, to be designated Series A Participating Convertible Preferred Stock. Following the recapitalization, GEI will hold shares representing approximately 22% of the common equity of the Company, which may increase to up to 30% over time with accretion of the liquidation preference on the Series A Preferred Stock. The remainder of the Company's shares will be held by the existing shareholders of the Company.

The recapitalization, which was the result of an extensive process to explore strategic alternatives for the long-term direction of the Company, should enable shareholders to achieve liquidity and diversification at a price which reflects the full value of the Company, while at the same time permitting the Company to continue to grow and prosper in the 21st century. The recapitalization is expected to be completed on or about June 12, 2003.

The Company's Board of Directors has unanimously approved the Recapitalization Agreement and the Amended Articles. In addition, certain shareholders of the Company representing 84.22% of the Class A Holders, 69.60% of the Class B Holders, 60.78% of the Class C Holders, 100% of the Class D Holders and 100% of the Class E Holders (the "Consenting Shareholders") entered into the Recapitalization Agreement with the Company and GEI. In the Recapitalization Agreement, each Consenting Shareholder agreed to vote their shares in favor of the Recapitalization Agreement and the Amended Articles at the Special Meeting. Therefore, in effect, the required shareholder approval of the Recapitalization Agreement and the Amended Articles under Pennsylvania law has already been obtained. However, the Company has called the Special Meeting so that each shareholder may have an opportunity to cast a vote on this important proposal.

The recapitalization, which is a complex transaction, is discussed in detail in the accompanying proxy statement. You are urged to read the proxy statement very carefully. Also enclosed are the following for your review and completion:

- Letter of Transmittal
- Proxy Card
- Substitute Form W-9 and/or W-8BEN, with Guidelines

If you have any questions, please call me at (724) 588-2550.

Sincerely,

Eric J. Werner
Vice President, Secretary
and General Counsel

Enclosures

**WERNER HOLDING CO. (PA), INC.**
93 Werner Road
Greenville, PA 16125-9499

---

**NOTICE OF SPECIAL MEETING OF SHAREHOLDERS**
**To be held on May 30, 2003**

---

May 16, 2003

To the Shareholders of Werner Holding Co. (PA), Inc.:

A Special Meeting of Shareholders of Werner Holding Co. (PA), Inc. (the "Company") will be held on Friday, May 30, 2003, at 9:00 a.m. local time at Investcorp International Inc., 280 Park Avenue, 36th Floor, West Tower, New York, New York, and any adjournment or postponement thereof (the "Special Meeting"), for the following purposes:

1. To approve an amendment to the Company's Articles of Incorporation (the "Amended Articles") and a Recapitalization and Stock Purchase Agreement (the "Recapitalization Agreement"), dated as of May 7, 2003, by and among the Company, Green Equity Investors III, L.P., a Delaware limited partnership and an affiliate of Leonard Green & Partners, L.P. ("GEI"), and certain shareholders of the Company party thereto, pursuant to which the Company will be recapitalized (the "Recapitalization") through:

   - GEI's purchase of 65,000 shares of a new class of preferred stock of the Company, to be designated Series A Participating Convertible Preferred Stock (the "Series A Preferred Stock"), for $65,000,000 in cash; and

   - the redemption of 39.6646% of each outstanding share of the Company's capital stock at a redemption price of $4,929.66 per share, to be effected through the Amended Articles that will:

     - authorize the Company's Board of Directors to provide for the issuance of shares of preferred stock, including the Series A Preferred Stock;

     - authorize a new class of common stock into which the Series A Preferred Stock will be convertible;

     - immediately prior to the closing of the Recapitalization, reclassify each outstanding share of the Company's common stock into (1) 0.396646 shares of a new class of redeemable common stock, the Class R Common Stock, and (2) 0.603354 shares of a retained

share of the relevant class of common stock (for example, 100 shares of Class C Common Stock will be reclassified into 39.6646 shares of Class R Common Stock and 60.3354 shares of post-Recapitalization Class C Common Stock).

2.    To transact such other business as may properly come before the Special Meeting.

Only holders of record of shares of the Company's capital stock as of the close of business on May 7, 2003 (the "Record Date") are entitled to notice of and to vote at the Special Meeting.  The list of those shareholders of the Company entitled to vote at the Special Meeting will be available for inspection at the Special Meeting.

The Company's by-laws provide that the presence, in person or by proxy, of shareholders entitled to cast at least a majority of the votes which all shareholders are entitled to cast on a particular matter shall constitute a quorum for purposes of considering the matter.

The Recapitalization is expected to close on or about June 12, 2003 and, on such date or such other date on which the recapitalization is consummated (the "Closing Date"), the redemption proceeds will be disbursed to shareholders who have surrendered their certificates to the Company for cancellation (and subsequent reissuance of a certificate representing the same class, and 60.3354% of the number of shares, represented by such surrendered certificate).  If your share certificate or certificates are pledged to and held by the Company pursuant to the Werner Holding Co. (PA), Inc. Stock Loan Plan, you will not need to physically surrender such certificate or certificates to the Company, as they are already in its possession, but you will still need to complete and return the Letter of Transmittal discussed below.

A Letter of Transmittal with which shareholders of the Company can surrender their certificates representing shares of pre-Recapitalization common stock and instruct the Company how to pay their cash redemption proceeds is also enclosed with the accompanying Proxy Statement. **You are urged to complete such Letter of Transmittal in accordance with the instructions contained therein and return it promptly, along with your share certificates and completed proxy card, in the enclosed pre-paid, pre-addressed return envelope to Werner Holding Co. (PA), Inc., 93 Werner Road, Greenville, Pennsylvania 16125-9499, Attention: Eric J. Werner, Vice President, General Counsel and Corporate Secretary.** In the event that the Recapitalization is not consummated, the Company will return as soon as practicable any surrendered certificates.  The Company will not pay any redemption proceeds to a shareholder until such shareholder has delivered their Letter of Transmittal and share certificates to the Company.  Since the Company will not be paying any interest with respect to the redemption proceeds, shareholders are urged to return their Letter of Transmittal, along with their share certificates, as soon as possible.  If you have any questions, please call Eric J. Werner at (724) 588-2550.

Whether or not you plan to attend the Special Meeting in person, and regardless of the number of shares of common stock that you own, please complete, sign and date the enclosed proxy card and return it promptly to the Company in the same return envelop provided for your share certificates and the Letter of Transmittal. If you attend the Special Meeting, you may vote your shares personally whether or not you have previously submitted a proxy.  Your prompt

2

cooperation will be greatly appreciated. A duly executed proxy will be voted as directed in the proxy notwithstanding any failure of the shareholder submitting such proxy to complete and deliver a Letter of Transmittal or share certificates.

**The Company's Board of Directors has unanimously approved the Recapitalization Agreement and the Amended Articles and unanimously recommends a vote FOR approval of the Recapitalization Agreement and the Amended Articles.**

By Order of the Board of Directors

Eric J. Werner
Secretary

3

# EXHIBIT 33

(Excerpts Only)

# WERNER HOLDING CO. (DE), INC.

## CONSENT TO AMENDMENTS TO INDENTURE
### With Respect to
### 10% SENIOR SUBORDINATED NOTES DUE 2007

Pursuant to the
Consent Solicitation Statement dated May 16, 2003

The Solicitation is made by Werner Holding Co. (DE), Inc. (the "**Company**") only to Holders (as defined below) of 10% Senior Subordinated Notes Due 2007 (the "**Notes**") of the Company, issued under the indenture, dated as of November 24, 1997 (the "**Indenture**"), by and among the Company, the guarantors named therein and The Bank of New York (as successor to IBJ Schroder Bank and Trust Company) (the "**Trustee**"). The term "**Holder**" means each person shown on the records of the registrar as a holder at 5:00 p.m., New York City time, on May 16, 2003 (the "**Record Date**").

> THE SOLICITATION WILL EXPIRE AT 5:00 P.M., NEW YORK CITY TIME, ON MAY 28, 2003, UNLESS EXTENDED BY THE COMPANY (SUCH DATE AND TIME AS IT MAY BE EXTENDED BY THE COMPANY, SHALL BE REFERRED TO AS THE "EXPIRATION DATE"). REGARDLESS OF WHETHER THE REQUISITE CONSENTS HAVE BEEN RECEIVED BY 5:00 P.M., NEW YORK CITY TIME, ON MAY 28, 2003, THE ORIGINAL EXPIRATION DATE, THE COMPANY MAY, IN ITS SOLE DISCRETION, TERMINATE THE SOLICITATION OR EXTEND THE SOLICITATION FOR A SPECIFIED PERIOD OR ON A DAILY BASIS.

This fully completed and executed Consent Form should be hand delivered, sent by overnight courier, or facsimile (followed by delivery by hand or overnight courier) to The Bank of New York (the "**Tabulation Agent**") as follows:

### THE BANK OF NEW YORK

| *By Overnight Courier:* | *By Hand:* | *By Registered or Certified Mail* |
|---|---|---|
| The Bank of New York Corporate Trust Operations Reorganization Unit 101 Barclay Street – 7E New York, NY 10286 Attn: Mr. Bernard Arsenec | The Bank of New York Corporate Trust Operations Reorganization Unit 101 Barclay Street – Lobby Window New York, NY 10286 Attn: Mr. Bernard Arsenec | The Bank of New York Corporate Trust Operations Reorganization Unit 101 Barclay Street – 7E New York, NY 10286 Attn: Mr. Bernard Arsenec |

By Facsimile Transmission (for Eligible Institutions only):
(212) 298-1915
Confirm by Telephone
(212) 815-5098

DELIVERY OF THE INSTRUMENT TO AN ADDRESS OTHER THAN AS SET FORTH ABOVE OR TRANSMISSION OF THIS CONSENT FORM VIA FACSIMILE TRANSMISSION OTHER THAN AS SET FORTH ABOVE WILL NOT CONSTITUTE A VALID DELIVERY. THE INSTRUCTIONS ACCOMPANYING THIS CONSENT FORM SHOULD BE READ CAREFULLY BEFORE THIS CONSENT FORM IS COMPLETED.

NOTWITHSTANDING THE FOREGOING, THE COMPANY AND THE TABULATION AGENT RESERVE THE RIGHT TO RECEIVE CONSENTS BY ANY OTHER REASONABLE MEANS OR IN ANY FORM THAT REASONABLY EVIDENCES THE GIVING OF A CONSENT.

RECEIPT OF THE REQUISITE CONSENTS BY THE TABULATION AGENT WILL NOT OBLIGATE THE COMPANY TO CONSUMMATE THE RECAPITALIZATION TRANSACTION OR TO MAKE THE CONSENT PAYMENTS.

Copies of the Consent Solicitation Statement, dated May 16, 2003, to which this Consent Form relates, as the same may be amended or supplemented from time to time (the "Consent Solicitation Statement"), and any other documents (or parts of documents) that constitute part of the Consent Solicitation Statement will be provided without charge upon request.  Requests should be directed to the Company's information agent, MacKenzie Partners, Inc. (the "Information Agent"), at:

MacKenzie Partners, Inc.
105 Madison Avenue
New York, New York 10016
Telephone: (800) 322-2885
Facsimile: (212) 929-0308

The Solicitation Agents for the Solicitation are:

| JPMorgan | Citigroup |
|---|---|
| 270 Park Avenue New York, New York 10017 Attn: Spencer Alstodt (212) 270-1111 or Toll-Free (800) 245-8812 | 390 Greenwich Street New York, New York 10013 Attn: Liability Management Group Telephone (Toll-Free): (800) 558-3745 |

THE COMPANY HAS NOT AUTHORIZED ANY PERSON (INCLUDING THE INFORMATION AGENT) TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS IN CONNECTION WITH THE SOLICITATION OF CONSENTS OTHER THAN AS SET FORTH IN THE CONSENT SOLICITATION STATEMENT AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY, THE INFORMATION AGENT OR THE SOLICITATION AGENTS.

INSTRUCTIONS FOR COMPLETING THIS CONSENT FORM MAY BE FOUND AT THE END OF THE ATTACHED EXHIBIT A FOR CONVENIENCE.

## CONSENT

By execution hereof, the undersigned acknowledges receipt of the Consent Solicitation Statement. The undersigned hereby represents and warrants that the undersigned is a Holder of the Notes indicated in the table attached as part of <u>Exhibit A</u> and has full power and authority to take the action indicated below in respect of such Notes. The undersigned will, upon request, execute and deliver any additional documents deemed by the Company or the Tabulation Agent to be necessary or desirable to perfect the Consent of the undersigned. The undersigned acknowledges that delivery of this Consent Form will constitute a binding agreement between the undersigned and the Company upon the terms and subject to the conditions of the Solicitation.

As a Holder, the undersigned hereby

CONSENTS ☐      DOES NOT CONSENT ☐

with respect to each of the proposed amendments (the "**Proposed Amendments**") to be made to the Indenture, which Proposed Amendments are described in the Consent Solicitation Statement. If neither of the boxes above is checked, but this Consent Form is otherwise properly completed and signed, the Company will deem the Holder to have consented to the Proposed Amendments. By execution hereof, the undersigned acknowledges receipt of the Consent Solicitation Statement. Holders must consent to all the Proposed Amendments or none of them. Capitalized terms used herein without definition shall have the meanings assigned to such terms in the Consent Solicitation Statement.

Consents may be revoked by Holders at any time on or prior to the receipt of the Requisite Consents by the Tabulation Agent (such time being referred to herein as the "Consent Achievement Time"). Any notice of revocation received after receipt of the Requisite Consents by the Tabulation Agent will not be effective, even if received prior to the Expiration Date. Promptly following the Consent Achievement Time, the Company and the Trustee will execute a supplemental indenture, and the Proposed Amendments will become effective. Once the Proposed Amendments become effective, each present and future holder of the Notes will be bound by the Proposed Amendments, whether or not such holder delivered a Consent.

Unless otherwise specified by the undersigned, this Consent Form relates to all Notes of which the undersigned is the Holder. If this Consent Form relates to less than all of the Notes as to which the undersigned is a Holder, the specific Notes to which this Consent Form relates shall be identified on the table attached hereto as part of <u>Exhibit A</u>.

A Consent hereby given, if effective, will be binding upon the Holder of the Notes who gives such Consent and upon any subsequent transferee or transferees of such Notes, subject only to revocation by the delivery of a written notice of revocation by the applicable Holder, executed and filed in the manner, and at the time, described in the Consent Solicitation Statement.

THE UNDERSIGNED, BY COMPLETING THE BOX ENTITLED "DESCRIPTION OF NOTES" IN THE ATTACHED <u>EXHIBIT A</u> AND SIGNING THIS CONSENT FORM, WILL BE DEEMED TO HAVE CONSENTED TO THE PROPOSED AMENDMENTS WITH RESPECT TO SUCH NOTES AND TO HAVE MADE CERTAIN REPRESENTATIONS AS DESCRIBED HEREIN. ONLY RECORD HOLDERS OF NOTES AND PERSONS AUTHORIZED TO SIGN BY RECORD HOLDERS AS EVIDENCED BY THE EXECUTED FORM OF PROXY ATTACHED HERETO AS PART OF <u>EXHIBIT A</u> ARE ENTITLED TO CONSENT TO THE PROPOSED AMENDMENTS. IF THE UNDERSIGNED IS NOT THE RECORD HOLDER OF THE NOTES, THE UNDERSIGNED MUST HAVE THE RECORD HOLDER SIGN THE FORM OF PROXY APPEARING IN THE ATTACHED <u>EXHIBIT A</u>.

THE SOLICITATIONS ARE NOT BEING MADE TO, NOR WILL CONSENT FORMS BE ACCEPTED FROM OR ON BEHALF OF, HOLDERS IN ANY JURISDICTION IN WHICH THE MAKING OF THE SOLICITATION, THE ACCEPTANCE OF SUCH CONSENT FORMS OR THE MAKING OF THE CONSENT PAYMENTS WOULD NOT BE IN COMPLIANCE WITH THE LAWS OF SUCH JURISDICTION.

**PLEASE READ THIS ENTIRE CONSENT FORM CAREFULLY BEFORE SIGNING BELOW**

Holders who wish to consent to the Proposed Amendments must complete the box below entitled "DESCRIPTION OF NOTES" and sign below. If the "Aggregate Principal Amount with Respect to Which Consents are Given" in column (3) of such box is left blank, the Holder delivering this Consent Form will be deemed to have given its Consent as to all Notes owned by such Holder.

Consents must be received by the Tabulation Agent, as specified above, before 5:00 p.m., New York City Time, on May 28, 2003, unless such date is extended by the Company.

---

**TO CONSENT TO THE PROPOSED AMENDMENTS, PLEASE SIGN BELOW**
(See Instructions 1, 2 and 3)

→  X _____  ←

→  X _____  ←

      Signature(s) of Record Holder(s)         Date

**PLEASE TYPE OR PRINT INFORMATION BELOW**

Name(s): _____

Capacity: _____

Address: _____

                (Including Zip Code)

Area Code and
Telephone Number: _____

**SIGNATURE GUARANTEE**
(If required; see Instruction 3)

Signature(s) Guaranteed
by an Eligible Institution: _____

                (Authorized Signature)

    _____

                (Title)

    _____

         (Name of Eligible Institution)

Dated: _____

---

**IMPORTANT—READ CAREFULLY**

Consents by the Record Holder(s) of Notes must be executed in exactly the same manner as the name(s) appear(s) on the Notes. If Notes to which a Consent relates are held of record by two or more joint holders, all such holders must sign this Consent Form. If a signature is by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation or other record holder acting in a fiduciary or representative capacity, such person

4

EXHIBIT 34

# GIBSON, DUNN & CRUTCHER LLP

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

200 Park Avenue  New York, New York 10166-0193
(212) 351-4000   (212) 351-4035 Fax
www.gibsondunn.com

June 11, 2003

(212) 351-4000                                                                           03263-01119

J.P. Morgan Securities Inc.
270 Park Avenue
New York, New York  10017

Citigroup Global Markets Inc.
388 Greenwich Street
New York, New York  10013

Re:      *Werner Holding Co. (DE), Inc. – Solicitation Agency Agreement
          dated as of May 12, 2003*

Ladies and Gentlemen:

        We have acted as counsel to of Werner Holding Co. (DE), Inc., a Delaware corporation (the "*Company*"), in connection with the preparation of:

      (i)      the Consent Solicitation Statement, dated May 16, 2003, including the consent form and cover letter related thereto, as supplemented by the Company's Current Report on Form 8-K and the exhibits thereto, filed with the Securities and Exchange Commission (the "*Commission*") on May 29, 2003 (collectively, the "*Solicitation Materials*");

      (ii)      the Supplemental Indenture, dated as of June 11, 2003 (the "*Supplemental Indenture*"), by and among the Company, the guarantors under the indenture referred to below (including their successors, the "*Guarantors*"), and The Bank of New York (as successor to IBJ Schroder Bank & Trust Company), as trustee under the indenture, dated as of November 24, 1997 (the "*Indenture*"), providing for the issuance of an aggregate principal amount of up to $270,000,000 of 10% Senior Subordinated Notes due 2007 (the "*Notes*"); and

LOS ANGELES   NEW YORK   WASHINGTON, D.C.   SAN FRANCISCO   PALO ALTO
LONDON   PARIS   ORANGE COUNTY   CENTURY CITY   DALLAS   DENVER

GIBSON, DUNN & CRUTCHER LLP

J.P. Morgan Securities Inc.
Citigroup Global Markets Inc.
June 11, 2003
Page 2

      (iii)    the Solicitation Agency Agreement, dated as of May 12, 2003 (the "*Solicitation Agency Agreement*"), between the Company, on the one hand, and each of J.P. Morgan Securities Inc. and Citigroup Global Markets Inc., on the other hand (the "*Solicitation Agents*"), entered into in connection with the solicitation (the "*Solicitation*") of consents (the "*Consents*") of the holders of the Notes to certain amendments to the Indenture.

      Each capitalized term used and not defined herein has the meaning assigned to that term in the Solicitation Agency Agreement. The Company and the Guarantors are collectively referred to herein as the "*Obligors*." The Supplemental Indenture and the Solicitation Agency Agreement are collectively referred to herein as the "*Transaction Documents*."

      We have assumed without independent investigation that:

a)   The signatures on all documents examined by us are genuine, all individuals executing such documents had all requisite legal capacity and competency and were duly authorized, the documents submitted to us as originals are authentic and the documents submitted to us as certified or reproduction copies conform to the originals;

b)   Each party to the Transaction Documents has all requisite power and authority to execute, deliver and perform its obligations under each of the Transaction Documents to which it is a party, the execution and delivery of such Transaction Documents by such party and performance of its obligations thereunder have been duly authorized by all necessary corporate or other action and do not violate any law, regulation, order, judgment or decree applicable to such party, and such Transaction Documents have been duly executed and delivered by each such party and (other than with respect to the Obligors) are legal, valid and binding obligations of such party, enforceable against it in accordance with their respective terms;

c)   There are no agreements or understandings between or among any of the parties to the Transaction Documents or third parties that would expand, modify or otherwise affect the terms of the Transaction Documents or the respective rights or obligations of the parties thereunder; and

d)   The Indenture constitutes the legal, valid and binding obligation of all parties thereto.

GIBSON, DUNN & CRUTCHER LLP

J.P. Morgan Securities Inc.
Citigroup Global Markets Inc.
June 11, 2003
Page 3

In rendering this opinion, we have made such inquiries and examined, among other things, originals or copies, certified or otherwise identified to our satisfaction, of such records, agreements, certificates, instruments and other documents as we have considered necessary or appropriate for purposes of this opinion. As to certain factual matters, we have relied to the extent we deemed appropriate and without independent investigation upon the representations and warranties of the Obligors in the Transaction Documents or certificates obtained from public officials and others, including an Affidavit of Tabulation from The Bank of New York, as Tabulation Agent (the "*Tabulation Agent*") under that certain Tabulation Agent Agreement, dated May 12, 2003, verifying the final tabulation report detailing the consents received by the Tabulation Agent from holders of the Notes in respect of the amendments to the Indenture contained in the Supplemental Indenture. We note that you are receiving an opinion of even date herewith furnished by Eric J. Werner, Esq., rendered in connection with the transactions contemplated by the Transaction Documents, as to certain of the matters covered by the assumptions set forth in paragraph (b) above with respect to the Obligors.

Based on the foregoing and in reliance thereon, and subject to the assumptions, exceptions, qualifications and limitations set forth herein, we are of the opinion that:

1.  Each Transaction Document constitutes a legal, valid and binding obligation of each Obligor party thereto, enforceable against it in accordance with its terms.

2.  On the Effective Date, the Indenture as supplemented by the Supplemental Indenture will conform in all material respects to the requirements of the Trust Indenture Act and the rules and regulations of the Commission applicable to an indenture that is qualified thereunder.

The foregoing opinions are subject to the following exceptions, qualifications and limitations:

A.  We render no opinion herein as to matters involving the laws of any jurisdiction other than the State of New York and the United States of America. This opinion is limited to the effect of the present state of the laws of the State of New York, the United States of America and the facts as they presently exist. We assume no obligation to revise or supplement this opinion in the event of future changes in such laws or the interpretations thereof or such facts. Except as expressly set forth in paragraph 2 above, we express no opinion regarding any federal or state securities laws or regulations.

B.  Our opinions set forth in paragraph 1 are subject to (i) the effect of any bankruptcy, insolvency, reorganization, moratorium, arrangement or similar laws affecting the rights and remedies of creditors generally (including, without limitation, the effect of statutory or other laws regarding fraudulent transfers or preferential transfers) and (ii) general principles of

GIBSON, DUNN & CRUTCHER LLP

J.P. Morgan Securities Inc.
Citigroup Global Markets Inc.
June 11, 2003
Page 4

equity, including without limitation concepts of materiality, reasonableness, good faith and fair dealing and the possible unavailability of specific performance, injunctive relief or other equitable remedies regardless of whether enforceability is considered in a proceeding in equity or at law.

C.  We express no opinion regarding the effectiveness of (i) any waiver of stay, extension or usury laws or of unknown future rights; or (ii) provisions relating to indemnification, exculpation or contribution, to the extent such provisions may be held unenforceable as contrary to federal or state securities laws.

This opinion is rendered to the Solicitation Agents in connection with the Transaction Documents and may not be relied upon by any person other than the Solicitation Agents or by the Solicitation Agents in any other context.  This opinion may not be quoted without the prior written consent of this Firm.

Very truly yours,

*Gibson, Dunn & Crutcher LLP*

GIBSON, DUNN & CRUTCHER LLP

JHE/BCB

80260163_2.DOC

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

200 Park Avenue  New York, New York 10166-0193
(212) 351-4000
www.gibsondunn.com

June 11, 2003

Direct Dial
(212) 351-4000

Fax No.
(212) 351-4035

Client No.
C 03263-01119

Green Equity Investors III, L.P.
Werner Co-Investment LLC
11111 Santa Monica Boulevard
Suite 2000
Los Angeles, CA  90025

Re:    *Recapitalization and Stock Purchase Agreement*

Ladies and Gentlemen:

We have acted as counsel to Werner Holding Co. (PA), Inc., a Pennsylvania corporation (the "Company"), in connection with the Recapitalization and Stock Purchase Agreement, dated as of May 7, 2003, (the "Agreement"), among the Company, the shareholders of the Company listed on the signature pages thereto and Green Equity Investors III, L.P., a Delaware limited partnership (together with its assignees, the "Investor"). This opinion is being delivered to you in accordance with the provisions of Section 7.12 of the Agreement. All capitalized terms used herein without definition have the meanings specified in the Agreement.

In connection with the opinion herein expressed, we have examined originals, or copies certified or otherwise identified to our satisfaction, of the Agreement and such other documents, corporate records, certificates of public officials and other instruments as we have deemed necessary or advisable to enable us to render the opinion set forth herein. As to any facts material to this opinion, we have relied upon statements and representations of officers and other representatives of the Company, including the representations and warranties of the Company contained in the Agreement. We have made no independent investigation of the factual basis of any facts set forth in such representations and warranties or certificates.

LOS ANGELES   NEW YORK   WASHINGTON, D.C.   SAN FRANCISCO   PALO ALTO
LONDON   PARIS   MUNICH   ORANGE COUNTY   CENTURY CITY   DALLAS   DENVER

GIBSON, DUNN & CRUTCHER LLP

Green Equity Investors III, L.P.
Werner Co-Investment LLC
June 11, 2003
Page 2

Upon the basis of the foregoing, we are of the opinion that the Agreement constitutes a valid and binding obligation of each of the Company and the Shareholders, enforceable against the Company and the Shareholders in accordance with its terms.

The opinion expressed herein is further subject to the following exceptions, assumptions, qualifications and limitations:

A.    We have assumed, with your permission:  (i) the genuineness of all signatures of all persons executing documents on behalf of all parties, the genuineness, authenticity and completeness of all documents submitted to us as originals, the conformity to originals of all documents submitted to us as copies, and the genuineness, authenticity and completeness of the originals from which such copies were made; (ii) the due authorization, execution and delivery of the Agreement by all parties thereto, whether or not due authorization, execution and delivery is a prerequisite to the effectiveness thereof; (iii) that all parties have the power, authority and legal right to enter into and perform the terms and conditions on their respective parts to be performed under the Agreement; (iv) the legal capacity of natural persons; and (v) that the Agreement constitutes a binding obligation of each of the parties thereto, other than the Company and the Shareholders, enforceable against such parties in accordance with its terms.

B.    Our opinion is qualified as to:  (i) limitations imposed by any applicable bankruptcy, insolvency, reorganization, moratorium, arrangement or other similar laws and court decisions of general application affecting creditors' rights generally (including the effect of statutory or other laws regarding fraudulent conveyances or transfers or preferential transfers); (ii) rights to indemnification and contribution that may be limited by applicable law and equitable principles; and (iii) general principles of equity, upon the specific enforceability of any of the remedies, covenants or other provisions of the Agreement and upon the availability of injunctive relief or other equitable remedies and the application of principles of equity (regardless of whether enforcement is considered in proceedings at law or in equity) as such principles relate to, limit or affect the enforcement of creditors' rights generally.

We render no opinion herein as to matters involving the laws of any jurisdiction other than the laws of the State of New York. This opinion is limited to the effect of the current state of the laws of the State of New York and the facts as they currently exist.  We assume no obligation to revise or supplement this opinion in the event of future changes in such laws or the interpretations thereof or such facts.

**GIBSON, DUNN & CRUTCHER LLP**

Green Equity Investors III, L.P.
Werner Co-Investment LLC
June 11, 2003
Page 3


      This opinion is rendered solely for your benefit and is not to be used, circulated, quoted or otherwise referred to for any other purpose without our written permission.

          Very truly yours,

          *Gibson, Dunn & Crutcher LLP*

EMG/WMR/ALF

80260387_1.DOC

# EXHIBIT 35

(Excerpts Only)

## AMENDED AND RESTATED SHAREHOLDER AGREEMENT

THIS AMENDED AND RESTATED SHAREHOLDER AGREEMENT (this "Agreement") is entered into as of June 11 , 2003, by and among WERNER HOLDING CO. (PA), INC., a Pennsylvania corporation (the "Company"), INVESTCORP INVESTMENT EQUITY LIMITED, a Cayman Islands corporation ("IIEL"), the other holders of shares of Class D Common Stock of the Company (IIEL and each such other holder individually a "Class D Shareholder" and collectively the "Class D Shareholders"), GREEN EQUITY INVESTORS III, L.P., a Delaware limited partnership ("GEI") the other holders of shares of Series A Preferred Stock of the Company (GEI and each other holder individually a "Preferred Holder" and collectively the "Preferred Holders") and the individuals listed on Schedule A hereto (individually a "Designated Shareholder" and collectively the "Designated Shareholders.") The Class D Shareholders, the Preferred Holders and the Designated Shareholders are hereinafter sometimes referred to individually as a "Shareholder" and collectively as the "Shareholders."

### R E C I T A L S

A.     The Company, the Class D Shareholders, certain other stockholders of the Company (including certain Designated Shareholders) and GEI have entered into a Recapitalization and Stock Purchase Agreement (the "Recapitalization Agreement"), dated as of May 7, 2003, pursuant to which the Company will effect a recapitalization upon the terms and subject to the satisfaction or waiver of the conditions set forth therein (the "Recapitalization") and, among other things, amend and restate the Company's Articles of Incorporation to include a Statement with Respect to Shares authorizing the issuance of the Preferred Shares (the "Preferred Statement.")

B.     Pursuant to the Recapitalization Agreement, immediately after the consummation of the Recapitalization, the Designated Shareholders shall collectively own 627.3577 shares of Post-Recapitalization Class A Common Stock and 5278.3744 shares of Post-Recapitalization Class B Common Stock, the Class D Shareholders shall collectively own 603.3540 shares of Post-Recapitalization Class D Common Stock and the Preferred Holders shall collectively own 65,000 Preferred Shares.

C.     This Agreement is being entered into pursuant to the Recapitalization Agreement, and is intended to amend, restate and supersede the Shareholder Agreement, dated as of November 24, 1997 (the "1997 Agreement"), among the Company, the Designated Shareholders and the Class D Shareholders.

### A G R E E M E N T

NOW, THEREFORE, effective as of immediately following the Closing of the Recapitalization, in consideration of the foregoing recitals and the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

10.    Retention Condition; Termination.

(a)    Retention Condition. (i) The rights granted to the GEI Investors pursuant to Section 2 and Section 7 shall terminate automatically and permanently at such time as the GEI Investors cease to own in the aggregate at least 50% of the Preferred Shares and any Common Shares issuable upon conversion of the Preferred Shares, (ii) the rights granted to the Investcorp Investors pursuant to Section 2(a), Section 2(b) and Section 7 shall terminate automatically and permanently at such time as the Investcorp Investors cease to own at least 50% of the aggregate equity position owned by the Investcorp Investors as of immediately after the closing of the Recapitalization and (iii) the rights granted to the Designated Shareholders pursuant to Section 2(a) shall terminate automatically and permanently at such time as the Designated Shareholders cease to own at least 50% of the aggregate equity position that they owned as of immediately after the closing of the Recapitalization.

(b)    Termination as to Shareholder.  This Agreement shall terminate with respect to a Shareholder at such time as the Shareholder ceases to hold any equity securities of the Company; provided, however, that the provisions of this Agreement shall continue in effect for the purpose of enforcing against such Shareholder all obligations and undertakings that shall have theretofore become operative; provided, further, however, that the provisions of this Agreement shall be binding upon any transferee of any Shareholder, whether such transfer was pursuant to a Permitted Transfer or otherwise.  Notwithstanding the foregoing, the benefits of this Agreement shall inure only to a Permitted Transferee of a Shareholder and only in accordance with Section 11(d).

(c)    Termination of Agreement.  This Agreement shall terminate upon the earliest to occur of (i) the Agreement having been terminated as to all Shareholders and all transferees of all Shareholders pursuant to paragraph (b) hereof and (ii) a Qualified IPO.

11.    Miscellaneous Provisions.

(a)    1997 Agreement.  The 1997 Agreement is hereby amended and restated in its entirety and shall no longer be of any force or effect. This Agreement supersedes and replaces the 1997 Agreement in all respects.

(b)    Further Action.  Each party hereto agrees to execute and deliver any instrument and take any action that may reasonably be requested by any other party for the purpose of effectuating the provisions of this Agreement.

(c)    Incorporation of Schedules.  The schedules attached hereto are incorporated into this Agreement and shall be deemed a part hereof as if set forth herein in full. References herein to "this Agreement" and the words "herein," "hereof" and words of similar import refer to this Agreement (including its schedules and exhibits) as an entirety.  In the event of any conflict between the provisions of this Agreement and any such schedule or exhibit, the provisions of this Agreement shall control.

(d)    Assignment.  No right under this Agreement shall be assignable, except as expressly provided in this Section 11(d) or in Sections 3, 4, 5 and 6 hereof, and any attempted assignment in violation of this provision shall be void.  The Company shall have the right to

assign its rights and obligations hereunder to any successor entity (including any entity acquiring substantially all of the assets of the Company), whereupon references herein to the Company shall be deemed to be to such successor. To the extent assignable in accordance with this Section 11(d), this Agreement, and the rights and obligations of the parties hereunder, shall be binding upon and inure to the benefit of any and all transferees of the Covered Shares subject hereto, in each case with the same force and effect as if such transferees were named herein as parties hereto, provided, however, that (i) the rights set forth in (A) Section 2(a) are personal to the Designated Shareholders and (B) Section 2 are personal to the GEI Investors and the Investcorp Investors and (ii) such rights may not be assigned or transferred to any party and any attempted assignment or transfer thereof shall be void. Notwithstanding the foregoing any GEI Investor can assign any of its rights under this Agreement to any other GEI Investor and any Investcorp Investor can assign any of its rights under this Agreement to any other Investcorp Investor.

(e)    Enforcement. The parties recognize that irreparable damage will result in the event that this Agreement shall not be specifically performed. Should any dispute arise concerning the disposition of any Common Shares hereunder, the parties hereto agree that an injunction may be issued restraining such disposition pending determination of such controversy and that no bond or other security may be required in connection therewith. Should any dispute arise concerning the right or obligation of the Shareholders or the Company to purchase or sell any of the Common Shares subject hereto, such right or obligation shall be enforceable by a decree of specific performance. Such remedies shall, however, not be exclusive and shall be in addition to any other remedy which the parties may have.

(f)    Notices. Any notice or other communication required or which may be given hereunder shall be in writing by hand delivery, registered or certified first class mail, telecopier or air courier guaranteeing overnight delivery:

(i)    if to the Company, to:

Werner Holding (PA), Inc.
93 Werner Road
Greenville, PA 16125
Attention: Eric J. Werner, Esq.
Phone: (724) 588-2000
Fax: (724) 589-5898

*with a copy (which shall not constitute notice) to:*

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attention: E. Michael Greaney, Esq.
Phone: (212) 351-4000
Fax: (212) 351-4035

(ii)    if to the Investcorp Investors, to:

> Investcorp Management Service Limited
> c/o Investcorp Bank B.S.C.
> P.O. Box 5340,
> Investcorp House,
> Manama, Bahrain,
> Attn: Gary S. Long
> Phone  011-973-532-000
> Fax: 011-973-536-541

*with a copy (which shall not constitute notice) to:*

> Gibson, Dunn & Crutcher LLP
> 200 Park Avenue
> New York, NY 10166
> Attention: E. Michael Greaney, Esq.
> Phone:  (212) 351-4000
> Fax:  (212) 351-4035

(iii)    if to the GEI Investors, to:

> Green Equity Investors III, L.P.
> 11111 Santa Monica Blvd., Suite 2000
> Los Angeles, CA  90025
> Attention: Michael S. Wong
> Phone: (310) 954-0415
> Fax: (310) 954-0404

*with a copy (which shall not constitute notice) to:*

> Skadden, Arps, Slate, Meagher & Flom LLP
> 300 South Grand Avenue, 34th Floor
> Los Angeles, CA  90071
> Attention: Nick Saggese
> Phone: (213) 687-5000
> Fax: (213) 687-5600

(iv)    if to any other Shareholder, to his or its address set forth on
Schedule A attached hereto,

*with a copy (which shall not constitute notice) to:*

> Werner Holding (PA), Inc.
> 93 Werner Road
> Greenville, PA 16125
> Attention: Eric J. Werner, Esq.

and

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attention: E. Michael Greaney, Esq.

or at such other address, notice of which is given in accordance with the provisions of this Section 11(f). All such notices shall be deemed to have been duly given when delivered by hand, if personally delivered; five (5) business days after being deposited in the mail, postage prepaid, if mailed; when receipt is acknowledged, if telecopied; and on the next business day, if timely delivered to an air courier guaranteeing overnight delivery.

(g)    Applicable Law. This Agreement and all disputes or controversies arising out of or related to this Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of New York.

(h)    Entire Agreement; Amendments and Waivers. This Agreement sets forth the entire agreement and supersedes all prior agreements, arrangements, communications and understandings, both written and oral, among the parties with respect to the subject matter of this Agreement. The failure of any party to seek redress for the violation of or to insist upon the strict performance of any term of this Agreement shall not constitute a waiver of such term and such party shall be entitled to enforce such term without regard to such forbearance. This Agreement may be amended, each party hereto may take any action herein prohibited or omit to take action herein required to be performed by it, and any breach of or compliance with any covenant, agreement, warranty or representation may be waived, only by the prior written consent or written waiver of the Company, the Investcorp Investors, the GEI Investors and at least a majority in interests of the Designated Shareholders.

(i)    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the undersigned have executed this Shareholders Agreement as of the date first set forth above.

WERNER HOLDING CO. (PA), INC.

By: _____

    Name:

    Title:

GREEN EQUITY INVESTORS III, L.P.

By: GEI Capital III, LLC, its General Partner

    By:_____

        Name:

        Title:

WERNER CO-INVESTMENT LLC

By: Leonard Green & Partners, L.P.

    By: LGP Management, Inc., its General Partner

        By:_____

           Name:

           Title:

IN WITNESS WHEREOF, the undersigned have executed this Shareholders Agreement as of the date first set forth above.

WERNER HOLDING CO. (PA), INC.

By: _____

    Name:
    Title:

GREEN EQUITY INVESTORS III, L.P.

By: GEI Capital III, LLC, its General Partner

By: _____

    Name: PETER J. NOLAN
    Title:

WERNER CO-INVESTMENT LLC

By: Leonard Green & Partners, L.P.

By: LGP Management, Inc., its General Partner

By: _____

    Name: PETER J. NOLAN
    Title:

INVESTCORP INVESTMENT EQUITY
LIMITED

By: _Sidney J. Coleman_
Name: The Director Ltd.
Title: Director

Other Class D Shareholders

BALLET LIMITED

By:_____
Name:
Title:

DENARY LIMITED

By:_____
Name:
Title:

GLEAM LIMITED

By:_____
Name:
Title:

20

INVESTCORP INVESTMENT EQUITY
LIMITED

By:_____
     Name:
     Title:

Other Class D Shareholders


**BALLET LIMITED**

By: _____
     Stephen Ritchie
     Authorized Representative


**DENARY LIMITED**

By: _____
     Craig Bottger
     Authorized Representative

**GLEAM LIMITED**

By: _____
     Anthony Palys
     Authorized Representative


**HIGHLANDS LIMITED**

By: _____
     Kevin Murphy
     Authorized Representative


**NOBLE LIMITED**

By: _____
     Abeer Al Shehabi
     Authorized Representative


20

**OUTRIGGER LIMITED**

By: _____
Mufeed Rajab
Authorized Representative

**QUILL LIMITED**

By: _____
Mahmood Al Aradi
Authorized Representative

**RADIAL LIMITED**

By: _____
Stephen J. Atkinson
Authorized Representative

**SHORELINE LIMITED**

By: _____
Kevin O'Shea
Authorized Representative

**ZINNIA LIMITED**

By: _____
Meredith I. Brody
Authorized Representative

21

DESIGNATED SHAREHOLDERS

_____
Donald M. Werner


_____
Howard L. Solot


_____
Bruce D. Werner


_____
Michael E. Werner


_____
Craig R. Werner


_____
Eric J. Werner


_____
Michael J. Solot

JUN. 10. 2003 12:23PM    WERNER LEGAL DEPT                    NO. 0856    P. 1/6    P. 1

NO. 0833    P. 24/27

## DESIGNATED SHAREHOLDERS

_____
Donald M. Werner

_____
Howard L. Solot

_____
Bruce D. Werner

_____
Michael E. Werner

_____
Craig R. Werner

_____
Eric J. Werner

_____
Michael J. Solot

724- 588- 0618

DESIGNATED SHAREHOLDERS

Donald M. Werner

Howard L. Solot

Bruce D. Werner

Michael E. Werner

Craig R. Werner

Eric J. Werner

Michael J. Solot

## DESIGNATED SHAREHOLDERS

Donald M. Werner
_____

Howard L. Solot
_____

Bruce D. Werner
_____

Michael E. Werner
_____

Craig R. Werner
_____

Eric J. Werner
_____

Michael J. Solot
_____

DESIGNATED SHAREHOLDERS

_____
Donald M. Werner


_____
Howard L. Solot


_____
Bruce D. Werner


_____
Michael E. Werner


_____
Craig R. Werner


_____
Eric J. Werner


_____
Michael J. Solot

DESIGNATED SHAREHOLDERS

_____

Donald M. Werner


_____

Howard L. Solot


_____

Bruce D. Werner


_____

Michael E. Werner


_____

Craig R. Werner


_____

Eric J. Werner


_____

Michael J. Solot

DESIGNATED SHAREHOLDERS

_____

Donald M. Werner

_____

Howard L. Solot

_____

Bruce D. Werner

_____

Michael E. Werner

_____

Craig R. Werner

_____

Eric J. Werner

_____

Michael J. Solot

# EXHIBIT 36

(Excerpts Only)

**WERNER HOLDING CO. (DE), INC.**

---

CREDIT AGREEMENT

dated as of June 11, 2003

---

$230,000,000

Senior Secured Credit Facilities

---

JPMORGAN CHASE BANK,

as Administrative Agent,

CITIGROUP GLOBAL MARKETS INC.,

as Syndication Agent,

and

J. P. MORGAN SECURITIES, INC. and
CITIGROUP GLOBAL MARKETS INC.,

as Joint Lead Arrangers and Joint Bookrunners

# Table of Contents

## Page

SECTION 1.   DEFINITIONS ................................................................................. 2
   1.1   Defined Terms ............................................................................................. 2
   1.2   Other Definitional Provisions................................................................... 25

SECTION 2.   TERM LOANS............................................................................... 25
   2.1   Term Loans................................................................................................ 25
   2.2   Repayment of Term Loans........................................................................ 25
   2.3   Use of Proceeds ........................................................................................ 25

SECTION 3.   AMOUNT AND TERMS OF REVOLVING CREDIT COMMITMENTS ........ 26
   3.1   Revolving Credit Commitments ............................................................... 26
   3.2   Commitment Fee........................................................................................ 26
   3.3   Proceeds of Revolving Credit Loans........................................................ 26
   3.4   Swing Line Commitment .......................................................................... 26
   3.5   Issuance of Letters of Credit .................................................................... 28
   3.6   Participating Interests ............................................................................... 29
   3.7   Procedure for Opening Letters of Credit ................................................. 29
   3.8   Reimbursement.......................................................................................... 29
   3.9   Letter of Credit Fees ................................................................................. 30
   3.10   Letter of Credit Reserves........................................................................ 31
   3.11   Further Assurances .................................................................................. 32
   3.12   Obligations Absolute .............................................................................. 32
   3.13   Assignments ............................................................................................ 33
   3.14   Participations ........................................................................................... 33
   3.15   Replacement of the Issuing Lender ........................................................ 33

SECTION 4.   [RESERVED]................................................................................. 33

SECTION 5.   GENERAL PROVISIONS APPLICABLE TO LOANS..................................... 33
   5.1   Procedure for Borrowing........................................................................... 33
   5.2   Conversion and Continuation Options ..................................................... 34
   5.3   Changes of Commitment Amounts ........................................................... 35
   5.4   Optional and Mandatory Prepayments; Repayments of Term Loans....................... 36
   5.5   Interest Rates and Payment Dates ............................................................ 41
   5.6   Computation of Interest and Fees............................................................. 42
   5.7   Certain Fees ............................................................................................... 42
   5.8   Inability to Determine Interest Rate ........................................................ 42
   5.9   Pro Rata Treatment and Payments ........................................................... 43
   5.10   Illegality.................................................................................................. 45
   5.11   Requirements of Law .............................................................................. 46
   5.12   Indemnity................................................................................................. 49

5.13   Repayment of Loans; Evidence of Debt .................................................. 49
5.14   Replacement of Lenders ......................................................................... 50

SECTION 6.    REPRESENTATIONS AND WARRANTIES ................................. 50
6.1   Financial Condition .................................................................................. 50
6.2   No Change .................................................................................................. 51
6.3   Corporate Existence; Compliance with Law ........................................ 52
6.4   Corporate Power; Authorization ............................................................ 52
6.5   Enforceable Obligations ........................................................................... 53
6.6   No Legal Bar ............................................................................................. 53
6.7   No Material Litigation ............................................................................. 53
6.8   Investment Company Act .......................................................................... 54
6.9   Federal Regulation ................................................................................... 54
6.10  No Default ................................................................................................. 54
6.11  Taxes .......................................................................................................... 54
6.12  Subsidiaries; Immaterial Subsidiaries ................................................. 55
6.13  Ownership of Property; Liens ................................................................. 55
6.14  ERISA ........................................................................................................ 55
6.15  Collateral Documents .............................................................................. 56
6.16  Copyrights, Patents, Permits, Trademarks and Licenses ................... 57
6.17  Environmental Matters ............................................................................ 57
6.18  Accuracy and Completeness of Information ......................................... 58
6.19  Solvency .................................................................................................... 58
6.20  Labor Matters .......................................................................................... 58

SECTION 7.    CONDITIONS PRECEDENT ........................................................ 59
7.1   Conditions to Initial Loans and Letters of Credit ............................... 59
7.2   Conditions to All Loans and Letters of Credit .................................... 63

SECTION 8.    AFFIRMATIVE COVENANTS ...................................................... 64
8.1   Financial Statements ............................................................................... 64
8.2   Certificates; Other Information ............................................................. 65
8.3   Payment of Obligations ........................................................................... 67
8.4   Conduct of Business and Maintenance of Existence ........................... 67
8.5   Maintenance of Property; Insurance ..................................................... 67
8.6   Inspection of Property; Books and Records; Discussions ................... 68
8.7   Notices ....................................................................................................... 68
8.8   Environmental Laws ................................................................................. 69
8.9   Additional Collateral ............................................................................... 70

SECTION 9.    NEGATIVE COVENANTS ............................................................ 72
9.1   Indebtedness .............................................................................................. 73
9.2   Limitation on Liens .................................................................................. 75
9.3   Limitation on Contingent Obligations .................................................. 77
9.4   Prohibition of Fundamental Changes .................................................... 77
9.5   Prohibition on Sale of Assets ................................................................ 78

9.6    Limitation on Investments, Acquisitions, Loans and Advances .................................. 79
9.7    Capital Expenditures ................................................................................................. 82
9.8    Interest Rate Agreements ........................................................................................... 83
9.9    Debt to EBITDA ........................................................................................................ 83
9.10   Interest Coverage ....................................................................................................... 84
9.11   [RESERVED] ............................................................................................................. 84
9.12   Limitation on Dividends ............................................................................................ 84
9.13   Transactions with Affiliates ...................................................................................... 85
9.14   Prepayments and Amendments of Permanent Subordinated Debt ........................... 86
9.15   Limitation on Changes in Fiscal Year ....................................................................... 86
9.16   Limitation on Business .............................................................................................. 86
9.17   Designated Senior Indebtedness ................................................................................ 86

SECTION 10.    EVENTS OF DEFAULT ................................................................................ 87

SECTION 11.    THE AGENTS; THE ISSUING LENDER ........................................................ 90
11.1    Appointment ............................................................................................................. 90
11.2    Delegation of Duties ................................................................................................. 90
11.3    Exculpatory Provisions ............................................................................................. 90
11.4    Reliance by the Administrative Agent ...................................................................... 90
11.5    Notice of Default ...................................................................................................... 91
11.6    Non-Reliance on Agents and Other Lenders ............................................................ 91
11.7    Indemnification ......................................................................................................... 92
11.8    Each Agent in its Individual Capacity ...................................................................... 92
11.9    Successor Administrative Agent ............................................................................... 92
11.10   Issuing Lender as Issuer of Letters of Credit ........................................................... 93

SECTION 12.    MISCELLANEOUS ...................................................................................... 93
12.1    Amendments and Waivers ......................................................................................... 93
12.2    Notices ...................................................................................................................... 94
12.3    No Waiver; Cumulative Remedies ............................................................................ 95
12.4    Survival of Representations and Warranties ............................................................. 96
12.5    Payment of Expenses and Taxes ............................................................................... 96
12.6    Successors and Assigns; Participations and Assignments ....................................... 97
12.7    Set-off ..................................................................................................................... 101
12.8    Payments Pro Rata .................................................................................................. 102
12.9    Counterparts ........................................................................................................... 102
12.10   Governing Law; No Third Party Rights .................................................................. 102
12.11   Submission to Jurisdiction; Waivers ....................................................................... 103
12.12   Releases .................................................................................................................. 103
12.13   Interest .................................................................................................................... 103
12.14   Special Indemnification .......................................................................................... 104
12.15   Permitted Payments and Transactions .................................................................... 105
12.16   [RESERVED] ........................................................................................................... 105
[12.17   Certain Provisions Regarding Alabama Mortgaged Property ............................ 105

## SCHEDULES

| Schedule I | List of Addresses for Notices; Lending Offices; Commitment Amounts |
| Schedule II | Pricing Fee Grid |
| Schedule 6.7 | Litigation |
| Schedule 6.12 | Subsidiaries |
| Schedule 6.13 | Fee and Leased Properties |
| Schedule 6.15(b) | UCC Filing Offices |
| Schedule 6.16 | Patents, Trademarks and Copyrights |
| Schedule 6.17 | Environmental |
| Schedule 9.1(a) | Existing Indebtedness |
| Schedule 9.2(h) | Existing Liens |
| Schedule 9.3(d) | Existing Contingent Obligations |

## EXHIBITS

| EXHIBIT A | Form of Term Loan Note |
| EXHIBIT B | Form of Revolving Credit Note |
| EXHIBIT C | [RESERVED] |
| EXHIBIT D | Form of Swing Line Note |
| EXHIBIT E | Form of Assignment and Acceptance |
| EXHIBIT F | Form of Collateral Agreement |
| EXHIBIT G-1 | Form of Holdings Guarantee |
| EXHIBIT G-2 | Form of Subsidiary Guarantee |
| EXHIBIT H | Form of Holdings Pledge Agreement |
| EXHIBIT I | Form of Subsection 5.11(d)(2) Certificate |
| EXHIBIT J-1 | Form of Opinion of Gibson, Dunn & Crutcher LLP |
| EXHIBIT J-2 | Form of Opinion of General Counsel to the Company |
| EXHIBIT K-1 | Form of Holdings Closing Certificate |
| EXHIBIT K-2 | Form of Company Closing Certificate |
| EXHIBIT K-3 | Form of Subsidiaries Closing Certificate |
| EXHIBIT L | Form of Mortgage |

CREDIT AGREEMENT, dated as of June 11, 2003, among WERNER HOLDING CO. (DE), INC., a Delaware corporation (the "Company"), the several lenders from time to time parties hereto (the "Lenders"), CITIGROUP GLOBAL MARKETS INC., as syndication agent (in such capacity, the "Syndication Agent"), CITIGROUP GLOBAL MARKETS INC. and J. P. MORGAN SECURITIES, INC., as joint lead arrangers and joint bookrunners (in such capacity, the "Arrangers"), and JPMORGAN CHASE BANK, as administrative agent for the Lenders (in such capacity, the "Administrative Agent" and, together with the Syndication Agent, the "Agents").

W I T N E S S E T H:

WHEREAS, the Company is party to a Credit Agreement, dated as of November 24, 1997, as amended by the First Amendment, dated as of June 30, 2001 (as so amended, the "Existing Credit Agreement"), between the Company, the several lenders from time to time parties thereto and Deutsche Bank Trust Company Americas, as administrative agent;

WHEREAS, Green Equity Investors III, L.P., ("GEI"), Werner Holding Co. (PA), Inc., a Pennsylvania corporation ("Holdings") and certain shareholders of Holdings have entered into a Recapitalization and Stock Purchase Agreement, dated as of May 7, 2003 (together with any schedules attached thereto, as amended, supplemented or otherwise modified from time to time, the "Recapitalization Agreement"), which will effect a recapitalization (the "Recapitalization") of Holdings, which shall include a sale of capital stock of Holdings to GEI and its affiliates (the "GEI Investors") for approximately $65,000,000;

WHEREAS, in connection with the Recapitalization, the Company intends (i) to refinance and replace its existing credit facilities under the Existing Credit Agreement in the aggregate principal amount of approximately $185,000,000, (ii) to provide funds to Holdings for the redemption of an aggregate amount of approximately $150,000,000 of its capital stock and payments to management in connection with option cancellations and bonus payments, (iii) to obtain consents (the "Noteholder Consents") required from the holders of the Company's 10.0% Senior Subordinated Notes Due November 15, 2007 (as amended, supplemented or otherwise modified from time to time, the "Senior Subordinated Notes") in connection with the Transactions (as defined below) and (iv) to pay fees and expenses relating to the Transactions of approximately $20,000,000 (including payments in respect of the Noteholder Consents) (the Recapitalization and the other transactions described in the foregoing recitals are collectively referred to herein as the "Transactions");

WHEREAS, upon the consummation of the Transactions, GEI will own approximately 22% of the outstanding capital stock of Holdings and the remainder will be held by Investcorp S.A., a Luxembourg corporation ("Investcorp"), certain affiliated entities and other investors and certain management of the Company and existing shareholders of Holdings (together with GEI Investors, the "Investor Group");

WHEREAS, Holdings and the Company intend to finance the Transactions from the following sources: (a) $65,000,000 in participating convertible preferred equity (consisting of a cash investment of $65,000,000 from the GEI Investors); (b) borrowings under the senior

secured credit facilities provided for herein; (c) funds provided by the A/R Facility; and (d) cash of the Company; and

WHEREAS, the Company has requested the Lenders to make loans and other extensions of credit available to the Company to enable the Company to finance a portion of the Transactions and for the other purposes set forth herein;

NOW, THEREFORE, the Company, the Administrative Agent, the Syndication Agent, the Arrangers and the Lenders agree as follows:

SECTION 1.   DEFINITIONS

1.1   Defined Terms.  As used in this Agreement, the terms defined in the caption hereto shall have the meanings set forth therein, and the following terms have the following meanings:

"Accepting Lenders": as defined in subsection 5.4(c)(vii).

"Acquired Capital Expenditures": as defined in subsection 9.7.

"Acquired Person": as defined in subsection 9.7.

"Additional Mortgage": as defined in subsection 8.9(f).

"Adjusted Working Capital": at any time shall mean an amount equal to the Consolidated Current Assets at such time minus Consolidated Current Liabilities at such time.

"Adjustment Date": as defined in the definition of Applicable Margin.

"Administrative Agent": as defined in the preamble hereto.

"Administrative Questionnaire": an Administrative Questionnaire in a form supplied by the Administrative Agent".

"Affected Eurodollar Loans": as defined in subsection 5.4(b).

"Affiliate": of any Person (a) any Person (other than the Company or a Subsidiary) which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, or (b) any Person who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above. For purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote 25% or more of the securities having ordinary voting power for the election of directors of such Person, whether by ownership of securities, contract, proxy or otherwise, or (y) to direct or cause the direction of the management and policies of such Person, whether by ownership of securities, contract, proxy or otherwise.

"Agents": as defined in the preamble hereto.

11.10  <u>Issuing Lender as Issuer of Letters of Credit</u>.  Each Lender which is a holder of a Revolving Credit Commitment (collectively "<u>Revolving Credit Lenders</u>") hereby acknowledges that the provisions of this Section 11 shall apply to the Issuing Lender, in its capacity as issuer of the Letters of Credit, in the same manner as such provisions are expressly stated to apply to the Administrative Agent, except that obligations to indemnify the Issuing Lender shall be ratable among the Revolving Credit Lenders in accordance with their respective Revolving Credit Commitments (or, if the Revolving Credit Commitments have been terminated, the outstanding principal amount of their respective Revolving Credit Loans and L/C Obligations and their respective participating interests in the outstanding Letters of Credit).

SECTION 12.    <u>MISCELLANEOUS</u>

12.1  <u>Amendments and Waivers</u>.  Except as otherwise expressly set forth in this Agreement, no Credit Document nor any terms thereof may be amended, supplemented, waived or modified except in accordance with the provisions of this subsection 12.1.  With the written consent of the Required Lenders, the Administrative Agent and the respective Credit Parties or their Subsidiaries may, from time to time, enter into written amendments, supplements or modifications hereto for the purpose of adding any provisions to any Credit Document to which they are parties or changing in any manner the rights of the Lenders or of any such Credit Party or its Subsidiaries thereunder or waiving, on such terms and conditions as the Administrative Agent may specify in such instrument, any of the requirements of any such Credit Document or any Default or Event of Default and its consequences; <u>provided</u> that:

(a)    (i) no such waiver and no such amendment, supplement or modification shall (x) release all or substantially all of the Collateral without the written consent of all Lenders or (y) release all or substantially all of the Guarantors without the written consent of all Lenders and (ii) notwithstanding any of the foregoing, neither the preceding clause (i) nor the immediately preceding paragraph of this subsection 12.1 shall be applicable to and no consent shall be required for (i) releases of collateral in connection with any Asset Sales permitted by subsection 9.5, (ii) releases of collateral in accordance with subsection 12.12 or (iii) upon the reincorporation of the Company or any Subsidiary in a new jurisdiction or the creation of a new Subsidiary of the Company, any release of collateral in connection with the transfer of such released collateral to such reincorporated entity or new Subsidiary in compliance with subsection 9.4, <u>provided</u> that the Administrative Agent, in its sole discretion, determines that such release and transfer, together with any grant and perfection of a new Lien therein in favor of the Administrative Agent, will cause no material impairment of the value of the collateral taken as a whole, after giving effect to such release and transfer;

(b)    no such waiver and no such amendment, supplement or modification shall (x) without the prior written consent of each Lender whose obligations hereunder are being directly modified, waive or extend the final maturity date of any Note or the scheduled payment date of any installment of any Loan, or reduce the rate or extend the time of payment of interest thereon, or change the method of calculating interest thereon, or reduce or extend the time of payment of any fee payable to such Lender hereunder, or reduce the principal amount thereof, or extend the expiry of any Lender's Commitment or



change the amount of any Lender's Commitment or Commitment Percentage, or (y) without the prior written consent of each Lender, amend, modify or waive any provision of subsection 5.9(b) or this subsection 12.1 or reduce the percentage specified in the definition of Required Lenders or consent to the assignment or transfer by the Company of any of its rights and obligations under any Credit Document;

(c)   no such waiver and no such amendment, supplement or modification affecting any Agent or Issuing Lender shall amend, modify or waive any provision of Section 11 without the written consent of such Agent or Issuing Lender, as the case may be; and

(d)   no such waiver, and no such amendment, supplement or modification shall amend, modify or waive the prepayment or order of application requirements specified in subsection 5.4(c)(i), (ii), (iii) and (v) or subsection 5.4(a) without the written consent of the holders of more than 50% of each of (i) the aggregate unpaid principal amount of the Term Loans adversely affected thereby, if any, and (ii) the Revolving Credit Commitments adversely affected thereby, if any, or, if the Revolving Credit Commitments are terminated, the aggregate unpaid principal amount of the Revolving Credit Loans (the Term Loans and the Revolving Credit Commitments of any Non-Funding Lender to be disregarded in determining such percentage at any time) adversely affected thereby, if any; provided that the foregoing provisions of this paragraph (d) shall not be applicable to any modifications to subsection 5.4(a) or 5.4(c)(vi) in order to provide for pro rata payments to any additional Tranche of Term Loans on substantially the same basis as payments to the Term Loans existing on the Closing Date are made;

any such waiver and any such amendment, supplement or modification described in this subsection 12.1 shall apply equally to each of the Lenders and shall be binding upon each Credit Party and its Subsidiaries, the Lenders, the Administrative Agent and the Issuing Lender and all future holders of the Notes and the Loans. Any extension of a Letter of Credit by the Issuing Lender shall be treated hereunder as a new Letter of Credit. In the case of any waiver, the Credit Parties, the Lenders, the Administrative Agent and Issuing Lender shall be restored to their former position and rights hereunder and under the outstanding Notes, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

12.2  Notices.  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy or telex, if one is listed) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when sent, confirmation of receipt received, or, in the case of telex notice, when sent, answerback received, addressed as follows in the case of the Company and the Administrative Agent, and as set forth in Schedule I in the case of any Lender, or to such other address as may be hereafter notified by the respective parties hereto and any future holders of the Notes:

The Company:
Werner Holding Co. (DE), Inc.
c/o Werner Holding Co. (PA), Inc.
93 Werner Road
Greenville, Pennsylvania 16125
Attention: Eric J. Werner, Esq.
Telecopy: (742) 588-0718

With a copy to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
Attention: Janet Vance, Esq.
Telecopy: (212) 351-5288

The Administrative Agent, the Issuing Lender
and the Swing Line Lender:
JPMorgan Chase Bank
111 Fannin, 10th Floor/MC 46
Houston, TX 77002
Attention: Tokunboh Taiwo
Telecopy: (713) 750-2452
Telephone: (713) 750-2536

With a coy to:

JPMorgan Chase Bank
270 Park Avenue, 4th Floor
New York, New York 10017
Attention: Neil Boylan
Telecopy: (212) 270-6637

provided that any notice, request or demand to or upon the Administrative Agent or the Issuing
Lender pursuant to subsections 3.4, 3.5, 5.1, 5.2, 5.3 and 5.4 shall not be effective until received
and, provided further, that the failure to provide the copies of notices to the Company provided
for in this subsection 12.2 shall not result in any liability to the Administrative Agent.

12.3  No Waiver; Cumulative Remedies.  No failure to exercise and no delay in
exercising, on the part of any Agent or any Lender, any right, remedy, power or privilege
hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right,
remedy, power or privilege hereunder preclude any other or further exercise thereof or the
exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and
privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and
privileges provided by law.



12.4  <u>Survival of Representations and Warranties</u>.  All representations and warranties made hereunder and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement, the Letters of Credit and the Notes.

12.5  <u>Payment of Expenses and Taxes</u>.  The Company agrees (a) to pay or reimburse the Administrative Agent, the Arrangers and the Syndication Agent for all their reasonable out-of-pocket costs and expenses incurred in connection with the development, negotiation, preparation and execution of the Credit Documents and any other documents prepared in connection herewith, and the consummation of the transactions contemplated hereby and thereby, including, without limitation, the reasonable fees and disbursements of one counsel (in addition to any local or special counsel reasonably requested) to the Administrative Agent, the Arrangers and the Syndication Agent, (b) <u>to pay or reimburse all of the reasonable expenses, including, without limitation, reasonable fees and expenses of counsel, incurred by the Administrative Agent in connection with the administration of the facilities provided for herein or in connection with any amendments, waivers, work-outs or restructurings in respect thereof,</u> (c) to pay or reimburse the Administrative Agent, the Arrangers, the Syndication Agent, the Issuing Lender and each Lender for all their costs and expenses incurred in connection with, and to pay, indemnify, and hold the Administrative Agent, the Syndication Agent, the Issuing Lender and each Lender harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever arising out of or in connection with, the enforcement or preservation of any rights under any Credit Document and any such other documents or any foreclosure, collection or bankruptcy proceedings in respect thereof, including, without limitation, reasonable fees and disbursements of counsel to the Administrative Agent, the Arrangers, the Syndication Agent, and each Lender incurred in connection with the foregoing and in connection with advising the Administrative Agent with respect to its rights and responsibilities under this Agreement and the documentation relating thereto, (d) to pay, indemnify, and to hold the Administrative Agent, the Syndication Agent, the Arrangers and each Lender harmless from any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other similar taxes (other than withholding taxes), if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, any Credit Document and any such other documents, and (e) to pay, indemnify, and hold the Administrative Agent, the Syndication Agent, the Arrangers, the Issuing Lender and each Lender and their respective Affiliates, officers, employees, directors and trustees harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including, without limitation, reasonable fees and disbursements of counsel) which may be incurred by or asserted against the Administrative Agent, the Syndication Agent, the Arrangers, the Issuing Lender or the Lenders or such Affiliates, officers, directors or trustees (x) arising out of or in connection with any investigation, litigation or proceeding related to this Agreement, the other Credit Documents, the proceeds of the Loans and the transactions contemplated by or in respect of such use of proceeds, or any of the other transactions contemplated hereby, whether or not the Administrative Agent, the

Syndication Agent, the Arrangers, the Issuing Lender or any of the Lenders or such Affiliates, officers, directors or trustees is a party thereto, including, without limitation, any of the foregoing relating to the violation of, noncompliance with or liability under, any Environmental Law applicable to the Company, any of its Subsidiaries or any of the facilities and properties owned, leased or operated by the Company or any of its Subsidiaries, or (y) without limiting the generality of the foregoing, by reason of or in connection with the execution and delivery or transfer of, or payment or failure to make payments under, Letters of Credit (it being agreed that nothing in this subsection 12.5(d)(y) is intended to limit the Company's obligations pursuant to subsection 3.8) (all the foregoing, collectively, the "indemnified liabilities"), provided that the Company shall have no obligation hereunder with respect to indemnified liabilities of the Administrative Agent, the Syndication Agent, the Arrangers, the Issuing Lender or any Lender or any of their respective Affiliates, officers, directors and trustees arising from (i) the gross negligence or willful misconduct of the person seeking indemnification or (ii) legal proceedings commenced against the Administrative Agent, the Syndication Agent, the Arrangers, the Issuing Lender or any Lender by any security holder or creditor thereof arising out of and based upon rights afforded any such security holder or creditor solely in its capacity as such or (iii) legal proceedings commenced against the Administrative Agent, the Syndication Agent, the Arrangers or any Lender by any Transferee (as defined in subsection 12.6(f)) thereof. Without limiting the foregoing, and to the extent permitted by applicable law, the Company agrees not to assert, and hereby waives (and shall cause the Subsidiaries not to assert and to waive) all rights for contribution or any other rights of recovery with respect to all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, under or related to Environmental Laws, that any of them might have by statute or otherwise against the Administrative Agent, the Syndication Agent, the Arrangers, the Issuing Lender or any Lender. The agreements in this subsection 12.5 shall survive repayment of the Loans and all other amounts payable hereunder.

12.6  <u>Successors and Assigns; Participations and Assignments</u>. (a) This Agreement shall be binding upon and inure to the benefit of the Company, the Lenders, the Administrative Agent, the Syndication Agent, the Documentation Agent, the Co-Agent, all future holders of the Notes and the Loans, and their respective successors and assigns, except that the Company may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of each Lender.

(b)  (i)  Any Lender may, without the consent of the Company, the Administrative Agent, the Issuing Lender or the Swingline Lender, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Company, the Administrative Agent, the Issuing Lender and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Credit Documents. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or



instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in subsection 12.1(b) (other than with respect to assignments or transfers by the Company of any of its rights and obligations under any Credit Document) that affects such Participant. Subject to paragraph (b)(ii) of this subsection 10.6, the Company agrees that, subject to 12.6(b)(ii), each Participant shall be entitled to the benefits of Sections 3.10, 5.11 and 5.12 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (c) of this subsection. To the extent permitted by law, and subject to 12.6(b)(ii), each Participant also shall be entitled to the benefits of Section 12.7 as though it were a Lender, provided such Participant agrees to be subject to Section 12.8(b) as though it were a Lender. Participations may be non-pro rata.

(ii)  A Participant shall not be entitled to receive any greater payment under subsection 3.10, 5.11, 12.7 or 5.12 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant.

(c)  (i)  Subject to the conditions set forth in paragraph (c)(ii) below and compliance with paragraph (g) of this Section 12.6, any Lender may assign to one or more banks, mutual funds or financial institutions or entities (each, an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of:

(A)     the Company, provided that no consent of the Company shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if an Event of Default under clause (a) or (f) of Section 10 has occurred and is continuing, any other Assignee; and

(B)     the Administrative Agent, provided that no consent of the Administrative Agent shall be required for an assignment of (x) any Revolving Credit Commitment to an assignee that is a Lender with a Revolving Credit Commitment immediately prior to giving effect to such assignment or (y) all or any portion of a Term Loan to a Lender, an Affiliate of a Lender or an Approved Fund.

(ii)     assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 or, in the case of a Term Loan, $1,000,000, unless each of the Company and the Administrative Agent otherwise consent, provided that no such consent of the Company shall be required if an Event of Default under clause (a) or (f) of Section 10 has occurred and is continuing;

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement, <u>provided</u> that this clause shall not be construed to prohibit the assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of one Type of Commitments or Loans; and

(C)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee of $3,500, payable by the assigning or assignee Lender as they shall mutually agree; and

(D)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

For the purposes of this Section 12.6(c), the term "Approved Fund" has the following meaning: "<u>Approved Fund</u>" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (d) below, from and after the effective date specified in each Assignment and Acceptance the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 5.11, 5.12 and 12.5). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 12.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (b) of this Section.

(d)    The Administrative Agent, acting for this purpose as an agent of the Company, shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of the Loans and L/C Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>"). The entries in the Register shall be conclusive, in the absence of manifest error, and the Company, the Administrative Agent, the Issuing Lender and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for



inspection by the Company, the Issuing Lender and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)  Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Assignee, the information referred to in clause (D) above (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (c) of this Section and any written consent to such assignment required by paragraph (c) of this Section, the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph. On or prior to the effective date of such acceptance, the Company at its own expense, shall execute and deliver to the Administrative Agent (in exchange for any or all of the Term Loan Notes or Revolving Credit Notes of the assigning Lender, if any) new Term Loan Notes or Revolving Credit Notes, as the case may be, to the order of such Assignee (if requested) in an amount equal to the Term Loans or Revolving Credit Commitment, as the case may be, assumed by it pursuant to such Assignment and Acceptance and, if the assigning Lender has retained a Commitment or any Term Loans hereunder, new Term Loan Notes or Revolving Credit Notes, as the case may be, to the order of the assigning Lender in an amount equal to the Commitment or such Term Loans, as the case may be, retained by it hereunder (if requested). Such new Notes shall be dated the Closing Date and shall otherwise be in the form of the Notes replaced thereby.

(f)  (i)  The Administrative Agent, the Syndication Agent, the Arrangers and the Lenders agree that they will use reasonable efforts to protect the confidentiality of any confidential information concerning the Company and its Subsidiaries and Affiliates. Notwithstanding the foregoing, the Company authorizes each Lender to disclose to any Participant or Assignee (each, a "Transferee") and any prospective Transferee or to any Person who evaluates, approves, structures or administers the Loans on behalf of a Lender and who is subject to this confidentiality provision any and all information in such Lender's possession concerning Holdings, the Company and its Subsidiaries which has been delivered to such Lender by or on behalf of the Company pursuant to this Agreement or which has been delivered to such Lender by or on behalf of the Company in connection with such Lender's credit evaluation of Holdings, the Company and its Subsidiaries prior to becoming a party to this Agreement; provided that each Lender shall cause its respective prospective Transferees and any Person who evaluates, approves, structures or administers the Loans on such Lender's behalf to agree to protect the confidentiality of any confidential information concerning Holdings, the Company and its Subsidiaries and Affiliates.

(ii)  Notwithstanding anything herein to the contrary, any party hereto (and each employee, representative or other agent of such party) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment or tax structure; provided, however, that this clause shall not permit any party hereto (or any employee, representative or other agent thereof) to disclose (i) any information, the disclosure of which would otherwise be prohibited by this Agreement, that is not relevant to an understanding of the tax treatment or tax structure of the transactions contemplated by this Agreement (including the identity of any party hereto (or its

employees, representatives or other agents) or any information that could lead another to determine such identity) or (ii) any other information to the extent that such disclosure could result in a violation of any federal or state securities law.

(g)  If, pursuant to this subsection 12.6, any interest in this Agreement or any Note is transferred to any Transferee which is organized under the laws of any jurisdiction other than the United States or any State thereof, the transferor Lender shall cause such Transferee, concurrently with the effectiveness of such transfer to comply with subsection 5.11(d).

(h)  For avoidance of doubt, the parties to this Agreement acknowledge that the provisions of this subsection concerning assignments of Loans and Notes relate only to absolute assignments and that such provisions do not prohibit assignments creating security interests, including, without limitation, (x) any pledge or assignment by a Lender of any Loan or Note to any Federal Reserve Bank in accordance with applicable law and (y) in the case of a Lender that is a fund, with the consent of the Administrative Agent, any pledge or assignment by such Lender of all or any portion of its Loans and Notes to its trustee in support of its obligations to its trustee; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledge or assignee for such Lender as a party hereto.

12.7  Set-off.  In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Company, any such notice being expressly waived by the Company to the extent permitted by applicable law, upon the occurrence and during the continuation of any Event of Default or upon the filing of a petition under any of the provisions of the federal bankruptcy code or amendments thereto, by or against; the making of an assignment for the benefit of creditors by; the application for the appointment, or the appointment, of any receiver of, or of any substantial portion of the property of; the issuance of any execution against any substantial portion of the property of; the issuance of a subpoena or order, in supplementary proceedings, against or with respect to any substantial portion of the property of; or the issuance of a warrant of attachment against any substantial portion of the property of; the Company to set off and apply against any indebtedness, whether matured or unmatured, of the Company to such Lender, any amount owing from such Lender to the Company, at or at any time after, the happening of any of the above mentioned events, and as security for such indebtedness, the Company hereby grants to each Lender a continuing security interest in any and all deposits, accounts or moneys of the Company, then or thereafter maintained with such Lender, subject in each case to subsection 12.8 of this Agreement.  The aforesaid right of set-off may be exercised by such Lender against the Company or against any trustee in bankruptcy, debtor in possession, assignee for the benefit of creditors, receiver or execution, judgment or attachment creditor of the Company, or against anyone else claiming through or against the Company or such trustee in bankruptcy, debtor in possession, assignee for the benefit of creditors, receiver, or execution, judgment or attachment creditor, notwithstanding the fact that such right of set-off shall not have been exercised by such Lender prior to the making, filing or issuance, or service upon such Lender of, or of notice of, any such petition; assignment for the benefit of creditors; appointment or application for the appointment of a receiver; or issuance of execution, subpoena, order or warrant.  Each Lender agrees promptly to notify the Company, and the Administrative Agent after any such set-off and application made by

such Lender, provided that the failure to give such notice shall not affect the validity of such set-off and application.

12.8   Payments Pro Rata. (a) Except as otherwise provided in this Agreement, the Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of the Company in respect of any obligations hereunder, it shall distribute such payment to the Lenders pro rata based upon their respective shares, if any, of the obligations with respect to which such payment was received.

(b)   Each of the Lenders agrees that, if it should receive any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Credit Documents, or otherwise), which is applicable to the payment of the principal of, or interest on, the Loans, unpaid drawings with respect to Letters of Credit, commitment fees or Letter of Credit fees, of a sum which with respect to the related sum or sums received by other Lenders is in a greater proportion than the total of such obligation then owed and due to such Lender bears to the total of such obligation then owed and due to all of the Lenders immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other Lenders an interest in the respective obligations of the respective Credit Party to such Lenders in such amount as shall result in a proportional participation by all the Lenders in such amount; provided that if all or any portion of such excess amount is thereafter recovered from such Lender, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

(c)   Notwithstanding anything to the contrary contained herein, the provisions of the preceding subsections 11.8(a) and (b) shall be subject to the express provisions of this Agreement which require, or permit, differing payments to be made to Lenders which are not Non-Funding Lenders as opposed to Non-Funding Lenders.

12.9   Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Agreement signed by all the parties shall be lodged with the Company and the Administrative Agent. This Agreement shall become effective with respect to the Company, the Administrative Agent, the Syndication Agent, the Arrangers and the Lenders when the Administrative Agent shall have received copies of this Agreement executed by the Company, the Administrative Agent, the Documentation Agent and the Lenders, or, in the case of any Lender, shall have received telephonic confirmation from such Lender stating that such Lender has executed counterparts of this Agreement or the signature pages hereto and sent the same to the Administrative Agent.

12.10   Governing Law; No Third Party Rights. This Agreement and the Notes and the rights and obligations of the parties under this Agreement and the Notes shall be governed by, and construed and interpreted in accordance with, the law of the State of New York. This Agreement is solely for the benefit of the parties hereto and their respective successors and

assigns, and, except as set forth in subsection 12.6, no other Persons shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.

12.11  Submission to Jurisdiction; Waivers.  (a)  Each party to this Agreement hereby irrevocably and unconditionally:

(i)     submits for itself and its property in any legal action or proceeding relating to this Agreement or any of the other Credit Documents, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof;

(ii)    consents that any such action or proceeding may be brought in such courts, and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(iii)   agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address set forth in subsection 12.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(iv)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(v)     waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, indirect, exemplary, consequential or punitive damages.

(b)  Each party hereto unconditionally waives trial by jury in any legal action or proceeding referred to in paragraph (a) above and any counterclaim therein.

12.12  Releases.  The Administrative Agent and Lenders agree to cooperate with the Company and its Subsidiaries with respect to any sale or other disposition permitted by subsection 9.5 and promptly take such action and execute and deliver such instruments and documents necessary to release the liens and security interests created by the Security Documents relating to any of the assets or property affected by any such sale permitted by subsection 9.5. including, without limitation, any Uniform Commercial Code amendment, release or termination or partial release or termination statements, provided that such liens and security interests in Receivables Facility Assets shall only be required to be released to the extent required by the relevant Receivables Facility.

12.13  Interest.  Each provision in this Agreement and each other Credit Document is expressly limited so that in no event whatsoever shall the amount paid, or otherwise

agreed to be paid, by the Company for the use, forbearance or detention of the money to be loaned under this Agreement or any other Credit Document or otherwise (including any sums paid as required by any covenant or obligation contained herein or in any other Credit Document which is for the use, forbearance or detention of such money), exceed that amount of money which would cause the effective rate of interest to exceed the highest lawful rate permitted by applicable law (the "Highest Lawful Rate"), and all amounts owed under this Agreement and each other Credit Document shall be held to be subject to reduction to the effect that such amounts so paid or agreed to be paid which are for the use, forbearance or detention of money under this Agreement or such other Credit Document shall in no event exceed that amount of money which would cause the effective rate of interest to exceed the Highest Lawful Rate. Notwithstanding any provision in this Agreement or any other Credit Document to the contrary, if the maturity of the Loans or the obligations in respect of the other Credit Documents are accelerated for any reason, or in the event of any prepayment of all or any portion of the Loans or the obligations in respect of the other Credit Documents by the Company or in any other event, earned interest on the Loans and such other obligations of the Company may never exceed the Highest Lawful Rate, and any unearned interest otherwise payable on the Loans or the obligations in respect of the other Credit Documents that is in excess of the Highest Lawful Rate shall be cancelled automatically as of the date of such acceleration or prepayment or other such event and (if theretofore paid) shall, at the option of the holder of the Loans or such other obligations, be either refunded to the Company or credited on the principal of the Loans. In determining whether or not the interest paid or payable, under any specific contingency, exceeds the Highest Lawful Rate, the Company and the Lenders shall, to the maximum extent permitted by applicable law, amortize, prorate, allocate and spread, in equal parts during the period of the actual term of this Agreement, all interest at any time contracted for, charged, received or reserved in connection with this Agreement.

12.14  Special Indemnification. Notwithstanding any provision in this Agreement to the contrary, (A) each Lender, or Transferee of any Lender pursuant to subsection 12.6(g) of this Agreement, shall indemnify the Company and the Administrative Agent, and hold each of them harmless against any and all payments, expenses or taxes which the Company or the Administrative Agent may become subject to or obligated to pay if and to the extent that, (i) on the Closing Date or the effective date of transfer, as the case may be, such Lender, or such Transferee of a Lender pursuant to subsection 12.6(g) of this Agreement, (a) makes the representation and covenants set forth in subsection 5.11(d)(2) of this Agreement or, in the case of a Transferee, pursuant to subsection 12.6(g)(2) of this Agreement and the Assignment and Acceptance, and (b) is not in fact also qualified to make the representation and covenants set forth in subsection 5.11(d)(1) of this Agreement or, in the case of a Transferee, pursuant to subsection 12.6(g)(2) of this Agreement and the Assignment and Acceptance, and (ii) as a result of any Change in Law or compliance by such Lender, or Transferee, with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority the Company or the Administrative Agent is required to make any additional payments on account of U.S. withholding taxes and amounts related thereto with respect to any payments under this Agreement, any Note, or a Eurodollar Loan, made prior to such Change in Law or request or directive, none of which payments would have been required if such Lender, or Transferee, was qualified on the Closing Date or the date of the transfer, as the case may be, to

make the representation and covenants set forth in subsection 5.11(d)(1) of this Agreement or pursuant to subsection 12.6(g)(1) of this Agreement and the Assignment and Acceptance, as the case may be, and (B) each Lender, or Transferee, agrees that to the extent any amount payable by such Lender or Transferee pursuant to this subsection 12.14 remains unpaid on any Interest Payment Date or the date on which any prepayment is made, the Company shall have the right to set-off against any payment due to such Lender or Transferee on such date any amounts owing to the Company pursuant to this subsection 12.14.

12.15  <u>Permitted Payments and Transactions</u>.  Notwithstanding any provision to the contrary contained in this Agreement, the Company and its Subsidiaries shall be permitted to make payments (including fees and expenses) pursuant to or in respect of, the following agreements, and, in the case of clauses (a) and (d) below, to engage in the following transactions: (a) (i) the Financing Advisory Agreement, dated as of October 8, 1997 between Investcorp International Inc. and the Company, (ii) the Amended and Restated Agreement For Management Advisory, Strategic Planning and Consulting Services, dated as of June 11, 2003 among Investcorp International Inc. and the Company; (iii) the Stand-By Commitment Letter, dated as of November 19, 1997, between Invifin, S.A. and the Company, (iv) the Recapitalization Agreement and (v) the Management Services Agreement, dated as of June 11, 2003, between the Company and Leonard Green Partners, L.P.; (b) agreements with any Person or Persons providing for the payment of customary fees in connection with serving as a director of the Company or any Subsidiary of the Company; (c) agreements providing for the payment of commercially reasonable fees in connection with any permitted financing, refinancing, sale, transfer, sale and leaseback or other permitted disposition of any assets of the Company or its Subsidiaries; (d) the borrowing of any Indebtedness to the extent, and upon the terms and conditions, the same is expressly permitted under subsection 9.1; and (e) agreements providing for commercially reasonable fees in connection with any permitted purchase or acquisition of stock or assets by the Company or any of its Subsidiaries.

12.16  [RESERVED]

12.17  <u>Certain Provisions Regarding Alabama Mortgaged Property</u>. Notwithstanding anything to the contrary contained elsewhere in this Agreement or any of the other Credit Documents, it is hereby acknowledged and agreed that the Mortgage executed and delivered on the Closing Date with respect to the Mortgaged Property of the Company located in Alabama (the "Alabama Mortgaged Property") shall secure only the Term Loans and obligations directly relating thereto. Furthermore, and notwithstanding anything to the contrary contained in this Agreement or any other Credit Document, if and to the extent that proceeds received from any exercise of remedies with respect to the Alabama Mortgaged Property are applied to the repayment of outstanding Term Loans and related interest or other obligations, then on a prospective basis any distributions to be made to the Lenders (other than with respect to any Interest Rate Agreements secured pursuant to the various Security Documents) pursuant to the provisions of any other Security Document shall be adjusted with the intent that the Lenders other than the holders of Term Loans receive incremental distributions at such times, and in such amounts, as the Administrative Agent reasonably determines shall cause the Lenders to share equally and ratably in the aggregate distributions made to the Lenders (other than with respect to any Interest Rate Agreements secured pursuant to the respective Security Documents) pursuant to

the various Security Documents on the same basis as such distributions would have been made if all of the Security Documents (including the Mortgage with respect to the Alabama Mortgage Property) had at all times equally and ratably secured all obligations hereunder.

**SIGNATURE PAGE TO**
**CREDIT AGREEMENT**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered in New York, New York by their proper and duly authorized officers as of the day and year first above written.

WERNER HOLDING CO. (DE), INC.

By: _____
Title:

JPMORGAN CHASE BANK, as
Administrative Agent,
Issuing Lender and a Lender

By: _____
Title:

J.P. MORGAN SECURITIES, INC., as Joint
  Lead Arranger and as Joint Bookrunner

CITIGROUP GLOBAL MARKETS INC., as
  Syndication Agent, Joint Lead Arranger,
  and as Joint Bookrunner

By: _____
Title:

CITICORP NORTH AMERICA, INC., as
  Lender

By: _____
Title:

**SIGNATURE PAGE TO
CREDIT AGREEMENT**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered in New York, New York by their proper and duly authorized officers as of the day and year first above written.

WERNER HOLDING CO. (DE), INC.

By: _____
Title:

JPMORGAN CHASE BANK, as
Administrative Agent,
Issuing Lender and a Lender

By: _____
Title:                  GARY L. SPEVACK
                        VICE PRESIDENT

J.P. MORGAN SECURITIES INC., as Joint
Lead Arranger and as Joint Bookrunner

By: _____
Title:                  GARY L. SPEVACK
                        VICE PRESIDENT

CITIGROUP GLOBAL MARKETS INC., as
Syndication Agent, Joint Lead Arranger,
and as Joint Bookrunner

By: _____
Title:

CITICORP NORTH AMERICA, INC., as
Lender

By: _____
Title:

**SIGNATURE PAGE TO**
**CREDIT AGREEMENT**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered in New York, New York by their proper and duly authorized officers as of the day and year first above written.

WERNER HOLDING CO. (DE), INC.


By: _____
Title:


JPMORGAN CHASE BANK, as
Administrative Agent,
Issuing Lender and a Lender


By: _____
Title:


J.P. MORGAN SECURITIES, INC., as Joint
Lead Arranger and as Joint Bookrunner


CITIGROUP GLOBAL MARKETS INC., as
Syndication Agent,  Joint Lead Arranger,
and as Joint Bookrunner

By: _____
Title:
JULIE PERSILY
Managing Director

CITICORP NORTH AMERICA, INC., as
Lender

By: _____
Title:
JULIE PERSILY
Managing Director and Vice President

**SIGNATURE PAGE TO THE
CREDIT AGREEMENT**

GENERAL ELECTRIC CAPITAL
CORPORATION

By: _____
Name:
Title:   W. JEROME McDERMOTT
         DULY AUTHORIZED SIGNATORY

SIGNATURE PAGE TO THE
CREDIT AGREEMENT

NATEXIS BANQUE POPULAIRES

By: _____
Name:     FRANK H. MADDEN, JR.
Title:     VICE PRESIDENT & GROUP MANAGER


_____
JOSEPH A. MILLER
ASSISTANT VICE PRESIDENT

ALLIED IRISH BANKS PLC

By: _____
Name:
Title        **JOHN FARRACE**
        **Senior Vice President**

By: _____
Name:
Title        **HILARY PATTERSON**
        **Vice President**

**SIGNATURE PAGE TO THE
CREDIT AGREEMENT**

FIRST SUNAMERICA LIFE INSURANCE
COMPANY

By: _____

Name: **W. Jeffrey Baxter**
Title: **Vice President**

SIGNATURE PAGE TO THE
CREDIT AGREEMENT

KZH CYPRESSTREE-1 LLC

By: _____
Name:
Title:
        Virginia Conway
        Authorized Agent

SIGNATURE PAGE TO THE
CREDIT AGREEMENT

KZH ING-2-LLC

By: _____

Name:

Title:

Virginia Conway
Authorized Agent

SIGNATURE PAGE TO THE
CREDIT AGREEMENT

KZH STERLING LLC

By: _____
Name:
Title:        Virginia Conway
              Authorized Agent

SIGNATURE PAGE TO THE
CREDIT AGREEMENT

KZH WATERSIDE  LLC

By: _____

Name:

Title:               Virginia Conway
                     Authorized Agent

SIGNATURE PAGE TO THE
CREDIT AGREEMENT

STANWICH LOAN FUNDING LLC

By:

Name:

Title:    ANN E. MORRIS
ASST VICE PRESIDENT

SIGNATURE PAGE TO THE
CREDIT AGREEMENT

GALAXY CLO 1999-1, LTD.

By: AIG Global Investment Adviser, Inc. its
Collateral Manager

By: _____
Name:     W. Jeffrey Baxi_
Title:     Vice Presiden_

SIGNATURE PAGE TO THE
CREDIT AGREEMENT

KZH SOLEIL-2 LLC

By: _____
Name:
Title:        Virginia Conway
              Authorized Agent

SIGNATURE PAGE TO THE
CREDIT AGREEMENT

JUPITER LOAN FUNDING LLC

By:

Name:

Title:    ANN E. MORRIS
ASST VICE PRESIDENT

SIGNATURE PAGE TO THE
CREDIT AGREEMENT

WINGED FOOT FUNDING TRUST

By:

Name:

Title:

ANN E. MORRIS
AUTHORIZED AGENT

SIGNATURE PAGE TO THE
CREDIT AGREEMENT

KZH RIVERSIDE LLC

By: _____
Name:
Title:            Virginia Conway
                  Authorized Agent

SIGNATURE PAGE TO THE
CREDIT AGREEMENT

KZH SOLEIL LLC

By: _____

Name:

Title:

Virginia Conway
Authorized Agent



SCHEDULE I

## LIST OF ADDRESSES FOR NOTICES, LENDING OFFICES, COMMITMENT AMOUNTS

| Institution/Fund | Notice Information | Revolving Facility | Term Loans |
|---|---|---|---|
| Allied Irish Banks plc | AIB Corporate Banking NY<br>Allied Irish Banks plc<br>405 Park Avenue, 2nd Floor<br>New York, NY 10022<br>Attn: Rima Terradista<br>Telephone: 212-515-6842<br>Fax: 212-339-8325 | $3,000,000.00 | $0.00 |
| Citigroup North America, Inc. | Citicorp North America, Inc.<br>390 Greenwich Street<br>1st Floor<br>New York, NY 10013<br>Attn: Elvind Hegelstad<br>Telephone: 212-723-6947<br>Fax: 212-723-8547 | $15,000,000.00 | $0.00 |
| First SunAmerica Life Insurance Company | SunAmerica Investments<br>1 SunAmerica Center<br>Los Angeles, CA 90067-6022<br>Attn: Lisa Moore, 37th Floor<br>Telephone: 310-772-6525<br>Fax: 310-772-6078 | $0.00 | $2,200,000.00 |
| Galaxy CLO 1999-1, Ltd. | SunAmerica Investments<br>1 SunAmerica Center<br>Los Angeles, CA 90067-6022<br>Attn: Lisa Moore, 37th Floor<br>Telephone: 310-772-6525<br>Fax: 310-772-6078 | $0.00 | $950,000.00 |
| General Electric Capital Corporation | General Electric Capital Corporation<br>Corporate Financial Services<br>201 High Ridge Road<br>Stamford, CT 06927-5100<br>Attn: George Greene<br>Telephone: 203-316-7573<br>Fax: 203-602-8344 | $5,000,000.00 | $10,000,000.00 |
| JPMorgan Chase Bank | JPMorgan Chase Bank<br>270 Park Avenue | $25,000,000.00 | $150,050,000.00 |

| Institution/Fund | Notice Information | Revolving Facility | Term Loans |
|---|---|---|---|
| | New York, NY 10017<br>Attn: Neil Boylan<br>Telephone: 212-270-1410<br>Fax: 212-270-6637 | | |
| Jupiter Loan Funding LLC | Banc of America Securities LLC<br>100 North Tryon Street<br>NC1-007-06-07<br>Charlotte, NC 28255<br>Attn: Annabet Morris/Diana Himes<br>Telephone: 704-387-1939/9951<br>Fax: 704-388-0648 | $0.00 | $500,000.00 |
| KZH CypressTree-1 LLC | c/o JPMorgan Chase Bank<br>4 MetroTech Center, 10th Floor<br>Brooklyn, NY 11245<br>Attn: Virginia Conway<br>Telephone: 718-242-4932<br>Fax: 718-242-6220 | $0.00 | $3,175,000.00 |
| KZH ING-2 LLC | c/o JPMorgan Chase Bank<br>4 MetroTech Center, 10th Floor<br>Brooklyn, NY 11245<br>Attn: Virginia Conway<br>Telephone: 718-242-4932<br>Fax: 718-242-6220 | $0.00 | $3,175,000.00 |
| KZH Riverside LLC | c/o JPMorgan Chase Bank<br>4 MetroTech Center, 10th Floor<br>Brooklyn, NY 11245<br>Attn: Virginia Conway<br>Telephone: 718-242-4932<br>Fax: 718-242-6220 | $0.00 | $350,000.00 |
| KZH Soleil LLC | c/o JPMorgan Chase Bank<br>4 MetroTech Center, 10th Floor<br>Brooklyn, NY 11245<br>Attn: Virginia Conway<br>Telephone: 718-242-4932<br>Fax: 718-242-6220 | $0.00 | $400,000.00 |

| Institution/Fund | Notice Information | Revolving Facility | Term Loans |
|---|---|---|---|
| KZH Soleil-2 LLC | c/o JPMorgan Chase Bank 4 MetroTech Center, 10th Floor Brooklyn, NY 11245 Attn: Virginia Conway Telephone: 718-242-4932 Fax: 718-242-6220 | $0.00 | $800,000.00 |
| KZH Sterling LLC | c/o JPMorgan Chase Bank 4 MetroTech Center, 10th Floor Brooklyn, NY 11245 Attn: Virginia Conway Telephone: 718-242-4932 Fax: 718-242-6220 | $0.00 | $1,900,000.00 |
| KZH Waterside LLC | c/o JPMorgan Chase Bank 4 MetroTech Center, 10th Floor Brooklyn, NY 11245 Attn: Virginia Conway Telephone: 718-242-4932 Fax: 718-242-6220 | $0.00 | $1,000,000.00 |
| Natexis Banques Populaires | Natexis Banques Populaires 1251 Avenue of the Americas, 34th Floor New York, NY 10020 Attn: Frank Madden Telephone: 212-872-5180 Fax: 212-354-9106 | $2,000,000.00 | $4,000,000.00 |
| Stanwich Loan Funding LLC | Cigna Retirement & Investment Services 280 Trumbull Street, H16B Hartford, CT 06103 Attn: Lisa Richardson Telephone: 860-534-9023 Fax: 860-534-9276 | $0.00 | $1,000,000.00 |
| Winged Foot Funding Trust | Banc of America Securities LLC 100 North Tryon Street NC1-007-06-07 Charlotte, NC 28255 Attn: Annabet Morris/Diana Himes | $0.00 | $500,000.00 |

| Institution/Fund | Notice Information | Revolving Facility | Term Loans |
|---|---|---|---|
|  | Telephone: 704-387-1939/9951<br>Fax: 704-388-0648 |  |  |
| Total |  | $50,000,000.00 | $180,000,000.00 |

509265-0085-08312-NY03.2270674.3

# EXHIBIT 37

(Excerpts Only)

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

200 Park Avenue  New York, New York 10166-0193
(212) 351-4000
www.gibsondunn.com

June 11, 2003

**Direct Dial**
(212) 351-4000

**Fax No.**
(212) 351-4035

**Client No.**
*03263-01119*

JPMorgan Chase Bank, as Administrative Agent for the Lenders party to the Credit Agreement referred to below and to the Lenders

Re:    *Werner Holding Co. (DE), Inc. -- Credit Agreement dated as of June 11, 2003*

Ladies and Gentlemen:

We have acted as counsel to Werner Holding Co. (DE), Inc., a Delaware corporation (the "*Company*"), Werner Co., a Pennsylvania corporation and a subsidiary of the Company ("*Werner*"), WIP Technologies, Inc., a Delaware corporation and a subsidiary of the Company ("*WIP*"), and Werner Holding Co. (PA), Inc., a Pennsylvania corporation and the sole shareholder of the Company ("*Holdings*") in connection with the preparation of:

(i)    the Credit Agreement dated as of June 11, 2003 (the "Credit Agreement") by and among the Company, the lenders from time to time parties thereto (the "*Lenders*"), Citigroup Global Markets Inc., as syndication agent (in such capacity, the "*Syndication Agent*"), Citigroup Global Markets Inc. and J. P. Morgan Securities, Inc., as joint lead arrangers and joint bookrunners (in such capacity, the "*Arrangers*"), and JPMorgan Chase Bank, as administrative agent for the Lenders (in such capacity, the "*Administrative Agent*" and, together with the Syndication Agent, the "*Agents*");

(ii)    the Notes dated as of June 11, 2003 (the "*Notes*") made by the Company payable to the order of the Lenders;

LOS ANGELES  NEW YORK  WASHINGTON, D.C.  SAN FRANCISCO  PALO ALTO
LONDON  PARIS  MUNICH  ORANGE COUNTY  CENTURY CITY  DALLAS  DENVER

## GIBSON, DUNN & CRUTCHER LLP

JPMorgan Chase Bank, as Administrative Agent for Lenders party to the Credit Agreement
referred to below
June 11, 2003
Page 2

      (iii)    the Subsidiary Guarantee dated as of June 11, 2003 (the "*Subsidiary Guarantee*") executed by Werner and WIP (each a "*Subsidiary Guarantor*" and collectively, the "*Subsidiary Guarantors*");

      (iv)    the Holdings Guarantee dated as of June 11, 2003 (the "*Holdings Guarantee*") executed by Holdings (together with the Subsidiary Guarantors, each a "*Guarantor*" and collectively, the "*Guarantors*");

      (v)    the Collateral Agreement dated as of June 11, 2003 (the "*Collateral Agreement*") by and among the Company, Werner and WIP;

      (vi)    the Pledge Agreement dated as of June 11, 2003 (the "*Holdings Pledge Agreement*") by and between Holdings and the Administrative Agent;

      (vii)    the financing statements on Form UCC1 naming the Company and the WIP as debtors to be filed in the governmental offices listed on Schedule A hereto (each a "*Financing Statement*").

      Each capitalized term used and not defined herein has the meaning assigned to that term in the Credit Agreement. The Collateral Agreement and the Holdings Pledge Agreement are collectively referred to herein as the "*Collateral Documents.*" The Credit Agreement, the Notes, the Collateral Documents, the Holdings Guarantee and the Subsidiary Guarantee are collectively referred to herein as the "*Financing Documents.*" The Company and the Guarantors are collectively referred to herein as the "*Obligors.*" "*Specified Obligors*" means the Company and WIP. Each relevant Obligor's right, title and interest in the personal property collateral described in the Collateral Documents is referred to herein collectively as the "*UCC Collateral.*" The Uniform Commercial Code as enacted and in effect in the State of New York is referred to herein as the "*NYUCC.*" The Uniform Commercial Code as enacted and in effect in the State of Delaware and the Commonwealth of Pennsylvania (the "*Other States*") is referred to herein as the "*Other UCCs.*" The States of New York and the Other States are referred to herein as the "*Perfection States,*" and the NYUCC and the Other UCCs are each referred to herein as a "*UCC.*" All references to sections or other subparts of the NYUCC include references to the equivalent provisions of the Other UCCs, unless the context otherwise requires. All terms defined in a UCC are used herein as defined therein.

      We have assumed without independent investigation that:

a)    The signatures on all documents examined by us are genuine, all individuals executing such documents had all requisite legal capacity and competency and (except in the case of documents signed on behalf of the Specified Obligors) were duly authorized, the



## GIBSON, DUNN & CRUTCHER LLP

JPMorgan Chase Bank, as Administrative Agent for Lenders party to the Credit Agreement
referred to below
June 11, 2003
Page 3

documents submitted to us as originals are authentic and the documents submitted to us
as certified or reproduction copies conform to the originals;

b) Each party to the Financing Documents (other than the Specified Obligors) has all
requisite power and authority to execute, deliver and perform its obligations under each
of the Financing Documents to which it is a party, the execution and delivery of such
Financing Documents by such party and performance of its obligations thereunder have
been duly authorized by all necessary corporate or other action and do not violate any
law, regulation, order, judgment or decree applicable to such party, and such Financing
Documents have been duly executed and delivered by each such party and are legal, valid
and binding obligations of such party (other than the Obligors), enforceable against it in
accordance with their respective terms;

c) The execution, delivery and performance of the Financing Documents by each Obligor
do not and will not violate any law, regulation, order, judgment or decree applicable to
such Obligor, except as expressly covered by our opinions in paragraph 5 below;

d) There are no agreements or understandings between or among any of the parties to the
Financing Documents or third parties that would expand, modify or otherwise affect the
terms of the Financing Documents or the respective rights or obligations of the parties
thereunder or that would modify, release, terminate, subordinate or delay the attachment
of the security interest and liens granted thereunder;

e) Each Obligor has, and will have at all times relevant to this opinion, rights in the UCC
Collateral within the meaning of Section 9-203(b)(2) of the NYUCC; and

f) To the extent that the ability of the Administrative Agent to enforce remedies under the
Financing Documents in respect of UCC Collateral comprised of inventory may be
affected thereby, each Obligor is in compliance with the Fair Labor Standards Act (see
Citicorp Industrial Credit, Inc. v. Brock, 483 U.S. 27, 107 S.Ct. 2694 (1987)).

In rendering this opinion, we have made such inquiries and examined, among
other things, originals or copies, certified or otherwise identified to our satisfaction, of such
records, agreements, certificates, instruments and other documents as we have considered
necessary or appropriate for purposes of this opinion. As to certain factual matters, we have
relied to the extent we deemed appropriate and without independent investigation upon the
representations and warranties of the Obligors in the Financing Documents, a certificate of an
officer of the Obligors, a copy of which is attached hereto (the "*Officer's Certificates*") or
certificates obtained from public officials and others.

Based on the foregoing and in reliance thereon, and subject to the assumptions,
exceptions, qualifications and limitations set forth herein, we are of the opinion that:

**GIBSON, DUNN & CRUTCHER LLP**

JPMorgan Chase Bank, as Administrative Agent for Lenders party to the Credit Agreement
referred to below
June 11, 2003
Page 4

       1.  Each Specified Obligor is a validly existing corporation in good standing
under the laws of the State of Delaware and has all requisite corporate power and authority to
execute, deliver and perform its obligations under the Financing Documents to which it is a
party.

       2.  The execution and delivery by each Specified Obligor of the Financing
Documents to which it is a party and the performance of its obligations thereunder have been
duly authorized by all necessary corporate action.  Each Financing Document to which an
Obligor is a party has been duly executed and delivered by such Obligor party thereto.

       3.  Each Financing Document constitutes a legal, valid and binding obligation of
each Obligor party thereto, enforceable against it in accordance with its terms.

       4.  The execution, delivery and performance by each Specified Obligor of the
Financing Documents to which it is a party, do not and will not violate the charter or bylaws of
such Specified Obligor.

       5.  The execution, delivery and performance by each Obligor of the Financing
Documents to which it is a party, do not and will not violate, or require any filing with or
approval of any governmental authority or regulatory body of the State of New York or the
United States of America or under, any law or regulation of the State of New York or the United
States of America applicable to such Obligor that, in our experience, is generally applicable to
transactions in the nature of those contemplated by the Financing Documents, or the Delaware
General Corporation Law, except for filings required for the perfection of Liens and such filings
or approvals that, if not made or obtained, would not have a material adverse effect on the
Obligors taken as a whole or on their ability to perform their obligations under the Financing
Documents and would not expose any Lender Party to liability.

       6.  No Obligor is required to register as an "investment company" within the
meaning of the Investment Company Act of 1940, as amended.

       7.  Each Obligor has granted a valid security interest in favor of the
Administrative Agent, for the benefit of the Lender Parties, in such Obligor's interest in the UCC
Collateral described in the Collateral Documents to which such Obligor is a party, securing the
performance of the obligations purported to be secured thereby, to the extent a security interest
can be created therein under Article 9 of the NYUCC.  Upon the filing of the Financing
Statements with the governmental offices indicated on Schedule A, such security interest in the
UCC Collateral of each Obligor listed on Schedule A will be perfected to the extent security
interests therein can be perfected by the filing of UCC1 financing statements under Article 9 of
the relevant Perfection States.

**GIBSON, DUNN & CRUTCHER LLP**



JPMorgan Chase Bank, as Administrative Agent for Lenders party to the Credit Agreement referred to below
June 11, 2003
Page 5

        8.   Upon delivery to the Administrative Agent in the State of New York of certificates representing the shares of capital stock described on Schedule B hereto in accordance with the provisions of the Collateral Documents (the "*Pledged Shares*") the security interest of the Administrative Agent, for the benefit of the Lender Parties, in the Pledged Shares will be perfected and will be prior in right to all other security interests therein under Article 9 of the NYUCC.

        9.   The execution and delivery by the Company of the Credit Agreement and the performance of its obligations thereunder do not result in a breach or violation of Regulation U or X of the Board of Governors of the Federal Reserve System.

        The foregoing opinions are subject to the following exceptions, qualifications and limitations:

        A.   We render no opinion herein as to matters involving the laws of any jurisdiction other than the State of New York and the United States of America and, for purposes of paragraphs 1, 2, 4 and 5 above, the Delaware General Corporation Law and, to the limited extent set forth below, the Other UCCs.  We are not engaged in practice in the State of Delaware; however, we are generally familiar with the Delaware General Corporation Law as currently in effect and have made such inquiries as we consider necessary to render the opinions contained in paragraphs 1, 2, 4 and 5, but we have not obtained an opinion of counsel admitted in Delaware.  Furthermore, we have not obtained an opinion of counsel admitted in the Other States with respect to the perfection of the security interest in the UCC Collateral.  We have, however, examined the extent to which the applicable provisions of the Other UCCs, as presently in effect, vary from those contained in the Uniform Commercial Code as adopted by the National Conference of Commissioners on Uniform State Laws, as those variations appear in the <u>Uniform Commercial Code Reporting Service</u>, Section Two State UCC Variations Binder, published by West Group (updated as of March 2003) (the "*UCC Reporting Service*"), and our opinions in paragraph 7 above, to the extent such opinions involve conclusions as to the perfection of such security interest under the laws of the Other States, are based solely on such review.  This opinion is limited to the effect of the present state (or, to the extent relating to the Other UCCs, the state of such laws as reflected in the UCC Reporting Service) of the laws of the State of New York and the United States of America and, to the limited extent set forth above, the laws of the State of Delaware and Pennsylvania and the facts as they currently exist.  We assume no obligation to revise or supplement this opinion in the event of future changes in such laws (or reflected in updates of the UCC Reporting Service after March 2003) or the interpretations thereof or such facts.  We express no opinion regarding the Securities Act of 1933, as amended, or, except as expressly set forth in paragraph 6, any other federal or state securities laws or regulations.

GIBSON, DUNN & CRUTCHER LLP

JPMorgan Chase Bank, as Administrative Agent for Lenders party to the Credit Agreement
referred to below
June 11, 2003
Page 6

B.  Our opinions set forth in paragraphs 3 and 7 are subject to (i) the effect of any
bankruptcy, insolvency, reorganization, moratorium, arrangement or similar laws affecting the
rights and remedies of creditors generally (including, without limitation, the effect of statutory or
other laws regarding fraudulent transfers or distribution by corporations to stockholders or
preferential transfers) and (ii) general principles of equity, including without limitation concepts
of materiality, reasonableness, good faith and fair dealing and the possible unavailability of
specific performance, injunctive relief or other equitable remedies regardless of whether
enforceability is considered in a proceeding in equity or at law.

C.  We express no opinion regarding the effectiveness of (i) any waiver (whether
or not stated as such) under the Financing Documents of, or any consent thereunder relating to,
unknown future rights or the rights of any party thereto existing, or duties owing to it, as a matter
of law; (ii) any waiver (whether or not stated as such) contained in the Financing Documents of
rights of any party, or duties owing to it, that is broadly or vaguely stated or does not describe the
right or duty purportedly waived with reasonable specificity; (iii) provisions relating to
indemnification, exculpation or contribution, to the extent such provisions may be held
unenforceable as contrary to public policy or federal or state securities laws or due to the
negligence or willful misconduct of the indemnified party; (iv) any provision in any Financing
Document waiving the right to object to venue in any court; (v) any agreement to submit to the
jurisdiction of any Federal Court; (vi) any waiver of the right to jury trial; (vii) any provision
purporting to establish evidentiary standards; (viii) any provision to the effect that every right or
remedy is cumulative and may be exercised in addition to any other right or remedy or that the
election of some particular remedy does not preclude recourse to one or more others; or (ix) the
availability of damages or other remedies not specified in the Financing Documents in respect of
breach of any covenants (other than covenants relating to the payment of principal, interest,
indemnities and expenses).

D.  We express no opinion as to the effect of any facts or circumstances that
would exonerate or constitute a defense to the obligation of a surety, unless such defense has
been waived effectively by such Guarantor, on the enforceability of the Holdings Guarantee or
other Financing Documents against, or on the ability of a secured party to realize upon collateral
security pledged or granted by, any Guarantor or any other "surety" (which could include a co-
borrower jointly liable for loans extended to another co-borrower, a hypothecator of property to
secure obligations owed to another person or a common creditor that has subordinated
obligations owing to it).

E.  We express no opinion as to (i) any waivers or variations of rights of a debtor,
including a guarantor, or duties of a secured party under provisions referred to in Section 9-602
of the NYUCC or (ii) any provision in the Collateral Documents (A) that may be deemed to
permit the Administrative Agent or any other person to sell or otherwise foreclose upon any
UCC Collateral, or to apply the proceeds thereof, except in compliance with the NYUCC,

GIBSON, DUNN & CRUTCHER LLP

JPMorgan Chase Bank, as Administrative Agent for Lenders party to the Credit Agreement
referred to below
June 11, 2003
Page 7

applicable laws of the United States and other applicable state and local laws, or (B) that may be
deemed to impose on the Administrative Agent standards for the care of the UCC Collateral in
the possession or control of the Administrative Agent that would violate Section 9-207 or 9-208
of the NYUCC or to render such standards inapplicable. Without limitation of clause (ii)(A), we
express no opinion with respect to any provision to the extent that it authorizes the Lender
Parties to purchase UCC Collateral at a private sale, if such Collateral is neither customarily sold
in a recognized market nor the subject of widely distributed standard price quotations. We call
to your attention that Sections 9-611, 9-612 and 9-613 of the NYUCC include requirements for
notice in connection with a private sale or other disposition of UCC Collateral as well as a public
sale, unless the UCC Collateral is perishable or threatens to decline speedily in value or is a type
customarily sold in a recognized market.

     F.  Our opinion is subject to the effect of Section 552 of the United States
Bankruptcy Code (limiting security interests in property acquired after the commencement of a
case under the United States Bankruptcy Code). We call to your attention that under the
provisions of the NYUCC certain third parties, such as buyers and lessees of goods in the
ordinary course of business, licensees of general intangibles (including software) in the ordinary
course of business, holders in due course of negotiable instruments, protected purchasers of
securities or certain purchasers of security entitlements or financial assets, could acquire such
property free of the security interests of the Lender Parties, even though such security interests
are perfected.

     G.  We express no opinion with respect to the priority (and therefore no opinion
as to the respective rights of any creditor, encumbrancer or other third party as against the rights
of the Lender Parties) of any security interest in the UCC Collateral, except as expressly set forth
in paragraph 8.

     H.  We express no opinion with respect to (i) the existence, non-existence or
value of any UCC Collateral, (ii) any part of the UCC Collateral that is or may be such that a
security interest therein is not covered by Article 9 of the NYUCC by virtue of Section 9-109,
(iii) the perfection of the security interests in any portion of the UCC Collateral, including
deposit accounts, goods covered by a certificate of title (such as automobiles), patents,
trademarks, copyrights, letter-of-credit rights and money, to the extent that filing of a financing
statement is not or may not be sufficient to perfect a security interest therein (whether as a result
of requirements for control or possession of such collateral, the applicability of preemptive
United States laws or of certificate of title statutes or otherwise) and (iv) the law governing
perfection of security interests by filing under Section 9-301 of the UCC. Without limitation of
clause (ii) or (iii) above, we express no opinion with respect to the perfection or enforcement of
any security interest in accounts that are obligations of the Federal government, any agency or
department thereof or any state or local government or any agency or political subdivision
thereof, to the extent that any applicable laws require any actions in addition to the filing of

# GIBSON, DUNN & CRUTCHER LLP

JPMorgan Chase Bank, as Administrative Agent for Lenders party to the Credit Agreement
referred to below
June 11, 2003
Page 8

financing statements under the UCC of the relevant Perfection States. We further express no
opinion as to transfers of interests or rights in patents, trademarks or copyrights in connection
with exercise of remedies against UCC Collateral under the Collateral Agreement. Further, we
have assumed without investigation of any kind that the Financing Statements to be filed in the
Other States will be adequate in form under the Other UCCs for acceptance by the governmental
offices listed on Schedule A hereto and the for filing and for perfection of the security interests
referenced in paragraph 7 above.

I.   We express no opinion with respect to (i) the adequacy or accuracy of the
descriptions of the UCC Collateral contained in the Collateral Documents, in the Financing
Statements or in any document prepared in connection therewith, and for purposes of the
opinions set forth herein, we have assumed that all such descriptions are legally adequate, (ii) the
enforceability or perfection of any security interest in the proceeds of any UCC Collateral other
than pursuant to Section 9-315 of the UCC of the relevant Perfection States, (iii) any security
interest in consumer goods or commercial tort claims or (iv) perfection (or the law governing
perfection) of any security interest in timber to be cut or as-extracted collateral (including oil, gas
and other minerals).

J.   Perfection of the security interests generally will be terminated under the
circumstances described in Sections 9-316, 9-507, 9-508 and 9-515 of the UCC, unless
appropriate action is taken as provided therein. Without limitation, (i) all the financing
statements filed must be continued at prescribed intervals by the timely filing of continuation
statements and (ii) a new or amended financing statement may be required to be filed to retain
any perfected security interest in the event any Obligor changes its name, identity or location (as
determined under the UCC).

K.   Our opinions set forth in paragraphs 3 and 8 are subject to, in the case of the
Collateral Documents, the following qualifications: (i) the Administrative Agent may not be
entitled to vote the Pledged Shares or to receive dividends or other distributions directly from the
issuer thereof prior to becoming the record holder of the Pledged Shares; (ii) none of the Pledged
Shares or any interest therein may be sold or further transferred by the Administrative Agent
without registration under the Securities Act, except pursuant to an exemption from registration
contained in such Act, and qualification or exemption from qualification under any applicable
State securities or Blue Sky laws; and (iii) compliance with the Hart-Scott-Rodino Antitrust
Improvements Act of 1976 may be required prior to the exercise of any remedies thereunder.

L.   For purposes of our opinion in paragraph 9, we have assumed without
independent investigation that the representation and warranty of the Company set forth in
Section 6.9 of the Credit Agreement is and will be true and correct at all relevant times. Our
opinion in paragraph 9 is subject to (and we express no opinion in respect of) any requirement
applicable to the Administrative Agent or any Lender to obtain in good faith a Form FR U-1

GIBSON, DUNN & CRUTCHER LLP

JPMorgan Chase Bank, as Administrative Agent for Lenders party to the Credit Agreement
referred to below
June 11, 2003
Page 9

signed by the Obligors.  We express no opinion with respect to Regulation T of the Board of
Governors of the Federal Reserve System.

M.  For purposes of our opinion in paragraph 8, we have assumed without
independent investigation that (i) the certificates representing the Pledged Shares are indorsed to
the Administrative Agent or in blank by an effective indorsement (as such term is defined in the
NYUCC), and (ii) the Administrative Agent will at all times hereafter maintain possession of the
certificates representing the Pledged Shares in the State of New York and will not deliver (as
such term is defined in the NYUCC) the Pledged Shares to any third person.

N.  We express no opinion as to the applicability to, or the effect of
noncompliance by, any Lender Party with any state or federal laws applicable to the transactions
contemplated by the Financing Documents because of the nature of the business of such Lender
Party.

This opinion is rendered to the Lender Parties in connection with the Financing
Documents and may not be relied upon by any person other than the Lender Parties or by the
Lender Parties in any other context, provided that the Lender Parties may provide this opinion (i)
to bank examiners and other regulatory authorities should they so request in connection with
their normal examinations, (ii) to the independent auditors and attorneys of the Lender Parties,
(iii) pursuant to order or legal process of any court or governmental agency, (iv) in connection
with any legal action to which any Lender Party is a party arising out of the transactions
contemplated by the Financing Documents, or (v) the proposed permitted assignee of or
participant in the interest of any Lender Party under the Financing Documents.  This opinion
may not be quoted without the prior written consent of this Firm.

Very truly yours,

*Gibson, Dunn & Crutcher LLP*

GIBSON, DUNN & CRUTCHER LLP

EXHIBIT 38

SIMPSON THACHER & BARTLETT LLP

425 LEXINGTON AVENUE
NEW YORK, N.Y. 10017-3954
(212) 455-2000
———
FACSIMILE (212) 455-2502

JUNE 11, 2003

DIRECT DIAL NUMBER

E-MAIL ADDRESS

JPMorgan Chase Bank as Administrative Agent,
  as Issuing Lender and as a Lender under
  the Credit Agreement, as hereinafter
  defined (the "Agent")

    and

The Lenders listed on Schedule I hereto
  which are parties to the Credit Agreement
  on the date hereof

Re:    Credit Agreement dated as of June 11, 2003 (the "Credit Agreement") among Werner Holding Co. (DE), Inc. (the "Company"), Citigroup Global Markets Inc., as Syndication Agent, Citigroup Global Markets Inc. and J. P. Morgan Securities, Inc., as joint lead arrangers and joint bookrunners, the several lenders from time to time parties thereto (the "Lenders") and the Agent

Ladies and Gentlemen:

    We have acted as counsel to the Agent in connection with the preparation, execution and delivery of the following documents:

    (a)    the Credit Agreement;

    (b)    the Notes delivered to the Lenders on the date hereof;

    (c)    the Holdings Guarantee;

    (d)    the Subsidiary Guarantees;

    (e)    the Holdings Pledge Agreement; and

    (f)    the Collateral Agreement.

The documents described in the foregoing clauses (a) through (f) are collectively referred to herein as the "Credit Documents." Unless otherwise indicated, capitalized terms used but not defined herein shall have the respective meanings set forth in the Credit Agreement. This opinion is furnished to you in connection with the Credit Agreement.

    In connection with this opinion, we have examined:

    (A)    the Credit Agreement, signed by each Credit Party party thereto and by the Agent and certain of the Lenders;

LONDON        HONG KONG        TOKYO        LOS ANGELES        PALO ALTO

SIMPSON THACHER & BARTLETT LLP

(B)   each other Credit Document, signed by each Credit Party party thereto; and

(C)   forms of the Notes to be delivered after the date hereof.

We also have examined the originals, or duplicates or certified or conformed copies, of such records, agreements, instruments and other documents and have made such other investigations as we have deemed relevant and necessary in connection with the opinions expressed herein.   As to questions of fact material to this opinion, we have relied upon certificates of public officials and of officers and representatives of the Credit Parties.   In addition, we have examined, and have relied as to matters of fact upon, the representations made in the Credit Documents.

In rendering the opinion set forth below, we have assumed the genuineness of all signatures, the legal capacity of natural persons, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as duplicates or certified or conformed copies, and the authenticity of the originals of such latter documents.

In rendering the opinion set forth below we have assumed that (1) each of the Credit Documents is a valid and legally binding obligation of each of the Lenders parties thereto, (2) (a) each of the Credit Parties is validly existing and in good standing under the laws of the jurisdiction in which it is organized and has duly authorized, executed and delivered the Credit Documents to which it is a party in accordance with its Certificate of Incorporation or Articles of Incorporation and By-Laws, (b) execution, delivery and performance by each Credit Party of the Credit Documents to which it is a party do not violate the laws of the jurisdiction in which it is organized or any other applicable laws (excepting the laws of the State of New York and the Federal laws of the United States) and (c) execution, delivery and performance by each Credit Party of the Credit Documents to which it is a party do not constitute a breach or violation of any agreement or instrument which is binding upon such Credit Party and (3) no Credit Party is an "investment company" within the meaning of and subject to regulation under the Investment Company Act of 1940.

In rendering the opinion set forth below with respect to the Notes, we have assumed that at the time of any execution and delivery of Notes after the date hereof, the Board of Directors of the Company (or any committee thereof acting pursuant to authority properly delegated to such committee by the Board of Directors) has not taken any action to rescind or otherwise reduce its prior authorization of the issuance of such Notes.

Based upon and subject to the foregoing, and subject to the qualifications and limitations set forth herein, we are of the opinion that each Credit Document constitutes and each Note delivered to a Lender after the date hereof, assuming the due execution and delivery by the Credit Party which is the maker of such Note, will constitute the valid and legally binding obligation of each Credit Party which is a party thereto, enforceable against such Credit Party in accordance with its terms.

Our opinion set forth above is subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, (ii) general equitable principles (whether considered in a

proceeding in equity or at law), and (iii) an implied covenant of good faith and fair dealing. Our opinion set forth above also is subject to the qualification that certain provisions of the Security Documents in whole or in part, may not be enforceable, although the inclusion of such provisions does not render the Security Documents invalid, and the Security Documents and the laws of the State of New York contain adequate remedial provisions for the practical realization of the rights and benefits afforded thereby.

We express no opinion with respect to:

(A)    the effect of any provision of the Credit Documents which is intended to establish any standard other than a standard set forth in the Uniform Commercial Code as in effect in the State of New York as the measure of the performance by any party thereto of such party's obligations of good faith, diligence, reasonableness or care or of the fulfillment of the duties imposed on any secured party with respect to the maintenance, disposition or redemption of collateral, accounting for surplus proceeds of collateral or accepting collateral in discharge of liabilities;

(B)    the effect of any provision of the Credit Documents which is intended to permit modification thereof only by means of an agreement in writing by the parties thereto;

(C)    the effect of any provision of the Credit Documents insofar as it provides that any Person purchasing a participation from a Lender or other Person may exercise set-off or similar rights with respect to such participation or that any Lender or other Person may exercise set-off or similar rights other than in accordance with applicable law;

(D)    the effect of any provision of the Credit Documents imposing penalties or forfeitures;

(E)    the enforceability of any provision of any of the Credit Documents to the extent that such provision constitutes a waiver of illegality as a defense to performance of contract obligations;

(F)    the effect of any provision of the Credit Documents relating to indemnification or exculpation in connection with violations of any securities laws or relating to indemnification, contribution or exculpation in connection with willful, reckless or criminal acts or gross negligence of the indemnified or exculpated Person or the Person receiving contribution; or

(G)    the attachment or perfection of any security interest created or granted under the Security Documents.

In connection with the provisions of the Agreement whereby the parties submit to the jurisdiction of the courts of the United States of America located in the Southern District of New York, we note the limitations of 28 U.S.C. §§ 1331 and 1332 on subject matter jurisdiction of the Federal courts. In connection with the provisions of the Agreement which relate to forum selection of the courts of the United States located in the State of New York (including, without limitation, any waiver of any objection to venue or any objection that a court is an inconvenient forum), we note such court's discretion to transfer an action from one Federal court to another under 28 U.S.C. § 1404(a). In connection with the provisions of this Agreement which relate to a

PAGE 4

SIMPSON THACHER & BARTLETT LLP

forum selection of the courts of the State of New York (including without limitation, any waiver of any objection to venue or any objection that a court is an inconvenient forum), we note that under NYCPLR § 510 such court may have discretion to transfer the place of trial.

We are members of the Bar of the State of New York, and we do not express any opinion herein concerning any law other than the law of the State of New York and the Federal law of the United States.

This opinion letter is rendered to you in connection with the above-described transactions. This opinion letter may not be relied upon by you for any other purpose, or relied upon by, or furnished to, any other person, firm or corporation without our prior written consent.

Very truly yours,

_Simpson Thacher & Bartlett LLP_

SIMPSON THACHER & BARTLETT LLP

SIMPSON THACHER & BARTLETT LLP

THE LENDERS

ALLIED IRISH BANKS PLC

CITIGROUP NORTH AMERICA, INC.

FIRST SUNAMERICA LIFE INSURANCE COMPANY

GALAXY CLO 1999-1, LTD.

GENERAL ELECTRIC CAPITAL CORPORATION

JPMORGAN CHASE BANK

JUPITER LOAN FUNDING LLC

KZH CYPRESSTREE-1 LLC

KZH ING-2 LLC

KZH RIVERSIDE LLC

KZH SOLEIL LLC

KZH SOLEIL-2 LLC

KZH STERLING LLC

KZH WATERSIDE LLC

NATEXIS BANQUES POPULAIRES

SEMINOLE FUNDING LLC

STANWICH LOAN FUNDING LLC

WINGED FOOT FUNDING TRUST

EXHIBIT 39

## FIRST AMENDMENT

FIRST AMENDMENT, dated as of May 6, 2004 (this "First Amendment"), to the Credit Agreement, dated as of June 11, 2003 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among Werner Holding Co. (DE), Inc. (the "Company"), the several lenders from time to time parties to the Credit Agreement (the "Lenders"), Citigroup Global Markets Inc., as syndication agent (in such capacity, the "Syndication Agent"), Citigroup Global Markets Inc. and J.P. Morgan Securities, Inc., as joint lead arrangers and joint bookrunners (in such capacity, the "Arrangers"), and JPMorgan Chase Bank, as administrative agent for the Lenders (in such capacity, the "Administrative Agent" and, together with the Syndication Agent, the "Agents").

## W I T N E S S E T H :

WHEREAS, the Company, the Lenders, the Arrangers and the Agents are parties to the Credit Agreement;

WHEREAS, the Company has requested that the Lenders agree to amend certain provisions of the Credit Agreement, and the Lenders are agreeable to such request but only upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein, and for other valuable consideration the receipt of which is hereby acknowledged, the Company, the Lenders, and the Agents agree as follows:

SECTION 1.  AMENDMENTS.

1.1    Amendments to Section 1.1.  (a) Section 1.1 of the Credit Agreement is hereby amended by deleting therefrom the definition of "Applicable Margin" it its entirety and inserting in lieu thereof the following new definition:

"Applicable Margin": for Term Loans, Revolving Credit Loans and Swing Line Loans of the Types set forth below, the rate per annum set forth under the relevant column heading opposite such Loans below:

| | Alternate Base Rate Loans | Eurodollar Loans |
|---|---|---|
| Term Loans | 2.50% | 3.50% |
| Revolving Credit Loans and Swing Line Loans | 2.50% | 3.50% |

(b)  Section 1.1 of the Credit Agreement is hereby further amended by deleting clause (vi)(II) of the definition of "Consolidated EBITDA" in its entirety and inserting in lieu thereof the following:

> "(II) additional nonrecurring losses and charges up to a maximum aggregate amount of $17,000,000 in fiscal years 2004 and 2005 combined and $5,000,000 in each fiscal year of the Company thereafter, shall be excluded."

1.2    Amendment to Section 3.2.  Section 3.2 of the Credit Agreement is hereby amended by deleting the percentage "0.50%" and inserting in lieu thereof the percentage "0.75%".

1.3    Amendments to Section 8.1.  (a) Section 8.1 of the Credit Agreement is hereby amended by inserting the following new subsection (c):

> "(c) as soon as available, but in any event not later than 25 days after the end of each month of each fiscal year of the Company (other than the months of March, June, September and December), the unaudited consolidated balance sheet of the Company and its Subsidiaries as at the end of such month and the related unaudited consolidated statements of income and cash flows of the Company and its Subsidiaries for such monthly period and the portion of the fiscal year of the Company through such date, setting forth in each case in comparative form the figures for the corresponding month in, and year to date portion of, the previous year, and the figures for such periods in the budget prepared by the Company and furnished by the Administrative Agent, certified by the chief financial officer, controller or treasurer of the Company as being fairly stated in all material respects;".

(b)  Section 8.1 of the Credit Agreement is hereby further amended by changing subsection "(c)" of said Section to subsection "(d)".

(c)  Section 8.1 of the Credit Agreement is hereby further amended by changing subsection "(d)" of said Section to subsection "(e)".

1.4    Amendments to Section 9.7.  (a) Section 9.7 of the Credit Agreement is hereby amended by deleting in the table contained therein the rows corresponding to the base amounts for calendar years 2004 and 2005 and inserting in lieu thereof the following new rows:

| Year or Period | Base Amount |
| --- | --- |
| Calendar Year 2004 | $15,000,000 |
| Calendar Year 2005 | $15,000,000 |

(b)  Section 9.7 of the Credit Agreement is hereby further amended by inserting the following in clause (i) of said Section after the words "set forth above" and before the comma:

3

"(except for calendar years 2004 and 2005)".

1.5    Amendment to Section 9.9. Section 9.9 of the Credit Agreement is hereby amended by deleting in the table contained therein the rows corresponding to the fiscal years and fiscal quarters set forth below and inserting in lieu thereof the following new rows:

| Fiscal Year | Fiscal Quarter | Ratio |
|---|---|---|
| 2004 | Second | 5.00 |
| | Third | 6.00 |
| | Fourth | 6.75 |
| 2005 | First | 7.00 |
| | Second | 6.25 |
| | Third | 5.75 |
| | Fourth | 5.25 |

1.6    Amendment to Section 9.10. Section 9.10 of the Credit Agreement is hereby amended by deleting in the table contained therein the rows corresponding to the fiscal years and fiscal quarters set forth below and inserting in lieu thereof the following new rows:

| Fiscal Year | Fiscal Quarter | Ratio |
|---|---|---|
| 2004 | Second | 3.00 |
| | Third | 2.50 |
| | Fourth | 2.00 |
| 2005 | First | 2.00 |
| | Second | 2.25 |
| | Third | 2.50 |
| | Fourth | 2.50 |

1.7    Amendment to Section 9. Section 9 of the Credit Agreement is hereby amended by adding the following new Section 9.18:

"Receivables Facility. Fail to cause to be maintained in effect at all time through and including May 28, 2006, through arranging extensions and replacements as necessary, the Receivables Facility in an amount of not less than $50,000,000."

1.8    Amendments to Schedule II. Schedule II is deleted in its entirety.

SECTION 2.   CONDITIONS PRECEDENT.

4

    2.1   <u>Effective Date.</u> This First Amendment shall become effective as of the date first set forth above (the "<u>First Amendment Effective Date</u>") following the date on which all of the following conditions have been satisfied or waived:

    (a)   <u>Execution and Delivery.</u> The Administrative Agent shall have received counterparts of this First Amendment duly executed by (i) the Company and the Guarantors and (ii) the Required Lenders;

    (b)   <u>Fees and Expenses.</u> The Administrative Agent shall have received (i) for the account of each Lender entitled thereto, an amendment fee in an amount equal to 0.25% on the sum of (x) such Lender's Revolving Credit Commitment Percentage of the Revolving Credit Commitments plus (y) such Lender's Term Loan Commitment Percentage of the Term Loan Commitments, in each case calculated as of the First Amendment Effective Date, but such fees shall be payable only (A) to each Lender that has delivered (including by way of facsimile or electronic mail) its executed signature page to this First Amendment to the attention of Mariya Vinnik, of Simpson Thacher & Bartlett LLP, 425 Lexington Ave., New York, New York 10017, telecopy number 212-455-2502, email mvinnik@stblaw.com at or prior to close of business on May 6, 2004, and (B) only if the Company and the Subsidiary Guarantors execute this First Amendment and (ii) all fees and accrued expenses of the Administrative Agent required to be paid by the Company, including without limitation, the reasonable fees, disbursements and other charges of Simpson Thacher & Bartlett LLP;

    2.2   <u>Change in Pricing.</u> The amendments set forth in Sections 1.1 and 1.2 hereof shall be effective for the period commencing on the First Amendment Effective Date, and interest and commitment fees payable in respect of any period prior thereto, whether due or paid prior thereto or thereafter, shall be computed based on the Credit Agreement as in effect prior to this First Amendment.

SECTION 3.  GENERAL.

    3.1   <u>Representations and Warranties.</u> In order to induce the Agents and the Lenders to enter into this First Amendment, the Company hereby represents and warrants to the Agents, the Arrangers and the Lenders that: (a) the audited consolidated balance sheet of Holdings and its consolidated Subsidiaries as of December 31, 2003 and the related consolidated statements of operations and of cash flows for the fiscal year ended on such date, audited by PricewaterhouseCoopers LLP, copies of which have heretofore been furnished to each Lender, present fairly in accordance with GAAP the consolidated financial condition of Holdings and its consolidated Subsidiaries as at such date, and the consolidated results of their operations and their consolidated cash flows for the fiscal year then ended. Since December 31, 2003, there has been no material adverse change on (i) the business, operations, property or financial condition of the Company and its Subsidiaries taken as a whole, (ii) the ability of the Company and its Subsidiaries to perform their obligations under the Credit Documents and with respect to the other

financings contemplated hereby or (iii) the validity or enforceability of any material Credit Document or the rights and remedies of the Lenders and the Agents thereunder;

(b) after giving effect to this First Amendment, the representations and warranties of the Company contained in the Credit Agreement, the Security Documents and the Notes are true and correct in all material respects on and as of the First Amendment Effective Date (after giving effect hereto) as if made on and as of the First Amendment Effective Date (except where such representations and warranties expressly relate to an earlier date in which case such representations and warranties were true and correct in all material respects as of such earlier date); provided that (x) all references to the "Credit Agreement" in any Security Document or Note shall be and are deemed to mean the Credit Agreement as amended hereby and (y) Section 6.2 of the Credit Agreement shall be deemed to read as set forth in the immediately preceding paragraph (a) for all purposes of this First Amendment and the Credit Agreement on and after the First Amendment Effective Date; and

(c) each of the Company and the Guarantors has all necessary corporate power and authority to execute and deliver this First Amendment; the execution and delivery by each such party of this First Amendment have been duly authorized by all necessary corporate action on its part; and this First Amendment has been duly executed and delivered by each such party and constitute each such party's legal, valid and binding obligation, enforceable in accordance with its terms.

3.2    Notice of Effectiveness.  The Administrative Agent shall promptly advise the Lenders and the Company that this First Amendment has become effective and of the First Amendment Effective Date.

3.3    APPLICABLE LAW AND JURISDICTION.  THIS FIRST AMENDMENT HAS BEEN EXECUTED AND DELIVERED IN NEW YORK, NEW YORK, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

3.4    Counterparts.  This First Amendment may be executed by the parties hereto in any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

3.5    Consent of Guarantors.  Each of the Guarantors hereby consents to the modifications to the Credit Agreement contemplated hereby.

3.6    Successors and Assigns.  This First Amendment shall be binding upon and inure to the benefit of the Company and each of their respective successors and assigns, and upon the Agents and the Lenders and their successors and assigns.  The execution and delivery of this First Amendment by any Lender prior to the First Amendment Effective Date shall be binding upon its successors and assigns and shall be effective as to any loans or commitments assigned to it after such execution and delivery.

3.7    Continuing Effect.  Except as expressly amended hereby, the Credit Agreement as amended by this First Amendment shall continue to be and shall remain in full force and effect in accordance with its terms.  This First Amendment shall not constitute an amendment or waiver of any provision of the Credit Agreement not expressly referred to herein and shall not be construed as an amendment, waiver or consent to any action on the part of the Company that would require an amendment, waiver or consent of the Administrative Agent or the Lenders except as expressly stated herein.  Any reference to the "Credit Agreement" in any Security Document or Note or any related documents shall be deemed to be a reference to the Credit Agreement as amended by this First Amendment.

3.8    Headings.  Section headings used in this First Amendment are for convenience of reference only, are not part of this First Amendment and are not to affect the constructions of, or to be taken into consideration in interpreting, this First Amendment.

IN WITNESS WHEREOF, the parties hereto have caused this First Amendment to be executed and delivered by their respective duly authorized officers as of the date first above written.

WERNER HOLDING CO. (DE), INC.

By: _____

Title: Larry V. Friend
VP, CFO & Treasurer

WERNER HOLDING CO. (PA), INC., as Guarantor

By: _____

Title: Larry V. Friend
VP, CFO & Treasurer

WERNER CO., as Guarantor

By: _____

Title: Larry V. Friend
VP, CFO & Treasurer

WIP TECHNOLOGIES, INC., as Guarantor

By: _____

Title: Larry M. Friend
VP, CFO & Treasurer

JPMORGAN CHASE BANK, as Administrative
Agent and as a Lender

By: _____
   Title:

              Neil R. Boylan
              Managing Director

[REQUIRED LENDER]


By: _____
   Title:

EXHIBIT 40

**EXECUTION COPY**

<u>WAIVER AND AGREEMENT</u>

WAIVER AND AGREEMENT, dated as of March 31, 2005 (this "<u>Waiver</u>"), to the Credit Agreement, dated as of June 11, 2003 (as heretofore amended, supplemented or otherwise modified, the "<u>Credit Agreement</u>"), among Werner Holding Co. (DE), Inc. (the "<u>Company</u>"), the several lenders from time to time parties to the Credit Agreement (the "<u>Lenders</u>"), Citigroup Global Markets Inc., as syndication agent (in such capacity, the "<u>Syndication Agent</u>"), Citigroup Global Markets Inc. and J.P. Morgan Securities, Inc., as joint lead arrangers and joint bookrunners (in such capacity, the "<u>Arrangers</u>"), and JPMorgan Chase Bank, N.A. (formerly known as JPMorgan Chase Bank), in its capacity as administrative agent for the Lenders (in such capacity, the "<u>Administrative Agent</u>" and, together with the Syndication Agent, the "<u>Agents</u>").

### W I T N E S S E T H :

WHEREAS, the Company, the Lenders, the Arrangers and the Agents are parties to the Credit Agreement;

WHEREAS, the Company has advised the Administrative Agent and the Lenders that (i) as of March 31, 2005 Events of Defaults will occur and be continuing under Section 10(c) of the Credit Agreement by reason of the Company's failure to comply with the financial covenants contained in Sections 9.9 and 9.10 of the Credit Agreement for the fiscal quarter ending March 31, 2005 and (ii) as of April 6, 2005 Defaults will occur and be continuing (and become Events of Default on May 6, 2005) by reason of the Company's failure to comply with the requirements contained in Sections 8.1(a), 8.2(a) and 8.2(b) of the Credit Agreement to deliver financial statements for the fiscal year of the company ending December 31, 2004 and the required accompanying certificates and letter; and

WHEREAS, the Company has requested that the Lenders waive such Default and Events of Default until May 10, 2005 to afford the Company an opportunity to obtain new financing and refinance a portion of the Lenders' outstanding Loans under the Credit Agreement, and the Lenders are agreeable to such request but only upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein, and for other valuable consideration the receipt of which is hereby acknowledged, the Company, the Lenders, and the Agents agree as follows:

SECTION 1.  DEFINITIONS.  Unless otherwise defined herein, capitalized terms are used herein as defined in the Credit Agreement.

SECTION 2.  WAIVER.

The Lenders hereby waive, but only until the expiration of the Waiver Period (as defined below), any Default or Event of Default under Sections 10(c), (d) and (e) of the Credit Agreement arising solely by reason of the failure of the Company (a) to comply with Sections 9.9 (Debt to EBITDA) and 9.10 (Interest Coverage) of the Credit Agreement for the fiscal period ending on March 31, 2005 and (b) to comply with the requirements contained in Sections 8.1(a), 8.2(a) and 8.2(b) of the Credit Agreement with respect to the fiscal year of the Company ending on December 31, 2004.  The term "Waiver Period" shall mean the period from the Effective Date until the earliest to occur of (i) the occurrence of any Event of Default not expressly waived pursuant to this Waiver, (ii) 3:00 p.m. (New York City time) on May 10, 2005 and (iii) any failure by the Borrower to comply with Section 3 of this Waiver which, in the case of a failure to comply with Section 3.2, continues for a period of 2 Business Days.

SECTION 3.  AGREEMENTS; COVENANTS.

3.1    Financial Statements.  Notwithstanding anything to the contrary contained in the Credit Agreement or herein, the Company shall deliver to the Administrative Agent no later than 3:00 p.m. (New York City time) on May 10, 2005 the financial statements and related materials required by Sections 8.1(b) and 8.2(b) of the Credit Agreement in respect of the fiscal quarter ending March 31, 2005.

3.2    Weekly Reporting.  The Company shall deliver to the Administrative Agent not later than 5:00 p.m. on Wednesday of each week, commencing with the first such Wednesday to occur on or after the Effective Date, (a) a comparison of actual performance for the preceding week to the cash flow forecast for the Company and its consolidated Subsidiaries previously provided to the Administrative Agent and the Lenders on March 29, 2005, and a reasonably detailed explanation for any material variances in the form provided to (and agreed upon by) the Administrative Agent prior to the Effective Date, (b) a rolling cash flow forecast for the following 8 weeks, (c) a written report setting forth for each Business Day of the preceding week the amount of Available Cash (as defined below), (d) a written report setting forth the amount available for Holdings, the Company or any of its Subsidiaries to borrow under the Receivables Facility as of the preceding Friday, (e) an accounts payable and accounts receivable aging for the Company and its Subsidiaries as of the preceding Friday and (f) a written report on the status of the Company's efforts to obtain new financing in order to, among other things, refinance a portion of the Loans. The term "Available Cash" shall mean at any time, the cash of Holdings, the Company and its Subsidiaries on deposit in the accounts listed on Schedule I to this Waiver.

3.3    Available Cash.  The Company hereby agrees that the amount of Available Cash shall not be less than $10,000,000 for three consecutive Business Days on and after the Effective Date.

3.4    <u>Event of Default.</u>  The Company hereby agrees that any failure to comply with this Section 3 (which, in the case of a failure to comply with Section 3.2, continues for a period of 2 Business Days) shall constitute an immediate Event of Default.

SECTION 4.   CONDITIONS PRECEDENT.

This Waiver shall become effective as of the date first set forth above (the "<u>Effective Date</u>") following the date on which all of the following conditions have been satisfied or waived:

(a)    <u>Execution and Delivery.</u>  The Administrative Agent shall have received (including receipt by telecopy) counterparts of this Waiver duly executed by (i) the Company and the Guarantors and (ii) the Required Lenders;

(b)    <u>Fees and Expenses.</u>  The Administrative Agent shall have received (i) for the account of each Lender entitled thereto, a fee in an amount equal to 0.25% on the sum of (x) such Lender's Revolving Credit Commitment Percentage of the Revolving Credit Commitments plus (y) such Lender's Term Loan Commitment Percentage of the Term Loan Commitments, in each case calculated as of the Effective Date, but such fees shall be payable (A) only to each Lender that has delivered (including by way of facsimile or electronic mail) its executed signature page to this Waiver to the attention of Lauren Gee, of Simpson Thacher & Bartlett LLP, 425 Lexington Ave., New York, New York 10017, telecopy number 212-455-2502, email lgee@stblaw.com on or before 3:00 p.m. (New York City time) on March 31, 2005, and (B) only if the Company and the Guarantors execute this Waiver and (ii) all fees and accrued expenses of the Administrative Agent required to be paid by the Company, including without limitation, the reasonable fees, disbursements and other charges of Simpson Thacher & Bartlett LLP; and

(c)    <u>No Defaults.</u>  No Default or Event of Default shall have occurred and be continuing on the Effective Date after giving effect to this Waiver.  The Administrative Agent shall have received a certificate of the chief financial officer or treasurer of the Company, dated the Effective Date, certifying the satisfaction of this paragraph.

SECTION 5.   VALIDITY OF OBLIGATIONS AND LIENS

5.1    <u>Validity of Obligations.</u>  Each Credit Party acknowledges and agrees that (a) such Credit Party is truly and justly indebted to the Lenders and the Administrative Agent for the Obligations (as defined in the Security Agreement), without defense, counterclaim or offset of any kind, and such Credit Party ratifies and reaffirms the validity, enforceability and binding nature of such Obligations and (b) such Credit Party has no claim, right or cause of action of any kind against any Lender, the Administrative Agent or any of such Lender's or the Administrative Agent's present or former subsidiaries, Affiliates, officers, directors, employees, attorneys or other representatives or agents in connection with the Obligations, the Credit Agreement and the other Credit Documents, or the transactions contemplated hereby or thereby.

5.2    Collateral. Each Credit Party ratifies and reaffirms the validity and enforceability (without defense, counterclaim or offset of any kind) of the Liens and security interests granted to secure any of the Obligations by such Credit Party to the Administrative Agent, for the benefit of the Lenders, pursuant to the Security Documents to which such Credit Party is a party. Each Credit Party hereby represents and warrants to the Administrative Agent and the Lenders that, pursuant to the Security Documents to which such Credit Party is a party, the Obligations are secured by liens on and security interests in all of such Credit Party's assets to the extent required by the Security Documents.

SECTION 6.    GENERAL.

6.1    Representations and Warranties. (a) In order to induce the Agents and the Lenders to enter into this Waiver, the Company hereby represents and warrants to the Agents, the Arrangers and the Lenders that after giving effect to this Waiver, the representations and warranties of the Company contained in the Credit Agreement (other than Section 6.2), the Security Documents and the Notes are true and correct on and as of the Effective Date (after giving effect hereto) as if made on and as of the Effective Date (except where such representations and warranties expressly relate to an earlier date in which case such representations and warranties were true and correct in all material respects as of such earlier date); provided that all references to the "Credit Agreement" shall be and are deemed to mean the Credit Agreement as waived hereby; and

(b) In order to induce the Agents and the Lenders to enter into this Waiver, the Company hereby represents and warrants to the Agents, the Arrangers and the Lenders that each of the Company and the Guarantors has all necessary corporate power and authority to execute and deliver this Waiver; the execution and delivery by each such party of this Waiver have been duly authorized by all necessary corporate action on its part; and this Waiver has been duly executed and delivered by each such party and constitute each such party's legal, valid and binding obligation, enforceable in accordance with its terms.

6.2    Notice of Effectiveness. The Administrative Agent shall promptly advise the Lenders and the Company that this Waiver has become effective and of the Effective Date.

6.3    APPLICABLE LAW AND JURISDICTION. THIS WAIVER HAS BEEN EXECUTED AND DELIVERED IN NEW YORK, NEW YORK, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

6.4    Counterparts. This Waiver may be executed by the parties hereto in any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

6.5    Consent of Guarantors. Each of the Guarantors acknowledges and consents to all of the terms and conditions of this Waiver and agrees that this Waiver does not

5

operate to reduce or discharge such Guarantor's obligations under the Guarantees or the other Credit Documents to which such Guarantor is a party.

      6.6   <u>Successors and Assigns</u>.  This Waiver shall be binding upon and inure to the benefit of the Company and each of their respective successors and assigns, and upon the Agents and the Lenders and their successors and assigns.  The execution and delivery of this Waiver by any Lender prior to the Effective Date shall be binding upon its successors and assigns and shall be effective as to any loans or commitments assigned to it after such execution and delivery.

      6.7   <u>Continuing Effect</u>.  Except as expressly waived hereby, the Credit Agreement and the other Credit Documents shall continue to be and shall remain in full force and effect in accordance with its terms.  This Waiver shall not constitute an amendment or waiver of any provision of the Credit Agreement or the other Credit Documents not expressly referred to herein and shall not be construed as (or indicate the Lenders' willingness to agree to) an amendment, waiver or consent to any action on the part of the Company that would require an amendment, waiver or consent of the Administrative Agent or the Lenders except as expressly stated herein.  The Administrative Agent and the Lenders expressly reserve the right to exercise all of their rights and remedies under the Credit Agreement, the other Credit Documents and applicable law at any time after the expiration of the Waiver Period in respect of the occurrence and continuance of any Default or Event of Default waived pursuant to Section 2.

      6.8   <u>Headings</u>.  Section headings used in this Waiver are for convenience of reference only, are not part of this Waiver and are not to affect the constructions of, or to be taken into consideration in interpreting, this Waiver.

6

IN WITNESS WHEREOF, the parties hereto have caused this Waiver to be executed and delivered by their respective duly authorized officers as of the date first above written.

WERNER HOLDING CO. (DE), INC.


By: _____
       Title: _____



WERNER HOLDING CO. (PA), INC., as Guarantor


By: _____
       Title: _____



WERNER CO., as Guarantor


By: _____
       Title: _____



WIP TECHNOLOGIES, INC., as Guarantor


By: _____
       Title: _____

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent and as a Lender


By: _____
    Title:

**Signature page to Waiver and Agreement**

_____
(Name of Lender)

By: _____
     Title:

## SCHEDULE I

## Bank Accounts

**WERNER CO.**
**BANK ACCOUNTS**
**AS OF MARCH 31, 2005**

| BANK NAME | BANK ACCOUNT # | ACCOUNT DESCRIPTION |
|---|---|---|
| **WERNER CO.** | | |
| LaSalle National Bank (1) | 5800674771 | Chicago Lockbox |
| PNC | 1006799188 | Cash Concentration |
| PNC | 1006799057 | Sweep Account |
| NCB | 3730113 | Cash Concentration |
| Bank of America (1) | 3750358436 | Lockbox |
| FNB | 40-3187-8 | Greenville Deposits |
| Wells Fargo Bank (1) | 4600-164024 | Los Angeles Lockbox |
| PNC | 10-1729-0723 | Lumenos |
| PNC | 1006799137 | General Disbursements |
| PNC | 1006799145 | Greenville Hourly P/R |
| PNC | 1006799161 | Anniston Hourly P/R |
| Bank of America | 0534-09732 | Imprest Fund- Bell, Cal. |
| PNC | 1006799153 | Chicago Hourly P/R |
| LaSalle Bank-Illinois | 1430-016368 | Imprest Fund- Chicago |
| PNC | 1006799129 | Cash Salary |
| U. S. Bank | 4-9052688-6 | Kty. Petty Cash |
| PNC | 1006799049 | Kentucky hourly payroll |
| PNC | 10-1156-5132 | Merced hourly payroll |
| Bank of America | 00242-10060 | Petty Cash- Merced |

*(1)  The lockboxes are in the name of Werner Funding Corp.*

**WERNER FUNDING CORP.**

| | | |
|---|---|---|
| Wilmington Trust Co. | 2754-4665 | General Disbursement |

**WERNER HOLDING CO. (DE) INC.**

| | | |
|---|---|---|
| Wilmington Trust | 2638-4354 | General Disbursement |

**WERNER HOLDING CO. (PA) INC.**

| | | |
|---|---|---|
| PNC Bank | 1006799209 | General Disbursement |

**WIP TECHNOLOGIES, INC.**

| | | |
|---|---|---|
| Wilmington Trust | 2718-8729 | General Disbursement |

# EXHIBIT 41

(Excerpts Only)

EXECUTION COPY

SECOND AMENDMENT AND SECOND WAIVER

SECOND AMENDMENT AND SECOND WAIVER, dated as of May 10, 2005 (this "Amendment"), to and under the Credit Agreement, dated as of June 11, 2003 (as heretofore amended, supplemented or otherwise modified, the "Credit Agreement"), among Werner Holding Co. (DE), Inc. (the "Company"), the several lenders from time to time parties to the Credit Agreement (the "Lenders"), Citigroup Global Markets Inc., as syndication agent (in such capacity, the "Syndication Agent"), Citigroup Global Markets Inc. and J.P. Morgan Securities, Inc., as joint lead arrangers and joint bookrunners (in such capacity, the "Arrangers"), and JPMorgan Chase Bank, N.A. (formerly known as JPMorgan Chase Bank), as administrative agent for the Lenders (in such capacity, the "Administrative Agent" and, together with the Syndication Agent, the "Agents").

W I T N E S S E T H :

WHEREAS, the Company, the Lenders, the Arrangers and the Agents are parties to the Credit Agreement;

WHEREAS, pursuant to the Waiver and Agreement, dated as of March 31, 2005 (the "Existing Waiver"), to the Credit Agreement, the Lenders agreed to waive during the Waiver Period (as defined in the Existing Waiver) certain Defaults and Events of Default under the Credit Agreement (the "Waived Defaults") in order to afford the Company an opportunity to arrange new financing in part to repay a portion of the Loans;

WHEREAS the Company has obtained a commitment from Credit Suisse First Boston and Morgan Stanley Senior Funding, Inc., pursuant to a Commitment Letter, dated April 25, 2005 (the "Second Lien Facility Commitment Letter"), to provide a $100,000,000 senior secured second lien facility (the "Second Lien Facility"), the proceeds of which will be applied to, among other things, prepay the Loans as more fully set forth in this Amendment, and the Second Lien Facility shall be secured by a second Lien on the Collateral, junior to the Liens on the Collateral securing the obligations under the Credit Agreement;

WHEREAS, the Company has requested that the Lenders agree to amend and waive certain provisions of the Credit Agreement, including without limitation, to permit the incurrence of the Indebtedness under, and the Liens securing, the Second Lien Facility, and to waive permanently any uncured Waived Defaults, and the Lenders are agreeable to such request but only upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein, and for other valuable consideration the receipt of which is hereby acknowledged, the Company, the Lenders, and the Administrative Agent agree as follows:

12

3.19    <u>Amendments to Section 10.</u>

(a)    Section 10(c) of the Credit Agreement is hereby amended by deleting the phrase "subsection 10(c) of the Holdings Guarantee" in such Section and substituting in lieu thereof "Section 10 of the Holdings Guarantee".

(b)    Section 10 of the Credit Agreement is hereby amended by (i) adding the word "or" at the end of paragraph (k) in such subsection and (ii) adding immediately after paragraph (k) in such subsection the following:

"(l)  The Lien subordination provisions of any document governing the Second Lien Facility, including without limitation, the Intercreditor Agreement, shall cease for any reason to be valid or any Credit Party or any of its Subsidiaries shall so assert in writing.".

3.20    <u>Amendment to Subsection 12.15.</u>  Subsection 12.15(a) of the Credit Agreement is hereby amended by adding immediately prior to the period at the end of such subsection the following:

", <u>provided</u>, <u>however</u>, that on and after the Second Amendment Effective Date, the Company shall not pay (but shall accrue) any management fees under this clause (a) if, on the date such fees are due and payable either (i) any Revolving Credit Loans are outstanding or (ii) the sum of (x) the domestic cash and Cash Equivalent balances without encumbrances (other than Liens permitted pursuant to subsection 9.2(f) or subsection 9.2(n)) of the Company and the Subsidiary Guarantors on such date, <u>plus</u> (y) availability under all Receivables Facilities, <u>plus</u> (z) the Available Revolving Credit Commitments, is less than $35,000,000.".

3.21    <u>Amendments to Holdings Guarantee.</u>  Section 10(a) of the Holdings Guarantee is hereby amended by (i) deleting the word "and" immediately prior to clause (ii) in such Section and inserting in lieu thereof a comma and (ii) adding immediately after clause (ii) in such Section the following:

", (iii) Indebtedness under the Credit Documents and (iv) Indebtedness under the Second Lien Facility".

3.22    <u>Intercreditor Agreement.</u>  By their execution of this Amendment, the Required Lenders hereby authorize the Administrative Agent, on behalf of the Lenders, to execute and deliver the Intercreditor Agreement, in the form attached hereto as Exhibit A (the "<u>Intercreditor Agreement</u>").

SECTION 4.   CONDITIONS PRECEDENT.

4.1    <u>Effective Date.</u>  This Amendment shall become effective as of the date first set forth above (the "<u>Amendment Effective Date</u>") following the date on which all of the following conditions have been satisfied or waived:

(a)     <u>Execution and Delivery.</u>  The Administrative Agent shall have received counterparts of this Amendment duly executed by (i) the Company and the Guarantors and (ii) the Required Lenders;

(b)     <u>Fees and Expenses.</u>  The Administrative Agent shall have received (i) for the account of each Lender entitled thereto, an amendment fee in an amount equal to 0.25% on the sum of (x) such Lender's outstanding Revolving Credit Commitment plus (y) such Lender's outstanding Term Loans, in each case calculated as of the Amendment Effective Date (after giving effect to the prepayment of the Term Loans from the proceeds of the Second Lien Facility contemplated by this Amendment), but such fees shall be payable (A) only to each Lender that has delivered (including by way of facsimile or electronic mail) its executed signature page to this Amendment to the attention of Lauren Gee, of Simpson Thacher & Bartlett LLP, 425 Lexington Ave., New York, New York 10017, telecopy number 212-455-2502, email lgee@stblaw.com at or prior to 8:00 P.M., New York time, on May 5, 2005, and (B) only if the Company and the Subsidiary Guarantors execute this Amendment and (ii) all fees and accrued expenses of the Administrative Agent required to be paid by the Company, including without limitation, the reasonable fees, disbursements and other charges of Simpson Thacher & Bartlett LLP and Alvarez & Marsal (<u>provided</u> that the Company's obligations with respect to the fees, disbursements and other charges of Alvarez & Marsal shall be limited as set forth in their engagement letter, dated March 10, 2005);

(c)     After giving effect to this Amendment, there shall be no Default or Event of Default;

(d)     The Second Lien Facility shall have been consummated pursuant to documentation substantially consistent with the Second Lien Facility Commitment Letter and the term sheet attached thereto, the Intercreditor Agreement shall be in form and substance satisfactory to the Required Lenders, and the proceeds of the Second Lien Facility shall have been applied to prepay the Loans in the manner set forth in this Amendment; and

(e)     The Administrative Agent shall have received the financial statements and related materials required by subsection 8.1(a) of the Credit Agreement in respect of the fiscal year ending December 31, 2004, subsection 8.1(b) of the Credit Agreement in respect of the fiscal quarter ending March 31, 2005 and subsection 8.2(b) of the Credit Agreement in respect of the fiscal year ending December 31, 2004 and the fiscal quarter ending March 31, 2005.

4.2     <u>Change in Pricing</u>.  The amendment to the definition of Applicable Margin shall be effective for the period commencing on the Amendment Effective Date, and interest and fees payable in respect of any period prior thereto, whether due or paid prior thereto or thereafter, shall be computed based on the Credit Agreement as in effect prior to this Amendment.

SECTION 5.    VALIDITY OF OBLIGATIONS AND LIENS

5.1     <u>Validity of Obligations</u>.  Each Credit Party acknowledges and agrees that (a) such Credit Party is truly and justly indebted to the Lenders and the

14

Administrative Agent for the Obligations (as defined in the Collateral Agreement), without defense, counterclaim or offset of any kind, and such Credit Party ratifies and reaffirms the validity, enforceability and binding nature of such Obligations and (b) such Credit Party has no claim, right or cause of action of any kind against any Lender, the Administrative Agent or any of such Lender's or the Administrative Agent's present or former subsidiaries, Affiliates, officers, directors, employees, attorneys or other representatives or agents in connection with the Obligations, the Credit Agreement and the other Credit Documents, or the transactions contemplated hereby or thereby.

5.2     <u>Collateral</u>. Each Credit Party ratifies and reaffirms the validity and enforceability (without defense, counterclaim or offset of any kind) of the Liens and security interests granted to secure any of the Obligations by such Credit Party to the Administrative Agent, for the benefit of the Lenders, pursuant to the Security Documents to which such Credit Party is a party. Each Credit Party hereby represents and warrants to the Administrative Agent and the Lenders that, pursuant to the Security Documents to which such Credit Party is a party, the Obligations are secured by liens on and security interests in all of such Credit Party's assets to the extent required by the Security Documents.

SECTION 6.   GENERAL.

6.1     <u>Representations and Warranties</u>.

(a)     In order to induce the Agents and the Lenders to enter into this Amendment, the Company hereby represents and warrants to the Agents, the Arrangers and the Lenders that after giving effect to this Amendment, the representations and warranties of the Company contained in the Credit Agreement and the other Credit Documents are true and correct in all material respects on and as of the Amendment Effective Date (after giving effect hereto) as if made on and as of the Amendment Effective Date (except where such representations and warranties expressly relate to an earlier date in which case such representations and warranties were true and correct in all material respects as of such earlier date); <u>provided</u> that (x) all references to the "Credit Agreement" in any Credit Document shall be and are deemed to mean the Credit Agreement as amended hereby and (y) Section 6.2 of the Credit Agreement shall be deemed to refer to December 31, 2004 rather than December 31, 2003 for all purposes of this Second Amendment and the Credit Agreement on and after the Amendment Effective Date.

(b)     In order to induce the Agents and the Lenders to enter into this Amendment, the Company hereby represents and warrants to the Agents, the Arrangers and the Lenders that each of the Company and the Guarantors has all necessary corporate power and authority to execute and deliver this Amendment; the execution and delivery by each such party of this Amendment have been duly authorized by all necessary corporate action on its part; and this Amendment has been duly executed and delivered by each such party and constitute each such party's legal, valid and binding obligation, enforceable in accordance with its terms.

6.2     <u>Notice of Effectiveness</u>. The Administrative Agent shall promptly advise the Lenders and the Company that this Amendment has become effective and of the Amendment Effective Date.

15

    6.3    <u>APPLICABLE LAW AND JURISDICTION</u>. THIS AMENDMENT HAS BEEN EXECUTED AND DELIVERED IN NEW YORK, NEW YORK, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

    6.4    <u>Counterparts.</u>  This Amendment may be executed by the parties hereto in any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

    6.5    <u>Consent of Guarantors.</u>  Each of the Guarantors hereby consents to the modifications to the Credit Agreement contemplated hereby.

    6.6    <u>Successors and Assigns.</u>  This Amendment shall be binding upon and inure to the benefit of the Company and each of their respective successors and assigns, and upon the Agents and the Lenders and their successors and assigns.  The execution and delivery of this Amendment by any Lender prior to the Amendment Effective Date shall be binding upon its successors and assigns and shall be effective as to any loans or commitments assigned to it after such execution and delivery.

    6.7    <u>Continuing Effect</u>.  Except as expressly amended hereby, the Credit Agreement as amended by this Amendment shall continue to be and shall remain in full force and effect in accordance with its terms.  This Amendment shall not constitute an amendment or waiver of any provision of the Credit Agreement not expressly referred to herein and shall not be construed as an amendment, waiver or consent to any action on the part of the Company that would require an amendment, waiver or consent of the Administrative Agent or the Lenders except as expressly stated herein.  Any reference to the "Credit Agreement" in any Credit Document or any related documents shall be deemed to be a reference to the Credit Agreement as amended by this Amendment.

    6.8    <u>Headings</u>.  Section headings used in this Amendment are for convenience of reference only, are not part of this Amendment and are not to affect the constructions o, or to be taken into consideration in interpreting, this Amendment.

JPMORGAN CHASE BANK, N.A. (formerly
known as JPMorgan Chase Bank), as
Administrative Agent and as a Lender

By: _____

    Name:        **DAVID E. OLIVER**
    Title:         **VICE PRESIDENT**

EXHIBIT 42

EXECUTION COPY

<u>THIRD WAIVER AND AGREEMENT</u>

THIRD WAIVER AND AGREEMENT (this "<u>Waiver</u>"), dated as of March 29, 2006, to and under the Credit Agreement, dated as of June 11, 2003 (as heretofore amended, supplemented or otherwise modified, the "<u>Credit Agreement</u>"), among Werner Holding Co. (DE), Inc. (the "<u>Company</u>"), the several lenders from time to time parties to the Credit Agreement (the "<u>Lenders</u>"), and JPMorgan Chase Bank, N.A. (formerly known as JPMorgan Chase Bank), in its capacity as administrative agent for the Lenders (in such capacity, the "<u>Administrative Agent</u>").

W I T N E S S E T H :

WHEREAS, the Company, the Lenders and the Administrative Agent are parties to the Credit Agreement;

WHEREAS, the Company has advised the Administrative Agent of the occurrence and anticipated occurrence, the Events of Default by reason of the Company's failure to comply with the financial covenants contained in Sections 9.9 (Maximum Secured Leverage Ratio), 9.10 (Minimum Consolidated EBITDA) and 9.20 (Maximum First Lien Leverage Ratio) as at the last day of each of December 31, 2005 and March 31, 2006;

WHEREAS, the Company has further advised the Administrative Agent that a Default and an Event of Default will occur and be continuing by reason of the Company's failure to comply with the requirement contained in Section 8.1(a) of the Credit Agreement to deliver financial statements for the fiscal year of the Company ended December 31, 2005 without a "going concern" or like qualification; and

WHEREAS, the Company has requested that the Lenders waive such Defaults and Events of Default until May 10, 2006, and the Lenders are agreeable to such request but only upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual agreements contained herein, and for other valuable consideration the receipt of which is hereby acknowledged, the Company, the Lenders, and the Administrative Agent agree as follows:

SECTION 1.   DEFINITIONS.  Unless otherwise defined herein, capitalized terms are used herein as defined in the Credit Agreement.

SECTION 2.   WAIVER.

The Lenders hereby waive, but only until the expiration of the Waiver Period (as defined below), any Default or Event of Default under (a) Section 10(c) of the Credit Agreement arising solely by reason of (i) the failure of the Company to comply with Sections 9.9 (Maximum Secured Leverage Ratio), 9.10 (Minimum Consolidated EBITDA) and 9.20 (Maximum First

Lien Leverage Ratio) of the Credit Agreement, in each case as at the last day of each of December 31, 2005 and March 31, 2006 and (ii) the failure of the Company to comply with Section 8.7(a) of the Credit Agreement with respect to any Default or Event of Default waived hereby, (b) Section 10(b) of the Credit Agreement arising solely by reason of the failure of the representation and warranty made under Section 7.2(b) of the Credit Agreement to be true and correct as to the non-existence of any Defaults or Events of Default being waived hereunder in connection with the issuance of a Letter of Credit on or about March [8], 2006 and (c) Section 10(d) of the Credit Agreement arising solely by reason of the failure of the Company to comply with the requirement contained in Section 8.1(a) (Financial Statements) of the Credit Agreement that the annual financial statements for the fiscal year of the Company ended on December 31, 2005 be delivered without a "going concern" or like qualification. The term "Waiver Period" shall mean the period from the Effective Date (as defined below) until the earliest to occur of (i) any Default or Event of Default not expressly waived pursuant to this Waiver and (ii) 5:00 p.m. (New York City time) on May 10, 2006.

SECTION 3.   AGREEMENTS; COVENANTS.

3.1    Financial Statements. Notwithstanding anything to the contrary contained in the Credit Agreement or herein, the Company shall deliver to the Administrative Agent no later than 5:00 p.m. (New York City time) on May 10, 2006 the financial statements and related certificates required by Sections 8.1(b) and (e) and Sections 8.2(b) and (e) of the Credit Agreement in respect of the fiscal quarter ending March 31, 2006.

3.2    Weekly Reporting. During the Waiver Period, the Company shall deliver to the Administrative Agent not later than 5:00 p.m. on Wednesday of each week, commencing with the first such Wednesday to occur on or after the Effective Date, (a) a comparison of actual performance for the preceding week to the cash flow forecast for the Company and its consolidated Subsidiaries attached hereto as Exhibit A, and a reasonably detailed explanation for any material variances, (b) a rolling cash flow forecast for the following eight weeks, (c) a written report setting forth for each Business Day of the preceding week the amount of Available Cash, (d) a written report setting forth the amount available for Holdings, the Company or any of its Subsidiaries to borrow under the Receivables Facility as of the preceding Friday and (e) an accounts receivable aging for the Company and its Subsidiaries as of the preceding Friday.

3.3    Event of Default. The Company hereby agrees that any failure to comply with this Section 3 (which, in the case of a failure to comply with Section 3.2, continues for a period of two Business Days) shall constitute an immediate Event of Default.

SECTION 4.   CONDITIONS PRECEDENT.

This Waiver shall become effective as of the date first set forth above (the "Effective Date") following the date on which all of the following conditions have been satisfied or waived:

(a)     <u>Execution and Delivery.</u>  The Administrative Agent shall have received (including receipt by telecopy) counterparts of this Waiver duly executed by (i) the Company and the Guarantors and (ii) the Required Lenders;

(b)     <u>Fees and Expenses.</u>  The Administrative Agent shall have received (i) for the account of each Lender entitled thereto, a fee in an amount equal to 0.125% on the sum of (x) such Lender's Revolving Credit Commitment Percentage of the Revolving Credit Commitments plus (y) such Lender's Term Loan Commitment Percentage of the Term Loan Commitments, in each case calculated as of the Effective Date, but such fees shall be payable (A) only to each Lender that has delivered (including by way of facsimile or electronic mail) its executed signature page to this Waiver to the attention of Lisa Wood, of Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, telecopy number: 212-455-2502, email: lwood@stblaw.com on or before 3:00 p.m. (New York City time) on March 29, 2006, and (B) only if the Company and the Guarantors execute this Waiver and (ii) all fees and accrued expenses of the Administrative Agent required to be paid by the Company, including without limitation, the reasonable fees, disbursements and other charges of Simpson Thacher & Bartlett LLP;

(c)     <u>No Defaults.</u>  No Default or Event of Default shall have occurred and be continuing on the Effective Date after giving effect to this Waiver.  The Administrative Agent shall have received a certificate of the chief financial officer or treasurer of the Company, dated the Effective Date, certifying the satisfaction of this condition; and

(d)     <u>Other Waivers or Amendments.</u>  The Administrative Agent shall have received a fully executed and effective waiver or amendment, in form and substance satisfactory to the Administrative Agent and the Required Lenders, under each of the Second Lien Facility and the Receivables Facility, waiving the occurrence of (i) any existing "Default" or "Event of Default" thereunder, (ii) any "Default" or "Event of Default" thereunder anticipated to occur as a result of the failure of the Company to deliver the annual financial statements for the fiscal year of the Company ended on December 31, 2005 without a "going concern" or like qualification and (iii) any other "Default" or "Event of Default" thereunder anticipated to occur as at the last day of December 31, 2005 or March 31, 2006.

SECTION 5.   VALIDITY OF OBLIGATIONS AND LIENS.

5.1     <u>Validity of Obligations.</u>  Each Credit Party acknowledges and agrees that (a) such Credit Party is truly and justly indebted to the Lenders and the Administrative Agent for the Obligations (as defined in the Security Agreement), without defense, counterclaim or offset of any kind, and such Credit Party ratifies and reaffirms the validity, enforceability and binding nature of such Obligations and (b) such Credit Party has no claim, right or cause of action of any kind against any Lender, the Administrative Agent or any of such Lender's or the Administrative Agent's present or former subsidiaries, Affiliates, officers, directors, employees, attorneys or other representatives or agents in connection with the Obligations, the Credit Agreement and the other Credit Documents, or the transactions contemplated hereby or thereby.

5.2    <u>Collateral</u>. Each Credit Party ratifies and reaffirms the validity and enforceability (without defense, counterclaim or offset of any kind) of the Liens and security interests granted to secure any of the Obligations by such Credit Party to the Administrative Agent, for the benefit of the Lenders, pursuant to the Security Documents to which such Credit Party is a party. Each Credit Party hereby represents and warrants to the Administrative Agent and the Lenders that, pursuant to the Security Documents to which such Credit Party is a party, the Obligations are secured by liens on and security interests in all of such Credit Party's assets to the extent required by the Security Documents.

SECTION 6.   GENERAL.

6.1    <u>Representations and Warranties</u>. (a) In order to induce the Administrative Agent and the Lenders to enter into this Waiver, the Company hereby represents and warrants to the Administrative Agent and the Lenders that after giving effect to this Waiver, the representations and warranties of the Company contained in the Credit Agreement, the Security Documents and the Notes are true and correct in all material respects on and as of the Effective Date (after giving effect hereto) as if made on and as of the Effective Date (except where such representations and warranties expressly relate to an earlier date in which case such representations and warranties were true and correct in all material respects as of such earlier date); <u>provided</u> that all references to the "Credit Agreement" in any Security Document or Note shall be and are deemed to mean the Credit Agreement as waived hereby; and

(b)   In order to induce the Administrative Agent and the Lenders to enter into this Waiver, the Company hereby represents and warrants to the Administrative Agent and the Lenders that each of the Company and the Guarantors has all necessary corporate power and authority to execute and deliver this Waiver; the execution and delivery by each such party of this Waiver have been duly authorized by all necessary corporate action on its part; and this Waiver has been duly executed and delivered by each such party and constitutes each such party's legal, valid and binding obligation, enforceable in accordance with its terms.

6.2    <u>Notice of Effectiveness</u>. The Administrative Agent shall promptly advise the Lenders and the Company that this Waiver has become effective and of the Effective Date.

6.3    <u>APPLICABLE LAW AND JURISDICTION</u>. THIS WAIVER HAS BEEN EXECUTED AND DELIVERED IN NEW YORK, NEW YORK, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

6.4    <u>Counterparts</u>. This Waiver may be executed by the parties hereto in any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

6.5    <u>Consent of Guarantors</u>. Each of the Guarantors acknowledges and consents to all of the terms and conditions of this Waiver and agrees that this Waiver does not

operate to reduce or discharge such Guarantor's obligations under the Guarantees or the other Credit Documents to which such Guarantor is a party.

      6.6    <u>Successors and Assigns</u>. This Waiver shall be binding upon and inure to the benefit of the Company and each of its successors and permitted assigns, and upon the Administrative Agent and the Lenders and their respective successors and assigns. The execution and delivery of this Waiver by any Lender prior to the Effective Date shall be binding upon its successors and assigns and shall be effective as to any loans or commitments assigned to it after such execution and delivery.

      6.7    <u>Continuing Effect</u>. Except as expressly waived hereby, the Credit Agreement and the other Credit Documents shall continue to be and shall remain in full force and effect in accordance with its terms. This Waiver shall not constitute an amendment or waiver of any provision of the Credit Agreement or the other Credit Documents not expressly referred to herein and shall not be construed as (or indicate the Lenders' willingness to agree to) an amendment, waiver or consent to any action on the part of the Company that would require an amendment, waiver or consent of the Administrative Agent or the Lenders except as expressly stated herein. The Administrative Agent and the Lenders expressly reserve the right to exercise all of their rights and remedies under the Credit Agreement, the other Credit Documents and applicable law at any time after the expiration of the Waiver Period in respect of the occurrence and continuance of any Default or Event of Default waived pursuant to Section 2.

      6.8    <u>Headings</u>. Section headings used in this Waiver are for convenience of reference only, are not part of this Waiver and are not to affect the constructions of, or to be taken into consideration in interpreting, this Waiver.

IN WITNESS WHEREOF, the parties hereto have caused this Waiver to be executed and delivered by their respective duly authorized officers as of the date first above written.

WERNER HOLDING CO. (DE), INC.


By: _____
    Name:
    Title:


WERNER HOLDING CO. (PA), INC., as Guarantor


By: _____
    Name:
    Title:


WERNER CO., as Guarantor


By: _____
    Name:
    Title:


WIP TECHNOLOGIES, INC., as Guarantor


By: _____
    Name:
    Title:

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent and as a Lender

By: _____
    Name:
    Title:

**Signature page to Third Amendment, Third Waiver and Agreement**

_____

(Name of Lender)

By: _____

    Name:

    Title:

EXHIBIT 43

**WERNER.**

# Working Group List



*Please forward any changes to Andrew Park at
(310) 282-5508 or andrew.park@csfb.com*



# Werner Holding Company, Inc.

## Greenville, PA

93 Werner Road
Greenville, PA 16125-9499

| NAME / TITLE | PHONE / FAX / OTHER | HOME ADDRESS / PHONE |
|---|---|---|
| **Steve Richman**<br>*Chief Executive Officer* | (724) 588-2000<br>richmsp@wernerco.com | (847) 735-1069<br>(847) 226-9169 (Cell) |
| **Larry Friend**<br>*Chief Financial Officer* | (724) 588-2000 Ext. 2732<br>(724) 588-0718 (Fax)<br>(724) 988-9112 (Cell)<br>frienlv@wernerco.com | 121 Lake Shore Drive<br>Columbiana, OH  44408<br>(330) 892-0053<br>(330) 892-0061 (Fax)<br>(724) 813-3534 (Cell)<br>friendlv@aol.com |
| **Eric J. Werner**<br>*Vice President & General Counsel* | (724) 588-8600<br>(724) 588-0315 (Fax)<br>ejwerner@wernerco.com | 705 Westminster Road<br>Hermitage, PA  16148<br>(724) 342-2222<br>(724) 866-5280 (Cell) |
| **Geoffrey R. Hartenstein**<br>*Assistant General Counsel* | (724) 588-2000<br>(724) 588-0618 (Fax)<br>grhartenstein@wernerco.com | |



**WERNER**

# Investcorp

## New York, NY

280 Park Avenue
New York, NY 10017
(212) 599 4700
(212) 983 7073 (Fax)

| NAME / TITLE | PHONE / FAX / OTHER | HOME ADDRESS / PHONE |
|---|---|---|
| **Christopher J. Stadler** | (212) 703-1230<br>cstadler@investcorp.com | 307 Freeman's Lane<br>Franklin Lakes, NJ 07417<br>(201) 847-8968<br>(917) 674-1745 (Cell) |
| **Tom Sullivan** | (212) 703-1152<br>(212) 329-6707 (Fax)<br>tsullivan@investcorp.com | 141 Overhill Road<br>Bronxville, NY 10708<br>(914) 961-6210<br>(518) 229-3858 (Cell) |
| **Tarek Ajouz** | (212) 703-1107<br>(212) 329-6707 (Fax)<br>tajouz@investcorp.com | 301 Elizabeth Street, Apt. 6M<br>New York, NY 10012<br>(212) 334-3754<br>(917) 593-8017 |





# Leonard Green & Partners, L.P.

## Los Angeles, CA

11111 Santa Monica Boulevard
Suite 2000
Los Angeles, CA 90025

| NAME / TITLE | PHONE / FAX / OTHER | HOME ADDRESS / PHONE |
|---|---|---|
| **Peter J. Nolan** | (310) 954-0450<br>(310) 954-0404 (Fax)<br>nolan@leonardgreen.com | (310) 372-0484<br>(310) 650-0600 (Cell) |
| **Michael L. Wong** | (310) 954-0415<br>(310) 954-0404 (Fax)<br>mwong@leonardgreen.com | |



3



# Credit Suisse First Boston

## New York, NY

11 Madison Avenue
New York, NY 10010
(212) 325-2000

## Los Angeles, CA

2121 Avenue of the Stars
Suite 3000
Los Angeles, CA  90067
(310) 282-6161
(310) 282-6178 (Fax)

### Financial Sponsors – NY

| NAME / TITLE | PHONE / FAX / OTHER | HOME ADDRESS / PHONE |
| --- | --- | --- |
| Ed Yorke | (212) 538-6633<br>(212) 743-1827 (Fax)<br>ed.yorke@csfb.com | (203) 661-9328<br>(203) 918-8931 (Cell) |

### Financial Sponsors – LA

| NAME / TITLE | PHONE / FAX / OTHER | HOME ADDRESS / PHONE |
| --- | --- | --- |
| Ted Iantuono | (310) 282-7421<br>(310) 282-6178 (Fax)<br>ted.iantuono@csfb.com | 216 19th Street<br>Manhattan Beach, CA 90266<br>(310) 545-6300<br>(310) 625-9885 (Cell) |
| Michael Nutting | (310) 282-5073<br>(310) 284-7509 (Fax)<br>michael.nutting@csfb.com | 665 27th Street<br>Manhattan Beach, CA 90266<br>(310) 545-7501<br>(310) 850-8063 (Cell) |
| Hershel Gerson | (310) 282-5525<br>(310) 284-9225 (Fax)<br>hershel.gerson@csfb.com | 2201 Ocean Avenue, #1<br>Venice, CA 90291<br>(917) 327-7673 (Cell) |
| Sascha Kaeser | (310) 282-5043<br>(310) 284-7522 (Fax)<br>sascha.kaeser@csfb.com | 1400 Midvale Ave. #416<br>Los Angeles, CA 90024<br>(347) 886-7532 (Cell) |
| Andrew Park | (310) 282-5508<br>(310) 282-6178 (Fax)<br>andrew.park@csfb.com | 2600 Overland Ave, Apt 119<br>Los Angeles, CA 90064<br>(818) 400-3363 (Cell) |



4



# Credit Suisse First Boston (Cont'd)

## New York, NY

11 Madison Avenue
New York, NY 10010
(212) 325-2000

### Syndicated Loans Capital Markets – NY

| NAME / TITLE | PHONE / FAX / OTHER | HOME ADDRESS / PHONE |
|---|---|---|
| **David Miller** | (212) 538-7443<br>(646) 953-8090 (Fax)<br>david.miller@csfb.com | 5 Mayflower Road<br>Darien, CT 06820<br>(203) 202-9093<br>(310) 717-3475 (Cell) |
| **Adrian Croft** | (212) 325-1742<br>(917) 256-5011 (Fax)<br>adrian.croft@csfb.com | |

### Corporate Banking – NY

| NAME / TITLE | PHONE / FAX / OTHER | HOME ADDRESS / PHONE |
|---|---|---|
| **Robert Hetu** | (212) 325-4542<br>(212) 325-8615 (Fax)<br>robert.hetu@csfb.com | (212) 570-2275<br>(917) 685-7596 (Cell) |
| **Vanessa Gomez** | (212) 538-2993<br>(212) 448-3755  (Fax)<br>vanessa.gomez@csfb.com | (917) 539-3000  (Cell) |



5

**WERNER**

# Morgan Stanley

## New York, NY

1585 Broadway
New York, NY 10036
(212) 761-4000

**Syndicated Loans Capital Markets – NY**

| NAME / TITLE | PHONE / FAX / OTHER | HOME ADDRESS / PHONE |
|---|---|---|
| **Gene Martin** | (212) 761-1540<br>(212) 507-3755  (Fax)<br>gene.martin@morganstanley.com | (917) 855-9779 (Cell) |
| **John McCann** | (212) 761-2373<br>(212) 507-2491  (Fax)<br>john.mccann@morganstanley.com | (973) 202-0740 (Cell) |
| **Dennis Cornell** | (212) 761-3448<br>(212) 507-2477 (Fax)<br>dennis.cornell@morganstanley.com | (914) 862-2318<br>(917) 670-3691 (Cell) |
| **Paige Costigan** | (212) 761-2922<br>(212) 507-4548 (Fax)<br>paige.costigan@morganstanley.com | |
| **Matthew Kaitz** | (212) 761-2565<br>(212) 404-9764 (Fax)<br>matthew.kaitz@morganstanley.com | |
| **Su Yeo** | su.yeo@morganstanley.com | |

**Bank Loans – NY**

| NAME / TITLE | PHONE / FAX / OTHER | HOME ADDRESS / PHONE |
|---|---|---|
| **Jason Colodne** | (212) 761-2903<br>(212) 507-3444 (Fax)<br>jason.colodne@morganstanley.com | (212) 794-1130<br>(917) 697-0299 (Cell) |
| **Sean Dougherty** | (212) 791-2821<br>(212) 404-9585 (Fax)<br>sean.dougherty@morganstanley.com | (212) 864-7934<br>(917) 667-9996 (Cell) |
| **Eric Vander Mel** | (617) 856-8756<br>(212) 507-5450 (Fax)<br>eric.vandermel@morganstanley.com | (508) 612-3663 (Cell) |





# Loughlin Meghji

## New York, NY

148 Madison Avenue, Suite 800
New York, NY 10016

| NAME / TITLE | PHONE / FAX / OTHER | HOME ADDRESS / PHONE |
|---|---|---|
| **James J. Loughlin, Jr.** | (212) 340-8421<br>(212) 725-9322 (Fax)<br>jloughlin@lmco-ny.com | 307 Freeman's Lane<br>Franklin Lakes, NJ  07417<br>(201) 847-8968<br>(631) 875-8026  (Cell) |
| **Pat Fodale** | pfodale@lmco-ny.com | (917) 363-4218 |
| **Tom Wang** | (212) 340-8440<br>(212) 725-6815 (Fax)<br>twang@lmco-ny.com | (646) 729-4106 (Cell) |



**WERNER.**

# Gibson, Dunn & Crutcher LLP

## New York, NY

200 Park Avenue
New York, New York 10166-0193

| NAME / TITLE | PHONE / FAX / OTHER | HOME ADDRESS / PHONE |
|---|---|---|
| **Michael Greaney** | (212) 351-4065<br>(212) 351-5260 (Fax)<br>mgreaney@gibsondunn.com | 93 Adams Lane<br>New Canaan, CT 06840<br>(203) 966-0023<br>(917) 226-2852 (Cell) |
| **Janet Vance** | (212) 351-3854<br>(212) 351-5288 (Fax)<br>jvance@gibsondunn.com | 151 W. 17th St.<br>Penthouse A<br>New York, NY 10011<br>(212) 627-2588 |
| **Joerg H. Esdorn** | (212) 351-3851<br>(212) 351-5276<br>jesdorn@gibsondunn.com | 16 Maple Drive<br>Rye, NY 10580<br>(914) 707-1814 |
| **Ross Hallock** | (212) 351-3802<br>rhallock@gibsondunn.com | 52 E. 13th Street, Apt. 5E<br>New York, NY 10003<br>(917) 836-6131 (Cell) |



**CREDIT SUISSE** | FIRST BOSTON



# Willkie Farr & Gallagher LLP

## New York, NY

787 Seventh Avenue
New York, NY  10019

| NAME / TITLE | PHONE / FAX / OTHER | HOME ADDRESS / PHONE |
|---|---|---|
| **John Longmire, Esq.** | (212) 728-8574<br>(212) 728-8111 (Fax)<br>jlongmire@willkie.com | |
| **Matthew A. Feldman** | (212) 728-8000<br>(212) 728-8651 (Phone 2)<br>(212) 728-8111  (Fax)<br>mfeldman@willkie.com | |



EXHIBIT 44

MARCH 2005



STRICTLY PRIVATE AND CONFIDENTIAL

## WERNER CO.

**Working Group List**

**JPMorgan**

CONFIDENTIAL

**JPMorgan Chase Bank**
270 Park Avenue, 20th Floor
New York, NY 10017

| Special Credits Group | |
|---|---|
| Name and title | Direct telephone/fax |
| **Elizabeth H. Eisen** | Office: (212) 270-0328 |
| Managing Director | Fax: (212) 270-0453 |
| | elizabeth.h.eisen@chase.com |
| *Assistant* | *Office: (212) 270-0352* |
| *Arlene Gibbs* | *arlene.gibbs@chase.com* |
| **Ann Kurinskas** | Office: (212) 270-0408 |
| Managing Director | Fax: (212) 270-0453 |
| | ann.kurinskas@chase.com |
| *Assistant* | *Office: (212) 270-0419* |
| *Geraldine Leslie* | *geraldine.leslie@chase.com* |
| **David E. Oliver** | Office: (212) 270-0518 |
| Vice President | Fax: (212) 270-0453 |
| | david.e.oliver@chase.com |
| *Assistant* | *Office: (212) 270-0419* |
| *Geraldine Leslie* | *geraldine.leslie@chase.com* |
| **Marina Flindell** | Office: (212) 270-0591 |
| Vice President | Fax: (212) 270-0453 |
| | flindell_marina@jpmorgan.com |
| *Assistant* | *Office: (212) 270-0352* |
| *Arlene Gibbs* | *arlene.gibbs@chase.com* |
| **Antoine Munfa** | Office: (212) 270-2550 |
| | Fax: (212) 270-0453 |
| | antoine.r.munfa@jpmorgan.com |
| *Assistant* | *Office: (212) 270-0352* |
| *Arlene Gibbs* | *arlene.gibbs@chase.com* |

WERNER CO.

**JPMorgan**

C O N F I D E N T I A L

**JPMorgan Chase Bank**
270 Park Avenue, 4th Floor
New York, NY 10017

**Financial Sponsors Group**

| Name and title | Direct telephone/fax |
|---|---|
| **Neil Boylan** | Office: (212) 270-1410 |
| Managing Director | Fax: (212) 270-6637 |
| | Cell: (201) 230-2645 |
| | Home: (201) 847-8158 |
| | neil.boylan@jpmorgan.com |

WERNER CO.

JPMorgan

C O N F I D E N T I A L

**Simpson Thacher & Bartlett LLP**
425 Lexington Avenue
New York, NY 10017

**Counsel to the Administrative Agent**

| Name and title | Direct telephone/fax |
|---|---|
| **Steven Fuhrman** | Office: (212) 455-7235 |
| Partner | Fax: (212) 455-2502 |
| | Cell: (917) 841-6826 |
| | sfuhrman@stblaw.com |
| **Frank Huck** | Office: (212) 455-7025 |
| Partner | Fax: (212) 455-2502 |
| | Cell: (917) 648-7390 |
| | fhuck@stblaw.com |
| **Robert Trust** | Office: (212) 455-2556 |
| Associate | Fax: (212) 455-2502 |
| | Cell: (917) 968-9554 |
| | rtrust@stblaw.com |

WERNER CO.

JPMorgan

C O N F I D E N T I A L

**Alvarez & Marsal**
600 Lexington Avenue, 6th Floor
New York, NY 10022

**Financial Advisor to the Administrative Agent**

| Name and title | Direct telephone/fax |
|---|---|
| **Peter Cheston** | Office: (646) 495-3549 |
| Partner | Fax: (212) 759-6302 |
| | Cell: (917) 363-1504 |
| | pcheston@alvarezandmarsal.com |
| **Andrew Hede** | Office: (646) 495-3584 |
| Director | Fax: (212) 759-5532 |
| | Cell: (917) 239-2281 |
| | ahede@alvarezandmarsal.com |

WERNER CO.

JPMorgan

# EXHIBIT 45

(Excerpts Only)

# CONFIDENTIAL INFORMATION MEMORANDUM



## $100,000,000 SECOND LIEN TERM LOAN

**Special Notice regarding Material Non Public Information**

THIS CONFIDENTIAL INFORMATION MEMORANDUM MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION CONCERNING THE COMPANY OR ITS SECURITIES. BY ACCEPTING THIS CONFIDENTIAL INFORMATION MEMORANDUM, THE RECIPIENT AGREES TO USE ANY SUCH INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE POLICIES, CONTRACTUAL OBLIGATIONS AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

DRAFT

**CREDIT SUISSE** | FIRST BOSTON

Morgan Stanley

III168223



# Table of Contents

| | |
|---|---|
| Notice to and Undertaking by Recipients | 1 |
| Letter of Authorization | 4 |
| Invitation to Offer (Second Lien Term Loan) | 5 |
| Form of Commitment Letter | 6 |
| Administrative Details Reply Form | 8 |
| Transaction Timetable | 11 |
| Forward Looking Statements | 12 |
| Contact List | 13 |
| Executive Summary | 21 |
| Investment Considerations | 33 |
| Company Overview | 41 |
| Industry Overview | 55 |
| Management | 62 |
| Historical Financial Overview | 65 |
| Projected Financial Information | 70 |
| Exhibits | 73 |



Morgan Stanley

III168224



# Notice to and Undertaking by Recipients

TO:    Financial Institutions Invited to Participate in Werner Holding Co. (DE), Inc.'s $100,000,000 Second Lien Term Loan



This Confidential Information Memorandum (the "Confidential Information Memorandum") has been prepared solely for informational purposes from information supplied by or on behalf of Werner Holding Co. (DE), Inc. and its affiliates (the "Company"), and is being furnished by Credit Suisse First Boston ("CSFB") and Morgan Stanley (together with CSFB, the "Arrangers") to you in your capacity as a prospective lender (the "Recipient") in considering the proposed Second-Lien Term Loan described in the Confidential Information Memorandum (the "Facilities").



ACCEPTANCE OF THIS CONFIDENTIAL INFORMATION MEMORANDUM CONSTITUTES AN AGREEMENT TO BE BOUND BY THE TERMS OF THIS NOTICE AND UNDERTAKING AND THE SPECIAL NOTICE SET FORTH ON THE COVER PAGE HEREOF (THE "SPECIAL NOTICE"). IF THE RECIPIENT IS NOT WILLING TO ACCEPT THE CONFIDENTIAL INFORMATION MEMORANDUM AND OTHER EVALUATION MATERIAL (AS DEFINED HEREIN) ON THE TERMS SET FORTH IN THIS NOTICE AND UNDERTAKING AND THE SPECIAL NOTICE, IT MUST RETURN THE CONFIDENTIAL INFORMATION MEMORANDUM AND ANY OTHER EVALUATION MATERIAL TO THE ARRANGERS IMMEDIATELY WITHOUT MAKING ANY COPIES THEREOF, EXTRACTS THEREFROM OR USE THEREOF.



## I.  Confidentiality



As used herein:  (a) "**Evaluation Material**" refers to the Confidential Information Memorandum and any other information regarding the Company or the Facilities furnished or communicated to the Recipient by or on behalf of the Company in connection with the Facilities (whether prepared or communicated by the Arrangers or the Company, their respective advisors or otherwise) and (b) "**Internal Evaluation Material**" refers to all memoranda, notes, and other documents and analyses developed by the Recipient using any of the information specified under the definition of Evaluation Material.

The Recipient acknowledges that the Company considers the Evaluation Material to include confidential, sensitive and proprietary information and agrees that it shall use reasonable precautions in accordance with its established procedures to keep the Evaluation Material confidential; *provided however* that (i) it may make any disclosure of such information to which the Company gives its prior written consent, (ii) any of such information may be disclosed to it, its affiliates and their respective partners, directors, officers, employees, agents, advisors and other representatives (collectively, "**Representatives**") (it being understood that such Representatives shall be informed by it of the confidential nature of such information and shall be directed by the Recipient to treat such information in accordance with the terms of the Notice and Undertaking and the Special Notice) and (iii) it (and each Representative of the Recipient) may make any disclosure to any and all persons, without limitation of any kind, of the U.S. federal income tax treatment and U.S. federal income tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to the Recipient (or any Representative of the Recipient) relating to such tax treatment and tax structure. The Recipient agrees to be responsible for any breach of the Notice and Undertaking or the Special Notice that results from the actions or omissions of its Representatives.

The Recipient shall be permitted to disclose the Evaluation Material in the event that it is required by law or regulation or requested by any governmental agency or other regulatory authority (including any self-regulatory organization) or in connection with any legal proceedings. The Recipient agrees that it will notify the Arrangers as soon as practical in the event of any such disclosure (other than at the request of a regulatory authority), unless such notification shall be prohibited by applicable law or legal process.



Morgan Stanley

III168225









The Recipient shall have no obligation hereunder with respect to any Evaluation Material to the extent that such information (i) is or becomes publicly available other than as a result of a disclosure by the Recipient in violation of this agreement, or (ii) was within the Recipient's possession prior to its being furnished pursuant hereto or becomes available to the Recipient on a non-confidential basis from a source other than the Company or its agents, *provided* that the source of such information was not known by the Recipient to be bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to the Company or any other party with respect to such information.

In the event that the Recipient of the Evaluation Material decides not to participate in the transaction described herein, upon request of the Arrangers, such Recipient shall as soon as practicable return all Evaluation Material (other than Internal Evaluation Material) to the Arrangers or represent in writing to the Arrangers that the Recipient has destroyed all copies of the Evaluation Material (other than Internal Evaluation Material) unless prohibited from doing so by the Recipient's internal policies and procedures.

## II. Information

The Recipient acknowledges and agrees that (i) the Arrangers received the Evaluation Material from third party sources (including the Company) and it is provided to the Recipient for informational purposes, (ii) the Company or the Arrangers and its affiliates bear no responsibility (and shall not be liable) for the accuracy or completeness (or lack thereof) of the Evaluation Material or any information contained therein, (iii) no representation regarding the Evaluation Material is made by the Company or the Arrangers or any of its affiliates, (iv) neither the Company nor the Arrangers nor any of its affiliates has made any independent verification as to the accuracy or completeness of the Evaluation Material, and (v) the Arrangers and its affiliates shall have no obligation to update or supplement any Evaluation Material or otherwise provide additional information.

The Evaluation Material has been prepared to assist interested parties in making their own evaluation of the Company and the Facilities and does not purport to be all-inclusive or to contain all of the information that a prospective participant may consider material or desirable in making its decision to become a lender. Each Recipient of the information and data contained herein should take such steps as it deems necessary to assure that it has the information it considers material or desirable in making its decision to become a lender and should perform its own independent investigation and analysis of the Facilities or the transactions contemplated thereby and the creditworthiness of the Company. The Recipient represents that it is sophisticated and experienced in extending credit to entities similar to the Company. The information and data contained herein are not a substitute for the Recipient's independent evaluation and analysis and should not be considered as a recommendation by the Company or the Arrangers or any of its affiliates that any Recipient enter into the Facilities.

The Evaluation Material may include certain forward looking statements and projections provided by the Company. Any such statements and projections reflect various estimates and assumptions by the Company concerning anticipated results. No representations or warranties are made by the Company or any of its affiliates as to the accuracy of any such statements or projections. Whether or not any such forward looking statements or projections are in fact achieved will depend upon future events some of which are not within the control of the Company. Accordingly, actual results may vary from the projected results and such variations may be material. Statements contained herein describing documents and agreements are summaries only and such summaries are qualified in their entirety by reference to such documents and agreements.



2



III168226



## III. General

It is understood that unless and until a definitive agreement regarding the Facilities between the parties thereto has been executed, the Recipient will be under no legal obligation of any kind whatsoever with respect to the Facilities by virtue of this Notice and Undertaking except for the matters specifically agreed to herein and in the Special Notice.

The Recipient agrees that money damages would not be a sufficient remedy for breach of this Notice and Undertaking or of the Special Notice, and that in addition to all other remedies available at law or in equity, the Company and the Arrangers shall be entitled to equitable relief, including injunction and specific performance, without proof of actual damages.

This Notice and Undertaking and the Special Notice together embody the entire understanding and agreement between the Recipient and the Arrangers with respect to the Evaluation Material and the Internal Evaluation Material and supersedes all prior understandings and agreements relating thereto. The terms and conditions of this Notice and Undertaking and the Special Notice shall apply until such time, if any, that the Recipient becomes a party to the definitive agreements regarding the Facilities, and thereafter the provisions of such definitive agreements relating to confidentiality shall govern. If you do not enter into the Facilities, the application of this Notice and Undertaking and the Special Notice shall terminate with respect to all Evaluation Material on the date falling one year after the date of the Confidential Information Memorandum.

This Notice and Undertaking and the Special Notice shall be governed by and construed in accordance with the law of the State of New York, without regard to principles of conflicts of law (except Section 5-1401 of the New York General Obligation Law to the extent that it mandates that the law of the State of New York govern).









3



III168227



# Letter of Authorization









April 21, 2005

Credit Suisse First Boston
11 Madison Avenue
New York, NY 10010

Morgan Stanley Senior Funding, Inc.
1585 Broadway
New York, NY 10036

Ladies and Gentlemen:

We refer to the proposed $100,000,000 Second Lien Term Loan (the "**Second Lien Term Loan**") for Werner Holding Co. (DE), Inc. ("**Werner**" or the "**Company**") that you are arranging at our request, and the Confidential Information Memorandum forwarded herewith (the "**Confidential Information Memorandum**"). We have reviewed or participated in preparing the Confidential Information Memorandum and the information contained therein.

The Company has reviewed the information contained in the Confidential Information Memorandum and represents and warrants to you that the information contained in the Confidential Information Memorandum does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not materially misleading. Any management projections or forward-looking statements included in the Confidential Information Memorandum are based on assumptions and estimates developed by management of the Company in good faith and management believes such assumptions and estimates to be reasonable as of the date of the Confidential Information Memorandum. Whether or not such projections or forward looking statements are in fact achieved will depend upon future events some of which are not within the control of the Company. Accordingly, actual results may vary from the projections and such variations may be material. The projections included in the Confidential Information Memorandum should not be regarded as a representation by the Company or its management that the projected results will be achieved.

We request that you distribute the Confidential Information Memorandum to such financial institutions as you may deem appropriate to include in the Second Lien Term Loan. We agree that we will rely on, and that you are authorized to rely on, the undertakings, acknowledgments and agreements contained in the Notice to and Undertaking by Recipients accompanying the Confidential Information Memorandum or otherwise acknowledged by recipients of the Confidential Information Memorandum.

Yours sincerely,

Steven P. Richman
President and Chief Executive Officer



4



III168228



# Invitation to Offer (Second Lien Term Loan)






TO:    Financial Institutions Invited to Participate in Werner Holding Co. (DE), Inc.'s $100,000,000 Second Lien Term Loan

On behalf of Werner Holding Co. (DE), Inc. ("Werner" or the "Company"), Credit Suisse First Boston ("CSFB") and Morgan Stanley Senior Funding Inc. ("MSSF") are pleased to invite you to participate in the $100,000,000 Second Lien Term Loan (the "Second Lien Term Loan") described in this Confidential Information Memorandum dated April 2005.

Net proceeds from the Second Lien Term Loan will be used to repay the drawn amount on the Company's revolver, to satisfy the 2005 and 2006 amortization requirements of the Company's existing senior secured credit facility as well as to pay down additional principal and to pay related transaction fees and expenses. The general terms and conditions of the Second Lien Term Loan are outlined in this Confidential Information Memorandum.

Your final commitment will be subject to allocation at the discretion of Werner and CSFB and MSSF. CSFB and MSSF reserves the right to close the syndication at any time and allocate prior to the response deadline.

Please feel free to call any of the CSFB or MSSF representatives identified on the enclosed Contact List if you have any questions regarding the Second Lien Term Loan. We look forward to working with you on this transaction.

Sincerely,

Credit Suisse First Boston    Morgan Stanley Senior Funding, Inc.
April 2005    April 2005



5



III168229



# Form of Commitment Letter











[Lender's Letterhead]

[Month] [Day], 2005

Credit Suisse First Boston
Eleven Madison Avenue
New York, NY 10010

Attention: Lisa Wenger
Fax: (212) 448-3319

**Re: Werner Holding Co. (DE), Inc.**

Ladies and Gentlemen:

We refer to the Summary of Terms and Conditions for the above-referenced borrower (the "Borrower") included in the Confidential Information Memorandum dated as of April 2005. Subject only to satisfactory documentation, we are pleased to commit $_____ to the $100,000,000 Second Lien Term Loan, as referenced in the Confidential Information Memorandum.

Our decision to issue our commitment is based on our independent investigation of the financial condition, creditworthiness, affairs and status of the Borrower and not in reliance on any material or information provided to us by you or any of your affiliates, which, if so furnished, are hereby acknowledged by us to have been for informational purposes only and without representation or warranty. We acknowledge that you have no duty or responsibility, either initially or on a continuing basis, to provide us with any credit or other information with respect to the Borrower, whether such information came into your possession before we issued our commitment or at any time thereafter.

We acknowledge and agree that no secondary selling or offers to purchase will occur until such time as you declare the primary syndication to be complete. Furthermore, we represent that this commitment represents a commitment from our institution only, and does not in any way include a commitment or other arrangement from any other non-affiliated institution.

We understand that allocations may be made at your discretion. This letter shall be governed by the laws of the State of New York.

Very truly yours,

[NAME OF LENDER]

By: _____
Name:
Title:

**Please return this form by fax, with original copy to follow, no later than 5:00 PM New York time, on May 5, 2005.**



6

III168230



# Administrative Details Reply Form

**D**

Re:  Werner Holding Co. (DE), Inc.'s $100,000,000 Second Lien Term Loan

1)  **Name of Institution and Person For Signature Page:** _____

2)  **Name of Institution as It Should Appear in Any Publicity:** _____

**R**

3)  **Name of Person(s) to Receive Draft Credit Agreement:**

Name: _____

Telephone: _____

Facsimile: _____

**A**

Email: _____

4)  **Credit Contact:**

Name: _____    Title: _____

Address: _____

**F**

Telephone: _____    Facsimile: _____

5)  **Operations Contact:**     **Primary**     **Secondary**

Name: _____    _____

**T**

Address: _____    _____

Telephone: _____    _____

Facsimile: _____    _____

Email: _____    _____

6)  **Payment Instructions:**

Name of Bank:

ABA:

Account Name:

Account Number:

Reference/Attention:

7)  **Tax Withholding Form Attached:**     Please specify which form has been attached:

(Foreign Institutions Only)     _____

**Please return this form by fax to the attention of Terri Knuth, Fax:  (212) 841-2275, no later than 5:00 PM New York time, on May 5, 2005.**



7



III168231



# Administrative Details Reply Form



<u>Agent Information</u>
Credit Suisse First Boston
Eleven Madison Avenue
New York, NY   10010

<u>Agent Closing Contact</u>
Fay Rollins
Tel:   212-325-9041
Fax:  212-743-1865
E-Mail: fay.rollins@csfb.com

<u>Agent Wire Instructions</u>
Bank of New York
ABA 021000089
Account Name:  CSFB Agency Cayman Account
Account Number:  8900492627



> It is very important that **all** of the requested information be completed accurately and that this questionnaire be returned promptly.  If your institution is sub-allocating its allocation, please fill out an administrative questionnaire for each legal entity.

Legal Name of Lender to appear in Documentation:

_____

Signature Block Information: _____

    •   Signing Credit Agreement       Yes       No

    •   Coming in via Assignment       Yes       No

Type of Lender:

(Bank, Asset Manager, Broker/Dealer, CLO/CDO, Finance Company, Hedge Fund, Insurance, Mutual Fund, Pension Fund, Other Regulated Investment Fund, Special Purpose Vehicle, Other-please specify)

Lender Parent: _____

       <u>Lender Domestic Address</u>                 <u>Lender Eurodollar Address</u>

_____    _____

_____    _____

_____    _____



8



III168232



**D**
**R**
**A**
**F**
**T**

Contact Information Worksheet. Primary and Secondary Investors Side

|  | Primary Credit Contact | Secondary Credit Contact |
|---|---|---|
| Name: | | |
| Company: | | |
| Title: | | |
| Address: | | |
| | | |
| Telephone: | | |
| Facsimile: | | |
| E-Mail Address: | | |

|  | Primary Operations Contact | Secondary Operations Contact |
|---|---|---|
| Name: | | |
| Company: | | |
| Title: | | |
| Address: | | |
| | | |
| Telephone: | | |
| Facsimile: | | |
| E-Mail Address: | | |

Transfer Instructions

| Bank Name: | |
|---|---|
| ABA/Routing No.: | |
| Account Name: | |
| Account No.: | |
| FFC Account Name: | |
| FFC Account No.: | |
| Attention: | |
| Reference: | |



Morgan Stanley

III168233









**Tax Documents**

## NON-U.S. LENDER INSTITUTIONS:

### I. *Corporations:*
If your institution is incorporated outside of the United States for U.S. federal income tax purposes, <u>and</u> is the beneficial owner of the interest and other income it receives, you must complete one of the following three tax forms, as applicable to your institution: *a.) Form W-8BEN (Certificate of Foreign Status of Beneficial Owner)*, *b.) Form W-8ECI (Income Effectively Connected to a U.S. Trade or Business)*, or *c.) Form W-8EXP (Certificate of Foreign Government or Governmental Agency)*.

A U.S. taxpayer identification number is required for any institution submitting Form W-8ECI. It is also required on Form W-8BEN for certain institutions claiming the benefits of a tax treaty with the U.S. Please refer to the instructions when completing the form applicable to your institution. In addition, please be advised that U.S. tax regulations do not permit the acceptance of faxed forms. **An original tax form must be submitted.**

### II. *Flow-Through Entities:*
If your institution is organized outside the U.S., and is classified for U.S. federal income tax purposes as either a Partnership, Trust, Qualified or Non-Qualified Intermediary, or other non-U.S. flow-through entity, an original *Form W-8IMY (Certificate of Foreign Intermediary, Foreign Flow-Through Entity, or Certain U.S. Branches for United States Tax Withholding)* must be completed by the intermediary together with a withholding statement. Flow-through entities other than Qualified Intermediaries are required to include tax forms for each of the underlying beneficial owners.

Please refer to the instructions when completing this form. In addition, please be advised that U.S. tax regulations do not permit the acceptance of faxed forms. **Original tax form(s) must be submitted.**

## U.S. LENDER INSTITUTIONS:

If your institution is incorporated or organized <u>within</u> the United States, you must complete and return *Form W-9 (Request for Taxpayer Identification Number and Certification)*. **Please be advised that we request that you submit an original Form W-9.**

*Pursuant to the language contained in the tax section of the Credit Agreement, the applicable tax form for your institution must be completed and returned prior to the first payment of income. Failure to provide the proper tax form when requested may subject your institution to U.S. tax withholding.*

**Please return this form by fax to the attention of Julia Kingsbury, Fax: (212) 325-8304, no later than 5:00 PM New York time, on May 5, 2005.**



10



III168234



# Transaction Timetable





| April 2005 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

| May 2005 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

| Date | Activity |
|---|---|
| Thursday, April 21 | Bank Meeting and Conference Call:    9:30 AM EST Registration  10:00 AM EST Meeting |

CSFB Offices
Eleven Madison Avenue ("EMA")
New York, NY 10010

Meeting will be held in the EMA Club Room 2B

Dial-in:    (888) 283-3180 (Domestic)
(517) 645-6119 (International)
Passcode: Werner

Replay:    (866) 395-1642 (Domestic)
(203) 369-0464 (International)
Passcode: None needed
Available for 2 weeks until May 5th

| | |
|---|---|
| Thursday, May 5 | Commitments Due from Lenders (5PM EST) |
| Friday, May 6 | Allocations and Credit Document Distribution |
| Wednesday, May 11 | Comments Due on Credit Documentation |
| Thursday, May 12 | Closing |



11



III168235



# Forward Looking Statements











This Confidential Information Memorandum includes "forward-looking statements" within the meaning of Section 26A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. All statements, other than statements of historical fact, included herein may constitute forward-looking statements. Although the Company believes that the expectations reflected in such forward-looking statements are reasonable, it can give no assurance that such expectations will prove to be correct.





III168236



# Contact List



## CREDIT SUISSE FIRST BOSTON

Eleven Madison Avenue
New York, NY 10010



### Syndicated Loan Capital Markets (New York)

| NAME / TITLE | PHONE / FAX / OTHER | | |
|---|---|---|---|
| **David Miller**<br>*Managing Director* | Phone:<br>Fax:<br>Email: | (212) 538-7443<br>(646) 935-8090<br>david.miller@csfb.com |
| **Adrian Croft**<br>*Associate* | Phone:<br>Fax:<br>Email: | (212) 325-1742<br>(917) 256-5011<br>adrian.croft@csfb.com |



### Corporate Banking (New York)

| NAME / TITLE | PHONE / FAX / OTHER | | |
|---|---|---|---|
| **Robert Hetu**<br>*Director* | Phone:<br>Fax:<br>Email: | (212) 325-4542<br>(212) 325-8615<br>robert.hetu@csfb.com |
| **Vanessa Gomez**<br>*Vice President* | Phone:<br>Fax:<br>Email: | (212) 538-2993<br>(212) 448-3755<br>vanessa.gomez@csfb.com |





13

Morgan Stanley

III168237



# Contact List



## CREDIT SUISSE FIRST BOSTON

Eleven Madison Avenue
New York, NY 10010



### Syndicated Loan Sales Force

| NAME / TITLE | PHONE / FAX / OTHER | |
|---|---|---|
| **Joe Friedman** *Managing Director* | Phone: | (212) 538-0731 |
| | Fax: | (212) 538-8228 |
| | Email: | joe.friedman@csfb.com |
| **Grant Pothast** *Managing Director* | Phone: | (312) 750-1725 |
| | Fax: | (312) 750-9704 |
| | Email: | grant.pothast@csfb.com |
| **Andrew Mahder** *Managing Director* | Phone: | (212) 325-9907 |
| | Fax: | (212) 325-8228 |
| | Email: | andrew.mahder@csfb.com |
| **Michael Safko** *Managing Director* | Phone: | (212) 538-2413 |
| | Fax: | (212) 448-3324 |
| | Email: | mike.safko@csfb.com |
| **Andy Stock** *Managing Director* | Phone: | (212) 538-3982 |
| | Fax: | (212) 448-3326 |
| | Email: | andy.stock@csfb.com |
| **Matthew Tuck** *Managing Director* | Phone: | (212) 325-9915 |
| | Fax: | (212) 743-1703 |
| | Email: | matt.tuck@csfb.com |
| **Nancy Unrath** *Managing Director* | Phone: | (212) 538-2411 |
| | Fax: | (212) 448-3328 |
| | Email: | nancy.unrath@csfb.com |
| **Alan Berenbaum** *Director* | Phone: | (212) 538-6538 |
| | Fax: | (212) 448-3311 |
| | Email: | alan.berenbaum@csfb.com |
| **Jed Kelly** *Director* | Phone: | (212) 538-5556 |
| | Fax: | (212) 448-3317 |
| | Email: | jed.kelly@csfb.com |





III168238



| | |
|---|---|
| **John Bown**<br>*Vice President* | Phone: (212) 538-2478<br>Fax:    (212) 538-5286<br>Email:  john.bown@csfb.com |
| **Amanda Moran**<br>*Assistant Vice President* | Phone: (212) 538-2590<br>Fax:    (212) 538-5286<br>Email:  amanda.moran@csfb.com |








15

Morgan Stanley

III168239



# Contact List





## CREDIT SUISSE FIRST BOSTON

2121 Avenue of the Stars
Suite 3000
Los Angeles, CA 90067

### Investment Banking-Los Angeles

| NAME / TITLE | PHONE / FAX / OTHER | | |
|---|---|---|---|
| **Ted Iantuono**<br>*Managing Director* | Phone:<br>Fax:<br>Email: | (310) 282-7421<br>(310) 282-6178<br>ted.iantuono@csfb.com | |
| **Michael Nutting**<br>*Senior Associate* | Phone:<br>Fax:<br>Email: | (310) 282-5073<br>(310) 284-7509<br>michael.nutting@csfb.com | |
| **Hershel Gerson**<br>*Associate* | Phone:<br>Fax:<br>Email: | (310) 282-5525<br>(310) 284-9925<br>hershel.gerson@csfb.com | |
| **Sascha Kaeser**<br>*Analyst* | Phone:<br>Fax:<br>Email: | (310) 282-5043<br>(310) 282-6178<br>sascha.kaeser@csfb.com | |
| **Joe Bubel**<br>*Analyst* | Phone:<br>Fax:<br>Email: | (310) 282-5505<br>(310) 284-9208<br>joe.bubel@csfb.com | |





III168240



# Contact List

## CREDIT SUISSE FIRST BOSTON

Eleven Madison Avenue
New York, NY 10010

### Investment Banking-New York

| NAME / TITLE | PHONE / FAX / OTHER |
|---|---|
| **Ed Yorke**<br>*Managing Director* | Phone:  (212) 538-6633<br>Fax:     (212) 743-1827<br>Email:   ed.yorke@csfb.com |









17

III168241



# Contact List



## MORGAN STANLEY

1585 Broadway
New York, NY 10036

1 International Place | 13th Floor
Boston, MA 02110



### Syndication Loans Capital Markets

| NAME / TITLE | PHONE / FAX / OTHER | |
|---|---|---|
| **Gene Martin** | Phone: | (212) 761-1540 |
| | Fax: | (212) 507-3755 |
| | Email: | gene.martin@morganstanley.com |
| **John McCann** | Phone: | (212) 761-2373 |
| | Fax: | (212) 507-2491 |
| | Email: | john.mccann@morganstanley.com |
| **Dennis Cornell** | Phone: | (212) 761-3448 |
| | Fax: | (212) 507-2477 |
| | Email: | dennis.cornell@morganstanley.com |
| **Paige Costigan** | Phone: | (212) 761-2922 |
| | Fax: | (212) 507-4548 |
| | Email: | paige.costigan@morganstanley.com |
| **Matthew Kaitz** | Phone: | (212) 761-2565 |
| | Fax: | (212) 507-9764 |
| | Email: | matthew.kaitz@morganstanley.com |
| **Su Yeo** | Email: | su.yeo@morganstanley.com |



### Bank Loans

| NAME / TITLE | PHONE / FAX / OTHER | |
|---|---|---|
| **Jason Colodne** | Phone: | (212) 761-2903 |
| | Fax: | (212) 507-3444 |
| | Email: | jason.colodne@morganstanley.com |
| **Sean Dougherty** | Phone: | (212) 761-2821 |
| | Fax: | (212) 404-9585 |
| | Email: | sean.dougherty@morganstanley.com |
| **Eric Vander Mel** | Phone: | (617) 856-8756 |
| | Fax: | (212) 507-5450 |
| | Email: | eric.vandermel@morganstanley.com |





III168242



# Contact List



## WERNER CORPORATION

93 Werner Road
Greenville, PA 16125-9499





| NAME / TITLE | PHONE / FAX / OTHER | |
|---|---|---|
| **Steve Richman** <br> *Chief Executive Officer* | Phone: <br> Email: | (724) 588-2000, x2245 <br> richmsp@wernerco.com |
| **Larry Friend** <br> *Chief Financial Officer* | Phone: <br> Fax: <br> Email: | (724) 588-2000 Ext. 2732 <br> (724) 588-0718 <br> frienlv@wernerco.com |
| **Edward Gericke** <br> *Senior Vice President, Sales* | Phone: <br> Fax: <br> Email: | (847) 455-8001 Ext. 4232 <br> (847) 455-5972 <br> gericew@wernerco.com |
| **Eric J. Werner** <br> *Vice President, Secretary & General Counsel* | Phone: <br> Fax: <br> Email: | (724) 588-2000 Ext. 2205 <br> (724) 588-0618 <br> ejwerner@wernerco.com |



III168243

# EXHIBIT 46

(Excerpts Only)

WERNER HOLDING CO. (DE), INC.

CREDIT AGREEMENT

dated as of May 10, 2005

$100,000,000

Senior Secured Credit Facility

CREDIT SUISSE FIRST BOSTON,
acting through its Cayman Islands branch,

as Administrative Agent,
as Joint Bookrunner and
as Joint Lead Arranger

and

MORGAN STANLEY SENIOR FUNDING, INC.,

as Joint Bookrunner and
as Joint Lead Arranger

## Table of Contents

SECTION 1.   DEFINITIONS ................................................................................. 1
    1.1  Defined Terms ..................................................................................... 1
    1.2  Other Definitional Provisions ........................................................... 18

SECTION 2.   TERM LOANS ............................................................................... 19
    2.1  Term Loans ........................................................................................ 19
    2.2  Repayment of Term Loans ................................................................ 19
    2.3  Use of Proceeds ................................................................................ 19

SECTION 3.   [RESERVED] ................................................................................ 19

SECTION 4.   [RESERVED] ................................................................................ 19

SECTION 5.   GENERAL PROVISIONS APPLICABLE TO TERM LOANS ... 19
    5.1  Procedure for Borrowing ................................................................... 19
    5.2  Conversion and Continuation Options .............................................. 20
    5.3  [RESERVED] ..................................................................................... 20
    5.4  Optional and Mandatory Prepayments; Repayments of Term Loans ... 20
    5.5  Interest Rates and Payment Dates .................................................... 24
    5.6  Computation of Interest ..................................................................... 25
    5.7  Certain Fees ....................................................................................... 26
    5.8  Inability to Determine Interest Rate ................................................. 26
    5.9  Pro Rata Treatment and Payments .................................................... 26
    5.10  Illegality ........................................................................................... 28
    5.11  Requirements of Law ...................................................................... 28
    5.12  Indemnity ......................................................................................... 30
    5.13  Repayment of Term Loans; Evidence of Debt ................................ 31
    5.14  Replacement of Lenders .................................................................. 31

SECTION 6.   REPRESENTATIONS AND WARRANTIES ........................... 32
    6.1  Financial Condition ........................................................................... 32
    6.2  No Change .......................................................................................... 33
    6.3  Corporate Existence; Compliance with Law ..................................... 33
    6.4  Corporate Power; Authorization ....................................................... 34
    6.5  Enforceable Obligations .................................................................... 34
    6.6  No Legal Bar ...................................................................................... 34
    6.7  No Material Litigation ....................................................................... 34
    6.8  Investment Company Act ................................................................... 35
    6.9  Federal Regulation ............................................................................ 35
    6.10  No Default ........................................................................................ 35
    6.11  Taxes ................................................................................................ 35
    6.12  Subsidiaries; Immaterial Subsidiaries ............................................ 35
    6.13  Ownership of Property; Liens ......................................................... 35
    6.14  ERISA .............................................................................................. 36
    6.15  Collateral Documents ...................................................................... 36

6.16  Copyrights, Patents, Permits, Trademarks and Licenses ................................ 37
6.17  Environmental Matters ................................................................................ 37
6.18  Accuracy and Completeness of Information ................................................ 38
6.19  Solvency ..................................................................................................... 38
6.20  Labor Matters ............................................................................................. 39

SECTION 7.     CONDITIONS PRECEDENT ......................................................... 39
7.1  Conditions to Term Loans ............................................................................ 39

SECTION 8.     AFFIRMATIVE COVENANTS ...................................................... 43
8.1  Financial Statements .................................................................................... 43
8.2  Certificates; Other Information .................................................................... 44
8.3  Payment of Obligations ............................................................................... 46
8.4  Conduct of Business and Maintenance of Existence .................................... 46
8.5  Maintenance of Property; Insurance ............................................................ 46
8.6  Inspection of Property; Books and Records; Discussions ............................. 46
8.7  Notices ........................................................................................................ 47
8.8  Environmental Laws .................................................................................... 48
8.9  Additional Collateral ................................................................................... 49
8.10  Credit Ratings ........................................................................................... 51
8.11  Taxes ......................................................................................................... 51
8.12  Post-Closing Covenants ............................................................................ 51

SECTION 9.     NEGATIVE COVENANTS ............................................................ 51
9.1  Indebtedness ................................................................................................ 51
9.2  Limitation on Liens ...................................................................................... 53
9.3  Limitation on Contingent Obligations ......................................................... 55
9.4  Prohibition of Fundamental Changes ........................................................... 56
9.5  Prohibition on Sale of Assets ....................................................................... 56
9.6  Limitation on Investments, Acquisitions, Loans and Advances .................... 57
9.7  Capital Expenditures .................................................................................... 60
9.8  Interest Rate Agreements ............................................................................. 60
9.9  Maximum Secured Leverage Ratio .............................................................. 60
9.10  [RESERVED] ............................................................................................ 61
9.11  [RESERVED] ............................................................................................ 61
9.12  Limitation on Dividends ............................................................................ 61
9.13  Transactions with Affiliates ....................................................................... 62
9.14  Prepayments and Amendments of Permanent Subordinated Debt ............... 62
9.15  Limitation on Changes in Fiscal Year ........................................................ 62
9.16  Limitation on Business .............................................................................. 62
9.17  Designated Senior Indebtedness ................................................................ 62
9.18  Receivables Facility ................................................................................... 63
9.19  Amendment of First Lien Facility Documentation ..................................... 63

SECTION 10.    EVENTS OF DEFAULT ................................................................ 63

SECTION 11.    THE ADMINISTRATIVE AGENT ................................................ 65
11.1  Appointment .............................................................................................. 65
11.2  Delegation of Duties .................................................................................. 66
11.3  Exculpatory Provisions .............................................................................. 66

11.4    Reliance by the Administrative Agent ...................................................................67
11.5    Notice of Default...............................................................................................67
11.6    Non-Reliance on Administrative Agent and Other Lenders ...............................67
11.7    Indemnification .................................................................................................68
11.8    Administrative Agent in its Individual Capacity ..............................................68
11.9    Successor Administrative Agent ........................................................................68

SECTION 12.    MISCELLANEOUS......................................................................................69
12.1    Amendments and Waivers ................................................................................69
12.2    Notices ..............................................................................................................70
12.3    No Waiver; Cumulative Remedies.....................................................................71
12.4    Survival of Representations and Warranties ......................................................71
12.5    Payment of Expenses and Taxes .......................................................................71
12.6    Successors and Assigns; Participations and Assignments ..................................73
12.7    Set-off...............................................................................................................76
12.8    Payments Pro Rata ...........................................................................................76
12.9    Counterparts .....................................................................................................77
12.10   Governing Law; No Third Party Rights..............................................................77
12.11   Submission to Jurisdiction; Waivers..................................................................77
12.12   Releases ............................................................................................................78
12.13   Interest..............................................................................................................78
12.14   Special Indemnification ....................................................................................79
12.15   Permitted Payments and Transactions ...............................................................79
12.16   Patriot Act ........................................................................................................79
12.17   Acknowledgments .............................................................................................80
12.18   Intercreditor Agreement ...................................................................................80

## SCHEDULES

Schedule I              List of Addresses for Notices; Lending Offices;
                        Commitment Amounts
Schedule 6.7            Litigation
Schedule 6.12           Subsidiaries
Schedule 6.13           Fee and Leased Properties
Schedule 6.15(b)        UCC Filing Offices
Schedule 6.16           Patents, Trademarks and Copyrights
Schedule 6.17           Environmental
Schedule 8.12           Post-Closing Covenants
Schedule 9.1(a)         Existing Indebtedness
Schedule 9.2(h)         Existing Liens
Schedule 9.3(d)         Existing Contingent Obligations

## EXHIBITS

EXHIBIT A               Form of Term Loan Note
EXHIBIT B               [RESERVED]
EXHIBIT C               [RESERVED]
EXHIBIT D               [RESERVED]
EXHIBIT E               Form of Assignment and Acceptance
EXHIBIT F               Form of Collateral Agreement
EXHIBIT G-1             Form of Holdings Guarantee
EXHIBIT G-2             Form of Subsidiary Guarantee
EXHIBIT H               Form of Holdings Pledge Agreement
EXHIBIT I               Form of Subsection 5.11(d)(2) Certificate
EXHIBIT J-1             Form of Opinion of Gibson, Dunn & Crutcher LLP
EXHIBIT J-2             Form of Opinion of General Counsel to the Company
EXHIBIT K-1             Form of Holdings Closing Certificate
EXHIBIT K-2             Form of Company Closing Certificate
EXHIBIT K-3             Form of Subsidiaries Closing Certificate
EXHIBIT L               Form of Mortgage
EXHIBIT M               Form of Intercreditor Agreement

CREDIT AGREEMENT, dated as of May 10, 2005, among WERNER HOLDING CO. (DE), INC., a Delaware corporation (the "Company"), the several lenders from time to time parties hereto (the "Lenders"), CREDIT SUISSE FIRST BOSTON, acting through its Cayman Islands branch, as Joint Bookrunner and Joint Lead Arranger, MORGAN STANLEY SENIOR FUNDING, INC., as Joint Bookrunner and Joint Lead Arranger (Credit Suisse First Boston, acting through its Cayman Islands branch, and Morgan Stanley Senior Funding, Inc., collectively in such capacities, the "Arrangers"), and CREDIT SUISSE FIRST BOSTON, acting through its Cayman Islands branch, as administrative agent for the Lenders (in such capacity, the "Administrative Agent").

## W I T N E S S E T H :

WHEREAS, the Company desires that the Lenders extend certain loans to the Company under a senior secured credit facility the proceeds of which will be used by the Company (i) to repay loans outstanding under its existing senior secured revolving credit facility in an aggregate principal amount of approximately $26,700,000, (ii) to repay loans outstanding under its existing senior secured term loan facility in an aggregate principal amount of approximately $65,000,000, (iii) to pay fees and expenses incurred in connection with the foregoing in an aggregate amount of approximately $5,500,000 and (iv) for general corporate purposes, all subject to the terms and conditions contained herein; and

WHEREAS, the Lenders are willing to make such loans available to the Company upon the terms and conditions contained herein;

NOW, THEREFORE, the Company, the Administrative Agent, the Arrangers and the Lenders agree as follows:

SECTION 1.    DEFINITIONS

1.1    Defined Terms.  As used in this Agreement, the terms defined in the caption hereto shall have the meanings set forth therein, and the following terms have the following meanings:

"Accepting Lenders": as defined in subsection 5.4(c)(vii).

"Accreted Amount":  as defined in subsection 5.5(a).

"Acquired Capital Expenditures": as defined in subsection 9.7.

"Acquired Person": as defined in subsection 9.7.

"Additional Mortgage": as defined in subsection 8.9(f).

"Adjusted Working Capital":  at any time shall mean an amount equal to the Consolidated Current Assets at such time minus Consolidated Current Liabilities at such time.

"Adjustment Date":  as defined in the definition of Applicable Margin.

"Administrative Agent":  as defined in the preamble hereto.

"Administrative Questionnaire": an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affected Eurodollar Loans":  as defined in subsection 5.4(c).

1

Administrative Agent meeting the qualifications set forth above, provided that if the Administrative Agent shall notify the Company and the Lenders that no qualifying Person has accepted such appointment, or the Company shall have withheld its consent to the appointment of a successor Administrative Agent, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Credit Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed and such collateral security is assigned to such successor Administrative Agent) and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint (or the Administrative Agent, on behalf of the Lenders appoints) a successor Administrative Agent as provided for above in this paragraph (provided that the retiring Administrative Agent may elect to receive and distribute payments as paying agent for the Lenders (in such capacity, the "Paying Agent") until such time as a successor Administrative Agent is so appointed). Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents (if not already discharged therefrom as provided above in this paragraph). The fees payable by the Company to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Company and such successor. After the retiring Administrative Agent's resignation hereunder and under the other Credit Documents, the provisions of Section 11 and subsection 12.5 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent or as Paying Agent.

## SECTION 12.  MISCELLANEOUS

12.1  <u>Amendments and Waivers</u>. Except as otherwise expressly set forth in this Agreement, no Credit Document nor any terms thereof may be amended, supplemented, waived or modified except in accordance with the provisions of this subsection 12.1. With the written consent of the Required Lenders, the Administrative Agent and the respective Credit Parties or their Subsidiaries may, from time to time, enter into written amendments, supplements or modifications hereto for the purpose of adding any provisions to any Credit Document to which they are parties or changing in any manner the rights of the Lenders or of any such Credit Party or its Subsidiaries thereunder or waiving, on such terms and conditions as the Administrative Agent may specify in such instrument, any of the requirements of any such Credit Document or any Default or Event of Default and its consequences; <u>provided</u> that:

(a)   (i) no such waiver and no such amendment, supplement or modification shall (x) release all or substantially all of the Collateral without the written consent of all Lenders or (y) release all or substantially all of the Guarantors without the written consent of all Lenders and (ii) notwithstanding any of the foregoing, neither the preceding clause (i) nor the immediately preceding paragraph of this subsection 12.1 shall be applicable to and no consent shall be required for (i) releases of collateral in connection with any Asset Sales permitted by subsection 9.5, (ii) releases of collateral in accordance with subsection 12.12 or (iii) upon the reincorporation of the Company or any Subsidiary in a new jurisdiction or the creation of a new Subsidiary of the Company, any release of collateral in connection with the transfer of such

released collateral to such reincorporated entity or new Subsidiary in compliance with subsection 9.4; provided that the Administrative Agent, in its sole discretion, determines that such release and transfer, together with any grant and perfection of a new Lien therein in favor of the Administrative Agent, will cause no material impairment of the value of the collateral taken as a whole, after giving effect to such release and transfer;

(b)    no such waiver and no such amendment, supplement or modification shall (x) without the prior written consent of each Lender whose obligations hereunder are being directly modified, waive or extend the Maturity Date or Early Maturity Date, as applicable, of any Term Loan or Term Loan Note, or reduce the rate or extend the time of payment of interest thereon, or change the method of calculating interest thereon, or reduce or extend the time of payment of any fee payable to such Lender hereunder, or reduce the principal amount thereof, or extend the expiry of any Lender's Term Loan Commitment or change the amount of any Lender's Term Loan Commitment or Term Loan Commitment Percentage, or (y) without the prior written consent of each Lender, amend, modify or waive any provision of subsections 5.4(e) or 5.9(b), or this subsection 12.1 or reduce the percentage specified in the definition of Required Lenders or consent to the assignment or transfer by the Company of any of its rights and obligations under any Credit Document; and

(c)    no such waiver and no such amendment, supplement or modification affecting the Administrative Agent shall amend, modify or waive any provision of Section 11 without the written consent of the Administrative Agent;

any such waiver and any such amendment, supplement or modification described in this subsection 12.1 shall apply equally to each of the Lenders and shall be binding upon each Credit Party and its Subsidiaries, the Lenders, the Administrative Agent and all future holders of the Term Loan Notes and the Term Loans.  In the case of any waiver, the Credit Parties, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the outstanding Term Loan Notes, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

12.2    Notices.  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy or telex, if one is listed) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when sent, confirmation of receipt received, or, in the case of telex notice, when sent, answerback received, addressed as follows in the case of the Company and the Administrative Agent, and as set forth in Schedule I in the case of any Lender, or to such other address as may be hereafter notified by the respective parties hereto and any future holders of the Term Loan Notes:

The Company:
Werner Holding Co. (DE), Inc.
c/o Werner Holding Co. (PA), Inc.
93 Werner Road
Greenville, Pennsylvania 16125
Attention:  Eric J. Werner, Esq.
Telecopy: (724) 588-0618

With a copy to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
Attention: Janet Vance, Esq.
Telecopy: (212) 351-5288

The Administrative Agent:
Credit Suisse First Boston
Eleven Madison Avenue
New York, New York 10010
Attention: Agency Group
Telecopy: (212) 325-8304

provided that any notice, request or demand to or upon the Administrative Agent pursuant to subsections 5.1, 5.2 and 5.4 shall not be effective until received; and provided further, that the failure to provide the copies of notices to the Company provided for in this subsection 12.2 shall not result in any liability to the Administrative Agent.

Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Section 5 unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or the Company may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. Unless the Administrative Agent otherwise prescribes, (a) notices and other communications sent to an email address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (b) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its email address as described in the foregoing clause (a) of notification that such notice or communication is available and identifying the website address therefor.

12.3    No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

12.4    Survival of Representations and Warranties.  All representations and warranties made hereunder and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the Term Loan Notes.

12.5    Payment of Expenses and Taxes.  The Company agrees (a) to pay or reimburse the Administrative Agent and the Arrangers for all their reasonable out-of-pocket costs and expenses incurred in connection with the development, negotiation, preparation and execution of the Credit Documents and any other documents prepared in connection herewith, and the consummation of the

-71-

transactions contemplated hereby and thereby, including, without limitation, the reasonable fees and disbursements of one counsel (in addition to any local or special counsel reasonably requested) to the Administrative Agent and the Arrangers, (b) to pay or reimburse all of the reasonable expenses, including, without limitation, reasonable fees and expenses of counsel, incurred by the Administrative Agent in connection with the administration of the facilities provided for herein or in connection with any amendments, waivers, work-outs or restructurings in respect thereof, (c) to pay or reimburse the Administrative Agent and the Arrangers and each Lender for all their costs and expenses incurred in connection with, and to pay, indemnify, and hold the Administrative Agent and each Lender harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever arising out of or in connection with, the enforcement or preservation of any rights under any Credit Document and any such other documents or any foreclosure, collection or bankruptcy proceedings in respect thereof, including, without limitation, reasonable fees and disbursements of counsel to the Administrative Agent, the Arrangers, and each Lender incurred in connection with the foregoing and in connection with advising the Administrative Agent with respect to its rights and responsibilities under this Agreement and the documentation relating thereto, (d) to pay, indemnify, and to hold the Administrative Agent, the Arrangers and each Lender harmless from any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other similar taxes (other than withholding taxes), if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, any Credit Document and any such other documents, and (e) to pay, indemnify, and hold the Administrative Agent, the Arrangers and each Lender and their respective Affiliates, officers, employees, directors and trustees harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including, without limitation, reasonable fees and disbursements of counsel) which may be incurred by or asserted against the Administrative Agent, the Arrangers or the Lenders or such Affiliates, officers, directors or trustees arising out of or in connection with any investigation, litigation or proceeding related to this Agreement, the other Credit Documents, the proceeds of the Term Loans and the transactions contemplated by or in respect of such use of proceeds, or any of the other transactions contemplated hereby, whether or not the Administrative Agent, the Arrangers or any of the Lenders or such Affiliates, officers, directors or trustees is a party thereto, including, without limitation, any of the foregoing relating to the violation of, noncompliance with or liability under, any Environmental Law applicable to the Company, any of its Subsidiaries or any of the facilities and properties owned, leased or operated by the Company or any of its Subsidiaries (all the foregoing, collectively, the "indemnified liabilities"); provided that the Company shall have no obligation hereunder with respect to indemnified liabilities of the Administrative Agent, the Arrangers or any Lender or any of their respective Affiliates, officers, directors and trustees arising from (i) the gross negligence or willful misconduct of the person seeking indemnification, (ii) legal proceedings commenced against the Administrative Agent, the Arrangers or any Lender by any security holder or creditor thereof arising out of and based upon rights afforded any such security holder or creditor solely in its capacity as such or (iii) legal proceedings commenced against any Lender by any Transferee thereof relating to the sale of an assignment or participation interest, excluding any such proceedings relating to or arising out of the primary syndication by the Arrangers or their affiliates. Without limiting the foregoing, and to the extent permitted by applicable law, the Company agrees not to assert, and hereby waives (and shall cause the Subsidiaries not to assert and to waive) all rights for contribution or any other rights of recovery with respect to all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, under or related to Environmental Laws, that any of them might have by statute or otherwise against the Administrative Agent, the Arrangers or any Lender. The agreements in this subsection 12.5 shall survive repayment of the Term Loans and all other amounts payable hereunder.

12.6  <u>Successors and Assigns; Participations and Assignments</u>. (a)  This Agreement shall be binding upon and inure to the benefit of the Company, the Lenders, the Administrative Agent, the Arrangers, all future holders of the Term Loan Notes and the Term Loans, and their respective successors and assigns, except that the Company may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of each Lender.

(b)  (i)  Any Lender may, without the consent of the Company and the Administrative Agent, sell participations to one or more banks or other entities (a "<u>Participant</u>") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Term Loan Commitments and the Term Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Company, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Credit Documents. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; <u>provided</u> that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in subsection 12.1(a) or subsection 12.1(b) (other than with respect to assignments or transfers by the Company of any of its rights and obligations under any Credit Document) that affects such Participant. The Company agrees that, subject to subsection 12.6(b)(ii), each Participant shall be entitled to the benefits of Sections 5.11 and 5.12 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (c) of this subsection. To the extent permitted by law, and subject to subsection 12.6(b)(ii), each Participant also shall be entitled to the benefits of Section 12.7 as though it were a Lender, provided such Participant agrees to be subject to subsection 12.8(b) as though it were a Lender. Participations may be non-pro rata.

(ii)  A Participant shall not be entitled to receive any greater payment under subsection 5.11, 5.12 or 12.7 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant.

(c)  (i)  Subject to the conditions set forth in clause (ii) of this subsection 12.6(c) and compliance with subsection 12.6(g), any Lender may assign to one or more banks, mutual funds or financial institutions or entities (each, an "<u>Assignee</u>") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Term Loan Commitment and the Term Loans at the time owing to it) with notice to the Company and with the prior written consent (such consent not to be unreasonably withheld or delayed) of the Administrative Agent; <u>provided</u> that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Term Loan to a Lender, an Affiliate of a Lender or an Approved Fund.

(ii)    assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's Term Loan Commitment or Term Loans, the amount of the Term Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 (<u>provided</u> that simultaneous assignments to or by two or more Approved Funds shall be aggregated for purposes of determining such amount), unless each of the

Company and the Administrative Agent otherwise consent; provided that no such consent of the Company shall be required if an Event of Default under clause (a) or (f) of Section 10 has occurred and is continuing;

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement; provided that this clause shall not be construed to prohibit the assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of one Type of Term Loans; and

(C)    the parties to each assignment shall (1) electronically execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent (which initially shall be ClearPar, LLC) or (2) manually execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee of $3,500, payable by the assigning or assignee Lender as they shall mutually agree; and

(D)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

For the purposes of this subsection 12.6(c), the term "Approved Fund" has the following meaning: "Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (d) below, from and after the effective date specified in each Assignment and Acceptance the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 5.11, 5.12 and 12.5). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 12.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection 12.6(b).

(d)    The Administrative Agent, acting for this purpose as an agent of the Company, shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Term Loan Commitment of, and principal amount of the Term Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, in the absence of manifest error, and the Company, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this

-74-

Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Company and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)  Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Assignee, the information referred to in subclause (c)(ii)(D) above (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in subsection 12.6(c) and any written consent to such assignment required by subsection 12.6(c) (in each case to the extent required), the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph. On or prior to the effective date of such acceptance, the Company at its own expense, shall execute and deliver to the Administrative Agent (in exchange for any or all of the Term Loan Notes of the assigning Lender, if any) new Term Loan Notes to the order of such Assignee (if requested) in an amount equal to the Term Loans assumed by it pursuant to such Assignment and Acceptance and, if the assigning Lender has retained any Term Loans hereunder, new Term Loan Notes to the order of the assigning Lender in an amount equal to such Term Loans, retained by it hereunder (if requested). Such new Term Loan Notes shall be dated the Closing Date and shall otherwise be in the form of the Term Loan Notes replaced thereby.

(f)  (i)  The Administrative Agent, the Arrangers and the Lenders agree that they will use reasonable efforts to protect the confidentiality of any confidential information concerning the Company and its Subsidiaries and Affiliates. Notwithstanding the foregoing, the Company authorizes each Lender to disclose to any Participant or Assignee (each, a "Transferee") and any prospective Transferee or to any Person who evaluates, approves, structures or administers the Term Loans on behalf of a Lender and who is subject to this confidentiality provision any and all information in such Lender's possession concerning Holdings, the Company and its Subsidiaries which has been delivered to such Lender by or on behalf of the Company pursuant to this Agreement or which has been delivered to such Lender by or on behalf of the Company in connection with such Lender's credit evaluation of Holdings, the Company and its Subsidiaries prior to becoming a party to this Agreement; provided that each Lender shall cause its respective prospective Transferees and any Person who evaluates, approves, structures or administers the Term Loans on such Lender's behalf to agree to protect the confidentiality of any confidential information concerning Holdings, the Company and its Subsidiaries and Affiliates.

(ii)  Notwithstanding anything herein to the contrary, any party hereto (and each employee, representative or other agent of such party) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment or tax structure; provided, however, that this clause shall not permit any party hereto (or any employee, representative or other agent thereof) to disclose (i) any information, the disclosure of which would otherwise be prohibited by this Agreement, that is not relevant to an understanding of the tax treatment or tax structure of the transactions contemplated by this Agreement (including the identity of any party hereto (or its employees, representatives or other agents) or any information that could lead another to determine such identity) or (ii) any other information to the extent that such disclosure could result in a violation of any federal or state securities law.

(g)  If, pursuant to this subsection 12.6, any interest in this Agreement or any Term Loan Note is transferred to any Transferee which is organized under the laws of any jurisdiction other than the United States or any State thereof, the transferor Lender shall cause such Transferee, concurrently with the effectiveness of such transfer to comply with subsection 5.11(d).

(h) For avoidance of doubt, the parties to this Agreement acknowledge that the provisions of this subsection concerning assignments of Term Loans and Term Loan Notes relate only to absolute assignments and that such provisions do not prohibit assignments creating security interests, including, without limitation, (x) any pledge or assignment by a Lender of any Term Loan or Term Loan Note to any Federal Reserve Bank in accordance with applicable law and (y) in the case of a Lender that is a fund, with the consent of the Administrative Agent, any pledge or assignment by such Lender of all or any portion of its Term Loans and Term Loan Notes to its trustee in support of its obligations to its trustee; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledge or assignee for such Lender as a party hereto.

(i) Each Lender, upon execution and delivery hereof or upon succeeding to an interest in the Term Loan Commitments or Term Loans, as the case may be, represents and warrants as of the Closing Date or as of the effective date of the applicable Assignment and Acceptance that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the Term Loans; and (iii) it will make or invest in its Term Loans for its own account in the ordinary course of its business and without a view to distribution of such Term Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this subsection 12.6, the disposition of such Term Loan Commitments or Term Loans or any interests therein shall at all times remain within its exclusive control).

12.7  Set-off.  Subject to the terms of the Intercreditor Agreement, in addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Company, any such notice being expressly waived by the Company to the extent permitted by applicable law, upon the occurrence and during the continuation of any Event of Default or upon the filing of a petition under any of the provisions of the federal bankruptcy code or amendments thereto, by or against; the making of an assignment for the benefit of creditors by; the application for the appointment, or the appointment, of any receiver of, or of any substantial portion of the property of; the issuance of any execution against any substantial portion of the property of; the issuance of a subpoena or order, in supplementary proceedings, against or with respect to any substantial portion of the property of; or the issuance of a warrant of attachment against any substantial portion of the property of; the Company to set off and apply against any indebtedness, whether matured or unmatured, of the Company to such Lender, any amount owing from such Lender to the Company, at or at any time after, the happening of any of the above mentioned events, and as security for such indebtedness, the Company hereby grants to each Lender a continuing security interest in any and all deposits, accounts or moneys of the Company, then or thereafter maintained with such Lender, subject in each case to subsection 12.8 of this Agreement.  The aforesaid right of set-off may be exercised by such Lender against the Company or against any trustee in bankruptcy, debtor in possession, assignee for the benefit of creditors, receiver or execution, judgment or attachment creditor of the Company, or against anyone else claiming through or against the Company or such trustee in bankruptcy, debtor in possession, assignee for the benefit of creditors, receiver, or execution, judgment or attachment creditor, notwithstanding the fact that such right of set-off shall not have been exercised by such Lender prior to the making, filing or issuance, or service upon such Lender of, or of notice of, any such petition; assignment for the benefit of creditors; appointment or application for the appointment of a receiver; or issuance of execution, subpoena, order or warrant.  Each Lender agrees promptly to notify the Company, and the Administrative Agent after any such set-off and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such set-off and application.

12.8  Payments Pro Rata.  (a) Except as otherwise provided in this Agreement, the Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of the Company in respect of any obligations hereunder, it shall distribute such payment to the Lenders pro rata

based upon their respective shares, if any, of the obligations with respect to which such payment was received.

(b)  Each of the Lenders agrees that, if it should receive any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Credit Documents, or otherwise), which is applicable to the payment of the principal of, or interest on, the Term Loans of a sum which with respect to the related sum or sums received by other Lenders is in a greater proportion than the total of such obligation then owed and due to such Lender bears to the total of such obligation then owed and due to all of the Lenders immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other Lenders an interest in the respective obligations of the respective Credit Party to such Lenders in such amount as shall result in a proportional participation by all the Lenders in such amount; provided that if all or any portion of such excess amount is thereafter recovered from such Lender, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

12.9  Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Agreement signed by all the parties shall be lodged with the Company and the Administrative Agent. This Agreement shall become effective with respect to the Company, the Administrative Agent, the Arrangers and the Lenders when the Administrative Agent shall have received copies of this Agreement executed by the Company, the Administrative Agent, the Arrangers and the Lenders, or, in the case of any Lender, shall have received telephonic confirmation from such Lender stating that such Lender has executed counterparts of this Agreement or the signature pages hereto and sent the same to the Administrative Agent.

12.10  Governing Law; No Third Party Rights.  This Agreement and the Term Loan Notes and the rights and obligations of the parties under this Agreement and the Term Loan Notes shall be governed by, and construed and interpreted in accordance with, the law of the State of New York. This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and, except as set forth in subsection 12.6, no other Persons shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.

12.11  Submission to Jurisdiction; Waivers.  (a) Each party to this Agreement hereby irrevocably and unconditionally:

(i)  submits for itself and its property in any legal action or proceeding relating to this Agreement or any of the other Credit Documents, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof;

(ii)  consents that any such action or proceeding may be brought in such courts, and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(iii)  agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address set forth in subsection

-77-

12.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(iv)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(v)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, indirect, exemplary, consequential or punitive damages.

(b)  Each party hereto unconditionally waives trial by jury in any legal action or proceeding referred to in paragraph (a) above and any counterclaim therein.

12.12    Releases.  The Administrative Agent and Lenders agree to cooperate with the Company and its Subsidiaries with respect to any sale or other disposition permitted by subsection 9.5 and promptly take such action and execute and deliver such instruments and documents necessary to release the liens and security interests created by the Security Documents relating to any of the assets or property affected by any such sale permitted by subsection 9.5, including, without limitation, any Uniform Commercial Code amendment, release or termination or partial release or termination statements, provided that such liens and security interests in Receivables Facility Assets shall only be required to be released to the extent required by the relevant Receivables Facility.  The Administrative Agent is hereby further authorized to execute acknowledgments with respect to the Receivables Facility as may be reasonably requested by the Company.

12.13    Interest.  Each provision in this Agreement and each other Credit Document is expressly limited so that in no event whatsoever shall the amount paid, or otherwise agreed to be paid, by the Company for the use, forbearance or detention of the money to be loaned under this Agreement or any other Credit Document or otherwise (including any sums paid as required by any covenant or obligation contained herein or in any other Credit Document which is for the use, forbearance or detention of such money), exceed that amount of money which would cause the effective rate of interest to exceed the highest lawful rate permitted by applicable law (the "Highest Lawful Rate"), and all amounts owed under this Agreement and each other Credit Document shall be held to be subject to reduction to the effect that such amounts so paid or agreed to be paid which are for the use, forbearance or detention of money under this Agreement or such other Credit Document shall in no event exceed that amount of money which would cause the effective rate of interest to exceed the Highest Lawful Rate. Notwithstanding any provision in this Agreement or any other Credit Document to the contrary, if the maturity of the Term Loans or the obligations in respect of the other Credit Documents are accelerated for any reason, or in the event of any prepayment of all or any portion of the Term Loans or the obligations in respect of the other Credit Documents by the Company or in any other event, earned interest on the Term Loans and such other obligations of the Company may never exceed the Highest Lawful Rate, and any unearned interest otherwise payable on the Term Loans or the obligations in respect of the other Credit Documents that is in excess of the Highest Lawful Rate shall be cancelled automatically as of the date of such acceleration or prepayment or other such event and (if theretofore paid) shall, at the option of the holder of the Term Loans or such other obligations, be either refunded to the Company or credited on the principal of the Term Loans.  In determining whether or not the interest paid or payable, under any specific contingency, exceeds the Highest Lawful Rate, the Company and the Lenders shall, to the maximum extent permitted by applicable law, amortize, prorate, allocate and spread, in equal parts during the period of the actual term of this Agreement, all interest at any time contracted for, charged, received or reserved in connection with this Agreement.

12.14  Special Indemnification.  Notwithstanding any provision in this Agreement to the contrary, (A) each Lender, or Transferee of any Lender pursuant to subsection 12.6(g) of this Agreement, shall indemnify the Company and the Administrative Agent, and hold each of them harmless against any and all payments, expenses or taxes which the Company or the Administrative Agent may become subject to or obligated to pay if and to the extent that, (i) on the Closing Date or the effective date of transfer, as the case may be, such Lender, or such Transferee of a Lender pursuant to subsection 12.6(g) of this Agreement, (a) makes the representation and covenants set forth in subsection 5.11(d)(2) of this Agreement or, in the case of a Transferee, pursuant to subsection 12.6(g) of this Agreement and the Assignment and Acceptance, and (b) is not in fact also qualified to make the representation and covenants set forth in subsection 5.11(d)(1) of this Agreement or, in the case of a Transferee, pursuant to subsection 12.6(g) of this Agreement and the Assignment and Acceptance, and (ii) as a result of any Change in Law or compliance by such Lender, or Transferee, with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority the Company or the Administrative Agent is required to make any additional payments on account of U.S. withholding taxes and amounts related thereto with respect to any payments under this Agreement, any Term Loan Note, or a Eurodollar Loan, made prior to such Change in Law or request or directive, none of which payments would have been required if such Lender, or Transferee, was qualified on the Closing Date or the date of the transfer, as the case may be, to make the representation and covenants set forth in subsection 5.11(d)(1) of this Agreement or pursuant to subsection 12.6(g) of this Agreement and the Assignment and Acceptance, as the case may be, and (B) each Lender, or Transferee, agrees that to the extent any amount payable by such Lender or Transferee pursuant to this subsection 12.14 remains unpaid on any Interest Payment Date or the date on which any prepayment is made, the Company shall have the right to set-off against any payment due to such Lender or Transferee on such date any amounts owing to the Company pursuant to this subsection 12.14.

12.15  Permitted Payments and Transactions.  Notwithstanding any provision to the contrary contained in this Agreement, the Company and its Subsidiaries shall be permitted to make payments (including fees and expenses) pursuant to or in respect of, the following agreements, and, in the case of clauses (a) and (d) below, to engage in the following transactions:  (a) (i) the Financing Advisory Agreement, dated as of October 8, 1997 between Investcorp International Inc. and the Company, (ii) the Amended and Restated Agreement For Management Advisory, Strategic Planning and Consulting Services, dated as of June 11, 2003 among Investcorp International Inc. and the Company; (iii) the Stand-By Commitment Letter, dated as of November 19, 1997, between Invifin, S.A. and the Company and (iv) the Management Services Agreement, dated as of June 11, 2003, between the Company and Leonard Green Partners, L.P.; provided that on and after the Closing Date, the Company shall not pay (but shall accrue) any management fees under this clause (a) if, on the date such fees are due and payable the sum of (x) the domestic cash and Cash Equivalent balances without encumbrances (other than Liens permitted pursuant to subsection 9.2(f) or subsection 9.2(m)) of the Company and the Subsidiary Guarantors on such date, plus (y) availability under all Receivables Facilities, plus (z) unutilized revolving loan commitments under the First Lien Facility, is less than $35,000,000; (b) agreements with any Person or Persons providing for the payment of customary fees in connection with serving as a director of the Company or any Subsidiary of the Company; (c) agreements providing for the payment of commercially reasonable fees in connection with any permitted financing, refinancing, sale, transfer, sale and leaseback or other permitted disposition of any assets of the Company or its Subsidiaries; (d) the borrowing of any Indebtedness to the extent, and upon the terms and conditions, the same is expressly permitted under subsection 9.1; and (e) agreements providing for commercially reasonable fees in connection with any permitted purchase or acquisition of stock or assets by the Company or any of its Subsidiaries.

12.16  Patriot Act.  Each Lender and the Administrative Agent (for itself and not on behalf of any other party) hereby notifies Holdings and the Company that, pursuant to the requirements

of the Patriot Act, it is required to obtain, verify and record information that identifies Holdings and the Company, which information includes the names and addresses and other information that will allow such Lender or Administrative Agent, as applicable, to identify Holdings and the Company in accordance with the Patriot Act. The Company will, and will cause each of its Subsidiaries to, provide, to the extent commercially reasonable or required by any Requirement of Law, such information and take such actions as are reasonably requested by the Administrative Agent or any Lender to assist the Administrative Agent and the Lenders in maintaining compliance with the Patriot Act and any other applicable "know your customer" and anti-money laundering rules and regulations.

12.17    Acknowledgments.  The Company hereby acknowledges that:

(a)  it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Credit Documents;

(b)  neither the Administrative Agent, any Arranger nor any Lender has any fiduciary relationship with or duty to Holdings, the Company or any other Credit Party arising out of or in connection with this Agreement or any of the other Credit Documents, and the relationship between the Administrative Agent, the Arrangers and the Lenders, on one hand, and Holdings, the Company and the other Credit Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)  no joint venture is created hereby or by the other Credit Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among Holdings, the Company or any other Credit Party and the Lenders.

12.18    Intercreditor Agreement.  (a)  REFERENCE IS MADE TO THE INTERCREDITOR AGREEMENT DATED AS OF MAY 10, 2005 (AS AMENDED, RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED OR REPLACED FROM TIME TO TIME IN ACCORDANCE WITH THE TERMS THEREOF, THE "INTERCREDITOR AGREEMENT"), AMONG THE COMPANY, WERNER HOLDING CO. (PA), INC., THE SUBSIDIARIES OF THE COMPANY PARTY THERETO, JPMORGAN CHASE BANK, N.A., AS FIRST LIEN ADMINISTRATIVE AGENT (AS DEFINED THEREIN), AND CREDIT SUISSE FIRST BOSTON, ACTING THROUGH ITS CAYMAN ISLANDS BRANCH, AS SECOND LIEN ADMINISTRATIVE AGENT (AS DEFINED THEREIN). EACH LENDER HEREUNDER (A) ACKNOWLEDGES THAT IT HAS RECEIVED A COPY OF THE INTERCREDITOR AGREEMENT, (B) CONSENTS TO THE SUBORDINATION OF LIENS PROVIDED FOR IN THE INTERCREDITOR AGREEMENT, (C) AGREES THAT IT WILL BE BOUND BY AND WILL TAKE NO ACTIONS CONTRARY TO THE PROVISIONS OF THE INTERCREDITOR AGREEMENT AND (D) AUTHORIZES AND INSTRUCTS THE ADMINISTRATIVE AGENT TO ENTER INTO THE INTERCREDITOR AGREEMENT AS ADMINISTRATIVE AGENT AND ON BEHALF OF SUCH LENDER.

(b)  The Administrative Agent is hereby authorized by the Lenders, without any subsequent consent or approval, to enter into amendments, supplements or other modifications to, or replacements of, the Intercreditor Agreement in connection with a refinancing or replacement of the First Lien Credit Agreement as required under the Intercreditor Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered in New York, New York by their proper and duly authorized officers as of the day and year first above written.

WERNER HOLDING CO. (DE), INC.

By: _____
Name:   Larry V. Friend
Title:   VP, CFO & Treasurer

CREDIT SUISSE FIRST BOSTON,
acting through its Cayman Islands branch, as
Administrative Agent, as an Arranger and as a Lender

By: _____
Name:
Title:        ROBERT HETU
              DIRECTOR


By: _____
Name:
Title:        VANESSA GOMEZ
              VICE PRESIDENT

MORGAN STANLEY SENIOR FUNDING, INC.,
as an Arranger and as a Lender

By: _____
Name: Dan Allen
Title: Managing Director

<u>Schedule I</u>

<u>List of Addresses for Notices;</u>
<u>Lending Offices; Commitment Amounts</u>

| <u>Lender Name; Commitment Amount</u>: | <u>Lending Office/Address for Notices</u>: |
|---|---|
| Credit Suisse First Boston, acting through its Cayman Islands Branch | Credit Suisse First Boston<br>Eleven Madison Avenue<br>New York, New York 10010<br>Attention:  Agency Group<br>Telecopy:  (212) 325-8304 |
| $97,000,000.00 | |
| Morgan Stanley Senior Funding, Inc. | Morgan Stanley Senior Funding, Inc.<br>1585 Broadway<br>New York, New York 10036<br>Attention:  Sean P. Dougherty<br>Telecopy:  (212) 404-9585 |
| $3,000,000.00 | |

# EXHIBIT 47

(Excerpts Only)

INTERCREDITOR AGREEMENT

dated as of

May 10, 2005,

among

WERNER HOLDING CO. (DE), INC.,

WERNER HOLDING CO. (PA), INC.

the Subsidiaries of WERNER HOLDING CO. (DE), INC. party hereto,

JPMORGAN CHASE BANK, N.A.,

as First Lien Administrative Agent

and

CREDIT SUISSE FIRST BOSTON,
acting through its Cayman Islands branch,

as Second Lien Administrative Agent

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ...................................................... 2

SECTION 1.01. *Certain Defined Terms* .......................................... 2
SECTION 1.02. *Other Defined Terms* ........................................... 2
SECTION 1.03. *Terms Generally* ............................................... 9

ARTICLE II LIEN PRIORITIES ................................................ 9

SECTION 2.01. *Relative Priorities* ............................................. 9
SECTION 2.02. *Prohibition on Contesting Liens* ................................ 10
SECTION 2.03. *No New Liens* ................................................ 10
SECTION 2.04. *Similar Liens and Agreements* ................................. 10

ARTICLE III ENFORCEMENT OF RIGHTS; MATTERS RELATING TO COLLATERAL .. 11

SECTION 3.01. *Exercise of Rights and Remedies* ............................... 11
SECTION 3.02. *No Interference* .............................................. 12
SECTION 3.03. *Rights as Unsecured Creditors* ................................ 13
SECTION 3.04. *Releases* .................................................... 13
SECTION 3.05. *Insurance and Condemnation Awards* .......................... 14

ARTICLE IV PAYMENTS ..................................................... 15

SECTION 4.01. *Application of Proceeds* ....................................... 15
SECTION 4.02. *Payment Over* ............................................... 15

ARTICLE V BAILMENT AND SUB-AGENCY FOR PERFECTION OF CERTAIN SECURITY
INTERESTS ............................................................... 15

ARTICLE VI INSOLVENCY OR LIQUIDATION PROCEEDINGS .................... 16

SECTION 6.01. *General Applicability and Finance Matters* ...................... 16
SECTION 6.02. *Relief from the Automatic Stay* ................................ 18
SECTION 6.03. *Reorganization Securities* ..................................... 18
SECTION 6.04. *Post-Petition Interest* ........................................ 18
SECTION 6.05. *Separate Classes* ............................................. 19
SECTION 6.06. *Asset Sales* .................................................. 19

ARTICLE VII OTHER AGREEMENTS ......................................... 19

SECTION 7.01. *Matters Relating to Loan Documents* ........................... 19
SECTION 7.02. *Effect of Refinancing of Indebtedness under First Lien Credit
Documents* ............................................................ 20
SECTION 7.03. *No Waiver by First Lien Secured Parties* ....................... 21
SECTION 7.04. *Reinstatement* ............................................... 21
SECTION 7.05. *Purchase Right* .............................................. 21
SECTION 7.06. *Delivery of Information* ....................................... 23

ARTICLE VIII REPRESENTATIONS AND WARRANTIES .................................................. 23

SECTION 8.01. *Representations and Warranties of Each Party* ........................................... 23
SECTION 8.02. *Representations and Warranties of Each Administrative Agent* ........................... 23

ARTICLE IX NO RELIANCE; NO LIABILITY; OBLIGATIONS ABSOLUTE ..................... 24

SECTION 9.01. *No Reliance; Information* ........................................................ 24
SECTION 9.02. *No Warranties or Liability* ...................................................... 24
SECTION 9.03. *Obligations Absolute* ........................................................... 25

ARTICLE X MISCELLANEOUS ................................................................... 25

SECTION 10.01. *Notices* ...................................................................... 25
SECTION 10.02. *Conflicts* .................................................................... 26
SECTION 10.03. *Effectiveness; Survival* ...................................................... 26
SECTION 10.04. *Severability* ................................................................. 26
SECTION 10.05. *Amendments; Waivers* .......................................................... 26
SECTION 10.06. *Subrogation* .................................................................. 26
SECTION 10.07. *Applicable Law; Jurisdiction; Consent to Service of Process* ..................... 27
SECTION 10.08. *Waiver of Jury Trial* ......................................................... 27
SECTION 10.09. *Parties in Interest* .......................................................... 27
SECTION 10.10. *Specific Performance* ......................................................... 28
SECTION 10.11. *Headings* ..................................................................... 28
SECTION 10.12. *Counterparts* ................................................................. 28
SECTION 10.13. *Provisions Solely to Define Relative Rights* ................................... 28

INTERCREDITOR AGREEMENT, dated as of May 10, 2005, among WERNER HOLDING CO. (DE), INC., a Delaware corporation (the "*Company*"), WERNER HOLDING CO. (PA), INC., a Pennsylvania corporation, the subsidiaries of the Company party hereto, JPMORGAN CHASE BANK, N.A., as administrative agent (together with its successors in such capacity, the "*First Lien Administrative Agent*") for the First Lien Lenders (as defined below), and CREDIT SUISSE FIRST BOSTON, acting through its Cayman Islands branch ("*CSFB*"), as administrative agent (together with its successors in such capacity, the "*Second Lien Administrative Agent*") for the Second Lien Lenders (as defined below).

## PRELIMINARY STATEMENT

Reference is made to (a) the Credit Agreement, dated as of June 11, 2003 (as heretofore amended, supplemented or otherwise modified or as further amended, restated, supplemented or otherwise modified in accordance with the terms of this Agreement, the "*First Lien Credit Agreement*"), among the Company, the lenders from time to time party thereto (the "*First Lien Lenders*") and the First Lien Administrative Agent, (b) the Credit Agreement, dated as of May 10, 2005 (as amended, restated, supplemented or otherwise modified in accordance with the terms of this Agreement, the "*Second Lien Credit Agreement*" and, together with the First Lien Credit Agreement, the "*Credit Agreements*"), among the Company, the lenders from time to time party thereto (the "*Second Lien Lenders*"), CSFB, as joint lead arranger, as joint bookrunner, and as Second Lien Administrative Agent, and MORGAN STANLEY SENIOR FUNDING, INC., as joint lead arranger and as joint bookrunner, (c) the Collateral Agreement, dated as of June 11, 2003 (as heretofore amended, supplemented or otherwise modified or as further amended, restated, supplemented or otherwise modified in accordance with the terms of this Agreement, the "*First Lien Collateral Agreement*"), among the Company, the subsidiaries of the Company party hereto and the First Lien Administrative Agent, (d) the Collateral Agreement, dated as of May 10, 2005 (as amended, restated, supplemented or otherwise modified in accordance with the terms of this Agreement, the "*Second Lien Collateral Agreement*"), among the Company, the subsidiaries of the Company party hereto and the Second Lien Administrative Agent, and (e) the other Security Documents referred to in the Credit Agreements.

## RECITALS

A. The First Lien Lenders have made and have agreed to make loans and other extensions of credit to and on behalf of the Company pursuant to the First Lien Credit Agreement and the First Lien Obligations (such term and each other capitalized term used but not defined in these recitals having the meaning given it in Article I) are secured by first priority Liens on, and security interests in, the Collateral. The First Lien Lenders have agreed to amend the First Lien Credit Agreement to, among other things, permit the Company to borrow the Second Lien Term Loans and to permit the Company and the Guarantors to grant Liens to the Second Lien Administrative Agent for the benefit of the Second Lien Lenders upon, among other terms and conditions, the condition that the parties hereto enter into this Agreement.

B. The Second Lien Lenders have agreed to make loans to the Company pursuant to the Second Lien Credit Agreement, upon, among other terms and conditions, the condition that the Second Lien Obligations shall be secured by second priority Liens on, and security interests in, the Collateral.

C. The parties hereto are entering into this Agreement in connection with such amendment of the First Lien Credit Agreement and the execution and delivery of the Second Lien

Credit Agreement in order to, among other things, set forth their respective rights and remedies with respect to the Collateral.

Accordingly, the parties hereto agree as follows:

## ARTICLE I

### *Definitions*

SECTION 1.01. *Certain Defined Terms*. Capitalized terms used in this Agreement and not otherwise defined herein have the meanings set forth in the First Lien Credit Agreement, the Second Lien Credit Agreement, the First Lien Collateral Agreement or the Second Lien Collateral Agreement, as applicable.

SECTION 1.02. *Other Defined Terms*. As used in the Agreement, the following terms shall have the meanings specified below:

"*Administrative Agents*" shall mean the First Lien Administrative Agent and the Second Lien Administrative Agent.

"*Aggregate First Lien Exposure*" shall mean at any time, an amount equal to (a) the aggregate outstanding principal amount of First Lien Term Loans and (b) the amount of Revolving Credit Commitments then in effect or, if the Revolving Credit Commitments have been terminated, (i) the aggregate outstanding principal amount of Revolving Credit Loans and (ii) the aggregate amount of L/C Exposure.

"*Aggregate Second Lien Exposure*" shall mean at any time, an amount equal to the aggregate outstanding principal amount of Second Lien Term Loans.

"*Agreement*" shall mean this Intercreditor Agreement.

"*Applicable Percentage*" shall have the meaning assigned to such term in Section 6.01(c).

"*Bankruptcy Code*" shall mean Title 11 of the United States Code entitled "Bankruptcy," as now and hereinafter in effect, or any successor statute.

"*Bankruptcy Law*" shall mean the Bankruptcy Code and any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law.

"*Business Day*" shall mean a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required to close.

"*Company*" shall have the meaning assigned to such term in the preamble to this Agreement.

"*Closing Date*" shall mean May 10, 2005.

"*Collateral*" shall mean, collectively, the First Lien Collateral and the Second Lien Collateral.

SECTION 9.03. *Obligations Absolute*. The Lien priorities provided for herein and the respective rights, interests, agreements and obligations hereunder of the First Lien Administrative Agent and the other First Lien Secured Parties and the Second Lien Administrative Agent and the other Second Lien Secured Parties shall remain in full force and effect irrespective of:

(a) any lack of validity or enforceability of any Loan Document (other than this Agreement);

(b) any change in the time, place or manner of payment of, or, subject to the limitations set forth in Section 7.01(a), in any other term of, all or any portion of the First Lien Obligations;

(c) any amendment, waiver or other modification, whether by course of conduct or otherwise, of any Loan Document;

(d) securing of any First Lien Obligations or Second Lien Obligations with any additional collateral or Guarantees, or any exchange, release, voiding, avoidance or non-perfection of any security interest in any Collateral or any other collateral or any release of any Guarantee securing any First Lien Obligations or Second Lien Obligations; or

(e) any other circumstances that otherwise might constitute a defense available to, or a discharge of, the Company or any other Grantor in respect of the First Lien Obligations or the Second Lien Obligations or this Agreement, or any of the First Lien Secured Parties or the Second Lien Secured Parties in respect of this Agreement.

ARTICLE X

*Miscellaneous*

SECTION 10.01. *Notices*. Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, as follows:

(a) if to the Company or any other Grantor, to it at 93 Werner Road, Greenville, PA 16125, Attention of Eric J. Werner, Esq. (Fax No. (742) 588-0718), with a copy delivered to Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166, Attention of Janet Vance, Esq. (Fax No. (212) 351-5288);

(b) if to the First Lien Administrative Agent, to it at 111 Fannin, 10th Floor/MC46, Houston, TX 77002, Attention of Tokunboh Taiwo (Fax No. (713) 750-2452), with a copy to JPMorgan Chase Bank, 270 Park Avenue, 4th Floor, New York, NY 10017, Attention of David Oliver (Fax No. (212) 270-0453);

(c) if to the Second Lien Administrative Agent, to it at 11 Madison Avenue, New York, NY 10010, Attention of Agency Group (Fax No. (212) 325-8304).

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed

(properly addressed) to such party as provided in this Section or in accordance with the latest unrevoked direction from such party given in accordance with this Section. As agreed to among the Company and any Administrative Agent from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable Person provided from time to time by such Person.

SECTION 10.02. *Conflicts.*  In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of the other Loan Documents, the provisions of this Agreement shall control.

SECTION 10.03. *Effectiveness; Survival.*  This Agreement shall become effective when executed and delivered by the parties hereto.  All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement. The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding. The Second Lien Administrative Agent, for itself and on behalf of the other Second Lien Secured Parties, hereby waives any and all rights the Second Lien Secured Parties may now or hereafter have under applicable law to revoke this Agreement or any of the provisions of this Agreement.

SECTION 10.04. *Severability.*  In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 10.05. *Amendments; Waivers.*  (a)  No failure or delay on the part of any party hereto in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

(b)  Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the First Lien Administrative Agent and the Second Lien Administrative Agent.

SECTION 10.06. *Subrogation.*  The Second Lien Administrative Agent, for itself and on behalf of the other Second Lien Secured Parties, hereby waives any rights of subrogation it or they may acquire as a result of any payment hereunder until the Discharge of First Lien Obligations has occurred; *provided* that as between the Company and the other Grantors, on the one hand, and the Second Lien Secured Parties, on the other hand, any such payment that is paid over to the First Lien Administrative Agent pursuant to this Agreement shall be deemed not to reduce any of the Second Lien Obligations.

SECTION 10.07. *Applicable Law; Jurisdiction; Consent to Service of Process.*
(a)    THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

(b)  Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each party hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any party hereto may otherwise have to bring any action or proceeding relating to this Agreement in the courts of any jurisdiction.

(c)  Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any New York State or Federal court. Each party hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 10.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 10.08. *Waiver of Jury Trial.*  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 10.09. *Parties in Interest.*  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, replacements and assigns, as well as the other First Lien Secured Parties and Second Lien Secured Parties, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement. No other Person shall have or be entitled to assert rights or benefits hereunder. The First Lien Administrative Agent has entered into this Agreement on behalf of itself and the other First Lien Secured Parties and this Agreement is binding on the First Lien Administrative Agent and the other First Lien Secured Parties. However, the First Lien Administrative Agent does not control all of the First Lien Secured Parties and shall not be liable for actions taken by the First Lien Secured Parties other than the First Lien Administrative Agent in violation of the terms hereof without the consent of the First Lien Administrative Agent.

The Second Lien Administrative Agent has entered into this Agreement on behalf of itself and the other Second Lien Secured Parties and this Agreement is binding on the Second Lien Administrative Agent and the other Second Lien Secured Parties. However, the Second Lien Administrative Agent does not control all of the Second Lien Secured Parties and shall not be liable for actions taken by the Second Lien Secured Parties other than the Second Lien Administrative Agent in violation of the terms hereof without the consent of the Second Lien Administrative Agent.

SECTION 10.10. *Specific Performance*. Each Administrative Agent may demand specific performance of this Agreement and, on behalf of itself and the respective other Secured Parties, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense that might be asserted to bar the remedy of specific performance in any action which may be brought by the respective Secured Parties.

SECTION 10.11. *Headings*. Article and Section headings used herein and the Table of Contents hereto are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 10.12. *Counterparts*. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 10.03. Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 10.13. *Provisions Solely to Define Relative Rights*. The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Secured Parties, on the one hand, and the Second Lien Secured Parties, on the other hand. None of the Company, any other Grantor, any Guarantor or any other creditor thereof shall have any rights hereunder and none of the Company, any other Grantor or any Guarantor may rely on the terms hereof. Nothing in this Agreement is intended to or shall impair the obligations of the Company or any other Grantor or any Guarantor, which are absolute and unconditional, to pay the First Lien Obligations and the Second Lien Obligations as and when the same shall become due and payable in accordance with their terms.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

WERNER HOLDING CO. (DE), INC.

By: _____
    Name: Larry V. Friend
    Title: VP, CFO & Treasurer

WERNER HOLDING CO. (PA), INC.

By: _____
    Name: Larry V. Friend
    Title: VP, CFO & Treasurer

WERNER CO.

By: _____
    Name: Larry V. Friend
    Title: VP, CFO & Treasurer

WIP TECHNOLOGIES, INC.

By: _____
    Name: Larry V. Friend
    Title: VP, CFO & Treasurer

JPMORGAN CHASE BANK, N.A.,
as First Lien Administrative Agent

Name:            DAVID E. OLIVER
Title:            VICE PRESIDENT

CREDIT SUISSE FIRST BOSTON,
acting through its Cayman Islands branch,
as Second Lien Administrative Agent

By: _____

Name:
Title:        ROBERT HETU
              DIRECTOR

By: _____

Name:
Title:        VANESSA GOMEZ
              VICE PRESIDENT

ANNEX I

Provision for the Second Lien Credit Agreement

"REFERENCE IS MADE TO THE INTERCREDITOR AGREEMENT DATED AS OF MAY 10, 2005 (AS AMENDED, RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "*INTERCREDITOR AGREEMENT*"), AMONG THE COMPANY, WERNER HOLDING CO. (PA), INC., THE SUBSIDIARIES OF THE COMPANY PARTY THERETO, JPMORGAN CHASE BANK, AS FIRST LIEN ADMINISTRATIVE AGENT (AS DEFINED THEREIN), AND CREDIT SUISSE FIRST BOSTON, ACTING THROUGH ITS CAYMAN ISLANDS BRANCH, AS SECOND LIEN ADMINISTRATIVE AGENT (AS DEFINED THEREIN). EACH LENDER HEREUNDER (A) ACKNOWLEDGES THAT IT HAS RECEIVED A COPY OF THE INTERCREDITOR AGREEMENT, (B) CONSENTS TO THE SUBORDINATION OF LIENS PROVIDED FOR IN THE INTERCREDITOR AGREEMENT, (C) AGREES THAT IT WILL BE BOUND BY AND WILL TAKE NO ACTIONS CONTRARY TO THE PROVISIONS OF THE INTERCREDITOR AGREEMENT AND (D) AUTHORIZES AND INSTRUCTS THE ADMINISTRATIVE AGENT TO ENTER INTO THE INTERCREDITOR AGREEMENT AS ADMINISTRATIVE AGENT AND ON BEHALF OF SUCH LENDER."

Provision for the Second Lien Security Documents

"REFERENCE IS MADE TO THE INTERCREDITOR AGREEMENT DATED AS OF MAY 10, 2005 (AS AMENDED, RESTATED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "*INTERCREDITOR AGREEMENT*"), AMONG THE COMPANY, WERNER HOLDING CO. (PA), INC., THE SUBSIDIARIES OF THE COMPANY PARTY THERETO, JPMORGAN CHASE BANK, AS FIRST LIEN ADMINISTRATIVE AGENT (AS DEFINED THEREIN), AND CREDIT SUISSE FIRST BOSTON, ACTING THROUGH ITS CAYMAN ISLANDS BRANCH, AS SECOND LIEN ADMINISTRATIVE AGENT (AS DEFINED THEREIN). NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE LIEN AND SECURITY INTEREST GRANTED TO THE ADMINISTRATIVE AGENT, FOR THE BENEFIT OF THE SECURED PARTIES, PURSUANT TO THIS AGREEMENT AND THE EXERCISE OF ANY RIGHT OR REMEDY BY THE ADMINISTRATIVE AGENT AND THE OTHER SECURED PARTIES HEREUNDER ARE SUBJECT TO THE PROVISIONS OF THE INTERCREDITOR AGREEMENT. IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY BETWEEN THE PROVISIONS OF THE INTERCREDITOR AGREEMENT AND THIS AGREEMENT, THE PROVISIONS OF THE INTERCREDITOR AGREEMENT SHALL CONTROL."

EXHIBIT 48

EXECUTION COPY

## WAIVER AND AMENDMENT NO. 1

WAIVER AND AMENDMENT NO. 1, dated as of March 31, 2006 (this "Waiver"), among Werner Holding Co. (DE), Inc. (the "Borrower"), the Guarantors party hereto, the Lenders party hereto and Credit Suisse, Cayman Islands Branch (f/k/a Credit Suisse First Boston, acting through its Cayman Islands Branch), as administrative agent (in such capacity, the "Administrative Agent").

### RECITALS

WHEREAS, the Borrower, the Administrative Agent and the Lenders have entered into that certain Credit Agreement, dated as of May 10, 2005 (as amended, supplemented, restated or otherwise modified from time to time, the "Credit Agreement");

WHEREAS, the Borrower, Werner Holding Co. (PA), Inc. ("Werner"), certain Subsidiaries of the Borrower parties thereto, JPMorgan Chase Bank, N.A., as First Lien Administrative Agent (in such capacity, including any successor, the "First Lien Administrative Agent"), and the Administrative Agent, are parties to that certain Intercreditor Agreement, dated as of May 10, 2005 (as amended, supplemented, restated or otherwise modified from time to time, the "Intercreditor Agreement");

WHEREAS, the Borrower has requested that the Lenders waive and amend certain provisions of the Credit Agreement, and instruct the Administrative Agent to consent to amendments to the Intercreditor Agreement, in each case as set forth herein; and

WHEREAS, the Lenders party hereto are willing to so waive and amend the Credit Agreement, in each case pursuant to the terms and subject to the conditions set forth herein;

NOW THEREFORE, in consideration of the foregoing, the mutual agreements contained herein and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Section 1.   Definitions.   Unless otherwise specified herein, capitalized terms used in this Waiver shall have the meanings ascribed to them by the Credit Agreement.

Section 2.   Waivers.   The Lenders hereby waive during the Waiver Period (as defined below) any Event of Default or Default arising solely as a result of (a) the Borrower's failure to furnish to the Administrative Agent an accountant's report without a "going concern" or like qualification or exception with respect to the Borrower's financial statements for the fiscal year ended December 31, 2005 pursuant to Section 8.1(a) of the Credit Agreement, and (b) the Borrower's failure to comply with the maximum Secured Leverage Ratio for the fiscal quarters ended December 31, 2005 and March 31, 2006 pursuant to Section 9.9 of the Credit Agreement.   The term "Waiver Period" shall mean the period from the Effective Date (as defined below) until the earlier to occur of (i) any Default or Event of Default not expressly waived pursuant to this paragraph 2 and (ii) 5:00 p.m. (New York City time) on May 10, 2006.

Section 3.  Amendment.  Effective as of the Effective Date, Section 9.1(m) of the Credit Agreement is hereby amended by replacing "$7,500,000" in clause (x)(I) of the proviso therein with "$10,000,000".

Section 4.  Agreements.  (a)  Notwithstanding anything to the contrary contained in the Credit Agreement or herein, the Borrower shall deliver to the Administrative Agent no later than 5:00 p.m. (New York City time) on May 10, 2006 the financial statements and related certificates required by Section 8.1(b), Section 8.1(e), Section 8.2(b) and Section 8.2(e) of the Credit Agreement in respect of the fiscal quarter ending March 31, 2006.  The Borrower hereby agrees that any failure to comply with this Section 4(a) shall constitute an immediate Event of Default.

(b)  The Lenders party hereto hereby instruct the Administrative Agent to execute, deliver and perform, to become effective on the Effective Date, an amendment to the Intercreditor Agreement, in a form to be agreed between the Administrative Agent, the Borrower and the First Lien Administrative Agent, amending the definition of "Maximum First Lien Obligations Amount" in Section 1.02 of the Intercreditor Agreement by replacing "$7,500,000" in clause (c) thereof with "$10,000,000".

Section 5.  Effectiveness.  This Waiver shall become effective as of the date each of the following conditions precedent have been satisfied (the "Effective Date"):

(a)  the Administrative Agent shall have received this Waiver, duly executed and delivered by the Borrower, each Guarantor, the Administrative Agent and Lenders constituting the Required Lenders;

(b)  the Administrative Agent shall have received the following documents:

(i)  a fully executed and effective waiver or amendment under the First Lien Credit Agreement, in form and substance satisfactory to the Administrative Agent and the Required Lenders, waiving, until the earliest to occur of (x) any Default or Event of Default (as defined in the First Lien Credit Agreement) not expressly waived pursuant to the waiver thereto and (y) 5:00 p.m. (New York City time) on May 10, 2006, any Default or Event of Default under (A) Section 10(c) of the First Lien Credit Agreement arising solely by reason of (x) the failure of the Borrower to comply with Sections 9.9 (Maximum Secured Leverage Ratio), 9.10 (Minimum Consolidated EBITDA) and 9.20 (Maximum First Lien Leverage Ratio) of the First Lien Credit Agreement, in each case as at the last day of each of December 31, 2005 and March 31, 2006 and (y) the failure of the Borrower to comply with Section 8.7(a) of the First Lien Credit Agreement with respect to any Default or Event of Default waived thereby, (B) Section 10(b) of the First Lien Credit Agreement arising solely by reason of the failure of the representation and warranty made under Section 7.2(b) of the First Lien Credit Agreement to be true and correct as to the non-existence of any Defaults or Events of Default being waived thereunder in connection with the issuance of a letter of credit on or about March 8, 2006 and (c) Section 10(d) of the First Lien Credit Agreement arising solely by reason of the failure of the Borrower to comply with the requirement contained in Section 8.1(a) (Financial Statements) of the First Lien Credit Agreement that the annual financial statements for the fiscal year of the Borrower ended on December 31, 2005 be delivered without a "going concern" or like qualification; and

(ii)      a fully executed and effective waiver or amendment under the Receivables Facility, in form and substance satisfactory to the Administrative Agent and the Required Lenders, waiving any Default or Event of Default under Section 8.1(g) of the Financing Agreement, dated as of May 10, 2005, in respect of the Receivables Facility (as amended, supplemented, restated or otherwise modified from time to time, the "Financing Agreement") arising solely by reason of the failure of the Company to comply with the requirements contained in Section 5.2(f) of the Financing Agreement to timely deliver financial statements for the fiscal year of Werner ending December 31, 2005 with an audit opinion that does not contain "a going concern" or other qualifications.

(c)      the Administrative Agent shall have received for the account of each Lender entitled thereto, a fee in an amount equal to 0.125% on such Lender's Term Loan Commitment Percentage of the aggregate outstanding principal amount of the Term Loans, in each case calculated as of the Effective Date, but such fees shall be payable (i) only to each Lender that has delivered (including by way of facsimile or electronic mail) its executed signature page to this Waiver to the attention of Andrew Yoon, of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, telecopy number: 212-310-8689, email: andrew.yoon@weil.com, on or before the Effective Date, and (ii) only if the Borrower and the Guarantors execute this Waiver;

(d)      the representations and warranties contained herein shall be true and correct in all material respects; and

(e)      after giving effect to this Waiver, no Default or Event of Default shall have occurred and be continuing, and the Administrative Agent shall have received a certificate of the chief financial officer or treasurer of the Borrower, dated the Effective Date, certifying the satisfaction of this condition.

Section 6.    Representations and Warranties.    In order to induce the Administrative Agent and each Lender to enter into this Waiver, the Borrower and each Guarantor hereby represents and warrants to the Administrative Agent and each Lender that:

(a)      all of the representations and warranties contained in the Credit Agreement and in each Credit Document are true and correct in all material respects as of the date hereof after giving effect to this Waiver, except to the extent that any such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date;

(b)      the execution, delivery and performance by the Borrower and each Guarantor of this Waiver have been duly authorized by all necessary corporate action required on their part and this Waiver is the legal, valid and binding obligation of the Borrower and each Guarantor, enforceable against them in accordance with its terms, except as its enforceability may be affected by the effect of bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to or affecting the rights or remedies of creditors generally;

(c)    the execution, delivery and performance of this Waiver by the Borrower and each Guarantor does not contravene, and will not result in a breach of, or violate (i) any provision of the Borrower's or any Guarantor's certificate or articles of incorporation or bylaws or other similar documents, (ii) any law or regulation, or any order or decree of any court or government instrumentality, or (iii) any indenture, mortgage, deed of trust, lease, agreement or other instrument to which the Borrower or any Guarantor is a party or by which the Borrower or any Guarantor or any of their property is bound; and

(d)    after giving effect to this Waiver, no Default or Event of Default has occurred and is continuing.

Section 7.    Validity of Obligations and Liens.

(a)    Each Credit Party acknowledges and agrees that (i) such Credit Party is truly and justly indebted to the Lenders and the Administrative Agent for the Obligations (as defined in the Collateral Agreement), without defense, counterclaim or offset of any kind, and such Credit Party ratifies and reaffirms the validity, enforceability and binding nature of such Obligations and (ii) such Credit Party has no claim, right or cause of action of any kind against any Lender, the Administrative Agent or any of such Lender's or the Administrative Agent's present or former subsidiaries, Affiliates, officers, directors, employees, attorneys or other representatives or agents in connection with the Obligations, the Credit Agreement and the other Credit Documents, or the transactions contemplated hereby or thereby.

(b)    Each Credit Party ratifies and reaffirms the validity and enforceability (without defense, counterclaim or offset of any kind) of the Liens and security interests granted to secure any of the Obligations by such Credit Party to the Administrative Agent, for the benefit of the Lenders, pursuant to the Security Documents to which such Credit Party is a party. Each Credit Party hereby represents and warrants to the Administrative Agent and the Lenders that, pursuant to the Security Documents to which such Credit Party is a party, the Obligations are secured by liens on and security interests in all of such Credit Party's assets to the extent required by the Security Documents.

Section 8.    Release.    Each Credit Party hereby releases and forever discharges the Administrative Agent, the Lenders, each of their respective affiliates, agents, employees, directors, officers, counsel and advisors, and all persons controlling, controlled by, or under common control with any of the foregoing (collectively, the "Released Group") of and from all damage, loss, claims, demands, liabilities, obligations, actions and causes of action whatsoever which any Credit Party may now have or claim to have against any such member of the Released Group as of the date of this Waiver, and whether presently known or unknown, and of every nature and extent whatsoever on account of or in any way concerning, arising out of, founded upon or in any way relating to the Credit Agreement, this Waiver, or any of the other Credit Documents, including, but not limited to, all such loss or damage of any kind heretofore sustained, or that may arise as a consequence of the dealing between the parties.

Section 9.    Guarantor Consent.    Each Guarantor hereby consents to this Waiver agrees that the terms hereof shall not affect in any way its obligations and liabilities under the Credit Documents (as amended and otherwise expressly modified by the Waiver) to which it is a

party, all of which obligations and liabilities shall remain in full force and effect and each of which is hereby reaffirmed.

Section 10.   Reference to and Effect Upon the Credit Agreement.

(a)   Except as specifically set forth above, the Credit Agreement and the other Credit Documents shall remain in full force and effect and are hereby ratified and confirmed.

(b)   The waivers and amendment set forth herein are effective solely for the purposes set forth herein and shall be limited precisely as written, and except as specifically set forth herein, shall not be deemed to (i) be a consent to any amendment, waiver or modification of any other term or condition of the Credit Agreement or any other Credit Document, (ii) operate as a waiver or otherwise prejudice any right, power or remedy that the Administrative Agent or the Lenders may now have or may have in the future under or in connection with the Credit Agreement or any other Credit Document, (iii) constitute a waiver of any provision of the Credit Agreement or any Credit Document, or (iv) constitute a waiver of any Event of Default, Default or other event or condition that has resulted in or could result in the occurrence of an Event of Default or Default.   The Administrative Agent and the Lenders expressly reserve the right to exercise all of their rights and remedies under the Credit Agreement, the other Credit Documents and applicable law at any time after the expiration of the Waiver Period in respect of the occurrence and continuance of any Default or Event of Default waived pursuant to Section 2. Upon the effectiveness of this Waiver, each reference in the Credit Agreement to "this Agreement", "herein", "hereof" and words of like import and each reference in the Credit Agreement and the Credit Documents to the Credit Agreement shall mean the Credit Agreement as amended hereby.   This Amendment shall be construed in connection with and as part of the Credit Agreement.

(c)   This Amendment shall be a Credit Document.

Section 11.   Costs And Expenses.   The Borrower agrees to reimburse the Administrative Agent and Weil, Gotshal & Manges LLP for all fees, costs, and expenses, including the reasonable fees, costs, and expenses of counsel or other advisors for advice, assistance, or other representation in connection with this Waiver.

Section 12.   GOVERNING LAW. THIS WAIVER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK.

Section 13.   Headings.   Section headings in this Waiver are included herein for convenience of reference only and shall not constitute part of this Waiver for any other purposes.

Section 14.   Counterparts.   This Amendment may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Waiver as of the date first written above.

WERNER HOLDING CO. (DE), INC.

By: _____
Name: Larry V. Friend
Title: VP, CFO & Treasurer

WERNER HOLDING CO. (PA), INC.

By: _____
Name: Larry V. Friend
Title: VP, CFO & Treasurer

WERNER CO.

By: _____
Name: Larry V. Friend
Title: VP, CFO & Treasurer

WIP TECHNOLOGIES, INC.

By: _____
Name: Larry V. Friend
Title: VP, CFO & Treasurer

[SIGNATURE PAGE TO WAIVER AND AMENDMENT NO. 1]

CREDIT SUISSE, CAYMAN ISLANDS
BRANCH, as Administrative Agent and
Lender

By: _____

Name: **Michael A. Criscito**

Title: **Managing Director**

By: _____

Name: DIDIER SIFFER

Title: DIRECTOR

TCW Shared Opportunity Fund V, L.P.

By: TCW Asset Management Company, its
Investment Adviser

By: _____
        **C. Shawn Bookin**
        **Managing Director**

By: _____
        **Jason A. Breaux**
        **Vice President**

TCW Shared Opportunity Fund IV, L.P.

By: TCW Asset Management Company, its
Investment Adviser

By: _____
        **C. Shawn Bookin**
        **Managing Director**

By: _____
        **Jason A. Breaux**
        **Vice President**

[SIGNATURE PAGE TO WAIVER AND AMENDMENT NO. 1]

TCW Shared Opportunity Fund IVB, L.P.

By: TCW Asset Management Company, its
Investment Adviser

By: _____
      **C. Shawn Bookin**
      **Managing Director**

By: _____
      **Jason A. Breaux**
      **Vice President**

TCW/Drum Special Situation Partners, LLC

By: TCW Asset Management Company, its
Investment Adviser

By: _____
      **C. Shawn Bookin**
      **Managing Director**

By: _____
      **Jason A. Breaux**
      **Vice President**

[SIGNATURE PAGE TO WAIVER AND AMENDMENT NO. 1]

TCW Shared Opportunity Fund III, L.P.

By: TCW Asset Management Company, its
Investment Adviser

By: _____
C. Shawn Bookin
Managing Director


By: _____
Jason A. Breaux
Vice President

[SIGNATURE PAGE TO WAIVER AND AMENDMENT NO. 1]

03-24-'06 14:57  FROM-SUMMIT INV PARTNERS    +5136321697                T-663  P02/02  U-728

Union Central Life Ins Co

Summit Investment Partners LLC
as a Lender

By: _____
Name: Bruce A Ferguson
Title: MG Dir

[SIGNATURE PAGE TO WAIVER AND AMENDMENT NO. 1]

_____,
as a Lender

By:_____
Name:
Title:

HARBINGER CAPITAL PARTNERS MASTER FUND I, LTD.
By: HARBINGER CAPITAL PARTNERS OFFSHORE MANAGER, L.L.C.,
IT'S INVESTMENT MANAGER

_____
PHILIP A. FALCONE
VICE PRESIDENT

[SIGNATURE PAGE TO WAIVER AND AMENDMENT NO. 1]

Levine Leichtman Capital Partners III LP,

_as a Lender_

Levine Leichtman Capital Partners Inc, its general partner

By: _____

Name: Steven Hearn

Title: Vice President

**VAN KAMPEN**
**SENIOR LOAN FUND**
By: Van Kampen Asset Management

as a Lender

By: _____
Name:    **Christina Jamieson**
Title:    Executive Director

VAN KAMPEN
SENIOR INCOME TRUST
By: Van Kampen Asset Management

as a Lender

By:
Name: Christina Jamieson
Title: Executive Director

[SIGNATURE PAGE TO WAIVER AND AMENDMENT NO. 1]

03/24/2006 FRI 17:03 FAX                                                      ☑002/002

BDCM OPPORTUNITY FUND II, L.P.

By:   Black Diamond Capital Management,
L.L.C.,

Its Investment Manager, as a Lender

By: _____
Name:
Title:
             James J. Zenni, Jr.
         President & Managing Partner
   Black Diamond Capital Management, L.L.C.

NEWSTART FACTORS, INC
as a Lender

By: _John V Koerber_
Name: John V Koerber
Title:

APR-05-2006  16:43
APR 05 2006  4:24 PM FR MORGAN STANLEY LLG OP5371399 TO 912123108007        P.02/02
P.02

Morgan Stanley Senior Funding,
as a Lender Inc.

By: _Lisa Malone_
Name:
Title:        Lisa Malone
              Vice President

(SIGNATURE PAGE TO WAIVER AND AMENDMENT NO. 1)

** TOTAL PAGE.02 **
TOTAL P.02

EXHIBIT 49

<u>WAIVER AND AMENDMENT NO. 2</u>

WAIVER AND AMENDMENT NO. 2, dated as of May 10, 2006 (this "<u>Waiver</u>"), among Werner Holding Co. (DE), Inc. (the "<u>Borrower</u>"), the Guarantors party hereto, the Lenders party hereto and Credit Suisse, Cayman Islands Branch (f/k/a Credit Suisse First Boston, acting through its Cayman Islands Branch), as administrative agent for the Lenders (in such capacity, the "<u>Administrative Agent</u>").

RECITALS

WHEREAS, the Borrower, the Administrative Agent and the Lenders have entered into that certain Credit Agreement, dated as of May 10, 2005 (as amended, supplemented, restated or otherwise modified from time to time, the "<u>Credit Agreement</u>");

WHEREAS, pursuant to the Waiver and Amendment No. 1, dated as of March 31, 2006 (the "<u>First Waiver</u>"), to the Credit Agreement, the Lenders agreed to waive, during the period from the date of the First Waiver until the earlier to occur of May 10, 2006 or an Event of Default not waived pursuant to the First Waiver (such period, the "<u>Existing Waiver Period</u>"), the Defaults and Events of Default under Sections 10(c) and 10(d) of the Credit Agreement that were expressly set forth in the First Waiver (the "<u>Existing Defaults</u>");

WHEREAS, the Borrower acknowledges that upon any expiration of the Existing Waiver Period, the Administrative Agent and Lenders would be entitled to exercise all of their rights and remedies under the Credit Agreement, the other Credit Documents and applicable law in respect of such Existing Defaults, including without limitation, to deliver a Payment Blockage Notice and a Guarantor Payment Blockage Notice (in accordance with, and as such terms are defined in, the Indenture dated as of November 24, 1997, collectively, the "<u>Blockage Notices</u>") with respect to the Senior Subordinated Notes;

WHEREAS, in lieu of the expiration of the Existing Wavier Period and the exercise of such rights and remedies, the Borrower has requested that the Lenders extend the Existing Waiver Period in respect of the Existing Defaults so as to permit the Borrower to continue to pursue its restructuring efforts;

WHEREAS, as part of its waiver request to the Lenders, the Borrower advised the Administrative Agent and Lenders that the Borrower does not intend to make any payment on the Senior Subordinated Notes that would otherwise be prohibited if on May 10, 2006 the Existing Waiver Period expired and the Administrative Agent delivered the Blockage Notices;

WHEREAS, the Borrower intends to make its scheduled interest and principal payments due under the Credit Agreement; and

WHEREAS, the Lenders are agreeable to the requested extension of the Existing Waiver Period, but only upon the terms and subject to the conditions set forth herein;

NOW THEREFORE, in consideration of the foregoing, the mutual agreements contained herein and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Section 1. <u>Definitions</u>. Unless otherwise specified herein, capitalized terms used in this Waiver shall have the meanings ascribed to them by the Credit Agreement.

Section 2. <u>Waiver</u>. As used in this Waiver, the term "<u>Waiver Period</u>" shall mean the period from March 31, 2006 until the earliest to occur of (i) any Default or Event of Default not expressly waived pursuant to this Waiver, (ii) delivery of the Payment Notice (as defined below) and (iii) 5:00 p.m. (New York City time) on June 14, 2006. The Lenders hereby waive, but only until the expiration of the Waiver Period, the Existing Defaults.

Section 3. <u>Amendment</u>. Effective as of the Effective Date, Section 8.10 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

"8.10 <u>Credit Ratings</u>. Maintain at all time a private credit rating for the Facility by each of S&P and Moody's."

Section 4. <u>Agreements</u>.      (a) <u>Senior Subordinated Notes</u>. In consideration of the agreement of the Lenders pursuant to this Waiver to waive the Existing Defaults during the Waiver Period and, thereby, forego the right to direct the Administrative Agent to deliver the Blockage Notices, the Borrower hereby confirms its stated intention not to make any payment on the Senior Subordinated Notes that would otherwise be prohibited if on May 10, 2006 the Existing Waiver Period expired and the Administrative Agent delivered the Blockage Notices, <u>provided</u>, <u>however</u>, (a) the Borrower reserves the right, upon five (5) days' prior written notice to the Administrative Agent (such notice to be delivered by fax to Agency Group (Fax Number: 212-325-8304) and Warren Buhle (Fax Number: 212-310-8007), the "<u>Payment Notice</u>"), to make any such payment on the Senior Subordinated Notes, and (b) upon any expiration of the Waiver Period, the Administrative Agent and the Lenders reserve the right to exercise all of their rights and remedies under the Credit Agreement, the other Credit Documents and applicable law in respect of the Existing Defaults, including without limitation, to deliver the Blockage Notices.

(b) <u>Weekly Reporting</u>. The Borrower shall deliver to the Administrative Agent copies of the weekly financial reporting documents of the Borrower and its subsidiaries delivered to the First Lien Administrative Agent pursuant to Section 3.2 of the Fourth Waiver and Agreement dated as of May 10, 2006, among the Borrower, the Guarantors, certain lenders party thereto and the First Lien Administrative Agent (the "<u>First Lien Fourth Waiver</u>").

(c) <u>Alternate Base Rate Loans</u>. Notwithstanding anything to the contrary contained in the Credit Agreement, including without limitation, Section 5.1, Section 5.2 and the definition of Interest Period, from and after May 10, 2006 (a) no outstanding Alternate Base Rate Loan shall be subject to conversion to a Eurodollar Loan and (b) no outstanding Eurodollar Loan shall be continued as a Eurodollar Loan upon the expiration of the then current Interest Period with respect thereto, and all such outstanding Eurodollar Loans shall convert to Alternate Base Rate Loans upon such expiration, including without limitation, any Interest Period that will expire on May 12, 2006.

(d)      <u>Event of Default</u>. The Borrower hereby agrees that any failure to comply with this Section 4 shall constitute an immediate Event of Default.

Section 5. <u>Effectiveness</u>. This Waiver shall become effective as of the date each of the following conditions precedent have been satisfied (the "<u>Effective Date</u>"):

(a)    the Administrative Agent shall have received this Waiver, duly executed and delivered by the Borrower, each Guarantor, the Administrative Agent and Lenders constituting the Required Lenders;

(b)    the Administrative Agent shall have received a fully executed and effective First Lien Fourth Waiver, in form and substance satisfactory to the Administrative Agent and the Required Lenders, extending until at least the expiration of the Waiver Period, the waiver of the "Defaults" and "Events of Default" waived pursuant to the Third Waiver and Agreement, dated as of March 30, 2006, under the First Lien Facility;

(c)    the representations and warranties contained herein shall be true and correct in all material respects; and

(d)    after giving effect to this Waiver, no Default or Event of Default shall have occurred and be continuing, and the Administrative Agent shall have received a certificate of the chief financial officer or treasurer of the Borrower, dated the Effective Date, certifying the satisfaction of this condition.

Section 6. <u>Representations and Warranties</u>. In order to induce the Administrative Agent and each Lender to enter into this Waiver, the Borrower and each Guarantor hereby represents and warrants to the Administrative Agent and each Lender that:

(a)    all of the representations and warranties contained in the Credit Agreement and in each Credit Document are true and correct in all material respects as of the date hereof after giving effect to this Waiver, except to the extent that any such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date;

(b)    the execution, delivery and performance by the Borrower and each Guarantor of this Waiver have been duly authorized by all necessary corporate action required on their part and this Waiver is the legal, valid and binding obligation of the Borrower and each Guarantor, enforceable against them in accordance with its terms, except as its enforceability may be affected by the effect of bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to or affecting the rights or remedies of creditors generally;

(c)    the execution, delivery and performance of this Waiver by the Borrower and each Guarantor does not contravene, and will not result in a breach of, or violate (i) any provision of the Borrower's or any Guarantor's certificate or articles of incorporation or bylaws or other similar documents, (ii) any law or regulation, or any order or decree of any court or government instrumentality, or (iii) any indenture, mortgage, deed of trust, lease, agreement or other instrument to which the Borrower or any Guarantor is a party or by which the Borrower or any Guarantor or any of their property is bound; and

(d)    after giving effect to this Waiver, no Default or Event of Default has occurred and is continuing.

Section 7.    <u>Validity of Obligations and Liens</u>.

(a)    Each Credit Party acknowledges and agrees that (i) such Credit Party is truly and justly indebted to the Lenders and the Administrative Agent for the Obligations (as defined in the Collateral Agreement), without defense, counterclaim or offset of any kind, and such Credit Party ratifies and reaffirms the validity, enforceability and binding nature of such Obligations and (ii) such Credit Party has no claim, right or cause of action of any kind against any Lender, the Administrative Agent or any of such Lender's or the Administrative Agent's present or former subsidiaries, Affiliates, officers, directors, employees, attorneys or other representatives or agents in connection with the Obligations, the Credit Agreement and the other Credit Documents, or the transactions contemplated hereby or thereby.

(b)    Each Credit Party ratifies and reaffirms the validity and enforceability (without defense, counterclaim or offset of any kind) of the Liens and security interests granted to secure any of the Obligations by such Credit Party to the Administrative Agent, for the benefit of the Lenders, pursuant to the Security Documents to which such Credit Party is a party. Each Credit Party hereby represents and warrants to the Administrative Agent and the Lenders that, pursuant to the Security Documents to which such Credit Party is a party, the Obligations are secured by liens on and security interests in all of such Credit Party's assets to the extent required by the Security Documents.

Section 8.    <u>Release</u>. Each Credit Party hereby releases and forever discharges the Administrative Agent, the Lenders, each of their respective affiliates, agents, employees, directors, officers, counsel and advisors, and all persons controlling, controlled by, or under common control with any of the foregoing (collectively, the "<u>Released Group</u>") of and from all damage, loss, claims, demands, liabilities, obligations, actions and causes of action whatsoever which any Credit Party may now have or claim to have against any such member of the Released Group as of the date of this Waiver, and whether presently known or unknown, and of every nature and extent whatsoever on account of or in any way concerning, arising out of, founded upon or in any way relating to the Credit Agreement, this Waiver, or any of the other Credit Documents, including, but not limited to, all such loss or damage of any kind heretofore sustained, or that may arise as a consequence of the dealing between the parties.

Section 9.    <u>Guarantor Consent</u>. Each Guarantor hereby consents to this Waiver agrees that the terms hereof shall not affect in any way its obligations and liabilities under the Credit Documents (as amended and otherwise expressly modified by the Waiver) to which it is a party, all of which obligations and liabilities shall remain in full force and effect and each of which is hereby reaffirmed.

Section 10.    <u>Reference to and Effect Upon the Credit Agreement</u>.

(a)    Except as specifically set forth above, the Credit Agreement and the other Credit Documents shall remain in full force and effect and are hereby ratified and confirmed.

(b)    The waivers and amendment set forth herein are effective solely for the purposes set forth herein and shall be limited precisely as written, and except as specifically set forth herein, shall not be deemed to (i) be a consent to any amendment, waiver or modification of any other term or condition of the Credit Agreement or any other Credit Document, (ii) operate as a waiver or otherwise prejudice any right, power or remedy that the Administrative Agent or the Lenders may now have or may have in the future under or in connection with the Credit Agreement or any other Credit Document, (iii) constitute a waiver of any provision of the Credit Agreement or any Credit Document, or (iv) constitute a waiver of any Event of Default, Default or other event or condition that has resulted in or could result in the occurrence of an Event of Default or Default.  The Administrative Agent and the Lenders expressly reserve the right to exercise all of their rights and remedies under the Credit Agreement, the other Credit Documents and applicable law at any time after the expiration of the Waiver Period in respect of the occurrence and continuance of any Default or Event of Default waived pursuant to Section 2. Upon the effectiveness of this Waiver, each reference in the Credit Agreement to "this Agreement", "herein", "hereof" and words of like import and each reference in the Credit Agreement and the Credit Documents to the Credit Agreement shall mean the Credit Agreement as amended hereby.  This Amendment shall be construed in connection with and as part of the Credit Agreement.

(c)    This Amendment shall be a Credit Document.

Section 11.  <u>Costs And Expenses</u>.  The Borrower agrees to reimburse the Administrative Agent and Weil, Gotshal & Manges LLP for all fees, costs, and expenses, including the reasonable fees, costs, and expenses of counsel or other advisors for advice, assistance, or other representation in connection with this Waiver.

Section 12.  <u>GOVERNING LAW</u>. THIS WAIVER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK.

Section 13.  <u>Headings</u>.  Section headings in this Waiver are included herein for convenience of reference only and shall not constitute part of this Waiver for any other purposes.

Section 14.  <u>Counterparts</u>.  This Amendment may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Waiver as of the date first written above.

WERNER HOLDING CO. (DE), INC.


By:_____
Name:
Title:


WERNER HOLDING CO. (PA), INC.


By:_____
Name:
Title:


WERNER CO.


By:_____
Name:
Title:


WIP TECHNOLOGIES, INC.


By:_____
Name:
Title:

CREDIT SUISSE, CAYMAN ISLANDS
BRANCH, as Administrative Agent and
Lender

By:_____
Name:
Title:


By:_____
Name:
Title:

_____,
as a Lender


By:_____
Name:
Title:

EXHIBIT 50

**WERNER HOLDING CO. (PA), INC.**

---o0o---

MINUTES OF THE

REGULAR QUARTERLY MEETING OF THE BOARD OF DIRECTORS

---o0o---

June 16, 1998

Pursuant to notice duly given, a copy of which has been filed with these minutes, the Regular Quarterly Meeting of the Board of Directors of Werner Holding Co. (PA), Inc., a Pennsylvania corporation (hereafter called the "Corporation"), was held on the 16th day of June, 1998, at Investcorp International Inc. ("Investcorp"), 280 Park Avenue, 37th Floor, West Tower, New York, New York.

The meeting was called to order at 8:45 a.m. by Donald M. Werner, Chairman of the Board of Directors. Four (4) of the five (5) Directors of the Corporation were present: namely, Charles J. Philippin, Howard L. Solot, Savio W. Tung and Donald M. Werner, constituting a quorum for the proper conduct of business. The other Director, Christopher J. Stadler was unable to attend. Also present at the meeting as invited guests were Donald W. Resnick, Treasurer and Chief Financial Officer of the Corporation, Thomas J. Sullivan of Investcorp and Mamoun Askari of Investcorp. Eric J. Werner, Secretary of the Corporation, recorded these minutes.

After some discussion and upon motion duly made and seconded, it was:

RESOLVED: That the reading of the minutes of the Annual Meeting of the Board of Directors held on April 30, 1998, be, and hereby is, waived and that said minutes are approved as previously distributed.

Next, there was a review and discussion of the Corporation's recent Audit Committee Meeting held on June 5, 1998. Donald M. Werner reported that Ernst & Young presented their report to the Audit Committee and reviewed the audit process, approach and scope. The Audit Committee also reviewed professional fees, noting that certain of the professional fees incurred in 1997 (i.e. insurance transaction, 144A Offering, S4 Registration, etc.) would not repeat in 1998. The 1997 fees totaled approximately $850,000 while 1998 was estimated at $400,000. Donald M. Werner further noted that James A. Misavage, Internal Auditor at Werner Co. gave the Audit Committee a good update on projects and positive progress. Charles J. Philippin reinforced his concerns to the Board about special projects and fees.

The Board reviewed and discussed the sales and marketing reports for the Werner Ladder Co. ("WLC") and Werner Extruded Products ("WXP") commercial business units. Donald M. Werner reported that a WLC sales review had recently been held in Chicago. Participants included Michael E. Werner, sales management and certain Investcorp representatives. He also noted that complete books were provided at the meeting. It was noted that WLC's gross sales for the first 5 months of 1998 were even with 1997 and that April and May 1998 were still soft. Gross sales year to date for WLC were reported to be $139 million, which is $15.7 million or 10.1% below the $154 million plan. Both aluminum and fiberglass step ladders sold more in 1998 than 1997, but less than the plan. There was a big fall off in aluminum and fiberglass extension ladders sales which were 4% and 7% less than 1997 and 12% and 19% below the plan. All professional products (stages, scaffolds and industrial ladders) were reported below the plan. Donald M. Werner discussed some of the basic reasons for the sales differences, including El Nino, over buying in December ($5 million), warehouse consolidation, publishing of recapitalization information, loss of Hechinger, and the failure to deliver the Penguin. He noted that retail sales were up 8% over 1997 for the entire category. Power retailers were up 12% and hardware giants and retailers were up 25%, while the

Werner Holding Co. (PA), Inc.                                                    June 16, 1998
Minutes of the Regular Quarterly Meeting of the Board of Directors              Page 2 of 3

general hardware coop, distributors and paint were down 7% and professional was down 9.6%. He continued by noting that June 1998 was the first bright spot this year. The run rate for ladders for the first 10 days of June 1998 was $37.8 million, compared to $33 million in 1997 and the current plan w/o Hechinger of $32.6 million. Charles J. Philippin stated that he had two thoughts from the sales and marketing meeting with WLC. He inquired as to how WLC gives structure discounts to major customers. He questioned whether or not WLC could do cumulative tiering. There was some discussion regarding the best method to make it less attractive for customers to take a small number of SKU's/special promotions from competitors with financial incentive. Charles J. Philippin also noted that the Penguin process needs serious review noting that management seems either not to react to competition or not too lead vs. react.

WXP sales were reported as strong for the first five months of 1998. Gross sales year to date 1998 were $45.2 million compared to $40.5 million in 1997. WXP's year to date plan is $45.8 million, an 11.5% increase over 1997. Year to date sales for WXP were reported to be 98.8% of the current plan. At this time a handout was distributed detailing WXP's 2nd quarter metrics, highlights and 3rd quarter forecast. There was some discussion regarding the report and certain of the key points noted. WXP reported that the Anniston Division paint line was closed July 1, 1998 with a projected annual savings of $2 million and additional manufacturing and warehousing space available. WXP gave up the Champion account which was previously the largest paint/thermal account, but low margin.

The third quarter forecast for WXP was reported to be down due to the paint line closing and the discontinuance of certain accounts. The original 3rd quarter plan for 1998 was $28 million which was revised to $24.4 million, an 8.6% decrease from 3rd quarter 1997 of $26.7 million. WXP gross margin was reported as 15.7% April year-to-date. There was some brief discussion regarding delphi pricing and margin issues including aluminum costs.

At this time, the Board reviewed and discussed certain operations reports. Howard L. Solot presented handouts and reviewed engineering and manufacturing operations. Eric J. Werner reviewed human resource operations for the Board. The Board then received a report from Mark Elliott of LAI Ward Howell on the executive searches for a Chief Operating Officer and a Chief Financial Officer. After some discussion Howard L. Solot reviewed capital and cost initiatives for the Board.

Then, there was a review and discussion regarding the results of operations and latest consolidated financial statements of the Corporation, as well as projections for 1998 and the overall business plan. Gross sales were reported to be 10% over the plan for June 1998. Eric J. Werner gave a status of the S4 Exchange Offer. Discussions continued with a brief review of the Corporation's five (5) year plans and projections for 1998-2002. The discussions focused on 1998 and preparing for 1999.

There was also a review and discussion regarding the cost reduction program and operational improvement plan. Howard L. Solot described the Tomkins consulting firm proposal to do an Initiative Study for $48,300. There was also some discussion regarding the WXP marketing study which was reviewed/discussed at the first WXP sales and marketing meeting with Investcorp. Eric J. Werner discussed the review of outsourcing Information Systems and reported that it would not be feasible. The Board discussed the unplanned project for the new ferrule saw for Werner Co.'s Chicago Division at a cost of $158,000.

At this time, there was a brief discussion regarding the restructuring of corporate entities. It was noted that the consolidation was to be completed by July 1, 1998. The Board reviewed and discussed MIICA's portfolio transfer and the disposition plan for the remaining MIICA assets.

Next, there was a brief review and discussion regarding the present corporate organization, succession planning, and future growth and development. The Board received a handout from Howard L.

Werner Holding Co. (PA), Inc.                                          June 16, 1998
Minutes of the Regular Quarterly Meeting of the Board of Directors     Page 3 of 3

Solot and Donald M. Werner.  The Board continued with a review and discussion regarding certain management compensation programs. Donald M. Werner reviewed and discussed the bought share/option program plans.  He noted that the Corporation had established an option pool equivalent to 10% of the outstanding shares or 8,354 options but was only planning to mutually grant 7% for option rights or 5,847 options. The final plan for option grants without Donald W. Resnick and Howard L. Solot was 4,480 leaving 1,367 options available for additional participants.  Currently management is recommending, but has not finalized additional option grants, including 500 options for the new President/COO, 225 options for the new CFO, and the following bought shares/options for certain key employees in the following areas:

| Other Key Employees | Bought Shares | Options |
|---|---|---|
| Sales Management | 20 | 75 |
| Plant Managers (3) | 20 | 50 |
| Corp. Manufacturing Manager | 20 | 50 |
| Operations/Planning Manager | 20 | 50 |
| Corp. Purchasing Manager | 20 | 50 |
| Top Engineers (2) | 20 | 50 |
| Manager Customer Fulfillment | 20 | 50 |

Donald M. Werner also explained concerns that there may be a demotivation because of the lack of potential for a 1998 bonus due to the sales fall off.

There was a brief review and discussion regarding the Corporation's relations with lenders and its future financing needs, debt reduction, accounts receivable securitization, including a review of the various key financial covenants and ratios.

Next, there was a review and discussion regarding growth plans as it applies to new product development and international opportunities, including a potential joint venture with A.H. AL-Zamil & Sons. The Board also received a report on acquisition updates, including TracRac, Green Bull and Zarges/Tubesco Altrex.

There was a brief review and discussion regarding the Corporation's pension plans, including administration and investments related thereto.  The Board reviewed and discussed a possible 401(k) provider change.

There was continued discussion including a brief review of planned changes to healthcare benefits. The Board also briefly reviewed and discussed a possible enhanced early retirement program. Eric J. Werner was requested to do some further analysis for Board consideration.

There being no further business to come before the meeting, the Chairman adjourned the meeting at 2:30 p.m.

A true record.                          ATTEST:


                                        _____
                                        Eric J. Werner, Secretary
                                        [Corporate Seal]

EXHIBIT 51

**WERNER HOLDING CO. (PA), INC.**

---oOo---

MINUTES OF THE

REGULAR QUARTERLY MEETING OF THE BOARD OF DIRECTORS

---oOo---

December 14, 1998

Pursuant to notice duly given, a copy of which has been filed with these minutes, the Regular Quarterly Meeting of the Board of Directors of Werner Holding Co. (PA), Inc., a Pennsylvania corporation (hereafter called the "Corporation"), was held on the 14th day of December, 1998, at Investcorp International Inc., 280 Park Avenue, 37th Floor, West Tower, New York, New York.

The meeting was called to order at 10:15 a.m. by Donald M. Werner, Chairman of the Board of Directors. Four (4) of the five (5) Directors of the Corporation were present: namely, Charles J. Philippin, Howard L. Solot, Christopher J. Stadler and Donald M. Werner, constituting a quorum for the proper conduct of business. The other Director, Savio W. Tung was unable to attend. Also present at the meeting as invited guests were Thomas J. Sullivan, Mamoun Askari and James Egan of Investcorp International Inc., Edward P. Norris, Acting Chief Financial Officer and Treasurer of the Corporation, Robert P. Tamburrino, newly elected Chief Financial Officer and Treasurer of the Corporation, Joseph J. Despoy, President - Werner Extruded Products ("WXP") commercial business unit ("CBU"), Michael E. Werner, President - Werner Ladder Co. ("WLC") CBU, Craig R. Werner, Director of Manufacturing Strategy of Werner Co. ("Werner") and Assistant Secretary/Treasurer of the Corporation and David E. Galfus of Policano & Manzo, L.L.C. Eric J. Werner, Secretary of the Corporation, recorded these minutes.

After some discussion and upon motion duly made and seconded, it was unanimously:

RESOLVED: That the reading of the minutes of the Regular Quarterly Meeting of the Board of Directors held on September 22, 1998, be, and hereby is, waived and that said minutes are approved as previously distributed.

At this time Donald M. Werner presented the Board with a general business overview. He noted that sales performance had improved after the first five (5) months of 1998. He discussed the consolidations that have continued at all levels, including manufacturers, retailers and wholesalers. There was some discussion and Donald M. Werner commented that the Corporation will see fewer, but stronger competitors. He also noted that the ladder market has continued to shift toward the power retailers. Donald M. Werner continued with his overview reporting that the extrusion market has strengthened. The Corporation has completed the paint and thermal line shutdowns as well as eliminated low margin accounts and improved margins. Overall expense control was reported to be good with the exception of high sales program expenses caused by the shift to power retailers. Extrusion capacity was strained with multiple press breakdowns and wide swings in customer forecasts which caused increased overtime and unabsorption. There was some discussion, and Donald M. Werner reported that the Corporation completed the development of the New Product Development Program and is in the process of staffing. The Board requested a presentation on the New Product Development Program and staffing expectations.

Werner Holding Co. (PA), Inc.
Minutes of the Regular Quarterly Meeting of the Board of Directors

December 14, 1998
Page 2 of 3

Donald M. Werner continued the business overview with reviewing gross sales for the eleven (11) months year-to-date. He reported that 1997 November ytd gross sales of $408.4 million was a 12.7% increase over 1996. 1998 November ytd gross sales of $428.6 million was a 4.9% increase over 1997. Gross sales for WLC CBU 1998 November ytd was a 4.7% increase over 1997 and WXP CBU was a 5.7% increase over 1997. There was also a review and discussion regarding 1999 projections. 1999 gross sales were projected at $491.3 million which is a 6.7% increase over 1998. Adjusted EBITDA projections for 1999 are $66 million, a 32.3% increase over 1998.

Pursuant to the agenda, Donald M. Werner reviewed the recent Audit Committee Meeting for the Board of Directors. He noted that although there was not a quorum present, an informal meeting was held on December 9, 1998. Donald M. Werner summarized the matters discussed which included various accounting and auditing issues, quarterly results, year-end financial statement close, internal control comments and internal audit activity and plans. There was some discussion.

Next, the Board reviewed and discussed the sales and marketing reports for the WXP and WLC CBU's. Michael E. Werner led a review and discussion regarding WLC CBU. He reviewed and discussed the WLC 1998 Plan and projected year-end results. There was continued discussion regarding the WLC plan and year-end projections as well as a review of awards. He continued with a review of major customers and issues/opportunities. There was also a review of competitors.

At this time, Joseph J. Despoy led a review and discussion regarding WXP CBU. He noted that 1998 was a good year and that margins are improving. There was some discussion.

There was also a review and discussion regarding the cost and operational improvement plans. Craig R. Werner led a review and discussion of the handouts previously provided to the Board of Directors. He presented the Board with an update on the Tompkin's project and reviewed the process improvement team structure, schedule, capital requirements, and results. Craig R. Werner continued with a review and discussion of other major capital projects.

At this time Donald M. Werner provided the Board of Directors with an overview of the Corporation's 1999 Budget Book. The Board reviewed and discussed the 1999 capital budget as well as the 1999 operating budget. Michael E. Werner led a review of WLC CBU operating budget and sales projections including topside with assumptions, line of business review, channel review and top customers. Joseph J. Despoy led a review of WXP CBU operating budget and sales projections. There was some discussion. Edward P. Norris continued with a review of the results of operations and latest financial statements of the Corporation. There was some discussion regarding year-end projections.

The Board continued with a review and discussion regarding the status of the executive searches and various executive personnel issues. There was some discussion.

At this time there was a brief review of possible acquisitions followed by a review of new product development process. After discussion and upon motion made and duly seconded, it was unanimously:

RESOLVED: That the next Regular Quarterly Meeting of the Board of Directors be held at 9:00 a.m. on February 25, 1999, at New York, New York and that the remainder of the regularly scheduled meetings be as follows:

Werner Holding Co. (PA), Inc.                                    December 14, 1998
Minutes of the Regular Quarterly Meeting of the Board of Directors        Page 3 of 3

| Date | Time | Location |
|------|------|----------|
| May 13, 1999 | 9:00 a.m. | Greenville, PA |
| July 29, 1999 | 9:00 a.m. | Franklin Park, IL |
| October 29, 1999 | 9:00 a.m. | Greenville, PA |

There being no further business to come before the meeting, the Chairman adjourned the meeting.

A true record.                              ATTEST:

                                            _____
                                            Eric J. Werner, Secretary
                                            [Corporate Seal]

EXHIBIT 52

**WERNER HOLDING CO. (PA), INC.**

---oOo---

MINUTES OF THE

REGULAR QUARTERLY MEETING OF THE BOARD OF DIRECTORS

---oOo---

February 25, 1999

Pursuant to notice duly given, a copy of which has been filed with these minutes, the Regular Quarterly Meeting of the Board of Directors of Werner Holding Co. (PA), Inc., a Pennsylvania corporation (hereafter called the "Corporation"), was held on the 25th day of February, 1999, at Investcorp International Inc., 280 Park Avenue, 37th Floor, West Tower, New York, New York.

The meeting was called to order at 9:45 a.m. by Donald M. Werner, Chairman of the Board of Directors. All five (5) Directors of the Corporation were present: namely, Charles J. Philippin, Howard L. Solot, Christopher J. Stadler, Savio W. Tung and Donald M. Werner, constituting a quorum for the proper conduct of business. Also present at the meeting as invited guests were Thomas J. Sullivan, Mamoun Askari, James O. Egan and Charles K. Marquis of Investcorp International Inc., Robert P. Tamburrino, Vice President, Chief Financial Officer and Treasurer of the Corporation, Joseph J. Despoy, President - Werner Extruded Products ("WXP") commercial business unit ("CBU"), Michael E. Werner, President - Werner Ladder Co. ("WLC") CBU, Michael D. Isacco, Vice President - Manufacturing of Werner Co. ("Werner"). Eric J. Werner, Secretary of the Corporation, recorded these minutes.

After some discussion and upon motion duly made and seconded, it was unanimously:

RESOLVED:  That the reading of the minutes of the Regular Quarterly Meeting of the Board of Directors held on December 14, 1998, be, and hereby is, waived and that said minutes are approved with such changes as were discussed at the meeting and as are reflected in the final copy of the minutes which have been inserted in the Minute Book.

At this time, Donald M. Werner presented the Board of Directors with a general business overview. He began by welcoming James O. Egan and Charles K. Marquis to the meeting, commenting that Messers Egan and Marquis will be on the slate for Directors at the next Annual Meeting of Shareholders. Mr. Werner continued with a review of the Corporation's sales for year-end 1998. Net sales for year-end 1998 were $435 million compared to $416.3 million in 1997. Although 1998 finished $16.2 below projections it was an $18.7 million increase over 1997. Adjusted EBITDA for 1998 was $51.3 million versus $47 million in 1997, but $15 million below the 1998 projection. There was a continued review and discussion regarding WLC and WXP sales, including a review of January and February 1999.

Donald M. Werner continued with his business update focusing on manufacturing and the press outages at Werner's Anniston, Chicago and Greenville Divisions. He reviewed current operations and provided a brief update on the Corporation's Continuous Productivity and Cost Improvement Process (formerly referred to as the "Tompkins Project"), noting that James Tompkins, Rob Haynes and Burt Schaffer from the Tompkins Associates Inc. ("Tompkins") were scheduled to present an update to the Board after lunch. The business update continued with a review and discussion regarding Werner's Finance and Information Systems departments and current issues. Donald M. Werner then reviewed the status of the

Werner Holding Co. (PA), Inc.                                                    February 25, 1999
Minutes of the Regular Quarterly Meeting of the Board of Directors               Page 2 of 3

current Chief Operating Officer/President search, discussing each of the potential candidates and the use of a new search firm. There was some discussion and Donald M. Werner continued with a licensee update, reviewing current relations in India and Brazil.

Next, the Board reviewed and discussed the sales and marketing reports for the WXP and WLC CBU's. Michael E. Werner led a review and discussion regarding WLC CBU. Discussion topics included 1998 results and the 1999 forecast, new product development and strategic opportunities. Then Joseph J. Despoy led a review and discussion regarding WXP CBU. Mr. Despoy reviewed current business results as well as strategic growth alternatives.

At this time the Board reviewed and discussed operations, significant events, and cost/operational improvement plans. Michael D. Isacco led a review of the cost improvements, including the Tompkins project. Jim Tompkins, Rob Haynes and Burt Schaffer, of Tompkins joined the meeting at this time and presented the Board with an update on the Tompkins Business Process Continuation Improvement project. After some discussion, the Tompkins guests were excused from the meeting and Eric J. Werner reviewed and discussed purchasing cost improvements. Michael D. Isacco then continued with a review and discussion regarding the capital program, including the Chicago Division Warehouse expansion and the 9th press project development. There was some discussion.

Next, there was a review and discussion regarding various strategic matters, including materials, current capacity, extruded products market potential, financial modeling, acquisition potentials and alternatives for further development. Donald M. Werner led a review and discussion referring the Board to various handouts previously provided. There was some discussion.

At this time there was a review and discussion regarding the 1999 EBITDA bonus target. Then the Board reviewed and discussed the 1999 capital spending status and capital budget, including tracking year to date. There was some discussion.

Then, there was a review and discussion regarding the results of operations and latest consolidated financial statements of the Corporation. Robert P. Tamburrino led a review of the un-audited 1998 financials, 4th quarter 1998 trends and January 1999 financial results. There was a review and discussion regarding the 1999 operating and capital budgets. After some discussion, and upon motion duly made and seconded, it was unanimously:

RESOLVED: That the 1999 Financial Plan, including the operating and capital budgets, with a carryover of $18 million for capital expenditures from 1998 be, and hereby is, ratified, confirmed, adopted and approved in all respects.

At this time the Board reviewed and discussed aluminum pricing and risk strategies as well as pension and actuarial studies. There was some discussion. Then there was a brief discussion regarding the progress on the year 2000 project. After discussion and upon motion made and duly seconded, it was unanimously:

RESOLVED: That the Annual Meeting of the Board of Directors be held at 9:00 a.m. on March 13, 1999, at the corporate offices of the Corporation in Greenville, Pennsylvania and that the remainder of the regularly scheduled meetings be as follows:

| Date | Time | Location |
|------|------|----------|
| July 29, 1999 | 9:00 a.m. | Franklin Park, IL |
| October 29, 1999 | 9:00 a.m. | Greenville, PA |

Werner Holding Co. (PA), Inc.
Minutes of the Regular Quarterly Meeting of the Board of Directors

February 25, 1999
Page 3 of 3

FURTHER RESOLVED: That the date of the Annual Meeting of Shareholders be, and hereby is, set for Wednesday, May 12, 1999 at 2:00 p.m. at the corporate offices of the Corporation in Greenville, Pennsylvania.

There being no further business to come before the meeting, the Chairman adjourned the meeting at 5:40 p.m.

A true record.

ATTEST:

Eric J. Werner, Secretary
[Corporate Seal]

EXHIBIT 53

**WERNER HOLDING CO. (PA), INC.**

--- o0o ---

MINUTES OF THE
MEETING OF THE AUDIT COMMITTEE

--- o0o ---

March 23, 1999

Pursuant to notice duly given, a copy which has been filed with these minutes, a meeting of the Audit Committee of the Board of Directors of Werner Holding Co. (PA), Inc. (the "Corporation"), a Pennsylvania corporation, was held on the 23rd day of March, 1999, at Investcorp International Inc., 280 Park Avenue, 37th Floor, West Tower, New York, New York.

The meeting was called to order at 11:00 a.m. by Donald M. Werner, who served as Chairman of the Audit Committee. Two of the three members of the Audit Committee were present; namely, Donald M. Werner and Christopher J. Stadler, constituting a quorum for the proper conduct of business. The other member and Chairman of the Committee, Charles J. Philippin, was unable to attend. Also present at the meeting as invited guests, were James O. Egan and Thomas J. Sullivan of Investcorp International Inc., Edward P. Norris, consultant to the Corporation, C. Lee Thomas, Todd A. Trehan and Robert N. Sawyer from the Cleveland, Ohio office of Ernst & Young (E&Y), the independent auditors of the Corporation. Eric J. Werner, Secretary of the Audit Committee recorded these minutes.

After discussion, and upon motion duly made and seconded, it was:

RESOLVED:    That the reading of the minutes of the June 5, 1998 meeting of the Audit Committee be, and hereby is, waived and that said minutes are approved as previously distributed.

There was also a review and discussion of the informal Audit Committee Meeting held on December 9, 1998. Next, the Committee reviewed the revised Audit Committee Charter that had previously been distributed to the Committee. After brief discussion, and upon motion duly made and seconded, it was unanimously:

RESOLVED: To recommend to the Board of Directors that the Audit Committee Charter, substantially in the form attached hereto, be, and hereby is ratified, adopted, confirmed and approved in all respects.

At this time E&Y reviewed the 1998 Report to the Audit Committee which had been previously distributed. There was a review of the approach used in preparing the audit results. E&Y continued with a review of required communications, followed by a review of the areas of audit emphasis, which included:

- Product Liabilities and Workers' Compensation Reserves
- Commitments and Contingencies
- Income Taxes
- OPEB and Pension Liabilities
- Credit Memos and Customer Incentives
- Stock Award Plans
- Hedging and Futures Contracts
- Valuation of Investments
- Inventory Valuation
- New Disclosure Requirements for Operating Segments, Pensions and OPEB's and Comprehensive Income

Werner Holding Co. (PA), Inc.                                            March 23, 1999
Minutes of the Meeting of the Audit Committee                            Page 2 of 2

Then there was a review and discussion regarding the comments on the 1998 consolidated financial statements which included disclosures about segments, market risk disclosures, travel and entertainment expense reporting, income taxes, product liability and workers' compensation, hedging, credit memo reserves, income statement reclassifications, and commitments and contingencies. There was some discussion.

Next, E&Y reviewed and discussed their focus on adding value. There was a review of E&Y's involvement with various accounting and reporting related matters, including quarterly close assistance, proposed acquisition due diligence, development of the audit committee charter and agendas, post employment benefit valuations and assistance with the drafting of the financial statements and 10-K. There was also a review of E&Y's involvement with various tax consulting and planning matters, including transaction cost analysis, the MIICA dissolution, records retention review and Illinois state sales tax credit.

After some discussion, there was a review and discussion regarding recent financial reporting developments. There was also a review and discussion regarding internal audit activities and plans.

The guests were excused and there was a private meeting with the outside Directors and E&Y.

There being no further business to come before the meeting, the Chairman adjourned the meeting at 12:30 p.m.

A true record.


ATTEST:

Eric J. Werner, Secretary

[Corporate Seal]

EXHIBIT 54

# WERNER CO.

--- oOo ---

## NOTICE OF SPECIAL MEETING OF THE BOARD OF DIRECTORS

--- oOo ---

TO:    THE DIRECTORS OF WERNER CO.

Upon order of Donald M. Werner, Chairman of the Board of the Corporation, notice is hereby given that a Special Meeting of the Board of Directors of Werner Co. (the "Corporation") will be held via teleconference at Gibson, Dunn & Crutcher, 200 Park Avenue, New York, New York on Wednesday, September 29, 1999, at 4:00 p.m. Eastern Standard Time, for the following purposes:

1.    To review and discuss a potential acquisition and the proposed asset purchase agreement. (DGH/RPT)

2.    To consider and act upon any other matters which may properly come before the meeting. (DMW)

Eric J. Werner, Secretary

Dated September 17, 1999

**WERNER CO.**

---oOo---

MINUTES OF THE

SPECIAL MEETING OF THE BOARD OF DIRECTORS

---oOo---

September 29, 1999

Pursuant to a written Waiver of Notice, signed by all of the Directors of the Corporation, a copy of which has been filed with these minutes, a Special Meeting of the Board of Directors of Werner Co., a Pennsylvania corporation (hereafter called the "Corporation"), was held via teleconference on the 29th day of September, 1999.

The meeting was called to order at 4:05 p.m. by Donald M. Werner, Chairman of the Board of Directors. Seven (7) of the eight (8) Directors of the Corporation were present: namely, James O. Egan, Dennis G. Heiner, Charles K. Marquis, Howard L. Solot, Christopher J. Stadler, Thomas J. Sullivan and Donald M. Werner, constituting a quorum for the proper conduct of business. The other Director, Charles J. Philippin was unable to attend. Also present at the meeting as invited guests were Robert P. Tamburrino and Michael E. Werner. Eric J. Werner, Secretary of the Corporation, recorded these minutes.

After some discussion regarding the potential acquisition and proposed asset purchase agreement between Keller Ladders, Inc. and the Corporation, and upon motion duly made and seconded, it was unanimously:

**RESOLVED:** That the form of and the terms and provisions contained in the Agreement of Purchase and Sale of Assets (the "Agreement"), by and between the Corporation and Keller Ladders, Inc., substantially in the form previously distributed to the Board of Directors of the Corporation, be and they hereby are, authorized, approved and adopted in all respects, and that the officers of the Corporation be, and each of them individually hereby is, authorized and directed, in the name and on behalf of the Corporation, to execute and deliver the Agreement and any other agreements, certificates, instruments and documents as may be required in connection therewith, in substantially the form hereby approved with such changes or additions thereto as the officer or officers executing the same shall, by execution thereof, approve; and

**FURTHER RESOLVED:** That any and all actions taken prior to the date of this consent by any of the officers or representatives of the Corporation for and on behalf of the Corporation in connection with the Agreement be, and hereby are, approved, adopted, ratified and confirmed in all respects; and

**FURTHER RESOLVED:** That the proper officers of the Corporation or their designee be, and hereby are, authorized and directed to execute, in the name and on behalf of the Corporation and under its corporate seal as necessary or advisable, and to deliver any and all agreements, certificates, applications, checks or other instruments and take from time to time any and all such action as may be necessary or desirable to implement the foregoing resolutions and the purposes contemplated thereby; and

Werner Co.                                                          September 29, 1999
Minutes of the Special Meeting of the Board of Directors                   Page 2 of 2

**FURTHER RESOLVED**:  That this consent may be executed in one or more counterparts and shall, in all respects, be deemed to be in lieu of a formal meeting of the Board of Directors of the Corporation, and the Directors do hereby waive all notice requirements in connection with said meeting.

There being no further business to come before the meeting, the Chairman adjourned the meeting at 5:15 p.m.

A true record.

ATTEST:

_____
Eric J. Werner, Secretary

[Corporate Seal]

EXHIBIT 55

WERNER HOLDING CO. (PA), INC.

---oOo---

MINUTES OF THE

REGULAR QUARTERLY MEETING OF THE BOARD OF DIRECTORS

---oOo---

December 8, 1999

Pursuant to notice duly given, a copy of which has been filed with these minutes, the Regular Quarterly Meeting of the Board of Directors of Werner Holding Co. (PA), Inc., a Pennsylvania corporation (hereafter called the "Corporation"), was held on the 8th day of December, 1999, at Gibson, Dunn & Crutcher, 200 Park Avenue, New York, New York.

The meeting was called to order at 9:15 a.m. by Donald M. Werner, Chairman of the Board of Directors. Seven (7) of the eight (8) Directors of the Corporation were present: namely, James O. Egan, Dennis G. Heiner, Charles K. Marquis, Howard L. Solot, Christopher J. Stadler, Thomas J. Sullivan, and Donald M. Werner, constituting a quorum for the proper conduct of business. The other Director, Charles J. Philippin was unable to attend. Also present at the meeting as invited guests were Robert P. Tamburrino, Vice President, Treasurer and Chief Financial Officer of the Corporation, Savio W. Tung of Investcorp International Inc. and Michael E. Werner, President of Werner Ladder Co. ("WLC") commercial business unit ("CBU") a division of Werner Co. ("Werner"). Eric J. Werner, Secretary of the Corporation, recorded these minutes.

After some discussion and upon motion duly made and seconded, it was:

**RESOLVED:** That the reading of the minutes of the Regular Quarterly Meeting of the Board of Directors held on August 12, 1999, be, and hereby is, waived and that said minutes are approved as previously distributed.

At this time, Dennis G. Heiner provided the Board with a general business overview. Handouts were distributed and there was some discussion. Next, Robert P. Tamburrino led a review and discussion regarding financial results. Handouts were distributed and Mr. Tamburrino reviewed the October year to date operating results, November flash and forecast for 1999. After some discussion, Mr. Tamburrino led a review and discussion of the Keller acquisition integration status, West Coast facility and preliminary budget.

Following a short break, Dennis G. Heiner led a presentation on strategic matters, including a strategic issues update. He presented the Board with the Strawman strategic plan and reviewed priorities. There was some discussion.

At this time, Robert P. Tamburrino led a review and discussion of the 2000 budget. Handouts were distributed and there was some discussion. There was also a commercial business unit review as well as reviews of various Werner departments/functional areas.

Pursuant to the agenda, the Board reviewed and discussed amending the Werner Holding Co. (PA), Inc. Stock Incentive Plan and certain Stock Option Agreements as necessary and appropriate. After some discussion and upon motion duly made and seconded, it was unanimously:

**RESOLVED:** That the proper officers of the Corporation be, and hereby are, authorized and directed to enter into agreements and other documentation considered necessary or appropriate by such officers to implement the following:

- New, revised EBITDA targets as set forth on Exhibit A hereto shall govern the vesting of (1) the stock option grants set forth on Exhibit B hereto and (2) stock options hereafter granted under the Corporation's Stock Incentive Plan (and, except as set forth above, all stock options previously granted under the Stock Incentive Plan will continue to be subject to the original EBITDA targets set forth in documentation pertaining to the grant of such options);

- With respect to the form of Stock Option Agreement for use under the Stock Incentive Plan hereafter, (1) any recipient of a stock option grant who became or becomes an employee of the Corporation or any subsidiary on or prior to June 30 of a particular year shall be eligible for performance-based vesting based on achievement of the EBITDA target for such year and (2) any recipient of a stock option grant who became or becomes an employee of the Corporation or any subsidiary after June 30 of a particular year shall become first eligible for performance-based vesting based on achievement of the EBITDA target for the next year.

**FURTHER RESOLVED:** That amendments to the Stock Incentive Plan, the effected existing Stock Option Agreements and the form of Stock Option Agreement used under the Stock Incentive Plan to effectuate the foregoing are hereby approved.

Next, the Board reviewed the documentation relating to the compensation/incentive programs/benefits for Dennis G. Heiner as well as certain stock purchases/option grants to other Werner Co. employees. After some discussion and upon motion duly made and seconded, it was unanimously:

**RESOLVED:** That the form of, and each of the terms and provisions contained in the (i) Management Stock Purchase Agreement, as amended, between Investcorp Werner Holdings L.P., a Cayman Islands corporation, the Corporation and Dennis G. Heiner for Seven Hundred Twenty-Five (725) shares, and (ii) Stock Option Agreement pursuant to the Werner Holding Co. (PA), Inc. Stock Incentive Plan, by and between the Corporation and Dennis G. Heiner for One Thousand Two Hundred Fifty (1,250) options, and any and all actions taken by the officers of the Corporation in executing the same, be, and hereby are, ratified, confirmed, approved and adopted in all respects; and

**FURTHER RESOLVED:** That the Company ratify the adoption of the Werner Co. Deferred Stock Plan (the "Plan") by Werner Co., the Company's wholly-owned subsidiary, and authorize the grant to Dennis G. Heiner, the Chief Executive Office of Werner Co., of such number of shares of the Company's Class C stock, $0.01 par value ("Class C Stock") not to exceed One Thousand Three Hundred Eight (1308) shares, as shall be required to satisfy the obligation of Werner Co. to distribute Class C Stock to Mr. Heiner pursuant to the Plan; and

**FURTHER RESOLVED:** That the form of, and each of the terms and provisions contained in the (i) Management Stock Purchase Agreement, between Investcorp Werner Holdings L.P., a Cayman Islands corporation, the Corporation and Charles A. Barlow for Twenty-Five (25) shares, and (ii) Stock Option Agreement pursuant to the Werner Holding Co. (PA), Inc. Stock Incentive Plan, by and between the Corporation and Charles A. Barlow for One Hundred (100) options, and any and all actions taken by the officers of the Corporation in executing the same, be, and hereby are, ratified, confirmed, approved and adopted in all respects; and

**FURTHER RESOLVED:** That the form of, and each of the terms and provisions contained in the (i) Management Stock Purchase Agreement, between Investcorp Werner Holdings L.P., a Cayman Islands corporation, the Corporation and Lynn E. Price for Thirty-Five (35) shares, and (ii) Stock Option Agreement pursuant to the Werner Holding Co. (PA), Inc. Stock Incentive Plan, by and between the Corporation and Lynn E. Price for One Hundred (100) options, and any and all actions taken by the officers of the Corporation in executing the same, be, and hereby are, ratified, confirmed, approved and adopted in all respects; and

**FURTHER RESOLVED:** That the form of, and each of the terms and provisions contained in the (i) Management Stock Purchase Agreement, between Investcorp Werner Holdings L.P., a Cayman Islands corporation, the Corporation and Dennis J. Johnson for Twenty (20) shares, and (ii) Stock Option Agreement pursuant to the Werner Holding Co. (PA), Inc. Stock Incentive Plan, by and between the Corporation and Dennis J. Johnson for Fifty (50) options, and any and all actions taken by the officers of the Corporation in executing the same, be, and hereby are, ratified, confirmed, approved and adopted in all respects; and

**FURTHER RESOLVED:** That the form of, and each of the terms and provisions contained in the (i) Management Stock Purchase Agreement, between Investcorp Werner Holdings L.P., a Cayman Islands corporation, the Corporation and Robert A. Rosati for Twenty-Five (25) shares, and (ii) Stock Option Agreement pursuant to the Werner Holding Co. (PA), Inc. Stock Incentive Plan, by and between the Corporation and Robert A. Rosati for Seventy-Five (75) options, and any and all actions taken by the officers of the Corporation in executing the same, be, and hereby are, ratified, confirmed, approved and adopted in all respects.

Next, there was some discussion regarding Donald M. Werner's upcoming retirement. After some discussion and upon motion duly made and seconded, it was unanimously:

**RESOLVED:** That the officers of the Corporation be and hereby are authorized to enter into an amendment to the Stock Option Agreement of Donald M. Werner dated as of November 16, 1998 (the "DMW Option Agreement") which granted Mr. Werner stock options to purchase Five Hundred Eighty-Five (585) shares of Class C Common Stock to implement the following (effective upon Mr. Werner's retirement as an executive officer of the Corporation at December 31, 1999):

- Notwithstanding that Mr. Werner will cease to be an employee of the Corporation and any subsidiary upon such retirement, Mr. Werner will be entitled to continue to hold options to purchase 100 shares of Class C Common Stock under the DMW Option Agreement, as amended;

Werner Holding Co. (PA), Inc.
Minutes of the Regular Quarterly Meeting of the Board of Directors

- The balance of the options originally granted thereunder will be deemed cancelled;

- The options to purchase 100 shares remain subject to the same terms and conditions as set forth in the original DMW Option Agreement.

**FURTHER RESOLVED:** That the proper officers of the Corporation or their designee be, and hereby are, authorized and directed to execute, in the name and on behalf of the Corporation and under its corporate seal as necessary or desirable, and to deliver any and all agreements, certificates, applications, checks or other instruments taken from time to time, any and all such action as may be necessary or desirable to implement the foregoing resolutions as such officer deems appropriate and in the best interests of the Corporation.

There being no further business to come before the meeting, the Chairman adjourned the meeting at 3:12 p.m.

A true record.

ATTEST:

Eric J. Werner, Secretary

[Corporate Seal]

EXHIBIT 56

**WERNER HOLDING CO. (PA), INC.**

---oOo---

MINUTES OF THE ANNUAL MEETING OF SHAREHOLDERS

---oOo---

May 10, 2000

In accordance with due and sufficient notice properly given by the Secretary of Werner Holding Co. (PA), Inc., (the "Corporation"), a Pennsylvania corporation, on April 14, 2000, to each holder of Class A, B and D Stock of the Corporation, the only stock of the Corporation having voting privileges, the Annual Meeting of Shareholders was held at Investcorp International Inc., 280 Park Avenue, 36th Floor, West Tower, New York, New York, on Wednesday, May 10, 2000.

The meeting was called to order at 8:30 a.m. by Donald M. Werner, Chairman of the Board of Directors of the Corporation. The Shareholders present at the meeting included: Noel Berk-Rauch, Howard L. Solot, Donald M. Werner and Eric J. Werner. Also present at the meeting by invitation were Dennis G. Heiner, President and Chief Executive Officer of the Corporation, Robert P. Tamburrino, Vice President, Treasurer and Chief Financial Officer of the Corporation and Thomas J. Sullivan of Investcorp International Inc. Eric J. Werner, Secretary of the Corporation, recorded these minutes.

The Chairman asked the Secretary to determine the number of shares represented at the meeting. The Secretary reported that 1,629.3178 shares of the 1,879.5454 total shares, representing 86.69%, of the Corporation's Class A Stock issued and outstanding and entitled to vote at the meeting, 17,837.0840 shares of the 21,774.9346 shares, representing 81.92%, of the Corporation's Class B Stock issued and outstanding and entitled to vote at the meeting, and all 1,000 shares of the 1,000 shares, representing 100%, of the Corporation's Class D Stock issued and outstanding and entitled to vote at the meeting, were represented at the meeting either in person or by proxy. Each share of Class A Stock and Class B Stock is entitled to one vote and each share of Class D Stock is entitled to 50.6818 votes. The Secretary reported that 70,148.2018 of the 74,336.2800 total votes, representing 94.37% was represented at the meeting either in person or by proxy. The Secretary announced that a quorum was present for all purposes and that the meeting was lawfully and properly convened and competent to proceed with the transaction of business for which it had been called.

Then the Chairman made some general comments and presented an overview of the Corporation's 1999 financial performance noting that 1999 had been a good year. There was some discussion and the Chairman reviewed certain significant events occurring in 1999, including the election of Dennis G. Heiner as President and Chief Executive Officer, the Keller acquisition, and his own retirement. He noted that the Corporation could expect continued growth, restructuring and management additions throughout the year.

After discussion, the Chairman remarked that it was time to read and approve the minutes of the Special Meeting of the Shareholders held on July 15, 1999. There was a motion duly made and seconded that it be:

RESOLVED: That the reading of the minutes of the Special Meeting of the Shareholders on July 15, 1999, be, and hereby is, waived and that said minutes are approved as previously distributed.

Werner Holding Co. (PA), Inc.                                                    May 10, 2000
Minutes of the Annual Meeting of Shareholders                                    Page 2 of 3

There was some discussion and the votes were cast as follows:

| Votes For | Votes Against | Votes Withheld |
|-----------|---------------|----------------|
| 70,148.2018 | -0- | -0- |

The Secretary announced the votes and stated that the resolution had passed unanimously.

The Chairman stated that the next order of business was to fix the size of the Board of Directors and to elect the same. It was then moved and duly seconded that it be:

RESOLVED: That the size of the Board of Directors be set at eight (8) persons and that the following eight (8) persons be elected as Directors of the Corporation: James O. Egan, Dennis G. Heiner, Charles K. Marquis, Charles J. Philippin, Howard L. Solot, Christopher J. Stadler, Thomas J. Sullivan and Donald M. Werner, each to serve until the next Annual Meeting of Shareholders of the Corporation and until the election of the Director's successor, unless he shall resign or his office becomes vacant by reason of death, removal or other cause.

There was some discussion and the votes were cast as follows:

| Votes For | Votes Withheld |
|-----------|----------------|
| 69,057.1714 | 799.9995 votes withheld for Donald M. Werner |
| | 799.9995 votes withheld for Howard L. Solot |
| | and 1,091.0304 votes withheld for all |

The Secretary announced the votes and stated that the resolution had passed.

The Chairman stated that the next order of business was the approval and adoption of the Amended and Restated Articles of Incorporation in the form distributed to shareholders with the Notice of Meeting. It was then moved and duly seconded that it be:

RESOLVED: That the Amended and Restated Articles of Incorporation be, and hereby are, ratified, confirmed, adopted and approved in all respects.

There was some discussion and the votes were cast as follows:

| Votes For | Votes Against | Votes Withheld |
|-----------|---------------|----------------|
| 66,431.7723 | 799.9995 | 2,916.4320 |

The Secretary announced the votes and stated that the resolution had passed.

The Chairman announced that the next item on the agenda was the ratification of the selection of PriceWaterhouseCooper LLP as the Corporation's independent auditors for the next fiscal year. After discussion, and upon the recommendation from the Corporation's Audit Committee, it was then moved and duly seconded that it be:

Werner Holding Co. (PA), Inc.                                    May 10, 2000
Minutes of the Annual Meeting of Shareholders                   Page 3 of 3

    RESOLVED:    That the selection of PriceWaterhouseCooper LLP as the independent auditors of the Corporation for a term ending with the next Annual Meeting of Shareholders and thereafter until a successor is elected and qualified, be, and hereby is, ratified, confirmed and approved in all respects.

    There was some discussion and the votes were cast as follows:

| Votes For | Votes Against | Votes Withheld |
|-----------|---------------|----------------|
| 69,280.7734 | -0- | 867.4304 |

The Secretary announced the votes and stated that the resolution had passed.

    Next there was a discussion regarding the distribution of 1999 financial statements to all Shareholders. Robert P. Tamburrino reviewed and discussed the Corporation's recent 10-K filing. He noted that sales for 1999 were up 11% over 1998. The Corporations net income for 1999 was $11 million versus $0 for 1998. EBITDA increased from $51 million in 1998 to $60.8 million in 1999 which included certain unusual items (i.e. Keller $2 million, transition & executive hirings $2 million and unusual claims & past Amarlite pension employees $1 million). Mr. Tamburrino continued with a review of the Keller acquisition and integration. There was some discussion. He also noted that the balance sheet and financial covenants were in compliance and the $100 million credit line is mostly unused.

    The Chairman asked if there were any other matters which should properly come before the meeting. There being no further business to come before the meeting, after motion duly made and seconded, it was unanimously resolved to adjourn at 9:00 a.m.

    A true record.

                      Attest:

                      Eric J. Werner, Secretary

                      [Corporate Seal]

EXHIBIT 57

**WERNER HOLDING CO. (PA), INC.**

---o0o---

MINUTES OF THE

ANNUAL MEETING OF THE BOARD OF DIRECTORS

---o0o---

May 10, 2000

Pursuant to notice duly given, a copy of which has been filed with these minutes, the Annual Meeting of the Board of Directors of Werner Holding Co. (PA), Inc., a Pennsylvania corporation (hereafter called the "Corporation"), was held on the 10th day of May, 2000, at Investcorp International Inc., 280 Park Avenue, 36th Floor, West Tower, New York, New York.

The meeting was called to order at 9:00 a.m. by Donald M. Werner, Chairman of the Board of Directors. Seven (7) of the eight (8) Directors of the Corporation were present: namely, James O. Egan, Dennis G. Heiner, Charles K. Marquis, Howard L. Solot, Christopher J. Stadler, Thomas J. Sullivan and Donald M. Werner, constituting a quorum for the proper conduct of business. The other Director, Charles J. Philippin was unable to attend. Also present at the meeting as an invited guest was Robert P. Tamburrino, Vice President, Treasurer and Chief Financial Officer of the Corporation. Eric J. Werner, Secretary of the Corporation, recorded these minutes.

After some discussion and upon motion duly made and seconded, it was:

RESOLVED:  That the reading of the minutes of the Regular Quarterly Meeting of the Board of Directors held on March 2, 2000, be, and hereby is, waived and that said minutes are approved as previously distributed.

The next order of business was to elect the Chairman of the Board of Directors. After discussion and upon motion duly made by Christopher J. Stadler and seconded by Howard L. Solot, it was unanimously:

RESOLVED:   That Donald M. Werner, be, and hereby is, elected as Chairman of the Board, to serve until the first meeting of the Board of Directors following the next Annual Meeting of Shareholders of the Corporation and until the election and qualification of his successor, unless he shall resign or his office becomes vacant by reason of death, removal, or other cause.

After discussion and upon motion duly made by James O. Egan and seconded by Christopher J. Stadler, it was unanimously:

RESOLVED:   That the following persons be, and hereby are, elected officers of the Corporation, each to serve until the first meeting of the Board of Directors following the next Annual Meeting of Shareholders of the Corporation and until the election and qualification of his successor, unless he shall resign or his office becomes vacant by reason of death, removal, or other cause:

Werner Holding Co. (PA), Inc.                                                        May 10, 2000
Minutes of the Annual Meeting of the Board of Directors                             Page 2 of 3

| Name | Position |
|------|----------|
| Dennis G. Heiner | President and Chief Executive Officer |
| Robert P. Tamburrino | Vice President, Treasurer and Chief Financial Officer |
| Eric J. Werner | Vice President, Secretary, General Counsel and Corporate Ethics Officer |
| Larry V. Friend | Vice President and Controller |

Next, there was a brief review and discussion of the Corporation's Audit Committee and the recent Audit Committee Meeting held on March 24, 2000. After some discussion, and upon motion duly made by Christopher J. Stadler and seconded, it was unanimously:

RESOLVED: That the following persons be, and hereby are, appointed to the Audit Committee of the Corporation, each to serve until the next Annual Meeting of the Board of Directors, unless they shall resign or their office becomes vacant by reason of death, removal, or other cause:

Name:
James O. Egan
Dennis G. Heiner
Thomas J. Sullivan, Chairman
Donald M. Werner

After discussion and upon motion duly made and seconded, it was unanimously:

RESOLVED: That the officers of the Corporation be, and hereby are, authorized to execute a Written Consent of the Sole Shareholder in Lieu of Annual Meeting for the Corporation's wholly-owned subsidiary, Werner Holding Co. (DE), Inc., substantially in the form as has been previously distributed to the Board of Directors of the Corporation and is acceptable by the officer(s) executing the same.

At this time, the Board confirmed the dates of the next regular quarterly meetings of the Board of Directors scheduled for August 10, 2000 at 9:00 a.m. in Greenville, Pennsylvania and November 30, 2000 at 9:00 a.m. in New York, New York. It was noted that Howard L. Solot would be unable to attend the August meeting.

Next, the Board went into Executive Session. Dennis G. Heiner reviewed the Management Leadership Team survey and key issues. There was some discussion and Donald M. Werner reviewed various comments. There was also a review and discussion regarding the new short term variable pay bonus compensation program. After some discussion and upon motion duly made and seconded, it was unanimously:

RESOLVED: That the Werner Short Term Variable Pay Bonus Compensation Program, substantially in the form presented to this Board of Directors, be, and hereby is, adopted, approved, ratified and confirmed in all respects and the proper officers of the Corporation be, and hereby are, authorized and directed to amend the existing employment agreements to reflect such program.

The Board continued with a review and discussion regarding revising as appropriate the Fair Market Value of the shares of stock of the Corporation as required by the Shareholder Agreement, Werner Holding Co. (PA), Inc. Stock Incentive Plan, Stock Option Agreement and Management Stock Purchase Agreement. After some discussion and upon motion duly made and seconded, it was unanimously:

Werner Holding Co. (PA), Inc.                                           May 10, 2000
Minutes of the Annual Meeting of the Board of Directors                 Page 3 of 3

RESOLVED: That the Fair Market Value of the shares of Stock of the Corporation be, and hereby is $3,100 per share, effective as of May 10, 2000.

Next, the Board reviewed the current stock option vesting schedule and discussed vesting additional associates and amending the EBITDA vesting targets of certain stock option agreements. After some discussion and upon motion duly made and seconded, it was unanimously:

RESOLVED: That the attached list of associates specifying the number of options vested pursuant to management programs approved by this Board of Directors, be, and hereby is ratified, confirmed, adopted and approved in all respects; and

FURTHER RESOLVED: That the revised EBITDA targets as set forth on Exhibit A and B hereto shall govern the vesting of the stock option grants set forth on Exhibit C hereto and the proper officers of the Corporation be, and hereby are, authorized and directed to amend the existing agreements to include the revised EBITDA targets as well as amend the exercisability of the stock options from 1/5 vesting to 1/4 vesting per year as necessary and appropriate to implement this resolution.

At this time, Michael E. Werner, President Werner Ladder Co. ("WLC") commercial business unit ("CBU"), Daniel S. McAtee, Vice President Six Sigma/Master Black Belt at Werner Co. ("Werner") and William R. Hackett, Vice President Operations at Werner joined the meeting. Robert P. Tamburrino led a review and discussion regarding financial results for the first quarter of 2000. Handouts were distributed and there was some discussion. Mr. Tamburrino continued with a review of current profit improvement activities and provided an ERP update.

Next, Michael E. Werner presented the Board with an update on the Keller integration. After some discussion Dennis G. Heiner reviewed strategic initiatives. Michael E. Werner then provided the Board with an update on the WLC CBU, including key initiatives, situation analysis, new product development and acquisitions.

After some discussion Daniel S. McAtee presented the Board with an update on Werner Extruded Products CBU, including key initiatives, press utilization profits, profit improvement and acquisitions. William R. Hackett then provided the Board with an operations update and there was some discussion regarding the consulting agreement with The Highland Group to be approved by the Werner Board of Directors. After some discussion, the Board received an update on WLC quality initiatives.

There being no further business to come before the meeting, the Chairman adjourned the meeting at 4:25 p.m.

A true record.                                    ATTEST:

                                                  _____
                                                  Eric J. Werner, Secretary
                                                  [Corporate Seal]

EXHIBIT 58

WERNER HOLDING CO. (PA), INC.

---oOo---

MINUTES OF THE

REGULAR QUARTERLY MEETING OF THE BOARD OF DIRECTORS

---oOo---

November 30, 2000

Pursuant to notice duly given, a copy of which has been filed with these minutes, the Regular Quarterly Meeting of the Board of Directors of Werner Holding Co. (PA), Inc., a Pennsylvania corporation (hereafter called the "Corporation"), was held on the 30th day of November, 2000, at Investcorp International Inc., 280 Park Avenue, 37th Floor, West Tower, New York, New York.

The meeting was called to order at 9:15 a.m. by Donald M. Werner, Chairman of the Board of Directors. All nine (9) of the Directors of the Corporation were present; namely, Mamoun Askari, James O. Egan, Dennis G. Heiner, Charles K. Marquis, Howard L. Solot, Christopher J. Stadler, Thomas J. Sullivan, Donald M. Werner, and Michael E. Werner, constituting a quorum for the proper conduct of business. Also present at the meeting as invited guests were Robert P. Tamburrino, Chief Operating Officer, Vice President, Treasurer and Chief Financial Officer of the Corporation and Amy Basille of Investcorp International Inc. Eric J. Werner, Secretary of the Corporation, recorded these minutes.

Following an executive session of the Board, there was some discussion and upon motion duly made and seconded, it was unanimously:

**RESOLVED:** That the reading of the minutes of the Annual Meeting of the Board of Directors held on May 10, 2000, be, and hereby is, waived and that said minutes are approved as previously distributed.

Next, the Board confirmed the dates and locations of the 2001 Board of Director and Shareholder meetings scheduled as follows:

| Date | Time | Location |
|------|------|----------|
| March 8, 2001 | 9:00 a.m. | New York, NY |
| May 17, 2001 | * | New York, NY |
| August 8, 2001 | 9:00 a.m. | Chicago, IL |
| December 12, 2001 | 9:00 a.m. | New York, NY |

*Following 8:30 a.m. Annual Shareholder Meeting

At approximately 11:15 a.m. Larry V. Friend, Vice President and Controller of the Corporation and Daniel S. McAtee, Vice President Six Sigma of Werner Co. joined the meeting. Materials were distributed and Mr. Friend led a review and discussion regarding the Corporation's Year 2000 Estimate and Review. He reviewed the consolidated financial highlights, including a comparison of the 2000 forecast to the 2000 plan and 1999 actuals. There was some discussion and a continued review of the 2000 forecasts by strategic business units, inventories and cash flows as well as a review of EBITDA projections for 2000.

Werner Holding Co. (PA), Inc.                                                    November 30, 2000
Minutes of the Regular Quarterly Meeting of the Board of Directors                     Page 2 of 2

     After some discussion, Dennis G. Heiner presented the Board with an overview of the Year 2001 Business Plan.  Mr. Heiner reviewed the business planning process, objectives for the Corporation, growth and performance initiatives and operating priorities.  There was some discussion.

     Next, Robert P. Tamburrino presented the Board with an update on the ERP project and organizational changes.  Then there was a review and discussion of significant legal issues, led by Eric J. Werner.  After some discussion and upon motion duly made and seconded, it was unanimously:

     **RESOLVED**:  That the proper officers of the Corporation or their designee be, and hereby are, authorized and directed to execute, in the name and on behalf of the Corporation and under its corporate seal as necessary or desirable, and to deliver any and all agreements, certificates, applications, checks or other instruments taken from time to time, any and all such action as may be necessary or desirable to implement the foregoing resolutions as such officer deems appropriate and in the best interests of the Corporation.

There being no further business to come before the meeting, the Chairman adjourned the meeting at 2:30 p.m.

A true record.

                              ATTEST:

                              Eric J. Werner, Secretary

                              [Corporate Seal]

EXHIBIT 59

WERNER HOLDING CO. (PA), INC.

---oOo---

MINUTES OF THE

REGULAR QUARTERLY MEETING OF THE BOARD OF DIRECTORS

---oOo---

March 9, 2001

Pursuant to notice duly given, a copy of which has been filed with these minutes, the Regular Quarterly Meeting of the Board of Directors of Werner Holding Co. (PA), Inc., a Pennsylvania corporation (hereafter called the "Corporation"), was held on the 9th day of March, 2001, at Investcorp International Inc., 280 Park Avenue, 37th Floor, West Tower, New York, New York.

The meeting was called to order at 8:12 a.m. by Donald M. Werner, Chairman of the Board of Directors. All nine (9) of the Directors of the Corporation were present: namely, Mamoun Askari, James O. Egan, Dennis G. Heiner, Charles K. Marquis, Howard L. Solot, Christopher J. Stadler, Thomas J. Sullivan, Donald M. Werner, and Michael E. Werner, constituting a quorum for the proper conduct of business. Also present at the meeting as invited guests were Robert P. Tamburrino, Chief Operating Officer and Vice President of the Corporation, Larry V. Friend, Vice President, Chief Financial Officer and Treasurer of the Corporation, Edward W. Gericke, Vice President at Werner Co. ("Werner"), and Amy Basille of Investcorp International Inc. Eric J. Werner, Secretary of the Corporation, recorded these minutes.

After some discussion and upon motion duly made and seconded, it was unanimously:

**RESOLVED**:  That the reading of the minutes of the Regular Quarterly Meeting of the Board of Directors held on November 30, 2000, be, and hereby is, waived and that said minutes are approved as previously distributed.

Next, the Board confirmed the dates and locations of the 2001 Board of Director and Shareholder meetings scheduled as follows:

| Date | Time | Location |
|------|------|----------|
| May 17, 2001 | * | New York, NY |
| August 8, 2001 | 9:00 a.m. | Chicago, IL |
| December 12, 2001 | 9:00 a.m. | New York, NY |

*Following 8:30 a.m. Annual Shareholder Meeting

At this time the Board received a general management briefing from Dennis G. Heiner, including a review of 2000 results, the 2001 Business Plan and priorities and key performance drivers. Larry V. Friend continued the management briefing with a financial review including February 2001 year to date performance and key performance drivers year to date results.

Then Edward W. Gericke led a review and discussion regarding ladder products results year to date and the outlook for 2001. Mr. Gericke discussed key performance drivers and provided an update on the marketplace and major customers as well as ladder product priorities. Robert P. Tamburrino then presented the Board with an update on extruded products results year to date and outlook for 2001, including key performance drivers and priorities. Mr. Tamburrino then reviewed operations results year to date and 2001 priorities.

Werner Holding Co. (PA), Inc.                                           March 9, 2001
Minutes of the Regular Quarterly Meeting of the Board of Directors       Page 2 of 2

After some discussion the Board received an ERP update from Robert P. Tamburrino and an organizational update from Dennis G. Heiner. The guests were excused and the Board had an executive session.

Following an executive session of the Board, there was a review of significant legal issues led by Eric J. Werner. Then there was some discussion regarding the approval of option vesting and additional option grants. After discussion, and upon motion duly made and seconded, it was unanimously:

**RESOLVED:** That the attached list of associates specifying the number of options vested pursuant to management programs approved by this Board of Directors, be, and hereby is ratified, confirmed, adopted and approved in all respects; and

**FURTHER RESOLVED:** That the form of, and each of the terms and provisions contained in the Stock Option Agreements pursuant to the Werner Holding Co. (PA), Inc. Stock Incentive Plan, as amended, by and between the Corporation and each of the individuals on the attached option grant spreadsheet for the number of options next to their respective names, and any and all actions taken by the officers of the Corporation in executing the same, be, and hereby are, ratified, confirmed, approved and adopted in all respects; and

**FURTHER RESOLVED:** That the proper officers of the Corporation or their designee be, and hereby are, authorized and directed to execute, in the name and on behalf of the Corporation and under its corporate seal as necessary or desirable, and to deliver any and all agreements, certificates, applications, checks or other instruments taken from time to time, any and all such action as may be necessary or desirable to implement the foregoing resolutions as such officer deems appropriate and in the best interests of the Corporation.

There being no further business to come before the meeting, the Chairman adjourned the meeting at 11:55 a.m.

A true record.                          ATTEST:

                                        _____
                                        Eric J. Werner, Secretary

                                        [Corporate Seal]

EXHIBIT 60

WERNER HOLDING CO. (PA), INC.

---oOo---

MINUTES OF THE ANNUAL MEETING OF SHAREHOLDERS

---oOo---

May 15, 2001

In accordance with due and sufficient notice properly given by the Secretary of Werner Holding Co. (PA), Inc., (the "Corporation"), a Pennsylvania corporation, on April 12, 2001, to each holder of Class A, B and D Stock of the Corporation, the only stock of the Corporation having voting privileges, the Annual Meeting of Shareholders was held at Investcorp International Inc., 280 Park Avenue, 36th Floor, West Tower, New York, New York, on Tuesday, May 15, 2001.

The meeting was called to order at 8:35 a.m. by Michael E. Werner, who was appointed Chairman of the meeting. The Shareholders entitled to vote that were present at the meeting included: Noel Berk-Rauch, Howard L. Solot, Eric J. Werner and Michael E. Werner. Also present at the meeting by invitation were Dennis G. Heiner, President and Chief Executive Officer of the Corporation, Robert P. Tamburrino, Vice President and Chief Operating Officer of the Corporation, Larry V. Friend, Vice President, Chief Financial Officer and Treasurer of the Corporation, Ed W. Gericke, Vice President-Sales at Werner Co., Mamoun Askari, Charles L. Griffith, James F. Hardymon, Christopher J. Stadler and Thomas J. Sullivan of Investcorp International Inc. Eric J. Werner, Secretary of the Corporation, recorded these minutes.

The Chairman asked the Secretary to determine the number of shares represented at the meeting. The Secretary reported that all 1,879.5454 shares of the 1,879.5454 total shares, representing 100%, of the Corporation's Class A Stock issued and outstanding and entitled to vote at the meeting, 19,636.8026 shares of the 21,774.9346 shares, representing 90.18%, of the Corporation's Class B Stock issued and outstanding and entitled to vote at the meeting, and all 1,000 shares of the 1,000 shares, representing 100%, of the Corporation's Class D Stock issued and outstanding and entitled to vote at the meeting, were represented at the meeting either in person or by proxy. Each share of Class A Stock and Class B Stock is entitled to one vote and each share of Class D Stock is entitled to 50.6818 votes. The Secretary reported that 72,198.1480 of the 74,336.2800 total votes, representing 97.12% was represented at the meeting either in person or by proxy. The Secretary announced that a quorum was present for all purposes and that the meeting was lawfully and properly convened and competent to proceed with the transaction of business for which it had been called.

Then Dennis G. Heiner made some general comments and presented an overview of the Corporation's 2000 financial performance. He noted that 2000 had challenges and disappointments and although there was a lot of effort, the Corporation still didn't make the plan. He further noted that the Corporation made investments in a lot of initiatives and would now be better positioned coming into 2001 versus the end of 2000.

The Chairman stated that the next order of business was to fix the size of the Board of Directors and to elect the same. Christopher J. Stadler introduced Charles L. Griffith and James F. Hardymon and provided a brief review of their backgrounds. It was then moved and duly seconded that it be:

RESOLVED: That the size of the Board of Directors be set at eleven (11) persons and that the following eleven (11) persons be elected as Directors of the Corporation: Mamoun Askari, James O. Egan, Charles L. Griffith, James F. Hardymon, Dennis G. Heiner, Charles K. Marquis, Howard L. Solot, Christopher J. Stadler, Thomas J. Sullivan, Donald M. Werner and Michael E. Werner, each to serve until the next Annual Meeting of Shareholders of the Corporation and until the election of the Director's successor, unless he shall resign or his office becomes vacant by reason of death, removal or other cause.

Werner Holding Co. (PA), Inc.                                    May 15, 2001
Minutes of the Annual Meeting of Shareholders                   Page 2 of 2

There was some discussion and the votes were cast as follows:

Votes For                        Votes Withheld
71,151.5624                      1,046.5856 votes withheld for all

The Secretary announced the votes and stated that the resolution had passed.

The Chairman announced that the next item on the agenda was the ratification of the selection of PriceWaterhouseCooper LLP as the Corporation's independent auditors for the next fiscal year. After discussion, and upon the recommendation from the Corporation's Audit Committee, it was then moved and duly seconded that it be:

RESOLVED: That the selection of PriceWaterhouseCooper LLP as the independent auditors of the Corporation for a term ending with the next Annual Meeting of Shareholders and thereafter until a successor is elected and qualified, be, and hereby is, ratified, confirmed and approved in all respects.

There was some discussion and the votes were cast as follows:

Votes For              Votes Against          Votes Withheld
71,085.5144            -0-                    1,112.6336

The Secretary announced the votes and stated that the resolution had passed.

Next there was a discussion regarding the distribution of 2000 financial statements to all Shareholders as well as a review and discussion of the 2000 consolidated audited financial statements led by Larry V. Friend. There was also some discussion regarding 2000 operations and plans for 2001. Robert P. Tamburrino noted that 4 major programs continued from 2000 to 2001, including the implementation of Demand Flow, GE, ERP and the Greenville G4 Extrusion Press. There was some discussion.

The Chairman asked if there were any other matters which should properly come before the meeting. There being no further business to come before the meeting, after motion duly made and seconded, it was unanimously resolved to adjourn at 8:50 a.m.

A true record.

Attest:

Eric J. Werner, Secretary

[Corporate Seal]

EXHIBIT 61

**WERNER HOLDING CO. (PA), INC.**

---oOo---

MINUTES OF THE

ANNUAL MEETING OF THE BOARD OF DIRECTORS

---oOo---

May 15, 2001

Pursuant to notice duly given, a copy of which has been filed with these minutes, the Annual Meeting of the Board of Directors of Werner Holding Co. (PA), Inc., a Pennsylvania corporation (hereafter called the "Corporation"), was held on the 15th day of May, 2001, at Investcorp International Inc., 280 Park Avenue, 37th Floor, West Tower, New York, New York.

The meeting was called to order at 9:00 a.m. by Michael E. Werner, who was appointed Chairman of the meeting.  Ten (10) of the eleven (11) Directors of the Corporation were present: namely, Mamoun Askari, James O. Egan, Charles L. Griffith, James F. Hardymon Dennis G. Heiner, Charles K. Marquis, Howard L. Solot, Christopher J. Stadler, Thomas J. Sullivan and Michael E. Werner, constituting a quorum for the proper conduct of business.  The other Director, Donald M. Werner was unable to attend.  Also present at the meeting as invited guests were Robert P. Tamburrino, Vice President and Chief Operating Officer of the Corporation, Larry V. Friend, Vice President, Treasurer and Chief Financial Officer of the Corporation and Ed W. Gericke, Vice President-Sales of Werner Co.  Eric J. Werner, Secretary of the Corporation, recorded these minutes.

After some discussion and upon motion duly made and seconded, it was:

RESOLVED:  That the reading of the minutes of the Regular Quarterly Meeting of the Board of Directors held on March 9, 2001, be, and hereby is, waived and that said minutes are approved as previously distributed.

The next order of business was to elect the Chairman and Vice Chairman of the Board of Directors.  After discussion and upon motion duly made and seconded, it was unanimously:

RESOLVED:  That Donald M. Werner, be, and hereby is, elected as Chairman of the Board, and that Michael E. Werner, be, and hereby is, elected as Vice Chairman of the Board, to serve until the first meeting of the Board of Directors following the next Annual Meeting of Shareholders of the Corporation and until the election and qualification of their successors, unless they shall resign or their office becomes vacant by reason of death, removal, or other cause.

After discussion and upon motion duly made and seconded, it was unanimously:

RESOLVED:  That the following persons be, and hereby are, elected officers of the Corporation, each to serve until the first meeting of the Board of Directors following the next Annual Meeting of Shareholders of the Corporation and until the election and qualification of his successor, unless they shall resign or their office becomes vacant by reason of death, removal, or other cause:

Werner Holding Co. (PA), Inc.
Minutes of the Annual Meeting of the Board of Directors

May 15, 2001
Page 2 of 3

| <u>Name</u> | <u>Position</u> |
|---|---|
| Dennis G. Heiner | President and Chief Executive Officer |
| Robert P. Tamburrino | Vice President and Chief Operating Officer |
| Eric J. Werner | Vice President, Secretary, General Counsel and Corporate Ethics Officer |
| Larry V. Friend | Vice President, Chief Financial Officer and Treasurer |

Next, there was a brief review and discussion of the Corporation's Audit Committee and the recent Audit Committee Meeting held on March 14, 2001. Thomas J. Sullivan and Larry V. Friend noted that Price WaterhouseCoopers LLP is doing a good job and there are no items to bring to the attention of the Board. After some discussion, and upon motion duly made and seconded, it was unanimously:

RESOLVED: That the following persons be, and hereby are, appointed to the Audit Committee of the Corporation, each to serve until the next Annual Meeting of the Board of Directors, unless they shall resign or their office becomes vacant by reason of death, removal, or other cause:

<u>Name:</u>
James O. Egan
Dennis G. Heiner
Thomas J. Sullivan, Chairman
Donald M. Werner

After discussion and upon motion duly made and seconded, it was unanimously:

RESOLVED: That the officers of the Corporation be, and hereby are, authorized to execute a Written Consent of the Sole Shareholder in Lieu of Annual Meeting for the Corporation's wholly-owned subsidiary, Werner Holding Co. (DE), Inc., substantially in the form as has been previously distributed to the Board of Directors of the Corporation and is acceptable by the officer(s) executing the same.

At this time, the Board confirmed the dates of the next regular quarterly meetings of the Board of Directors scheduled for August 8, 2001 at 9:00 a.m. in Chicago, Illinois and December 11, 2001 at 9:00 a.m. in New York, New York.

At this time the Board received a general management briefing from Dennis G. Heiner, including a review of 2001 objectives and priorities, outgoing issues, and key performance drivers. Larry V. Friend continued the management briefing with a financial review including year to date March 2001 consolidated financial highlights, April 2001 estimates, and profit improvements actions.

Then Ed W. Gericke led a review and discussion regarding ladder products results year to date and the outlook for 2001. Mr. Gericke discussed key performance drivers and provided an update on the marketplace and major customers as well as ladder product priorities.

Werner Holding Co. (PA), Inc.                                    May 15, 2001
Minutes of the Annual Meeting of the Board of Directors          Page 3 of 3

Robert P. Tamburrino then presented the Board with an update on extruded products results year to date and outlook for 2001, including key performance drivers and priorities.   Mr. Tamburrino then reviewed operations results year to date and 2001 priorities.   He noted that extruded products re-forecasted $3 million below budget and that the industry is down 20%.

At this time the Board went into executive session.   Ed W. Gericke was excused and Craig R. Werner joined the meeting.

There being no further business to come before the meeting, the Chairman adjourned the meeting at 2:45 p.m.

A true record.                              ATTEST:

                                            Eric J. Werner, Secretary
                                            [Corporate Seal]

EXHIBIT 62

# WERNER CO.

--- oOo ---

## NOTICE OF SPECIAL MEETING OF THE BOARD OF DIRECTORS

--- oOo ---

TO:    THE DIRECTORS OF WERNER CO.

Upon order of Donald M. Werner, Chairman of the Board of the Corporation, notice is hereby given that a Special Meeting of the Board of Directors of Werner Co. (the "Corporation") will be held at Investcorp International Inc., 280 Park Avenue, 36th Floor, West Tower, New York, New York, on Wednesday, April 3, 2002, immediately following the Werner Holding Co. (PA), Inc. Annual Meeting, for the following purposes:

1.    To review and approve any funding requests as necessary.    (EJW)

2.    To grant general authority to officers to carry out the intent of the foregoing resolution.    (EJW)

3.    To consider and act upon any other matters which may properly come before the meeting.

Eric J. Werner, Secretary
Dated March 27, 2002

EXHIBIT 63

# WERNER HOLDING CO. (PA), INC.

----oOo----

## MINUTES OF THE ANNUAL MEETING OF SHAREHOLDERS

----oOo----

### April 3, 2002

In accordance with due and sufficient notice properly given by the Secretary of Werner Holding Co. (PA), Inc., (the "Corporation"), a Pennsylvania corporation, on March 6, 2002, to each holder of Class A, B and D Stock of the Corporation, the only stock of the Corporation having voting privileges, the Annual Meeting of Shareholders was held at Investcorp International Inc., 280 Park Avenue, 36th Floor, West Tower, New York, New York, on Wednesday, April 3, 2002.

The meeting was called to order at 8:30 a.m. by Donald M. Werner, the Chairman of the meeting. The Shareholders entitled to vote that were present at the meeting included: Howard L. Solot, Donald M. Werner and Eric J. Werner. Also present at the meeting by invitation were Dennis G. Heiner, President and Chief Executive Officer of the Corporation and Larry V. Friend, Vice President, Chief Financial Officer and Treasurer of the Corporation. Eric J. Werner, Secretary of the Corporation, recorded these minutes.

The Chairman asked the Secretary to determine the number of shares represented at the meeting. The Secretary reported that all 1,879.5454 shares of the 1,879.5454 total shares, representing 100%, of the Corporation's Class A Stock issued and outstanding and entitled to vote at the meeting, 20,177.9834 shares of the 21,774.9346 shares, representing 92.67%, of the Corporation's Class B Stock issued and outstanding and entitled to vote at the meeting, and all 1,000 shares of the 1,000 shares, representing 100%, of the Corporation's Class D Stock issued and outstanding and entitled to vote at the meeting, were represented at the meeting either in person or by proxy. Each share of Class A Stock and Class B Stock is entitled to one vote and each share of Class D Stock is entitled to 50.6818 votes. The Secretary reported that 72,739.3288 of the 74,336.2800 total votes, representing 97.85% was represented at the meeting either in person or by proxy. The Secretary announced that a quorum was present for all purposes and that the meeting was lawfully and properly convened and competent to proceed with the transaction of business for which it had been called.

Then Donald M. Werner made some general comments about the Corporation. He noted that he was pleased with the manner in which the executives managed the restructuring and challenges of 2001. He further noted that the Corporation seems well positioned for the coming year with a solid team.

After discussion, the Chairman remarked that it was time to read and approve the minutes of the Special Meeting of the Shareholders held on August 10, 2000 and the annual Meeting of Shareholders held on May 15, 2001. There was a motion duly made and seconded that it be:

Werner Holding Co. (PA), Inc.                                           April 3, 2002
Minutes of the Annual Meeting of Shareholders                          Page 2 of 3

RESOLVED: That the reading of the minutes of the Special Meeting of the Shareholders on August 10, 2000 and the Annual Meeting of the Shareholders on May 15, 2001, be, and hereby is, waived and that said minutes are approved as previously distributed.

There was some discussion and the votes were cast as follows:

| Votes For | Votes Against | Votes Withheld |
|---|---|---|
| 72,739.3288 | -0- | -0- |

The Secretary announced the votes and stated that the resolution had passed unanimously.

The Chairman stated that the next order of business was to fix the size of the Board of Directors and to elect the same. It was then moved and duly seconded that it be:

RESOLVED:  That the size of the Board of Directors be set at eleven (11) persons and that the following eleven (11) persons be elected as Directors of the Corporation: Mamoun Askari, James O. Egan, James F. Hardymon, Dennis G. Heiner, Charles K. Marquis, Howard L. Solot, Christopher J. Stadler, Thomas J. Sullivan, Stephen J. Tempini, Donald M. Werner and Michael E. Werner, each to serve until the next Annual Meeting of Shareholders of the Corporation and until the election of the Director's successor, unless he shall resign or his office becomes vacant by reason of death, removal or other cause.

There was some discussion and the votes were cast as follows:

| Votes For | Votes Withheld |
|---|---|
| 71,287.3736 | 1,451.9552 votes withheld for all |

The Secretary announced the votes and stated that the resolution had passed.

The Chairman announced that the next item on the agenda was the ratification of the selection of PriceWaterhouseCooper LLP as the Corporation's independent auditors for the next fiscal year. After discussion, and upon the recommendation from the Corporation's Audit Committee, it was then moved and duly seconded that it be:

RESOLVED:  That the selection of PriceWaterhouseCooper LLP as the independent auditors of the Corporation for a term ending with the next Annual Meeting of Shareholders and thereafter until a successor is elected and qualified, be, and hereby is, ratified, confirmed and approved in all respects.

There was some discussion and the votes were cast as follows:

| Votes For | Votes Against | Votes Abstain |
|---|---|---|
| 71,287.3736 | -0- | 1,451.9552 |

The Secretary announced the votes and stated that the resolution had passed.

Werner Holding Co. (PA), Inc.                                    April 3, 2002
Minutes of the Annual Meeting of Shareholders                   Page 3 of 3

Next there was a discussion regarding the distribution of 2001 financial statements to all Shareholders as well as a review and discussion of the 2001 consolidated audited financial statements led by Larry V. Friend. There was also some discussion regarding 2001 operations and plans for 2002.

The Chairman asked if there were any other matters which should properly come before the meeting. There being no further business to come before the meeting, after motion duly made and seconded, it was unanimously resolved to adjourn at 8:45 a.m.

A true record.

Attest:

Eric J. Werner, Secretary

[Corporate Seal]

EXHIBIT 64

**WERNER HOLDING CO. (PA), INC.**

---o0o---

MINUTES OF THE

ANNUAL MEETING OF THE BOARD OF DIRECTORS

---o0o---

April 3, 2002

Pursuant to notice duly given, a copy of which has been filed with these minutes, the Annual Meeting of the Board of Directors of Werner Holding Co. (PA), Inc., a Pennsylvania corporation (hereafter called the "Corporation"), was held on the 3rd day of April, 2002, at Investcorp International Inc., 280 Park Avenue, 36th Floor, West Tower, New York, New York.

The meeting was called to order at 12:00 noon by Donald M. Werner, the Chairman of the Board of Directors. Nine (9) of the eleven (11) Directors of the Corporation were present: namely, James F. Hardymon, Dennis G. Heiner, Charles K. Marquis, Howard L. Solot, Christopher J. Stadler, Thomas J. Sullivan, Stephen J. Tempini, Donald M. Werner and Michael E. Werner, constituting a quorum for the proper conduct of business. The other Directors, Mamoun Askari and James O. Egan were unable to attend. Also present at the meeting as invited guests were Robert P. Tamburrino, Vice President and Chief Operating Officer of the Corporation, Larry V. Friend, Vice President, Treasurer and Chief Financial Officer of the Corporation, Peter R. O'Coin, Senior Vice President Operations of the Corporation and Ed W. Gericke, Vice President-Sales of Werner Co. ("Werner"), Steve R. Bentson, Vice President – Manufacturing of Werner and Dana R. Snyder of Investcorp International Inc. ("Investcorp"). Eric J. Werner, Secretary of the Corporation, recorded these minutes.

The Chairman welcomed Stephen J. Tempini to the Board of Directors and Peter R. O'Coin to the Corporation. After some discussion and upon motion duly made and seconded, it was:

RESOLVED: That the reading of the minutes of the Regular Quarterly Meeting of the Board of Directors held on August 15, 2001, be, and hereby is, waived and that said minutes are approved as previously distributed.

The next order of business was to elect the Chairman and Vice Chairman of the Board of Directors. After discussion and upon motion duly made by Dennis G. Heiner and seconded by Howard L. Solot, it was unanimously:

RESOLVED: That Donald M. Werner, be, and hereby is, elected as Chairman of the Board, and that Michael E. Werner, be, and hereby is, elected as Vice Chairman of the Board, to serve until the first meeting of the Board of Directors following the next Annual Meeting of Shareholders of the Corporation and until the election and qualification of their successors, unless they shall resign or their office becomes vacant by reason of death, removal, or other cause.

After discussion and upon motion duly made by Dennis G. Heiner and seconded by James F. Hardymon, it was unanimously:

Werner Holding Co. (PA), Inc.                                          April 3, 2002
Minutes of the Annual Meeting of the Board of Directors               Page 2 of 4

RESOLVED:   That the following persons be, and hereby are, elected officers of the Corporation, each to serve until the first meeting of the Board of Directors following the next Annual Meeting of Shareholders of the Corporation and until the election and qualification of his successor, unless they shall resign or their office becomes vacant by reason of death, removal, or other cause:

| Name | Position |
|------|----------|
| Dennis G. Heiner | President and Chief Executive Officer |
| Peter R. O'Coin | Senior Vice President Operations |
| Larry V. Friend | Vice President, Chief Financial Officer and Treasurer |
| Eric J. Werner | Vice President, Secretary, General Counsel and Corporate Ethics Officer |

Next, there was a brief review and discussion regarding the Corporation's Audit Committee and the recent Audit Committee Meeting held on March 20, 2002.   After some discussion, and upon motion duly made by Christopher J. Stadler and seconded by Howard L. Solot, it was unanimously:

RESOLVED: That the following persons be, and hereby are, appointed to the Audit Committee of the Corporation, each to serve until the next Annual Meeting of the Board of Directors, unless they shall resign or their office becomes vacant by reason of death, removal, or other cause:

Name:
James O. Egan
Dennis G. Heiner
Thomas J. Sullivan, Chairman
Donald M. Werner

After discussion and upon motion duly made by Howard L. Solot and seconded by Thomas J. Sullivan, it was unanimously:

RESOLVED:  That the officers of the Corporation be, and hereby are, authorized to execute a Written Consent of the Sole Shareholder in Lieu of Annual Meeting for the Corporation's wholly-owned subsidiary, Werner Holding Co. (DE), Inc., substantially in the form as has been previously distributed to the Board of Directors of the Corporation and is acceptable by the officer(s) executing the same.

At this time, the Board confirmed the dates of the next regular quarterly meetings of the Board of Directors scheduled for August 22, 2002 at 9:00 a.m. in Chicago, Illinois and December 12, 2002 at 9:00 a.m. in New York, New York or Florida.

At this time the Board received a general management briefing from Dennis G. Heiner including a review of current business issues, the 2002 business plan and operating priorities. Then Ed W. Gericke led a review and discussion regarding sales and marketing results year to date and market challenges. Mr. Gericke provided a review of key customers, including The Home Depot and presented the outlook for 2002.

Werner Holding Co. (PA), Inc.                                          April 3, 2002
Minutes of the Annual Meeting of the Board of Directors                Page 3 of 4

At 12:40 p.m. the Board went into executive session. All of the guests were excused with the exception of Eric J. Werner. There was a review of the capital and operating budgets for 2002. After some discussion and upon motion duly made and seconded, it was unanimously:

RESOLVED: That the 2002 Financial Plan, including the operating and capital budgets, substantially in the form presented to the Board of Directors, be, and hereby is, ratified, confirmed, adopted and approved in all respects.

The Board reviewed and discussed revising the Fair Market Value of the shares of stock of the Corporation. After some discussion and upon motion duly made and seconded, it was unanimously:

RESOLVED: That the Fair Market Value of the Shares of Stock of the Corporation be, and hereby is ratified, confirmed and approved at $3,000.00 per share, effective April 3, 2002.

Next, the Board reviewed and discussed the payment of director fees to non-salaried Directors of the Corporation. After some discussion and upon motion duly made and seconded, it was unanimously:

RESOLVED: That all Directors of the Corporation, that are not salaried employees of the Corporation nor Investcorp, shall be paid an annual retainer of $10,000 and director fees of $10,000 per meeting for attendance at Board of Directors meetings of the Corporation, with an annual maximum of $50,000 per Director.

At this time there was a review and discussion regarding the separation agreement between the Corporation, Werner and Robert P. Tamburrino. After some discussion and upon motion duly made and seconded, it was:

RESOLVED: That the form of, and each of the terms and provisions contained in the Separation Agreement, by and between the Corporation, Werner Co. and Robert P. Tamburrino, to be executed by Robert P. Tamburrino, and any and all actions taken by the officers of the Corporation in executing the same, be and hereby are, ratified, confirmed, approved and adopted in all respects.

There was a short break and the Board welcomed the guests back to the meeting at 2:35 p.m. At this time, Steve R. Bentson and Peter R. O'Coin reviewed and discussed operations for the Board, including manufacturing performance and plans, product engineering, purchasing and extruded products. There was some discussion.

After discussion, and upon motion duly made and seconded, it was unanimously:

RESOLVED: That the proper officers of the Corporation or their designee be, and hereby are, authorized and directed to execute, in the name and on behalf of the Corporation and under its corporate seal as necessary or desirable, and to deliver any and all agreements, certificates, applications, checks or other instruments taken from time to time, any and all such action as may be necessary or desirable to implement the foregoing resolutions as such officers deem appropriate and in the best interest of the Corporation.

Werner Holding Co. (PA), Inc.                                              April 3, 2002
Minutes of the Annual Meeting of the Board of Directors                    Page 4 of 4

There being no further business to come before the meeting, the Chairman adjourned the meeting at 3:45 p.m.

A true record.

ATTEST:

Eric J. Werner, Secretary
[Corporate Seal]

EXHIBIT 65

**WERNER HOLDING CO. (PA), INC.**

---oOo---

MINUTES OF THE ANNUAL MEETING OF SHAREHOLDERS

---oOo---

April 9, 2003

In accordance with due and sufficient notice properly given by the Secretary of Werner Holding Co. (PA), Inc., (the "Corporation"), a Pennsylvania corporation, on March 18, 2003, to each holder of Class A, B and D Stock of the Corporation, the only stock of the Corporation having voting privileges, the Annual Meeting of Shareholders was held at Investcorp International Inc., 280 Park Avenue, 36th Floor, West Tower, New York, New York, on Wednesday, April 9, 2003.

The meeting was called to order at 9:00 a.m. by Donald M. Werner, the Chairman of the meeting. The Shareholders entitled to vote that were present at the meeting included: Noel Berk-Rauch, Donald M. Werner, and Eric J. Werner. Also present at the meeting by invitation were Dennis G. Heiner, President and Chief Executive Officer of the Corporation and Larry V. Friend, Vice President, Chief Financial Officer and Treasurer of the Corporation. Eric J. Werner, Secretary of the Corporation, recorded these minutes.

The Chairman asked the Secretary to determine the number of shares represented at the meeting. The Secretary reported that 1,639.3178 shares of the 1,879.5454 total shares, representing 87.22%, of the Corporation's Class A Stock issued and outstanding and entitled to vote at the meeting, 18,427.3876 shares of the 21,339.9346 shares, representing 86.35%, of the Corporation's Class B Stock issued and outstanding and entitled to vote at the meeting, and all 1,000 shares, representing 100%, of the Corporation's Class D Stock issued and outstanding and entitled to vote at the meeting, were represented at the meeting either in person or by proxy. The Secretary reported that 435 shares of the Class B Stock were ineligible to vote. Each share of Class A Stock and Class B Stock is entitled to one vote and each share of Class D Stock is entitled to 50.6818 votes. The Secretary reported that 70,748.5054 of the 73,901.2800 total votes, representing 95.73% were represented at the meeting either in person or by proxy. The Secretary announced that a quorum was present for all purposes and that the meeting was lawfully and properly convened and competent to proceed with the transaction of business for which it had been called.

Then Donald M. Werner made some general comments about the Corporation, including his disappointment with the Union at Werner Co.'s Greenville Division for the employees, the Greenville Division facility, the community and customers.

After discussion, the Chairman remarked that it was time to read and approve the minutes of the Special Meeting of the Shareholders held on May 9, 2002. There was a motion duly made and seconded that it be:

Werner Holding Co. (PA), Inc.
Minutes of the Annual Meeting of Shareholders

April 9, 2003
Page 2 of 3

RESOLVED:  That the reading of the minutes of the Special Meeting of the Shareholders on May 9, 2002, be, and hereby is, waived and that said minutes are approved as previously distributed.

There was some discussion and the votes were cast as follows:

| Votes For | Votes Against | Votes Withheld |
|---|---|---|
| 70,748.5054 | -0- | -0- |

The Secretary announced the votes and stated that the resolution had passed unanimously.

The Chairman stated that the next order of business was to fix the size of the Board of Directors and to elect the same.  It was then moved and duly seconded that it be:

RESOLVED:   That the size of the Board of Directors be set at twelve (12) persons and that the following twelve (12) persons be elected as Directors of the Corporation: Mamoun Askari, James O. Egan, James F. Hardymon, Dennis G. Heiner, Charles K. Marquis, Dana R. Snyder, Howard L. Solot, Christopher J. Stadler, Thomas J. Sullivan, Stephen J. Tempini, Donald M. Werner and Michael E. Werner, each to serve until the next Annual Meeting of Shareholders of the Corporation and until the election of the Director's successor, unless he shall resign or his office becomes vacant by reason of death, removal or other cause.

There was some discussion and the votes were cast as follows:

| Votes For | Votes Withheld |
|---|---|
| 69,276.0368 | 1,472.4686 votes withheld for all |

The Secretary announced the votes and stated that the resolution had passed.

The Chairman announced that the next item on the agenda was the ratification of the selection of PriceWaterhouseCooper LLP as the Corporation's independent auditors for the next fiscal year.  After discussion, and upon the recommendation from the Corporation's Audit Committee, it was then moved and duly seconded that it be:

RESOLVED:   That the selection of PriceWaterhouseCooper LLP as the independent auditors of the Corporation for a term ending with the next Annual Meeting of Shareholders and thereafter until a successor is elected and qualified, be, and hereby is, ratified, confirmed and approved in all respects.

There was some discussion and the votes were cast as follows:

| Votes For | Votes Against | Votes Abstain |
|---|---|---|
| 70,537.5536 | 189.3486 | 21.6032 |

The Secretary announced the votes and stated that the resolution had passed.

Werner Holding Co. (PA), Inc.                                                    April 9, 2003
Minutes of the Annual Meeting of Shareholders                                    Page 3 of 3

Next there was a discussion regarding the distribution of 2002 Annual Reports to all Shareholders. It was noted that they would be sent next week. At this time Larry V. Friend led a review and discussion regarding the 2002 consolidated audited financial statements. There was also some discussion regarding 2002 operations and plans for 2003. Noel Berk-Rauch asked a few questions and there was some discussion.

The Chairman asked if there were any other matters which should properly come before the meeting. There being no further business to come before the meeting, after motion duly made and seconded, it was unanimously resolved to adjourn at 9:20 a.m.

A true record.

Attest:

Eric J. Werner, Secretary

[Corporate Seal]

EXHIBIT 66

**WERNER HOLDING CO. (PA), INC.**

---oOo---

MINUTES OF THE

ANNUAL MEETING OF THE BOARD OF DIRECTORS

---oOo---

April 9, 2003

Pursuant to notice duly given, a copy of which has been filed with these minutes, the Annual Meeting of the Board of Directors of Werner Holding Co. (PA), Inc., a Pennsylvania corporation (hereafter called the "Corporation"), was held on the 9th day of April, 2003, at Investcorp International Inc., 280 Park Avenue, 36th Floor, West Tower, New York, New York.

The meeting was called to order at 9:40 a.m. by Donald M. Werner, the Chairman of the Board of Directors. Seven (7) of the twelve (12) Directors of the Corporation were present: namely, James F. Hardymon, Dennis G. Heiner, Dana R. Snyder, Howard L. Solot, Christopher J. Stadler, Thomas J. Sullivan and Donald M. Werner, constituting a quorum for the proper conduct of business. The other Directors, Mamoun Askari, James O. Egan, Charles K. Marquis, Stephen J. Tempini and Michael E. Werner were unable to attend. Also present at the meeting as invited guests were Larry V. Friend, Vice President, Treasurer and Chief Financial Officer of the Corporation, Peter R. O'Coin, Senior Vice President Operations of the Corporation and Ed W. Gericke, Vice President-Sales of Werner Co. ("Werner"), Steve R. Bentson, Vice President – Manufacturing of Werner, John J. Fiumefreddo, of Werner and Robert A. Rosati, of Werner. Eric J. Werner, Secretary of the Corporation, recorded these minutes.

After some discussion and upon motion duly made and seconded, it was:

**RESOLVED:** That the reading of the minutes of the Regular Quarterly Meeting of the Board of Directors held on February 27, 2003 be, and hereby is, waived and that said minutes are approved as previously distributed.

The next order of business was to elect the Chairman and Vice Chairman of the Board of Directors. After discussion and upon motion duly made by Thomas J. Sullivan and seconded by James F. Hardymon, it was unanimously:

**RESOLVED:** That Donald M. Werner, be, and hereby is, elected as Chairman of the Board, and that Michael E. Werner, be, and hereby is, elected as Vice Chairman of the Board, to serve until the first meeting of the Board of Directors following the next Annual Meeting of Shareholders of the Corporation and until the election and qualification of their successors, unless they shall resign or their office becomes vacant by reason of death, removal, or other cause.

After discussion and upon motion duly made by Thomas J. Sullivan and seconded by James F. Hardymon, it was unanimously:

**RESOLVED:** That the following persons be, and hereby are, elected officers of the Corporation, each to serve until the first meeting of the Board of Directors following the next Annual Meeting of Shareholders of the Corporation and until the election and qualification of his successor, unless they shall resign or their office becomes vacant by

Werner Holding Co. (PA), Inc.                                                    April 9, 2003
Minutes of the Annual Meeting of the Board of Directors                          Page 2 of 3

reason of death, removal, or other cause:

| Name | Position |
|------|----------|
| Dennis G. Heiner | President and Chief Executive Officer |
| Peter R. O'Coin | Senior Vice President Operations |
| Larry V. Friend | Vice President, Chief Financial Officer and Treasurer |
| Eric J. Werner | Vice President, Secretary, General Counsel and Corporate Ethics Officer |

Next, there was a brief review and discussion regarding the Corporation's Audit Committee and the recent Audit Committee Meeting held on March 19, 2003. Thomas J. Sullivan reported that the Audit Committee was pleased with the auditors' progress and that the Corporation was in compliance with the new disclosure requirements. After some discussion, and upon motion duly made by Dennis G. Heiner and seconded by James F. Hardymon, it was unanimously:

**RESOLVED**: That the following persons be, and hereby are, appointed to the Audit Committee of the Corporation, each to serve until the next Annual Meeting of the Board of Directors, unless they shall resign or their office becomes vacant by reason of death, removal, or other cause:

Name:
James O. Egan
Dennis G. Heiner
Thomas J. Sullivan, Chairman
Donald M. Werner

After discussion and upon motion duly made by Dennis G. Heiner and seconded by Thomas J. Sullivan, it was unanimously:

**RESOLVED**: That the officers of the Corporation be, and hereby are, authorized to execute a Written Consent of the Sole Shareholder in Lieu of Annual Meeting for the Corporation's wholly-owned subsidiary, Werner Holding Co. (DE), Inc., substantially in the form as has been previously distributed to the Board of Directors of the Corporation and is acceptable by the officer(s) executing the same.

At this time, the Board confirmed the dates of the next regular quarterly meetings of the Board of Directors scheduled for August 21, 2003 at 8:00 a.m. in Chicago, Illinois and November 12, 2003 at 8:30 a.m. in Greenville, Pennsylvania.

Next, the Board received a general management briefing from Dennis G. Heiner, followed by a top line growth strategy presentation by Edward W. Gericke. There was some discussion. Peter O'Coin reviewed and discussed the Far East strategy and Larry V. Friend provided a financial update. After some discussion, Robert A. Rosati provided an update on ERP for the Board.

Following discussions and an executive session of the Board, upon motion duly made and seconded, it was unanimously:

Werner Holding Co. (PA), Inc.
Minutes of the Annual Meeting of the Board of Directors

April 9, 2003
Page 3 of 3

**RESOLVED**:  That the Fair Market Value of the Shares of Stock of the Corporation be, and hereby is ratified, confirmed and approved at $3,500.00 per share, effective April 9, 2003.

**FURTHER RESOLVED**:  That effective April 9, 2003, Amendment No. 5 to the Werner Holding Co. (PA), Inc. Stock Incentive Plan, substantially in the form attached hereto and made a part hereof, be, and hereby is, ratified, confirmed, adopted and approved in all respects.

After discussion, and upon motion duly made and seconded, it was unanimously:

**RESOLVED**:  That the proper officers of the Corporation or their designee be, and hereby are, authorized and directed to execute, in the name and on behalf of the Corporation and under its corporate seal as necessary or desirable, and to deliver any and all agreements, certificates, applications, checks or other instruments taken from time to time, any and all such action as may be necessary or desirable to implement the foregoing resolutions as such officers deem appropriate and in the best interest of the Corporation.

There being no further business to come before the meeting, the Chairman adjourned the meeting at 3:15 p.m.

A true record.

ATTEST:

_____
Eric J. Werner, Secretary

[Corporate Seal]

EXHIBIT 67

**WERNER HOLDING CO. (PA), INC.**

---o0o---

MINUTES OF THE

ANNUAL MEETING OF THE BOARD OF DIRECTORS

---o0o---

May 14, 2004

Pursuant to notice duly given, a copy of which has been filed with these minutes, the Annual Meeting of the Board of Directors of Werner Holding Co. (PA), Inc., a Pennsylvania corporation (hereafter called the "Corporation"), was held on the 14th day of May, 2004, at Investcorp International Inc., 280 Park Avenue, 36th Floor, West Tower, New York, New York.

The meeting was called to order at 8:05 a.m. by Donald M. Werner, the Chairman of the Board of Directors. Eight (8) of the nine (9) Directors of the Corporation were present: namely, James F. Hardymon, Dennis G. Heiner, Peter J. Nolan, Dana R. Snyder, Thomas J. Sullivan, Donald M. Werner, Eric J. Werner and Michael S. Wong, constituting a quorum for the proper conduct of business. The other Director, Christopher J. Stadler, was unable to attend. Also present at the meeting as invited guests were Larry V. Friend, Vice President, Treasurer and Chief Financial Officer of the Corporation, Peter R. O'Coin, Senior Vice President Operations of the Corporation, Ed W. Gericke, Vice President – Sales of Werner Co. ("Werner"), Steve R. Bentson, Vice President – Manufacturing of Werner, John J. Fiumefreddo, Senior Vice President – Product Development of Werner, Tarek Ajouz of Investcorp International, Inc. and Howard L. Solot. Eric J. Werner, Secretary of the Corporation, recorded these minutes.

The Chairman made some general comments regarding the recent Annual Meeting of Shareholders. After some discussion and upon motion duly made and seconded, it was:

**RESOLVED:** That the reading of the minutes of the Regular Quarterly Meeting of the Board of Directors held on February 12, 2004 be, and hereby is, waived and that said minutes are approved as previously distributed.

The next order of business was to elect the Chairman of the Board of Directors. After discussion and upon motion duly made and seconded, it was unanimously:

**RESOLVED:** That Donald M. Werner, be, and hereby is, elected as Chairman of the Board, to serve until the first meeting of the Board of Directors following the next Annual Meeting of Shareholders of the Corporation and until the election and qualification of his successor, unless he shall resign or the office becomes vacant by reason of death, removal, or other cause.

After discussion and upon motion duly made and seconded, it was unanimously:

**RESOLVED:** That the following persons be, and hereby are, elected officers of the Corporation, each to serve until the first meeting of the Board of Directors following the next Annual Meeting of Shareholders of the Corporation and until the election and qualification of his successor, unless they shall resign or their office becomes vacant by reason of death, removal, or other cause:

Werner Holding Co. (PA), Inc.                                                        May 14, 2004
Minutes of the Annual Meeting of the Board of Directors                             Page 2 of 3

| Name | Position |
|------|----------|
| Dennis G. Heiner | President and Chief Executive Officer |
| Peter R. O'Coin | Senior Vice President Operations |
| Larry V. Friend | Vice President, Chief Financial Officer and Treasurer |
| Eric J. Werner | Vice President, Secretary, General Counsel and Corporate Ethics Officer |

Next, there was a brief review and discussion regarding the Corporation's Audit Committee and the recent Audit Committee meeting held on March 15, 2004. After some discussion, and upon motion duly made and seconded, it was unanimously:

**RESOLVED:** That the following persons be, and hereby are, appointed to the Audit Committee of the Corporation, each to serve until the next Annual Meeting of the Board of Directors, unless they shall resign or their office becomes vacant by reason of death, removal, or other cause:

Name:
Dana R. Snyder
Thomas J. Sullivan, Chairman
Michael S. Wong

After discussion and upon motion duly made and seconded, it was unanimously:

**RESOLVED:** That the officers of the Corporation be, and hereby are, authorized to execute a Written Consent of the Sole Shareholder in Lieu of Annual Meeting for the Corporation's wholly-owned subsidiary, Werner Holding Co. (DE), Inc., substantially in the form as has been previously distributed to the Board of Directors of the Corporation and is acceptable by the officer(s) executing the same.

At this time, the Board confirmed the dates of the next regular quarterly meetings of the Board of Directors scheduled for August 19, 2004 at 8:00 a.m. in Chicago, Illinois and November 10, 2004 at 8:00 a.m. in Los Angeles, California. There was some discussion regarding holding a future meeting in Mexico.

Dennis G. Heiner then provided the Board with a general management briefing and business overview. After some discussion Larry V. Friend presented the Board with a financial update. Ed W. Gericke provided the Board with a ladder products update, including a review of Lowe's sales. The Board continued with a review of new products led by John J. Fiumefreddo and an operations update from Peter R. O'Coin. There was some discussion followed by an extruded products update from Steve R. Bentson.

The Chairman recounted and thanked Howard L. Solot for his past service as a Director. Mr. Solot expressed his appreciation for the opportunity to have served past the 1997 Investcorp leveraged recapitalization. At this time the guests were excused and the Board held an Executive Session. After discussion, and upon motion duly made and seconded, it was unanimously:

**RESOLVED:** That the Fair Market Value of the Shares of Stock of the Corporation be, and hereby is ratified, confirmed and approved at $100.00 per share.

Werner Holding Co. (PA), Inc.                                          May 14, 2004
Minutes of the Annual Meeting of the Board of Directors               Page 3 of 3

**FURTHER RESOLVED**: That the proper officers of the Corporation or their designee be, and hereby are, authorized and directed to execute, in the name and on behalf of the Corporation and under its corporate seal as necessary or desirable, and to deliver any and all agreements, certificates, applications, checks or other instruments taken from time to time, any and all such action as may be necessary or desirable to implement the foregoing resolutions as such officers deem appropriate and in the best interest of the Corporation.

There being no further business to come before the meeting, the Chairman adjourned the meeting at 12:45 p.m.

A true record.

ATTEST:

Eric J. Werner, Secretary

[Corporate Seal]

EXHIBIT 68

# WERNER HOLDING CO. (PA), INC.

---oOo---

## MINUTES OF THE ANNUAL MEETING OF SHAREHOLDERS

---oOo---

### May 5, 2005

In accordance with due and sufficient notice properly given by the Secretary of Werner Holding Co. (PA), Inc., (the "Corporation"), a Pennsylvania corporation, on April 8, 2005, to each holder of Class A, B, D and Series A Preferred Stock of the Corporation, the only stock of the Corporation having voting privileges, the Annual Meeting of Shareholders was held at Investcorp International Inc., 280 Park Avenue, 36th Floor, West Tower, New York, New York, on Thursday, May 5, 2005.

The meeting was called to order at 8:00 a.m. by Donald M. Werner, the Chairman of the meeting. The Shareholders entitled to vote that were present at the meeting included: Noel Berk-Rauch, Donald M. Werner and Eric J. Werner. Also present at the meeting by invitation were Steven P. Richman, President, Chief Executive Officer and Director of the Corporation, Larry V. Friend, Treasurer and Chief Financial Officer of the Corporation, James F. Hardymon and Dana R. Snyder, Directors of the Corporation. Eric J. Werner, Secretary of the Corporation, recorded these minutes.

The Chairman asked the Secretary to determine the number of shares represented at the meeting. The Secretary reported that 1,127.6938 shares of the 1,134.0315 total shares, representing 99.44%, of the Corporation's Class A Stock issued and outstanding and entitled to vote at the meeting, 11,002.4505 shares of the 13,237.9952 shares, representing 83.11%, of the Corporation's Class B Stock issued and outstanding and entitled to vote at the meeting, all 603.3543 shares, representing 100%, of the Corporation's Class D Stock issued and outstanding and entitled to vote at the meeting, and all 65,000 shares, representing 100%, of the Corporation's Series A Preferred Stock issued and outstanding and entitled to vote at the meeting, were represented at the meeting either in person or by proxy. Each share of Class A Stock and Class B Stock is entitled to one vote, each share of Class D Stock is entitled to 50.6818 votes, and each share of Series A Preferred Stock is entitled to 0.25808662 votes. The Secretary reported that 59,484.8569 of the 61,726.7393 total votes, representing 96.37% were represented at the meeting either in person or by proxy. The Secretary announced that a quorum was present for all purposes and that the meeting was lawfully and properly convened and competent to proceed with the transaction of business for which it had been called.

After some brief comments, the Chairman remarked that it was time to read and approve the minutes of the Annual Meeting of the Shareholders held on April 7, 2004, as previously distributed. There was a motion duly made and seconded that it be:

> RESOLVED: That the reading of the minutes of the Annual Meeting of the Shareholders held on April 7, 2004, be, and hereby is, waived and that said minutes are approved as previously distributed.

Werner Holding Co. (PA), Inc.                                                    May 5, 2005
Minutes of the Annual Meeting of Shareholders                              Page 2 of 3

There was some discussion and the votes were cast as follows:

| Votes For | Votes Against | Votes Withheld |
|---|---|---|
| 59,484.8569 | -0- | -0- |

The Secretary announced the votes and stated that the resolution had passed unanimously.

The Chairman stated that the next order of business was to fix the size of the Board of Directors and to elect the same. It was then moved and duly seconded that it be:

RESOLVED: That the size of the Board of Directors be set at nine (9) persons and that the following nine (9) persons be elected as Directors of the Corporation: James F. Hardymon, Peter J. Nolan, Steven J. Richman, Dana R. Snyder, Christopher J. Stadler, Thomas J. Sullivan, Donald M. Werner, Eric J. Werner and Michael S. Wong, each to serve until the next Annual Meeting of Shareholders of the Corporation and until the election of the Director's successor, unless he shall resign or his office becomes vacant by reason of death, removal or other cause.

There was some discussion and the votes were cast as follows:

| Votes For | Votes Withheld |
|---|---|
| 59,241.9425 | 242.9144 votes withheld for all |

The Secretary announced the votes and stated that the resolution had passed.

The Chairman announced that the next item on the agenda was the ratification of the selection of PriceWaterhouseCooper LLP as the Corporation's independent auditors for the next fiscal year. After discussion, and upon the recommendation from the Corporation's Audit Committee, it was then moved and duly seconded that it be:

RESOLVED: That the selection of PriceWaterhouseCooper LLP as the independent auditors of the Corporation for a term ending with the next Annual Meeting of Shareholders and thereafter until a successor is elected and qualified, be, and hereby is, ratified, confirmed and approved in all respects.

There was some discussion and the votes were cast as follows:

| Votes For | Votes Against | Votes Abstain |
|---|---|---|
| 59,473.8225 | -0- | 11.0344 |

The Secretary announced the votes and stated that the resolution had passed.

Next there was a discussion regarding the distribution of 2004 Annual Reports to all Shareholders. There was a brief review and discussion regarding the consolidated audited financial statements of the Corporation as well as a review of 2004 operations and plans for 2005. Noel Berk-Rauch asked a few questions regarding the refinancing and current business conditions. There was a brief discussion.

Werner Holding Co. (PA), Inc.                                            May 5, 2005
Minutes of the Annual Meeting of Shareholders                           Page 3 of 3

     The Chairman asked if there were any other matters which should properly come before the meeting. There being no further business to come before the meeting, after motion duly made and seconded, it was unanimously resolved to adjourn at 8:30 a.m.

     A true record.

Attest:

_____
Eric J. Werner, Secretary

[Corporate Seal]

EXHIBIT 69

**WERNER HOLDING CO. (PA), INC.**

**and**

**WERNER HOLDING CO. (DE), INC.**

---o0o---

MINUTES OF A

ANNUAL MEETING OF THE BOARD OF DIRECTORS

---o0o---

May 5, 2005

Pursuant to notice duly given, a copy of which has been filed with these minutes, the Annual Meeting of the Board of Directors of Werner Holding Co. (PA), Inc., a Pennsylvania corporation, was held on the 5th day of May, 2005, at Investcorp International Inc., 280 Park Avenue, 36th Floor, West Tower, New York, New York. The meeting also functioned as a meeting of the Board of Directors of the corporation's wholly-owned subsidiary, Werner Holding Co. (DE), Inc. ("Werner DE"). The members of the Board of Werner DE are the same as those of Werner PA. As used in the section of these minutes relating to the 2005 Senior Secured Debt Refinancing, the term the "Corporation" refers to each of Werner PA and Werner DE and the term "Board" refers to the board of directors of each of Werner PA and Werner DE. In the remainder of these minutes, "Corporation" refers to Werner PA and "Board" to the board of directors of Werner PA.

The meeting was called to order at 8:40 a.m. by Donald M. Werner, the Chairman of the Board of Directors. All (9) nine of the Directors of the Corporation were present: namely, James F. Hardymon, Peter J. Nolan, Steven P. Richman, Dana R. Snyder, Christopher J. Stadler, Thomas J. Sullivan, Donald M. Werner, Eric J. Werner and Michael S. Wong, constituting a quorum for the proper conduct of business. Also present at the meeting as invited guests were Larry V. Friend, Vice President, Treasurer and Chief Financial Officer of the Corporation and Tarek Ajouz of Investcorp International, Inc. Additional invited guests joining the meeting were E. Michael Greaney, Janet Vance and Janet M. Weiss, of Gibson, Dunn & Crutcher and (via telephone conference) Daniel L. Wessels of Cohen & Grigsby, P.C. Eric J. Werner, Secretary of the Corporation, recorded these minutes.

The Chairman made some general comments regarding the recent Annual Meeting of Shareholders. There was some brief discussion.

## 2005 Senior Secured Debt Refinancing

Next, the Board discussed and considered the proposed restructuring of the Corporation's existing senior secured credit facility into separate first lien and second lien facilities. Eric J. Werner introduced Mr. Greaney, Ms. Vance and Ms. Weiss of Gibson, Dunn & Crutcher LLP as outside counsel for corporate, finance and restructuring matters pertaining to the refinancing and to the Board's fiduciary duties under Delaware law, as well as Mr. Wessels, outside counsel to the Corporation on matters pertaining to the Board's fiduciary duties under Pennsylvania law.

Mr. Greaney gave the Board a broad overview of the legal issues which are presented for consideration of the Board in the context of a debt refinancing of the type proposed. Mr. Greaney then suggested that Mr. Friend provide the board with the factual background which has resulted in the current

Werner Holding Co. (PA), Inc.                                            May 5, 2005
Minutes of the Annual Meeting of the Board of Directors                   Page 2 of 4

proposal to restructure the Corporation's senior credit facility, the terms of the proposal and the Corporation's efforts to pursue other alternatives.

A copy of the outline of Mr. Friend's presentation to the Board is included with these minutes.

Mr. Greaney and Ms. Weiss then gave a presentation to the board regarding an "Overview of Director's Fiduciary Duties" that are pertinent to a debt restructuring of the type being considered. A copy of the written materials on which the presentation was based was previously distributed to each director and is included with these minutes.

Mr. Wessels then gave the Board a supplemental presentation on Directors' fiduciary duties under Pennsylvania law.

The Board then engaged in a discussion concerning the debt refinancing proposal, its advantages and disadvantages, and alternatives to the refinancing. The discussion included several questions posed to management, the answers to such questions, and comments and views of various Board members.

At the end of such discussion, the Board members (a) unanimously determined that going forward with the debt refinancing as proposed was in the best interests of the Corporation, including its relevant constituencies such as equity holders and creditors and (b) approved the debt refinancing.

*       *       *

Next, Steven P. Richman provided the Board with a general management briefing and business overview. Larry V. Friend presented the Board with a financial update. Following the business update the guests were excused and the Board held an Executive Session.

After the Executive Session and upon motion duly made and seconded, it was:

**RESOLVED**: That the reading of the minutes of the Regular Quarterly Meeting of the Board of Directors held on February 16, 2005 be, and hereby is, waived and that said minutes are approved as previously distributed.

The next order of business was to elect the Chairman of the Board of Directors. After discussion and upon motion duly made and seconded, it was unanimously:

**RESOLVED**: That Donald M. Werner, be, and hereby is, elected as Chairman of the Board, to serve until the first meeting of the Board of Directors following the next Annual Meeting of Shareholders of the Corporation and until the election and qualification of his successor, unless he shall resign or the office becomes vacant by reason of death, removal, or other cause.

After discussion and upon motion duly made and seconded, it was unanimously:

**RESOLVED**: That the following persons be, and hereby are, elected officers of the Corporation, each to serve until the first meeting of the Board of Directors following the next Annual Meeting of Shareholders of the Corporation and until the election and qualification of his successor, unless they shall resign or their office becomes vacant by reason of death, removal, or other cause:

Werner Holding Co. (PA), Inc.                                        May 5, 2005
Minutes of the Annual Meeting of the Board of Directors              Page 3 of 4

| Name | Position |
|------|----------|
| Steven P. Richman | President and Chief Executive Officer |
| Larry V. Friend | Vice President, Chief Financial Officer and Treasurer |
| Eric J. Werner | Vice President, Secretary, General Counsel and Corporate Ethics Officer |

Next, there was a brief review and discussion regarding the Corporation's Audit Committee and the recent Audit Committee meeting held on March 15, 2005. After some discussion, and upon motion duly made and seconded, it was unanimously:

**RESOLVED**: That the following persons be, and hereby are, appointed to the Audit Committee of the Corporation, each to serve until the next Annual Meeting of the Board of Directors, unless they shall resign or their office becomes vacant by reason of death, removal, or other cause:

Name:
Dana R. Snyder
Thomas J. Sullivan, Chairman
Michael S. Wong

**FURTHER RESOLVED**: That the following persons be, and hereby are, appointed to the Organization and Compensation Committee of the Corporation, each to serve until the next Annual Meeting of the Board of Directors, unless they shall resign or their office becomes vacant by reason of death, removal, or other cause:

Name:
James F. Hardymon
Peter J. Nolan
Dana R. Snyder, Chairman
Thomas J. Sullivan

Management Liaisons
Steven P. Richman, President and Chief Executive Officer
Eric J. Werner, Vice President, Secretary, General Counsel and Corporate Ethics Officer

After discussion and upon motion duly made and seconded, it was unanimously:

**RESOLVED**: That the officers of the Corporation be, and hereby are, authorized to execute a Written Consent of the Sole Shareholder in Lieu of Annual Meeting for the Corporation's wholly-owned subsidiary, Werner Holding Co. (DE), Inc., substantially in the form as has been previously distributed to the Board of Directors of the Corporation and is acceptable by the officer(s) executing the same.

At this time, the Board confirmed the dates of the next regular quarterly meetings of the Board of Directors scheduled for September 29, 2005 at 8:00 a.m. in Chicago, Illinois and November 17, 2005 at 8:00 a.m. in El Paso, Texas.

Werner Holding Co. (PA), Inc.                                          May 5, 2005
Minutes of the Annual Meeting of the Board of Directors                Page 4 of 4

After discussion, and upon motion duly made and seconded, it was unanimously:

**RESOLVED**:  That the Fair Market Value of the Shares of Stock of the Corporation be, and hereby is ratified, confirmed and approved at $100.00 per share.

**FURTHER RESOLVED**:  That the proper officers of the Corporation or their designee be, and hereby are, authorized and directed to execute, in the name and on behalf of the Corporation and under its corporate seal as necessary or desirable, and to deliver any and all agreements, certificates, applications, checks or other instruments taken from time to time, any and all such action as may be necessary or desirable to implement the foregoing resolutions as such officers deem appropriate and in the best interest of the Corporation.

There being no further business to come before the meeting, the Chairman adjourned the meeting at 1:30 p.m.

A true record.

ATTEST:

Eric J. Werner, Secretary

[Corporate Seal]

EXHIBIT 70

## WERNER HOLDING CO. (PA), INC.

---o0o---

## MINUTES OF A

## SPECIAL MEETING OF THE BOARD OF DIRECTORS

---o0o---

## April 24, 2006

Pursuant to notice duly given, a copy of which has been filed with these minutes, a Special Meeting of the Board of Directors of Werner Holding Co. (PA), Inc., a Pennsylvania corporation (the "Corporation"), was held on the 24th day of April, 2006, at Rothschild, Inc., Conference Room #1, 51st Floor, 1251 Avenue of the Americas, New York, New York.

The meeting was called to order via teleconference at 11:20 a.m., local time, by Donald M. Werner, Chairman of the Board of Directors. Seven (7) of the nine (9) Directors of the Corporation were present: namely, Peter J. Nolan, Steven P. Richman, Dana R. Snyder, Thomas J. Sullivan, Donald M. Werner, Eric J. Werner, and Michael S. Wong, constituting a quorum for the proper conduct of business. The other Directors, James O. Egan and Christopher J. Stadler, were unable to attend. Also present at the meeting as invited guests were, Larry V. Friend, Vice President, Chief Financial Officer and Treasurer of the Corporation, James Christopoulos of Investcorp International Inc., J. Kristopher Galashan of Leonard Green & Partners, L.P., Neil A. Augustine, Bernard Douton, Brett Adamczyk, Carlos Orellana and Reid Phillips of Rothschild Inc., Matthew A. Feldman of Willkie Farr & Gallagher LLP., E. Michael Greaney of Gibson, Dunn & Crutcher LLP and James J. Loughlin and Patrick J. Fodale of Loughlin Meghji + Co. Eric J. Werner, Secretary of the Corporation, recorded these minutes.

Pursuant to the agenda, handouts were distributed and Mr. Augustine made a presentation to the Board regarding the financial restructuring process and status of the refinancing process. There was a review and discussion regarding the refinancing proposals being pursued as well as the recommendation to begin planning for chapter 11 while simultaneously negotiating with various constituencies. It was noted to prepare for mid May 2006 although late May was preferred. There were continued discussions regarding plans for DIP financing and communication strategies.

Larry V. Friend provided a financial review and Steve P. Richman gave a status update on the price increases. Neil Augustine and Eric J. Werner reviewed and discussed current aluminum pricing and forecasts. Mr. Sullivan clarified that all Shareholders, including family, should be solicited for addition capital (i.e. "incremental funding"). Bernard Douton reviewed the preliminary valuations for the Board and the typical methodologies utilized. Mr. Feldman explained various provisions of the Bankruptcy Code, including Section 363 and discussed litigation possibilities. After some discussion, Mr. Augustine reviewed the next steps and there was continued discussion.

There being no further business to come before the meeting, the Chairman adjourned the meeting at 2:30 p.m.

A true record.

ATTEST:

_____
Eric J. Werner, Secretary
[Corporate Seal]

EXHIBIT 71

**WERNER HOLDING CO. (PA), INC.**

---o0o---

NOTICE OF ANNUAL MEETING OF THE BOARD OF DIRECTORS

---o0o---

TO:      THE DIRECTORS OF WERNER HOLDING CO. (PA), INC.

Upon order of Donald M. Werner, Chairman of the Board of Directors, notice is hereby given that the Annual Meeting of the Board of Directors of Werner Holding Co. (PA), Inc. (the "Corporation") will be held at Investcorp International Inc., 280 Park Avenue, 36th Floor, West Tower, New York, New York, via teleconference, at 12:00 noon E.T. on Tuesday, May 16, 2006, for the following purposes:

1.   To read and approve the minutes of the meetings of the Board of Directors, as previously distributed.

(EJW)

2.   To elect Donald M. Werner as Chairman of the Board of Directors.

(EJW)

3.   To elect the officers of the Corporation:
| Steven P. Richman | President and Chief Executive Officer |
| Larry V. Friend | Vice President, Chief Financial Officer and Treasurer |
| Eric J. Werner | Vice President, Secretary, General Counsel and Corporate Ethics Officer |

(EJW)

4.   To appoint Audit Committee (T.J. Sullivan - Chairman, D.R. Snyder & M.S. Wong) and review and discuss the Corporation's March 21, 2006 Audit Committee Meeting.

(EJW/TJS)

5.   To appoint Organization and Compensation Committee (D.R. Snyder - Chairman, J.O. Egan, P.J. Nolan & T.J. Sullivan; S.P. Richman, President & Chief Executive Officer and E.J. Werner, Vice President, Secretary, General Counsel and Corporate Ethics Officer as Management Liasons).

(EJW/DRS)

6.   To authorize the officers of the Corporation to vote the shares the Corporation owns in its wholly-owned subsidiary, Werner Holding Co. (DE), Inc.

(EJW)

7.   Refinancing/Restructuring

(SPR)

8.   General management briefing.

(SPR)

9.   Executive board session.

(DMW)

10.  To grant general authority to officers to carry out the intent of the foregoing resolutions.

(EJW)

11.  To consider and act upon any other matters which may properly come before the meeting.

(EJW)

Eric J. Werner, Secretary
Dated May 11, 2006

WER 002308

EXHIBIT 72

# WERNER HOLDING CO. (DE), INC.

P.O. Box 8985
1105 North Market Street, Suite 1300
Wilmington, Delaware  19899

Telephone 302/478-5723  •  Telecopier 302/427-7663

October 17, 2003

Senior Secured Lenders Party to the Credit Agreement
ATTN: Mr. Neil R. Boylan (agent for the lenders)
Managing Director
JPMorgan Chase Bank
270 Park Avenue, Floor 4
New York, NY  10017-2070

Gentlemen:

In accordance with section 8.2(d) of the Credit Agreement, dated as of June 11, 2003, attached is a copy of the Form 8-K, which was filed with the Securities and Exchange Commission today.  The Form 8-K reports that Home Depot has informed us that they will no longer purchase aluminum and fiberglass stepladders from Werner and that it will be included in an extension ladder supplier line review with Home Depot later this month.  This line review process has several potential outcomes, which include losing additional business or gaining business.  The Form 8-K also discloses that management cannot make any forward-looking statements or estimates as to potential outcomes of the line review at this time.

As you know, we are not in a position to comment about what might or might not happen.  However, we do not believe that loss of the Home Depot stepladder business will cause the Company to violate any bank covenants.  There are a number of initiatives that we can under take to minimize the impact on the business and we are evaluating the alternatives under several different scenarios.  We intend to communicate to the senior lending group as appropriate, when we know the results of the line review and have had a reasonable period of time after that to understand and digest the issues, and to develop our strategies and specific plans.  Until then, please direct any questions to Mr. Neil R. Boylan at JPMorgan Chase Bank as agent for the senior secured lending group.

Yours Very Truly,

Larry V. Friend
Vice President, Chief Financial Officer
and Treasurer

LVF/lap

# WERNER HOLDING CO. (DE), INC.

P.O. Box 8985
1105 North Market Street, Suite 1300
Wilmington, Delaware 19899

Telephone 302/478-5723  •  Telecopier 302/427-7663

February 20, 2004

Mr. Neil R. Boylan
Managing Director
JPMorgan Chase Bank
270 Park Avenue, Floor 4
New York, NY 10017-2070

Dear Mr. Boylan:

This letter will serve to document our discussion earlier this week that it is our intent to provide the 2004 consolidated operating budget for Werner Holding Co (PA), Inc., which is required to be provided by section 8.1 (c) of the Credit Agreement, in connection with the upcoming meeting in March with the senior lender group in New York. We believe that it will be more informative for the group if we present our 2004 business plan along with our longer-term projections in person at the meeting where key members of our management team will be available to answer questions that arise. We are in the process of finalizing our projections and will call you in the near future to make arrangements for the meeting.

In the meantime, please do not hesitate to contact me if you have any questions or need additional information.

Yours very truly,

Larry V. Friend
Vice President, Chief Financial Officer
and Treasurer

CONFIDENTIAL

EXHIBIT 73

# WILLKIE FARR & GALLAGHER LLP

MATTHEW A. FELDMAN
212 728 8651
mfeldman@willkie.com

787 Seventh Avenue
New York, NY 10019-6099
Tel: 212 728 8000
Fax: 212 728 8111

March 22, 2005

<u>**VIA EMAIL and FIRST CLASS MAIL**</u>

Eric J. Werner, Esq.
Vice President & General Counsel
WERNER HOLDING CO. (PA), INC.
93 Werner Road
Greenville, Pennsylvania  16125-9499

Re:    <u>**Retainer Agreement with Willkie Farr & Gallagher**</u>

Dear Eric:

Willkie Farr & Gallagher (the "Firm") is pleased to accept representation of Werner Holding Co. (PA), Inc. and its subsidiaries (collectively, the "Company"), in connection with the Company's restructuring efforts.

1.    <u>**Nature of Engagement**</u>

The Firm's engagement will include assisting the Company in negotiating and implementing an out-of-court restructuring of its capital structure and, if necessary, representing the Company in preparing for and conducting all aspects of any cases prosecuted under Title 11 of the United States Code (the "Bankruptcy Code"). This aspect of the Firm's representation will include, among other things, assisting in preparing the petition for voluntary relief, defenses against any involuntary case, motions and other court papers, documents and agreements that may be called for, representing the Company at court appearances and out-of-court planning and negotiation meetings, as well as negotiating, preparing and prosecuting any plans of reorganization, related solicitation and disclosure statements and other related documents.

In short, in the event of a chapter 11 filing and subject to obtaining the necessary court approval, the Firm is available to represent the Company as a debtor in possession. We will also be available to represent the Company in any litigation that may arise, subject to obtaining any required court approval and subject to any ethical constraints arising from potential conflicts.

March 22, 2005
Page 2

2.    **Case Management and Coordination of Outside Counsel**

To the extent possible, given the nature and magnitude of the engagement, steps will be taken by us to coordinate tasks, and where practical, to allocate tasks to avoid unnecessary duplication of effort between us and other counsel.

If, as outlined below, court approval is not available for all aspects of a potential Chapter 11 case you wish us to handle and we agree to undertake, our representation would include as many of these aspects as may be approved.

3.    **Retainer**

The Firm customarily receives a reasonable retainer in matters of this nature. The retainer is designed to assure the Company's continued access to representation despite delays in obtaining authority to pay fees, the potential imposition of cash collateral requirements, and other factors. At this initial stage of the Firm's engagement, a reasonable retainer for our services is $50,000. The retainer funds will be held for the purposes of providing a retainer for professional services to be rendered and expenses to be charged by us to the Company's account in connection with work performed prior to the commencement of a bankruptcy case filed by or against the Company (the "Retainer").

The Retainer will be utilized to pay the Firm's fees and expenses as incurred. The Firm will send the Company periodic invoices for services rendered and charges and disbursements incurred. The invoices will reflect charges for services rendered calculated on the basis of our guideline hourly rates. In the event of a bankruptcy case, however, payment may be made only upon court approval. The Company agrees to replenish the Retainer promptly upon invoice.

4.    **Pre-Petition and Post-Petition Services**

Some fees, charges and disbursements incurred before the filing of a bankruptcy petition (voluntary or involuntary) may remain unpaid as of the date of a bankruptcy filing. The Retainer shall also secure the payment of any such unpaid fees, charges and disbursements (whether or not billed). If an order for relief relating to the Company is entered, the Retainer will be applied to any unpaid pre-petition invoices, work-in-progress and unbilled expenses. Thereafter, the remainder of the Retainer (the "PostPetition Retainer Balance") will be held as security for the payment of post-petition fees and expenses in accordance with Bankruptcy Rule 2016, or other applicable laws and rules. Post-petition fees and expenses are to be paid by the Company as and when approved by the Court and not intended to be setoff against the Post-Petition Retainer Balance until the conclusion of the cases.

5.    **Fees, Charges and Disbursements**

The Firm's monthly invoices will reflect charges for services rendered calculated on the basis of our guideline hourly rates. For attorney services, these rates range from $825 to $240 per hour. The guideline hourly rate charged for paralegals is $120 to $210 per hour. Our guideline hourly

2814178.1

March 22, 2005
Page 3

rates are adjusted periodically to reflect the advancing experience, capabilities and seniority of our professionals as well as general economic factors.

Our invoices will also include amounts for charges and disbursements. We have read and are familiar with your "Outside Counsel Management Guidelines". We will endeavor to comply with such guidelines.

If (a) the Company's restructuring efforts are successfully completed without the need for a court filing, (b) our retention as bankruptcy or other counsel to the Company is not approved or authorized by the court, or (c) it is decided that such approval ought not to be sought, the Retainer will be refunded to the Company after deducting all unpaid pre- and post-petition fees, charges and disbursements due to the Firm by the Company.

In the event of a fee dispute between the Company and the Firm involving amounts from $1,000 to $50,000, the Client shall be entitled to arbitration in accordance with Part 137 of the Rules of the Chief Administrator of the New York courts.

6.    **Confidentiality and Conflicts**

While confidential communications between a client and counsel are privileged, the filing of a bankruptcy case may severely impact this attorney-client privilege. Specifically, if a trustee is appointed in any bankruptcy case concerning a corporate debtor, the trustee will be able to obtain from us (or any other counsel to the corporation) and disclose to others information communicated by the corporation to counsel.

Because of the nature of the Firm's practice, from time to time, we may concurrently represent one client in a particular case and a creditor of that client in an unrelated matter. As soon as practicable, we will provide a schedule of our current representation of those unrelated engagements involving creditors of the Company of which we are presently aware.

Please be assured that, despite any such concurrent representation, we strictly preserve all client confidences and zealously pursue the interests of each of our clients, including those circumstances in which we represent the adversary of an existing client in an unrelated case. The Company agrees that it does not consider such concurrent representation, in unrelated matters, of the Company and any adversary to be inappropriate and, therefore, waives any objections to any such present or future concurrent representation. Of course, with respect to any particular matter that may arise in connection with any Chapter 11 case that may be commenced, we understand that the Company will evaluate all of the circumstances extant at that time and will coordinate assignments among the Firm and other counsel to best serve and benefit the Company.

The Firm is being engaged by the Company as a corporation. Our employment does not, and cannot, include the representation of any entity not listed within the definition of "Company" nor does it include the representation of any individual officer, director, shareholder or employee; we

March 22, 2005
Page 4

encourage each to consult independent counsel. In the event that one or more of the entities within the definition of "Company" is forced to file for bankruptcy or has an involuntary proceeding filed against it which is not part of the global restructuring being pursued by the Company, the Firm and the Board of Directors of the Company jointly will decide which entities the Firm should continue to represent and which entities representation will be terminated.

7.     **Conclusion**

The Company agrees to make appropriate employees of the Company available to the Firm to assist in factual inquiries and factual determinations, court hearings and appearances, transactions and dealings in relation to the subject matters with regard to which the Firm has been retained.

The Company may discharge the Firm at any time. The Firm may withdraw at any time with the Company's consent or for good cause without the Company's consent. Good cause includes the Company's breach of this Agreement (including the Company's failure to pay any statement when due), the Company's refusal or failure to cooperate with us, or any fact or circumstance that would render our continuing representation unlawful or unethical.

Other matters may arise in this representation not set forth in, or contemplated by, this letter. Indeed, given the magnitude of the representation, it would be unusual if this were not the case. Please feel free to contact us to clarify or identify any such matter that may arise in connection with our representation.

2814178.1

March 22, 2005
Page 5

     The foregoing sets forth the terms regarding the Firm's retention. There are no representations or promises other than as expressly set forth herein. If the foregoing terms of our representation meet with your approval, and it accurately represents your understanding of the Company's retainer agreement with this Firm, please execute one copy of this agreement, return it to us and transmit the retainer by wire transfer in the amount of $50,000. The Firm's wire transfer instructions are as follows:

| | |
|---|---|
| Bank Name: | THE CHASE MANHATTAN BANK |
| ABA No.: | 021000021 |
| | FOR THE ACCOUNT OF WILLKIE FARR & GALLAGHER |
| Account #: | 123-007887 |
| Reference: | Werner Co. |

**WILLKIE FARR & GALLAGHER**

By: _____

    Name:  Matthew A. Feldman

    Title:   Partner

Accepted:

**Werner Holding Co. (PA), Inc. and its subsidiaries**

By: _____

Name:  Eric J. Werner

Title:   Vice President, Secretary
        and General Counsel

Date:  March 22, 2005

2814178.1

### ATTACHMENT B – A Listing of Old Ladder Complaints Filed in States Other Than Delaware

### Complaints Filed in California

| Defendant | Case No. | District | Date Filed |
|-----------|----------|----------|------------|
| Blanchard Rodger | EDCV 08-0787 | Central District | 06-12-08 |
| Grief Brothers Corporation | 2:08-cv-01361 | Eastern District | 06-11-08 |
| International Forrest Products, Inc. | 1:08-cv-00825 | Eastern District | 06-11-08 |
| Rhodiana Corporation | 08-cv-1050 | Southern District | 06-12-08 |
| Suppose U Drive | cv-08-3869 | Central District | 06-12-08 |
| USF Bestway | 08-cv-03867 | Central District | 06-12-08 |

### Complaints Filed in New York

| Defendant | Case No. | District | Date Filed |
|-----------|----------|----------|------------|
| E-Data Technologies, LLC | 08-01262 | Southern District | 06-11-08 |
| Home Improvement Executive | 08-01261 | Southern District | 06-11-08 |
| IntraLinks, Inc. | 08-01260 | Southern District | 06-11-08 |
| Schafer Machine Company, Inc. | 08-08107 | Eastern District | 06-11-08 |

### Complaints Filed in Pennsylvania

| Defendant | Case No. | District | Date Filed |
|-----------|----------|----------|------------|
| TVC Communications | 08-093 | Middle District | 06-11-08 |
| Lewis Industrial Supply | 08-094 | Middle District | 06-11-08 |
| Design Specialists | 08-2236 | Western District | 06-11-08 |
| Ameripac Industries, Inc. | 08-2237 | Western District | 06-11-08 |
| Barber Chemicals, Inc. | 08-2238 | Western District | 06-11-08 |
| Intecc | 08-2240 | Western District | 06-11-08 |
| Kim Kraft, Inc. | 08-2241 | Western District | 06-11-08 |
| Minitab, Inc | 08-2243 | Western District | 06-11-08 |
| Paper Products Company, Inc. | 08-2244 | Western District | 06-11-08 |
| Seneca Printing | 08-2245 | Western District | 06-11-08 |
| Wire-Tech & Tool | 08-2246 | Western District | 06-11-08 |

### Complaints Filed in Ohio

| Defendant | Case No. | District | Date Filed |
|-----------|----------|----------|------------|
| Best R. L. Company | 08-04106 | Northern District | 06-12-08 |
| Epco Extrusion Painting Co. | 08-04105 | Northern District | 06-12-08 |
| Cormark d/b/a Insight Corporate Solution | 08-02168 | Southern District | 06-12-08 |
| Jones Technical Machine Corp | 08-04108 | Northern District | 06-12-08 |
| Bordner & Associates d/b/a Laser Reproductions | 08-02169 | Southern District | 06-12-08 |
| Litco International | 08-04107 | Northern District | 06-12-08 |
| Millcraft Paper Company | 08-01171 | Northern District | 06-12-08 |
| French Machine Inc. | 08-04109 | Northern District | 06-12-08 |
| B.V. Manufacturing Inc. | 08-04110 | Northern District | 06-12-08 |

**ATTACHMENT B – A Listing of Old Ladder Complaints Filed in States Other Than Delaware**

**Complaints Filed in the U.S. Bankruptcy Court for the Northern District of Illinois**

| Defendant | Adv. No. | Date Filed |
|---|---|---|
| Oil Gear Co. | 08A-0461 | 06-12-08 |
| Industrial Modern Pattern | 08A-0458 | 06-12-08 |
| Capstone Paper and Packaging  Corp | 08A-0459 | 06-12-08 |
| Madig Glove and Safety Mfg. Co. | 08A-0460 | 06-12-08 |
| Precision Service | 08A-0462 | 06-12-08 |
| Xtra Lease | 08A-0467 | 06-12-08 |
| Victor G. Smith & Assoc. | 08A-0464 | 06-12-08 |
| Sungard Availability Services LP | 08A-0463 | 06-12-08 |
| Universal Hydraulic Services | 08A-0466 | 06-12-08 |
| Hutchinson Tool Sales Co. | 08A-0457 | 06-12-08 |
| Hudson Tool & Die | 08A-0456 | 06-12-08 |
| H-O-H Chemicals, Inc | 08A-0455 | 06-12-08 |
| Health Concepts LLC | 08A-0454 | 06-12-08 |
| Forge Industrial Staffing | 08A-0453 | 06-12-08 |
| Chicago Rivet & Machine Co. | 08A-0452 | 06-12-08 |
| Bodycote Thermal Processing | 08A-0451 | 06-12-08 |
| Belco Industries, Inc | 08A-0450 | 06-12-08 |
| Applied Industrial Tech | 08A-0449 | 06-12-08 |
| Action Painting & Cleaning | 08A-0448 | 06-12-08 |