WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
J. Christopher Shore (JS-6031)

633 West Fifth Street, Suite 1900
Los Angeles, California 90071
(213) 620-7700
Craig Averch (Admitted Pro Hac Vice)

*Attorneys for Plaintiff OLD LADDER LITIGATION CO., LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OLD LADDER LITIGATION CO., LLC, as Litigation Designee on behalf of the Liquidation Trust,<br><br>    Plaintiff,<br><br>  v.<br><br>INVESTCORP BANK B.S.C., *et al.*,<br><br>    Defendants. | Case No.  08 CIV 0876 (RMB)(THK)<br><br>**PLAINTIFF'S APPENDIX OF UNREPORTED AUTHORITIES IN SUPPORT OF OPPOSITION TO DEFENDANTS' CONSOLIDATED MOTIONS FOR TRANSFER OF VENUE, AND DISMISSAL** |

The following unreported authorities, cited in Plaintiff's Opposition, are attached hereto:

**I.    Cases**

1.    *A. Esteban & Co., Inc. v. Metro. Transp. Auth.*, No. 02 Civ. 3615(NRB), 2002 WL 1059169 (S.D.N.Y. May 24, 2002);

2.    *In re Am. Inv. Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, 2007 WL 2541216 (E.D. Pa. Aug. 29, 2007);

3.    *Buckley v. Goldman, Sachs & Co.*, No. Civ. A. 02-CV-11497, 2005 WL 1206865 (D. Mass. May 20, 2005);

4.    *In re Crown Vantage, Inc.,* No. C-02-3838 MMC., 2006 WL 2348850 (N.D. Cal. Aug. 11, 2006);

5.    *In re Dean Witter P'ship Litig.*, No. 14816, 1998 WL 442456 (Del. Ch. July 17, 1998);

6.    *Lynch v. Nat'l Prescription Adm'rs*, No. 03 Civ. 1303(GBD), 2004 WL 385156 (S.D.N.Y. March 1, 2004);

7.    *Raines v. Switch Mfg. Corp.*, No. 96 Civ. 1361(JFK), 1996 WL 413720 at *3 (S.D.N.Y. July 24, 1996);

8.    *Solutia Inc v. FMC Corp.*, No. 04 Civ. 2842 (WHP), 2004 WL 1661115 (S.D.N.Y. July 27, 2004);

9.    *Thompson v. Glenmede Trust Co.*, No. Civ. A. 92-5233, 1993 WL 197031 (E.D. Pa. June 8, 1993); and

10.    *In re Total Containment, Inc.*, Bankruptcy No. 04-13144bf., Adversary No. 05-0145, 2008 WL 682455 (Bkrtcy. E.D. Pa. March 5, 2008).

**II.    Secondary Sources**

11.    Garfinkle, Neal M., <u>No Way Out: §546(e) is No Escape for the Public Shareholder of a Failed LBO</u>, 1991 Colum. Bus. L. Rev. 51 (1991);

12.    Redd, Christopher, <u>Treatment of Securities and Derivatives Transactions in Bankruptcy</u>, 24-SEP AM. BANKR. INST. J. 36, 56 (Sept. 2005); and

13.   Smith, Gerald K., and Kennedy, Frank R., <u>Fraudulent Transfers and Obligations:  Issues of Current Interest</u>, 43 S.C. L. Rev. 709 (1992).


Dated: July 8, 2008                    WHITE & CASE LLP
      New York, New York

                                             By:   <u>/s/ J. Christopher Shore    </u>
                                                   J. Christopher Shore (JS–6031)
                                                   1155 Avenue of the Americas
                                                   New York, New York  10036
                                                   (212) 819-8200

                                             *Attorneys for Plaintiff OLD LADDER*
                                             *LITIGATION CO., LLC*

EXHIBIT 1



Not Reported in F.Supp.2d                                                                                                   Page 1
Not Reported in F.Supp.2d, 2002 WL 1059169 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1059169 (S.D.N.Y.))**

**H**

A. Esteban & Co., Inc. v. Metropolitan Transp. Authority
S.D.N.Y.,2002.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
A. ESTÈBAN & COMPANY, INC., Plaintiff,
v.
METROPOLITAN TRANSPORTATION AUTHORITY, Michael Durso, and Robert Welch, Defendants.
No. 02 Civ. 3615(NRB).

May 24, 2002.

Sheldon Lustigman, The Lustigman Firm, for Plaintiff.
Rhonda Moll, Senior Employment Counsel, MTA, Rebecca K. Myers, Paul Hastings, Janofsky & Walker, LLP, for Defendant.

### MEMORANDUM & ORDER

BUCHWALD, J.

*1 Plaintiff, A. Estèban & Company, Inc. ("Estèban"), brought this action seeking a temporary restraining order and preliminary injunction preventing defendant Metropolitan Transportation Authority ("MTA") from informing the prime contractors with whom plaintiff works that they would no longer receive Disadvantaged Business Enterprise ("DBE") credit for work done by plaintiff. For the reasons discussed below, plaintiff's motion is denied.

### BACKGROUND

In June 1998, plaintiff, a reprographics company, was re-certified by the MTA as a DBE, entitling prime contractors to receive credit toward the DBE contract goal if they hire plaintiff as a subcontractor on MTA projects. Plaintiff currently works as a subcontractor for three of the prime contractors on the design phase of the East Side Access Project, a federally-funded transportation project.

We held oral argument on this motion on May 21, 2002. For the reasons stated on the record, we determined, notwithstanding the expiration date included in the MTA's June 1998 re-certification letter and a subsequent regulatory change, that the MTA could not remove Estèban's certification as a DBE without complying with the notice and hearing requirements set out in the Department of Transportation regulations. 49 C.F.R. § 26.87. Therefore, Estèban remained certified as an eligible DBE until March 12, 2002.[FN1]

> FN1. Plaintiff has indicated that it will challenge the MTA's determination under the Department of Transportation's appeal procedure, 49 C.F.R. § 26.89, though it has not yet done so. Accordingly, for reasons of exhaustion among others, the merits of the removal of DBE status are not before this Court.

The remaining issue, which we asked the parties to brief following the hearing, concerns whether on a going forward basis, the prime contractors with whom plaintiff does business may receive DBE credit for any future work allotted to plaintiff. While plaintiff agrees that it may not now enter into a new subcontract with other prime contractors on the project that could be used by another prime contractor to meet its DBE goals, it maintains that it retains its DBE status with respect to the three contractors with whom it was dealing prior to March 12, 2002.

### DISCUSSION

Plaintiff contends that, under 49 C.F.R. § 26.87(i)(2), the prime contractors can continue to receive credit for all work done by plaintiff until the completion of plaintiff's subcontract, which it claims lasts until the design phase of the East Side Access Project is complete.[FN2] Defendants argue

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 2
Not Reported in F.Supp.2d, 2002 WL 1059169 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1059169 (S.D.N.Y.))**

that plaintiff does not have a protectible subcontract within the meaning of 49 C.F.R. § 26.87.[FN3]

> FN2. The current projected completion date for the design phase is December, 2008. *See* Affidavit of Joseph J. Petrocelli, Chief Financial and Administrative Officer of the Project, sworn to on May 22, 2002.

FN3.49 C.F.R. § 26.87(i) states:

> Effects of removal of eligibility. When you remove a firm's eligibility, you must take the following action:

> (1) When a prime contractor has made a commitment to using the ineligible firm, or you have made a commitment to using a DBE prime contractor, but a subcontract or contract has not been executed before you issue the decertification notice provided for in paragraph (g) of this section, the ineligible firm does not count toward the contract goal or overall goal. You must direct the prime contractor to meet the contract goal with an eligible DBE firm or demonstrate to you that it has made a good faith effort to do so.

> (2) If a prime contractor has executed a subcontract with the firm before you have notified the firm of its ineligibility, the prime contractor may continue to use the firm on the contract and may continue to receive credit toward its DBE goal for the firm's work. In this case, or in a case where you have let a prime contract to the DBE that was later ruled ineligible, the portion of the ineligible firm's performance of the contract remaining after you issued the notice of its ineligibility shall not count toward your overall goal, but may count toward the contract goal.

> (3) Exception: If the DBE's ineligibility is caused solely by its having exceeded the size standard during the performance of the contract, you may continue to count its participation on that contract toward overall and contract goals.

Plaintiff's post-argument submission essentially argues that plaintiff has contractual rights enforceable against the prime contractors for whom they have done work. This, however, is not the issue. Rather, the question is whether the "prime contractor has executed a subcontract with the firm [Estèban]" within the meaning of § 26.87(i)(2). We find that it has not. In reaching that conclusion, we rely on well-established rules of construction: first, that a court relies on the plain meaning of a regulation, *SeeUnited States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242 (1989) (stating that "[t]he plain meaning of legislation should be conclusive, except in the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.") (citations omitted); second, that all parts of a statute (or regulation) are to be read as a consistent whole and meaning is to be given to each constituent part. *United States v. Morton,* 467 U.S. 822, 828 (1984).

**\*2** Applying these principles of construction, we examine first the language of the regulation at issue. The term "contract" is defined as "a legally binding relationship obligating a seller to furnish supplies or services ... and the buyer to pay for them."49 C.F.R. § 26.5. The meaning of the term "executed" as used in the regulation can be discerned from a reading of the language and, in particular, from a comparison of the two subparts of § 26.87. From the examination of the language of the regulation itself it is clear that an executed subcontract refers to a binding written agreement.[FN4] The contrast between (i)(1) and (i)(2) is between a "commitment" and an "executed ... subcontract."

> FN4. Further support for this reading may be found in § 26.13 which refers in the context of required assurances to "each

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2002 WL 1059169 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1059169 (S.D.N.Y.))**

subcontract the prime contractor *signs* with a subcontractor...."49 C.F.R. § 26.13 (emphasis added).

In the context of publicly funded projects with a host of mandates, it is hardly surprising that there would be requirement for written agreements to support the expenditure of public funding. It is undisputed that there was no comprehensive written contract between Estèban and any of the three prime contractors. Rather, the prior dealings between the plaintiff and the prime contractors were in the form of purchase orders that were signed based on an existing price list offered by the plaintiff. In effect, each purchase order constituted a distinct subcontract. It should be noted that the prime contractor for whom plaintiff did the most work, PB/STV, stated at oral argument that it did not consider itself limited to dealing with the plaintiff and plaintiff's post-argument submission concedes that it did not have an exclusive relationship with the other prime contractors. Accordingly, we find that while plaintiff had a pricing agreement with the prime contractors that bound the plaintiff to provide the promised prices throughout the length of the design phase of the project, there was no contract that bound any contractor to use plaintiff's services throughout the design phase. Quite simply, plaintiff did not have a requirements contract with any of the three prime contractors. In sum, plaintiff's price list constituted an offer, and each purchase order was an acceptance creating a new contract.

We now turn to our attention to whether there are other portions of Part 26 of Title 49 that will inform our reading of § 26.87(i). We believe that there is learning that may be gleaned from a consideration of § 26.89(b) that provides: "Pending the Department's decision in the matter [referring to the appeal process before the Department of Transportation], the recipient's decision remains in effect. The Department does not stay the effect of the recipient's decision while it is considering an appeal."This provision makes clear that in the balancing between the public interest and the private interest of the firm seeking to maintain DBE status that the public interest prevails. A reading of § 26.87(i) makes clear that it is designed to protect the interest of the prime contractor (i.e. avoid disruption) if it has already executed a subcontract with a company that it thought was DBE qualifed, but that in the absence of such a subcontract the public interest once more prevails. In either event, it is not the prospective interest of the potential subcontract that controls. Moreover, applying traditional preliminary injunction analysis, the public interest, when affected, is an important consideration. Clearly, the public interest, as determined by the MTA,[FN5] the body charged with making that decision initially, would not be served by the granting of the requested preliminary relief.

> FN5. Retaining plaintiff as an eligible DBE firm after the MTA has determined that the actual owner is not disadvantaged, would mean that a qualified DBE would not be afforded the opportunity to perform the work.

**\*3** Therefore, the prime contractors are entitled to get DBE credit for any work for which a purchase order had been issued prior to March 12, 2002. After that date, plaintiff falls under § 26.87(i)(1); any future orders from plaintiff would not count toward the contract or overall project DBE goals.

*CONCLUSION*

Having found that the regulation at issue does not support plaintiff's contention that it has executed subcontracts for future work as defined by 49 C.F.R. § 26.87(i), plaintiff's motion for a preliminary injunction is denied, and the temporary restraining order is vacated.

IT IS SO ORDERED.

S.D.N.Y.,2002.
A. Esteban & Co., Inc. v. Metropolitan Transp. Authority

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 4
Not Reported in F.Supp.2d, 2002 WL 1059169 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1059169 (S.D.N.Y.))**

Not Reported in F.Supp.2d, 2002 WL 1059169
(S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 2

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
**(Cite as: 2007 WL 2541216 (E.D.Pa.))**

**H**
In re American Investors Life Ins. Co. Annuity Market-
ing and Sales Practices Litigation
E.D.Pa.,2007.

United States District Court,E.D. Pennsylvania.
In re AMERICAN INVESTORS LIFE INSURANCE
CO. ANNUITY MARKETING AND SALES PRAC-
TICES LITIGATION.
Relates to:
Gilmour v. Bohmueller, et al. Civil Action No. 04-2535
Trimble v. Weinstein, et al. Civil Action No. 05-2101
Brennan v. Weinstein, et al. Civil Action No. 05-3588.

MDL Docket No. 1712.

Aug. 29, 2007.

*MEMORANDUM AND ORDER*

McLAUGHLIN, J.

*TABLE OF CONTENTS*

| | | | |
|---|---|---|---|
| I. | | Factual Background................... | 2 |
| | A. | The Scheme................... | 3 |
| | B. | The Defendants................... | 7 |
| | | 1. | The Insurance Company Group.......... | 8 |
| | | 2. | The Sales Group............ | 9 |
| | | 3. | The Attorney Group........ | 10 |
| | C. | The Plaintiffs and Their Individu- | 10 |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
**(Cite as: 2007 WL 2541216 (E.D.Pa.))**

al Allega-
tions ...

| | | |
|---|---|---|
| 1. | Richard and Dena Stein.............. | 10 |
| 2. | Mary Lynch................... | 12 |
| 3. | Beryl and Charlotte Price........... | 14 |
| 4. | John Healy................... | 15 |
| 5. | Jean Ryles................... | 16 |
| 6. | George Miller................ | 17 |
| 7. | Edward and Gloria Inferrera........... | 18 |
| 8. | Evelyn Edwards............... | 19 |
| 9. | Jonathan Upchurch /Edith Newcomer...... | 20 |
| 10. | Walter and Suzanne Gilmour........... | 21 |
| 11. | Harcourt Trimble, | 22 |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 3
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
**(Cite as: 2007 WL 2541216 (E.D.Pa.))**

| | | III/ Harcourt and Barbara Trimble................ | |
|---|---|---|---|
| | 12. | Margie Brennan Treitz/ Gilbert and Joanne Brennan................. | 24 |
| II. | Procedural History and Overview of the Claims..... | | 28 |
| III. | Analysis.................. | | 33 |
| | A. | Defendants Dismissed for Failure to State Any Claim................ | 34 |
| | B. | RICO................ | 35 |
| | 1. | Claim Under Subsection 1962(c)...... | 35 |

Slip Copy                                                      Page 4
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
**(Cite as: 2007 WL 2541216 (E.D.Pa.))**

|   |   |   |   |
|---|---|---|---|
| a. | Existence of an Enterprise.... | | 36 |
| | (1) | The Existence of an Ongoing Organization......... | 37. |
| | (2) | The Various Associates Functioned as a Continuing Unit........ | 41. |
| | (3) | Existence Separate and Apart from Alleged Racketeering Activity ... | 43. |
| b. | Conduct or Participation..... | | 45 |
| c. | Racketeering Activity...... | | 49 |
| | (1) | Scheme to Defraud...... | 51. |
| | (2) | Use of the Mails or Wires..... | 55. |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 5
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
**(Cite as: 2007 WL 2541216 (E.D.Pa.))**

|   |   |   | (a) | The Insurance Company Group Defendants. | 57 |
|   |   |   | (b) | Bohmueller. | 59 |
|   |   |   | (c) | Weinstein and Plaza. | 61 |
|   |   |   | (d) | The Patriot Group. | 62 |
|   |   | (3) | Injury to Business or Property ... | | 63. |
|   | 2. | Claim Under Subsection 1962(d)...... | | | 67 |
|   | 3. | Whether the McCarron-Ferguson Act Bars the Plaintiffs' RICO Claims...... | | | 68 |
| C. | State Law Claims............. | | | | 69 |
|   | 1. | Statute of Limitations.......... | | | 70 |
|   | 2. | Breach of Fiduciary Duty........ | | | 73 |

Slip Copy                                                                                           Page 6
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
**(Cite as: 2007 WL 2541216 (E.D.Pa.))**

..

3.    Negligent
      Supervi-
      sion.........                                        75
      ..

4.    Unjust
      Enrich-
      ment........                                          76
      ....

5.    Fraudu-
      lent Mis-
      represent-                                            79
      ation and
      Negligent
      Misrep-
      resenta-
      tion.........
      ...

6.    Civil
      Conspir-                                              81
      acy..........
      ...

7.    Profes-
      sional                                                81
      Negli-
      gence......
      ....

8.    Breach of
      Con-                                                  84
      tract........
      ....

9.    Violation
      of the                                                86
      Pennsylv
      ania Un-
      fair Trade
      Practices
      and Con-
      sumer
      Protec-
      tion
      Law.....

10.   Negli-                                                87

Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
**(Cite as: 2007 WL 2541216 (E.D.Pa.))**

gence Per
Se...........

11.    An Ac-                                    88
count-
ing..........
..

*1 In this multidistrict litigation, the plaintiffs have sued several defendants for damages arising from an allegedly fraudulent scheme to sell senior citizens unnecessary and unsuitable estate planning instruments and annuities. According to the plaintiffs, the defendants participated in this scheme through their involvement in one of three groups: the "Insurance Company Group," the "Sales Group," or the "Attorney Group." The plaintiffs seek damages and injunctive relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., as well as under various state law causes of action.

The defendants in the *Stein* consolidated class action, as well as certain defendants in the *Gilmour, Trimble,* and *Treitz* individual actions, have filed motions to dismiss. Also pending in the *Trimble* individual action is a motion for judgment on the pleadings.[FN1] These motions all seek dismissal on the ground that the plaintiffs have failed to state a claim.

> FN1. The full citations for the four lawsuits that are subject to the instant motions are as follows: *Stein v. AmerUs Group Co.,* No. 05-1712;*Gilmour v. Bohmueller,* No. 04-2535;*Trimble v. Weinstein,* No. 05-2101; and *Treitz v. Weinstein,* No. 05-3588.

The Court will grant the motions to dismiss insofar as they seek dismissal of all claims against defendants Chiavaroli, Ms. Strope, Newmark, and AMH. The Court will also grant the motions to the extent that they seek dismissal of the RICO claims alleged by the Inferreras, Ryles, Miller, and Edwards. To the extent that the motions seek dismissal of the RICO claims alleged by all other plaintiffs, the Court will deny the motions. With regard to the state clams, the Court will grant the motions in part and deny them in part.

**I. *Factual Background***

The defendants consist of a group of insurance companies (the "Insurance Company Group"), a group of salespeople (the "Sales Group"), and a group of attorneys (the "Attorney Group"). According to the plaintiffs, these three groups worked together to execute an allegedly fraudulent scheme whose goal was to sell senior citizens unnecessary and unsuitable estate planning instruments and annuities. (*Stein* ¶¶ 1-8;*Gilmour* ¶ 1;*Trimble* ¶ 2;*Treitz* ¶ 2).

**A. *The Scheme***

According to the plaintiffs, the Insurance Company Group was the architect of the allegedly fraudulent scheme. It was this group of defendants that originally developed and underwrote the annuities at issue in this litigation. These annuities, the plaintiffs allege, possessed certain characteristics, such as lengthy deferral periods (*i.e.,* receipt of monthly payments would be deferred) and large surrender charges (*i.e.,* early-withdrawal penalties), that rendered them unsuitable investments for senior citizens. It was this very class of individuals, however, that the Insurance Company Group targeted for sale of its product. (*Stein* ¶¶ 11-13;*Gilmour* ¶¶ 173-81;*Trimble* ¶¶ 146-54;*Treitz* ¶¶ 169-77).

The Insurance Company Group induced these individuals to buy its annuities by devising an allegedly fraudulent sales scheme, which it then disseminated to members of both the Sales Group and the Attorney Group via standardized marketing materials and sales presentations. Under this scheme, the Insurance Company Group provided Sales Group members with "leads" that consisted of individuals who were 65 years or older and who had an estimated income bracket of $35,000 or more. Through the standardized marketing materials

Slip Copy                                                                                                Page 8
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
(Cite as: 2007 WL 2541216 (E.D.Pa.))

and sales presentations, the Insurance Company Group taught the Sales Group members how to first gain the trust of these potential annuity purchasers and then how to take advantage of that trust by selling them unnecessary and unsuitable estate planning instruments and annuities. (*Stein* ¶¶ 14-22, 223;*Gilmour* ¶¶ 174-77;*Trimble* ¶¶ 147-50;*Treitz* ¶¶ 170-73).

**\*2** As set forth in the Insurance Company Group's marketing materials and sales presentations, members of the Sales Group would gain the trust of senior citizens by conferring upon themselves imaginary titles, such as "Certified Elder Adviser" or "Certified Senior Adviser." In addition, the materials instructed the Sales Group members to establish relationships with attorneys who were willing to allow the salespeople to identify themselves as lawyers or agents of lawyers. Such self-identification, the plaintiffs allege, induced potential annuity purchasers to trust members of the Sales Group as though they were objective advisers, rather than individuals with financial incentives to sell annuities. (*Stein* ¶¶ 14-23;*Gilmour* ¶¶ 194-99;*Trimble* ¶¶ 167-73;*Treitz* ¶¶ 190-96).

Having thus cloaked their true intentions, members of the Sales Group were then instructed to conduct seminars (or other such seemingly informational presentations) at which the salespeople would offer ostensibly disinterested financial advice. At these presentations, the Sales Group members were instructed to hold themselves out as disinterested financial planners whose only affiliation was with an attorney. Instead of offering disinterested advice, however, members of the Sales Group used these seminars and presentations, which were developed by the Insurance Company Group, solely as a way of convincing senior citizens to purchase the Insurance Company Group's annuities. (*Stein* ¶¶ 250-57;*Gilmour* ¶¶ 194-200;*Trimble* ¶¶ 167-73;*Treitz* ¶¶ 190-96).

When conducting these presentations, members of the Sales Group were instructed to encourage attendees to set up living trusts through the attorneys with whom the Sales Group members had previously established relationships-the Attorney Group. Such living trusts would, members of the Sales Group assured attendees, help

minimize taxes, as well as avoid certain pitfalls associated with wills and probate. The process of creating these living trusts, however, was simply a convenient way of further cloaking the salesperson's true intentions, as well as identifying assets that could be used to purchase annuities. (*Stein* ¶¶ 251-58;*Gilmour* ¶¶ 196-202;*Trimble* ¶¶ 171-77;*Treitz* ¶¶ 194-200).

The process of creating a living trust helped the Sales Group members accomplish these goals because it entails taking an inventory of all the living-trust purchaser's assets. Only by placing all assets within the trust could the living-trust purchaser possibly achieve the tax-minimization and probate-avoidance goals that were touted as the benefits of the product. The Sales Group members could thus further identify themselves as lawyers or associates of lawyers by taking this inventory, as well as identify which assets could be used to purchase the Insurance Company Group's annuities.(*Stein* ¶¶ 251-58;*Gilmour* ¶¶ 196-202;*Trimble* ¶¶ 171-77;*Treitz* ¶¶ 194-200).

**\*3** At the conclusion of these presentations, Sales Group members would schedule follow-up visits with the attendees. At these follow-up visits, the Sales Group members would again urge the potential annuity purchasers to set up living trusts so that the salespeople could use the inventory process as a "door-opener" for selling the Insurance Company Group's annuities. Alternatively, if the individual had already purchased such an instrument, the Sales Group members would immediately take an inventory of the potential purchaser's assets, ostensibly so that the living trust could achieve its goals. Upon taking the inventory, the Sales Group members would recommend that the potential purchaser use any available assets to purchase one or more of the Insurance Company Group's annuities. The Sales Group members would bolster this recommendation by representing that the annuity was a "suitable" investment. If the individual agreed to buy an annuity, the Sales Group member would sell him the product, thereby earning a hefty commission. (*Stein* ¶¶ 254-58;*Gilmour* ¶¶ 199-203;*Trimble* ¶¶ 172-76;*Treitz* ¶¶ 195-99).

In the course of selling the living trusts and annuities, the Sales Group members were instructed to make sev-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                    Page 9
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
(Cite as: 2007 WL 2541216 (E.D.Pa.))

eral alleged material misrepresentations and omissions to potential purchasers, including (i) the alleged misrepresentation that the salespeople were neutral financial advisers when they were not, (ii) the alleged misrepresentation that a living trust would help the purchaser reduce taxes and avoid probate when it did not, (iii) the alleged misrepresentation that the annuities were "suitable" investments for the purchasers, and (iv) the alleged material omission that the long-term deferred annuities contained lengthy deferral periods, large surrender charges, and substantial early-withdrawal penalties on death benefits. (*Stein* ¶¶ 14, 254, 259;*Gilmour* ¶¶ 1, 2, 43;*Trimble* ¶¶ 2-6;*Treitz* ¶¶ 2-7).

### B. *The Defendants*

The named defendants in the four lawsuits that are currently under consideration vary. In the *Stein* consolidated class action, the plaintiffs sue only members of the Insurance Company Group. In the *Gilmour, Trimble,* and *Treitz* individual actions, the plaintiffs sue members of the Insurance Company Group, the Sales Group, and the Attorney Group. Despite this difference in named defendants, the complaints are virtually identical in their description of the allegedly fraudulent scheme, as well as the various defendants' alleged participation therein.

### 1. *The Insurance Company Group*

The Insurance Company Group consists of AmerUs Group Company ("AMH"); AmerUs Annuity Group Co. ("AAG"); American Investors Life Insurance Co. ("AILIC"); American Investors Sales Group ("AISG"); Creative Marketing International Corporation ("CMIC"); and Insurance Agency Marketing Services, Inc. ("IAMS").[FN2]

> FN2. The Second Amended Consolidated Class Action Complaint also names AmerUs Life Insurance Company ("AML"). The Insurance Company Group filed a supplemental motion to dismiss stating that AML had not been properly served and reserving all rights and defenses of AML. AML may move to dismiss at a later

date.

Defendant AMH is a holding company whose subsidiaries are primarily engaged in the business of marketing, underwriting, and distributing a broad range of individual life, annuity, and insurance deposit products to individuals and businesses. AAG is a wholly owned subsidiary of AMH. AILIC, AISG, CMIC, and IAMS are, in turn, wholly owned subsidiaries of AAG. AILIC is in the business of underwriting and issuing annuities. AISG, CMIC, and IAMS are engaged in the business of marketing, underwriting, and distributing a broad range of life insurance and annuity products. (*Stein* ¶¶ 8-13, 46-54;*Gilmour* ¶¶ 8-13;*Trimble* ¶¶ 13-22;*Treitz* ¶¶ 17-26).

### 2. *The Sales Group*

*4 The Sales Group consists of the individual salespeople, as well as the entities employing them, who executed the allegedly fraudulent scheme. This group constitutes the conduit through whom the Insurance Company Group interacted directly with potential annuity purchasers. These salespeople and entities include Brian Newmark ("Newmark"), Victoria Larson ("Larson"), Kenneth Krygowski ("Krygowski"), Diane Strope ("Ms.Strope"), Stephen Strope ("Mr.Strope"), Mary Chiavaroli ("Chiavaroli"), Ralph Spangler ("Spangler"), Michael Horowitz ("Horowitz"),[FN3] Estate Planning Advisers Corp. ("EPAC"), the Patriot Group, Best Estate Services ("BES"), and Guardian Insurance Agency, Inc. ("Guardian").(*Stein* ¶¶ 6, 56-61;*Gilmour* ¶¶ 30-38;*Trimble* ¶¶ 36-38;*Treitz* ¶¶ 40-46).

> FN3. Michael Horowitz is identified in the caption of the *Gilmour* complaint as "Michael Horowitz, a/k/a Michael Hamilton," and he is referred to in the body of the complaint as "Michael Hamilton." Because "Michael Horowitz" appears from the caption of the case to be this defendant's true name, the Court will refer to him throughout this opinion as "Michael Horowitz" or simply "Horowitz."

Slip Copy                                                                                                    Page 10
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
(Cite as: 2007 WL 2541216 (E.D.Pa.))

### 3. The Attorney Group

The Attorney Group consists of people who actually are, or at one time were, members of the bar of a state in the United States and who prepared living trust documents and/or other estate planning documents for senior citizens in connection with the purchase of the defendants' annuities. These attorneys furthered the allegedly fraudulent scheme by allowing Sales Group members to use the attorney-client relationship to mask the salespeople's financial incentives, as well as discover assets that could be transferred into the Insurance Company Group's annuities. Members of this group include Barry Bohmueller ("Bohmueller"), Brett Weinstein ("Weinstein"), and Jason Plaza ("Plaza").(*Stein* ¶¶ 6, 55;*Gilmour* ¶¶ 19-29;*Trimble* ¶¶ 23-32;*Treitz* ¶¶ 27-36).

### C. The Plaintiffs and Their Individual Allegations[FN4]

> FN4. Richard and Dena Stein, Mary Lynch, Charlotte and Beryl Price, George Miller, Edward and Gloria Inferrera, Jean Ryles, Evelyn Edwards, and Jonathan Upchurch are named plaintiffs in the *Stein* consolidated class action complaint. Walter Gilmour, Harcourt Trimble, III, and Margie Brennan Treitz are the plaintiffs in the three individual cases.

### 1. Richard and Dena Stein

In early 2002, Richard and Dena Stein ("the Steins") responded to an advertisement for a seminar about financial planning. At the seminar, Larson and other representatives of EPAC held themselves out as neutral estate planners who could help the Steins by providing estate planning services. Larson also identified herself as a financial adviser and an employee of attorney Bohmueller. At no time did Larson or any of the other presenters identify themselves as salespeople. At the end of the seminar, the Steins identified themselves to Larson and informed her that they wished to work with her to plan their estate and finances.

On or about April 23, 2002, Larson came to the Steins' home and conducted an in-depth interview. During this visit, Larson made representations to the Steins about the purported advantages that a living trust possesses over wills and probate. At a subsequent visit, the Steins gave Larson $600, payable to "Barry Bohmueller," for the purchase of a living trust. During the same visit, Larson convinced the Steins to liquidate $20,147.88 held in an IRA to purchase an AILIC annuity on Mr. Stein.

Larson did not, however, inform the Steins that the annuity was a fifteen-year deferred annuity whose payments would not start until Mr. Stein turned 90. Larson also failed to disclose the large penalties for any withdrawal that occurred earlier than that date. And finally, Larson represented that the annuity would be available to Mrs. Stein, the beneficiary, immediately following Mr. Stein's death, despite the fact that the money would have to be left with the defendants for five years after Mr. Stein's death to avoid paying substantial penalties. (*Stein* ¶¶ 98-114).

### 2. Mary Lynch

*5 Mary Lynch ("Lynch") came into contact with the defendants through a seminar on estate planning, which she heard about through an advertisement at a local senior center. At the seminar, which was conducted by Larson and other sales agents, the presenters held themselves out as neutral estate planners and did not identify themselves as insurance salespeople. The presenters also touted the benefits that living trusts held over probate and wills.

On or about July 19, 2001, Michael Ciccone ("Ciccone") came to Lynch's home and conducted an in-depth interview with her. Following this visit, Ciccone, Larson, and Krygowski came to Lynch's home on a number of additional occasions, each time making representations about the advantages that living trusts possess over wills and probate. At no time during any of these visits did Ciccone, Larson, or Krygowski identify themselves as salespeople. These members of the Sales Group instead held themselves out as disinterested estate planners who were working with attorney Bohmueller to best serve Lynch's estate planning needs.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 11
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
**(Cite as: 2007 WL 2541216 (E.D.Pa.))**

On or about July 19, 2001, Lynch decided to set up a living trust, but she declined to purchase an annuity. Lynch accordingly gave Ciccone a check for $1,795.00, payable to "Barry Bohmueller," for the purchase of a living trust. Despite Lynch's decision to purchase only a living trust, members of the Sales Group nevertheless continued to urge her to purchase one or more of the defendants' annuities. After several follow-up contacts by Larson and other EPAC personnel, Lynch finally decided to purchase an AILIC annuity in early 2003. Lynch liquidated $65,000 to purchase this annuity.

At the time Lynch purchased the annuity, neither Larson nor any other members of the Sales Group disclosed the fact that payments on the annuity would not begin until Lynch reached 125 years of age. The salespeople also failed to disclose the substantial charges associated with early withdrawal of the principal invested. Not only did the salespeople fail to disclose these attributes, but Larson told Lynch that the annuity funds would be available to her beneficiaries immediately following her death. In truth, the funds would need to be left with the defendants for five years after Lynch's death to avoid the beneficiaries' incurring substantial penalties. (*Stein* ¶¶ 115-34).

### 3. *Beryl and Charlotte Price*

In response to a newspaper advertisement, Beryl and Charlotte Price ("the Prices") attended a seminar on EPAC's estate planning services in early 2002. At the seminar, Larson and other EPAC representatives made a presentation detailing how EPAC's services could benefit the Prices and the other attendees. Shortly after the seminar, Larson called the Prices twice and arranged to meet with them in their home.

During that meeting, which occurred on or around January 23, 2002, Larson spoke to the Prices about the purported advantages of a living trust and led the Prices to believe that she was a qualified, experienced estate planner working with the office of attorney Bohmueller. Larson did not, at any time, disclose that she was a licensed insurance agent or that she received commissions for the sale of living trusts and annuities.

*6 Directly after the meeting, the Prices gave Larson a check for $1,845.00, payable to "Bohmueller Law Offices," for the purchase of a living trust. On or around February 28, 2002, Larson returned to the Prices' home to deliver a loose-leaf binder containing the living trust documents that attorney Bohmueller had ostensibly prepared. Larson told the Prices that she or attorney Bohmueller would take all the necessary actions to establish and fund the living trust. She did not, however, inform the Prices that they needed to transfer their residence or any other assets into the trust, and she did not do so on their behalf.

In the course of selling the Prices the living trust and delivering the documents associated with it, Larson also urged the Prices to purchase two AILIC annuities. Larson told the Prices that the rate of return on the annuities would be greater than what they were earning from their current investments and that the interest rate on the annuities could only increase. When the Prices told Larson that they wanted 25% of their investment to be available for distribution the following year, she assured them that the annuities would allow such a distribution. She did not, however, disclose that the annuities imposed penalties for early withdrawals. Convinced by Larson's sales pitch, the Prices liquidated a total of $61,000 from their IRA accounts to purchase two AILIC annuities. (*Stein* ¶¶ 135-58).

### 4. *Joseph Healy*

In or around August of 2001, Joseph Healy ("Healy") attended an estate planning seminar conducted by Larson and other EPAC personnel. At the seminar, Larson gave Healy a piece of paper indicating that she was a "Certified Senior Adviser" for EPAC. Sometime after the seminar, Larson and Krygowski visited Healy at his home to discuss his estate plan and the purported advantages of a living trust. Larson and Krygowski also led Healy to believe that they were qualified and experienced estate planners working with attorney Bohmueller's office. Larson even gave Healy a card from "Bohmueller Law Offices" on which she had written her name. Neither Larson nor Krygowski told Healy that they were licensed insurance agents or that they re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 12
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
**(Cite as: 2007 WL 2541216 (E.D.Pa.))**

ceived commissions for the sale of living trusts and an-
nuities.

On or around August 29, 2001, Healy gave Krygowski a
check for $1,795.00, payable to "Bohmueller Law Of-
fices," for the purchase of a living trust. Over the next
few months, Larson and Krygowski persuaded Healy to
purchase an AILIC deferred annuity with an initial
premium of $106,916.87. Neither Larson nor
Krygowski disclosed that payments on the annuity
would not begin for fifteen years after purchase or that
any withdrawals of principal in the first ten years after
purchase would be subject to substantial penalties.
(*Stein* ¶¶ 159-73).

### 5. Jean Ryles

Jean Ryles ("Ryles") was induced into purchasing two
AILIC annuities by unnamed representatives of Americ-
an Family Legal Plan ("AFLP"). These salespeople
came to Ryles' home, holding themselves out as disin-
terested estate planners working for, or on behalf of, at-
torney Weinstein, and made a presentation regarding the
benefits of their services. During this presentation, the
salespeople extolled the advantages that living trusts
have over probate and wills.

*7 As a result of this presentation, Ryles purchased a
living trust, as well as two AILIC annuities whose ini-
tial premiums totaled over $80,000. At no time during
the presentation did the AFLP representatives disclose
to Ryles that they were, in fact, insurance salespeople,
or that the annuities contained early-withdrawal penal-
ties. (*Stein* ¶¶ 174-82).

### 6. George Miller

Sometime in 1999, George Miller ("Miller") responded
by mail to a newspaper advertisement concerning Wein-
stein living trusts. Larson and other representatives of
the Addison Group responded by informing Miller that
they could provide estate planning services that would
benefit him. After telephoning Miller to arrange a meet-
ing, Larson came to Miller's home on or about June 22,
1999.

On that date, Larson spoke with Miller about the sup-
posed advantages of a living trust and led him to believe
that she was a qualified estate planner working with at-
torney Weinstein. She did not inform Miller that she
was an insurance agent or that she received commis-
sions from the sale of annuities. On the day of the meet-
ing, Miller gave Larson a check for $1,995.00, payable
to attorney Weinstein, for the purchase of a living trust.

During subsequent visits to Miller's home, Mr. Strope,
another member of the Sales Group, persuaded Miller to
liquidate $215,000 from his investment portfolio of pre-
dominately blue-chip investments to purchase an annu-
ity from American Equity Investment Life Insurance
Company, Inc. ("American Equity"). Mr. Strope did not
disclose that the annuity would not make any payments
for ten years or that it imposed surrender charges for
early withdrawals of principal.

Mr. Strope did, however, tell Miller that the rate of re-
turn on the annuity would be 26.95% per annum. In
2000, Miller received a statement in the mail from
American Equity and discovered that the rate of return
for the annuity was 3%, as opposed to the 26.95% that
Mr. Strope had promised. When Miller complained to
Mr. Strope, Mr. Strope blamed the decreased rate of re-
turn on the decline in the stock market.

Mr. Strope then convinced Miller to purchase an annu-
ity from AILIC. Mr. Strope did not disclose to Miller
that this annuity would not make payments for fifteen
years or that it also imposed early-withdrawal penalties.
(*Stein* ¶¶ 183-200).

### 7. Edward and Gloria Inferrera

Edward and Gloria Inferrera ("the Inferreras") were in-
duced into purchasing two of the defendants' annuities
by Charles Studebaker ("Studebaker") of Studebaker
and Associates, a duly appointed life insurance agent of
the Insurance Company Group. The initial premium
payments on these annuities totaled approximately
$15,000.00. In selling the Inferreras the annuities,
Studebaker used the defendants' standardized marketing
materials and sales presentations.

Slip Copy                                                                                                      Page 13
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
(Cite as: 2007 WL 2541216 (E.D.Pa.))

Shortly after purchasing the annuities, the Inferreras incurred substantial medical and other expenses associated with their deteriorating health. The Inferreras consequently requested the surrender of their two annuities. Upon being informed that surrender charges in excess of $6,000 would be imposed, the Inferreras decided to liquidate other investments to meet their cash-flow needs. The Inferreras anticipate that they will soon be forced to withdraw a substantial portion of, if not surrender, their annuities. As a result, they will be subject to the surrender charges associated with such an action.(*Stein* ¶¶ 201-05).

### 8. *Evelyn Edwards*

**8** Evelyn Edwards ("Edwards") was induced into purchasing an AILIC annuity by Christopher Grant Cary ("Cary"), one of the defendants' sales agents. Cary convinced Edwards to purchase the annuity by using the defendants' standardized marketing materials, forms, and policies. At no time did Cary fully disclose the risks and adverse information associated with the purchase of the defendants' deferred annuities. Edwards' initial premium payment for the annuity was $12,000.00, followed by a second payment of $15,000.00.

Edwards' health has deteriorated, and she is no longer capable of living on her own. She has therefore moved into an assisted living facility in New York State. Edwards is running out of money and will need to surrender her annuity in the near future. (*Stein* ¶¶ 206-09).

### 9. *Jonathan Upchurch/Edith Newcomer*

Jonathan Upchurch ("Upchurch") is the nephew of, and attorney in fact for, plaintiff Edith Newcomer ("Newcomer"). Newcomer is a retired schoolteacher who would occasionally attend neighborhood seminars that provided senior citizens with financial advice. At one of these seminars, Newcomer was introduced to Patrick Letizia ("Letizia"), who was a licensed sales agent of AILIC. In late 1999, Letizia, who claimed to be an expert in money management and annuities, told Newcomer that an annuity would help her grow her money. Based on Letizia's representation, Newcomer

purchased a deferred annuity from Provident Mutual Life and Annuity Company of America ("Provident") for an initial premium of $521,347.68.

In approximately September of 2002, Letizia instructed Newcomer to terminate her Provident annuity and purchase a new deferred annuity from AILIC. As a result of her early termination of the Provident policy, Newcomer was subject to a $44,074.42 surrender charge. Newcomer then used the balance that she received from Provident, $568,070.32, to purchase a fifteen-year deferred annuity from American Investors whose payments would not begin until Newcomer reached 102 years of age. (*Stein* ¶¶ 210-18).

### 10. *Walter and Suzanne Gilmour*

Walter and Suzanne Gilmour ("the Gilmours") were approached on March 22, 2001, by Horowitz, who knocked on the door of the Gilmours' residence and identified himself as a qualified estate planner who was working with attorney Bohmueller. Horowitz did not, on that day or any other, reveal that he was in fact a salesperson employed by the Patriot Group. Instead, Horowitz promoted and touted the advantages that living trusts hold over wills and probate. These representations were substantially similar to those that were contained in the Insurance Company Group's standardized marketing materials and sales presentations. As a result of Horowitz's representations, the Gilmours gave Horowitz a check for $1,850.00, payable to "Bohmueller Law Offices," for the purchase of a living trust.

Also at that meeting, Horowitz falsely represented to the Gilmours that if they put their money into annuities, future annuity payments would be income-tax and inheritance-tax free. At subsequent visits, Mr. Strope, another employee of the Patriot Group, repeated similar misrepresentations and assured the Gilmours that the purchase of annuities would be a way of placing money in the hands of the Gilmours' beneficiaries immediately, while avoiding probate taxes. The salesmen eventually convinced the Gilmours to liquidate $1.5 million of their then-existing assets to purchase two AILIC annuit-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 14
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
(Cite as: 2007 WL 2541216 (E.D.Pa.))

**\*9** At no time did Horowitz or Mr. Strope reveal that they would receive commissions for selling the AILIC annuities. Horowitz and Mr. Strope also failed to disclose the substantial penalties that would accrue if one of the Gilmours' beneficiaries attempted to withdraw any of the annuities' principal within five years of the annuitant's death. When Mrs. Gilmour passed away on February 17, 2005, however, Mr. Gilmour learned that immediate payment of the death benefits from Mrs. Gilmour's AILIC annuity would carry these substantial penalties. (*Gilmour* ¶¶ 117-71).

11. *Harcourt Trimble, III/Harcourt and Barbara Trimble*

Harcourt Trimble, III ("Trimble, III"), is the co-executor of the estate of his father and mother, Harcourt and Barbara Trimble ("the Trimbles"). Mrs. Trimble passed away on January 7, 2002, and Mr. Trimble passed away on March 21, 2002.

The Trimbles were originally approached by the defendants on May 5, 2001, when Spangler, an employee of the Patriot Group, came to their home. On that day, Spangler held himself out as a neutral, qualified estate planner and touted the advantages that living trusts possess over wills and probate. Spangler claimed that such instruments avoid probate, save attorneys' fees, assure privacy after death, permit quicker distribution of assets, avoid court challenges, and are required to avoid guardianship. As a result of these representations, the Trimbles purchased a living trust by giving Spangler a check made payable to "Bohmueller Law Offices" in the amount of $1,895.00.

At this meeting and at subsequent meetings, Spangler also discussed the benefits of the Insurance Company Group's annuities. Spangler falsely claimed that any money the Trimbles used to purchase these annuities, as well as any future payments from these annuities, would be free of inheritance and income taxes. In addition, Spangler did not disclose (i) that any such annuity could not be canceled or rescinded without penalty, (ii) that

the 8.75% interest rate was a first-year interest rate only, and (iii) that death benefits made under the annuity were subject to substantial penalties unless the beneficiary agreed to leave the funds with the Insurance Company Group for five years after the death of the annuitant. As a result of these misrepresentations and omissions, the Trimbles liquidated $666,000 of their stock portfolio to purchase a fifteen-year deferred annuity that would not begin making payments until Mrs. Trimble was 100 and Mr. Trimble was 104.

After the Trimbles passed away, Trimble, III, found the documents for the living trust that his parents had set up through defendant Bohmueller and accordingly called the attorney. In response to the call, Weinstein contacted Trimble, III, and informed him that he worked with Bohmueller and would be the attorney handling the estate and affairs of the plaintiff's parents. Weinstein did not inform Trimble, III, that contrary to the representations made to his parents, the living trust did not avoid probate, attorneys' fees, or costs involved with processing their estate.

**\*10** Weinstein proceeded to open the probate estates and to have the inheritance and income tax returns prepared in 2001. In connection with these returns, Trimble, III, paid over $57,000 in inheritance taxes, interest, and penalties. Trimble, III, also paid Weinstein $19,610.00 in attorneys' fees. In addition, Trimble, III, was personally assessed taxes, interest, and penalties in the amount of $156,762.00 for the 2003 tax year, due to the allegedly deficient estate planning and legal advice proffered by Weinstein and Bohmueller. (*Trimble* ¶¶ 82-144).

12. *Margie Brennan Treitz/Gilbert and Joanne Brennan*

Margie Brennan Treitz ("Treitz") is the personal representative of her mother and father, Gilbert and Joanne Brennan ("the Brennans"). Mr. Brennan passed away in July of 2003, and Mrs. Brennan passed away in April of 2006.

The Brennans were originally approached by the defendants on January 26, 2001, when Krygowski, an em-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 15
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
(Cite as: 2007 WL 2541216 (E.D.Pa.))

ployee of EPAC, came to their home. At this meeting, Krygowski held himself out as a neutral, qualified estate planner and touted the advantages that living trusts possess over wills and probate. Krygowski claimed that such instruments avoid probate, save attorneys' fees, assure privacy after death, permit quicker distribution of assets, avoid court challenges, and are required to avoid guardianship. As a result of these representations, the Brennans purchased a living trust by giving Krygowski a check made payable to "Bohmueller Law Offices" in the amount of $1,795.00.

At this meeting and at subsequent meetings, Krygowski, who was later joined by Larson, also discussed the benefits of the Insurance Company Group's annuities. Krygowski and Larson falsely claimed that any money the Brennans used to purchase these annuities, as well as any future payments from these annuities, would be free of inheritance and income taxes. In addition, Krygowski and Larson did not disclose (i) that any such annuity could not be canceled or rescinded without penalty, (ii) that the 6.75% interest rate was a first-year interest rate only, and (iii) that death benefits made under the annuity were subject to substantial penalties unless the beneficiary agreed to leave the funds with the Insurance Company Group for five years after the death of the annuitant. As a result of these misrepresentations and omissions, the Brennans purchased an AILIC annuity for an initial premium payment of $130,290.54. The monthly payments on this annuity would not have started until 2016, when Mrs. Brennan would have been 85 and Mr. Brennan would have been 92.

On April 15, 2002, Larson persuaded the Brennans to liquidate more of their assets and to purchase two more AILIC annuities. At this time, Mr. Brennan purchased a fifteen-year deferred annuity for an initial premium payment of $45,678.98, and Mrs. Brennan purchased a fifteen-year deferred annuity for an initial premium payment of $71,709.33. Payments on these annuities would not have begun until Mr. Brennan was 93 and Mrs. Brennan was 87.

*11 In March of 2003, Mr. Brennan was hospitalized, and his family contacted Larson to change the trustee and executor of Mr. Brennan's living trust from his daughter Margie to his daughter Ann Marie. In response, Chiavaroli, another employee of EPAC, contacted Plaza, an attorney employed at Bohmueller's law office, to make the requested change. Plaza complied and overnighted the documents with an unsigned Bohmueller cover letter and instructions to Ms. Strope, another employee of EPAC. The next day, Larson brought the documents to the hospital and the Brennans signed them. On July 23, 2003, Mr. Brennan passed away.

At the time of his death, Mr. Brennan had two AILIC annuities with a combined accumulated value of $188,657.24. Mrs. Brennan was the beneficiary of both annuities, but she did not have any of the documents pertaining to the annuities. On September 4, 2003, Larson approached Mrs. Brennan and persuaded her to purchase a new, fifteen-year deferred annuity from Amer-Us for an initial premium payment of $25,942.00. Shortly after this policy application was made, Larson told Mrs. Brennan that she should also liquidate her remaining assets, as well as Mr. Brennan's two annuities, and put the proceeds into this new annuity.

In making these recommendations, Larson did not inform Mrs. Brennan that she could utilize the provisions of her husband's annuities to transfer to herself the annuities' entire accumulated value. Instead, Larson caused Mrs. Brennan to elect the lump-sum surrender value of Mr. Brennan's annuities, which resulted in Mrs. Brennan incurring a $17,344.49 surrender charge. When Mrs. Brennan asked Larson about the approximately $20,000 "fee" that was deducted from the annuity, Larson told her that the surrender charge was merely a one-time fee that the government charged when spouses switch names on annuities. In truth, Larson recommended that Mrs. Brennan elect such a payout because it would allow Larson to collect an additional commission from Mrs. Brennan's placing the proceeds of her husband's annuities into the new annuity.

At no point did Krygowski or Larson disclose that they were insurance sales agents who would be paid commissions from the Insurance Company Group. Furthermore, the living trust that the Brennans purchased did not avoid probate, fees, or inheritance taxes. (*Treitz* ¶¶ 92-167).

Slip Copy                                                                                          Page 16
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
**(Cite as: 2007 WL 2541216 (E.D.Pa.))**

## II. *Procedural History and Overview of the Claims*

In an opinion dated June 2, 2006, this Court dismissed two putative class actions [FN5] in this multidistrict litigation on the ground that the plaintiffs had failed to plead a valid RICO enterprise. *In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, MDL No. 1712, 2006 WL 1531152, at *7 (E.D.Pa. June 2, 2006). The plaintiffs in those class actions, all of whom are named plaintiffs in the *Stein* consolidated class action, sued several insurance companies (some of whom were unrelated, competitor companies), sales agents, and lawyers for damages arising from an allegedly fraudulent scheme to sell unnecessary and unsuitable estate planning instruments and annuities. *Id.* at *1. The Court held that although the plaintiffs did allege that the defendants were aware of each other's actions and that each defendant performed a critical role within the alleged scheme, the plaintiffs did not allege that an organizational structure connected or controlled the various defendants. *Id.* at *7-*8.

> FN5. The named plaintiffs in these two putative class actions consisted of the Prices, Healy, and Miller. *In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, MDL No. 1712, 2006 WL 1531152, at *3-*10 (E.D.Pa. June 2, 2006).

*12 According to the Court, the complaints did not allege how the attorneys and the insurance companies were related. *Id.* Furthermore, the complaints failed to allege how certain competitor insurance companies worked together toward a common goal. *Id.* at *8. The Court concluded that the plaintiffs described what appeared to be an enterprise from the outside, but what turned out to be a collection of entities and individuals that contained no organizational structure on the inside. *Id.* Such allegations, the Court reasoned, were insufficient to demonstrate the existence of a RICO enterprise.*Id.*

The Court accordingly dismissed the plaintiffs' RICO claims without prejudice and allowed the plaintiffs to file amended complaints. *Id.* at *12.The Court also discussed the other elements of a RICO claim so that the plaintiffs would have guidance if they filed such amendments. *See id.* at *9-*12.

The plaintiffs have now amended their complaints, and the defendants have responded by filing a new round of motions to dismiss. The amended complaints bring claims against the defendants as follows:

| Claim | Stein | Gilmour | Trimble | Treitz |
|---|---|---|---|---|
| Violation of RICO | AMH, AAG, AIL-IC, AML, CMIC, IAMS | AMH, AAG, AIL-IC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AIL-IC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AIL-IC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, Bohmueller |
| Conspiracy to Violate RICO | AMH, AAG, AIL-IC, AML, CMIC, IAMS | AMH, AAG, AIL-IC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AIL-IC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AIL-IC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, |

Slip Copy                                                                                                    Page 17
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
**(Cite as: 2007 WL 2541216 (E.D.Pa.))**

| | | | Bohmueller |
|---|---|---|---|
| Breach of Fiduciary Duty | AMH, AAG, AIL-IC, AML, CMIC, IAMS | AMH, AAG, AIL-IC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AIL-IC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AIL-IC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, Bohmueller |
| Negligent Supervision | AMH, AAG, AIL-IC, AML, CMIC, IAMS | AMH, AAG, AIL-IC, CMIC, AISG, Bohmueller | AMH, AAG, AIL-IC, CMIC, Weinstein, Bohmueller | AMH, AAG, AIL-IC, CMIC, Weinstein, Plaza, Bohmueller |
| Unjust Enrichment | AMH, AAG, AIL-IC, AML, CMIC, IAMS | AMH, AAG, AIL-IC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AIL-IC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AIL-IC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, Bohmueller |
| Fraudulent Misrepresentation | | AMH, AAG, AIL-IC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AIL-IC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AIL-IC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, Bohmueller |
| Negligent Misrepresentation | | AMH, AAG, AIL-IC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AIL-IC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AIL-IC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, Bohmueller |
| Civil Conspiracy | | AMH, AAG, AIL-IC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AIL-IC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AIL-IC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
**(Cite as: 2007 WL 2541216 (E.D.Pa.))**

Page 18

| | | | |
|---|---|---|---|
| Professional Negligence | Bohmueller | AMH, AAG, AILIC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | Bohmueller Weinstein, Plaza, Bohmueller |
| Breach of Contract | AMH, AAG, AILIC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AILIC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AILIC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, Bohmueller |
| Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law | AMH, AAG, AILIC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AILIC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AILIC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, Bohmueller |
| Negligence Per Se | AMH, AAG, AILIC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AILIC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AILIC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, Bohmueller |
| Accounting | AMH, AAG, AILIC, CMIC, AISG, Mr. Strope, Horowitz, BES, Patriot Group, Guardian, Bohmueller | AMH, AAG, AILIC, CMIC, Patriot Group, Spangler, Weinstein, Bohmueller | AMH, AAG, AILIC, CMIC, Newmark, Larson, Krygowski, Ms. Strope, Chiavaroli, EPAC, Weinstein, Plaza, Bohmueller |

**\*13** The following motions to dismiss are pending before the Court:

AMH, AAG, AILIC, AML, CMIC, IAMS, and AISG's motions to dismiss and for judgment on the pleadings in all four complaints;

The Patriot Group's motion to dismiss the *Gilmour* complaint;

Brian Newmark, EPAC, Larson, Ms. Strope, Krygowski, and Chiavaroli's motion to dismiss the *Treitz* complaint;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
(Cite as: 2007 WL 2541216 (E.D.Pa.))

Attorney Bohmueller's motions to dismiss the *Gilmour, Trimble,* and *Treitz* complaints; and

Attorneys Weinstein and Plaza's motions to dismiss the *Trimble* and *Treitz* complaints.

III. *Analysis*[FN6]

> FN6. When considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a court accepts all facts and allegations listed in the complaint as true and construes them in the light most favorable to the plaintiff.*H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 249, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Rocks v. City of Phila.,* 868 F.2d 644, 645 (3d Cir.1989)."[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When considering a motion for judgment on the pleadings that is based on failure to state a claim, a Court should apply the same standard as that which is a applied to such a motion brought pursuant to Rule 12(b).*Turbe v. Virgin Islands,* 938 F.2d 427, 428 (3d Cir.1991).

The Court will first discuss which defendants should be dismissed because there are no allegations of wrongdoing in fact against them. The Court will then turn to the merits of the plaintiffs' RICO claims. And finally, the Court will address the merits of the plaintiffs' various state law claims.

A. *Defendants Dismissed for Failure to State Any Claim*

The Court will dismiss Chiavaroli and Ms. Strope from the *Treitz* case because the complaint does not allege that they participated in any wrongdoing with respect to the plaintiffs in that lawsuit. The sole allegations against Chiavaroli and Ms. Strope are that (i) the two individuals were employed by Bohmueller and/or one or more of the other defendants, (ii) Chiavaroli had com-

munications with Plaza regarding the amendment to Mr. Brennan's living trust, and (iii) Ms. Strope was the addressee on an overnighted package of documents relating to the amendment. (*Treitz* ¶¶ 45-46, 112-13).

The Court will also dismiss Newmark from the *Treitz* case because the complaint does not allege that Newmark personally participated in any wrongdoing with respect to the plaintiffs in that lawsuit. Newmark is not alleged to have ever met the Brennans, nor is he alleged to have personally participated in the sale of any annuities to the Brennans. Newmark's sole connection to the Brennans' purchase of annuities is his status as the President of EPAC, the company that employed the sales agents who allegedly made misrepresentations to the Brennans in connection with their annuity purchase. (*Treitz* ¶ 42). Such an allegation is insufficient to state a claim against Newmark. *See Wicks v. Milzoco Builders, Inc.,* 503 Pa. 614, 470 A.2d 86, 90 (Pa.1983) (noting the "general, if not universal, rule" that an officer of a corporation is not personally liable to third persons for the acts of other agents, officers, or employees of the corporation, unless he specifically directed the particular act to be done, or participated or cooperated therein).

The Court will likewise dismiss AMH from all cases because the plaintiffs' sole allegation against this defendant is that it was the holding company for AAG, AILIC, CMIC, IAMS, and AISG.[FN7] There is no piercing the corporate veil or alter ego claim alleged in any of the complaints.

> FN7. In each one of their motions to dismiss, the Insurance Company Group defendants argue that the plaintiffs have failed to allege any claims of wrongdoing against one or more of the related insurance companies. At this point in the litigation, the Court will not dismiss any of these corporations on this basis, except AMH. AAG and AILIC are alleged to have participated in the alleged scheme by underwriting certain of the plaintiffs' annuities. (*Stein* ¶¶ 45, 106). CMIC, IAMS, and AISG are alleged to have developed the allegedly fraudulent marketing materials.(*Stein* ¶¶ 96-97).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                        Page 20
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
**(Cite as: 2007 WL 2541216 (E.D.Pa.))**

B. *RICO*

1. *Claim Under Section 1962(c)*

**\*14** All the plaintiffs have alleged that the defendants violated section 1962(c) of the RICO statutes. Section 1962 provides, in relevant part, that "[i]t shall be unlawful for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ...."18 U.S.C. § 1962(c) (2000). To state a claim for a violation of section 1962(c), a plaintiff must allege that each defendant (i) conducted or participated in the conduct (ii) of an enterprise (iii) through a pattern (iv) of racketeering activity. *Lum v. Bank of Am.,* 361 F.3d 217, 223 (3d Cir.2004). In addition, to have standing to bring such a claim, a plaintiff must demonstrate that he or she has been injured in his or her business or property by the conduct constituting the violation. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3292, 87 L.Ed.2d 346 (1985).

The defendants argue that the plaintiffs have not adequately alleged one or more of these elements. In addressing these arguments, the Court will begin by determining whether the plaintiffs have adequately pled the existence of a RICO enterprise. The Court will then discuss the "conduct or participation," and "racketeering activity" elements of the claim.^FN8 The Court will conclude by discussing whether the plaintiffs have alleged an injury to their business or property.

> FN8. The defendants do not argue that the plaintiffs have failed to plead the "pattern" element of a section 1962(c) claim. The Court therefore will not discuss this element.

a. *Existence of an Enterprise*

RICO defines the term "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."18 U.S.C. § 1961(4). The plaintiffs allege an association-in-fact enterprise consisting of members of the Insurance Company Group, the Sales Group, and the Attorney Group. The Court finds that the plaintiffs have pled a valid RICO enterprise.

To establish the existence of an association-in-fact enterprise, a plaintiff must prove: (i) that there exists an ongoing organization, formal or informal; (ii) that the various associates of the organization function as a continuing unit; and (iii) that the organization has an existence separate and apart from the alleged pattern of racketeering activity. *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *United States v. Riccobene,* 709 F.2d 214, 221 (3d Cir.1983).

(1) *The Existence of an Ongoing Organization*

In *Riccobene,* the United States Court of Appeals for the Third Circuit explained that the "ongoing organization" attribute relates to the superstructure or framework of the alleged enterprise. *Riccobene,* 709 F.2d at 222. To satisfy this attribute, a plaintiff must demonstrate that some sort of hierarchical or consensual structure exists within the group for the making of decisions. *Id.* According to the Court of Appeals, "[t]here must be some mechanism for controlling and directing the affairs of the group on an on-going, rather than ad hoc, basis."*Id.* Such a requirement does not mean, however, that every decision must be made by the same person; authority may be delegated. *Id.*

**\*15** In the present case, the defendants argue that the plaintiffs' allegations are insufficient to satisfy the "ongoing organization" attribute of a RICO enterprise. According to the defendants, the plaintiffs fail to allege that a structure existed for making decisions and resolving disputes in carrying out the alleged scheme. Furthermore, the defendants argue that the plaintiffs' allegations negate the "ongoing organization" attribute because they fail to allege any connection between the Insurance Company Group and the Attorney Group. The plaintiffs' allegations, the defendants argue, show only the ability of the Insurance Company Group to oversee the Sales Group's sale of annuities, not the Attorney Group's provision of legal services.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 21
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
(Cite as: 2007 WL 2541216 (E.D.Pa.))

The Court finds that the plaintiffs have properly pled the "ongoing organization" attribute of a RICO enterprise. According to the plaintiffs, the Insurance Company Group stood at the head of the alleged enterprise and directed the activities of the association-in-fact on an ongoing basis.(*Stein* ¶¶ 248, 263;*Gilmour* ¶¶ 192, 210;*Trimble* ¶¶ 165, 183;*Treitz* ¶¶ 188, 206). The Insurance Company Group wielded this control by developing a highly structured sales scheme, which it disseminated to the Sales Group members via standardized marketing materials and sales presentations.(*Stein* ¶¶ 12, 78;*Gilmour* ¶ 53;*Trimble* ¶ 147-50;*Treitz* ¶¶ 170-73). As directed by the Insurance Company Group, the Sales Group members then communicated this scheme to members of the Attorney Group. (*Stein* ¶ 257;*Gilmour* ¶¶ 203, 215;*Trimble* ¶¶ 176, 188;*Treitz* ¶¶ 199, 211).

Under this scheme, the members of each group played specific roles. The Insurance Company Group designed and disseminated the allegedly fraudulent sales scheme, provided "leads" that consisted of potential annuity purchasers, and underwrote the annuities that were ultimately sold. The Sales Group members followed the Insurance Company Group's detailed instructions by associating with attorneys who were willing to participate in the scheme and then executing the scheme according to the Insurance Company Group's standardized marketing materials and sales presentations. And finally, the Attorney Group also followed the instructions of the Insurance Company Group, which called for the attorneys to allow members of the Sales Group to use the living-trust creation process as a tool for selling annuities. (*Stein* ¶¶ 14-25, 233;*Gilmour* ¶¶ 174-81;*Trimble* ¶¶ 147-54;*Treitz* ¶¶ 170-77).

According to the plaintiffs, the Insurance Company Group maintained control over the alleged association-in-fact by (i) disseminating the standardized marketing materials and sales presentations to the Sales Group members, (ii) instructing the Sales Group members to communicate the scheme to the Attorney Group, (iii) exercising authority to approve or disapprove all written marketing materials that were shown to potential annuity purchasers, (iv) underwriting the annuities that were sold pursuant to the scheme, and (iv) paying the Sales Group members commissions for the sale of annuities. (*Stein* ¶¶ 248, 263;*Gilmour* ¶¶ 192, 210;*Trimble* ¶¶ 165, 183;*Treitz* ¶¶ 188, 206).

*16 Although it is true that the plaintiffs do not allege that the Insurance Company Group paid the members of the Attorney Group directly, the plaintiffs do allege that the members of the Attorney Group followed the Insurance Company Group's instructions in executing the scheme. (*Stein* ¶¶ 265-68;*Gilmour* ¶¶ 212-16;*Trimble* ¶¶ 185-89;*Treitz* ¶¶ 208-12). The Attorney Group members followed these instructions because, according to the plaintiffs, the entire scheme would not work unless they did so. (*Stein* ¶¶ 257-58;*Gilmour* ¶ 204;*Trimble* ¶ 177;*Treitz* ¶ 200). Thus, the Insurance Company Group wielded control over the Attorney Group members by providing them with a scheme whose success-and therefore the attorneys' ability to make money from the sale of living trusts incident to the execution of the scheme-depended on the attorneys' following the instructions set forth in the marketing materials and sales presentations. (*Id.*)

The present complaints are distinguishable from the complaints that the Court dismissed for failure to plead a valid RICO enterprise in its previous opinion. *See In re Am. Investors Life Ins. Co.,* 2006 WL 1531152. In the previous complaints, the plaintiffs failed to allege that an organizational structure connected or controlled the various associates of the alleged enterprise.*Id.* at *7-*8.The previous complaints did not allege any connection at all between the Insurance Company Group and the Attorney Group, and the complaints failed to allege how certain competitor insurance companies worked together toward a common goal. *Id.*

Here, the plaintiffs have alleged a highly structured organization that was overseen and directed by the Insurance Company Group. According to the plaintiffs, the defendants were not simply a string of participants in a scheme that lacked any distinct structure or system of authority. Rather, the enterprise, as alleged, depended for its success on the participants' following the instructions developed and disseminated by the Insurance Company Group-instructions that allegedly governed the conduct of the association-in-fact from the identific-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
**(Cite as: 2007 WL 2541216 (E.D.Pa.))**

ation of the sales target all the way to the sale of the actual annuity, complete with the reward system that motivated the sales agents and attorneys to repeat the process. *See In re Nat'l W. Life Ins. Deferred Annuity Litig.,* 467 F.Supp.2d 1071, 1081 (S.D.Cal.2006).

*(2) The Various Associates Functioned as a Continuing Unit*

The second essential attribute of an enterprise under RICO is that the various associates of the alleged enterprise must function as a continuing unit.*Riccobene,* 709 F.2d at 223. This attribute may be satisfied even though individuals leave the group and new members join at a different time. *Id.* Each associate of the alleged enterprise must, however, perform a role in the group consistent with the organizational structure established by the first attribute and which furthers the activities of the organization. *Id.*

**\*17** In the present case, the defendants argue that the plaintiffs' association-in-fact is too nebulous and imprecise to constitute an enterprise. According to the defendants, the plaintiffs' use of the term "group" is simply an artful pleading device for artificially combining unrelated individuals and that RICO does not permit the "grouping" of "groups" without consideration of whether all the individuals or entities within the "group" are actually associated in fact.

The Court agrees with the defendants that the plaintiffs may not manufacture a RICO enterprise by using the term "group," but it finds that the plaintiffs have alleged facts that are sufficient to show that the various associates of the alleged enterprise functioned as a continuing unit. Stripped of their "group" nomenclature, the associates of the alleged association-in-fact consist of several related corporations that engaged in various aspects of the insurance industry, their sales agents, and the attorneys who helped the sales agents to sell the insurance companies' annuities. (*Stein* ¶¶ 6-10;*Gilmour* ¶¶ 8-36;*Trimble* ¶¶ 13-32;*Treitz* ¶¶ 17-36). Although the sales agents and attorneys involved in each annuity sale were not identical, their roles in the organizational structure of the alleged enterprise remained the same.

*Stein* ¶¶ 14-25, 233;*Gilmour* ¶¶ 174-81;*Trimble* ¶¶ 147-54;*Treitz* ¶¶ 170-77). Indeed, the plaintiffs allege that the sales scheme only worked if these sales agents and attorneys played the exact roles and followed the specific instructions set forth in the insurance companies' standardized marketing materials and sales presentations. (*Stein* ¶¶ 257-58;*Gilmour* ¶ 204;*Trimble* ¶ 177;*Treitz* ¶ 200). The Court accordingly finds that the plaintiffs have adequately pled the second essential attribute of a RICO enterprise.

*(3) Existence Separate and Apart from Alleged Racketeering Activity*

The third essential attribute of a RICO enterprise is that the organization constitute an entity that is separate and apart from the pattern of activity in which it engages. *Riccobene,* 709 F.2d at 223. This last attribute does not require a plaintiff to allege that the enterprise has some function wholly unrelated to the racketeering activity, but rather that it has an existence beyond that which is necessary to commit the predicate racketeering offenses.*Id.* at 223-24.In *Town of Kearny v. Hudson Meadows Urban Renewal Corp.,* 829 F.2d 1263 (3d Cir.1987), the United States Court of Appeals for the Third Circuit found that the separate existence requirement was satisfied where persons associated with the enterprise engaged in two separate but similar schemes. *Id.* at 1266.

In the present case, the defendants argue that the plaintiffs' allegations do not satisfy the "separateness" attribute of a RICO enterprise because the plaintiffs fail to allege that the association-in-fact itself existed separate and apart from the pattern of racketeering activity at issue in the litigation. According to the defendants, the plaintiffs plead only that the individual members of the association-in-fact were separate and apart from the alleged racketeering activity.

**\*18** The Court finds that the plaintiffs have sufficiently pled the "separateness" attribute of a RICO enterprise. The plaintiffs allege that the members of the association-in-fact engage in other activities besides those at issue in this complaint, including selling annuities to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                        Page 23
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
**(Cite as: 2007 WL 2541216 (E.D.Pa.))**

persons not similarly situated to the plaintiffs, selling insurance products other than annuities, and providing financial planning and retirement planning to persons other than the plaintiffs. (*Stein* ¶ 247;*Gilmour* ¶ 190;*Trimble* ¶ 163;*Treitz* ¶ 186). Although this allegation is ambiguous as to whether it refers to the individual members of the enterprise or to the enterprise as a whole, at this stage of the litigation, the Court is obligated to construe the allegations in the light most favorable to the plaintiff. *H.J.,* 492 U.S. at 249. The Court therefore reads this allegation as stating that the association-in-fact worked together to engage in activities other than those at issue in the complaints.

Such a construction is consistent with the plaintiffs' other allegation that the various elements of the association-in-fact function as a continuing unit to commit the scheme at issue, as well as to earn money by providing financial planning and investments to persons other than those who are similarly situated to the plaintiffs. (*Stein* ¶ 246;*Gilmour* ¶ 189;*Trimble* ¶ 162;*Treitz* ¶ 185). The Court accordingly finds that the plaintiffs have adequately pled the third and final essential attribute of a RICO enterprise.

b. *Conduct or Participation*

A plaintiff bringing a section 1962(c) claim must not only show that an enterprise exists, but that each defendant conducted or participated in the conduct of the enterprise's affairs.[FN9] The Supreme Court has interpreted the "conduct or participation" element to require a plaintiff to allege that a defendant participated in the operation or management of the enterprise itself. *Reves v. Ernst & Young,* 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1991); *see also Univ. of Md. at Balt. v. Peat, Marwick, Main & Co.,* 996 F.2d 1534, 1539 (3d Cir.1993) (applying *Reves* in a motion to dismiss context).

> FN9. Courts have also required section 1962(c) plaintiffs to show that the defendant is distinct from the alleged enterprise. This requirement stems from the statute's language that the "person" sued must be "employed by or associ-

ated with" an enterprise. Because an enterprise cannot logically employ or associate with itself, the defendant must be distinct from the alleged enterprise. *Brittingham v. Mobil Corp.,* 943 F.2d 297, 300 (3d Cir.1991) (citing *B.F. Hirsch v. Enright Ref. Co.,* 751 F.2d 628, 633-634 (3d Cir.1984)).

When a defendant is a corporation, the alleged enterprise "must be more than an association of individuals or entities conducting the normal affairs" of that corporation. *Brittingham,* 943 F.2d at 301. In *Brittingham,* the plaintiffs brought a section 1962(c) claim against Mobil Oil Corporation and its subsidiary for misrepresenting the degradable qualities of a line of trash bags. *Id.* at 299.The plaintiffs alleged an association-in-fact enterprise consisting of Mobil, its subsidiary, and the advertising agencies that they had hired to promote the trash bags. *Id.* at 300.Following court-ordered discovery on the limited issue of whether the plaintiffs could demonstrate facts sufficient to sustain the RICO claim, the district court granted the defendants' motion for summary judgment on the ground that the alleged enterprise was not sufficiently distinct from the defendants. *Id.* at 300.

The Court of Appeals affirmed, reasoning that a corporation must always act through its employees, agents, or affiliated entities acting on its behalf. *Id.* at 301.Because the plaintiffs had produced no evidence indicating that the defendant corporations took a distinctive role in the alleged racketeering activity, the court concluded that summary judgment was appropriate. *Id.* at 303.The court reached this decision despite the plaintiffs' inclusion of Mobil's advertising agencies in the alleged enterprise because "[t]he advertising agencies were defendants' agents, and did no more than conduct the affairs of the defendant corporations."*Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                   Page 24
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
(Cite as: 2007 WL 2541216 (E.D.Pa.))

At various places in their pending motion, the Insurance Company Group defendants suggest that the allegations of two of the named plaintiffs-the *Stein* complaint-the Inferreras and Edwards-fail the person-enterprise distinction because they do not allege that a lawyer participated in their purchase of an annuity. Without the participation of a lawyer, these defendants argue, such plaintiffs allege an enterprise that consists of nothing more than an association of the Insurance Company Group's agents and affiliated entities conducting the normal affairs of the defendant corporations.

The Court will not decide this issue because it concludes below that these plaintiffs do not allege any predicate acts of racketeering activity. The Court, therefore, will dismiss the RICO claims of these plaintiffs on that ground.

To conduct or participate in the conduct of an enterprise's affairs, a defendant must "have some part in directing those affairs."*Reves,* 507 U.S. at 179. The defendant need not, however, hold a formal position within an enterprise to "participate" in its affairs. *United States v. Parise,* 159 F.3d 790, 796 (3d Cir.1998). Indeed, the "conduct or participation" requirement "does not limit RICO liability to upper management because 'an enterprise is operated not just by upper management but also by lower-rung participants in the enterprise who are under the direction of upper management.'"*Id.* (quoting *Reves,* 507 U.S. at 184 (internal quotation marks omitted)). RICO liability may therefore extend to those who knowingly further the illegal aims of the enterprise by carrying out the directives of those in control. *United States v. Urban,* 404 F.3d 754, 769-70 (3d Cir.2005). In applying *Reves,* the United States Court of Appeals for the Third Circuit has stated that RICO liability will apply where there is "a nexus between the person and the conduct in the affairs of an enterprise."*Id.* at 770.

**\*19** In the present case, attorneys Weinstein and Plaza argue that the plaintiffs in *Trimble* and *Treitz* fail to al-

lege that Weinstein or Plaza participated in the operation or management of the enterprise because these two attorneys did not participate in the sale of annuities or legal services. According to these defendants, the plaintiffs allege that they retained attorney Bohmueller, not Weinstein or Plaza, in connection with their purchase of living trusts. Bohmueller therefore is the only attorney who could have participated in the allegedly fraudulent scheme.

The Court concludes that the plaintiffs in *Trimble* and *Treitz* have adequately pled that attorneys Weinstein and Plaza participated in the operation or management of the alleged enterprise. The plaintiffs allege that Bohmueller, Weinstein, and Plaza acted in concert to provide legal services to the plaintiffs in connection with their purchase of annuities and other estate planning instruments. (*Trimble* ¶ 31;*Treitz* ¶ 35). The plaintiffs further allege that Weinstein and Plaza did so with the knowledge that these services were being rendered in furtherance of the allegedly fraudulent sales scheme.(*Trimble* ¶ 49;*Treitz* ¶ 59). As explained above, this provision of legal services was integral to the allegedly fraudulent scheme, which was developed and overseen by members of the Insurance Company Group. (*Trimble* ¶ 177;*Treitz* ¶ 200). The plaintiffs in *Trimble* and *Treitz* have therefore adequately pled that Weinstein and Plaza "knowingly furthered the illegal aims of the enterprise by carrying out the directives of those in control," thereby demonstrating the requisite nexus between these defendants and the conduct of the affairs of the enterprise. *See Urban,* 404 F.3d at 769-70.

c. *Racketeering Activity*

To state a claim under § 1962(c), a plaintiff must allege that the defendant conducted the alleged enterprise through a "pattern of racketeering activity." *See Sedima,* 473 U.S. at 496. A "pattern of racketeering activity" is defined as the commission of at least two of the predicate offenses listed in 18 U.S.C. § 1961(1) within a ten-year period. 18 U.S.C. § 1961(5). In the present case, the plaintiffs allege that the defendants engaged in a pattern of mail and wire fraud, which are among the "racketeering activities" enumerated in § 1961(1).18

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 25
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
(Cite as: 2007 WL 2541216 (E.D.Pa.))

U.S.C. § 1961(1).

The federal mail and wire fraud statutes prohibit the use of the mail or interstate wires for purposes of carrying out any scheme or artifice to defraud.[FN10] *See* 18 U.S.C. §§ 1341, 1343; *see also Annulli v. Panikkar,* 200 F.3d 189, 200 n. 9 (3d Cir.1999). To state a claim for mail or wire fraud, a plaintiff must therefore allege (i) a scheme to defraud, and (ii) use of the mails or interstate wires in furtherance thereof. *See United States v. Pharis,* 298 F.3d 228, 234 (3d Cir.2002).

> FN10. The mail fraud statute, 18 U.S.C. § 1341, makes it a crime to mail or cause to be delivered by mail any matter or thing for the purpose of executing, or attempting to execute, any scheme or artifice to defraud. The wire fraud statute, 18 U.S.C. § 1343, makes it a crime to transmit or cause to be transmitted any communication by wire, radio, or television in interstate or foreign commerce for the purpose of executing any scheme or artifice to defraud. Thus, the statutes cover in-state mailings, but not in-state telephone calls. *Annulli v. Panikkar,* 200 F.3d 189, 200 n. 9 (3d Cir.1999).

Furthermore, where, as here, a plaintiff relies on the federal mail and wire fraud statutes as the basis for the alleged RICO violation, the plaintiff's allegations must comply with Federal Rule of Civil Procedure 9(b). *Lum,* 361 F.3d at 223; Fed.R.Civ.P. 9(b). Rule 9(b) requires a plaintiff to plead fraud with particularity sufficient to place the defendants on notice of the precise misconduct with which they are charged, and to protect defendants from spurious charges of fraudulent behavior. *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984). Allegations of date, place, and time are adequate to satisfy the Rule, but nothing in the Rule requires such specificity. *Id.* Instead, plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud. *Id.* Until a class is certified, a court must judge the adequacy of the fraud allegations solely by reference to the allegations relating to the named plaintiffs. *Lum,* 361 F.3d at 225 (citing *Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 659 (3d Cir.1998)).

*20 In the present case, the defendants argue that the plaintiffs have failed to plead a pattern of racketeering activity because (i) the plaintiffs' allegations do not allege a scheme to defraud, and (ii) the plaintiffs have failed to allege with sufficient particularity the defendants' use of the mail or interstate wires in furtherance thereof.

*(1) Scheme to Defraud*

A scheme to defraud "need not be fraudulent on its face but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Coyle,* 63 F.3d 1239, 1243 (3d Cir.1995). Noting that the federal mail and wire fraud statutes have been "expansively construed," the United States Court of Appeals for the Third Circuit has stated that the scheme need not involve affirmative misrepresentations. *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1415-16 (3d Cir.1991). The court has stated, however, that the statutory term "defraud" usually entails the deprivation of something of value by "trick, deceit, chicane or overreaching." *Id.*

In the present case, the defendants make two arguments as to why the plaintiffs have failed to plead a scheme to defraud.[FN11] First, the defendants argue that there was no fraud because the alleged misrepresentations or omissions of material fact regarding the characteristics of the annuities were contradicted or disclosed in the annuity contracts themselves. And second, the defendants contend that the alleged misrepresentation about the annuities' "suitability" for the plaintiffs-a misrepresentation that the plaintiffs contend lies at the heart of this case-constitutes a non-actionable matter of opinion, rather than a fraudulent misrepresentation of fact. Because the Court finds that the plaintiffs have adequately pled a scheme to defraud regardless of whether "suitability" is a misrepresentation of fact or a matter of opinion, the Court will deny the plaintiffs' motion to dismiss without addressing the "suitability" issue.[FN12]

> FN11. The defendants also argue that the Inferreras, Ryles, and Edwards, in particular, fail to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plead the scheme to defraud with sufficient particularity because their allegations are too vague to permit the Court to discern what alleged misrepresentations and omissions were made to these plaintiffs in connection with their annuity purchases. The Court will not decide this issue because it concludes below that these plaintiffs do not allege any use of the mails or interstate wires in connection with their purchase of the Insurance Company Group's annuities. The Court, therefore, will dismiss the RICO claims of these plaintiffs on that ground.

FN12. During oral argument on the motions to dismiss, the plaintiffs' lead counsel asked the Court to ignore the plaintiffs' allegation that the defendants misrepresented the suitability of the annuities in deciding whether the plaintiffs had stated a claim under RICO. The plaintiffs do intend to rely on this allegation when moving for class certification. The plaintiffs' lead counsel asked the Court to refrain from any decision on whether representations about the suitability of the annuities constitutes fraud until then. Tr. at 89-91.

Contrary to the defendants' contention, the plaintiffs in the present litigation have adequately pleaded a scheme to defraud despite the fact that many of the alleged misrepresentations and omissions were contradicted or disclosed in the annuity contracts themselves. According to the plaintiffs, the scheme called for Sales Group members to gain the trust of senior citizens by affirmatively misrepresenting themselves as objective estate planning advisers, rather than commissioned salespeople. (*Stein* ¶¶ 14-17;*Gilmour* ¶¶ 174-78;*Trimble* ¶¶ 147-51;*Treitz* ¶¶ 170-74). Having gained the trust of senior citizens, often through visits to their homes, the Sales Group members then allegedly misrepresented the benefits of living trusts in order to convince senior citizens to purchase the estate planning instruments. According to the plaintiffs, instead of minimizing taxes and avoiding probate, the living trusts did nothing more than offer the salespeople a convenient way of identifying assets that could be used to purchase the Insurance Company Group's annuities. (*Stein* ¶¶ 251-58;*Gilmour* ¶¶ 196-202;*Trimble* ¶¶ 171-77;*Treitz* ¶¶ 194-200).

**\*21** Once the trust of these senior citizens was gained and the available assets were identified, the Sales Group members would then recommend that the senior citizens purchase one or more of the Insurance Company Group's annuities. (*Stein* ¶¶ 254-58;*Gilmour* ¶¶ 199-203;*Trimble* ¶¶ 172-76;*Treitz* ¶¶ 195-99). In the course of selling the annuities, the Sales Group members were instructed to omit certain facts relating to the annuities, including (i) that they were deferred (*i.e.,* that the receipt of monthly payments would be deferred), (ii) how long they would be deferred, and (iii) the existence of surrender charges for early capital withdrawals. (*Stein* ¶¶ 14, 254, 259;*Gilmour* ¶¶ 1, 2, 43;*Trimble* ¶¶ 2-6;*Treitz* ¶¶ 2-7). These omissions were allegedly material because the annuities had deferral periods that often extended into the plaintiffs' nineties or beyond. (*Stein* ¶¶ 108, 145, 165, 181, 193, 202-03, 206, 212;*Gilmour* ¶ 163;*Trimble* ¶ 92;*Treitz* ¶ 106).

The Court finds that such a scheme involved misrepresentations and omissions that are reasonably calculated to deceive persons of ordinary prudence and comprehension. *See Coyle,* 63 F.3d at 1243. Simply having the plaintiffs sign annuity contracts that contradict or disclose these alleged misrepresentations is not enough to change that conclusion.

Indeed, the two district court cases that the defendants cite to substantiate their argument that the annuity contracts cured the effect of the Sales Group's omissions and misrepresentations are not on point. *See Warden v. Crown Am. Realty Trust,* No. 96-25J, 1999 WL 476996 (W.D.Pa. July 6, 1999); *see also Knez Optical, Inc. v. Singer Optical Group, Inc.,* No. 94-7582, 1995 WL 649262 (E.D.Pa. Nov.3, 1995).*Warden* was a purported securities fraud class action where the court dismissed a claim brought under section 10(b) of the Exchange Act because the plaintiffs had failed to plead reasonable and justifiable reliance. *Warden,* 1999 WL 476996, at \*1. Such reasoning is inapplicable to the case at hand because the Supreme Court has specifically stated that justifiable reliance is not an element of the federal mail or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                        Page 27
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
**(Cite as: 2007 WL 2541216 (E.D.Pa.))**

wire fraud statutes. *Neder v. United States*, 527 U.S. 1, 24-25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

*Knez* is likewise inapplicable because it involves an application of the parol evidence rule. *Knez*, 1995 WL 649262, at *4-*6. There, the district court dismissed the plaintiff's RICO claims based on federal mail and wire fraud because the parol evidence rule barred the court from considering the alleged oral misrepresentations at issue. *Id.* In the present litigation, the defendants do not argue that the parol evidence rule bars the court from considering the alleged misrepresentations and omissions made by members of the Sales Group members.

The Court accordingly finds that the plaintiffs have adequately pleaded a scheme to defraud for purposes of the federal mail and wire fraud statutes.

### (2) *Use of the Mails or Wires*

**\*22** To state a claim for federal mail or wire fraud, a plaintiff must also allege that the defendant used the mails or interstate wires in furtherance of the scheme to defraud. *See Pharis*, 298 F.3d at 234. Detailed allegations regarding the fraudulent scheme overall are not a substitute for detailed allegations about the acts of mail or wire fraud.[FN13] *See Warden v. McLelland*, 288 F.3d 105, 114 (3d Cir.2002); *Rolo*, 155 F.3d at 658-659. Mailings and wire communications do not have to be fraudulent in and of themselves to come within the mail and wire fraud statutes. *Schmuck v. United States*, 489 U.S. 705, 715, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). They do not even have to be an essential part of the fraudulent scheme; they only need to be "incident to an essential part of the scheme."*Id.* at 709-10.Use of the mails or wires even after money has been obtained through allegedly fraudulent means may come within the statute if it serves to lull the alleged victim into a false sense of security and prevent detection. *United States v. Sampson*, 371 U.S. 75, 81, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962).

> FN13. In *Rolo*, 155 F.3d 644, the plaintiffs made "quite detailed" allegations regarding the fraudulent scheme and described the contents

of the mailings in "reasonably specific terms." *Id.* at 658.The court held, nevertheless, that the plaintiffs failed to plead mail fraud with particularity because the complaint did not specify "when, by whom, and to whom a mailing was sent, and the precise content of each particular mailing."*Id.* at 659.Similarly, in *Warden v. McLelland*, 288 F.3d 105 (3d Cir.2002), the complaint provided a "reasonably clear overall picture of what had been alleged," but did "not state clearly how [the communications alleged to constitute wire fraud] were false or misleading or how they contributed to the alleged fraudulent scheme."*Id.* at 114.The Court of Appeals instructed the district court to re-examine the complaint and permit the plaintiffs to amend if appropriate. *Id.*

The defendant does not have to send the mailing or wire communication personally. A defendant may be liable where he or she acts "with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended."*Pereira v. United States*, 347 U.S. 1, 8-9, 74 S.Ct. 358, 98 L.Ed. 435 (1954); *United States v. Bentz*, 21 F.3d 37, 40 (3d Cir.1994).

From these cases, the Court discerns the following principle: to properly allege that a defendant committed an act of mail or wire fraud, a plaintiff must allege facts from which the Court can infer (i) that the defendant used the mails or interstate wires as part of a scheme to defraud, or (ii) that the mails or interstate wires were used, and that the defendants took some action whereby such use was reasonably foreseeable. Many of the moving defendants argue that the allegations of certain plaintiffs fail to comply with this requirement. The Court will examine each of these defendants' arguments in turn.

### (a) *The Insurance Company Group Defendants*

The Insurance Company Group defendants-AAG, AIL-IC, CMIC, IAMS, and AISG-argue that the allegations of the Steins, Inferreras, Gilmours, Trimbles, Brennans

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 28
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
**(Cite as: 2007 WL 2541216 (E.D.Pa.))**

(Treitz), Lynch, Ryles, Miller, and Edwards are deficient because these plaintiffs either (i) fail to allege any use of the mails or interstate wires at all, or (ii) fail to plead such use with particularity as required by Rule 9(b). The Court agrees with the Insurance Company Group's contention that the Inferreras, Ryles, Miller, and Edwards have failed to adequately plead mail or wire fraud. The Court finds, however, that the rest of the above-mentioned plaintiffs have pled the requisite two predicate acts of mail and wire fraud against the insurance companies.

According to the complaints, the Insurance Company Group directed the affairs of the alleged association-in-fact, which operated, at least in part, to execute an allegedly fraudulent scheme to sell senior citizens unnecessary and unsuitable estate planning instruments and annuities. (*Stein* ¶¶ 247, 259;*Gilmour* ¶¶ 191, 205;*Trimble* ¶¶ 164, 178;*Treitz* ¶¶ 187, 201). The complaints describe, in varying detail, how this scheme allegedly induced each plaintiff to purchase one or more of the Insurance Company Group's annuities.(*Stein* ¶¶ 98-218;*Gilmour* ¶¶ 117-71;*Trimble* ¶¶ 82-144;*Treitz* ¶¶ 92-167). Within these pleadings, the Steins, Gilmours, Trimbles, Brennans (Treitz), and Lynch each identify at least two separate, specific uses of the mails or wires that were incident to an essential element of this scheme (*i.e.,* the sale of the Insurance Company Group's annuities).FN14 (*Id.*) This use of the mails and interstate wires was a reasonably foreseeable consequence of the Insurance Company Group's alleged conduct. These plaintiff's allegations of federal mail and wire fraud against the Insurance Company are therefore sufficient to withstand the instant motion to dismiss. *See Schmuck,* 489 U.S. at 715.

> FN14. The Steins: (i) Larson's May 2002 mailing of the Steins' application to purchase an AILIC annuity to AmerUs; and (ii) AmerUs' December 2002 letter to the Steins regarding the financial performance of AILIC and the valuation of the Steins' annuity. (*Stein* ¶¶ 107, 114).

> Lynch: (i) AmerUs' April 2003 mailing of a policy amendment to Lynch; (ii) AmerUs'

January 2004 letter to Lynch relating to her AILIC annuity and the rates at which it could be renewed; and (iii) AILIC and AAG's January and March 2005 letters to Lynch regarding certain aspects of her annuity.(*Stein* ¶¶ 130, 134, 271).

> The Gilmours: (i) AILIC's mailing of the Gilmours' annuity policies to Mr. Strope or Horowitz; and (ii) Mr. Strope or Horowitz's mailing of the signed annuity policies back to AILIC. (*Gilmour* ¶ 224).

> The Trimbles: (i) AILIC's mailing of the Trimbles' annuity policy to Spangler; and (ii) Spangler's mailing of the signed annuity policy back to AILIC. (*Trimble* ¶ 194).

> The Brennans: (i) AILIC's mailing of the Trimbles' annuity policy to Larson; and (ii) Larson's mailing of the signed annuity policy back to AILIC. (*Treitz* ¶ 194).

**\*23** The allegations of the Inferreras, Ryles, Miller, and Edwards, however, fail to plead any predicate acts of mail or wire fraud. The Inferreras, Ryles, and Edwards do not allege any use of the mails or interstate wires at all in connection with their purchase of the Insurance Company Group's annuities.(*Stein* ¶¶ 174-82, 201-09). And although Miller does allege the use of the mail or interstate wires in connection with his purchase of an annuity, this use appears to relate to his purchase of an annuity from American Equity, a corporation that is neither a defendant in this litigation nor related in any way to the Insurance Company Group defendants. (*Stein* ¶¶ 183-200). The Court will accordingly dismiss these plaintiffs' RICO claims.

**(b)** *Bohmueller*

Bohmueller argues that the plaintiffs in the *Gilmour, Trimble,* and *Treitz* actions have failed to adequately plead that he used the mails or interstate wires in furtherance of the alleged scheme to defraud. According to Bohmueller, these plaintiffs either do not allege that the attorney used the mails or interstate wires at all, or they

fail to explain how the attorney's use of the mails or interstate wires furthered the allegedly fraudulent scheme.

According to the complaints, Bohmueller participated in the allegedly fraudulent scheme to sell the Insurance Company Group's annuities by, among other things, knowingly allowing Sales Group members to use the living-trust creation process as a way of identifying assets that could be used to purchase annuities. (*Gilmour* ¶¶ 196-201;*Trimble* ¶¶ 169-74;*Treitz* ¶¶ 192-97). Bohmueller's involvement in the scheme as it relates to the plaintiffs in *Gilmour, Trimble,* and *Treitz* is evidenced by the alleged fact that these plaintiffs all purchased living trusts by checks made payable to "Bohmueller Law Offices." (*Gilmour* ¶ 129;*Trimble* ¶ 93;*Treitz* ¶ 101). These plaintiffs have each identified at least two separate, specific uses of the mails or wires that were incident to their purchase of the Insurance Company Group's annuities (an essential element of the scheme to defraud).[FN15] These uses of the mails or interstate wires were a reasonably foreseeable consequence of Bohmueller's actions, which helped facilitate the allegedly fraudulent annuity sales. These plaintiffs' allegations of federal mail and wire fraud against Bohmueller are therefore sufficient to withstand his motion to dismiss.

> FN15. The Gilmours: (i) AILIC's mailing of the Gilmours' annuity policies to Mr. Strope or Horowitz; and (ii) Mr. Strope or Horowitz's mailing of the signed annuity policies back to AILIC. (*Gilmour* ¶ 224).
>
> The Trimbles: (i) AILIC's mailing of the Trimbles' annuity policy to Spangler; and (ii) Spangler's mailing of the signed annuity policy back to AILIC. (*Trimble* ¶ 194).
>
> The Brennans: (i) AILIC's mailing of the Trimbles' annuity policy to Larson; and (ii) Larson's mailing of the signed annuity policy back to AILIC. (*Treitz* ¶ 194).

### (c) *Weinstein and Plaza*

Attorney defendants Weinstein and Plaza argue that the plaintiffs in *Trimble* and *Treitz* have failed to allege that

either attorney committed the requisite predicate acts of mail or wire fraud. Weinstein contends that the allegations of mail and wire fraud in *Trimble* are too vague to satisfy the requirements of Rule 9(b), and both Weinstein and Plaza argue that the allegations in *Treitz* are deficient because (i) they are too vague, and (ii) they refer to the conduct of attorney Bohmueller, not the conduct of Weinstein or Plaza.

**\*24** The plaintiff in *Trimble* alleges that Weinstein was partners with Bohmueller and acted in concert with Bohmueller to provide the Trimbles with legal services, including the preparation of the Trimbles' living trust.(*Trimble* ¶¶ 29-32). The plaintiff in *Treitz* likewise alleges that Weinstein and Plaza acted in concert with Bohmueller to provide legal services to the Brennans, including the preparation of the Brennans' living trust.(*Treitz* ¶¶ 31-36). As explained above, it was reasonably foreseeable that this conduct in furtherance of the alleged scheme to defraud would lead to the use of the mails or interstate wires. The plaintiffs in *Treitz* and *Trimble* have therefore adequately alleged that Weinstein and Plaza committed the requisite acts of mail or wire fraud.

### (d) *The Patriot Group*

The Patriot Group argues that the plaintiff in *Gilmour* has failed to adequately plead that the Patriot Group committed the requisite predicate acts of federal mail or wire fraud. According to this defendant, the *Gilmour* plaintiff's allegations of mail and wire fraud (i) are too vague to satisfy Rule 9(b), and (ii) fail to specify how the Patriot Group's use of the mails or interstate wires furthered the alleged scheme to defraud.

The plaintiff in *Gilmour* has alleged numerous specific instances of the Patriot Group's use of the mail or interstate wires in furtherance of the alleged scheme to defraud. For example, the plaintiff alleges that in May of 2001, the Patriot Group, through its sales agent Mr. Strope, mailed the Gilmours' AILIC annuity applications from the Patriot Group's Pennsylvania office to AILIC's Kansas office. (Gilmour Amended RICO Case Statement No. 4(ff)(1)). The plaintiff also alleges that

on June 29, 2001, the Patriot Group, through Mr. Strope, mailed the Gilmours' signed policy delivery receipt from the Patriot Group's Pennsylvania office to AILIC. (Gilmour Amended RICO Case Statement No. 4(ff)(21)). Although these mailings are not fraudulent in and of themselves, they were done incident to an essential part of the scheme (*i.e.,* the sale of the Insurance Company Group's annuities). The Court therefore finds that the plaintiff in *Gilmour* has alleged that the Patriot Group participated in the requisite predicate acts of mail or wire fraud. *See Schmuck,* 489 U.S. at 709-10, 715.

(3) *Injury to Business or Property*

A plaintiff has standing to bring a RICO claim if, and can recover only to the extent that, he has been injured in his business or property by the conduct constituting the violation. *Sedima,* 473 U.S. at 496.As explained by the United States Court of Appeals for the Third Circuit, this "injury to business or property" element of a RICO claim requires the plaintiff to plead a concrete financial loss and not mere injury to a valuable, intangible property interest. *See Maio v. Aetna, Inc.,* 221 F.3d 472, 483 (3d Cir.2000).

The defendants argue that the plaintiffs lack standing to bring a RICO claim because they have failed to allege any concrete financial loss. According to the defendants, the plaintiffs' alleged injury-that they were fraudulently induced to purchase annuities whose undisclosed deferral periods and surrender charges tied up their money and deprived them of current income-is not the type of concrete financial loss that RICO's standing requirement demands.

**\*25** As a preliminary matter, this argument ignores the alleged fact that most of the plaintiffs were fraudulently induced to purchase living trusts for which they had no actual use. This payment of between $600 and $2,000 for a useless estate planning instrument constitutes the type of actual monetary loss that is sufficient to satisfy RICO's injury requirement. *See Maio,* 221 F.3d at 483-84. By virtue of this allegation alone, the Steins, Prices, Gilmours, Trimbles, Brennans (*Treitz* ), Lynch, Healy, Ryles, and Miller have standing to bring RICO

claims. (*Stein* ¶¶ 105, 125, 140, 163, 179, 191, 259;*Gilmour* ¶¶ 129, 205;*Trimble* ¶¶ 93, 178;*Treitz* ¶¶ 101, 201).

More importantly, the plaintiffs' allegation that they were fraudulently induced to purchase annuities that had undisclosed deferral periods and surrender charges does, in fact, constitute the type of concrete financial loss that is sufficient to confer standing under RICO.

In *Maio,* the plaintiffs alleged that the defendant, Aetna, engaged in a fraudulent scheme to induce individuals to purchase their health insurance by, among other things, representing that its insureds would receive "high quality" health care from physicians. *Maio,* 221 F.3d at 474-78. In reality, Aetna's internal policies restricted the physicians' ability to provide the health care that the plaintiffs were promised. *Id.* at 474-79.The plaintiffs claimed that their injury consisted of the difference in value between the "high quality" health insurance promised and the "inferior" health insurance actually received. *Id.* at 486.The plaintiffs did not allege that they suffered any personal injuries, were denied necessary benefits, or received inferior care.*Id.* at 485.According to the plaintiffs, their financial loss was not dependant upon individualized allegations concerning the level or adequacy of the care that each plaintiff received under Aetna's plan. *Id.* at 487.Rather, the plaintiffs' injury consisted solely of the financial losses that they incurred by paying too much for their enrollment in Aetna's "inferior" health plan. *Id.* at 485.

The Court of Appeals rejected this theory, holding that the plaintiffs could not establish that they suffered a tangible economic harm compensable under RICO. *Id.* at 488.According to the court, absent allegations that Aetna failed to provide sufficient health insurance coverage in the sense that their insureds received inadequate, inferior, or delayed medical treatment, there was no factual basis for the plaintiffs' allegation that they had been injured in their "property" because the health insurance they received was inferior, and therefore worth less, than what they paid for it. *Id.*

The Court reached this conclusion because the plaintiffs' property interest in their health insurance cov-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

erage took the form of a contractual right to receive a certain level of benefits from Aetna. *Id.* at 490.The contours of this contractual right was defined by the parties' contractual agreement as well as Aetna's extra-contractual promise to provide "high quality" health care. *Id.* at 491.It inexorably followed, the court reasoned, that the plaintiffs could not establish a RICO injury absent proof that Aetna failed to perform under the parties' arrangement. *Id.* at 490.

**\*26** In the present case, the plaintiffs allege that they were injured in connection with their purchase of the Insurance Company Group's annuities.(*Stein* ¶ 273,*Gilmour* ¶ 228;*Trimble* ¶ 198;*Treitz* ¶ 221). These annuities, like the health insurance policies in *Maio*, took the form of contractual rights to receive certain benefits. (*Stein* ¶ 62). To establish a RICO injury, the plaintiffs must therefore allege that the defendants failed to perform under the parties' arrangement. *Maio*, 221 F.3d at 490. The plaintiffs have alleged such a failure to perform.

According to the complaints, the Sales Group members induced the plaintiffs to purchase the annuities without disclosing that the annuities contained deferral periods and surrender charges. (*Stein* ¶¶ 109, 127-28, 146-47, 149-50, 166, 174, 183, 193-94, 205-06, 216-17;*Gilmour* ¶ 134;*Trimble* ¶ 95;*Treitz* ¶ 107). The plaintiffs' injury therefore consists of the difference in value between the annuities that they were promised (those without deferral periods and surrender charges) and the annuities that they actually received (those with deferral periods and surrender charges).

Although this damages theory appears similar to that which was posited by the plaintiffs in *Maio*, it contains one critical difference. In *Maio*, the contracts at issue were for the provision of "high quality" health care services. *Maio*. 221 F.3d at 485. According to the court, the plaintiffs failed to plead a RICO injury because the plaintiffs did not allege that they had actually received health care that was inferior to that which they were promised. *Id.* at 488.Here, on the other hand, the contracts at issue were for the right to collect future payments, as well as the right to convert their contracts back into cash. (*Stein* ¶¶ 62-67). These rights were im-

paired by the undisclosed deferral periods and surrender charges. The plaintiffs in the present litigation have alleged that they actually received less than what they were promised.

The plaintiffs therefore have standing under RICO and may recover to the extent that they were harmed by the undisclosed deferral periods and surrender charges. *Sedima*, 473 U.S. at 496.

### 2. *Claim Under Section 1962(d)*

The defendants argue that the plaintiffs' RICO conspiracy claim under 18 U.S.C. § 1962(d) should be dismissed because the plaintiffs have failed to plead an underlying violation of section 1962(c).

To state a RICO conspiracy claim under section 1962(d), a plaintiff must allege (i) an agreement to commit the predicate acts of fraud, and (ii) knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate section 1962(a), (b), or (c).*Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir.1989). A section 1962(d) claim cannot be pursued where there is no cognizable RICO enterprise or pattern of racketeering activity alleged by the defendant or co-conspirators. *See Lum*, 361 F.3d at 227 n. 5 ("Any claim under section 1962(d) based on conspiracy to violate the other subsections of section 1962 must fail if the substantive claims are themselves deficient.").

**\*27** In the present case, the Court has dismissed the section 1962(c) claims of the Inferreras, Ryles, Miller, and Edwards because these plaintiffs have failed to plead the requisite pattern of racketeering activity. The Court will accordingly dismiss their claims under 1962(d), as well. Because the Court has concluded that the rest of the plaintiffs have stated valid RICO claims under section 1962(c), it will deny the defendants' motion to dismiss their RICO conspiracy claims.

### 3. *Whether the McCarron-Ferguson Act Bars the Plaintiffs' RICO Claims*

The defendants argue that the McCarron-Ferguson Act,

15 U.S.C. §§ 1011, *et seq.,* bars the plaintiffs' RICO claims insofar as these claims are based on allegations that the annuities are per se unsuitable and fraudulently designed. Because the Court has declined to address the plaintiffs' allegations of per se unsuitability in this opinion, the Court will not address this argument.

C. *State Law Claims*[FN16]

> FN16. Although neither the Supreme Court nor the United States Court of Appeals for the Third Circuit has explicitly ruled on the issue, it appears that in MDL proceedings the transferee court applies the choice-of-law rules that would govern in the transferor forum. *Smith v. Waste Mgmt., Inc.,* 407 F.3d 381, 384 n. 1 (5th Cir.2005); *In re Rezulin Prod. Liab. Litig.,* 392 F.Supp.2d 597, 606 (S.D.N.Y.2005); *In re Diet Drugs Prod. Liab. Litig.,* MDL-1203, No. 03-20284, 2004 WL 1925010, at *1 (E.D.Pa. Aug.30, 2004).

> In this case, suits brought by the Inferreras and Edwards were transferred to this Court from California and Florida, respectively. The Court must therefore apply the choice-of-law rules from California and Florida to determine which state's laws govern these claims. In addition, the Court must look at Pennsylvania's choice-of-law rules to determine which state's laws govern the rest of the plaintiffs' claims, all of which are contained in complaints that were originally filed in this Court.

> The Court finds that the choice-of-law rules of Pennsylvania, Florida, and California all require application of the laws of the jurisdictions where the transactions, misconduct, and injuries allegedly occurred. *See Huber v. Taylor,* 469 F.3d 67, 74-81 (3d Cir.2006); *see also Trumpet Vine Inv., N.V. v. Union Capital Partners I, Inc.,* 92 F.3d 1110, 1116 (11th Cir.1996); *Waggoner v. Snow, Becker, Kroll, Klaris & Krauss,* 991 F.2d 1501, 1508

(9th Cir.1993). In this case, those states are Pennsylvania, Florida, and California.

Before a choice-of-law question arises, however, there must first be a true conflict between the potentially applicable bodies of law. *Huber,* 469 F.3d at 74. If there is no conflict, then the district court may refer interchangeably to the laws of the states whose laws potentially apply.*Id.* In the present case, the parties do not argue, and the Court does not find, that there is a true conflict between the laws of Pennsylvania, Florida, and California with regard to breach of fiduciary duty, negligence, or unjust enrichment (the only state law claims alleged by the Inferreras and Edwards).*See, e.g., eToll, Inc. v. Elias/Savion Adver., Inc.,* 811 A.2d 10, 22 (Pa.Super.Ct.2002) (discussing the requirements for the establishment of a fact-specific fiduciary duty); *City Solutions, Inc. v. Clear Channel Commc'ns, Inc.,* 201 F.Supp.2d 1048, 1050 (N.D.Cal.2002); *see also Lanz v. Resolution Trust Corp.,* 764 F.Supp. 176, 179 (S.D.Fla.1991) (same);.

The Court will therefore refer to these states' laws interchangeably in addressing these claims.

1. *Statute of Limitations*

The Insurance Company Group defendants, the EPAC defendants (EPAC, Larson, Mr. Strope, and Krygowski), and Bohmueller argue that many of the plaintiffs' tort claims against them are barred by Pennsylvania's two-year statute of limitations on such causes of action. These plaintiffs respond by arguing that their tort claims are timely because the delayed discovery doctrine tolls the applicable statute of limitations.

Although ordinarily treated as an affirmative defense, failure to comply with the applicable statute of limitations may be raised on a motion to dismiss where the allegations made on the face of the complaint show that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the cause of action is time-barred. *Benak v. Alliance Capital Mgmt., L.P.*, 435 F.3d 396, 400 n. 14 (3d Cir.2006). In Pennsylvania, tort claims are subject to a two-year statute of limitations. 42 Pa. Cons.Stat. § 5524(7) (2004). This limitations period begins to run as soon as the right to institute and maintain a suit arises, which, as a general rule, is when the injury was inflicted. *Drelles v. Mfrs. Life Ins. Co.*, 881 A.2d 822, 831 (Pa.Super.Ct.2005). Mistake, misunderstanding, or lack of knowledge in themselves do not toll the running of the statute. *See Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 503 Pa. 80, 468 A.2d 468, 471 (Pa.1983).

The delayed discovery doctrine is an exception to the general rule that a cause of action begins to run at the time of injury. *Id.* This doctrine excludes from consideration the time during which a party who has not suffered an immediately ascertainable injury remains "reasonably unaware" of the facts and circumstances surrounding his claim. *Drelles,* 881 A.2d at 831. The key point that gives rise to the doctrine's application is the inability of the injured party, despite the exercise of "reasonable diligence," to know that he has been injured and by what cause. *Id.* Although the test for "reasonable diligence" is objective, "[i]t is sufficiently flexible to take into account the differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question."*Fine v. Checcio*, 582 Pa. 253, 870 A.2d 850, 858 (Pa.2005). Because this inquiry is "fact-driven," the determination of whether an individual plaintiff has exercised "reasonable diligence" is ordinarily left to the jury. *See id.*

**\*28** In the present case, the Insurance Company Group defendants, the EPAC defendants (EPAC, Larson, Mr. Strope, and Krygowski), and Bohmueller argue that the statute of limitations on the plaintiffs' tort claims against them began running on the date the plaintiffs purchased their annuities. On that date, each plaintiff received his or her annuity contract, which allegedly contradicted or disclosed all the alleged misrepresentations and omissions that induced the plaintiff to purchase the annuities. According to these defendants, the tort claims of the Steins, Prices, Gilmours, Trimbles, Brennans

*Treitz* ), Lynch, and Healy should be dismissed because more than two years elapsed between their annuity purchase and the date on which they filed suit.

The Court finds that the complaints, on their face, do not show that these plaintiffs' claims are time-barred. Although more than two years passed between the date on which these plaintiffs purchased their annuities (and therefore received their annuity contracts) and the date on which they filed suit, it is unclear whether these plaintiffs failed to exercise "reasonable diligence" in apprising themselves of their claims. The complaints allege that the Sales Group members gained these plaintiffs' trust so that the plaintiffs would rely solely upon their representations (and omissions) when deciding whether to purchase an annuity. (*Stein* ¶¶ 14-23;*Gilmour* ¶¶ 194-99;*Trimble* ¶¶ 167-73;*Treitz* ¶¶ 190-96). Furthermore, the complaints allege that even if these plaintiffs had tried to read the annuity contract, the contracts themselves were so complex that they were insufficient to apprise these plaintiffs of their claims. (*Stein* ¶¶ 11, 69-71;*Gilmour* ¶ 165).

The Court therefore will not dismiss these plaintiffs' tort claims on the ground that they are time-barred.

*2. Breach of Fiduciary Duty*

The Insurance Company defendants, EPAC defendants (EPAC, Larson, Mr. Strope, and Krygowski), and Attorney Group defendants (Bohmueller, Weinstein, and Plaza) argue that the plaintiffs' claims against them for breach of fiduciary duty should be dismissed because the plaintiffs have failed to plead the existence of a fiduciary relationship. The plaintiffs respond by arguing that a fiduciary relationship arose from the relationship of trust that the Sales Group members created in connection with the allegedly fraudulent sales scheme. The plaintiffs further allege that any breach of this fiduciary relationship is attributable to both the Insurance Company Group defendants and the Attorney Group defendants because the salespeople were acting on their behalf.

A fiduciary relationship may arise "where by virtue of the respective strength and weakness of the parties, one

Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
**(Cite as: 2007 WL 2541216 (E.D.Pa.))**

has a power to take advantage of or exercise undue in-fluence over the other."*eToll, Inc. v. Elias/Savion Ad-ver., Inc.,* 811 A.2d 10, 22 (Pa.Super.Ct.2002). The crit-ical question in determining whether such a relationship exists is whether the relationship goes beyond mere reli-ance on superior skill and into a relationship character-ized by "overmastering influence" on one side or "weakness, dependence, or trust, justifiably reposed," on the other. *Id.* at 23 (citing *Basile v. H & R Block,* 777 A.2d 95, 101 (Pa.Super.Ct.2001)). Such a relationship may arise, for example, when one occupies toward an-other a position of adviser or counselor.*Basile,* 777 A.2d at 102. Individuals who purport to give business advice "may engender confidential relations if others, by virtue of their own weakness or inability, the ad-viser's pretense or expertise, or a combination of both, invest such a level of trust that they seek no other coun-sel."*Id.* Any breaches of this duty by an agent may be attributed to his principal, so long as the agent is acting within the scope of his agency. *See Aiello v. Ed Saxe Real Estate, Inc.,* 508 Pa. 553, 499 A.2d 282, 285 (Pa.1985).

**\*29** In the present case, the plaintiffs allege that the members of the Sales Group, acting on behalf of the In-surance Company Group and the Attorney Group, held themselves out at all times as experts in estate planning and as associates of lawyers. The sales agents further gained the trust of the defendants by conferring on themselves imaginary titles, such as "Certified Elder Adviser." (*Stein* ¶¶ 14-23;*Gilmour* ¶¶ 194-200;*Trimble* ¶¶ 167-73;*Treitz* ¶¶ 190-96). With their true identities cloaked, the Sales Group members then conducted in-formational presentations, often followed by in-home visits, where the salespeople ostensibly offered the plaintiffs disinterested financial advice. (*Id.*) At these presentations and in-home visits, the Sales Group mem-bers recommended that the plaintiffs, all of whom were senior citizens, use any available assets to purchase an-nuities. (*Stein* ¶¶ 108, 145, 165, 181, 193, 202-03, 206, 212, 254-58;*Gilmour* ¶¶ 163, 199-203;*Trimble* ¶¶ 92, 172-76;*Treitz* ¶¶ 106, 195-99). The Court finds that these allegations are sufficient to plead the existence of a fiduciary relationship.

### 3. *Negligent Supervision*

The Insurance Company Group defendants, Weinstein, and Plaza argue that the plaintiffs' claims against them for negligent supervision should be dismissed because (i) the plaintiffs have failed to plead the elements of a negligent supervision claim, (ii) the plaintiffs cannot predicate a negligence claim on suitability, and (iii) the economic loss doctrine bars the plaintiffs' claims.

A claim for negligent supervision provides a remedy for injuries to third parties who would otherwise be fore-closed from recovery under the principal-agent doctrine of respondeat superior because the wrongful acts of em-ployees in these cases are likely to be outside the scope of employment or not in furtherance of the principal's business. *Heller v. Patwil Homes, Inc.,* 713 A.2d 105, 107 (Pa.Super.Ct.1998); *see also IRPC, Inc. v. Hudson United Bancorp.,* No. 0474, 2002 WL 372945, at *4 (Pa.Com.Pl. Jan.18, 2002) (noting that an employee act-ing outside the scope of his employment is an element of a claim for negligent supervision).

In the present case, the plaintiffs have alleged throughout their complaints that the Sales Group mem-bers were acting under the direction of the Insurance Company Group and Attorney Group to further the al-legedly fraudulent scheme.(*Stein* ¶¶ 14-16, 250;*Gilmour* ¶ 194;*Trimble* ¶ 167;*Treitz* ¶ 190). Nowhere in the com-plaints do the plaintiffs allege that the Sales Group members were acting outside the scope of their agency. The Court will accordingly dismiss the plaintiffs' claims against the Insurance Company Group defendants, Weinstein, and Plaza for negligent supervision.

### 4. *Unjust Enrichment*

To state a claim for unjust enrichment, a plaintiff must allege (i) that the plaintiff conferred a benefit on the de-fendant, (ii) that the defendant appreciated the benefit, and (iii) that the defendant accepted and retained the be-nefit under circumstances such that it would be inequit-able for defendant to retain the benefit without payment of value. *Mitchell v. Moore,* 729 A.2d 1200, 1202 (Pa.Super.1999). A claim for unjust enrichment is de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

feated by the existence of an enforceable and binding contract. *Schott v. Westinghouse Elec. Corp.,* 436 Pa. 279, 259 A.2d 443, 448 (Pa.1969); *see also Matter of Penn Ctr. Transp. Co.,* 831 F.2d 1221, 1230 (3d Cir.1987) (finding that a plaintiff cannot maintain a claim of unjust enrichment when an express contract existed on the same subject). A plaintiff may, however, plead in the alternative when the validity of a contract is in question. *See Indep. Enter. Inc. v. Pittsburgh Water & Sewer Auth.,* 103 F.3d 1165, 1175 (3d Cir.1997).

**\*30** The Insurance Company Group defendants and the EPAC defendants (EPAC, Larson, Mr. Strope, and Krygowski) argue that the plaintiffs' claims against them for unjust enrichment should be dismissed because the parties' relationships are governed by the annuity contracts. The plaintiffs in the *Stein* class action complaint respond by arguing that their claims for unjust enrichment should not be dismissed because the annuity contracts were procured by fraud and may therefore be invalid. This argument is consistent with these plaintiffs' prayer for relief, which seeks a return of all amounts paid for the defendants' products. (*Stein* ¶ 300b). Because these plaintiffs challenge the enforceability of the annuity contracts, the Court will not dismiss their claim for unjust enrichment at this time.

The plaintiffs in the *Gilmour, Brennan,* and *Treitz* individual actions argue that their claims for unjust enrichment should not be dismissed because the claims are pled in the alternative to their breach of contract claims.FN17 These plaintiffs' breach of contract claims arise from an alleged promise made by members of the Sales Group, on behalf of the Insurance Company Group defendants, to provide these plaintiffs with estate planning services. As will be discussed more fully below, these plaintiffs have failed to state a claim for breach of contract. The *Gilmour, Trimble,* and *Treitz* plaintiffs, however, have failed to plead that they conferred any benefit on the Insurance Company Group or EPAC defendants in exchange for this promise to provide estate planning services. Indeed, the only benefits that these plaintiffs allegedly conferred on the insurance companies and salespeople were payments made in connection with the plaintiffs' purchases of annuities.

The plaintiffs' relationship with these defendants is therefore governed by the annuity contracts. The Court will accordingly dismiss the *Gilmour, Trimble,* and *Treitz* plaintiffs' claims for unjust enrichment against the Insurance Company Group and EPAC defendants.

> FN17. In contrast to the *Stein* plaintiffs, the plaintiffs in *Gilmour, Trimble,* and *Treitz* do not contest the validity of the annuity contracts.

Weinstein and Plaza argue that the claims against them for unjust enrichment should be dismissed because the plaintiffs have failed to plead that the attorneys conferred a benefit on them. The plaintiffs respond by pointing to their allegations that these attorneys acted in concert with, and shared fees with, attorney Bohmueller, who received money from the plaintiffs in connection with their purchase of living trusts. (*Trimble* ¶¶ 29-32;*Treitz* ¶¶ 31-36). The Court finds that this allegation is sufficient to demonstrate that the plaintiffs conferred a benefit on Weinstein and Plaza. The Court will accordingly deny these defendants' motion on this ground.

*5. Fraudulent Misrepresentation and Negligent Misrepresentation*

The Insurance Company Group defendants, EPAC defendants (EPAC, Larson, Mr. Strope, and Krygowski), Weinstein, and Plaza argue that the plaintiffs' claims against them for fraudulent and negligent misrepresentation should be dismissed because the plaintiffs (i) have failed to plead justifiable reliance on the alleged misrepresentations, and (ii) have failed to plead these claims with the particularity required by Rule 9(b).

**\*31** To state a claim for either fraudulent or negligent misrepresentation, a plaintiff must plead justifiable reliance. *See Bortz v. Noon,* 556 Pa. 489, 729 A.2d 555, 560-61 (Pa.1999) (listing the essential elements of both fraudulent and negligent misrepresentation). To be justifiable, reliance upon the representation of another must be reasonable. *Porreco v. Porreco,* 571 Pa. 61, 811 A.2d 566, 571 (Pa.2002). This "reasonableness" may be affected by the nature of the relationship between the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 36
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
(Cite as: 2007 WL 2541216 (E.D.Pa.))

parties.

Claims for fraudulent misrepresentation must meet the heightened pleading standard set forth in Federal Rule 9(b). Although Rule 9(b) does not govern claims of negligent misrepresentation, district courts in this circuit have generally required "a degree of specificity." *See, e.g., Floyd v. Brown & Williamson Tobacco Corp.,* 159 F.Supp.2d 823, 834 (E.D.Pa.2001); *see also S. Ocean Seafood Co. v. Holt Cargo Sys., Inc.,* No. 96-5217, 1997 WL 539763, at *11 n. 23 (E.D.Pa. Aug.11, 1997). The United States Court of Appeals for the Third Circuit has cautioned that in applying Rule 9(b) pleading requirements, courts should be sensitive to the fact that an overly stringent application of the Rule "may permit sophisticated defrauders to successfully conceal the details of their fraud."*See Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 284 (3d Cir.1992).

Pennsylvania has adopted the Restatement (Second) of Agency regarding the liability of a principal for the tortious misrepresentations of his agents.*Bolus v. United Penn Bank,* 363 Pa.Super. 247, 525 A.2d 1215, 1223-24 (Pa.Super.Ct.1987). Under the Restatement, "[a] principal is subject to liability for loss caused to another by the other's reliance upon a tortious representation of a servant or other agent, if the representation is: (a) authorized; (b) apparently authorized; or (c) within the power of the agent to make for the principal."*Id.* (quoting the Restatement (Second) of Agency § 257 (1958)).

In the present case, the Court has already concluded that the plaintiffs in the individual actions state a claim under RICO. This conclusion applies equally to the Rule 9(b) arugment here. As to justifiable reliance, the plaintiffs adequately allege such reliance, that is usually a jury question.

### 6. Civil Conspiracy

The plaintiffs in the individual actions have alleged civil conspiracy. The Insurance Company Group defendants and Weinstein and Plaza have moved to dismiss. The Court will deny the motions.

In order to state a claim for conspiracy under Pennsylvania law, a plaintiff must allege: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage."*McKeeman v. Corestates Bank, N.A.,* 751 A.2d 655, 660 (Pa.Super.Ct.2000) (citations omitted).

As set out above in the section addressing the adequacy of the RICO allegations, the complaint contains sufficient allegations to fulfill the three essential elements of a conspiracy claim.

### 7. Professional Negligence

*32 The attorney defendants argue that the plaintiffs' professional negligence claims against them in the individual actions should be dismissed because the attorney defendants never entered into any professional relationship with the plaintiffs. The plaintiffs respond that the attorney defendants directly performed estate planning services for the plaintiffs.

Under Pennsylvania law, clients may bring tort actions against professionals who do not provide the client with services consistent with the standard expected of the profession. Professional negligence actions can be maintained only against persons licensed in Pennsylvania or another state as: (1) health care providers are defined in 40 Pa. Cons.Stat. § 1303.503; (2) accountants; (3) architects; (4) chiropractors; (5) dentists; (6) engineers or land surveyors; (7) nurses; (8) optometrists; (9) pharmacists; (10) physical therapists; (11) psychologists; (12) veterinarians; or (13) attorneys. Pa. R. Civ. P. 1042.1. The elements of a professional negligence claim against an attorney are: 1) employment of the attorney or other basis for duty; 2) the failure of the attorney to exercise ordinary skill and knowledge; and 3) that such failure proximately caused damage to the plaintiff. *Kituskie v. Corbman,* 552 Pa. 275, 714 A.2d 1027, 1030 (1998).

Here, the plaintiffs allege that the attorney defendants

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 37
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
**(Cite as: 2007 WL 2541216 (E.D.Pa.))**

provided them with legal advice and owed them common law duties to provide competent, knowledgeable legal representation. (*Gilmour* ¶¶ 262-63; *Trimble* ¶¶ 233-34; *Treitz* ¶¶ 245-46). The plaintiffs claim that attorney defendants breached those duties by failing to consult with plaintiffs, failing to adequately review investment vehicles, and failing to disclose the relationships between the attorney defendants and the other defendants, among other allegations. (*Gilmour* ¶ 265; *Trimble* ¶ 236; *Treitz* ¶ 248). The plaintiffs claim that they suffered damages due to the professional negligence of the attorney defendants. The Court finds that these allegations are sufficient to plead professional negligence against the attorney defendants.

Defendant Weinstein claims that plaintiff Trimble has filed a defective certificate of merit and that his claims should be dismissed on that ground. Pennsylvania Rule of Civil Procedure 1042.3 requires the filing of a certificate of merit "[i]n any action based upon an allegation that a licensed professional deviated from an accepted professional standard." Pa. R. Civ. P. 1042.3(a). A separate certificate of merit must be filed against each defendant. Pa. R. Civ. P. 1042.3(b). Plaintiff Trimble grouped defendant Weinstein and the Weinstein Law Offices together with "John Does 1-10 (Bohmueller Partners)." The Court is satisfied with the validity of the certificate of merit. The Court considers Weinstein and the "Weinstein Law Offices" to be the same entity. The addition of the John Does does not invalidate the certificate.

**\*33** In addition, plaintiff Trimble alleges a second count of professional negligence against all defendants. The allegations are duplicative as to the attorney defendants. The other defendants (the Insurance Company Group defendants, the Patriot Group, and Spangler) are not licensed professionals under Pa. R. Civ. P. 1042.1, and therefore the professional negligence claim cannot be maintained. *Gilmour v. Bohmueller,* No. Civ. A. 04-2535, 2005 WL 241181 (E.D.Pa. Jan.27, 2005). The Court dismisses this claim.

*8. Breach of Contract*

The plaintiffs in the individual cases allege that they entered into an agreement with the defendants whereby the plaintiffs specifically instructed the defendants to provide estate planning that would result in tax and estate benefits, tax-free and otherwise beneficial investments, and living trusts that would avoid probate. (*Gilmour* ¶ 273; *Trimble* ¶ 240; *Trietz* ¶ 270). The plaintiffs allege that the defendants breached those agreements by failing to deliver the agreed-upon services and that the plaintiffs suffered damages as a result. The Insurance Company Group defendants, attorney defendants Weinstein and Plaza, and the Patriot Group (as to Plaintiff Gilmour) move for dismissal. They contend that there is no such contract and that the plaintiffs' allegations are too vague to constitute essential terms.

Under Pennsylvania law, a claim for breach of contract must allege the following three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Omicron Sys., Inc. V. Weiner,* 860 A.2d 554, 564 (Pa.Super.Ct.2004) (citation omitted). An enforceable contract exists where the parties reached a mutual agreement, exchanged consideration, and set forth the terms of their bargain with sufficient clarity. *See Biddle v. Johnsonbaugh,* 444 Pa.Super. 450, 664 A.2d 159, 163 (Pa.Super.Ct.1995) (citation omitted).

The Trimble and Treitz complaints fail to state the specific identities of the defendants who entered into the contracts.[FN18] Gilmour does allege that the Sales Agent Group defendants acted as contracting agents for Bohmueller and the Insurance Group Company defendants, but all the plaintiffs fail to specify what consideration supported the contract and what the plaintiffs' duties were under the contract. The plaintiffs' allegations restate the basic wrongs laid out in the rest of the complaints but do not specifically plead the contract's essential terms, as required in *CoreStates,* 723 A.2d at 1058. This is insufficient to establish the existence of the contract.

> FN18. In his reply brief Plaintiff Trimble names Mr. Strope as the agent for Weinstein and Spangler as the agent for the Insurance Group defendants. This information does not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 38
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
**(Cite as: 2007 WL 2541216 (E.D.Pa.))**

appear in Trimble's amended complaint, however, and the Court will not take notice of it.

Therefore, the plaintiffs' breach of contract claims are insufficient to establish a cause of action against any of the defendants, and the defendants' motions to dismiss these claims are granted.

### 9. *Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law*

The plaintiffs claim that all of the defendants violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL" or "Consumer Protection Law") in performing estate, asset, and tax services for the plaintiffs in a deceptive manner likely to cause consumer confusion.(*Gilmour,* ¶¶ 285-90;*Trimble,* ¶¶ 251-56;*Treitz,* ¶¶ 276-81);73 Pa. Cons.Stat. § 201-2(4). The plaintiffs also allege that the Sales Group engaged in the unauthorized practice of law, in violation of 42 Pa. Cons.Stat. Ann. § 2524 and the UTPCPL, and that the Insurance Company Group and Attorney Group aided and abetted the Sales Group in this unauthorized practice of law.(*Gilmour,* ¶¶ 291-92;*Trimble,* ¶¶ 257-58;*Treitz,* ¶¶ 282-83).

*\*34* The defendants argue that to state a claim under the UTPCPL, the plaintiffs must plead and prove the elements of common law fraud. The cases the defendants cite rest on Pennsylvania case law that predated a 1996 amendment to the UTPCPL, changing "any other fraudulent conduct" to "any other fraudulent or deceptive conduct."73 Pa. Cons.Stat. § 201-2. Since that amendment, the Pennsylvania Supreme Court has not ruled on whether plaintiffs must still plead and prove all the elements of common law fraud. The Court, however, need not rule at this point in the proceedings on the exact requirements for stating a claim under the UTPCPL. The Court concluded above that the complaints state a claim for fraudulent misrepresentation and civil conspiracy. The plaintiffs' main theory for violation of the UTPCPL is similar to conspiracy and fraudulent misrepresentation. The Court also will not dismiss the UTPCPL claims for lack of a pleading of reliance. Although not

fulsome, the plaintiffs' pleadings sufficiently allege reliance.

Because the Court found that the complaints state a claim for violation of the UTPCPL under one of the plaintiffs' theories, the Court will not at this time rule on the validity of the plaintiffs' other theories for UTPCPL liability.

### 10. *Negligence Per Se*

The plaintiffs claim that the defendants' use of non-attorney sales agents to solicit the plaintiffs to purchase living trusts and deferred annuities constitutes the unauthorized practice of law, in violation of Pennsylvania law. They further allege that such violation gives rise to a claim of negligence per se. The Insurance Company Group defendants and defendants Weinstein and Plaza argue that the negligence per se claim has not been adequately asserted. The Court considers negligence per se to be a method of proving certain elements of a negligence claim (*i.e.,* duty and breach of the duty) rather than a distinct cause of action. The plaintiffs have not made a negligence claim, so negligence per se is inapplicable. The Court therefore dismisses the plaintiffs' negligence per se claims against all defendants.

### 11. *An Accounting*

The plaintiffs in the individual actions have alleged causes of action for an accounting. The Insurance Company Group defendants and Weinstein and Plaza have moved to dismiss on the ground that an accounting is not a cause of action, but a remedy. The Court agrees and will dismiss the accounting count in the three complaints. The Court expresses no view as to whether some or all of the information sought in the accounting count would be available through discovery or whether some form of an accounting would be an appropriate remedy in this case if the plaintiffs are able to establish liability.

An appropriate Order follows.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 39
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
(Cite as: 2007 WL 2541216 (E.D.Pa.))

*ORDER*

AND NOW, this 29th day of August, 2007, upon consideration of the following motions:

A. Motion to Dismiss Amended Complaints in Trimble and Brennan Actions filed by defendants Brett Weinstein, Esquire, and Jason A. Plaza, Esquire **(Docket No. 108 in MDL-1712; Docket No. 63 in Civil Action No. 05-2101);**

**\*35** B. Motion to Dismiss Fourth Amended Complaint filed by Plaintiff Gilmour of defendants AmerUs Group Co., AmerUs Annuity Group Co., American Investors Life Insurance Company, Creative Marketing International Corp., and American Investors Sales Group Co. **(Docket No. 111 in MDL-1712; Docket No. 173 in Civil Action No. 04-2535);**

C. Motion to Dismiss First Amended Complaint filed by Plaintiffs Treitz and Brennan of defendants AmerUs Group Co., AmerUs Annuity Group Co., American Investors Life Insurance Company, and Creative Marketing International Corp. **(Docket No. 112 in MDL-1712; Docket No. 53 in Civil Action No. 05-3588);**

D. Motion to Dismiss Consolidated Amended Class Complaint of defendants AmerUs Group Company, AmerUs Annuity Group Company, American Investors Life Insurance Company, Creative Marketing International Corporation, and Insurance Agency Marketing Services, Inc. **(Docket No. 113 in MDL-1712);**

E. Motion for Judgment on the Pleadings as to Trimble's First Amended Complaint of defendants AmerUs Group Co., AmerUs Annuity Group Co., American Investors Life Insurance Company, Inc., and Creative Marketing International Corp. **(Docket No. 123 in MDL-1712; Docket No. 67 in Civil Action No. 05-2101);**

F. Motion to Dismiss Plaintiff's Amended Complaint of defendants Brian J. Newmark, Estate Planning Advisors Corp., Victoria Larson, Diane Strope, Mary Chiavaroli, and Kenneth Krygowski **(Docket No. 133 in MDL-1712; Docket No. 56 in Civil Action No. 05-3588);**

G. Motion to Dismiss Counts I, II and VII of the Fourth

Amended Complaint filed by defendant The Patriot Group, Inc. **(Docket No. 167 in Civil Action No. 04-2535);**

H. Motion to Dismiss Fourth Amended Complaint filed by defendant Bohmueller **(Docket No. 172 in Civil Action No. 04-2535);**

I. Motion to Dismiss First Amended Complaint filed by defendant Bohmueller **(Docket No. 64 in Civil Action No. 05-2101);**

J. Motion to Dismiss Amended Complaint of defendants Brett Weinstein, Esquire, and Jason A. Plaza, Esquire **(Docket No. 51 in Civil Action No. 05-3588);** and

K. Motion to Dismiss First Amended Complaint filed by defendant Bohmueller **(Docket No. 52 in Civil Action No. 05-3588);**

and upon consideration of the oppositions to the motions and after oral argument held on March 30, 2007, IT IS HEREBY ORDERED that said motions are granted in part and denied in part for the reasons stated in a memorandum of today's date as follows:

1. The motions of AmerUs Group Company, Brian Newmark, Mary Chiavaroli, and Diane Strope are granted in their entirety.

2. The motions of AmerUs Annuity Group Co., American Investors Life Insurance Co., American Investors Sales Group, Creative Marketing International Corporation, and Insurance Agency Marketing Services, Inc., are granted as to the RICO claims of Jean Ryles, George Miller, Edward and Gloria Inferrera, and Evelyn Edwards, and as to the claims of negligent supervision, unjust enrichment in the individual actions, breach of contract, professional negligence, negligence per se, and an accounting. In all other respects, their motions are denied.

**\*36** 3. The motion of The Patriot Group is granted as to the claims of breach of contract, negligence per se, professional negligence, and an accounting. In all other respects, its motion is denied.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369
**(Cite as: 2007 WL 2541216 (E.D.Pa.))**

4. The motions of Barry Bohmueller are granted as to negligence per se, breach of contract, and an accounting. In all other respects, his motions are denied.

5. The motions of Brett Weinstein and Jason Plaza are granted as to negligent supervision, breach of contract, negligence per se, and an accounting. In all other respects, their motions are denied.

6. The motion of Estate Planning Advisors Corp., Victoria Larson, and Kenneth Krygowski is granted as to unjust enrichment, breach of contract, negligence per se, and an accounting. In all other respects, their motion is denied.

7. The professional negligence claim is also dismissed as to Ralph Spangler.

8. The breach of contract, negligence per se, and accounting claims are dismissed as to all the defendants.

E.D.Pa.,2007.
In re American Investors Life Ins. Co. Annuity Marketing and Sales Practices Litigation
Slip Copy, 2007 WL 2541216 (E.D.Pa.), RICO Bus.Disp.Guide 11,369

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 3

Westlaw.

Not Reported in F.Supp.2d                                                                                         Page 1
Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.))**

**C**
Buckley v. Goldman, Sachs & Co.
D.Mass.,2005.
Only the Westlaw citation is currently available.
United States District Court,D. Massachusetts.
Dennis J. BUCKLEY, as the Trustee of the Globe
Holdings, Inc. and Globe Manufacturing Corp. Lit-
igation Trust
v.
GOLDMAN, SACHS & CO., et al.
**No. Civ.A.02-CV-11497RGS.**

May 20, 2005.

Larry Henin, Mark Weyman, Melissa Golub, Todd
D. Robichaud, Anderson, Kill & Olick, New York,
NY, Vincent F. O'Rourke, Jr., Bowditch & Dewey
LLP, Worcester, MA, for Plaintiffs.
mily C. Shanahan, John D. Donovan, Jr., Ropes &
Gray LLP, Boston, MA, Debra A. Squires-Lee,
Wilmer Cutler Pickering Hale and Dorr LLP,
Richard M. Zielinski, Goulston & Storrs, Rheba
Rutkowski, Bingham Mccutchen LLP, Paul Glick-
man, Glickman Turley, LLP, David L. Evans,
Hanify & King Professional Corporation, Boston,
MA, for Defendants.

*MEMORANDUM AND ORDER ON DEFEND-
ANTS' MOTIONS TO DISMISS*

STEARNS, J.
*1 On July 24, 2002, Dennis Buckley, in his capa-
city as the Litigation Trustee for Globe Holdings,
Inc., and Globe Manufacturing Corporation (the
Globe companies), sued thirty-six defendants
whose involvement in a recapitalization plan and
leveraged buyout (LBO) in July of 1998 is said to
have rendered the Globe companies insolvent
"before the ink was dry." The Trustee, who is seek-
ing to recover $300 million in damages, has
brought claims on behalf of the estates of the bank-
rupt debtor-corporations and their creditors. The
defendants can be sorted into five groups, each of
which will be described. The groups in various

combinations seek to dismiss the entirety of the
Trustee's Complaint, although not always on the
same grounds. After a conference with the parties,
the court agreed to hold three separate hearings on
the motions.[FN1]

> FN1. The hearings were held on May 22,
> 2003, May 30, 2003, and June 14, 2004. A
> fourth hearing was held on May 27, 2004,
> on an unrelated issue raised *sua sponte* by
> the court.

The basic facts set out in the Complaint are as fol-
lows. Globe Holdings was a Massachusetts corpor-
ation. Its headquarters and operating subsidiary,
Globe Manufacturing, were based in Fall
River.FN2For over fifty years, Globe Manufactur-
ing was a leading domestic manufacturer of span-
dex and latex elastomeric fibers. The Globe com-
panies were managed by Thomas Rodgers, Jr., and
several members of his family (the Rodgers defend-
ants).[FN3]

> FN2. Although some corporate names
> differed before the LBO, the parties use
> the post-LBO names, a practice that the
> court will follow.

> FN3. The nine Rodgers defendants include
> five individuals who held management po-
> sitions in the Globe companies, Thomas
> Rodgers, Jr., Thomas Rodgers, III, Robert
> Bailey, Americo Reis, and Lawrence
> Walsh, and four shareholders, Maureen
> Bateman, Sara Rodgers, Robert Stoico, and
> Gisela Rodgers.

In 1992, Goldman, Sachs & Co. (Goldman Sachs)
and five affiliated limited partnerships (the Gold-
man Funds) acquired 46 percent of Globe Holdings'
stock. The purchase gave the Goldman Funds the
right to appoint three members of Globe Holdings'
board of directors. The Goldman Funds nominated
Robert Gregory, Elizabeth Cogan, and Richard

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 2
Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.))**

Friedman (the Goldman directors) to serve on the board. In late 1997, the Rodgers defendants and the Goldman Funds decided to sell their respective interests in the Globe companies. Globe Holdings retained Goldman Sachs as its financial advisor in connection with the sale. Globe Manufacturing hired Valuation Research Corporation (VRC) to evaluate a contemplated LBO. Goldman Sachs, the Goldman Funds, the Goldman directors, and VRC comprise the Goldman defendants.

Goldman Sachs then solicited offers to purchase the Globe companies. The investment banking firm of Code Hennessy & Simmons, LLC (CHS) became interested and recommended that one of its investment funds, Code Hennessy & Simmons III LP (CHSIII), purchase the companies. CHS, CHSIII, and three managers of CHS who were involved in implementing the LBO-Andrew Code, Peter Gotsch, and Edward Lhee-comprise the CHS defendants. The CHS defendants retained the law firm of Kirkland & Ellis to provide legal advice and to prepare the necessary documents. Globe Holdings retained the law firm of Hale & Dorr to do the same. Kirkland & Ellis, Hale & Dorr, and John Burgess, a partner at Hale & Dorr, comprise the Law Firm defendants.[FN4]

> FN4. The Law Firm defendants, along with CHS, VRC, and Goldman Sachs are sometimes referred to in the briefs as the Professional defendants.

On July 31, 1998, the LBO took place. The LBO consisted of a series of transactions: Globe Manufacturing received $121.8 million from several financial institutions (the Bank Group) in the form of a Senior Credit Facility; Globe Manufacturing issued $150 million of senior subordinated notes (the Manufacturing Notes); and Globe Holdings issued $25 million worth of senior discount notes (the Holdings Notes). Globe Holdings simultaneously transferred most of its assets and liabilities to Globe Manufacturing. When all was said and done, Globe Holdings' shareholders had received $243.6 million for the tender of their shares, while Globe Manufac-

turing owed $120 million in short term debt and $150 million in long term debt to the Bondholders.

**\*2** The LBO yielded $2.3 million in management bonuses to the officers and directors of the Globe companies. The Professional defendants reaped $8.7 million in fees. Of the $243.6 million paid to the Globe shareholders, the lion's share went to the stockholders of the Goldman Funds, to the Rodgers defendants, and to certain minority shareholders. Of the minority shareholders, Thomas Roos, Christine Fennelly, Thomas Roos and Geraldine Roos, the M. Rita Trust C and D, Alexander Rodgers, Patricia Hayes, and Daniel Hayes are named as defendants. They are referred to in the briefs as the Outside Shareholder defendants.

After the LBO, Globe Manufacturing scraped along for two and a half years before defaulting on the Senior Credit Facility and Holdings Notes. On January 31, 2001, the Globe companies filed for Chapter 11 bankruptcy in the Northern District of Alabama. On March 14, 2001, the Bankruptcy Court approved the sale of the Globe companies' remaining assets to Radicispandex Corporation for $52 million, leaving unpaid the bulk of the debt incurred as a result of the LBO. On January 23, 2002, the Bankruptcy Court approved the Globe companies' Joint Chapter 11 Plan. The Trustee maintains that under the terms of the Joint Plan, he acquired any cause of action related to the LBO owned by the debtor companies, as well as any related claims belonging to the Globe companies' creditors.

The Trustee's Complaint alleges fifteen causes of action. They are: fraudulent transfer with intent to defraud; fraudulent transfer based on constructive fraud; common-law fraud; breach of fiduciary duty; aiding and abetting breach of fiduciary duty; aiding and abetting fraud; breach of contract; negligence; negligent misrepresentation; gross negligence; professional malpractice; unjust enrichment; breach of the duty of good faith and fair dealing; unlawful distribution; and inevitably, a violation of G.L. c. 93A. The five groups of defendants have each filed motions to dismiss. Collectively, the motions attack

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.))**

all counts of the Complaint.

*More Definite Statement*

Defendants complain that while the Trustee purports to be acting on behalf of both the creditors of the debtor-corporations and the estates of the debt-or-corporations, he has failed to specify which claims arise from which of the two groups of entities. The failure impacts upon both the defendants' claims and defenses.[FN5] The fraud claims suffer from the same lack of precision and attribution, forcing defendants to argue contingent theories of dismissal. While the Trustee's opposition clarifies the nature of the claims to some extent, the Complaint has not been amended to incorporate the clarifications. Consequently, the motions to dismiss will be *ALLOWED* without prejudice, in anticipation of the filing of a more definite Amended Complaint.[FN6]

> FN5. For instance, defendants have asserted the affirmative defense of res judicata against claims brought by the Trustee on behalf of the debtor-corporations, but the Complaint does not specify the claims that are alleged to have been acquired from the corporate debtors.

> FN6. While the court could simply stop here and wait for an Amended Complaint to be filed, in the interests of avoiding further delay, the court will assume that the amendments will conform to the positions taken by the Trustee in his opposition, and will rule on the remaining motions to dismiss accordingly.

*Res Judicata*

All defendants argue that the claims brought on behalf of the estates of the debtor-corporations are barred by res judicata (claim preclusion). Defendants begin with the proposition that a final judgment in bankruptcy extinguishes a debtor's claims. "Like final judgments, confirmed plans of reorganization are binding on all parties, and issues that

could have been raised pertaining to such plans are barred by *res judicata."In re Heritage Hotel Partnership I,* 160 B.R. 374, 377 (9th Cir.BAP1993), quoting J.S. Gilbert, *Substantive Consolidation in Bankruptcy: A Primer,* 43 Vand. L.Rev. 207, 239 (1990). There is, however, an exception to the general rule. "Under a generally accepted exception to the res judicata doctrine, a litigant's claims are not precluded if the court in an earlier action expressly reserved the litigant's right to bring those claims in a later action."*Apparel Art Int'l, Inc. v. Amertex Enterprises Ltd.,* 48 F.3d 576, 586 (1st Cir.1995), citing *Kale v. Combined Ins. Co. of Am.,* 924 F.2d 1161, 1167 (1st Cir.1991).*SeealsoRestatement (Second) of Judgments* § 26(1)(b) (1982).

**\*3** Defendants argue that the judgment approving the Globe companies' Joint Plan and creating the Litigation Trust does not fall within this exception. Relying on *D & K Properties Crystal Lake v. Mut. Life Ins. Co. of N.Y.,* 112 F.3d 257, 261 (7th Cir.1997), defendants contend that "[t]o avoid res judicata the reservation of a cause of action must be both express, as in writing, and express, as in specifically identified," the latter of which the defendants contend the Joint Plan does not do.

The Joint Plan's Reservation of Rights clause, at § VIII-D, states that:

[a]ll claims, rights to payment, causes of action, cross-claims and counterclaims of the Debtors of any kind or nature whatsoever including, without limitation, Causes of Action and Avoidance Actions, against third parties arising before the Confirmation Date that have not been disposed of prior to the Confirmation Date shall be preserved and assigned to the Litigation Trust.

The Plan then explains that the term " 'claim' has the meaning set forth in section 101(5) of the Bankruptcy Code."Under the Bankruptcy Code, 11 U.S.C. § 101(5), a "claim" means:
(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Causes of Action" are defined in ¶ 25 of § I-A of the Plan, as follows:
[c]auses of [a]ction means all Claims and causes of action now owned or hereafter acquired by the Debtors or the Estates, or any of them, or which may be maintained by the Debtors or the Estates, or any of them, for their own benefit or for the benefit of creditors, whether arising under any contract or under the Bankruptcy Code or other federal or state law, including, without limitation, Avoidance Actions, but excluding Claims and causes of action and related recoveries (a) transferred to the Buyer under the terms of the Asset Purchase Agreement; (b) released pursuant to the Plan; and (c) constituting rights of recharacterization or subordination released pursuant to the Plan.

Similarly, "Avoidance Actions" are defined in ¶ 16 of § I-A as:
any claim or cause of action of the Debtors, or either of them, or the Estates or creditors thereof, or any of them, that is or may be the subject of an adversary proceeding or other action under sections 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, or other applicable law.[FN7]

> FN7. In apparent anticipation of defendants' res judicata attack, the Plan at § VIII-D(2), states:
>
> > [t]he foregoing enumeration of potential claims and causes of action is nonexclusive and shall not constitute a limitation or waiver of any claim, right to payment, demand or cause of action not so enumerated. Such claims and causes of ac-

tion shall not, under any circumstances, be waived, deemed waived or otherwise limited as a result of the failure of the Debtors to describe a particular cause of action with more specificity.... Accordingly, except as otherwise provided in the Plan, Confirmation of the Plan, approval of the Disclosure Statement, entry of the Confirmation Order, and the consummation of the Plan shall not constitute res judicata, collateral estoppel, claim preclusion or issue preclusion so as to preclude the prosecution of any claim or cause of action after Confirmation and will not in any way estop (judicially or otherwise) the Debtors or the Litigation Trustee from transferring to the Litigation Trust or the Litigation Trustee from pursuing any claim or cause of action, except for the claims and causes of action released pursuant to section VII.B of the Plan.

Defendants argue that an improperly reserved claim cannot be salvaged by a boilerplate savings clause.

Defendants argue that the court should be guided by the reasoning of *Browning v. Levy,* 283 F.3d 761, 774-775 (6th Cir.2002). In *Browning,* a reservation of rights, very much like the one at issue in the Joint Plan, was found of too high an order of generality to survive challenge. The plan in *Browning* reserved the Trustee's right to:

*4 enforce any claims ... that the Debtor or its bankruptcy estate may hold against any person or entity, including, without limitation, claims and causes of action arising under sections 542, 543, 544, 547, 548, 550, or 553 of the Bankruptcy Code.

The *Browning* court held that this "blanket reservation was of little value to the bankruptcy court and the other parties to the bankruptcy proceeding because it did not enable the value of [the successor corporations'] claims to be taken into account in the

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.))**

disposition of the debtor's estate. Significantly, it neither names [the defendant law firm] nor states the factual basis for the reserved claims. We therefore conclude that [the corporation's] blanket reservation does not defeat the application of res judicata to its claims against [the law firm]." [FN8] *Id.* at 775.

> FN8.*Butsee* *In re Kmart Corp.,* 310 B.R. 107 (Bankr.N.D.Ill.2004), where after a comprehensive survey of cases, including *Browning* and *D & K Properties,* the court concluded that:
>
> > identifying causes of action by type or category are not mere blanket reservations. Therefore, categorical reservation can effectively avoid the *res judicata* bar. Dispensing with a requirement of cataloging claims by name comports with the Court's view ... that section 1123(b)(3) does not require "specific and unequivocal" identification. It also comports with the Court's observation that the section is "broad enough to encompass both those situations where a debtor is trying to preserve a potential future claim about which the affected party has no notice and the subset of claims that have already been filed.
> >
> > *Id.,* 310 B.R. at 124.

While *Browning* is a well-reasoned case, a more recent (and for this court, controlling) decision, *In re Bankvest Capital Corp. .,* 375 F.3d 51, 59-60 (1st Cir.2004), parts company with *Browning.*

Several circuits have concluded that, pursuant to sections 1123 and 1141, confirmation of a plan is given res judicata effect, which bars a debtor or trustee from bringing avoidance actions not expressly reserved in the plan. *See,e.g.,P.A. Bergner & Co. v. Bank One, Milwaukee, N.A. (In re P.A. Bergner & Co.),* 140 F.3d 1111, 1117-18 (7th Cir.1998); *McFarland v. Leyh (In re Texas Gen.*

*Petroleum Corp.),* 52 F.3d 1330, 1335 n. 4 (5th Cir.1995); *Harstad v. First American Bank (In re Harstad),* 39 F.3d 898, 903 (8th Cir.1994); *In re Mako,* 985 F.2d 1052, 1056 (10th Cir.1993)."The requirement that retention of the avoidance powers be clear serves to protect the unsecured creditors and to ensure that post-confirmation avoidance proceedings are for their benefit."*In re Mako,* 985 F.2d at 1056 (10th Cir.1993).

Assuming, without deciding, that we follow the reasoning of these decisions, Fleet's argument fails because the Plan expressly provides that Gray has the right to pursue avoidance actions:

The Liquidating Supervisor, under the supervision of the Post-Effective Date Committee ... is authorized to investigate, prosecute and, if necessary, litigate, any Cause of Action [the definition of which expressly includes avoidance actions] ... on behalf of the Debtor and shall have standing as an Estate representative to pursue any Causes of Action and Claim objections, whether initially filed by the Debtor or the Liquidating Supervisor....

Fleet contends that this language does not preserve the right to pursue claims as it fails specifically to mention the claim against Fleet. *Compare* *D & K Props. Crystal Lake v. Mut. Life Ins. Co. of N.Y.,* 112 F.3d 257, 260-61 (7th Cir.1997) (stating, "[a] blanket reservation that seeks to reserve all causes of action reserves nothing."). We disagree. See *Bergner,* 140 F.3d at 1117 (stating, "[t]he courts that have spoken of the need for 'specific' and 'unequivocal' language have focused on the requirement that plans unequivocally retain claims of a given type, not on any rule that individual claims must be listed specifically.") (citations omitted); *Harstad,* 39 F.3d at 903 (ruling that debtors "should have specifically reserved the right to pursue claims of this sort postconfirmation."); *Cohen v. TIC Fin. Sys. (In re Ampace Corp.),* 279 B.R. 145, 160 (Bankr.D.Del.2002) (stating, "the Bankruptcy Code contemplates that debtors may seek confirmation of their plans prior to litigating all avoidance actions ... [t]herefore, in my opinion, a general reservation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in a plan of reorganization indicating the type or category of claims to be preserved should be sufficiently specific to provide creditors with notice that their claims may be challenged post-confirmation.") (citations omitted). The cases upon which Fleet primarily relies involve provisions of a far more general nature. *See D & K Properties Crystal Lake,* 112 F.3d at 259 (plan purported to reserve "all causes of action existing in favor of the Debtor."); *Harstad,* 39 F.3d at 902 (plan purported to reserve "any right of Debtors to recover assets pursuant to the provisions of the Bankruptcy Code."). The Plan, we believe, adequately preserves Gray's right to bring avoidance actions.

**\*5** The language of the Joint Plan is comparable to that in *Bankvest* as the reservation of rights specifically references "Avoidance Actions." Moreover, the Disclosure Statement that was attached to the Joint Plan stated that the Trustee will pursue "causes of actions" and "claims" relating to the LBO and the recapitalization of the Globe companies. Moreover, Section II.C. of the Disclosure Statement provides that:

[c]ertain entities, including the Manufacturing Bondholders Committee and Trade Creditors Committee, have asserted that the Recapitalization gave rise to fraudulent transfer claims against the selling shareholders, the Lending Group and others.... Claims related to the Recapitalization against parties other than the Released Parties are reserved and, pursuant to the Plan, shall be transferred to and pursued by the Litigation Trust for the benefit of the Debtors' creditors.

Because the Joint Plan provides sufficient notice that claims arising out of the LBO were intended to survive the bankruptcy judgment, they are not barred by res judicata.[FN9] Consequently, the defendants' motions seeking dismissal on this ground are *DENIED.*

> FN9. Defendants' attack on the Trustee's ability to bring claims on behalf of the corporations' creditors is similarly misplaced.

Defendants contend (correctly) that a bankruptcy trustee does not stand in the shoes of the debtor's creditors. The Trustee, however, is not bringing the creditors' claims in his capacity as a bankruptcy trustee, but in his capacity as a Litigation Trustee to whom the creditor claims have been assigned. There is nothing untoward (or unusual) about a trustee acting in such a dual capacity. *See Young v. Lepone,* 305 F.3d 1 (1st Cir.2002).

*Fraudulent Transfer Claims*

The Trustee has alleged a transfer with intent to defraud in Count I and a transfer based on constructive fraud in Count II.[FN10] While the Complaint fails to specify the statutory or common-law basis for these claims, the Trustee in his opposition states that Counts I and II are brought pursuant to 11 U.S.C. § 544(b), which empowers a trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim....[FN11]

> FN10. The Trustee has pled a related claim of unjust enrichment in Count XII.

> FN11. A bankruptcy trustee (or his successor) is also authorized by § 548(a) of the Bankruptcy Code to bring a fraudulent transfer claim. The claim, however, must be brought within the two-year limitations period, and is therefore not applicable to this case. 11 U.S.C. § 548(a)(1)(A).

The Rodgers defendants, the Outside Shareholder defendants, and the Goldman defendants argue that the "settlement payments" exception to § 544(b) bars the Trustee from asserting these claims.[FN12]

> FN12. As the Outside Shareholder defendants are not named in Count I, they have not joined the motion to dismiss this count.

Notwithstanding sections 544, 545, 547,

Not Reported in F.Supp.2d                                                                 Page 7
Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.))**

548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment ... or settlement payment, as defined in section 101 or 741 of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e). Defendants maintain that transfers of funds that took place in effecting the LBO were "settlement payments" made through "financial institutions" and therefore fall within the exception. See *Kaiser Steel Corp. v. Charles Schwab & Co.,* 913 F.2d 846, 849 (10th Cir.1990) (Kaiser I); *Kaiser Steel Corp. v. Pearl Brewing Co.,* 952 F.2d 1230, 1239-1240 (10th Cir.1991)(*Kaiser II* ). Unfortunately, the definition of "settlement payment" referenced by § 546(e) sheds little light on exactly what Congress intended the exception to include. It states that a

*6 "settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.[FN13]

FN13.11 U.S.C. § 101 is even less helpful.

11 U.S.C. § 741(8). Judge Queenan of our Bankruptcy Court has aptly observed that "[t]he statutory definition of th[e] term [settlement payment] ... is as opaque as it is circular."*In re Healthco Int'l, Inc.,* 195 B.R. 971, 983 (Bankr.D.Mass.1996).

In a very thoughtful opinion, *Zahn v. Yucaipa Capital Fund,* 218 B.R. 656, 675 (D.R.I.1998), the district court noted that the only function served by the statutory definition is to "point the curious to the common use of the term in the securities trade."As the *Zahn* court explained.[FN14]

FN14. The extract that follows is lengthy, but I do not think I can improve on Chief

Judge Lagueux's analysis.

[t]he securities industry utilizes a "clearance and settlement" system, wherein parties use intermediaries to make trades of public stock which are instantaneously credited, but in which the actual exchange of stock and consideration therefor takes place at a later date. See*Wieboldt II,* 131 B.R. at 664-65 [ (N.D.Ill.1991) ], (citing Neil M. Garfinkel, *Note, No Way Out: Section 546(e) Is No Escape for the Public Shareholder of a Failed LBO,* 1991 Colum. Bus. L.Rev. 51 (internal citations omitted) ("Note")). This later date is known as the "settlement" date; on this date the trade is "settled" by actually exchanging what was promised on the trade date. *Id.*

The intermediaries' role in this system is critical; typically there are several layers of brokers on each side of a trade, with a clearing agency positioned in the middle. *Id.* The clearing agency, on the date of the trade itself, makes entries (credits or debits) in the accounts of its members (financial institutions or brokers), which reflect the trade. *Id.* Thus, while settlement occurs later, the trade itself is functionally instantaneous. The system depends upon a series of guarantees, made by all parties in the chain, that they will live up to their obligations regardless of a default by another party in the chain. *Id.* These guarantees allow the parties to trade free of worry about events between the trade date and the settlement date.

The need to preserve the stability of this system led Congress to create the § 546(e) exception to the trustee's avoidance powers. See*Jewel Recovery, L.P. v. Gordon,* 196 B.R. 348, 352 (N.D.Tex.1996); *Wieboldt II,* 131 B.R. at 664. If the pre-bankruptcy trades by a bankrupt intermediary could be set aside, then the guarantees that allow the system to function would be threatened, the parties could not proceed with confidence, and a bankruptcy by one party in the chain could spread to other parties in the chain, threatening a collapse of the entire industry. *Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Against this background, it appears unlikely that Congress intended the term "settlement payment" to cover the present transfers. True, these transfers "settled" a purchase and sale of securities. The Tenth Circuit has held that payments made by brokers to selling shareholders in an LBO are "settlement payments" covered by the § 546(e) exception. *Kaiser Steel,* 952 F.2d at 1240. Another court, however, has held that such payments were not meant to be covered by § 546(e).*Wieboldt II,* 131 B.R. at 664-65. In addition, commentators have criticized *Kaiser* for applying § 546(e) in a situation that did not implicate the concerns behind that exception. *See,e.g.,* Frank R. Kennedy & Gerald K. Smith, *Fraudulent Transfers and Obligations: Issues of Current Interest,* 43 S.C. L.Rev. 709 (1992); William C. Rand, *Comment,In re Kaiser Steel Corporation: Does Section 546(e) of the Code Apply to a Fraudulent Conveyance Made in the Form of an LBO Payment?,* 19 Fordham Urb. L.J. 87 (1991); Jane Elizabeth Kiker, Casenote, *Judicial Repeal of Fraudulent Conveyance Laws: Kaiser Steel Corp. v. Charles Schwab & Co.,913 F.2d 846 (10th Cir.1990),* 14 Hamline L.Rev. 453 (1991).

**\*7** In both *Kaiser* and *Wieboldt II,* the LBOs involved the clearance and settlement system; while the respective courts split on whether the LBOs were sufficiently connected to the system to justify the application of § 546(e), the system was at least involved. *Kaiser Steel,* 952 F.2d at 1235-36;*Wieboldt II,* 131 B.R. at 664-65.

Here, however, the question is not nearly as close.... The only possible link between this transaction and the securities industry is the fact that securities were sold; however, the stock at issue was not even publicly traded. The stock transfers thus had no connection whatsoever to the clearance and settlement system, and allowing avoidance would have no impact at all on that system.

*Id.,* at 675-676.[FN15]

FN15.*SeealsoIn re Healthco Int'l, Inc.,* 195 B.R. at 983 ("Congress intended to protect

ordinary course of business transfers related to the purchase or sale of securities ... [and was] concerned that avoidance of such transfers would leave a securities clearing agency exposed on its guaranty of payment of the sales price and delivery of the securities. The payment [at issue] was a one-time distribution in complete liquidation of its stock interest. These circumstances, particularly where there is no showing of a guaranty by a securities clearing agency, are not what Congress had in mind in enacting section 546(e).").

The holding in *Zahn* is unmistakably at odds with *Kaiser,* as well as with *In re Resorts Int'l, Inc.,* 181 F.3d 505, 515 (3rd Cir.1999).[FN16] In *Resorts Int'l,* the Third Circuit was persuaded that the term "settlement payment" was expansive enough in meaning to encompass payments made to bring about an LBO.

FN16.*SeealsoHechinger Inv. Co. of Del. v. Fleet Retail Fin. Group,* 274 B.R. 71, 86-89 (D.Del.2002) (agreeing with *Kaiser* and *Resorts Int'l* ).

In the securities industry, a settlement payment is generally the transfer of cash or securities made to complete a securities transaction. *SeeKaiser Steel Corp. v. Charles Schwab & Co.,* 913 F.2d 846, 849 (10th Cir.1990) (citing various securities industry texts). Here, the securities passed from Lowenschuss's broker, Merrill Lynch, to the transfer bank, Chase Manhattan. Resorts wired funds to Chase which Chase then forwarded to Merrill Lynch who paid Lowenschuss. Although no clearing agency was involved in this transfer, two financial institutions-Merrill Lynch and Chase-were. Under a literal reading of section 546, therefore, this was a settlement payment "made by ... a financial institution." 11 U.S.C. § 546(e).

*Id.* at 515.Thus, the court could "see no absurd result from the application of the statute's plain language and [we] will not disregard it."[FN17]*Id.* While the Third Circuit's conclusion is etymologic-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 9
Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.))**

ally defensible, as Judge Learned Hand observed "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning."(Judge Hand is quoted in both *Bevill, Bresler & Schulman Asset Management Corp. v. Spencer Sav. & Loan Ass'n,* 878 F.2d 742, 750 (3rd Cir.1989), and *In re Healthco Int'l, Inc.,* 195 B.R. at 983). The object that Congress sought to accomplish by enacting § 546(e) was to protect the operation of the security industry's clearance and settlement system. That interest is not furthered in any meaningful sense by bringing an LBO like the one at issue in this case under the exemption of § 546(e) simply because funds fortuitously passed through financial institutions on their way into the hands of the defendants.[FN18]Consequently, defendants' motions to dismiss the fraudulent transfer counts will be *DENIED.*[FN19][FN20]

> FN17.*But see Munford v. Valuation Research Corp.,* 98 F.3d 604, 610 (11th Cir.1996), holding that even if a payment is a settlement payment under § 546(e), the exemption is not applicable in an LBO unless the transfer (or settlement payment) was ultimately made "by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency."Because the recipients of the allegedly fraudulent transfers in this case were the shareholders, under *Munford'* s reasoning, § 546(e) would not apply.

> FN18. The sale of securities at issue was the shareholders' tender of their shares to the Globe companies. This transaction is not the type of securities trade the avoidance of which would avert injury to the securities industry as it does not expose buyers and sellers who were strangers to the transaction to liability or loss.

> FN19. The CHS defendants point out that CHS has been improperly named in Count II. The $25 million bridge loan alleged by the Trustee to have been a fraudulent transfer was made by CHSIII and not CHS. Similarly, the CHS defendants note that the individually named CHS defendants are not alleged by the Trustee to have been recipients of the disputed funds. Both points are well taken and the court will allow the motions to dismiss Counts I and Count II, to the extent they are alleged against these defendants.

> FN20. Defendants argue that symmetry requires that the unjust enrichment count also be dismissed if the fraudulent transfer counts are barred by § 546(e). Because the court does not agree with the latter proposition, the motion(s) to dismiss Count XII will be *DENIED.*

*Fraud and Misrepresentation*

**\*8** Defendants next attack is on the adequacy of the fraud-related allegations set out in the Complaint. The court will turn first to the arguments that concern only the CHS defendants and the Law Firm defendants. The CHS defendants argue that Count III and Count IX, which allege fraud and negligent misrepresentation, respectively, fail to attribute any misrepresentation or misstatement to any CHS defendant. This is true. Hence, the motion to dismiss Counts III and IX as to these defendants will be *ALLOWED.*Second, the Law Firm defendants, joined by CHS, argue that Counts V and VI, which allege aiding and abetting a breach of fiduciary duty and aiding and abetting fraud (Kirkland & Ellis and Hale & Dorr in Count V, and Kirkland & Ellis, Hale & Dorr, and CHS in Count VI), fail to allege that the defendants acted with unlawful intent. Paragraph 231 of the Complaint contains the only allegation of scienter pertaining to these counts. It states that "the Professional Defendants knew, or should have known, of these actions or designs by Goldman Sachs, the Officers and Director Defend-

ants and/or Valuation Research."Defendants contend (correctly) that the law requires more than mere negligence in this regard.

The second element [of aiding and abetting] is that defendant must have an unlawful intent, i.e., knowledge that the other party is breaching a duty and the intent to assist that party's actions. [*Brown v. Perkins,* 83 Mass. (1 Allen) 89, 98 (1861) ].*SeeMcGrath v. Sullivan,* 303 Mass. 327, 21 N.E.2d 533 (1939); *The American Agricultural Chemical Co. v. Robertson,* 273 Mass. 66, 172 N.E. 871 (1930)."

*Payton v. Abbot Labs,* 512 F.Supp. 1031, 1035 (D.Mass.1981).*SeealsoCommerce Bank & Trust Co. v. Vulcan Industries, Inc.,* 2002 WL 1554389, *2 (Mass.Sup.Ct. May 17, 2002).[FN21] Consequently, the defendants' motions to dismiss Counts V and VI will accordingly be *ALLOWED.*

> FN21. The Trustee points to (then) Judge Breyer's decision in *Maruho v. Miles,* 13 F.3d 6 (1st Cir.1993). Judge Breyer, however, supports the defendants' position. "The Massachusetts courts have made clear that a defendant 'aids and abets' a tortfeasor only if, at the least, the defendant actually *knows* about 'its substantial, supporting role in an unlawful enterprise.' " *Id.* at 10-11.

The court will now turn to the defendants' more global assault on the fraud-related claims. The defendants contend that the purported misstatements and omissions alleged are not actionable, as they fall either broadly into the category of opinion and prediction or are not alleged to have been false when made.

The misrepresentations in the LBO Offering Memorandum identified by the Trustee were as follows.

• "[M]angement estimates that worldwide sales of spandex fiber will increase at a compound annual growth rate of 9% over the next three years and that

fine denier spandex sales will exceed the overall market growth rate during this period. Complaint, ¶ 104.

• The demand for fine denier spandex has "increased faster than the overall market" and "this trend is expected to continue."Complaint, ¶ 105.

• "[T]he Company does not believe that, after giving effect to the Transactions, it (i) was or will be insolvent or rendered insolvent, (ii) was or will be engaged in a business or transaction for which its remaining assets constituted unreasonably small capital or (iii) intends or intended to incur, or believes or believed that it will or would incur, debts beyond its ability to pay such debts as they mature. These beliefs are based on the Company's operating history and analysis of internal cash flow projections and estimated values of assets and liabilities of the Company at the time of the Offering. There can be no assurance, however, that a court passing on these issues would make the same determination."Complaint, ¶ 128.[FN22]

> FN22. The Trustee also alleges, in ¶ 108 of the Complaint, that the language of the Offering Memorandum "portray[ing] favorable near term growth" is an actionable misrepresentation. But the actual language of the Memorandum from which the "portrayal" is culled simply recites historical facts about Globe's prior record of successful penetration of the domestic spandex market. According to the Trustee, this recital implicitly promises similar success in the future. Not only is this implied promise difficult to read into the historical analysis, there is no allegation that any of the historical facts it recites are untrue.

*9 The Trustee also alleges that the Opinion Letter issued by VRC contained the following misrepresentations. The Opinion Letter stated that:

• "Each of (a) Holdings and its subsidiaries on a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

consolidated basis and (b) the Borrower [New Manufacturing] and its subsidiaries on a consolidated basis are and will be able to pay their respective debts and other liabilities (including, without limitation, the New Financing, the State Liabilities, and the Identified Contingent Liabilities) as such debts become absolute and matured in the ordinary course of business."Complaint, ¶ 114.

• It considers the company's forecasts to be "reasonable and attainable in light of current and near term economic expectations, and nothing has come to our attention that would cause [us] to believe the basic assumptions used in the forecasts were unreasonable."Complaint, ¶ 115.

• "[N]othing [has] come to [our] attention, that causes us to believe that [the Company] would not be viewed as a going concern" after the LBO. Complaint, ¶ 116.

Defendants contend that these statements, read in context with the accompanying cautionary language, are nothing more than opinions and predictions. It has long been the law that statements of a promissory nature or predictions about future events are not actionable unless at the time the statements were made the speaker knew that the predictions were false or the promise impossible to keep. *Commonwealth v. Drew,* 36 Mass. 179, 185 (1837).*SeeRodowicz v. Massachusetts Mut. Life Ins. Co.,* 192 F.3d 162, 175 (1st Cir.1999) ("[F]alse statements of opinion, of conditions to exist in the future, or of matters promissory in nature 'are not actionable in a claim for misrepresentation.' "); *In re Fidelity/Apple Securities Litig.,* 986 F.Supp. 42, 49 (D.Mass.1997) ("[M]ere opinions, predictions about future events, and statements that are true when made, are not actionable as misrepresentations under Massachusetts law.").

The first two alleged misrepresentations alleged in the Offering Memorandum state that "management *estimates* that worldwide sales of spandex fiber will increase at a ... rate of 9%," and that "this trend [of increased demand for] fine denier spandex is *expec-*

*ted* to continue."[Emphasis added]. The third states that "the Company does not *believe* that, after giving effect to the Transactions, it (i) was or will be insolvent or rendered insolvent, (ii) was or will be engaged in a business or transaction for which its remaining assets constituted unreasonably small capital or (iii) intends or intended to incur, or *believes* or *believed* that it will or would incur, debts beyond its ability to pay such debts as they mature."[Emphasis added.] Under established law, these statements are not actionable.[FN23]

> FN23. Moreover, the precatory language of the Offering Memorandum specifically warned that "statements regarding the Company's future financial position, business strategy, budgets, projected costs and plans and objective[s] of management for future operations are forward looking statements ... [for which] it can give no assurance that such expectations will prove to have been correct."

The Trustee counters that "[e]ven if [a] statement is viewed as a representation as to future events, it falls within the exception to the general rule precluding recovery [if] it involves a situation 'where the parties to the transaction are not on equal footing but where one has or is in a position where he should have superior knowledge concerning the matters to which the misrepresentations relate." ' *Gopen v. American Supply Co.,* 10 Mass.App.Ct. 342, 345, 407 N.E.2d 1255 (1980), citing Williston, *Contracts* § 1496, at 373-374 (3d ed.1970).*SeealsoStolzoff v. Waste Systems Int'l, Inc.,* 58 Mass.App.Ct. 747, 760-763, 792 N.E.2d 1031 (2003) (company officers falsely represented to shareholders that their business was thriving). The Trustee argues that because the defendants had superior knowledge about the market environment in which the Globe companies operated, their predictive statements should be viewed as assertions of fact. *SeeCommonwealth v. Anthony,* 306 Mass. 470, 474-475, 28 N.E.2d 542 (1940); *Briggs v. Carol Cars, Inc.,* 407 Mass. 391, 395-396, 553 N.E.2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

930 (1990). The Trustee, for example, contends that the failure to warn readers of the Offering Memorandum that an increase in foreign imports would impact the company's sales and its ability to meet its debt obligations amounts to a misrepresentation by omission. That cheaper imports compete with more expensive domestically produced goods hardly seems the kind of specialized knowledge that defendants would uniquely possess or would be beyond the ability of a reader of the Offering Memorandum to acquire. Moreover, the Offering Memorandum was not silent on the issue of competition.

**\*10** The elastomeric fiber industry is highly competitive.... There can be no assurance that the Company will be able to compete successfully in the future against its competitors or that the Company will not experience increased price competition, which could materially and adversely affect the Company's results of operations, financial condition and ability to meet its obligations under the Notes.

In 1997, approximately 92% of the Company's sales were to the textile and apparel industries. These industries are highly cyclical and are characterized by rapid shifts in consumer demand, as well as competitive pressures and price and demand volatility. The demand for the Company's products is principally dependent upon the level of demand for certain types of apparel.... A reduction in the level of demand for apparel or a decrease in consumer demand for products containing elastomeric fibers could have a material adverse effect on the Company's results of operations, financial condition and ability to meet its obligations under the Notes.

This discussion of the potential effects of competition on the Globe companies' later sales would have alerted any reasonable reader to the possibility that fluctuations in the elastomeric fiber market could impact the financial health of any investment. Consequently, the motions to dismiss with respect to the alleged misrepresentations in the Offering Memorandum will be *ALLOWED*.

The conclusion is different with respect to the VRC Opinion Letter. The statements of VRC identified in the Complaint are presented as the professional opinion of an "acknowledged leader in the rendering of insolvency opinions ... using sophisticated financial modeling."Complaint, ¶ 132. The statements attributed to VRC are not couched as future-oriented or forward looking, but as solid assurances that the debt ratio resulting from the LBO would not overburden New Manufacturing or impair its ability to service the debt. As such, these allegations survive the motions to dismiss.[FN24]

> FN24. Defendants also argue that the fraud claims are not pled with the specificity required by Rule 9(b). I am satisfied that the allegations pled in ¶¶ 111-117, 151-162 of the Complaint, are sufficiently specific with respect to the VRC Opinion Letter. See*Rodi v. Southern N.E. Sch. of Law,* 389 F.3d 5 (1st Cir.2004) (the specificity requirement in a fraud context "extends only to the particulars of the allegedly misleading statement itself"). Defendants may also prove correct in their prediction that the Trustee will be unable to prove reliance, but that issue is not now before the court.

*Duty Based Claims*

The Law Firm defendants, the Goldman defendants, the CHS defendants, and the Rodgers defendants have each moved to dismiss the duty-based claims.FN25The Law Firm defendants argue that the claims against them for malpractice, breach of fiduciary duty, and Chapter 93A must be dismissed because the only duty that the law firms owed was to their clients (in Kirkland & Ellis' case, CHS, and in Hale & Dorr's case, Globe Holdings). Defendants acknowledge that under Massachusetts law, an attorney may owe a duty of care to a third party whom he knows is relying on the legal services he is rendering to his client. *The Van Brode Group, Inc. v. Bowditch & Dewey,* 36 Mass.App.Ct. 509, 516, 633 N.E.2d 424 (1994). But as *Spinner v. Nutt,* 417 Mass. 549, 556, 631 N.E.2d 542 (1994), makes

Not Reported in F.Supp.2d                                                                                   Page 13
Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.))**

clear, the duty to a third party will not be imposed (even where reliance is shown) if it would conflict with the attorney's duty to his client. The Trustee's allegations against the Law Firm defendants fail to identify any duty beyond that owed by each firm to its own client. Consequently, the motion to dismiss the duty-based claims will be *ALLOWED.*[FN26]

> FN25. The arguments of the Rodgers defendants are addressed in the context of the court's order requiring the Trustee to amend his Complaint to specifically state on whose behalf each of the Trustee's claims are brought.

> FN26. The Law Firm defendants' motion to dismiss the contract-based claims will be *ALLOWED* as the Complaint fails to identify a basis on which a contractual relationship between the defendants and the Trustee entities could be inferred. Nor is any plausible allegation made that the entities were the intended beneficiaries of a contractual relationship between any of the law firm defendants and a third party.

*11 In similar vein, the CHS defendants and the Goldman defendants argue persuasively that the Complaint fails to set forth the basis and identity of any fiduciary or contractual duty that they allegedly owed to any of the entities the Trustee represents. *SeeAviall, Inc. v. Ryder Systems, Inc.,* 913 F.Supp. 826, 832 (S.D.N.Y.1996); *Page v. Frazier,* 388 Mass. 55, 64, 445 N.E.2d 148 (1983); *Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.),* 208 B.R. 288, 310 (Bankr.D.Mass.1997).[FN27] Accordingly, the motions to dismiss these claims will also be *ALLOWED.*

> FN27. Defendants also argue that CHSIII, as the buyer in the transaction, did not owe a duty to any of the seller debtor-corporations. The Trustee, however, points out that after the sale, the CHS defendants approved the $25 million loan in alleged breach of the obligations that they assumed

as a result of the LBO.

### ORDER

For the foregoing reasons, the motions to dismiss will be *ALLOWED* consistent with the rulings made within the body of this opinion.

SO ORDERED.

D.Mass.,2005.
Buckley v. Goldman, Sachs & Co.
Not Reported in F.Supp.2d, 2005 WL 1206865 (D.Mass.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 4

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2006 WL 2348850 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2348850 (N.D.Cal.))

**H**

In re Crown Vantage, Inc.
N.D.Cal.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
In re CROWN VANTAGE, INC., Debtor
Crown Paper Company, et al., Plaintiffs
v.
Fort James Corporation, f/k/a James River Corporation of Virginia, et al., Defendants.
No. C-02-3838 MMC.

Aug. 11, 2006.

David Boies, Boies Schiller & Flexner, Armonk, NY, Joel R. Ohlgren, Joseph F. Coyne, Jr., Theodore A. Cohen, Jane Langdell, Michelle Sherman, Sheppard, Mullin, Richter & Hampton LLP, Los Angeles, CA, Kristin Linsley Myles, Susan Traub Boyd, Munger Tolles & Olson LLP, San Francisco, CA, for Plaintiffs.
Christopher A. Caserta, David Rogers, Beus Gilbert, Phoenix, AZ, Leo Ray Beus, Malcolm Loeb, Beus Gilbert PLLC, Scottsdale, AZ, Allison Lane Cooper, James C. Krieg, Stan G. Roman, Krieg Keller Sloan Reilley & Roman LLP, San Francisco, CA, Kenneth Alfred O'Brien, Michelle Sherman, Sheppard Mullin Richter & Hampton LLP, Los Angeles, CA, for Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

MAXINE M. CHESNEY, District Judge.
*1 Before the Court is the motion, filed April 26, 2006 by defendants Fort James Corporation, Fort James Operating Company, Fort James Fiber Company, and Fort James International Holdings, Ltd. (collectively, "Fort James"), for summary judgment as to Count One in plaintiffs' Second Amended Complaint ("SAC"). Plaintiffs Crown Paper Company, Crown Vantage, Inc., Jeffrey H. Beck, Liquidating Trustee, and Crown Paper Liquidating

Trust (collectively, "Crown") have filed opposition, to which Fort James has replied. Additionally, with the Court's permission, Fort James has filed additional evidence in support of its motion and Crown has filed a sur-reply. The matter came on regularly for hearing on June 16, 2006. Leo R. Beus and Malcolm Loeb of Beus Gilbert LLP appeared on behalf of Crown. Joseph Coyne of Sheppard, Mullin, Richter & Hampton LLP appeared on behalf of Fort James. Following the hearing, with the Court's permission, Fort James filed a reply to Crown's sur-reply.

Having considered the papers filed in support of and in opposition to the motion, and the arguments of counsel, the Court rules as follows.

**BACKGROUND**

Crown alleges that in 1995 "Fort James engaged in a series of transactions which culminated in a 'spin-off' of assets to Crown."(See SAC ¶ 644.) The "series of transactions" included Crown's transferring cash to Fort James and Fort James's transferring various assets to Crown. (See SAC ¶¶ 653(a)-(h) .) [FN1] Crown alleges the cash transfers were made with the "actual intent to hinder, delay, or defraud Crown's creditors," (see SAC ¶ 723), were "made without Crown receiving any consideration," (see SAC ¶ 727), and resulted in Crown's being "rendered insolvent," (see SAC ¶ 698).

> FN1. The transactions comprising the spin-off are set forth in the SAC, (see SAC ¶ 653), and, with more particularity, in the "Sequence of Events" section of the Contribution Agreement between Fort James and Crown, (see Coyle Decl. Ex. Q at ML004379-86).

**DISCUSSION**

In Count One, Crown seeks to set aside the cash transfers to Fort James, pursuant to 11 U.S.C. §

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 2
Not Reported in F.Supp.2d, 2006 WL 2348850 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2348850 (N.D.Cal.))**

544(b), which provides that a trustee, on behalf of the debtor's creditors, may avoid a transfer "voidable under applicable law." *See*11 U.S.C. § 544(b)(1). "Applicable law" within the meaning of § 544(b) includes state law. *See Wyle v. C.H. Rider & Family (In re United Energy Corp.),* 944 F.2d 589, 593 (9th Cir.1991). By order filed July 12, 2004, the Court held Virginia law governed Count One. (*See* Order, filed July 12, 2004, at 14:11.) Under Virginia law, a transfer "given with intent to delay, hinder or defraud creditors, purchasers or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers or other persons, their representatives or assigns, be void,"*see*Va.Code Ann. § 55-80, and a transfer "which is not upon consideration deemed valuable in law ... by a transferor who is thereby rendered insolvent, shall be void as to creditors whose debts shall have been contracted at the time it was made,"*see*Va.Code Ann. § 55-81.

The total amount of cash Crown asserts it transferred to Fort James as part of the "spin-off" is approximately $532 million. (*See* Pls.' Opp., filed May 12, 2006, at 17:1-2 (stating plaintiffs seek "the $532 million cash taken by Fort James").) Of that amount, it is undisputed that on August 23, 1995, Crown, through an escrow agent, transferred $484,940,953.48 to Fort James, and that Fort James received such sum on August 28, 1995. (*See* Coyne Decl. Ex. S at MW003762-70.) The parties dispute whether Crown transferred to Fort James the remaining amount of approximately $48 million.

## A. $48 Million "Cash Sweep"

*2 Crown alleges Fort James engaged in a "cash sweep" and "withdrew" $48 million "from Crown." (*See* SAC ¶ 653(b).) Fort James argues it is entitled to summary judgment as to this claim, whether based on § 55-80 or § 55-81, because Crown cannot establish such amount was transferred by Crown to Fort James.

To avoid a transfer under Virginia law, Crown must

first demonstrate "a transfer was made." *See Shaia v. Meyer (In re Meyer),* 244 F.3d 352, 353 (4th Cir.2001). Crown offers no evidence that Crown itself possessed $48 million and that it transferred such amount, voluntarily or involuntarily, to Fort James. Rather, as Crown explained at the hearing conducted June 15, 2006, its theory as to the $48 million "cash sweep" is that Fort James, before Crown was even operating, had promised to transfer that amount to Crown but did not. (*See* Reporter's Transcript, June 16, 2006, at 96:3-20.) In other words, even under Crown's own theory, there was no "transfer" of $48 million from Crown to Fort James.

Accordingly, Fort James is entitled to summary judgment on Count One to the extent such claim is based on the alleged "cash sweep" of $48 million.

## B. $484,940,953.48 Transfer

With respect to the remaining sum at issue, $484,940,953.48, Fort James argues it is entitled to summary judgment to the extent Count One is based on § 55-81 because Crown cannot establish Fort James failed to provide Crown with consideration. Additionally, Fort James argues that said amount constituted "settlement payments" under 11 U.S.C. § 546(e) and, as such, cannot be avoided under either § 55-80 or § 55-81.

### 1. Consideration

"To avoid a transfer pursuant to [§ 55-81], the trustee must demonstrate that (1) a transfer was made, (2) the transfer was not supported by consideration deemed valuable at law, and (3) the transfer was done when the transferor was insolvent or the transfer rendered the transferor insolvent."*See Meyer,* 244 F.3d at 353. As noted, Fort James argues Crown cannot demonstrate the second element, a lack of consideration deemed valuable at law.[FN2]

> FN2. Fort James does not argue, for purposes of the instant motion, that Crown

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2006 WL 2348850 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2348850 (N.D.Cal.))**

was not insolvent at the time of the cash transfer or thereafter.

At the outset, the parties disagree as to whether, in determining whether Crown received consideration for its transfer of cash, each exchange taken to effectuate the spinoff must be viewed in isolation, as Crown argues, or whether the exchanges must be considered as one integrated transaction, as Fort James argues.

Under Virginia law, where a debtor endeavors to effectuate a particular result, and such result requires the debtor to engage in more than one transfer, each such transfer is considered as one transaction for purposes of determining whether the debtor received consideration. *See C-T of Virginia, Inc. v. Euroshoe Associates Ltd. Partnership,* 762 F.Supp. 675, 678-79 (W.D.Va.1991) (holding, where debtor and holding company agreed to accomplish "reverse triangular merger," and effectuation of such agreement required debtor to engage in transfers with both its shareholders and with holding company, each such transfer considered as one "transaction" for purposes of determining if, under Virginia Code § 55-81, debtor received consideration valuable at law), *aff'd,*953 F.2d 637 (4th Cir.1992); *see also Official Committee of Unsecured Creditors v. Action Industries, Inc. (In re Phar-Mor, Inc. Securities Litig.),* 185 B.R. 497, 503 (W.D.Pa.1995) (holding, where debtor and investor entered into stock purchase agreement, under which investor first transferred cash to debtor, debtor then repurchased stock from shareholders, and debtor next transferred ownership of repurchased stock to investor, all transfers had to be "collapse[d] ... into a single transaction to assess their true impact upon the debtor").

**\*3** Here, Fort James and Crown entered into an agreement to effectuate the spin-off by way of a specified "sequence of events," and agreed that each such event must occur as a "condition" to consummation of the agreement. (*See* Coyne Decl. Ex. L at FJ067687). In other words, it is undisputed that the parties agreed to the series of exchanges in or-

der to effectuate one specific result-the spin-off. Under such circumstances, for purposes of determining whether Crown received consideration, the exchanges comprising the spin-off cannot be viewed in the abstract or in isolation, but, rather, must be viewed together as one integrated transaction.

Crown argues that Fort James, irrespective of the actuality, is estopped from arguing the parties engaged in one integrated transaction. Crown relies on a letter Fort James wrote to the Internal Revenue Service ("IRS"), in which Fort James set forth each of the exchanges the parties intended to make to accomplish a "proposed spinoff transaction." (*See id.*Ex. C at FJ041834, FJ041836-39.) In describing the exchange by which Fort James would transfer assets to Crown, Fort James stated it would "contribute the assets [to Crown] in exchange for all of the outstanding stock of [Crown] and the assumption by [Crown] of the liabilities (including intercompany debt owed to [Fort James] ), associated with [the assets]." (*See id.*Ex. C at FJ041836.) In describing the exchange by which Crown would transfer cash to Fort James, Fort James stated Crown would "incur third party debt and will use part of the proceeds of such borrowing to pay off the intercompany debt owed to JRC and assumed by [Crown]." (*See id.*Ex. C at FJ041837 .) Fort James asked the IRS to determine whether those two exchanges, if they occurred, would be characterized, for federal tax purposes, as a "reorganization." (*See id.*Ex. C at FJ041845.) The IRS subsequently advised Fort James that if the spin-off occurred in the manner described by Fort James, the above-referenced exchanges would be characterized as a "reorganization." (*See id.*Ex. F at CP-C7-2224.)

Crown argues that because Fort James obtained certain tax benefits by virtue of the above-referenced two exchanges being deemed a "reorganization" under the Internal Revenue Code, Fort James is estopped from characterizing the spin-off as an integrated transaction by which Fort James, in effect,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 4
Not Reported in F.Supp.2d, 2006 WL 2348850 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2348850 (N.D.Cal.))**

transferred assets to Crown and received from Crown consideration in the form of cash. Crown relies on *Robb-Fulton v. Robb (In re Robb),* 23 F.3d 895 (4th Cir.1994), in which the Fourth Circuit adopted the reasoning of several district courts that had held where a debtor, prior to bankruptcy, obtains a tax benefit by characterizing payments to a former spouse as alimony, the debtor is estopped from recharacterizing such payments as something other than alimony in an effort to avoid having to continue to make such payments. *See id.* at 898 (citing cases). Courts in other circuits, however, have not found estoppel under such circumstances, holding courts should not be bound by the "labels" the parties use to characterize their obligations to former spouses, but, instead, should determine the actual substance of the obligation. *See, e.g., Sampson v. Sampson (In re Sampson),* 997 F.2d 717, 724-25 and n. 6 (10th Cir.1993); *Kritt v. Kritt (In re Kritt),* 190 B.R. 382, 388 (B.A.P. 9th Cir.1995).

\*4 Crown cites no authority extending the reasoning in *Robb* beyond claims by debtors to discharge ongoing alimony and/or child support obligations. In any event, the Court finds the latter line of cases more persuasive, at least under the circumstances presented in the instant case. Here, the IRS was fully informed as to the substance of each step comprising the spin-off, and made its own determination as to how the federal tax code would treat two of the various exchanges comprising the spin-off. Further, unlike the cases involving alimony and/or child support, Fort James is not attempting to use the Bankruptcy Code to rid itself of what otherwise would be an ongoing obligation. Consequently, Crown has failed to show Fort James is estopped from arguing the exchanges comprising the spin-off transaction should be treated as one integrated transaction.

Accordingly, the Court finds, for purposes of determining whether Crown received consideration from Fort James for the transfer of $484,940,953.48, the series of exchanges comprising the spin-off must be viewed as an integrated transaction.

Turning to the question of whether that consideration was "valuable," the Court first notes that under Virginia law, "consideration deemed valuable in law," as used in § 55-81, refers to "*any* valuable consideration received by the transferor." *See Meyer,* 244 F.3d at 355 (emphasis added). Unlike statutes that allow a creditor to avoid a conveyance where the debtor did not receive "reasonably equivalent value" for the transfer, § 55-81"focus[es] on whether a transaction involved any valuable consideration at all,"*see C-T of Virginia,* 762 F.Supp. at 678 (distinguishing 11 U.S.C. § 548(a)(2)); *see also C-T of Virginia,* 953 F.2d 637, 1992 WL 12307 at \*2 (holding § 55-81"does not require reasonably equivalent value").

Here, it is undisputed that Crown received assets from Fort James, including real property located in Delaware, Louisiana, Maine, Massachusetts, Michigan, Mississippi, New Hampshire, New Jersey, Vermont, and Virginia, (*see* Coyne Decl. Ex. Q at ML004380-81, ML004394-431), which assets Crown concedes had a fair market value of between $50,000,000 and $300,000,000 at the time of Crown's acquisition, (*see id.*Ex. Y at 5, 9-10).

Crown argues that because Crown incurred liabilities in connection with the spin-off, which liabilities, according to Crown, exceeded the value of the assets, (*see* Potter Decl. ¶¶ 33-38), Crown, in effect, received nothing of value from Fort James. This argument fails, both as a matter of evidence and as a matter of law. First, as defendants point out, Crown does not offer any evidence that, at the time of the spin-off, the assets had no, or a negative, value; rather, Crown offers evidence that when Crown sold certain of the assets several years later, those assets were sold for less than their "book value" at the time of the spin-off. (*See id.* ¶ 36.)Second, under Virginia law, in determining whether a debtor received consideration for purposes of § 55-81, courts do not use a "balance sheet test." *See C-T of Virginia,* 762 F.Supp. at 678 (holding courts apply-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 2006 WL 2348850 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2348850 (N.D.Cal.))

ing § 55-81"focus on whether a transaction involved any valuable consideration at all, and not on the balance sheet test"; stating "[a]lthough C-T may have given up more than it received, it gained something, and that is enough to prevent avoidance of the transfer"), *aff'd,*953 F.2d 637, 1992 WL 12307 at *2 (rejecting creditor's argument that § 55-81 requires courts to apply "pecuniary, balance sheet approach"); *see also Inspiration Coal, Inc. v. Mullins,* 690 F.Supp. 1502, 1505-06 (W.D.Va.1988) (holding "balance sheet" approach inapplicable under § 55-81). Rather, as discussed above, Virginia law allows the transfer to be set aside only where the debtor receives nothing of value. Here, Crown, as noted, concedes the transferred assets had, at the time of the transfers, a fair market value of between $50 million and $300 million, which, as a matter of law, constitutes valuable consideration.

**\*5** Accordingly, Fort James is entitled to summary judgment on Count One to the extent such claim is based on § 55-81.

### 2. Settlement Payments

Fort James, relying on 11 U.S.C. § 546(e), which provides that a "settlement payment" may not be set aside as a fraudulent conveyance, argues that when Crown transferred the $484,940,953.48 to Fort James, such transfer constituted a "settlement payment." Consequently, Fort James argues, plaintiffs cannot establish a claim under either Virginia Code §§ 55-80 or 55-81.[FN3]

> FN3. As discussed above, Fort James is entitled to summary judgment to the extent Count One is based on a claim under § 55-81. Accordingly, the Court need only consider whether § 546(e) bars Crown's claim under § 55-80.

As noted, Count One is based on 11 U.S.C. § 544, which allows a trustee to avoid transfers voidable under state law. An exception to § 544 exists as to a

"settlement payment ... made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency that is made before the commencement of the [bankruptcy] case."*See*11 U.S.C. § 546(e). A "settlement payment" is defined as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or other similar payment commonly used in the securities trade."*See Jonas v. Resolution Trust Corp. (In re Comark),* 971 F.2d 322, 325 (9th Cir.1992)."Generally, a settlement is the completion of a securities transaction."*Id.* (internal quotation and citation omitted).

The manner by which Crown obtained the funds it later transferred to Fort James is undisputed: (1) on August 23, 1995, Crown borrowed $243,591,953.48 from banks, (*see* Coyne Decl. Ex. O at CP-C138-0835-36, CP-C138-0927-29; Ex. S at MW003744); (2) on August 23, 1995, Crown raised $242,500,00 through issuance of "unsecured senior subordinated notes," (*see* Coyne Decl. Ex. P at CV111503, Ex. S at MW003742); and (3) on August 23, 1995, Crown transferred the sum of $484,940,953.48 to an escrow agent, who, on August 28, 1995, transferred that amount to Fort James upon completion of the spin-off, (*see id.*Ex. S at MW003746-50).

A transaction that does not occur on a "public market" and does not "involve the process of clearing trades" is not a "settlement payment" within the meaning of § 546(e).*See Kipperman v. Circle Trust F.B.O. (In re Grafton Partners, L.P.),* 321 B.R. 527, 538 (B.A.P. 9th Cir.2005); *see also Jewel Recovery, L.P. v. Gordon,* 196 B.R. 348, 350, 352 (N.D.Tex.1996) (holding "private transaction which did not implicate the clearance and settlement process" not "settlement payment" within meaning of § 546(e)). An agreement by a bank to loan money is not a transaction on a public market, let alone one that involves the process of clearing trades.

With respect to funds raised by Crown by the issu-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ance of notes, such notes were publicly sold through underwriters, (*see* Coyne Decl. Ex. P at CV111503), and, consequently, each such sale appears to qualify as a "securities transaction." *See* 11 U.S.C. § 101(49)(A)(i) (providing "note" is a "security"). The "settlement" of each such transaction, however, was complete, at the latest, when Crown received payment from the issuing underwriters, and thus was complete before the transfer at issue herein between Crown and Fort James.

*6 Accordingly, Fort James is not entitled to summary judgment on Count One to the extent Fort James relies on § 546(e).

## CONCLUSION

For the reasons stated above, Fort James's motion for summary judgment is hereby GRANTED in part and DENIED in part, as follows.

1. To the extent Count One is based on the alleged "cash sweep" of $48 million, the motion is GRANTED.

2. To the extent Count One is based on the transfer of $484,940,953.48 and premised on a violation of Virginia Code § 55-81, the motion is GRANTED.

3. To the extent Count One is based on the transfer of $484,940,953.48 and premised on a violation of Virginia Code § 55-80, the motion is DENIED.

**IT IS SO ORDERED.**

N.D.Cal.,2006.
In re Crown Vantage, Inc.
Not Reported in F.Supp.2d, 2006 WL 2348850 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 5



Not Reported in A.2d                                                                                          Page 1
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d, 1998 WL 442456 (Del.Ch.))**

▷
In re Dean Witter Partnership Litigation
Del.Ch.,1998.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
In re DEAN WITTER PARTNERSHIP LITIGA-
TION
**No. CIV. A. 14816.**

July 17, 1998.

Pamela S. Tikellis, Esquire, and Robert J. Kriner,
Jr., Esquire, of Chimicles, Jacobsen & Tikellis,
Wilmington, Delaware; of Counsel: Nicholas E.
Chimicles, Esquire, Denise Davis Schwartzman,
Esquire, Francis J. Farina, Esquire, and M. Kather-
ine Meermans, Esquire, of Chimicles, Jacobsen &
Tikellis, Haverford, Pennsylvania, Attorneys for
Plaintiffs.
Kenneth J. Nachbar, Esquire, of Morris, Nichols,
Arsht & Tunnell, Wilmington, Delaware; of Coun-
sel: Martin London, Esquire, Richard A. Rosen, Es-
quire, Robert N. Kravitz, Esquire, and Tracy An-
binder Baron, Esquire, of Paul, Weiss, Rifkind,
Wharton & Garrison, New York, New York, Attor-
neys for Defendants.

MEMORANDUM OPINION

CHANDLER, Chancellor.
*1 Investors, owners of interests in numerous real
estate limited partnerships, seek an accounting and
damages from general partners and financial ad-
visors for breaches of the fiduciary duties of care,
loyalty and candor. Information available to the in-
vestors long before these lawsuits were instituted
put the investors on notice of the wrongs about
which they now complain. Therefore, all of the in-
vestors' claims are barred by operation of the ap-
plicable statute of limitations.

I. BACKGROUND

This action is a consolidation of several actions
brought by plaintiff investors against defendants
Dean Witter, Discover & Co. ("Dean Witter Dis-
cover"), Dean Witter Reynolds, Inc. ("Dean Witter
Reynolds"), Dean Witter Realty, Inc. ("Dean Witter
Realty") (collectively "Dean Witter"), the man-
aging and associate general partners of seven Dean
Witter real estate limited partnerships, and Tempo-
GP, Inc. ("Tempo-GP"), the general partner of
Dean Witter/Coldwell Banker Tax Exempt Mort-
gage Fund, L.P. ("Tax Exempt Mortgage
Fund").FN1

> FN1. An Order of Consolidation dated Au-
> gust 16, 1996, consolidated three actions
> filed in the Court of Chancery-*Segel v.
> Dean Witter, Discover & Co.,* C.A. No.
> 14816 (filed Feb. 6, 1996); *Schectman v.
> Dean Witter, Discover & Co.,* C.A. No.
> 14829 (filed Feb. 9, 1996); *Dosky v. Dean
> Witter, Discover & Co.,* C.A. No. 14838
> (filed Feb. 15, 1996)-and added to the con-
> solidated action plaintiffs from two other
> suits, one pending in the Southern District
> of New York-*Grigsby v. Dean Witter
> Reynolds, Inc.,* S.D .N.Y., No. 96 Civ.
> 4064(LAP) (originally filed Dec. 27,
> 1995)-and one pending in the District of
> Maryland-*Young v. Dean Witter, Discover
> & Co.,* C.A. No. H-96-1139 (D.Md.)
> (originally filed Feb. 6, 1996).*See* Order of
> Consolidation (Aug. 16, 1996) (Docket
> No. 9).

Plaintiffs are customers of Dean Witter Reynolds,
who between 1984 and 1989, purchased from Dean
Witter Reynolds units of the following limited part-
nerships: Dean Witter Realty Income Partnership I,
L.P. ("Income I"); Dean Witter Realty Income Part-
nership II, L.P. ("Income II"); Dean Witter Realty
Yield Income Partnership III, L.P. ("Income III");
Dean Witter Realty Income Partnership IV, L.P.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 2
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d, 1998 WL 442456 (Del.Ch.))**

("Income IV"); Dean Witter Realty Yield Plus, L.P. ("Yield Plus"); Dean Witter Realty Yield Plus II, L.P. ("Yield Plus II"); Dean Witter Realty Growth Properties, L.P. ("Growth Properties"); and Falcon Classic Cable Income Properties, L.P. ("Falcon Classic Cable").[FN2] With the exception of Falcon Classic Cable, each of these Partnerships is a wholly-owned direct or indirect subsidiary of Dean Witter and is organized in the State of Delaware.

> FN2. These limited partnerships will be referred to collectively as the "Partnerships." The Partnerships bearing the Dean Witter name, *i.e.,* all of the defendant partnerships except Falcon Classic Cable, will also be referred to as the "Proprietary Partnerships." All of the Proprietary Partnerships are real estate limited partnerships.

Defendant Dean Witter Discover, a Delaware corporation, is a publicly-held financial services company providing credit and investment products. Defendant Dean Witter Reynolds, a Delaware corporation, is a broker-dealer and member of the New York Stock Exchange and other major securities, futures and options exchanges in the United States. Dean Witter Reynolds operates the securities business of Dean Witter Discover and acted as the offeror and/or underwriter for the sale of the Partnerships to plaintiffs. Dean Witter Reynolds also organized the Proprietary Partnerships that it sold to plaintiffs and acted as the exclusive selling agent for Falcon Classic Cable, which it did not sponsor.

Defendant Dean Witter Realty, a Delaware corporation, is a wholly-owned subsidiary of Dean Witter Discover. Dean Witter Realty is responsible for the creation, marketing and oversight of the Proprietary Partnerships. It is also the parent of the Delaware corporate subsidiaries formed to serve as the managing general partners of the Proprietary Partnerships. These corporate subsidiaries are, in turn, the general partners of the Delaware limited partnerships or corporations formed to serve as the associate general partners of the Proprietary Partnerships.[FN3] Officers and employees of Dean Witter

Realty served as officers and employees of these general partners. Dean Witter Realty was in charge of the day-to-day operations of each of the general partners of the Proprietary Partnerships.

> FN3. Managing and associate general partners will be referred to collectively as the "general partners."

**\*2** Defendants Dean Witter Realty Income Properties I Inc. and Dean Witter Realty Income Associates I, L.P. are the managing and associate general partners, respectively, of Income I. Defendants Dean Witter Realty Income Properties II Inc. and Dean Witter Realty Income Associates II, L.P. are the managing and associate general partners, respectively, of Income II. Defendants Dean Witter Realty Income Properties III Inc. and Dean Witter Realty Income Associates III, L.P. are the managing and associate general partners, respectively, of Income III. Defendants Dean Witter Realty Fourth Income Properties Inc. and Dean Witter Realty Income Associates IV, L.P. are the managing and associate general partners, respectively, of Income IV. Defendants Dean Witter Realty Yield Plus Inc. and Dean Witter Realty Yield Plus Associates, L.P. are the managing and associate general partners, respectively, of Yield Plus. Defendants Dean Witter Realty Yield Plus II Inc. and Dean Witter Realty Yield Plus Associates II, L.P. are the managing and associate general partners, respectively, of Yield Plus II. Defendants Dean Witter Realty Growth Properties Inc. and Dean Witter Realty Growth Associates, L.P. are the managing and associate general partners, respectively, of Growth Properties.

In addition, plaintiffs named as defendants Dean Witter Realty Income Associates I Inc. and Dean Witter Realty Income Associates II Inc.-the general partners of the associate general partners of Income I and Income II, respectively. Each of these defendant general partners is a Dean Witter affiliate, or wholly-owned direct or indirect subsidiary, organized in Delaware.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 3
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d, 1998 WL 442456 (Del.Ch.))**

Defendant Tempo-GP, a Delaware corporation, was originally owned jointly by a Dean Witter Discover subsidiary and Coldwell Banker Commercial Group, Inc. Today, Tempo-GP is a wholly-owned subsidiary of Dean Witter Discover. Tempo-GP is the general partner of the Tax Exempt Mortgage Fund and directed and controlled its activities.[FN4]

> FN4. In their Amended Complaint, none of the plaintiffs claims to have purchased units of the Tax Exempt Mortgage Fund. As such, plaintiffs do not have standing to assert any claims with respect to that fund or its general partner, Tempo-GP. *See Alabama By-Products Corp. v. Cede & Co.,* Del.Supr., 657 A.2d 254, 264 (1995).

Plaintiffs purport to bring this action on behalf of all persons and entities who purchased units of the Partnerships sold by or through Dean Witter Reynolds or other selling agents affiliated with Dean Witter from 1984 through the present.[FN5] Plaintiffs allege that defendants breached their fiduciary duties in connection with the Partnerships organized, sold and operated by defendants, in which plaintiffs invested. Among other things, plaintiffs allege that defendants breached the duties of loyalty, candor and care they owed to plaintiffs as their fiduciaries. Plaintiffs complain that they relied-to their detriment-upon the good faith of defendants in their roles as fiduciaries, as general partners, financial advisors and agents, and as officers and directors of the general partners. According to plaintiffs, defendants' breaches have caused plaintiffs to suffer the losses of substantial portions of their investments and have failed to realize the income, liquidity and security in their investments as promised them by defendants.[FN6]

> FN5. First Consolidated and Amended Class Action Complaint ¶ 37 (Docket No. 10) [hereinafter *Complaint* ]. All further references to "plaintiffs" shall include the named plaintiffs as well as the purported class of plaintiffs.

> FN6. Complaint ¶ 3.

*3 Plaintiffs assert that Dean Witter sold the Partnerships through uniform sales materials that promoted sale of the Partnerships at the expense of candor. Specifically, plaintiffs claim that defendants misrepresented or failed to disclose to them at the time of purchase the nature of the risks involved in investing in the Partnerships, that defendants misrepresented or failed to disclose the financial condition of the Partnerships in order to conceal losses, mismanagement, fraud and self-dealing, and that defendants misled plaintiffs into believing that Dean Witter was recommending and selecting investments that presented low risk and were suitable for retirement accounts.[FN7] Plaintiffs further allege that although Dean Witter represented to plaintiffs that it would maintain a relationship with the Partnerships and oversee their operation,[FN8] Dean Witter failed to supervise the Partnerships in the plaintiff investors' best interests.

> FN7. Pls.' Memo. in Opp. to Defs.' Motion to Dismiss at 6 (Docket No. 32) [hereinafter *Pls.' Memo. in Opposition* ].

> FN8. Complaint ¶ 25.

Plaintiffs insist that defendants were instead engaging in a systematic scheme designed to organize, sell and operate high risk, speculative limited partnerships in order to enrich themselves at the expense of plaintiff investors. According to plaintiffs, once defendants obtained investment capital from plaintiffs, defendants used the capital to purchase underperforming or failing investments owned by Dean Witter affiliates or to refinance underperforming loans owed to Dean Witter affiliates. Plaintiffs further allege that defendants channeled Partnership funds into faltering projects owned by earlier-formed Partnerships, to create the illusion of financial health for those Partnerships and to aid in marketing new ones.[FN9]

> FN9. Pls.' Memo. in Opposition at 2.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 4
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d, 1998 WL 442456 (Del.Ch.))**

Defendants filed a motion to dismiss on December 10, 1996.[FN10] The motion cites several grounds for dismissal, including: (1) that the claims are time-barred; (2) that plaintiffs' allegations fail to state a claim; and (3) that plaintiffs have improperly brought this action as a direct, rather than derivative, action. The parties briefed the motion, presented oral argument to the Court, and conducted a supplemental round of briefing specifically addressing the statute of limitations issue. As explained below, I agree with defendants that the applicable statute of limitations bars plaintiffs' claims.[FN11] Thus, plaintiffs' claims must be dismissed for failure to file within the statutory period.

> FN10. Defs.' Memo. in Support of Motion to Dismiss (Docket No. 21) [hereinafter *Defs.' Motion to Dismiss* ].

> FN11. Because I have determined that defendants' claim of time-bar is dispositive, I need not address the other grounds offered by defendants in their motion to dismiss.

## II. LEGAL STANDARD

There is clear legal precedent in Delaware for granting a motion to dismiss on the ground that a plaintiff's claims are barred by operation of the statute of limitations.[FN12] This is so even in equity. Although statutes of limitation do not generally apply directly in equity, equity follows the law and will apply a statute of limitations by analogy in appropriate circumstances.[FN13] Moreover, it is "well settled that where the complaint itself alleges facts that show that the complaint is filed too late, the matter may be raised by [a] motion to dismiss."[FN14]

> FN12. *Boeing Co. v. Shrontz,* Del. Ch., C.A. No. 11273, Berger, V . C. (Apr. 20, 1992) (dismissing breach of fiduciary duty claims on grounds of time-bar); *Halpern v. Barran,* Del. Ch., 313 A.2d 139 (1973) (same).

> FN13. *Kahn v. Seaboard Corp.,* Del. Ch., 625 A.2d 269, 271 (1993). *See also United States Cellular Inv. Co. v. Bell Atlantic Mobile Sys., Inc.,* Del.Supr., 677 A.2d 497 (1996) ("Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period.").

> FN14. *Seaboard,* 625 A.2d at 277 (dismissing, with permission to replead, complaint in equity on statute of limitations grounds).

*4 In evaluating a motion to dismiss, I am required to assume the truthfulness of all well-pleaded (*i.e.,* nonconclusory) allegations of the complaint for purposes of the motion.[FN15] I am also required to draw from the complaint all inferences or conclusions of fact that may reasonably be drawn from the specific facts alleged therein.[FN16] Conclusions asserted in the complaint, however, will only be accepted as true if there are specific allegations of fact to support them.[FN17] In the end, I may only dismiss the Amended Complaint if it is clear that plaintiffs will not be entitled to relief under any set of facts that could be proven based on the allegations of the complaint.[FN18]

> FN15. *Loudon v. Archer-Daniels-Midland Co.,* Del.Supr., C.A. No. 88, 1996, at 11-12, Veasey, C.J. (Sept. 17, 1997) (en banc); *Grobow v. Perot.* Del.Supr., 539 A.2d 180, 187 & n. 6 (1988).

> FN16. *Id.*

> FN17. *In re Santa Fe Pac. Shareholders Litig.,* Del.Supr., 669 A.2d 59, 65-66 (1995); *Grobow,* 539 A.2d at 187 & n. 6.

> FN18. Ct. Ch. R. 12(b)(6); *Rabkin v. Philip A. Hunt Chem. Corp.,* Del.Supr., 498 A.2d 1099, 1105 (1985); *Litman v. Prudential-Bache Properties, Inc.,* Del. Ch., C.A. No. 12137, at 4-5, Chandler, V.C. (Jan. 14,

Not Reported in A.2d                                                                Page 5
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d, 1998 WL 442456 (Del.Ch.))**

1994), *aff'd,*Del.Supr., 642 A.2d 837 (1994).

Plaintiffs cite *Snyder v. Butcher & Co.,* Del.Super., C.A. No. 91C-04-289, Goldstein, J. (Sept. 15, 1992), for the proposition that it is improper for a court to grant a motion to dismiss on statute of limitations grounds whenever the complaint alleges fraudulent concealment as part of its claims. Plaintiffs, however, misread *Snyder. Snyder* stated that granting a motion to dismiss on statute of limitations grounds would be inappropriate where a plaintiff has "*successfully pled* fraudulent concealment." *Id* . at 9 (emphasis added). Where a plaintiff has successfully alleged a claim of fraudulent concealment "the affirmative statute of limitations defense turns on a question of fact," rendering a summary disposal inappropriate. *Id. Snyder* does nothing, however, to alter the general rule that when it is clear from the face of the complaint that the statute of limitations bars a plaintiff's claims, despite an allegation of fraudulent concealment, dismissal is still appropriate. *See Boeing Co. v. Shrontz,* op. at 4-5 (dismissing breach of fiduciary duty claims on statute of limitations grounds, despite allegation of fraudulent self-dealing).*See also Shockley v. Dyer,* Del.Supr., 456 A.2d 798, 799 (1983) (affirming grant of summary judgment, despite plaintiff's allegation of fraudulent concealment, where viewing the facts in a light most favorable to plaintiffs, "it becomes clear that by an exercise of due diligence plaintiff could have discovered her rights.").

### III. ANALYSIS

*A. Statute of Limitations*

It is well-settled under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty.[FN19]With the exception of the Falcon Classic Cable claim, which was a brand new claim as of the filing of the Amended Complaint on October 7, 1996, plaintiffs filed their pre-consolidation complaints on February 6, 1996, alleging breaches of fiduciary duty by Dean Witter and the general partners of the Partnerships.FN20 Applying the three-year statute of limitations, any claim that accrued prior to February 6, 1993 (or prior to October 7, 1993, with respect to the Falcon Classic Cable claim) is barred by operation of the statute. If, however, plaintiffs' cause of action accrued on or after February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic claim), then the claims are timely and can proceed.

FN19.10 *Del. C.* § 8106; *Dofflemyer v. W.F. Hall Printing Co.,* D. Del., 558 F.Supp. 372, 379 (1983) (applying Delaware law).

FN20. Under the Order of Consolidation, all documents previously filed and served in the cases consolidated by the Order were deemed filed, served and part of the record in the consolidated action. Only the three Court of Chancery cases were consolidated by that Order. The earliest of these cases-*Segel*-was filed February 6, 1996. Thus, February 6, 1996, is the earliest operative date for statute of limitations purposes. *See* Order of Consolidation ¶¶ 1, 9.

*B. Time of Accrual*

The general law in Delaware is that the statute of limitations begins to run, *i.e.,* the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action.[FN21]Plaintiffs here complain of two different types of injuries. First, they allege that Dean Witter violated its fiduciary duties in the marketing and

Not Reported in A.2d                                                                                   Page 6
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d, 1998 WL 442456 (Del.Ch.))**

sale of the Partnerships. Second, plaintiffs allege that defendants [FN22] committed post-offering breaches of their fiduciary duties in connection with the management and oversight of the Partnerships.

> FN21.*David B. Lilly Co. v. Fisher,* D. Del., 18 F.3d 1112, 1117 (1994); *Isaacson, Stolper & Co. v. Artisan's Sav. Bank,* Del.Supr., 330 A.2d 130, 132 (1974).

> FN22. Plaintiffs do not allege post-offering mismanagement with respect to Falcon Classic Cable. Complaint ¶¶ 266-68.

Plaintiffs allege that defendants breached their fiduciary duties in recommending and selling to plaintiffs Partnerships that would never (and could never) achieve their promised objectives. Accepting this allegation as true, plaintiffs' injuries occurred *when they purchased* their Partnership interests as a result of defendants' alleged misrepresentations.FN23Thus, plaintiffs' cause of action accrued when they invested in the allegedly fraudulent Partnerships. The Partnerships at issue were marketed and sold to the plaintiffs in the mid-to-late 1980s. The last of these sales was completed by the end of 1989.[FN24]Thus, with respect to the marketing and sale of the Partnerships, plaintiffs' cause of action accrued no later than year-end 1989. Absent tolling of the statute of limitations, these claims became stale at the end of 1992-years before plaintiffs filed their Amended Complaint.

> FN23.*Seidel v. Lee,* D. Del., C.A. No. 93-494-JJF, at 16, Farnen, C.J. (Dec. 30, 1996) (applying Delaware law) (fiduciary duty claim accrues when breach accomplished).*See also In re Merrill Lynch Ltd. Partnerships Litig.,* S.D.N.Y., No. 95 Civ. 10657(MBM), at 11-20 (Aug. 26, 1997) (applying federal RICO law, which has same standard for statute of limitations accrual).

> FN24. Complaint ¶¶ 9-23.

**\*5** With respect to the allegations of post-offering breaches arising out of the management and oversight of the Partnerships, plaintiffs allege that defendants operated the Partnerships to benefit themselves at the expense of the investors. Among other things, plaintiffs complain that Partnership real estate investments were chosen solely for the purpose of benefiting other Dean Witter affiliates and that the Partnerships paid excessive commissions and fees. For each Partnership, these alleged violations of fiduciary duty began-and plaintiffs consequently began to suffer injury-shortly after each Partnership was formed. The Amended Complaint is replete with allegations of injudicious mortgage loans and unwarranted management commissions throughout the mid-to-late 1980s.[FN25]Thus, as with the marketing and sales claims, plaintiffs' cause of action regarding the alleged post-offering breaches accrued no later than year-end 1989.[FN26]Plaintiffs filed their complaint on February 6, 1996-well past the expiration of the three-year limitations period. *Absent tolling,* therefore, all of plaintiffs' claims fall outside the statutory period and would be time-barred.

> FN25.*See, e.g.,* Complaint ¶¶ 91-121 (Yield Plus), ¶¶ 129-35 (Yield Plus II), ¶¶ 136-46 (Yield Plus & Yield Plus II), ¶¶ 156-79 (Growth Properties), ¶¶ 193-98 (Income I), ¶¶ 209-16 (Income II), ¶¶ 233-39 (Income II, III & IV).

> FN26.*Dofflemyer,* 558 F.Supp. at 379 (fiduciary duty claim accrues at time of breach).

*C. Tolling*

Plaintiffs allege that their claims are timely because the statute of limitations was tolled until January 26, 1996, when an article in the *Wall Street Journal*FN27-reporting that the Securities and Exchange Commission ("SEC") was negotiating with Dean Witter Reynolds and two other brokerage firms concerning their limited partnership sales practices during the 1980s and that a settlement

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 7
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d, 1998 WL 442456 (Del.Ch.))**

fund might be established-first put them on notice of their potential claims.[FN28] Plaintiffs assert three separate theories to support a tolling of the statute of limitations in this case: (1) inherently unknowable injuries; (2) fraudulent concealment; and (3) equitable tolling. Each of these doctrines permits tolling of the limitations period where the facts underlying a claim were so hidden that a reasonable plaintiff could not timely discover them.[FN29]

> FN27. This article will be referred to as the *"Wall Street Journal* article" or the "article."

> FN28. Pls.' Memo. in Opposition at 9.

> FN29. *See, e.g., Playtex, Inc. v. Columbia Casualty,* Del.Super., C.A. No. 88C-MR-233, at 7, Del Pesco, J. (Sept. 20, 1993) ("Ignorance of the facts supporting a cause of action will not toll the statute, absent some special consideration such as 'inherently unknowable' injuries or fraudulent concealment.").

Under the doctrine of inherently unknowable injuries, the running of the statute of limitations is tolled while the discovery of the existence of a cause of action is a practical impossibility.[FN30] For the limitations period to be tolled under this doctrine, there must have been no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury.[FN31] Often, plaintiffs can establish "blameless ignorance" by showing justifiable reliance on a professional or expert whom they have no ostensible reason to suspect of deception.[FN32] This doctrine tolls the limitations period until a plaintiff had "reason to know" that a wrong has been committed.[FN33]

> FN30. *Ruger v. Funk,* Del.Super., C.A. No. 93C-04-210, at 5-6, Lee, J. (Jan. 22, 1996).

> FN31. *Seidel,* op. at 17.

> FN32. *See, e.g., Isaacson.* 330 A.2d at

133-34 (applying "discovery rule" in light of relationship of "confidence and reliance by plaintiff on the expertise of defendant").

> FN33. *Pack & Process, Inc. v. Celotex Corp.,* Del.Super., 503 A.2d 646, 650 (1985).

The statute of limitations will also be tolled if a defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff on notice of the truth.[FN34] Unlike the doctrine of inherently unknowable injuries, fraudulent concealment requires an affirmative act of concealment by a defendant-an "actual artifice" that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry.[FN35] "Mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to operation of the statute [of limitations]."[FN36] Where there has been fraudulent concealment from a plaintiff, the statute is suspended until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence.[FN37]

> FN34. *Litman,* op. at 8.

> FN35. *Halpern,* 313 A.2d at 143.

> FN36. *Id.*

> FN37. *Id.*

**\*6** Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary.[FN38] Underlying this doctrine is the idea that "even an attentive and diligent [investor] relying, in complete propriety, upon the good faith of [fiduciaries] may be completely ignorant of transactions that ... constitute self-interested acts injurious to the [Partnership]."[FN39] This doctrine tolls the limitations period until an investor knew or had reason to know of the facts constituting the

Not Reported in A.2d                                                                 Page 8
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d, 1998 WL 442456 (Del.Ch.))**

FN40

FN38.*Yaw v. Talley,* Del. Ch., C.A. No. 12882, at 10, Jacobs, V.C. (March 7, 1994) (Fiduciaries who benefit personally from their wrongdoing, especially as a result of fraudulent self-dealing, will not be afforded the protection of the statute of limitations.).

FN39.*Seaboard,* 625 A.2d at 275-76 (Given the fiduciary duties that the law imposes on corporate directors, stockholders are entitled to rely on the good faith of the directors when they act with respect to the corporation's property or processes.).

FN40.*In re Maxxam, Inc./Federated Dev. Shareholders Litig.,* Del. Ch., 659 A.2d 760, 769 (Feb. 13, 1995).

As the party asserting that tolling applies, plaintiffs bear the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled.[FN41] Significantly, if the limitations period is tolled under any of these theories, it is tolled *only until* the plaintiff discovers (or exercising reasonable diligence should have discovered) his injury.[FN42] Thus, the limitations period begins to run when the plaintiff is *objectively* aware of the facts giving rise to the wrong, *i.e.,* on inquiry notice.[FN43] Accordingly, for plaintiffs to establish that this action was filed in a timely manner, under any one of these theories, they must convince the Court that they were *not* on inquiry notice of their claims before February 6, 1993 (or before October 7, 1993, with respect to the Falcon Classic Cable claim).[FN44]

FN41.*United States Cellular,* 677 A.2d at 504;*Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, at 35, Allen, C. (Nov. 21, 1995).

FN42.*In re ML-Lee Acquisition Fund II, L.P. Litig.,* D. Del., 848 F.Supp. 527, 554

(1994) (inherently unknowable injuries); *United States Cellular,* 677 A.2d at 503 (equitable tolling); *Litman,* op. at 8 (fraudulent concealment).

FN43.*See Seidel,* op. at 16-17 (inherently unknowable injuries: statute tolled until such time as persons of ordinary intelligence and prudence would have facts sufficient to place them on inquiry notice of an injury); *Seaboard,* 625 A.2d at 275 (equitable tolling: statute of limitations does not run against plaintiff until he knows or has reason to know facts alleged to give rise to wrong); *Halpern,* 313 A.2d at 143 (fraudulent concealment: running of statute suspended only until plaintiff's rights are discovered or would have been discovered by exercise of reasonable diligence).*See also Nardo v. Guido DeAscanis & Sons, Inc.,* Del.Super., 254 A.2d 254, 256 (1969) (standard for length of tolling is the same for fraudulent concealment, equitable tolling and inherently unknowable torts).

FN44. Where the tolling of the statute of limitations turns on controverted issues of fact, a pre-discovery dismissal of the claim would be inappropriate. *See, e.g., In re Asbestos Litig.,* Del.Super., 673 A.2d 159, 163 (1996) (only when the record is uncontroverted that plaintiff "discovered" his injury more than [three] years prior to filing his suit is summary judgment appropriate). However, when it is clear from the face of the complaint (and the documents incorporated by reference in it) that plaintiffs' tolling theories fail even to raise a legitimate doubt about the time the claims accrued, dismissal is appropriate if the claims were filed after the applicable limitations period expired. Plaintiffs cite *In re Maxxam* for the proposition that "a defendant should not be permitted to use the stat-

Not Reported in A.2d                                                    Page 9
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d, 1998 WL 442456 (Del.Ch.))**

ute of limitations as a shield where the defendant possesses information critical to the existence of an actionable claim of wrongdoing and prevents the plaintiff from discovering that information in a timely fashion."*In re Maxxam, Inc./Federated Dev. Shareholders Litig.,* Del. Ch., C.A. Nos. 12111 & 12353, at 13, Jacobs, V.C. (June 21, 1995). The danger is in dismissing an action prematurely when plaintiffs do not yet have access to the information they need to state their claims fully. Here, it is clear to the Court that all of the necessary information was not only publicly available, but already in plaintiffs' hands at least as far back as 1990-an entirely different situation than the one presented to the *In re Maxxam* Court.

*D. Were Plaintiffs on Inquiry Notice?*

Defendants contend it is clear that, based on the allegations of the Amended Complaint, plaintiffs cannot under any circumstances show that the statute of limitations was tolled for the length of time necessary to render their action timely. First, defendants note that the very facts pleaded in the Amended Complaint demonstrate that plaintiffs were on inquiry notice of defendants' alleged wrongful conduct long before February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic Cable claim). Second, defendants point out that other Partnership investors filed lawsuits against Dean Witter Reynolds alleging breach of fiduciary duty in connection with the same Proprietary Partnerships *before* the *Wall Street Journal* article was published.[FN45] That fact, defendants argue, shows conclusively that the existence of the claims was not beyond the grasp of the reasonably diligent investor. Finally, defendants make the practical argument that the *Wall Street Journal* article, touted by plaintiffs as their clarion call, could not possibly have provided the "essential missing information" that plaintiffs assert. The article simply did not disclose any information about Dean Witter's sales practices, nor did it identify any limited partnerships by name.

> FN45.*See, e.g., Grigsby v. Dean Witter Reynolds Inc.,* Cal.Super. Ct., C.A. No. 695777 (filed Dec. 27, 1995) (asserting claims with respect to the Proprietary Partnerships); *McCoy v. Dean Witter Reynolds, Inc.,* E.D. Tenn., C.A. No. 94-5779 (regarding demand for arbitration filed Dec. 28, 1989, asserting claims with respect to Income I & II); *Eno v. Dean Witter Reynolds, Inc.,* N.Y. Sup.Ct., Index No. 127300/95 (regarding demand for arbitration filed May 25, 1994, asserting claims with respect to Income II).

Defendants emphasize that the allegations of wrongful conduct asserted in the Amended Complaint are based on events that all occurred in the mid-to-late 1980s. Moreover, every fact cited by plaintiffs in the Amended Complaint comes from disclosures in documents that were either provided to plaintiffs contemporaneously with the wrongful conduct now being alleged or publicly available Securities Exchange Commission ("SEC") filings made by the Partnerships.[FN46] As a matter of law, defendants assert, disclosures in any of those documents-the sole source of plaintiffs' allegations-were sufficient to place plaintiffs on inquiry notice of their claims long before February 6, 1993.

> FN46. According to defendants, investors in each Partnership received from Dean Witter a prospectus (and all applicable supplements), annual and quarterly reports, and periodic "property profiles" describing properties in which the Partnership had invested. Each Partnership also filed with the SEC (and made available to investors on request) reports on Form 10-K, reports on Form 10-Q, and reports on Form 8-K. Defs.' Motion to Dismiss at 7-8.

> The Court may properly consider the contents of the *Wall Street Journal* art-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                           Page 10
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d, 1998 WL 442456 (Del.Ch.))**

icle, Partnership prospectuses, property profiles, customer account statements, quarterly and annual reports and SEC filings in considering this motion to dismiss, because by expressly referring to and so heavily relying on these documents in the Amended Complaint, plaintiffs have incorporated them by reference into the Amended Complaint. *Glaser v. Norris,* Del. Ch., C.A. No. 9583, at 9 n. 1, Chandler, V.C. (Jan. 6, 1992).

*7 Although the information they now use to support their allegations was publicly available at the time of the alleged wrongs, plaintiffs claim that they were prevented from discovering defendants' wrongful conduct prior to January 26, 1996, as a result of defendants' misrepresentations regarding the health of their Partnership investments. Until reading the *Wall Street Journal* article, plaintiffs assert that they relied-and were entitled to rely-on defendants' assurances that the Partnerships' properties were performing better than comparable properties, that the Partnerships' losses were only temporary, and that these losses were not caused by any wrongful conduct on the part of defendants. In fact, the Partnerships' losses were accompanied by an overall real estate market decline. It was the publication of the article, plaintiffs contend, that first alerted them to their potential claims, *i.e.,* to the idea that their investment losses were the result of defendants' wrongful conduct rather than a general downturn in the real estate market. And it was not until, *after reading the article,* plaintiffs hired a consulting expert, who sifted through "more than 300 publicly-filed documents," that plaintiffs were able to reconstruct the Partnerships and actually discover defendants' wrongful conduct.[FN47] Accordingly, plaintiffs argue they were not on inquiry notice until January 26, 1996 and, therefore, that is the date the statute of limitations began to run.

FN47. Pls.' Memo. in Opposition at 3.

As noted above, the limitations period is tolled until

such time that persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued,* would lead to the discovery of the injury.[FN48] Inquiry notice does *not* require *actual* discovery of the reason for the injury. Nor does it require plaintiffs' awareness of all of the aspects of the alleged wrongful conduct. Rather, the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme.[FN49] Thus, the critical inquiry for purposes of this motion to dismiss is: were plaintiffs *entitled to rely* on defendants' representations for as long as they did, *i.e.,* up until publication of the January 26, 1996, *Wall Street Journal* article, or were they on inquiry notice before that date?[FN50]

> FN48. *In re ML-Lee Acquisition Fund II, L.P. Litig.,* 848 F.Supp. at 554 (defendants' misrepresentations were unknowable until publication of the Annual Report disclosing particular investment and its lack of success).

> FN49. *McCoy v. Goldberg,* S.D.N.Y., 748 F.Supp. 146, 158 (1990) (statutory period does not await plaintiffs' leisurely discovery of the full details of the alleged scheme) (internal citations omitted). Although plaintiffs suggest that their claims were "unknowable" because it required an expert to uncover defendants' alleged wrongdoing, that argument is without merit. It may in fact have taken an expert to unravel the entire scheme alleged by plaintiffs. But having all of the facts necessary to articulate the wrong is *not* required. Rather, "[o]nce a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice." *Harner v. Prudential Secs. Inc.,* E.D. Mich., 785 F.Supp. 626, 633 (1992) (citations omitted), *aff'd,* 6th Cir., 35 F.3d 565 (1994).

> FN50. Defendants assert that when plaintiffs read the article, they responded

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                   Page 11
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d, 1998 WL 442456 (Del.Ch.))**

by doing what they could have done several years earlier-they read the public documents and hired an expert to review them. Defs.' Motion to Dismiss at 15-16.

The Partnerships sustained steady losses from the outset. Plaintiffs allege that defendants purposely put them off the trail of inquiry by notifying them of these losses, while at the same time reassuring plaintiffs that the Partnerships were returning profits.[FN51] For example, plaintiffs "received regular distributions, falsely reassuring [them] regarding the financial condition of their investments."[FN52] In reliance on the fiduciary duties owed by defendants, plaintiffs assert that they "had no reason to go behind Defendants' campaign of misinformation" to discover the true source of the Partnership losses.[FN53]

> FN51.*See, e.g.,* Income III, 1990 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (Dec. 10, 1996), Ex. 6-C (Docket No. 25) ("1990 was a difficult and disappointing year for real estate investments in general.... Fortunately, due to the high quality of its properties and size of its portfolio, the Partnership has been able to avoid the worst of the[ ] problems.... The cash distribution paid during the 1990 fiscal year was ... an annualized return of 6.25%.").

> FN52. Pls.' Memo. in Opposition at 51.

> FN53.*Id.* at 48.

*8 Plaintiffs specifically complain that the annual reports concealed the fact that these consistent cash distributions were actually a return of investors' capital rather than a "return on investment."[FN54] Pointing to the 1990 Annual Report for the Yield Plus II Partnership as an example, plaintiffs assert that they could not have known that Partnership capital was being impaired, in light of the statement that the "distribution ... was an annualized return on investment of 7.5%."[FN55] But in the

same annual report, three pages away on page four, is a chart showing clearly that the partners' capital had declined from the previous year. Moreover, from a chart on page six, it is apparent from even the most cursory glance that the amount of the cash distributions for the year 1990 far exceeded the Partnership's net income for the same year. These charts are not, as plaintiffs suggest, hard to understand, nor are they buried at the back of a thick report. The typical annual report for the Partnerships is no more than fifteen pages in length. While the distributions were maintained at a fairly high level, looking beyond the language on the first page of these annual reports, the fact that the distributions are consistently greater than the Partnership income *should have alerted* plaintiffs to the fact that something was amiss.

> FN54.*See, e.g.,* Pls.' Memo. in Opposition at 7, 23-24, 26-28, 51.

> FN55. Yield Plus II, 1990 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (Dec. 10, 1996), Ex. 2-D (Docket No. 23).

Plaintiffs seek refuge in the proposition that where the statute of limitations inquiry involves claims of self-dealing by a fiduciary, "[t]he emphasis is upon the protection of the beneficiary of the fiduciary duty, so long as she is reasonably attentive to her interests, albeit trusting."[FN56] Accordingly, plaintiffs assert, the fiduciary relationship between plaintiffs and defendants in this case entitled plaintiffs to rely upon the presumed good faith and loyalty of defendants. Plaintiffs correctly point out that beneficiaries are entitled to trust their fiduciaries .[FN57] As a result, reasonable reliance on the competence and good faith of those who have assumed a legal responsibility toward a plaintiff can be sufficient to toll the running of the statute of limitations.[FN58] But, the trusting plaintiff still must be *reasonably attentive* to his interests. "[B]eneficiaries should not put on blinders to such *obvious signals as publicly filed documents, annual and quarterly reports, proxy statements, and SEC*

filings." [FN59]Thus, even where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available.[FN60]

> FN56.*Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, at 37, Allen, C. (Nov. 21, 1995).

> FN57.*See, e.g., Borden v. Sinskey,* 3d Cir., 530 F.2d 478, 489, n. 10 (1976) ("Shareholders have no duty to search a corporation's records for evidence of misconduct on the part of corporate officers and directors. Rather, they are entitled to assume that those standing in a fiduciary relationship to them will be faithful to their charge.").

> FN58.*Seaboard,* 625 A.2d at 275.

> FN59.*Seidel,* op. at 18 (emphasis added).

> FN60.*Id.* (rejecting plaintiff's inherently unknowable tolling argument because "the public documents, which form the basis of many of Plaintiff's claims, could have provided Plaintiff with adequate notice of an alleged misconduct by Defendants."). In the instant case, the public documents provide the basis for *all* of plaintiffs' claims. *See also In re USACafes, L.P. Litig.,* Del. Ch., C.A. No. 11146, 18 Del. J. Corp. L. 1204, 1213 (1993) ("[I]nterest holders need not delve aggressively into the internal affairs of a ... limited partnership in order to assure that a non-public, self-dealing transaction is not foreclosed from attack by limitations, but when facts are disclosed that give rise to inquiry, an applicable statute of limitations will require timely action to preserve rights.").

It is not too much to ask investors to read beyond the first page of an annual report, to read past the rosy forecasts and actually look at the cold, hard figures provided to them. Had plaintiffs bothered, for example, to read past the first page of the 1989 Annual Report for Income II-a document that was delivered to investors by mid-1990 at the latest-they would have been alarmed.[FN61] Although large distributions were being made, with a quick glance it is clear that the amount of these distributions far exceeded the "net income" figure.[FN62] In fact, the figures show the amount of the "partners' capital" steadily declining from 1986 to 1989.[FN63] Yet, the first page of this annual report states so optimistically: "The cash distribution paid for the 1989 fiscal year [constituted] an annualized return of 7%."This blatant contradiction should have been a "red flag" to any investor-and should have prompted an inquiry by plaintiffs into the health of their investments.[FN64]

> FN61. Income II, 1989 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (July 11, 1997), Ex. C (Docket No. 52).

> FN62. For the fiscal year 1989, the Income II Partnership shows a net income figure of $7,043,996 and cash distributions of $13,768,450. *Id.* at 7.

> FN63.*Id.*

> FN64.*In re Prudential Sec. Inc. L.P. Litig.,* S.D.N.Y., 930 F.Supp. 68, 76 (1996) ("Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of that fraud will be imputed to him.").

*9 The presence of this inherently contradictory information in each Partnership's annual report starting in the late 1980s for the earlier Partnerships and its appearance in all of the Partnerships by 1990 compels the conclusion that plaintiffs were not reasonably attentive to their investment

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 13
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d, 1998 WL 442456 (Del.Ch.))**

[FN65]Plaintiffs were not entitled to sit idly by, blindly relying on defendants' assurances, when the documents and disclosures plaintiffs received regularly were so suggestive of mismanagement.[FN66]Whether accompanied by optimistic projections or not, these discrepancies alone were sufficient notice of wrongdoing to prompt inquiry into the Partnerships. Upon receipt for each Partnership of the first annual report revealing cash distributions in excess of net income, plaintiffs were on inquiry notice of their claims.[FN67]

FN65.*See, e.g., Income I,* 1989 Annual Report, Ex. A; Income II, 1989 Annual Report, Ex. C; Income III, 1989 Annual Report, Ex. L; Income IV, 1989 Annual Report, Ex. M; Growth Properties, 1989 Annual Report, Ex. D (attachments to the Affidavit of Ronald J. DiPietro (July 11, 1997) (Docket No. 52)); Yield Plus, 1989 Annual Report, Ex. 1-D; Yield Plus II, 1990 Annual Report, Ex. 2-D (attachments to Affidavit of Ronald J. DiPietro (Dec. 10, 1996) (Docket No. 23)); Falcon Classic Cable, 1990 Annual Report, Ex. B (attachment to Affidavit of Mary Lou Frick (Dec. 10, 1996) (Docket No. 26)).

FN66.*See, e.g., Playtex, Inc. v. Columbia Casualty,* Del.Super., C.A. No. 88C-MR-233, at 7, Del Pesco, J. (Sept. 20, 1993) ("inherently unknowable" theory of tolling did not apply where a "wealth of information regarding [the cause of action] was generally available" when the fraud occurred); *Halpern,* 313 A.2d at 143 (statute is tolled only for the "period of fraudulent concealment").

FN67.*See Ruger v. Funk, op.* at 6 ("Actual discovery surely commences the running of the statute; so will any change in circumstances that renders the injury no longer inherently unknowable, or the ignorance of the party-plaintiff no longer

blameless.").

The Amended Complaint also alleges that such "deceptive" cash distributions were used to promote the sale of later Partnerships, and the purchasers of the later Partnerships would have no reason to review the financial information/materials for the earlier Partnerships. Assuming this is true, it still should have been obvious to the investors soon after receiving their annual reports that the cash distributions *they* were receiving were inflated and not reflective of actual earnings. Perhaps for one year, this would not raise too much concern, but certainly after the second or third straight year of cash distributions that far exceeded Partnership income, accompanied by a commensurate decline in partners' capital, plaintiffs should have been aware that the cash distributions they were receiving were not the result of investment gains-and that they were most likely duped into purchasing the Partnerships in the first place. The inherent contradiction between the distributions-described in these annual reports as "annualized returns"-and the declining partners' capital and net income lower than the distributions should have caused plaintiffs to question whether the touted cash distributions of the earlier partnerships were truly indicative of profits. That is inquiry notice. *Queen Anne Pier Condominium Council v. Raley,* Del.Super., C.A. No. 85C-JA10, at 8, Lee, J. (Jan. 26, 1988) (inquiry notice means the existence of facts sufficient to put person of ordinary intelligence and prudence on inquiry which, *if pursued,* would lead to the discovery).

## IV. CONCLUSION

On the basis of this record, I conclude that the in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 14
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d, 1998 WL 442456 (Del.Ch.))**

formation in the annual reports alone should have provided plaintiffs with adequate notice of any alleged misconduct by defendants.[FN68] Based on the facts alleged in the Amended Complaint, drawing all inferences in favor of plaintiffs, I conclude that plaintiffs were clearly on inquiry notice of their claims long before February 6, 1993 (or before October 7, 1993, with regard to the Falcon Classic Cable claim).[FN69] The limitations period for this cause of action is three years. Plaintiffs' February 1996 filing (the earliest of plaintiffs' filings) comes *more* than three years after they were placed on inquiry notice. For these reasons, I grant defendants' motion to dismiss on the ground that the plaintiffs' claims are time-barred by operation of the statute of limitations.[FN70]

FN68. Although I conclude that the glaring inconsistencies contained in the annual reports were sufficient, in and of themselves, to place plaintiffs on inquiry notice of their potential causes of action, those discrepancies were not the only indications plaintiffs had of their potential claims. I need not address them in substance (as I find the material in the annual reports dispositive on the issue), but I am inclined to agree with defendants' other assertions of plaintiffs' inquiry notice: (1) that plaintiffs were on notice no later than 1992, when defendants changed the format of their monthly account statements to reflect the true, rather than par, value of the Partnerships. *See In re Prudential Sec. Inc. L.P. Litig.*, 930 F.Supp. at 76-77; (2) that some investors in the Partnerships did manage to file lawsuits against the very same limited partnerships *before* January 26, 1996, suggests the alleged wrongful conduct was detectable by the average investor; and (3) that the *Wall Street Journal* article neither disclosed any concrete information about sales practices or the investments in question, nor mentioned by name the limited partnership defendants in this case, thus

raising a serous doubt as to how the article alone could have prompted such an inquiry.

FN69. *Cf. Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.*, Del. Ch., C.A. No. 13950, Allen, C. (Nov. 21, 1995) (motion to dismiss denied because issue of plaintiffs' inquiry notice was in dispute).

FN70. Plaintiffs' request, in the alternative, to amend their Amended Complaint is hereby denied. No amendment would cure the fatal flaw in plaintiffs' current Amended Complaint-that it was filed too late.*Glaser v. Norris*, Del. Ch., C.A. No. 9538, at 30-31, Chandler, V.C. (Jan. 6, 1992) ("A court should deny leave to amend a complaint when the amendment would be futile due to the insufficiency of the proposed amendment.")

IT IS SO ORDERED.

Del.Ch.,1998.
In re Dean Witter Partnership Litigation
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 6

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 385156 (S.D.N.Y.), 33 Employee Benefits Cas. 1099

**(Cite as: Not Reported in F.Supp.2d, 2004 WL 385156 (S.D.N.Y.))**

Page 1

C

Lynch ex rel. Trustee of Health and Welfare Fund of Patrolmen's Benevolent Ass'n of City of New York and Retiree Health & Welfare Fund of Patrolmen's Benevolent Ass'n of City of New York v. National Prescription Adm'rs
S.D.N.Y.,2004.

United States District Court,S.D. New York.
Patrick LYNCH, as Trustee of the Health and Welfare Fund of the Patrolmen's Benevolent Ass'n of the City of New York and the Retiree Health & Welfare Fund of the Patrolmen's Benevolent Ass'n of the City of New York, on behalf of himself and all other similarly situated Plans, Plaintiff,
v.
NATIONAL PRESCRIPTION ADMINISTRAT-ORS, Express Scripts, Inc. and John Does 1 Through 25, Defendants.
**No. 03 Civ. 1303(GBD).**

March 1, 2004.

**Background:** Trustee of health and welfare funds brought class action against pharmacy benefit managers (PBM) for funds and unnamed drug manufacturers, alleging PBMs breached their fiduciary duties under Employee Retirement Income Security Act (ERISA) and state law, and that manufacturers aided and abetted PBMs in breaching their duties.

**Holding:** On defendants' motion to transfer action for convenience of parties and witnesses, and in interests of justice, the District Court, Daniels, J., held that transfer to Eastern District of Missouri was not warranted for convenience of parties and witnesses, and in interests of justice.
Motion denied.

West Headnotes

**Federal Courts 170B ⟋106.5**

170B Federal Courts
    170BII Venue

        170BII(B) Change of Venue
            170BII(B)1 In General; Venue Laid in Proper Forum
                170Bk106 Determination in Particular Transferable Actions
                    170Bk106.5 k. In General. Most Cited Cases
    (Formerly 170Bk106)
Transfer of class action by trustee of health and welfare funds against pharmacy benefit managers (PBM) for funds and unnamed drug manufacturers, alleging breach of fiduciary duties under Employee Retirement Income Security Act (ERISA) and state law, to Eastern District of Missouri was not warranted for convenience of parties and witnesses, and in interests of justice; notwithstanding that defendants were defending against similar suit in Eastern District of Missouri, Southern District of New York was where majority of relevant trial witnesses and trustee were located, as well as where operative facts occurred. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.;28 U.S.C.A. § 1404(a).

*OPINION*

DANIELS, J.
**\*1** Plaintiff Patrick J. Lynch, as trustee of the Health and Welfare Fund of the Patrolmen's Benevolent Association of the City of New York ("PBA") and the Retiree Health and Welfare Fund of the PBA (collectively, the "Funds") brings this suit alleging breach of fiduciary duty in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001*et. seq.* and common law. Defendants moved to transfer the instant action to the Eastern District of Missouri pursuant to 28 U.S.C. § 1404(a). For the reasons stated below, defendants' motion to transfer the case to the Eastern District of Missouri is denied.

*I. Background*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiff Patrick Lynch, the Trustee for the Funds of the PBA, retained defendant National Prescription Administrators ("NPA"), headquartered in East Hanover, New Jersey, as its Pharmacy Benefit Manager ("PBM") from 1981 to August 2002. In this capacity, NPA worked with prescription drug plan sponsors, insurance companies and/or third party administrators to facilitate the supply of prescription drugs to participants whose plans provide such benefits. Defendant Express Scripts, Inc. ("ESI"), also a PBM, acquired NPA in April 2002 and served as the Funds' PBM from April until August 2002. In his complaint, plaintiff alleges that NPA and ESI breached their fiduciary duty under ERISA and under common law by benefitting from various "pricing spreads" and "kickbacks" from the drug manufacturers. Complaint at 2, ¶¶ 3, 4. According to plaintiff, these activities allowed defendants to "enrich themselves at the expense of the [Funds]" by receiving discounts and rebates from drug manufacturers which defendants then converted for their benefit .[FN1] Plaintiff further alleges that unnamed drug manufacturer defendants aided and abetted NPA and ESI in breaching their fiduciary duties.

> FN1. *Id.* Plaintiff brings suit as a class action on behalf of all self-funded prescription drug plans and all such plans that are employee benefit plans.

## II. *Discussion*

Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." This statute gives district courts discretion to transfer cases according to "an individualized, case-by-case consideration of convenience and fairness." *Stewart Organization, Inc. v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988).

The inquiry on a motion to transfer is twofold. The court must first determine whether the action

sought to be transferred is one that 'might have been brought' in the transferee court. Second, the court must determine whether, considering the 'convenience of parties and witnesses' and the interest of justice, a transfer is appropriate.

*Wilshire Credit Corp. v. Barrett Capital Management Corp.,* 976 F.Supp. 174 (W.D.N.Y.1997). Plaintiff does not dispute that the present action could have been brought in the Eastern District of Missouri, as defendant ESI's principal place of business is located within that district in St. Louis, Missouri.

**\*2** In deciding the appropriate choice of forum, courts have looked to both the " 'private interest factors' affecting the convenience of the litigants" and the " 'public interest factors' affecting the convenience of the forum." *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241, 102 S.Ct. 252, 258, 70 L.Ed.2d 419 (1981) (citation omitted).[FN2] The private interest factors include:

> FN2. The public factors include the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty. *See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241, 102 S.Ct. 252, 70 L.Ed.2d 419. These factors are typically analyzed in a *forum non conveniens* determination. *Van Cauwenberghe v. Baird,* 486 U.S. 517, 108 S.Ct. 1945, 100 L.Ed.2d 517 (1988).

(1) the convenience of witnesses; (2) the location of relevant documents and relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2004 WL 385156 (S.D.N.Y.), 33 Employee Benefits Cas. 1099
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 385156 (S.D.N.Y.))**

witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interest of justice, based on the totality of the circumstances. *MBCP Peerlogic LLC v. Critical Path, Inc.,* 2002 WL 31729626 at *3 (S.D.N.Y.2002)(citing *Constitution Reins. Corp. v. Stonewall Ins. Co.,* 872 F.Supp. 1247, 1250 (S.D.N.Y.1995)).*See also*Dwyer v. General Motors Corp., 853 F.Supp. 690, 692 (S.D.N.Y.1994); *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). While courts are to consider the above factors, there is "no rigid formula for balancing these factors and no single one of them is determinative."*Citigroup, Inc. v. City Holding Company and City Nat'l Bank,* 97 F.Supp.2d 549, 561 (S.D.N.Y.2000) (citations omitted). In addition, the Court must defer to the plaintiff's choice of forum unless the balance of convenience and justice weigh heavily in favor of defendant's proposed forum. *Id.;Toy Biz, Inc. v. Century Corp.,* 990 F.Supp. at 330 (S.D.N.Y.1998); *Jannus Group, Inc. v. Independent Container, Inc.,* 1998 U.S. Dist. LEXIS 13106 *9 (S.D.N.Y. Aug. 24, 1998).

Defendants advance several theories in favor of transfer. They contend that this case is related to *Minshew v. ESI,* a case presently pending before the United States District Court for the Eastern District of Missouri, and should therefore be transferred in the interest of judicial economy. They also contend that the majority of the witnesses and relevant documents are in the Eastern District of Missouri. They further argue that in class actions like the present case, the plaintiff's choice of forum is entitled to minimal weight. *Berman v. Informix Corp.,* 30 F.Supp.2d 653, 659 (S.D.N.Y.1998).

A. *Convenience of the Witnesses*

The first factor, the convenience of witnesses, is considered the single most important factor in the analysis of whether a transfer should be granted.*Aerotel, Ltd. v. Sprint Corp.,* 100 F.Supp.2d

189, 197 (S.D.N.Y.2000). The moving party must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover. *Factors Etc. v. Four Seasons Hotels, Ltd., 579 F.2d 215, 218 (1978).* Defendants contend that the location of the primary witnesses favors transfer to the Eastern District of Missouri. Defendants provide supporting affidavits naming seventeen members of the ESI Senior Management Team in St. Louis as potential witnesses, and state that the "management activities" of NPA have been transferred to ESI in St. Louis. Cordes Affidavit ("Aff."), ¶¶ 1, 3-8; Zimmerman Aff., ¶ 2. Although the number of witnesses named seem to favor defendants' argument, "[d]etermining the convenience of a forum to witnesses requires more than simply adding up the number of potential witnesses in the alternative fora. The nature and importance of a potential witness's testimony also inform the Court's determination."*Garrel v. NYLCare Health Plans, Inc. & NYLCare Health Plans of the Mid-Atlantic, Inc.,* 1999 WL 459925 (S.D.N.Y.1999)(citing *Vaughn v. American Basketball Assn.,* 419 F.Supp. 1274, 1276 (S.D.N.Y.1976).

**\*3** Defendants contend that most of NPA's senior employees are no longer employed by ESI. They deny knowledge of any NPA witnesses in New York. Despite the defendants' contentions, plaintiff asserts that former NPA employees comprise most of the key witnesses and that many of them continue to reside in the New York-New Jersey area.[FN3]Plaintiff further argues that NPA continues to employ other key witnesses and is still located in East Hanover, New Jersey, approximately twenty miles from this Court. Because ESI headquarters are located in St. Louis, at least some records and witnesses relevant to this case may be found in Missouri. However, defendants have not established that convenience of the witnesses as a whole will be increased through transfer of venue. The defendants fail to consider that NPA, located in New Jersey, served as the pharmacy benefit manager of the NYC PBA Funds for twenty years prior to its acquisition by ESI. Moreover, although de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 4
Not Reported in F.Supp.2d, 2004 WL 385156 (S.D.N.Y.), 33 Employee Benefits Cas. 1099
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 385156 (S.D.N.Y.))**

fendants argue that discovery and trial will be costly, disruptive and will involve "high-level managers," they fail to explain precisely in what manner its own employees would be inconvenienced or their business operations disrupted. Memorandum in Support of Defendants' Motion for Transfer Under 28 U.S.C. § 1404(a) ("Defendants' Brief") at 10-12. The convenience of the witnesses, therefore, does not favor transfer of this case from this jurisdiction.

> FN3. E.g., President Richard Ullman, NPA former President; Carmine Russo, Funds Administrator for the Health and Welfare Fund and the Retiree Health and Welfare Fund of the PBA; Stacy Tabor, Executive V .P. for Customer Relations; Allan Zimmerman, Senior Executive and General Manager.

B. *Location of Documents and Access to Sources of Proof*

Courts have held that "[t]he location of documents factor is neutral '[in] today's era of photocopying, fax machines and Federal Express.' " *Aerotel, Ltd. v. Sprint Corp.,* 100 F.Supp.2d 189, 197 n. 2 (S.D.N.Y.2000)(*quotingCoker v. Bank of America,* 984 F.Supp. 757, 766 (S.D.N.Y.1997). Here, defendants argue that because ESI's principal place of business is in St. Louis and NPA "records, practices, and governance" have been shifted to ESI headquarters, the cost to them in terms of "time, money and disruption of their business operations, particularly in arranging for virtually all the sources of proof in the case to be transported to New York" would far outweigh the cost to plaintiff in attending trial in Missouri. Defendants' Brief at 10-11. However, defendants do not specify the nature and extent of relevant documents located in Missouri. They also fail to demonstrate that the amount of physical evidence situated in Missouri is so overwhelming that it is impractical and unduly burdensome to ship it back to New York. Moreover, defendants ignore plaintiff's assertion that some evidence is still located in NPA's East Hanover, NJ of-

fices. Since documents can be transmitted to New York, and it is possible that many documents may still be retained by NPA in New Jersey, this factor does not favor transfer.

C. *Convenience of the Parties*

Plaintiff argues that the NYC PBA Funds and their material witnesses are located in or near the Southern District of New York. Defendants contend that ESI employees are "likely" to be primary witnesses and that their testimony is "likely" to be "central" to this case. Defendant's Brief at 10. Defendants further contend that it would be both expensive and disruptive for ESI's employees to attend two separate trials, one "halfway across the country" from ESI headquarters. *Id.* Defendants have not established that they shoulder a greater burden in litigating this case in plaintiff's chosen venue than plaintiff would if this case were litigated in Missouri. Given that plaintiff Lynch is in his home forum and NPA, plaintiff's Pharmacy Benefit Manager of two decades, is within twenty miles of this District, a transfer to Missouri would "merely switch the burden of inconvenience from one party to the other."*Schieffelin & Co. v. Jack Co. of Boca, Inc.* 725 F.Supp. 1314, 1322 (S.D.N.Y.1989). The convenience of the parties, therefore, if not neutral, does not clearly swing in defendants' favor.

D. *Locus of Operative Facts*

*4 "The location of the operative events is a primary factor in determining a § 1404(a) motion to transfer."*ZPC 2000, Inc. v. SCA Group, Inc.,* 86 F.Supp.2d 274 (S.D.N.Y.2000)(*quotingSmart v. Goord,* 21 F.Supp.2d 309 (S.D.N.Y.1998). Although defendants argue that "virtually all of the 'operative facts' of this lawsuit occurred in Missouri and elsewhere, but not in New York,"[FN4] many of the facts necessary to determine whether NPA and ESI were fiduciaries, arose in New York. Memorandum of Law in Opposition to Defendants' Motion to Transfer ("Plaintiff's Brief") at 10. Fur-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

thermore, plaintiff argues that the policies and practices of NPA that are in question were allegedly implemented in New York, where the NYC PBA Funds are located. *Id.* This factor, therefore, also favors non-transfer.

> FN4. Defendants' Brief at 10. According to plaintiff's Complaint, many of the operative facts arose in New Jersey and New York.

### E. *Availability of Process*

The fifth factor, the availability of process to compel the attendance of unwilling witnesses, also favors the plaintiff's choice of forum. Defendants in this case do not directly argue that process to compel unwilling witnesses is an issue. Plaintiff, on the other hand, asserts that the key non-party witnesses are primarily former NPA employees. They cannot be compelled to testify in an Eastern District of Missouri action under Fed.R.Civ.P. 45, since the majority of these non-party witnesses reside outside of that district. Plaintiff identifies specific non-party witnesses, who, because they reside within 100 miles of the Southern District of New York, are subject to subpoena by this Court pursuant to Fed.R.Civ.P. 45(c)(3) and can thus be compelled to appear pursuant to Fed.R.Civ.P. 45(c)(3)(A)(ii).FN5 As there is no process to compel the attendance of these witnesses if this case is transferred to the Eastern District of Missouri, this factor also favors non-transfer.

> FN5. Plaintiff identifies Richard Ullman, Stacy Tabor, and David Karlin as non-party witnesses that reside within 100 miles of the courthouse in this District. Plaintiff's Brief at 9.

### F. *Relative Means of the Parties*

"Where a disparity exists between the means of the parties, a court may consider the relative means of the parties in determining venue."*Everest Capital Ltd. V. Everest Funds Mgmt., L.L.C.,* 178

F.Supp.2d 459, 467 (S.D.N.Y.2002)(*quotingAerotel, Ltd. v. Sprint Corp.,* 100 F.Supp.2d 189, 197 (S.D.N.Y.2000)). Defendants do not offer any argument as to this factor. Plaintiff argues that he is Trustee for a health benefits fund serving the PBA, which represents both active and retired New York City Police Officers. Plaintiff maintains that a large disparity exists in this case. In contrast to the PBA, a non-profit organization, ESI is a multibillion dollar corporation that grossed over $820 million in profits in 2002. Plaintiff's Brief at 13. It is uncontested, therefore, that defendants' resources are greater than plaintiff's and that litigation in the Eastern District of Missouri would pose a much greater relative financial burden on plaintiff than the burden on defendants to litigate in this district. *Id.* at 467-68 (finding that the relative means factor weighed against the party with the greater resources).FN6

> FN6. It is not unreasonable that defendants who took over a New Jersey company doing business in New York would be expected and anticipated that they may be required to resolve disputes arising out of that activity in New York.

### G. *Forum's Familiarity with Governing Law*

**\*5** Plaintiff argues that because they have asserted violations of New York state law, the chosen forum of New York would best be able to apply that law. Plaintiff's Brief at 12. Defendants, however, dispute that New York law would apply to all of these claims, arguing that because the case has been presented as a class action, the laws of numerous states may apply. Transcript of Oral Argument, July 9, 2003 at 33. They further argue that "[I]n this day of on-line legal research, a federal judge in Missouri is well equipped to apply the existing laws" to the present action, under "ERISA or state law." Defendants Reply Memorandum in Support of Their Motion for Transfer at 3. This logic applies equally to a federal judge in New York, where, in the absence of unique complex state law issues, a New York court would be "capable of applying" the laws

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2004 WL 385156 (S.D.N.Y.), 33 Employee Benefits Cas. 1099
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 385156 (S.D.N.Y.))**

of another state. *S-Fer Intern., Inc. v. Paladion Partners, Ltd.,* 906 F.Supp. 211, 215-16 (S.D.N.Y.1995)(*citingElite Parfums, Ltd. v. Rivera,* 872 F.Supp. 1269 (S.D.N.Y.1995)). Taking as true that the laws of the fifty states will apply, this factor does not weigh in favor of transferring this case to Missouri, as both the Missouri and New York courts will be capable of applying the varying laws of the states.

### H. *Plaintiff's Choice of Forum*

"The plaintiff's choice of forum is ordinarily entitled to 'considerable weight.' " *Goggins v. Alliance Capital Management, L .P.,* 279 F.Supp.2d 228, 232 (S.D.N.Y.2003)(*citingIn re Nematron Corp. Sec. Litig.,* 30 F.Supp.2d 397, 405 (S.D.N.Y.1998)). Defendants argue, however, that plaintiff's choice of his home forum is weakened both because plaintiff seeks to represent a national class and because the operative facts of the case have no "material connection with this district." Defendants' Brief at 9. Plaintiff counters that the principal events giving rise to the instant case occurred between the NYC PBA Funds and NPA within a short distance of this District. Plaintiff also asserts that the choice of his home forum indicates that it is more likely he has taken pains to avoid inconvenience and annoyance to the parties. Plaintiff's Brief at 11. Given that NPA was Pharmacy Benefit Manager to the PBA of the City of New York for more than twenty years, and the activities of the NPA with respect to the PBA is at issue, it is clear that a "material connection" exists between New York and the underlying transactions of this claim. *SeeBerman,* 30 F.Supp .2d at 659 (equating "material connection" to "significant contact between the forum state and the underlying events allegedly underlying the claim). Consequently, the possible certification of this case as a class action creates fewer issues weighing against according deference to plaintiff's choice of forum. Thus, because the balance of the factors do not strongly favor defendants at this point, this factor favors non-transfer. *Id.* (finding that plaintiff's

choice of forum was outweighed by the factors which overwhelmingly favored defendant).

### I. *Trial Efficiency and the Interest of Justice*

*\*6* "The interest of justice is a broad concept which requires the court to consider the *totality of the circumstances* presented."*Capital Venture Int'l. v. Network Commerce, Inc.,* No. 01 Civ. 4390, 2002 WL 417246, at \*1 (S.D.N.Y. Mar.15, 2002)(emphasis added). Defendants rely heavily on their argument that the instant case is "related" to *Minshew,* an action pending in the transferee court. The two cases are certainly similar in that they share some of the same factual questions and legal issues. As plaintiffs point out, however, *Minshew* does not name NPA as a defendant, does not involve any employee benefit plans that employed NPA as their PBM, was brought by an individual participant of a plan, and does not include the consumer fraud claim or common law claims on behalf of non-ERISA plans. Moreover, "[w]hile the existence of related litigation in another district is a factor that favors transfer ... it is only one factor to consider and balance with all the other factors on a case-by-case basis."*Queens Legal Ser. Corp. v. Legal Ser. Corp.,* 2000 WL 1093001 at \*4 (S.D.N.Y.2000)(*quotingMuller v. Walt Disney Productions,* 822 F.Supp. 1033, 1037 (S.D.N.Y.1993)). Here, where "[a] district court maintains broad discretion in deciding whether to transfer a case 'in the interest of justice," ' and where the totality of the circumstances weigh in favor of remaining in the plaintiff's chosen forum, any relatedness of the instant case to *Minshew* does not compel transfer to the Eastern District of Missouri. *SeeAPA Excelsior III L.P. v. Premiere Technologies, Inc.,* 49 F.Supp.2d 664, 667 (S.D.N.Y.1999).

### III. *Conclusion*

In sum, the convenience of the majority of relevant trial witnesses, the ability to compel the attendance of unwilling witnesses, the convenience of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 385156 (S.D.N.Y.), 33 Employee Benefits Cas. 1099
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 385156 (S.D.N.Y.))**

plaintiff and relative inconvenience to the defend-
ant, the locus of operative facts, and the relative
means of the parties supports keeping this case in
the Southern District of New York. Defendant has
failed to meet its burden of demonstrating that the
transfer to the Eastern District of Missouri is war-
ranted in the interest of justice. Defendant's motion
to transfer, therefore, is denied.

S.D.N.Y.,2004.
Lynch ex rel. Trustee of Health and Welfare Fund
of Patrolmen's Benevolent Ass'n of City of New
York and Retiree Health & Welfare Fund of Patrol-
men's Benevolent Ass'n of City of New York v. Na-
tional Prescription Adm'rs
Not Reported in F.Supp.2d, 2004 WL 385156
(S.D.N.Y.), 33 Employee Benefits Cas. 1099

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7

Westlaw.

Not Reported in F.Supp.                                                                                  Page 1
Not Reported in F.Supp., 1996 WL 413720 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1996 WL 413720 (S.D.N.Y.))**

C

Raines v. Switch Manufacturing Corp.

S.D.N.Y.,1996.

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Mark A. RAINES, Gregory A. Deeney and Preston Binding Co., Plaintiffs,

v.

SWITCH MANUFACTURING CORP., Defendant.

**No. 96 CIV. 2361 (JFK).**

July 24, 1996.

Rogers & Wells, John E. Daniel, Robert D. Schaffer, New York City, for Plaintiffs.

Lucas & Just, David L. Just, Donald C. Lucas, New York City, for Defendant Switch Manufacturing.

*OPINION and ORDER*

KEENAN, District Judge:

*1 Defendant moves the Court for an order transferring this action pursuant to 28 U.S.C. § 1404(a) to United States District Court for the Northern District of California. The Court grants Defendant's motion.

*Background*

This is an action for patent infringement. Plaintiffs Mark A. Raines ("Raines") and Gregory A. Deeney ("Deeney") are Oregon residents. Plaintiffs Raines and Deeney are allegedly co-inventors and co-owners of a patent for a certain type of snowboard binding. *See*United States Patent No. 4,973,073 ("the patent") (issued Nov. 27, 1990). Plaintiff Preston Binding Company ("Preston") is a Washington corporation with its principal place of business in Preston, Washington. Preston is a wholly-owned subsidiary of Ride, Inc. ("Ride"), a Washington corporation with its principal place of business also in Preston, Washington. Plaintiff Preston claims a present material interest in the patent, having allegedly entered into an agreement with Plaintiffs

Raines and Deeney to own the patent "in the near future." *See* Compl. ¶ 9.

Defendant Switch Manufacturing Corp. ("Switch") is a California corporation with its principal place of business in San Francisco, California. Defendant Switch develops, designs, manufactures and sells boot and binding systems for snowboards. The Complaint alleges that Defendant Switch is willfully and intentionally infringing Plaintiffs' patent by selling certain snowboard binding systems, both within this district and elsewhere, without Plaintiffs' authorization. *See* Compl. ¶¶ 12, 13.

Defendant Switch moves for transfer, admitting that venue is proper in this district under 28 U.S.C. §§ 1391(c) and 1400(b), but arguing that transfer is warranted under 28 U.S.C. § 1404(a). *See* Def.'s Mem. at 3-4. Plaintiffs oppose the motion. *See* Pls.' Mem. at 1-4.

*Discussion*

A defendant may move to transfer a civil action for the convenience of the parties and witnesses and in the interest of justice to any other district or division where it might initially have been brought. *See*28 U.S.C. § 1404(a). The Court may consider Defendant's motion because this action could have been brought initially in the Northern District of California. *See*28 U.S.C. § 1400(b). A determination on the motion lies in the Court's sound discretion. *See Factors, Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 218 (2d Cir.1978), *cert. denied,*440 U.S. 908 (1979); *Seagoing Uniform Corp. v. Texaco, Inc.,* 705 F.Supp. 918, 936 (S.D.N.Y.1989). Defendant Switch has the burden of establishing the propriety of the transfer by a clear and convincing showing. *See Factors,* 579 F.2d at 218; *Kanbar v. U.S. Healthcare, Inc.,* 715 F.Supp. 602, 604 (S.D.N.Y.1989). The Court considers as relevant factors (1) where the operative events occurred; (2) the location of relevant witnesses and documents;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 2
Not Reported in F.Supp., 1996 WL 413720 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1996 WL 413720 (S.D.N.Y.))**

(3) any inconvenience to the parties; (4) Plaintiff's choice of forum and (5) the docket conditions of the transferor and transferee districts. *See Kanbar,* 715 F.Supp. at 605; *Chokoladefabriken Lindt & Sprungli Aktiengesellschaft v. Rykoff-Sexton, Inc.,* 24 U.S.P.Q.2d 1236, 1238 (S.D.N.Y.1992). The convenience of the party and non-party witnesses is particularly important. *See Nieves v. American Airlines,* 700 F.Supp. 769, 772 (S.D.N.Y.1988).

1. Operative events

**\*2** Defendant argues that the operative events which give rise to this action-Plaintiffs' alleged creation of the binding, their efforts to patent that creation, and Defendant's allegedly infringing manufacturing activities-all occurred in the western United States. *See* Def.'s Mem. at 1-2. Defendant argues that no operative events occurred in this district, insofar as no infringing activity attributable to Switch occurred in New York. *See* Def.'s Mem. at 10-11. Defendant acknowledges that "[i]nfringement occurs whenever someone 'makes, uses, sells or offers for sale' a patented device without the consent of the patent owner" and also acknowledges that a small percentage of Switch products are sold in this district. *See* Reply Mem. at 2-3, 8 (quoting 35 U.S.C. § 271(a)). Defendant alleges, however, that the Switch products sold in this district are sold by an independent distributor, and therefore argues that those sales are not attributable to Switch as acts of infringement within this district. *See* Reply Mem. at 8. For their part, Plaintiffs do not identify any operative events that occurred in this district. *See* Pls.' Mem. at 4-13.

Defendant Switch also alludes to a defect in personal jurisdiction within this district. *See* Def.'s Mem. at 5. Defendant cites *Art Leather Manufacturing Co., Inc., v. Albumx Corp.* for the proposition that a small number of sales through a distributor is "too remote to be the cause of the injury within the state of New York." *Art Leather Manufacturing Co., Inc., v. Albumx Corp.,* 888 F.Supp. 565, 567-68 (S.D.N.Y.), *dismissed by,*67 F.3d 319 (2d

; *see also Ariola v. King,* 505 F.Supp. 30, 31 (D.C.Ariz.1980) (allowing transfer on due process grounds despite marginal infringement within the transferor district). Leaving aside the issue of personal jurisdiction, which is not before the Court on this motion, *Art Leather Manufacturing* supports a finding that the action against Switch has no material connection to this district. Accordingly, the deference usually given to a plaintiff's choice of forum is significantly reduced. *See Chokoladefabriken Lindt,* 24 U.S.P.Q.2d at 1238.

2. Location of documents, location of witnesses, and inconvenience of the parties

Defendant argues that the location of relevant documents, the location of the witnesses, and the inconveniences faced by the parties all favor a transfer. The Court agrees.

Plaintiffs do not claim to reside or to do substantial business in this district. *See* Pls.' Mem. at 4-7. The Court therefore finds no substantial inconvenience to the Plaintiffs resulting from a transfer. *See* Def.'s Reply Mem. at 4 (arguing that the individual plaintiffs have such strong contacts with the western United States that they would not be inconvenienced by a transfer).

Plaintiffs do not claim that the relevant documentary evidence-Plaintiffs' or Defendant's evidence-is located in this district. *See* Pls.' Mem. at 7. Plaintiffs argue that the location of documentary evidence is not material since Defendant Switch's documents "are, without doubt, limited in number" and easily transported. *Id.* Even assuming Defendant's documents are easily transported, however, this ease of transport weighs no more heavily in favor of this district than the proposed transferee district.

**\*3** The Court finds that the location of the probable witnesses favors transfer. The Court accepts Defendant's argument that the individual plaintiffs, their patent attorney, most of Plaintiff Preston's of-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 3
Not Reported in F.Supp., 1996 WL 413720 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1996 WL 413720 (S.D.N.Y.))**

ficers and employees, and all of Defendant Switch's officers and employees are located in the western United States. *See* Def.'s Reply Mem. at 6-8. Although Plaintiffs argue that their probable witnesses favor an east coast venue and will be inconvenienced by a transfer, Plaintiffs do not identify a single witness within this district, and actually identify only three probable witnesses: two from Toronto, Canada and one from Boston, Massachusetts. Although Plaintiffs do state a general intention to call expert and third-party witnesses from the Washington, D.C. area, the northeast United States, and possibly Europe, *see* Pls.' Mem. at 2, 5-7, Defendant persuasively responds that such expert witnesses fully expect to travel and may be found "throughout the United States," including the San Francisco area. Def.'s Reply Mem. at 5.

A final issue relative to the convenience to the parties is consideration of the parties' relative financial means. *See Dwyer v. General Motors Corp.,* 853 F.Supp. 690, 694 (S.D.N.Y.1994); Lorenz Aff.Ex. 1 (showing Ride, Inc.'s sales figures). The Court finds that retaining the action in this district would both unduly burden Defendant and needlessly complicate the litigation process. These concerns outweigh whatever minimal inconvenience accruing to Plaintiffs from a transfer, especially where Plaintiffs and this action have no substantial contacts with this district. *See Max Planck Gesellschaft v. General Electric Co.,* 858 F.Supp. 380, 382 (S.D.N.Y.1992); *Dwyer,* 853 F.Supp. at 694; *Chokoladefabriken Lindt,* 24 U.S.P.Q.2d at 1238.

**3. Plaintiff's choice of forum and respective docket conditions**

Plaintiffs correctly argue that deference should be given to their choice of forum. *See* Pls.' Mem. at 8 (citing *Schieffelin & Co. v. Jack Co. of Boca, Inc.,* 725 F.Supp. 1314, 1321-22 (S.D.N.Y.1989) (Keenan, J.)). But as Plaintiffs themselves acknowledge, this deference fades if, as here, "the balance of factors weighs strongly in favor of the defendant." *See* Pls' Mem. at 8.

Finally, the Court notes that the Southern District of New York is one of the busiest in the nation. The interests of judicial economy demand that parties may bring suit here only by showing a substantial connection between the cause of action and this district. *See Kanbar,* 715 F.Supp. at 605. As noted above, Plaintiffs have failed to show such a connection.

**4. Consolidation**

Plaintiffs argue that the Court should not consider Defendant's desire to consolidate this action with Defendant's subsequently filed action against Plaintiffs in the Northern District of California. *See* Pls.' Mem. at 1-4. The Court agrees that a subsequently filed action "should not control the court's selection of a proper forum" on a motion to transfer. *See* Pls.' Mem. at 14 n. 12 (citing *Intercontinental Monetary Corp. v. Performance Guarantees, Inc.,* 705 F.Supp. 144, 151-52 (S.D.N.Y.1989). The Court therefore does not consider consolidation as a factor.

*Conclusion*

\*4 For the foregoing reasons, the Court is satisfied that Defendant has met its burden and established the propriety of a transfer. *See Factors,* 579 F.2d at 218; *Kanbar,* 715 F.Supp. at 604. The Court grants Defendant's motion and hereby directs the Clerk of the Court to transfer this action pursuant to 28 U.S.C. § 1404(a) to United States District Court for the Northern District of California and thereafter to close this case and to remove it from the Court's active calendar.

SO ORDERED.

S.D.N.Y.,1996.
Raines v. Switch Manufacturing Corp.
Not Reported in F.Supp., 1996 WL 413720 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 8

Westlaw.

Not Reported in F.Supp.2d                                                         Page 1
Not Reported in F.Supp.2d, 2004 WL 1661115 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 1661115 (S.D.N.Y.))**

**H**
Solutia Inc. v. FMC Corp.
S.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
SOLUTIA INC., Plaintiff,
v.
FMC CORPORATION, Defendant.
**No. 04 Civ. 2842(WHP).**

July 27, 2004.

Barbara B. Edelman, Mindy Barfield, Dinsmore &
Shohl LLP, Lexington, KY, for plaintiff.
Ann B. Laupheimer, Jeremy A. Rist, Blank Rome
LLP, Philadelphia, PA, for defendant.

*MEMORANDUM and ORDER*

PAULEY, J.
*1 Plaintiff Solutia Inc. ("Solutia") brings this ac-
tion against defendant FMC Corporation ("FMC")
for damages arising from FMC's alleged breach of a
joint venture agreement. On February 20, 2004,
Solutia filed this action in the Bankruptcy Court for
the Southern District of New York, where it is cur-
rently in Chapter 11 bankruptcy proceedings. FMC
moves to withdraw the reference of this adversary
proceeding from the bankruptcy court to this Court.
For the reasons set forth below, FMC's motion to
withdraw the reference is granted.

*BACKGROUND*

FMC and Solutia are both national, publicly-traded
companies doing business in the global chemicals
sector. (Compl.¶ 6.) On April 29, 1999, the parties
entered into a Joint Venture Agreement (the
"Agreement") to combine their purified phosphoric
acid [FN1] ("PPA") businesses into a new joint ven-
ture. (Compl.¶¶ 8, 10.) The Agreement required
each party to contribute equally-valued assets and
intellectual property to the venture, including produc-
tion facilities, research and development facilit-

ies and other assets. (Compl. ¶¶ 14-16, Appendix
A: Joint Venture Agreement ¶¶ 6, 6.2, 6.4.) The
Agreement also required FMC to contribute a li-
cense to use certain technologies (the "wet pro-
cessed" method) developed by FMC and FMC's
Spanish subsidiary, FMC Foret, for use at a facility
in Conda, Idaho (the "Conda Facility"). (Compl. ¶¶
16, 18, 21-22; Agreement ¶ 6.4.) Solutia contends
that under the Agreement, the parties agreed to pro-
duce food-grade PPA for human consumption using
the wet-processed method. (Compl.¶¶ 8, 18.) The
Federal Trade Commission approved the venture,
and the parties jointly formed Astaris, LLC
("Astaris") on April 1, 2000. (Compl.¶¶ 11-14.)
Each party owns fifty percent of Astaris. (Compl. ¶
14; Agreement ¶ 5.1.)

> FN1. According to the complaint, PPA is
> "a principal ingredient in may food and in-
> dustrial applications, including the produc-
> tion of phosphate salts."(Compl.¶ 7.)

Solutia initially filed suit against FMC in Missouri
state court on October 16, 2003, alleging that the
Conda Facility never performed as expected, and
attributing Astaris' problems to FMC. (FMC Mem.
Ex. B: Missouri Complaint; Com pl. ¶¶ 25-26.) The
Missouri action contained state law claims only, in-
cluding allegations of breach of contract, breach of
fiduciary duty, and negligent and fraudulent mis-
representations concerning FMC's wet processed
method. (FMC Mem. Ex. B.) FMC filed a motion to
dismiss on December 15, 2003. Shortly thereafter,
Solutia filed for bankruptcy in the Bankruptcy
Court for the Southern District of New York. The
Solutia reorganization involves over 90,000 credit-
ors and claims of over $3 billion. The Missouri
court scheduled a hearing for the motion to dismiss
for March 17, 2004. However, on February 20,
2004, Solutia voluntarily dismissed the Missouri
action and filed this action, containing nearly
identical allegations, against FMC in the bank-
ruptcy court. (*Compare* FMC Mem. Ex. B, *with*
FMC Mem. Ex. C.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In this action, Solutia alleges: (1) breach of article 6.4 of the Agreement due to FMC's failure to supply technology capable of producing 80,000 metric tons of food-grade PPA (the "technology") (Compl.¶¶ 37-41); (2) breach of article 16.1 of the Agreement due to FMC's failure to disclose all facts relevant to the transaction (Compl.¶¶ 42-48); (3) breach of article 3.14(c) of the Asset Transfer Agreement for failure to supply the technology capable of producing 80,000 metric tons of food-grade PPA (Compl.¶¶ 49-55); (4) breach of article 6.2 of the Assignment Agreement for failure to deliver the technology; (5) breach of fiduciary duty (Compl.¶¶ 56-60); (6) negligent misrepresentation based on FMC's alleged failure to disclose that the technology would not be readily adoptable to the Conda Facility and would not be as successful as it was in Spain (Compl.¶¶ 70-76); and (7) fraud and fraud in the inducement with respect to FMC's alleged withholding of material information about the technology (Compl.¶¶ 77-87).

*2 Solutia seeks at least $322 million in compensatory damages, lost profits, and punitive damages. (Compl.¶¶ 41, 48, 55, 60.) Solutia also seeks, alternatively, rescission of the Agreement and restitution for the value Solutia transferred to Astaris. (Compl.¶¶ 69, 78, 87.) The parties agree that there are no substantive rights under Chapter 11 implicated in this suit, and that there are no claims involving the right of priority of Solutia's creditors. (See FMC Mem. at 7.)

## DISCUSSION

### I. Applicable Legal Standards

In 1984, Congress enacted the Bankruptcy Amendments and Federal Judgeship Act of 1984, which states that jurisdiction of all core bankruptcy proceedings is vested exclusively in federal district courts. 28 U.S.C. § 1334(a). By standing order dated July 10, 1984, this adversary proceeding was automatically referred to the Bankruptcy Court for the Southern District of New York as a case arising under, or related to a case under, Title 11 of the United States Code. FMC moves for an order withdrawing the reference to the bankruptcy court pursuant to 28 U.S.C. § 157(d).Section 157(d) states in relevant part, "[t]he district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its motion or on a timely motion of any party, for cause shown,"28 U.S.C. § 157(d). As there is no statutory definition of what "cause" suffices for withdrawal of the reference, this Court looks to *Orion Pictures Corp. v. Showtime Networks,* 4 F.3d 1095 (2d Cir.1993), the seminal case on that subject. *SeeIridium Operating LLC v. Motorola, Inc.,* 285 B.R. 822, 828 (S.D.N.Y.2002).

In *Orion Pictures,* the Second Circuit established factors for district courts to consider in determining whether cause exists to warrant withdrawal: "(1) whether the claim is core or non-core; (2) what is the most efficient use of judicial resources; (3) what is the delay and what are the costs to the parties; (4) what will promote uniformity of bankruptcy administration; (5) what will prevent forum shopping; and (6) other related factors."*Orion Pictures Corp. v. Showtime Networks,* 4 F.3d 1095, 1101 (2d Cir.1993); *accordSouth Street Seaport Ltd. Partnership v. Burger Boys, Inc.,* 94 F.3d 755, 762 (2d Cir.1996).

### II. Orion Factors

#### A. Core/Non-Core

"A district court considering whether to withdraw the reference should first evaluate whether the claim is core or non-core, since it is upon this issue that questions of efficiency and uniformity will turn."*Orion Pictures,* 4 F.3d at 1101;*accordIridium Operating,* 285 B.R. at 834. It is undisputed that this action concerns a non-core dispute. Unlike core proceedings, non-core proceedings involve disputes over rights that are unrelated to the federal bankruptcy laws and could proceed in a court that lacks

Not Reported in F.Supp.2d                                                                                        Page 3
Not Reported in F.Supp.2d, 2004 WL 1661115 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 1661115 (S.D.N.Y.))**

federal bankruptcy jurisdiction. *Complete Mgmt., Inc. v. Arthur Andersen LLP,* 02 Civ. 1736 (NRB), 2002 WL 31163878, at *2 (S.D.N.Y. Sept. 27, 2002); *Weschler v. Squadron, Plesent & Sheinfeld LLP,* 201 B.R. 635, 639 (S.D.N.Y.1996). While a bankruptcy judge may preside over a non-core proceeding, he may not determine the action and is "only empowered to submit proposed findings of fact and conclusions of law to the district court for *de novo* review."*Orion Pictures,* 4 F.3d at 1101. Since "non-core matters [are] subject to *de novo* review by the district court[,] ... [the court could] conclude that in a given case unnecessary costs could be avoided by a single proceeding in district court."*Orion Pictures,* 4 F.3d at 1101.

*3 The non-core nature of this adversary proceeding strongly weighs in favor of withdrawal of the reference. While this favor tips in favor of FMC's position, a court is not required to withdraw the reference solely because a proceeding is non-core. *Durso Supermarkets, Inc. v. D'Urso,* 170 B.R. 211, 214 (S.D.N.Y.1994). Accordingly, this court also weighs questions of efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors in determining whether to withdraw the reference for this non-core proceeding. See*Orion Pictures,* 4 F.3d at 1101.

B. *Efficient Use of Judicial Resources*

FMC argues that the reference should be withdrawn due to the complexity of this proceeding, especially against the backdrop of the Solutia bankruptcy, a major reorganization. FMC states that the following factors support a finding that efficient use of judicial resources favors a withdrawal of the reference: (1) the non-core nature of Solutia's claims; (2) the bankruptcy court's lack of experience with this litigation; (3) the interference with the Solutia reorganization before the bankruptcy court; (4) the suitability of the district court for a lengthy trial of non-core claims and the need for supervision over intensive discovery; and (5) the requirement of *de*

*novo* review by this Court if it declines to withdraw the reference.

Solutia argues that this Court will benefit from the bankruptcy judge's findings of fact and conclusions of law, even with respect to matters to be reviewed *de novo.*Solutia contends that the mere fact that the bankruptcy court's findings will be subject to review is insufficient cause to withdraw the reference. Solutia attempts to analogize litigation of this matter before the bankruptcy judge to litigation of pre-trial matters before a magistrate judge. That analogy is imperfect. Bankruptcy judges are deluged with matters relating to the administration of bankrupt estates and are the busiest courts in the nation. This case will impose significant demands on any court overseeing it. Magistrate judges receive discrete assignments, and have much greater control over their calendars.

This Court finds that judicial economy favors withdrawal of the reference. By litigating this non-core matter in the district court, judicial resources will be conserved instead of having two courts administer two rounds of briefing and argument on the same issues. Further, the parties agree that this litigation will require discovery over at least a one year period and a trial of three to four weeks. The bankruptcy court's task will be complicated by discovery disputes that require judicial intervention.

C. *Delay and Expense to the Parties*

In a non-core proceeding, the bankruptcy court's findings are subject to *de novo* review, "which could lead to duplication of effort."*In re McMahon,* 222 B.R. 205, 208 (S.D.N.Y.1998); *accord*Abondolo v. GGR Holbrook Medford, Inc., 285 B.R. 101, 113 (E.D.N.Y.2002); *In re Kentile Floors, Inc.,* 95 Civ. 2470(LTS), 1995 WL 479512, at *4 (S.D.N.Y. Aug. 10, 1995). This factor strongly favors withdrawal of the reference. If this Court did not withdraw the reference it would conduct a *de novo* review of the bankruptcy court's rulings, resulting in relitigation of claims and significant addi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2004 WL 1661115 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 1661115 (S.D.N.Y.))**

tional costs and expenditure of time and effort to both parties.

D. *Uniformity of Bankruptcy Administration*

*4 Solutia argues that considerations of uniformity in bankruptcy administration favor withdrawal of the reference since this action involves no substantive issues of federal bankruptcy law. *American Equities Group, Inc. v. Ahava Dairy Prods. Corp.,* 01 Civ. 5207(RWS), 2001 WL 1143188, at *3 (S.D.N.Y. Sept. 27, 2001). Where an action involves garden variety breach of contract matters that are non-core, uniformity in bankruptcy law "compels withdrawal" of those claims. *American Equities,* 2001 WL 1143188, at *2-3. A review of the complaint confirms that the issues in this dispute are exclusively state law matters involving breach of contract, breach of fiduciary duty, and misrepresentation. As there are no bankruptcy-related issues here, this factor weighs in favor of withdrawal of the reference.

E. *Forum Shopping*

The parties sharply refute each others' factual assertions regarding forum shopping. Solutia filed its complaint against FMC in Missouri state court in October of 2003. Subsequently, Solutia filed a bankruptcy petition in December 2003, and began to analyze its pending litigation. Solutia opted to voluntarily withdraw the Missouri action and refile the case as an Adversary Proceeding in Bankruptcy Court for reasons of economics and efficient administration of the estate. Solutia notes that no discovery was taken in the Missouri action.

FMC claims that Solutia's refiling in the Bankruptcy Court was a manipulative effort to get another "bite at the apple" since FMC had already filed a motion to dismiss, or to thwart a state jury trial. However, the Missouri court never heard oral argument on the motion to dismiss, so it is difficult to assess whether Solutia was forum shopping or merely consolidating litigation in an efficient man-

ner. Accordingly, this factor is neutral.

F. *Aggregation of Factors*

In sum, because this adversary proceeding is non-core and a majority of the other *Orion* factors support cause for withdrawal, FMC's motion to withdraw the reference is granted.

### CONCLUSION

For the reasons set forth above, defendant's motion to withdraw the reference to the bankruptcy court is granted.

S.D.N.Y.,2004.
Solutia Inc. v. FMC Corp.
Not Reported in F.Supp.2d, 2004 WL 1661115 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 9

Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)

**(Cite as: Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.))**

▷

Thompson v. Glenmede Trust Co.
E.D.Pa. 1993.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
B. Ray THOMPSON, Jr., et al.
v.
GLENMEDE TRUST COMPANY, et al.
**No. CIV. A. 92-5233.**

June 8, 1993.

MEMORANDUM AND ORDER

HUTTON.

**\*1** Presently before the Court is a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 23.1, 12(b)(6) and 9(b), the plaintiffs' response and the defendants' reply. The Motion is filed on behalf of defendants Glenmede Trust Company, Glenmede Corporation, Thomas W. Langfitt, Albert E. Piscopo, J. Howard Pew, J. N. Pew, III, J. N. Pew, IV, R. Anderson Pew, John G. Pew, Jr., G. Thompson Pew, Jr., Francis M. Richards, Jr., Karin E. Myrin and Samuel W. Morris, Sr..

## I. BACKGROUND

A. *Parties*

The plaintiffs in this matter include seven individual members of the Thompson family.[FN1] In addition, three plaintiffs have sued in their capacity as trustees of five Thompson family trusts.[FN2] The individual plaintiffs, in addition to their common bond in the Thompson family name, all hold shares of stock in Oryx Energy Corporation ("Oryx"). In addition, the five Thompson family trusts each hold shares of Oryx stock for the benefit of members of the Thompson family. Collectively, the plaintiffs were the second largest shareholder of Oryx. All plaintiffs shall be commonly referred to as the "Thompson Family" or "plaintiffs."

The plaintiffs have named as defendants the Glenmede Trust Company ("Glenmede Trust") and its parent Glenmede Corporation. Glenmede Trust is Glenmede Corporation's wholly owned subsidiary. The plaintiffs have also named J. Howard Pew, II, J. N. Pew, III, J. N. Pew, IV, R. Anderson Pew, John G. Pew, Jr., and G. Thompson Pew, Jr., as defendants (hereinafter "Pew Defendants"). These defendants are shareholders of Glenmede Corporation and have for the most part been directors of one or both of Glenmede Corporation and Glenmede Trust during the times relevant to the events complained of in the complaint. John G. Pew, Jr. was also a director of Oryx.

The complaint also names Thomas W. Langfitt. Mr. Langfitt is the president, chief executive officer and a director of both Glenmede Corporation and Glenmede Trust. Mr. Langfitt is also the president of seven trusts commonly known as the Pew Charitable Trusts.[FN3] In addition, the plaintiffs have named Albert E. Piscopo. Mr. Piscopo is the executive vice president and chief financial officer of Glenmede Corporation and Glenmede Trust. He was also a director of Oryx.

The plaintiffs have also named Glenmede Trust in its capacity as trustee of nine trusts. These trusts include the seven Pew Charitable Trusts and The Waldorf Educational Foundation, and The J. Howard Pew Fund for Presbyterian Uses. The remaining trustees of these trusts have also been named in the capacity as trustee. Defendants, J. Howard Pew, II, J. N. Pew, III, J. N. Pew, IV, and R. Anderson Pew, have been members of the board that assists in managing the Pew Charitable Trusts. Francis M. Richard, Jr. is sued in his capacity as co-trustee for the Medical Trust, one of the Pew Charitable Trusts. Karin E. Myrin and Samuel W. Morris, Sr. are sued in their capacities as co-trustees for the Waldorf Educational Foundation. The plaintiff has referred to all these trusts and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)
(Cite as: Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.))

trustees as the "Defendant Trusts."

*2 Finally, the plaintiffs have named Robert P. Hauptfuhrer. Mr. Hauptfuhrer is the chairman of the board, a director, and chief executive officer of Oryx.

B. Plaintiffs' Claims

The triggering event which prompted the filing of this diversity action involves a stock buy-back transaction in which Oryx purchased approximately 25.3 million shares held by the trusts of which Glenmede Trust was trustee. Glenmede Trust held shares of Oryx as trustee for the previously named nine trusts. Oryx purchased the 25.3 million shares for $1.36 billion. As a result of the purchase, the market for Oryx shares began to fall. From the date of the purchase, September 11, 1990 to the filing of the complaint on December 7, 1992, Oryx stock fell from a high of approximately $54 a share to the low to mid $20 range. The Thompson Family alleges a loss of approximately $80 million as a result of the buy-back transaction.

The plaintiffs contend that the goals of the transaction were: (1) to divert funds improperly out of Oryx and into the Defendant Trusts; (2) to liquidate or diversify the Defendant Trusts' holdings of Oryx stock and to maximize the value received for the Defendant Trusts' holdings in Oryx; (3) to entrench and protect defendant Hauptfuhrer in his executive position at Oryx; and (4) to allay his concerns that the Glenmede/Pew defendants might act unilaterally in a way that would threaten his position.

Plaintiffs have alleged that the transaction was instigated, devised and executed by Glenmede Trust, its parent, defendant Glenmede Corporation, and the Pew Defendants and the Defendant Trusts. (Complaint ¶¶ 3, 34). The plaintiffs allege that Glenmede Trust and Glenmede Corporation are controlled by the Pew family. Allegedly, the stock transaction was detrimental to Oryx and the plaintiffs and was extremely lucrative for Glen-

mede Corporation, Glenmede Trust, the Defendant Trusts and the Pew Defendants. (Complaint ¶ 43). Plaintiffs allege that Glenmede Trust failed to advise them before and after the transaction of its consequences to Oryx.

According to the allegations of the complaint, Glenmede owed fiduciary duties to plaintiffs (the Thompson family interests) at the same time as it owed duties to the Pew family interests. Plaintiffs allege that Glenmede and the Pew family interests are commonly controlled and indivisible, making the duties owed to plaintiffs even clearer. Those duties were allegedly breached when the Pew family interests were advanced by the buy-back transaction, and the Thompsons were ignored by Glenmede and harmed by the transaction it precipitated.

All defendants named in this action with the exception of defendant Robert P. Hauptfuhrer have collectively joined in this motion to dismiss.

II. DISCUSSION

Federal Rule of Civil Procedure 8(a) requires that a plaintiff's complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief ... " Fed.R.Civ.P. 8(a). Defendants have moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). When considering this motion, the Court shall take all allegations in the complaint as true and construe them in the light most favorable to the plaintiffs. *H.J. Inc. v. Northwest Bell Tel. Co.,* 109 S.Ct. 2893, 2906 (1989). The complaint shall only be dismissed if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Id.* (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

*3 As a special pleading matter, a count for fraud must be stated with particularity. Fed.R.Civ.P. 9(b). Rule 9(b) provides:

(b) Fraud, Mistake, Condition of the Mind. In all

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed.R.Civ.P. 9(b). To meet the requirement of Rule 9(b), the complaint must allege sufficient detail as to the circumstances of the alleged fraud so that the defendant will have notice of the precise misconduct charged. *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3d Cir.1984), *cert. denied,*469 U.S. 1211 (1985); *In re Scott Paper Securities Litigation,* 138 F.R.D. 56, 58 (E.D.Pa.1991); *Antinoph v. Laverell Reynolds Securities, Inc.,* 703 F.Supp. 1185, 1188 (E.D.Pa.1989) (Hutton, J.).

The defendants have also moved to dismiss pursuant to Federal Rule of Civil Procedure 23.1. The defendants contend that some of the plaintiffs' claims are derivative and must be filed on behalf of Oryx. However, they argue that since the plaintiffs have not complied with the pleading requirements of a derivative action under Rule 23.1, these "derivative claims" must be dismissed. Rule 23.1, entitled "Derivative Actions by Shareholders," in pertinent part provides:

In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law, and (2) that the action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and

the reasons for the plaintiff's failure to obtain the action or for not making the effort.

The Court will address each count separately.

A. *Count One: Breach of Fiduciary Duty*

Count one alleges violations of fiduciary duties owed to the Thompson Family. The count seeks relief against Glenmede Corporation, Glenmede Trust, the Pew Defendants, the Defendant Trusts, Defendant Langfitt and Defendant Piscopo. The plaintiffs' fiduciary allegations can be classified as: (1) the fiduciary relationship arising from Glenmede Trust's oral and written agreement to provide financial guidance to the Thompson Family (Complaint ¶ 21); and (2) the fiduciary relationship arising from the defendants' status as dominant and controlling shareholders and/or directors of Oryx. (Complaint ¶ 24).

*4 The plaintiffs have asserted that the defendants violated their fiduciary duties by:

(a) failing to advise plaintiffs that Oryx shares should be sold prior to the buy-back transaction;

(b) participating in the scheme and conspiracy [improperly diverting funds out of Oryx to the benefit of the Defendant trusts and entrenching defendant Hauptfuhrer at Oryx];

(c) entering into the buy-back transaction; and

(d) failing to advise plaintiffs at the time of or following the transaction of the detrimental effect of the transaction on Oryx and plaintiffs and to advise plaintiffs to sell their Oryx stock.

(Complaint ¶ 44).

1. Agreement for Financial Guidance-*Defendant Glenmede Trust Company*

The plaintiffs contend that Glenmede Trust owed fiduciary duties to them in its capacity as the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.))**

plaintiffs' investment advisor. (Complaint ¶¶ 1 and 20). This contractual fiduciary relationship allegedly covered the plaintiffs' ownership interest in Oryx. The defendant Glenmede Trust does not challenge the plaintiffs' claim of violation of this particular fiduciary relationship in this motion.

**2. Defendant Glenmede Corporation, Defendant Trusts, Defendant Langfitt, Defendant Piscopo and the *Pew Defendants***

The plaintiffs' complaint, although recognizing a distinction between Glenmede Trust and Glenmede Corporation, has commonly referred to both Glenmede Trust and Glenmede Corporation. The plaintiffs' reasoning behind this common reference is the allegation that "[b]oth entities have substantially similar management and directors and have each acted interchangeably ... " (Complaint ¶ 11). Although not entirely clear, it is apparent from the complaint and the parties' briefs that the fiduciary relationship with respect to the investment agreement is solely between defendant Glenmede Trust and the plaintiffs. (Complaint ¶¶ 1 and 20). The complaint states that the professional fiduciary is Glenmede Trust. (Complaint ¶ 1).

Nevertheless, with respect to Glenmede Corporation as well as the Pew defendants, the Defendant Trusts, Defendant Piscopo, and Defendant Langfitt, the plaintiffs have not alleged a fiduciary relationship. "A fiduciary relationship exists where there is 'a relationship involving trust and confidence, and the proof must show confidence reposed by one side and domination and influence exercised by the other." *Antinoph v. Laverell Reynolds Sec. Inc.,* 703 F.Supp. 1185, 1188 (E.D.Pa.1988), (Hutton, J.), (*quoting, Lehner v. Crane Co.,* 448 F.Supp. 1127, 1131 (E.D.Pa.1978)); *See also City of Harrisburg v. Bradford Trust,* 621 F.Supp. 463, 473 (M.D. Pa.1985). "It is not enough to show that the plaintiff reposed its trust in the defendant; the latter must also have accepted the fiduciary relationship." *City of Harrisburg,* 621 F.Supp. at 473; *Antinoph,* 703 F.Supp. at 1188.

The plaintiffs' complaint does not allege that plaintiffs have reposed their trust in these particular defendants nor does it allege that these particular defendants accepted a fiduciary relationship with the plaintiffs. *Antinoph,* 703 F.Supp at 1188; *Bradford Trust,* 621 F.Supp. at 473-474. The plaintiffs have only alleged the investment advisory fiduciary relationship with respect to Glenmede Trust. Accordingly, the plaintiffs' complaint does not allege a claim against these defendants for violation of a fiduciary duty.

**3. *Status as Shareholder and Director of ORYX***

\*5 To the extent that the plaintiffs have raised claims for breach of fiduciary duties arising from the defendants' status as dominant and controlling shareholder and/or directors of Oryx in count one, the plaintiffs' claim shall be dismissed. The plaintiffs freely admit that they have not complied with the requirements of Fed.R.Civ.P. 23.1. (Plaintiffs' Memorandum in Opposition at 9). In particular, the plaintiffs have not alleged that they have made efforts to obtain the desired action from the directors or comparable authority and from the shareholders or members, or the reasons for the failure to obtain the action or for not making the effort. Instead, they contend that Rule 23.1 does not apply to their complaint because it only seeks relief for claims which are individual. The defendants contend that these claims are derivative.

Under Delaware law, the state of incorporation of Oryx, the court must examine the nature of wrongs alleged in the body of the complaint rather than the plaintiffs' designation or stated intention in determining whether a claim is derivative or individual.FN4 *Brug v. The Enstar Group, Inc.,* 755 F.Supp. 1247, 1257 (D.Del.1991), (*citing, Lipton v. News Int'l, Plc,* 514 a.2d 1075, 1078 (Del.1986)). A stockholder can maintain an individual action if he has sustained a "special injury." *Lipton,* 514 A.2d at 1078. A special injury is defined as a wrong inflicted upon a stockholder alone or a wrong affecting any particular right which he is asserting such

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

as preemptive rights, rights involving control of the corporation, or a wrong affecting the stockholders and not the corporation. *Id. (quoting Elster v. American Airlines, Inc.,* 100 A.2d 219, 223 (Del.Ch.1953)). "A shareholder who suffers an injury peculiar to itself should be able to maintain an individual action, even though the corporation also suffers an injury from the same wrong." *Lipton,* 514 A.2d at 1079. However, "[w]hen an injury to corporate stock falls equally upon all stockholders, then an individual stockholder may not recover for the injury to his stock alone, but must seek recovery derivatively on behalf of the corporation." *Bokat v. Getty Oil Co.,* 262 A.2d 246, 249 (Del.1970).

The plaintiffs' claims arising from the particular breach of the fiduciary duty existing as a result of the defendants' status as dominant and controlling shareholder and/or directors of Oryx are not individual. These claims are derivative. *See MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.,* 1985 WL 21129 (Del.Ch.), (*citing, Gearhart Industries, Inc. v. Smith International,* 741 F.2d 707, 721 (5th Cir.1984); *Bokat v. Getty Oil Co.,* 262 A.2d 246, 249 (Del.Sup.1970).

The plaintiffs have not identified any wrong peculiar to them with respect to this violation. The plaintiffs' injuries are common to all shareholders of Oryx and to Oryx itself. The complaint states that the buy-back transaction was "inimical to the best interests of Oryx and its remaining shareholders, including the Thompson plaintiffs ... " (Complaint ¶ 36). The plaintiffs' complaint primarily articulates that the fiduciary breach of the defendants resulted in the decline in value of their shareholdings in Oryx. (Complaint ¶ 47). The best summary of the plaintiffs' injuries appears in the plaintiffs' complaint at paragraph 4. It provides:

**\*6** As a result of the buy-back transaction, the Oryx shareholders remaining after the transaction (including plaintiffs) have seen the apparent value of their company shares plummet from a high of over $53 per share on the day of the transaction, to the low to mid-$20's per share today. The loss in

value of the plaintiffs' Oryx shares since the buy-back transaction is over $80 million.

Further, the relief which the plaintiffs are requesting in their complaint confirms this determination. The relief sought may be an indicator as to the derivative nature of a claim. *Kramer v. Western Pac. Indus.. Inc.,* 546 A.2d 348, 352 (Del.1988). The complaint in this case includes the request for the following relief with respect to count one:

B) ... Rescission of the buy-back transaction;

D) ... Disgorgement of any consideration derived by any defendant from the buy-back transaction, and imposition of a constructive trust on any such consideration.

Rescission of a contract as a remedy is only available to a party to the contract. *Paul S. Mullin & Assocs., Inc. v. Bassett,* 632 F.Supp. 532, 537 (D.Del 1986). The plaintiffs were not a party to the buy-back transaction between Glenmede Trust and Oryx. Rescission could only be available to one of those parties. Further, the plaintiffs recognized that they would not be personally entitled to disgorgement consideration by requesting a constructive trust. These remedies are the type of remedies expected to be pled in a derivative action seeking relief on behalf of the corporation.

Since the violation of this fiduciary relationship is derivative, the plaintiffs may not maintain this claim without first complying with Federal Rule of Civil Procedure 23.1. Plaintiffs have admitted that they have not complied with the rule's requirements. Accordingly, this claim is dismissed with respect to all defendants who have been named in this count for failure to meet the requirements of Rule 23.1.

B. *Count Two*

1. *Civil Conspiracy*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                Page 6
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.))**

Count two seeks liability for civil conspiracy against all defendants. In *Burnside v. Abbott Laboratories,* 505 A.2d 973 (Pa.Super.1985), the Pennsylvania court stated:

To state a cause of action for civil conspiracy under Pennsylvania law, a complaint must allege the existence of all elements necessary to such a cause of action. A cause of action for conspiracy requires that two or more persons combine or enter an agreement to commit an unlawful act or to do an otherwise lawful act by unlawful means. Proof of malice is an essential part of a cause of action for conspiracy.

*Id.* at 980.(citations omitted). *See also Murphy v. Villanova Univ.,* 547 F.Supp. 512, 522 (E.D.Pa.1982), *aff'd without op.,*707 F.2d 1402 (3d Cir.1983); *Swartzbauer v. Lead Industries Ass'n, Inc.,* 794 F.Supp. 142 (E.D.Pa.1992).

The plaintiffs' complaint provides:

The primary goals of the scheme and conspiracy were:

(a) to divert funds improperly out of Oryx into the Defendant Trusts; to liquidate or diversify the Defendant Trusts' holdings of Oryx stock out of Oryx, preferably into cash or other diversified assets; and to maximize the value received for the Defendant Trusts' holdings in Oryx; and

*7 (b) to entrench and protect Hauptfuhrer in his executive position at Oryx and allay his concerns that the Glenmede/Pew defendants might act unilaterally in a way that would threaten his position.

(Complaint ¶ 32). The complaint fails to plead a cause of action for civil conspiracy. Noticeably absent from the plaintiffs' conspiracy allegations is the essential element of malice. The complaint is devoid of any allegation that the defendants acted with the intent to injure the plaintiffs. Accordingly, the plaintiffs' conspiracy allegations are dismissed.

2. *Aiding and Abetting*

Count two of the plaintiffs' complaint alleges aiding and abetting against all defendants. In support of their claim, the plaintiffs cite section 876 of the Restatement (Second) of Torts. Section 876, entitled "Persons Acting in Concert," provides:

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876. The plaintiffs contend that the defendants are jointly and severely liable for the fiduciary breach of Glenmede Trust because they acted in concert. Apparently, the plaintiffs are proceeding under 876(b).

A claim for aiding and abetting in a breach of a fiduciary duty as described by § 876(b) of the Restatement, although not specifically provided for by the Pennsylvania Supreme Court, has been recognized as a cognizable claim in the Eastern District of Pennsylvania. In *Pierce v. Rossetta Corp.,* Civil Action No. 88-5873, 1992 WL 165817 (E.D. Pa. June 12, 1992), anticipating the acceptance of the claim by Pennsylvania courts the district court held:

the elements for a claim for aiding and abetting breach of a fiduciary duty under Pennsylvania law would be: (1) a breach of a fiduciary duty owed to another; (2) knowledge of the breach by the aider and abettor; and (3) substantial assistance or encouragement by the aider and abettor in effecting

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that breach.

*Id.* at *8 (*citing* Restatement (Second) Torts § 876 (1979); *Kranzdorf v. Green,* 582 F.Supp. 335, 337 (E.D.Pa.1983)). The *Pierce* court based the decision on a thorough examination of relevant Pennsylvania authority.

The defendants do not take issue with the *Pierce* decision. However, the defendants' contend that this aiding and abetting liability does not extend to the officers or directors of a corporation for a breach committed by the corporation. The defendants contend that the reasoning which bars a claim of conspiracy between officers and directors of a corporation and the corporation itself necessarily prevents the plaintiffs' aiding and abetting claim.

*8 It is clear that officers and directors of a corporation cannot conspire with a corporation. *Nix v. Temple Univ,* 596 A.2d 1132, 1137 n.3 (Pa.Super 1991) (*citing, Daniel Adams Assoc. v. Rimbach Pub., Inc.,* 519 A.2d 997 (Pa.Super.1987)); *Accord, e.g., Scott v. Township of Bristol,* Civil Action No. 1412, 1990 WL 178556 (E.D.Pa.1990), (Hutton, J.). Generally, the acts of the agents of a corporation are the acts of the corporation itself. Since a individual cannot conspire without another party, a corporation cannot conspire with its agents, officers and directors. *Jaqielski v. Package Mach. Co..* 489 F.Supp. 232, 233 (E.D.Pa.1980).

The plaintiffs have not cited any Pennsylvania authority for the proposition that a director or officer of a corporation could be liable for aiding and abetting a fiduciary breach by the corporation. However, this is not surprising given that no Pennsylvania court has yet held any individual liable for aiding and abetting a fiduciary breach. Nor do the cases which the plaintiffs cite support the conclusion that officers and directors of a corporation can be liable for aiding and abetting a breach of a fiduciary duty by the corporation.

The plaintiffs' reliance on *Seaboard Industries, Inc. v. Monaco,* 276 A.2d 305 (1971), is not persuasive.

*Seaboard* involved the liability of a director for joint participation of, approving of, acquiescing in, or concealing a breach of a fiduciary of another director owed to the corporation. *Id.* Thus, it involved a breach committed by a director. It did not involve liability of a director for a corporate breach of a fiduciary duty. Nothing in the opinion would lead this court to the conclusion that aiding and abetting could be established against a director for assisting the corporation in a fiduciary breach.

Plaintiffs' remaining cases are also not persuasive. *Kransdorf v. Green,* 582 F.Supp. 335 (E.D.Pa.1983) (aiding and abetting liability claim permitted against a non-agent of the corporation); *Ging v. Parker-Hunter Inc.,* 544 F.Supp. 49 (W.D. Pa.1982) (permitting corporation to be liable for aiding and abetting securities fraud of a third party); *Hickman v. Taylor,* 75 F.Supp. 528 (E.D.Pa.1947) (non-agent alleged to have participated in corporation's negligence).

Nevertheless, under existing Pennsylvania law it appears that the Pennsylvania Supreme Court would not permit an "aiding and abetting" claim against the officers and directors of a corporation for the wrong of the corporation. A claim for a breach of a fiduciary duty although arising from a contract, is an allegation of tortious conduct. *See Zimmer v. Guntal & Co. Inc.,* 732 F.Supp. 1330, 1336 (W.D.Pa.1989); Restatement (Second) of Torts, § 874 (1979). Under Pennsylvania law, officers and directors are not liable for tortious conduct of the corporation in the absence of affirmative participation in the conduct. *Wicks v. Milzoco Builders, Inc.,* 470 A.2d 86, 90 (Pa.1983); *Chester-Cambridge Bank & Trust Co. v. Rhodes,* 31 A.2d 128, 131 (Pa.1943). Under this participation theory, the defendant directors and officers can be liable for knowingly participating in the tortious act. *Wicks.* 470 A.2d at 90; *Chester-Cambridge Bank & Trust Co.,* 31 A.2d at 131; *see also Newman v. Forward Lands, Inc.,* 418 F.Supp. 134, 137 (E.D.Pa.1976).

*9 In *Chester-Cambridge Bank & Trust Co. v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Rhodes,* the Supreme Court of Pennsylvania, in addressing the issue of officer and director liability stated:

It is true that a director or officer of a corporation may have personal liability for damages suffered by third persons when he knowingly participates in a wrongful act. *See Malone v. Pierce,* 231 Pa. 534, 80 A. 979; *Warner v. McMullin,* 131 Pa. 370, 18 A. 1056. But where, as in this case, directors or officers are charged with nonfeasance, no individual liability attaches. This has always been the rule in this jurisdiction. *See Spering's Appeal,* 71 Pa. 11, 10 Am.Rep. 684; *Swentzel v. Penn Bank,* 147 Pa. 140, 23 a. 405, 415, 15 L.R.A. 305, 30 A.m.St.Rep. 718; *Cohen, et al. v. Maus, et al.,* 297 Pa. 454, 147 A.103. In the latter case we held that directors of a corporation could not be charged with individual liability for conversion of property by the corporation of which they had no actual knowledge. However (297 Pa. at page 458, 147 A. 103), Justice Schaffer, afterwards Chief Justice, pointed out that a director who participated actively in the conversion would have been personally liable.

31 A.2d at 131. The Court in a more recent discussion of the participation theory stated:
Pennsylvania law recognizes the participation theory as a basis of liability. The general, if not universal, rule is that an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor; but that an officer of a corporation who takes no part in the commission of the tort committed by the corporation is not personally liable to third persons for such a tort, nor for the acts of other agents, officers or employees of the corporation in committing it, unless he specifically directed the particular act to be done or participated, or cooperated therein. (citations omitted)

*Wicks,* 470 A.2d at 90.

Accordingly, this Court will apply Pennsylvania's participation theory to the plaintiffs' aiding and abetting claim in Count II with respect to the acts of directors and officers of Glenmede Trust. Therefore, if the plaintiffs have alleged that the directors and officers knowingly participated in, cooperated or directed the corporation's breach of fiduciary duty, Count II against these individuals will survive a motion to dismiss.

With respect to the defendant directors and officers of the corporation, the plaintiffs have not specifically alleged that these individuals have participated in the breach of the fiduciary duty. The plaintiffs must plead that each defendant director or officer "active[ly] participat[ed] in a positively wrongful act intendedly and directly operating injuriously to the prejudice of the [plaintiffs]." *See Newman v. Forward Lands Inc.,* 418 F.Supp. 134, 136 (E.D.Pa.1976).

In addition, the Court recognizes that a claim for aiding and abetting a breach of a fiduciary duty would exist against non-agents of Glenmede Trust under Pennsylvania law. *Pierce v. Rossetta Corp.,* Civil Action No. 88-5873, 1992 WL 165817 (E.D. Pa. June 12, 1992). However, the Court finds that based upon the allegations in the complaint, plaintiffs have not sufficiently stated claims for aiding and abetting with respect to the remaining defendants. The plaintiffs have not alleged the requirements of aiding and abetting as set forth in *Pierce v. Rossetta Corp.,* 1992 WL 165817 at *8. The complaint does allege a breach of a fiduciary duty by Glenmede Trust as discussed above. The complaint also alleges that all the defendants had knowledge of the fiduciary relationship. (Complaint ¶ 46). However, the plaintiffs have not alleged substantial assistance or encouragement in effecting the breach by the remaining defendants who were not acting as officers and directors of the Glenmede Trust. Accordingly, Count II with respect to non-agents of Glenmede Trust is dismissed.

### 3. *Glenmede Corporation*

**\*10** The plaintiffs seek to extend liability to Glenmede Corporation as the parent for the acts of Glen-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 9
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.))**

mede Trust on the basis of aiding and abetting liability. The defendant Glenmede Corporation contends that it cannot be liable for aiding and abetting a breach of a fiduciary duty owed by its wholly owned subsidiary for the same reasons that a director or officer cannot be liable for aiding and abetting the corporation of which they control. Glenmede Corporation, citing *Copperweld Corp. v. Independance Tube Corp., 467 U.S. 752, 777 (1984)*, contends that a parent corporation cannot conspire with a wholly-owned subsidiary because they have a single conscience and are run by a "single driver." Thus, it argues that it cannot be liable for aiding and abetting its subsidiary.

Pennsylvania law provides the circumstances for which a parent corporation may be liable for the acts of its subsidiary within the doctrine of piercing the corporate veil. *Parker v. Bell Asbestos Mines, Ltd., 607 F.Supp. 1397 (D.C. Pa.1985); McCarthy v. Ference, 58 A.2d 49 (Pa.1948).* In *First Realvest Inc. v. Avery Builders, Inc., 600 A.2d 601 (Pa.Super.1991)*, the court stated:

The Pennsylvania Supreme Court has held that the corporate form "will be disregarded only when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime." In applying the test (for piercing the corporate veil), ... any court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception ... Care should be taken on all occasions to avoid making "the entire theory of the corporate entity ... useless ... "

*Id.* at 604, (citations omitted). In determining whether to pierce the corporate veil, courts are basically concerned with determining if equity requires that the shareholder's traditional insulation from personal liability be disregarded and with ascertaining if the corporate form is a sham, constituting a facade for the operation of the dominant shareholder. *Carpenter's Health and Welfare Fund v. Ambrose, 727 F.2d 279 (3d Cir.1983); Village at Camelback Property Owners Assn. Inc. v. Carr,*

538 A.2d 528 (Pa.Super.1988); *Wicks v. Milzoco Builders Inc., 470 A.2d 86, 90-91 (Pa.1983).*

In this case, Glenmede Trust is the wholly owned subsidiary of Glenmede Corporation. The plaintiffs have alleged that the entities have "substantially similar management and directors and have each acted interchangeably with the other with respect to the matters described in [the] complaint." (Complaint ¶ 11). However, this alone is not sufficient to allege that Glenmede Trust is a sham or alter ego of the Glenmede Corporation. Allegations of joint action is not sufficient to justify piercing the corporate veil between a parent and subsidiary corporation. *Nobers v. Crucible, Inc., 602 F.Supp. 703 (W.D. Pa.1985).* The complaint must allege facts sufficient to support a finding that Glenmede Trust was dominated by Glenmede Corporation to an extent that Glenmede Trust was a sham or alter ego. Relevant facts for piercing under an alter ego theory would be:

**\*11** (a) insufficient capitalization;

(b) intermingling of funds;

(c) other officers and directors were not functioning;

(d) failure to observe corporate formalities;

(e) failure to pay dividends;

(f) the fact that the corporation is a facade for the operations of the dominant stockholder;

*Nobers v. Crucible, Inc., 602 F.Supp. at 707; Village at Camelback Property Owners Assn. Inc., 538 A.2d at 535; United States v. Pisani, 646 F.2d 83, 88 (3d Cir.1981).* The complaint does not meet these requirements.

However, the plaintiffs contend that the existence of fraud in the complaint is sufficient for purposes of piercing the corporate veil. The complaint has alleged that Glenmede Trust was used to perpetrate common law fraud. *See infra,* at 23-24. Considering

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 10
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.))**

the complaint in light most favorable to the plaintiffs as the Court must do, the plaintiffs may have the potential for piercing the corporate veil of Glenmede Trust for this fraud. Accordingly, Glenmede Corporation's motion to dismiss count two is denied.

### C. *Count Three*

In count three, the plaintiffs allege common law fraud against all defendants. A claim for common-law fraud requires a misrepresentation made for the purpose of inducing reliance on the false statement. *Antinoph v. Laverell Reynolds Securities Inc.,* 703 F.Supp. 1185, 1187 n.1. A claim of fraud based upon failure to disclose information is actionable if there exists a confidential or fiduciary relationship. *See Id.; City of Harrisburg v. Bradford Trust Co.,* 621 F.Supp. 463, 473 (D.C. Pa.1985); *see e.g. Federal Land Bank of Baltimore v. Fetner,* 410 A.2d 344 (Pa.Super.1979), *cert. denied,* 446 U.S. 918 (1980).

As the Court has previously discussed, the plaintiffs' complaint has alleged a confidential/fiduciary relationship with respect to Glenmede Trust. The complaint provides that the "[d]efendants concealed the pendency of the buy-back transaction until it was consummated and announced on September 11, 1990." (Complaint ¶ 37). The defendants also allegedly concealed knowledge and information regarding Oryx's inability to generate capital needed to ultimately allow Oryx to create value for its shareholders and their knowledge that the buy-back transaction would operate to depress the value of the plaintiffs' stock. (Complaint ¶¶ 37, 38). Therefore, the complaint states a common law claim against Glenmede Trust.

However, the complaint does not allege a claim against defendants, Glenmede Corporation, the Pew Defendants, the Defendant Trusts, Defendants Piscopo and Defendant Langfitt. As explained in the Court's discussion of count one, no fiduciary relationship between these defendants and the plaintiffs

has been alleged. Accordingly, the plaintiffs' common law fraud claim is dismissed against these defendants.

### D. *Count Four*

Count four seeks relief against Glenmede Trust, Glenmede Corporation and the Defendant Trusts for unjust enrichment. In *Burgettstown-Smith Township Joint Sewage Authority v. Langeloth Townsite Company,* 588 A.2d 43 (Pa.Super.1991), the court noted that:

*\*12* [e]ssential elements of "unjust enrichment" are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.

*Id.* at 44, (quoting, *Wolf v. Wolf,* 514 a.2d 901, 905-06 (Pa.Super.1986), *overruled on other grounds by Van Buskirk v. Van Buskirk,* 590 A.2d 4, 8 (Pa.1991)). "A necessary element of unjust enrichment is that a benefit must have been conferred for which no compensation was given." *Meyers Plumbing & Heating Supply Co. v. West End Fed. Sav. & Loan Ass'n,* 498 A.2d 966, 969 (Pa.Super.1985). The plaintiffs' complaint fails to allege the requisites of such a claim. Accordingly, Count four of the complaint is dismissed.

### E. *Count Five*

The fifth count of the plaintiffs' complaint alleges breach of contract by both Glenmede Trust and Glenmede Corporation. As the Court has previously discussed, the complaint alleges an investment advisory agreement in which Glenmede Trust accepted the position as the plaintiffs' professional fiduciary. (Complaint ¶¶ 1, 17 and 20). Glenmede Trust does not oppose the claim in the motion. However, Glenmede Corporation contends that it is not a party to the investment advisory contract and, therefore, it can not be liable on the contract simply

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 11
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.))**

due to its parent subsidiary relationship. The plaintiffs contend that liability extends pursuant to the equitable doctrine of piercing the corporate veil. As the Court has found that the complaint alleges a claim for piercing the corporate veil, Glenmede Corporations motion to dismiss count five is denied.

### F. Count Six

The last count of the plaintiffs' complaint alleges negligence against both Glenmede Trust and Glenmede Corporation. The plaintiffs are contending that Glenmede Trust is liable for professional negligence with respect to its oral and written agreement to act as the plaintiffs' investment advisor and that the Glenmede Corporation is liable for both its participation in the negligence and under the plaintiffs' theory of piercing the corporate veil.

To state a claim for professional negligence, the plaintiffs must allege: (1) employment by a person or entity giving rise to a duty to the plaintiffs; (2) the failure of the defendant to exercise ordinary skill and knowledge; and (3) that this negligence proximately caused damages to the plaintiff. *See Schenkel v. Nonheit,* 405 A.2d 493, 494 (Pa.Super.1979), (Essential elements for cause of action against attorney for professional negligence).

The plaintiffs' complaint alleges that the plaintiffs contracted with Glenmede Trust to provide investment advise and guidance with respect to the plaintiffs' holdings in Oryx stock. Allegedly, the defendants breached their duty to exercise ordinary skill and knowledge by:

(a) failing to advise plaintiffs that Oryx shares should be sold prior to the buy-back transaction;

*13 (b) participating in the scheme and conspiracy [improperly diverting funds out of Oryx to the benefit of the Defendant trusts and entrenching defendant Hauptfuhrer at Oryx];

(c) entering into the buy-back transaction; and

(d) failing to advise plaintiffs at the time of or following the transaction of the detrimental effect of the transaction on Oryx and plaintiffs and to advise plaintiffs to sell their Oryx stock.

(Complaint ¶ 44). Finally, the plaintiffs contend that their injuries were proximately caused by Glenmede Trust. Accordingly, the complaint states a claim for negligence against the defendant Glenmede Trust.

However, Glenmede Trust contends that its agreement with the plaintiffs specifically excludes liability for negligence. Glenmede Trust cites an exculpatory clause of its agreement with the plaintiffs. The clause provides:

Glenmede shall not be liable for any loss or damage or any costs and expenses associated with such loss or damage resulting from any act, omission or mistake or judgment in the course of, or connected with, the performance of its responsibilities hereunder, or that of its representatives, agents or employees, except for its own gross negligence or bad faith.

(Complaint ¶ 23).

In *Topp Copy Products Inc. v. Singletary,* 591 A.2d 298 (Pa.Super.1991), the Pennsylvania court recently discussed the issue of the application of exculpatory clauses under Pennsylvania law. The Court stated:

Our Supreme Court has held that an exculpatory clause is generally valid where three conditions are satisfied. The three conditions are: (1) the clause "does not contravene any policy of law, that is, ... it is not a matter of interest to the public or State"; (2) the "contract is between persons relating entirely to their own private affairs"; and (3) "each party is a free bargaining agent ... [in that the agreement] is not in effect a mere contract of adhesion."

If these conditions are met, and the clause is determined to be valid, the contract must still meet four additional standards in order to be "interpreted

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                        Page 12
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)
(Cite as: Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.))

and construed to relieve a person of liability for his own ... acts of negligence." The four standards are: (1) the contract immunizing a party from liability for negligence must be construed strictly, "since they are not favorites of the law"; (2) the contract must state the intention of the parties "with the greatest particularity, ... beyond doubt by express stipulation, [and] no inference from words of general import can establish it"; (3) the contract must be construed against the party seeking immunity from liability; and (4) the burden of establishing the immunity is upon the party seeking protection of the clause.

These seven considerations demonstrate that contracts providing for the immunity of parties from their own negligent acts are not regarded positively under the law of the Commonwealth.

*Id.* at 301 (citations omitted).

**\*14** While Glenmede Trust may be immune from liability for negligence pursuant to the clause, the Court cannot determine from the face of the complaint the specific application of the clause under Pennsylvania's teachings. Therefore, Glenmede Trust's motion to dismiss count six is denied.

With respect to Glenmede Corporation, it is clear that the plaintiffs' complaint does not allege that the corporation was the professional advisor of the plaintiffs. However, the plaintiffs contend that Glenmede Corporation as the parent of Glenmede Trust is liable for the negligence under the piercing theory discussed above. Since the Court has found that the plaintiffs may have a claim against Glenmede Corporation under the Pennsylvania doctrine, the plaintiffs' claim for negligence shall not be dismissed against Glenmede Corporation.

An appropriate Order follows.

## ORDER

AND NOW, this 8th day of June, 1993, upon consideration of the Defendants' Motion to Dismiss,

the Plaintiffs' Response and the Defendants' Reply, IT IS HEREBY ORDERED that:

(1) Count I of the Plaintiffs' Complaint against Glenmede Corporation, J. Howard Pew, II, J. N. Pew, III, J. N. Pew, IV, R. Anderson Pew, John G. Pew, Jr., G. Thompson Pew, Jr., Thomas W. Langfitt, Albert E. Piscopo, Francis M. Richards, Jr., Karin E. Myrin and Samuel W. Morris Sr. is DISMISSED;

(2) Count II of the Plaintiffs' Complaint for civil conspiracy against all defendants is DISMISSED;

(3) Count II of the Plaintiffs' Complaint for aiding and abetting a breach of fiduciary duty against Glenmede Trust, J. Howard Pew, II, J. N. Pew, III, J. N. Pew, IV, R. Anderson Pew, John G. Pew, Jr., G. Thompson Pew, Jr., Thomas W. Langfitt, Albert E. Piscopo, Francis M. Richards, Jr., Karin E. Myrin and Samuel W. Morris Sr. is DISMISSED;

(4) Count III of the Plaintiffs' Complaint against Glenmede Corporation, J. Howard Pew, II, J. N. Pew, III, J. N. Pew, IV, R. Anderson Pew, John G. Pew, Jr., G. Thompson Pew, Jr., Thomas W. Langfitt, Albert E. Piscopo, Francis M. Richards, Jr., Karin E. Myrin and Samuel W. Morris Sr. is DISMISSED;

(5) Count IV of the Plaintiffs' Complaint against Glenmede Trust, Glenmede Corporation, J. Howard Pew, II, J. N. Pew, III, J. N. Pew, IV, R. Anderson Pew, Francis M. Richards, Jr., Karin E. Myrin and Samuel W. Morris Sr. is DISMISSED; and

(6) The Motion to Dismiss Count V and Count VI of the Plaintiffs' Complaint is DENIED.

IT IS FURTHER ORDERED that Plaintiffs are granted leave to file an amended complaint within twenty (20) days of the date of this Order.

> FN1. The plaintiffs are as follows: B. Ray Thompson, Jr., Juanne J. Thompson, Catherine V. Thompson, Adella S. Thompson, B. Ray Thompson, III, Sarah Thompson

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 13
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.))**

Tarver, Rebekah L. Thompson.

FN2. The trustees of the five trusts are as follows: B. Ray Thompson, Jr., Juanne J. Thompson, Dale A. Keasling.

FN3. The seven trusts are as follows: the Pew Memorial Trust, the J. Howard Pew Freedom Trust, The Mabel Pew Myrin Trust, The J. N. Pew Jr. Charitable Trust, The Medical Trust, Mary Anderson Trust, and The Knollbrook Trust.

FN4. In a diversity action, state law applies to the determination of whether an action is individual or derivative under Federal Rule of Civil Procedure 23.1. *Sax v. World Wide Press, Inc.,* 809 F.2d 610, 613 (9th Cir.1987); *Brown v. Ferro Corp.* 763 F.2d 798, 803 (6th Cir.) ("Shareholder's derivative actions are governed by Rule 23.1 of the federal Rules of Civil Procedure, and federal courts apply the law of the state in which the company is incorporated."), *cert. denied,* 474 U.S. (1985).

E.D.Pa. 1993.
Thompson v. Glenmede Trust Co.
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 10

Westlaw.

Slip Copy                                                                                              Page 1
Slip Copy, 2008 WL 682455 (Bkrtcy.E.D.Pa.)
**(Cite as: 2008 WL 682455 (Bkrtcy.E.D.Pa.))**

**H**
In re Total Containment, Inc.
Bkrtcy.E.D.Pa.,2008.
Only the Westlaw citation is currently available.
United States Bankruptcy Court,E.D. Pennsylvania.
In re TOTAL CONTAINMENT, INC. Debtor.
George L. Miller, Chapter 11 trustee, Plaintiff
v.
Marcel Dutil, The Canam Manac Group, Inc.,
Canam Steel Corporation, Finloc, Inc., Finloc Cap-
ital, Inc., Finloc US, Inc., Winston Towers 1988,
Inc., Polyflow, Inc., Jay R. Wright, Jr., Bernard
Gouin, and Pierre Desjardins, Defendants.
**Bankruptcy No. 04-13144bf.**
**Adversary No. 05-0145.**

March 5, 2008.

David Dormont, Steven M. Coren, Kaufman, Coren
& Ress, P.C., Philadelphia, PA, for Plaintiff.
Jeffrey D. Herschman, Susan S. Maher, DLA Piper
RudnicGray Cary, Mark J. Friedman, Piper Rud-
nick LLP, Baltimore, MD, Phillip E. Wilson, Jr.,
DLA Piper U.S. LLP, Phillip E. WILSON, Piper
Rudnick et al, Louis J. Schwartzberg, Towers Per-
rin, Christopher W. Wasson, Linda J. Casey, Pepper
Hamilton LLP, Philadelphia, PA, for Defendants.

### MEMORANDUM

BRUCE FOX, United States Bankruptcy Judge.
*1 The former chapter 11 trustee, George L. Miller,
who is now plan administrator under the terms of a
confirmed plan providing for the liquidation of all
assets of Total Containment, Inc. (TCI), com-
menced an adversary proceeding asserting seven
counts against 11 defendants, seeking in excess of
$23 million in damages along with declaratory re-
lief. In his amended complaint, as summarized by
the defendants, the trustee asserted claims: "against
all defendants for breach of fiduciary duty related to
TCI's sale of certain assets (First Claim); against
all defendants for fraudulent transfer of those same
assets (Second Claim); successor liability against

Polyflow, Inc. ("PolyFlow") (Third Claim); against
the individual defendants for breach of fiduciary
duty and negligence related to two judgments is-
sued against TCI (Fourth and Fifth Claims); against
all defendants for "deepening the insolvency" of
TCI (Sixth Claim); and against all defendants ex-
cept Canam Group [FN1] for certain declaratory re-
lief related to the allowance of claims against the
bankruptcy estate (Seventh Claim)." Memorandum
of Canam Defendants, at 1.

> FN1. Formerly known as Canam Manac
> Group, Inc.

In light of a prior ruling concerning defendants' mo-
tions to dismiss, these counts are now arrayed
against the following defendants: Count I-all de-
fendants; Count II-Finloc, Inc., Finloc Capital, Inc.,
Winston Towers 1988, Inc., and PolyFlow, Inc;
Count III-PolyFlow, Inc.; Count IV-Messrs. Dutil,
Wright, Gouin, and Desjardins; Count V-Messrs.
Dutil, Wright, Gouin, and Desjardins; Count VI-all
defendants except Finloc Capital and Winston
Towers; and Count VII-all defendants except
Canam Group, Inc. [FN2]

> FN2. At the time of this earlier ruling, only
> Canam Group had not filed a proof of
> claim against TCI. Since then, Canam
> Group asserted that it became the suc-
> cessor in interest to Canam Steel. At oral
> argument, the parties agreed that Count
> VII now involves Canam Group but not
> Canam Steel as a defendant.

The various defendants have filed two joint motions
for summary judgment as concerns Counts I, II, IV-
VII. These motions are opposed by the plaintiff.
The parties have submitted voluminous exhibits, in-
cluding numerous partial deposition transcripts,
along with lengthy memoranda in support of their
respective positions. For the reasons that follow,
those motions shall be granted in small part and
denied in large part.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## I.

Federal Rule of Bankruptcy Procedure 7056 incorporates Fed.R.Civ.P. 56, the summary judgment rule, into bankruptcy adversary proceedings. Summary judgment avoids the expense and delay of an unnecessary trial when no material facts are in dispute and one or more of the parties is entitled to prevail on the merits. *See, e.g., Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,*429 U.S. 1038 (1977). The standard for determining the applicability of summary judgment under Rule 56 is well established. As the Third Circuit Court of Appeals observed:

> Summary judgment is appropriate when the moving party is entitled to judgment as a matter of law and there is no genuine dispute of material fact.... In order to defeat "a properly supported summary judgment motion, the party opposing it must present sufficient evidence for a reasonable jury to find in its favor."*Groman v. Township of Manalapan,* 47 F.3d 628, 633 (3d Cir.1995) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250-52, 106 S.Ct. 2505, 2511-12, 91 L.Ed.2d 202 (1986)). In essence, the non-moving party must demonstrate a dispute over facts that might affect the outcome of the suit. *Id.* Moreover, in reviewing the record, we must give the non-moving party the benefit of all reasonable inferences....

*\*2 Hampton v. Borough of Tinton Falls Police Dep't,* 98 F.3d 107, 112 (3d Cir.1996).

The application of these general principles is affected by the allocation of the evidentiary burden of persuasion, were the dispute to proceed to trial. That is, a trial court's approach to summary judgment is influenced by whether the party seeking summary judgment would have the burden of persuasion at trial. *See generally Coquellette, et al.* 11 *Moore's Federal Practice 3d,* §§ 56.03[4], 56.13[3] (2006). This approach was well summarized in *Adams v. Consolidated Rail Corp.,* 1994 WL 383633, at \* 1-\*2 (E.D .Pa.1994):

The Supreme Court articulated the allocation of burdens between a moving and nonmoving party in a motion for summary judgment in *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). The Court held that where the movant is the defendant, or the party without the burden of proof on the underlying claim, the movant still has the initial burden of showing the court the absence of a genuine issue of material fact, but that this does not require the movant to support the motion with affidavits or other materials that negated the opponent's claim. *Id.* at 323.In contrast, where, as here, "the party moving for summary judgment is the plaintiff, or the party who bears the burden of proof at trial, the standard is more stringent."*National State Bank v. Federal Reserve Bank,* 979 F .2d 1579, 1582 (3d Cir.1992). To sustain its initial burden under such circumstances, the movant must:

> "support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."

*Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993).... If the movant makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact[.]

(citations omitted); *accord In re White,* 243 B.R. 498, 501 n. 4 (Bankr.N.D.Ala.1999).

Thus, "[w]hen, as here, the nonmoving party bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden. The nonmoving party creates a genuine issue of material fact if he provides sufficient evidence to allow a reasonable

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

jury to find for him at trial." *Wetzel v. Tucker,* 139 F.3d 380, 383 n. 2 (3d Cir.1998).

As noted earlier, in applying the above-mentioned standard for summary judgment, "[the court must] view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995); *see also Wetzel v. Tucker,* 139 F.3d at 383 n. 2; *Helen L. v. DiDario,* 46 F.3d 325, 329 (3d Cir.), *cert. denied* sub nom. *Pennsylvania Secretary of Public Welfare v. Idell S.,* 516 U.S. 813 (1995); *Valhal Corp. v. Sullivan Associates, Inc.,* 44 F.3d 195, 200 (3d Cir.1995); *Goodman v. Mead Johnson & Co.,* 534 F.2d at 573. Moreover, the moving party bears the burden of proving that no genuine issue of material fact is in dispute. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). Once the movant has carried its initial burden, however, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 587 (quoting Fed.R.Civ.P. 56(e)). As explained by the Third Circuit:

> **\*3** At the summary judgment stage of proceedings, if the movant-in this case the Defendants-can point to the absence of any factual support for one of [the] essential elements [of the complaint], then the non-movant, bearing the burden of persuasion at trial, must introduce specific facts showing a need for trial, pursuant to Fed.R.Civ.P. 56(e). *See Celotex,* 477 U.S. at 322-24, 106 S.Ct. 2548. If the non-moving party fails to go beyond conclusory allegations in its pleadings and to produce specific facts indicating that there is a genuine issue for trial, summary judgment will be granted in favor of the moving party.

*Annulli v. Panikkar,* 200 F.3d 189, 198-99 (3d Cir.1999) (overruled on other grounds by *Rotella v. Wood,* 528 U.S. 549 (2000)) (citations omitted).

II.

Upon review of the parties' submissions, the following material facts are not in dispute.

A.

The identity of the parties and their relationships are material to the claims asserted by the former chapter 11 trustee. They are outlined as follows:

Total Containment, Inc. (TCI) is a Pennsylvania corporation formed in 1986 to distribute underground piping systems and products used to transport petroleum and alcohol-based motor vehicle fuels from underground storage tanks to aboveground fuel dispensers. Amended Complaint and Answers, ¶ 17; Defendant's Ex. 1, at 18. It was located in Oaks, Pennsylvania when it filed a voluntary petition in bankruptcy on March 4, 2004. Around 1997, TCI began producing its own piping; prior to that date, much of its piping was obtained from one or more third-party vendors.

George L. Miller was chosen as the chapter 11 trustee by the United States trustee. Upon confirmation of a liquidation chapter 11 plan, Mr. Miller became the plan administrator. The claims he asserts in this adversary proceeding are among the remaining unliquidated assets of the estate.

Defendant Marcel Dutil was a director of TCI and is a citizen of Canada. He was also the chairman, president, majority shareholder and chief executive officer of defendant Canam Group until 2003. He was also chief executive officer of defendant Canam Steel, president of defendant Winston Towers, and director of defendants Finloc, Inc. and Finloc US. In these various roles, he drew salary solely from Canam Group and from an entity known as Placements CMI. Ex. P-5, at 50-52. Until August 2006, Mr. Dutil, through his family, controlled the stock of Canam Group. In numerous documents, Mr. Dutil is referred to as the primary or major shareholder of TCI. Although this description is imprecise, it does reflect an understanding

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that he had exercised authority over the corporate shareholders of TCI and in that sense was the controlling TCI shareholder. *See* Ex. P-19 (Canam Admissions, ¶¶ 11, 14, 17).

Defendant Canam Group is a Canadian corporation that owns 100% of the stock of defendant Canam Steel. It also owns preferred stock in defendant Finloc, Inc. Canam Group is primarily engaged in the design and fabrication of construction projects. *See* Ex. P-5, at 12.

*4 Defendant Finloc, Inc. is also a Canadian corporation. It owns 40% of the stock of defendant Finloc, U.S. and is the successor in interest to defendant Finloc Capital, Inc., also a Canadian corporation. *See* Finloc's Answer, ¶ 10; Ex. P-19 (Admission, ¶ 23). At the time of TCI's bankruptcy filing, it owned 16.4% of TCI's common stock.

Defendant Finloc Capital was a Canadian corporation located at the same address as Finloc, Inc. before its merger with that corporation. Any monetary advances made by Finloc Capital to TCI were authorized by Mr. Dutil. Ex. P-5, at 118-19.

Defendant Canam Steel is a Delaware corporation that formerly owned all of the preferred stock in the debtor, TCI. That preferred stock was transferred to Finloc U.S. in July 2002. It is a wholly-owned subsidiary of Canam Group. Mr. Dutil's son-in-law is corporate president. Ex. P-5, at 40.

Defendant Finloc U.S. is a Delaware corporation located at the same address as Canam Steel. It owns 100% of the stock of defendant PolyFlow, Inc., and at the time of TCI's bankruptcy filing it owned 71.08% of the debtor's common stock.

Defendant Winston Towers is a Florida corporation that owned 60% of the stock issued by defendant Finloc US. It had no employees and acted through Mr. Dutil or at his direction. Ex. P-5, at 117-18.

Defendant PolyFlow is a Pennsylvania corporation formed in March 2002 and is located at the same location as TCI in Oaks, Pennsylvania. At the time of TCI's bankruptcy filing, the president of Poly-Flow was Jay R. Wright, Jr.

Defendant Jay R. Wright, Jr. was the president, chief executive officer and director of TCI. Since July 2002, he has also served as the president of PolyFlow.

Defendant Bernard Gouin was a director of TCI. He was also a vice-president of Canam Group and vice-president and treasurer of Canam Steel. Ex. P-7, at 5. He has acted as paid consultant for the Canam defendants and Mr. Dutil since August 2001. *Id.,* at 6-8.While Mr. Gouin served as director of TCI, his only compensation was paid by Canam Steel. Exs. P-5, at 258; P-7, at 19-21.

Defendant Pierre Desjardins was a director and chairman of TCI. He has provided consulting services to Canam Group. Canam Steel and/or Finloc, Inc. paid Mr. Gouin for his services as director of TCI so that he could be covered by group health insurance for himself and his family. Exs. P-5, at 57; P-6, at 15. (TCI possibly reimbursed Canam Steel for this compensation. Ex. P-6, at 16).

**B.**

Before 1997, TCI purchased much of its pipes from Dayco Products. After complaints about problems with TCI's piping systems, TCI sued Dayco for breach of warranty and breach of contract, while Dayco countersued TCI for breach of contract, all claims being heard in federal district court. *See Total Containment, Inc. v. Dayco Products, Inc.,* 2001 WL 984708 (E.D.Pa.2001). After trial, on May 3, 2001, TCI was awarded $1,325,808 on its contract claim and obtained no award on its warranty claim; Dayco was awarded $3,715,170 on its counterclaim. *Id.* Those awards were affirmed on appeal. *See Total Containment, Inc. v. Dayco Products, Inc.,* 43 Fed. Appx. 511 (3d Cir.2002). TCI never satisfied the Dayco judgment against it. Nor is there evidence that Dayco executed upon its judgment.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                    Page 5
Slip Copy, 2008 WL 682455 (Bkrtcy.E.D.Pa.)
(Cite as: 2008 WL 682455 (Bkrtcy.E.D.Pa.))

*5 Around 1997, in light of its dispute with Dayco, TCI began to manufacture its own primary piping.FN3The funds to construct and manufacture such piping initially came, at least in part, from Canam Steel, which obtained preferred stock in return. During 1997 and 1998, TCI was fairly profitable. In 1999, TCI signed a promissory note in the amount of $5 million in favor of Bank of America, the proceeds of which were used, at least in part, to repay another commercial lender. That BOA obligation was later increased to a high of $8 million, and still later reduced to about $6.5 million.

> FN3. The district court explained that the piping system used by TCI included a pipe within a pipe, with the outer pipe containing any leaks, and the inner pipe considered the primary pipe.

By 2001, the year of the Dayco decision, TCI was losing money, reporting as much as $11.9 million in operating losses. In order to keep operating after the adverse Dayco judgment in May 2001, TCI obtained funds from Finloc Capital (now Finloc, Inc.) and Winston Towers beginning around July 2001. Those payments to TCI were approved by Mr. Dutil.

In March 2002, PolyFlow was incorporated as a subsidiary of Finloc US, and the directors of TCI voted to transfer all of TCI's pipe production business to PolyFlow. The asset transfer took place in July 2002, by which PolyFlow paid $3,599,913 in cash to TCI and assumed TCI's $2,550,000 purported debt to Finloc, Inc. To obtain this cash, Finloc Capital transferred $1,965,000 to Finloc US, and Winston Towers transferred to Finloc U.S. $1,785,000, for a total transfer of $3,750,000. Finloc U.S. then purchased 100 shares of PolyFlow stock for $3,750,000 and paid $161,954 to Canam Steel. PolyFlow thereafter paid TCI the aforementioned $3,599,913.

After receiving these funds from PolyFlow, TCI paid $1,753,137.50 to Finloc Capital, $1,783,579.86 to Winston Towers and $53,923 to Finloc, Inc., totaling $3,590,640.36 in distributions. Only about $9,000 of the PolyFlow purchase price was retained by TCI.

After this July 2002 transfer of assets from TCI, which transaction was approved by Mr. Dutil, Ex. P-5, at 194, PolyFlow began production of piping at the same location as TCI, using the same assets, some of the same employees and some of the same management as had been engaged by TCI.

After the July 2002 asset transfer, TCI obtained its piping from PolyFlow and continued distributing it to its customers. TCI continued, however, to suffer operating losses. There appears to be no dispute that after the July 2002 asset sale and transfer of sale proceeds, TCI's liabilities exceeded its assets. Ex. P-19 (Admissions, ¶¶ 1, 4, 9). In addition, it is agreed that TCI lent funds to PolyFlow, which funds were not repaid as of the date of TCI's bankruptcy filing in March 2004. Ex. P-5, at 312-14.

In January 2002, TCI was sued by Murphy Oil in the Philadelphia Court of Common Pleas. On March 1, 2004, a $4 million judgment was entered against TCI and in favor of Murphy Oil, as a sanction for TCI's failure to comply with various discovery orders. TCI was also sued by PISCES by OWP, Inc. in federal district court in Ohio in 2002. When counsel withdrew at TCI's request and TCI did not engage replacement counsel, default judgment was entered against it for $1.3 million.

III.

A.

*6 Upon my review of the parties' submissions, I conclude that the following material facts are in dispute. This dispute reflects diametrically opposed interpretations regarding the reasons for, and the fairness of, the July 2002 transfers of assets from TCI.

Slip Copy                                                                          Page 6
Slip Copy, 2008 WL 682455 (Bkrtcy.E.D.Pa.)
**(Cite as: 2008 WL 682455 (Bkrtcy.E.D.Pa.))**

The defendants justify the PolyFlow purchase of TCI assets in the following terms.

After 1998, during the period when TCI began manufacturing and using its own piping, the market for its products slowed. As a result, the pipe manufacturing assets were not fully being used. And one of the primary reasons that TCI was unprofitable was due to the overhead costs of maintaining this unused production capacity. To assist TCI, its directors decided to form a new corporate entity that would purchase the pipe production assets and then sell needed pipe to TCI at a lower cost than it had taken TCI to produce it, while beginning a new business of selling piping used in "down-hole drilling." *See* Ex. P-5, at 155-56. (Presumably, PolyFlow would obtain this lower cost through greater use of the production equipment.) Furthermore, in order to insure that a fair value for the assets was obtained, the pipe production assets were to be sold at a price determined by third-party appraisers and approved by independent corporate directors of TCI.

Consistent with this strategy, two appraisal firms were engaged: one to value the tangible pipe production assets; the other to value the intangible piping assets. The purchase price paid by PolyFlow is essentially the sum of these two appraisals. In addition, the proceeds of the sale were used by TCI to pay outstanding debts with the highest interest rates. Finally, the defendants contend that the July 2002 transfers were approved by the two independent directors of TCI, Messrs. Gouin and Desjardins, and thus fall within their reasoned business judgment.[FN4]

> FN4. In July 2002, TCI had only four directors on its board: Messrs. Dutil, Wright, Gouin and Desjardins.

The result, from the defendants' point of view, was a transaction by which TCI obtained fair value for its assets, repaid its most expensive debt, and no longer had a drain on its balance sheet. The unprofitable pipe production business was simply "outsourced." Therefore, the defendants did not breach any fiduciary duties, aid others in breaching their duties, did not participate in any fraudulent conveyances, did not deepen TCI's insolvency, nor did they act inequitably to warrant subordination of their claims.

The plaintiff challenges all of the assertions made by the defendants in these two summary judgment motions, and views the July 2002 transaction as a blatant attempt to remove a valuable asset from TCI and so be out of the reach of TCI's creditors.

First, the plaintiff proffers evidence that the value of the assets transferred was actually much higher than the $6 million plus paid. It refers to an expert report retroactively valuing the pipe production business assets in 2002 at more than $17 million. *See* Exs. P-127, 128. The plaintiff's expert rejects for a number of reasons the conclusions of TCI's 2002 appraisals that are relied upon heavily by the defendants.

*7 The plaintiff's expert maintains that the appraisers were not informed of all the tangible and intangible assets to be transferred. Ex. P-127, at 2. Moreover, the plaintiff's expert report asserts that TCI had developed a valuable technique in manufacturing its piping; one that TCI management believed would significantly increase the amount of oil and gas recoverable from older, existing wells.[FN5] This pipe production technique to be applied in down hole drilling was projected by TCI management to have significant value that was not considered by the two TCI appraisers.

> FN5. Plaintiff cites to Ex. P-121, a 2006 PolyFlow business plan document, for a detailed description of this new pipe production technique referred to as "Thermoflex."

The plaintiff's expert also opines that the pipe production assets were a self-contained business and should have been appraised on a going-concern, discounted future income approach, using 2002 in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

come projections prepared by Mr. Wright. Ex. P-127, at 3-4. The two appraisals obtained by TCI in 2002 used a different methodology: the tangible assets were valued at replacement cost, Ex. P-55, at 9; the intangible assets (which the appraiser considered to be only the "unpatented technology," Ex. P-8 at 31), were valued as the present value of royalties that a third-party would pay to use this technology. Ex. P-56, at 3.[FN6]

> FN6. To the extent the plaintiff contends that use of replacement value was inappropriate, Mr. Desjardins may agree. Ex. P-4, at 81, 8-89.

Second, the plaintiff challenges the defendants' application of Pennsylvania's business judgment rule. *See generally Cuker v. Mikalauskas*, 692 A.2d 1042, 1046 (Pa.1997). Initially, the plaintiff contends that to the extent the individual directors' fiduciary duty was breached, the business judgment rule is inapplicable under state law. *See* 15 Pa.C.S.A. § 1715(a).

In addition, the plaintiff also maintains that the two directors who approved the PolyFlow transaction, defendants Gouin and Desjardins, were far from independent of the influence exerted by Mr. Dutil and the Canam defendants. In support thereof, the plaintiff observes that Mr. Gouin and Mr. Desjardins were being paid by Canam Steel and/or Finloc, Inc. and long had connection with Mr. Dutil and his companies, serving as employees and/or consultants. *See generally* Ex. 19 (Request for Admissions, # 24).[FN7] Moreover, from the disputed facts, the plaintiff may be able to prove at trial that Messrs. Gouin and Desjardins did not obtain knowledge of all material facts surrounding the PolyFlow transaction (*i.e.,* the value of the down-hole drilling technology) to warrant application of the business judgment rule. *See generally Keyser v. Commonwealth National Financial Corp.,* 675 F.Supp. 238, 261 (M.D.Pa.1987).

> FN7. REQUEST FOR ADMISSION NO. 24:

From August 10, 2001 and continuing through and including Mr. Miller's appointment as Trustee of TCI, the directors of TCI included only Dutil and individuals who were employed by or served as independent contractors to an entity who's [sic] voting shares were owned and controlled, directly or indirectly, by Dutil.

RESPONSE: Admitted.

Moreover, the plaintiff refers to evidence that there was no negotiation over the July 2002 purchase price, in that Mr. Wright was indirectly involved in the transaction as president of both TCI and Poly-Flow, and that TCI made no attempt to obtain competing bids. Thus, the inference is created that the sales price chosen was favorable to the targeted buyer, PolyFlow, and the transaction intended to defraud existing creditors.

Indeed, the plaintiff refers to documents to support his contention that the July 2002 transaction was structured solely to prevent the potentially valuable pipe production business from the reach of creditors of TCI, such as Dayco. In corroboration of his position, the plaintiff offers memos reflecting such concerns, including one from Bank of America, TCI's commercial lender. BOA's approval of the Poly-Flow sale was required, and was received. In December 2002, the lender prepared a "financial statement analysis" of its loan position which stated in part:

> **\*8** The Bank has approved the sale of certain fixed assets of Total Containment, Inc. to a related entity PolyFlow, Inc. TCI has recently developed a special type of pipe which can be used to reactivate presently defunct oil wells. TCI has decided to spinoff this facet of the business in order to shield it from potential liability arising from the Dayco lawsuit.

Ex. P-97, at 1-2[FN8]; *see also* Ex. P-48.

Slip Copy                                                                                                        Page 8
Slip Copy, 2008 WL 682455 (Bkrtcy.E.D.Pa.)
**(Cite as: 2008 WL 682455 (Bkrtcy.E.D.Pa.))**

FN8. This information about TCI's new technology came to the Bank of America employees either from defendants Gouin or Wright. Ex. P-7, at 62-64. Other documents relied upon by the plaintiff in opposing summary judgment were prepared by TCI's former corporate counsel, advising that a transfer of assets to a newly formed corporate entity could, in certain circumstances, give rise to a fraudulent conveyance, breach of fiduciary duty and/or successor liability. *See, e.g.,* Ex. P-113 (memo dated July 10, 2001 from corporate counsel to Mr. Desjardins).

In addition, the plaintiff points to documents and transcripts revealing that the purported Winston Towers secured debt repaid by TCI, using a significant portion of the purchase price from PolyFlow, involved the back-dating of some loan documents. Exs. P-7, at 125-26; P-10, at 126-27; P-98. The plaintiff infers that this Winston loan was actually an equity contribution (but does not appear to challenge the legitimacy of the secured loan held by Finloc, Inc.).*See generally In re Submicron Systems Corp.,* 432 F.3d 448. 454-57 (3d Cir.2006) (analyzing when corporate debt should be recharacterized as equity).

Finally, the plaintiff emphasizes that at the time of the July 2002 transfer, TCI was disclosing in its corporate reports that its liabilities exceeded its assets. This was certainly true after the July 2002 transfers had concluded. Thus, TCI was either insolvent or made insolvent by these transfers.

In other words, if plaintiff's evidence were found credible, and giving him the benefit of all reasonable inferences, he may be able to prove at trial that some or all of the defendants acted in concert to transfer TCI's valuable pipe production assets into a newly formed corporation-at the same location, with the same personnel and dealing with the same customers-so that these assets would be outside the reach of TCI's creditors, such as Dayco. Thus, they created PolyFlow, an entity controlled by the Fin-

loc/Canam companies and Mr. Dutil, TCI's so-called primary shareholder. Furthermore, they structured the transfer to minimize the cash paid to TCI and then paid out virtually all of those funds to related companies based upon partially challenged debt obligations owed to companies controlled by its primary shareholder. *See generally* In re *Trimble,* 479 F.2d 103 (3d Cir.1973). And all this occurred while TCI was insolvent or became insolvent.

The defendants strongly deny these challenges to the propriety of the July 2002 transactions. They may fairly argue that Pennsylvania state law permits shareholders to make loans to a corporation. *See generally In re Erie Drug Co.,* 416 Pa. 41, 43-44 (1964). Moreover, I recognize that a retroactive valuation made by plaintiff's expert based upon projections made by TCI's management of future piping sales may not be persuasive at trial. Clearly, however, there are credibility issues that cannot now be resolved in the context of summary judgment. Giving the non-moving plaintiff the benefit of all reasonable inferences, I now conclude that he may persuade a fact-finder that his interpretation of the motivations and conduct of the defendants is accurate. If so, he may prevail under his breach of fiduciary duty claim (with liability extended to those who knowingly and materially aided and abetted the fiduciaries).[FN9] He may also prevail on his fraudulent conveyance claim under state law, as incorporated by section 544.[FN10] (In so doing, I have no present need to endorse his measure of damages.)

FN9. I shall not repeat my prior analyses of the state law standard for the establishment of fiduciary duties by corporate directors, officers and in certain instances, corporate shareholders; nor shall I repeat my earlier discussion of accomplice liability for such a breach of duty. *See generally Pierce v. Rosetta Corp.,* 1992 WL 165817, at *8 (E.D.Pa.1992). I do recognize that Pennsylvania's Supreme Court has not ex-

pressly affirmed that a non-fiduciary may be liable for aiding and abetting a breach of fiduciary duty, and that some courts have predicted that such liability does not exist under state law. *See, e.g., In re Student Finance Corp.,* 335 B.R. 539, 551 (D.Del.2005).*Contra Adena, Inc. v. Cohn,* 162 F.Supp.2d 351 (E.D.Pa.2001).

FN10.Section 544 of the Bankruptcy Code allows the plaintiff to asset a claim using Pennsylvania's Uniform Fraudulent Transfer Act ("PUFTA"). This state law provides that a "transfer made or obligation incurred by a debtor is fraudulent as to a creditor ... if the debtor made the transfer: (1) with actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor was insolvent at the time of the transfer or became insolvent as a result of it."12 Pa. C. S.A. § 5104. The elements of a fraudulent transfer and the relief permitted are delineated in the statute.

**\*9** Therefore, defendants' joint requests for summary judgment as to Counts I and II shall be denied.FN11

FN11. Although not raised by any of the defendants, I have also considered whether the former trustee has standing to assert a breach of fiduciary duty claim if TCI was insolvent prior to the PolyFlow transaction. Questions of standing, if they exist, must be considered sua sponte, as they are akin to subject matter jurisdiction. *See, e.g., National Ass'n for Advancement of Multijurisdiction Practice v. Gonzales,* 211 Fed. Appx. 91, 94 n. 3 (3d Cir.2006); *In re Weaver,* 632 F.2d 461, 462 n. 6 (5th Cir.1980); *see generally FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215 (1990).

In order for a bankruptcy trustee to have standing to raise a claim of breach of fiduciary duty, it must be a claim that belonged to TCI's estate at the time it filed its bankruptcy petition. *See generally Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown,* Inc., 296 F.3d 164, 169 (3d Cir.2002). This requires that the claim not be specific to or held by individual creditors. *Id.,* at 170;*In re Educators Group Health Trust,* 25 F.3d 1281, 1284 (5th Cir.1994).

Pennsylvania common law imposes a fiduciary duty upon corporate officers in favor of creditors, as well as to the corporation, when the corporation is insolvent. *See, e.g., Heaney v. Riddle,* 343 Pa. 453, 456 (1942); *Voest-Alpine Trading USA v. Vantage Steel Corp.,* 919 F.2d 206, 209 & 217 n. 25 (3d Cir.1990); *Brown v. Presbyterian Ministers Fund,* 484 F.2d 998, 1005 (3d Cir.1973). It is accepted, however, that the trustee of the insolvent corporation has standing to bring an action under Pennsylvania law for breach of fiduciary duty when corporate assets are wrongfully dissipated. *See, e.g., Branch v. Kaiser,* 291 Pa. 543 (1928); *Brown v. Presbyterian Ministers Fund,* 484 F.2d at 1005;*In re Insulfoams, Inc.,* 184 B.R. 694, 703-04 (Bankr.W.D.Pa.1995), aff'd sub nom., *Donaldson v. Bernstein,* 104 F.3d 547, 554 n. 2 (3d Cir.1997); *see generally Pepper v. Litton,* 308 U.S. 295, 307 (1939):

While normally that fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee. For that standard of fiduciary obligation is designed for the protection

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the entire community of interests in the corporation-creditors as well as stockholders.

(footnotes omitted).

Thus, I conclude that the plaintiff has standing to raise his breach of fiduciary duty claim in Count I.

B.

I reach a similar conclusion as to Counts VI and VII.

In Count VI, the plaintiff has raised the tort of "deepening insolvency" against certain defendants. Although this tort has not been accepted in all jurisdictions, *see, e.g., Trenwick America Litigation Trust v. Ernst & Young, L.L.P.,* 906 A.2d 168 Del. Ch.2006), *aff'd,*931 A.2d 438 (Del.2007) (Table), the Third Circuit Court of Appeals has predicted that Pennsylvania's Supreme Court will recognize it. *Official Committee of Unsecured Creditors v. R .F. Lafferty & Co.,* 267 F.3d 340, 349 (3d Cir.2001) ( "[W]e conclude that, if faced with the issue, the Pennsylvania Supreme Court would determine that 'deepening insolvency' may give rise to a cognizable injury.").

The *Lafferty* court, in analyzing this state law tort, defines deepening insolvency as an injury resulting "from the fraudulent expansion of corporate debt and prolongation of corporate life."*Id.,* at 347.*See, e.g., In re CITX Corp., Inc.,* 2005 WL 1388963, at *10 (E.D.Pa.2005) ("[F]raudulent and concealed incurrence of debt can damage the value of corporate property by allowing an otherwise insolvent corporation to continue to incur debt, resulting in eventual bankruptcy."), *aff'd,*448 F.3d 672 (3d Cir.2006); *Corporate Aviation Concepts, Inc. v. Multi-Service Aviation Corp.,* 2004 WL 1900001, at *4 (E.D.Pa.2004) ("As articulated by the Third Circuit, deepening insolvency involves 'prolonging an insolvent corporation's life through [b]ad debt.'") (quoting *Lafferty* at 350);*In re Adelphia Communic-*

*ations Corp.,* 324 B.R. 492, 500 (Bankr.S.D.N.Y.2005) ("[T]o be held liable for deepening insolvency, a party must have been able to foresee that the debtor was being operated for an improper purpose."); In re *Global Service Group, LLC,* 316 B.R. 451, 456 (Bankr.S.D.N.Y.2004) (Deepening insolvency is defined as the " 'fraudulent prolongation of a corporation's life beyond insolvency,' resulting in damage to the corporation caused by increased debt.") (quoting *Schacht v. Brown,* 711 F.2d 1343, 1350 (7th Cir.1983)). Liability for this tort must be grounded upon fraudulent rather than negligent conduct. *In re CITX Corp., Inc.,* 448 F.3d 672, 681 (3d Cir.2006). Moreover, when an independent cause of action establishes a remedy for decrease in assets or lost profits, an additional recovery for deepening insolvency may not lie. *Id.,* at 678.

Here, the plaintiff identifies evidence he intends to offer at trial which, giving him the benefit of the doubt, could lead a fact-finder to conclude that TCI was not dissolved after the July 2002 transfers in order to reduce the possibility that TCI creditors (particularly Dayco) would investigate the Poly-Flow transaction and challenge it as fraudulent. Furthermore, although TCI was left as a going concern, it had no ability to pay its creditors-as no loans or capital infusion were forthcoming and its operating expenses exceeded revenues-and so its liabilities increased allegedly by roughly $2 million between July 2002 and March 2004 when a voluntary petition in bankruptcy was filed.

*10 The defendants seek summary judgment as to Count VI primarily relying upon the affirmative defense of *in pari delicto.*The Third Circuit court describes this doctrine as barring the plaintiff from asserting "a claim against a defendant if the plaintiff bears fault for the claim."*Lafferty,* 267 F.3d at 354;*see In re Dublin Securities, Inc.,* 133 F.3d 377, 380 (6th Cir.1997) ("[N]o Court will lend its aid to a man who founds his cause of action upon an immoral or illegal act.") (internal quotation marks omitted).

The doctrine of *in pari delicto* will only apply as a defense to the deepening insolvency claim if the debtor corporation committed some wrongdoing. The wrongful conduct of the individual corporate officers and directors can be imputed to the corporation only if the conduct were committed (1) "in the course of [the officer or director's] employment, and (2) for the benefit of the corporation."*Lafferty* at 358-59.Thus, the wrongful conduct of a defendant will not be imputed to the corporation if the action was not for the benefit of the corporation. This "adverse interest exception" thus applies where actions taken were adverse to the corporation and not for its benefit.*Id.,* at 359;*In re the Personal and Business Insurance Agency,* 334 F.3d 239, 243 (3d Cir.2003).

As noted earlier, there are numerous disputed factual issues surrounding the July 2002 transactions. Although the defendants posit that these transfers were undertaken solely for the benefit of TCI, the plaintiff strongly disagrees. He refers to evidence he would offer at trial that, if believed, suggests that the July 2002 transfers were structured solely to benefit the defendants and were designed to harm the debtor corporation. If so proven, defendants' affirmative defense will be unavailing.

As for Count VII, equitable subordination under section 510(c) requires at least three elements:

> (1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the bankruptcy code.

*Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims,* 160 F.3d 982, 986-87 (3d Cir.1998). Furthermore, relief under section 510(c) should be tailored to offset the harm caused by the inequitable conduct. *In re Submicron Systems Corp.,* 432 F.3d at 462.

For reasons just stated, if the plaintiff's proffered evidence is credible and persuasive, he may be able to prove all of the elements for relief under section 510(c) as to some or all of the defendants who have asserted claims against TCI. The extent of that relief need not now be considered. Thus, summary judgment as to Counts VI and VII are not warranted.

IV.

Counts IV and V concern litigation brought against TCI that was resolved long after July 2002.

*11 Shortly before TCI's bankruptcy filing, two default judgments were entered against it. One, for $4 million, was entered on March 1, 2004, in favor of Murphy Oil USA, Inc., as a discovery sanction due to TCI's failure to comply with court orders directing discovery responses. The other, for about $1.3 million, was entered on January 9, 2004, in favor of PISCES by OPW, Inc., and was entered after TCI voluntarily dismissed its litigation counsel and then did not engage new trial counsel, despite being afforded opportunity to do so.

The plaintiff asserts that the four director defendants were guilty of breach of fiduciary duty and negligence in permitting these two judgments to be entered. The individual defendants argue, in seeking summary judgment, that TCI had no funds with which to litigate these two lawsuits, as it is undisputed that TCI was losing money in 2003 and 2004, and purportedly had no ability to borrow funds from commercial lenders.[FN12]

> FN12. As TCI was borrowing from Bank of America based upon a guarantee provided by Canam Steel, it is unclear from this record whether-with Canam Steel's approval and guarantee-the bank would not have advanced additional funds to TCI in early 2004.

In opposing summary judgment, the plaintiff proposes to offer at trial evidence that TCI had avail-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

able funds with which to defend these two lawsuits. He emphasizes that in 2003 TCI advanced at least $450,000 to PolyFlow, and that PolyFlow owed TCI about $900,000 in total advances, plus $400,000 in outstanding receivables in March 2004. *See* Ex. P-10. Moreover, he intends to offer evidence from Mr. Wright that he was under instruction to delay all litigation either with the hope that the plaintiffs would settle cheaply, or that TCI would simply cease to operate leaving these two plaintiffs with no assets against which to execute.

Mr. Dutil justified TCI's conduct regarding Poly-Flow loans from TCI and the outstanding PolyFlow debt to TCI by noting that TCI was in default on its loan from Bank of America and was concerned that the commercial lender would execute upon funds held by TCI. He asserts that any TCI funds not forwarded or retained by PolyFlow would have involuntarily been used to repay the bank. Clearly, this raises a factual dispute regarding TCI's ability to fund the litigation, and whether TCI's directors intentionally or negligently wrongfully failed to act.

However, TCI was only damaged to the extent litigation would likely have resulted in liability less than the amount of the default judgments, offset by the estimated costs of litigation to TCI. *See generally Honeywell, Inc. v. American Standards Testing Bureau, Inc.,* 851 F.2d 652, 655 (3d Cir.1988), *cert. denied,* 488 U.S. 1010 (1989).

In support of his claim involving the Murphy Oil judgment, the plaintiff intends to offer at trial evidence that Murphy Oil would have settled its lawsuit for $120,000. Exs. P-9, at 18-25; P-16, at 49-50. The plaintiff intends to offer no expert testimony or other evidence concerning the value of this litigation claim against TCI. The defendants counter that Murphy Oil's trial counsel denies ever making such a settlement offer. Ex. P-9 at 38-40. They expect to prove that Mr. Wright's belief that such an offer was made was erroneous, as he was not present during settlement discussions. *See* Ex. P19 (Admission, ¶ 59).

*12 Insofar as Counts IV and V involve the Murphy Oil claim, I will deny summary judgment, but limit the disputed evidence offered at trial to whether Murphy Oil made a settlement offer that was wrongfully rejected by TCI's board of directors, acting through one or more of its members. In opposition to summary judgment, the plaintiff offers no evidence on the merits of the underlying litigation and the standard of care. *See, e.g., Gans v. Mundy,* 762 F.2d 338 (3d Cir.), *cert. denied,* 474 U.S. 1010 (1985); *see also Honeywell, Inc. v. American Standards Testing Bureau, Inc .* He only refers to evidence that, if credible, may prove the wrongful rejection of a purported settlement offer. *See Schmidt v.. Currie,* 217 Fed. Appx. 153, 155 (3d Cir.2007). The plaintiff, however, refers to no evidence that he would proffer at trial to demonstrate that TCI suffered any damages from the PISCES default judgment, other than a conclusory statement by Mr. Wright that he considered PISCES' claim-which was based upon a contract, *viz.,* a breach of a settlement agreement-as without merit. Ex. P-16, at 92. This lay conclusion by itself would be insufficient to meet the plaintiff's burden at trial. *See Honeywell, Inc. v. American Standards Testing Bureau, Inc.; Gans v. Mundy.* Therefore, summary judgment in favor of the individual defendants as concerns PISCES and Counts IV and V is justified.

An appropriate order shall be entered.

ORDER

AND NOW, this 5th day of March 2008, for the reasons stated in the accompanying memorandum, it is hereby ordered that the motions for summary judgment filed by the defendants (as to all counts in the amended complaint except Count III) is denied in large part. Summary judgment in favor of the individual defendants is granted as to Counts IV and V but only as those counts involve the PISCES default judgment.

It is further ordered that on or before April 4, 2008,

Slip Copy, 2008 WL 682455 (Bkrtcy.E.D.Pa.)
**(Cite as: 2008 WL 682455 (Bkrtcy.E.D.Pa.))**

the parties shall submit a joint pretrial statement
consistent with Local Bankr.R. 7016-1. A final pre-
trial conference shall take place on April 11, 2008
at 9:30 a.m in Bankruptcy Courtroom # 2, at which
time the trial dates shall be announced.

Bkrtcy.E.D.Pa.,2008.
In re Total Containment, Inc.
Slip Copy, 2008 WL 682455 (Bkrtcy.E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 11

# NO WAY OUT: SECTION 546(e) IS NO ESCAPE FOR THE PUBLIC SHAREHOLDER OF A FAILED LBO

## INTRODUCTION

The 1980s marked the heyday of the "mega-transaction," when "raiders" plundered "cash cows" and "white knights" often made off with the "crown jewels." The strategies and intricacies driving these deals were a mystery to most Americans — they were solely the province of relatively small sectors of the corporate, legal, and financial communities. One of the transactions that came to the fore in the 1980s was the leveraged buyout ("LBO"), in which small Davids were able to acquire Goliath companies through a combination of large debt/equity ratios and a friendly management. The large amount of debt incurred, however, placed a heavy burden upon the acquired company, a burden many of those companies have not been able to shoulder. As a result, many of the large companies acquired through LBOs during the '70s and '80s have filed for bankruptcy.[1] As the trustees in bankruptcy seek to either reorganize the corporation or consolidate the estate for the benefit of creditors, they are turning more frequently to fraudulent conveyance law in an attempt to avoid the leveraged buyout.[2] Some recent litigation concerning one of these bankrupt companies has raised the novel issue of whether or not a relatively obscure section of the U.S. Bankruptcy Code might exempt from avoidance payments made to shareholders during the buyout.[3]

This Note argues that section 546(e) of the Bankruptcy Code[4] should not be read to exempt from avoidance certain LBO payments made to public shareholders. Part I provides a

---

[1]   Resorts International, Weiboldt Stores, Revco, Tabor Realty, Kaiser Steel, and R.H. Macy are among those.

[2]   See United States v. Tabor Court Realty, 803 F.2d 1288 (3d Cir. 1986). See also Wieboldt Stores, Inc. v. Schottenstein, 94 Bankr. 488 (N.D. Ill. 1988); Kaiser Steel Corp. v. Charles Schwab & Co., 913 F.2d 846 (10th Cir. 1990).

[3]   See Kaiser Steel Corp. v. Charles Schwab & Co., 913 F.2d 846 (10th Cir.); 11 U.S.C. § 546(e) (1990).

[4]   11 U.S.C. §§ 1-1330 (1990).

51

HeinOnline -- 1991 Colum. Bus. L. Rev. 51 1991

brief overview of the procedural and historical setting which frames this debate, the application of fraudulent conveyance law to LBOs, and the treatment given section 546(e) by the courts. Part II examines the genesis of section 546(e) and presents an argument against its application in this area.

## I. BACKGROUND

### A.    Leveraged Buyouts and Fraudulent Conveyance Law

### 1.    The Leveraged Buyout

In a typical leveraged acquisition, management and/or an investor group purchases the shares of the target company in order to fully capture its expected earnings.[5] The term leveraged comes from the fact that a very large percentage of the capital used to finance the acquisition is obtained by borrowing against the assets of the target company. This capital restructuring device offers many potential rewards if the company remains viable over the long term. The assumption of debt will result in significant tax savings through the deduction of interest payments from the company's income.[6] Additionally, since the ownership base has been narrowed dramatically, the growth in equity occurring as the debt is repaid is divided among fewer players. A successful LBO can provide tremendous financial rewards to the new equity holders.[7]

The sequence of events in a leveraged buyout might run as follows: a combination of inside managers and outside investors decide that they want to take the target company ("Target") private; they feel that the market has undervalued Target to the point that they can offer the shareholders a substantial premium for their stock and still acquire a cash generating entity. The manager/investor group forms the LBO company ("Company"). The group that formed Company contributes $10 of their own funds and obtains $90 through an unsecured loan

---

[5]    Michel & Shaked, *The LBO Nightmare: Fraudulent Conveyance Risk*, FIN. ANALYSTS J., March/April 1990, at 43.

[6]    *See* Miller, *The Modigliani-Miller Propositions After Thirty Years*, 2 J. ECON. PERSPECTIVES 99, 116-18 (Fall 1988).

[7]    *See* D. Baird, *Fraudulent Conveyances, Agency Costs and Leveraged Buyouts* (November 20, 1989) (unpublished draft).

from a lender ("Lender"). Company then uses its funds to buy Target's shares from its public shareholders and then merges into Target. Target then grants liens and security interests to Lender to secure Company's loan. The effect of these transactions is that Target has assumed $90 of debt, and is owned by the small investor/management group.

There are many variations upon this basic transaction scenario, but in each of them, the acquired company's debt to equity ratio has increased, and its number of shareholders has usually decreased.[8] The LBO is a complicated transaction, and its intricacies are difficult to understand.[9] While the advantages of such a financing structure may not be immediately obvious, they nevertheless do exist. The tremendous amount of debt incurred provides an excellent tax shelter; under the tax code, payments of interest are fully deductible.[10] Thus income that would ordinarily have been taxed at either the corporate or shareholder level is now used to repay the debt. So income that would otherwise have gone to pay taxes has instead, in effect, been used to subsidize the price of the LBO.[11] Most important to the acquiring group, however, is the gradual increase in their equity in the target. As the income stream repays the debt, the controlling group's investment becomes less and less leveraged. Depending upon the applicable tax provisions, the new shareholders will either extract the profits of the company as dividends or extend a public offering once the debt has been repaid.[12]

2.    Fraudulent Conveyance Law

The first fraudulent conveyance law was enacted by the English Parliament in 1571 and was known as the Statute of

---

[8]  Michel & Shaked, *supra* note 5, at 43-45.
[9]  *See* Baird, *supra* note 7, at 2; Lowenstein, *Management Buyouts*, 85 COLUM. L. REV. 730 (1985).
[10]  I.R.C. § 163(a) (1990).
[11]  *See* Canellos, *The Over-leveraged Acquisition*, 39 TAX LAW 100 (1985).
[12]  If the personal income tax rate is higher than the capital gains rate, the buyout group is more likely to take profits in the form of a public offering because the income will be in the form of a capital gain. If the capital gains tax is higher, the reverse would probably hold true. *See generally* Baird, *supra* note 7, at 5 (discussing possible tax advantages presented by leveraged transactions).

13 Elizabeth.[13] The statute declared void any transfer by a debtor made with the intent of hindering, delaying or defrauding his creditors.[14] This statute has provided the basis for modern fraudulent conveyance statutes, including the Uniform Fraudulent Conveyance Act ("UFCA") and its successor, the Uniform Fraudulent Transfer Act ("UFTA").[15] These statutes not only protect against actual fraud[16], as did the Statute of 13 Elizabeth, but also protect against constructive fraud as well.[17]

Modern fraudulent conveyance law is incorporated in the Bankruptcy Code in section 548. Subsection (a)(1) deals with intentional fraud, while subsection (a)(2) brings in constructive fraud provisions.[18] The trustee in bankruptcy may set aside any transfer or obligation that is deemed to fall under one of these provisions.[19] Section 548, however, only applies to "any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within *one year* before the date of the filing of the petition."[20] The Code itself, then, only reaches transfers made within one year of the filing of the petition. However, the "strong arm" section of the Code, section 544(b), makes available to the trustee any applicable state laws. Therefore, if the alleged fraudulent transfer occurred more than one year before the filing, the trustee may "reach out" to make use of the applicable state fraudulent conveyance statute, whose statute of limitations is presumably more favorable.[21] It is important to note that

---

[13]  13 Eliz., ch. 5 (1571).

[14]  *Id.*

[15]  The UFCA applies in Arizona, Delaware, Maryland, Massachusetts, Michigan, Montana, Nebraska, New Mexico, New York, Ohio, Pennsylvania, Tennessee, the Virgin Islands, and Wyoming. The UFTA applies in Arkansas, California, Florida, Hawaii, Idaho, Maine, Minnesota, Nevada, New Hampshire, New Jersey, North Dakota, Oklahoma, Oregon, Rhode Island, South Dakota, Texas, Utah, Washington, West Virginia, and Wisconsin. The remaining states have either adopted a version similar to one of these two, or one based upon common law principles as embodied in the Statute of 13 Elizabeth.

[16]  *See infra* notes 24, 25; UFCA § 7, 7A U.L.A. 427 (1985); UFTA § 7, 7A U.L.A. 639 (1990).

[17]  UFCA §§ 4, 5, 6, 7A U.L.A. 474, 504 (1985); UFTA §§ 4(a)(2)(i), 5(a), 7A U.L.A. 652, 657 (1990).

[18]  11 U.S.C. § 548 (1990).

[19]  *Id.*

[20]  *Id.* § 548(a).

[21]  11 U.S.C. § 544(a) (1990). For example, New York's statute of limitations

Case 1:08-cv-00876-RMB-THK     Document 123-12     Filed 07/08/2008     Page 6 of 20

when asserting a claim through section 544(b), the trustee stands in the shoes of an unsecured creditor, and only those transfers that are voidable under state law by an unsecured creditor may be voided by the trustee.[22]

Because actual fraud is so difficult to prove, the various fraudulent conveyance statutes have incorporated constructive fraud provisions — if the indicia of fraud are present, intent is presumed.[23] Thus, although there may be no proof of scienter, transfers or obligations which satisfy constructive fraud provisions will be deemed invalid nevertheless. The Bankruptcy Code's constructive fraud provisions are based on those found in the UFCA. The UFTA's differ slightly in formulation but not significantly in effect.

The applicability of the provisions turns, as might be expected, upon the financial position of the debtor. Essentially, a transfer or obligation will be considered constructively fraudulent if the debtor does not receive "reasonably equivalent value" (according to the Code and the UFTA) or "fair consideration" (according to the UFCA) and one of the three following conditions exists: (1) the debtor is insolvent at the time of the transfer, or will be rendered insolvent as a result of such transfer;[24] (2) the debtor was engaged, or was about to engage, in a business or transaction, and the transfer left the debtor with an unreasonably small amount of capital;[25] or (3) the debtor in-

---

on constructive fraud is six years. N.Y. CIV. PRAC. L. & R. §§ 213(1) (McKinney 1989). California's runs the later of four years after the transfer occurred, or one year after the transfer could have reasonably been discovered, but in no event later than seven years after the transfer. CAL. CIV. CODE § 3439.09 (1991).

[22]  11 U.S.C. § 544(b) (1990). While an unsecured creditor outside of bankruptcy could recover no more than the value of his claim in a fraudulent conveyance action, inside of bankruptcy, the trustee, standing in the shoes of unsecured creditors, can set aside the entire transaction, in accordance with the Supreme Court decision in *Moore v. Bay*, 284 U.S. 4 (1931), as long as on the date of the filing, a single creditor was owed debt from the time of the transaction.

[23]  Blassberg & Vasily, *Fraudulent Conveyance Issues in Leveraged Acquisitions*, 1990 REV. OF BANKING & FIN. SERVICES 209.

[24]  11 U.S.C. § 548(a)(2)(b)(i) (1990); UFCA § 4, 7A U.L.A. 474 (1985); UFTA § 5(a), 7A U.L.A. 657 (1985).

[25]  11 U.S.C. § 548(a)(2)(b)(ii) (1990); UFCA § 5, 7A U.L.A. 504 (1985); UFTA § 4(a)(2)(i), 7A U.L.A. 653 (1985).

tends to incur, or believes he will incur, debts that will be beyond the debtor's ability to pay as they mature.[26]

Accordingly, if the trustee in bankruptcy can either prove actual intent or satisfy the requirements of the constructive fraud provisions, the trustee can void the entire transaction which prejudiced the creditors' positions.

### 3.    The Applicability of Fraudulent Conveyance Law to LBOs

As more and more LBOs fail, the trustees of bankrupt corporations are turning to fraudulent conveyance law in an effort to avoid the LBO and either recover the funds paid out or subordinate the claims of the lenders who funded the buyout to those of the unsecured creditors.[27] Although it was once thought that LBOs might not be subject to fraudulent conveyance law,[28] it is now fairly apparent that they are. The extent to which the buyouts may be set aside is still uncertain.[29]

Some LBOs can be attacked by claiming they violate the intentional fraud provision of the applicable state fraudulent conveyance statute.[30] Because of the difficulty of proving scienter, however, most trustees have sought to avoid the leveraged buyout through the constructive fraud provisions.

In a typical LBO, the essence of the transaction is that the company substitutes debt for equity. Equity is distributed to the old shareholders in the form of a cash payout, and the

---

[26]  11 U.S.C. § 548(a)(2)(b)(iii) (1990); UFCA § 6, 7A U.L.A. 507 (1985); UFTA § 4(a)(2)(ii), 7A U.L.A. 653 (1985).

[27]  *See* Credit Managers Ass'n v. Federal Co., 629 F. Supp. 175 (C.D. Cal. 1985). *See also* Wieboldt Stores, Inc. v. Schottenstein, 94 Bankr. 488 (N.D. Ill. 1988); *In re* Metro Communications, Inc., 95 Bankr. 921 (Bankr. W.D. Pa. 1989).

[28]  *See generally* Baird & Jackson, *Fraudulent Conveyance Law and Its Proper Domain*, 38 VAND. L. REV. 829; 850-54 (1985) (arguing that fraudulent conveyance law should not necessarily be applicable to leveraged buyouts). *See also* Credit Managers Ass'n v. Federal Co., 629 F. Supp. 175 (C.D. Cal. 1986) (although the court did not reach the issue of whether or not fraudulent conveyance law applies to leveraged buyouts, it did suggest that it would not have been inclined to rule that it did, relying heavily upon the Baird & Jackson article cited above).

[29]  *See In re* Metro, 95 Bankr. 921. *See also* Wieboldt, 94 Bankr. 488; *In re* Ohio Corrugating Co., 70 Bankr. 920 (Bankr. N.D. Ohio 1987), *aff'd*, 91 Bankr. 430 (N.D. Ohio 1988).

[30]  *See* United States v. Tabor Court Realty, 803 F.2d 1288 (3d Cir. 1986).

company assumes the debt required to achieve that payout. If the LBO is consummated while the company is insolvent, or leaves the company insolvent or with too little working capital after the deal is consummated, it may be attacked if the company did not receive "reasonable value" or "fair consideration" for the transfer or obligation.[31]

A properly structured LBO might be arranged, however, so that the individual steps of the buyout, when viewed as discrete transactions, may not be constructively fraudulent as to creditors. Consider, for example, an LBO where the target company has granted liens and security interests in its assets to secure a large loan, which was used, under the direction of the management buyout group, to repurchase all of the outstanding stock. The two steps involved are: 1) the company granted a security interest in its assets (incurred an obligation) for which it received X amount of dollars, ostensibly reasonably equivalent value, and 2) the company then used the funds (effected a transfer) to buy its own stock from its old shareholders. Saving the question of whether or not the shares are truly reasonably equivalent in value for later analysis, it appears that the company has effected a valid transfer.[32] Value has ostensibly been exchanged for value in each of the two transactions.

There are two complications to this scenario, however. The first is that if the company is insolvent at the time of the buyout, the shareholders, by tendering their shares, might not be giving reasonably equivalent value for the funds they have received; a share in an insolvent company is arguably worthless. This, however, is a debatable claim. Under the UFTA and Bankruptcy Code, an entity is insolvent if its debts are greater than its fairly valued assets.[33] It does not directly follow, how-

---

[31] *See supra* notes 24-25.

[32] In the real world, LBOs are rarely accomplished this way and the potential for constructive fraud is more readily apparent. Many LBOs involve "upstream" guarantees, where the target guarantees the acquiring company's loan. *See* Bernstein, *Leveraged Buyouts and Fraudulent Conveyances*, 9 INT'L FIN. L. REV. 24 (August 1990).

Assuming that upstream guarantees which result in some type of tangible benefit to the guarantor are not fraudulent conveyances, the fact that the loan proceeds flow directly from the acquiring company to the shareholders renders questionable the claim that the target company has received reasonably equivalent value for incurring its obligation through the upstream guarantee.

[33] 11 U.S.C. § 101(31)(a) (1990).

ever, that the shares of a company deemed insolvent by the Code and UFTA would not still trade at a positive value.[34] Accordingly, it cannot be said with certainty that the shareholders have not given "reasonably equivalent value," especially when one of the accepted valuation methods in corporate law is market value.[35]

The second complication is that if the individual steps of the LBO are "collapsed" and viewed as one larger transaction, the application of the constructive fraud provisions becomes clear: the target company has incurred an obligation and received no benefit, because the funds have passed, in essence, directly from the lender to the shareholders.[36]

Accordingly, courts have been willing to find LBOs constructively fraudulent if they determine that the debtor did not receive fair consideration or reasonably equivalent value for its transfer or obligation, and either of the following two situations existed: (1) the debtor was insolvent at the time of transfer, or became insolvent as a result of the transfer, or (2) the debtor was engaged, or about to engage, in a business for which the transfer left it undercapitalized.[37] The potential targets of the trustee in bankruptcy seeking to avoid the LBO have ranged from public shareholders[38] to the financing lender[39] to the directors of the acquiring company.[40]

### B.    The *Kaiser* Decision and Section 546(e)

All of these issues were present in the litigation surrounding the leveraged buyout of Kaiser Steel. In 1984, Kaiser Steel bought out its public shareholders in an LBO. The relevant

---

[34]    *See* Baird & Jackson, *supra* note 28, at 851-52.

[35]    *See* Martignette v. Sagamore Mfg. Co., 340 Mass. 136 (1959).

[36]    Baird & Jackson, *supra* note 28, at 851; *see also* Wieboldt Stores, Inc. v. Schottenstein, 94 Bankr. 488 (N.D. Ill. 1988) (although court refused to collapse steps of LBO so as to reach innocent public shareholders, it did so as to those parties who acted with knowledge and effected the deal).

[37]    *See* United States v. Gleneagles Investment Co., 565 F. Supp. 556 (M.D. Pa. 1983). *See also Wieboldt*, 94 Bankr. 488; Credit Managers Ass'n v. Federal Co., 629 F. Supp. 175 (C.D. Cal. 1985).

[38]    *Wieboldt*, 94 Bankr. 488.

[39]    *In re* Ohio Corrugating Co., 70 Bankr. 920 (Bankr. N.D. Ohio 1987), *aff'd*, 91 Bankr. 430 (N.D. Ohio 1988).

[40]    *Wieboldt*, 94 Bankr. 488.

particulars of the transaction are as follows. Kaiser Acquisition Company ("KAC") was incorporated in Delaware for the purposes of acquiring Kaiser Steel, a Nevada corporation. At Kaiser Steel's annual shareholder meeting, the following merger plan was approved by its shareholders: KAC would obtain a loan from Citibank N.A. of 100 million dollars which was secured by all of Kaiser's assets. KAC would then be merged into Kaiser, and upon consummation of the merger, each share of the outstanding common stock was converted into the right to receive 22 dollars in cash, plus one share of preferred stock A and one share of preferred stock B, both in the new entity. The surviving corporation would then use the loan proceeds and some of its cash reserves to fund the distribution to the public shareholders, with the result that all of the outstanding common stock of the surviving entity would be owned by the acquisition group.[41]

The merger was effected on February 29, 1984. In 1987, Kaiser filed for bankruptcy and the trustee commenced actions against numerous defendants, including many former public shareholders and over 150 brokerage houses, in an effort to avoid the LBO.[42] Kaiser's strategy was to establish that the LBO was constructively fraudulent, and then to use section 550(a) of the Code to recover the value of the property transferred — the LBO payments — from the defendants as "initial transferees."[43] Subsequently, Charles Schwab & Co., Inc.

---

[41] *Kaiser Steel Prospectus and Proxy Statement* (December 9, 1983).

[42] *See In re* Kaiser Steel Corp., 105 Bankr. 639 (Bankr. D. Colo. 1989), *rev'd*, 110 Bankr. 514 (D. Colo. 1990).

[43] Kaiser's complaint was brought pursuant to §§ 544(b), 548 and 550(a)(1) of the Bankruptcy Code, and under CAL. CIVIL CODE § 3439.01 *et seq.* (1985). The § 548 claim consisted of the constructive fraud sections of the Code, while the § 544 claim made available the California constructive fraud provisions. The § 544(a) claim enables the trustee, if he can avoid a transaction under §§ 544, 545, 547, 548, 549, 553(b) or 724(a), to recover the property transferred or the value of the transfer from "the initial transferee of such transfer." 11 U.S.C. § 550 (1990).

Because the LBO had taken place more than one year before the commencement of the case, the trustee was forced to use the "strong-arm" section of the Code in order to apply California's constructive fraud provisions. If Kaiser had been able to establish that the LBO was fraudulent as to Kaiser's creditors, § 550(a) would have enabled it to collect the value of the property transferred from anyone deemed an initial transferee. The advantages of such a strategy are clear: Kaiser could recover the funds from those with presumably the deep-

("Schwab") filed a motion for summary judgment. Schwab was joined in this motion by many of the other defendants, and asserted two defenses to Kaiser's claim: (1) it was not an "initial transferee" under section 550(a) and (2) the LBO payments were exempt from avoidance by the trustee under section 546(e).[44]

The bankruptcy judge denied the motion on both grounds.[45] The district court accepted Kaiser's interlocutory appeal and reversed on both issues, finding that Schwab was not an initial transferee and that the LBO payments were "settlement payments"[46] within the meaning of section 546(e), and so exempt from the avoidance power of the trustee.[47] Kaiser then appealed, and the circuit court affirmed on the section 546(e) defense, without reaching the transferee issue.[48] Because section 546(e) limits the avoiding powers of a trustee, the section 550(a) recovery is inapplicable, since section 550(a) can only be used to recover funds to the extent they are avoidable by the trustee.

This defense was one of first impression. To the circuit court's knowledge, no one had ever attempted to apply section

---

est pockets — the brokerage houses and financial institutions that had handled the funds — and then let them recover from the ultimate recipients of the payments.

[44] 11 U.S.C. § 546(e) reads:

Notwithstanding sections 544, 545, 547, 548(a)(2), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101(34), 741(5), or 761(15) of this title, or settlement payment, as defined in section 101(35) or 741(8) of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution or securities clearing agency, that is made before the commencement of this case, except under section 548(a)(1) of this title.

[45] *In re* Kaiser Steel Corp., 105 Bankr. 639 (Bankr. D. Colo. 1989), *rev'd*, 110 Bankr. 514 (D. Colo. 1990).

[46] 11 U.S.C. § 741(8) (1990) defines settlement payment as follows: " 'settlement payment' means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade."

11 U.S.C. § 101(35) also defines settlement payment, but the definition is virtually identical, and is only applicable in the forward contract provision sections of the Code.

[47] *In re* Kaiser Steel Corp., 110 Bankr. 514 (D. Colo. 1990).

[48] Kaiser Steel Co. v. Charles Schwab & Co., 913 F.2d 846 (10th Cir. 1990).

546(e) to an LBO.[49] Accordingly, the circuit court examined the legislative history behind the enaction of the provision, as well as the treatment given section 546(e) by other courts, albeit in different contexts. The circuit court concluded that although the legislative history was not conclusive per se, the broad interpretation given "settlement payment" by other courts,[50] the relatively clear language of the statute, and the route by which the payments were disbursed were sufficient to enable the circuit court to rule that the payments were indeed "settlement payments." At the time of this writing, the question of whether or not section 546(e) operates to protect the public shareholders is undecided. The answer to that question lies in the legislative history of the provision, an understanding of the clearance and settlement system which allows for a smoothly functioning market, and an appreciation of Congress's concerns regarding the financial markets.

## II. THE APPLICABILITY OF SECTION 546(e) TO PUBLIC SHAREHOLDERS

### A.    The Legislative History of Section 546(e)

Section 546(e) has its origins in a 1975 New York district court case, *Seligson v. New York Produce Exchange*[51], in which the court refused to find that a 12 million dollar margin payment made by a bankrupt commodities broker was exempt from the avoiding powers of the broker's trustee in bankruptcy. In response to *Seligson*, Congress incorporated section 764(c) into the new Bankruptcy Code,[52] intending to provide protection from the types of claims represented by *Seligson*.[53] The ratio-

---

[49]  *Id.*
[50]  *See* Bevill, Bresler & Schulman v. Spencer Sav. & Loan, 878 F.2d 742 (3d Cir. 1989); *In re* Blanton, 105 Bankr. 321 (Bankr. E.D. Va. 1989).
[51]  394 F. Supp. 125 (S.D.N.Y. 1975).
[52]  *See* White, *The Commodity-Related Provisions of the Bankruptcy Act of 1978*, in Record of the Association of the Bar of the City of New York (April 1979), at 269-71.
[53]  S. REP. NO. 989, 95th Cong., 2d Sess., at 106 (1978).
11 U.S.C. § 764(c) (1978) read:
>    Notwithstanding sections 544, 545, 547, 548 and 724(a) of this title, the trustee may not set aside a transfer that is a margin payment to or deposit with a commodity broker or forward contract

nale behind exempting margin and settlement payments in the commodities industries from the avoidance powers of the trustee was to prevent the bankruptcy of one party in the commodities clearance and settlement chain from spreading to other parties and possibly threatening the collapse of the affected market — in short, fear of "the domino effect."[54]

Even at the time of enaction, however, Congress recognized that it would have to make some technical amendments to the commodities and securities provision of the code in order to work out the "bugs" in the new legislation.[55] Most pertinent to the securities industries, however, was the fact that the protection afforded to the commodities industries had not been explicitly extended to the securities industries. As a result, the 1982 provisions made some minor amendments to commodity related provisions and extended their broad protection to the securities industries.[56] The amendments were intended to insure that

---

merchant or is a settlement payment made by a clearing organization and that occurs before the commencement of the case, except section 548(a)(1) of this title.

Also indicative of this purpose was the following exchange on the Senate floor between Senators Mathias and DeConcini:

Mr. Mathias: Am I correct in my understanding of the Senator's statement that the intent of section 764 and section 548(d)(2) is to provide that margin payments and settlement payments previously made by a bankrupt to a commodity broker, forward contract merchant and by or to a clearing organization are non-voidable transfers by the bankrupt's trustee? . . .

Mr. DeConcini: Yes.

Mr. Mathias: I thank the Senator for his assurance that it is the intention of section 764(c) and section 548(d)(2) to protect all margin payments in the customer-broker-clearinghouse chain. This vital protection substantially reduces the likelihood that the bankruptcy of one customer or broker will lead to the bankruptcy of another broker or clearinghouse.

124 CONG. REC. S17,433 (Oct 6, 1978).

[54] *Bankruptcy of Commodity and Securities Brokers, 1981: Hearings Before the Subcomm. on Monopolies and Commercial Law of the House Comm. on the Judiciary*, 97th Cong., 1st Sess. 203 (1981) (statement of Edmund Schroeder); H.R. REP. NO. 420, 97th Cong., 2d Sess., at 1 (1982).

[55] H.R. REP. NO. 1195, 96th Cong., 2d Sess., at 6 (1980).

[56] The amendments are embodied in H.R. 4935, 97th Cong., 2d Sess. (1982). Specifically, § 764(c) was repealed and re-enacted as 11 U.S.C. § 546(d) (1982), which read:

Notwithstanding sections 544, 545, 547, 548(a)(2) and 548(b) of this title, the trustee may not avoid a transfer that is a margin or

the avoiding powers of a trustee in bankruptcy would not be used to set aside margin or settlement payments absent evidence of actual fraud.[57] In 1984 and again in 1986, Congress amended the Bankruptcy Code, redesignating 546(d) as 546(e) and wording it in its current form.[58]

This historical framework, however, must be examined against the real-world system it was designed to protect. It is one thing to state that margin and settlement payments are exempt from avoidance; it is another to understand what those payments are and why they should be protected. Therein lies the key to an informed and workable application of section 546(e).

### 1.    The Clearing and Settlement Systems

In 1975, Congress directed the Securities and Exchange Commission to use its authority to facilitate the establishment of a national system for the prompt and accurate clearance and settlement of securities transactions. The advantageous features of such a system would be invaluable in terms of promoting the SEC's goals of protecting investors and safeguarding securities and funds.[59] In addition, the centralization that a national

---

settlement payment, as defined in section 741 or 761 of this title, or deposit made by or to a commodity broker, forward contract merchant, stockbroker, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1) of this title.

Section 546(d), then, incorporated the protections of former section 764(c), and extended them to the securities industries as well.

The 1982 amendments also included the definition of settlement payment, enacted as 11 U.S.C. § 741(8) (1982), which read:

"settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.

[57]    H.R. REP. No. 420, 97th Cong., 2d Sess., at 2 (1982).

[58]    *See supra* text accompanying note 52.

[59]    Some of those advantages include "the use of modern data processing techniques, the standardization of forms and time deadlines, and the provision of a central location for the matching of trade data. Use of these systems encourages the resolution of uncompared trades, maximizes the benefits of netting buy and sell transactions in the same security, and aids the Congressional goal of immobilizing stock certificates through book-entry transfer of securities in the settlement of transactions." *Hearings*, note 54 *supra*.

system fosters would make possible a smoothly functioning market as the volume of trades increased.[60]

The system that is now established works roughly as follows: typically, when a customer wishes to buy a security, he or she places an order with his or her broker, who purchases the security from another broker, who is acting on behalf of a party who has placed an order to sell. Once the trade has been agreed upon, the process by which the security is delivered in exchange for the purchase price is known as "clearance and settlement." The clearing agency compares the trades its member brokers have made to arrive at an accounting of the day's transactions, which it then uses to establish each broker's money and securities settlement obligations. Finally, the trades are "settled" — funds and securities are delivered in satisfaction of the obligations.[61]

One of the keys to the success of this system is that each participant in the chain guarantees that he or she will make good on his or her obligation. The buying broker guarantees that he or she will deliver funds in exchange for the securities. The selling broker guarantees he will deliver the security in exchange for funds.[62] Because the comparison and settlement process is not instantaneous, however, the clearing agency must guarantee to the seller that it will deliver the funds, and it

---

The specific mandate to the Securities and Exchange Commission was expressed in section 17A of the Securities Act, 15 U.S.C. § 78q-1 (1990), which reads in pertinent part:

National System for Clearance and Settlement of Securities Transactions.

(a)(1) The Congress finds that

(A) The prompt and accurate clearance and settlement of securities transactions, including the transfer of record ownership and the safeguarding of securities and funds related thereto, are necessary for the protection of investors and persons facilitating transactions by and acting on behalf of investors . . . .

[60] *Hearings*, *supra* note 54, at 246 (statement by Mr. Bevis Longstreth, Commissioner of the SEC).

[61] *Id.* at 244, 301-04. *See generally* Exchange Act Release No. 34-13,163 at nn.54-56 (Jan. 13, 1977).

[62] In most instances, physical delivery does not actually occur, since the majority of outstanding shares are held in a computerized book entry system at a depository, such as the Depository Trust Company ("DTC"). Instead, DTC credits and debits each of its participants' accounts with the correct amount of funds and securities, which the participants then distribute to their customers.

must also guarantee to the buyer that it will deliver the securities. In the event of a default by any party in the chain, the clearing agency must still make good on its guarantee, which it can do by calling on a backup clearing fund provided by its members.[63] Brokers and other intermediaries require collateralization of their respective risks by means of various types of margin payments.[64] This system depends upon the availability of the respective guarantees to the clearing agency; without them, the potential exposure is tremendous.

The threat, then, that a bankruptcy of one of the market participants poses to the rest of the market becomes clear. If the trustee can recover as a preference, or avoid as a fraudulent conveyance, any of the types of payments that are used to secure the obligations of the market participants — and minimize the risk for the clearing agency — one participant's bankruptcy might trigger a ripple effect that spreads throughout the securities industry.[65] In order for the system to work smoothly, the parties must be able to assume that the margin and settlement payments are valid, and will not be subject to subsequent attack.[66]

B.    The Application of Section 546(e) to LBO Payments: The Mode of Inquiry

From an understanding of the clearing and settlement process, and the available legislative history as to the purpose behind the provisions of the Bankruptcy Code pertaining to the commodities and securities industries, a framework emerges to

---

[63] *Hearings, supra* note 54, at 301 (statement by Jack Nelson, President, National Securities Clearing Corporation).

[64] GROUP OF THIRTY, CLEARANCE AND SETTLEMENT SYSTEMS IN THE WORLD SECURITIES MARKETS at 39 (1989).

The use of margin and mark to market payments is also crucial in minimizing the clearing agency's exposure to risk in the event of drastic market movement during the period between the trade and settlement dates. Usually, the agency will require additional payments from its members to cover the daily price fluctuations in the event of default. If all of the settlements flow smoothly, however, these additional payments are refunded during settlement. Without guarantee of these payments, however, the potential risk to the clearing agency and its members is tremendous.

[65] H.R. REP. No. 420, 97th Cong., 2d Sess., at 1 (1982).

[66] *Id.* at 2. *See also Hearings, supra* note 54, at 260.

serve as a guide as to the scope and applicability of sections 546(e) and 741(8).

Not all payments made by a customer to a broker, or vice-versa, are "settlement payments." Dividends, for example, are often distributed via a broker but would not be considered settlement payments according to the usual definitions of "settlement."[67] Settlement implies some sort of connection to an exchange or trade, and because Congress considered section 546(e) within the context of insulating the workings of the securities markets (the trading or exchanging of securities), that should also be the contextual framework in which the scope of "settlement payment" is examined.[68]

In determining, then, whether or not a particular flow of funds between a customer and a broker is indeed a "settlement payment" for purposes of section 546(e), the proper question should be: "Is this generally the type of transfer whose protection is necessary to the smooth working of the securities markets?" Where LBO payments to public shareholders are concerned, the answer to that question is "No." The inviolability of payments to shareholders is simply not basic to the operation of

---

[67]  *See supra* text accompanying note 65.

[68]  11 U.S.C. § 764(c) (1978) referred to "deposits with a commodity broker or forward contract merchant" as one of the types of transfers that could not be avoided. During the hearings on the technical revisions to the Code, Mr. Bevis Longstreth, Commissioner of the SEC, made the following suggestion:

> In light of the rapidly expanding new financial services and products today being offered by brokers to their customers — many of which are not related to traditional securities activities — it should be made clear in either the bill itself or in the accompanying legislative history, that the only 'deposits' intended to be protected are those made to finance or facilitate securities or commodities transactions.

*Hearings, supra* note 54, at 261.

The word "deposit" was eliminated from the new section 546(d) and instead was incorporated into the definition of margin in 11 U.S.C. § 741(5) (1982), making it clear that the only types of deposits protected were those that pertained to margin payments of some sort, for example, where a customer might maintain a deposit with a broker out of which the broker could draw margin payments as it became necessary.

It is instructive, but not determinative, that the Commissioner's suggestion was followed. Although it cannot be assumed that his views represent those of Congress, his statements about the kinds of transfers to which protection should be limited are helpful nevertheless in that they provide a coherent and unified framework for determination.

the clearance and settlement systems. Those systems will be only incidentally affected, if at all, if former shareholders are required to return payments they received in an LBO. Neither the system of guarantees nor the solvency of participants in the chain is threatened by a legal order in which payments to the shareholders by their brokers are subject to recovery by a trustee in bankruptcy.[69] Thus, while the flows of funds to and between financial intermediaries in the clearance and settlement chain must be protected in order to insure the stability of those systems, funds flowing from the intermediaries to the shareholders do not require protection, and section 546(e) should therefore not apply.

This reading of section 546(e), one that is based upon an understanding of the purpose behind the enaction of the section, essentially asserts that payments from a broker to a customer are not protected "settlement payments" within the

---

[69]  It is conceivable that a ripple effect might occur if the customer were unable to meet other trading obligations as a result of being forced to return the LBO payment, so that the customer's broker would be unable to meet its obligations, and so on. This is essentially the thrust of the argument presented by the SEC as *amicus curiae* in the *Kaiser* litigation. *See* Brief of the Securities and Exchange Commission at 15, *Kaiser* (No. 90-1078).

Recognizing the improbability of the above scenario, the SEC then goes on to make two other arguments in favor of § 546(e)'s applicability. The first is a plain meaning argument: The section says what it says and should therefore be applied. Contrary to the SEC's assertion, the section is far from clear, and because of the import of a decision either way in this area, it seems judicially irresponsible not to consider the role the provision was intended to play in the context of the securities markets. "It says what it says" should not carry a great deal of weight at all, much less the day.

The second argument the SEC presents is that to find shareholders liable in general would undermine investor confidence in the market and increase market volatility. Therefore, § 546(e) should be read to insulate shareholders. This argument essentially asserts that investors should not be required to examine the validity of the transactions they effect in the marketplace. In today's world, a rule which promotes shareholder passivity and ignorance does not seem to further any compelling purpose.

Capital formation and investor confidence should not be significantly affected by a legal environment that requires an investor to look before he or she leaps. Shareholders reap the benefits of these buyouts in the form of large premiums when they approve the transaction. They should similarly be exposed to some of the risks. If fairness dictates that some shareholders should be exempted, then a way should be found to do that. But bending a relatively specific bankruptcy provision to serve as a blanket exemption in the name of investor confidence is both unwarranted and ill-advised.

meaning of sections 546(e) and 741(8). Consequently, it is subject to the criticism that it goes against the plain meaning of the section. However, due to the lack of legislative history on the definition of "settlement payment," and in light of the purpose of section 546(e) as set forth above, the suggested reading of the section provides a framework of applicability which does not contradict the language of the statute, but rather finds meaning in that language by placing it in a contextual setting based upon the purpose of the section.

Extending section 546(e) to place public shareholders beyond the reach of the trustee in bankruptcy essentially uses dull scissors to perform delicate surgery. Even assuming *arguendo* that some shareholders should not be required to repay sums that they received years earlier due to considerations of equity, section 546(e) is too crude an instrument to satisfactorily accomplish that result. It would not permit any distinctions between shareholders, but it would provide a blanket exemption. If protection of shareholders is a desired result, it should be effectuated by appropriate judicial or legislative action that will allow for the necessary distinctions to be made. No matter how attractive section 546(e) must have looked to the defense attorney who first stumbled upon it, it was not intended to apply to, and is in fact ill-suited for, the purpose to which the *Kaiser* defendants have attempted to put it.

## CONCLUSION

Leveraged buyouts that later become insolvent have recently been subject to attack by the trustees in bankruptcy through fraudulent conveyance law. The trustees have asserted claims against the lenders who financed the acquisition, the insiders who approved of and benefitted from the plan, and the selling shareholders who received a substantial premium for tendering their shares. A recent Tenth Circuit decision has focused attention on the limits placed by Congress on the trustee's avoidance powers in the context of the securities and commodities markets.[70] Reading section 546(e) in light of Congress's stated intent and with an understanding of the mechanisms underlying the markets suggests that this section should not be extended

---

[70] *Kaiser Steel Co. v. Charles Schwab & Co.*, 913 F.2d 876 (10th Cir. 1990).

to protect public shareholders. The concerns that motivated section 546(e)'s genesis simply do not obtain with enough force in the public shareholder context to merit its application, and it is far too blunt an instrument to be fashioned into a tool used to protect shareholders. It is a very narrow provision, and neither its purpose nor policy considerations in general speak convincingly to its application in this area.

Neil M. Garfinkel

EXHIBIT 12

**Treatment of Securities and Derivatives Transactions in Bankruptcy**
**Part II**

*Written by:*
*Christopher J. Redd*
*Duane Morris LLP; Philadelphia*
*cjredd@duanemorris.com*

Feature
Article

**Web posted and Copyright © September 1, 2005, American Bankruptcy Institute.**

**Editor's Note:** *Part I appeared in the July/August 2005 issue.*

art I of this article summarized the basic concepts underpinning derivatives transactions and outlined the provisions in the Bankruptcy Code (Financial Market Provisions) where these types of transactions and securities transactions are accorded special treatment. The table summarizes the basic structure of the Financial Market Provisions described in greater detail in Part I.

Note the additional references in the table to Master Netting Agreements, the provisions for which were inserted into the Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA). Master Netting Agreements were not specifically discussed in Part I as a separate category of "protected contracts"[1] because the provisions relating to these agreements largely supplement the protections relating to the five types of protected contracts. The provisions relating to Master Netting Agreements (as well as other amendments made by BAPCPA) now make it clear that the financial market participants identified in the Financial Market Provisions ("protected participants") can close out and set off or "net" mutual claims against the debtor arising not only under or within specific types of protected contracts, but also across two or more types of protected contracts. Thus, a protected participant can set off a claim it has against the debtor under a forward contract against an amount it owes the debtor under a separate swap agreement. The master netting provisions, however, will not apply unless the protected participant is first entitled to the protections afforded with respect to each individual protected contract for which close-out or other netting is sought.

**Settlement Payments, the Stockbroker Defense and the *Enron* Cases**

As discussed in Part I of this article, several subsections of §546 of the Code limit the ability of a trustee or debtor-in-possession (DIP) to avoid a transfer of property that constitutes a margin, settlement or other similar payment (a "protected payment") made by or to a protected participant.[2] With respect to securities transactions, §546(e) has been referred to as the "stockbroker defense,"[3] referring to the fact that the settlement of securities contracts often is accomplished by and through one or more protected participants that are stockbrokers. The scope of this defense, however, has been the subject of much litigation and conflicting opinions among the courts.

The stockbroker defense turns on the definition of the term "settlement payment" as defined by Code §741(8).[4] Several courts considering application of §546(e) have interpreted "settlement payment" in §741(8) in an extremely broad manner as essentially any payment made toward the completion of any type of securities transaction.[5] Some courts, however, have balked at giving the term such a broad meaning in cases where the multi-party clearing system of intermediaries and guarantees used in the public securities markets is not implicated. For these courts, protecting transactions not involving this system would do damage to one of the primary policies behind the use of avoidance powers in bankruptcy cases, *i.e.*, the preservation of the debtor's estate for all creditors.[6] A split of authority is evident in cases involving failed leveraged buyouts of publicly traded securities where the cash and securities are distributed through a financial intermediary.[7]

It should be noted, though, that not all securities cases (not even all LBO cases) involve publicly traded securities. In cases involving purely private transactions, the courts appear to be more aligned in refusing to apply §546(e).[8]

In another recent trend, courts have also declined to apply §546(e) to protect transactions tainted by fraud, illegality or other irregularities.[9] While §546(e) does not protect settlement payments determined to be intentionally fraudulent transfers received by a transferee in bad faith, in many cases intentional fraud and bad faith may not be present or provable. Nevertheless, in the *Adler Coleman Clearing* and *Grafton Partners* cases, the courts specifically found that under the circumstances in which the disputed payments were made, the payments were not of the type "commonly used in the securities trade" and thus were not settlement payments under §546(e). In two recently published opinions arising out of the *Enron* cases, the U.S. Bankruptcy Court for the Southern District of New York

also addressed issues of whether payments under certain arguably unusual (if not intentionally fraudulent) transactions constituted settlement payments under §546(e).[10]

The first case, *Enron I,* involves an equity forward transaction in which Enron agreed to purchase shares of its own publicly traded common stock from Bear, Stearns International Limited and Bear, Stearns Securities Corp. (Bear Stearns) at a specified price per share and at a specified future termination date. The original terms of the transaction, entered into in May 2000, required Enron to purchase 323,000 shares of Enron stock at a per share price of $79.415 (subject to certain adjustments) on May 24, 2001. While the parties subsequently amended the terms of the transaction, Enron ultimately settled the forward transaction on Aug. 22, 2001, (three and one-half months before the initial bankruptcy filing) by paying Bear Stearns approximately $26 million in exchange for the 323,000 shares. Enron Corp.'s stock was only trading at $36.68 per share on the agreed termination date.

After Enron commenced its bankruptcy cases, the company brought an adversary proceeding against Bear Stearns claiming that the $26 million payment was avoidable as a constructively fraudulent transfer under §§544(a) and 548 (b)(1)(B), and that the payment violated Oregon state law[11] as an unlawful distribution to a stockholder while the company was insolvent. Bear Stearns filed a motion to dismiss the adversary proceeding, asserting the stockbroker defense of §546(e). Bear Stearns also asserted that the avoidance action was barred by §546(g) as a payment under and in connection with a swap agreement. Finally, Bear Stearns argued that the Financial Market Provisions of the Code preempted any contrary Oregon state law.

Significant portions of the parties' briefs focused on the conflicting case law regarding the stockbroker defense. Bear Stearns argued that the $26 million payment was clearly a "settlement payment" to a stockbroker under §546(e), citing the cases that interpreted the term broadly. Citing *Munford* and *Wieboldt,* Enron argued that the transaction was a "one-off" private transaction between two parties that, if unwound, would have no impact on the public markets. In other portions of the briefs, the parties argued at length as to whether the equity forward transaction constituted a forward contract or swap agreement under the Code.

In the end, the court focused on Enron's argument that the payment violated Oregon's corporation law as an unlawful distribution to a shareholder while the company was insolvent. Citing *Adler Coleman Clearing,* Enron had argued that the illegal and void payment could not be considered a settlement payment "commonly used" in either the securities or forward contract trade. The court seemed to accept this argument, assuming for the purposes of the motion to dismiss that Enron was insolvent at the time, or as a result, of the payment. The court went a step further, however, by holding that there was no settlement payment because there was no valid securities transaction to settle.[12] Since under Oregon law the payment and the transaction as a whole were deemed void (as opposed to voidable) and legal nullities, the protection offered to settlement payments by §546(e) would not apply.

The court employed the same reasoning in holding that the payment under a void transaction was not protected as a payment under or in connection with a swap agreement under §546(g). Based on its findings regarding Oregon law, the court summarily dismissed Bear Stearns's preemption argument by holding that the consequence that the transaction was null and void was "simply a function of state law that was not preempted" by the Code.[13] Bear Stearns's motion to dismiss was therefore denied.

The case will presumably move forward along with the multitude of other avoidance actions in the Enron cases on the primary issue of whether Enron was insolvent when the payment was made. Since Enron filed very similar adversary proceedings against three other financial institutions seeking the return of additional amounts exceeding $883 million, the decision could ultimately significantly affect the level of distributions in the Enron cases.

It is less clear what impact the decision will have on future cases. The court itself apparently believed that its holding will be narrowly applied because of the unique nature of the case and the minority view taken by the Oregon courts as to the consequences of unlawful shareholder distributions—*i.e.,* that the payment was void and not merely voidable.[14] Indeed, in holding as it did, the *Enron* court distinguished the case of *PHP Liquidating LLC v. Robbins.*[15]

In *PHP,* the successor entity to the debtor under a liquidating chapter 11 plan attempted to avoid the debtor's pre-petition redemption of stock from insiders because the redemption violated the Delaware General Corporate Law's prohibition on making such distributions while the company is insolvent. The *PHP* court found that §546(e) would have barred any avoidance action on behalf of the estate.[16] The *Enron* court noted that, while potentially voidable, the settlement payment in *PHP* was valid until avoided and therefore unavoidable under §546(e).[17] The *Enron* court's opinion therefore suggests that it would have likely decided Enron I differently had Oregon law merely provided that the payments were voidable instead of void.

It is interesting to note that the *PHP* court did not discuss the argument made in *Enron I* to the effect that because the redemption payment was illegal under applicable state law, the payment was not "commonly used in the securities trade" and therefore not a "settlement payment" under the Code. It would seem that this argument could be made with equal force even if the applicable state law only made the payment voidable. Since the argument rests on an interpretation of the definition of the term "settlement payment," preemption is not an issue. The *Enron I* decision could be seen as lending some credence to this argument by its implicit endorsement of the *Adler Coleman Clearing* and *Grafton* cases.[18]

The question of whether certain payments were, in fact, "commonly used in the securities trade" was determined to be an issue reserved for trial in *Enron II*. In that case, Enron is seeking to recover certain payments it made within 90 days of its bankruptcy filing on account of unsecured and uncertificated short-term commercial paper notes it had previously issued through J.P. Morgan. The offering memorandum pursuant to which the notes were issued provided that the notes were not redeemable or subject to voluntary prepayment prior to maturity. Nevertheless, in a series of transactions shortly before its bankruptcy, Enron paid more than $1 billion to the defendants on account of the notes. The payments were made to and through J.P. Morgan and certain other securities brokers.

Enron alleged that the payments amounted to prepayments of the notes prior to maturity and, further, that the par value paid on the notes was significantly more than the notes' market value. Enron therefore sued to recover the payments as both preferential and fraudulent transfers. Various of the defendants filed motions to dismiss the claims, arguing that the payments were not prepayments on the debt evidenced by the notes but were instead settlement payments on account of the purchase price for the notes, which were securities. Thus, the defendants argued that the stockbroker defense of §546(e) applied to bar Enron's preference and fraudulent transfer claims.

The court denied the motions to dismiss, holding that a number of factual issues would have to be determined at trial, including the issue as to whether the payments were made on account of antecedent debt or for the purchase of securities as that term is defined in the Bankruptcy Code. Assuming that the notes were securities, however, the court also held that evidence must be presented as to whether payments prior to the maturity date at significantly above-market prices and contrary to the offering memorandum could constitute settlement payments commonly used in the securities trade. While it is impossible to predict what may happen at any trial on this issue, the tone of the court's opinion suggests that the court had its doubts as to whether the defendants could make the necessary evidentiary showing. Thus, as was the case in *Enron I,* the decision in *Enron II* may ultimately result in a big recovery for the Enron estate.

The *Enron* decisions will undoubtedly give many in the securities and other financial market industries pause for concern. It should be noted that the International Swaps and Derivatives Association, Securities Industry Association and Bond Market Association filed a joint *amicus curiae* brief supporting Bear Stearns's motion to dismiss in *Enron I*. The Bond Market Association filed another *amicus curiae* brief supporting the defendants' motions to dismiss in *Enron II*. These industry observers and other market participants are likely to argue that the decisions represent an overly restrictive view of §546(e) and the Code's other similar Financial Market Provisions, and that these types of decisions could ultimately put financial markets at risk. Denying application of §546(e) in *Enron II* could mean the unwinding of a large number of payments to close to a hundred defendants.

On the other hand, the Financial Market Provisions such as §546(e) were primarily designed to protect ordinary or routine transaction payments. Certainly, one could legitimately question whether the payments made by Enron under the circumstances of the above-described cases were ordinary or "common" in the securities trade. While there may be legitimate reasons (and it may be perfectly lawful or ordinary in most circumstances) for large corporations to enter into transactions involving their own publicly traded securities, these types of transactions raise characterization issues that are simply not present in cases where the underlying securities are issued by a third party.[19]

Perhaps the lesson for financial institutions is that when they engage in transactions that, either by themselves or due to their use in a particular situation, push the boundaries of what is common in the industry, they risk having the payments they receive in connection with such transactions exposed to attack as constituting preferential or fraudulent transfers. In sum, financial institutions should not assume that §546(e) will protect every payment that a party to the transaction might label a "settlement payment."

| Financial Market Provisions | | | | | |
| --- | --- | --- | --- | --- | --- |
| **Financial Market Provisions** | | | | | |
| Protected Contracts→ | Securities Contracts §741(7) | Commodities Contracts §761(4), Forward Contracts §101(25) | Repurchase Agreements §101(47) | Swap Agreements §101(53B) | Master Netting Agreements §101(38A) |
| Protected Participants→ | stockbrokers §101(53A), financial institutions §101(22), securities clearing agencies §101(48), financial participants §101(22A) | commodity brokers §101(6), forward contract merchants §101(26), financial participants §101(22A) | repo participants §101(46), financial participants §101(22A) | swap participants §101(53C), financial participants §101(22A) | master netting agreement participants §101(38B), financial participants §101(22A) |
| **Substantive Protections↓** | | | | | |
| Exceptions to the Automatic Stay→ | §362(b)(6) | §362(b)(6) | §362(b)(7) | §362(b)(17) | §362(b)(27) |
| Limitations on Avoidance of Pre-petition Transfers→ | §§546(e), 548(d)(2)(B), 553(b)(1) | §§546(e), 548(d)(2)(B), 553(b)(1) | §§546(f), 548(d)(2)(C), 553(b)(1) | §§546(g), 548(d)(2)(D), 553(b)(1) | §§546(j), 548(d)(2)(E), 553(b)(1) |
| Protection of Contractual Rights to Liquidate and Terminate→ | §555 | §556 | §559 | §560 | §561 |

## Footnotes

[1] Identified in Part I and in the Code as securities contracts, commodity contracts, forward contracts, repurchase agreements and swap agreements. Return to article

[2] *See* Code §§546(e)-(g) and new §546(j) (added by BAPCPA). Return to article

[3] *Jewel Recovery L.P. v. Gordon (In re Zale Corp.),* 196 B.R. 348, 352 (N.D. Tex. 1996). Return to article

[4] Code §741(8) defines a settlement payment as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment or any other similar payment commonly used in the securities trade." Return to article

[5] *Bevill, Bresler & Schulman Asset Mgmnt. Corp. v. Spencer Sav. & Loan Ass'n.,* 878 F.2d 742, 751 (3d Cir. 1989); *Jonas v. Resolution Trust Corp. (In re Comark),* 971 F.2d 322, 326 (9th Cir. 1992); *Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.),* 952 F.2d 1230, 1237 (10th Cir. 1991); *Kaiser Steel Corp. v. Charles Schwab & Co. Inc.,* 913 F.2d 846, 848 (10th Cir. 1990). Return to article

[6] *See, e.g., Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.),* 263 B.R. 406, 479 (S.D.N.Y. 2001); *Jewel Recovery,* 196 B.R. at 352. Return to article

[7] *Compare, e.g., Lowenschuss v. Resorts Int'l. Inc. (In re Resorts Int'l. Inc.),* 181 F.3d 505, 516 (3d Cir. 1999), *and In re Kaiser Steel,* 952 F.2d at 1239, *with Munford v. Valuation Research Corp.,* 98 F.3d 604, 610 (11th Cir. 1996), *and Wieboldt Stores,* 131 B.R. at 664. Return to article

[8] *See Kipperman v. Circle Trust (In re Grafton Partners L.P.),* 321 B.R. 527, 529 (BAP 9th Cir. 2005) (finding "nonpublic transactions in illegally unregistered securities are not 'commonly used in the securities trade.'"); *American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Securities Corp.,* 351 F.Supp.2d 79 (S.D.N.Y. 2004) (stating that "it is not clear that the 'reversal of the [transfer at issue in this case] may result in disruption of the securities industry, creating a potential chain reaction that could threaten collapse of the affected market'") (*quoting In re Adler Coleman Clearing Corp.,* 263 B.R. at 480); *Zahn v. Yucaipa Capital Fund,* 218 B.R. 656, 675-77 (D. R.I. 1998) (finding "stock transfers...had no connection whatsoever to the clearance and settlement system, and allowing avoidance would have no impact at all on that system"); *Jewel Recovery,* 196 B.R. at 351-53 (finding the "plain language of §546(e) would appear to apply to this transaction," but the "transaction was a private transaction which did not implicate the clearance and settlement process"); *Official Committee of Unsecured Creditors v. ASEA Brown Boveri Inc. (In re Grand Eagle Cos.),* 288 B.R. 484, 494 (Bankr. N.D. Ohio 2003) (finding "such a simplistic reading of §546(e) ignores the meaning of the term 'settlement payment' within the securities industry and would essentially convert that statutory provision into a blanket transactional cleansing mechanism for any entity savvy enough to funnel payments for the purchase and sale of privately held stock through a financial institution"). Return to article

[9] *See Adler Coleman Clearing Corp.,* 263 B.R. at 481 (referring to "phantom fraudulent payments") and *Grafton Partners,* 321 B.R. at 529 (referring to "illegally unregistered securities"). Return to article

[10] *See Enron Corp. v. Bear, Stearns Int'l. Ltd. (In re Enron Corp.),* 323 B.R. 857 (Bankr S.D.N.Y. 2005) (*Enron I*) and *Enron Corp. v. J.P. Morgan Securities Inc. (In re Enron Corp.),* Adv. Pro. No. 03-92677A, 2005 WL 1400099 (Bankr. S.D.N.Y., June 15, 2005) (*Enron II*). Return to article

[11] Enron was incorporated in Oregon. Return to article

[12] *Enron,* 2005 WL 957325 at *18-20. Return to article

[13] *Id.* at *17. Return to article

[14] *Id.* at *19 ("This situation would only arise in the context of a company purchasing its own shares while insolvent or because of which it became insolvent and if that company were incorporated in a state that rendered such a transaction void"). Return to article

[15] 291 B.R. 592 (D. Del. 2003). Return to article

[16] *PHP,* 291 B.R. at 596. However, since the plaintiff in *PHP* did not bring its claims as a representative of the estate but as the direct assignee of unsecured creditors, the court also found that §546(e) did not apply. Return to article

[17] *Enron,* 2005 WL 957325 at *18. Return to article

[18] This argument could not be used successfully in cases involving swap agreements since the defined term "settlement payment" does not appear in §546(g). That section refers to payments "under" or "in connection with" a swap agreement. In addition, upon the effective date of BAPCPA, the definition of swap agreement will be greatly expanded to include all different kinds of forward agreements and securities transactions. Thus, to the extent a forward or securities transaction qualifies as a swap agreement under the Code (unless the payments are void under applicable state law), payments in connection with such an agreement should be protected from avoidance under §546(g) regardless of whether the payment would be considered "commonly used" in either the securities or forward contract trade. Return to article

[19] For instance, had the stock that was the subject of the equity forward agreement in *Enron I* been issued by an unaffiliated third party, the purchase of the stock could not have been considered a distribution to a shareholder. Similarly, the purchase of notes in *Enron II* could not be considered a payment of debt if the notes were not issued

Case 1:08-cv-00878-RMB-THK   Document 123-13   Filed 07/08/2008   Page 7 of 7

by Enron. Return to article

Back

EXHIBIT 13

# FRAUDULENT TRANSFERS AND OBLIGATIONS: ISSUES OF CURRENT INTEREST

### Gerald K. Smith* and Frank R. Kennedy**

I. Introduction ....................................... 710
II. The Treatment of Fraudulent Obligations........... 714
III. Transferee Defined ............................... 720
IV. Liability of Those Benefitted and Participants in Fraudulent Transfers ............................. 723
V. Time to File Suit .................................. 734
VI. Bankruptcy Code Section 546(e): A Safe Harbor for Leveraged Buyouts? ............................... 751

* Partner, Lewis & Roca, Phoenix, Arizona. B.S. 1958, Kansas State University; LL.B. 1961, New York University. Mr. Smith served as Deputy Director for the Commission on the Bankruptcy Laws of the United States from 1972 to 1973. Mr. Smith is involved in commercial litigation and bankruptcy matters that involve fraudulent transfers and obligations. Lewis & Roca was counsel for Kaiser Steel Resources, Inc. in the *Kaiser Steel* litigation discussed *infra* notes 206-61 and accompanying text. Lewis & Roca also served as counsel for the William Herbert Hunt and Nelson Bunker Hunt Liquidating Trusts in the litigation discussed *infra* notes 57-66, 185-201. Mr. Smith has no client relationship in connection with this Article, but his participation in these cases may have influenced his views and he brings this to the attention of the reader. The views stated herein are not necessarily those of Lewis & Roca.

** Thomas M. Cooley Professor of Law Emeritus, University of Michigan Law School; Southeastern Bankruptcy Law Institute Distinguished Visiting Professor, Georgia State University College of Law. Of Counsel, Sidley & Austin, Chicago, Illinois. A.B. 1935, Southwest Missouri State University; LL.B. 1939, Washington University; J.S.D. 1953, Yale University. Professor Kennedy served as Executive Director for the Commission on the Bankruptcy Laws of the United States from 1971 to 1973. Professor Kennedy has from time to time been consulted on matters that involve the laws relating to fraudulent transfers and obligations. He was consulted as a potential expert witness in litigation by the Federal Deposit Insurance Corporation (FDIC) against Conrad Cafritz to recover a fraudulent transfer allegedly made to the law firm of Weil, Gotshal & Manges. This litigation is referenced *infra* note 272. Also, Professor Kennedy was on the brief for appellants in United States v. Tabor Court Realty Corp., 803 F.2d 1288 (3d Cir. 1986), *cert. denied*, 483 U.S. 1005 (1987), referenced *infra* notes 196, 202-05, 295 and accompanying text. Professor Kennedy has no client relationship in connection with this Article, but his participation in the *Tabor Court (Gleneagles)* litigation may have influenced his views and he brings this to the attention of the reader. The views stated herein are not necessarily those of Sidley & Austin.

709

VII.  THE  FDIC's  FRAUDULENT  TRANSFER  ACT  UNDER
      F.I.R.R.E.A. .......................................... 767
VIII. CONCLUSION .......................................... 772

## I.  INTRODUCTION

The law of fraudulent transfers concerns property transferred by a debtor who, but for the transfer, could have satisfied the claims of his, her, or its creditors. If the property was transferred to defeat the creditors' rights, or under circumstances deemed fraudulent, then it is a fraudulent transfer.[1] The creditors' traditional remedy is to "recapture . . . the property from the fraudulent grantee or from a subgrantee who took gratuitously or paid value with notice."[2]

The law of fraudulent obligations is similar. If the obligation is created to defeat the creditors' rights, or under circumstances deemed fraudulent, then it is a fraudulent obligation. The creditors' remedy is to invalidate the obligation.

The remedy for fraudulent obligations is always adequate. However, the remedy for fraudulent transfers is often inadequate because the initial transferee either transfers or consumes the property and is impecunious. To the extent the property itself cannot be recovered, the creditor is allowed to recover the value of the property from "any guilty person through whose hands the asset may have passed."[3] But, according to Professor Glenn, it is generally not possible to recover from those who aided, participated in, or conspired to effect the fraudulent transfer because the general creditor plaintiff has no property interest in the assets of the debtor. However, Professor Glenn views the rule as different after judgment: "The meddling outsider becomes liable under principles that are easy to understand, but they do not

---

1. The creditor's right . . . is to realize upon all property that is capable of conversion into money or distribution. In other words, the creditor should be able to reach whatever is available to the debtor. Now, the kind of wrongdoing that is known as a fraudulent conveyance consists of putting realizable assets beyond the reach of the creditor's process, whatever form that process may take.

1 GARRARD GLENN, FRAUDULENT CONVEYANCES AND PREFERENCES § 1, at 2 (rev. ed. 1940).

2. Id. § 56, at 77; Jack F. Williams, Revisiting the Proper Limits of Fraudulent Transfer Law, 8 BANKR. DEV. J. 55, 116-26 (1991). For a discussion of other remedies, including equitable subordination, see Robert C. Clark, The Duties of the Corporate Debtor to its Creditors, 90 HARV. L. REV. 505 (1977).

3. 1 GLENN, supra note 1, § 56, at 77. "The grievance asserted under the theory of fraudulent conveyance is that property has been put beyond the reach of process normally available to creditors; hence all persons involved in the wrongdoing are responsible for the property, and its proceeds or value." Id. § 57.

flow directly from the Statute of Elizabeth or any modern substitute."[4]

---

4. *Id.* § 56. Professor Glenn cited chapters 6 and 13 of his treatise in support of his observation. However, only chapter 6 contains any relevant discussion, and it does not support his general statement.

> The Statute of Elizabeth, it will be recalled, gave a queer sort of *qui tam* action in which the recovery went, one half to the Crown and the other half to the party aggrieved. But those aspects of the Act simply sloughed off as time went along, although there were strange survivals in one or more of our States. Apart from that, however, the notion that an action lies in tort is so discredited, that one may venture upon a generality. It may safely be said, then, that there is no tort cause of action, when a transfer is made before the creditor obtains judgment; and it only remains to notice the exceptions, actual or apparent.
>
> . . . . But an exception which proves the rule, is made where the transfer takes place after the aggrieved creditor has obtained judgment, or procured a warrant of attachment. We then have a "rescue", to the injury of a man who, by judgment or attachment, has acquired the right to subject the debtor's assets to his claim; and so in that case an action lies.
>
> An extension of this idea, however, is not so easy to justify. It has been held that a tort action lies when the fraudulent transfer was made on the eve of judgment or attachment, and in view of that event. The cases which go so far seem to overlook the fact that the creditor is sufficiently protected by the Statute of Fraudulent Conveyances, and does not really stand in need of a tort action.

*Id.* § 74, at 122-24 (footnotes omitted). Professor Glenn cited Schwenn v. Schwenn, 166 N.W. 171 (Wis. 1918), as one authority that supports the no-tort-action proposition. However, *Schwenn* held to the contrary when a single creditor was defrauded. Professor Glenn also cited a student-written case critique of *Schwenn*. It succinctly capsulized the state of the law in 1918 as follows:

> The weight of authority is that an unsecured general creditor cannot maintain an action against third persons conspiring with the debtor fraudulently to dispose of the debtor's property. Since such a creditor has no lien upon or interest in the property of his debtor, he has lost only a possibility of realization, and this injury is too remote and speculative. Nor can the creditor be said to be damaged in law, for he still has his debt, and has open to him the privilege of securing judgment and then enforcing any of the remedies of the judgment creditor. *The result of allowing such actions would be to subject the fraudulent transferee to liability for all the debts of his transferor, however large the debts, and however small the value of the property transferred, for the action would be equally available to every creditor.*

Recent Decision, 18 COLUM. L. REV. 363 (1918) (citations omitted) (emphasis added). Neither the Uniform Fraudulent Conveyance Act (UFCA), promulgated in 1918, nor its 1984 revision, the Uniform Fraudulent Transfer Act (UFTA), departs from providing creditors with the remedy of recovery of the fraudulently transferred property. However, the UFTA also provides for a money judgment in the amount of the value of the asset transferred as an alternative remedy, apparently at the election of the creditor. *See generally* Williams, *supra* note 2, at 116-26. Section 550(a)(1) of the Bankruptcy Code, 11 U.S.C. § 550(a)(1) (1988), and § 8(b)(1) of the UFTA, 7A U.L.A. 662 (1985), expressly allow recovery from those who do not receive the fraudulently transferred property but who nonetheless benefit from it. *See infra* notes 67-88 and accompanying text. This is a significant change, but probably reflects the rule under prior law. *E.g.* Mack v. Newton,

By the time of the revised edition of Professor Glenn's famous treatise, there was a clear-cut basis for recovery from those who aided, participated in, or conspired to effect an intentionally fraudulent transfer. Section 870 of the Restatement of Torts, promulgated in 1939, assigned liability to anyone who intended the consequences of his or her acts.[5] This rule was more clearly expressed in 1977 in section 870 of the Second Restatement of Torts, which provided that "[o]ne who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances."[6] The section was intended to serve as a guide for determining when liability should be imposed for harm that was intentionally inflicted, "even though the conduct does not come within the requirements of one of the well established and named intentional torts."[7]

One of the problems with a rule that does not impose liability on those who aid and abet or participate in an intentionally fraudulent transfer is that there is no disincentive not to do so. The only remedy is against the transferee, and that is a remedy to recover the property transferred or its value. Professor Carlson made this point in his criticism of existing fraudulent conveyance law:

> One fact about the fraudulent conveyance law remedy that must be strongly emphasized is that the debtor is not rendered more liable to his creditor because he has made a fraudulent conveyance. Only third parties are prejudiced. Furthermore, liability of third parties, under existing law, is limited to the property actually received (or its value).[8]

The recent decision of the Supreme Court of Georgia in *Kesler v. Veal*,[9] which reversed a Georgia Court of Appeals decision, discusses this issue. In a case involving an intentional fraudulent transfer, the court of appeals affirmed a jury verdict setting aside a transfer of real

---

737 F.2d 1343, 1356-58 (5th Cir. 1984). The new language encompasses transfers that would create resulting trusts. Under the Restatement of Trusts, if the debtor pays for property and the title is in the name of a third party, a resulting trust for the benefit of the debtor can be imposed. RESTATEMENT (SECOND) OF TRUSTS § 440 (1957). Creditors of the debtor then can reach the property to satisfy their claims. *Id.* § 407(3). Both the Bankruptcy Code and the UFTA avoid this unnecessary step by allowing recovery from anyone who benefits from the transfer.

5. RESTATEMENT OF TORTS § 870 (1939); *cf.* RESTATEMENT (SECOND) OF TORTS §§ 766, 744(b) (1977).

6. RESTATEMENT (SECOND) OF TORTS § 870 (1977).

7. *Id.* cmt. a.

8. David Gray Carlson, *Is Fraudulent Conveyance Law Efficient?*, 9 CARDOZO L. REV. 643, 652 (1987) (citations omitted).

9. 362 S.E.2d 214 (Ga.), *rev'g* 356 S.E.2d 254 (Ga. Ct. App. 1987).

property and awarding actual and punitive damages against the transferee. The supreme court reversed on the basis that the legislature did not intend that the transferee should be liable for damages in addition to disgorging the property received.[10]

One concern of the courts in refusing to extend liability to those who aid and abet or participate in a fraudulent transfer is that innocent persons might be subjected to liability in connection with constructively fraudulent transfers.[11] However, rather than precluding all claims, it would be better to limit liability to those aiding and abetting or participating in transfers intended to hinder, delay, or defraud creditors. Another concern is whether the legislature intends to limit the remedy to recovery of the property transferred (or its value); the fraudulent transfer statutes do not address the liability of third parties. This was the rationale of the Supreme Court of Georgia in *Kesler v. Veal.* However, the fraudulent transfer statutes only deal with transfers or obligations. The statutes do not purport to allow or limit liability under tort law or other statutory provisions.

Fraudulent transfer law developed gradually over the centuries, undergoing significant formulations in the Statute of 13 Elizabeth[12] and its famous restatement in *Twyne's Case.*[13] A major event along the way was the promulgation of the Uniform Fraudulent Conveyance Act (UFCA) in 1918.[14] Thirty years later, section 67d of the Bankruptcy Act was conformed to the language of the UFCA with the passage of the Chandler Act Amendments.[15] About thirty years after that, the pace quickened with the rewriting of the Bankruptcy Act's fraudulent transfer provisions as part of the work of the Commission on the Bankruptcy Laws of the United States. The proposed Bankruptcy Act of 1973[16] recommended changes that were adopted in the Bankruptcy Reform Act of 1978.[17] Thereafter, in an interesting turnabout, the UFCA was conformed to the Bankruptcy Code with the promulgation of the Uniform Fraudulent Transfer Act (UFTA)[18] in 1984.[19]

---

10. *Id.* at 215.

11. *See* Elliott v. Glushon, 390 F.2d 514 (9th Cir. 1967).

12. An Act Against Fraudulent Deeds, Alienations, &c., 13 Eliz., ch. 5 (1570) (Eng.).

13. 76 Eng. Rep. 809 (Star Chamber 1601).

14. 7A U.L.A. 427 (1985).

15. Chandler Act, ch. 575, § 67d, 52 Stat. 840, 877-78 (1938) (repealed 1978).

16. COMM. ON THE BANKRUPTCY LAWS OF THE UNITED STATES, REPORT OF THE COMM. ON THE BANKRUPTCY LAWS OF THE UNITED STATES, H.R. DOC. NO. 13, 93d Cong., 1st Sess., Part II, § 4-608, at 175-76 (1973) [hereinafter 1973 COMMISSION REPORT].

17. Pub. L. No. 95-598, 92 Stat. 2549 (codified as amended at 11 U.S.C. §§ 101-1330 (1988 & Supp. II 1990)).

18. 7A U.L.A. 639 (1985).

19. *See id.* prefatory note, at 639-42.

What had been a rivulet of fraudulent transfer and obligation cases over the centuries has now become a torrent, and this torrent will become a raging river in the decade of the 1990s, fed in part by litigation arising out of the leveraged buyout (LBO) craze of the 1980s.

This Article is an attempt to identify and explore developing issues in the law of fraudulent transfers and obligations. The issues chosen for discussion include claims resulting from the avoidance of fraudulent transfers and whether they share *pari passu* with the claims of unsecured creditors; how courts are resolving who is a transferee for purposes of liability; the liability of those who benefit from or participate in fraudulent transfers; the time to file suit under the Bankruptcy Code; the "safe harbor" for LBOs; and the recent enactment of a fraudulent transfer act for the benefit of the FDIC that primes the rights of the bankruptcy trustee under the Bankruptcy Code.

## II.  THE TREATMENT OF FRAUDULENT OBLIGATIONS

The UFCA assimilated the treatment of fraudulent obligations to the treatment of fraudulent transfers, and the UFTA, section 67d of the Bankruptcy Act, and section 548 of the Bankruptcy Code, which are patterned on the UFCA, have followed suit. It is sometimes asserted or assumed that an obligation is a transfer; but it is not. Equating obligations and transfers is appropriate only if an obligation is secured by a transfer. In such a case both the obligation and the transfer may be voidable because they arise from the same set of fraudulent circumstances.

The classic remedy for a fraudulent transfer is avoidance of the transfer because it impedes the collection of a creditor's claim.[20] The successful suitor in a fraudulent transfer action is permitted to levy on the transferred property as if the transfer had never occurred. The transfer often is not voidable, however, by virtue of the fact that the property has disappeared or has come into the hands of a bona fide purchaser who is protected by a savings clause found in every fraudulent transfer law. In such an eventuality the creditor is authorized to recover the value of the property fraudulently transferred from the transferee or any subsequent transferee who is not protected by virtue of its standing as a good faith transferee for value or successor to a protected transferee.

Section 550(a) of the Bankruptcy Code authorizes the trustee to

---

20. "[T]he branch of law which we are to examine . . . simply confers upon the creditor, or a representative of creditors such as a trustee in bankruptcy, the right to disregard the conveyance and treat the affected asset as though the transfer had not been made." 1 GLENN, *supra* note 1, § 2, at 3.

recover from the initial transferee or any unprotected transferee "the property transferred, or, if the court so orders, the value of such property."[21] The value of the property is typically determined as of the time of the transfer.[22] If the property has increased in value after the transfer, section 550(d) of the Bankruptcy Code recognizes that the transferee is entitled to be reimbursed or otherwise protected to the extent the transferee has improved the value of the property without being compensated. The implication of this provision is that any adventitious increases in the value of the property transferred accrues to the estate. Section 8(b) of the UFTA[23] authorizes a creditor to recover the value of the property transferred up to the amount of the creditor's claim. Under section 8(c) the value is determined as of the time of the transfer but is subject to adjustment as the equities may require.[24]

Subdivisions (d) and (h) of section 502 of the Bankruptcy Code contain an implication that when a transfer is avoided pursuant to section 550, the transferee has a claim for the value of the property subject to the avoided transfer.[25] The implication is strongest when the transfer avoided was a nonfraudulent preference[26] and is weakest when the transferee was chargeable with having an actual intent to defraud.[27] Nevertheless, there is judicial authority for allowing even a transferee with fraudulent intent to assert a claim against the debtor's estate for value returned to the estate.[28] Section 548(c) of the Bank-

---

21. 11 U.S.C. § 550(a) (1988).

22. United States v. Fernon, 640 F.2d 609, 611 (5th Cir. Unit B Mar. 1981); Hamilton Nat'l Bank v. Halstead, 31 N.E. 900 (N.Y. 1892).

23. UNIF. FRAUDULENT TRANSFER ACT § 8(b), 7A U.L.A. 662 (1985).

24. Id. § 8(c).

25. Section 502(d) conditions the transferee's claim on the disgorgement of the property transferred or the value for which the transferee is liable. 11 U.S.C. § 502(d) (1988). Section 502(h) converts the transferee's claim into a prepetition claim for the purposes of determining its allowability and priority. Id. § 502(h). Precursors of § 502(d) in the Bankruptcy Act generated controversy because of overweening construction. See JAMES A. MACLACHLAN, BANKRUPTCY § 143, at 133-36 (1956); id. § 268, at 310-11.

26. See, e.g., Katchen v. Landy, 382 U.S. 323 (1966); Keppel v. Tiffin Sav. Bank, 197 U.S. 356 (1905). These cases applied § 57g of the Bankruptcy Act, which is the predecessor of § 502(d) of the Bankruptcy Code.

27. The relevant case law is not extensive or illuminating. See, e.g., In re Spotless Tavern Co., 4 F. Supp. 752, 755 (D. Md. 1933) (disallowing a fraudulent mortgagee's claim for cash advanced to the debtor under the Bankruptcy Act); see also Barnard v. Seaman, 211 N.W. 473, 474 (Minn. 1926) (denying reimbursement to a transferee guilty of actual fraud under the UFCA); James A. McLaughlin, Note, Application of the Uniform Fraudulent Conveyance Act, 46 HARV. L. REV. 404, 433-35 (1933) (opining that under the UFCA actually fraudulent transferees should be denied reimbursement).

28. See Misty Management Corp. v. Lockwood, 539 F.2d 1205 (9th Cir. 1976). [T]he modern view is that a transferee guilty of fraudulent behavior may nevertheless prove a claim against the bankrupt estate, once he returns the fraud-

ruptcy Code[29] and section 8(d) of the UFTA[30] recognize that to the extent value has been given, a good faith transferee or obligee has a lien against the property transferred or a right of setoff against the amount of the liability imposed as a result of the fraudulent transaction.[31]

---

ulently conveyed property to the estate. A rule to the contrary would allow the estate to recover the voidable conveyance and to retain whatever consideration it had paid therefor. Such a result would clearly be inequitable.

*Id.* at 1214 (citations omitted); *In re* Moody, 131 F. 525, 530 (N.D. Iowa 1904) (stating that the trustee is not entitled to avoid a transfer while retaining the consideration received).

29. 11 U.S.C. § 548(c) (1988).

30. UNIF. FRAUDULENT TRANSFER ACT § 8(d), 7A U.L.A. 662 (1985).

31. William B. Tanner Co., Inc. v. United States (*In re* Automated Business Sys., Inc.), 642 F.2d 200, 203 (6th Cir. 1981) (excusing from liability a transferee that, without fraudulent intent or knowledge of the debtor-transferor's fraudulent intent, accepted a transfer as payment of its claim, although payment was made from funds provided to the debtor for another purpose); Carr v. DeMusis (*In re* Carr), 34 B.R. 653, 657-58 (Bankr. D. Conn. 1983) (avoiding redemption of debtor's mortgaged property from strict foreclosure by third mortgagee on payment by junior lienholder of $9,022 under § 548(a)(2)(A)), *aff'd*, 40 B.R. 1007 (D. Conn. 1984) (avoiding a transfer to the redemptioner for 31% of the debtor's equity and refusing to grant a lien to the final transferees for lack of good faith); Gillman v. Preston Family Inv. Co. (*In re* Richardson), 23 B.R. 434, 449 (Bankr. D. Utah 1982) (granting a lien to a bidder at a constructively fraudulent foreclosure sale for the amount of the bid plus interest from the date of sale).

In *Carr* the court reasoned that because the value of debtor's equity was $30,000, the transfer to the redeeming lienholder was constructively fraudulent, but the court allowed the redemptioner, who was in good faith, a lien for amount it paid on redemption. The officers and attorney for the redeeming lienholder who acquired the property from the redemptioner on payment of its $231 judgment lien were denied a lien for their outlay because they were found not to be good faith transferees.

The *Carr* case is criticized by Professor Vern Countryman in Vern Countryman, *The Trustee's Recovery in Preference Actions*, 3 BANKR. DEV. J. 449, 466 (1986), for not allowing the officers and attorney to retain their interests because they gave value in good faith and therefore the redemption by their transferor was not voidable. Thus, the court did not need to resort to § 550(b) at all.

"As a matter of equity, the transferee is normally entitled to a credit for those proceeds of [a] sale [which violated a bulk transfer statute] traceable to funds held by the Trustee." Ross v. Rodolpho (*In re* Villa Roel, Inc.), 57 B.R. 835, 839 (Bankr. D.D.C. 1985) (citing Murdock v. Plymouth Enter., Inc. (*In re* Curtina Int'l, Inc.), 23 B.R. 969, 980 (Bankr. S.D.N.Y. 1982)). The transferee was denied credit in the *Villa Roel* case, however, because the debtor's estate had no assets. In Verco Industries v. Spartan Plastics (*In re* Verco Industries), 704 F.2d 1134 (9th Cir. 1983), the court was presented with the problem of fashioning an appropriate remedy for the trustee when the parties to a bulk transfer failed to comply with the notice requirements of Uniform Commercial Code (UCC) Article 6, but the debtor in possession had received cash, property, an assumption of indebtedness, and a promissory note from the transferee. The debtor was allowed to retain the property that had never been delivered to the purchaser and the right to recover on the purchaser's promissory note, but the purchaser's claim under § 502(h) for the loss resulting from the avoidance was recognized as an appropriate set-

Although sections 544 and 548 of the Bankruptcy Code authorize the trustee to avoid a transfer *or* an obligation, section 102(5) negates any implication that the trustee may not avoid *both* a transfer that secures or is otherwise related to an obligation *and* the obligation itself.[32] Section 7(a)(1) of the UFTA[33] likewise authorizes a creditor to obtain avoidance of a fraudulent transfer *or* obligation. The question has been raised, frequently of late, in court opinions and commentary whether subordination of the claim underlying a voidable lien is an appropriate remedy for a complainant creditor. There is no provision in the UFTA comparable to either section 102(5) of the Bankruptcy Code or section 510(c), the Bankruptcy Code's provision that authorizes equitable subordination of a claim or interest. Moreover, it has frequently been held that an individual creditor is not authorized by the Bankruptcy Code to obtain relief in the form of subordination of another creditor's claim.[34] The court is nevertheless authorized by section 7(a)(3)(iii) of the UFTA[35] to grant any other relief the circumstances may require. This provision has been liberally construed,[36] and subordinating the claim of one creditor to the claim of another when both creditors are before the court is not incompatible with the policy of the UFTA. Indeed, the avoidance of a creditor's claim accomplishes

off against the liability on the note. *Id.* at 1137-39. Professor Countryman appropriately raised the question of why the purchaser should not have been allowed a claim for his loss against the debtor's estate without regard to the setoff against the note. Countryman, *supra*, at 482.

Section 8(a) of the UFTA insulates any "person who took in good faith and for a reasonably equivalent value" from avoidance under § 4(a) (1) (*i.e.*, a good faith purchaser from a party who made a transfer or incurred an obligation with actual intent to hinder, delay, or defraud). UNIF. FRAUDULENT TRANSFER ACT § 8(a), 7A U.L.A. 662 (1985).

Transferees for less than fair consideration but without actual fraudulent intent were accorded liens pursuant to § 9(2) of the UFCA in Goodhope v. Overgaard, 227 N.W. 380 (S.D. 1929) (questioned by McLaughlin, *supra* note 27, at 433).

32. Section 102(5) states that the word "or" is not to be read as exclusive when it appears in the Bankruptcy Code. 11 U.S.C. § 102(5) (1988). Sections 544 and 548 allow the trustee to avoid either transfers *or* obligations. *Id.* §§ 544(a), 548(a).

33. 7A U.L.A. 660 (1985).

34. International Union, UAAAIW v. Ludwig Honold Mfg. Co., 30 B.R. 790, 792 (Bankr. E.D. Pa. 1983) (citing Fred Reuping Leather Co. v. Fort Greene Nat'l Bank (*In re* Honesdale Union Stamp Shoe Co.), 102 F.2d 372 (3d Cir. 1939)); Societa Internationale Turismo v. Barr (*In re* Lockwood), 14 B.R. 374, 381 (Bankr. E.D.N.Y. 1981). *But cf.* National Trust Co. v. Hideaway Beach, Inc. (*In re* Hideaway Beach, Inc.), 54 B.R. 548, 553 (Bankr. S.D. Fla. 1985) (equitably subordinating the claims of insider transferees who breached their fiduciary duty to the corporation).

35. UNIF. FRAUDULENT TRANSFER ACT § 7(a)(3)(iii), 7A U.L.A. 660 (1985).

36. *See* Frank R. Kennedy, *Reception of the Uniform Fraudulent Transfer Act*, 43 S.C. L. REV. 655, 672 (1992).

the same result *vis-a-vis* all other creditors.[37] It seems clear, however, that equitable subordination in a UFTA proceeding must not result in a detrimental change in the relative priority of a creditor not before the court with respect to the creditors who are parties to the proceeding.

Equitable subordination is appropriate when a defendant's conduct is directed toward a particular creditor who was misled by the defendant's conduct.[38] A fraudulent transfer, however, typically is not directed toward or detrimental to only one creditor or even to only a group of creditors. The importation of equitable subordination into the panoply of remedies available to a defrauded creditor, however, enables the court to modify the relief accorded in light of competing considerations. Thus, the lien to which a transferee is entitled for the consideration that the transferee gave in a constructively fraudulent transfer conceivably may be required to share its priority with secured creditors whose equities are entitled to equal treatment. Instead of allowing the claim of a creditor whose security interest is avoided as constructively fraudulent to compete *pari passu* with other creditors, however, the court may subordinate the claim of the erstwhile secured creditor.[39]

---

37. *See* David Gray Carlson, *The Trustee's Strong Arm Power Under the Bankruptcy Code*, 43 S.C. L. REV. 841, 855-63 (1992).

38. *See, e.g.*, American Cigar Co. v. MNC Commercial Corp. (*In re* M. Paolella & Sons, Inc.), 85 B.R. 965, 973-74 (Bankr. E.D. Pa. 1988); Monzack v. ADB Invs. (*In re* EMB Assocs., Inc.), 92 B.R. 9, 17 (Bankr. D.R.I. 1988) (finding that an insider committed egregious misconduct by demanding liens on the debtor's property while allowing past and future creditors to continue investing money in the insolvent debtor).

39. *See, e.g.*, Miller v. Borton (*In re* Bowman Hardware & Elec. Co.), 67 F.2d 792, 795 (7th Cir. 1933) (subordinating the claim of a creditor who induced the debtor to deny its indebtedness to that creditor when the debtor was negotiating with another creditor who relied on the debtor's misrepresentation in extending credit); Cambridge Meridian Group, Inc. v. Connecticut Nat'l Bank (*In re* Erin Food Servs., Inc.), 117 B.R. 21, 26-28 (Bankr. D. Mass. 1990) (apparently subordinating security interests for loans aggregating $61,741,000 to the claims of unsecured creditors to the extent of $5,827,541, which represented the amount that the debtor diverted from financing the debtor's operations and needs; citing the reference in § II of the New Hampshire Fraudulent Conveyance Statue to "rules of law and equity" in support of allocating loans "between those that are fully secured and prioritized, and loans in fact used for an unsecured purpose") (discussed in Ellen J. Pollock, *Secured Lenders Can Lose Place in Line*, WALL ST. J., June 20, 1991, at B4); *see also In re* Process-Mainz Press, Inc., 236 F. Supp. 333, 348-49 (N.D. Ill. 1964) (finding that a lender who financed a buyout, taking the debtor's assets and a pledge of the debtor's stock as security, and who thereafter assumed control of the debtor's financial affairs, manipulating them for its own benefit, was a fraudulent transferee of the mortgaged assets; and subordinating the lender's claims to the claims of unsecured creditors on determination by the court that the lender "was not a secured creditor but in substance the owner" of the corporate debtor in view of its "control, domination, spoliation, ownership and breach of fiduciary duty"), *rev'd on jurisdictional*

In *Murphy v. Meritor Savings Bank (In re O'Day Corp.)*[40] the court held, after an extended evidentiary hearing on the trustee and a secured creditor's motions, that the trustee had stated grounds for relief under sections 4 and 5 of the UFCA against the bank that financed a leveraged buyout.[41] The trustee argued that it would be anomalous to avoid the liens and then permit the bank to participate in the recovered assets as an unsecured creditor.[42] The bank countered that it was entitled, as an unsecured creditor, to a pro rata share of the estate or, at worst, to participate as a subordinated creditor under section 510 of the Code.[43] After disagreeing with the bank and agreeing with the trustee, the court elaborated on the reasons why the bank's claim as an unsecured creditor should be subordinated pursuant to section 510 of the Code.[44] The court found no fraudulent intent on the part of the bank, however, and explicitly declined to annul the obligations incurred by the debtor or to order disgorgement of the payments received after the LBO.[45] A mortgage to the bank that secured an antecedent debt independent of the LBO was sustained.[46]

At least one state has expressly listed "equitable subordination" in section 10 of its version of the UFTA as one of the "principles of law and equity" that supplement the Uniform Act.[47]

In *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*[48] Cir-

---

*grounds*, 369 F.2d 513 (7th Cir. 1965), *cert. denied*, 386 U.S. 957 (1967).

> Traditionally, the doctrine is applied to subordinate the claims of insiders, but the claim of a party not in control of the debtor can also be subordinated if he is guilty of sufficiently egregious conduct. A lender's cooperation in a sales transaction which is deemed to be in fraud of creditors may well be considered such conduct.

James F. Queenan, Jr., *The Collapsed Leveraged Buyout and the Trustee-in Bankruptcy*, 11 CARDOZO L. REV. 1, 28 (1989) (footnotes omitted) (citing Taylor v. Standard Gas & Elec. Co., 306 U.S. 307, 322-23 (1939)). Queenan describes *Taylor* as an instance of complete subordination of a claim of the parent company of a debtor subsidiary because of the parent's inequitable conduct. For a more extended consideration of equitable subordination as a remedy in fraudulent transfer cases, see Clark, *supra* note 2, at 517-36; Emily L. Sherwin, *Creditors' Rights Against Participants in a Leveraged Buyout*, 72 MINN. L. REV. 449, 455-60 (1988).

40. 126 B.R. 370 (Bankr. D. Mass. 1991); *see also* Claudia MacLachlan, *Bank Lost Place in Line, Is Sued*, NAT'L L.J., June 10, 1991, at 7; Patricia Rummer, *Courts Bump Secured Debt in LBO Deals to Back of the Line*, COM. LAW BULL., July-Aug. 1991, at 8-12.

41. *O'Day Corp.*, 126 B.R. at 403-04, 409-10.

42. *Id.* at 411.

43. *Id.* at 412.

44. *Id.*

45. *Id.* at 413.

46. *Id.* at 410, 413.

47. *See* UTAH CODE ANN. § 25-6-11 (1989).

48. 926 F.2d 1248 (1st Cir. 1991).

720          SOUTH CAROLINA LAW REVIEW          [Vol. 43

cuit Judge Cyr, writing for the First Circuit, declared that section 510(c) of the Bankruptcy Code, which authorizes equitable subordination of a claim, could not be employed to avoid security interests given to insiders of a corporate debtor as fraudulent transfers.[49] After subordination orders entered by the bankruptcy court were vacated on the ground that only allowed claims can be subordinated, however, the court held that the series of liens given the insiders were fraudulent transfers.[50] The opinion did not preclude the possibility that the insiders might still file claims pursuant to sections 502(d) and (h) and that these claims might yet be allowed and subordinated to unsecured claims rather than utterly disallowed.

## III. TRANSFEREE DEFINED

Neither the Bankruptcy Code nor the UFTA defines transferee. The courts have had a difficult time determining who is a transferee for purposes of liability under section 550 of the Bankruptcy Code. The courts have dealt with this problem only minimally under the UFTA.[51] The problem arises typically when the fraudulent transfer is a deposit of money to a bank account or a payment to brokers or agents for the benefit of third parties. Several approaches have evolved as to when the one receiving money is liable as a transferee. Judge Easterbrook found that transferee status requires "dominion over the money or other asset, the right to put the money to one's own purposes."[52] Other courts have hinged transferee status on whether the transferee had notice that the transaction was suspect,[53] whether the recipient had a direct business relationship with the transferor,[54] and whether the transferee was liable under common-law agency principles.[55]

---

49. *Id.* at 1253-54.

50. *Id.* at 1255.

51. *See* Kennedy, *supra* note 36, at 662-65.

52. Bonded Fin. Servs., Inc. v. European Am. Bank, 838 F.2d 890, 893 (7th Cir. 1988). Judge Easterbrook's approach was cited favorably by the district court in Lowry v. First National Bank (*In re* Robinson Brothers Drilling, Inc.), 97 B.R. 77, 81 (W.D. Okla. 1988), *aff'd*, 892 F.2d 850 (10th Cir. 1989). Easterbrook's definition also was utilized in Nordberg v. Societe Generale (*In re* Chase & Sanborn Corp.), 848 F.2d 1196, 1200 (11th Cir. 1988).

53. *See* Huffman v. Commerce Sec. Corp. (*In re* Harbour), 845 F.2d 1254, 1258 (4th Cir. 1988).

54. *See* Lowry v. Security Pac. Business Credit, Inc. (*In re* Columbia Data Prods., Inc.), 892 F.2d 26, 28 (4th Cir. 1989).

55. *See* Kaiser Steel Corp. v. Jacobs (*In re* Kaiser Steel Corp.), 105 B.R. 639, 649 (Bankr. D. Colo. 1989), *rev'd sub nom.* Kaiser Steel Resources, Inc. v. Jacobs (*In re* Kaiser Steel Corp.), 110 B.R. 514 (D. Colo.), *aff'd on other grounds sub nom.* Kaiser Steel Corp. v. Charles Schwab & Co. (*In re* Kaiser Steel Corp.), 913 F.2d 846 (10th Cir. 1990)

Under the Bankruptcy Act of 1898, a transferee had to have ownership of or the beneficial interest in transferred assets before it could be required to return them.[56] Appellant, Kaiser Steel Resources, Inc. (Kaiser), in *Kaiser Steel Resources, Inc. v. Jacobs (In re Kaiser Steel Corp.)*,[57] argued that Congress changed the Bankruptcy Act of 1898 by enacting section 550(a) of the Bankruptcy Code. Section 550(a) expressly permits recovery from the initial transferee regardless of whether the initial transferee is the owner of the fraudulently transferred property either legally or beneficially. In attempting to defeat liability, stockbrokers, who had received funds from Kaiser in redemption of customer stock, argued that they were not initial transferees. The bankruptcy court concluded that the brokers were liable as agents for undisclosed principals.[58] The district court reversed, holding that agency principles were inapplicable because the broker (Schwab) had "no contractual relationship" with Kaiser, the debtor.[59] Kaiser's brief to the Tenth Circuit argued not only in support of the bankruptcy court's ruling[60] but also that the stockbrokers had sufficient control

---

(*Kaiser I*).

56. *See* Carson v. Federal Reserve Bank, 172 N.E. 475, 482-83 (N.Y. 1930).

57. 110 B.R. 514 (D. Colo. 1990).

58. *Kaiser Steel Corp. v. Jacobs*, 105 B.R. at 649.

59. *Kaiser Steel Resources, Inc. v. Jacobs*, 110 B.R. at 522-23.

60. The bankruptcy court reviewed numerous cases interpreting Section 550, and explained how they have employed, in essence, centuries-old agency principles. Its analysis ties into the Fourth Circuit's holding in *Columbia Data Products* that the initial transferee is the one who has "a direct business relationship with the debtor." 892 F.2d at 28. That entity is generally a disclosed principal in "conduit" cases, but it may be the agent for an undisclosed principal.

The blunt fact is that brokers are agents; more to the point, they are agents for undisclosed or partially disclosed principals; and, as such, they are governed, at least in part, by the common law.

. . . .

(1) Kaiser's shareholders had the right to sue Kaiser in contract to get the $22 they were promised for each share of common stock they turned in. At the least, the Kaiser merger created a quasi-contractual obligation enforceable by and rescindable against the shareholders. *See United States v. Neidorf*, 522 F.2d 916, 918 (9th Cir. 1975), *cert. denied*, 423 U.S. 1087 (1976) (fraudulent conveyance action alleging dividends and stock transactions rendered company insolvent; shareholder liability is based on quasi-contract). Schwab had the right to sue, in contract, to enforce the merger as agent for its undisclosed customer principals. Schwab, dealing with Kaiser as an agent for partially disclosed principals, can likewise be sued. Restatement (Second) of Agency § 321 (1958); *Port Ship Service v. International Ship Management*, 800 F.2d 1418 (5th Cir. 1986) (agent liable for debts of partially disclosed principals).

(2) The remedy Kaiser seeks in this suit, a return of the $22 per share taken by its shareholders, is akin to the remedy of rescission. *Cf. Pinter v. Dahl*, 486 U.S. 622, 108 S. Ct. 2063, 2076 n.18 (1988) (Securities Act remedy is

over the funds to result in initial transferee liability. The later argument was premised on the following: Schwab, for all intents and purposes, was a stockholder to the outside world, including Kaiser[61]; Schwab's customer agreements gave it broad rights over the cash received on behalf of its customers[62]; Schwab had even greater control

---

substantial equivalent of equitable rescission); *Randall v. Lotfsgaarden*, 478 U.S. 647, 651-52, 106 S. Ct. 3143, 3147 (1986) (describing Securities Act remedy as rescission or rescissionary damages); *Prudential-Bache Securities, Inc. v. Cullather*, 678 F. Supp. 601 (E.D. Va. 1987) (equitable rescission claim supplements statutory securities rescission claims).

> *An agent who has received* things from another *for a disclosed or partially disclosed principal* in a transaction conducted by him *has a duty to return them or their proceeds* if the other rescinds the transaction for a cause existing at the time of their receipt, to the extent that the agent has not, before notice of rescission and in good faith, changed his position.

Restatement (Second) of Agency § 339, pp. 97-98 (1958) (emphasis added). Rescission predicated on fraud may be obtained from an agent with no privity to the fraudulent agreement. *Pinter v. Dahl*, 108 S. Ct. at 2079 n.23 (citing *Gordon v. Burr*, 506 F.2d 1080 (2d Cir. 1974) (stock purchaser suit for rescission against broker)).

An agent for a partially disclosed principal cannot escape liability on "mere conduit" grounds. *Insurance Brokers Service, Inc. v. Marsh & McLennan*, 665 F. Supp. 649, 651 (N.D. Ill. 1987). And there is no change of position when an agent, like Schwab, only credits its principals' accounts and maintains a lien on the money. Restatement (Second) of Agency § 339, Comment f. . . .

(3) Kaiser's cause of action need not fit precisely into a rescission or contract niche for agency principles to apply. Restatement (Second) of Agency § 321, Comment b is clear:

> *Separate liability of agent.* Unless agreed otherwise, the agent is subject to separate liability and may be sued individually without the joinder of the principal.

Agents acting for undisclosed or partially disclosed principals are liable for statutory violations, as well as torts and contract breaches. *Powers v. Coffeyville Livestock Sales Co., Inc.*, 665 F.2d 311 (10th Cir. 1981) (auctioneer liability for violation of UCC, interpreted in light of common law agency). *See also* cases supplementing federal securities law analysis with common law agency rules, *e.g.*, *In re Atlantic Financial Management, Inc.*, 784 F.2d 29 (1st Cir. 1986); *Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 712-16 (2d Cir.), *cert. denied*, 449 U.S. 1011 (1980); *Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111, 1118-19 (5th Cir. 1980).

Schwab kept its principals' identities to itself; it benefitted by doing so; it has the means to collect in turn from those principals; it should be held responsible for the legal obligations flowing from its choices, whether Kaiser's suit lies in contract, tort, or statute.

Appellant's Opening Brief at 22-25, *Kaiser I*, 913 F.2d 846 (10th Cir. 1990) (footnotes omitted).

61. *Id.* at 14-15.
62. *Id.* at 16.

over cash received for Kaiser stock bought on the margin[63]; Schwab had the right to use the cash credited to its customer accounts[64]; Schwab had total control over the Kaiser cash for a week[65]; and Schwab had more control than a bank.[66] As will be seen in Part VI, Kaiser's arguments went unanswered and unresolved.

## IV. LIABILITY OF THOSE BENEFITTED AND PARTICIPANTS IN FRAUDULENT TRANSFERS

The position taken by Professor Glenn, the preeminent authority on the subject of fraudulent transfers, may have been responsible for the hesitancy of courts to develop theories of recovery against those

---

63. *Id.* at 17-18.

64. *Id.* at 18-19.

65. *Id.* at 19-21.

66. The Seventh Circuit concluded in *Bonded Financial* that its bank had no dominion and control because "the Bank did not even acquire a valuable right to offset its loan against the funds in [the check payee's] account," and did not acquire dominion "until [the payee told it] to debit the account to reduce the loan." 838 F.2d at 893, 934. The court indicated initial transferee dominion and control would exist if the bank had the right to take and use the money upon receipt merely because of offset rights or a customer instruction.

Schwab, in contrast, had more than inchoate, common-law offset rights. Unlike the bank in *Bonded Financial*, Schwab had the right to take and use the Kaiser money pursuant to broad customer written authorization, especially to the extent its customers had purchased their Kaiser stock on margin, and pursuant to industry practice and SEC rules. Schwab had the express right to take the Kaiser money, its collateral, to repay any margin loans, and could even hold it to ensure funds would be available to cover other customer purchase obligations.

The difference between banking and brokerage is most prominent in the several days just after funds are received for a customer's accounts. The bank in *Bonded Financial* received money directed to a specific customer and a specific account; it was not able to use the money for a week before crediting that account and allowing the customer to withdraw it.

Schwab received Kaiser's money directed simply to "Schwab." Neither Kaiser nor DTC knew how many customers, if any, Schwab had. Some brokers disbursed all the money, and some kept most for their arbitrage account—only the brokers knew for sure. And until the brokers reconciled their books and credited their customers, with no required deadline to do so, the customers could not withdraw the money. The customer could not use the money in the interim; but under SEC rules, the broker could use the money to make a lot more money. Under *Bonded Financial*, which this Court found provides "sound guidance," and in light of all five types of rights and powers described above, Schwab had sufficient dominion and control to be an initial transferee, responsible to return the cash it received and used, and take up the burden of collecting from its customers.

*Id.* at 21-22.

who assist in making fraudulent transfers. Whatever the reason, those who assist fraudulent transfers but do not necessarily receive any direct benefit from the transfer have remained largely outside the reach of creditors' remedies. What cases there are have reached differing results. Several cases simply state, as did Professor Glenn, that there can be no recovery from one who aids, participates in, or conspires to effect a fraudulent transfer.[67] Other courts have permitted recovery.[68] In *Atlanta Shipping Corp. v. Chemical Bank*[69] the Second Circuit held that there is no aider and abettor liability under the New York fraudulent conveyance statute, but that there is aider and abettor liability under New York common law if funds are wrongfully diverted.[70]

In *Elliott v. Glushon*[71] the Ninth Circuit refused to recognize conspiracy liability under section 67d of the Bankruptcy Act. The Ninth

---

67. *See* Lowell Staats Mining Co. v. Philadelphia Elec. Co., 878 F.2d 1271, 1276 n.1 (10th Cir. 1989); FDIC v. Porco, 552 N.E.2d 158, 159-60 (N.Y. 1990). In Mack v. Newton, 737 F.2d 1343 (5th Cir. 1984), a bankruptcy trustee sought to assert claims against the debtor's former principals on the theory that they had conspired to divert the debtor's assets. The trustee argued that the transfers were made both without adequate consideration and with the intent to hinder, delay, or defraud creditors. The court rejected these claims for the most part, reasoning that neither federal law (*i.e.*, §§ 67d(6) and 70e(2) of the Bankruptcy Act) nor state law (*i.e.*, the Texas Fraudulent Conveyance Act) authorized a claim against someone who did not receive either directly or indirectly any benefit from the transfer. *Id.* at 1356-62; *see also* Menner v. Slater, 83 P. 35, 35 (Cal. 1905); Gilmore v. Tucker, 148 Cal. Rptr. 86 (Cal. Dist. Ct. App. 1978) (text available on LEXIS) (holding that a plaintiff cannot recover on a conspiracy claim unless the defendants committed a separate wrong that caused the plaintiff to suffer damages).

68. *See, e.g.*, McElhanon v. Hing, 728 P.2d 256, 261-64 (Ariz. Ct. App. 1985) (holding that an attorney who drafted transfer documents knowing that the consideration for the transfer was inadequate, that the debtor would be rendered insolvent, and that the debtor intended to defraud creditors may be held liable for conspiring to commit a fraudulent conveyance), *vacated en banc in part on other grounds*, 728 P.2d 273 (Ariz. 1986), *cert. denied*, 481 U.S. 1030 (1987); Dalton v. Meister, 239 N.W.2d 9, 17-18 (Wis. 1976).

69. 818 F.2d 240 (2d Cir. 1987).

70. *Id.* at 250-51. The Second Circuit affirmed the district court, which had held that there was no aiding and abetting liability under the fraudulent conveyance statute.

> The fourth cause of action contains a claim against Chemical for aiding and abetting a fraudulent conveyance. We do not believe it possible to state such a claim. In a fraudulent conveyance action, the plaintiff attacks the conveyance seeking to reclaim the property conveyed. The appropriate relief is to void the conveyance. An aiding and abetting claim against someone other than a transferee is meaningless in these circumstances. That aspect of the fourth cause of action alleging that Chemical aided and abetted a fraudulent conveyance is dismissed.

Atlanta Shipping Corp. v. Chemical Bank, 631 F. Supp. 335, 348 (S.D.N.Y. 1986) (citation omitted), *aff'd*, 818 F.2d 240 (2d Cir. 1987).

71. 390 F.2d 514 (9th Cir. 1967).

Circuit declined to follow its earlier decision in *Brainard v. Cohn*[72] in which the court held that all conspiring parties "are as one who received the property, and each joint tort-feasor has the burden of bearing the entire loss."[73] In *Elliott*, however, the Ninth Circuit limited *Brainard* to situations in which the defendants have "intermixed" the fraudulently transferred property with identical property so that identifying the fraudulently transferred property is impossible.[74] Also, the court ruled that section 67d is designed to cancel fraudulent transfers, not "to render civilly liable all persons who may have contributed in some way to" making a fraudulent transfer.[75] The court was concerned about how far a contrary rule would lead.

> It is also significant that the term "fraudulent transfer" as used in the [Bankruptcy] Act includes a great many transactions which do not constitute "actual" fraud; no intent to defraud need be found so long as the prescribed statutory criteria are met. Thus there is affirmative justification for rejecting a rule under which all persons having a hand in transactions later held void under the Act would be civilly liable. Limiting recovery in the manner suggested by the appellee Glushon protects innocent persons from civil liability, while at the same time preserving the assets of the bankrupt's estate.[76]

The Fifth Circuit followed *Elliott* in *Mack v. Newton*[77] and rejected conspiracy liability under both the Bankruptcy Act and the Texas fraudulent conveyance statute.[78] The Fifth Circuit noted that *Elliott* had been followed in the First, Second, and Eighth Circuits and that no court had disagreed with *Elliott*.[79] *Mack* is, perhaps, no more than the product of Professor Glenn's persuasiveness. In *Mack* the Fifth Circuit relied on the Texas Supreme Court's decision in *Estate of Stonecipher v. Estate of Butts*.[80] In *Estate of Stonecipher* the Texas Supreme Court, in language reminiscent of Professor Glenn, stated the following in regard to actions in civil conspiracy:

---

72. 8 F.2d 13 (9th Cir. 1925).

73. *Id.* at 15.

74. *Elliott*, 390 F.2d at 515-16.

75. *Id.* at 516.

76. *Id.* at 516-17 (footnote omitted).

77. 737 F.2d 1343 (5th Cir. 1984).

78. *Id.* at 1356-62.

79. *Id.* at 1358 (citing Robinson v. Watts Detective Agency, Inc., 685 F.2d 729, 737-38 (1st Cir. 1982), *cert. denied*, 459 U.S. 1105, *and cert. denied*, 459 U.S. 1204 (1983); Klein v. Tabatchnick, 610 F.2d 1043, 1048 n.4 (2d Cir. 1979); Jackson v. Star Sprinkler Corp., 575 F.2d 1223, 1234 (8th Cir. 1978)). The Ninth Circuit had also reaffirmed its holding in *Elliott. Id.* (citing Gough v. Titus (*In re* Christian & Porter Aluminum Co.), 584 F.2d 326, 339 (9th Cir. 1978)).

80. 591 S.W.2d 806 (Tex. 1979).

[A] general creditor has no right in or lien upon property of the debtor and therefore suffers no damages if the debtor's property is conveyed to others to evade payment. The damage sustained by the creditor in being deprived of an opportunity to make a levy and this damage is too remote. The loss suffered is not of a right, but of a chance to secure a right.[81]

Recent decisions, however, indicate that the law is changing. Several courts have recognized a shareholder's right to recovery against those who aid and abet fraudulent transfers made by a corporation on the theory that they aid and abet a breach of fiduciary duty.[82] Although in *Mack* the Fifth Circuit stated that Texas law does not allow an action for civil conspiracy,[83] a recent Texas Court of Appeals decision suggests that relief may be permitted for what is in effect a conspiracy to effect a fraudulent transfer under a constructive fraud theory.[84] Furthermore, one bankruptcy judge has interpreted *Mack* to allow recovery from anyone who benefits from a fraudulent transfer,

---

81. *Id.* at 808 (citing Le Gierse v. Whitehurst, 18 S.W. 510 (Tex. 1886)).

82. *See* Samuel M. Feinberg Testamentary Trust v. Carter, 652 F. Supp. 1066, 1082-84 (S.D.N.Y. 1987) (holding that greenmailers may be held liable as aiders and abettors to target company's management); Heckmann v. Ahmanson, 214 Cal. Rptr. 177, 182-83 (Ct. App. 1985) (holding that corporate "greenmailers" could be liable for proceeds received in failed takeover bid as aiders and abettors to a breach of fiduciary duty committed by the incumbent management); Gilbert v. El Paso Co., 490 A.2d 1050, 1056-58 (Del. Ch. 1984) (holding that a hostile corporate raider that withdrew its original tender offer upon reaching an agreement with the incumbent management, which included golden parachute arrangements, could be liable in civil conspiracy for aiding and abetting a breach of the incumbent management's fiduciary duty), *aff'd*, 575 A.2d 1131 (Del. 1990).

83. Mack v. Newton, 737 F.2d 1343, 1356 (5th Cir. 1984).

84. In Speed v. Eluma International, Inc., 757 S.W.2d 794 (Tex. Ct. App. 1988), the directors and shareholders of a corporation attempted a bulk sale of the company's assets. The corporation's creditors, however, obtained a court order enjoining the sale. One of the directors, who owned the land on which the company operated, then claimed that the company was in default on its lease and foreclosed on his landlord's lien. At the foreclosure sale the original buyer purchased the company's assets for the same price agreed upon in the thwarted bulk sale agreement. *Id.* at 795.

The Texas Court of Appeals found sufficient evidence to support a verdict of constructive fraud. *Id.* at 798. It ruled that the directors had perpetrated a sham transaction in order to breach an equitable duty owed to the company's creditors. The court defined constructive fraud broadly to include the breach of a "legal or equitable duty which . . . the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *Id.* at 796. The court held the directors personally liable for damages and noted that the purchaser of the company's assets also could have been held personally liable for damages. *Id.* Although the court based the purchaser's liability on the idea that it was "merely a continuation" of the original debtor company, its decision could be interpreted as relying on an aider and abettor or civil conspiracy theory of recovery.

not just those who directly receive the property transferred.[85] This is consistent with section 550(a) of the Bankruptcy Code, which expressly allows recovery from "the entity for whose benefit such transfer was made."[86]

> In view of the change in the statutory language, decisions like *Elliott v. Glushon,* based on the more limited language of the Bankruptcy Act, have lost their former authority. It is no longer true that Congress has limited the trustee's action "to recovery against persons who have 'received' the property in question." Fraudulent conveyances are now like preferential transfers, as to which actions would always lie against the persons who benefitted from them, as well as those who were the recipients of such transfers.[87]

Recent cases, relying on section 550(a), have allowed personal recoveries from the stockholders of closely held corporations if the stockholders benefit from a fraudulent transfer received by the corporation.[88] Thus, despite Professor Glenn, the law is evolving.

---

85. Ossen v. Bernatovich (*In re* National Safe Northeast, Inc.), 76 B.R. 896, 904 (Bankr. D. Conn. 1987).

86. 11 U.S.C. § 550(a)(1) (1988).

87. Pereira v. Checkmate Communications Co. (*In re* Checkmate Stereo & Elecs., Ltd.), 9 B.R. 585, 620 (Bankr. E.D.N.Y. 1981) (citations omitted), *aff'd,* 21 B.R. 102 (E.D.N.Y. 1982).

88. In Tavormina v. Weiss (*In re* Behr Contracting, Inc.), 79 B.R. 84 (Bankr. S.D. Fla. 1987), a corporate debtor transferred $68,000 within a year of bankruptcy to American Dream Realty & Mortgage, Inc., a corporation owned wholly by a man named Weiss who also was a director of the debtor corporation. The bankruptcy court held that § 550(a)(1) enabled recovery of the transfer both from American Dream *and* from Weiss. As the court reasoned: "It is undisputed that American Dream is fully owned by Weiss and has no assets or liabilities. As such, the court concludes that the transfer was for the benefit of Weiss and therefore, recoverable from him." *Id.* at 87 (citing 11 U.S.C. § 550(a)(1) (1988)). In Ossen v. Bernatovich (*In re* National Safe Northeast, Inc.), 76 B.R. 896 (Bankr. D. Conn. 1987), the court held that $48,000 transferred from the debtor, which was owned wholly by Bernatovich, to another corporation also owned wholly by Bernatovich could be recovered from Bernatovich himself. *Id.* at 904. As the court explained: "Bernatovich, as the sole stockholder of both the debtor and ATM, was in a position that enabled him to manipulate transactions between the two corporations for [his] benefit." *Id.* And in Ohio Corrugating Co. v. Security Pacific Business Credit, Inc. (*In re* Ohio Corrugating Co.), 70 B.R. 920 (Bankr. N.D. Ohio 1987), an LBO case, the court held that a corporation which did not even exist at the time of the transfer could be sued on the theory that it was "an entity for whose benefit the transfer was made under section 550(a)(1)." *Id.* at 924. Also, the court concluded that the sole stockholder of this newly formed corporation could be sued but cautioned that some additional evidence is needed beyond the fact of sole ownership. The court stated, "Plaintiff must prove that SHEPPARD [the sole stockholder] acted other than in the normal course of business of DPAC I, DPAC II, or OHIO CORRUGATING [the corporations] and must submit appropriate evidence as to SHEPPARD's individual liability." *Id.* at 925. There is also authority that the intended benefit need not have been *received* by the

A significant development in recent years was the enactment of the Racketeer Influenced and Corrupt Organizations Act (RICO) in 1970.[89] Under certain circumstances RICO, and its state law counterparts,[90] allow recovery from those who participate in or assist fraudulent transfers.[91] Although judicial reception of the RICO statute has been chilly, this is largely because of its misuse.[92] Courts should not be hostile to its use, however, if a transfer is made with the express intent to hinder, delay, or defraud creditors under circumstances that violate

---

defendant. *See* Merrill v. Dietz (*In re* Universal Clearing House Co.), 62 B.R. 118, 127 (D. Utah 1986) (allowing recovery from an individual who requested that the debtor write a check directly to one of the individual's creditors); Hayley v. Sorani (*In re* Richmond Produce Co.), 118 B.R. 753, 759 (Bankr. N.D. Cal. 1990) ("[R]ecovery of an avoided transfer may be ordered under 11 U.S.C. § 550(a)(1) even though the entity did not actually receive a benefit as a result of the transfer.").

89. Pub. L. No. 91-452, tit. IX, 84 Stat. 941-48 (codified as amended at 18 U.S.C. §§ 1961-1968 (1988 & Supp. II 1990)); *see generally* H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989); Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985) (discussing and construing various provisions of RICO).

90. Similar legislation has been adopted in a number of states. *E.g.* ARIZ. REV. STAT. ANN. §§ 13-2301 to -2317 (1989 & Supp. 1991); FLA. STAT. ANN. chs. 895.01 to .09 (Harrison 1991 & Supp.).

91. The RICO statute defines "racketeering activity" by referring to various criminal acts, the so-called predicate acts. 18 U.S.C. § 1961(1) (Supp. II 1990). The list of activities includes criminal bankruptcy fraud, best defined by 18 U.S.C. § 152:

> Whoever, either individually or as agent or officer of any person or corporation, in contemplation of a case under title 11 by or against him or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation;
>
> . . . .
>
> Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

18 U.S.C. § 152 (1988). Section 1962(d) of RICO makes it unlawful for anyone to conspire to commit racketeering activities, *id.* § 1962(d), and § 1964 authorizes the Attorney General to institute civil proceedings against anyone who violates § 1962. In addition, § 1964 creates a private cause of action for anyone who suffers injury to "business or property by reason of a violation of section 1962," and a plaintiff can recover triple damages under the statute. *Id.* § 1964(c).

92. *See, e.g.*, Avirgan v. Hull, 932 F.2d 1572, 1582 (11th Cir. 1991) (affirming Rule 11 sanctions against journalists who brought a groundless RICO action apparently in an attempt to obtain evidence on the Iran-Contra scandal through the discovery process), *cert. denied*, 112 S. Ct. 913 (1992); Chapman & Cole v. Itel Container Int'l, B.V., 865 F.2d 676, 683-85 (5th Cir.) (affirming sanctions for violation of Rule 11 imposed on attorneys who asserted RICO counterclaim to deter plaintiff from continuing its cause of action) (citing Black & Magenheim, *Using the RICO Act in Civil Cases*, 22 HOUS. LAW. 20, 24-25 (Oct. 1984)), *cert. denied*, 493 U.S. 872 (1989). There are efforts underway to amend RICO to carve out business disputes and "garden variety" fraud. *See* H.R. 1717, 102d Cong., 1st Sess. (1991).

section 152 of Title 18, the definition of criminal bankruptcy fraud.[93] Under RICO a plaintiff can proceed against those who conspired in or aided and abetted the fraudulent conduct because there is a specific conspiracy provision within RICO.[94] It requires that the participants agreed to violate section 1962(a), (b), or (c) of RICO. Thus, assuming the elements of a RICO claim are otherwise met, a fraudulent transfer—that is, a knowing and fraudulent transfer of property made with the intent to defeat the provisions of Title 11, or in contemplation of a case under Title 11—gives rise to joint and several liability against those who participated in the fraudulent conduct.

The trustee in bankruptcy clearly has standing to bring a RICO claim if the debtor is an entity because the entity can be separated from the individuals involved in the fraud.[95] The claim is an asset of

---

93. 18 U.S.C. § 152 (1988).

94. *Id.* § 1962(d). The general rules as to criminal conspiracy are similar and require:

> an agreement between two or more persons to commit a crime . . . and an overt act by one of them in furtherance of the agreement. The government must prove beyond a reasonable doubt that the defendant knew of the conspiracy and that he voluntarily became a part of it. The existence of a conspiracy may be proved by circumstantial evidence and may be inferred from concert of action.

United States v. Yamin, 868 F.2d 130, 133 (5th Cir.), *cert. denied*, 492 U.S. 924 (1989); *cf.* United States v. Manzella, 782 F.2d 533, 537 (5th Cir.) (holding that conspiracy constitutes a predicate act under RICO), *cert. denied*, 476 U.S. 1123, *and cert. denied*, 479 U.S. 961 (1986); United States v. Phillips, 664 F.2d 971, 1015 (5th Cir. 1981) (rejecting criminal defendant's double jeopardy objection because racketeering and conspiracy represent separate violations under RICO), *cert. denied*, 457 U.S. 1136, *and cert. denied*, 459 U.S. 906 (1982).

95. In Wooten v. Loshbough, 951 F.2d 768 (7th Cir. 1991), the court ruled as follows:

> The company's claim against the defendants for what they did to it is a corporate asset now vested in the trustee so that he can liquidate it for the benefit of the company's creditors—including Wooten—in accordance with their legal entitlements in bankruptcy. Wooten is seeking to jump the queue—to bypass bankruptcy—to wrest this valuable corporate asset from the trustee by suing the defendants directly. To allow her to do this would upset the priorities established by the bankruptcy law—which gives a low priority to a judgment creditor, who despite the apparent connotation of the term is just another unsecured creditor until by executing the judgment he obtains a judicial lien.

*Id.* at 770 (citing Linsey v. Federal Land Bank (*In re Lindsey*), 823 F.2d 189, 191 (7th Cir. 1987); Barnett v. Stern, 93 B.R. 962, 975-77 (N.D. Ill. 1988), *rev'd*, 909 F.2d 973 (7th Cir. 1990)); *cf.* Whalen v. Carter, 954 F.2d 1087 (5th Cir. 1992) (denying RICO standing to plaintiffs as shareholders but finding standing for limited partners to assert RICO claims against general partners and third parties); Mid-State Fertilizer Co. v. Exchange Nat'l Bank, 877 F.2d 1333 (7th Cir. 1989) (denying standing to shareholders and creditors who sued individually because RICO claims can be brought only by the entity directly injured by a fraudulent transfer); Ocean Energy II, Inc. v. Alexander & Alexander,

the estate under Bankruptcy Code section 541(a)[96] and derivative suits by stockholders are automatically stayed under section 362(a).[97] However, establishing the trustee's standing is more problematic if the debtor is an individual because the debtor is involved in the fraud. In *Barnett v. Stern*[98] an individual involved in various fraudulent transfers filed bankruptcy. The court held that the individual's trustee had standing to prosecute a RICO claim.[99] The court did not find, however, that the cause of action belonged to the estate under either section 541 (because the debtor was *in pari delicto* and therefore could not bring the claim outside of bankruptcy[100]) or section 544 (the court interpreted section 544 as limited to "avoidance claims"[101]) of the Bankruptcy Code.[102] Instead, the court distinguished cases that had followed the Supreme Court's decision in *Caplin v. Marine Midland*

---

Inc., 868 F.2d 740 (5th Cir. 1989) (setting forth a two-part test for shareholder RICO standing based on derivative suit analysis). *But see* Feltman v. Prudential-Bache Sec., 122 B.R. 466 (S.D. Fla. 1990) (holding that the Chapter 11 trustee of sham corporations created by a convicted embezzler to hide the proceeds of his crimes could not assert RICO claims because the debtor corporations were *in pari delicto* with the embezzeler's fraud).

96. 11 U.S.C. § 541(a) (1988); *see* Wooten, 951 F.2d at 770.

97. 11 U.S.C. § 362(a) (1988).

98. 93 B.R. 962 (N.D. Ill. 1988), *rev'd on other grounds*, 909 F.2d 973 (7th Cir. 1990).

99. In *Barnett* the debtor was an individual who had fraudulently transferred personal assets to a trust prior to filing a Chapter 7 petition. Two creditors initiated a RICO claim against third parties for their involvement in the prepetition fraudulent transfers. The court held that the bankruptcy trustee, not the creditors, had standing to pursue RICO claims which concerned prepetition fraudulent activity. *Id.* at 967-72. In Kremen v. Blank, 55 B.R. 1018 (D. Md. 1985), however, the court held that the trustee has standing to challenge only postpetition RICO violations. The court reasoned as follows:

> Plaintiff argues that property conveyed by the Debtor in an effort to defraud his creditors prior to the filing of his Petition remains the property of the Estate. It is true that, like an unsecured general creditor, the trustee has standing to overturn fraudulent conveyances. 11 U.S.C. § 544(a)(b). Property fraudulently conveyed reverts to the estate. However, a general creditor without a lien has no legal right or interest in a Debtor's property prior to obtaining a judgment of fraudulent conveyance. *Van Royen v. Lacey*, 262 Md. 94, 277 A.2d 13 (1971). A trustee has no greater interest than an unsecured creditor in property conveyed prior to the Debtor's voluntary filing of a bankruptcy petition.

*Id.* at 1021.

100. *Barnett*, 93 B.R. at 969.

101. *Id.* at 969-70.

102. *Id.* At least one court has held that although a RICO claim is not estate property if the debtor participated in the fraud, it is assertable by the trustee under § 544. Lumbard v. Maglia, Inc., 621 F. Supp. 1529, 1541-42 (S.D.N.Y. 1985) (holding that the trustee can bring a RICO claim under § 544 even if the debtor participated in the challenged wrongdoing).

*Grace Trust Co.,*[103] which held that a bankruptcy trustee does not have standing to assert damage claims that belong to creditors.[104] In the *Caplin* case the creditors whose claims were being asserted were debenture holders who had claims against the indenture trustee for breach of its fiduciary duty.[105] The *Barnett* court relied on "common sense," the principle of equitable distribution, and a series of alter-ego cases in distinguishing *Caplin* and finding RICO standing.[106] However, all but one of the alter-ego cases cited by the court allowed a debtor corporation to pierce its own corporate veil, and thus the decisions are based on the idea that the alter-ego claims became property of the estate under section 541 of the Bankruptcy Code. The one alter-ego case that directly supports the *Barnett* court's holding is *Koch Refining v. Farmers Union Central Exchange, Inc.*[107] In *Koch* the Seventh Circuit interpreted *Caplin* only as denying standing to the trustee if the trustee is asserting the personal claims of a specific creditor.[108] Thus, the *Koch* court stated that "allegations that could be asserted by any creditor could be brought by the trustee as a representative of all credi-

---

103. 406 U.S. 416 (1972).

104. *Barnett,* 93 B.R. at 970-72.

The question was settled, for all practical purposes, under the Act by *Caplin v. Marine Midland Grace Trust Co.,* where the Supreme Court held that a trustee had no standing to bring an action on behalf of certain creditors (bondholders) against an indenture trustee. Because of the reach of the doctrine of *Moore v. Bay* . . . *Caplin* was widely understood to prohibit trustees from raising creditor damage actions generally, including alter ego claims. Since such a veil-piercing action was not a claim which the corporation could bring in its own behalf under state law, and thus was not property of the estate under Section 70a, there was no way for the trustee to argue that standing existed by virtue of this alternate route either.

The *Caplin* court determined, also, that Section 70e, whereby the trustee could assert the rights of creditors of the estate, was limited to avoidance of transfers or obligations. The court was concerned with, among other things, the subrogation problems which would be raised when estate creditors, some of whom could not have recovered under state law, attempted to participate in the trustee's recovery.

Richard L. Epling, *Trustee's Standing to Sue in Alter Ego or Other Damage Remedy Actions,* 6 BANKR. DEV. J. 191, 192-93 (1989).

105. *See Caplin,* 406 U.S. at 417-21.

106. *Barnett,* 93 B.R. at 967-72; *see also* St. Paul Fire & Marine Ins. Co. v. PepsiCo., Inc., 884 F.2d 688 (2d Cir. 1989) (finding that an alter-ego claim was a generalized claim and could be pursued only by the trustee because the claim is property of the estate); S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (*In re* S.I. Acquisition, Inc.), 817 F.2d 1142 (5th Cir. 1987) (ruling that if state law does not specifically forbid a corporation from piercing its own corporate veil, then common sense, judicial economy, and the bankruptcy process indicate that the trustee should have standing to bring third party claims and pierce its debtor's veil).

107. 831 F.2d 1339 (7th Cir. 1987), *cert. denied,* 485 U.S. 906 (1988).

108. *Id.* at 1347 n.11.

tors."[109] The *Koch* court, however, ultimately based its holding that the trustee had standing to pursue an alter-ego claim on the same rationale as the other alter-ego cases cited in the *Barnett* decision.[110] Thus, the legal authority supporting the *Barnett* decision is somewhat dubious.

The Eighth Circuit has taken a different view of the matter. In *Mixon v. Anderson (In re Ozark Restaurant Equipment Co.)*[111] the Eighth Circuit held that an alter-ego claim belonged to the creditors and not the debtor corporation. Therefore, the alter-ego claim was not property of the bankruptcy estate.[112] The Eighth Circuit, relying on the legislative history underlying section 544, also held that section 544(a) does not allow the trustee to assert creditors' claims.[113] Based on the work of the Commission on the Bankruptcy Laws of the United States, the sponsors of the Bankruptcy Reform Act of 1978 originally proposed a version of section 544 that contained an additional subsection expressly overruling *Caplin*.[114] Congress did not adopt this proposal,[115] and in *Ozark Restaurant Equipment* the Eighth Circuit found

---

109. *Koch*, 831 F.2d at 1348-49.
110. *Id.* at 1343-47.
    Virtually all of these recent cases find that standing lies in Section 541 by discovering a right of action under state law permitting a corporation to maintain an alter ego action against its own stockholders and other insiders; in effect, this action permits a corporation to pierce its own veil. Surprisingly, *Koch Refining v. Farmers Union Central Exchange, Inc.*, suggested that standing might also be found by inference in Section 544(a). However, the court, in a very hazy opinion, then proceeded to disclaim that notion. The court in *Koch* then relied on reasoning that was similarly adopted by the Fourth and Fifth Circuits. It examined underlying state law (Indiana and Illinois) and concluded that since those states did not expressly *prohibit* a corporation from maintaining an alter ego action, the cause of action must belong to the corporation and pass to the trustee as property of the estate.
Epling, *supra* note 104, at 196 (footnotes omitted).
111. 816 F.2d 1222 (8th Cir.), *cert. denied*, 404 U.S. 848 (1987).
112. *Id.* at 1224-26.
113. *Id.* at 1227-30.
114. This proposal was based on § 4-604(b)(2) of the Commission's Proposed Bankruptcy Act of 1973:
    The Trustee may, when in the best interest of the estate, enforce any claim which any class of creditors has against any person and if necessary for that purpose, the court may stay any other pending action on such claims. If the trustee brings an action on such a claim, he shall give notice to all creditors who could have brought an action on the claim if the trustee had not done so. Any judgment entered for or against the trustee on such claim shall be binding on all such creditors and any recovery by the trustee shall be for the benefit only of such creditors after the deduction of all expenses incurred by the trustee in effecting such recovery.
1973 COMMISSION REPORT, *supra* note 16, at 160.
115. *See* Epling, *supra* note 104, at 193-95.

this inaction determinative. The court declined to distinguish *Caplin* even though the claims in *Caplin* were claims that belonged to specific creditors, rather than claims that all creditors could assert.[116]

A further roadblock to RICO fraudulent transfer claims are several cases which have indicated that the RICO claims of creditors are too speculative or are not ripe until the fraudulent transfer claims of the trustee are resolved. Only then will the extent of the injury be known. The Second Circuit addressed this issue in *Bankers Trust Co. v. Rhoades*[117] and concluded that although RICO does not impose any special standing limitations on creditors, any RICO plaintiff must suffer injury in fact.[118] Therefore, the overlap between the creditors' RICO claim and the trustee's fraudulent transfer claim "does not present a question of [the creditors'] standing to bring a civil RICO claim, but rather presents the question of which and how much in damages [the creditors'] can recover under that RICO claim."[119] On the damages issue the court stated:

> [S]hould the bankruptcy trustee ultimately recover all the fraudulently transferred assets, [the creditors'] injury could be significantly reduced; conversely should the assets never be recovered, or should the bankruptcy court order the claim abandoned, [the creditors'] injury would be much more severe.
>
> Trebling and attorney's fees aside, congress intended the basic award under civil RICO to compensate the plaintiff for injury to "his property or business." 18 U.S.C. § 1964(c) (1984). As in other areas of the law, this compensation takes the form of awarding damages sufficient to place the plaintiff in the same financial position he would have occupied absent the illegal conduct.
>
> Yet, at this time, it is impossible to determine the amount of damages that would be necessary to make plaintiff [creditors] whole, because it is not known whether some or all of the fraudulently transferred funds will be recovered by the [debtor] corporation.[120]

Although in *Barnett* the Seventh Circuit held that the trustee has standing to assert RICO claims, in dictum the court concurred with the Second Circuit's conclusion that the judgment creditors' damage claims were speculative and premature because "it remains to be seen whether they will be able to satisfy their claims from the bankruptcy estate."[121]

---

116. *Ozark Restaurant Equipment*, 816 F.2d at 1227-29.
117. 859 F.2d 1096 (2d Cir. 1988), *cert. denied*, 490 U.S. 1007 (1989).
118. *Id.* at 1100 (citing Sedima v. Imrex Co., 473 U.S. 479 (1985)).
119. *Id.* at 1101.
120. *Id.* at 1106.
121. Barnett v. Stern, 909 F.2d 973, 977 n.4 (7th Cir. 1990). In L'Europeenne de Banque v. La Republica de Venezuela, 700 F. Supp. 114 (S.D.N.Y. 1988), the plaintiff, a

## V.  TIME TO FILE SUIT

Section 546 of the Bankruptcy Code limits the time within which avoidance actions can be initiated to two years following the appointment of a trustee.[122] Some courts and commentators have difficulty with this provision because they feel it is too open-ended in Chapter 11 cases, where the norm is to continue the debtor in possession and a trustee may never be appointed. In such cases the time to initiate an avoidance action does not expire until some indefinite time in the future when the case is closed or dismissed.[123] Even the confirmation of a plan is irrelevant to the time period within which to commence an action. In *Korvettes, Inc. v. Sanyo Electric, Inc. (In re Korvettes, Inc.)*[124] Judge Lifland became the first judge to try to correct this problem. Not satisfied with section 546(a), he simply rewrote it:

It is thus my view that the longer of confirmation or two years from the reorganization filing date should be the appropriate period for the bringing of preference actions for statute of limitations purposes. Stated differently, a debtor in possession should be able to bring preference actions until a reorganization case is confirmed, no matter how long that process naturally takes. If, however, a case is confirmed in less than two years, the debtor may bring these actions until the two-year period has elapsed, so long as it has provided in the confirmation documents that preference actions may be brought post-confirmation. A formulation crafted in the alternative is indeed proper as the statute of limitations under former Bankruptcy Act Section 11(e) was constructed in this manner. Pursuant to Act Section 11(e), a trustee could bring preference actions for the longer of two years from the date of the bankrupt's adjudication in bankruptcy or any applicable federal or state statute of limitations, so long as that federal or state statute had not expired before the adjudication. *A fortiori*, the Chapter 11 debtor in possession should be able to bring preference

---

consortium of banks, brought a RICO claim against third parties for looting the assets of a Venezuelan bank that had contracted with the consortium. *Id.* at 116. Citing *Rhoades*, the court held that the plaintiff's RICO claim was not ripe because the Venezuelan bank was still in liquidation proceedings that could result in a reduction of the plaintiff's damages. *Id.* at 118-19; *see also* Lincoln House, Inc. v. Dupre, 903 F.2d 845, 847-48 (1st Cir. 1990) (upholding the district court's dismissal of a RICO fraudulent transfer claim filed during the pendency of plaintiff's claim for breach of contract against defendant because the RICO injury was contingent upon plaintiff winning the contract claim); Wooten v. Loshbough, 738 F. Supp. 314, 316-17 (N.D. Ind. 1990) (holding that personal injury judgment creditor of corporation who sued third parties under RICO for looting corporate assets lacked standing because the injury to the judgment creditor was indirect and the amount of her damages too speculative), *aff'd*, 951 F.2d 768 (7th Cir. 1991).

122. 11 U.S.C. § 546 (1988 & Supp. II 1990).

123. *Id.* § 546 (a)(2) (1988).

124. 42 B.R. 217 (Bankr. S.D.N.Y. 1984), *rev'd*, 67 B.R. 730 (S.D.N.Y. 1986).

actions for the longer of two years from the date of the filing of a Chapter 11 petition or entry of an order of confirmation.[125]

The district court reversed Judge Lifland, however, holding that the statute was clear and that the court could not ignore it merely because the court disagreed with it.[126] The case law, until about the middle of 1990, other than Judge Lifland's brief misadventure, solidly supported the proposition that section 546(a) means what it says: The two-year statutory limitation begins to run when a trustee is appointed under one of the named sections; otherwise, avoidance actions can be brought at any time until the case is closed or dismissed. Unfortunately, in 1990 and 1991, four more courts jumped the tracks.[127] Two of these were inspired by the Tenth Circuit's decision in *Zilkha Energy Co. v. Leighton*,[128] but the other acted before *Zilkha*.[129]

By its terms, section 546(a)(1) does not apply to debtors in possession. The Tenth Circuit's holding to the contrary is based upon section 1107(a) of the Code, which gives a debtor in possession all the rights and powers of a trustee subject to any limitations imposed upon a Chapter 11 trustee.[130] Because section 546(a)(1) imposes a two-year limitation period upon Chapter 11 trustees, the court concluded that because of section 1107(a) this limitation also applies to debtors in possession. Hence, the court held that the two-year period begins to run from the date of the filing of the petition because that is the date the debtor in possession is "appointed."[131]

It is well settled that "when the express language of a statute is clear, a court will not adopt a different construction absent clear legislative history contradicting the plain meaning of the words."[132] The

---

125. *Id.* at 222-23 (citation omitted).

126. Korvettes, Inc. v. Sanyo Elec., Inc. (*In re* Korvettes, Inc.), 67 B.R. 730, 734 (S.D.N.Y. 1986).

127. Zilkha Energy Co. v. Leighton, 920 F.2d 1520, 1524 (10th Cir. 1990); Sparmal Enters., Inc. v. Moffit Realty Corp. (*In re* Sparmal Enters., Inc.), 126 B.R. 559, 562 (S.D. Ind. 1991); Construction Management Servs., Inc. v. Manufacturers Hanover Trust Co. (*In re* Coastal Group, Inc.), 125 B.R. 730, 731-32 (Bankr. D. Del. 1991); Lill v. Bricker (*In re* Lill), 116 B.R. 543, 546 (Bankr. N.D. Ohio 1990).

128. 920 F.2d 1520 (10th Cir. 1990).

129. The *Lill* decision is dated May 21, 1990, prior to the Tenth Circuit's decision in *Zilkha*, which is dated December 10, 1990.

130. 11 U.S.C. § 1107(a) (1988).

131. *Zilkha*, 920 F.2d at 1523-24.

132. United States v. Holroyd, 732 F.2d 1122, 1125 (2d Cir. 1984); *see* United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242 (1989); United States v. Oregon, 366 U.S. 643, 648 (1961); *Ex Parte* Collett, 337 U.S. 55, 61 (1949) ("This canon of construction has received consistent adherence in our decisions."); Gemsco, Inc. v. Walling, 324 U.S. 244, 260 (1945); Helvering v. City Bank Farmers Trust Co., 296 U.S. 85, 89 (1935) ("We are not at liberty to construe language so plain as to need no construction, or to refer to

*Zilkha* opinion cited no legislative history supporting the result it reached. This omission was undoubtedly due to the total absence of any legislative history in the briefs and supplemental briefs of the parties to the court.[133] If the court had examined the legislative history and the historical antecedents of sections 546(a) and 1107(a), it could not have concluded that Congress intended section 546(a)(1) to apply to debtors in possession.

The legislative history begins not with section 546 of the Bankruptcy Reform Act of 1978 but with section 77B, the corporate reorganization statute enacted in 1934.[134] Section 77B(b)(10) provided for the tolling of all periods of time prescribed by the Bankruptcy Act and of all other statutes of limitations during the pendency of the reorganization.[135] The Chandler Act amendments of 1938,[136] which repealed section 77B and added Chapters X, XI, and XII, contained similar suspension provisions. For example, section 261 of Chapter X provided that "the running of all periods of time prescribed by this Act in respect to commission of acts of bankruptcy, the recovery of preferences, and the avoidance of liens and transfers shall be suspended while a proceeding under this chapter is pending and until it is finally dismissed."[137]

The Chandler Act Amendments of 1938 also added section 11e, which required a "receiver or trustee . . . within two years subsequent to the date of adjudication [to] institute proceedings . . . upon any claim against which the period of limitation fixed by Federal or State law had not expired at the time of the filing of the petition in bankruptcy."[138] In *Herget v. Central National Bank & Trust Co.*[139] the Supreme Court applied section 11e to an action by a liquidating trustee to recover a preference under section 60 of the Act,[140] and the statute

---

Committee reports where there can be no doubt of the meaning of the words used."); Caminetti v. United States, 242 U.S. 470, 485 (1917).

133. The *Zilkha* case was only marginally, if at all, an avoidance action. The claim asserted by the reorganized debtor was to recover mistaken royalty overpayments made to the defendants on oil and gas leases before the debtor filed bankruptcy. 920 F.2d at 1521-22. The reorganized debtor cast one of the claims as a strong arm claim, brought under § 544(a)(1), to avoid the fact that the state statute of limitations had run. *Id.* at 1522. Appellants' and appellees' briefs contained no reference to legislative history.

134. Act of June 7, 1934, ch. 424, sec. 1, § 77B, 48 Stat. 911, 912-22 (repealed 1938).

135. *Id.* § 77B(b)(10), 48 Stat. at 915.

136. Chandler Act, ch. 575, 52 Stat. 840-940 (1938) (repealed 1978).

137. *Id.* ch. X, § 261, 52 Stat. at 902. To the same effect, see § 391 (Chapter XI) and § 516 (Chapter XII) of the Chandler amendments. *Id.* ch. XI, § 391, 52 Stat. at 914; *id.* ch. XII, § 516, 52 Stat. at 928.

138. *Id.* ch. III, § 11e, 52 Stat. at 849.

139. 324 U.S. 4 (1945).

140. *Id.* at 9.

was later applied to a fraudulent conveyance as well.[141] Later decisions made clear, however, that section 11e's two-year time period was to be applied consistently with the tolling provisions of the reorganization chapters described above.

In *Davis v. Security National Bank*[142] the trustee's preference action would have been untimely under section 11e unless the time during the Chapter X case was excluded. In holding that the action was timely, the court rejected an argument very similar to the one that is the foundation for the *Zilkha* decision:

> Appellee argues that the appellant trustee is barred because the Chapter X trustee might have proceeded to recover the alleged preferential payment. To be sure, the Chapter X trustee had all of the powers of a trustee in bankruptcy [but] there is nothing in the Act which even remotely suggests that the Chapter X trustee is *required* to exercise *all* of the powers of a general trustee in bankruptcy.[143]

Similarly, the court in *Liman v. Bank of Nova Scotia*[144] held that section 11e did not bar a preference complaint filed nearly seven years after the original Chapter XI petition, but within two years of an order that terminated the attempted reorganization and directed that bankruptcy proceed.[145] As in *Davis*, the court rejected the argument that because the reorganization trustee could have recovered the preferential payment, the liquidating trustee should be barred:

> The fact is the reorganization trustee did not (for reasons best known to that trustee) exercise his discretion to seek recovery of the alleged preferential payment during the pendency of the reorganization effort. The reorganization trustee may not have been aware of the possibility of any such action against defendant who had been paid in full by the Chase Manhattan Bank. As another leading text writer has said: "Such recovery . . . may be had during the Chapter X administration, but § 261 [11 U.S.C. § 661] recognizes the possibility that either no such action will be taken or the pertinent facts will not be discovered before the dismissal of the reorganization proceeding, and it accordingly suspends the running of the various periods of time involved."
>
> One purpose of §§ 661 and 791 seems plain. They suspend the running of all statutes of limitations affecting claims provable under Chapters X and XI by the creditors of the debtor so as to allow for unfettered consideration by the creditors of any plan of reorganization or arrangement. The other purpose of §§ 661 and 791 seems equally obvious. They suspend the running of the time within which a trustee

---

141. Wells v. Place, 92 F. Supp. 477 (N.D. Ohio 1950).
142. 447 F.2d 1094 (9th Cir. 1971).
143. *Id.* at 1097-98 (citations omitted).
144. 337 F. Supp. 62 (S.D.N.Y. 1971).
145. *Id.* at 63.

in bankruptcy must proceed to recover a preference (after the hypothetical date of adjudication set by §§ 778(a)(2) and 638) during the pendency of a Chapter XI or X proceeding so that the rights of creditors to an equal share of the estate in any ensuing bankruptcy proceeding may be protected.[146]

In summary, prior to the enactment of the 1978 Bankruptcy Reform Act, section 11e gave liquidating trustees two years within which to initiate preference and fraudulent conveyance actions. However, this period was tolled during the pendency of a reorganization case. This was true even though the trustee or debtor in possession had the power under Chapters X, XI, and XII to initiate preference and fraudulent conveyance actions. It was against this background that the Commission on the Bankruptcy Laws of the United States commenced its work in the early 1970s.

The Commission's section 7-201(b) provided, as to the debtor, that "the debtor shall have all the rights and exercise all the powers of the trustee under subdivision (a) and under this chapter, subject to such limitations and conditions as the administrator or the court may prescribe."[147] As indicated in Note 2 to the Commission's proposed section:

> Subdivision (b), is derived from §§ 188, 342, and 444 of the [Bankruptcy] Act. . . . Until a trustee or receiver is appointed, the debtor has all the rights and powers of a trustee appointed under [the reorganization chapter]. These rights and powers are, however, subject to the control of the administrator and the court. Under prior reorganization law, section 188, 342, and 444, granted the debtor the title and vested the debtor with the rights, subject to the duties, and all the powers of a trustee "subject, however, at all times to the control of the judge and to such limitations, restrictions, terms, and conditions as the judge may from time to time prescribe."[148]

The House and Senate versions of section 7-201(b) were enacted as section 1107(a) of the Bankruptcy Code. The relevant legislative history is found in the House and Senate Reports, which state:

> This section places a debtor in possession in the shoes of a trustee in every way. The debtor is given the rights and powers of a chapter 11 trustee. He is required to perform the functions and duties of a chapter 11 trustee (except the investigative duties). He is also subject to any limitations on a chapter 11 trustee, and to such other limitations and conditions as the court prescribes . . . .[149]

---

146. *Id.* at 66 (citations omitted).
147. 1973 COMMISSION REPORT, *supra* note 16, at 68.
148. *Id.* at 235.
149. S. REP. No. 989, 95th Cong., 2nd Sess. 116 (1978), *reprinted in* 1978

There is nothing in this language—other than the reference to the "limitations on a chapter 11 trustee"—to suggest that Congress intended in any way to impose a statute of limitations on preference and fraudulent conveyance actions commenced by debtors in cases in which trustees are not appointed.

The Commission also incorporated the extension provisions of section 11e of the Bankruptcy Act in its proposed section 4-102(a),[150] which later became section 108. However, the Commission neglected to include, probably through oversight, the judicial construction given section 11e by *Herget*. The Senate rectified this omission by adding a limitation on avoidance actions in subdivision (c) to its version of section 546, which, with changes not relevant here, ultimately became section 546(a)(1).[151] The legislative history states simply: "Subsection (c) adds a statute of limitations to the use by the trustee of the avoiding powers. The limitation is two years after his appointment, or the time the case is closed or dismissed, whichever occurs later."[152]

Because section 103(b) makes section 546(a)(1) applicable to reorganization cases[153] and because the tolling provisions of Chapters X, XI, and XII of the Bankruptcy Act were not carried over into Chapter 11 of the Code, the Code departs from prior reorganization law. It is clear that if a trustee is appointed, the two-year limitation period on preference and fraudulent conveyance actions in a reorganization begins to run when the trustee is appointed, and that such claims are barred when a case is closed or dismissed. Clearly Congress eliminated the tolling provisions as to the trustee. It concluded that the trustee must initiate suit within the two-year period, but that was the only change. It is equally clear that Congress did not intend to go further and eliminate the tolling provisions that have existed since the first corporate reorganization statute that allowed the debtor to remain in possession. Nor did Congress intend to overrule prior case law. The Supreme Court has repeatedly emphasized its reluctance "to accept arguments that would interpret the [Bankruptcy] Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history."[154]

---

U.S.C.C.A.N. 5787, 5902; H.R. REP. No. 595, 95th Cong., 1st Sess. 404 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6360.

150. 1973 COMMISSION REPORT, *supra* note 16, at 68.

151. S. 2266, 95th Cong., 2nd Sess. § 546(c) (1978) (codified as amended at 11 U.S.C. § 546(a)(1) (1988)).

152. S. REP. No. 989, 95th Cong., 2nd Sess. 87 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5873.

153. 11 U.S.C. § 103(a) (1988).

154. Dewsnup v. Timm, 112 S. Ct. 773, 779 (1992); Midlantic Nat'l Bank v. New

Clearly, section 1107(a) gives a debtor in possession the powers of a trustee. The issue is whether the time limitation in section 546(a)(1), which by its terms applies only to trustees, also applies to debtors in possession. Courts which have found that the time limitation does apply to debtors in possession have unilaterally instituted a dramatic reversal of prior reorganization law that can be explained only by a misinterpretation of section 1107(a) and the relevant legislative history.

Section 1107(a) was not created out of whole cloth in 1978. Similar language was used in the reorganization chapters of the Bankruptcy Act, and that language basically was carried over into Chapter 11. The analogous sections in these earlier statutes had nothing whatsoever to do with the time to sue. The only change in 1978 was to make the *powers* of the debtor in possession, which had been subject to limitations imposed by the court, subject to the limitations imposed under Chapter 11 as well.

The 1978 Code added additional references to "limitations," but it did not change the meaning of the word "limitations" as it was used in section 1107(a)'s predecessors. It was a limitation on the *power of a trustee to sue*, not a statute of limitations or a prescription of the time within which to sue. The time within which to sue was found in another section of the Bankruptcy Act—section 11e—and it was tolled in reorganization cases.[155] Section 546(a)(1) operates the same way, with only one significant change: The time within which a trustee must sue runs even while the reorganization case is pending, but the change applies only to a trustee. The prior reorganization rule as to a debtor in possession remains the same; there simply is no time limitation running while the debtor in possession administers a Chapter 11 reorganization. Until 1990, no court had held otherwise.

Prior to 1990 courts held time and again that section 546(a)'s two-year limitation applied only to trustees appointed pursuant to one of the sections enumerated in the statute.[156] This "prevailing view"[157] was

Jersey Dep't of Envtl. Protection, 474 U.S. 494, 501 (1986) (citing Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 266-67 (1979)) ("The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific. The Court has followed this rule with particular care in construing the scope of bankruptcy codifications."). In Grogan v. Garner, 111 S. Ct. 654 (1991), the Supreme Court looked to the prior statute for guidance and stated that "[a]bsent a·clear indication from Congress of a change in policy, it would be inconsistent with the earlier expression of congressional intent to construe the exceptions to allow some debtors facing fraud judgments to have those judgments discharged." *Id.* at 661.

155. *See supra* notes 138-48 and accompanying text.

156. *See, e.g.,* Mahoney, Trocki & Assocs., Inc. v. Kunzman (*In re* Mahoney, Trocki & Assocs., Inc.), 111 B.R. 914, 918 (Bankr. S.D. Cal. 1990) ("It is clear that § 546(a)(1) is inapplicable to a debtor-in-possession."); Alithochrome Corp. v. East Coast Finishing

summarized in *Collier on Bankruptcy* as follows:

> Note that the two year limitation period runs from the appointment of a trustee under section 702, 1104, 1163, 1302, or 1202. Thus, if a debtor in possession is serving in a case under chapter 11 and no trustee has been appointed, the two year period arguably would not begin to run unless and until a trustee is appointed. The better view is that section 1107(a), which gives the debtor powers of a trustee and subjects the debtor in possession to the limitations placed on a trustee, does not equate service of the debtor in possession with the appointment of a trustee for the purposes of section 546(a).[158]

Moreover, section 546(a) escaped the Bankruptcy Amendments and Federal Judgeship Act of 1984 unchanged.[159] At the time Congress was considering the 1984 amendments there were at least two reported decisions which held that section 546(a)(1) does not apply to debtors in possession.[160] This is some evidence that the *Zilkha* construction does not square with congressional intent.[161]

In *Lill v. Bricker (In re Lill)*,[162] however, the court, without any discussion or authority, reached the same conclusion that the *Zilkha* court did.[163] And after *Zilkha* the courts in *Sparmal Enterprises, Inc. v. Moffit Realty Corp. (In re Sparmal Enterprises, Inc.)*[164] and *Construction Management Services, Inc. v. Manufacturers Hanover Trust*

---

Sales Corp. (*In re* Alithochrome Corp.), 53 B.R. 906, 909 (Bankr. S.D.N.Y. 1985) ("Alithochrome properly argues that that two year statute of limitations does not apply to preference actions brought by a Chapter 11 debtor in possession.").

157. Boatman v. E.J. Davis Co. (*In re* Choice Vend, Inc.), 49 B.R. 719, 720 (Bankr. D. Conn. 1985).

158. 4 COLLIER ON BANKRUPTCY ¶ 546.02, at 546-10 to -11 (Lawrence P. King et al. eds., 15th ed. 1991) (footnote omitted); *see id.* at 546-11 n.9 ("Section 546(a)(1) is inapplicable to debtors in possession; thus a debtor in possession may commence a suit to recover a preference more than two years after the filing of the petition.").

159. *See* Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, sec. 351, § 546(c)-(e), 98 Stat. 333, 358-59.

160. Edleman v. Gleason (*In re* Silver Mill Frozen Foods, Inc.), 23 B.R. 179, 181 (Bankr. W.D. Mich. 1982); One Mktg. Co. v. Addington & Assocs. (*In re* One Mktg. Co.), 17 B.R. 738, 739 (Bankr. S.D. Tex. 1982).

161. *See* Korvettes, Inc. v. Sanyo Elec., Inc. (*In re* Korvettes, Inc.), 67 B.R. 730, 733 (S.D.N.Y. 1986); *Choice Vend*, 49 B.R. at 721 ("It may be presumed Congress was aware of this interpretation and desired no change."); *see also* Air Transp. Ass'n of Am. v. Professional Air Traffic Controllers Org., 667 F.2d 316, 321 (2d Cir. 1981) ("[Courts] can presume that Congress is aware of settled judicial constructions of existing law, and that it intends to retain those remedies that it has left in place." (citation omitted)).

162. 116 B.R. 543 (Bankr. N.D. Ohio 1990).

163. *Lill* was decided before *Zilkha*. Thus, the court had no authority and cited none; it relied on its own two sentence analysis of the interplay between § 546(a)(1) and § 1107(a). *Id.* at 546.

164. 126 B.R. 559 (S.D. Ind. 1991).

Co. (*In re Coastal Group, Inc.*)[165] chose to ignore the "prevailing view" and follow *Zilkha*. The most recent pronouncements on the subject, however, considered all four decisions and rejected them.[166] The *Zilkha* view has been rejected not only because of its inconsistency with the language of the statute and legislative history but for policy reasons that were well summarized by the district court in *Korvettes*:

> As the authorities that have considered the question have recognized, this conclusion is well-grounded in policy. The respective duties of a debtor in possession and a trustee make application of the two year rule inappropriate to constrain a debtor in possession. While a debtor in possession continues the operation of the business, a trustee appointed pursuant to 11 U.S.C. § 704 is responsible for the expeditious liquidation of the estate in order to protect the interest of the creditors. While a trustee's tasks include pursuing preferential transfer claims in furtherance of liquidation of assets, a debtor in possession traditionally will not attack ancillary issues such as preferences until it has dealt with reorganization.[167]

Section 546(a)(1) explicitly provides that trustees have two years from the date of their appointment to bring an action under sections 544 or 548 of the Code. Any contrary interpretation is flatly inconsistent with the language of the statute and with all prior case law interpreting it.[168] If section 546 imposed a two-year limitation upon all claims, it could very easily and simply have said that "an action or proceeding under section 544 . . . may not be commenced after two years from the date of the filing of the petition." That, however, is not what section 546 says.

---

165. 125 B.R. 730 (Bankr. D. Del. 1991).

166. *E.g.* Caplan v. United States Brass & Copper Co. (*In re* Century Brass Prods., Inc.), 127 B.R. 720, 721 (Bankr. D. Conn. 1991) ("The law in this circuit, with which this court concurs, convincingly rebuts the *Zilkha* analysis."); United States Lines, Inc. v. United States (*In re* McLean Indus., Inc.), 132 B.R. 247 (Bankr. S.D.N.Y. 1991); Mancuso v. Continental Bank Nat'l Ass'n (*In re* Topcor, Inc.), 132 B.R. 119 (Bankr. N.D. Tex. 1991); Pate v. Hunt (*In re* Hunt), 136 B.R. 437 (Bankr. N.D. Tex. 1991); Pullman Constr. Indus., Inc. v. National Steel Serv. Center (*In re* Pullman Constr. Indus., Inc.), 132 B.R. 359, 363 (Bankr. N.D. Ill. 1991) ("Use of the term 'limitation' in § 1107(a) plainly does not mean 'statute of limitations.' The Congress would have used the latter phrase if that was intended, for 'statute of limitations' is a term of art with readily understood meaning."); Katon v. International Bank (*In re* Tamiami Range & Gun Shop, Inc.), 130 B.R. 617 (Bankr. S.D. Fla. 1991).

167. *Korvettes*, 67 B.R. at 733-34.

168. *See, e.g.*, Edleman v. Gleason (*In re* Silver Mill Frozen Foods, Inc.), 23 B.R. 179, 181 (Bankr. W.D. Mich. 1982) ("The statute is clear that the two year limitation runs from the date the trustee is appointed, not the date the case is filed."); 4 COLLIER ON BANKRUPTCY, *supra* note 158, at 546-11 ("If a trustee is appointed in a case under chapter 11 or in a case converted from chapter 11, he will have two years from the date of his appointment to commence actions pursuant to § 546(a).").

The court in *Coastal Group* distinguished cases in which trustees had been appointed from those in which no trustee had been appointed.[169] The *Zilkha* court specifically declined to take a position on that issue but indicated that its conclusion might be different in the case of a subsequently appointed trustee.[170] It did so, both by citing a case in which the court rejected the very argument[171] and by acknowledging that the appointment of a trustee is "a distinguishable circumstance requiring a different analysis."[172]

In *Boatman v. E.J. Davis Co. (In re Choice Vend, Inc.)*,[173] the case cited by the *Zilkha* court, a voluntary Chapter 11 case was filed on December 21, 1981. A trustee was appointed on February 7, 1983, and a section 547 suit was filed on September 26, 1984.[174] The defendant argued that "the two-year period referred to in § [546(a)(1)] starts when a voluntary petition is filed," and hence the trustee's suit was barred.[175] The court flatly rejected the defendant's argument "as unsupported and contrary to the clear language of the statute."[176] If the two year limitation began to run on the date the bankruptcy petition is filed, it would produce wildly and intolerably disparate results in fraudulent conveyance cases because the time available for suits by trustees would vary from one case to the next.

A Chapter 11 debtor normally is more interested in preserving relationships and thus has little incentive to pursue preference and fraudulent conveyance actions. This incentive is further lessened because "the debtor in possession and the debtor who made the preferential transfer being one and the same, there may be no inclination to

---

169. *Coastal Group*, 125 B.R. at 731-32.

170. Zilkha Energy Co. v. Leighton, 920 F.2d 1520, 1524 n.11 (10th Cir. 1990).

171. *Id.* (citing Boatman v. E.J. Davis Co. (*In re* Choice Vend, Inc.), 49 B.R. 719, 720 (Bankr. D. Conn. 1985)).

172. *Id.*

173. 49 B.R. 719 (Bankr. D. Conn. 1985).

174. *Id.* at 720 & n.1.

175. *Id.* at 720.

176. *Id.; accord* One Mktg. Co. v. Addington & Assocs. (*In re* One Mktg. Co.), 17 B.R. 738, 739-40 (Bankr. S.D. Tex. 1982) ("If the statute of limitations is allowed to run before the appointment of an independent trustee, this might harm other creditors.").

> Without this approximate two-year period, a trustee who does not immediately determine what potential claims are available for the recovery of assets may forever be barred from asserting those claims if the statute of limitations expires early in the bankruptcy, or potentially before the trustee is even appointed. Such would contravene the broad powers Congress has granted to the trustee under §§ 544, 547 and 548 of the Code to recover property for the benefit of the estate.

Rosania v. Haligas (*In re* Dry Wall Supply, Inc.), 111 B.R. 933, 937 (Bankr. D. Colo. 1990).

seek a return of the preferential transfer."[177]

Several courts have held that section 546(a) extends the time for bringing avoidance actions if the state statute of limitations has not yet run at the time the bankruptcy petition is filed.[178] However, Judge Abramson held in *Lynn v. NCNB Texas National Bank (In re Corland Corp.)*[179] that section 546 does not extend the running of the state statute of limitations. Judge Abramson's decision was based, at least in part, on two concerns. First, he noted that the plaintiffs had not cited any cases in which a court had held that section 546(a) extends a state statute of limitations.[180] Second, Judge Abramson was concerned that a contrary holding "would render the provisions of 11 U.S.C. § 108(a) meaningless at least in bankruptcy cases filed where trustees are appointed. In such instances, section 546(a) would always control regardless of whether or not the limitations period found in section 108 had expired."[181] In *Mahoney, Trocki & Assocs., Inc. v. Kunzman (In re Mahoney, Trocki & Assocs., Inc.)*[182] the court answered the second concern by pointing out that section 108 does not apply at all because a fraudulent transfer action maintained under section 544(b) is "clearly the creation of the Bankruptcy Code," and section " '108(a) refers to pre-filing causes of action belonging to the debtor and not to a cause of action created by the Bankruptcy Code.' "[183] Therefore, when the issue next came before him, Judge Abramson reversed himself and held that section 546(a) controls when the state statute has not run prior to the filing of the petition.[184]

In *Pate v. Hunt (In re Hunt)*[185] Nelson Bunker Hunt and William Herbert Hunt filed Chapter 11 cases on September 21, 1988. Reorgani-

---

177. *One Marketing*, 17 B.R. at 739.

178. *Dry Wall Supply*, 111 B.R. at 936 ("[A]s long as the state law statute of limitations has not run before the debtor's filing for bankruptcy, the trustee can bring a fraudulent conveyance action as long as he complies with the provisions of § 546(a)."); Mahoney, Trocki & Assocs., Inc. v. Kunzman (*In re* Mahoney, Trocki & Assocs., Inc.), 111 B.R. 914, 920 (Bankr. S.D. Cal. 1990) ("So long as the statute of limitations has not run at the filing of the petition, the trustee may then utilize the provisions of § 546(a)."); *see In re* Revco D.S., Inc., 118 B.R. 468, 498 (Bankr. N.D. Ohio 1990) (appendix) ("[T]he weight of authority supports the proposition that as long as the statute of limitations has not run as of the date of the filing of the petition, section 546(a) acts to extend the time to bring the cause of action.").

179. Adv. No. 388-3529 (Bankr. N.D. Tex. Aug. 3, 1989).

180. *Id.* at 17.

181. *Id.* at 17-18.

182. 111 B.R. 914 (Bankr. S.D. Cal. 1990).

183. *Id.* at 920 (quoting Andrew v. Coopersmith (*In re* Downtown Inv. Club III), 89 B.R. 59, 65 (Bankr. 9th Cir. 1988)).

184. Mancuso v. Continental Bank Nat'l Ass'n (*In re* Topcor, Inc.), 132 B.R. 119, 124 (Bankr. N.D. Tex. 1991).

185. 136 B.R. 437 (Bankr. N.D. Tex. 1991).

zation plans were confirmed in the cases in December of 1989. Under the plans assets and causes of action were transferred to liquidating trusts. On June 11, 1991, the trustees of the liquidating trusts initiated adversary proceedings in the bankruptcy cases seeking to avoid transfers under sections 544 and 548 of the Bankruptcy Code and to recover the properties transferred or their value.[186] The defendants included the debtors' relatives and "trustees of trusts created for the benefit of the Debtors' children and grandchildren," along with certain corporate, general partnership, and limited partnership entities in which the individual defendants or their trusts had ownership interests.[187]

Motions to dismiss were urged by defendants who asserted that the claims were time barred by state statutes of limitations and section 546(a) of the Bankruptcy Code. The independent trustees had been appointed pursuant to the plans in January 1990, and the fraudulent transfer actions were filed in June 1991. Thus, more than two years had expired between the date of the filing of the bankruptcy cases and the filing of the fraudulent transfer actions, but only one year and six months had expired between the trustees' appointments and the filing of the fraudulent transfer actions. If section 546(a) controlled and the two-year period within which actions under sections 544 and 548 can be brought commenced running at the date of the filing of the Chapter 11 cases, the fraudulent transfer actions were time barred.

Because many millions of dollars worth of properties and cash had been transferred, this was a significant matter but not one of first impression before Judge Abramson. He had decided *Mancuso v. Continental Bank National Ass'n (In re Topcor, Inc.)*[188] approximately two months earlier. In *Topcor* Judge Abramson held that section 108 of the Bankruptcy Code does not control the time within which a section 544(b) avoidance claim can be brought[189] and that the time period in section 546(a) does not begin to run upon the filing of the petition but upon the appointment of a trustee.[190]

---

186. *Id.* at 440-41.
187. *Id.* at 440.
188. 132 B.R. 119 (Bankr. N.D. Tex. 1991).
189. *Id.* at 125-26.
190. *Id.* at 124. In support of his holding, Judge Abramson made the following observations:

Limitations periods are intended to apprise defendants of any adverse claims against them by preventing plaintiffs from sleeping on their rights to the detriment of the defendants. *See Crown Cork & Seal Co. v. Parker*, 462 U.S. 345, 352, 76 L. Ed. 2d 628, 103 S. Ct. 2392 (1983). The Court notes that this purpose is not unduly frustrated by giving the Trustee two years from the date of his appointment to bring any fraudulent transfer actions. The Court also notes that several compelling reasons support Congress' decision to provide trustees two years to commence any avoidance actions.

746           SOUTH CAROLINA LAW REVIEW           [Vol. 43

In *Hunt* Judge Abramson considered not only *Zilkha* but also its progeny, which at that time included *Sparmal Enterprises* and

---

The most evident reason for providing trustees two years to bring avoidance actions is to ensure that the trustee has ample time to investigate any potential claims and causes of action for the estate. *In re Dry Wall Supply, Inc.*, 111 B.R. at 936-37. In *Dry Wall Supply*, the Colorado District Court stated that, "[w]ithout this two year period, a trustee who does not immediately determine what potential claims are available for the recovery of assets may forever be barred from asserting those claims if the statute of limitations expires early in the bankruptcy, or potentially before the trustee is even appointed." *Id.* at 937. The opportunity to investigate potential claims is not the only consideration in allowing trustees an additional limitations period for filing such actions.

Another reason to provide trustees with a two year limitation period is the way many bankruptcy proceedings progress. Often, a debtor will file a bankruptcy petition under Chapter 11 of the Code, and the case will remain open for years before a Chapter 11 trustee is appointed or the case is converted to Chapter 7. In such instances, unless the court orders otherwise, the creditors of the estate are dependent upon the Debtor in Possession to bring any avoidance claims on their behalf. *Nebraska State Bank v. Jones*, 846 F.2d 477, 478 (8th Cir. 1988) (only trustees, and not creditors, have standing to bring § 544(b) avoidance actions); *See also In re Hansen*, 114 B.R. at 932.

The very nature of Chapter 11 proceedings demonstrates the problems with the *Zilkha* holding that the two year limitations period provided by § 546(a) begins to run from the date the bankruptcy petition is filed. In a Chapter 11 case, the Debtor in Possession is concerned primarily with rehabilitating the company by developing a confirmable plan of reorganization. The Debtor in Possession negotiates with the creditors of the estate regarding the treatment they will receive under the plan, and ultimately, it is the creditors who vote to accept or reject the plan. The Debtor in Possession may decide during this negotiation period to compromise, settle, or abandon any avoidance actions. Therefore, even though both a Debtor in Possession and a trustee have fiduciary responsibilities to the estate, the recovery of preferential transfers is more likely to occur with a trustee.

Furthermore, the Debtor in Possession has less incentive to bring an avoidance action, since the Debtor is the one who made the preferential transfer in the first place. *Perlstein v. Saltzstein (In re AOV Indus., Inc.)*, 62 B.R. 968, 974 (Bankr. D.C. 1986). Therefore, sound policy calls for providing trustees an additional two years from the date of appointment to bring any § 544(b) actions.

The Court also points out that its holding is in accord with the general policy of the Code to provide trustees broad avoidance powers to maximize the value of the estate for the benefit of all creditors. *See American Nat'l Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266, 1275 (5th Cir.1983). Furthermore, numerous courts have held that *each* trustee appointed under the enumerated provisions of § 546(a) has two years within which to commence avoidance actions. *Smith v. Moody (In re Moody)*, 77 B.R. 566, 573-74 (S.D.Tex.1987), *aff'd*, 862 F.2d 1194 (5th Cir.1987) (limitations period under § 546(a) runs anew with each successive trustee appointed).

*Id.* at 124-25 (footnote omitted).

*Coastal Group.* Judge Abramson concluded that the cases were decided wrongly and that "Congress made it perfectly clear that § 546(a)(1) applies only to trustees appointed under specifically enumerated sections of the Code."[191]

---

191. Pate v. Hunt (*In re* Hunt), 136 B.R. 437, 447 (Bankr. N.D. Tex. 1991). The court stated:

> The decisions relied upon by the Defendants generally begin with a determination that § 546(a) is ambiguous, thereby allowing the courts to construe the statute. Then, the courts generally follow a two-part analysis. First, the courts equate a debtor-in-possession with a Chapter 11 trustee by citing § 1107(a) of the Code. In finding that § 546(a)(1) applies to debtors in possession, the Delaware bankruptcy court emphasized that the debtor-in-possession is subject to any limitations applicable to a Chapter 11 trustee. *In re Coastal Group, Inc.*, 125 B.R. at 732.
>
> Secondly, the courts address the issue of whether a debtor-in possession is subject to the same two year statute of limitations as an appointed trustee. The Tenth Circuit stated:
>
> > We do not believe that Congress intended to limit actions filed by an appointed trustee to two years without making the same restriction apply to a debtor in possession who is the functional equivalent of an appointed trustee. Because of the virtual identity of function between a trustee and a debtor in possession, there would be no reason to create a different limitation period for the filing of actions by the two fiduciaries. Moreover, when the balance of § 546 is considered, it is even more apparent that Congress intended for the word "trustee" to apply to a debtor in possession, for every reference to actions brought by a trustee contained in § 546 obviously applies to actions brought by a debtor in possession. A contrary analysis would deprive § 546 of significance in the majority of recovery actions filed in Chapter 11 cases.
> >
> > Consequently, we construe § 546(a)(1) to apply to actions filed by a debtor in possession, and we believe the period of limitation begins to run from the date of the filing of a petition for reorganization under chapter 11. We reach that conclusion because the debtor becomes a debtor in possession on that date.
>
> *Zilkha*, 920 F.2d at 1524. Although it has been followed by a few courts, *Zilkha* is contrary to the majority of cases that have addressed § 546(a)(1). This Court declines to follow the *Zilkha* analysis for the reasons set out below.
>
> (b) The Statute is Unambiguous
>
> Initially, this Court finds the wording of § 546(a)(1) unambiguous. If it had intended for the word "trustee" to apply to a debtor-in-possession as the Tenth Circuit Court of Appeals believed, Congress could have made it clear by including the words "debtor-in-possession" or referring to the "date of the petition". [sic] Instead, Congress made it perfectly clear that § 546(a)(1) applies only to trustees appointed under specifically enumerated sections of the Code. Where the statute's language is unambiguous, the inquiry into the meaning of the statute should begin and end with its language, and the Court's sole function is to enforce it according to its terms. *United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 241 (1989), *citing Caminetti v. United States*, 242 U.S. 470, 485 (1917). This Court agrees with the district court in *Korvettes, Inc. v. Sanyo Elec., Inc. (In re Korvettes, Inc.)*, 67 B.R. 730 (S.D.N.Y. 1986) that:

Also, Judge Abramson found that *Zilkha* was inconsistent with the Fifth Circuit's decision in *MortgageAmerica Corp. v. American Federal Savings and Loan (In re MortgageAmerica Corp)*,[192] in which the court stated that "the limitations period under section 546(a) should commence consistent with the appointment of the trustee through a written order."[193]

Judge Abramson's opinion is particularly persuasive because of its observations about the distinction between a trustee and a debtor in possession, which of course goes to the heart of the matter.

> This Court also disagrees with the Tenth Circuit Court of Appeals' view that § 546(a)(1) should apply to debtors in possession as well as trustees because of the "virtual identity of function between a trustee and a debtor-in-possession." *Zilkha*, 920 F.2d at 1524. Although many of the powers and duties of a trustee are granted to or imposed upon a debtor-in-possession, they are distinct entities, often operating under different agendas. A debtor-in-possession is concerned primarily with rehabilitating the company by developing a confirmable plan of reorganization. The debtor-in-possession negotiates with the creditors of the estate regarding the treatment they will receive under the plan, knowing that ultimately it is the creditors who vote to accept or reject the plan. The debtor-in-possession may decide during this negotiation period to compromise, settle, or abandon any avoidance actions, or may simply let potential claims lie until after a plan is confirmed.
>
> A Chapter 11 trustee, however, is primarily interested in obtaining the maximum return possible for the estate's creditors. In order to achieve this result, a trustee generally will be more diligent in pursuing any possible avoidance actions. Even though both a debtor-in-possession and a trustee have fiduciary responsibilities to the estate, a trustee is more likely to pursue voidable transfers. Further-

---

> [a]t the time Congress amended the Bankruptcy Code in 1984, several cases had interpreted subsection 546(a)(1)'s two year time bar as starting to run only after a trustee is appointed, and as inapplicable to debtors in possession. Congress' failure to amend subsection 546(a)(1) to include debtors in possession supports the view that that subsection does not apply to them. *See Air Transport Association of America v. PATCO*, 667 F.2d 316, 321 (2d Cir. 1981) (court can "presume that Congress is aware of settled judicial constructions of existing law . . . and that it intends to retain those remedies that it has left in place"), cited in *In re Choice Vend, supra,* 49 B.R. at 721.

> *In re Korvettes,* 67 B.R. at 733.

*Id.* at 446-47 (parallel citations omitted) (footnotes omitted).

192. 831 F.2d 97 (5th Cir. 1987) (per curiam).

193. *Id.* at 98; *see also* Chapman v. Cardell Cabinets, Inc. (*In re* Nash Phillips/Copus-Houston, Inc.), 114 B.R. 466 (Bankr. W.D. Tex. 1990) (holding that for purposes of § 546 a trustee is appointed on the date the order approving the appointment is entered on the docket unless the order indicates a *nunc pro tunc* appointment).

more, while a trustee is specifically required to investigate the affairs of the debtor and file a statement of the results of such investigation, including any causes of action available to the estate, a debtor-in-possession is not required to perform such duties. Therefore, the Tenth Circuit's conclusion that a debtor-in-possession is the "functional equivalent" of an appointed trustee is theoretically correct, but not in synch with real life.

Furthermore, a debtor-in-possession has less incentive to bring an avoidance action, since the debtor is the one who made the questioned transfer in the first place. This rationale clearly applies in this case. It is doubtful that the Debtors in Possession would have any incentive to bring any of the claims alleged in the Complaints if the Debtors made the alleged transfers to their relatives and affiliates. Therefore, sound policy justifies Congress having provided trustees two years from the date of appointment to bring any avoidance actions, while not limiting all avoidance actions to two years from the petition date. This Court concludes that the *Zilkha* line of cases are incorrect in holding that the two year limitations period in § 546(a)(1) applies to debtors in possession.[194]

Turning to the applicability of the state statutes of limitations, Judge Abramson felt that such statutes were relevant only to the issue of whether the claim was time barred prior to bankruptcy. If it was not, then section 546(a) "supersedes the state statute of limitations" and controls "since it provides a specific time within which a § 544 claim can be brought."[195] Moreover, Judge Abramson went on to hold that even those fraudulent transfer claims that would have been time barred prior to the filing of the bankruptcy cases were not subject to state statutes of limitations because state statutes of limitations do not run against the federal government.[196] Because the United States had an allowable unsecured claim in *Hunt* and was in a position to set aside the transfers in question, the running of the statute of limitations under the UFCA was not a defense. The UFTA attempts to reverse this rule by providing that the expiration of the prescribed period "bars the right rather than the remedy on expiration of the statutory periods prescribed."[197] Under section 544(b) of the Bankruptcy Code, however, the representative of creditors (the trustee or debtor in pos-

---

194. *Hunt*, 136 B.R. at 447-48 (footnotes omitted) (citation omitted).

195. *Id.* at 450.

196. *Id.* at 450-51; *accord* United States v. Parker House Sausage Co., 344 F.2d 787, 788 (6th Cir. 1965) (per curiam) (holding that state statutes of limitations do not run against the IRS); United States v. Gleneagles Inv. Co., 565 F. Supp. 556, 583 (M.D. Pa. 1983), *aff'd sub nom.* United States v. Tabor Court Realty Corp., 803 F.2d 1288 (3d Cir. 1986), *cert. denied*, 483 U.S. 1005 (1987); *see* Kennedy, *supra* note 36, at 684.

197. UNIF. FRAUDULENT TRANSFER ACT prefatory note, 7A U.L.A. 642 (1991); *see id.* § 9 cmt. 1, 7A U.L.A. at 665-66.

session) steps into the shoes of the United States of America and therefore is not bound by state statutes of limitations.[198]

Judge Abramson had previously ruled in *Lynn v. NCNB Texas National Bank, N.A. (In re Corland Corp.)*[199] that the state statute of limitations controlled, but that section 108(a) of the Bankruptcy Code extended the state limitations period to at least two years after the filing of the bankruptcy case. Judge Abramson had expressly rejected the argument that section 546(a) controlled, concluding that section 546(a) "merely acts as an additional limitation period in respect of a trustee's ability to bring certain avoidance actions."[200] However, in *Topcor* Judge Abramson backed off his holding in *Corland*, and at the time of *Hunt*, Judge Abramson was of the opinion that section 546(a) controlled the time limitations on avoidance actions brought under sec-

---

198. The *Hunt* court stated:

Plaintiffs are asserting avoidance actions on behalf of the estate for the benefit of all creditors (including the IRS). *See American Nat'l. Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266, 1275 (5th Cir. 1983) (the trustee in an avoidance action acts for the benefit of all creditors). It is well settled that the United States is not bound by state statutes of limitation. *United States v. Summerlin*, 310 U.S. 414 (1940). Furthermore, the government utilizes state law in an action to set aside a fraudulent conveyance. Therefore, the question is whether a trustee, or similar party such as Plaintiffs as representatives of the estates in this proceeding, who acquires the status of an actual unsecured creditor for purposes of § 544(b) is immune from state statutes of limitations when utilizing the status of the United States as an unsecured creditor under § 544(b).

Section 544(b) of the Code creates a power of avoidance in a trustee to avoid any transfer that an actual unsecured creditor of the debtor as of the date of the petition could have avoided. For purposes of the dismissal motions, the Court must accept as true Plaintiffs' allegations in the Complaints that the United States of America was an actual unsecured creditor of the Debtors as of the petition date. *Kaiser Aluminum*, 677 F.2d at 1050. Furthermore, § 544(b) permits a trustee to "stand in the shoes of a creditor" to assert any state law claims that a creditor may have. *Kupetz v. Wolf*, 845 F.2d 842, 845 (9th Cir.1988). Therefore, this Court concludes that Plaintiffs are not barred by the applicable state statutes of limitations since they acquired the status of the United States pursuant to § 544(b) of the Code. *United States v. Gleneagles Investment Co., Inc.*, 565 F.Supp. 556, 583 (M.D. Pa. 1983), *aff'd sub. nom., United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986), *cert. denied, McClellan Realty Co. v. United States*, 483 U.S. 1005 (1987) (trustee's claim asserted on behalf of the United States was not barred by the state statute of limitations since the trustee was empowered to assert the rights of the United States as a creditor). Finally, if a transfer is avoidable at all by any creditor, it is avoidable in full for all creditors. *Abramson v. Boedeker*, 379 F.2d 741, 748 n.16 (5th Cir. 1967), *cert. denied*, 389 U.S. 1006 (1967).

*Hunt*, 136 B.R. at 450-51 (parallel citations omitted) (footnotes omitted).

199. Adv. No. 388-3529 (Bankr. N.D. Tex. Aug. 3, 1989).

200. *Id.* at 17.

tions 544(a), 548, and 550(a). Thus, he concluded that the language of section 108(a) controls only those causes of action owned by the debtor prior to bankruptcy. Section 108(a) provides that if the applicable state law sets a time "within which the debtor may commence an action, and such period has not expired before" the bankruptcy petition is filed, the trustee can bring the action before the latter of the end of the applicable state law time period or two years after the case is filed.[201] Clearly, section 108(a) relates only to actions that may be initiated by the debtor. Fraudulent transfer actions under state law or section 548 of the Bankruptcy Code, which only the trustee can bring, are not actions that could be commenced by the debtor prior to the filing of the bankruptcy case. Thus, Judge Abramson recognized the error he had made in *Corland*, corrected his position in *Topcor*, and reemphasized the correct rule in *Hunt*.

## VI. BANKRUPTCY CODE SECTION 546(e): A SAFE HARBOR FOR LEVERAGED BUYOUTS?

It has been less than ten years since the *Gleneagles* case lit up the corporate firmament.[202] In the six years that have passed since the Third Circuit's affirmance of most of the district court's rulings in its three *Gleneagles* decisions,[203] much has taken place in the world of fraudulent transfers and LBOs. Although some courts have been reluctant to apply fraudulent transfer law to LBOs,[204] it is now well accepted that the UFCA, UFTA, and section 548 of the Bankruptcy Code apply to LBOs.[205] In adversary proceedings that arose in the *Kai-*

---

201. 11 U.S.C. § 108(a) (1988).

202. United States v. Tabor Court Realty Corp., 803 F.2d 1288 (3d Cir. 1986), *cert. denied*, 483 U.S. 1005 (1987).

203. United States v. Gleneagles Inv. Co., 584 F. Supp. 671 (M.D. Pa. 1984); United States v. Gleneagles Inv. Co., 571 F. Supp. 935 (M.D. Pa. 1983); United States v. Gleneagles Inv. Co., 565 F. Supp. 556 (M.D. Pa. 1983), *aff'd sub nom.* United States v. Tabor Court Realty Corp., 803 F.2d 1288 (3d Cir. 1986), *cert. denied*, 483 U.S. 1005 (1987).

204. *See* Kupetz v. Continental Ill. Nat'l Bank & Trust Co., 77 B.R. 754, 759-60 (C.D. Cal. 1987), *aff'd sub nom.* Kupetz v. Wolf, 845 F.2d 842 (9th Cir. 1988); Credit Managers Assoc. v. Federal Co., 629 F. Supp. 175 (C.D. Cal. 1986). This hostility is shared by a few commentators. *See* Douglas G. Baird, *Fraudulent Conveyances, Agency Costs and Leveraged Buyouts*, 20 J. LEG. STUD. 1 (1990); Douglas G. Baird & Thomas H. Jackson, *Fraudulent Conveyance Law and Its Proper Domain*, 38 VAND. L. REV. 829, 850-55 (1985).

205. Many cases and much commentary recognize the applicability of laws governing fraudulent transfers to leveraged buyouts. *See* Lippi v. City Bank, 955 F.2d 599 (9th Cir. 1992); Voest-Alpine Trading USA Corp. v. Vantage Steel Corp., 732 F. Supp. 1315 (E.D. Pa. 1989); Weiboldt Stores, Inc. v. Schottenstein, 94 B.R. 488 (N.D. Ill. 1988); United States v. Gleneagles Inv. Co., 565 F. Supp. 556 (M.D. Pa. 1983), *aff'd sub nom.*

*ser Steel* Chapter 11 case, however, the Tenth Circuit recently closed the door to recovery in bankruptcy from stockholders who are stockbrokers[206] or represented by stockbrokers.[207]

The *Kaiser Steel* litigation involved an LBO merger approved in January, 1984, and effective in February, 1984. On the effective date of the merger Kaiser's stockholders were required to tender shares to Kaiser's disbursing agent in exchange for cash and preferred stock of the new company. Because Kaiser was listed on the New York Stock Exchange, most of its stock was in the possession of a clearing agency that received the cash and preferred stock from the disbursing agent. The clearing agency in turn transferred the cash and preferred stock to the accounts of its participants, which included brokers and other financial intermediaries. Eventually the beneficial owners of the Kaiser stock received the LBO proceeds.[208]

---

United States v. Tabor Court Realty Corp., 803 F.2d 1288 (3d Cir. 1986), *cert. denied*, 483 U.S. 1005 (1987); Steph v. Branch, 255 F. Supp. 526 (E.D. Okla. 1966), *aff'd*, 389 F.2d 233 (10th Cir. 1968); Ohio Corrugating Co. v. DPAC, Inc. (*In re* Ohio Corrugating Co.), 91 B.R. 430 (Bankr. N.D. Ohio 1988); Kaiser Steel Corp. v. Jacobs (*In re* Kaiser Steel Corp) 87 B.R. 154 (Bankr. D. Colo. 1988); Ohio Corrugating Co. v. Security Pac. Business Credit, Inc. (*In re* Ohio Corrugating Co.), 70 B.R. 920 (Bankr. N.D. Ohio 1987); David Gray Carlson, *Leveraged Buyouts in Bankruptcy*, 20 GA. L. REV. 73 (1985); Richard M. Cieri et al., *An Introduction to Legal and Practical Considerations in the Restructuring of Troubled Leveraged Buyouts*, 45 BUS. LAW. 333 (1989); Matthew T. Kirby et al., *Fraudulent Conveyance Concerns in Leveraged Buyout Lending*, 43 BUS. LAW. 27 (1987); David A. Murdoch et al., *Leveraged Buyouts and Fraudulent Transfers: Life After* Gleneagles, 43 BUS. LAW. 1 (1987); Queenan, *supra* note 39, *passim*; Sherwin, *supra* note 39, *passim*; Kathryn V. Smyser, *Going Private and Going Under: Leveraged Buyouts and the Fraudulent Conveyance Problem*, 63 IND. L.J. 781 (1988); Kevin J. Liss, Note, *Fraudulent Conveyance Law and Leveraged Buyouts*, 87 COLUM. L. REV. 1491 (1987). There has not yet been a reported decision under the UFTA, but there is no reason why the result would be otherwise.

206. Kaiser Steel Corp. v. Charles Schwab & Co., 913 F.2d 846 (10th Cir. 1990) (*Kaiser I*). For critical commentary on *Kaiser I*, see Jane E. Kiker, Comment, *Judicial Repeal of Fraudulent Conveyance Laws*: Kaiser Steel Corp. v. Charles Schwab & Co., 913 F.2d 846 (10th Cir. 1990), 14 HAMLINE L. REV. 453 (1991) and William C. Rand, Comment, In re Kaiser Steel Corporation: *Does Section 546(e) of the Bankruptcy Code Apply to a Fraudulent Conveyance Made in the Form of an LBO Payment?*, 19 FORDHAM URB. L.J. 87 (1991) (criticizing the decision in *Kaiser I* as unjustly protecting stockholders at the expense of creditors, mistaking congressional intent, and incorrectly relying on cases inapplicable to the equity securities market).

207. Kaiser Steel Corp. v. Pearl Brewing Co. (*In re* Kaiser Steel Corp.), 952 F.2d 1230 (10th Cir. 1991) (*Kaiser II*), *cert. denied*, 112 S. Ct. 3015 (1992). For a case holding that § 546(e) does not bar the avoidance of LBO payments to stockholders, see Weiboldt Stores, Inc. v. Schottenstein, 131 B.R. 655, 663-65 (N.D. Ill. 1991) (citing Neil M. Garfinkel, Comment, *No Way Out: Section 546(e) is no Escape for the Public Shareholder of a Failed LBO*, 1991 COLUM. BUS. L. REV. 51).

208. The Tenth Circuit capsulized the process as follows:

Most of the common stock was in the possession of Depository Trust Com-

Kaiser filed a Chapter 11 case in 1987 and initiated an adversary proceeding seeking to recover $162 million in cash and preferred stock distributed under the LBO plan. The initial lawsuit named as defendants the "street name shareholders" of the Kaiser stock. A second action was filed after discovery from the initial broker defendants disclosed the names of the beneficial owners of Kaiser stock. The second action asserted the same fraudulent conveyance theories but joined as defendants a large number of the beneficial owners. The district court withdrew the reference of the adversary proceedings and consolidated the cases with other adversary proceedings related to Kaiser's LBO.

Before the withdrawal of the reference, several brokers moved for summary judgment on the basis that as to shares not beneficially owned, the brokers were "mere conduits" rather than initial transferees and were therefore not liable under section 550(a)(1) of the Bankruptcy Code.[209] Also, the brokers interjected section 546(e), which was enacted shortly before the Kaiser LBO. Their defense was that section 546(e) exempts settlement payments from recovery in section 544(b) and section 548(a)(2) actions. Therefore, as a matter of law the brokers were not liable because the benefits of the LBO were received by the brokers as settlement payments.[210]

Bankruptcy Judge Matheson denied the brokers' motion for summary judgment[211] but was reversed by the district court on the grounds that the brokers were mere conduits and section 546(e) precluded recovery.[212] The Tenth Circuit affirmed but solely on the ground that the distributions to the stockbrokers were settlement payments exempt

---

pany ("DTC"), a securities clearing agency acting as depository. After the merger, DTC tendered the [Kaiser stock] certificates to Bank of America [the disbursing agent] and received the payments of LBO consideration [the cash and preferred stock]. DTC then transferred these payments to the accounts of its participants, including brokers and other financial intermediaries. These intermediaries, in turn, either disbursed the payments to their customers who were the beneficial owners of Kaiser Steel stock or retained the payments if they themselves were the beneficial owners. Some shares were exchanged through securities clearing agencies other than DTC, and since DTC stopped handling trades of Kaiser Steel shares prior to the effective date of the LBO, some financial intermediaries and beneficial owners were required to tender their shares directly to Bank of America.
*Kaiser II*, 952 F.2d at 1235-36.

209. *See* Kaiser Steel Resources, Inc. v. Jacobs (*In re* Kaiser Steel Corp.), 110 B.R. 514, 517-21 (D. Colo.), *aff'd sub nom. Kaiser I*, 913 F.2d 846 (10th Cir. 1990).

210. *See id.* at 521-22.

211. Kaiser Steel Corp. v. Jacobs, 105 B.R. 639, 653-54 (Bankr. D. Colo. 1989), *rev'd sub nom.* Kaiser Steel Resources, Inc. v. Jacobs (*In re* Kaiser Steel Corp.), 110 B.R. 514 (D. Colo.), *aff'd sub nom. Kaiser I*, 913 F.2d 846 (10th Cir. 1990).

212. *See Kaiser Steel Resources*, 110 B.R. at 519-21, 521-22.

from recovery as fraudulent conveyances under section 546(e).[213]

In *Kaiser II* the Tenth Circuit dealt with the remaining issue, whether section 546(e), which provides that "the trustee may not avoid a transfer that is a . . . settlement payment . . . made by or to a . . . stockbroker, financial institution, or securities clearing agency,"[214] protected the beneficial owners of the Kaiser stock. The opinion summarized Kaiser's arguments on appeal as follows:

> First, it maintains that these payments are not "settlement payments." Second, it insists that even if the payments are settlement payments, payments made "by or to" one of the enumerated entities are protected under section 546(e) *only* to the extent the recipient is a participant in the clearance and settlement system (i.e., a stockbroker, financial institution, clearing agency, or some other participant). Settlement payments received by an "equity security holder," according to Kaiser, are not protected.[215]

The court observed that "settlement payment" encompasses all types of payments in light of the broad definition under section 741(8) and that it is necessary to interpret settlement payment "as it is plainly understood within the securities industry."[216] The court recognized that two opportunities for a settlement arise in a typical securities trade and that these settlements involve two corresponding sets of guarantees. The first, the so-called "street-side settlement," occurs between brokers and the clearing agency, and the second, the "customer-side settlement . . . occurs between the broker and its customer."[217]

Kaiser argued that the term "settlement payment" in section 546(e) only applies to routine purchases and sales of securities, and not to an "extraordinary securities transaction" like an LBO.[218] However, the Tenth Circuit observed that neither section 546(e) nor section 741(8) is limited on its face to routine purchases and sales of securities.

---

213. *Kaiser I*, 913 F.2d 846 (10th Cir. 1990). This holding did not determine whether the ultimate recipients of the LBO proceeds, the beneficial owners of the Kaiser stock, would have to disgorge the proceeds. That issue was resolved by the Tenth Circuit approximately four months later in *Kaiser II*. In *Kaiser I* the Tenth Circuit did not reach the issue because it held that brokers acting on behalf of third parties were protected by § 546(e). The *Kaiser II* court noted that as a result of *Kaiser I*, "Kaiser . . . abandoned all claims against the appellees [brokers] in this case insofar as they acted in conduit/financial intermediary capacities. Therefore, all appellees remaining before us are shareholders or brokers that beneficially owned the Kaiser Steel shares tendered in connection with the LBO." *Kaiser II*, 952 F.2d at 1236.

214. 11 U.S.C. § 546(e) (Supp. II 1990).

215. *Kaiser II*, 952 F.2d at 1236-37.

216. *Id.* at 1237 (citing McCarthy v. Bronson, 111 S. Ct. 1737, 1740 (1991); Shell Oil Co. v. Iowa Dep't of Revenue, 488 U.S. 19, 25 (1988)).

217. *Id.* at 1237-38.

218. *Id.* at 1239.

The court apparently believed that the term "settlement payment" is broad enough to include payments received in transactions other than routine purchases and sales of securities. The court relied primarily on the fact that section 362(b)(6) excepts from the automatic stay a

> setoff by a . . . stockbroker . . . of any mutual debt and claim under or in connection with . . . securities contracts, as defined in section 741(7) . . . that constitutes the setoff of a claim against the debtor for a margin payment . . . or settlement payment . . . arising out of . . . securities contracts against cash, securities, or other property held by or due from such . . . stockbroker . . . to margin, guarantee, secure, or settle . . . securities contracts.[219]

The court reasoned that if Congress had intended what Kaiser argued, Congress would have used the same language in section 546(e) that it used in section 362(b)(6).[220] However, the settlement payment in section 546(e) is narrower than the "settlement payment . . . arising out of . . . securities contracts" in section 362(b)(6) because the language in section 362(b)(6) indicates that Congress intended to expand the settlement payment exception from the stay to include loans of securities in addition to purchases and sales of securities. Therefore, if any conclusion can be drawn from the use of the phrase "arising out of . . . securities contracts" in section 362(b)(6), it is that a "settlement payment" alone, which is what Section 546(e) addresses, does not include payments that arise from loans of securities. Thus, the *Kaiser II* court improperly adopted a broad definition of settlement payment for purposes of section 546(e).[221]

Also, the court concluded that an LBO is a securities transaction.

> While the leveraged buy out may not be a "routine" securities trade, at least as viewed by Kaiser, we cannot deny what in substance took place here. The LBO was a securities transaction, varying only in form from the various other ways in which a shareholder's equity interest can be sold. The former Kaiser Steel shareholders effectively sold their equity interests to the new investors in exchange for money and a continuing stake in the new entity as preferred shareholders. In settlement of that transaction, the Kaiser Steel shareholders tendered their shares and received payment. These payments were "settlement payments."[222]

---

219. 11 U.S.C. § 362(b)(6) (Supp. II 1990).

220. *Kaiser II*, 952 F.2d at 1239 (citing Gozlon-Peretz v. United States, 111 S. Ct. 840, 846-847 (1991) (stating that if particular language is used in one section of a statute but omitted in another, Congress is presumed to have acted " 'intentionally and purposely in the disparate inclusion or exclusion' ") (quoting Russello v. United States, 464 U.S. 16, 23 (1983))).

221. *See id.* at 1239-40.

222. *Id.* (citing *Kaiser I*, 913 F.2d 846, 850 (10th Cir. 1990)).

A student commentator, in a recent article analyzing *Kaiser I*, disagreed with the Tenth Circuit's interpretation of the relevant Bankruptcy Code provisions and proposed a "framework . . . to serve as a guide as to the scope and applicability of sections 546(e) and 741(8)."[223]

> Settlement implies some sort of connection to an exchange or trade, and because Congress considered section 546(e) within the context of insulating the workings of the securities markets (the trading or exchanging of securities), that should also be the contextual framework in which the scope of "settlement payment" is examined.
>
> In determining, then, whether or not a particular flow of funds between a customer and a broker is indeed a "settlement payment" for purposes of section 546(e), the proper question should be: "Is this generally the type of transfer whose protection is necessary to the smooth working of the securities markets?" Where LBO payments to public shareholders are concerned, the answer to that question is "No." The inviolability of payments to shareholders is simply not basic to the operation of the clearance and settlement systems. Those systems will be only incidentally affected, if at all, if former shareholders are required to return payments they received in an LBO. Neither the system of guarantees nor the solvency of participants in the chain is threatened by a legal order in which payments to the shareholders by their brokers are subject to recovery by a trustee in bankruptcy. Thus, while the flows of funds to and between financial intermediaries in the clearance and settlement chain must be protected in order to insure the stability of those systems, funds flowing from the intermediaries to the shareholders do not require protection, and section 546(e) should therefore not apply.[224]

The Tenth Circuit found comfort in the "symmetry of treatment" that its decision accorded to those stockholders who sold their stock before the LBO tender date and those who tendered their shares pursuant to the LBO plan.[225]

> [T]hose shareholders who tendered their shares one day after the LBO and received the LBO consideration are treated just the same under the Code as shareholders who sold their shares in the market one day prior to the LBO and received a settlement payment reflecting the market value of the LBO consideration. Neither type of investor will be forced to disgorge . . . .[226]

However, these are entirely different situations. The consideration in

---

223. Garfinkel, *supra* note 207, at 65-66.
224. *Id.* at 66-67.
225. *Kaiser II*, 952 F.2d at 1240 n.10.
226. *Id.* at 1240.

the LBO flowed from the target corporation (the debtor) and constitutes a fraudulent transfer because there was no reasonable equivalent value returned to the target corporation. The securities traded one day before the LBO are entirely different. Someone in the market place purchased these securities and paid with consideration that flowed from that purchaser, not the target of the LBO. There is no basis at all for setting aside these pre-LBO transactions, and little more than the court's desire for symmetry can explain the court's reasoning. No public policy is served by excepting from avoidance profits enjoyed by those who waited on a further rise in the market just to reach a symmetry with those who took their profits early.

Nonetheless, the court believed that a "symmetry of treatment" was justified not only by "the plain notion of 'settlement'" but also by Congress's decision to promote "finality," "'speed and certainty in resolving complex financial transactions.'"[227] Furthermore, it found its earlier *Kaiser I* decision consistent with section 546(e)'s goal of protecting "'the nation's financial markets from the instability caused by the reversal of settled securities transactions.'"[228] These concerns seem beside the point, however, because Kaiser limited its prayer for recovery to the beneficial owners. A recovery from the beneficial owners would have had no impact on the nation's financial markets, other than perhaps to dampen the enthusiasm for LBOs, nor would it have slowed down any complex financial transactions. Nonetheless, the court somehow concluded that its holding was "supported by Congress' policy of promoting the health of the clearance and settlement system, which by all accounts is one of the fundamental aims of the 546(e) exemption."[229]

---

227. *Id.* at 1240 n.10 (quoting H.R. REP. No. 484, 101st Cong., 2d Sess. 2 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 224).

228. *Id.* (quoting *Kaiser I*, 913 F.2d 846, 848 (10th Cir. 1990) (quoting Kaiser Steel Resources, Inc. v. Jacobs (*In re* Kaiser Steel Corp.), 110 B.R. 514, 522 (D. Colo.), *aff'd*, *sub nom. Kaiser I*, 913 F.2d 846 (10th Cir. 1990))); *see also* Garfinkel, *supra* note 207, at 61-65 (discussing congressional concerns about the effect of the avoiding powers on the securities market).

229. *Kaiser II*, 952 F.2d at 1240 n.10. The SEC's brief in *Kaiser I* asserted this improbable threat to the securities market: If brokerage customers are forced to return LBO payments they might not pay the brokers, who will fail and cause a ripple effect that would cripple the market. Brief of the Securities and Exchange Commission at 30-35, *Kaiser I*, 913 F.2d 846 (10th Cir. 1990). One commentator analyzed the SEC's brief as follows:

Recognizing the improbability of the above scenario, the SEC then goes on to make two other arguments in favor of § 546(e)'s applicability. The first is a plain meaning argument: The section says what it says and should therefore be applied. Contrary to the SEC's assertion, the section is far from clear, and because of the import of a decision either way in this area, it seems judicially irresponsible not to consider the role the provision was intended to play in the

Also, the Tenth Circuit held that those brokers who were beneficial owners of Kaiser shares were exempted from avoidance recovery by the "clear" reference to stockbrokers in section 546(e).[230] Kaiser argued that these brokers acted as equity security holders, who are not exempted from avoidance recovery in section 546(e), and not as stockbrokers because a stockbroker is not a stockbroker unless it acts for a customer.[231] The court held, however, that the plain language of the statute protects all stockbrokers regardless of the nature of their ownership. "Certainly, we cannot say that the clear application is absurd, given the fact that disruption in the securities industry—an inevitable result if leveraged buy outs can freely be unwound years after they occurred—is also a harm the statute was designed to avoid."[232] In conclusion, the court stated that it was "not convinced [its holding] leaves the trustee remediless by way of a suit for damages, or some similar device, against specific individuals or institutions for unlawful acts."[233]

---

context of the securities markets. "It says what it says" should not carry a great deal of weight at all, much less the day.

The second argument the SEC presents is that to find shareholders liable in general would undermine investor confidence in the market and increase market volatility. Therefore, § 546(e) should be read to insulate shareholders. This argument essentially asserts that investors should not be required to examine the validity of the transactions they effect in the marketplace. In today's world, a rule which promotes shareholder passivity and ignorance does not seem to further any compelling purpose.

Capital formation and investor confidence should not be significantly affected by a legal environment that requires an investor to look before he or she leaps. Shareholders reap the benefits of these buyouts in the form of large premiums when they approve the transaction. They should similarly be exposed to some of the risks. If fairness dictates that some shareholders should be exempted, then a way should be found to do that. But bending a relatively specific bankruptcy provision to serve as a blanket exemption in the name of investor confidence is both unwarranted and ill-advised.

Garfinkel, *supra* note 207, at 67 n.69.

230. *Kaiser II*, 953 F.2d at 1240-41.

231. *Id.* at 1240 n.11. Section 101(54) defines a stockbroker as a "person . . . with respect to which there is a customer . . . *and* . . . that is engaged in the business of effectuating transactions in securities." 11 U.S.C. § 101(54)(A)-(B) (Supp. II 1990) (emphasis added).

232. *Kaiser II*, 953 F.2d at 1241.

233. *Id.* As explained in Kaiser's petition for certiorari, while the *Kaiser* decisions may not have left Kaiser remediless, they did have a substantial adverse impact.

The increased cost and risk and reduction of monies available to fund retiree trusts is clear and immediate for Kaiser's creditors and retirees. The Tenth Circuit concluded its decision with the point that Kaiser could still sue specific individuals or institutions for unlawful acts. (App. A at 26A). Kaiser has done so, pursuing and settling various claims, including one with the officers and directors who held a $25 million insurance policy that decreased with each dollar spent by defense counsel, for $17 million. The retiree medical

In determining whether stockbrokers *qua* stockbrokers were liable for LBO payments, the Tenth Circuit in *Kaiser I* determined that the phrase "settlement payment" included the receipt of proceeds from an LBO. In *Kaiser II* the question was not whether the payments could be recovered from the stockbrokers *qua* stockbrokers, but whether the payments could be recovered from the beneficial owners of Kaiser stock, who in some cases were brokers. Kaiser took the position that

> [s]ection 546(e) of the Bankruptcy Code, far from literally and unam-
> biguously precluding collection from beneficial shareowners . . . does
> not preclude that collection at all. Equity security holders, defined in
> Bankruptcy Code § 101(16), are not among the parties enumerated in
> § 546(e) to be exempt from fraudulent conveyance recovery. Stock-
> brokers themselves are not within the scope of the statute when they
> are also equity security holders.[234]

In its Brief the SEC conceded that Congress did not intend to create a safe harbor for LBOs by acknowledging that the "by or to" language in section 546(e) was discussed only "in the context of payments between brokers and payments between brokers and clearing agencies."[235] The SEC also recognized that "protecting individual shareholders would not necessarily further the exact purpose that led to the enactment of Section 546(e)" and that "the hearings focused upon the system of guarantees through which the clearance and settlement process operates."[236]

In the Congressional hearings on the 1982 amendment to section 546(e), Commissioner Bevis Longstreth testified for the Securities and Exchange Commission.[237] He described the pending amendments as "technical, clarifying, and minor substantive amendments to the new

---

trust has already exhausted all the net litigation proceeds it has received to
date, on benefits payments costing about $400,000 a month. Kaiser is still pur-
suing claims against accountants and an investment banker, but recognizes
that comparative negligence statutes and judgment reduction requirements of
the directors and officers' settlement may well reduce any collection from
them. Kaiser has claims against the Jacobs Group, including a $14 million
"greenmail" claim; $33 million of its claims against the Jacobs Group are for
monies distributed for their shares, however.

Petition for a Writ of Certiorari to the United States Court of Appeals for the Tenth Circuit at 29, Kaiser Steel Resources, Inc. v. Pearl Brewing Co. (Nos. 90-1243, 1245) (footnote omitted). The Supreme Court denied Kaiser's petition. 112 S. Ct. 3015 (1992).

234. Appellant's Reply Brief at 1, *Kaiser II*, 952 F.2d 1230 (10th Cir. 1991) (Nos. 90-1243, 90-1245), *cert. denied*, 112 S. Ct. 3015 (1992).

235. Brief of the Securities and Exchange Commission at 16 n.16, *Kaiser II*, 952 F.2d 1230 (10th Cir. 1991) (Nos. 90-1243, 90-1245), *cert. denied*, 112 S. Ct. 3015 (1992).

236. *Id.* at 15-16.

237. H.R. REP. No. 420, 97th Cong., 2d Sess. 2 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583, 584.

Bankruptcy Code."[238] He stated that "[i]n brief, the Commission's position is that the preference, fraudulent transfer and stay provisions can be interpreted to apply in harmful and costly ways to customary methods of operation essential to the securities industry."[239] One of the problems he noted was the fact that there were express provisions that protected the commodities industry, but none that protected the securities industry. Commissioner Longstreth was concerned that this omission would give rise to an unfortunate inference that no protection was intended for the securities industry.

The Commission was particularly concerned that the preference, fraudulent transfer, and automatic stay provisions could have an adverse impact on the national clearance and settlement system. The Commission's view was that the Bankruptcy Code created three problems. First, the elimination of the reasonable cause to believe requirement from the preference provisions increased the number of securities transactions subject to preference avoidance. The solution was to apply the commodities exemption, then in section 764(c), to the securities industry as well as the commodities industry.[240]

The second problem noted by the Commission was a fraudulent conveyance problem,

> which is a problem closely analogous to the one arising under Section 547 and exists under Section 548 of the code related to fraudulent transfers. Section 548 establishes another class of transfers by the debtor which, in order to achieve equity among creditors, can be avoided by the trustee. These include, among others, transfers of any property of the debtor made within 1 year before the bankruptcy where the debtor received less than "a reasonably equivalent value" in exchange and was then insolvent or thereby became insolvent. Unfortunately, however, section 548(d)(2)(B) provides that a "commodity broker . . . that receives a margin payment . . . takes for value."
>
> Once again, this language by emphasizing that a commodities margin payment is not subject to the trustee's avoiding powers, creates the inference that a functionally identical securities margin payment is subject to avoidance as a fraudulent transfer.[241]

---

238. *Bankruptcy of Commodity and Securities Brokers: Hearings Before the Subcomm. on Monopolies and Commercial Law of the House Comm. on the Judiciary*, 97th Cong., 1st Sess. 238 (1981) [hereinafter *Hearings*].

239. *Id.* at 239.

240. To extend the protections afforded the commodities industry to the securities industry, Congress repealed § 764(c) in 1982. Act of July 27, 1982, Pub. L. No. 97-222, § 17(c), 96 Stat. 240. Congress then added what is now § 546(e) to the Code and changed the definitions in § 741 to include securities margin and settlement payments. *Id.* §§ 4, 8, 96 Stat. at 236, 237.

241. *Hearings, supra* note 238, at 240. Jack Nelson, President of National Securities Clearing Corporation, stated that "the new uncertainty regarding fraudulent transfers

The solution suggested and enacted was to extend the special treatment accorded commodities margin payments to securities margin and settlement payments.[242]

A third problem was created by the automatic stay.

[The stay] would force a clearing agency or broker to obtain explicit judicial permission to close out the open securities positions of an insolvent broker or customer. Once a broker or customer is insolvent, the clearing agency—to take one example—will receive no further mark-to-market or clearance fund payments, even if the market continues to move against the insolvent broker's net securities position.

At this point, the clearing agency can limit its loss exposure by closing out that net position. The automatic stay would prevent such a step until court permission could be obtained, by which time mounting losses may have rendered the agency itself insolvent, or at least resulted in further losses.

The proposed amendments would extend and clarify section 362(b)(6) and other related provisions to make it clear that, in general, neither securities nor commodities brokers and clearing agencies can be stayed from exercising their rights to apply margin payments to close out open positions of brokers and customers.[243]

In response to Congressman Butler's question as to whether there was a need for an amendment, Commissioner Longstreth said:

I think the answer—part answer—is that in the hashing out that

---

involves section 548 of the Code. Under previous law, it was clear that margin and mark-to-market payments did not constitute fraudulent transfers, since they were made for the purpose of satisfying or securing a present or antecedent debt." *Id.* at 312. Section 548 created this uncertainty because prior to 1982 it deemed that only commodities broker margin payments were taken for value. *See* 11 U.S.C. § 548(d)(2)(B) (Supp. V 1981) (current version at 11 U.S.C. § 548(d)(2)(B) (Supp. II 1990)).

242. *See* Act of July 27, 1982, Pub. L. No. 97-222, sec. 5, § 548(d)(2)(B), 96 Stat. 235, 236 (including margin and settlement payments received by stockbrokers within those transfers deemed to be made for value) (current version at 11 U.S.C. § 548(d)(2)(B) (Supp. II 1990)).

243. *Hearings, supra* note 238, at 241. In its prepared statement, *id.* at 242-62, the Securities and Exchange Commission made its concerns about the automatic stay perfectly clear:

I should add parenthetically that while one or even a few days' price movement may not seem like problems of unacceptable magnitude, in times of market volatility substantial sums can be involved. Thus, in the case of major brokerage firms, losses resulting from net securities positions could run to millions of dollars on any single day. If such losses are suffered by a clearing agency and, due to the operation of the automatic stay, are dramatically increased and must be absorbed by the solvent participants in the system, they could result in a chain reaction of insolvencies and chaos in the securities markets.

*Id.* at 258 (footnote omitted).

led to the code, the problems to which I have alluded were recognized as problems to the commodities industry and solutions to these problems are embedded in the code, but another industry closely linked and very similar, if not indistinguishable in this area, was left out. That would be bad enough without the negative inference, but you have got the negative inference that is a powerful one, given a code that is painfully detailed and carefully built word upon word, so that inferences can easily be drawn, negative or positive, by omissions.[244]

In *Kaiser I* the court concluded that the 1982 amendment to section 546(e) expanded the market protection "beyond the ordinary course of business to include margin and settlement payments to and from brokers, clearing organizations, and financial institutions."[245] Prior to the 1982 amendments, the predecessor of subsection (e), section 764(c) of the Bankruptcy Reform Act of 1978,[246] protected only "the ordinary course of business in the [commodities] market."[247] Kaiser argued that the court in *Kaiser I* was incorrect in concluding that Congress intended to extend market protections beyond the ordinary course of business.

The "expansion" took the form of allowing, for the first time, the prompt liquidation of an insolvent's securities and commodities contracts, unfettered by any stay, to minimize losses if the market were to move sharply in the wrong direction. 11 U.S.C. §§ 555, 556. The other provisions only "clarified" the existing Code protections, and gave the same protections to participants in the securities market. H.R. Rep. No. 97-420, 97th Cong., 2d Sess. 2 (1982), *reprinted in* 1982 U.S. Code Cong. & Admin. News 583-87. ("The new § 546([e]) reiterates the provisions of current § 764(c). The new section also encom-

---

244. *Id.* at 264-65. Theodore H. Focht, General Counsel for the Securities Investor Protection Corporation, concurred that there was an ambiguity that needed clarification.

   The proposed amendment to section 546 of the Bankruptcy Code would prevent a trustee from avoiding a transfer which is a deposit made by or to a commodities broker, forward contract merchant, stockbroker, or securities clearing agency.

   The word "deposit" is undefined. It is, in my view, too ambiguous a word and might be used to defeat a trustee's attempt to recover a preferential transfer that should be recovered.

   The committee report, I believe, could clarify this matter by making it clear that a preferential payment which is neither a margin, mark-to-market or settlement payment, nor a deposit to a clearing fund should continue to be recoverable by a trustee as it is under existing law.

*Id.* at 285.

245. *Kaiser I*, 913 F.2d 846, 849 (10th Cir. 1990).

246. 11 U.S.C. § 764(c) (Supp. V 1981) (repealed 1982).

247. H.R. REP. No. 595, 95th Cong., 2d Sess. 392 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6348.

passes both stockbrokers and securities clearing agencies."). Thus, the same ordinary course of business protections were extended from the commodities industry to the securities industry, but the protections themselves were not expanded beyond ordinary course of business transactions.[248]

Kaiser asserted that there was no evidence reflected anywhere that the 1982 amendments were intended to include transactions like leveraged buyouts, mergers, and dividend payments within the protection of section 546(e). In the absence of any manifest congressional intention to include such payments, Kaiser argued that the statute should not be interpreted to apply beyond the situations mentioned in the legislative history.[249]

---

248. Appellant's Opening Brief and Response to Order to Show Cause at 6, *Kaiser II*, 952 F.2d 1230 (10th Cir. 1991) (Nos. 90-1243, 90-1245), *cert. denied*, 112 S. Ct. 3015 (1992).

249. The Court does not judicially legislate by interpreting settlement payment only in the context defined by the industry in its publications and testimony to Congress. Rather, it judicially legislates when it interprets beyond Congress' intent, as evidenced by the information Congress considered when enacting the law, into unchartered and unconsidered depths.

The Supreme Court has repeatedly concluded that statutes should not be interpreted to cover situations unmentioned in the legislative history. In *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1 (1985), for example, the petitioner argued that the proscription of "manipulative acts or practices, in connection with any tender offer" in Section 14(e) of the Securities Exchange Act covered fully disclosed acts which manipulated the price of the takeover target's stock. The Court said, "[n]owhere in the legislative history is there the slightest suggestion that § 14(e) serves any purpose other than disclosure, or that the term 'manipulative' should be read as an invitation to the courts to oversee the substantive fairness of tender offers; the quality of any offer is a matter for the marketplace." *Id.* at 11-12. The Court refused to broaden the scope of the statute beyond the context evidenced in the legislative history to an unconsidered context.

Similarly, in *United States v. American Trucking Associations*, 310 U.S. 534 (1940), the Court refused to give the ICC the power to regulate the qualifications and hours of service of employees, other than those employees concerned with the safety of operations. It said, "We are especially hesitant to conclude that Congress intended to grant the Commission other than the customary power to secure safety in view of the absence in the legislative history of the Act of any discussion of the desirability of giving the Commission broad and unusual powers over all employees." *Id.* at 546-47. *See also Heppner v. Alyeska Pipeline Service Co.*, 665 F.2d 868 (9th Cir. 1981), where the court held that personal injury actions unrelated to the special environmental risks created by the trans-Alaskan pipeline were not within the scope of the Trans-Alaska Pipeline Authorization Act. The Court said that "[a]n explicit denial in the legislative history of the distant possibilities included within [the statutory language's] sweep is not required. Instead we need only see if the purpose of the Act, as revealed by the legislative history, confirms that the language

In *Kaiser I* the court recognized that "Kaiser's position that section 546(e) was only intended to insulate from avoidance routine securities transactions is not without merit."[250] The court did not, however, respond to Kaiser's position that the statute should not be broadened beyond the intent manifested in the legislative history, except to state that "we will not interpret the term 'settlement payment' so narrowly as to exclude the exchange of stock for consideration in an LBO."[251]

Also in *Kaiser II*, Kaiser argued that in order to be exempt from preference avoidance section 546(e) settlement payments had to be made by or to the enumerated entities. The enumerated entities include "a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency,"[252] but do not include an "equity security holder."[253]

> Congress addressed and intended to protect only the brokers and clearing agencies who stand behind the obligations of an insolvent customer or broker to make settlement payments. The broker on behalf of the customer and the clearing agency on behalf of the broker interpose themselves between the customers wishing to buy and sell securities. The counterpart of a bankrupt customer, the beneficial holder of the security sold to or brought from the bankrupt customer, is likely unidentifiable. The clearing agencies net out stock positions and cash in their broker members' accounts each day. On the date when a bankrupt's broker settled his sale of a particular stock, the broker could well have had no change in the number of that company's shares in its account at the clearing agency, or a decrease. It could have had no change or a decrease in its cash account as well,

---

should not be read too broadly." 665 F.2d at 873.

Of the many transactions in which publicly traded companies and their street name and beneficial shareholders can engage, Congress only addressed securities contracts, those that were open and those that had been settled when a brokerage company or its customer filed bankruptcy, in the Bankruptcy Code provisions bearing to any degree on this case. The "ripple effect" of a customer or broker insolvency on the financial stability of clearing agencies and other brokers applies only in the "securities contract" context. Only with securities contracts do the clearing agencies and brokers guarantee consummation. A corporate merger payment like Kaiser's is not within the scope of risks Congress intended to protect. The Court does not judicially legislate by restricting statutory language to the context Congress addressed.

*Id.* at 11-13 (footnote omitted).

250. *Kaiser I*, 913 F.2d 846, 850 (10th Cir. 1990).

251. *Kaiser II*, 952 F.2d 1230, 1239 (10th Cir. 1991), *cert. denied*, 112 S. Ct. 3015 (1992).

252. 11 U.S.C. § 546(e) (Supp. II 1990).

253. Appellant's Opening Brief and Response to Order to Show Cause at 14, *Kaiser II*, 952 F.2d 1230 (10th Cir. 1991) (Nos. 90-1243, 90-1245), *cert. denied*, 112 S. Ct. 3015 (1992).

due to other transactions. Collection from customer counterparts to trades, if they could somehow be identified, was never contemplated because the brokers and clearing agencies were the true trading partners.[254]

Furthermore, because a stockbroker by definition must be acting for a customer,[255] section 546(e) clearly cannot insulate a payment to a stockbroker in its capacity as an equity security holder.[256]

The Tenth Circuit responded that "the statute is clear. The statute exempts payments made 'by or to' a stockbroker, financial institution, or clearing agency. Again, unless there is some reason to believe the clear application is absurd or otherwise unreasonable, we can leave our inquiry at that."[257] However, this did not answer Kaiser's assertion that the Code definition of stockbroker requires a transaction in securities done on behalf of a customer.[258]

---

254. *Id.* at 14-15.

255. 11 U.S.C. § 101(54) (Supp. II 1990) ("[S]tockbroker means person . . . with respect to which there is a customer . . . .").

256. For the relevant legislative history, see *Hearings, supra* note 238.

257. *Kaiser II*, 952 F.2d at 1240 (quoting 11 U.S.C. § 546(e) (Supp. II 1990)). The Bankruptcy Code sponsor's statements about the reason for including payments "by" as well as "to" the enumerated parties, the insertion of the words "by or," and the deletion of the phrase "made by a clearing organization" indicate that the Code's sponsors intended to bring these payments under § 764(c).

> Mr. MATHIAS. "Am I correct in my understanding of the Senator's [Mr. DeConcini's] statement that the intent of section 764 and section 548(d)(2) is to provide that *margin payments and settlement payments* previously made *by a bankrupt to a commodity broker,* forward contract merchant and *by or to a clearing organization* are nonvoidable transfers by the bankrupt's trustee?"
>
> MR. DECONCINI. "Yes."

124 CONG. REC. 34018 (1978) (emphasis added).

258. The opinion did address the issue further in a footnote:

> It is difficult to imagine, for instance, how Congress could recognize that a settlement payment may be made by a stockbroker to its customer (whether that customer is bankrupt or not), *see* Appellant's Opening Brief at 16 (citing reference in legislative history to "settlement payment owed to a customer"), and not realize that section 546(e), which on its face protects settlement payments by a stockbroker, is likely to be read by a court to protect settlement payments by a stockbroker to its customer.
>
> Further, Kaiser's claim that § 546(e) does not protect brokers trading on their own account is clearly wrong. Kaiser argues that such brokers are "equity security holders" and not "stockbrokers." It notes as well that "stockbrokers" must have "customers." 11 U.S.C. § 101(54)(A). However, the definition of "stockbroker" was intentionally fashioned to include dealers who "effect[] transactions in securities . . . with members of the general public, *from or for such person's own account,*" 11 U.S.C. § 101(54)(B) (emphasis added), and "customer," as used in the Code is a term of art, broadly defined in § 741(2) to "include anybody that interacts with the [broker] in a capacity that concerns securities transactions." S.Rep. No. 989, 95th Cong., 2d Sess. 100 (1978), *re-*

On the key issue of whether a settlement payment, which is not defined in the Code, includes consideration paid to shareholders for their stock in connection with a LBO,[259] the court concluded that it did. The court unequivocally stated that "we must interpret the term 'settlement payment' as it is plainly understood within the securities industry."[260] But the court did not do so!

"Settlement" is a word with meaning "in the securities trade"; it is not all-encompassing. Rather, in the numerous industry publications cited by the Tenth Circuit, "settlement" is defined as the completion of a securities transaction, which in turn is defined as a "trade". Neither the Bankruptcy Code provision nor a single industry publication which any of the parties has unearthed applies the word "settlement" to one-time mandatory redemptions or cash mergers where corporate assets are distributed to shareholders, rather than a market trade where shares and money are exchanged between buyers and sellers. Moreover, the understanding of settlement payment "in the securities trade" is evidenced by Kaiser's uncontroverted affidavit from a securities industry expert, stating that the "mandatory redemption of Kaiser common stock as part of the leveraged buyout was not a 'settlement payment' as that term is commonly used in the se-

---

printed in 1978 U.S.C.C.A.N. 5787, 5886. The customer requirement was apparently designed only to prevent employees of brokers from claiming the benefits of certain Code provisions. See S.Rep. No. 989, 95th Cong., 2d Sess. 27 (1978), reprinted in 1978 U.S.C.C.A.N. 5813.
Kaiser II, 952 F.2d at 1240 n.11.

259. Section 546(e) refers to § 741(8) for the meaning of settlement payment. However, as Kaiser pointed out in its brief in Kaiser II, this is a nondefinition.

As Gertrude Stein might say, "a settlement payment is a settlement payment is a settlement payment." But litigation is settled, debts are settled, trades are settled, and settlement payments are made. When a brokerage customer is delinquent on amounts due to a broker, and enters into a settlement agreement to pay monthly installments before or after litigation, are the payments to the broker settlement payments exempt from preference or fraudulent conveyance attack? Are payments pursuant to a pre-bankruptcy workout agreement to a bank, a "financial institution," settlement payments which are likewise insulated? What if the debt arises out of the financing of a stock purchase? See In re Edelsberg, 101 B.R. 386, 389 (Bankr. S.D. Fla. 1989) (garnishment on debt for stock purchases not settlement payment). The Third Circuit said the definition of settlement payments is "extremely broad," but breadth does not stretch to infinity. There are hybrids of Gertrude Stein's roses; there are hybrids of settlement payments. When the term is used in a statute, it must be limited to the context Congress addressed. That context was simply and only "securities contracts," trades guaranteed by brokers and clearing agencies.
Appellant's Opening Brief and Response to Order to Show Cause at 7-8, Kaiser II, 952 F.2d 1230 (10th Cir. 1991) (Nos. 90-1243, 90-1245), cert. denied, 112 S. Ct. 3015 (1992).

260. Kaiser II, 952 F.2d at 1237.

curities trade."[261]

## VII.  THE FDIC'S FRAUDULENT TRANSFER ACT UNDER F.I.R.R.E.A.

As a legislative expression of outrage at the frauds perpetrated by the participants in the activities that precipitated the dramatic decline of the savings and loan industry, Congress has enacted a special fraudulent transfer law for the benefit of the victims of that decline.[262] Sometimes identified as part of the Crime Control Act of 1990,[263] subparagraph (17) of section 1821(d) of Title 12 authorizes the Federal Deposit Insurance Corporation, or another appointee of the Comptroller of the Currency or the Director of the Office of Thrift Supervision, to act as a conservator or receiver for any insured depository institution in avoiding a fraudulent transfer made or obligation incurred by an "institution-affiliated party" or a debtor of the institution.[264] Sec-

---

261. Petition for a Writ of Certiorari to the United States Court of Appeals for the Tenth Circuit at 12, Kaiser Steel Resources, Inc. v. Pearl Brewing Co. (Nos. 90-1243, 1245) (citations omitted). The Supreme Court denied the petition. 112 S. Ct. 3015 (1992).

262. Congressman Charles E. Schumer, sponsor of the law, gave this brief account of relevant history: .

Since a year ago last August, when the [Financial Institutions Reform, Recovery, and Enforcement Act of 1989] became effective, the losses from failed financial institutions have ballooned. Reports of criminal activity and grossly excessive behavior that led to the dramatic decline of the savings and loan industry have proliferated. Title XXV responds to the public outcry to put to justice those who defrauded the savings and loan industry by providing Federal regulating agencies, Federal prosecutors, and law enforcement agencies with additional tools to combat fraud and abuse affecting financial institutions.

. . . .

Subtitle B of the legislation, which is aimed at protecting assets from wrongful disposition, expands the authority of the Attorney General, conservators, receivers or liquidating agents and Federal banking agencies to enjoin the dissipation of assets wrongfully obtained.

Subtitle B further expands the power of conservators, receivers or liquidating agents to void fraudulent transfers . . . .

136 CONG. REC. E 3684 (1990).

263. Pub. L. No. 101-647, 104 Stat. 4789-4968 (1990). The statute was enacted as title 25 of the Crime Control Act of 1990, entitled the Comprehensive Thrift and Bank Fraud Prosecution and Taxpayer Recovery Act of 1990. *Id.* at 4859-88.

264. 12 U.S.C. § 1821(d)(17) (Supp. II 1990). The statute provides as follows:

(A) In general

The Corporation, as conservator or receiver for any insured depository institution, and any conservator appointed by the Comptroller of the Currency or the Director of the Office of Thrift Supervision may avoid a transfer of any interest of an institution-affiliated party, or any person who the Corporation or conservator determines is a debtor of the institution, in property, or any obli-

tion 1821(d)(17) contains an extraordinary and questionable grant of superiority for the rights it creates over "any rights of a trustee or any other party (other than any party which is a Federal agency) under Title 11."[265] The statute is not well drafted and presents several troublesome issues apart from those involving its relationship to the Bankruptcy Code and other legislation dealing with fraudulent transfers.

First, the legislation contains its own statute of limitations; it applies only to transfers and obligations incurred within five years of the date the FDIC or other agency as conservator or receiver is appointed.[266] It has been held, however, that section 1821(d)(17) applies retroactively to transfers made before its enactment.[267] A transfer or

---

gation incurred by such party or person, that was made within 5 years, for the date on which the Corporation or conservator was appointed conservator or receiver if such party or person voluntarily or involuntarily made such transfer or incurred such liability with the intent to hinder, delay, or defraud the insured depository institution, the Corporation or other conservator, or any other appropriate Federal banking agency.

**(B) Right of recovery**

   To the extent a transfer is avoided under subparagraph (A), the Corporation or any conservator described in such subparagraph may recover, for the benefit of the insured depository institution, the property transferred, or, if a court so orders, the value of such property (at the time of such transfer) from—

      (i) the initial transferee of such transfer or the institution-affiliated party or person for whose benefit such transfer was made; or

      (ii) any immediate or mediate transferee of any such initial transferee.

**(C) Rights of transferee or obligee**

   The Corporation or any conservator described in subparagraph (A) may not recover under subparagraph (B) from—

      (i) any transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith; or

      (ii) any immediate or mediate good faith transferee of such transferee.

**(D) Rights under this paragraph**

   The rights under this paragraph of the Corporation and any conservator described in subparagraph (A) shall be superior to any rights of a trustee or any other party (other than any party which is a Federal agency) under Title 11.

*Id.*

265. *Id.* § 1821(d)(17)(D).

266. *Id.* § 1821(d)(17)(A).

267. FDIC v. Yemelos, 778 F. Supp. 329 (E.D. La. 1991). In *Yemelos* the court noted that the Supreme Court has not resolved tensions between two lines of decisions dealing with the retroactive application of statutes but, relying principally on Bradley v. School Board, 416 U.S. 696 (1974), the court decided in favor of retroactivity because, frankly, it yields the result which the Court finds to be the just, logical, and proper decision in this instance, and because the Court believes that Congress, in enacting the statute, intended that the statute be applied retroactively to enable the FDIC to protect its solvency so that it is available to pro-

obligation must be made or incurred "with the intent to hinder, delay, or defraud the insured depository institution" in order to be voidable.[268] The absence of any language or legislative history suggesting that Congress intended to render voidable a constructively fraudulent transfer or obligation of the kind described in section 548(a)(2) of the Bankruptcy Code,[269] sections 4(a)(2) and 5 of the UFTA,[270] and sections 4, 5, and 6 of the UFCA[271] predictably has generated dispute about whether such a transfer or obligation is vulnerable to avoidance under section 1821(d)(17).[272]

---

tect the deposits of the insured depositors in this nation's banks. *Yemelos*, 778 F. Supp. at 332. The court added that "§ 1821(d)(17) is really a procedural tool for the FDIC, as it does not confer any substantive rights which it did not already possess by virtue of the fraudulent conveyance avoidance rules of the United States bankruptcy laws and the action to annul under Louisiana state law." *Id.* at 333.

268. 12 U.S.C. § 1821(d)(17)(A) (Supp. II 1990).

269. 11 U.S.C. § 548(a)(2) (1988).

270. UNIF. FRAUDULENT CONVEYANCE ACT §§ 4(a)(2), 5, 7A U.L.A. 652-53, 657 (1985).

271. *Id.* §§ 4, 5, 6, 7A U.L.A. at 474, 504, 507.

272. The dispute has arisen in at least four reported cases. The most explicit consideration of this issue appears in *In re* Colonial Realty Co., 134 B.R. 1017 (Bankr. D. Conn. 1991), *aff'd*, Civ. No. 3:91-200X, 1991 WL 288833 (D. Conn. Dec. 30, 1991), in which the court read the statute as not applicable to constructively fraudulent transfers. *Id.* at 1022. Thus, the court suggested, the statute "excludes the most commonly brought fraudulent conveyance actions." *Id.* The bankruptcy court's decision upholding the applicability of the automatic stay to FDIC's § 1821(d)(17) action against a Chapter 7 debtor was affirmed by the district court on appeal, without reference to the standard applicable in avoiding transfers under the statute. *Colonial Realty*, 1991 WL 288833 at *9.

In FDIC v. Cafritz, 762 F. Supp. 1503 (D.D.C. 1991), the court ruled that the FDIC had made a sufficient showing to justify the issuance of a temporary restraining order and the appointment of a trustee pending a determination on the merits. *Id.* at 1510. The court found that the FDIC had made a prima facie case of actual fraud under § 1821(d)(17) without deciding whether state or federal law applies under the statute and rejected the defendants' argument that only direct, as distinguished from circumstantial, evidence could be considered by the court in determining whether a fraudulent conveyance had occurred. *Id.* at 1506-07.

In Resolution Trust Corp. v. Cruce, 783 F. Supp. 1309 (D. Kan. 1992), the court followed *Cafritz* in sustaining the issuance of a preliminary injunction. *Id.* at 1313-14. Without ruling on whether state law governs the voidability of challenged transfers under § 1821(d)(17), the court examined the transactions under Kansas law and found that evidence of three badges of fraud—insolvency of the transferor, lack of consideration "for the most part" for the transfers, and an insider relationship with the transferor—was "enough indices of fraud . . . even under Kansas Law, to present fair grounds for litigation." *Id.*

In FDIC v. Owen, Civ. No. 5:91-00389, 1991 WL 173325 (D. Conn. Sept. 3, 1991), the court sustained the issuance of a preliminary injunction and the seizure of vehicles because the FDIC had shown that while in default on several loans, the debtor conveyed collateral to his relatives, and his testimony in regard to these transactions lacked credibility. *Id.* at *14-*19.

Second, the statute does not indicate when an unperfected or un-discovered transfer or obligation is deemed to occur for the purpose of computing the period of limitations.[273] By explicitly conferring superi-ority on the rights created by the statute over the rights of a trustee or any other party under Title 11, however, section 1821(d) appears to leave the claims of individual creditors under nonbankruptcy law in-tact. The same is true of the bankruptcy trustee's power under section 544(b) of the Bankruptcy Code. Such creditors or the trustee thus would be able to avoid unperfected or undiscovered transfers or obliga-tions under state law or the Bankruptcy Code. The argument in favor of recognizing the continued validity of individual creditors' rights is particularly strong in cases concerning transfers and obligations that are not voidable by the conservator or receiver under section 1841(d)—*i.e.*, cases in which the transfer or obligation is only construc-tively fraudulent and cases involving transfers or obligations that oc-curred prior to the commencement of the five year period of limita-tions prescribed in section 1821(d)(17)(A).

Another problem with section 1841(d) is that it does not specify how the proceeds of any recovery from a transferee are to be distrib-uted. Thus, employees, suppliers, tort claimants, and other creditors of the depositary institution, some of whom may have contributed sub-stantially to the value of the property fraudulently transferred, may or may not be entitled to share in the recovered proceeds, although their equities may be at least as strong as the beneficiaries of the recovery based on the statute.

In the recent case of *Board of Governors of the Federal Reserve System of the United States v. MCorp Financial, Inc.*,[274] the Supreme Court displayed a troubling insensitivity to the need for a balancing approach when the policies of the bankruptcy laws and the protection of creditors' interests conflict with the exigencies of administrative reg-ulation under the banking laws and related statutes. The Court held that the automatic stay does not preclude the Board of Governors from continuing ongoing administrative proceedings against a bank holding company in Chapter 11.[275] Nevertheless, the Court was careful to point out that the administrative proceedings in question had not yet even-tuated in any order affecting the bankruptcy court's control of the debtor's property and that "if and when judicial proceedings are com-menced to enforce such an order, then it may well be proper for the Bankruptcy Court to exercise its concurrent jurisdiction under 28

---

273. *Compare* 11 U.S.C. § 548(d)(1)(1988) *with* UNIF. FRAUDULENT TRANSFER ACT § 6, 7A U.L.A. 658-59 (1985).

274. 112 S. Ct. 459 (1991).

275. *Id.* at 463-64.

U.S.C. § 1334(b)."[276]

In *In re Colonial Realty Co.*[277] a Connecticut bankruptcy court did not hesitate to invoke its concurrent jurisdiction over a section 1821(d)(17) fraudulent transfer action brought by the FDIC in the United States District Court for the Southern District of Florida.[278] The FDIC argued that the automatic stay does not apply to proceedings instituted by the FDIC under § 1821(d)(17) and that it should not be bound by the stay or any ruling of the bankruptcy court based on the stay.[279] The bankruptcy court disagreed and entered an injunction against the continuation of the action by the FDIC.[280] The district court affirmed[281] in the following unequivocal language:

> Inasmuch as Congress has not explicitly stated that the FDIC is exempt from the automatic stay and there is no other authority for such an exception, I simply cannot accept the position of the FDIC so that it may, without prior bankruptcy court approval, decide that any action it wishes to bring to recover fraudulent conveyances complies with 12 U.S.C. section 1821(d)(17). Were the FDIC allowed to circumvent the automatic stay for such purposes, certainly every bankruptcy case involving a debtor to an insolvent depositary institution in receivership—a very large number of cases—would degenerate into chaos, as the FDIC and other creditors compete and race for assets around the world and as the trustee seeks to intervene, as suggested by the FDIC, in every action it believes the FDIC should be prevented from continuing.
>
> We have no evidence that Congress intended any such irrational and destructive result or that it intended to remove the process of

---

276. *Id.* at 464.

277. 134 B.R. 1017 (Bankr. D. Conn. 1991), *aff'd*, Civ. No. 3:91-200X, 1991 WL 288833 (D. Conn. Dec. 30, 1991).

278. *Id.* at 1020-21.

279. *Id.* at 1019-20.

280. *Id.* at 1025. The bankruptcy court pointed out that although § 1821(d)(17)(D) grants the FDIC rights superior to those of the bankruptcy trustee, this grant does not immunize the FDIC from application of the automatic stay. A secured creditor likewise enjoys superiority to the rights of the trustee but remains subject to the stay. Moreover, "[t]he automatic stay provisions do not constitute a 'right' of a trustee, but a congressionally-mandated restraint that springs into existence upon the filing of a bankruptcy case." *Id.* at 1021. General Counsel for the FDIC and RTC announced that § 1821(d)(17) "was added to ensure that the special powers given to a conservator/receiver of a failed financial institution and FDIC/RTC corporate may not be utilized by a bankruptcy trustee under 11 U.S.C. section 544(b), and to provide that the claims of a conservator/receiver and/or FDIC/RTC corporate are superior to the claims of a bankruptcy trustee." Alfred J.T. Byrne, *Basic Issues Affecting the FDIC and the RTC in Bankruptcy Cases*, 65th Annual Meeting of the National Conference of Bankruptcy Judges 7-39, 7-42 (1992).

281. *In re* Colonial Realty Co., Civ. No. 3:91-200X, 1991 WL 288833 (D. Conn. Dec. 30, 1991).

recovering assets from the administrative oversight of the bankruptcy courts.[282]

## VIII. CONCLUSION

The UFCA, UFTA, and the Bankruptcy Code have all assimilated the treatment of fraudulent obligations to the treatment of fraudulent transfers. When property that has been fraudulently transferred is no longer recoverable, the transferee has been subjected to an obligation to pay for its value, typically measured as of the time of the transfer. If the transfer is avoided and the property is recovered, the Bankruptcy Code contains implications that the transferee has a claim for the value of the property disgorged. The courts generally have declined to allow a claim on behalf of a transferee who is found guilty of intentional fraud, but there is authority to the contrary. Good faith transferees or obligees are accorded a lien against the fraudulently transferred property to the extent they gave value for the property. Equitably subordinating the claim of a fraudulent transferee pursuant to section 510(c) of the Bankruptcy Code has been recognized as appropriate in a number of recent cases. Although equitable subordination may be useful in fashioning relief in particular circumstances, it probably has limited utility as a remedy against fraudulent transferees and obligees.

It is sometimes difficult to determine who is a transferee in a fraudulent transaction when the defendant argues that it was merely a conduit. In *Bonded Financial Services, Inc. v. European American Bank*[283] Judge Easterbrook required that a defendant have "dominion over the money or other asset, the right to put the money to one's own purposes," in order to be a transferee.[284] The *Kaiser Steel* cases, however, complicated the definition of transferee. The bankruptcy court held that stockbrokers who had received funds from the debtor in redemption of customer stock are liable as transferees because they act as agents for undisclosed principals.[285] The district court reversed, however, holding that agency principles do not apply.[286] The Tenth Circuit affirmed on the basis that section 546(e) of the Code precludes

---

282. *Id.* at *6–*7.

283. 838 F.2d 890 (7th Cir. 1988).

284. *Id.* at 893.

285. Kaiser Steel Corp. v. Jacobs (*In re Kaiser Steel Corp.*), 105 B.R. 639, 649-50 (Bankr. D. Colo. 1989), *rev'd sub nom.* Kaiser Steel Resources, Inc. v. Jacobs (*In re Kaiser Steel Corp.*), 110 B.R. 514 (D. Colo.), *aff'd sub nom. Kaiser I*, 913 F.2d 846 (10th Cir. 1990).

286. *Kaiser Steel Resources*, 110 B.R. at 522-23.

any recovery from stockbrokers.[287] The Tenth Circuit did not reach the correctness of the district court's ruling in favor of the stockbrokers grounded on a lack of contractual relationship between the stockbrokers and the corporate debtor.

The law of fraudulent transfers allows recovery from transferees of property or its value when the property has been transferred to defeat creditors' rights. Professor Glenn's treatise, *Fraudulent Conveyances and Preferences*, has been influential in deterring the recognition of any liability in tort for aiding and abetting a fraudulent transfer.[288] Nonetheless, a judicial willingness to impose liability on those who aid and abet fraudulent transfers is emerging. Such liability has not been predicated on the law of fraudulent conveyances but on implications derived from the law governing fiduciary relationships and from recently enacted statutes, including the Bankruptcy Code and the RICO Act. Courts have no difficulty finding that the bankruptcy trustee has standing to assert RICO claims if the debtor is an entity. However, individual debtors are another matter because they are *in pari delicto*. *Barnett v. Stern*[289] recognized that the trustee in bankruptcy has standing to represent all creditors in proceedings under the Act against persons involved in prepetition fraudulent transfers. In distinguishing *Caplin v. Marine Midland Grace Trust Co.*,[290] the court relied on cases that allowed the trustee to pursue alter-ego causes of action.[291] However, RICO's effectiveness has been limited by several cases which have indicated that RICO claims brought by creditors are too speculative or are not ripe until the fraudulent transfer claims of the trustee are resolved.[292]

Section 546(a) of the Bankruptcy Code requires trustees to bring actions to avoid fraudulent transfers within two years of their appointment or before the closing or dismissal of the case. The debtor in possession appears not to be subject to a time limitation as long as the case is pending. With the exception of Bankruptcy Judge Lifland's opinion in *Korvettes, Inc. v. Sanyo Electric (In re Korvettes, Inc.)*,[293] the courts applied the statute as it was written until 1990, when four courts, including the Tenth Circuit in *Zilkha Energy Co. v. Leigh-*

---

287. *Kaiser II*, 952 F.2d 1230 (10th Cir. 1991), *cert. denied*, 112 S. Ct. 3015 (1992); *Kaiser I*, 913 F.2d 846 (10th Cir. 1990).

288. *See supra* notes 3-4 and accompanying text.

289. 93 B.R. 962 (N.D. Ill. 1988), *rev'd on other grounds*, 909 F.2d 973 (7th Cir. 1990).

290. 406 U.S. 416 (1972).

291. *Barnett*, 93 B.R. at 967-72.

292. *See supra* notes 117-21 and accompanying text.

293. 42 B.R. 217 (Bankr. S.D.N.Y. 1984), *rev'd*, 67 B.R. 730 (S.D.N.Y. 1986).

ton,[294] rewrote the statute and subjected debtors in possession to the two-year statute of limitations. Under pre-Code law a liquidating trustee was given two years within which to bring avoidance actions, but the statute of limitations was tolled during the pendency of a reorganization case. The tolling provisions of the Bankruptcy Act applicable in reorganization cases were not incorporated into the Bankruptcy Code, but there is no evidence that Congress intended to deny the benefit of tolling to debtors in possession. In view of the duties and incentives operating when a debtor is retained in possession, the *Zilkha* interpretation of section 546(a) is seriously objectionable on policy grounds.

It was held in the *Gleneagles* case[295] that state statutes of limitations on fraudulent transfer actions are not operative against the federal government.[296] According to the prevailing view, if the applicable state period of limitations has not expired when a debtor files bankruptcy, section 546(a) extends the limitations period. A potential conflict between sections 108(a) and 546(a) of the Code has been resolved by recognizing that when the latter section applies, a federal rather than a state cause of action is being asserted. Moreover, section 108(a) applies only to causes of action that belong to the debtor; it does not apply to causes of action the trustee asserts by way of subrogation under section 544(b).[297]

The UFTA, UFCA, and section 548 of the Bankruptcy Code have generally been held applicable to fraudulent transfer claims that arise from leveraged buyouts, but the Tenth Circuit in the two *Kaiser Steel* cases has held that section 546(e) bars the trustee from recovering against stockholders who are either stockbrokers or who are represented by stockbrokers—at least when the distributions to the stockbrokers could be considered settlement payments.[298] Kaiser's argument that section 546(e) was not intended to immunize extraordinary securities transactions like leveraged buyouts was rejected on the basis of a literal reading of the statute.[299] Although shareholders who sold their shares prior to an LBO and those who sold them afterward may be in quite different positions *vis-a-vis* creditors of the corporate debtor, the court took comfort in treating them the same way under its reading of

---

294. 920 F.2d 1520 (10th Cir. 1990).

295. United States v. Gleneagles Inv. Co., 565 F. Supp. 556 (M.D. Pa. 1983), *aff'd sub nom.* United States v. Tabor Court Realty Corp., 803 F.2d 1288 (3rd Cir. 1986), *cert. denied*, 483 U.S. 1005 (1987).

296. *Id.* at 583.

297. *See* Lynn v. NCNB Texas Nat'l Bank (*In re* Corland Corp.), Adv. No. 388-3529 (Bankr. N.D. Tex. Aug. 3, 1989).

298. *See supra* notes 206-61 and accompanying text.

299. *Kaiser II*, 952 F.2d 1230, 1238-41 (10th Cir. 1991), *cert. denied*, 112 S. Ct. 3015 (1992).

section 546(e). It is unfortunate that the court refused to consider the legislative history of the statute in construing the undefined term "settlement payment."

Congress added section 1821(d)(17) to Title 12 as a special fraudulent transfer law for the FDIC and other conservators of insured depository institutions who pursue property and its proceeds fraudulently disposed of by those responsible for the "dramatic decline of the savings and loan industry."[300] The statute grants superiority for the rights it creates over the trustee's rights under the Bankruptcy Code. Section 1821(d)(17) is not well drafted, however, and appears not to reach constructively fraudulent transfers. It has a five-year statute of limitations but has been construed to have a retroactive application. The District Court of Connecticut in *In re Colonial Realty Co.*[301] held that the statute does not preclude applicability of the automatic stay and upheld an injunction issued by the bankruptcy court against the FDIC's pursuit of its new remedy, notwithstanding its statutory superiority.[302]

---

300. 136 CONG. REC. E 3684 (1990) (statement of Rep. Schuler); *see supra* notes 262-82 and accompanying text.

301. Civ. No. 3:91-200X, 1991 WL 288833 (D. Conn. Dec. 30, 1991).

302. *Id.* at *6-*7.