UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

OLD LADDER LITIGATION CO., LLC, as Litigation          :
Designee on behalf of the Liquidation Trust,           :
                                                       :
                              Plaintiff,               :    08 cv 0876 (RMB)(THK)
                                                       :
            vs.                                        :
                                                       :
INVESTCORP BANK B.S.C., et al.,                        :
                                                       :
                              Defendants.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


**APPENDIX OF UNREPORTED AUTHORITIES REGARDING REPLY
MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTIONS TO
TRANSFER VENUE AND TO DISMISS THE COMPLAINT**

I.    **CASES**

1. *Ario v. Deloitte & Touche LLP*, No. 7345 M.D. 2002, Memorandum Opinion and Order, (Pa. Commw. Ct. June 13, 2008)

2. *In re Authentidate Holding Corp. Sec. Litig.*, Master File 05 Civ. 5323, 2006 U.S. Dist. LEXIS 47971 (S.D.N.Y July 14, 2006)

3. *In re Dean Witter Partnership Litig.*, C.A. No. 14816, 1998 Del. Ch. LEXIS 133 (Del. Ch. July 17, 1998)

4. *Miller v. Santilli*, No. 1225, 2007 Phila. Ct. Com. Pl. LEXIS 252 (Phila. Ct. Com. Pl. Sept. 20, 2007)

5. *Nelson v. Emerson*, C.A. No. 2937, 2008 WL 1961150 (Del. Ch. May 6, 2008)

6. *Thompson v. Glenmede Trust Co.*, No. Civ. A. 92-5233, 1993 WL 197031 (E.D. Pa. June 8, 1993)

7. *In re Total Containment, Inc.*, Adv. No. 05-0145, 2008 WL 682455 (Bankr. E.D. Pa. Mar. 5, 2008)

8. *Zito v. Leasecomm Corp.*, 02 Civ. 8074, 2003 U.S. Dist. LEXIS 17236 (S.D.N.Y. Sept. 30, 2003)

II.    **OTHER AUTHORITIES**

9. Gen. Order M10-450 (July 10, 1984)

Dated: New York, New York
      July 29, 2008

                         SKADDEN, ARPS, SLATE, MEAGHER
                         & FLOM LLP

                         /s/ William P. Frank
                         William P. Frank
                         (William.Frank@skadden.com)
                         Four Times Square
                         New York, New York  10036
                         (212) 735-3000
                              and
                         Anthony W. Clark
                         (Anthony.Clark@skadden.com)
                         One Rodney Square
                         P.O. Box 636
                         Wilmington, Delaware 19899
                         (302) 651-3000
                         Counsel for Investcorp Entity Defendants
                         and Investcorp Director Defendants

Exhibit 1

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Joel S. Ario,
Insurance Commissioner of the
Commonwealth of Pennsylvania,
in his Official Capacity as Liquidator
of Reliance Insurance Company,
               Plaintiff

    v.                        No. 734 M.D. 2002

Deloitte & Touche LLP and
Jan A. Lommele,
               Defendants



## Memorandum Opinion and Order

Before this Court is the summary judgment motion filed by Deloitte & Touche, LLP (Deloitte) and Jan A. Lommele (Lommele) in response to a complaint filed by Joel S. Ario,[1] Acting Insurance Commissioner of the Commonwealth of Pennsylvania, in his capacity as statutory liquidator on behalf of Reliance Insurance Company (Reliance).

## I. Background

On May 29, 2001, and October 3, 2001, pursuant to Chapter V of the Insurance Department Act (Act),[2] this Court ordered respectively the rehabilitation

---

[1] When the complaint was filed, M. Diane Koken was the Insurance Commissioner for the Commonwealth of Pennsylvania. Subsequently, Ms. Koken retired from state service and Joel S. Ario was appointed acting insurance commissioner.

[2] Act of May 17, 1921, P.L. 789, *as amended*, 40 P.S. §§211-221.63.

and the liquidation of Reliance Insurance Company,[3] due to insolvency.  Pursuant to those orders, the Insurance Commissioner was appointed statutory liquidator (Liquidator)[4] and vested with all powers that position conferred upon him by the Act.  *See* Sections 521 and 523(23) of the Act, 40 P.S. §§221.21 and 221.23(23).  Pursuant to those powers, a complaint was filed in this Court's original jurisdiction against Saul P. Steinberg, Robert M. Steinberg, George R. Baker, George E. Bello, Dennis A. Busti, Lowell C. Freiberg, Kenneth R. Frohlich, Thomas P. Gerrity, Stewart J. Gerson, Linda S. Kaiser, Jewell Jackson McCabe, Irving Schneider, Bernard L. Schwartz, Richard E. Snyder, Bruce E. Spivey, Howard E. Steinberg, James E. Yacobucci and Paul W. Zeller (collectively, Officers and Directors) alleging a claim for breach of fiduciary duty.  In addition, there were claims for negligence, malpractice, misrepresentation and breach of contract against Deloitte and Touche and Jan A. Lommele.  The complaint against the Officers and

---

[3] In May 2001, M. Diane Koken, Insurance Commissioner for the Commonwealth of Pennsylvania, presented the Court with a petition to rehabilitate Reliance Insurance Company (Reliance Estate).  By order of this Court dated May 29, 2001, the Commissioner was appointed Rehabilitator of the Reliance Estate pursuant to Article V of the Pennsylvania Insurance Department Act, 40 P.S. §§221.1-231.  By the terms of that order, all assets of the Reliance Estate were placed under the control of the Commissioner acting as Rehabilitator and the Commonwealth Court.

Subsequently, the Liquidator advised the Court that with an Estate value nearing, if not in excess of $200 million, and potential claims numbering in the hundreds of thousands, the insolvency of the Reliance Estate was more profound than initially presented, and it was in need of immediate and constant attention.  Upon further petition dated October 3, 2001, the Commissioner advised this Court that she consented to the entry of an order terminating the rehabilitation of the Reliance Estate, placing the Reliance Estate into liquidation, and appointing the Commissioner as Liquidator, pursuant to Article V.  This Court granted the petition, and Reliance was placed into liquidation.

[4] In May 2001, M. Diane Koken was the Insurance Commissioner for the Commonwealth of Pennsylvania.  Following Ms. Koken's retirement, Joel S. Ario was appointed acting Insurance Commissioner.

Directors has settled.  We now address Defendants, Deloitte and Touche and Jan A. Lommele (collectively, Deloitte) motion for summary judgment as to Counts I through VII[5] of the Amended Complaint.  For the reasons that follow, the Motion is denied in part and granted in part.

## II.  Uncontested Facts

The genesis of Reliance is the Fire Association of Philadelphia, which was comprised of five volunteer fire companies that organized in 1817 and began underwriting fire insurance.  Domiciled in Pennsylvania for regulatory purposes, Reliance maintained its headquarters in Philadelphia where it successfully underwrote personal and commercial insurance accounts.  Its growth into one of the largest property and casualty insurance companies in the United States began in 1968, when Leasco Data Processing Equipment corporate founder Saul Steinberg acquired Reliance.  The acquisition was the result of a leveraged buyout that Steinberg engineered using $400 million borrowed from Leasco shareholders.

Steinberg bought both Reliance and Leasco in 1982 and turned them into one privately held company.  Later, in 1986 Steinberg took the business public with a publicly traded insurance holding company, Reliance Group Holdings (RGH), which company wholly owned Reliance Financial Services (RFS).  RFS wholly owned Reliance Insurance Company (Reliance).  The public stock offering raised $550 million in new capital, adding to the issuance of senior notes and

---

[5] The Liquidator filed an eight count complaint.  Count VIII alleges that fees paid to Defendants constitute a preference payment.  That Count is not part of Defendants motion for summary judgment.

subordinated debentures. At all relevant times, the member composition of the Board of Directors of RGH, RFS, and Reliance was nearly identical.

Additionally, in 1987 the Reliance Board of Directors authorized the creation of Reliance National (RN) for the purpose of underwriting professional liability and directors and officers coverage. By 1998, RN by underwriting policies designed to achieve rapid growth in the company had exploded into a company that wrote $3 billion in gross written premiums. RN wrote polices of international reinsurance, substandard personal auto, environmental liability, petrochemical casualty, boiler and machinery, financing guaranty for agricultural output and motion pictures, and healthcare coverage for nursing homes and community health plans, and medical malpractice coverage for emergency room physicians. While RN was generating revenue through its specialty market policies, Reliance was experiencing marginal growth as by the mid-1990's, there was strong competition in the property and casualty insurance industry resulting in the lowering of prices to maintain business.

Diminished Reliance[6] revenue was a main concern to RGH and RFS, which depended upon Reliance for income. The RGH/RFS shareholders, of whom

_____

[6] As of December 1999, eight property and casualty insurance companies participated in a pooling arrangement that transferred their loss and loss adjustment expense exposure to Reliance. The companies in the pooling arrangement were: Reliance Insurance Company (94% pool percentage), United Pacific Insurance Company (1% pool percentage), Reliance National Indemnity Company (1% pool percentage), Reliance Insurance Company of Illinois (1% pool percentage), Reliance National Insurance Company (1% pool percentage), Reliance Universal Insurance Company (1% pool percentage), Reliant Insurance Company (0.5% pool percentage), Reliance Direct Insurance Company (0.5% pool percentage). Seven companies after application of external and intercompany reinsurance arrangements ceded all of their loss and loss adjustment expense exposure to Reliance. Reliance, after application of external reinsurance arrangements, retained 94% of the remaining net loss and loss adjustment expense exposure and **(Footnote continued on next page...)**

Saul Steinberg was one, were recipients of a portion of the payments Reliance made to RGH and RFS. From 1998 through the first half of 2000, relying upon the financial statements prepared by Deloitte, the Reliance Directors caused Reliance to pay its parent companies over $500 million in cash. While the monies flowed out of Reliance, the Reliance Directors did not require RGH to pay $200 million RGH owed Reliance. To further compound problems, by 1999 there were substantial financial losses resulting from the rapid growth initiatives. The financial effect of the combination of the drain on revenue, coupled with the Upstream Payments[7] to RGH and RFS and the forecast of increased risk but diminished revenue, was to be measured and analyzed by Deloitte and Touche (Deloitte).

Deloitte provided auditing and actuarial services to RGH, RFS, and Reliance for a number of years up to and including the year 1999. In its capacity as auditor, Deloitte provided statements of actuarial opinion regarding the loss reserves[8] carried by Reliance, conducted audits of Reliance's financial statements,[9]

---

**(continued...)**

distributed the remaining 6% back to the seven companies according to the pool percentages listed in the parenthetical.

[7] Reliance's payment of $91.4 million to RGH in June and July 2000 is referred to throughout the opinion as the "Upstream Payment."

[8] "Reserves" or "loss reserves" – the amount carried as liabilities in the financial reporting of an insurer and established by estimating future payments based on pending claims. An insurer's increase in reserves negatively affects the company's profits as it reduces the surplus potentially available for dividends to shareholders. *Norton on Insurance Coverage in Pennsylvania*, Second Edition, Picadio, Anthony P. and Gillespie, Bridget M. 2006.

[9] Reliance was required to submit to the Insurance Department audited financial statements prepared in conformity with statutory accounting principles (SAP) (*see* section 320 of the Insurance Company Law, 40 P.S. §443 relating to annual and other reports). The audited financial statements were also required to be prepared in accordance with generally accepted accounting principles (GAAP).

and issued reports on those audits.[10] Deloitte's services were performed pursuant to engagement letters countersigned by Reliance.[11]

In each engagement letter (letters dated 1998, 1999, and 2000) Deloitte agreed and represented that it would

> "serve as an independent accountants and auditors for Reliance. ... [A]udit [Reliance's] consolidated financial statements for the year ending December 1998 [1999, 2000] ... in accordance with generally accepted auditing standards, ... which includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.
> ....
>
> In connection with the planning and the performance of [the] audit, ... [w]e [Deloitte] will report directly to the Audit Committee any fraud of which we become aware that involves senior management, and any fraud (whether caused by senior management or other employees) of which we become aware that causes a material misstatement of the financial statements.

---

[10] The audits of Reliance's financial statements were to be done in accordance with General Accepted Auditing Standards (GAAS). Under this standard the auditor's report:

  (1)    shall state whether the financial statements were presented in accordance with GAAP or another comprehensive basis of accounting;

  (2)    shall identify the circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period;

  (3)    shall contain informative disclosures in the financial statements which are to be reasonably adequate unless otherwise stated in the report; and,

  (4)    shall contain either an expression of opinion regarding the financial statements taken as a whole, or an assertion to the effect that an opinion cannot be expressed.

When an overall opinion cannot be expressed, the reasons thereof shall be stated. Finally, where an auditor's name is associated with financial statements, the report should contain an indication of the character of the auditor's work, if any, and the degree of responsibility that the auditor is accepting.

[11] Engagement Letters pertaining to years, 1998, 1999, and 2000 are appended to the Amended Complaint, and can also be found at Exhibit 47 appended to the Liquidator's Response to Defendants' Motion for Summary Judgment.

07-18-2008    08:58 AM    Client Ref:    From: PICS    To:    Page    9

....

We will also report directly to Reliance Insurance Company and the Audit Committee, matters coming to our attention during the course of our audit that we believe are reportable conditions. Reportable conditions are significant deficiencies in the design or operation of internal control that could adversely affect the Company's ability to record, process, summarize, and report financial data consistent with the assertions of management in the financial statements.

....

We estimate that our total fees for this audit will range from $1,500,000 to $1,800,000 plus actual out-of-pocket expenses (e.g., travel, typing, telephone).

...

Our fee for services encompasses the financial statements of each of the Reliance related entities.

(Liquidator's Reply to the Defendants' Motion for Summary Judgment, Exhibit 43, Exhibit C, pages 1-4.)

The Reliance 1999 Annual Statement filed with the Department of Insurance (Department) on March 1, 2000, showed Reliance's risk-based capital (RBC) level[12] at 187.3 which is within the "Company Action Level."[13] This level

---

[12] "RBC level" or risk based capital level – an insurer's company action level RBC (risk based capital). 40 P.S. §221.1-A. The RBC calculation formula takes into account asset risk, credit risk, underwriting risk, and all other business risks and other relevant risks as are set forth in the RBC instructions. 40 P.S. 221.5-A.

[13] "Company action level" means one or more of the following events:
    (1) the filing of an RBC report by an insurer that indicates that:
        (i) the insurer's total adjusted capital is greater than or equal to its regulatory action level RBC but less than its company action level RBC....

See 40 P.S. §221.1-A. When a company action level event occurs, the insurer shall prepare and submit to the Insurance Commissioner an RBC plan that shall include, at a minimum, all of the following:

**(Footnote continued on next page...)**

07-18-2008     08:50 AM     Client Ref:          From: PICS          To:          Page  10

of deficiency triggers enhanced regulatory oversight, including submission of a risk based capital plan to resolve the deficiency. (Deloitte Auditor's Report, May 26, 2000, Note 14.) Accompanying the 1999 Annual Statement was a Statement of Actuarial Opinion signed by Jan Lommele of Deloitte opining that Reliance's loss and loss adjustment expenses at December 31, 1999 made a "reasonable provision in the aggregate for all unpaid loss and loss expense obligations...." On June 1, 2000, Deloitte issued an audit report on Reliance's statutory financial statements, including an opinion that the statements fairly presented Reliance's financial condition under applicable statutory accounting principles.

In the complaint, the Liquidator has asserted that Deloitte committed both actuarial and audit malpractice. The Liquidator has alleged that Deloitte

---

**(continued...)**

    (1) Identification of the conditions that contribute to the company action level event.
    (2) Proposals of corrective actions that the insurer intends to take and that would be expected to result in the elimination of the company action level event.
    (3) Projections of the insurer's financial results for the current year and at least the four succeeding years, both in the absence of proposed corrective actions and giving effect to the proposed corrective actions, including projections of statutory operating income, net income, and capital surplus. Projections for both new and renewal business may include separate projections for each major line of business and separately identify each significant income, expense and benefit component.
    (4) Identification of the key assumptions impacting the insurer's projections and the sensitivity of the projections to the assumptions.
    (5) Identification of the quality of and problems associated with the insurer's business, including, but not limited to, its assets, anticipated business growth and associated surplus strain, extraordinary exposure to risk, mix of business and use of reinsurance, if any, in each case. ...

40 P.S. §221.6-A(a).

violated auditing standards and in doing so committed actuarial malpractice by improperly certifying that Reliance's loss reserves were reasonably stated in the 1999 Statement of Actuarial Opinion. It has been alleged that because of that malpractice, Reliance overstated its surplus in the 1999 Annual Statement. Further, because of Deloitte's audit malpractice there was a misrepresentation of financial condition in Reliance's 1999 financial statements in the form of an overstatement of Reliance's surplus. That misrepresentation caused Reliance to escape regulatory scrutiny and caused Reliance to pay RGH $91.4 million in June and July 2000 ("Upstream Payment"), which payment coupled with additional underwriting losses deepened Reliance's insolvency.

For the purposes of this summary judgment motion, Deloitte does not contest the Liquidator's allegations of malpractice. Instead, Deloitte argues that that the Liquidator's deepening insolvency damages are unavailable as a matter of law, and further, that the Liquidator is unable to establish causation. In response, the Liquidator counters that a determination of causation is a factual determination for the jury to resolve.

## II. Standard of Review

A motion for summary judgment may only be granted in the clearest of cases. Pa. R.C.P. No. 1035. A court shall grant a motion for summary judgment only where no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or, if after the completion of discovery relevant to the motion, an adverse party who will bear the burden of proof at trial has failed to

produce evidence of facts essential to the cause of action or defense. Pa. R.C.P. No. 1035.2; *Swords v. Harleysville Insurance Company*, 883 A.2d 562 (Pa. 2005).

In reviewing a motion for summary judgment, the court must examine the record in the light most favorable to the non-moving party. *Id.* The court must be able to determine whether the moving party is entitled to judgment as a matter of law. All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party and in favor of the non-moving party. *Cooper v. Delaware Valley Medical Center*, 654 A.2d 547 (Pa. 1995). To defeat a summary judgment motion, the adverse party must come forth with evidence showing the existence of the facts essential to the cause of action or defense. Note to Rule 1035.2.

## III. Discussion

Deloitte contends that it is entitled to summary judgment on all claims as the Liquidator is unable to prove either harm or causation. Deloitte argues that deepening insolvency damages are not available in a malpractice action and in support of its position relies on *In re CitX Corp.*, 448 F.3d 672 (3d Cir. 2006). Deloitte contends that the Reliance Officers and Directors authorized the payment of the Upstream Payments. Deloitte suggests that the $134 million underwriting loss was caused by company mismanagement.

### A. Upstream Payment

The Liquidator advances the theory that because of the actions of Deloitte, or lack thereof, Reliance suffered two independent damages. The first damage was the Upstream Payment.

10

Deloitte contends that with regard to the Upstream Payment the Liquidator has failed to establish that Deloitte could have prevented the Upstream Payment. On this issue, the Liquidator has averred, if, after reviewing the financial statements, Deloitte had proffered a more candid opinion, giving consideration to all Reliance related entities, the Upstream Payment of $91.4 million would not have been made. The argument is novel, but illusory, as it is without foundation.

For tort liability to exist, the defendant, by an act or omission, must have injured the plaintiff by disregarding a duty imposed by law. 26-162 Appleman on Insurance § 162.6. The evidence is that the $91.4 million was a debt Reliance owed RGH. The financial statements captured the debt. There is no evidence that Deloitte's engagement extended beyond the audit of the financial statements. There is no evidence that Deloitte assisted Reliance in its making of business decisions, that it advised Reliance regarding the propriety of making the Upstream Payment, or that Deloitte failed to include the Upstream Payment in the financial statements. *Sub judice*, there is no evidence suggesting that with regard to the issuance of the $91.4 million Upstream Payment, Deloitte breached a duty owed to Reliance. Thus, Deloitte's motion for summary judgment as to the issuance of the Upstream Payment IS GRANTED.

## B. $134 million underwriting losses

### i.     *Summary Judgment – deepening insolvency damages*

Deloitte seeks summary judgment based upon *CitX Corp.*, contending that Pennsylvania law does not recognize deepening insolvency damages. This issue is one of first impression, resolution of which is rooted in tort law. A professional malpractice claim premised on a negligence theory is recognized in

11

Pennsylvania. *Guy v. Liederbach,* 459 A.2d 744 (Pa. 1983). To prevail on the claim, the Liquidator must establish that (1) Deloitte owed a duty to Reliance and its policyholders, (2) Deloitte breached its duty, (3) Reliance was harmed, and (4) Deloitte's breach of duty caused the harm Reliance suffered. *Martin v. Evans,* 711 A.2d 458 (Pa. 1998). Deloitte relies on *CitX Corp.*[14] to support its position that the harm alleged, *i.e.,* deepening insolvency, is not recoverable under Pennsylvania law. Further, even if deepening insolvency can constitute a valid damage award, Deloitte argues that the Liquidator is unable to prove the causation element of a negligence claim. This Court disagrees with the arguments advanced by Deloitte.

In *CitX,* Detweiler, Hershey and Associates and Robert Schoen, CPA (the accounting firm) compiled the financial statements for an internet company that subsequently filed for bankruptcy. The financial statements were used to attract additional investors. *Id.,* 448 F.3d at 674. As a result of the financial statements, new investment flowed into the company. However, the money flowed out more quickly than it flowed in, resulting in the company incurring millions in debt, and ending with a declaration of bankruptcy. Seitz, the trustee in bankruptcy, filed an action against the accounting firm alleging malpractice and deepening insolvency. *Id.* The Third Circuit affirmed the district court's grant of summary judgment in favor of the accounting firm, finding that the trustee's evidence was based largely upon a false affidavit given by the company's chief operating officer. The Third Circuit concluded that deepening insolvency was not a "valid theory of

_____

[14] "Decisions of the federal district courts and courts of appeals, including those of the Third Circuit Court of Appeals, are not binding on Pennsylvania courts, even when a federal question is involved. *Chiropractic Nutritional Associations v. Empire Blue Cross & Blue Shield,* 669 A.2d 975 (Pa. Super. 1995); *see also, Hall v. Pennsylvania Board of Probation and Parole,* 851 A.2d 859, 865 (Pa. 2005). However, Pennsylvania Courts frequently look to the Federal Courts for guidance.

damages for an independent cause of action." *CitX Corp.*, 448 F.2d at 677.  In reaching that conclusion the Third Circuit considered *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340 (3d Cir. 2001).

In *Lafferty & Co.*, the Court defined deepening insolvency as "an injury to a debtor's corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life." *Id.* at 347.  In *Lafferty*, the Official Committee of Unsecured Creditors brought a claim on behalf of two debtor corporations alleging that certain third parties had fraudulently induced the corporations to issue debt securities, which deepened their insolvency and ultimately forced them into bankruptcy.  The district court interpreted Pennsylvania law in part through an analysis of federal law and, in part, through an analysis of Pennsylvania common law.

In recognizing deepening insolvency, the 7th Circuit concluded that cases that oppose deepening insolvency rest upon the seriously flawed assumption that prolongation of a corporation's life beyond insolvency is automatically to be considered a benefit to the corporation's interests. *Schnacht v. Brown*, 711 F.2d 1343 (7th Cir. Ill. 1983).  Similarly, in *Hannover Corp. of America v. Beckner*, 211 B.R. 849, 854055 (M.D. La. 1997), the Louisiana Bankruptcy Court noted that "a corporation can suffer injury from fraudulently extended life, dissipation of assets, or increased insolvency.  Likewise, in *Allard v. Arthur Andersen & Co.*, 924 F.Supp. 488, 494 (S.D.N.Y. 1996), the Southern District of New York in applying New York law recognized the theory of deepening insolvency; as did the court in, *In re Gouiran Holdings, Inc.*, 165 B.R. 104, 107 (E.D.N.Y. 1994) (applying New York law, and refusing to dismiss claims brought by a creditor's committee because it was possible that two years of negligently prepared financial statements

could have been a substantial cause of the debtor incurring unmanageable debt and filing for bankruptcy).

In looking at Pennsylvania law, the *Lafferty* Court, citing 37 Pennsylvania Law Encyclopedia, Torts §4, at 120 (1961), recognized that the basic legal principle in this Commonwealth is that "for every legal wrong there must be a correlative legal right." *Id., (citation omitted)*. The court concluded that it could not rule out the existence of a cognizable injury but dismissed the case on other grounds. The circuit court affirmed, holding that "deepening insolvency was a valid cause of action under Pennsylvania law." *Id.* at 348.

Interpreting *Lafferty,* the *CitX* Court did not reject *Lafferty's* holding relating to deepening insolvency. Instead, the *CitX* Court understood *Lafferty* to mean that deepening insolvency is not a damage as that term is understood to mean remedy, but rather, deepening insolvency is a cause of action as that term is understood to mean a fact or facts which would entitle a person to sustain action and give one the right to seek a remedy. Specifically, the Court wrote:

> In that opinion [*Lafferty*], we concluded that deepening insolvency was a valid Pennsylvania cause of action. Although we did describe deepening insolvency as a 'type of injury,' and a 'theory of injury,' we never held that it was a valid theory of damages for an independent cause of action. Those statements in *Lafferty* were in the context of a deepening insolvency *cause of action*. They should not be interpreted to create a novel theory of damages for an independent cause of action like malpractice.

*CitX Corp.,* at 676 (citations omitted). However, the court went on to state that "[w]here an independent cause of action gives a firm a remedy for the increase in its liabilities, the decrease in fair asset value, or its lost profits, then the firm may

recover, without reference to the incidental impact upon the solvency calculation." *In re CitX Corp.*, 448 F.3d at 678 (quoting Sabin Willett, *The Shallows of Deepening Insolvency*, 69 Bus. Law. 549, 575 (2005)).

Again, in *The Official Committee of Unsecured Creditors of Allegheny Health, Education and Research Foundation v. Pricewaterhousecoopers, LLP*, 2:00cv684, 2007 U.S. Dist. LEXIS 3331, the district court was faced with the deepening insolvency theory of damages. To resolve the dichotomy that the conclusions in *CitX Corp.* and *Lafferty* presented, the district court juxtaposed the facts of each case. The *Allegheny Health* Court explained that in *CitX Corp,* the accountants prepared a mere compilation and expressly stated that it would not audit or review financial statements, whereas, in *Allegheny Health,* the accountants prepared audited financial statements. While the *Allegheny Health* Court found the distinction was of no moment, we find it compelling.

The amount and degree of responsibility undertaken by the accountant distinguishes a compilation and an audit. *Robert Wooler Co. v. Fidelity Bank,* 479 A.2d 1027, 1030 (Pa. Super. 1984), *petition for allowance of appeal denied,* 528 A.2d 957 (Pa. 1987). In an audited engagement, the accountant assumes responsibility for the accuracy of the figures presented in the financial statements. The accountant effectively warrants the reliability of the report, which he prepares. In an unaudited engagement, the accountant does not warrant and is not responsible for the ultimate accuracy of the report if the figures supplied by the client are erroneous. *Id.*

As the federal courts have noted, social policy gives life to tort law; its purpose is to protect the plaintiff, as a member of a class of people to whom a duty

15

is owed, to be free from unreasonable risk of injury. *See Hahn v. Atlantic Richfield Co.,* 625 F.2d 1095, 1104 (3d Cir. 1980) (citing *Bradshaw v. Rawlings,* 612 F.2d 135 (3d Cir. 1979)). The interest is protected by imposing the duty to perform to a certain standard of conduct on defendant as a matter of law. *Id.; see also, R.W. Manzek,* 888 A.2d 740, 746 (Pa. 2005). It is beyond cavil that under Pennsylvania law, accountants, as skilled professionals, are to provide services consistent with those of their profession at large. *Wooler,* 479 A.2d 1032. There is simply nothing in Pennsylvania law that insulates accountants from being sued for negligence in the performance of professional services. Concomitantly, nothing in Pennsylvania law shields accountants from a damage award when the plaintiff prevails on the negligence claim. Damages, which are by definition a pecuniary compensation or indemnity, include all suffered loss, detriment, or injury that occurs through the negligence of another that a plaintiff proves. Deepening insolvency can be both a loss and an injury that occurs through the negligence of another.

Deepening insolvency is an organic theory that reflects the dynamic nature of this global economy. It recognizes the expertise of professionals such as accountants, and, imposes an obligation upon those professionals to perform to the highest standards. And, where there is failure, if pled and proven, the deepening insolvency theory allows for the imposition of liability upon those professionals who through their failure to perform their duties, plunge institutions into financial despair, leaving regulatory agencies and bankruptcy courts to try and put "humpty dumpty" back together again.

This Court concludes that where deepening insolvency damages are sought, if the underlying action is based upon a complied financial statement, as in *CitX Corp.,* deepening insolvency damages may not be available. However,

16

where, as in *Allegheny Health*, the accountants have prepared an audited financial statement and the plaintiff has asserted independent causes of action, such as negligence, based upon the compiled financial statement, deepening insolvency damages are available. Thus, we conclude that while we do not recognize the deepening insolvency theory as an independent cause of action, if negligence is alleged and proven, the plaintiff may use the deepening insolvency matrix in calculating the damages caused by defendant's negligence.

*Sub judice*, the Liquidator has alleged that Deloitte negligently audited Reliance's financial statements. That alleged negligence caused, among other things, Reliance to pay debts it did not owe, increased Reliance's liabilities, and deflected regulatory scrutiny. Obviously, this Court finds merit in the statement contained on page 25 of the Liquidator's "Memorandum of Law in Opposition to Motion of Defendants Deloitte & Touche LLP and Jan A. Lommele for Partial Summary Judgment" that "deepening insolvency ... is simply the incidental impact of the harm caused by Deloitte's negligence." The Liquidator seeks to recover damages based on independent causes of action in the form of professional negligence, breach of contract, and aiding and abetting a breach of fiduciary duty. Accordingly, Deloitte is not entitled to summary judgment based on *CitX Corp.*.

### ii.    *Summary judgment causation theory too speculative*

Lastly, Deloitte seeks summary judgment on the basis that the Liquidator's theories of causation[15] are unduly speculative. Deloitte contends that

---

[15] The Liquidator posits that Deloitte's failure to follow GAAS and GAAP standards in performing its audits was a breach of Deloitte's fiduciary duty to Reliance and its policyholders and creditors. In addition, the Liquidator asserts that Deloitte knowingly participated in and/or aided and abetted Reliance's officers and directors in breaching their fiduciary duties to the **(Footnote continued on next page...)**

the Liquidator cannot establish that Deloitte's conduct is the proximate cause of any damages that Reliance may have sustained. To resolve the issues, Deloitte's

---

**(continued...)**

policyholders. Regarding the breach of fiduciary duty assertion, Section 874 of the Restatement (Second) Torts states

> A person who *knowingly assists* a fiduciary in committing a breach of trust is himself guilty of tortious conduct and is subject to liability for the harm thereby caused. (Emphasis added.)

> A claim for "knowing participation" in a breach of a fiduciary duty is made by proving (1) a breach by a fiduciary of obligations to another; (2) that the defendant knowingly induced or participated in the breach, and (3) that the plaintiff suffered damages as a result of the breach.

Restatement (Second) of Torts §874 (1979). Regarding the "aiding and abetting" assertion, Section §876 sets forth

> Persons Acting in Concert
> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts, Section 876 (1979). Parties act in concert when they act in accordance with an agreement, either express or implied, to cooperate in a particular line of conduct or to accomplish a particular result. The agreement may be understood to exist from the conduct itself. Whenever two or more persons commit tortious acts in concert, each becomes subject to liability for the acts of the others, as well as for his own acts. *Id., comment c.*

conduct must be evaluated to determine whether its actions and inactions were the proximate cause of Reliance's deepening insolvency.

The Supreme Court of Pennsylvania has consistently stated that in a negligence action, it is incumbent upon a plaintiff to establish a causal connection between a breach of some duty owed plaintiff and defendant's conduct, and it must be shown to have been the proximate cause of plaintiff's injury. In *Commerce Bank v. First Union National Bank*, 911 A.2d 133 (Pa. Super. 2006), the Superior Court explained that

> Proximate causation is defined as a wrongful act which was a substantial factor in bringing about the plaintiff's harm. Proximate cause does not exist where the causal chain of events resulting in plaintiff's injury is so remote as to appear highly extraordinary that the conduct could have brought about the harm.

> Proximate cause is a question of law to be determined by the court before the issue of actual cause may be put to the jury. A determination of legal causation, essentially regards whether the negligence, if any, was so remote that as a matter of law, the actor cannot be held legally responsible for the harm which subsequently occurred. Therefore, the court must determine whether the injury would have foreseen by an ordinary person as the natural and probable outcome of the act complained of.

> ...

> The following considerations are in themselves or in combination with one another important in determining whether the actor's actor is a substantial factor in bringing harm to another:

> (a)    the number of other factors which contribute to producing the harm and the extent of the effect which they have in producing it;

07-18-2008    08:50 AM    Client Ref:    From: PICS    To:    Page 22

> (b)    whether the actor's conduct created a force or a series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;

[and]

> (c)    lapse of time.

*Commerce Bank*, 911 A.2d at 141 (Pa. Super. 2006) (*quoting Lux v. Gerald E. Ort Trucking, Inc.*, 887 A.2d 1281, 1286-1288 (Pa. Super. 2005), *petition for allowance of appeal denied*, 901 A.2d 499 (Pa. 2006)). Distilled, this Court must decide the legal significance of Deloitte's malpractice, *i.e.*, whether Deloitte has established that its behavior as a matter of law permits Deloitte to avoid liability for the ensuing Reliance insolvency.

The Liquidator asserts Deloitte's malpractice was in the form of

> ➢  Deloitte's failure to identify understated loss reserves,

> ➢  Deloitte's reliance on a system of internal controls it knew or should have known were faulty;

> ➢  Deloitte's failure to plan and execute its audit to ensure that the internal control weaknesses did not result in material misstatements in the Reliance's financial statements;

> ➢  Deloitte's failure to question or exclude certain recorded assets resulting in an overstatement of surplus; failure to issue going concern opinions on the financial statements of Reliance and RGH at times when it knew or should have known of facts and circumstances that would have led a reasonable auditor to be skeptical of Reliance's ability to continue as a going concern for a reasonable period of time

(Amended Complaint, paragraph 142.)

 Upon review of the evidence, this Court finds that Deloitte has not established unequivocally that its conduct was not a substantial factor in bringing about the insolvency of Reliance Insurance Company.

 Deloitte knew that the business community, particularly A.M. Best, and the insurance departments throughout the country relied on the audits it prepared to determine the financial fitness of Reliance. Deloitte knew that any change in booked reserves could affect Reliance's A.M. Best rating. Deloitte also knew that any change in reserves would subject Reliance to regulatory scrutiny. Deloitte also either knew or should have known that businesses, large and small, relied on the A.M. Best rating when deciding whether to place business with Reliance. The financial statements prepared by Deloitte were an essential tool used to determine the financial soundness of Reliance.

 The essence of tort law is to reallocate risks when one person has wrongfully and without consent caused harm to another. See Ernest Weinrib, The Special Morality of Tort Law, 35 McGill L.J. 541 (1990). Here, it is not for this author, but for the trier of fact to determine whether a wrong has occurred and if so, whether the wrong caused harm. We find that the evidence presented by the Liquidator creates a genuine issue of material fact.

 Accordingly, we enter the following

## O R D E R

AND NOW, this 13th day of June, 2008, Deloitte's motion for summary judgment as to Counts I through VII of the Amended Complaint as it relates to the $91.4 million Upstream Payment is GRANTED; the motion for summary judgment as to Counts I through VII as it relates to the $134 million underwriting losses is DENIED.

James Gardner Colins, Senior Judge

Exhibit 2

LEXSEE 2006 US DIST LEXIS 47971

**IN RE AUTHENTIDATE HOLDING CORP. SECURITIES LITIGATION; This Document Relates To All Actions**

**MASTER FILE 05 Civ. 5323 (LTS)(DFE)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 47971; Fed. Sec. L. Rep. (CCH) P93,919*

**July 14, 2006, Decided**
**July 14, 2006, Filed**

**COUNSEL:** [*1] For Illinois State Board of Investment, Lead Plaintiff: Andrew J. Entwistle, Johnston de Forest Whitman, Jr., Richard William Gonnello, Entwistle & Cappucci LLP, New York, NY.

For Eli Friedman, Individually and on behalf of all others similarly situated, Plaintiff: Samuel Howard Rudman, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, LLP(LIs), Melville, NY.

For Authentidate Holding Corp., Defendant: Irwin Howard Warren, Weil, Gotshal & Manges LLP(NYC), New York, NY.

For Surendra Pai, Defendant: Irwin Howard Warren, Weil, Gotshall & Manges LLP(NYC), New York, NY.

For John J. Waters, Defendant: Irwin Howard Warren, Weil, Gotshal & Manges LLP(NYC), New York, NY.

For Denis H. Bunt, Defendant: Irwin Howard Warren, Weil, Gotshal & Manges LLP(NYC), New York, NY.

For Peter R. Smith, Defendant: Irwin Howard Warren, Weil, Gotshal & Manges LLP(NYC), New York, NY.

For John T. Botti, Defendant: Irwin Howard Warren, Weil, Gotshal & Manges LLP(NYC), New York, NY.

For Thomas Franceski, Defendant: Irwin Howard Warren, Weil, Gotshal & Manges LLP(NYC), New York, NY.

For F. Ross Johnson, Defendant: Irwin Howard Warren,

Weil, Gotshal & Manges LLP(NYC), New [*2] York, NY.

For Charles C. Johnston, Defendant: Irwin Howard Warren, Weil, Gotshal & Manges LLP(NYC), New York, NY.

For Steven A. Kriegsman, Defendant: Irwin Howard Warren, Weil, Gotshal & Manges LLP(NYC), New York, NY.

For J. David Luce, Defendant: Irwin Howard Warren, Weil, Gotshal & Manges LLP(NYC), New York, NY.

For J. Edward Sheridan, Defendant: Irwin Howard Warren, Weil, Gotshal & Manges LLP(NYC), New York, NY.

For Harry J. Silverman, Defendant: Irwin Howard Warren, Weil, Gotshal & Manges LLP(NYC), New York, NY.

For Erik Fidel, Movant: Curtis Victor Trinko, Law Offices of Curtis V. Trinko, LLP, New York, NY.

For Marit Fidel, Movant: Curtis Victor Trinko, Law Offices of Curtis V. Trinko, LLP, New York, NY.

For Stephen L. Waldman, Roy Laurence Jacobs, Roy Jacobs & Associates, New York, NY.

**JUDGES:** LAURA TAYLOR SWAIN, United States District Judge.

**OPINION BY:** LAURA TAYLOR SWAIN

2006 U.S. Dist. LEXIS 47971, *2; Fed. Sec. L. Rep. (CCH) P93,919

## OPINION

### OPINION AND ORDER

Defendant Authentidate Holding Corporation and the individual Defendants in this securities litigation have brought a motion to dismiss lead Plaintiffs' Consolidated Amended Securities Class Action Complaint ("Complaint") pursuant to *Rules 9(b)* and *12(b)(6)* of the Federal Rules of Civil Procedure [*3] and the Private Securities Litigation Reform Act ("PSLRA.") Defendants principally argue that several of Plaintiffs' claims are time-barred, that Plaintiffs lack standing to bring a claim under *Section 11* of the Securities Act, that Plaintiffs have failed sufficiently to plead loss causation as to their patent-related claims, that the Amended Complaint fails to plead facts demonstrating fraud as to each Defendant, and that Defendant Authentidate Holding Corp. ("Authentidate" or the "Company") did not misrepresent or omit to disclose a material fact. The Court has jurisdiction of this matter pursuant to *28 U.S.C. § 1331.*

For the reasons that follow, Plaintiffs' claims premised on the non-disclosure of the contract with the United States Postal Service, Plaintiffs' claims premised on the non-disclosure of any performance metrics or language regarding termination contained within that contract, and Plaintiffs' claims regarding non-disclosure of the Patent Office's rejection of Defendants' patent applications are dismissed with prejudice. All of Plaintiffs' remaining claims are dismissed without prejudice and with leave to replead.

### DISCUSSION

In deciding [*4] a motion brought pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* to dismiss a complaint for failure to state a claim, "the court must accept as true all of the well pleaded facts and consider those facts in the light most favorable to the plaintiff." *Hudson Valley Black Press v. Internal Revenue Service, 307 F. Supp. 2d 543, 545 (S.D.N.Y. 2004).* A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).* A court may consider, in deciding a motion to dismiss, documents that are integral to the complaint or are incorporated by reference in the pleadings. *See Rizzo v. The MacManus Group., Inc., 158*

*F. Supp. 2d 297, 301 (S.D.N.Y. 2001)* (a court may consider "documents that are incorporated by reference in the pleadings" when deciding a motion to dismiss under *Rule 12(b)(6)*), and *Sable v. Southmark/Envicon Capital Corp., 819 F. Supp. 324, 328 (S.D.N.Y. 1993)* (in deciding a motion to dismiss, [*5] a court "may consider documents which form the basis of allegations of fraud if the documents are 'integral to the complaint.'") (internal citations omitted)).

In order to state a claim for securities fraud under *Section 10(b)* of the Securities Exchange Act of 1934 ("Exchange Act") and *Rule 10b-5* promulgated by the SEC thereunder (collectively, "*Section 10(b)*"), a plaintiff must demonstrate that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir.2000).*

*Section 11* of the Securities Act of 1933 ("*Section 11*" and "Securities Act") imposes civil liability on persons preparing materially misleading registration statements. To state a claim under *Section 11*, an injured plaintiff need allege only that a defendant made or participated in making a "material misstatement or omission" in a registration statement for a security the plaintiff acquired; liability for such misstatements extends to, among others, underwriters of securities [*6] and to anyone who consented to be "named as having prepared or certified [a] report or valuation which is used in connection with the registration statement." *15 U.S.C.A. § 77k(a)(4), (5) (West 2006).*

To state claims under *Section 20(a)* of the Exchange Act, *15 U.S.C. § 78t(a)* (for control person liability as to *Section 10(b)* claims), and *Section 15* of the Securities Act, *15 U.S.C. § 77o* (for control person liability as to *Section 11* claims), plaintiff must allege (i) a primary violation by a controlled person, and (ii) control by the defendant of the primary violator. *Section 20(a)* imposes the additional requirement that the plaintiff allege culpable participation.

### Statute of Limitations

*Section 13* of the Securities Act provides that no action for a violation of *Section 11* may be maintained "unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery

Case 1:08-cv-00876-RMB-THK    Document 127    Filed 07/29/2008    Page 30 of 36

Page 3
2006 U.S. Dist. LEXIS 47971, *6; Fed. Sec. L. Rep. (CCH) P93,919

should have been made by the exercise of reasonable diligence . . . In no event shall any such action be brought to enforce a liability . . . more than three years after the security was bona fide offered [*7] to the public." *15 U.S.C.A. § 77m (West 2006). Section 9(e)* of the Exchange Act contains a similar limitation which applies to violations of *Sections 10(b)* and *20(a). 15 U.S.C. § 78i(e).* Section 804 of the Sarbanes-Oxley Act of 2002 extended the statute of limitations for "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws." The new deadline, which is codified at *28 U.S.C. § 1658(b),* is the earlier of (1) "2 years after the discovery of the facts constituting the violation" or (2) "5 years after such violation." *28 U.S.C. § 1658(b) (West, 2006).*

Thus, as both parties acknowledge, the relevant statute of limitations for the fraud claims asserted under *Sections 10(b)* and *20(a)* in this action is two years and the statute of limitations for *Section 11* claims not sounding in fraud (as Plaintiffs acknowledge is the case here; *see* Pl. Opp. at 30 n. 37) is one year. The limitations period begins when a plaintiff has actual or inquiry notice of the facts underlying its potential [*8] claims. Plaintiffs will be deemed to have discovered fraud for statute of limitations purposes when a reasonable investor of ordinary intelligence would have discovered its existence. *See Dodds v. Cigna Securities, Inc., 12 F.3d 346, 350 (2d Cir. 1993).*

This action was commenced on June 6, 2005. Defendant argues (and Plaintiffs do not appear to contest) that any claims premised on the alleged non-disclosure of the contract with the United States Postal Service, or premised on the non-disclosure of any performance metrics or language regarding termination contained within that contract, are time-barred, as the agreement itself (along with information regarding the metrics) was publicly filed on September 27, 2002, more than two years prior to the filing of the Complaint. The Court finds that the disclosures in Defendants' public filing, when viewed as a whole and even when construed in the light most favorable to Plaintiffs, were sufficient to put Plaintiffs on inquiry notice of the facts constituting the alleged fraud to the extent that claims are premised on non-disclosure of the contract with the United States Postal Service, or the non-disclosure of any performance [*9] metrics or contractual language regarding termination. Thus, all such claims are time-barred and are dismissed with prejudice, as granting Plaintiffs' request for leave to replead them would be futile. *See Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)* (holding that leave to replead should not be granted in certain situations, including when amendment would be futile).

Defendants also argue that Plaintiffs' claims regarding non-disclosure of the Patent Office's rejection of Defendants' patent applications (*see* Compl. P 52) are time-barred. Plaintiffs did not respond to this argument in their opposition papers and did not address it at oral argument, and thus appear to concede this point. To the extent any of Plaintiffs' claims are premised on the Patent Office's rejection of Defendant's application for a patent, or non-disclosure of such rejection, those claims are time barred, as the rejections have been matters of public record since November 1, 2001, when the Patent Office's notices of non-final rejection of the applications became publicly available. In any event, Plaintiffs were placed on inquiry notice by Authentidate's September 27, 2002 Form [*10] 10-K, which warned that the Company had no patents, that there could be no assurance the patents would in fact be issued and that there was a possibility that patent infringement had occurred or might occur. Accordingly, claims regarding non-disclosure of the Patent Office's rejection of Defendants' patent applications are time-barred and are dismissed with prejudice. Again, granting leave to replead would be futile. The remaining patent-related claims, namely that Defendants stole patented technology from a competitor and submitted "half-hearted" patent applications in an attempt to mislead the public, will be addressed below.

*Lack of Intent to Perform/Rule 9(b)*

Plaintiffs argue that the Defendants have mischaracterized Plaintiffs' case, and assert that one of the claims made in their Complaint is that Defendants failed to disclose that Authentidate never intended to be bound by the revenue metrics that were embodied in the Postal Service contract. However, the only portion of the Complaint Plaintiffs identified in their opposition papers and at oral argument as pleading this claim is a passage purporting to quote a single statement made by Defendant Botti during a November 4, 2004, Earnings [*11] Conference Call for analysts, investors and media representatives. During that call, Defendant Botti allegedly characterized the revenue metrics as "basically a guideline to say we would meet that [sic] something to

2006 U.S. Dist. LEXIS 47971, *11; Fed. Sec. L. Rep. (CCH) P93,919

measure whether we were going forward or not. So these metrics I think were basically agreed to between us as something to say, hey let's take another look at it and the post office is a very thorough, very large organization with a lot on its plate." (Compl. P 165.)

*Fed. R. Civ. P. 9(b)* governs pleading in fraud actions and provides that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with *particularity*." (Emphasis added.) This particularity mandate requires that the plaintiff "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 88 (2d Cir. 1999)* (internal quotation marks and citation omitted). Plaintiffs have failed to meet this heightened pleading [*12] standard with respect to their allegation that Authentidate never intended to be bound by the revenue metrics that were part of the Postal Service contract. Plaintiffs have failed to identify why Defendant Botti's statement is fraudulent; the one purported quotation is insufficient to provide factual support for Plaintiffs' conclusory assertion that the Company *never* intended to be bound by the contract. However, as Plaintiffs have made a bare (albeit insufficient) allegation and have requested leave to replead dismissed claims, they will be given an opportunity to plead the claim properly. *Rule 15* provides that leave to replead "shall be granted when justice so requires." *Fed. R. Civ. P. 15(a).* Although leave to amend is not automatic, a plaintiff generally is to be afforded an opportunity to test his claim on the merits if the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, *Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962).* Thus, any claims premised on the allegation that the Company never intended to be bound by the revenue metrics that were part of the Postal Service [*13] contract are dismissed without prejudice, and Plaintiffs are granted leave to replead these claims.

*Loss Causation*

Plaintiffs allege that the market price of Authentidate stock declined when the "failure to obtain patent protection was revealed to the public." (Compl. P 216.) Under *Section 10(b)*, a plaintiff "must allege loss causation with sufficient particularity such that [a court] can determine whether the factual basis for its claim, if

proven, could support an inference of proximate cause." *First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 770 (2d Cir. 1994).* Defendants argue that the Complaint fails to plead facts demonstrating a causal connection between Plaintiffs' alleged losses and any alleged omissions regarding the status of Authentidate's patent applications. Plaintiffs did not dispute this argument in their opposition papers or at oral argument. Because Plaintiffs have failed to allege loss causation regarding their patent-related claims, including their allegations that Defendants stole patent technology from a competitor and submitted "half-hearted" patent applications in an attempt to mislead the public, with sufficient particularity [*14] to allow this Court to determine whether the factual basis for their claim, if proven, could support an inference of proximate cause, Plaintiffs' patent claims that are not time-barred are dismissed without prejudice and with leave to replead. *See Foman, 371 U.S. at 182.*

*Non-Disclosure of Failure to Meet First Revenue Metrics*

Plaintiffs allege throughout the Complaint and also in their opposition papers that the Defendants violated *Section 10(b)* and *Rule 10b-5* because they knew for months, but failed to disclose, that the Company was in material breach, as of January 15, 2004, of the first revenue metric. However, under the terms of Authentidate's agreement with the Postal Service, which the Court may consider in its ruling on this motion as it was filed with the SEC, *see Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000)* (citation omitted), the period for achieving the revenue metrics was extended until July 2004. The first written notice of noncompliance was not provided by the Postal Service to Authentidate until September of 2004, and the Company publicly and, it appears, timely announced its receipt of this notice on September 8, 2004. Thus, [*15] any claims premised on the argument that the Company failed to disclose that it was in breach of the first revenue metrics are dismissed without prejudice and with leave to replead. *See Foman, 371 U.S. at 182.*

*Analysts' Statements*

Plaintiffs claim (Complaint PP 107-111) that Defendants are liable for statements by stock market analysts recommending Authentidate as a "strong buy" and describing the software as a "potential killer application." For corporate insiders to have liability under *Section 10(b)* for allegedly misleading statements that

appeared in analyst reports, the plaintiff must plead facts demonstrating that the defendants "intentionally fostered a mistaken belief concerning a material fact that was incorporated into reports; or adopted or placed their imprimatur on the reports." *Novak v. Kasaks, 216 F.3d 300, 314 (2nd Cir. 2000)* (citations and internal quotation marks omitted). Here, Plaintiffs fail to meet this burden. They merely assert in a conclusory fashion, without specific factual support, that a report by an analyst was based on Defendants' materially false and misleading statements and that Defendants' alleged misrepresentations [*16] were directly incorporated into the report and formed the basis for its high projections. Plaintiffs have failed to address this issue in their opposition papers, and their oral arguments concerning this matter at oral argument were insufficient to demonstrate that the claim should survive as plead. All claims based on analyst reports are dismissed without prejudice, and with leave to replead. *See Foman, 371 U.S. at 182.*

### Remaining 10(b) Claim

Plaintiffs' only remaining *Section 10(b)* claim is that Defendants failed to update their public disclosures regarding a purported agreement in principle Authentidate had reached with the Postal Service to amend the Revenue Metrics. To state a *Section 10(b)* claim, a plaintiff must allege that a defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and, (5) that plaintiffs' reliance was the proximate cause of their injury." *Lentell, 396 F.3d at 172* (citation omitted). *Section 10(b)* claims are subject to the heightened pleading standards of both *Federal Rule of Civil Procedure 9(b)* [*17] , discussed above, and the PSLRA, which requires a plaintiff to plead facts that give rise to a "strong inference" that Defendants acted with scienter. *See 15 U.S.C. § 78u-4(b)(2).* "A plaintiff can establish this intent 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir.1995)* (internal citation omitted).

Plaintiffs allege that Defendants acted with the motive of keeping Authentidate's stock price at an artificial level to facilitate the Company's avoidance of insolvency through a February 2004 stock offering. They also allege that individual Defendants had the motive of engaging in lucrative insider trading. Plaintiffs' reliance on the stock offering as demonstrative of a motive for fraud in connection with the alleged failure to update is unavailing, as any connection between the February 2004 stock offering and failures to update a September 2004 statement are too attenuated to support a reasonable inference of scienter. [*18] Plaintiffs' invocation of insider-trading allegations is unavailing as to individual Defendants Pai, Waters, Smith, Luce, Johnson and Silverman, who are not alleged to have sold any stock during the class period. Finally, even as to those Defendants who are alleged to have sold stock during the class period, Plaintiffs have failed to satisfy *Rule 9(b)*'s heightened pleading standard in that they have not plead this claim with the requisite particularity, and have failed to satisfy the PSLRA's pleading standard as well.

Accordingly, any claims based on Defendants' failure to update the disclosures regarding an agreement in principle with the Postal Service to amend the revenue metrics are dismissed without prejudice and with leave to replead. *See Foman, 371 U.S. at 182.*

Since the issue of pleading scienter based on knowing falsity, conscious misbehavior or recklessness has been raised in the briefs and the Court is granting leave to replead, it should be noted that the current Complaint does not sufficiently allege facts to support a finding of scienter based on the knowing falsity, or even conscious misbehavior or recklessness, of Defendants' statements or lack thereof [*19] with regard to the purported agreement with the Postal Service.

### Section 11 Claims

*Section 11* of the Securities Act imposes liability on an issuer of securities (and its directors and officers) when, in offering its shares to the public, a company fails to provide required information or includes misleading statements in its registration statements. Defendants argue that, because Plaintiffs do not and could not allege that they themselves purchased securities in the February 2004 offering, which was a private placement of unregistered securities, they lack standing to assert their *Section 11* claim. Plaintiffs correctly note, however, that *Section 11* of the Securities Act provides a cause of action to *any* plaintiff, including after market purchasers, who can *trace* securities to a registration statement that contains a material misstatement or omission. *See*

*DeMaria v. Andersen*, 318 F.3d 170 (2d Cir. 2003). The named Plaintiffs argue that, although they "did not purchase shares in the [Public] Offering [made by those who had acquired shares in the private offering that was the subject of the contested registration statement], [they] have standing [*20] to pursue the *Section 11* claim on behalf of those Class Members who did." (Pl. Opp. 31, n. 39.) The Complaint asserts, without identifying the Class Members implicated and without any factual support, that "Class Members acquired Authentidate common stock traceable to the February 2004 Registration Statement." (Compl. P 269.)

"In conducting the lawsuit on behalf of all class members and all those who have brought complaints that have been consolidated under their leadership, Lead Plaintiffs have a responsibility to *identify and include named plaintiffs* who have standing to represent the various potential subclasses of plaintiff who may be determined, at the class certification stage, to have distinct interests or claims." *In re Global Crossing, Ltd. Securities Litigation*, 313 F. Supp. 2d 189, 205 (S.D.N.Y. 2003) (emphasis added). Although for a *Section 11* claim, plaintiffs are not "required to explain how their shares can be traced; general allegations that plaintiff purchased 'pursuant to' or traceable to false registration statement have been held sufficient to state a claim" (*id. at 208*), plaintiffs must at the very least identify named class [*21] members who do have standing to bring such claims. *See In re Initial Public Offering Securities Litigation*, 214 F.R.D. 117, 122 (S.D.N.Y. 2002) (holding that "[i]n order to maintain a class action, Plaintiffs must first establish that they have a valid claim with respect to the shares that they purchased. If the named plaintiffs have no cause of action in their own right, their complaint must be dismissed, even though the facts set forth in the complaint may show that others might have a valid claim"); *see also In re WorldCom, Inc. Securities Litigation*, 294 F. Supp. 2d 392, 422 (S.D.N.Y. 2003) (denying a motion to dismiss *Section 11* claims in part because "[i]n filing the Complaint, [PSLRA] lead plaintiff fulfilled its obligation to assess the causes of action available to the class, to plead those claims in the consolidated amended complaint, *and to identify as named plaintiffs* any additional class representatives that were necessary to assert the claims." (emphasis added)).

Because Plaintiffs have not alleged that they themselves or other named Plaintiffs have standing to bring a *Section 11* claim, the motion to dismiss is granted

and [*22] the claim is dismissed without prejudice and with leave to replead.

*Control Person Claims*

Finally, Plaintiff asserts secondary liability against all of the individual Defendants as "control persons" under *Section 20(a)* (for the *10(b)* claims) and against ten of the Defendants under *Section 15* (for the *Section 11* claim). To state a claim under Section 20(a) of the Exchange Act, *15 U.S.C. § 78t(a)*, and Section 15 of the Securities Act, *15 U.S.C. § 77o*, a plaintiff must allege (i) a primary violation by a controlled person, and (ii) control by the defendant of the primary violator. *Section 20(a)* imposes the additional requirement that the plaintiff must allege culpable participation. In light of the fact that all of Plaintiffs' primary *Section 10(b)* and *Section 11* claims against Defendants have been dismissed, Plaintiffs' *Section 20(a)* and *Section 15* control person claims are likewise dismissed without prejudice. To the extent Plaintiffs wish to replead control person claims in conjunction with the primary liability claims they have been granted leave to replead today, they may do so.

CONCLUSION

For the [*23] foregoing reasons, Plaintiffs' claims premised on the non-disclosure of the contract with the United States Postal Service, Plaintiffs' claims premised on the non-disclosure of any performance metrics or language regarding termination contained within that contract, and Plaintiffs' claims regarding non-disclosure of the Patent Office's rejection of Defendants' patent applications are dismissed with prejudice. All of Plaintiffs' remaining claims are dismissed without prejudice and with leave to replead.

Any further amended Complaint shall be filed and served within 21 days from the date of this Order. Any claims that are not timely replead will be dismissed with prejudice and without further advance notice to Plaintiffs.

SO ORDERED.

Dated: New York, New York

July 14, 2006

LAURA TAYLOR SWAIN

United States District Judge

Exhibit 3

LEXSEE 1998 DEL CH LEXIS 133

IN RE DEAN WITTER PARTNERSHIP LITIGATION

CONSOLIDATED CIVIL ACTION NO. 14816

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1998 Del. Ch. LEXIS 133*

**October 16, 1997, Date Submitted
July 17, 1998, Date Decided**

**NOTICE:**

[*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:** Defendants' motion to dismiss granted.

**COUNSEL:** Pamela S. Tikellis, Esquire, and Robert J. Kriner, Jr., Esquire, of CHIMICLES, JACOBSEN & TIKELLIS, Wilmington, Delaware; OF COUNSEL: Nicholas E. Chimicles, Esquire, Denise Davis Schwartzman, Esquire, Francis J. Farina, Esquire, and M. Katherine Meermans, Esquire, of CHIMICLES, JACOBSEN & TIKELLIS, Haverford, Pennsylvania, Attorneys for Plaintiffs.

Kenneth J. Nachbar, Esquire, of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware; OF COUNSEL: Martin London, Esquire, Richard A. Rosen, Esquire, Robert N. Kravitz, Esquire, and Tracy Anbinder Baron, Esquire, of PAUL, WEISS, RIFKIND, WHARTON & GARRISON, New York, New York, Attorneys for Defendants.

**JUDGES:** William B. CHANDLER, Chancellor.

**OPINION BY:** WILLIAM B. CHANDLER

**OPINION**

MEMORANDUM OPINION

CHANDLER, Chancellor

Investors, owners of interests in numerous real estate limited partnerships, seek an accounting and damages from general partners and financial advisors for breaches of the fiduciary duties of care, loyalty and candor. Information available to the investors long before [*2] these lawsuits were instituted put the investors on notice of the wrongs about which they now complain. Therefore, all of the investors' claims are barred by operation of the applicable statute of limitations.

I. BACKGROUND

This action is a consolidation of several actions brought by plaintiff investors against defendants Dean Witter, Discover & Co. ("Dean Witter Discover"), Dean Witter Reynolds, Inc. ("Dean Witter Reynolds"), Dean Witter Realty, Inc. ("Dean Witter Realty") (collectively "Dean Witter"), the managing and associate general partners of seven Dean Witter real estate limited partnerships, and Tempo-GP, Inc. ("Tempo-GP"), the general partner of Dean Witter/Coldwell Banker Tax Exempt Mortgage Fund, L.P. ("Tax Exempt Mortgage Fund"). [1]

1 An Order of Consolidation dated August 16, 1996, consolidated three actions filed in the Court of Chancery--*Segel v. Dean Witter, Discover & Co.*, C.A. No. 14816 (filed Feb. 6, 1996); *Schectman v. Dean Witter, Discover & Co.*, C.A. No. 14829 (filed Feb. 9, 1996); *Dosky v. Dean Witter, Discover & Co.*, C.A. No. 14838 (filed Feb. 15, 1996) and added to the consolidated action plaintiffs from two other suits, one pending in the Southern District of New York--*Grigsby v. Dean Witter Reynolds, Inc.*, S.D.N.Y., No. 96

1998 Del. Ch. LEXIS 133, *2

Civ. 4064 (LAP) (originally filed Dec. 27, 1995)--and one pending in the District of Maryland-*Young v. Dean Witter, Discover & Co.,* C.A. No. H-96-1139 (D. Md.) (originally filed Feb. 6, 1996). *See* Order of Consolidation (Aug. 16, 1996) (Docket No. 9).

[*3] Plaintiffs are customers of Dean Witter Reynolds, who between 1984 and 1989, purchased from Dean Witter Reynolds units of the following limited partnerships: Dean Witter Realty Income Partnership I, L.P. ("Income I"); Dean Witter Realty Income Partnership II, L.P. ("Income II"); Dean Witter Realty Yield Income Partnership III, L.P. ("Income III"); Dean Witter Realty Income Partnership IV, L.P. ("Income IV"); Dean Witter Realty Yield Plus, L.P. ("Yield Plus"); Dean Witter Realty Yield Plus II, L.P. ("Yield Plus II"); Dean Witter Realty Growth Properties, L.P. ("Growth Properties"); and Falcon Classic Cable Income Properties, L.P. ("Falcon Classic Cable"). [2] With the exception of Falcon Classic Cable, each of these Partnerships is a wholly-owned direct or indirect subsidiary of Dean Witter and is organized in the State of Delaware.

> 2  These limited partnerships will be referred to collectively as the "Partnerships." The Partnerships bearing the Dean Witter name, *i.e.,* all of the defendant partnerships except Falcon Classic Cable, will also be referred to as the "Proprietary Partnerships." All of the Proprietary Partnerships are real estate limited partnerships.

[*4] Defendant Dean Witter Discover, a Delaware corporation, is a publicly-held financial services company providing credit and investment products. Defendant Dean Witter Reynolds, a Delaware corporation, is a broker-dealer and member of the New York Stock Exchange and other major securities, futures and options exchanges in the United States. Dean Witter Reynolds operates the securities business of Dean Witter Discover and acted as the offeror and/or underwriter for the sale of the Partnerships to plaintiffs. Dean Witter Reynolds also organized the Proprietary Partnerships that it sold to plaintiffs and acted as the exclusive selling agent for Falcon Classic Cable, which it did not sponsor.

Defendant Dean Witter Realty, a Delaware corporation, is a wholly-owned subsidiary of Dean Witter Discover. Dean Witter Realty is responsible for the creation, marketing and oversight of the Proprietary

Partnerships. It is also the parent of the Delaware corporate subsidiaries formed to serve as the managing general partners of the Proprietary Partnerships. These corporate subsidiaries are, in turn, the general partners of the Delaware limited partnerships or corporations formed to serve as the associate [*5] general partners of the Proprietary Partnerships. [3] Officers and employees of Dean Witter Realty served as officers and employees of these general partners. Dean Witter Realty was in charge of the day-to-day operations of each of the general partners of the Proprietary Partnerships.

> 3  Managing and associate general partners will be referred to collectively as the "general partners."

Defendants Dean Witter Realty Income Properties I Inc. and Dean Witter Realty Income Associates I, L.P. are the managing and associate general partners, respectively, of Income I. Defendants Dean Witter Realty Income Properties II Inc. and Dean Witter Realty Income Associates II, L.P. are the managing and associate general partners, respectively, of Income II. Defendants Dean Witter Realty Income Properties III Inc. and Dean Witter Realty Income Associates III, L.P. are the managing and associate general partners, respectively, of Income III. Defendants Dean Witter Realty Fourth Income Properties Inc. and Dean Witter Realty [*6] Income Associates IV, L.P. are the managing and associate general' partners, respectively, of Income IV. Defendants Dean Witter Realty Yield Plus Inc. and Dean Witter Realty Yield Plus Associates, L.P. are the managing and associate general partners, respectively, of Yield Plus. Defendants Dean Witter Realty Yield Plus II Inc. and Dean Witter Realty Yield Plus Associates II, L.P. are the managing and associate general partners, respectively, of Yield Plus II. Defendants Dean Witter Realty Growth Properties Inc. and Dean Witter Realty Growth Associates, L.P. are the managing and associate general partners, respectively, of Growth Properties.

In addition, plaintiffs named as defendants Dean Witter Realty Income Associates I Inc. and Dean Witter Realty Income Associates II Inc.--the general partners of the associate general partners of Income I and Income II, respectively. Each of these defendant general partners is a Dean Witter affiliate, or wholly-owned direct or indirect subsidiary, organized in Delaware.

Defendant Tempo-GP, a Delaware corporation, was originally owned jointly by a Dean Witter Discover

1998 Del. Ch. LEXIS 133, *6

subsidiary and Coldwell Banker Commercial Group, Inc. Today, Tempo-GP is a wholly-owned [*7] subsidiary of Dean Witter Discover. Tempo-GP is the general partner of the Tax Exempt Mortgage Fund and directed and controlled its activities. [4]

> [4]   In their Amended Complaint, none of the plaintiffs claims to have purchased units of the Tax Exempt Mortgage Fund. As such, plaintiffs do not have standing to assert any claims with respect to that fund or its general partner, Tempo-GP. *See Alabama By-Products Corp. v. Cede & Co., Del. Supr., 657 A.2d 254, 264 (1995).*

Plaintiffs purport to bring this action on behalf of all persons and entities who purchased units of the Partnerships sold by or through Dean Witter Reynolds or other selling agents affiliated with Dean Witter from 1984 through the present. [5] Plaintiffs allege that defendants breached their fiduciary duties in connection with the Partnerships organized, sold and operated by defendants, in which plaintiffs invested. Among other things, plaintiffs allege that defendants breached the duties of loyalty, candor and care they owed to plaintiffs [*8] as their fiduciaries. Plaintiffs complain that they relied-to their detriment-upon the good faith of defendants in their roles as fiduciaries, as general partners, financial advisors and agents, and as officers and directors of the general partners. According to plaintiffs, defendants' breaches have caused plaintiffs to suffer the losses of substantial portions of their investments and have failed to realize the income, liquidity and security in their investments as promised them by defendants. [6]

> [5]   First Consolidated and Amended Class Action Complaint P 37 (Docket No. 10) [hereinafter *Complaint*]. All further references to "plaintiffs" shall include the named plaintiffs as well as the purported class of plaintiffs.
> [6]   Complaint P 3.

Plaintiffs assert that Dean Witter sold the Partnerships through uniform sales materials that promoted sale of the Partnerships at the expense of candor. Specifically, plaintiffs claim that defendants misrepresented or failed to disclose to them at the time of [*9] purchase the nature of the risks involved in investing in the Partnerships, that defendants misrepresented or failed to disclose the financial

condition of the Partnerships in order to conceal losses, mismanagement, fraud and self-dealing, and that defendants misled plaintiffs into believing that Dean Witter was recommending and selecting investments that presented low risk and were suitable for retirement accounts. [7] Plaintiffs further allege that although Dean Witter represented to plaintiffs that it would maintain a relationship with the Partnerships and oversee their operation, [8] Dean Witter failed to supervise the Partnerships in the plaintiff investors' best interests.

> [7]   Pls.' Memo. in Opp. to Defs.' Motion to Dismiss at 6 (Docket No. 32) [hereinafter *Pls.' Memo. in Opposition*].
> [8]   Complaint P 25.

Plaintiffs insist that defendants were instead engaging in a systematic scheme designed to organize, sell and operate high risk, speculative limited partnerships in order to enrich themselves [*10] at the expense of plaintiff investors. According to plaintiffs, once defendants obtained investment capital from plaintiffs, defendants used the capital to purchase underperforming or failing investments owned by Dean Witter affiliates or to refinance underperforming loans owed to Dean Witter affiliates. Plaintiffs further allege that defendants channeled Partnership funds into faltering projects owned by earlier-formed Partnerships, to create the illusion of financial health for those Partnerships and to aid in marketing new ones. [9]

> [9]   Pls.' Memo. in Opposition at 2.

Defendants filed a motion to dismiss on December 10, 1996. [10] The motion cites several grounds for dismissal, including: (1) that the claims are time-barred; (2) that plaintiffs' allegations fail to state a claim; and (3) that plaintiffs have improperly brought this action as a direct, rather than derivative, action. The parties briefed the motion, presented oral argument to the Court, and conducted a supplemental round of briefing specifically [*11] addressing the statute of limitations issue. As explained below, I agree with defendants that the applicable statute of limitations bars plaintiffs' claims. [11] Thus, plaintiffs' claims must be dismissed for failure to file within the statutory period.

> [10]   Defs.' Memo. in Support of Motion to Dismiss (Docket No. 21) [hereinafter *Defs.' Motion to Dismiss*].
> [11]   Because I have determined that defendants'

claim of time-bar is dispositive, I need not address the other grounds offered by defendants in their motion to dismiss.

## II. LEGAL STANDARD

There is clear legal precedent in Delaware for granting a motion to dismiss on the ground that a plaintiff's claims are barred by operation of the statute of limitations. [12] This is so even in equity. Although statutes of limitation do not generally apply directly in equity, equity follows the law and will apply a statute of limitations by analogy in appropriate circumstances. [13] Moreover, it is "well settled that where the complaint itself alleges facts [*12] that show that the complaint is filed too late, the matter may be raised by [a] motion to dismiss." [14]

> [12]  *Boeing Co. v. Shrontz*, 1992 Del. Ch. LEXIS 84, Del. Ch., C.A. No. 11273, Berger, V.C. (Apr. 20, 1992) (dismissing breach of fiduciary duty claims on grounds of time-bar); *Halpern v. Barran, Del. Ch., 313 A.2d 139 (1973)* (same).
> [13]  *Kahn v. Seaboard Corp., Del. Ch., 625 A.2d 269, 271 (1993). See also United States Cellular Inv. Co. v. Bell Atlantic Mobile Sys., Inc., Del. Supr., 677 A.2d 497 (1996)* ("Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period.").
> [14]  *Seaboard, 625 A.2d at 277* (dismissing, with permission to replead, complaint in equity on statute of limitations grounds).

In evaluating a motion to dismiss, I am required to assume the truthfulness of all well-pleaded *(i.e.,* nonconclusory) allegations of the complaint for purposes of the motion. [15] I am also required to draw from the complaint [*13] all inferences or conclusions of fact that may reasonably be drawn from the specific facts alleged therein. [16] Conclusions asserted in the complaint, however, will only be accepted as true if there are specific allegations of fact to support them. [17] In the end, I may only dismiss the Amended Complaint if it is clear that plaintiffs will not be entitled to relief under any set of facts that could be proven based on the allegations of the complaint. [18]

> [15]  *Loudon v. Archer-Daniels-Midland Co., Del.*

*Supr., 700 A.2d 135, 140 (1997)* (en banc); *Grobow v. Perot, Del. Supr., 539 A.2d 180, 187 & n.6 (1988).*
[16]  *Id.*
[17]  *In re Santa Fe Pac. Shareholder Litig., Del. Supr., 669 A.2d 59, 65-66 (1995); Grobow, 539 A.2d at 187 & n.6.*
[18]  Ct. Ch. R. 12(b)(6); *Rabkin v. Philip A. Hunt Chem. Corp., Del. Supr., 498 A.2d 1099, 1105 (1985); Litman v. Prudential-Bache Properties, Inc., 1994 Del. Ch. LEXIS 3, *6, Del. Ch., C.A. No. 12137, Chandler, V.C. (Jan. 14, 1994), aff'd, Del. Supr., 642 A.2d 837 (1994).*

Plaintiffs cite *Snyder v. Butcher & Co., 1992 Del. Super. LEXIS 362*, Del. Super., C.A. No. 91C-04-289, Goldstein, J. (Sept. 15, 1992), for the proposition that it is improper for a court to grant a motion to dismiss on statute of limitations grounds whenever the complaint alleges fraudulent concealment as part of its claims. Plaintiffs, however, misread *Snyder. Snyder* stated that granting a motion to dismiss on statute of limitations grounds would be inappropriate where a plaintiff has *"successfully pled* fraudulent concealment" *1992 Del. Super. LEXIS 362* at *10 (emphasis added). Where a plaintiff has successfully alleged a claim of fraudulent concealment "the affirmative statute of limitations defense turns on a question of fact," rendering a summary disposal inappropriate. *Id. Snyder* does nothing, however, to alter the general rule that when it is clear from the face of the complaint that the statute of limitations bars a plaintiff's claims, despite an allegation of fraudulent concealment, dismissal is still appropriate. *See Boeing Co. v. Shrontz, 1992 Del. Ch. LEXIS 84* at *1 (dismissing breach of fiduciary duty claims on statute of limitations grounds, despite allegation of fraudulent self-dealing). *See also Shockley v. Dyer, Del. Supr., 456 A.2d 798, 799 (1983)* (affirming grant of summary judgment, despite plaintiff's allegation of fraudulent concealment, where viewing the facts in a light most favorable to plaintiffs, "it becomes clear that by an exercise of due diligence plaintiff could have discovered her rights.").

[*14]  III. ANALYSIS

1998 Del. Ch. LEXIS 133, *14

*A. Statute of Limitations*

It is well-settled under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty. [19] With the exception of the Falcon Classic Cable claim, which was a brand new claim as of the filing of the Amended Complaint on October 7, 1996, plaintiffs filed their pre-consolidation complaints on February 6, 9 & 15, 1996, alleging breaches of fiduciary duty by Dean Witter and the general partners of the Partnerships. [20] Applying the three-year statute of limitations, any claim that accrued prior to February 6, 1993 (or prior to October 7, 1993, with respect to the Falcon Classic Cable claim) is barred by operation of the statute. If, however, plaintiffs' cause of action accrued on or after February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic claim), then the claims are timely and can proceed.

> [19]  *10 Del. C. § 8106; Dofflemyer v. W.F. Hall Printing Co., D. Del., 558 F. Supp. 372, 379 (1983)* (applying Delaware law).
>
> [20]  Under the Order of Consolidation, all documents previously filed and served in the cases consolidated by the Order were deemed filed, served and part of the record in the consolidated action. Only the three Court of Chancery cases were consolidated by that Order. The earliest of these cases–*Segel*–was filed February 6, 1996. Thus, February 6, 1996, is the earliest operative date for statute of limitations purposes. *See* Order of Consolidation PP 1, 9.

[*15] *B. Time of Accrual*

The general law in Delaware is that the statute of limitations begins to run, *i.e.*, the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action. [21] Plaintiffs here complain of two different types of injuries. First, they allege that Dean Witter violated its fiduciary duties in the marketing and sale of the Partnerships. Second, plaintiffs allege that defendants [22] committed post-offering breaches of their fiduciary duties in connection with the management and oversight of the Partnerships.

> [21]  *David B. Lilly Co. v. Fisher, D. Del., 18 F.3d 1112, 1117 (1994); Isaacson, Stolper & Co. v. Artisan's Sav. Bank, Del. Supr., 330 A.2d 130, 132 (1974).*

[22]  Plaintiffs do not allege post-offering mismanagement with respect to Falcon Classic Cable. Complaint PP 266-68.

Plaintiffs allege that defendants breached their fiduciary duties in recommending and selling to plaintiffs Partnerships that would [*16] never (and could never) achieve their promised objectives. Accepting this allegation as true, plaintiffs' injuries occurred *when they purchased* their Partnership interests as a result of defendants' alleged misrepresentations. [23] Thus, plaintiffs' cause of action accrued when they invested in the allegedly fraudulent Partnerships. The Partnerships at issue were marketed and sold to the plaintiffs in the mid-to-late 1980s. The last of these sales was completed by the end of 1989. [24] Thus, with respect to the marketing and sale of the Partnerships, plaintiffs' cause of action accrued no later than year-end 1989. Absent tolling of the statute of limitations, these claims became stale at the end of 1 992--years before plaintiffs filed their Amended Complaint.

> [23]  *Seidel v. Lee, D. Del., 954 F. Supp. 810, 816 (1996)* (applying Delaware law) (fiduciary duty claim accrues when breach accomplished). *See also In re Merrill Lynch Ltd. Partnerships Litig., 7 F. Supp. 2d 256, 1997 U.S. Dist. LEXIS 12809, *24-36, S.D.N.Y., No. 95 Civ. 10657 (MBM) (Aug. 26, 1997)* (applying federal RICO law, which has same standard for statute of limitations accrual).

[*17]

> [24]  Complaint PP 9-23.

With respect to the allegations of post-offering breaches arising out of the management and oversight of the Partnerships, plaintiffs allege that defendants operated the Partnerships to benefit themselves at the expense of the investors. Among other things, plaintiffs complain that Partnership real estate investments were chosen solely for the purpose of benefiting other Dean Witter affiliates and that the Partnerships paid excessive commissions and fees. For each Partnership, these alleged violations of fiduciary duty began-and plaintiffs consequently began to suffer injury-shortly after each Partnership was formed. The Amended Complaint is replete with allegations of injudicious mortgage loans and unwarranted management commissions throughout the mid-to-late 1980s. [25] Thus, as with the marketing and sales claims, plaintiffs' cause of action regarding the

alleged post-offering breaches accrued no later than year-end 1989. [26] Plaintiffs filed their complaint on February 6, 1996, well past the expiration of the three-year limitations period. *Absent tolling*, therefore, [*18] all of plaintiffs' claims fall outside the statutory period and would be time-barred.

> 25 *See, e.g.*, Complaint PP 91-121 (Yield Plus), PP 129-35 (Yield Plus II), PP 136-46 (Yield Plus & Yield Plus II), PP 156-79 (Growth Properties), PP 193-98 (Income I), PP 209-16 (Income II), PP 233-39 (Income II, III & IV).
> 26 *Dofflemyer, 558 F. Supp. at 379* (fiduciary duty claim accrues at time of breach).

### C. Tolling

Plaintiffs allege that their claims are timely because the statute of limitations was tolled until January 26, 1996, when an article in the *Wall Street Journal* [27] --reporting that the Securities and Exchange Commission ("SEC") was negotiating with Dean Witter Reynolds and two other brokerage firms concerning their limited partnership sales practices during the 1980s and that a settlement fund might be established-first put them on notice of their potential claims. [28] Plaintiffs assert three separate theories to support a tolling of the statute of limitations in this case: [*19] (1) inherently unknowable injuries; (2) fraudulent concealment; and (3) equitable tolling. Each of these doctrines permits tolling of the limitations period where the facts underlying a claim were so hidden that a reasonable plaintiff could not timely discover them. [29]

> 27 This article will be referred to as the *"Wall Street Journal* article" or the "article."
> 28 Pls.' Memo. in Opposition at 9.
> 29 *See, e.g., Playtex, Inc. v. Columbia Casualty, 1993 Del. Super. LEXIS 286, *9*, Del. Super., C.A. No. 88C-MR-233, Del Pesco, J. (Sept. 20, 1993) ("Ignorance of the facts supporting a cause of action will not toll the statute, absent some special consideration such as 'inherently unknowable' injuries or fraudulent concealment.").

Under the doctrine of inherently unknowable injuries, the running of the statute of limitations is tolled while the discovery of the existence of a cause of action

is a practical impossibility. [30] For the limitations period to be tolled under this doctrine, there must have been [*20] no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury. [31] Often, plaintiffs can establish "blameless ignorance" by showing justifiable reliance on a professional or expert whom they have no ostensible reason to suspect of deception. [32] This doctrine tolls the limitations period until a plaintiff had "reason to know" that a wrong had been committed. [33]

> 30 *Ruger v. Funk, 1996 Del. Super. LEXIS 34, *7*, Del. Super., C.A. No. 93C-04-210, Lee, J. (Jan. 22, 1996).
> 31 *Seidel*, op. at 17.
> 32 *See, e.g., Isaacson, 330 A.2d at 133-34* (applying "discovery rule" in light of relationship of "confidence and reliance by plaintiff on the expertise of defendant").
> 33 *Pack & Process, Inc. v. Celotex Corp., Del. Super., 503 A.2d 646, 650 (1985).*

The statute of limitations will also be tolled if a defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff [*21] on notice of the truth. [34] Unlike the doctrine of inherently unknowable injuries, fraudulent concealment requires an affirmative act of concealment by a defendant-an "actual artifice" that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry. [35] "Mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to operation of the statute [of limitations]." [36] Where there has been fraudulent concealment from a plaintiff, the statute is suspended until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence. [37]

> 34 *Litman*, op. at 8.
> 35 *Halpern, 313 A.2d at 143.*
> 36 *Id.*
> 37 *Id.*

Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing,

even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary. [*22] [38] Underlying this doctrine is the idea that "even an attentive and diligent [investor] relying, in complete propriety, upon the good faith of [fiduciaries] may be completely ignorant of transactions that . . . constitute self-interested acts injurious to the [Partnership]." [39] This doctrine tolls the limitations period until an investor knew or had reason to know of the facts constituting the wrong. [40]

[38] Yaw v. Talley, 1994 Del. Ch. LEXIS 35, *17, Del. Ch., C.A. No. 12882, Jacobs, V.C. (March 7, 1994) (Fiduciaries who benefit personally from their wrongdoing, especially as a result of fraudulent self-dealing, will not be afforded the protection of the statute of limitations.).

[39] Seaboard, 625 A.2d at 275-76 (Given the fiduciary duties that the law imposes on corporate directors, stockholders are entitled to rely on the good faith of the directors when they act with respect to the corporation's property or processes.).

[40] In re Maxxam, Inc. / Federated Dev. Shareholders Litig., Del. Ch., 659 A.2d 760, 769 (Feb. 13, 1995).

[*23]

As the party asserting that tolling applies, plaintiffs bear the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled. [41] Significantly, if the limitations period is tolled under any of these theories, it is tolled only until the plaintiff discovers (or exercising reasonable diligence should have discovered) his injury. [42] Thus, the limitations period begins to run when the plaintiff is objectively aware of the facts giving rise to the wrong, i.e., on inquiry notice. [43] Accordingly, for plaintiffs to establish that this action was filed in a timely manner, under any one of these theories, they must convince the Court that they were not on inquiry notice of their claims before February 6, 1993 (or before October 7, 1993, with respect to the Falcon Classic Cable claim). [44]

[41] United States Cellular, 677 A.2d at 504; Carlton Investments v. TLC Beatrice Int'l Holdings, Inc., 1995 Del. Ch. LEXIS 140, *46, Del. Ch., C.A. No. 13950, Allen, C. (Nov. 21, 1995).

[42] In re ML-Lee Acquisition Fund II, L.P. Litig.,

D. Del., 848 F. Supp. 527, 554 (1994) (inherently unknowable injuries); United States Cellular, 677 A.2d at 503 (equitable tolling); Litman, op. at 8 (fraudulent concealment).

[*24]

[43] See Seidel, op. at 16-17 (inherently unknowable injuries: statute tolled until such time as persons of ordinary intelligence and prudence would have facts sufficient to place them on inquiry notice of an injury); Seaboard, 625 A.2d at 275 (equitable tolling: statute of limitations does not run against plaintiff until he knows or has reason to know facts alleged to give rise to wrong); Halpern, 313 A.2d at 143 (fraudulent concealment: running of statute suspended only until plaintiff's rights are discovered or would have been discovered by exercise of reasonable diligence). See also Nardo v. Guido DeAscanis & Sons, Inc., Del. Super., 254 A.2d 254, 256 (1969) (standard for length of tolling is the same for fraudulent concealment, equitable tolling and inherently unknowable torts).

[44] Where the tolling of the statute of limitations turns on controverted issues of fact, a pre-discovery dismissal of the claim would be inappropriate. See, e.g., In re Asbestos Litig., Del. Supr., 673 A.2d 159, 163 (1996) (only when the record is uncontroverted that plaintiff "discovered" his injury more than [three] years prior to filing his suit is summary judgment appropriate). However, when it is clear from the face of the complaint (and the documents incorporated by reference in it) that plaintiffs' tolling theories fail even to raise a legitimate doubt about the time the claims accrued, dismissal is appropriate if the claims were filed after the applicable limitations period expired. Plaintiffs cite In re Maxxam for the proposition that "a defendant should not be permitted to use the statute of limitations as a shield where the defendant possesses information critical to the existence of an actionable claim of wrongdoing and prevents the plaintiff from discovering that information in a timely fashion." In re Maxxam, Inc./Federated Dev. Shareholders Litig., 1995 Del. Ch. LEXIS 73, *19-20, Del. Ch., C.A. Nos. 12111 & 12353, Jacobs, V.C. (June 21, 1995). The danger is in dismissing an action prematurely when plaintiffs do not yet have access to the information they need to state their claims fully.

Here, it is clear to the Court that all of the necessary information was not only publicly available, but already in plaintiffs' hands at least as far back as 1990--an entirely different situation than the one presented in the *In re Maxxam* Court.

[*25] *D. Were Plaintiffs on Inquiry Notice?*

Defendants contend it is clear that, based on the allegations of the Amended Complaint, plaintiffs cannot under any circumstances show that the statute of limitations was tolled for the length of time necessary to render their action timely. First, defendants note that the very facts pleaded in the Amended Complaint demonstrate that plaintiffs were on inquiry notice of defendants' alleged wrongful conduct long before February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic Cable claim). Second, defendants point out that other Partnership investors filed lawsuits against Dean Witter Reynolds alleging breach of fiduciary duty in connection with the same Proprietary Partnerships *before* the *Wall Street Journal* article was published. [45] That fact, defendants argue, shows conclusively that the existence of the claims was not beyond the grasp of the reasonably diligent investor. Finally, defendants make the practical argument that the *Wall Street Journal* article, touted by plaintiffs as their clarion call, could not possibly have provided the "essential missing information" that plaintiffs assert. The article simply [*26] did not disclose any information about Dean Witter's sales practices, nor did it identify any limited partnerships by name.

45   *See, e.g., Grigsby v. Dean Witter Reynolds Inc.*, Cal. Super. Ct., C.A. No. 695777 (filed Dec. 27, 1995) (asserting claims with respect to the Proprietary Partnerships); *McCoy v. Dean Witter Reynolds, Inc.*, E.D. Tenn., C.A. No. 94-5779 (regarding demand for arbitration filed Dec. 28, 1989, asserting claims with respect to Income I & II); *Eno v. Dean Witter Reynolds, Inc.*, N.Y. Sup. Ct, Index No. 127300/95 (regarding demand for arbitration filed May 25, 1994, asserting claims with respect to Income II).

Defendants emphasize that the allegations of wrongful conduct asserted in the Amended Complaint are based on events that all occurred in the mid-to-late 1980s. Moreover, every fact cited by plaintiffs in the Amended Complaint comes from disclosures in documents that were either provided to plaintiffs contemporaneously

with the wrongful conduct now being alleged or publicly [*27] available Securities Exchange Commission ("SEC") filings made by the Partnerships. [46] As a matter of law, defendants assert, disclosures in any of those documents--the sole source of plaintiffs' allegations--were sufficient to place plaintiffs on inquiry notice of their claims long before February 6, 1993.

46   According to defendants, investors in each Partnership received from Dean Witter a prospectus (and all applicable supplements), annual and quarterly reports, and periodic "property profiles" describing properties in which the Partnership had invested. Each Partnership also filed with the SEC (and made available to investors on request) reports on Form 10-K, reports on Form 10-Q, and reports on Form 8-K. Defs.' Motion to Dismiss at 7-8.

The Court may properly consider the contents of the *Wall Street Journal* article, Partnership prospectuses, property profiles, customer account statements, quarterly and annual reports and SEC filings in considering this motion to dismiss, because by expressly referring to and so heavily relying on these documents in the Amended Complaint, plaintiffs have incorporated them by reference into the Amended Complaint *Glaser v. Norris, 1992 Del. Ch. LEXIS 1*, *13 n.1, Del. Ch., C.A. No. 9538, Chandler, V.C. (Jan. 6, 1992).

[*28] Although the information they now use to support their allegations was publicly available at the time of the alleged wrongs, plaintiffs claim that they were prevented from discovering defendants' wrongful conduct prior to January 26, 1996, as a result of defendants' misrepresentations regarding the health of their Partnership investments. Until reading the *Wall Street Journal* article, plaintiffs assert that they relied--and were entitled to rely--on defendants' assurances that the Partnerships' properties were performing better than comparable properties, that the Partnerships' losses were only temporary, and that these losses were not caused by any wrongful conduct on the part of defendants. In fact, the Partnerships' losses were accompanied by an overall real estate market decline. It was the publication of the article, plaintiffs contend, that first alerted them to their potential claims, *i. e.,* to the idea that their investment losses were the result of defendants' wrongful conduct rather than a general downturn in the real estate market.

1998 Del. Ch. LEXIS 133, *28

And it was not until, *after reading the article,* plaintiffs hired a consulting expert, who sifted through "more than 300 publicly-filed [*29] documents," that plaintiffs were able to reconstruct the Partnerships and actually discover defendants' wrongful conduct. [47] Accordingly, plaintiffs argue they were not on inquiry notice until January 26, 1996 and, therefore, that is the date the statute of limitations began to run.

47 Pls.' Memo. in Opposition at 3.

[*30] As noted above, the limitations period is tolled until such time that persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued,* would lead to the discovery of the injury. [48] Inquiry notice does *not* require *actual* discovery of the reason for the injury. Nor does it require plaintiffs' awareness of all of the aspects of the alleged wrongful conduct. Rather, the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme. [49] Thus, the critical inquiry for purposes of this motion to dismiss is: were plaintiffs *entitled to rely* on defendants' representations for as long as they did, *i.e.,* up until publication of the January 26, 1996, *Wall Street Journal* article, or were they on inquiry notice before that date? [50]

48 *In re ML-Lee Acquisition Fund II L.P. Litig., 848 F. Supp. at 554* (defendants' misrepresentations were unknowable until publication of the Annual Report disclosing particular investment and its lack of success).

[*31]

49 *McCoy v. Goldberg, S.D.N.Y., 748 F. Supp. 146, 158 (1990)* (statutory period does not await plaintiffs' leisurely discovery of the fill details of the alleged scheme) (internal citations omitted). Although plaintiffs suggest that their claims were "unknowable" because it required an expert to uncover defendants' alleged wrongdoing, that argument is without merit. It may in fact have taken an expert to unravel the entire scheme alleged by plaintiffs. But having all of the facts necessary to articulate the wrong is *not* required. Rather, "once a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice." *Harner v. Prudential Secs. Inc., E.D. Mich., 785 F. Supp. 626, 633 (1992)* (citations omitted), *aff'd,* 6th Cir., 35 F.3d 565

*(1994).*

50 Defendants assert that when plaintiffs read the article, they responded by doing what they could have done several years earlier—they read the public documents and hired an expert to review them. Defs.' Motion to Dismiss at 15-16.

The Partnerships [*32] sustained steady losses from the outset. Plaintiffs allege that defendants purposely put them off the trail of inquiry by notifying them of these losses, while at the same time reassuring plaintiffs that the Partnerships were returning profits. [51] For example, plaintiffs "received regular distributions, falsely reassuring [them] regarding the financial condition of their investments." [52] In reliance on the fiduciary duties owed by defendants, plaintiffs assert that they "had no reason to go behind Defendants' campaign of misinformation" to discover the true source of the Partnership losses. [53]

51 *See, e.g.,* Income III, 1990 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (Dec. 10, 1996), Ex. 6-C (Docket No. 25) ("1990 was a difficult and disappointing year for real estate investments in general.... Fortunately, due to the high quality of its properties and size of its portfolio, the Partnership has been able to avoid the worst of the[] problems.... The cash distribution paid during the 1990 fiscal year was . . .an annualized return of 6.25%.").

52 Pls.' Memo. in Opposition at 51.

[*33]

53 *Id. at* 48.

Plaintiffs specifically complain that the annual reports concealed the fact that these consistent cash distributions were actually a return of investors' capital rather than a "return on investment." [54] Pointing to the 1990 Annual Report for the Yield Plus II Partnership as an example, plaintiffs assert that they could not have known that Partnership capital was being impaired, in light of the statement that the "distribution . . . was an annualized return on investment of 7.5%" [55] But in the same annual report, three pages away on page four, is a chart showing clearly that the partners' capital had declined from the previous year. Moreover, from a chart on page six, it is apparent from even the most cursory glance that the amount of the cash distributions for the year 1990 far exceeded the Partnership's net income for the same year. These charts are not, as plaintiffs suggest,

hard to understand, nor are they buried at the back of a thick report. The typical annual report for the Partnerships is no more than fifteen pages in length. While the distributions were maintained [*34] at a fairly high level, looking beyond the language on the first page of these annual reports, the fact that the distributions are consistently greater than the Partnership income *should have alerted* plaintiffs to the fact that something was amiss.

54    *See, e.g.,* Pls.' Memo. in Opposition at 7, 23-24, 26-28, 51.

55    Yield Plus II, 1990 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (Dec. 10, 1996), Ex. 2-D (Docket No. 23).

Plaintiffs seek refuge in the proposition that where the statute of limitations inquiry involves claims of self-dealing by a fiduciary, "the emphasis is upon the protection of the beneficiary of the fiduciary duty, so long as she is reasonably attentive to her interests, albeit trusting." [56] Accordingly, plaintiffs assert, the fiduciary relationship between plaintiffs and defendants in this case entitled plaintiffs to rely upon the presumed good faith and loyalty of defendants. Plaintiffs correctly point out that beneficiaries are entitled to trust [*35] their fiduciaries. [57] As a result, reasonable reliance on the competence and good faith of those who have assumed a legal responsibility toward a plaintiff can be sufficient to toll the running of the statute of limitations. [58] But, the trusting plaintiff still must be *reasonably attentive* to his interests. *"Beneficiaries should not put on blinders to such obvious signals as publicly filed documents, annual and quarterly reports, proxy statements, and SEC filings."* [59] Thus, even where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available. [60]

56    *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc., 1995 Del. Ch. LEXIS 140, *47-48,* Del. Ch., C.A. No. 13950, Allen, C. (Nov. 21, 1995).

57    *See, e.g., Borden v. Sinskey, 3d Cir., 530 F.2d 478, 489, n.10 (1976)* ("Shareholders have no duty to search a corporation's records for evidence of misconduct on the part of corporate officers and directors. Rather, they are entitled to assume that those standing in a fiduciary relationship to them will be faithful to their charge.").

[*36]

58    *Seaboard, 625 A.2d at 275.*

59    *Seidel,* op. at 18 (emphasis added).

60    *Id* (rejecting plaintiff's inherently unknowable tolling argument because "the public documents, which form the basis of many of Plaintiff's claims, could have provided Plaintiff with adequate notice of an alleged misconduct by Defendants."). In the instant case, the public documents provide the basis for *all* of plaintiffs' claims. *See also In re USACafes, L.P. Litig.,* Del. Ch., C.A. No. 11146, *18 Del. J. Corp. L. 1204, 1213 (1993)* ("[I]nterest holders need not delve aggressively into the internal affairs of a . . . limited partnership in order to assure that a non-public, self-dealing transaction is not foreclosed from attack by limitations, but when facts are disclosed that give rise to inquiry, an applicable statute of limitations will require timely action to preserve rights.").

It is not too much to ask investors to read beyond the first page of an annual report, to read past the rosy forecasts and actually look at the cold, hard figures provided to them. Had plaintiffs [*37] bothered, for example, to read past the first page of the 1989 Annual Report for Income II-a document that was delivered to investors by mid-1990 at the latest-they would have been alarmed. [61] Although large distributions were being made, with a quick glance it is clear that the amount of these distributions far exceeded the "net income" figure. [62] In fact, the figures show the amount of the "partners' capital" steadily declining from 1986 to 1989. [63] Yet, the first page of this annual report states so optimistically: "The cash distribution paid for the 1989 fiscal year [constituted] an annualized return of 7%." This blatant contradiction should have been a "red flag" to any investor--and should have prompted an inquiry by plaintiffs into the health of their investments. [64]

61    Income II, 1989 Annual Report at 1, attached to affidavit of Ronald J. DiPietro (July 11, 1997), Ex. C (Docket No. 52).

62    For the fiscal year 1989, the Income II Partnership shows a net income figure of $ 7,043,996 and cash distributions of $ 13,768,450. *Id. at 7.*

63    *Id.*

64    *In re Prudential Sec. Inc. Ltd. Partnerships Litig., S.D.N.Y., 930 F. Supp. 68, 76 (1996)* ("Where the circumstances are such as to suggest to a person of ordinary intelligence the probability

that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of that fraud will be imputed to him.").

[*38] The presence of this inherently contradictory information in each Partnership's annual report starting in the late 1980s for the earlier Partnerships and its appearance in all of the Partnerships by 1990 compels the conclusion that plaintiffs were not reasonably attentive to their investment interests. [65] Plaintiffs were not entitled to sit idly by, blindly relying on defendants' assurances, when the documents and disclosures plaintiffs received regularly were so suggestive of mismanagement. [66] Whether accompanied by optimistic projections or not, these discrepancies alone were sufficient notice of wrongdoing to prompt inquiry into the Partnerships. Upon receipt for each Partnership of the first annual report revealing cash distributions in excess of net income, plaintiffs were on inquiry notice of their claims. [67]

[65] See, e.g., Income I, 1989 Annual Report, Ex. A; Income II, 1989 Annual Report, Ex. C; Income III, 1989 Annual Report, Ex. L; Income IV, 1989 Annual Report, Ex. M; Growth Properties, 1989 Annual Report, Ex. D (attachments to the Affidavit of Ronald J. DiPietro (July 11, 1997) (Docket No. 52)); Yield Plus, 1989 Annual Report, Ex. 1-D; Yield Plus II, 1990 Annual Report, Ex. 2-D (attachments to Affidavit of Ronald J. DiPietro (Dec. 10, 1996) (Docket No. 23)); Falcon Classic Cable, 1990 Annual Report, Ex. B (attachment to Affidavit of Mary Lou Frick (Dec. 10, 1996) (Docket No. 26)).

[*39]

[66] See, e.g., Playtex, Inc. v. Columbia Casualty, 1993 Del. Super. LEXIS 286, *10, Del. Super., C.A. No. 88C-MR-233, Del Pesco, J. (Sept 20, 1993) ("inherently unknowable" theory of tolling did not apply where a "wealth of information regarding [the cause of action] was generally available" when the fraud occurred); Halpern, 313 A.2d at 143 (statute is tolled only for the "period of fraudulent concealment").

[67] See Ruger v. Funk, 1996 Del. Super. LEXIS 34 at *8 ("Actual discovery surely commences the running of the statute; so will any change in circumstances that renders the injury no longer

inherently unknowable, or the ignorance of the party-plaintiff no longer blameless.").

The Amended Complaint also alleges that such "deceptive" cash distributions were used to promote the sale of later Partnerships, and the purchasers of the later Partnerships would have no reason to review the financial information/materials for the earlier Partnerships. Assuming this is true, it still should have been obvious to the investors soon after receiving their annual reports that the cash distributions *they* were receiving were inflated and not reflective of actual earnings. Perhaps for one year, this would not raise too much concern, but certainly after the second or third straight year of cash distributions that far exceeded Partnership income, accompanied by a commensurate decline in partners' capital, plaintiffs should have been aware that the cash distributions they were receiving were not the result of investment gains-and that they were most likely duped into purchasing the Partnerships in the first place. The inherent contradiction between the distributions described in these annual reports as "annualized returns" and the declining partners' capital and net income lower than the distributions should have caused plaintiffs to question whether the touted cash distributions of the earlier partnerships were truly indicative of profits. That is inquiry notice. *Queen Anne Pier Condominium Council v. Raley, 1988 Del. Super. LEXIS 20, *10, Del. Super., C.A. No. 85C-JA10, Lee, J. (Jan. 26, 1988) (inquiry notice means the existence of facts sufficient to put person of ordinary intelligence and prudence on inquiry which, *if pursued,* would lead to the discovery).

[*40] IV. CONCLUSION

On the basis of this record, I conclude that the information in the annual reports alone should have provided plaintiffs with adequate notice of any alleged misconduct by defendants. [68] Based on the facts alleged in the Amended Complaint, drawing all inferences in favor of plaintiffs, I conclude that plaintiffs were clearly on inquiry notice of their claims long before February 6, 1993 (or before October 7, 1993, with regard to the Falcon Classic Cable claim). [69] The limitations period for this cause of action is three years. Plaintiffs' February

1996 filing (the earliest of plaintiffs' filings) comes *more* than three years after they were placed on inquiry notice. For these reasons, I grant defendants' motion to dismiss on the ground that the plaintiffs' claims are time-barred by operation of the statute of limitations. [70]

68    Although I conclude that the glaring inconsistencies contained in the annual reports were sufficient, in and of themselves, to place plaintiffs on inquiry notice of their potential causes of action, those discrepancies were not the only indications plaintiffs had of their potential claims. I need not address them in substance (as I find the material in the annual reports dispositive on the issue), but I am inclined to agree with defendants' other assertions of plaintiffs' inquiry notice: (1) that plaintiffs were on notice no later than 1992, when defendants changed the format of their monthly account statements to reflect the true, rather than par, value of the Partnerships. *See In re Prudential Sec. Inc. L.P. Litig., 930 F. Supp. at 76-77*; (2) that some investors in the Partnerships did manage to file lawsuits against the very same limited partnerships *before* January 26, 1996, suggests the alleged wrongful conduct was detectable by the average investor; and (3)

that the *Wall Street Journal* article neither disclosed any concrete information about sales - practices or the investments - in question, nor mentioned by name the limited partnership defendants in this case, thus raising a serious doubt as to how the article alone could have prompted such an inquiry.

[*41]

69    *Cf. Carlton Investments v. TLC Beatrice Int'l Holdings, Inc., 1995 Del. Ch. LEXIS 140*, Del. Ch., C.A. No. 13950, Allen, C. (Nov. 21, 1995) (motion to dismiss denied because issue of plaintiffs' inquiry notice was in dispute).

70  Plaintiffs' request, in the alternative, to amend their Amended Complaint is hereby denied. No amendment would cure the fatal flaw in plaintiffs' current Amended Complaint-that it was filed too late. *Glaser v. Norris, 1992 Del. Ch. LEXIS 1, *42*, Del. Ch., C.A. No. 9538, Chandler, V.C. (Jan. 6, 1992) ("A court should deny leave to amend a complaint when the amendment would be futile due to the insufficiency of the proposed amendment.")

IT IS SO ORDERED.

Exhibit 4

LEXSEE 2007 PHILA CT COM PL LEXIS 252

**GEORGE L. MILLER, Chapter 7 Trustee Of the bankruptcy estates of AMERICAN BUSINESS FINANCIAL SERVICES, INC. and subsidiaries, Plaintiff, v. ANTHONY J. SANTILLI, BEVERLY SANTILLI, ALBERT W. MANDIA, JEFFREY M. RUBIN et al., Defendant.**

**NO. 1225, COMMERCE PROGRAM, Control Nos. 041182, 061519, 061580**

**COMMON PLEAS COURT OF PHILADELPHIA COUNTY, PENNSYLVANIA, CIVIL TRIAL DIVISION**

*2007 Phila. Ct. Com. Pl. LEXIS 252*

**September 20, 2007, Decided**

**JUDGES:** [*1] MARK I. BERNSTEIN, J.

**OPINION BY:** MARK I. BERNSTEIN

**OPINION**

COMMERCE PROGRAM

**ORDER**

**AND NOW,** this 20<th> day of September, 2007, after hearing oral argument and in accord with the Opinion issued simultaneously, it is hereby **ORDERED** that the Motion for Judgment On The Pleadings of JP Morgan, Bear Sterns, Morgan Stanley, and Credit Suisse is **GRANTED in part,** the Preliminary Objections of U.S. Bank are **SUSTAINED in part,** and the Preliminary Objections of the Director and Officer defendants [1] are **SUSTAINED in part.**

> 1   The Director and Officer defendants are: Anthony J. Santilli, Beverly Santilli, Albert W. Mandia, Jeffrey M. Rubin, Leonard Becker, Michael R. DeLuca, and Harold Sussman.

Count IV of the Complaint for Breach of Duty of Care, Mismanagement, Negligence and/or Gross Negligence is **DISMISSED** as to Leonard Becker, Michael R. DeLuca and Harold Sussman only. Count V claiming Aiding and Abetting Breach of Fiduciary Duty, Count VI claiming Aiding and Abetting Fraud, and Count VIII claiming Civil Conspiracy are **DISMISSED** as to

U.S. Bank National Association only. Count VII claiming Deepening Insolvency and all allegations of joint and several liability contained in Count IX claiming Fraudulent Transfer are **DISMISSED** [*2] as to all defendants.

The remainder of the Motion is **DENIED,** and the remainder of the Preliminary Objections are **OVERRULED.** Objecting defendants shall file an Answer to the Complaint within twenty (20) days of the date of entry hereof.

**BY THE COURT,**

**MARK I. BERNSTEIN, J.**

**OPINION**

Plaintiff George L. Miller is the Chapter 7 bankruptcy trustee (the "Trustee") of American Business Financial Services, Inc. and its subsidiaries ("ABFS"), which were in the business of making residential mortgage loans to credit-impaired or "subprime" borrowers (the "Subprime Loans"). ABFS is a Delaware corporation with its headquarters in Pennsylvania.

In this action, the Trustee has brought claims against the following persons: four officers of ABFS, Anthony J. Santilli, Beverly Santilli, Albert W. Mandia, and Jeffrey M. Rubin (collectively, the "Officers"); and three directors of ABFS, Leonard Becker, Michael R. DeLuca, and Harold Sussman (collectively, the "Directors"). The Trustee has also asserted claims against five financial

Page 2

2007 Phila. Ct. Com. Pl. LEXIS 252, *2

institutions and their affiliates, all of whom had business dealings with ABFS: U.S. Bank National Association ("U.S. Bank"); JP Morgan Chase Bank, J.P. Morgan Securities, Inc., and [*3] JP Morgan Chase & Co (collectively, "JP Morgan"); Credit Suisse (USA), Inc., Credit Suisse First Boston, Credit Suisse First Boston Mortgage Securities Corp., and Credit Suisse First Boston Mortgage Capital, LLC (collectively, "Credit Suisse"); Bear, Sterns & Co., Inc., Bear Stearns Financial Products Inc., and Bear Sterns Asset Backed Securities, Inc. (collectively, "Bear Sterns"); and Morgan Stanley & Co., Morgan Stanley Dean Witter & Co., Morgan Stanley ABS Capital I, Inc., and Morgan Stanley Mortgage Capital, Inc. (collectively, "Morgan Stanley").

The Trustee alleges [2] that from 2000-2003, ABFS sold and pledged groups of Subprime Loans to certain trusts which it had created. Those trusts issued securities in order to raise capital for ABFS by selling interests in the trust assets ("Securitizations") primarily to institutional investors. These "Securitizations" were underwritten [3] by JP Morgan, Credit Suisse, Bear Sterns, and Morgan Stanley (collectively, the "Securitization Institutions"). ABFS received cash from the sale of the securities and retained rights to future income ("Residual Interests") on the Subprime Loans transferred to the trusts. This lawsuit centers on the fact [*4] that ABFS recorded the "fair value" of these Residual Interests as assets on its financial statements.

> 2   For purposes of deciding the Preliminary Objections, "all material facts set forth in the complaint as well as all inferences reasonably deducible therefrom are admitted as true for the purposes of review." *Sullivan v. Chartwell Inv. Partners, LP, 2005 PA Super 124, 873 A.2d 710, 714 (Pa. Super. 2005)*. Similarly, in deciding a Motion for Judgment on the Pleadings, the court "must accept as true all well pleaded statements of fact of the party against whom the motion is [made] and consider against him only those facts that he specifically admits." *Md. Cas. Co. v. Odyssey Contr. Corp., 2006 PA Super 25, 894 A.2d 750, 753 (Pa. Super. 2006)*.
>
> 3   "To underwrite" is "to assume financial responsibility for; guarantee against failure." American Heritage Dictionary, p 1948 (3d ed. 1992). "An underwriting contract . . . is an agreement, made before corporate shares are brought before the public, that in the event of the

public not taking all the shares of the number mentioned in the agreement, the underwriter will take the shares which the public do not take." Blacks' Law Dictionary, p. 1527 (6th ed. 1990).

The Trustee alleges in [*5] the Complaint that the Officers, ABFS' accountants, [4] and the Securitization Institutions grossly overvalued the Residual Interests, so that ABFS would appear to be solvent and even prosperous when it was not. The Trustee also alleges in the Complaint that the Officers engaged in the following improper acts:

> 67.  Commencing at a time presently unknown by the Trustee and continuing until the ABFS bankruptcy filing, the Officer Defendants erroneously misused $ 5.7 million from the mortgage escrow funds they were charged with the responsibility to service and maintain.
>
> 99.  During the five years immediately preceding ABFS's bankruptcy filing Defendants Santilli and Beverly Santilli were paid more than $ 10 million in unreasonable salaries and bonus compensation from an insolvent ABFS.
>
> 100.  During the five years immediately preceding ABFS's bankruptcy filing, five other members of the Santilli family were on the company payroll (including children Carole Santilli and John Santilli) and were paid more than $ 2.6 million in unreasonable salaries and bonus compensation from an insolvent ABFS.
>
> 101.  During the five years immediately preceding ABFS's bankruptcy filing, Defendants Santilli and Beverly [*6] Santilli essentially used ABFS as the Santilli family bank, wrongfully paying themselves substantial sums on account of personal charges and expenses that were not honest or legitimate business expenses of an insolvent ABFS.
>
> 102.  During the five years immediately preceding ABFS's

Page 3

2007 Phila. Ct. Com. Pl. LEXIS 252, *6

bankruptcy filing, Defendant Mandia was paid more than $ 2.5 million in unreasonable salary and bonus compensation from an insolvent ABFS.

103. During the five years immediately preceding ABFS's bankruptcy filing, Defendant Rubin was paid more than $ 2.4 million in unreasonable salary and bonus compensation from an insolvent ABFS.

104. During the period of ABFS's insolvency, the ABFS Defendants caused ABFS to declare and pay more than $ 1.4 million of unlawful dividends to Santilli and his wife.

105. During the period of ABFS's insolvency, the ABFS Defendants caused ABFS to relieve Santilli of the obligation to repay $ 600,000 that he had borrowed from ABFS (yet the loan was retained as an asset on ABFS's balance sheet). 5

The Trustee claims that the Directors should have, but failed to, discover the overvaluations of the Residual Interests as well as the Officers' other financial chicanery. The Trustee alleges [*7] as follows:

114. At all times material hereto, the Outside Director Defendants knew or should have known that the Officer Defendants had been perpetrating the frauds and engaging in the wrongdoing alleged in this Complaint.

115. The Outside Director Defendants consciously and intentionally disregarded their corporate responsibilities, in that they, among other wrongs, (i) failed to act in good faith, (ii) failed to act in the honest belief that their actions or inaction were taken in the best interests of ABFS and its creditors, and (iii) knowingly and deliberately remained indifferent to critical deficiencies in ABFS's corporate information and accounting systems, demonstrating a clear disregard for the financial health of the company. 6

4    The accountants were not named by the Trustee as defendants in this action, but the accountants have been joined as additional defendants.

5    Complaint, PP 67, 99-105.

6    Complaint, PP 114-115.

In addition to the Securitizations, ABFS raised funds through the sale of subordinated notes (the "Notes") to unsophisticated investors. These Notes were recorded on ABFS' balance sheet as debt. To reduce this debt, the Officers and Directors caused ABFS to offer to [*8] exchange the Notes for preferred stock in ABFS ("Exchange Offers"). US Bank served as the "indenture trustee" for the sale of the Notes and the Exchange Offers. As "indenture trustee," it is alleged in the Complaint that US Bank provided "financial cover and credibility in connection with ABFS's business." 7

7    Id., P 156.

The Trustee has asserted the following claims against the various defendants based on the foregoing:

Count I for Fraud and Count IV for Breach of Duty of Care/Mismanagement/ Negligence/Gross Negligence against the Officers for falsifying ABFS' financial statements to hide its rapidly deteriorating financial position.

Count II for Breach of Fiduciary Duty and Count IV for Breach of Duty of Care/Mismanagement/ Negligence/Gross Negligence against the Officers for self-dealing and improper use of ABFS funds.

Count III for Breach of Fiduciary Duty and Count IV for Breach of Duty of

Care/Mismanagement/ Negligence/Gross Negligence against the Directors because they failed to discover the Officers' wrongdoing.

Count V for Aiding and Abetting Breach of Fiduciary Duty, Count VI for Aiding and Abetting Fraud, and Count VIII for Conspiracy to commit fraud and breach of fiduciary duty [*9] against US Bank for its role in the sales of Notes and the Exchange Offers.

Count V for Aiding and Abetting Breach of Fiduciary Duty, Count VI for Aiding and Abetting Fraud, and Count VIII for Conspiracy to commit fraud and breach of fiduciary duty against the Securitization

Page 4

2007 Phila. Ct. Com. Pl. LEXIS 252, *9

Institutions for their role in the Securitizations.

Count VII for Deepening of Insolvency against all defendants for causing ABFS to continue in business while insolvent.

Count IX for Fraudulent Transfer against all defendants for taking money, including underwriting fees, from ABFS without affording reasonably equivalent value.

The Securitization Institutions answered the Complaint and filed the Motion for Judgment on the Pleadings presently before the court. The defendant Officers and Directors and US Bank filed the Preliminary Objections to the Complaint presently before the court. Since the same issues are raised in the Motion for Judgment on the Pleadings and the Preliminary Objections, they will be addressed together.

I. Choice of Law Analysis.

As a preliminary matter, the parties' question whether Pennsylvania or Delaware law applies to the Trustee's claims. ABFS was incorporated in Delaware, and, therefore, it [*10] is governed by the Delaware Corporations Law. ABFS' headquarters are in Pennsylvania. Since many of the activities alleged in the Complaint occurred in Pennsylvania, Pennsylvania law may apply to some claims. Where the parties dispute which jurisdiction's law applies, the court must first determine whether there is a true conflict of laws. The Superior Court has clearly explained this principle: "In Pennsylvania, choice of law analysis first entails a determination of whether the laws of the competing states actually differ. If not, no further analysis is necessary. If [the court] determines a conflict is present, [it] must then analyze the governmental interests underlying the issue and determine which state has the greater interest in the application of its law." [8]

> [8] *Ratti v. Wheeling Pittsburgh Steel Corp., 2000 PA Super 239, 758 A.2d 695, 702 (Pa. Super. 2000).*

II. Count VII for Deepening Insolvency.

All defendants object to the claim for "deepening insolvency." Defendants argue that Delaware law applies. Plaintiff argues that Pennsylvania law applies. There is no true conflict because neither state recognizes a cause

of action for deepening insolvency. The Delaware Chancery Court recently clearly held [*11] that deepening insolvency is not recognized as a cause of action in Delaware:

> The concept of deepening insolvency has been discussed at length in federal jurisprudence, perhaps because the term has the kind of stentorious academic ring that tends to dull the mind to the concept's ultimate emptiness.
>
> * * *
>
> The rejection of an independent cause of action for deepening insolvency does not absolve directors of insolvent corporations of responsibility. Rather, it remits plaintiffs to the contents of their traditional toolkit, which contains, among other things, causes of action for breach of fiduciary duty and for fraud. The contours of these causes of action have been carefully shaped by generations of experience, in order to balance the societal interests in protecting investors and creditors against exploitation by directors and in providing directors with sufficient insulation so that they can seek to create wealth through the good faith pursuit of business strategies that involve a risk of failure. If a plaintiff cannot state a claim that the directors of an insolvent corporation acted disloyally or without due care in implementing a business strategy, it may not cure that deficiency [*12] simply by alleging that the corporation became more insolvent as a result of the failed strategy. [9]

The Delaware Supreme Court affirmed that holding without opinion. [10]

> [9] *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 204 (Del. Ch. 2006), aff'd, 2007 Del. LEXIS 357 (Del. Aug. 14, 2007).*
> [10] *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P., 2007 Del. LEXIS 357 (Del. Aug. 14, 2007).*

Likewise, no Pennsylvania state court has ever

Page 5

2007 Phila. Ct. Com. Pl. LEXIS 252, *12

recognized a cause of action for deepening insolvency. The Third Circuit has predicted that "the Pennsylvania Supreme Court would determine that 'deepening insolvency' may give rise to a cognizable injury," [11] but the Third Circuit later predicted that "only fraudulent conduct will suffice to support a deepening-insolvency claim under Pennsylvania law." [12] This court finds that the law of Pennsylvania parallels that of Delaware on the issue in this case. [13]

> 11    *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 349-350 (3d Cir. 2001).*
> 12    *In re Citx Corp., 448 F.3d 672, 681 (3d Cir. 2006).*
> 13    "A federal court's interpretation of Pennsylvania law is not binding on this court." *Mutual Ben. Ins. Co. v. Goschenhoppen Mut. Ins. Co., 392 Pa. Super. 363, 370, 572 A.2d 1275, 1278 (1990).*

"Deepening [*13] insolvency" may be a cognizable harm justifying the court's exercise of equitable powers while there is still time to limit the natural and inevitable consequences of the continued "deepening." However, once the ultimate harm from an unrestrained deepening insolvency has been suffered and bankruptcy has occurred, traditional claims for fraud and breach of fiduciary duty, which "have been carefully shaped by generations of experience," are sufficient to recover for any wrongdoing. In this case, bankruptcy has already occurred and the Trustee is pursuing claims for fraud and breach of fiduciary duty. The Preliminary Objections are sustained, and the Motion for Judgment on the Pleadings is granted, as to the Trustee's claim for "deepening insolvency," and the claim is dismissed.

III. Count IX for Fraudulent Transfer.

All defendants object to the fraudulent transfer claims on the basis that the Trustee lacks standing to raise such claims. No party disputes that Pennsylvania law applies. The Pennsylvania Uniform Fraudulent Transfer Act ("UFTA") creates a cause of action for a "creditor." It says:

> In an action for relief against a transfer or obligation under this chapter, a creditor, subject [*14] to the limitations in sections 5108 (relating to defenses, liability and protection of transferee) and 5109

(relating to extinguishment of cause of action), may obtain . . . avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim. [14]

The statute defines "creditor" as "a person who has a claim." [15] A "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." [16] Therefore, UFTA grants a cause of action to any person who has a "claim." Since the Trustee does not assert any right to payment against ABFS, the Trustee does not have a "claim" against ABFS. Therefore, under the terms of UFTA viewed in isolation, the Trustee does not have standing to bring an action against ABFS.

> 14    *12 Pa. C.S. § 5107.*
> 15    *Id. § 5101.*
> 16    *Id.*

If the Trustee does have standing to bring a fraudulent transfer claim, it must be found in some other statute or rule of law. The Bankruptcy Code gives the Trustee a claim against ABFS under UFTA. The Bankruptcy Code provides:

> The trustee may avoid any transfer of an interest of the [*15] debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding [certain types of] unsecured claim[s]. [17]

According to Collier on Bankruptcy, this provision "gives the trustee the right to use applicable state law, namely, the UFCA or the UFTA . . . to avoid a fraudulent transfer, separate and apart from the avoidance rights given the trustee" under other sections of the Bankruptcy Code. [18] Therefore, the Trustee has standing to assert a fraudulent transfer claim against the defendants.

> 17    *11 U.S.C.S. § 544(b).* Although the Trustee disclaims reliance on this section, the court must rule in accord with applicable law regardless of counsel's strategic decisions.
> 18    5-548 Collier on Bankruptcy-15th Edition Rev. § 548.01.

The defendants, however, cannot be found jointly

Page 6

2007 Phila. Ct. Com. Pl. LEXIS 252, *15

and severally liable for the fraudulent transfers ABFS made to other defendants. UFTA allows a creditor to sue only the specific transferee of a fraudulent transfer. Under UFTA,

> The judgment may be entered against... the first transferee of the asset or the person for whose benefit the transfer was made. [19]

The Trustee claims that each defendant is the first transferee in its [*16] own transaction with ABFS, so each can be found liable under UFTA only for the amounts it improperly received from ABFS and not for anything other defendants obtained in separate transactions. The allegations of joint and several liability for fraudulent transfers are dismissed.

> 19 *12 Pa. C.S. § 5108.*

IV. Count I for Fraud.

Moving defendants object to the Trustee's claims for fraud based on two related arguments. They claim that since the Trustee stands in the shoes of ABFS, the Trustee is *in pari delicto* with the Officers who committed the fraud. Defendants reasons that the Trustee cannot assert claims based on its own fraud. They also claim that the Officers' fraud must be imputed to ABFS, and therefore, neither the Trustee nor ABFS can claim to have justifiably relied upon the Officers misstatements. [20] The parties present no conflict between the law of Pennsylvania and Delaware on these issues.

> 20 Justifiable reliance by the victim is one of the required elements of a claim for fraud. *Bortz v. Noon, 556 Pa. 489, 499, 729 A.2d 555, 560 (1999).*

*In pari delicto* is usually applied in an action between the corporation and an innocent third party. [21] In Wishnefsky v. Riley & [*17] Fanelli, P.C., [22] the Superior Court said:

> The common law doctrine of *in pari delicto* ('in equal fault') is an application of the principle that no court will lend its aid to a man who grounds his action upon an immoral or illegal act. When the doctrine is applied, the result is to render the transaction between the parties absolutely

without any force or effect whatever. The law will leave the parties just in the condition in which it finds them.

Herein, the corporation ABFS was used as the vehicle for the Officers' conspiracy with the other defendants. A conspiracy using the corporate structure improperly to defraud creditors and shareholders does not equate to ABFS being at fault. *In pari delicto* is not applicable when a corporation brings an action against an insider for misconduct. In reaching this conclusion, the court believes the reasoning of the Delaware Court of Chancery in *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.* is sound:

> There are certainly situations when an entity could be injured by an insider's misconduct and when the entity, as to third parties, would be charged with knowledge of that misconduct. Suppose, for example, that a board of directors conspired with [*18] the company's auditors to embezzle $ 100 million, giving the auditor a 10% cut if it characterized the stolen funds improperly in the company's financial statements. In that circumstance, the directors' knowledge of the wrongdoing would not bar a derivative suit against the directors and the auditors on behalf of the company, even though a third party relying reasonably on the company's false financial statements might have a basis to sue the company and charge it with its insiders' knowledge. Many of the great corporate scandals have involved concerted activity by company advisors and insiders, activity that sometimes harmed not only outsiders but also, derivatively, the company's innocent stockholders. The doctrine of in pari delicto has never operated in Delaware as a bar to providing relief to the innocent by way of a derivative suit. [23]

Just as *in pari delicto* does not bar a shareholder derivative suit, it does not bar a bankruptcy trustee from asserting claims comparable to shareholder claims, such as the fraud claim asserted in this action.

> 21 *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 212, n. 132 (Del. Ch. 2006),*

2007 Phila. Ct. Com. Pl. LEXIS 252, *18

*aff'd, 2007 Del. LEXIS 357 (Del. Aug. 14, 2007).*
22   *2002 PA Super 153, 799 A.2d 827, 829 (Pa. Super. 2002).*
23   *Trenwick, 906 A.2d at 212, n. 132.*

Officers' [*19] fraudulent conduct will not be imputed to the corporation "if the officers' interests were adverse to the corporation and not for the benefit of the corporation." 24 In this case, the Trustee alleges that the Officers furthered their own interests adverse to those of ABFS by looting corporate assets. Specifically, the Complaint alleges that the Officers: 1) overstated ABFS' assets so as to prolong its existence as a vehicle for their wrongdoing; 2) misused $ 5.7 million in mortgage escrow funds; 3) overpaid themselves and family members; 4) reimbursed themselves with ABFS' funds for personal expenses; and 5) relieved one Officer of his obligation to repay a loan from ABFS. 25 These acts were not done for corporate benefit. The Officers' plundering of the company cannot be imputed to ABFS. ABFS cannot be *in pari delicto* with its looters. The Preliminary Objections are overruled, and the Motion for Judgment on the Pleadings is denied, as to the Trustee's claim for fraud.

24   *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 359 (3d Cir. 2001).*
25   Complaint, PP 67, 85, 86, 99-105.

V. Count V for Aiding and Abetting Breach of Fiduciary Duty, Count VI for Aiding and [*20] Abetting Fraud, and Count VIII for Conspiracy.

The Securitization Institutions and US Bank object to claims of aiding and abetting fraud and breach of fiduciary duty. They claim that no such cause of action exists in Pennsylvania. They are wrong. Aiding and abetting, or concerted action, as a cause of action is described in the Restatement of Torts as follows:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives

substantial assistance or encouragement to the other so to conduct himself, or

> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person. 26

This section of the Restatement is the law of Pennsylvania. It has been cited with approval by the Pennsylvania Supreme Court 27 and the Superior Court. 28 The Commonwealth Court has expressly held that aiding and abetting breach of fiduciary duty is a cognizable tort. 29

26   *Restatement (Second) Torts § 876.*
27   *Skipworth by Williams v. Lead Indus. Ass'n, 547 Pa. 224, 236, 690 A.2d 169, 174 (1997)* [*21] (The Supreme Court found the Superior Court's interpretations of the concert of action theory to be "eminently reasonable" and "expressly adopt[ed] them.").
28   *Sovereign Bank v. Ganter, 2006 PA Super 338, 914 A.2d 415, 424 (Pa. Super. 2006)* ("*Section 876 of the Restatement (Second) of Torts* addresses the tort of civil aiding and abetting, which is also known as concerted tortious conduct. . . If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act. . . Considering the evidence in a light most favorable to Sovereign as the verdict winner, we conclude Sovereign presented sufficient, circumstantial evidence to demonstrate concerted tortious conduct on the part of Mr. Ganter."); *Larsen v. Philadelphia Newspapers, 411 Pa. Super. 534, 547,602 A.2d 324, 331 (1991)* ("A cause of action for concerted activity under *Section 876 of the Restatement (Second) of Torts* has been recognized by our Pennsylvania courts."); *Jefferis v. Commonwealth, 371 Pa. Super. 12, 18, 537 A.2d 355, 358 (1988)*("Factors relevant to determining whether the defendant's act was a substantial factor in the commission [*22] of the tort include, but are not limited to, the nature of the act encouraged, the amount of assistance given, the defendant's presence or absence at the time of the tort, the defendant's

Page 8

2007 Phila. Ct. Com. Pl. LEXIS 252, *22

relation to the tortfeasor and the foreseeability of the harm that occurred."); *Kline v. Ball, 306 Pa. Super. 284, 287, 452 A.2d 727, 728 (1982)* (In considering § 876(b), the court held that "we are inclined to feel that appellants' argument from the Restatement of Torts 2d has merit, and that on facts similar to those of the instant \ matter, § 876 might well prove applicable.")

29    *Koken v. Steinberg, 825 A.2d 723, 732 (Pa. Commw. 2003)* ("the Liquidator has clearly identified the wrong, a breach of fiduciary duty, the wrongdoer, Reliance, and the party that acted in concert with the wrongdoer, Deloitte. Accordingly, this Court concludes that the Liquidator has stated a cause of action against Deloitte for aiding and abetting a breach of fiduciary duty pursuant to *Section 876 of the Restatement (Second) of Torts*.").

Delaware also recognizes such a cause of action. *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 215 (Del. Ch. 2006), aff'd, 2007 Del. LEXIS 357 (Del. Aug. 14, 2007).*

As [*23] alleged in the Complaint, "the substantial assistance provided by [each of the Securitization Institutions] included . . . determining the value of the substantially inflated gain to be booked by ABFS in connection with the securitizations." [30] This factual allegation leads to the reasonable inference that the Securitization Institutions: 1) had knowledge of the Officers' wrongdoing; 2) committed their own wrong against ABFS; and 3) provided substantial assistance to the Officers in their fraudulent scheme. The Trustee pled all the elements of a claim for aiding and abetting fraud and breach of fiduciary duty against the Securitization Institutions. Based on these facts, the claim of conspiracy against the Securitization Institutions also stands. [31] The Securitization Institutions' Motion for Judgment on the Pleadings is denied as to the Trustee's claims for aiding and abetting and conspiracy.

30    Complaint, PP 155, 157-159.
31    "In order to state a cause of action for civil conspiracy, a plaintiff must show that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means. Proof of malice, i.e., an intent to injure, is essential [*24] in proof of a conspiracy." *Thompson Coal Co. v. Pike Coal*

*Co., 488 Pa. 198, 211, 412 A.2d 466, 472 (1979).*

There is, however, no factual allegation from which one can conclude that US Bank, the "indenture trustee," knew of the Officers' wrongdoing, or that US Bank committed any independent breach of duty owed to ABFS. The Trustee alleges that US Bank provided "substantial assistance" to the Officers as follows:

80. At all times material hereto, US Bank played a substantial role in the issuance and sale of ABFS Subordinated Notes, and, without the participation and financial credibility provided by US Bank, ABFS would not have been successful in continuing to issue and sell ABFS Subordinated Notes and the Officer Defendants' scheme would have unraveled and collapsed years earlier.

89. [T]he ABFS Defendants, BDO, US Bank and others concocted a scheme to remove debt from ABFS' balance sheet by the artifice of exchange offers, registered with the SEC, pursuant to which the existing holders of ABFS Subordinate Notes would be afforded the opportunity to 'exchange' these notes for preferred stock and/or combination of preferred stock and new debt.

156. The substantial assistance provided by US [*25] Bank included, but was not limited to: (a) serving as indenture trustee in connection with the sale of $ 1.5 billion of ABFS Subordinated Notes; (b) serving as indenture trustee in connection with the two exchange offers that were used as an artifice to mask ABFS's insolvency; (c) agreeing to serve as indenture trustee for the third exchange offer that never took place because the SEC denied approval; and, (d) providing financial cover and credibility in connection with ABFS's business. [32]

Substantial assistance is one of two requisite elements of a claim for aiding and abetting tortious conduct. The claim also requires either that US Bank knew of the defendants' wrongdoing that it was assisting, or that US

2007 Phila. Ct. Com. Pl. LEXIS 252, *25

Bank committed a separate tort against ABFS. [33] US Bank is only alleged to have served as the statutorily required indenture trustee. This activity does not rise to the level of aiding and abetting. Therefore, US Bank's Preliminary Objections as to the Trustee's claims for the aiding and abetting and conspiracy against US Bank are sustained and the claims must be dismissed.

32   Complaint, PP 80, 89, and 156.
33   *Restatement (Second) Torts § 876.*

VI. Count III for Breach of Fiduciary Duty [*26] and Count IV for Breach of Duty of Care/Mismanagement/Negligence/Gross Negligence.

The Directors object to the breach of fiduciary duty and gross negligence claims because ABFS' Certificate of Incorporation absolves them of any and all fiduciary responsibility. Under Delaware law, which applies because ABFS was incorporated in Delaware, an entity's Certificate of Incorporation may contain:

A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit. [34]

34   *8 Del. C. § 102(b)(7).*

The Trustee admits that ABFS' Certificate of Incorporation contains this immunity provision, but the Trustee argues that the claims against the Directors are nonetheless cognizable because [*27] he alleges intentional misconduct as follows: [35]

144. The Outside Director Defendants'

intentional ignorance, abdication of their roles as directors, and/or willful blindness toward ABFS' improper transactions and system failures constituted breaches of the Outside Director Defendants' fiduciary duties to ABFS and its creditors.

145. The Outside Directors failed to establish internal controls and acted with intentional and conscious disregard for ABFS and its creditors. [36]

The Delaware immunity statute does not bar claims for "intentional misconduct." The Trustee's fiduciary duty claim against the directors is not barred. However, in the Trustee's claim for "Breach of Duty of Care/Mismanagement/Negligence/Gross Negligence," the Trustee alleges that "[t]o the extent that any of the wrongdoing alleged [in the claim for breach of fiduciary duty] was not the result of intentional wrongdoing on the part of any of the ABFS Defendants, it resulted from mismanagement, negligence and/or gross negligence for which each said defendant is liable." [37] Delaware's immunity statute covers this claim. The Delaware Supreme Court has held that "even if the plaintiffs had stated a claim for gross negligence, [*28] such a well-pleaded claim is unavailing because defendants have brought forth the *Section 102(b)(7)* charter provision that bars such claims." [38] The Directors' Preliminary Objections to the Trustee's negligence claim against them are sustained, and the negligence claim is dismissed.

35   Complaint, P 118.
36   *Id.,* PP 144-145.
37   *Id.,* P 151.
38   *Malpiede v. Townson, 780 A.2d 1075, 1094-1095 (Del. 2001).*

The Motion for Judgment on the Pleadings of the Securitization Institutions is granted in part and denied in part. The Preliminary Objections of US Bank and the Officers and Directors are sustained in part and overruled in part.

**BY THE COURT,**

**MARK I. BERNSTEIN, J.**

Exhibit 5

Westlaw.

Not Reported in A.2d                                                    Page 1
Not Reported in A.2d, 2008 WL 1961150 (Del.Ch.)
**2008 WL 1961150 (Del.Ch.)**

C

Nelson v. Emerson
Del.Ch.,2008.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
NOT DESIGNATED FOR PUBLICATION
Court of Chancery of Delaware.
William G. NELSON, IV, Plaintiff,
v.
E. James EMERSON and Kathleen Emerson, Defendants.
**C.A. No. 2937-VCS.**

Submitted: Feb. 8, 2008.
Decided: May 6, 2008.

Martin J. Weis, Esquire, Dilworth Paxson LLP, Wilmington, Delaware; James J. Rodgers, Esquire, James W. Hennessey, Esquire, Matthew Faranda-Diedrich, Esquire, DILWORTH PAXSON LLP, Philadelphia, Pennsylvania, Attorneys for Plaintiff. David A. Jenkins, Esquire, Joelle E. Polesky, Esquire, Smith, Katzenstein & Furlow LLP, Wilmington, Delaware, Attorneys for Defendants.

MEMORANDUM OPINION

STRINE, Vice Chancellor.

I. *Introduction*

\*1 Plaintiff William G. Nelson was the sole secured creditor of Repository Technologies, Inc. ("Repository" or the "Company"). Nelson alleges that for nearly two years Repository was insolvent and not paying the interest owed under a substantial line of credit that he had extended to the Company. When Nelson threatened to enforce his rights as a secured creditor, Repository filed for bankruptcy. Nelson now claims that defendants E. James Emerson and Kathleen Emerson, two of the Repository's directors and its majority stockholders, breached their fiduciary duties to Repository by causing the Company to file for bankruptcy and by paying themselves "excessive" compensation during the time that Repository was insolvent, both before and after the bankruptcy filing. Nelson is particularly displeased at Repository's bankruptcy filing because the Company's plan to reorganize involved using principles of bankruptcy law to attempt to recharacterize Nelson's debt as equity. In Nelson's view, the Emersons breached their fiduciary duties by undertaking that strategy because Repository was only successful in having a portion of Nelson's debt recharacterized, therefore it did not prevail in having enough debt recharacterized to allow the Company to reorganize successfully. Thus, Nelson sees the bankruptcy filing as having served no purpose other than frustrating his ability to collect on the debt owed to him by the Company and extending the length of time that the Emersons remained on the Company's payroll.

The problem with Nelson's claims is that he is seeking a second chance to win the same game. Nelson made the same arguments he raises in this case to the Bankruptcy Court for the Northern District of Illinois when he sought to have Repository's bankruptcy filing dismissed as being filed in bad faith or, alternatively, due to gross mismanagement of the Company. The Bankruptcy Court, despite dismissing Repository from Bankruptcy because it could not reorganize successfully, explicitly found that "the bankruptcy filing cannot be held to be in bad faith" and that there had not been "any mismanagement of [Repository's] assets and business."FN1 Satisfied with the dismissal of Repository's bankruptcy, but unhappy with the Bankruptcy Court's ruling that the bankruptcy had not been brought in bad faith, Nelson appealed to the District Court for the Northern District of Illinois and argued that the Bankruptcy Court's findings on the bad faith issue were dicta. In essence, Nelson was attempting to preserve his ability to present his bad faith argument to another tribunal in the hope that a new court might find the argument more sub-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 2
Not Reported in A.2d, 2008 WL 1961150 (Del.Ch.)
**2008 WL 1961150 (Del.Ch.)**

stantial. The District Court rejected Nelson's argument, ruling that the bad faith determination was an essential part of the Bankruptcy Court's holding because Nelson himself had advanced the argument that the bankruptcy filing was made in bad faith.

> FN1.*In re Repository Tech., Inc.* ("*Repository I*"), 363 B.R. 868, 896 (Bankr.N.D.Ill.2007).

Undeterred, Nelson filed claims in this court arguing that the Emersons breached their fiduciary duties to Repository by filing the bankruptcy action in bad faith. He contends that the Bankruptcy Court's holdings on the bad faith and gross mismanagement arguments are not preclusive because those findings were not essential to the Bankruptcy Court's final judgment. I reject that contention because the U.S. District Court held that the arguments Nelson made to the Bankruptcy Court and that the Bankruptcy Court explicitly ruled on are part of that Court's holding. Nelson is precluded from arguing otherwise. Moreover, although Nelson did not appeal the Bankruptcy Court's ruling on his excessive compensation argument by challenging its determination that there had been no mismanagement of Repository's assets, I reject Nelson's argument that Bankruptcy Court's ruling on Nelson's excessive compensation was not essential to its final judgment using the same reasoning as the U.S. District Court.

**\*2** Nelson also argues that the bad faith standard used in bankruptcy law is not the same as the standards used to determine breaches of fiduciary duty under Delaware law. In making that argument, Nelson misunderstands the applicable Delaware law. It is settled Delaware law that an insolvent company is not required to turn off the lights and liquidate when that company's directors believe that continuing operations will maximize the value of the company. Federal bankruptcy law shares this belief and provides procedures that enable an insolvent company to continue its operations while at the same time balancing the interests of the affected corporate constituencies. Nelson argues that this court

should hold Repository's directors liable for taking advantage of the bankruptcy laws despite the fact the Bankruptcy Code has mechanisms to prevent abuse and that the Bankruptcy Court explicitly found that Repository had filed for bankruptcy in good faith. As a prudential matter, this court should generally defer to the Bankruptcy Court and its expertise in addressing the misuse of the bankruptcy laws. But because the parties did not address that issue, my ruling rests on the determination that the Bankruptcy Court's factual findings preclude any liability under Delaware fiduciary duty law. The directors of an insolvent company who, in good faith, undertake a strategy to benefit the company's equity holders cannot be held liable just because the strategy failed. The Bankruptcy Court has already determined that Repository's bankruptcy filing was a non-frivolous strategy and that it was partially successful. That precludes any finding that the Emersons breached their fiduciary duties by causing the Company to undertake that strategy.

Alternatively, I note that even if Nelson were not precluded from making his fiduciary duty claim, his pleadings fail to state a claim that the Emersons breached their fiduciary duties. Repository's charter contains a § 102(b)(7) clause that exculpates its directors from liability for breaches of their duty of care. Nelson must, therefore, plead facts supporting a viable claim for a breach of the duty of loyalty to survive the Emersons' motion to dismiss. Nelson's assertion that the Emersons caused Repository to pay them excessive compensation while the Company was insolvent does not support a duty of loyalty claim because the complaint neither quantifies the amount of the allegedly excessive compensation nor describes which directors approved that compensation or suggests that those unknown directors were not independent. Likewise, Nelson's contention that the Emersons caused Repository to file for bankruptcy in bad faith for the purpose of frustrating Nelson's efforts to collect the debt owed to him by Repository does not support a duty of loyalty claim. The pled facts merely suggest that the Emersons caused Repository to file a non-frivolous re-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 3
Not Reported in A.2d, 2008 WL 1961150 (Del.Ch.)
**2008 WL 1961150 (Del.Ch.)**

characterization claim for the benefit of its equity holders, a business decision that, although not ultimately successful, is protected by the business judgment rule.

II. *Factual Background*[FN2]

FN2. The facts are drawn from the complaint, the documents it incorporates, and other publicly filed documents, including documents filed in the related federal court proceedings. *See, e.g., West Coast Mgmt. & Capital, LLC v. Carrier Access Corp.,* 914 A.2d 636, 641 (Del.Ch.2006) (taking "judicial notice of the federal court decisions and orders" in the context of a motion to dismiss); *In re Wheelabrator Techs., Inc. S'holders Litig.,* 1992 WL 212595, at *12 (Sept. 1, Del. Ch.1992) (stating that this court may take judicial notice of publicly filed documents on a motion to dismiss).

A. *The Path To Bankruptcy*

**\*3** Repository markets, supplies, and maintains customer relationship software pursuant to licensing agreements with its customers. Repository filed for bankruptcy in April 2006, was dismissed from bankruptcy in February 2007, and was later sold to plaintiff William G. Nelson, IV, its only secured creditor, via a secured party sale in March 2007.[FN3] The events relevant to this lawsuit are those that occurred before the sale of Repository to Nelson. During the relevant time period, there were two primary factions that had an interest in Repository. One faction was comprised of defendants E. James Emerson and his wife Kathleen Emerson. The Emersons were Repository's majority stockholders and served as officers and directors of the Company.[FN4] The other faction consisted of plaintiff Nelson. Beginning in 1996, Nelson was a minority stockholder in Repository. But Nelson was not a passive minority stockholder. Nelson was a

Repository director from 1996 until April 11, 2006, a mere two weeks before Repository filed for bankruptcy. Nelson also served as the Company's Chief Executive Officer from mid-2002 through mid-2004.

FN3. *In re Repository Tech., Inc.* ("*Repository II*"). 381 B.R. 852, 862 (N.D.Ill.2008).

FN4. *Repository I,* 363 B.R. at 873 ("Mr. Emerson and Mrs. Emerson own 37.02% and 29.82% of the equity interests in RTI, respectively, for a combined 66.84% of the equity interests."). During the relevant time period, as best as can be gathered from the complaint, Repository's board varied in size from three directors to five directors. Compl. ¶¶ 4-6, 10, 33; *see also Repository I,* 363 B.R. at 872 ("Since 1996, RTI's Board of Directors had between three and five directors and Mr. Nelson had only one seat on the Debtor's Board of Directors while the principal shareholders, [the Emersons], had two seats, so Mr. Nelson was never in control of the Board of Directors.").

Nelson's resignation as director and Repository's bankruptcy filing were related to Nelson's other role at Repository, his status as a secured creditor of the Company since 2002. Nelson, who at the time of bankruptcy had a secured claim against Repository of over $2 million, triggered Repository's voluntary bankruptcy filing by sending Repository a notice of default letter (the "Default Letter") on the same day he resigned from Repository's board. Nelson first became a creditor of Repository in August 2002, when Repository and he executed agreements creating a secured $500,000 line of credit with a 15% interest rate (the "Nelson Line of Credit").[FN5] By December 31, 2002, Nelson had advanced Repository the full $500,000 under the Nelson Line of Credit. Approximately a year later, in December 2003, the Repository board voted to increase the line of credit to $1,500,000.[FN6] There-

Not Reported in A.2d                                                                                           Page 4
Not Reported in A.2d, 2008 WL 1961150 (Del.Ch.)
**2008 WL 1961150 (Del.Ch.)**

after, Nelson advanced funds totaling over $1,740,000 under the Nelson Line of Credit and received interest payments on the outstanding amounts. But the advances-and the Company's interest payments to Nelson-stopped in June 2004 when Nelson announced that he would not advance any more funds under the Nelson Line of Credit.

> FN5. Repository's board, excluding Nelson who abstained, voted unanimously to approve the Nelson Line of Credit.

> FN6. The board approved the increased in the Nelson Line of Credit by a vote of three to zero, with Nelson and Mrs. Emerson abstaining.

Nelson alleges that by June 2004, Repository had become insolvent because it stopped paying its debts as they became due, specifically the interest on the Nelson Line of Credit. Moreover, Repository's June 30, 2004 balance sheet showed assets of $494,451 compared to liabilities of $2,528,453. Whether by coincidence or not, mid-2004 was also when Nelson left his post as Repository's CEO.

Repository, despite its seemingly bleak financial condition, was able to obtain one last inflow of cash from debt financing. In October 2004, Repository obtained $202,461 from West Suburban Bank in return for granting the Bank a promissory note and related security interest in Repository's assets (the "Bank Note"). Repository, although it was not making the required interest payments on the Nelson Line of Credit, stayed current on its obligations under the Bank Note through the time it filed for bankruptcy.

*4 After not receiving interest payments on the Nelson Line of Credit for nearly two years, Nelson forced the issue in the Spring of 2006. The first thing Nelson did was to purchase the Bank Loan, which at that time had a balance of $126,484, on April 10, 2006. This made Nelson Repository's only secured creditor. The following day, Nelson resigned from Repository's board and sent the De-

fault Letter. The Default Letter did not declare an immediate default, but instead requested that the obligations under the Nelson Line of Credit be made current within 15 days or Nelson would consider an act of default to have occurred. The letter put Repository in a difficult situation because it owed over $509,687 in interest payments under the Nelson Line of Credit.

### B. *Repository Files For Bankruptcy*

Repository responded to Nelson's demand that it act upon his Default Letter within 15 days, but not in the manner that he requested. On April 25, 2007, Repository filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Illinois. Nelson alleges that the bankruptcy filing was "authorized by [Repository's] board at the insistence of Mr. Emerson."[FN7] Nelson also contends that Repository was "substantially current on all its debts and obligations but for those that ar[o]se under the [Nelson Line of Credit]."[FN8] Nelson's secured claims against the bankruptcy estate totaled at least $2,377,148.[FN9] In contrast, the unsecured claims against the estate, excluding approximately $400,000 in unearned maintenance for Repository's future requirements to maintain its customers' software, totaled less than $35,000.[FN10] Thus, the bankruptcy proceedings were in essence a dispute between Nelson and Repository.

> FN7. Compl. ¶ 21.

> FN8. *Id.* ¶ 26.

> FN9. *Id.* ¶¶ 39, 44 (alleging that Repository owed Nelson principal of not less than $1,665,000 on the Nelson Line of Credit and related accrued interest of $509,687 in addition to $126,484 in principal on the Bank Loan).

> FN10. *Repository I,* 363 B.R. at 879-80.

After the bankruptcy was filed, Nelson made the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 5
Not Reported in A.2d, 2008 WL 1961150 (Del.Ch.)
**2008 WL 1961150 (Del.Ch.)**

first move by moving to dismiss the bankruptcy case for cause under § 1112(b) of the Bankruptcy Code.[FN11] Among the reasons Nelson argued that the bankruptcy case should be dismissed were that Repository could not effectuate a plan in Chapter 11, that there was continuing loss to or diminution of the estate during the bankruptcy, that Repository's assets and business had been grossly mismanaged, and that the bankruptcy petition was filed in bad faith.[FN12] Repository, in turn, filed an adversary action against Nelson in bankruptcy seeking recharacterization of Nelson's loans to equity and equitable subordination of Nelson's loans[FN13] as well as a recovery from Nelson for breach of fiduciary duty.[FN14] The Bankruptcy Court consolidated the motion to dismiss the bankruptcy case and the adversary action and held a trial on those issues.

> FN11. 11 U.S.C. § 1112(b); Emersons Op. Br. Ex. A ("Motion To Dismiss Bankruptcy Case").

> FN12. Motion To Dismiss Bankruptcy Case at 6-11.

> FN13. Recharacterization of loans from debt to equity and equitable subordination are two distinct doctrines that can have a similar practical effect on a party's indebtedness. *See* Emersons Op. Br. Ex. D ("Bankruptcy Court Findings & Conclusions") at 1. Recharacterization of debt to equity looks at whether a debt is really an equity contribution disguised as a debt. *See, e.g., In re Outboard Marine Corp. v. Quantum Indus. Partners, LDC,* 2003 WL 21697357, at *2-5 (N.D.Ill. July 22, 2003). Equitable subordination is a doctrine that, based on a creditor's inequitable conduct and its effect on other creditors, allows that creditor's debt to be subordinated to other claims in bankruptcy or allows the creditor's liens to be transferred to the bankruptcy estate. 11 U.S.C. § 510; *see also In re Lifschultz Fast Freight,* 132 F.3d 339, 343-45 (7th Cir.1997).

> FN14. Bankruptcy Court Findings & Conclusions at 1. The alleged breaches of fiduciary duty related to Nelson's acquisition of the Bank Loan and his sending of the Default Letter. *Repository I,* 363 B.R. at 891-92.

### 1. Nelson's Claims In This Court And His Arguments To The Bankruptcy Court

In describing the arguments Nelson made to the Bankruptcy Court to support his motion to dismiss the bankruptcy case, I will juxtapose the claims he makes in this action because the comparison between the two is critical to the proper resolution of this motion to dismiss. To support his assertion that Repository had been grossly mismanaged, Nelson argued to the Bankruptcy Court that "during the entirety of the time period in which [Repository's] financial difficulties [had] become apparent ... [Repository's] officers, [the Emersons], [had] chosen to divert [Repository's] assets to their own pockets by richly compensating themselves and members of their immediate family through inflated compensation and commission structures."[FN15] Here and now, Nelson contends that the Emersons breached their fiduciary duties by "authorizing exorbitant salaries and benefits for themselves when the company was insolvent."[FN16]

> FN15. Motion To Dismiss Bankruptcy Case ¶ 24; *see also* Emersons Op. Br. Ex. A ("Nelson Brief To Bankruptcy Court") at 4-5.

> FN16. Compl. ¶ 62, *see also id.* ¶¶ 63-65.

**\*5** To support his assertion that the bankruptcy was filed in bad faith, Nelson argued that Repository filed for bankruptcy "with the sole purpose of preventing Mr. Nelson from potentially exercising his state court rights" and that "evidence of self-dealing and mismanagement suggest a filing other than in good faith."[FN17] Here, Nelson asserts that the Emersons breached their fiduciary duties by

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                       Page 6
Not Reported in A.2d, 2008 WL 1961150 (Del.Ch.)
**2008 WL 1961150 (Del.Ch.)**

"causing [Repository] to file for bankruptcy in order to frustrate the efforts of [Repository's] creditors, as well as to maintain their control over [Repository] and to continue the flow of excessive salaries and benefits for their personal gain."[FN18] Moreover, Nelson argued to the Bankruptcy Court that the bankruptcy filing was in bad faith because it risked damaging Repository's "single most valuable asset," its customers who were creditors due to their ongoing maintenance contracts with Repository.[FN19] In this action, Nelson also points to the bankruptcy filing as having a detrimental effect on Repository's "reputation among customers in the software community."[FN20]

> FN17. Motion To Dismiss Bankruptcy Case ¶¶ 47, 48; *see also* Nelson Brief To Bankruptcy Court at 12-13.

> FN18. Compl. ¶ 62.

> FN19. Motion To Dismiss Bankruptcy Case ¶ 43; *see also* Nelson Brief To Bankruptcy Court at 13.

> FN20. Compl. ¶ 63.

### 2. *The Bankruptcy Court's Findings*

After a full trial, the Bankruptcy Court granted Nelson's motion to dismiss the bankruptcy case on February 13, 2007. But it did so only on the basis that Repository could not effectuate a plan in Chapter 11 because the Court decided that it would only recharacterize $240,000 of the Nelson Line of Credit to equity rather than a larger portion of the Nelson debt.[FN21] The Bankruptcy Court found against Nelson on his other arguments. The Court explicitly stated:

> FN21.*Repository I,* 363 B.R. at 882, 895. The $240,000 represents the amount advanced under the Nelson Line of Credit in excess of the $1,500,000 limit approved by Repository's board. *Id* . at 882.The Bankruptcy Court also found that Nelson had

not breached his fiduciary duty to Repository. *Id.* at 894.

Other grounds were argued in favor of dismissal, but they were not established. Nelson has not shown:

> a. continuing loss to or diminution of the estate during the bankruptcy;

> b. *any mismanagement of Debtor's assets and business;* or

> c. *the filing of a bankruptcy case and petition in bad faith.*

Present management has kept the Debtor's business stable and operations have shown progress and efficient operation. The filing of this bankruptcy was a rational reaction to Nelson's action, and was partially successful. Therefore, *the bankruptcy filing cannot be held to be in bad faith.*[FN22]

> FN22.*Repository I,* 363 B.R. at 896 (emphasis added).

In other words, the Bankruptcy Court specifically found that Nelson failed to establish the very same arguments that Nelson now repeats in this action.

### 3. *The Bankruptcy Court's Decision Is Affirmed On Appeal*

Both parties appealed the Bankruptcy Court decision to the U.S. District Court for the Northern District of Illinois. The District Court affirmed the Bankruptcy Court's decision in full.[FN23] The only argument made on appeal that is directly relevant to this action is Nelson's contention that the District Court should strike the language indicating the bankruptcy was a "rational reaction to Nelson's actions" and that the "bankruptcy filing [could] not be held to be in bad faith."[FN24] The District Court rejected Nelson's contention and stated that the "language [was] part of the Bankruptcy Court's

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 7
Not Reported in A.2d, 2008 WL 1961150 (Del.Ch.)
**2008 WL 1961150 (Del.Ch.)**

holding because Nelson based his dismissal motion on [Repository's] bad faith."[FN25] The District Court further observed that "Nelson's argument that the Bankruptcy Court's language is dictum is defeated by his own motion requesting a finding of bad faith in support of dismissing RTI's bankruptcy case."[FN26]

> FN23. *Repository II,* 381 B.R. at 874.

> FN24. *Id.* at 873.

> FN25. *Id.*

> FN26. *Id.*

### C. *The Events After Repository Was Dismissed From Bankruptcy*

**\*6** Immediately after the bankruptcy case was dismissed, Nelson sought relief from the U.S. District Court for the Northern District of Illinois in the form of an order precluding Repository from dissipating its assets. The District Court granted Nelson's request for a temporary restraining order. Repository, however, frustrated at least one of Nelson's goals in seeking the order because it transferred $100,000 to its bankruptcy counsel "just minutes before the Court issued [the] temporary restraining order."[FN27]

> FN27. Compl. ¶ 55.

In March 2007, the month after Repository was dismissed from bankruptcy, the District Court appointed a receiver for Repository. That same month Nelson purchased all of Repository's assets, including its claims against the Emersons, in a transaction that was approved by the receiver.[FN28]

> FN28. *Repository II,* 381 B.R. at 862.

### D. *Nelson Files A Complaint In This Court In An Attempt To Relitigate The Arguments Denied By The Bankruptcy Court*

On May 1, 2007, Nelson filed a complaint in this court seeking recovery on behalf of Repository (and as the holder of Repository's claims) against the Emersons for their alleged breach of fiduciary duties to Repository.[FN29] As discussed above, Nelson's complaint alleges that the Emersons breached their fiduciary duties to Repository by paying themselves excessive compensation while Repository was insolvent and by filing for bankruptcy. The alleged facts and related arguments are essentially the same as those Nelson made in the Bankruptcy Court.

> FN29. Nelson, as a creditor, also filed a direct action against the Emersons alleging breaches of their fiduciary duties. Nelson agrees that this claim should be dismissed in light of a recent decision by the Delaware Supreme Court holding that creditors cannot bring direct actions for breaches of fiduciary duties. *See N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,* 930 A.2d 92 (Del.2007).

### III. *Procedural Framework*

The Emersons have moved to dismiss Nelson's complaint pursuant to Court of Chancery Rule 12(b)(6). In addressing a motion to dismiss, I must assume the truthfulness of all well-pled facts in the complaint and draw all reasonable inferences in the light most favorable to Nelson, the nonmoving party.[FN30] I need not, however, accept as true conclusory allegations that are unsupported by facts contained in the complaint.[FN31] After evaluating the complaint in this manner, I must dismiss any claim that Nelson would not be entitled to recover upon under any reasonable set of facts properly supported by the complaint.[FN32]

> FN30. *E.g., In re General Motors (Hughes) S'holder Litig.,* 897 A .2d 162, 168 (Del.2006) (quoting *Savor, Inc. v. FMR Corp.,* 812 A.2d 894, 896-97 (Del.2002)).

> FN31. *E.g., Hughes,* 897 A.2d at 168 (quoting *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 65-66

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d　　　　　　　　　　　　　　　　　　　　　　　　　Page 8
Not Reported in A.2d, 2008 WL 1961150 (Del.Ch.)
**2008 WL 1961150 (Del.Ch.)**

(Del.1995)).

FN32.*E.g.,* *Hughes,* 897 A.2d at 168 (quoting *Savor,* 812 A.2d at 896-97).

### IV. *Legal Analysis*

The Emersons have moved to dismiss Nelson's bad faith bankruptcy filing and excessive compensation claims on the grounds that those claims are barred by the doctrine of collateral estoppel,[FN33] also known as issue preclusion, and that those claims fail to state a claim upon which relief can be granted.

> FN33. The Emersons do not assert that Nelson is barred from bringing his claims by the doctrine of claim preclusion because the Emersons were not named parties in the bankruptcy case. Tr. of Oral Arg. (Feb. 5, 2008) at 4-5. Candidly, this ruling would rest more comfortably on the doctrine of claim preclusion given the identity of interests between Repository and the Emersons as equity holders. Judicial, litigative, and business efficiency are all best served by a rule that requires litigants in bankruptcy to press as many of their claims as they are able during the bankruptcy proceeding itself. The elimination of rear view issues is a key part of the bankruptcy process for all concerned, and needless claim splitting is economically wasteful and taxes scarce societal dispute resolution resources.

### A. *Collateral Estoppel*

The doctrine of collateral estoppel "precludes a party to a second suit involving a different claim or cause of action from the first from relitigating an issue necessarily decided in a first action involving a party to the first case."[FN34] "[T]he preclusive effect of a foreign judgment is measured by [the] standards [used by] the rendering forum."[FN35] The Emersons base their collateral estoppel claim on the

findings and conclusions of the U.S. Bankruptcy Court for the Northern District of Illinois and the U.S. District Court for the Northern District of Illinois, and therefore the collateral estoppel standard of the U.S. Court of Appeals for the Seventh Circuit applies.[FN36] The Seventh Circuit requires that a party establish four elements before a court may invoke collateral estoppel: "(1) the issue sought to be precluded must be the same as that involved in the prior litigation, (2) the issue must have been actually litigated, (3) the determination of the issue must have been essential to the final judgment, and (4) the party against whom estoppel is invoked must [have been] fully represented in the prior action."[FN37]

> FN34.*One Virginia Ave. Condo. Ass'n of Owners v. Reed,* 2005 WL 1924195, at * 10 (Del. Ch. Aug. 8, 2005).

> FN35.*Columbia Cas. Co. v. Playtex FP, Inc.,* 584 A.2d 1214, 1217 (Del.1991).

> FN36. The Emersons note that there is a possibility that Delaware law on collateral estoppel might apply, but acknowledge that the difference between the Delaware and Seventh Circuit standard for collateral estoppel is not material in this case. Emersons Rep. Br. at 1.

> FN37.*See, e.g., Universal Guar. Life Ins. Co. v. Coughlin,* 481 F.3d 458, 462 (7th Cir.2007) (internal quotation and citation omitted).

*7 Here, the parties' dispute over the application of collateral estoppel involves two of the four elements. Nelson argues that collateral estoppel does not apply because the only issue essential to the District Court judgment was that Repository could not effectively reorganize and that the rest of its findings are dicta. Nelson also argues that the bad faith filing issue in this case is not the same issue determined by the Bankruptcy Court because the legal standards are different.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 9
Not Reported in A.2d, 2008 WL 1961150 (Del.Ch.)
**2008 WL 1961150 (Del.Ch.)**

1. *The Essential To The Judgment Element*

a. *The Bad Faith Filing Claim*

Nelson argues that collateral estoppel does not bar its bad faith filing claim because the Bankruptcy Court's finding on the bad faith filing issue was dicta and therefore collateral estoppel does not apply because the court's determination on that issue was not essential to the court's final judgment. According to Nelson, the Bankruptcy Court's final judgment was based on Repository's inability to effectuate a valid plan under Chapter 11 and nothing else in the decision is entitled to preclusive effect. But the U.S. District Court ruling on appeal collaterally estops that argument because it rejected that same argument when Nelson made it on appeal .FN38Although one might have thought that Nelson would drop this argument after the District Court issued its ruling, Nelson continued to make this argument at oral argument after the District Court had issued its ruling.FN39The District Court ruling was plainly correct on its merits. Nelson himself pled the issue of bad faith, and a Bankruptcy Court ruling in his favor could have not only provided an independent basis for dismissing Repository's bankruptcy case, but also could have resulted in a fee recovery by Nelson and served as collateral estoppel.FN40That collateral estoppel effect might have been beneficial to Nelson in an action such as this fiduciary duty action against the Emersons or in the federal court action Nelson brought against Repository's bankruptcy counsel that alleges counsel harmed Nelson by conspiring with Emersons to breach their fiduciary duties and cause Repository to breach its loan contract with Nelson.FN41More important, the Bankruptcy Court judge, knowing that Nelson had reserved the right to seek "other and further relief as [the Bankruptcy Court] deems just and equitable,"FN42 had to decide the bad faith issue because two common types of such further relief, fee shifting and an order requiring the debtor's counsel to disgorge its fees, could have been premised on a finding that the bankruptcy filing and recharacterization action were frivolous and filed in bad faith.FN43The Bankruptcy Court therefore had to address this issue, which Nelson himself put in contention. Thus, Nelson is collaterally estopped from raising that issue here.

FN38.*Repository II*, 381 B.R. at 873.

FN39. Tr. Of Oral Arg. (Feb. 5, 2008) at 38. The colloquy at oral argument went as follows: THE COURT: [Y]ou are going to now say that the finding of bad faith was not essential to the judgment?

[Counsel for Nelson]: That's correct. My reason for that is that the judgment of the Court is a dismissal of the case. The fact that those issues were lost by Mr. Nelson were not essential to the judgment of the Court. The judgment of the Court stands upon-upon a dismissal because of the inability to reorganize....

*Id.*

FN40.*Id.* at 38-39 (Nelson's counsel acknowledging upon questioning that a successful bad faith ruling could have potentially resulted in some type of attorney fee relief for Nelson, whether it was the shifting of the fees for Nelson's counsel to Repository or an order affirmatively prohibiting the Company from paying its own counsel, and that such a ruling would have been eligible for collateral estoppel effect).

FN41.*See* Letter from Joelle E. Polesky to Vice Chancellor Leo E. Strine, Jr. (Feb. 8, 2008) Ex. E ¶¶ 27, 32 (first amended complaint in the District Court action by Nelson against Repository's counsel). I say might because to use collateral estoppel offensively against Repository's counsel or the Emersons, they would have had to have had the interests fairly represented by Repository on the issue. *See*18A CHARLES

Not Reported in A.2d                                                                              Page 10
Not Reported in A.2d, 2008 WL 1961150 (Del.Ch.)
**2008 WL 1961150 (Del.Ch.)**

A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 4448 (2008); *see also id.* § 4460 (stating that "[m]any of the decisions that extend preclusion through corporate relationships involve controlling owners" and that "[t]he easiest cases are those in which a controlling owner has in fact participated extensively in directing litigation by or against the corporation"). Given their role in the filing, that requirement might well have been satisfied.

FN42. Motion To Dismiss Bankruptcy Case at 15.

FN43. Nelson argued that the bankruptcy filing was made in bad faith and presented evidence at trial on that argument, but did not convince the Bankruptcy Court. *See* Motion to Dismiss Bankruptcy Case ¶ 39 (quoting the statement in *In re James Wilson Associates,* 965 F.2d 160, 170 (7th Cir.1992), that "[t]he clearest case of bad faith is where the debtor enters Chapter 11 knowing that there is no chance to reorganize [its] business and hoping merely to stave off the evil day when the creditors take control of [its] property."). Had Nelson established that the bankruptcy was filed in bad faith, Nelson would likely have filed a Rule 9011 motion for sanctions in an attempt to have his fees shifted to Repository and have Repository's counsel disgorge the interim fee awards it had received. Fed. R. Bankr.P. 9011; *see In re McCormick Road Associates,* 127 B.R. 410, 413 (N.D.Ill.1991) (suggesting the use of Rule 9011 in response to bankruptcy petitions filed in subjective bad faith); *see also Matter of Volpert,* 110 F.3d 494, 501 n. 11 (7th Cir.1997) ( "Under Rule 9011, a bankruptcy court may sanction parties who file documents in bad faith or for an 'improper purpose, such as to harass or to

cause unnecessary delay or ... cost.'") (quoting Fed. R. Bankr.P. 9011(b)(1)); *Matter of Taxman Clothing Co.,* 49 F.3d 310, 312 (7th Cir.1995) (stating "all interim awards of attorney's fees [to the debtor's counsel] in bankruptcy cases are tentative" and can be undone by a later order of the court); *In re Charter Tech. Inc.,* 160 B.R. 925, 931-32 (Bankr.W.D.Pa.1993) (finding that debtor's counsel had forgotten who he was representing and became "hostile to the [d]ebtor corporation and its creditors" and ordering, as sanctions pursuant to Rule 9011, "that [the debtor's counsel's] retainer be disgorged, that he be allowed no fees in the within bankruptcy proceeding and that any fees to be collected by him shall be collected from his real client, [the debtor's president and principal stockholder]").

b. *The Excessive Compensation Claim*

Equally undeterred by his loss before the District Court, Nelson argues that the Bankruptcy Court's determination on excessive compensation was dicta and not essential to the Bankruptcy Court's judgment.[FN44] Nelson did not make that same argument on appeal to the District Court, so (somewhat counterintuitively) he is not collaterally estopped from making that argument here.[FN45] But the reasoning that the District Court used in finding that the Bankruptcy Court's bad faith filing was not dicta results in the conclusion that the excessive compensation determination was essential to the Bankruptcy Court's holding-Nelson cannot later argue that the Bankruptcy Court's ruling on an argument he made in support of his own motion for relief to the Bankruptcy Court is dicta.[FN46] Nelson's motion and brief in the Bankruptcy Court argued that the Emersons' pre- and post-petition compensation was evidence of gross mismanagement and that that mismanagement was in turn evidence of bad faith.FN47 Like his other bad faith argument, a finding in his favor on this could have resulted in fee

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 11
Not Reported in A.2d, 2008 WL 1961150 (Del.Ch.)
**2008 WL 1961150 (Del.Ch.)**

shifting and would have been eligible for collateral estoppel effect .[FN48]

FN44. The parties also spar over the effect of the Bankruptcy Court's approval of the payment of salaries and commissions during the pendency of the bankruptcy. The Emersons assert that Nelson is collaterally estopped from making his excessive compensation claim on the basis of those approvals. Nelson counters by arguing that the approvals of compensation payments during bankruptcy were not final judgments entitled to preclusive effect and that the issue is not the same as the issue presented in this case because the issue presented here also involves compensation paid after Repository became insolvent but before it filed for bankruptcy. I see no need to address the issue of the effect of the approvals because I find that the Bankruptcy Court's ruling that there was no mismanagement of Repository's assets is the final word on that subject.

FN45. There is, however, a strong argument that Nelson should not be able to collaterally attack that ruling in this court after failing to challenge it using the appeal process.

FN46. *Repository II,* 381 B.R. at 873.

FN47. *See* Motion To Dismiss Bankruptcy Case ¶¶ 24, 48; *see also* Nelson Brief To Bankruptcy Court at 4-5, 12-13. The fact that Nelson's motion and his brief included these arguments as the primary support for his assertion of gross mismanagement defeats Nelson's dubious argument that it is not clear that the mismanagement ruling addressed the Emersons' pre-petition compensation.

FN48. Although Nelson does not specifically advance the argument, his not essen-

tial to the judgment contention is much stronger with respect to the pre-petition compensation because it is arguable that the "gross mismanagement of the estate" statutory basis for dismissing a bankruptcy filing only applies to post-petition conduct. *See* 11 U.S.C. § 1112(b)(4)(B); *In re Rey,* 2006 WL 2457435, at *5 n. 3 (Bankr.N.D.Ill. Aug. 21, 2006) (noting that § 1112(b)(4)(B)"refers to 'gross mismanagement of the estate,' arguably rendering pre-petition mismanagement irrelevant."). I do not find that argument persuasive, however, because Nelson specifically argued the pre-petition compensation to the Bankruptcy Court in support of his gross mismanagement contention and the Bankruptcy Court chose to explicitly rule that Nelson had not shown "any mismanagement of [Repository's] assets" rather than ruling that only post-petition conduct was relevant and confining its finding that there had been no mismanagement to post-petition conduct. In other words, I conclude that the Bankruptcy Court deliberately ruled on Nelson's own pre-petition excessive compensation claim after reviewing Nelson's arguments on that specific issue and the related evidence.

### 2. *The Same Issue Element*

**\*8** Nelson also argues that collateral estoppel does not bar its bad faith filing claim because the issue in this action is different from the issue considered by the Bankruptcy Court when it determined that Repository's "bankruptcy filing [could] not be held to be in bad faith."[FN49] Nelson argues that the issue in this action is different because a different legal standard applies.[FN50]

FN49. *Repository I,* 363 B.R. at 896.

FN50. Nelson has made a meal out of another issue. After the Bankruptcy Court dismissed the bankruptcy petition, Nelson

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 12
Not Reported in A.2d, 2008 WL 1961150 (Del.Ch.)
**2008 WL 1961150 (Del.Ch.)**

moved for a temporary restraining order to keep Repository from dissipating its assets. Shortly before the hearing on his motion, Repository paid its bankruptcy counsel $100,000 for its work on the dismissed case. Nelson now says that this payment was a material fact that the Bankruptcy Court did not consider when determining whether Repository's filing was made in bad faith. I reject the argument that this later-arising fact undermines the preclusive effect of the Bankruptcy Court's ruling on the bad faith issue for several reasons. First, I refuse to assume that the Emersons exist out of chronological time. Their decision to have Repository pay its counsel after the dismissal of the bankruptcy case has no logical bearing on whether the earlier decision to file for bankruptcy was made in good faith, and is certainly not material enough to undermine the preclusive effect of the Bankruptcy Court's ruling. *See Illinois Bell Tel. Co. v. Haines & Co., Inc.,* 713 F.Supp. 1122, 1124 (N.D.Ill.1989) ("Issues actually litigated in a prior action have preclusive effect if the controlling facts remain unchanged in the later action. That some minor, subsidiary facts are different will not bar the application of collateral estoppel."); *see also Ramallo Bros. Printing, Inc. v. El Dia, Inc.,* 490 F.3d 86. 90 (1st Cir.2007) ("While we acknowledge that changed circumstances may defeat collateral estoppel, collateral estoppel remains appropriate where the changed circumstances are not material."); 18 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 4417 (2008) ("The possibility that new facts may surround continuation of the same basic conduct should not defeat preclusion unless it is shown that the new facts are relevant under the legal rules that control the outcome."). Nor is deciding to pay counsel who filed what a

Bankruptcy Court found were non-frivolous claims an eyebrow raising act. Nelson has not pled an independent claim based on this act, and at most that payment would seem to at most give rise to some sort of cause of action on Nelson's behalf based on a failure by Repository to honor his rights as a creditor. In fact, Nelson is seeking to pursue such relief in U.S. District Court right now, having sued Repository's Bankruptcy Counsel for a return of its fees and other relief based on the theory that counsel had conspired with the Emersons to breach their fiduciary duties and cause Repository to breach its loan contract with Nelson. Letter from Joelle E. Polesky to Vice Chancellor Leo E. Strine, Jr. (Feb. 8, 2008) Ex. E ¶¶ 27, 32. Moreover, Nelson, who gained access to Repository's books and records rapidly after the Bankruptcy Action, failed to avail himself of options to present this supposedly troubling fact to either the Bankruptcy Court, through a Rule 60(b) motion, or to the U.S. District Court to which he addressed his application for a temporary restraining order and to which he appealed the Bankruptcy Court order. *See* Fed. R. Bankr.P. 9024 (making Rule 60(b) applicable in bankruptcy cases with three exceptions not relevant here); Fed.R.Civ.P. 60(b)(2) (allowing a motion for relief from a final judgment on the basis of newly discovered evidence). I acknowledge it is unusual to suggest that Nelson should have moved pursuant to Rule 60(b) in a situation where he achieved his primary goal of having Repository dismissed from bankruptcy, but Nelson's conduct in appealing the bad faith ruling indicates that he wanted that ruling overturned so he could monetarily benefit from a ruling on that issue in his favor. If, as Nelson now argues, the $100,000 payment was a material fact that would have affected the bankruptcy

Not Reported in A.2d                                                                                    Page 13
Not Reported in A.2d, 2008 WL 1961150 (Del.Ch.)
**2008 WL 1961150 (Del.Ch.)**

court's bad faith ruling, he should have addressed that argument to the Bankruptcy Court rather than bringing a second action in state court on the same issue.

Nelson's different legal standard argument is that the legal standard that the Bankruptcy Court used in making its determination that the bankruptcy filing was not in bad faith differs from the Delaware relevant standard for evaluating whether that filing constituted a breach of fiduciary duty.[FN51] The Emersons reply by arguing that it does not matter that the legal standard is different because "the identical factual issue is presented-did the Emersons cause RTI to file for bankruptcy in bad faith?"[FN52] The critical question, however, is whether the Bankruptcy Court's factual findings would have a different effect under Delaware fiduciary duty law than under bankruptcy law.[FN53] The answer to that question is that the Bankruptcy Court's finding that the bankruptcy filing was not made in bad faith, that is, it was a non-frivolous attempt to reorganize the Company by recharacterizing Nelson's debt as equity, precludes a finding that the Company's directors violated their fiduciary duties by filing for bankruptcy.

FN51. Although not raised by the parties, there is a plausible argument that state law claims that allege that a bankruptcy filing was made in bad faith, such as those for breach of fiduciary duty or abuse of process, are preempted. *See Casden v. Burns,* 504 F.Supp.2d 272, 282 (N.D.Ohio 2007) ("Because it is distinctly the province of bankruptcy law to determine liability for improper actions relating to bankruptcy filings, [the plaintiff's claim that the decision to file for bankruptcy was a breach of fiduciary duty] is preempted."); *Gonzales v. Parks,* 830 F.2d 1033, 1035-36 (9th Cir.1987) ("Implicit in the Parkses' appeal is the notion that state courts have subject matter jurisdiction to hear a claim that the filing of a bankruptcy petition constitutes

an abuse of process. We disagree with that assumption. Filings of bankruptcy petitions are a matter of exclusive federal jurisdiction. State courts are not authorized to determine whether a person's claim for relief under a federal law, in a federal court, and within that court's exclusive jurisdiction, is an appropriate one. Such an exercise of authority would be inconsistent with and subvert the exclusive jurisdiction of the federal courts by allowing state courts to create their own standards as to when persons may properly seek relief in cases Congress has specifically precluded those courts from adjudicating."). *But see Davis v. Yageo Corp.,* 481 F.3d 661, 678 (9th Cir.2007) ("Plaintiffs' breach of fiduciary duty claims are not preempted by federal bankruptcy law because these claims concern conduct that occurred prior to bankruptcy. The cases upon which defendants rely hold only that state law causes of action for abuse of process and malicious prosecution involving conduct that occurred during bankruptcy are preempted."); *U.S. Express Lines Ltd. v. Higgins,* 281 F.3d 383, 393 (3rd Cir.2002) ("Despite the broad scope of remedies available in the Code and the general exclusivity of the federal courts in bankruptcy, we have held that a state claim for malicious abuse of process was not preempted.").*See generally* Brian Bix, *Considering the State Law Consequences of an Allegedly Improper Bankruptcy Filing,* 67 AM. BANKR. L.J. 325 (1993).

FN52. Emerson Rep. Br. at 4.

FN53. 18 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 4417 (2008) ("[C]areful examination of the controlling legal principles may show that the standards are the same, or that the fact findings

Not Reported in A.2d
Not Reported in A.2d, 2008 WL 1961150 (Del.Ch.)
**2008 WL 1961150 (Del.Ch.)**

Page 14

have the same effect under either standard, so that the same issue is presented by both systems of law .").

It is settled Delaware law that "[e]ven when the company is insolvent, the board may pursue, in good faith, strategies to maximize the value of the firm."[FN54] Filing a Chapter 11 bankruptcy petition is a federally-sanctioned strategy for maximizing the value of an insolvent company.[FN55] Here, after a full trial, the Bankruptcy Court determined that Repository used that strategy in good faith.[FN56] Directors of a Delaware corporation do not commit a breach of fiduciary duty against the corporation if they, in good faith, seek to benefit the equity holders by bringing a bankruptcy, in order to recharacterize certain debt as equity.[FN57] So long as that action is not frivolous, such an exercise of business judgment to advance the interests of the equity holders is not a breach of fiduciary duty simply because the directors do not achieve ultimate success.[FN58]

FN54. *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,* 906 A.2d 168, 204 (Del. Ch.2006), *aff'd,* 931 A.2d 438 (Del.2007).

FN55. *See, e.g., Trenwick,* 906 A.2d at 204 ("Chapter 11 of the Bankruptcy Code expresses a societal recognition that an insolvent corporation's creditors (and society as a whole) may benefit if the corporation continues to conduct operations in the hope of turning things around."); *Production Resources Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772, 793 n. 66 (Del. Ch.2004) ("[I]n most instances when a firm is insolvent but believes itself to have a prospect for viability, the firm will seek out the protections of the Bankruptcy Code and attempt to restructure its affairs through the well-articulated body of federal law specifically designed for that purpose."); *see also Trenwick,* 906 A.2d at 204 n. 103 (citing numerous federal decisions explaining the purpose of federal

bankruptcy protection and the discretion afforded to directors in deciding whether to take advantage of the bankruptcy process).

FN56. Nelson's argument that good faith in bankruptcy law only considers objective factors whereas good faith in Delaware fiduciary duty law considers subjective intent is misguided. The very decision that Nelson cites to support that proposition explains that in determining whether the debtor filed for bankruptcy in bad faith a court "may consider any factors which evidence an *intent* to abuse the judicial process and the purposes of the reorganization provisions."*In re McCormick Road Associates,* 127 B.R. at 413 (quoting *In re Phoenix Piccadilly Ltd.,* 849 F.2d 1393, 1394 (11th Cir.1988) (emphasis added); *see also id.* at 415 ("[O]nce a court has properly found that the debtor has failed to satisfy the court's objective good faith inquiry-i.e., whether reorganization is the proper course of action in a particular debtor's case-it may properly dismiss the debtor's petition without considering the debtor's subjective good faith. In other words, a finding of subjective bad faith-i.e., intentional abuse of the bankruptcy laws-is not a necessary prerequisite to dismissal for bad faith filing.") (internal quotation and citations omitted). Moreover, the use of objective factors as a proxy for subjective intent makes sense. *See Production Resources,* 863 A.2d at 793 n. 85 ("Because it is impossible for non-divine judges to peer into the hearts and souls of directors, this court has recognized the importance of considering relevant circumstantial facts that bear on scienter, which include the substance and effects of the defendants' conduct."). The reality is that Nelson received a trial on, among other issues, whether Repository's bankruptcy filing was

Not Reported in A.2d                                                                                          Page 15
Not Reported in A.2d, 2008 WL 1961150 (Del.Ch.)
**2008 WL 1961150 (Del.Ch.)**

made in subjective bad faith. That he failed to prevail on that contention does not mean his argument was not fairly considered.

FN57.*See Gheewalla,* 930 A.2d at 103 (explaining that its rationale for not recognizing direct fiduciary duty claims by creditors was that "[d]irectors of insolvent corporations must retain the freedom to engage in vigorous, good faith negotiations with individual creditors for the benefit of the corporation") (citing *Production Resources,* 863 A.2d at 797).

FN58.*See id.*("Recognizing that directors of an insolvent corporation owe direct fiduciary duties to creditors, would create uncertainty for directors who have a fiduciary duty to exercise their business judgment in the best interest of the insolvent corporation.").

### B. *Failure To State A Claim*

The Emersons, in the alternative, have moved to dismiss the breach of fiduciary duties claim for the failure to state a claim upon which relief can be granted. Although I have dismissed Nelson's claims on the basis of collateral estoppel, I address the Rule 12(b) arguments briefly. Before beginning the analysis, I note that the complaint must plead a viable claim that the Emersons breached their duty of loyalty to Repository to survive the Emersons' motion to dismiss because Repository's charter contains a § 102(b)(7) clause that exculpates its directors for breaches of the duty of care.

### 1. *The Bad Faith Bankruptcy Filing Claim*

**\*9** Nelson asserts that the complaint pleads a viable claim that the Emersons breached their fiduciary duty of loyalty by filing for bankruptcy for the purpose of frustrating Nelson's efforts to collect on his secured claims against the Company.[FN59] As discussed previously, the directors of a Delaware corporation do not commit a breach of fiduciary duty if

they have the corporation file a non-frivolous claim, seeking to recharacterize certain debt to equity in order to protect the interests of the company's equity holders. In such a circumstance, the non-frivolous, good faith nature of the lawsuit makes filing that lawsuit a decision that is protected by the business judgment rule. To hold that this sort of decision is a basis for director liability if the company loses in Bankruptcy Court would discourage directors from exercising their business judgment by subjecting them to a judicially invented English Rule that makes them personally liable for the winner's costs and damages simply because of an adverse judgment.

FN59. Nelson argues that in *Production Resources Group, L.L. C. v. NCT Group, Inc.* this Court recognized that facts demonstrating that directors acted to frustrate a creditor's collection efforts could suggest self-interest and bad faith and thus support a claim for breach of the duty of loyalty by a creditor. 863 A.2d at 799-800. Nelson ignores the explicitly tentative tact taken by *Production Resources* to this issue.*Production Resources* questioned whether a direct claim for breach of fiduciary duty could be brought by a particular creditor but determined that it was unnecessary and improvident to decide that question prematurely at the dismissal stage because venerable Delaware case law was confusing on whether a creditor could bring a direct claim and the plaintiff had asserted viable derivative claims that would allow the case to survive the defendant's motion to dismiss. *Id.* at 800-01;*see also id.* at 798 (citing *Asmussen v. Quaker City Corp.,* 156 A. 180, 181 (Del. Ch.1931), for the general rule that directors of insolvent corporations may appropriately prefer particular creditors and *Pennsylvania Co. for Insurances on Lives and Granting Annuities v. South Broad St. Theatre Co.,* 174 A. 112, 115-16 (Del.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 16
Not Reported in A.2d, 2008 WL 1961150 (Del.Ch.)
**2008 WL 1961150 (Del.Ch.)**

Ch.1934), for the exception that the board's preference of one creditor over another could be a breach of fiduciary duty if motivated by self-interest). Fortunately, the Delaware Supreme Court soon clarified this area of our law, by holding that creditors may not bring direct claims against directors for breach of fiduciary duty but must rely on statutory, contractual, and other nonfiduciary claims available to creditors. *Gheewalla,* 930 A.2d at 103 ("[I]ndividual creditors of an insolvent corporation have no right to assert direct claims for breach of fiduciary duty against corporate directors. Creditors may nonetheless protect their interest by bringing derivative claims on behalf of the insolvent corporation or any other direct nonfiduciary claim, as discussed earlier in this opinion, that may be available for individual creditors.") *see also id.* 930 A.2d at 99 ("[C]reditors are afforded protection through contractual agreements, fraud and fraudulent conveyance law, implied covenants of good faith and fair dealing, bankruptcy law, general commercial law and other sources of creditor rights."). As to an insolvent corporation, a creditor may prosecute a derivative suit but only to advance fiduciary duty claims belonging to the corporation itself. *Id.* at 101-02.

### 2. *The Excessive Compensation Claim*

To state a claim for excessive compensation, a plaintiff "must either plead facts from which it may reasonably be inferred that the board or the relevant committee that awarded the compensation lacked independence (e.g., was dominated or controlled by the individual receiving the compensation), in which event proof of such allegations would cast upon the officer the burden to prove that the compensation paid was objectively reasonable in the circumstances or plead facts from which it may reasonably be inferred that the board, while inde-

pendent, nevertheless lacked good faith (i.e., lacked an actual intention to advance corporate welfare) in making the award."[FN60]

> FN60.*Gagliardi v. TriFoods Intern., Inc.,* 683 A.2d 1049, 1051 (Del. Ch.1996).

Nelson falls woefully short of the mark. In two key areas, Nelson's complaint is devoid of any pled facts, as opposed to mere conclusory accusation. First, the complaint does not state who approved the Emersons' compensation. Second, the complaint does describe the specifics of the compensation, including the amount of the compensation. This is not at all excused by any lack of information on his part. For one thing, Nelson has had access to all of Repository's books and records since March 2007 when he purchased the Company. More important, Nelson was a Repository director at all relevant times until two weeks before the bankruptcy filing. His complaint fails to indicate *any* dissent on his part to the compensation of the Emersons.

First, the complaint does not provide any factual support for Nelson's allegation that Repository's board was controlled and dominated by the Emersons.[FN61] The complaint does not state who was on Repository's board at the time of the alleged excessive compensation or describe who-e.g., the board or the board compensation committee-approved or acquiesced to the Emersons' compensation. This failure is particularly problematic because, as discussed, Nelson himself was on Repository's board at all relevant times until two weeks before the bankruptcy filing.[FN62] Moreover, the simple assertion that the Emersons controlled the board is questionable because the complaint itself acknowledges that in December 2003, albeit at a time before the alleged excessive compensation was paid, the Repository board had five members, only two of whom were the Emersons.[FN63] Thus, no inference of pure numerical control of the board by the Emersons can reasonably be made.

> FN61. Compl. ¶ 11.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                   Page 17
Not Reported in A.2d, 2008 WL 1961150 (Del.Ch.)
**2008 WL 1961150 (Del.Ch.)**

FN62.*Id.* ¶ 4.

FN63.*Id.* ¶ 33.

**\*10** Second and even more fatally to Nelson's claim, his complaint provides *no* information about the amount or specific instances of the alleged excessive compensation.[FN64] By no facts, I mean *none* that quantify what compensation the Emersons received and when, much less any that support an inference that the non-pled amounts exceeded what was rational and proper. As explained above, Nelson has no excuse for the lack information about the alleged excessive compensation. Therefore, "[i]n the absence of [pled] facts casting a legitimate shadow over the exercise of business judgment reflected in compensation decisions," this claim must be dismissed."[FN65]

FN64.*See id.* ¶ 2 (alleging that the Emersons enriched "themselves and members of their family through the payment of exorbitant salaries, benefits and expenses); *id.* ¶ 13 (alleging that "Mrs. Emerson received excessive commissions in that commissions were paid for customer service, rather than sales activities); *id.* ¶ 14 (alleging that the Emersons "both dined frequently at [Repository's] expense, charging meals to the company American Express Card"); *id.* ¶ 20 (alleging that the "continued payment of excessive salaries and commissions further diminished [Repository's] cash reserves"). Nelson's contention that amounts and specifics are not necessary because the payment of *"any* compensation during insolvency was exorbitant" is absurd and illustrates why conclusory pleading that compensation is "excessive" has been held to be not sufficient to state a claim. Nelson Ans. Br. at 18 n. 9 (emphasis in original).

FN65.*Gagliardi,* 683 A.2d at 1051.

V. *Conclusion*

For the foregoing reasons, the Emersons' motion to dismiss is granted because Nelson is collaterally estopped from relitigating his fiduciary duty claim and Nelson's complaint fails to state a viable claim for breach of fiduciary duty. IT IS SO ORDERED.

Del.Ch.,2008.
Nelson v. Emerson
Not Reported in A.2d, 2008 WL 1961150 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 6

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)
**1993 WL 197031 (E.D.Pa.)**

Page 1

▷
Thompson v. Glenmede Trust Co.
E.D.Pa. 1993.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
B. Ray THOMPSON, Jr., et al.
v.
GLENMEDE TRUST COMPANY, et al.
**No. CIV. A. 92-5233.**

June 8, 1993.

MEMORANDUM AND ORDER

HUTTON.

**\*1** Presently before the Court is a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 23.1, 12(b)(6) and 9(b), the plaintiffs' response and the defendants' reply. The Motion is filed on behalf of defendants Glenmede Trust Company, Glenmede Corporation, Thomas W. Langfitt, Albert E. Piscopo, J. Howard Pew, J. N. Pew, III, J. N. Pew, IV, R. Anderson Pew, John G. Pew, Jr., G. Thompson Pew, Jr., Francis M. Richards, Jr., Karin E. Myrin and Samuel W. Morris, Sr..

I. BACKGROUND

A. *Parties*

The plaintiffs in this matter include seven individual members of the Thompson family.[FN1] In addition, three plaintiffs have sued in their capacity as trustees of five Thompson family trusts.[FN2] The individual plaintiffs, in addition to their common bond in the Thompson family name, all hold shares of stock in Oryx Energy Corporation ("Oryx"). In addition, the five Thompson family trusts each hold shares of Oryx stock for the benefit of members of the Thompson family. Collectively, the plaintiffs were the second largest shareholder of Oryx. All plaintiffs shall be commonly referred to as the

"Thompson Family" or "plaintiffs."

The plaintiffs have named as defendants the Glenmede Trust Company ("Glenmede Trust") and its parent Glenmede Corporation. Glenmede Trust is Glenmede Corporation's wholly owned subsidiary. The plaintiffs have also named J. Howard Pew, II, J. N. Pew, III, J. N. Pew, IV, R. Anderson Pew, John G. Pew, Jr., and G. Thompson Pew, Jr., as defendants (hereinafter "Pew Defendants"). These defendants are shareholders of Glenmede Corporation and have for the most part been directors of one or both of Glenmede Corporation and Glenmede Trust during the times relevant to the events complained of in the complaint. John G. Pew, Jr. was also a director of Oryx.

The complaint also names Thomas W. Langfitt. Mr. Langfitt is the president, chief executive officer and a director of both Glenmede Corporation and Glenmede Trust. Mr. Langfitt is also the president of seven trusts commonly known as the Pew Charitable Trusts.[FN3] In addition, the plaintiffs have named Albert E. Piscopo. Mr. Piscopo is the executive vice president and chief financial officer of Glenmede Corporation and Glenmede Trust. He was also a director of Oryx.

The plaintiffs have also named Glenmede Trust in its capacity as trustee of nine trusts. These trusts include the seven Pew Charitable Trusts and The Waldorf Educational Foundation, and The J. Howard Pew Fund for Presbyterian Uses. The remaining trustees of these trusts have also been named in the capacity as trustee. Defendants, J. Howard Pew, II, J. N. Pew, III, J. N. Pew, IV, and R. Anderson Pew, have been members of the board that assists in managing the Pew Charitable Trusts. Francis M. Richard, Jr. is sued in his capacity as co-trustee for the Medical Trust, one of the Pew Charitable Trusts. Karin E. Myrin and Samuel W. Morris, Sr. are sued in their capacities as co-trustees for the Waldorf Educational Foundation. The plaintiff has referred to all these trusts and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                        Page 2
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)
**1993 WL 197031 (E.D.Pa.)**

trustees as the "Defendant Trusts."

**\*2** Finally, the plaintiffs have named Robert P. Hauptfuhrer. Mr. Hauptfuhrer is the chairman of the board, a director, and chief executive officer of Oryx.

### B. Plaintiffs' Claims

The triggering event which prompted the filing of this diversity action involves a stock buy-back transaction in which Oryx purchased approximately 25.3 million shares held by the trusts of which Glenmede Trust was trustee. Glenmede Trust held shares of Oryx as trustee for the previously named nine trusts. Oryx purchased the 25.3 million shares for $1.36 billion. As a result of the purchase, the market for Oryx shares began to fall. From the date of the purchase, September 11, 1990 to the filing of the complaint on December 7, 1992, Oryx stock fell from a high of approximately $54 a share to the low to mid $20 range. The Thompson Family alleges a loss of approximately $80 million as a result of the buy-back transaction.

The plaintiffs contend that the goals of the transaction were: (1) to divert funds improperly out of Oryx and into the Defendant Trusts; (2) to liquidate or diversify the Defendant Trusts' holdings of Oryx stock and to maximize the value received for the Defendant Trusts' holdings in Oryx; (3) to entrench and protect defendant Hauptfuhrer in his executive position at Oryx; and (4) to allay his concerns that the Glenmede/Pew defendants might act unilaterally in a way that would threaten his position.

Plaintiffs have alleged that the transaction was instigated, devised and executed by Glenmede Trust, its parent, defendant Glenmede Corporation, and the Pew Defendants and the Defendant Trusts. (Complaint ¶¶ 3, 34). The plaintiffs allege that Glenmede Trust and Glenmede Corporation are controlled by the Pew family. Allegedly, the stock transaction was detrimental to Oryx and the plaintiffs and was extremely lucrative for Glen-

mede Corporation, Glenmede Trust, the Defendant Trusts and the Pew Defendants. (Complaint ¶ 43). Plaintiffs allege that Glenmede Trust failed to advise them before and after the transaction of its consequences to Oryx.

According to the allegations of the complaint, Glenmede owed fiduciary duties to plaintiffs (the Thompson family interests) at the same time as it owed duties to the Pew family interests. Plaintiffs allege that Glenmede and the Pew family interests are commonly controlled and indivisible, making the duties owed to plaintiffs even clearer. Those duties were allegedly breached when the Pew family interests were advanced by the buy-back transaction, and the Thompsons were ignored by Glenmede and harmed by the transaction it precipitated.

All defendants named in this action with the exception of defendant Robert P. Hauptfuhrer have collectively joined in this motion to dismiss.

### II. DISCUSSION

Federal Rule of Civil Procedure 8(a) requires that a plaintiff's complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief ... " Fed.R.Civ.P. 8(a). Defendants have moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). When considering this motion, the Court shall take all allegations in the complaint as true and construe them in the light most favorable to the plaintiffs. *H.J. Inc. v. Northwest Bell Tel. Co.,* 109 S.Ct. 2893, 2906 (1989). The complaint shall only be dismissed if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Id.* (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

**\*3** As a special pleading matter, a count for fraud must be stated with particularity. Fed.R.Civ.P. 9(b). Rule 9(b) provides:

(b) Fraud, Mistake, Condition of the Mind. In all

Not Reported in F.Supp.                                                                              Page 3
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)
**1993 WL 197031 (E.D.Pa.)**

averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed.R.Civ.P. 9(b). To meet the requirement of Rule 9(b), the complaint must allege sufficient detail as to the circumstances of the alleged fraud so that the defendant will have notice of the precise misconduct charged. *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3d Cir.1984), *cert. denied,*469 U.S. 1211 (1985); *In re Scott Paper Securities Litigation,* 138 F.R.D. 56, 58 (E.D.Pa.1991); *Antinoph v. Laverell Reynolds Securities, Inc.,* 703 F.Supp. 1185, 1188 (E.D.Pa.1989) (Hutton, J.).

The defendants have also moved to dismiss pursuant to Federal Rule of Civil Procedure 23.1. The defendants contend that some of the plaintiffs' claims are derivative and must be filed on behalf of Oryx. However, they argue that since the plaintiffs have not complied with the pleading requirements of a derivative action under Rule 23.1, these "derivative claims" must be dismissed. Rule 23.1, entitled "Derivative Actions by Shareholders," in pertinent part provides:

In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law, and (2) that the action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and

the reasons for the plaintiff's failure to obtain the action or for not making the effort.

The Court will address each count separately.

A. *Count One: Breach of Fiduciary Duty*

Count one alleges violations of fiduciary duties owed to the Thompson Family. The count seeks relief against Glenmede Corporation, Glenmede Trust, the Pew Defendants, the Defendant Trusts, Defendant Langfitt and Defendant Piscopo. The plaintiffs' fiduciary allegations can be classified as: (1) the fiduciary relationship arising from Glenmede Trust's oral and written agreement to provide financial guidance to the Thompson Family (Complaint ¶ 21); and (2) the fiduciary relationship arising from the defendants' status as dominant and controlling shareholders and/or directors of Oryx. (Complaint ¶ 24).

*4 The plaintiffs have asserted that the defendants violated their fiduciary duties by:

(a) failing to advise plaintiffs that Oryx shares should be sold prior to the buy-back transaction;

(b) participating in the scheme and conspiracy [improperly diverting funds out of Oryx to the benefit of the Defendant trusts and entrenching defendant Hauptfuhrer at Oryx];

(c) entering into the buy-back transaction; and

(d) failing to advise plaintiffs at the time of or following the transaction of the detrimental effect of the transaction on Oryx and plaintiffs and to advise plaintiffs to sell their Oryx stock.

(Complaint ¶ 44).

1. Agreement for Financial Guidance-*Defendant Glenmede Trust Company*

The plaintiffs contend that Glenmede Trust owed fiduciary duties to them in its capacity as the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 4
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)
**1993 WL 197031 (E.D.Pa.)**

plaintiffs' investment advisor. (Complaint ¶¶ 1 and 20). This contractual fiduciary relationship allegedly covered the plaintiffs' ownership interest in Oryx. The defendant Glenmede Trust does not challenge the plaintiffs' claim of violation of this particular fiduciary relationship in this motion.

2. *Defendant Glenmede Corporation, Defendant Trusts, Defendant Langfitt, Defendant Piscopo and the Pew Defendants*

The plaintiffs' complaint, although recognizing a distinction between Glenmede Trust and Glenmede Corporation, has commonly referred to both Glenmede Trust and Glenmede Corporation. The plaintiffs' reasoning behind this common reference is the allegation that "[b]oth entities have substantially similar management and directors and have each acted interchangeably ... " (Complaint ¶ 11). Although not entirely clear, it is apparent from the complaint and the parties' briefs that the fiduciary relationship with respect to the investment agreement is solely between defendant Glenmede Trust and the plaintiffs. (Complaint ¶¶ 1 and 20). The complaint states that the professional fiduciary is Glenmede Trust. (Complaint ¶ 1).

Nevertheless, with respect to Glenmede Corporation as well as the Pew defendants, the Defendant Trusts, Defendant Piscopo, and Defendant Langfitt, the plaintiffs have not alleged a fiduciary relationship. "A fiduciary relationship exists where there is 'a relationship involving trust and confidence, and the proof must show confidence reposed by one side and domination and influence exercised by the other." *Antinoph v. Laverell Reynolds Sec. Inc.*, 703 F.Supp. 1185, 1188 (E.D.Pa.1988), (Hutton, J.), (*quoting, Lehner v. Crane Co.*, 448 F.Supp. 1127, 1131 (E.D.Pa.1978)); *See also City of Harrisburg v. Bradford Trust*, 621 F.Supp. 463, 473 (M.D. Pa.1985). "It is not enough to show that the plaintiff reposed its trust in the defendant; the latter must also have accepted the fiduciary relationship." *City of Harrisburg*, 621 F.Supp. at 473; *Antinoph*, 703 F.Supp. at 1188.

The plaintiffs' complaint does not allege that plaintiffs have reposed their trust in these particular defendants nor does it allege that these particular defendants accepted a fiduciary relationship with the plaintiffs. *Antinoph*, 703 F.Supp at 1188; *Bradford Trust*, 621 F.Supp. at 473-474. The plaintiffs have only alleged the investment advisory fiduciary relationship with respect to Glenmede Trust. Accordingly, the plaintiffs' complaint does not allege a claim against these defendants for violation of a fiduciary duty.

3. *Status as Shareholder and Director of ORYX*

*5 To the extent that the plaintiffs have raised claims for breach of fiduciary duties arising from the defendants' status as dominant and controlling shareholder and/or directors of Oryx in count one, the plaintiffs' claim shall be dismissed. The plaintiffs freely admit that they have not complied with the requirements of Fed.R.Civ.P. 23.1. (Plaintiffs' Memorandum in Opposition at 9). In particular, the plaintiffs have not alleged that they have made efforts to obtain the desired action from the directors or comparable authority and from the shareholders or members, or the reasons for the failure to obtain the action or for not making the effort. Instead, they contend that Rule 23.1 does not apply to their complaint because it only seeks relief for claims which are individual. The defendants contend that these claims are derivative.

Under Delaware law, the state of incorporation of Oryx, the court must examine the nature of wrongs alleged in the body of the complaint rather than the plaintiffs' designation or stated intention in determining whether a claim is derivative or individual.FN4 *Brug v. The Enstar Group, Inc.*, 755 F.Supp. 1247, 1257 (D.Del.1991), (*citing, Lipton v. News Int'l, Plc*, 514 a.2d 1075, 1078 (Del.1986)). A stockholder can maintain an individual action if he has sustained a "special injury." *Lipton*, 514 A.2d at 1078. A special injury is defined as a wrong inflicted upon a stockholder alone or a wrong affecting any particular right

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                  Page 5
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)
**1993 WL 197031 (E.D.Pa.)**

which he is asserting such as preemptive rights, rights involving control of the corporation, or a wrong affecting the stockholders and not the corporation. *Id. (quoting Elster v. American Airlines, Inc.,* 100 A.2d 219, 223 (Del.Ch.1953)). "A shareholder who suffers an injury peculiar to itself should be able to maintain an individual action, even though the corporation also suffers an injury from the same wrong." *Lipton,* 514 A.2d at 1079. However, "[w]hen an injury to corporate stock falls equally upon all stockholders, then an individual stockholder may not recover for the injury to his stock alone, but must seek recovery derivatively on behalf of the corporation." *Bokat v. Getty Oil Co.,* 262 A.2d 246, 249 (Del.1970).

The plaintiffs' claims arising from the particular breach of the fiduciary duty existing as a result of the defendants' status as dominant and controlling shareholder and/or directors of Oryx are not individual. These claims are derivative. *See MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.,* 1985 WL 21129 (Del.Ch.), (*citing, Gearhart Industries, Inc. v. Smith International,* 741 F.2d 707, 721 (5th Cir.1984); *Bokat v. Getty Oil Co.,* 262 A.2d 246, 249 (Del.Sup.1970).

The plaintiffs have not identified any wrong peculiar to them with respect to this violation. The plaintiffs' injuries are common to all shareholders of Oryx and to Oryx itself. The complaint states that the buy-back transaction was "inimical to the best interests of Oryx and its remaining shareholders, including the Thompson plaintiffs ... " (Complaint ¶ 36). The plaintiffs' complaint primarily articulates that the fiduciary breach of the defendants resulted in the decline in value of their shareholdings in Oryx. (Complaint ¶ 47). The best summary of the plaintiffs' injuries appears in the plaintiffs' complaint at paragraph 4. It provides:

**\*6** As a result of the buy-back transaction, the Oryx shareholders remaining after the transaction (including plaintiffs) have seen the apparent value of their company shares plummet from a high of over \$53 per share on the day of the transaction, to

the low to mid-\$20's per share today. The loss in value of the plaintiffs' Oryx shares since the buy-back transaction is over \$80 million.

Further, the relief which the plaintiffs are requesting in their complaint confirms this determination. The relief sought may be an indicator as to the derivative nature of a claim. *Kramer v. Western Pac. Indus., Inc.,* 546 A.2d 348, 352 (Del.1988). The complaint in this case includes the request for the following relief with respect to count one:

B) ... Rescission of the buy-back transaction;

D) ... Disgorgement of any consideration derived by any defendant from the buy-back transaction, and imposition of a constructive trust on any such consideration.

Rescission of a contract as a remedy is only available to a party to the contract. *Paul S. Mullin & Assocs., Inc. v. Bassett,* 632 F.Supp. 532, 537 (D.Del 1986). The plaintiffs were not a party to the buy-back transaction between Glenmede Trust and Oryx. Rescission could only be available to one of those parties. Further, the plaintiffs recognized that they would not be personally entitled to disgorgement consideration by requesting a constructive trust. These remedies are the type of remedies expected to be pled in a derivative action seeking relief on behalf of the corporation.

Since the violation of this fiduciary relationship is derivative, the plaintiffs may not maintain this claim without first complying with Federal Rule of Civil Procedure 23.1. Plaintiffs have admitted that they have not complied with the rule's requirements. Accordingly, this claim is dismissed with respect to all defendants who have been named in this count for failure to meet the requirements of Rule 23.1.

**B. Count Two**

**1. Civil Conspiracy**

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 6
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)
**1993 WL 197031 (E.D.Pa.)**

Count two seeks liability for civil conspiracy against all defendants. In *Burnside v. Abbott Laboratories,* 505 A.2d 973 (Pa.Super.1985), the Pennsylvania court stated:

To state a cause of action for civil conspiracy under Pennsylvania law, a complaint must allege the existence of all elements necessary to such a cause of action. A cause of action for conspiracy requires that two or more persons combine or enter an agreement to commit an unlawful act or to do an otherwise lawful act by unlawful means. Proof of malice is an essential part of a cause of action for conspiracy.

*Id.* at 980.(citations omitted). *See also Murphy v. Villanova Univ.,* 547 F.Supp. 512, 522 (E.D.Pa.1982), *aff'd without op.,* 707 F.2d 1402 (3d Cir.1983); *Swartzbauer v. Lead Industries Ass'n, Inc.,* 794 F.Supp. 142 (E.D.Pa.1992).

The plaintiffs' complaint provides:

The primary goals of the scheme and conspiracy were:

(a) to divert funds improperly out of Oryx into the Defendant Trusts; to liquidate or diversify the Defendant Trusts' holdings of Oryx stock out of Oryx, preferably into cash or other diversified assets; and to maximize the value received for the Defendant Trusts' holdings in Oryx; and

*7 (b) to entrench and protect Hauptfuhrer in his executive position at Oryx and allay his concerns that the Glenmede/Pew defendants might act unilaterally in a way that would threaten his position.

(Complaint ¶ 32). The complaint fails to plead a cause of action for civil conspiracy. Noticeably absent from the plaintiffs' conspiracy allegations is the essential element of malice. The complaint is devoid of any allegation that the defendants acted with the intent to injure the plaintiffs. Accordingly, the plaintiffs' conspiracy allegations are dismissed.

## 2. *Aiding and Abetting*

Count two of the plaintiffs' complaint alleges aiding and abetting against all defendants. In support of their claim, the plaintiffs cite section 876 of the Restatement (Second) of Torts. Section 876, entitled "Persons Acting in Concert," provides:

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876. The plaintiffs contend that the defendants are jointly and severally liable for the fiduciary breach of Glenmede Trust because they acted in concert. Apparently, the plaintiffs are proceeding under 876(b).

A claim for aiding and abetting in a breach of a fiduciary duty as described by § 876(b) of the Restatement, although not specifically provided for by the Pennsylvania Supreme Court, has been recognized as a cognizable claim in the Eastern District of Pennsylvania. In *Pierce v. Rossetta Corp.,* Civil Action No. 88-5873, 1992 WL 165817 (E.D. Pa. June 12, 1992), anticipating the acceptance of the claim by Pennsylvania courts the district court held:

the elements for a claim for aiding and abetting breach of a fiduciary duty under Pennsylvania law would be: (1) a breach of a fiduciary duty owed to another; (2) knowledge of the breach by the aider and abettor; and (3) substantial assistance or encouragement by the aider and abettor in effecting

Not Reported in F.Supp.                                                                                                     Page 7
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)
**1993 WL 197031 (E.D.Pa.)**

that breach.

*Id.* at \*8 (*citing,*Restatement (Second) Torts § 876 (1979); *Kranzdorf v. Green,* 582 F.Supp. 335, 337 (E.D.Pa.1983)). The *Pierce* court based the decision on a thorough examination of relevant Pennsylvania authority.

The defendants do not take issue with the *Pierce* decision. However, the defendants' contend that this aiding and abetting liability does not extend to the officers or directors of a corporation for a breach committed by the corporation. The defendants contend that the reasoning which bars a claim of conspiracy between officers and directors of a corporation and the corporation itself necessarily prevents the plaintiffs' aiding and abetting claim.

**\*8** It is clear that officers and directors of a corporation cannot conspire with a corporation. *Nix v. Temple Univ.* 596 A.2d 1132, 1137 n.3 (Pa.Super 1991) (*citing, Daniel Adams Assoc. v. Rimbach Pub., Inc.,* 519 A.2d 997 (Pa.Super.1987)); *Accord, e.g., Scott v. Township of Bristol,* Civil Action No. 1412, 1990 WL 178556 (E.D.Pa.1990), (Hutton, J.). Generally, the acts of the agents of a corporation are the acts of the corporation itself. Since an individual cannot conspire without another party, a corporation cannot conspire with its agents, officers and directors. *Jaqielski v. Package Mach. Co.,* 489 F.Supp. 232, 233 (E.D.Pa.1980).

The plaintiffs have not cited any Pennsylvania authority for the proposition that a director or officer of a corporation could be liable for aiding and abetting a fiduciary breach by the corporation. However, this is not surprising given that no Pennsylvania court has yet held any individual liable for aiding and abetting a fiduciary breach. Nor do the cases which the plaintiffs cite support the conclusion that officers and directors of a corporation can be liable for aiding and abetting a breach of a fiduciary duty by the corporation.

The plaintiffs' reliance on *Seaboard Industries, Inc. v. Monaco,* 276 A.2d 305 (1971), is not persuasive.

*Seaboard* involved the liability of a director for joint participation of, approving of, acquiescing in, or concealing a breach of a fiduciary of another director owed to the corporation. *Id.* Thus, it involved a breach committed by a director. It did not involve liability of a director for a corporate breach of a fiduciary duty. Nothing in the opinion would lead this court to the conclusion that aiding and abetting could be established against a director for assisting the corporation in a fiduciary breach.

Plaintiffs' remaining cases are also not persuasive. *Kranzdorf v. Green,* 582 F.Supp. 335 (E.D.Pa.1983) (aiding and abetting liability claim permitted against a non-agent of the corporation); *Ging v. Parker-Hunter Inc.,* 544 F.Supp. 49 (W.D. Pa.1982) (permitting corporation to be liable for aiding and abetting securities fraud of a third party); *Hickman v. Taylor,* 75 F.Supp. 528 (E.D.Pa.1947) (non-agent alleged to have participated in corporation's negligence).

Nevertheless, under existing Pennsylvania law it appears that the Pennsylvania Supreme Court would not permit an "aiding and abetting" claim against the officers and directors of a corporation for the wrong of the corporation. A claim for a breach of a fiduciary duty although arising from a contract, is an allegation of tortious conduct. *See Zimmer v. Guntal & Co. Inc.,* 732 F.Supp. 1330, 1336 (W.D.Pa.1989); Restatement (Second) of Torts, § 874 (1979). Under Pennsylvania law, officers and directors are not liable for tortious conduct of the corporation in the absence of affirmative participation in the conduct. *Wicks v. Milzoco Builders, Inc.,* 470 A.2d 86, 90 (Pa.1983); *Chester-Cambridge Bank & Trust Co. v. Rhodes,* 31 A.2d 128, 131 (Pa.1943). Under this participation theory, the defendant directors and officers can be liable for knowingly participating in the tortious act. *Wicks,* 470 A.2d at 90; *Chester-Cambridge Bank & Trust Co.,* 31 A.2d at 131; *see also Newman v. Forward Lands, Inc.,* 418 F.Supp. 134, 137 (E.D.Pa.1976).

**\*9** In *Chester-Cambridge Bank & Trust Co. v.*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 8
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)
**1993 WL 197031 (E.D.Pa.)**

*Rhodes,* the Supreme Court of Pennsylvania, in addressing the issue of officer and director liability stated:

It is true that a director or officer of a corporation may have personal liability for damages suffered by third persons when he knowingly participates in a wrongful act. *See Malone v. Pierce,* 231 Pa. 534, 80 A. 979; *Warner v. McMullin,* 131 Pa. 370, 18 A. 1056. But where, as in this case, directors or officers are charged with nonfeasance, no individual liability attaches. This has always been the rule in this jurisdiction. *See Spering's Appeal,* 71 Pa. 11, 10 Am.Rep. 684; *Swentzel v. Penn Bank,* 147 Pa. 140, 23 a. 405, 415, 15 L.R.A. 305, 30 A.m.St.Rep. 718; *Cohen, et al. v. Maus, et al.,* 297 Pa. 454, 147 A.103. In the latter case we held that directors of a corporation could not be charged with individual liability for conversion of property by the corporation of which they had no actual knowledge. However (297 Pa. at page 458, 147 A. 103), Justice Schaffer, afterwards Chief Justice, pointed out that a director who participated actively in the conversion would have been personally liable.

31 A.2d at 131. The Court in a more recent discussion of the participation theory stated:
Pennsylvania law recognizes the participation theory as a basis of liability. The general, if not universal, rule is that an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor; but that an officer of a corporation who takes no part in the commission of the tort committed by the corporation is not personally liable to third persons for such a tort, nor for the acts of other agents, officers or employees of the corporation in committing it, unless he specifically directed the particular act to be done or participated, or cooperated therein. (citations omitted)

*Wicks,* 470 A.2d at 90.

Accordingly, this Court will apply Pennsylvania's participation theory to the plaintiffs' aiding and abetting claim in Count II with respect to the acts of

directors and officers of Glenmede Trust. Therefore, if the plaintiffs have alleged that the directors and officers knowingly participated in, cooperated or directed the corporation's breach of fiduciary duty, Count II against these individuals will survive a motion to dismiss.

With respect to the defendant directors and officers of the corporation, the plaintiffs have not specifically alleged that these individuals have participated in the breach of the fiduciary duty. The plaintiffs must plead that each defendant director or officer "active[ly] participat[ed] in a positively wrongful act intendedly and directly operating injuriously to the prejudice of the [plaintiffs]." *See Newman v. Forward Lands Inc.,* 418 F.Supp. 134, 136 (E.D.Pa.1976).

In addition, the Court recognizes that a claim for aiding and abetting a breach of a fiduciary duty would exist against non-agents of Glenmede Trust under Pennsylvania law. *Pierce v. Rossetta Corp.,* Civil Action No. 88-5873, 1992 WL 165817 (E.D. Pa. June 12, 1992). However, the Court finds that based upon the allegations in the complaint, plaintiffs have not sufficiently stated claims for aiding and abetting with respect to the remaining defendants. The plaintiffs have not alleged the requirements of aiding and abetting as set forth in *Pierce v. Rossetta Corp.,* 1992 WL 165817 at *8. The complaint does allege a breach of a fiduciary duty by Glenmede Trust as discussed above. The complaint also alleges that all the defendants had knowledge of the fiduciary relationship. (Complaint ¶ 46). However, the plaintiffs have not alleged substantial assistance or encouragement in effecting the breach by the remaining defendants who were not acting as officers and directors of the Glenmede Trust. Accordingly, Count II with respect to non-agents of Glenmede Trust is dismissed.

### 3. Glenmede Corporation

*10 The plaintiffs seek to extend liability to Glenmede Corporation as the parent for the acts of Glen-

Not Reported in F.Supp.                                                        Page 9
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)
**1993 WL 197031 (E.D.Pa.)**

mede Trust on the basis of aiding and abetting liability. The defendant Glenmede Corporation contends that it cannot be liable for aiding and abetting a breach of a fiduciary duty owed by its wholly owned subsidiary for the same reasons that a director or officer cannot be liable for aiding and abetting the corporation of which they control. Glenmede Corporation, citing *Copperweld Corp. v. Independance Tube Corp.*, 467 U.S. 752, 777 (1984), contends that a parent corporation cannot conspire with a wholly-owned subsidiary because they have a single conscience and are run by a "single driver." Thus, it argues that it cannot be liable for aiding and abetting its subsidiary.

Pennsylvania law provides the circumstances for which a parent corporation may be liable for the acts of its subsidiary within the doctrine of piercing the corporate veil. *Parker v. Bell Asbestos Mines, Ltd.*, 607 F.Supp. 1397 (D.C. Pa.1985); *McCarthy v. Ference*, 58 A.2d 49 (Pa.1948). In *First Realvest Inc. v. Avery Builders, Inc.*, 600 A.2d 601 (Pa.Super.1991), the court stated:

The Pennsylvania Supreme Court has held that the corporate form "will be disregarded only when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime." In applying the test (for piercing the corporate veil), ... any court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception ... Care should be taken on all occasions to avoid making "the entire theory of the corporate entity ... useless ... "

*Id.* at 604, (citations omitted). In determining whether to pierce the corporate veil, courts are basically concerned with determining if equity requires that the shareholder's traditional insulation from personal liability be disregarded and with ascertaining if the corporate form is a sham, constituting a facade for the operation of the dominant shareholder. *Carpenter's Health and Welfare Fund v. Ambrose*, 727 F.2d 279 (3d Cir.1983); *Village at Camelback Property Owners Assn. Inc. v. Carr*,

538 A.2d 528 (Pa.Super.1988); *Wicks v. Milzoco Builders Inc.*, 470 A.2d 86, 90-91 (Pa.1983).

In this case, Glenmede Trust is the wholly owned subsidiary of Glenmede Corporation. The plaintiffs have alleged that the entities have "substantially similar management and directors and have each acted interchangeably with the other with respect to the matters described in [the] complaint." (Complaint ¶ 11). However, this alone is not sufficient to allege that Glenmede Trust is a sham or alter ego of the Glenmede Corporation. Allegations of joint action is not sufficient to justify piercing the corporate veil between a parent and subsidiary corporation. *Nobers v. Crucible, Inc.*, 602 F.Supp. 703 (W.D. Pa.1985). The complaint must allege facts sufficient to support a finding that Glenmede Trust was dominated by Glenmede Corporation to an extent that Glenmede Trust was a sham or alter ego. Relevant facts for piercing under an alter ego theory would be:

*11 (a) insufficient capitalization;

(b) intermingling of funds;

(c) other officers and directors were not functioning;

(d) failure to observe corporate formalities;

(e) failure to pay dividends;

(f) the fact that the corporation is a facade for the operations of the dominant stockholder;

*Nobers v. Crucible, Inc.*, 602 F.Supp. at 707; *Village at Camelback Property Owners Assn. Inc.*, 538 A.2d at 535; *United States v. Pisani*, 646 F.2d 83, 88 (3d Cir.1981). The complaint does not meet these requirements.

However, the plaintiffs contend that the existence of fraud in the complaint is sufficient for purposes of piercing the corporate veil. The complaint has alleged that Glenmede Trust was used to perpetrate common law fraud. *See infra*, at 23-24. Consider-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 10
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)
**1993 WL 197031 (E.D.Pa.)**

ing the complaint in light most favorable to the plaintiffs as the Court must do, the plaintiffs may have the potential for piercing the corporate veil of Glenmede Trust for this fraud. Accordingly, Glenmede Corporation's motion to dismiss count two is denied.

### C. *Count Three*

In count three, the plaintiffs allege common law fraud against all defendants. A claim for common-law fraud requires a misrepresentation made for the purpose of inducing reliance on the false statement. *Antinoph v. Laverell Reynolds Securities Inc.,* 703 F.Supp. 1185, 1187 n.1. A claim of fraud based upon failure to disclose information is actionable if there exists a confidential or fiduciary relationship. *See Id.; City of Harrisburg v. Bradford Trust Co.,* 621 F.Supp. 463, 473 (D.C. Pa.1985); *see e.g. Federal Land Bank of Baltimore v. Fetner,* 410 A.2d 344 (Pa.Super.1979), *cert. denied,* 446 U.S. 918 (1980).

As the Court has previously discussed, the plaintiffs' complaint has alleged a confidential/fiduciary relationship with respect to Glenmede Trust. The complaint provides that the "[d]efendants concealed the pendency of the buy-back transaction until it was consummated and announced on September 11, 1990." (Complaint ¶ 37). The defendants also allegedly concealed knowledge and information regarding Oryx's inability to generate capital needed to ultimately allow Oryx to create value for its shareholders and their knowledge that the buy-back transaction would operate to depress the value of the plaintiffs' stock. (Complaint ¶¶ 37, 38). Therefore, the complaint states a common law claim against Glenmede Trust.

However, the complaint does not allege a claim against defendants, Glenmede Corporation, the Pew Defendants, the Defendant Trusts, Defendants Piscopo and Defendant Langfitt. As explained in the Court's discussion of count one, no fiduciary relationship between these defendants and the plaintiffs

has been alleged. Accordingly, the plaintiffs' common law fraud claim is dismissed against these defendants.

### D. *Count Four*

Count four seeks relief against Glenmede Trust, Glenmede Corporation and the Defendant Trusts for unjust enrichment. In *Burgettstown-Smith Township Joint Sewage Authority v. Langeloth Townsite Company,* 588 A.2d 43 (Pa.Super.1991), the court noted that:

**\*12** [e]ssential elements of "unjust enrichment" are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.

*Id.* at 44, (*quoting, Wolf v. Wolf,* 514 a.2d 901, 905-06 (Pa.Super.1986), *overruled on other grounds by Van Buskirk v. Van Buskirk,* 590 A.2d 4, 8 (Pa.1991)). "A necessary element of unjust enrichment is that a benefit must have been conferred for which no compensation was given." *Meyers Plumbing & Heating Supply Co. v. West End Fed. Sav. & Loan Ass'n,* 498 A.2d 966, 969 (Pa.Super.1985). The plaintiffs' complaint fails to allege the requisites of such a claim. Accordingly, Count four of the complaint is dismissed.

### E. *Count Five*

The fifth count of the plaintiffs' complaint alleges breach of contract by both Glenmede Trust and Glenmede Corporation. As the Court has previously discussed, the complaint alleges an investment advisory agreement in which Glenmede Trust accepted the position as the plaintiffs' professional fiduciary. (Complaint ¶¶ 1, 17 and 20). Glenmede Trust does not oppose the claim in the motion. However, Glenmede Corporation contends that it is not a party to the investment advisory contract and, therefore, it can not be liable on the contract simply

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 11
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)
**1993 WL 197031 (E.D.Pa.)**

due to its parent subsidiary relationship. The plaintiffs contend that liability extends pursuant to the equitable doctrine of piercing the corporate veil. As the Court has found that the complaint alleges a claim for piercing the corporate veil, Glenmede Corporations motion to dismiss count five is denied.

### F. *Count Six*

The last count of the plaintiffs' complaint alleges negligence against both Glenmede Trust and Glenmede Corporation. The plaintiffs are contending that Glenmede Trust is liable for professional negligence with respect to its oral and written agreement to act as the plaintiffs' investment advisor and that the Glenmede Corporation is liable for both its participation in the negligence and under the plaintiffs' theory of piercing the corporate veil.

To state a claim for professional negligence, the plaintiffs must allege: (1) employment by a person or entity giving rise to a duty to the plaintiffs; (2) the failure of the defendant to exercise ordinary skill and knowledge; and (3) that this negligence proximately caused damages to the plaintiff. *See Schenkel v. Nonheit,* 405 A.2d 493, 494 (Pa.Super.1979), (Essential elements for cause of action against attorney for professional negligence).

The plaintiffs' complaint alleges that the plaintiffs contracted with Glenmede Trust to provide investment advise and guidance with respect to the plaintiffs' holdings in Oryx stock. Allegedly, the defendants breached their duty to exercise ordinary skill and knowledge by:

(a) failing to advise plaintiffs that Oryx shares should be sold prior to the buy-back transaction;

*13 (b) participating in the scheme and conspiracy [improperly diverting funds out of Oryx to the benefit of the Defendant trusts and entrenching defendant Hauptfuhrer at Oryx];

(c) entering into the buy-back transaction; and

(d) failing to advise plaintiffs at the time of or following the transaction of the detrimental effect of the transaction on Oryx and plaintiffs and to advise plaintiffs to sell their Oryx stock.

(Complaint ¶ 44). Finally, the plaintiffs contend that their injuries were proximately caused by Glenmede Trust. Accordingly, the complaint states a claim for negligence against the defendant Glenmede Trust.

However, Glenmede Trust contends that its agreement with the plaintiffs specifically excludes liability for negligence. Glenmede Trust cites an exculpatory clause of its agreement with the plaintiffs. The clause provides:

Glenmede shall not be liable for any loss or damage or any costs and expenses associated with such loss or damage resulting from any act, omission or mistake or judgment in the course of, or connected with, the performance of its responsibilities hereunder, or that of its representatives, agents or employees, except for its own gross negligence or bad faith.

(Complaint ¶ 23).

In *Topp Copy Products Inc. v. Singletary,* 591 A.2d 298 (Pa.Super.1991), the Pennsylvania court recently discussed the issue of the application of exculpatory clauses under Pennsylvania law. The Court stated:

Our Supreme Court has held that an exculpatory clause is generally valid where three conditions are satisfied. The three conditions are: (1) the clause "does not contravene any policy of law, that is, ... it is not a matter of interest to the public or State"; (2) the "contract is between persons relating entirely to their own private affairs"; and (3) "each party is a free bargaining agent ... [in that the agreement] is not in effect a mere contract of adhesion."

If these conditions are met, and the clause is determined to be valid, the contract must still meet four additional standards in order to be "interpreted

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 12
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)
**1993 WL 197031 (E.D.Pa.)**

and construed to relieve a person of liability for his own ... acts of negligence." The four standards are: (1) the contract immunizing a party from liability for negligence must be construed strictly, "since they are not favorites of the law"; (2) the contract must state the intention of the parties "with the greatest particularity, ... beyond doubt by express stipulation, [and] no inference from words of general import can establish it"; (3) the contract must be construed against the party seeking immunity from liability; and (4) the burden of establishing the immunity is upon the party seeking protection of the clause.

These seven considerations demonstrate that contracts providing for the immunity of parties from their own negligent acts are not regarded positively under the law of the Commonwealth.

*Id.* at 301 (citations omitted).

**\*14** While Glenmede Trust may be immune from liability for negligence pursuant to the clause, the Court cannot determine from the face of the complaint the specific application of the clause under Pennsylvania's teachings. Therefore, Glenmede Trust's motion to dismiss count six is denied.

With respect to Glenmede Corporation, it is clear that the plaintiffs' complaint does not allege that the corporation was the professional advisor of the plaintiffs. However, the plaintiffs contend that Glenmede Corporation as the parent of Glenmede Trust is liable for the negligence under the piercing theory discussed above. Since the Court has found that the plaintiffs may have a claim against Glenmede Corporation under the Pennsylvania doctrine, the plaintiffs' claim for negligence shall not be dismissed against Glenmede Corporation.

An appropriate Order follows.

## ORDER

AND NOW, this 8th day of June, 1993, upon consideration of the Defendants' Motion to Dismiss,

the Plaintiffs' Response and the Defendants' Reply, IT IS HEREBY ORDERED that:

(1) Count I of the Plaintiffs' Complaint against Glenmede Corporation, J. Howard Pew, II, J. N. Pew, III, J. N. Pew, IV, R. Anderson Pew, John G. Pew, Jr., G. Thompson Pew, Jr., Thomas W. Langfitt, Albert E. Piscopo, Francis M. Richards, Jr., Karin E. Myrin and Samuel W. Morris Sr. is DISMISSED;

(2) Count II of the Plaintiffs' Complaint for civil conspiracy against all defendants is DISMISSED;

(3) Count II of the Plaintiffs' Complaint for aiding and abetting a breach of fiduciary duty against Glenmede Trust, J. Howard Pew, II, J. N. Pew, III, J. N. Pew, IV, R. Anderson Pew, John G. Pew, Jr., G. Thompson Pew, Jr., Thomas W. Langfitt, Albert E. Piscopo, Francis M. Richards, Jr., Karin E. Myrin and Samuel W. Morris Sr. is DISMISSED;

(4) Count III of the Plaintiffs' Complaint against Glenmede Corporation, J. Howard Pew, II, J. N. Pew, III, J. N. Pew, IV, R. Anderson Pew, John G. Pew, Jr., G. Thompson Pew, Jr., Thomas W. Langfitt, Albert E. Piscopo, Francis M. Richards, Jr., Karin E. Myrin and Samuel W. Morris Sr. is DISMISSED;

(5) Count IV of the Plaintiffs' Complaint against Glenmede Trust, Glenmede Corporation, J. Howard Pew, II, J. N. Pew, III, J. N. Pew, IV, R. Anderson Pew, Francis M. Richards, Jr., Karin E. Myrin and Samuel W. Morris Sr. is DISMISSED; and

(6) The Motion to Dismiss Count V and Count VI of the Plaintiffs' Complaint is DENIED.

IT IS FURTHER ORDERED that Plaintiffs are granted leave to file an amended complaint within twenty (20) days of the date of this Order.

> FN1. The plaintiffs are as follows: B. Ray Thompson, Jr., Juanne J. Thompson, Catherine V. Thompson, Adella S. Thompson, B. Ray Thompson, III, Sarah Thompson

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 13
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)
**1993 WL 197031 (E.D.Pa.)**

Tarver, Rebekah L. Thompson.

FN2. The trustees of the five trusts are as follows: B. Ray Thompson, Jr., Juanne J. Thompson, Dale A. Keasling.

FN3. The seven trusts are as follows: the Pew Memorial Trust, the J. Howard Pew Freedom Trust, The Mabel Pew Myrin Trust, The J. N. Pew Jr. Charitable Trust, The Medical Trust, Mary Anderson Trust, and The Knollbrook Trust.

FN4. In a diversity action, state law applies to the determination of whether an action is individual or derivative under Federal Rule of Civil Procedure 23.1. *Sax v. World Wide Press, Inc.,* 809 F.2d 610, 613 (9th Cir.1987); *Brown v. Ferro Corp.* 763 F.2d 798, 803 (6th Cir.) ("Shareholder's derivative actions are governed by Rule 23.1 of the federal Rules of Civil Procedure, and federal courts apply the law of the state in which the company is incorporated."), *cert. denied,* 474 U.S. (1985).

E.D.Pa. 1993.
Thompson v. Glenmede Trust Co.
Not Reported in F.Supp., 1993 WL 197031 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 7

Westlaw.

Slip Copy

Slip Copy, 2008 WL 682455 (Bkrtcy.E.D.Pa.)

**2008 WL 682455 (Bkrtcy.E.D.Pa.)**

**H**

In re Total Containment, Inc.

Bkrtcy.E.D.Pa.,2008.

Only the Westlaw citation is currently available.

United States Bankruptcy Court,E.D. Pennsylvania.

In re TOTAL CONTAINMENT, INC. Debtor.

George L. Miller, Chapter 11 trustee, Plaintiff

v.

Marcel Dutil, The Canam Manac Group, Inc.,
Canam Steel Corporation, Finloc, Inc., Finloc Cap-
ital, Inc., Finloc US, Inc., Winston Towers 1988,
Inc., Polyflow, Inc., Jay R. Wright, Jr., Bernard
Gouin, and Pierre Desjardins, Defendants.

**Bankruptcy No. 04-13144bf.**

**Adversary No. 05-0145.**


March 5, 2008.

David Dormont, Steven M. Coren, Kaufman, Coren
& Ress, P.C., Philadelphia, PA, for Plaintiff.

Jeffrey D. Herschman, Susan S. Maher, DLA Piper
RudnicGray Cary, Mark J. Friedman, Piper Rud-
nick LLP, Baltimore, MD, Phillip E. Wilson, Jr.,
DLA Piper U.S. LLP, Phillip E. WILSON, Piper
Rudnick et al, Louis J. Schwartzberg, Towers Per-
rin, Christopher W. Wasson, Linda J. Casey, Pepper
Hamilton LLP, Philadelphia, PA, for Defendants.


MEMORANDUM

BRUCE FOX, United States Bankruptcy Judge.

*1 The former chapter 11 trustee, George L. Miller,
who is now plan administrator under the terms of a
confirmed plan providing for the liquidation of all
assets of Total Containment, Inc. (TCI), com-
menced an adversary proceeding asserting seven
counts against 11 defendants, seeking in excess of
$23 million in damages along with declaratory re-
lief. In his amended complaint, as summarized by
the defendants, the trustee asserted claims: "against
all defendants for breach of fiduciary duty related
to TCI's sale of certain assets (First Claim); against
all defendants for fraudulent transfer of those same
assets (Second Claim); successor liability against

Polyflow, Inc. ("PolyFlow") (Third Claim); against
the individual defendants for breach of fiduciary
duty and negligence related to two judgments is-
sued against TCI (Fourth and Fifth Claims); against
all defendants for "deepening the insolvency" of
TCI (Sixth Claim); and against all defendants ex-
cept Canam Group [FN1] for certain declaratory re-
lief related to the allowance of claims against the
bankruptcy estate (Seventh Claim)." Memorandum
of Canam Defendants, at 1.

FN1. Formerly known as Canam Manac
Group, Inc.

In light of a prior ruling concerning defendants' mo-
tions to dismiss, these counts are now arrayed
against the following defendants: Count I-all de-
fendants; Count II-Finloc, Inc., Finloc Capital, Inc.,
Winston Towers 1988, Inc., and PolyFlow, Inc;
Count III-PolyFlow, Inc.; Count IV-Messrs. Dutil,
Wright, Gouin, and Desjardins; Count V-Messrs.
Dutil, Wright, Gouin, and Desjardins; Count VI-all
defendants except Finloc Capital and Winston
Towers; and Count VII-all defendants except
Canam Group, Inc.[FN2]

FN2. At the time of this earlier ruling, only
Canam Group had not filed a proof of
claim against TCI. Since then, Canam
Group asserted that it became the suc-
cessor in interest to Canam Steel. At oral
argument, the parties agreed that Count
VII now involves Canam Group but not
Canam Steel as a defendant.

The various defendants have filed two joint motions
for summary judgment as concerns Counts I, II, IV-
VII. These motions are opposed by the plaintiff.
The parties have submitted voluminous exhibits, in-
cluding numerous partial deposition transcripts,
along with lengthy memoranda in support of their
respective positions. For the reasons that follow,
those motions shall be granted in small part and
denied in large part.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 2
Slip Copy, 2008 WL 682455 (Bkrtcy.E.D.Pa.)
**2008 WL 682455 (Bkrtcy.E.D.Pa.)**

I.

Federal Rule of Bankruptcy Procedure 7056 incorporates Fed.R.Civ.P. 56, the summary judgment rule, into bankruptcy adversary proceedings. Summary judgment avoids the expense and delay of an unnecessary trial when no material facts are in dispute and one or more of the parties is entitled to prevail on the merits. *See, e.g., Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038 (1977). The standard for determining the applicability of summary judgment under Rule 56 is well established. As the Third Circuit Court of Appeals observed:

> Summary judgment is appropriate when the moving party is entitled to judgment as a matter of law and there is no genuine dispute of material fact.... In order to defeat "a properly supported summary judgment motion, the party opposing it must present sufficient evidence for a reasonable jury to find in its favor."*Groman v. Township of Manalapan,* 47 F.3d 628, 633 (3d Cir.1995) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250-52, 106 S.Ct. 2505, 2511-12, 91 L.Ed.2d 202 (1986)). In essence, the non-moving party must demonstrate a dispute over facts that might affect the outcome of the suit. *Id.* Moreover, in reviewing the record, we must give the non-moving party the benefit of all reasonable inferences....

**\*2** *Hampton v. Borough of Tinton Falls Police Dep't,* 98 F.3d 107, 112 (3d Cir.1996).

The application of these general principles is affected by the allocation of the evidentiary burden of persuasion, were the dispute to proceed to trial. That is, a trial court's approach to summary judgment is influenced by whether the party seeking summary judgment would have the burden of persuasion at trial. *See generally* Coquellette, *et al.* 11 *Moore's Federal Practice 3d,* §§ 56.03[4], 56.13[3] (2006). This approach was well summarized in *Adams v. Consolidated Rail Corp.,* 1994 WL 383633, at \*1-\*2 (E.D.Pa.1994):

The Supreme Court articulated the allocation of burdens between a moving and nonmoving party in a motion for summary judgment in *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). The Court held that where the movant is the defendant, or the party without the burden of proof on the underlying claim, the movant still has the initial burden of showing the court the absence of a genuine issue of material fact, but that this does not require the movant to support the motion with affidavits or other materials that negated the opponent's claim. *Id.* at 323.In contrast, where, as here, "the party moving for summary judgment is the plaintiff, or the party who bears the burden of proof at trial, the standard is more stringent."*National State Bank v. Federal Reserve Bank,* 979 F .2d 1579, 1582 (3d Cir.1992). To sustain its initial burden under such circumstances, the movant must:

> "support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."

*Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993).... If the movant makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact[.]

(citations omitted); *accord In re White,* 243 B.R. 498, 501 n. 4 (Bankr.N.D.Ala.1999).

Thus, "[w]hen, as here, the nonmoving party bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden. The nonmoving party creates a genuine issue of material fact if he provides sufficient evidence to allow a reasonable

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 3
Slip Copy, 2008 WL 682455 (Bkrtcy.E.D.Pa.)
**2008 WL 682455 (Bkrtcy.E.D.Pa.)**

jury to find for him at trial."*Wetzel v. Tucker,* 139 F.3d 380, 383 n. 2 (3d Cir.1998).

As noted earlier, in applying the above-mentioned standard for summary judgment, "[the court must] view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion."*Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995); *see also Wetzel v. Tucker,* 139 F.3d at 383 n. 2;*Helen L. v. DiDario,* 46 F.3d 325, 329 (3d Cir.), *cert. denied*sub nom.*Pennsylvania Secretary of Public Welfare v. Idell S.,* 516 U.S. 813 (1995); *Valhal Corp. v. Sullivan Associates, Inc.,* 44 F.3d 195, 200 (3d Cir.1995); *Goodman v. Mead Johnson & Co.,* 534 F.2d at 573. Moreover, the moving party bears the burden of proving that no genuine issue of material fact is in dispute. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). Once the movant has carried its initial burden, however, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 587 (quoting Fed.R.Civ.P. 56(e)). As explained by the Third Circuit:

> *\*3* At the summary judgment stage of proceedings, if the movant-in this case the Defendants-can point to the absence of any factual support for one of [the] essential elements [of the complaint], then the non-movant, bearing the burden of persuasion at trial, must introduce specific facts showing a need for trial, pursuant to Fed.R.Civ.P. 56(e).*See Celotex,* 477 U.S. at 322-24, 106 S.Ct. 2548. If the non-moving party fails to go beyond conclusory allegations in its pleadings and to produce specific facts indicating that there is a genuine issue for trial, summary judgment will be granted in favor of the moving party.

*Annulli v. Panikkar,* 200 F.3d 189, 198-99 (3d Cir.1999) (overruled on other grounds by*Rotella v. Wood,* 528 U.S. 549 (2000)) (citations omitted).

II.

Upon review of the parties' submissions, the following material facts are not in dispute.

A.

The identity of the parties and their relationships are material to the claims asserted by the former chapter 11 trustee. They are outlined as follows:

Total Containment, Inc. (TCI) is a Pennsylvania corporation formed in 1986 to distribute underground piping systems and products used to transport petroleum and alcohol-based motor vehicle fuels from underground storage tanks to aboveground fuel dispensers. Amended Complaint and Answers, ¶ 17; Defendant's Ex. 1, at 18. It was located in Oaks, Pennsylvania when it filed a voluntary petition in bankruptcy on March 4, 2004. Around 1997, TCI began producing its own piping; prior to that date, much of its piping was obtained from one or more third-party vendors.

George L. Miller was chosen as the chapter 11 trustee by the United States trustee. Upon confirmation of a liquidation chapter 11 plan, Mr. Miller became the plan administrator. The claims he asserts in this adversary proceeding are among the remaining unliquidated assets of the estate.

Defendant Marcel Dutil was a director of TCI and is a citizen of Canada. He was also the chairman, president, majority shareholder and chief executive officer of defendant Canam Group until 2003. He was also chief executive officer of defendant Canam Steel, president of defendant Winston Towers, and director of defendants Finloc, Inc. and Finloc US. In these various roles, he drew salary solely from Canam Group and from an entity known as Placements CMI. Ex. P-5, at 50-52. Until August 2006, Mr. Dutil, through his family, controlled the stock of Canam Group. In numerous documents, Mr. Dutil is referred to as the primary or major shareholder of TCI. Although this description is imprecise, it does reflect an understanding

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

that he had exercised authority over the corporate shareholders of TCI and in that sense was the controlling TCI shareholder. *See* Ex. P-19 (Canam Admissions, ¶¶ 11, 14, 17).

Defendant Canam Group is a Canadian corporation that owns 100% of the stock of defendant Canam Steel. It also owns preferred stock in defendant Finloc, Inc. Canam Group is primarily engaged in the design and fabrication of construction projects. *See* Ex. P-5, at 12.

**\*4** Defendant Finloc, Inc. is also a Canadian corporation. It owns 40% of the stock of defendant Finloc, U.S. and is the successor in interest to defendant Finloc Capital, Inc., also a Canadian corporation. *See* Finloc's Answer, ¶ 10; Ex. P-19 (Admission, ¶ 23). At the time of TCI's bankruptcy filing, it owned 16.4% of TCI's common stock.

Defendant Finloc Capital was a Canadian corporation located at the same address as Finloc, Inc. before its merger with that corporation. Any monetary advances made by Finloc Capital to TCI were authorized by Mr. Dutil. Ex. P-5, at 118-19.

Defendant Canam Steel is a Delaware corporation that formerly owned all of the preferred stock in the debtor, TCI. That preferred stock was transferred to Finloc U.S. in July 2002. It is a wholly-owned subsidiary of Canam Group. Mr. Dutil's son-in-law is corporate president. Ex. P-5, at 40.

Defendant Finloc U.S. is a Delaware corporation located at the same address as Canam Steel. It owns 100% of the stock of defendant PolyFlow, Inc., and at the time of TCI's bankruptcy filing it owned 71.08% of the debtor's common stock.

Defendant Winston Towers is a Florida corporation that owned 60% of the stock issued by defendant Finloc US. It had no employees and acted through Mr. Dutil or at his direction. Ex. P-5, at 117-18.

Defendant PolyFlow is a Pennsylvania corporation formed in March 2002 and is located at the same location as TCI in Oaks, Pennsylvania. At the time

of TCI's bankruptcy filing, the president of Poly-Flow was Jay R. Wright, Jr.

Defendant Jay R. Wright, Jr. was the president, chief executive officer and director of TCI. Since July 2002, he has also served as the president of PolyFlow.

Defendant Bernard Gouin was a director of TCI. He was also a vice-president of Canam Group and vice-president and treasurer of Canam Steel. Ex. P-7, at 5. He has acted as paid consultant for the Canam defendants and Mr. Dutil since August 2001. *Id.*, at 6-8. While Mr. Gouin served as director of TCI, his only compensation was paid by Canam Steel. Exs. P-5, at 258; P-7, at 19-21.

Defendant Pierre Desjardins was a director and chairman of TCI. He has provided consulting services to Canam Group. Canam Steel and/or Finloc, Inc. paid Mr. Gouin for his services as director of TCI so that he could be covered by group health insurance for himself and his family. Exs. P-5, at 57; P-6, at 15. (TCI possibly reimbursed Canam Steel for this compensation. Ex. P-6, at 16).

### B.

Before 1997, TCI purchased much of its pipes from Dayco Products. After complaints about problems with TCI's piping systems, TCI sued Dayco for breach of warranty and breach of contract, while Dayco countersued TCI for breach of contract, all claims being heard in federal district court. *See Total Containment, Inc. v. Dayco Products, Inc.,* 2001 WL 984708 (E.D.Pa.2001). After trial, on May 3, 2001, TCI was awarded $1,325,808 on its contract claim and obtained no award on its warranty claim; Dayco was awarded $3,715,170 on its counterclaim. *Id.* Those awards were affirmed on appeal. *See Total Containment, Inc. v. Dayco Products, Inc.,* 43 Fed. Appx. 511 (3d Cir.2002). TCI never satisfied the Dayco judgment against it. Nor is there evidence that Dayco executed upon its judgment.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                        Page 5
Slip Copy, 2008 WL 682455 (Bkrtcy.E.D.Pa.)
**2008 WL 682455 (Bkrtcy.E.D.Pa.)**

**\*5** Around 1997, in light of its dispute with Dayco, TCI began to manufacture its own primary piping.FN3 The funds to construct and manufacture such piping initially came, at least in part, from Canam Steel, which obtained preferred stock in return. During 1997 and 1998, TCI was fairly profitable. In 1999, TCI signed a promissory note in the amount of $5 million in favor of Bank of America, the proceeds of which were used, at least in part, to repay another commercial lender. That BOA obligation was later increased to a high of $8 million, and still later reduced to about $6.5 million.

> FN3. The district court explained that the piping system used by TCI included a pipe within a pipe, with the outer pipe containing any leaks, and the inner pipe considered the primary pipe.

By 2001, the year of the Dayco decision, TCI was losing money, reporting as much as $11.9 million in operating losses. In order to keep operating after the adverse Dayco judgment in May 2001, TCI obtained funds from Finloc Capital (now Finloc, Inc.) and Winston Towers beginning around July 2001. Those payments to TCI were approved by Mr. Dutil.

In March 2002, PolyFlow was incorporated as a subsidiary of Finloc US, and the directors of TCI voted to transfer all of TCI's pipe production business to PolyFlow. The asset transfer took place in July 2002, by which PolyFlow paid $3,599,913 in cash to TCI and assumed TCI's $2,550,000 purported debt to Finloc, Inc. To obtain this cash, Finloc Capital transferred $1,965,000 to Finloc US, and Winston Towers transferred to Finloc U.S. $1,785,000, for a total transfer of $3,750,000. Finloc U.S. then purchased 100 shares of PolyFlow stock for $3,750,000 and paid $161,954 to Canam Steel. PolyFlow thereafter paid TCI the aforementioned $3,599,913.

After receiving these funds from PolyFlow, TCI paid $1,753,137.50 to Finloc Capital, $1,783,579.86 to Winston Towers and $53,923 to Finloc, Inc., totaling $3,590,640.36 in distributions. Only about $9,000 of the PolyFlow purchase price was retained by TCI.

After this July 2002 transfer of assets from TCI, which transaction was approved by Mr. Dutil, Ex. P-5, at 194, PolyFlow began production of piping at the same location as TCI, using the same assets, some of the same employees and some of the same management as had been engaged by TCI.

After the July 2002 asset transfer, TCI obtained its piping from PolyFlow and continued distributing it to its customers. TCI continued, however, to suffer operating losses. There appears to be no dispute that after the July 2002 asset sale and transfer of sale proceeds, TCI's liabilities exceeded its assets. Ex. P-19 (Admissions, ¶¶ 1, 4, 9). In addition, it is agreed that TCI lent funds to PolyFlow, which funds were not repaid as of the date of TCI's bankruptcy filing in March 2004. Ex. P-5, at 312-14.

In January 2002, TCI was sued by Murphy Oil in the Philadelphia Court of Common Pleas. On March 1, 2004, a $4 million judgment was entered against TCI and in favor of Murphy Oil, as a sanction for TCI's failure to comply with various discovery orders. TCI was also sued by PISCES by OWP, Inc. in federal district court in Ohio in 2002. When counsel withdrew at TCI's request and TCI did not engage replacement counsel, default judgment was entered against it for $1.3 million.

### III.

### A.

**\*6** Upon my review of the parties' submissions, I conclude that the following material facts are in dispute. This dispute reflects diametrically opposed interpretations regarding the reasons for, and the fairness of, the July 2002 transfers of assets from TCI.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 6
Slip Copy, 2008 WL 682455 (Bkrtcy.E.D.Pa.)
**2008 WL 682455 (Bkrtcy.E.D.Pa.)**

The defendants justify the PolyFlow purchase of TCI assets in the following terms.

After 1998, during the period when TCI began manufacturing and using its own piping, the market for its products slowed. As a result, the pipe manufacturing assets were not fully being used. And one of the primary reasons that TCI was unprofitable was due to the overhead costs of maintaining this unused production capacity. To assist TCI, its directors decided to form a new corporate entity that would purchase the pipe production assets and then sell needed pipe to TCI at a lower cost than it had taken TCI to produce it, while beginning a new business of selling piping used in "down-hole drilling." *See* Ex. P-5, at 155-56. (Presumably, PolyFlow would obtain this lower cost through greater use of the production equipment.) Furthermore, in order to insure that a fair value for the assets was obtained, the pipe production assets were to be sold at a price determined by third-party appraisers and approved by independent corporate directors of TCI.

Consistent with this strategy, two appraisal firms were engaged: one to value the tangible pipe production assets; the other to value the intangible piping assets. The purchase price paid by PolyFlow is essentially the sum of these two appraisals. In addition, the proceeds of the sale were used by TCI to pay outstanding debts with the highest interest rates. Finally, the defendants contend that the July 2002 transfers were approved by the two independent directors of TCI, Messrs. Gouin and Desjardins, and thus fall within their reasoned business judgment.[FN4]

> FN4. In July 2002, TCI had only four directors on its board: Messrs. Dutil, Wright, Gouin and Desjardins.

The result, from the defendants' point of view, was a transaction by which TCI obtained fair value for its assets, repaid its most expensive debt, and no longer had a drain on its balance sheet. The unprofitable pipe production business was simply "outsourced." Therefore, the defendants did not breach any fiduciary duties, aid others in breaching their duties, did not participate in any fraudulent conveyances, did not deepen TCI's insolvency, nor did they act inequitably to warrant subordination of their claims.

The plaintiff challenges all of the assertions made by the defendants in these two summary judgment motions, and views the July 2002 transaction as a blatant attempt to remove a valuable asset from TCI and so be out of the reach of TCI's creditors.

First, the plaintiff proffers evidence that the value of the assets transferred was actually much higher than the $6 million plus paid. It refers to an expert report retroactively valuing the pipe production business assets in 2002 at more than $17 million. *See* Exs. P-127, 128. The plaintiff's expert rejects for a number of reasons the conclusions of TCI's 2002 appraisals that are relied upon heavily by the defendants.

*7 The plaintiff's expert maintains that the appraisers were not informed of all the tangible and intangible assets to be transferred. Ex. P-127, at 2. Moreover, the plaintiff's expert report asserts that TCI had developed a valuable technique in manufacturing its piping; one that TCI management believed would significantly increase the amount of oil and gas recoverable from older, existing wells.[FN5] This pipe production technique to be applied in down hole drilling was projected by TCI management to have significant value that was not considered by the two TCI appraisers.

> FN5. Plaintiff cites to Ex. P-121, a 2006 PolyFlow business plan document, for a detailed description of this new pipe production technique referred to as "Thermoflex."

The plaintiff's expert also opines that the pipe production assets were a self-contained business and should have been appraised on a going-concern, discounted future income approach, using 2002 in-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 7
Slip Copy, 2008 WL 682455 (Bkrtcy.E.D.Pa.)
**2008 WL 682455 (Bkrtcy.E.D.Pa.)**

come projections prepared by Mr. Wright. Ex. P-127, at 3-4. The two appraisals obtained by TCI in 2002 used a different methodology: the tangible assets were valued at replacement cost, Ex. P-55, at 9; the intangible assets (which the appraiser considered to be only the "unpatented technology," Ex. P-8 at 31), were valued as the present value of royalties that a third-party would pay to use this technology. Ex. P-56, at 3.[FN6]

> FN6. To the extent the plaintiff contends that use of replacement value was inappropriate, Mr. Desjardins may agree. Ex. P-4, at 81, 8-89.

Second, the plaintiff challenges the defendants' application of Pennsylvania's business judgment rule. *See generally Cuker v. Mikalauskas,* 692 A.2d 1042, 1046 (Pa.1997). Initially, the plaintiff contends that to the extent the individual directors' fiduciary duty was breached, the business judgment rule is inapplicable under state law. *See* 15 Pa.C.S.A. § 1715(a).

In addition, the plaintiff also maintains that the two directors who approved the PolyFlow transaction, defendants Gouin and Desjardins, were far from independent of the influence exerted by Mr. Dutil and the Canam defendants. In support thereof, the plaintiff observes that Mr. Gouin and Mr. Desjardins were being paid by Canam Steel and/or Finloc, Inc. and long had connection with Mr. Dutil and his companies, serving as employees and/or consultants. *See generally* Ex. 19 (Request for Admissions, # 24).[FN7] Moreover, from the disputed facts, the plaintiff may be able to prove at trial that Messrs. Gouin and Desjardins did not obtain knowledge of all material facts surrounding the PolyFlow transaction (*i.e.,* the value of the down-hole drilling technology) to warrant application of the business judgment rule. *See generally Keyser v. Commonwealth National Financial Corp.,* 675 F.Supp. 238, 261 (M.D.Pa.1987).

> FN7. REQUEST FOR ADMISSION NO. 24:

From August 10, 2001 and continuing through and including Mr. Miller's appointment as Trustee of TCI, the directors of TCI included only Dutil and individuals who were employed by or served as independent contractors to an entity who's [sic] voting shares were owned and controlled, directly or indirectly, by Dutil.

RESPONSE: Admitted.

Moreover, the plaintiff refers to evidence that there was no negotiation over the July 2002 purchase price, in that Mr. Wright was indirectly involved in the transaction as president of both TCI and Poly-Flow, and that TCI made no attempt to obtain competing bids. Thus, the inference is created that the sales price chosen was favorable to the targeted buyer, PolyFlow, and the transaction intended to defraud existing creditors.

Indeed, the plaintiff refers to documents to support his contention that the July 2002 transaction was structured solely to prevent the potentially valuable pipe production business from the reach of creditors of TCI, such as Dayco. In corroboration of his position, the plaintiff offers memos reflecting such concerns, including one from Bank of America, TCI's commercial lender. BOA's approval of the Poly-Flow sale was required, and was received. In December 2002, the lender prepared a "financial statement analysis" of its loan position which stated in part:

> *8 The Bank has approved the sale of certain fixed assets of Total Containment, Inc. to a related entity PolyFlow, Inc. TCI has recently developed a special type of pipe which can be used to reactivate presently defunct oil wells. TCI has decided to spinoff this facet of the business in order to shield it from potential liability arising from the Dayco lawsuit.

Ex. P-97, at 1-2 [FN8]; *see also* Ex. P-48.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

FN8. This information about TCI's new technology came to the Bank of America employees either from defendants Gouin or Wright. Ex. P-7, at 62-64. Other documents relied upon by the plaintiff in opposing summary judgment were prepared by TCI's former corporate counsel, advising that a transfer of assets to a newly formed corporate entity could, in certain circumstances, give rise to a fraudulent conveyance, breach of fiduciary duty and/or successor liability. *See, e.g.,* Ex. P-113 (memo dated July 10, 2001 from corporate counsel to Mr. Desjardins).

In addition, the plaintiff points to documents and transcripts revealing that the purported Winston Towers secured debt repaid by TCI, using a significant portion of the purchase price from PolyFlow, involved the back-dating of some loan documents. Exs. P-7, at 125-26; P-10, at 126-27; P-98. The plaintiff infers that this Winston loan was actually an equity contribution (but does not appear to challenge the legitimacy of the secured loan held by Finloc, Inc.).*See generally In re Submicron Systems Corp.,* 432 F.3d 448, 454-57 (3d Cir.2006) (analyzing when corporate debt should be recharacterized as equity).

Finally, the plaintiff emphasizes that at the time of the July 2002 transfer, TCI was disclosing in its corporate reports that its liabilities exceeded its assets. This was certainly true after the July 2002 transfers had concluded. Thus, TCI was either insolvent or made insolvent by these transfers.

In other words, if plaintiff's evidence were found credible, and giving him the benefit of all reasonable inferences, he may be able to prove at trial that some or all of the defendants acted in concert to transfer TCI's valuable pipe production assets into a newly formed corporation-at the same location, with the same personnel and dealing with the same customers-so that these assets would be outside the reach of TCI's creditors, such as Dayco. Thus, they created PolyFlow, an entity controlled by the Fin-loc/Canam companies and Mr. Dutil, TCI's so-called primary shareholder. Furthermore, they structured the transfer to minimize the cash paid to TCI and then paid out virtually all of those funds to related companies based upon partially challenged debt obligations owed to companies controlled by its primary shareholder. *See generally* In re *Trimble,* 479 F.2d 103 (3d Cir.1973). And all this occurred while TCI was insolvent or became insolvent.

The defendants strongly deny these challenges to the propriety of the July 2002 transactions. They may fairly argue that Pennsylvania state law permits shareholders to make loans to a corporation. *See generally In re Erie Drug Co.,* 416 Pa. 41, 43-44 (1964). Moreover, I recognize that a retroactive valuation made by plaintiff's expert based upon projections made by TCI's management of future piping sales may not be persuasive at trial. Clearly, however, there are credibility issues that cannot now be resolved in the context of summary judgment. Giving the non-moving plaintiff the benefit of all reasonable inferences, I now conclude that he may persuade a fact-finder that his interpretation of the motivations and conduct of the defendants is accurate. If so, he may prevail under his breach of fiduciary duty claim (with liability extended to those who knowingly and materially aided and abetted the fiduciaries).[FN9] He may also prevail on his fraudulent conveyance claim under state law, as incorporated by section 544.[FN10](In so doing, I have no present need to endorse his measure of damages.)

FN9. I shall not repeat my prior analyses of the state law standard for the establishment of fiduciary duties by corporate directors, officers and in certain instances, corporate shareholders; nor shall I repeat my earlier discussion of accomplice liability for such a breach of duty. *See generally Pierce v. Rosetta Corp.,* 1992 WL 165817, at *8 (E.D.Pa.1992). I do recognize that Pennsylvania's Supreme Court has not ex-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 9
Slip Copy, 2008 WL 682455 (Bkrtcy.E.D.Pa.)
**2008 WL 682455 (Bkrtcy.E.D.Pa.)**

pressly affirmed that a non-fiduciary may be liable for aiding and abetting a breach of fiduciary duty, and that some courts have predicted that such liability does not exist under state law. *See, e.g., In re Student Finance Corp.,* 335 B.R. 539, 551 (D.Del.2005).*Contra Adena, Inc. v. Cohn,* 162 F.Supp.2d 351 (E.D.Pa.2001).

FN10.Section 544 of the Bankruptcy Code allows the plaintiff to asset a claim using Pennsylvania's Uniform Fraudulent Transfer Act ("PUFTA"). This state law provides that a "transfer made or obligation incurred by a debtor is fraudulent as to a creditor ... if the debtor made the transfer: (1) with actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor was insolvent at the time of the transfer or became insolvent as a result of it."12 Pa. C. S.A. § 5104. The elements of a fraudulent transfer and the relief permitted are delineated in the statute.

**\*9** Therefore, defendants' joint requests for summary judgment as to Counts I and II shall be denied.[FN11]

FN11. Although not raised by any of the defendants, I have also considered whether the former trustee has standing to assert a breach of fiduciary duty claim if TCI was insolvent prior to the PolyFlow transaction. Questions of standing, if they exist, must be considered sua sponte, as they are akin to subject matter jurisdiction. *See, e.g., National Ass'n for Advancement of Multijurisdiction Practice v. Gonzales,* 211 Fed. Appx. 91, 94 n. 3 (3d Cir.2006); *In re Weaver,* 632 F.2d 461, 462 n. 6 (5th Cir.1980); *see generally FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215 (1990).

In order for a bankruptcy trustee to have standing to raise a claim of breach of fiduciary duty, it must be a claim that belonged to TCI's estate at the time it filed its bankruptcy petition. *See generally Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown,* Inc., 296 F.3d 164, 169 (3d Cir.2002). This requires that the claim not be specific to or held by individual creditors. *Id.,* at 170;*In re Educators Group Health Trust,* 25 F.3d 1281, 1284 (5th Cir.1994).

Pennsylvania common law imposes a fiduciary duty upon corporate officers in favor of creditors, as well as to the corporation, when the corporation is insolvent. *See, e.g., Heaney v. Riddle,* 343 Pa. 453, 456 (1942); *Voest-Alpine Trading USA v. Vantage Steel Corp.,* 919 F.2d 206, 209 & 217 n. 25 (3d Cir.1990); *Brown v. Presbyterian Ministers Fund,* 484 F.2d 998, 1005 (3d Cir.1973). It is accepted, however, that the trustee of the insolvent corporation has standing to bring an action under Pennsylvania law for breach of fiduciary duty when corporate assets are wrongfully dissipated. *See, e.g., Branch v. Kaiser,* 291 Pa. 543 (1928); *Brown v. Presbyterian Ministers Fund,* 484 F.2d at 1005;*In re Insulfoams, Inc.,* 184 B.R. 694, 703-04 (Bankr.W.D.Pa.1995), aff'd sub nom., *Donaldson v. Bernstein,* 104 F.3d 547, 554 n. 2 (3d Cir.1997); *see generally Pepper v. Litton,* 308 U.S. 295, 307 (1939):

While normally that fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee. For that standard of fiduciary obligation is designed for the protection

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

of the entire community of interests in the corporation-creditors as well as stockholders.

(footnotes omitted).

Thus, I conclude that the plaintiff has standing to raise his breach of fiduciary duty claim in Count I.

### B.

I reach a similar conclusion as to Counts VI and VII.

In Count VI, the plaintiff has raised the tort of "deepening insolvency" against certain defendants. Although this tort has not been accepted in all jurisdictions, *see, e.g., Trenwick America Litigation Trust v. Ernst & Young, L.L.P.,* 906 A.2d 168 Del. Ch.2006), *aff'd,* 931 A.2d 438 (Del.2007) (Table), the Third Circuit Court of Appeals has predicted that Pennsylvania's Supreme Court will recognize it. *Official Committee of Unsecured Creditors v. R .F. Lafferty & Co.,* 267 F.3d 340, 349 (3d Cir.2001) ( "[W]e conclude that, if faced with the issue, the Pennsylvania Supreme Court would determine that 'deepening insolvency' may give rise to a cognizable injury.").

The *Lafferty* court, in analyzing this state law tort, defines deepening insolvency as an injury resulting "from the fraudulent expansion of corporate debt and prolongation of corporate life."*Id.,* at 347.*See, e.g., In re CITX Corp., Inc.,* 2005 WL 1388963, at *10 (E.D.Pa.2005) ("[F]raudulent and concealed incurrence of debt can damage the value of corporate property by allowing an otherwise insolvent corporation to continue to incur debt, resulting in eventual bankruptcy."), *aff'd,*448 F.3d 672 (3d Cir.2006); *Corporate Aviation Concepts, Inc. v. Multi-Service Aviation Corp.,* 2004 WL 1900001, at *4 (E.D.Pa.2004) ("As articulated by the Third Circuit, deepening insolvency involves 'prolonging an insolvent corporation's life through [b]ad debt.'") (quoting *Lafferty* at 350);*In re Adelphia Communic-*

*ations Corp.,* 324 B.R. 492, 500 (Bankr.S.D.N.Y.2005) ("[T]o be held liable for deepening insolvency, a party must have been able to foresee that the debtor was being operated for an improper purpose."); In re *Global Service Group, LLC.* 316 B.R. 451, 456 (Bankr.S.D.N.Y.2004) (Deepening insolvency is defined as the " 'fraudulent prolongation of a corporation's life beyond insolvency,' resulting in damage to the corporation caused by increased debt.") (quoting *Schacht v. Brown,* 711 F.2d 1343, 1350 (7th Cir.1983)). Liability for this tort must be grounded upon fraudulent rather than negligent conduct. *In re CITX Corp., Inc.,* 448 F.3d 672, 681 (3d Cir.2006). Moreover, when an independent cause of action establishes a remedy for decrease in assets or lost profits, an additional recovery for deepening insolvency may not lie. *Id.,* at 678.

Here, the plaintiff identifies evidence he intends to offer at trial which, giving him the benefit of the doubt, could lead a fact-finder to conclude that TCI was not dissolved after the July 2002 transfers in order to reduce the possibility that TCI creditors (particularly Dayco) would investigate the Poly-Flow transaction and challenge it as fraudulent. Furthermore, although TCI was left as a going concern, it had no ability to pay its creditors-as no loans or capital infusion were forthcoming and its operating expenses exceeded revenues-and so its liabilities increased allegedly by roughly $2 million between July 2002 and March 2004 when a voluntary petition in bankruptcy was filed.

**\*10** The defendants seek summary judgment as to Count VI primarily relying upon the affirmative defense of *in pari delicto.*The Third Circuit court describes this doctrine as barring the plaintiff from asserting "a claim against a defendant if the plaintiff bears fault for the claim."*Lafferty,* 267 F.3d at 354;*see In re Dublin Securities, Inc.,* 133 F.3d 377, 380 (6th Cir.1997) ("[N]o Court will lend its aid to a man who founds his cause of action upon an immoral or illegal act.") (internal quotation marks omitted).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 11
Slip Copy, 2008 WL 682455 (Bkrtcy.E.D.Pa.)
**2008 WL 682455 (Bkrtcy.E.D.Pa.)**

The doctrine of *in pari delicto* will only apply as a defense to the deepening insolvency claim if the debtor corporation committed some wrongdoing. The wrongful conduct of the individual corporate officers and directors can be imputed to the corporation only if the conduct were committed (1) "in the course of [the officer or director's] employment, and (2) for the benefit of the corporation."*Lafferty* at 358-59.Thus, the wrongful conduct of a defendant will not be imputed to the corporation if the action was not for the benefit of the corporation. This "adverse interest exception" thus applies where actions taken were adverse to the corporation and not for its benefit.*Id.,* at 359;*In re the Personal and Business Insurance Agency,* 334 F.3d 239, 243 (3d Cir.2003).

As noted earlier, there are numerous disputed factual issues surrounding the July 2002 transactions. Although the defendants posit that these transfers were undertaken solely for the benefit of TCI, the plaintiff strongly disagrees. He refers to evidence he would offer at trial that, if believed, suggests that the July 2002 transfers were structured solely to benefit the defendants and were designed to harm the debtor corporation. If so proven, defendants' affirmative defense will be unavailing.

As for Count VII, equitable subordination under section 510(c) requires at least three elements:

> (1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the bankruptcy code.

*Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims,* 160 F.3d 982, 986-87 (3d Cir.1998). Furthermore, relief under section 510(c) should be tailored to offset the harm caused by the inequitable conduct. *In re Submicron Systems Corp.,* 432 F.3d at 462.

For reasons just stated, if the plaintiff's proffered evidence is credible and persuasive, he may be able to prove all of the elements for relief under section 510(c) as to some or all of the defendants who have asserted claims against TCI. The extent of that relief need not now be considered. Thus, summary judgment as to Counts VI and VII are not warranted.

### IV.

Counts IV and V concern litigation brought against TCI that was resolved long after July 2002.

*11 Shortly before TCI's bankruptcy filing, two default judgments were entered against it. One, for $4 million, was entered on March 1, 2004, in favor of Murphy Oil USA, Inc., as a discovery sanction due to TCI's failure to comply with court orders directing discovery responses. The other, for about $1.3 million, was entered on January 9, 2004, in favor of PISCES by OPW, Inc., and was entered after TCI voluntarily dismissed its litigation counsel and then did not engage new trial counsel, despite being afforded opportunity to do so.

The plaintiff asserts that the four director defendants were guilty of breach of fiduciary duty and negligence in permitting these two judgments to be entered. The individual defendants argue, in seeking summary judgment, that TCI had no funds with which to litigate these two lawsuits, as it is undisputed that TCI was losing money in 2003 and 2004, and purportedly had no ability to borrow funds from commercial lenders.[FN12]

> FN12. As TCI was borrowing from Bank of America based upon a guarantee provided by Canam Steel, it is unclear from this record whether-with Canam Steel's approval and guarantee-the bank would not have advanced additional funds to TCI in early 2004.

In opposing summary judgment, the plaintiff proposes to offer at trial evidence that TCI had avail-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                     Page 12
Slip Copy, 2008 WL 682455 (Bkrtcy.E.D.Pa.)
**2008 WL 682455 (Bkrtcy.E.D.Pa.)**

able funds with which to defend these two lawsuits. He emphasizes that in 2003 TCI advanced at least $450,000 to PolyFlow, and that PolyFlow owed TCI about $900,000 in total advances, plus $400,000 in outstanding receivables in March 2004. *See* Ex. P-10. Moreover, he intends to offer evidence from Mr. Wright that he was under instruction to delay all litigation either with the hope that the plaintiffs would settle cheaply, or that TCI would simply cease to operate leaving these two plaintiffs with no assets against which to execute.

Mr. Dutil justified TCI's conduct regarding Poly-Flow loans from TCI and the outstanding PolyFlow debt to TCI by noting that TCI was in default on its loan from Bank of America and was concerned that the commercial lender would execute upon funds held by TCI. He asserts that any TCI funds not forwarded or retained by PolyFlow would have involuntarily been used to repay the bank. Clearly, this raises a factual dispute regarding TCI's ability to fund the litigation, and whether TCI's directors intentionally or negligently wrongfully failed to act.

However, TCI was only damaged to the extent litigation would likely have resulted in liability less than the amount of the default judgments, offset by the estimated costs of litigation to TCI. *See generally Honeywell, Inc. v. American Standards Testing Bureau, Inc.,* 851 F.2d 652, 655 (3d Cir.1988), *cert. denied,*488 U.S. 1010 (1989).

In support of his claim involving the Murphy Oil judgment, the plaintiff intends to offer at trial evidence that Murphy Oil would have settled its lawsuit for $120,000. Exs. P-9, at 18-25; P-16, at 49-50. The plaintiff intends to offer no expert testimony or other evidence concerning the value of this litigation claim against TCI. The defendants counter that Murphy Oil's trial counsel denies ever making such a settlement offer. Ex. P-9 at 38-40. They expect to prove that Mr. Wright's belief that such an offer was made was erroneous, as he was not present during settlement discussions. *See* Ex. P19 (Admission, ¶ 59).

*12 Insofar as Counts IV and V involve the Murphy Oil claim, I will deny summary judgment, but limit the disputed evidence offered at trial to whether Murphy Oil made a settlement offer that was wrongfully rejected by TCI's board of directors, acting through one or more of its members. In opposition to summary judgment, the plaintiff offers no evidence on the merits of the underlying litigation and the standard of care. *See, e.g., Gans v. Mundy,* 762 F.2d 338 (3d Cir.), *cert. denied,*474 U.S. 1010 (1985); *see also Honeywell, Inc. v. American Standards Testing Bureau, Inc .* He only refers to evidence that, if credible, may prove the wrongful rejection of a purported settlement offer. *See Schmidt v.. Currie,* 217 Fed. Appx. 153, 155 (3d Cir.2007). The plaintiff, however, refers to no evidence that he would proffer at trial to demonstrate that TCI suffered any damages from the PISCES default judgment, other than a conclusory statement by Mr. Wright that he considered PISCES' claim-which was based upon a contract, *viz.,* a breach of a settlement agreement-as without merit. Ex. P-16, at 92. This lay conclusion by itself would be insufficient to meet the plaintiff's burden at trial. *See Honeywell, Inc. v. American Standards Testing Bureau, Inc.; Gans v. Mundy.*Therefore, summary judgment in favor of the individual defendants as concerns PISCES and Counts IV and V is justified.

An appropriate order shall be entered.

### ORDER

AND NOW, this 5th day of March 2008, for the reasons stated in the accompanying memorandum, it is hereby ordered that the motions for summary judgment filed by the defendants (as to all counts in the amended complaint except Count III) is denied in large part. Summary judgment in favor of the individual defendants is granted as to Counts IV and V but only as those counts involve the PISCES default judgment.

It is further ordered that on or before April 4, 2008,

Slip Copy                                                                                      Page 13
Slip Copy, 2008 WL 682455 (Bkrtcy.E.D.Pa.)
**2008 WL 682455 (Bkrtcy.E.D.Pa.)**

the parties shall submit a joint pretrial statement
consistent with Local Bankr.R. 7016-1. A final pre-
trial conference shall take place on April 11, 2008
at 9:30 a.m in Bankruptcy Courtroom # 2, at which
time the trial dates shall be announced.

Bkrtcy.E.D.Pa.,2008.
In re Total Containment, Inc.
Slip Copy, 2008 WL 682455 (Bkrtcy.E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 8

LEXSEE 2003 US DIST LEXIS 17236

**THOMAS ZITO, et al., Plaintiffs, -v- LEASECOMM CORPORATION, MICROFINANCIAL INCORPORATED CARDSERVICE INTERNATIONAL, INC., E-COMMERCE EXCHANGE, INC., ON-LINE EXCHANGE, RICHARD KARN WILSON, a/k/a RICHARD KARN, PATRICK RETTEW, PETER R. VON BLEYLEBEN, RICHARD F. LATOUR, CAROL SALVO, PAUL SCHNEIDER, and MEDTRAK CORPORATION, Defendants.**

**02 Civ. 8074 (GEL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 17236*

**September 30, 2003, Decided
September 30, 2003, Filed**

**SUBSEQUENT HISTORY:** Dismissed by, in part, Motion granted by, in part, Motion denied by, in part *Zito v. Leasecomm Corp., 2004 U.S. Dist. LEXIS 19778 (S.D.N.Y., Sept. 30, 2004)*

**DISPOSITION:**    [*1] Plaintiff's motion for leave to amend complaint granted.

**COUNSEL:** John C. Klotz, New York, NY, for Plaintiffs Thomas Zito et al.

Andrew P. Fishkin, Edwards & Angell, LLP, New York, NY, for defendants Leasecomm Corp., Microfinancial, Inc., Peter von Bleyleben, Richard Latour, and Carol Salvo.

Steven M. Bierman, Sidley Austin Brown & Wood LLP, New York, NY, for defendant Cardservice International, Inc.

Kenneth J. King, Patterson Belknap Webb & Tyler LLP, New York, NY, for defendant E-Commerce Exchange, Inc.

James A. Saville, Jr., Hill Rivkins & Hayden LLP, New York, NY, for defendants On-Line Exchange and Paul Schneider.

Andrea J. Pollack, Quinn Emanuel Urquhart Oliver &

Hedges, LLP, New York, NY, for defendant Richard Karn Wilson.

**JUDGES:** GERARD E. LYNCH, United States District Judge.

**OPINION BY:** GERARD E. LYNCH

**OPINION**

OPINION AND ORDER

    GERARD E. LYNCH, District Judge:

    In this civil RICO action, 167 plaintiffs sue Leasecomm Corporation and its parent Microfinancial Inc. ("MFI/Leasecomm"), three of its officers (Peter R. von Bleyleben, Richard F. Latour, and Carol Salvo) (the "MFI Officers"), three of its alleged "dealers and vendors" (Compl. P 39) (Cardservice International, [*2] E-Commerce Exchange, and Online Exchange), and several shareholders of those or other dealers (Patrick Rettew and Richard Karn Wilson, shareholders of non-defendant Themeware, Inc.; Medtrak Corporation, a shareholder of defendant On-Line Exchange; and Paul Schneider, the principal shareholder of Medtrak), for damages arising from alleged fraudulent schemes involving the leasing of e-commerce services and products. All defendants except Rettew and Medtrak

2003 U.S. Dist. LEXIS 17236, *2

(who have not responded to the complaint) have moved to dismiss. Plaintiffs, in addition to opposing those motions, have asked leave to amend their complaint to correct any deficiencies and to name as an additional defendant Chuck Burtzloff, former president of defendant Cardservice International.

BACKGROUND

The following facts are taken from the Complaint, the allegations of which must be assumed true for purposes of these motions to dismiss. Prior to 1999, MFI/Leasecomm was engaged in the business of leasing or financing the purchase of "tangible business machine products including credit card validators." (Compl. P 46.) Those products were actually marketed by other entities, including defendant Cardservice International ("Cardservice"). [*3] (Id.) In 1999, MFI began a program in which it leased intangible e-commerce services, "such as access to web sites, 'virtual web sites' and future services." (Id. P 48.) These products were marketed by, among others, defendants E-Commerce Exchange ("ECX"), Cardservice, and Online Exchange ("OX"), and by non-defendant Themeware. (Id. P 49.) MFI/Leasecomm entered into "strategic alliances" with these entities, which plaintiffs refer to as MFI/Leasecomm's "dealers." (Id. PP 41-44.)

The complaint focuses on two kinds of conduct by the defendants. The first is the deceptive marketing practices of the MFI/Leasecomm dealers, who plaintiffs allege used deceptive advertising and unfair "bait and switch" tactics to corral vulnerable customers into leasing their overpriced and ineffective products. The dealers, however, did not themselves execute lease agreements with the customers; rather, the dealers, by prior arrangement with MFI/Leasecomm, had the customers sign a form lease provided by MFI/Leasecomm, which MFI/Leasecomm later executed. The second type of conduct is the aggressive, and allegedly fraudulent and extortionate, enforcement tactics subsequently used by MFI/Leasecomm [*4] against defaulting lessees - tactics enabled in part by the leases' allegedly one-sided, unconscionable terms. The complaint alleges that the dealers and MFI/Leasecomm constituted a single "enterprise" by virtue of an arrangement between the dealers and MFI/Leasecomm under which the dealers immediately received a one-time payment of between 40 and 60% of the face value of the leases from MFI/Leasecomm through an automated "no human

intervention" process. (Id. PP 54, 56.)

I. Marketing Practices of the Dealers

Plaintiffs' allegations of deceptive and unfair marketing practices involve two separate marketing campaigns, each perpetrated by a different set of dealers. The first campaign was conducted by non-defendant Themeware, whose shareholders include defendants Richard Karn Wilson (generally referred to in the complaint, and therefore in this Opinion, as "Karn") and Patrick Rettew. (Compl. PP 22-23.) Karn is also described as Themeware's "principal spokesman." (Id. P 22.) The second campaign involved dealer defendants OX and ECX, as well as OX's principal shareholder Medtrak. The Complaint alleges that these campaigns were not only intrinsically fraudulent for the [*5] reasons described below, but that each also constituted an offer of a franchise under applicable state and federal laws, and was unlawful because the dealer failed to make required disclosures pursuant to those laws.

A. The iPage Builder Scheme: Themeware, Cardservice, and the "Karn Infomercial"

In 1997, Themeware began marketing, through a television "infomercial" hosted by Karn, a "bundle of products called the Internet Tool Box," at a price of $ 49.95. (Compl. PP 68-71, 77(f).) The infomercial referred to the product as the "Internet Business Tool Box," and led the viewer "to believe that [it] contained software and services worth as much as $ 800" which would "give them the facility to accept credit cards on their web pages" and enable them to "make money on the Internet immediately." (Id. PP 77, 78(b).) It promised a "30-day money back guarantee." (Id.) The Tool Box actually consisted of items "many of [which] were readily available for no or nominal charge." (Id. P 77(c).) It did not permit purchasers to accept credit cards on their web pages without purchasing additional services from Cardservice "at a cost of many thousands of dollars." (Id. P 77(f). [*6] ) Furthermore, the internet connection provided as part of the Tool Box software "specifically stated it was for non-commercial use[]." (Id. P 77(h).)

In 1999, Themeware developed "iPage Builder," a "high-priced" product that "linked together services of many providers" and would enable customers to "sell products for various providers" through web pages controlled by Themeware and maintained using Themeware's "software and procedures." (Id. PP 72,

2003 U.S. Dist. LEXIS 17236, *6

78(c)-(h).) To market this set of services, Themeware broadcast the Karn infomercial, which made no mention of iPage Builder, as "bait," pressuring callers who expressed interest by calling its toll-free number into purchasing iPage Builder instead of the Internet Tool Box. (Id. PP 74, 77(e), (i).) The iPage Builder services themselves were defective in certain ways; more importantly, iPage Builder was much more expensive and "was financed by a 'non-cancellable lease' purchased through" MFI/Leasecomm. (Id. P 77(d), (g).)

B. The "Merchant Account" Scheme: ECX, OX, and Medtrak

Plaintiffs make a much more confusing series of allegations about a marketing scheme conducted by ECX, OX (which is controlled by Medtrak), and [*7] non-defendant National Entrepreneur Support Association ("NESA"). The scheme involved selling exclusive-territory distributorships or "merchant accounts" for unspecified products. The complaint describes the products in one place as ECX's products (Compl. P 88) and at another as OX's (id. P 90). The merchant accounts were sold using an allegedly "unfair and deceptive" videotape of a seminar sponsored by NESA; the complaint variously describes that video as the "ECX Video" (id. P 92), the "NESA video" (id. P 92(d)), and the "Online [OX] video" (id. P 92(m)). Attendance at the seminar itself was promoted by a direct-mail campaign. The seminar was allegedly deceptive in that it promised that distributors could, with minimal time commitment, skills, or risk, earn a "positive cash flow" (id. P 92(b)) and revenues in the "hundreds of thousands [of] dollars" (id. P 92(c).) It promised that OX would "conduct an extensive infomercial campaigns [sic]" for the products and that participants would receive "extensive training." (Id. P 92(1), (m).) The investment necessary was "either $ 1450 ... or 89.95 a month for four years." (Id. P 92(e).) These payments [*8] were to be made to Leasecomm, under the same form lease that was used in the iPage Builder scheme.

II. The Leasecomm Leases

When individuals signed up for either the Themeware or the ECX/OX program, they were asked to sign a form lease from Leasecomm. The lease is headed "Non Cancellable Lease Agreement" and states, in bold capitals, that "NEITHER SUPPLIER NOR ANY SALESPERSON IS AN AGENT OF LESSOR NOR ARE THEY AUTHORIZED TO WAIVE OR ALTER

THE TERMS OF THIS LEASE." (Compl. Ex. D.) Yet the dealer defendants, according to the complaint, told customers that "the contracts were cancellable." (Id. P 127(i).) The complaint alleges that the dealer defendants pressured plaintiffs to sign the leases using illusory inducements such as "waiver of usual fees and rebate coupons for the usual fees." (Id. P 112 & Ex. E.)

The lease includes a space for filling in the lessee's bank account information to permit automatic withdrawals. (Id. Ex. F.) In smaller type, the lease permits Leasecomm not only to automatically debit the lease charges, but also to charge an additional $ 5.00 per month if it becomes "necessary to switch to statement billing due to insufficient funds," to continue [*9] the lease on a month-to-month basis if the lessee fails to notify Leasecomm sixty days prior to its expiration that he or she opts to terminate the lease, to charge a late fee of fifteen percent of any amount past due, and to charge collection costs (including charges for collection letters and phone calls, and for locating lessee's other assets). The lease states that "lessee fully recognizes [Leasecomm's] right to enforce the lease free from any defenses, offsets counterclaims [sic]," that lessee has not received any express or implied warranties for the products leased and has "unconditionally waived any claims ... against Leasecomm." It also provides for "the exclusive jurisdiction of the Courts of ... Massachusetts" and waives "any objection to venue" there. Plaintiffs allege improprieties in the execution of the leases, including forging of some lessees' signatures, the use of "witnesses" who did not in fact witness lessees' signatures, failure to fill out essential terms of the lease, and failure to provide copies of leases to lessees. (Id. PP 127.)

Finally, plaintiffs allege that Leasecomm used extortionate means to collect on the leases, such as

insulting, [*10] harassing and intentionally harmful rhetoric including disparaging personal remarks, embarrassing messages left with third parties about sending debtors to jail, taunting debtors about their credit and threatening to destroy their credit unless payment was made without objection for each and every charge.

(Id. P148.) They allege that Leasecomm made

unauthorized withdrawals from plaintiffs' bank accounts and that Leasecomm inflated its charges by (1) making "frequent, duplicative contacts" such as multiple collection calls on the same day, and then "charging for each contact" (id. P 151), and (2) presenting bad checks for payment multiple times on the same day (id. P 152 & Ex. G). Plaintiffs also allege that Leasecomm "obtained thousands of default judgements [sic] in Massachusetts and ... sought enforcement of the same" while "concealing from the court the nature of the contract between Leasecomm and the debtors." (Id. P 155.)

DISCUSSION

I. Legal Standards

A. Dismissal under *Rule 12(b)(6)*

On a motion to dismiss under *Fed. R. Civ. P. 12(b)(6)*, the Court must accept "as true the facts alleged in the [*11] complaint," *Jackson Nat'l Life Ins. Co. v. Merrill, Lynch & Co., 32 F.3d 697, 699-700 (2d Cir. 1994)*, and may grant the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Thomas v. City of New York, 143 F.3d 31, 36 (2d Cir. 1998)* (citations omitted); see also *Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996)* (when adjudicating motion to dismiss under *Fed. R. Civ. P. 12(b)(6)*, the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims" (internal quotation marks and citations omitted)). When deciding a motion to dismiss pursuant to *Rule 12(b)(6)*, the Court may consider documents attached to the complaint as exhibits or incorporated in it by reference. *Brass v. American Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)*. All reasonable inferences are to be drawn in the plaintiff's favor, which often makes it "difficult to resolve [certain questions] as a matter of law." *In re Independent Energy Holdings PLC, 154 F. Supp. 2d 741, 747 (S.D.N.Y. 2001)*. [*12]

B. Civil RICO

Plaintiff's RICO claim, the only federal claim and therefore the basis of federal jurisdiction for the case, is based on *18 U.S.C. § 1962(c)*, which makes it unlawful for "any person employed by or associated with any [interstate] enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," and *18 U.S.C.*

*§ 1962(d)*, which penalizes conspiracy to violate, inter alia, *§ 1962(c)*.

Thus, in order to state a substantive cause of action under RICO, the plaintiff must allege that a defendant engaged in "(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity" (5) resulting in (6) injury to business or property. *Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 89 (2d Cir. 1999)*, quoting *Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 87 L. Ed. 2d 346, 105 S. Ct. 3275 (1985)*.

A RICO "enterprise" can be "any individual, partnership, corporation, association, or other legal entity, [or] any union or group of individuals associated in fact although not a legal [*13] entity." *18 U.S.C. § 1961(4)*. The enterprise cannot, however, be the very defendant that is itself charged with being the "person ... associated with" and "participating in the conduct of" the enterprise; that is, the enterprise must be distinct from each of the "persons" conducting it. *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F.3d 339, 343-44 (2d Cir. 1994)*. Here, plaintiffs allege an "association in fact" consisting of Themeware, Cardservice, OX, ECX, and MFI/Leasecomm. (Compl. P 51.) They also allege, in passing, that "Leasecomm was itself an enterprise conducted by MFI and its defendants Bleyleben, Latour, and Salvo, all officers and shareholders of MFI." (Id. P 52.)

The "pattern of racketeering activity" must consist of at least two "predicate acts" of racketeering activity within ten years, *§ 1961(5)*, where the "acts" are certain violations of state or federal law as set forth in *§ 1961(1)*. Plaintiffs here allege predicate acts consisting of wire fraud, *18 U.S.C. § 1343*, mail fraud, *18 U.S.C. § 1341*, and violations of the Hobbs Act, *18 U.S.C. § 1951*. [*14] (Compl. PP 171-182.)

Courts in this district, in agreement with the holdings of several Courts of Appeals, have carefully scrutinized civil RICO claims at the dismissal stage, since the statute was "enacted expressly, as set forth in the preamble to the Act, 'to seek the eradication of organized crime in the United States'" and therefore "mere assertion of a RICO claim ... has an almost inevitable stigmatizing effect on those named as defendants." *Katzman v. Victoria's Secret Catalogue, 167 F.R.D. 649, 654-55 (S.D.N.Y. 1996)* (quoting *Figueroa Ruiz v. Alegria, 896 F.2d 645, 650 (1st Cir.1990))*; see also *Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998)* (citing Katzman and

2003 U.S. Dist. LEXIS 17236, *14

dismissing RICO claims); *Goldfine v. Sichenzia, 118 F. Supp. 2d 392, 397 (S.D.N.Y. 2000)* (stating that "this Court looks with particular scrutiny at Civil RICO claims to ensure that the Statute is used for the purposes intended by Congress" and dismissing RICO claim).

II. Plaintiffs' RICO Claims

RICO is a complex statute, whose defining elements consist of abstract conceptions (the "enterprise" and the "pattern of racketeering" [*15] activity) that must exist in specified, also highly abstract relationships. (In *§ 1962(c)*, for example, the enterprise must be "conduct[ed] ... through" a pattern of racketeering.) This abstract and complex structure permits the use of the statute to combat a wide variety of substantive criminal activities, from official corruption to business fraud to terrorist acts, but also renders it difficult for plaintiffs to plead the elements of a cause of action with clarity and concision.

Like many civil RICO complaints, the complaint here recites a large number of facts about the business practices of MFI/Leasecomm, its dealers, and certain individuals who are involved with them, and then draws the general conclusion that these facts constitute violations of RICO. Curiously, although federal prosecutors have over the years developed pleading conventions that facilitate the presentation of RICO violations in a coherent way, civil RICO plaintiffs rarely make use of criminal RICO indictments as models, and instead persist in presenting confusing pleadings that make it extremely difficult to identify which defendants are charged with committing which predicate acts, or how the alleged pattern [*16] of racketeering is related to the enterprise.

Given the notice pleading standards of the Federal Rules of Civil Procedure, even as supplemented by the requirement that fraud be pleaded with particularity, the lack of clarity in plaintiffs' pleading will not necessarily defeat their claims. To the extent the Court can identify the elements of a RICO violation, the complaint will be held to state a claim on which relief can be granted. But the broad-brush, imprecise approach to pleading exemplified by this complaint challenges the defendants' ability to understand what they are being sued for, the Court's ability to understand the plaintiffs' theories, and the plaintiffs' ability to survive judicial scrutiny that may misperceive the plaintiffs' true intentions. In formulating any amended complaint, plaintiffs are encouraged to spell out more clearly the nature of the enterprise alleged, the

specific predicate acts that constitute the pattern of racketeering, and the persons who are alleged to have committed each of those predicate acts.

A. The Alleged RICO Enterprises

As noted above, plaintiffs appear to allege two different RICO enterprises: one an "association in fact" consisting [*17] of MFI/Leasecomm and four of its dealers (Compl. P 51), [1] the other consisting only of Leasecomm itself (id. P 52). The latter theory can support only a portion of the superstructure of the complaint. As a corporation, Leasecomm may constitute an enterprise as defined in *§ 1961(4)*. On such a theory, however, neither Leasecomm nor MFI can be defendants charged with conducting the enterprise, for Leasecomm cannot itself be both the enterprise and a defendant charged with operating the enterprise, and a corporation and its wholly-owned subsidiary are not "distinct" for the purposes of RICO when they are acting "within the scope of a single corporate structure, guided by a single corporate consciousness." *Discon, Inc. v. NYNEX Corp., 93 F.3d 1055, 1063-64 (2d Cir. 1996).* [2]

[1] Although the defendants correctly point out that plaintiffs' careless terminology at several places in the complaint creates potential confusion about exactly which persons or entities plaintiffs seek to include in the enterprise (Leasecomm/MFI Mem. 4-5), P 51 is the only place in the complaint that purports to define an "association-in-fact" enterprise, and is clearly intended by plaintiffs as the authoritative definition of the larger enterprise being alleged.

[*18]

[2] Nor can the enterprise allegation be saved by defining it as an association in fact of Leasecomm and its employees, since "where employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation" and the enterprise element is not satisfied. *Riverwoods Chappaqua,'30 F.3d at 343-44.*

The dealer defendants and their officers are not alleged to have participated in the conduct of Leasecomm itself. Accordingly, the only defendants who can be sued for conducting the enterprise consisting of Leasecomm

Case 1:08-cv-00876-RMB-THK    Document 127-3    Filed 07/29/2008    Page 30 of 50

Page 6
2003 U.S. Dist. LEXIS 17236, *18

itself are its officers, von Bleyleben, Latour and Salvo. As will be further discussed below, the allegations of conduct by these individuals themselves are both sparse and vague, and the complaint extensively details actions committed by other defendants who are alleged to be part of the broader "association in fact" enterprise, which are apparently intended to constitute aspects of "patterns of [*19] racketeering activity," through which those defendants are alleged to have conducted the alleged enterprise. It is therefore dopubtgul that the plaintiffs intend to rely on the narrower theory that these three individual defendants conducted the affairs of Leasecomm itself in a manner that violates RICO.

In light of this ambiguity, and because the plaintiffs' memorandum of law focuses primarily on the broader enterprise, the enterprise alleged here will be analyzed only as an "association in fact" enterprise consisting of MFI/Leasecomm and its dealers Themeware, Cardservice, OX and ECX. Since the plaintiffs seek permission to amend their complaint, and, as noted below, will have to do so in order to state a claim against most of the defendants, it would be desirable for them to clarify the nature of the enterprise they intend to plead. For the present, however, the Court must address whether the alleged broader enterprise constitutes a viable RICO enterprise.

Courts have struggled with the potentially amorphous concept of the "association in fact." On the one hand, criminal organizations are not noted for their compliance with the niceties of corporate form; in enacting RICO, Congress [*20] clearly intended to address the conduct of loose associations of persons who conduct their criminal business outside the formal structures of corporations, partnerships or other legal entities. On the other hand, courts have been careful to prevent plaintiffs or prosecutors from using RICO to "string together all of the defendants and label[] them an association-in-fact enterprise." *Nasik Breeding & Research Farm Ltd. v. Merck & Co., 165 F. Supp. 2d 514, 539 (S.D.N.Y. 2001).* The Supreme Court identified the hallmarks of an association-in-fact enterprise in *United States v. Turkette, 452 U.S. 576, 69 L. Ed. 2d 246, 101 S. Ct. 2524 (1981),* noting that to constitute a RICO enterprise, a group of malefactors must be "associated together for a common purpose of engaging in a course of conduct," and must show "evidence of an ongoing organization, formal or informal, and ... evidence that the various associates functioned as a continuing unit." *Id. at*

583.

Whether a group of individuals or corporations exhibit such organization and common purpose is ordinarily a question of fact. At the same time, a complaint must allege facts that permit [*21] an inference that such an association exists. Defendants variously argue that the facts alleged in the complaint "do not support any hierarchy or organization required for an enterprise, but rather disclose *separate and distinct* 'e commerce businesses' ... entirely lacking continuity in personnel, structure, or 'common purpose" (Cardservice Mem. 10), or that the complaint "simply alleges that a number of different corporations engaged in different activities, sometimes together and sometimes apart, over a finite period of time" (Leasecomm/MFI Mem. 7). These objections are not well taken.

Plaintiffs clearly allege that although MFI/Leasecomm ostensibly does nothing more than provide financing for the various vendors of goods and services who are its customers, in reality it operates an integrated enterprise in which, through "strategic alliances" (Compl. P 43) with vendors that it has carefully vetted and selected (id. P 40), the vendors utilize "heavy-handed, high-powered mass marketing" of dubious and misrepresented services to induce consumers to enter leases that are then instantly and automatically transferred to MFI/Leasecomm (id. PP 53-55). Plaintiff effectively [*22] claim that this system - allegedly touted by von Bleyleben and Latour as "unique and apart from the normal standards of the leasing and credit industry" (id. P53) - was designed to create a steady flow of lease income to MFI/Leasecomm by putting the vendors out front to engage in fraudulent marketing, while allowing Leasecomm to collect the profits free of recourse by defrauded customers, as an ostensibly independent financing institution that operated merely as the assignee of the leases. Fairly read, the complaint alleges that MFI/Leasecomm's primary customers were marketers of dubious products by fraudulent means, and that the supposedly independent businesses defendants reference in their argument functioned as an integrated system for fleecing the unwary. Of course, it remains to be seen whether plaintiffs can prove this claim. But at this stage of the case, it cannot be said that plaintiffs have failed to allege that the enterprise exists.

Two other arguments must be addressed. First, it can be argued that the facts alleged in the complaint suggest

two separate enterprises, one linking MFI/Leasecomm to Cardservice and Themeware, the other tying MFI/Leasecomm to ECX, OX, [*23] and Medtrak. In their initial description of the "MFI/Leasecomm Enterprise," plaintiffs allege that Themeware, ECX, Cardservice and OX "all functioned as dealers for Leasecomm in obtaining customers" such as plaintiffs. (Compl. P 39.) With these four dealers, MFI/Leasecomm "entered into special relationships ... which it called 'strategic alliances.'" (Id. P 43.) This could be read to suggest separate "associations in fact" between MFI/Leasecomm and each of the dealers, or at least two distinct enterprises, one devoted to the Themeware scheme and another involved in the ECX/OX scheme, in what is called in the conspiracy case law a hub-and-spokes structure. See, e.g., *Kotteakos v. United States, 328 U.S. 750, 90 L. Ed. 1557, 66 S. Ct. 1239 (1946).* [3] As ECX argues, the complaint thus alleges "two separate fraudulent schemes ... neither of which involves all of the entities alleged ... to be part of the enterprise." (ECX Mem. 12-13.)

    3    There are only two references in that description to any direct connection among the four dealers: a statement that they "cooperated with each other in conducting trade shows, infomercials and web page advertisements" (Compl. P 49), and a statement that Cardservice and ECX (in its former incarnation as Card Service Laguna), were, at least in 1997 and 1998, "affiliates." (Id. P 47.) The former statement is unspecific, and the latter assertion is irrelevant, inasmuch as Card Service Laguna was a different predecessor corporation distinct from ECX, organized under the laws of a different state, and is not alleged to have played any role in the RICO enterprise. (Compl. PP 18-19.) The alleged "cooperat[ion]" among the "strategic partners" appears to refer to cooperation within, but not between, the two distinct marketing campaigns described later in the complaint: On the one hand, Themeware's development and marketing "in cooperation with Cardservice and Leasecomm" of the "Internet Tool Box" and iPage Builder products (id. PP 72, 75), and on the other hand ECX's and OX's involvement in the marketing of "merchant accounts" using a videotaped seminar (id. PP 88-96).

[*24] It does not follow, however, that the plaintiffs

have failed to allege an enterprise under RICO. It is commonplace in RICO enterprises for the members of the enterprise to engage in separate schemes or conspiracies, not all of which involve all of the participants in the enterprise. See, e.g., *United States v. Mauro, 80 F.3d 73, 77 (2d Cir. 1996); United States v. Coonan, 938 F.2d 1553, 1560-61 (2d Cir. 1991).* As described above, plaintiffs' complaint alleges that MFI/Leasecomm operated an organized and integrated scheme by which it would recruit companies making similar sorts of fraudulent pitches for different products, who in turn would induce customers to enter leases with MFI/Leasecomm that would then be aggressively enforced by it despite the customers' anticipated dissatisfaction with the products and services provided. Whether plaintiffs can prove that this enterprise really existed, that is, that it had a sufficiently coherent hierarchy, organization or structure to demonstrate that it had a genuine existence as an association, rather than being simply a series of opportune ad hoc agreements between MFI/Leasecomm and other independent companies, [*25] must await discovery and trial. But the complaint alleges a single enterprise, even if, as is commonly the case in such criminal associations, every participant was not involved in or even specifically aware of the activities of the other participants.

Second, various defendants argue that "the enterprise's lifespan [as alleged in the complaint] was not long enough to fall within the purview of RICO." (MFI/Leasecomm Mem. at 7-8.) The only authority cited for this proposition is *Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 351 (S.D.N.Y. 1998).* But that authority is unpersuasive, since (1) as a decision of a parallel court, *Schmidt* does not bind this Court; (2) the discussion cited by defendants was effectively labeled as dictum by the Schmidt court itself, see id. (noting that "the continuity issue is not dispositive here"); and (3) the question of "continuity" is properly an attribute of the pattern of racketeering, and not of the enterprise.

B. Predicate Acts

After a series of allegations describing the alleged enterprise (Compl. PP 34-52), the complaint proceeds to describe a variety of alleged "deceptive practices" of the enterprise (id. PP [*26] 59-155) and alleged "financial manipulation" by MFI (id. PP 156-170). The complaint then proceeds to allege, in conclusory terms, a number of alleged predicate acts of mail fraud, wire fraud, and

extortion (id. PP 171-182). The somewhat chaotic organization of the complaint makes it difficult or impossible to understand what predicate acts are alleged to have been committed by which defendants, or even clearly to understand what the predicate acts are.

The principal predicate acts relied upon by plaintiffs are acts of mail and wire fraud. In order to allege a violation of the mail or wire fraud statutes, a plaintiff must allege the elements of the offense: "(i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires." *United States v. Autuori, 212 F.3d 105, 115 (2d Cir. 2000).* A scheme to defraud "has been described as a plan to deprive a person of something of value by trick, deceit, chicane or overreaching." *Id.,* quoting *McNally v. United States, 483 U.S. 350, 358, 97 L. Ed. 2d 292, 107 S. Ct. 2875 (1987),* and *Hammerschmidt v. United States, 265 U.S. 182, 188, 68 L. Ed. 968, 44 S. Ct. 511 (1924)* [*27] (internal quotation marks omitted).

Plaintiffs' complaint contains allegations that appear to suggest that the defendants schemed to defraud the customers of the dealers by misrepresenting the nature of the products and services being offered. The complaint, however, describes so many diverse and overlapping schemes and activities of the various defendants that it is often impossible to identify which of these activities are attributed to whom, and which are alleged to constitute the scheme or schemes to defraud in furtherance of which the mails are alleged to have been used. For example, Leasecomm is alleged to have offered "unconscionable" contracts of adhesion that "included in fine print information and clauses required to be conspicuous" (Compl. PP 97-101), and that contained provisions "disadvantageous to plaintiffs" (id. P 102). It is unclear, however, whether and how these one-sided contract terms are alleged to have constituted misrepresentation or fraud; merely proposing an unconscionable contract term is not a crime. Similarly, the RICO portion of the complaint contains lengthy allegations of violations of state civil consumer protection laws (id. PP 59-67), which [*28] do not constitute RICO predicates, and still other paragraphs (id. PP 78-87) alleging that certain of the leased services constituted franchises, a concept irrelevant to RICO though relevant to some of the plaintiffs' other claims. In addition, von Bleyleben and Latour are alleged to have engaged in "pumping" the stock price of MFI (id. PP 161-170); it is unclear to what extent if any this activity is alleged to constitute a part of

any scheme to defraud the plaintiffs. Nowhere is there a clear statement of the fraudulent schemes any particular defendant is alleged to have participated in on behalf of the enterprise, and used the mails or wires to further.

This confusing morass of schemes and plots is then followed by a series of alleged mailings and wire transmissions. (Compl. PP 171-180.) The complaint does not specify which if any of the various schemes to defraud arguably described in the preceding portions of the complaint these mailings and wire transmissions were intended to further. For example, it can be inferred that plaintiffs intend to allege that the wire transmission of the Karn infomercial was in furtherance of a scheme to defraud purchasers of the "Internet [*29] Tool Box" described in paragraphs 68 through 77, though this is not expressly stated. At any rate, the infomercial would appear to have nothing to do with the various other schemes set forth in the complaint. The mailing' and return of contracts and account statements, and the making of dunning phone calls, could be construed as having been intended to further any of several of the schemes. However, no connection between any particular scheme and these alleged mailings and wire communications is stated.

Moreover, the complaint largely fails to identify which defendants engaged in any of these alleged predicate acts. This is a critical omission. RICO makes it a crime for a "person" associated with an enterprise to conduct the enterprise through a pattern of racketeering. In other words, it is not the *enterprise* in general that must engage in the pattern of racketeering, but each defendant who must somehow participate in the conduct the enterprise by means of a pattern of racketeering acts. Thus, to state a cause of action against any particular defendant, a complaint under *§ 1962(c)* must charge each named defendant with engaging in specific racketeering acts, constituting a pattern [*30] within the meaning of the statute, committed by that defendant in the course of conducting the affairs of the enterprise. Alleging, as this complaint does, that a variety of defendants engaged in a variety of different schemes, and that somebody used the mails or wires in furtherance of at least some of those schemes, does not adequately charge particular defendants with violating the statute.

A close reading of the mail and wire fraud allegations will clarify the problem. The allegation regarding the transmission of the Karn infomercial is

stated in the passive voice ("the Kara infomercial described above was transmitted by electronic means ... in violation of [*18 U.S.C. § 1343*]"). (Compl. P 171.) No particular defendant is said to have committed this alleged crime. The other predicate acts are for the most part attributed to Leasecomm, except for the mailing of lease contracts to plaintiffs, which is attributed in P 172 to the "Leascomm Associates" (defined in P 41 as "Themeware, ECX, Cardservice and [OX]"). The individual defendants and Medtrack are not alleged to have committed any of these offenses. The failure to attribute *any* predicate acts, [*31] let alone a pattern of them, to several of the defendants not only dooms the complaint as to those defendants, but further complicates the task of assigning any particular alleged mailing or wire transmission to any particular scheme to defraud.

This disorganized pleading in itself requires dismissal of the RICO cause of action, since the complaint fails coherently to identify the predicate crimes the defendants are alleged to have committed. Nevertheless, the Court will briefly discuss what appear to be the allegations against various particular defendants, for such guidance as that may provide in connection with potential repleading.

1. MFI/Leasecomm

Plaintiffs appear to allege that Leasecomm committed numerous predicate acts by (1) committing mail fraud in directing plaintiffs to return the Leasecomm leases by mail and by mailing statements "for monies allegedly due on account of [its leases]"; (2) committing wire fraud by making phone calls demanding payment on the leases; and (3) violating the Hobbs act by using "threats and intimidation" to "collect monies" due under the leases. (Compl. PP 173-182.) Characteristically, the Complaint attributes these predicate acts only to [*32] Leasecomm, while many of the factual allegations that appear to support them are attributed to MFI or to "MFI/Leasecomm." For purposes of this discussion, the Court makes no attempt to distinguish the two corporations. Any amended complaint, however, will have to identify which entity or entities plaintiffs intend to charge with which acts.

While plaintiffs fail to identify the particular scheme or schemes the mailings and wire transmissions are alleged to have furthered, it appears that they believe that Leasecomm was a knowing participant in several schemes to defraud consumers by misrepresenting to them the value of various products and services and the terms of the leases. Such a scheme would constitute a scheme or artifice to defraud within the meaning of the mail and wire fraud statutes, because it would seek to deprive the consumers who are its targets of money and property by the making of false representations. If plaintiffs intend to make such an allegation, they must provide a plain statement of each scheme they allege that these defendants participated in, by clearly defining the nature of the scheme, the misrepresentations they allege constituted the fraud, and the mailings [*33] that they allege furthered each scheme. It appears likely that such a scheme or scheme can be defined from the various jumbled allegations made against these defendants.

MFI/Leasecomm also argues that the allegations of extortion fail adequately to allege violations of the Hobbs Act. The Hobbs Act makes it a crime "in any way ... [to] affect[] commerce ... by ... extortion." *18 U.S.C. § 1951(a)*. "Extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *§ 1951(b)(2)*. Leasecomm argues that plaintiffs have not stated a claim under the Hobbs Act because "a threat to cause economic loss is not ... wrongful [unless] it is used to obtain property to which the threatener is not entitled," *United States v. Jackson, 180 F.3d 55, 70 (2d Cir. 1999)*, and that it was entitled, by virtue of the leases, to the property it obtained.

This argument fails because plaintiffs accuse Leasecomm of more than just threats "to cause economic loss" and because plaintiffs allege that Leasecomm was not "entitled" to the monies it [*34] collected or attempted to collect. Plaintiffs allege threats to "have various plaintiffs put in jail" and to "embarrass and humiliate plaintiff with his/her business associates, family and friends." (Compl. P 181.) These were threats to plaintiffs' dignity and liberty, not just threats of economic loss. Plaintiffs also allege that the leases were not valid contracts because of the fraudulent conduct of Leasecomm's dealers and their agents, the unconscionability of the lease terms, the forging of some lessees' signatures and the omission in some cases of essential terms. (Id. P 127(d), (e).) If plaintiffs are correct on any of these grounds, Leasecomm would not have been "entitled" to the monies it demanded, and may not even have had reason to believe that it was so entitled. Thus, the Hobbs Act allegations could satisfy the

predicate act requirement as to MFI/Leasecomm.

Once again, however, the allegations are hardly models of clear pleading. The Hobbs Act paragraph fails to allege an effect on interstate commerce, does not use the word extortion, and does not specify that MFI/Leasecomm intended to obtain property to which it was not entitled. As a consequence, the [*35] theory set forth above is at best a guess by the Court at the theory plaintiffs might intend. Any amended complaint must clearly allege all elements of a Hobbs Act violation.

## 2. The MFI/Leasecomm Officers

MFI/Leasecomm officers von Bleyleben, Latour, and Salvo correctly argue that plaintiffs have failed to allege any predicate acts attributable to them. (Von Bleyleben Mem. 3-4.) At most, the Complaint can be interpreted to state that these defendants were the principal officers of MFI/Leasecomm and that they were involved in the decision to seek revenue through the aggressive collection practices alleged. (Compl. PP 14-16, 164-169.) To violate *18 U.S.C. § 1962(c)*, however, a defendant must have committed two or more predicate acts of racketeering, each of which is itself a serious crime. The predicate racketeering acts of mail fraud, wire fraud, and Hobbs Act extortion in the complaint are directly attributed only to the corporate defendant Leasecomm and to unspecified "agents," and not to the three defendant officers. (Compl. PP 175-180.)

Plaintiffs do, however, make other allegations that suggest that this gap could be bridged in a proper pleading. First, [*36] the Complaint alleges that von Bleyleben, Latour and Salvo "were the officers of MFI principally responsible for the design and implementation of Leasecomm's UDAP practices." (Id. P 187.) Although "UDAP" is earlier defined as "unfair and deceptive acts and practices" in violation of the *Federal Trade Commission Act* and various similar state regulatory statutes (id. P 59) -- none of which are themselves RICO predicates -- this may suggest that plaintiffs intend to allege or could allege that the MFI/Leasecomm officers were personally responsible for whatever schemes to defraud they believe MFI or Leasecomm engaged in, and for the mailings and wire transmissions in furtherance of those schemes that the corporate defendants are accused of causing to be made. An amended pleading should specifically allege which predicate acts each defendant is accused of committing.

Second, the complaint alleges, in the briefest and most conclusory of terms, that "each of the defendants conspired to violate" *§ 1962(c)*, in violation of *§ 1962(d)*. It is possible to violate *§ 1962(d)* by conspiring with others, even without committing or agreeing to commit any predicate acts oneself. *Salinas v. United States, 522 U.S. 52, 139 L. Ed. 2d 352, 118 S. Ct. 469 (1997).* [*37] Plaintiffs, however, nowhere describe the nature of any such alleged conspiracy, or the role of any defendant in it, or how the conspiracy, as distinct from the substantive violations of RICO, caused them injury. It is certainly not clear that plaintiffs intend to allege that the MFI/Leasecomm officer defendants were guilty of conspiring to participate in the affairs of the enterprise by a pattern of racketeering acts committed by others, without themselves being responsible for the commission of any racketeering acts. To the extent that any such theory is intended, it should be spelled out in any amended complaint.

Plaintiffs fail to comprehend that in making allegations under RICO, they are charging the defendants with having committed serious criminal offenses. It is not enough to allege that predicate acts were committed by somebody, in furtherance of an enterprise in which the defendants were involved. Rather, to state a violation of *§ 1962(c)* by any defendant, plaintiffs must allege that that defendant personally committed two or more predicate acts. The present complaint does not allege that von Bleyleben, Latour or Salvo participated in any predicate acts at all.

## 3. OX, [*38] ECX, Medtrak, and Schneider

The complaint fails adequately to allege that any of the defendants associated with the OX/ECX "merchant account" scheme committed any predicate acts of racketeering. None of the "predicate acts" specifically identified as such in the complaint (Compl. PP 171-178) are more than vaguely attributed to any of these defendants, or indeed are expressly connected to the "merchant account" scheme. Medtrak and Schneider are not mentioned at all in these sections. It can be inferred that OX and ECX, under the rubric of "Leasecomm Associates," are accused of causing Leasecomm contracts to be mailed to certain plaintiffs. (Id. P 172.) As previously discussed, however, the failure to clearly articulate a connection between these mailings and any particular scheme or artifice makes it difficult to identify who is alleged to be responsible for which criminal acts.

The complaint does refer (in sections not identified as defining alleged predicate acts) to other acts that could constitute mailings and wire communications in furtherance of the "merchant account" scheme, such as the mailing of the videotaped seminar (id. P 91) and of direct mail solicitations ( [*39] id. P 92(a)), and the making of "follow-up marketing telephone calls" (id. P 93). But claims based upon fraud, including claims of wire or mail fraud as predicate acts to a RICO claim, must be pleaded with particularity. *Fed. R. Civ. P. 9(b); McLaughlin v. Anderson, 962 F.2d 187, 190-91 (2d Cir. 1992)*. The complaint does not satisfy this requirement, due to the vague and inconsistent description of the roles played by the participants in that scheme. Plaintiffs equivocate as to who authored the video (and therefore the alleged misrepresentations it contained), and do not clearly specify which entity or entities mailed the video, mailed the Leasecomm leases, and made the marketing telephone calls. See *id. at 191* (a fraud complaint must "identify those responsible for the [false] statements"). Indeed, the complaint appears to attribute most of the fraudulent activities undertaken in connection with this scheme to a non-defendant, NESA. Thus, the RICO claims against OX and ECX must be dismissed, subject to a repleading specifying who was responsible for which fraudulent communications.

The only allegations [*40] involving Medtrak and Schneider arise from the facts that Medtrak was Online's "controlling shareholder and controlling principal" that "controlled [OX's] operations" (id. P 25), that OX "was described as 'backed' by Medtrak" in certain promotional materials (id. P 92(c)), and that Schneider in turn controlled both Medtrak's and OX's operations (id. P 26). The RICO claims against Medtrak and Schneider are therefore entirely dependent on the claims against OX, and these defendants are even more remote from any allegation of personal responsibility for any predicate acts of racketeering. The complaint thus must be dismissed as to them, notwithstanding the fact that Medtrak is in default.

4. Cardservice, Rettew, and Karn

The complaint's allegations concerning the Themeware bait-and-switch scheme are more clearly stated and adequately allege acts of wire fraud on the part of Themeware -- which is not a defendant. The authorship and misrepresentations of the infomercial, and the circumstances under which the bait-and-switch was effected, are clearly spelled out, satisfying the requirements of *Rule 9(b)*. (Compl. P 77.)

Karn argues that since his role was only to make the [*41] Internet Tool Box infomercial, which itself did not mention iPage Builder (and was produced before iPage builder was developed), plaintiffs have failed to make "allegations of acts from which [specific intent to defraud] can be inferred." But with respect to the element of fraudulent intent, the requirements of *Rule 9(b)* are relaxed when "the allegations lie peculiarly within the opposing parties' knowledge and are accompanied by information that raises a strong inference of fraud." *Ouaknine v. MacFarlane, 897 F.2d 75, 81 (2d Cir. 1990)*. Plaintiffs have alleged that the infomercial, even as a marketing device for the Internet Tool Box alone, contained material misrepresentations by Karn (see id. P 77(b), (c), (f), (h)), including his calling the product the "Internet Business Tool Box" and thereby implying that the product was appropriate for conducting a business through the Internet. While Karn is correct that this fraud is not the wire fraud upon which the RICO claim is based (as it did not involve the Leasecomm leases), the presence of fraudulent statements in the infomercial itself supports an inference that the infomercial was intended [*42] to be used for fraudulent purposes. Furthermore, it can be inferred from the allegations of the complaint that Karn, as shareholder and "principal spokesperson" for Themeware "at all pertinent times" (id. P 22), remained involved in its marketing efforts and in the particular acts of wire fraud involved in the alleged "bait and switch" scheme. Since Karn's actual role, if any, is particularly within his knowledge, and since the circumstances cited raise a strong inference of some fraud, plaintiffs have sufficiently alleged that he was responsible for committing predicate acts in furtherance of the scheme.

Whether the complaint sufficiently attributes any predicate acts to Cardservice is a closer question. The complaint alleges that Cardservice "expended substantial sums of money in developing the iPage Builder program with Themeware and in marketing the bait and switch Tool Box." (Id. P 75.) The allegation that Cardservice simply funded the marketing effort is insufficient to support an inference that it had any control over the fraudulent use made of the infomercial, and more generally is insufficient to support an inference of fraudulent intent. There is no allegation that [*43] Cardservice had anything to do with the development of the Internet Tool Box or the content of the Karn

infomercial, or that it had any input into the way responses to the infomercial were handled. Therefore, the RICO claim against Cardservice, as currently framed, fails to allege fraudulent conduct by it. However, as plaintiffs have in any event moved for leave to amend their complaint to add claims against Cardservice's former president Chuck Burtzloff, they will be permitted to amend their complaint to more clearly allege, if they can, any culpable role Cardservice played in the alleged scheme to defraud and the mailings in furtherance of it.

Finally, Themeware's alleged "shareholder and ... principal officer" Rettew has neither answered the complaint nor moved for dismissal, and is therefore in default. However, the complaint does not allege that Rettew personally participated in any alleged predicate acts' of racketeering. The present complaint therefore does not state a RICO claim against him.

C. Pattern of Racketeering Activity

To establish a "pattern of racketeering activity," a plaintiff must show that a defendant's predicate acts "themselves amount to, or that they [*44] otherwise constitute a threat of, *continuing* racketeering activity." *H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 241, 106 L. Ed. 2d 195, 109 S. Ct. 2893 (1989).* As the Second Circuit summarized this requirement:

> The continuity necessary to prove a pattern can be either "closed-ended continuity," or "open-ended continuity." See *id. at 239, 241.* Closed-ended continuity is demonstrated by predicate acts that "amount to continued criminal activity," by a particular defendant. To satisfy closed-ended continuity, the plaintiff must prove "a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months ... do not satisfy this requirement." *Id. at 242 ....* To satisfy open-ended continuity, the plaintiff need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed. *Id. at 242-43.* In assessing whether or not the plaintiff has shown open-ended

continuity, the nature of the RICO enterprise and of [*45] the predicate acts are relevant. See *Schlaifer Nance & Co. v. Estate of Andy Warhol, 119 F.3d 91, 97 (2d Cir. 1997); GICC Capital Corp. [v. Technology Finance Group, Inc., 67 F.3d 463,] 466 [(2d Cir. 1995)].* Where the enterprise is engaged primarily in racketeering activity, and the predicate acts are inherently unlawful, there is a threat of continued criminal activity, and thus open-ended continuity. See *H.J. Inc., 492 U.S. at 242-43* ("The threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes."). However, where the enterprise primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity. See *id. at 243.*

*Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242-43 (2d Cir. 1999).*

Thus, closed-ended continuity is "centrally a temporal concept" [*46] which may be demonstrated by "proving a series of related predicates extending over a substantial period of time." *H.J., Inc., 492 U.S. at 242.* The only enlightenment H.J. provides as to what constitutes a "substantial period of time" is its statement that "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.* However, the Second Circuit has emphasized that duration is not the only relevant issue: "Although closed-ended continuity is primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists." *Cofacredit, 187 F.3d at 242.*

Leasecomm (as well as ECX and Cardservice) argues that "the enterprise's lifespan was not long enough

to fall within the purview of RICO," since "the Second Circuit has *never* found sufficient continuity for RICO purposes where the predicate acts all occurred within two years" (MFI/Leasecomm Mem. at 7), and the maximum length of the patterns of racketeering [*47] alleged here was eighteen months (id. at 7-8, citing Compl. PP 172-173). The Second Circuit itself has noted that since H.J. was decided it has not found "closed-ended continuity" in an alleged pattern of racketeering that lasted less than two years. *De Falco v. Bernas, 244 F.3d 286, 321 (2d Cir. 2001).* [4] But such statistics do not make binding law; the Second Circuit has never set a rigid floor for the "substantial period" requirement. [5]

> 4  Prior to the Supreme Court's decision in H.J., decision, the Second Circuit had found racketeering acts committed over a "period of nearly two years" sufficient to constitute a pattern of racketeering activity. *Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc., 879 F.2d 10, 18 (2d Cir. 1989).* Procter & Gamble has not been overruled or reconsidered in light of H.J.
>
> 5  Even as a statistical fact, the observation about the Circuit's prior decisions supports little weight, considering that it is derived from an extremely small sample of cases: *GICC Capital Corp., 67 F.3d at 467* (finding one year insufficient); *Metromedia v. Fugazy, 983 F.2d 350, 369 (2d Cir. 1992)* (finding two years sufficient); *Jacobson v. Cooper, 882 F.2d 717, 720 (2d Cir. 1989)* (finding eight-year period sufficient). In *DeFalco* itself, the Second Circuit declined to find "closed-ended continuity" in a scheme that lasted only eighteen months, but (1) that discussion was essentially dictum, since the Court found that a pattern of racketeering had been proved on a theory of "open-ended continuity," and (2) in *DeFalco*, the alleged pattern being discussed was a pattern of extortionate acts directed essentially at a single victim, and is thus distinguishable from the present case.

[*48]  The Second Circuit has explicitly held (consistent with the Supreme Court's statement that continuity "may" be shown by the temporal extent of the predicate acts) that duration is but one of several factors to be considered in determining whether a pattern of racketeering activity had the requisite continuity. *GICC Capital Corp., 67 F.3d at 467* (court must "weigh[] a variety of non-dispositive factors, including, inter alia,

the length of time over which the alleged predicate acts took place, the number and variety of acts, the number of participants, the number of victims, and the presence of separate schemes.") There is no authority for a pleading requirement involving a minimum duration of two years, and the predicate acts described here are certainly alleged to have stretched out over much longer than "a few weeks or months."

Moreover, plaintiffs might well be able to establish, at least as to Leasecomm, a pattern of racketeering activity that exhibits "open-ended continuity." Although the enterprise alleged here was involved in apparently legitimate business and is not an entirely illegitimate association such as a criminal gang, the complaint appears to allege [*49] that Leasecomm at least committed the predicate acts charged that the predicate acts as a "regular way of operating that business," *Cofacredit, 187 F.3d at 243,* that conceivably extended beyond the particular "strategic partners" named in the complaint. Further discussion of this possibility is unnecessary at the present time, since it is unnecessary to the resolution of the motion as to the present complaint.

Under these circumstances, where the complaint alleges that predicate acts continued for a period of time that is (at least) close to long enough to establish continuity solely on grounds of duration, and where at least some participants in the alleged enterprise are alleged to have engaged in at least two different fraudulent schemes with a large number of individual victims, it cannot be said as a matter of law, simply based on the limited duration of the alleged schemes, that the complaint fails to allege sufficient continuity to establish a pattern of racketeering.

As to most of the defendants, however, the present complaint does not sufficiently allege a pattern of racketeering in any case. As noted above, duration or continuity [*50] is required attribute not of the *enterprise,* but of the *pattern of racketeering.* In order to plead a claim under *§ 1962(c),* plaintiffs must allege that each defendant participated in the conduct of the enterprise through a pattern of racketeering, which pattern must consist of at least two racketeering acts that exhibit the necessary continuity and relatedness to constitute a *pattern.* Because, for reasons set forth above, it is not clear what predicate acts, if any at all, are alleged against most of the defendants, it is impossible to decide whether those acts constitute a pattern. Thus, the

incoherence of the pleading with respect to the nature of the predicate acts alleged against the defendants precludes a finding that a pattern has in fact been alleged. Nevertheless, since defendants' argument that there can be no pattern that lasts as short as eighteen months must be rejected, and since the allegations in the complaint appear to contain facts that may prove sufficient to state a RICO claim against at least some of the defendants, plaintiffs will be granted permission to replead.

D. Conduct of the Enterprise

1. Leasecomm and its Officers

Leasecomm and its officers argue that plaintiffs [*51] fail to allege that any of them "conduct[ed] or participated, directly or indirectly, in the conduct of" the enterprise. (Leasecomm Mem. at 8, quoting *18 U.S.C. § 1962(c)*; Von Bleyleben Mem. 2.) The argument derives from the Supreme Court's decision in *Reves v. Ernst & Young, 507 U.S. 170, 122 L. Ed. 2d 525, 113 S. Ct. 1163 (1993)*, which held that in order to satisfy this requirement, a defendant must participate in the management or operation of the enterprise, since to "conduct" the affairs of an enterprise "one must have some part in directing those affairs." *Id. at 179.* Leasecomm points specifically to plaintiffs' failure to allege "that Leasecomm or MFI had any involvement in the other defendants' marketing efforts, solicitation of customers, selection of customers, or in formulating the transactions in question." (MFI/Leasecomm Mem. at 11.)

This argument is unpersuasive. Leasecomm *is* alleged to have formulated the transactions, for the complaint charges that Leasecomm's leases were the linchpin of the schemes and Leasecomm determined both the content of those leases and the means by which they were enforced. Leasecomm [*52] also purchased the leases for forty to sixty percent of their face value through an automated system that Leasecomm itself touted as "unique" and "not in accord with industry standards." (Compl. P 133; see also id. P 138 (detailing unique practices claimed by MFI in SEC filings, including some of those alleged to be fraudulent).) Thus, Leasecomm is not alleged to have simply "supplied financing" to the other defendants (MFI/Leasecomm Mem. at 11); it is charged with constructing and executing an entire method of doing business that enabled and encouraged dealers with which it had established "strategic partnerships" to sign up lessees on a wholesale basis, at a large markup from the dealers' costs, without

concern for the lessees' business and computer acumen, ability to pay, or creditworthiness. The complaint thus sufficiently alleges that Leasecomm "conduct[ed] or participate[d], directly or indirectly, in the conduct of [the] enterprise's affairs." *18 U.S.C. § 1962(c).*

Von Bleyleben, Latour, and Salvo call "thin" and insufficiently detailed the complaint's allegation that they "principally responsible for the design and implementation of the [unfair [*53] and deceptive] practices" and that they "developed the Leasecomm unconscionable contracts [and] its marketing system ... and regularized the extortionate, unfair and deceptive collection practices." (Von Bleyleben Mem. 2, quoting Compl. PP 185, 187.) However, there is no heightened pleading requirement for the "conduct" element of a RICO claim. Indeed, it is hard to imagine what more plaintiffs could allege at this stage, when the precise role of these defendants is information peculiarly within their knowledge and not the plaintiffs'. As the alleged principal officers of MFI and Leasecomm, who are alleged to have designed the entire overall scheme and to have directed the activities of the companies at the center of the alleged enterprise, these defendants have surely been alleged to have participated in the conduct of the affairs of the alleged enterprise.

2. Karn

Karn argues that, as an actor who simply provided professional services to Themeware by participating in the production of the infomercial "later used by the ... enterprise," the actions attributed to him cannot satisfy the "conduct" requirement of RICO. (Karn R. Mem. at 3.) The complaint, the allegations of which [*54] must be accepted as true for purposes of this motion, does not allege that Karn was an "actor," but rather that he was one of Themeware's shareholders and its "principal spokesperson." Nevertheless, the complaint falls short of stating facts that would suggest Karn participated, directly or indirectly, in conducting the alleged RICO enterprise. It alleges that Karn "participated in the ... scheme when he knew, or ... should have known that his statements were being used" for fraudulent purposes. (Compl. P 189.) However, to simply allege that Karn participated in the enterprise, or was guilty of predicate crimes, is insufficient; the statute makes it illegal to "participate ... in the conduct of [enterprise] affairs," where the noun "conduct" is used in the sense of "operation or management." *Reves, 507 U.S. at 179.* Thus

2003 U.S. Dist. LEXIS 17236, *54

plaintiffs must allege that Karn had "some part in directing [the enterprise's] affairs." Id. Neither making statements knowing that they will be exploited by an enterprise, nor being a shareholder of an entity involved in that enterprise, constitutes a "part in directing" it. Thus the RICO claims against Karn will be dismissed, subject to a [*55] repleading that sufficiently alleges facts supporting an inference that Karn conducted the enterprise's affairs.

### E. Injury

Leasecomm argues that plaintiffs have failed to allege any cognizable injury traceable to its alleged racketeering acts since (1) plaintiffs fail to specify "what the[] purported damages consist of', (2) there can be no recovery for emotional distress under RICO; (3) the complaint does not specify "whether any particular plaintiff made a single lease payment or paid anything on a judgment," and (4) any payments that plaintiffs made voluntarily cannot be claimed as damages.

These assertions, to the extent they are accurate, do not justify dismissal. Plaintiffs' allegation that each plaintiff suffered damages "as a ... result of the foregoing violations [of RICO] ... in such amount as may be determined but at least in the amount of $ 50,000" is' sufficient to withstand a motion to dismiss; it is unnecessary for plaintiffs to provide factual detail, such as which plaintiffs made lease payments or paid judgments, at this stage. [6] See Cantor v. Life Alert, Inc., 655 F. Supp. 673, 681 (S.D.N.Y. 1987). Leasecomm's [*56] challenge to the recovery sought for emotional distress ignores the fact that the claims for emotional distress damages are based on independent, state-law causes of action, not RICO. The RICO count specifies that the damages inflicted were damages to plaintiffs' "business or property." (Compl. P 196.) Whether or not some plaintiffs made their lease payments voluntarily is an issue of fact, especially where plaintiffs allege extortion, so Leasecomm's argument concerning such payments is premature.

[6]   Leasecomm confuses ripeness doctrine with pleading requirements. While "a cause of action does not accrue under RICO until the amount of damages becomes clear and definite," nothing in the complaint indicates that the amount of damages for any defendant is not now "clear and definite." The damage amounts simply have not been described in great detail in the complaint,

which, under the Federal Rules, need not be that specific.

### F. Causation

Leasecomm argues that Zito's allegation cannot meet the requirement that [*57] its actions be the "but for" and proximate cause of plaintiffs' injuries.

Leasecomm confuses "but for" causation with direct or proximate causation, claiming that since the "conduct of defendants other than Leasecomm and MFI was the direct, intervening cause" of damages, the requirement is not met. Even accepting arguendo Leasecomm's essentially factual allegation that the direct and intervening cause of plaintiffs' injuries was the dealers' marketing conduct, not Leasecomm's actions, the requirement of "but for" causation is not defeated. "But for" causation means only that absent the alleged RICO violations - "but for" them - no injury would have been suffered. To the extent that the dealers' marketing conduct was largely motivated by the way Leasecomm structured its relationship with the dealers, Leasecomm's actions would still be a "but for" cause of plaintiffs' injuries.

But here, plaintiffs allege more than that; they allege that they were damaged by (1) being enticed to sign the Leasecomm leases by the various Leasecomm associates, and by subsequently (2) being forced, by Leasecomm's "unique" collection practices, to make payments under those leases. But for the existence [*58] of the leases and the enforcement of their terms by Leasecomm, there could have been no injury to plaintiffs. Thus, the "but for" causation requirement is satisfied whether or not the enticement to sign them is considered the more direct cause. Put another way, there can be multiple "but for" causes of varying degrees of directness, and here, both (1) and (2) were, at least according to the complaint, "but for" causes of plaintiffs' damages.

The requirement of proximate causation is the stricter one. If, as Leasecomm claims, the damages here were alleged to have "flow[ed] from [plaintiffs'] voluntary decisions to enter into business transactions that they now regret" or from their "decision not to make the required lease payments" (Leasecomm Mem. 28), Leasecomm would be entitled to prevail on the RICO claim. Of course, this is not what plaintiffs allege, and it is the allegations that must be accepted as true at this state, not Leasecomm's version of the facts. The

complaint attributes plaintiffs' damages to the fraudulent misrepresentations made by the Leasecomm associates and the extortionate collection practices engaged in by Leasecomm. Thus whether the plaintiffs' actions in [*59] signing the leases, making payments, or refusing to make payments were completely voluntary or were procured by the defendants so as to create liability under RICO depends upon the factual truth of plaintiffs' claims, and thus cannot be resolved prior to discovery.

Finally, to the extent that Leasecomm argues that any losses were caused by its strategic partners, and not by it, that argument too is simply a denial of the facts allege by the plaintiffs. However unclear the complaint may be in other particulars, it clearly alleges that Leasecomm's methods of doing business were designed to facilitate and profit from high-pressure and deceptive marketing practices by its "strategic partners." Plaintiffs may not be able to prove that, but they have alleged it and are entitled to present evidence in support of their theory.

G. RICO conspiracy

1. The iPage Builder Scheme

Leasecomm and Cardservice argue that plaintiffs' claim of a RICO conspiracy under *18 U.S.C. § 1962(d)* must be dismissed because the complaint fails to allege that Leasecomm itself agreed to commit predicate acts as required in *Morin v. Trupin, 832 F. Supp. 93, 99 (S.D.N.Y. 1993)*. [*60] Since Morin, however, the Supreme Court has made it clear that there is no such requirement: "The RICO conspiracy statute ... did not ... work the radical change [in conspiracy law] of requiring the Government to prove each conspirator agreed that he would be the one to commit two predicate acts." *Salinas, 522 U.S. at 64*. It is sufficient that the alleged conspirator "intend[ed] to further [the] endeavor" or "adopted the goal of furthering or facilitating" it. *Id. at 65*. For the same reasons that the complaint adequately alleges that Leasecomm conducted the affairs of the enterprise, it adequately alleges that it conspired to further or facilitate those affairs.

As to Cardservice, the complaint alleges that "On information and belief, Cardservice expended substantial sums of money in developing the iPage Builder program with Themeware and in marketing the bait and switch Tool Box." (Compl. P 75.) Economic support for the RICO activities of another defendant could support an inference that a party agreed to further or facilitate those

activities and therefore conspired with that defendant to violate RICO. As noted above, however, the conspiracy [*61] claim is set forth only in brief and conclusory terms, and cannot save the complaint's failure to articulate the alleged predicate acts on which it is based. Since the complaint fails adequately to detail what crime was intended to be committed -- that is, who is alleged to have engaged in what predicate acts in furtherance of the enterprise's objectives -- it does not adequately charge a conspiracy.

Karn moves to dismiss the RICO conspiracy claim on the grounds that plaintiffs have "alleged nothing more than the conclusion that 'each of the defendants conspired to violate'" RICO, and that the most plaintiffs assert with respect to Karn is that he "knew or should have known of the bait and switch scheme." (Karn Mem. 10 (quoting Compl. P 195.)) But "should have known" is not enough to establish conspiracy, which is a crime of specific intent. To prove a conspiracy, a plaintiff must show that a defendant joined the conspiracy with the intent to commit the offenses that are its object, that is, with the affirmative intent to make the conspiracy succeed." *United States v. Ceballos, 340 F.3d 115, 123-24 (2d Cir. 2003)*. The complaint does not allege facts supporting an [*62] inference that Karn "adopted the goal of furthering or facilitating" the larger RICO enterprise encompassing the acts of Leasecomm/MFI and Themeware, therefore, the RICO conspiracy claim against him will be dismissed without prejudice to a repleading sufficiently alleging facts supporting his participation in a conspiracy.

2. The Merchant Account Scheme

As plaintiffs have failed to adequately allege any predicate acts involving ECX, OX, Medtrak, and Schneider with respect to the merchant account scheme, the RICO conspiracy claim must also be dismissed against those defendants, without prejudice to a repleading that corrects the deficiencies already noted and also adequately alleges the existence of and participation in a conspiracy by some or all of those defendants.

H. Summary

Plaintiffs have failed adequately to allege specific predicate acts attributable to the defendants. Accordingly, its RICO claim will be dismissed without prejudice to a repleading that cures the various defects discussed in this opinion. In particular, a repleading should (1) clarify the

structure and organization of the enterprise alleged; (2) identify, as to each defendant, the predicate acts of racketeering [*63] that it is alleged to have committed, by defining the nature of any fraudulent schemes each defendant is alleged to have devised and the mailings or wire transmissions that it caused to be made in furtherance of that scheme (or whatever other predicate crimes constituting the pattern of racketeering that defendant is alleged to have committed); and (3) provide allegations supporting the claim that any named defendant participated in the conduct of the affairs of the enterprise.

Because the RICO claim provides the only basis of federal jurisdiction, dismissal of that cause of action entails dismissal of the entire complaint. See *28 U.S.C. § 1367(c)(3)* (permitting dismissal of pendent state claims when "the district court has dismissed all claims over which it has original jurisdiction"). However, because of the likelihood that plaintiffs will be able to replead successfully alleging a RICO claim against at least some defendants, it is appropriate to address the other issues raised by the motions to dismiss.

III. Personal Jurisdiction

At the motion to dismiss stage, "plaintiff need make only a prima facie showing of jurisdiction through its own [*64] affidavits and supporting materials ... notwithstanding any controverting presentation by the moving party." *Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981).* [7] Facts alleged by the plaintiff may be provisionally accepted as true. *Credit Lyonnais Securities (USA), Inc. v. Alcantara, 183 F.3d 151, 153 (2d Cir. 1999).*

[7] Ultimately, of course, plaintiff will be required to establish personal jurisdiction by a preponderance of the evidence. *Id.*

Karn and the Leasecomm officer defendants move to dismiss the complaint against them on the basis of lack of personal jurisdiction. [8] Since the RICO claims against Karn will be dismissed, as discussed above, on the grounds that he is not alleged to have participated in the conduct of the enterprise, and any amended complaint asserting claims against him will necessarily supplement in significant ways the factual allegations already asserted, it would be unproductive for the Court to address his personal jurisdiction [*65] arguments at this stage.

[8] OX and Schneider have asserted lack of personal jurisdiction as a defense in their answers, but have not moved for dismissal on those grounds at this stage, The Court notes that they have preserved this defense, but will defer any determination of whether it has jurisdiction over OX and Schneider until the issue is fully presented by the parties.

The Leasecomm officers contend that neither New York's long-arm statute, *N.Y. C.P.L.R. § 302,* nor RICO's nationwide service provision, *18 U.S.C. § 1965(b),* justifies jurisdiction over them by a court in New York. Plaintiff responds by arguing that (1) under New York law, "when a foreign resident conspires to cause tortious damages in New York, New York courts have long-arm jurisdiction even if the acts performed in New York are performed by another conspirator" (P. Mem. 43, citing *Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988));* and [*66] (2) RICO's nationwide service provision applies when, as here, "no single forum [exists] where all the [RICO] defendants either reside or may be found" (P. Mem. 45).

*Kreutter* did not, as plaintiffs suggest, state any rule about alleged conspirators in tort actions. It did, however, hold that where a company "engaged in purposeful activities in this State in relation to [plaintiff's] transaction for the benefit of and with the knowledge and consent of [out-of-state individual] defendants," and where those individual defendants "exercised some control over [the] Company in the matter," jurisdiction in New York over the individual defendants is supported under that provision of the long-arm statute, C.P.L.R. § 302(a)(1), relating to a defendant's doing business in the state. *Kreutter, 71 N.Y.2d at 467.*

The factual allegations here meet the requirements of *Kreutter.* The affidavit of plaintiff's attorney states that defendant von Bleyleben, in 1998, "signed a stipulation with the Attorney General for the State of West Virginia that essentially promised to cease and desist from several of the practices involved in this litigation," and that a "former [*67] systems analyst for MFI ... identified [von] Bleyleben as ... the author of the Leasecomm lease." (Klotz Decl. PP 14-17.) The same systems analyst "identified ... Salvo as the person in charge of collections on the leases." (Id. P 18.) The complaint alleges that von Bleyleben and Latour "own stock options and shares of stock in MFI" and that they touted the fact that

2003 U.S. Dist. LEXIS 17236, *67

MFI/Leasecomm's revenues generated by "Late Fees, Loss and Damage Fees ... enhanced [MFI's] returns dramatically." (Compl. P 167.) These facts, if true, would establish that the officer defendants exercised control over the acts of MFI/Leasecomm at issue here, and that they benefitted from them. Since it is not disputed that those acts involved both the "transact[ion of] ... business within the state," *N.Y. C.P.L.R. § 302(a)(1)*, and since it is alleged that they constituted "tortious act[s] without the state causing injury to person or property within the state," id. *§ 302(a)(3)*, jurisdiction over the officer defendants is proper, at least provisionally, under the rationale of *Kreutter*. It is thus unnecessary to address the applicability of *§ 1965(b)* to this case.

### IV. [*68] State-law Claims

As noted above, with the dismissal of plaintiffs' RICO claim, there is no basis for subject-matter jurisdiction over any state-law claims arising from that scheme. Nevertheless, as noted above, the Court will address defendants' arguments against the likely possibility that the same issues will arise in connection with plaintiffs' anticipated amended complaint.

### A. Choice of Law

Leasecomm argues that pursuant to a choice-of-law provision in the leases (Compl. Ex. D), Massachusetts law applies to the state-law claims. Although the complaint references the law of numerous jurisdictions, in responding to the motions to dismiss plaintiffs do not address this issue, and appear to concede that Massachusetts law applies. (See, e.g., P. Mem. 47 ("Massachusetts courts in dealing with [the concept of unfair and deceptive practices] have not hesitated to look to New York courts for guidance.")) Therefore, the Court will apply the statutory and common law of Massachusetts to the state law claims asserted.

### B. Fraud on the Court

Count Two of the complaint, which names only Leasecomm (Compl. P 200), asserts that Leasecomm fraudulently obtained default judgments [*69] in Massachusetts courts against certain plaintiffs by concealing from those courts that the judgments "were the product of a racketeering conspiracy, were the fruits of unfair and deceptive acts and practices, contained ... charges for which there was no legal justification and were in execution of ... unconscionable contract[s]."

(Compl. PP 201-203.) Leasecomm moves to dismiss this claim under *Fed. R. Civ. P. 9(b)*, which requires that fraud be pled with particularity. Leasecomm argues that "plaintiffs do not interpose particularized pleadings that describe the purported 'frauds.'" (MFI/Leasecomm Mem. at 33.)

Each of the four "facts" that Leasecomm is alleged to have concealed in obtaining these judgments actually constitutes or includes a legal conclusion: The existence of a racketeering conspiracy, the unfairness and deceptiveness of the practices, the legal justification for Leasecomm's charges, and the unconscionability of the leases are not "facts" in the sense required by *Rule 9(b)*, since "conclusory averments of the existence of fraud made on information and belief and unaccompanied by a statement of clear and convincing probative facts [*70] which support such belief do not serve to raise the issue of the existence of fraud." *Madonna v. U.S., 878 F.2d 62, 66 (2d Cir. 1989)* (quoting *Di Vito v. Fidelity & Deposit Co. of Maryland, 361 F.2d 936, 939 (7th Cir. 1966))*. Therefore plaintiffs' fraud on the court claim will be dismissed without prejudice to its renewal in an amended complaint satisfying the requirement articulated in *Madonna*. [9]

> 9 Leasecomm's alternative argument that this claim should be dismissed because "only a Massachusetts state court can fairly review its own judgments" is unpersuasive. (MFI/Leasecomm Mem. 32.) As Leasecomm admits, "there is no absolute bar to undoing a preexisting, final judgment of a state court in federal court." Id. The consideration that such relief should "ordinarily" be sought in the rendering court "where possible" is outweighed here by the efficiency interest in having the entire dispute adjudicated in one forum.

### C. Massachusetts Unfair and Deceptive Practices Act

[*71] Plaintiffs allege in Count Three that the conduct described in the complaint "constituted unfair and deceptive [acts] and practices as [such] conduct is defined by state UDAP statutes and regulations set forth in schedule Two [of the complaint.]" (Compl. P 210.) Count Three is asserted against "all defendants jointly and severally." (Id. P 209.)

### 1. Leasecomm/MFI

Leasecomm and MFI state, and plaintiffs do not deny, that only Section 9 and Section 11 of the Massachusetts Unfair and Deceptive Practices Act ("UADPA"), Mass. Gen. Laws ch. 93A,§ 9(3), are conceivably applicable to the conduct alleged here. Leasecomm argues that any claim under § 9 must be dismissed because the plaintiffs failed to "mail a written demand letter to [the] prospective defendants" as required by that section. (MFI/Leasecomm Mem. 34.) Plaintiffs offer no response to this claim; the point will therefore be deemed conceded, and any claim based on § 9 is dismissed.

As to § 11, Leasecomm laboriously analyzes eight "categories of 'acts'" which plaintiffs allege violated the Act. (MFI/Leasecomm Mem. 35.) Its attacks on the complaint's allegations can themselves be categorized, [*72] and dealt with collectively, as follows:

### Leasecomm's Lack of Involvement

Leasecomm moves for dismissal of claims based upon certain of the alleged acts on the grounds that neither Leasecomm nor MFI are claimed to have engaged in these acts. (MFI/Leasecomm Mem. 36.) However, since plaintiffs have adequately alleged that Leasecomm and the other defendants were participating in a common scheme, it is a question of fact whether the control exercised by Leasecomm over the tactics used by its dealers is sufficient to support a claim of liability against Leasecomm. Therefore, Leasecomm's claim of lack of involvement does not justify dismissal of the UADPA claims against it.

### Insufficient Factual Detail

Leasecomm also repeatedly suggests that plaintiffs' allegations are too "vague" or "conclusory" or "insubstantial" to withstand a motion to dismiss, or points to specific facts that plaintiffs fail to allege though they are assertedly required to do so to state a claim. (MFI/Leasecomm Mem. 37, 40, 41, 42, 43, 44.) Of course, calling allegations "conclusory" does not make them so. Indeed, the 234-paragraph complaint does much more than simply aver in conclusory fashion [*73] that the defendants engaged in unfair or deceptive practices: It alleges numerous specific unfair and/or deceptive acts by the various defendants and even attaches supporting documentation where appropriate. The complaint, while hardly a model of clarity in its presentation of the underlying facts and resulting claims, gives each of the

defendants fair notice as to what acts or omissions are alleged to have been wrongful and the legal bases for relief. This is all that is required at the pleading stage. See *Fed. R. Civ.P. 8(a)* (requiring pleading to "contain ... a short and plain statement of the claim showing that the pleader is entitled to relief"); *Conley v. Gibson, 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)* ("All the [Federal] Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.")

### Factual Arguments

Leasecomm also attempts to justify dismissal of certain UADPA claims by making its own averments of facts. With respect to the claim that the leases contained unconscionable provisions rendering [*74] them unfair or deceptive, Leasecomm asserts that the lease provisions in question "are all standard, garden variety provisions found in typical lease agreements" and that certain provisions "benefit[] plaintiffs at least as much, if not more, than ... Leasecomm." (MFI/Leasecomm Mem. 37.) With respect to the circumstances under which the leases were executed, Leasecomm argues that "it is absurd for plaintiffs to suggest that they relied on attributed promises that the leases were cancellable when the Leasecomm contract states right up front, in large, bold letters, that it is a "NON-CANCELLABLE LEASE AGREEMENT." (Id. at 40.) With respect to Leasecomm's allegedly unfair collection practices, Leasecomm argues that the complaint is factually inconsistent because the plaintiffs, who describe themselves as "moderate-income consumers" (Compl. P 3), also claim that Leasecomm "expressly targeted individuals with poor credit ratings." (Id. P 144.)

"At this stage, the Court may not undertake to determine which version of the facts to credit; rather, the Court is obligated to accept the plaintiff's version." Bear Stearns Merchang Fund Corp. v. Modern Technologies Corp., Dkt. No. [*75] 02 Civ. 6084 (GEL), slip op. at 2 (S.D.N.Y. Jan. 14, 2003), citing *Jackson Nat'l Life Ins. Co., 32 F.3d at 699-700*. Whether the lease provisions are "standard" or "garden variety," whether they benefitted or harmed the plaintiffs, whether the plaintiffs, notwithstanding the leases' headline to the contrary, relied on representations that the leases were cancellable, and whether "moderate-income consumers" sometimes have poor credit ratings, are all factual issues. To the

extent those issues are material to the claims, Leasecomm's assertions are inconsistent with those in the complaint and the reasonable inferences that may be drawn from it. Leasecomm's motion to dismiss the UADPA claims will be denied, and so the claims survive against von Bleyleben, Latour, and Salvo as well.

### 2. Cardservice and Karn

Cardservice moves to dismiss the UADPA claim against it on the grounds that the complaint alleges only that it helped develop the iPage product and that it "expended ... money" in marketing the Internet Tool Box. Since neither of these activities is, by itself, an unfair or deceptive act, Cardservice's motion will be granted.

Karn does not seek dismissal of any of the [*76] UADPA claims, and, as the "primary spokesperson" for Themeware, is alleged to have participated in the making of the deceptive Internet Tool Box infomercial. As discussed above, the allegations of the complaint support an inference that he played a role in the manner in which the infomercial was used in promoting iPage Builder. Accordingly, there is no basis for dismissing the UADPA claims against him.

### C. Unlawful Franchise Offerings Claim

Plaintiffs allege that the Karn infomercial constituted "an offer of a franchise as that term is defined by federal regulation and state statutes and regulations" (Compl. P 78), and that, with respect to the "merchant accounts" scheme, "Leasecomm was a principal in the sale of franchises by OX and ECX" (Id. P 96). Since, under federal and state law, franchisers must "make detailed disclosures to purchasers of franchises" (Compl. PP 80-81; see also id. P 82 (listing information required to be disclosed)), and since defendants did not make those disclosures, plaintiffs claim that all defendants are liable "jointly and severally" to the plaintiffs for damages (id. P 215), and that plaintiffs are entitled to rescission of the Leasecomm [*77] leases and to an injunction "directing the defendants to cause credit reporting agencies to delete all references to the plaintiffs' respective dealing [sic] with Leasecomm." (Id. PP 217-218.)

All defendants move to dismiss the unlawful franchise offering claim as relevant to each of them on the basis that plaintiffs have failed to adequately allege that what was offered was a "franchise." They analyze the claim under New York's definition of a franchise

offering, as that is the statute singled out in the complaint (id. P 211; but see id. P 81 (listing 30 states with franchise statutes or regulations requiring disclosures)), and, more convincingly, as New York's statute is considered "the broadest and most plaintiff-friendly in the nation" (ECX Mem. 20, citing David J. Kaufman, The New York Franchise Act, 823 PLI/Comm. 100, 205 (2001)). Plaintiffs do not challenge this characterization of New York's law, and in fact single it out again in their opposition brief (P. Mem. 50), so the Court will proceed on the assumption that if plaintiffs' franchise-related claims fail under New York law, they also fail under any other relevant state or federal law.

New York defines [*78] a "franchise" to be

a contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which:

(a) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchiser, and the franchisee is required to pay, directly or indirectly, a franchise fee, or

(b) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services substantially associated with the franchiser's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchiser or its affiliate, and the franchisee is required to pay, directly or indirectly, a franchise fee.

N.Y. Gen. Bus. L. § 681(3).

Defendants' principal argument is that they cannot have offered franchises because the only contract or agreement referenced in the complaint is the Leasecomm lease. That contract purports only to grant the lessee a "license" for an unspecified "item," which could be "any combination of tangible assets, rights to access or use services, software, documentation [*79] and manuals, etc." (Compl. Ex. D.) Thus, defendants claim, the offer of the lease by any of the defendants cannot constitute the offer of a franchise, since the lease makes no reference to

Case 1:08-cv-00876-RMB-THK    Document 127-3    Filed 07/29/2008    Page 45 of 50

Page 21
2003 U.S. Dist. LEXIS 17236, *79

lessee's right to engage in any business. Furthermore, the money collected under the lease was not a "franchise fee" as required by the statute, since the lease explicitly states that the monies due were license fees for use of an "item."

This characterization, however, ignores the entire thrust of the plaintiffs' complaint, which is that the lease arrangement was simply a way for Leasecomm and its "strategic partners" to profit from the underlying fraudulent transactions in which the "Leasecomm Associates" solicited consumers to purchase worthless products or enter dubious business relationships. Plaintiffs assert that the leases were simply financing devices by which the victims' promises to pay for the goods or services or business opportunities offered by the dealers were transferred for cash payments to an aggressive collection agency that purported to be free of responsibility for the misrepresentations allegedly made by the dealers. In short, it is the underlying agreement between the dealers [*80] and the consumers that, on plaintiffs' theory of the case, determines whether a franchise has been offered, not the generic lease provided by Leasecomm. Nor can Leasecomm escape from these charges by claiming that it, at least, did not offer any franchises, since the complaint alleges that Leasecomm was intimately involved in the recruitment its partners and the design of their collective business model. Whether these allegations are true is to be determined, but the complaint cannot be dismissed as a matter of law because the defendants dispute plaintiffs' allegations.

The complaint, however, clear what exactly the defendants were offering. The ECX/OX scheme seems quite literally to fit within the statutory definition of a franchise. The defendants' decision to characterize the payments required of plaintiffs as a "lease" rather than a "franchise fee" cannot obscure the reality that, at least as alleged in the complaint, ECX and OX offered consumers a "business opportunity" to obtain "distributorships" of products apparently provided by ECX or OX, which would be supported by infomercials created and transmitted by those companies. Those infomercials would constitute the principal [*81] marketing effort on behalf of the products, and defendants and NESA, not the plaintiffs, "would be responsible for the promotion of the web site and the training of customers and sub-distributors." (Compl P 92.) In exchange, the customer would have to pay either a one-time fee or a monthly payment over a four-year period. (Id. P 92(e).)

These allegations adequately assert that the customers were being asked to enter an agreement in which they are "granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchiser, and the franchisee is required to pay, directly or indirectly, a franchise fee." N.Y. Gen. Bus. L. § 681(3)(a).

The Themeware scheme less clearly fits this model. Although plaintiffs allege that "purchasers [of the "Internet Tool Box"] were offered the opportunity to sell products for various purchasers" (Compl. P 78(d)), there is no allegation that these were specific products that would be offered "under a marketing plan or system prescribed in substantial part" by the defendants. While the complaint alleges that "web pages created by iPage Builder were [*82] required to carry the iPage logo" (id. P 78(f)), there is no indication that the products to be sold would carry any trademark or logo of the defendants, as required under N.Y. Gen. Bus. L. § 681(3)(b). For all of plaintiffs' efforts to cast the service offered by the Karn infomercial as a franchise, the thrust of the complaint seems rather to be that customers were being offered a package of internet services and products that would enable them to operate a business of their choice, not a business being provided to them in franchise form.

These conclusions would dictate dismissal of the franchise claims against Leasecomm, Cardservice, Karn, and Rettew regarding the iPageBuilder/Internet Tool Box scheme, and denial of the dismissal motions of Leasecomm, ECX and OX regarding the "merchant account" scheme. However, given the lack of clarity of the complaint, the very cursory briefing of these claims by the parties, and the need for repleading in any event, plaintiffs will be granted leave to replead the claims regarding the Themeware scheme; a fuller record and fuller briefing addressed to an amended complaint could lead to different conclusions.

D. Common-Law Fraud

Cardservice's [*83] motion to dismiss the common-law fraud claims against it will be granted for the same reasons cited above with respect to the UADPA claim.

Leasecomm argues that plaintiffs' common-law fraud claims must be dismissed because they are not pleaded with particularity as required by Fed. R. Civ. P. 9(b);

specifically, Leasecomm argues that the "allegations in the complaint completely fail the 'time, place, and manner' requirement for a fraud claim," fail to identify the "speaker" of the fraudulent statements, and fail to specify the nature of the misrepresentations. (Leasecomm Mem. 49.) While as a general rule, it is indeed necessary for the time and place of a fraudulent representation to be specified in the complaint, *Ouaknine v. MacFarlane, 897 F.2d 75, 79 (2d Cir. 1990)*, this requirement has been relaxed where the complaint describes the "nature and operation of the scheme in which the defendants are alleged to have participated." *Beth Israel Medical Center v. Smith, 576 F. Supp. 1061, 1070-71 (S.D.N.Y. 1983)* (finding that "in view of the complaint's detailed description of the defendants' scheme ... the failure [*84] to describe particular letters or telephone calls is not fatal to the complaint."); see also *Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York, 808 F. Supp. 213, 229 (S.D.N.Y. 1992)* ("The complaint need not specify the time, place and content of each mail communication where the nature and mechanics of the underlying scheme is sufficiently detailed."). The essential requirement is that plaintiffs state "what the alleged fraud consists of specifically." *Beth Israel, 576 F. Supp. at 1071* (quoting *Segal v. Gordon, 467 F.2d 602, 607 (2d Cir. 1972)).*

Plaintiffs have met this requirement. They state that the Karn video and the representations made by the dealers at the time plaintiffs signed the leases all contained specific misrepresentations that plaintiffs relied upon in signing the Leasecomm leases. A copy of the infomercial is attached to the complaint as an exhibit. (Compl. Ex. A.) Plaintiffs identify numerous particular representations in it which they allege were fraudulent. (Id. PP 77, 92.) With respect to the "pressure to sign documents," plaintiffs have identified the misrepresentations (id. PP 112-113) they rely [*85] on and attached copies of the documents involved (id. Ex. E). This is sufficient to give defendants notice of "what the alleged fraud consists of specifically."

Leasecomm further states that "none of the core 'fraud' claims ... are specifically attributed to either Leasecomm and MFI individually, but rather are laid at the door of defendants collectively." (MFI/Leasecomm Mem. 50.) It then argues that this violates the requirement of particularity since the complaint fails to "give notice to each defendant of its alleged misconduct." (Id., quoting *In re Blech Securities Litigation, 961 F. Supp. 569, 580 (S.D.N.Y. 1997.)*) This, however, is a

mischaracterization of the complaint, which clearly attributes the fraudulent statements to certain defendants, and claims that all defendants are liable "as principal or co-conspirator." (Compl. P 224.) Furthermore, the requirements of *Rule 9(b)* do not apply to an allegation of conspiracy to defraud, but only to the underlying allegations of fraud. *Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 26 n.4 (2d Cir. 1990).*

Finally, Leasecomm argues that plaintiffs fail to plead with particularity facts [*86] from which its intent to defraud can be inferred. This misstates the law, in that the complaint, to satisfy *Rule 9(b)*, need not plead with particularity facts showing fraudulent intent, but must only "allege facts which give rise to a strong inference that the defendants possessed the requisite fraudulent intent." *Kramer v. Time Warner Inc., 937 F.2d 767, 776 (2d Cir. 1991).* This plaintiffs have done, for the following factual allegations support a strong inference that Leasecomm intended to force vulnerable lessees to pay thousands of dollars for products or services worth no more than $ 300:

- MFI/Leasecomm's business had always involved "financing tangible business machine products including credit card validators sold by defendant CARDSERVICE" (Compl. P 46); such validators have a value of "no more than $ 300" (id. P 103).

- In 1999 Leasecomm began aggressively seeking business involving the leasing of "intangible services such as access to web sites" (id. P 48); the services involved "were of no, or inconsequential, value" (id. P 102(a)).

- These services were "marketed by [Leasecomm's] strategic partners" who were supervised by Leasecomm. (Compl. [*87] PP 40, 49).

- MFI purchased the leases from its dealers for 40 to 60% of their face value, "creating an annualized return on its investment of in excess of 25 percent." (Id. P 56.)

- The leases were non-cancellable even in the event of "failure of service," and they provided for automatic debiting from lessees bank accounts. (Id. Ex. D.)

- MFI/Leasecomm's business plan included "Persistent, Innovative Collections." (Compl. P 166.) Specifically, Leasecomm intended to "pursue[] debtors who other companies would write-off [sic]" using "a

network of over 100 law firms nationwide," and it intended to derive a large portion of its profits from the additional collection fees it imposed on defaulting lessees, and it in fact charged lessees for multiple collection calls made on the same day. (Id. PP 138-139, 151, 153, Ex. G.)

The allegations of the complaint satisfy *Rule 9(b)* in that from them, each defendant can determine exactly what statements or conduct is being labeled fraudulent, and the nature of the fraud or misrepresentation alleged. The common-law fraud claims will therefore not be dismissed against Leasecomm, its officers, or Karn.

E. Intentional Infliction [*88] of Emotional Distress

Under Massachusetts law, a claim of intentional infliction of emotional distress ("IIED") requires the following four elements:

(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct, (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community, (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure in

*Agis v. Howard Johnson Co., 371 Mass. 140, 145, 355 N.E.2d 315 (1976).* Although the complaint does not specify what specific conduct by defendants was so "extreme and outrageous" that it caused the requisite "severe emotional distress," plaintiffs' opposition brief cites the collection tactics of Leasecomm, in particular, the allegations contained in P 148 of the complaint:

Leasecomm's collection representatives used insulting, harassing and intentionally harmful rhetoric including [*89] disparaging personal remarks, embarrassing messages left with third parties about sending debtors to jail, taunting debtors about their credit and

threatening to destroy their credit unless payment was made without objection for each and every charge including unjustified credit fee charges.

Leasecomm and Cardservice argue that the IIED claim fails because the complaint, with respect to the fourth element, "merely 'parrots the requisite element[] of the claim but lacks factual support for [its] wholly conclusory allegations." (MFI/Leasecomm Mem. 52, quoting *Kurker v. Hill, 689 N.E.2d 833, 839, 44 Mass. App. Ct. 184 (Mass. App. Ct. 1998.))* The Court agrees with this characterization of the complaint. The complaint alleges generally that "defendant's actions did cause severe emotional distress to plaintiffs the amount of $ 20,000," and that a group of 48 specified plaintiffs, "due to pre-existing medical conditions and other aggravating circumstances including especially mean-spirited and intended harassment[,] suffered aggravated damages." (Compl. PP 232-233.) Cf. *Harrison v. Loyal Protective Life Ins. Co., 379 Mass. 212, 396 N.E.2d 987, (Mass., 1979)* (allegation [*90] that plaintiff "lost all hope to live and to continue as an active person after he recovered from his illness" sufficient); *Brown v. Nutter, McClennen & Fish, 45 Mass. App. Ct. 212, 696 N.E.2d 953, 955 (Mass. App. Ct. 1998)* (allegation that plaintiff had been "unable to return to work for the next week[,] remained confined to her bed, suffering from nightmares, anxiety attacks, and uncontrollable crying[, and] suffers still from nightmares and anxiety attacks as a result of [defendant's] actions" was sufficient). As presently framed, the complaint alleges inadequate facts to support a claim of IIED, and that claim will be dismissed.

CONCLUSION

Because the complaint fails to allege a violation of RICO, which is the only federal claim asserted by plaintiffs, the entire complaint must be dismissed. However, because the facts alleged in the complaint make it sufficiently likely that the plaintiffs can assert a valid RICO claim against at least some of the defendants, plaintiff's motion for leave to amend the complaint is granted. The amended complaint shall be filed no later than November 3, 2003.

SO ORDERED.

Dated: September 30, 2003

2003 U.S. Dist. LEXIS 17236, *90

GERARD E. LYNCH                                    [*91]  United States District Judge

Exhibit 9

M 10-450

U.S. DISTRICT COURT
FILED
JUL 11 1984
S. D. OF N. Y.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Pursuant to Section 157(a) of the Bankruptcy
Amendments and Federal Judgeship Act of 1984, any or all
cases under title 11 and any or all proceedings arising
under title 11 or arising in or related to a case under
title 11 are referred to the bankruptcy judges for this
district.

So Ordered,

ROBERT J. WARD
Acting Chief Judge

July 10, 1984

CERTIFICATE OF SERVICE

The undersigned, an attorney duly admitted to practice law before this Court,

hereby certifies under penalty of perjury, that on July 29, 2008, I caused a true copy of the

*Appendix of Unreported Authorities Regarding Reply Memorandum of Law in Support of*

*Defendants' Joint Motions to Transfer Venue and to Dismiss the Complaint* and *Reply*

*Memorandum of Law in Support of Defendants' Joint Motions to Transfer Venue and to*

*Dismiss the Complaint* to be served upon the following parties as indicated:


By First-Class Mail

Kevin C. Walz
8045 Bainbrook Drive
Chagrin Falls, OH 44023

David A. Cardillo
23 St. Glory Road
Greenville, PA 16125


Dated:  New York, New York
        July 29, 2008

Steven Ray Katzenstein
_____
Steven Ray Katzenstein

1